DAVID H. KRAMER, State Bar No. 168452
MAURA L. REES, State Bar No. 191698
LAUREN GALLO WHITE, State Bar No. 309075
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: dkramer@wsgr.com
       mrees@wsgr.com
       lwhite@wsgr.com

BRIAN M. WILLEN (admitted *Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
Email: bwillen@wsgr.com

Attorneys for Defendants and Counterclaimants
YOUTUBE, LLC and GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER and PIRATE MONITOR LTD, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>YOUTUBE, LLC and GOOGLE LLC;<br><br>　　　　Defendants.<br><br>───────────────────────────<br><br>YOUTUBE, LLC and GOOGLE LLC;<br><br>　　　　Counterclaimants,<br><br>　v.<br><br>PIRATE MONITOR LTD,<br><br>　　　　Counterclaim Defendant. | CASE NO.: 3:20-cv-04423-JD<br><br>**YOUTUBE, LLC AND GOOGLE LLC'S OPPOSITION TO COUNTER-DEFENDANT PIRATE MONITOR'S MOTION TO DISMISS COUNTERCLAIMS**<br><br>Hearing Date: January 21, 2021<br>Time: 10:00am<br>Location: Courtroom 11, 19th Floor<br>Judge: Hon. James Donato |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

STATEMENT OF THE ISSUES ................................................................................................ 2

FACTUAL BACKGROUND ..................................................................................................... 3

    A.    The YouTube Service ............................................................................................ 3

    B.    Pirate Monitor and Its Representations to YouTube .............................................. 3

    C.    YouTube's Counterclaims and Interrogatory Response ......................................... 5

ARGUMENT ............................................................................................................................... 7

    I.    DEFENDANTS SUFFICIENTLY PLEADED HOW PIRATE MONITOR ACTED THROUGH ITS AGENTS ...................................................................... 7

        A.    Rule 9(b) Does Not Apply to § 512(f) Claims or to Allegations of an Agent's Identity or Relationship to the Principal .......................................... 7

        B.    YouTube's Agency Allegations Provided Adequate Notice to Pirate Monitor and Satisfy Any Applicable Pleading Standard ........................... 10

    II.    DEFENDANTS SUFFICIENTLY PLEADED JUSTIFIABLE RELIANCE ...... 12

    III.    DEFENDANTS HAVE STANDING TO SEEK INJUNCTIVE RELIEF ........... 14

CONCLUSION .......................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*625 3rd St. Assocs. v. Alliant Credit Union*,
   633 F. Supp. 2d 1040 (N.D. Cal. 2009) .................................................................................. 13

*Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001) .................................................................................................. 15

*Bauer Bros. LLC v. Nike Inc.*,
   2011 U.S. Dist. LEXIS 23025 (S.D. Cal. Mar. 8, 2011) ........................................................ 14

*Brock v. Concord Auto. Dealership LLC*,
   2016 U.S. Dist. LEXIS 27380 (N.D. Cal. Mar. 3, 2016) ....................................................... 13

*Chanthavong v. Aurora Loan Servs.*,
   2011 U.S. Dist. LEXIS 138333 (E.D. Cal. Nov. 30, 2011) ..................................................... 9

*Curtis v. Shinsachi Pharm., Inc.*,
   45 F. Supp. 3d 1190 (C.D. Cal. 2014) ................................................................................... 12

*Doran v. Wells Fargo Bank*,
   2012 U.S. Dist. LEXIS 42805 (D. Haw. Mar. 28, 2012) .................................................. 9, 14

*Edwards v. Marin Park, Inc.*,
   356 F.3d (9th Cir. 2004) .......................................................................................................... 9

*Enttech Media Grp. LLC v. Okularity, Inc.*,
   2020 U.S. Dist. LEXIS 222489 (C.D. Cal. Oct. 2, 2020) .................................................. 7, 12

*Ferrari v. Mercedes Benz USA, LLC*,
   2017 U.S. Dist. LEXIS 114271 (N.D. Cal. July 21, 2017) ...................................................... 8

*Green v. Beer*,
   2009 U.S. Dist. LEXIS 27503 (S.D.N.Y. Mar. 30, 2009) ................................................ 10, 12

*Heredia v. Intuitive Surgical, Inc.*,
   2016 U.S. Dist. LEXIS 163716 (N.D. Cal. Nov. 28, 2016) .................................................... 9

*ISE Entm't Corp. v. Longarzo*,
   2018 U.S. Dist. LEXIS 40755 (C.D. Cal. Feb. 2, 2018) ......................................................... 7

*Lenz v. Universal Music Corp.*,
   815 F.3d 1145 (9th Cir. 2015) ............................................................................................... 14

*Leyvas v. Bank of Am. Corp.*,
    601 F. Supp. 2d 1201 (S.D. Cal. 2009) .............................................................................. 9

*Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*,
    431 F.3d 353 (9th Cir. 2005) ............................................................................................ 13

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ............................................................................................ 15

*Midwest Commerce Banking Co. v. Elkhart City Ctr.*,
    4 F.3d 521 (7th Cir. 1993) .................................................................................................. 8

*Mitsui O.S.K. Lines Ltd. v. SeaMaster Logistics, Inc.*,
    618 F. App'x 304 (9th Cir. 2015) .................................................................................... 13

*Nayab v. Capital One Bank (USA), N.A.*,
    942 F.3d 480 (9th Cir. 2019) ............................................................................................ 10

*Noll v. eBay, Inc.*,
    282 F.R.D. 462 (N.D. Cal. 2012) ..................................................................................... 13

*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*,
    157 Cal. App. 4th 835 (Cal. App. Ct. 2007) .................................................................... 13

*Odom v. Microsoft Corp.*,
    486 F.3d 541 (9th Cir. 2007) (en banc) ................................................................... 8, 9, 10

*Pac. Gas & Elec. Co. v. Jesse M. Lange Distrib.*,
    2005 U.S. Dist. LEXIS 35128 (E.D. Cal. Dec. 21, 2005) .................................................. 9

*Patel v. Pac. Life Ins. Co.*,
    2009 U.S. Dist. LEXIS 44105 (N.D. Tex. May 22, 2009) ................................................. 9

*Radware, Inc. v. United States Telepacific Corp.*,
    2020 U.S. Dist. LEXIS 29188 (N.D. Cal. Feb. 20, 2020) ................................................ 12

*Rubenstein v. Neiman Marcus Grp., LLC*,
    687 F. App'x 564 (9th Cir. 2017) .................................................................................... 10

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*,
    806 F.2d 1393 (9th Cir. 1986) .......................................................................................... 10

*Sloan v. GM, LLC*,
    287 F. Supp. 3d 840 (N.D. Cal. 2018) ............................................................................. 11

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) .............................................................................................. 9

*TLS Grp., S.A. v. NuCloud Glob., Inc.*,
    2016 U.S. Dist. LEXIS 51751 (D. Utah Apr. 18, 2016) ....................................................... 9

*United States ex rel. Chorches for Bankr. Estate of Fabula v.
    Am. Med. Response, Inc.*,
    865 F.3d 71 (2d Cir. 2017) .................................................................................................. 10

*Viacom Int'l. Inc. v YouTube, Inc.*,
    940 F. Supp. 2d 110 (S.D.N.Y. 2013) ................................................................................... 3

*Weinstein v. Saturn Corp.*,
    303 F. App'x 424 (9th Cir. 2008) ........................................................................................ 11

*Xia Bi v. McAuliffe*,
    927 F.3d 177 (4th Cir. 2019) ............................................................................................... 13

**STATUTES**

17 U.S.C. § 512(c)(1)(C) ............................................................................................................ 5, 14

17 U.S.C. § 512(c)(3)(A) ................................................................................................................ 14

17 U.S.C. § 512(f) ..................................................................................................................*passim*

**RULES**

Fed. R. Civ. P. 8 .............................................................................................................................. 7

Fed. R. Civ. P. 9(b) .................................................................................................................*passim*

YouTube has spent over $100 million developing industry-leading tools that enable qualified copyright holders to automatically claim or block content that others seek to post to its service. But in the hands of the wrong party, these tools can cause serious harm. Plaintiff Pirate Monitor is suing for access to these tools, but as detailed in YouTube's counterclaims, Pirate Monitor's deceptive behavior disqualifies it from such access and entitles YouTube to redress.

Pirate Monitor devised an elaborate scheme to prove itself sufficiently trustworthy to use YouTube's advanced copyright management tools. Through agents using pseudonyms to hide their identities, Pirate Monitor uploaded some two thousand videos to YouTube, each time representing that the content did not infringe anyone's copyright. Shortly thereafter, Pirate Monitor invoked the notice-and-takedown provisions of the Digital Millennium Copyright Act ("DMCA") to demand that YouTube remove the same videos its agents had just uploaded, stating under oath that the videos infringed its copyrights or those of copyright owners it claimed to represent. In short, Pirate Monitor lied, either when it uploaded the videos in the first place or when it demanded their removal. As set out in YouTube's counterclaims, Pirate Monitor's machinations render it liable for breach of contract and fraud or, alternatively, for violating § 512(f) of the DMCA, which prohibits knowingly false takedown notices.

Pirate Monitor does not dispute the charges, but has nevertheless moved to dismiss, arguing that YouTube should have offered more detailed allegations to support its claims.

Pirate Monitor is wrong. Pirate Monitor first contends that YouTube must more specifically identify the agents that Pirate Monitor employed to carry out its scheme. Not so. Despite deliberate efforts by Pirate Monitor to obscure the identities and connections of its agents, YouTube pleaded more than enough to show, at this stage of the case, that the video uploads were from unidentified parties acting at Pirate Monitor's direction. Rule 9(b) requires no more. But there is plenty. YouTube has already provided a detailed answer to Pirate Monitor's interrogatory explaining that the agents responsible for uploading the videos (ostensibly from Pakistan) logged into YouTube via the same unique computer address (in Hungary) from which Pirate Monitor was sending its takedown requests, and did so at the very same time. While these

details come as no surprise to Pirate Monitor and could be added to an amended pleading, they go beyond what is required by the Federal Rules.

Nor does YouTube need to do more to plead justifiable reliance for its § 512(f) and fraud claims. It was plainly justifiable for YouTube to have relied on the representations Pirate Monitor made in DMCA notices that YouTube was required to accept as a condition of its safe harbor protection. And it was equally reasonable for YouTube to rely on representations from Pirate Monitor's agents about their right to upload videos—made in agreements backed by the threat of legal penalties for copyright infringement.

Finally, Pirate Monitor asserts that YouTube lacks standing for injunctive relief. But there is no reason for the Court to address this issue now: Pirate Monitor concedes YouTube's standing to seek damages, and the Court need not determine the propriety of an injunction at this stage. In any event, YouTube has alleged a threat of future harm, based on Pirate Monitor's motives and its past behavior, which involved thousands of instances of abuse. Nothing more is required in YouTube's initial pleadings.

Pirate Monitor's effort to delay reckoning for its systematic misconduct fails. YouTube's counterclaims are properly pleaded and should proceed.

## STATEMENT OF THE ISSUES

1. Whether an entity that has deliberately concealed the identities of its agents to participate in illegal conduct may obtain dismissal of breach of contract, fraud, and § 512(f) claims for lack of particularized allegations about those agents, when it receives adequate notice of the claims against it.

2. Whether YouTube adequately pleaded justifiable reliance on Pirate Monitor's fraudulent representations when those representations were made in written agreements and statutorily-prescribed notices.

3. Whether allegations that a defendant has engaged in fraudulent conduct thousands of times suffice to support a claim for injunctive relief where the defendant retains the motive and ability to repeat the misconduct.

# FACTUAL BACKGROUND

### A. The YouTube Service

Since its founding in 2005, YouTube has provided a platform for users to share their video creations with the world. Counterclaims, ECF 34 ("CC") ¶ 10. Today, YouTube serves as an unparalleled medium for original creative expression, offering a worldwide audience access to an extraordinary diversity of content. *Id.* ¶¶ 10–11. YouTube is committed to helping copyright owners protect against the unauthorized use of their works on the service, and it has implemented numerous industry-leading initiatives toward this end. *Id.* ¶ 12. YouTube complies in all respects with the safe harbor provisions of the DMCA. *Id.* ¶ 13; *see also Viacom Int'l. Inc. v YouTube, Inc.*, 940 F. Supp. 2d 110 (S.D.N.Y. 2013). And YouTube's efforts go far beyond what the law requires. CC ¶ 13.

In particular, YouTube has invested over $100 million to develop Content ID, an advanced content identification system that uses digital fingerprinting technology to help identify copyrighted materials. *Id.* ¶ 14. Content ID empowers users to automatically remove content from YouTube, block it from appearing in the first place, or claim it and collect associated ad revenue. *Id.* ¶ 15. The tool, however, has the potential to be misused to censor videos that others have every right to post and share. *Id.* Further, the tool enables users to improperly claim ownership rights in others' content, and to siphon to themselves revenue that rightly belongs to others. *Id.* Because of these potential abuses, YouTube limits access to the tool, seeking to ensure that those who use it will do so responsibly and will not cause harm to YouTube, its users, or other copyright owners. *Id.* ¶ 16.

### B. Pirate Monitor and Its Representations to YouTube

Pirate Monitor LTD claims to be a British Virgin Islands company that represents copyright holders. *Id.* ¶¶ 4–6. Pirate Monitor applied to obtain access to the Content ID system but was refused, in part, because it had not established a track record of sending valid takedown requests pursuant to the DMCA. *Id.* ¶¶ 33–34. In response, Pirate Monitor conceived of a plot to overcome that obstacle. *Id.* ¶¶ 32–36.

From August through November 2019, Pirate Monitor, through its agents, created more than a dozen accounts on YouTube using bogus account information to conceal their connection to Pirate Monitor. *Id.* ¶¶ 22, 46. Pirate Monitor's agents then used these accounts to upload hundreds of videos to YouTube. *Id.* ¶¶ 22–23. These included clips from at least one of the copyrighted works that Pirate Monitor accuses YouTube of infringing in this action, as well as clips from the prequel to another such work. *Id.* ¶¶ 24–25.

Pirate Monitor agreed to YouTube's Terms of Service agreement ("ToS") each time it created a YouTube account. *Id.* ¶¶ 17, 21. Under that agreement, Pirate Monitor promised to provide "accurate and complete" account information for the accounts it created. *See id.* ¶ 19. Pirate Monitor also represented that it "own[ed] or ha[d] the necessary licenses, rights, consents, and permissions to publish" the videos it uploaded to the service and that the videos "would not contain third party copyrighted material, or material that is subject to other third party proprietary rights…." *Id.* ¶ 18. Pirate Monitor reaffirmed these promises each time it submitted a video to YouTube. *Id.* ¶¶ 21, 27. Based on these representations, YouTube allowed Pirate Monitor to create accounts and post hundreds of videos to the YouTube service. *Id.* ¶¶ 17–27.

Shortly after uploading these videos, Pirate Monitor sent YouTube hundreds of takedown requests under the DMCA, in many instances for the same videos it had just uploaded through its disguised accounts. *Id.* ¶ 28. In those notices, Pirate Monitor represented that those same videos infringed its copyrights or the copyrights of a party whom Pirate Monitor was acting for.[1] *Id.* In reliance on Pirate Monitor's representations, and in accordance with the DMCA, YouTube

---

[1] There appears to be an interlocking and impenetrable web of aliases, alter egos and agencies among Pirate Monitor LTD, Hungarian film director Gabor Csupo, Pirate Monitor LLC, and a Hungarian movie operation, MegaFilm. Csupo is Pirate Monitor LTD's sole stockholder. *See* ECF 36 (Revised Certificate of Interested Parties). Csupo was also identified as the person sending the takedown notices using an account in the name of "Pirate Monitor LLC," supposedly on behalf of MegaFilm as aggrieved copyright owner. Pirate Monitor LTD claims in this action to own the copyright to three Hungarian films via assignment from Megafilm. *See* ECF 1 at ¶¶ 65–70 (listing three Hungarian works). As best YouTube can tell at this point, if these are separate parties at all, they were all acting as agents of one another in their interactions with YouTube. YouTube is seeking discovery on the relationships, but Pirate Monitor has thus far obstructed it.

processed the takedown notices and removed or disabled access to the videos at issue. CC ¶¶ 28–29; 17 U.S.C. § 512(c)(1)(C).

During this cycle of upload and removal, YouTube had no idea that the party uploading the videos was the same as the party insisting that they be removed. It did not know that the same party representing that the videos were authorized quickly turned around to claim they were infringing. YouTube only learned of the connection through a costly investigation, well after the fact. *Id.* ¶¶ 55, 65. And without the benefit of discovery, it remains unclear if Pirate Monitor was lying when it uploaded the videos or when it sent DMCA notices requesting their removal. *Id.* ¶ 29.

### C. YouTube's Counterclaims and Interrogatory Response

Based on these facts, YouTube asserted counterclaims that Pirate Monitor either breached the ToS and committed fraud in entering into it, or, in the alternative, violated the DMCA's prohibition on knowing misrepresentations in connection with DMCA takedown requests. *See* 17 U.S.C. § 512(f). Pirate Monitor responded with this motion, arguing that YouTube's allegations did not sufficiently apprise Pirate Monitor of the basis for the counterclaims. It also served a contention interrogatory asking YouTube to set forth the facts underlying its claims of Pirate Monitor's deception. Harold Decl. Ex. 1.

YouTube obliged. In a lengthy response, YouTube explained that in processing the nearly 2,000 takedown requests it received from Pirate Monitor in the fall of 2019, it noticed a pattern. Harold Decl. Ex. 1. The videos that Pirate Monitor sought to remove from the service were short clips of a uniform length, almost all 30 seconds long. *Id.* The clips were generally from obscure Hungarian movies and almost all had been uploaded in bulk by users whose unique Internet Protocol ("IP") addresses at the time of the uploads indicated they were in Pakistan. *Id.* That alone was suspicious: there is no obvious reason why short clips from relatively unknown Hungarian-language movies should be uploaded to YouTube from accounts and devices in Pakistan. *Id.* Further, numerous clips came from a series of accounts having similar user names (e.g. "RansomNova11," "RansomNova12," etc.). And the uploads did not appear consistent with

users actually seeking to share copies of the movies—among other things, there was no apparent order to the clips and the users supplied nondescript, non-informative titles for them. *See, e.g.*, *id.* (citing https://www.youtube.com/channel/UCjD2F2LhPlWLUsGN2zWt70w/videos (account page for the user "RansomNova" showing scores of 31 second clips with titles such as "Test1617," "Test 1618," etc. and "Spanish Film Clips")). The timing of the takedown requests was even more suspicious. Pirate Monitor was sending takedown requests for the clips very soon after they had been uploaded, and in many cases, before the clips had even been viewed by anyone. *Id.*

After considerable digging, YouTube found a smoking gun. Harold Decl. Ex. 1. In November 2019, amidst a raft of takedown notices from Pirate Monitor, one of the "RansomNova" users that had been uploading clips via IP addresses in Pakistan logged into their YouTube account from a computer connected to the Internet via an IP address in Hungary. Pirate Monitor had been sending YouTube its takedown notices from a computer assigned that very same unique numeric address in Hungary. *Id.* Simply put, whoever RansomNova is, he or she was sharing Pirate Monitor's computer and/or Internet connection, and doing so at the same time Pirate Monitor was using the same computer and/or connection to send YouTube takedown notices. *Id.*[2]

---

[2] Today, as YouTube was in the process of filing this opposition brief (and more than five months after Plaintiffs filed this case), Pirate Monitor's counsel sent YouTube a terse email claiming that due to "an error," one of the three copyrighted works it charged YouTube with infringing in its complaint should not have been included. Pirate Monitor also claimed error in later including that work in a sworn response to an interrogatory asking for a complete identification of the copyrighted works at issue. Pirate Monitor offered no explanation for these repeated "errors," nor any explanation for why it only now mentioned them for the first time. It simply offered to extend YouTube's time to file this brief. Pirate Monitor's inability to get straight what it claims to own and what it claims has been infringed has important procedural and substantive ramifications for this case, and YouTube is entitled to judgment in its favor on the infringement claim that Pirate Monitor now concedes it improperly asserted. But Pirate Monitor's belated concession does not meaningfully impact YouTube's counterclaims or this motion.

# ARGUMENT

## I. DEFENDANTS SUFFICIENTLY PLEADED HOW PIRATE MONITOR ACTED THROUGH ITS AGENTS

Pirate Monitor argues that Defendants have not adequately alleged that it had an agency relationship with the pseudonymous individuals ostensibly in Pakistan who uploaded hundreds of short clips from Hungarian movies to YouTube. Mem. 8–10, 13–14. Pirate Monitor is wrong. Even where Rule 9(b) applies, it does not require particularized allegations about the identity of an agent or the agent's relationship to the principal. And it certainly does not do so here—where the relevant details are all in Pirate Monitor's possession and its scheme depended on deliberately concealing those details from YouTube. But under any standard, YouTube has alleged ample facts establishing the relevant agency relationship. A party is not required to prove its case in its complaint, and the pleading rules do not allow Pirate Monitor to escape any accounting for fraudulent and illegal conduct by concealing the identity of its agents and obscuring its connection to them.

### A. Rule 9(b) Does Not Apply to § 512(f) Claims or to Allegations of an Agent's Identity or Relationship to the Principal

Pirate Monitor cites no case applying Rule 9(b) to a § 512(f) claim. Further, its motion ignores the recent decision in *Enttech Media Grp. LLC v. Okularity, Inc.*, 2020 U.S. Dist. LEXIS 222489 (C.D. Cal. Oct. 2, 2020), which explained that Rule 9(b) does *not* cover § 512(f) claims: "Plaintiff only alleges that Defendants violated 17 U.S.C. § 512(f) because they misrepresented that Plaintiff's images were infringing. Nothing about this claim turns on allegations of fraud. Therefore, Rule 8 is the proper pleading standard." *Id.* at *11; *accord ISE Entm't Corp. v. Longarzo*, 2018 U.S. Dist. LEXIS 40755, at *16–17 (C.D. Cal. Feb. 2, 2018) (rejecting "a stringent pleading requirement" for § 512(f) claims).[3]

---

[3] In tacit recognition that no law supports a higher pleading standard for a § 512(f) claim, Pirate Monitor instead argues that because YouTube's § 512(f) claim "relies entirely on the same alleged conduct central to a separate fraud count" it must satisfy Rule 9(b). Mem. 12. But the premise of the argument is incorrect. YouTube's § 512(f) claim is pleaded "as an alternative" to
(continued...)

But even if Rule 9(b) applied, Pirate Monitor wrongly asserts that it requires particularized pleading of an agent's identity or its relationship with the principal corporation. Rule 9(b) requires only that "'the circumstances constituting fraud'" be stated with particularly— *i.e.* the who, what, where, and when of the fraudulent conduct. *Odom v. Microsoft Corp.*, 486 F.3d 541, 555 (9th Cir. 2007) (en banc) (quoting Fed. R. Civ. P. 9(b)). YouTube's counterclaim does exactly that:

- *Who?* Pirate Monitor and its agents, acting through more than a dozen "accounts on YouTube" that used "bogus account registration information" to upload hundreds of excerpts from obscure Hungarian works-in-suit. CC ¶¶ 22–25.
- *What?* Pirate Monitor fraudulently represented that "it had the authority to post the videos that it did, and that the videos did not infringe any third party's copyrights." *Id*. ¶ 49; *id.* ¶ 18 (quoting relevant language from the ToS Agreement).
- *Where?* Pirate Monitor made its representations over the Internet, on YouTube's website. *Id.* ¶ 46.
- *When?* Pirate Monitor's fraud occurred "mainly from August through November 2019" either each time it uploaded a video, or each time it sent a notice alleging that same video was infringing. *Id.*

These allegations provide more than enough particulars for Pirate Monitor to "prepare an adequate answer." *Odom*, 486 F.3d at 555.

Contrary to what Pirate Monitor avers, Rule 9(b) goes no further. It does not apply to "every element" of a fraud claim or to all "'the facts necessary to show that the alleged fraud was actionable.'" *Ferrari v. Mercedes Benz USA, LLC*, 2017 U.S. Dist. LEXIS 114271, at *14 n.5 (N.D. Cal. July 21, 2017) (quoting *Midwest Commerce Banking Co. v. Elkhart City Ctr.*, 4 F.3d 521, 524 (7th Cir. 1993)). And it does not typically require identifying a corporation's agents by

---

the fraud claim, and actually relies on different facts. CC ¶ 58. It alleges that Pirate Monitor sent takedown notices for videos that it knew were non-infringing. *Id.* ¶ 64. In contrast, YouTube's fraud claim alleges that Pirate Monitor made misrepresentations that its video uploads would not infringe in an effort to mislead YouTube into accepting them. *Id.* ¶¶ 50–52.

1  name. *Accord Odom*, 486 F.3d at 555 (fraud claim did not require pleading name of retail store

2  cashier). The "Ninth Circuit has not held that, where the defendant is a business entity, the

3  plaintiff must plead the names of defendant's representatives who allegedly made the fraudulent

4  misrepresentations." *Doran v. Wells Fargo Bank*, 2012 U.S. Dist. LEXIS 42805, at *13–15 (D.

5  Haw. Mar. 28, 2012) (citing *Edwards v. Marin Park, Inc.*, 356 F.3d at 1060, 1066 (9th Cir.

6  2004)). With corporate entities, it is enough to simply plead that corporate "representatives"

7  committed the fraud. *Id.* at *14; *accord Chanthavong v. Aurora Loan Servs.*, 2011 U.S. Dist.

8  LEXIS 138333, at *24–25 (E.D. Cal. Nov. 30, 2011). It can even be sufficient to identify just the

9  corporation itself, because "[t]hat entity should be able to identify the specific individuals

10  involved." *Leyvas v. Bank of Am. Corp.*, 601 F. Supp. 2d 1201, 1216 (S.D. Cal. 2009). *Leyvas* is

11  particularly instructive here, given that Pirate Monitor is essentially just an alter ego of Gabor

12  Csupo. *See* ECF 36 (Pirate Monitor's Revised Certificate of Interested Parties). Given the facts

13  YouTube alleged, a small, closed corporation should have no difficulty identifying the agents

14  involved.

15  Nor is heightened pleading required for "agency allegations," because "Rule 9(b) makes

16  no mention of . . . agency theories." *Pac. Gas & Elec. Co. v. Jesse M. Lange Distrib.*, 2005 U.S.

17  Dist. LEXIS 35128, at *10 (E.D. Cal. Dec. 21, 2005). Some cases have required particularized

18  allegations of agency or conspiracy in "fraud suit[s] involving multiple defendants," but—unlike

19  the cases cited by Pirate Monitor (Mem. 10)—the fraud claim here involves only a single

20  defendant: Pirate Monitor. *Cf. Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (cited by

21  plaintiff; fraud claim cannot lump defendants together; complaint must inform each defendant of

22  its alleged participation in the fraud). Other courts have required heightened pleading for

23  "allegations that the agency itself was a fraud," such as where parties "created the appearance of

24  an agency relationship to facilitate fraud." *Patel v. Pac. Life Ins. Co.*, 2009 U.S. Dist. LEXIS

25  44105, at *34 (N.D. Tex. May 22, 2009). *Accord TLS Grp., S.A. v. NuCloud Glob., Inc.*, 2016

26  U.S. Dist. LEXIS 51751, at *31 (D. Utah Apr. 18, 2016) ("[T]he Rule 9(b) particularity

27  requirements apply only if the issue of agency is an integral part of the material fact that was

28

1  misrepresented to the claimant."). But again, that is not the case here: Pirate Monitor did not put
2  forward a fraudulent agency relationship; rather, in order to further its fraudulent takedown
3  scheme, it actively concealed that an agency relationship existed at all. Rule 9(b) does not
4  require particularized allegations about deliberately concealed information.

5        As the Ninth Circuit has explained, even under Rule 9(b), a "pleader is not required to
6  allege facts that are 'peculiarly within the opposing party's knowledge,'" such as when the
7  opposing party conceals the relevant facts. *Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d
8  480, 493 (9th Cir. 2019); *see also Rubenstein v. Neiman Marcus Grp., LLC*, 687 F. App'x 564,
9  567–68 (9th Cir. 2017) (under Rule 9(b), a claimant "need not specifically plead facts to which
10 she cannot 'reasonably be expected to have access'"). Pirate Monitor did exactly that—it
11 "mask[ed] the relationship" with the party (or parties) it surreptitiously directed to post content
12 on YouTube. CC ¶ 22. Pirate Monitor's whole enterprise depended on obscuring its connection
13 to the accounts responsible for posting the videos. "Demanding Rule 9 particularity" makes no
14 sense in this context: "[w]here an agency relationship is hidden, plaintiffs cannot be expected, at
15 the pleading stage, to know the particulars of how, when, and where the agency relationship was
16 created." *Green v. Beer*, 2009 U.S. Dist. LEXIS 27503, at *41 n.22 (S.D.N.Y. Mar. 30, 2009).
17 "It is not the purpose of Rule 9(b)" to render fraud lawsuits "toothless as to particularly clever
18 fraudulent schemes." *United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med.*
19 *Response, Inc.*, 865 F.3d 71, 86 (2d Cir. 2017). Rule 9(b) is instead satisfied where the
20 allegations provide enough notice "so that the defendant can prepare an adequate answer."
21 *Odom*, 486 F.3d at 555 (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d
22 1393, 1400 (9th Cir. 1986)). YouTube's allegations do exactly that.

23       **B.  YouTube's Agency Allegations Provided Adequate Notice to Pirate Monitor and
24           Satisfy Any Applicable Pleading Standard**

25       YouTube's counterclaims do considerably more than "merely assert[]" an agency
26 relationship between Pirate Monitor and "unidentified individuals." Mem. 10, 12. Even within
27 the limitations created by Pirate Monitor's concealment, YouTube offered a more than plausible
28

allegation of agency and provided particularized allegations about both the agency relationship and the identity of the agents.

YouTube alleged facts showing that the user or users who uploaded the purportedly infringing video clips were acting under Pirate Monitor's direction and as Pirate Monitor's agents. YouTube alleged that Pirate Monitor relied on these "authorized agents" as part of its scheme to gain access to Content ID. CC ¶ 22. YouTube pleaded specific details about those agents' role in creating bogus accounts to upload videos to YouTube. CC ¶¶ 24–25, 28, 32. YouTube also alleged that Pirate Monitor's agents "surreptitiously upload[ed] a substantial volume of content" from obscure Hungarian films, and then "shortly after" those uploads, Pirate Monitor "sen[t] DMCA takedown requests for that same content." *Id.* ¶¶ 28, 35. The allegations about the suspicious timing of the takedown notices (*id*. ¶ 35) certainly constitute "allegations from which an agency relationship may plausibly be inferred" between the uploader and the person sending the takedown notices. *Sloan v. GM, LLC*, 287 F. Supp. 3d 840, 876 (N.D. Cal. 2018); *The Heredia v. Intuitive Surgical, Inc.*, 2016 U.S. Dist. LEXIS 163716, at *12–14 (N.D. Cal. Nov. 28, 2016) (finding "facts to plausibly infer" an agency relationship pleaded and stating that further issues about "[t]he contours of [an agency] relationship . . . are factual questions that cannot be resolved at this stage").

But even assuming that Rule 9(b) required particularized pleading of an agency relationship, YouTube satisfied that requirement. In *Weinstein*, the Ninth Circuit (without deciding whether Rule 9(b) "applies to allegations of agency") held that the simple allegation that one party "exercised 'substantial control'" over another satisfied Rule 9(b). *Weinstein v. Saturn Corp.*, 303 F. App'x 424, 426 (9th Cir. 2008). YouTube's allegation that Pirate Monitor's agents were "authorized" combined with YouTube's allegations of coordinated, contemporaneous conduct between the agents in uploading the videos and Pirate Monitor in sending takedown notices for those same videos shows such "substantial control." *Id.* Nothing more is required, "especially as information about [Pirate Monitor's] precise relationship with its [agents] . . . is largely within [its] possession, custody or control." *Sloan*, 287 F. Supp. 3d at 876

(citation omitted); *see Green*, 2009 U.S. Dist. LEXIS 27503, at *41 n.22 (particulars should not be required "[w]here agency relationship is hidden").

YouTube also pleaded enough particulars to "identify" Pirate Monitor's agents. As the counterclaims allege, these agents set up YouTube accounts that, between August and November 2019, uploaded hundreds of short clips of Hungarian-language films, including works in suit and closely related works. Pirate Monitor can certainly identify those accounts based on the allegations because, as YouTube alleged, Pirate Monitor would have seen them in the process of sending "hundreds of takedown requests" **aimed specifically at those clips and accounts**. CC ¶ 28. Pirate Monitor should need no more information to understand the nature of the agency relationship here. It cannot claim lack of notice or use pleading technicalities to dodge answering for its fraud.[4]

## II.  DEFENDANTS SUFFICIENTLY PLEADED JUSTIFIABLE RELIANCE

Pirate Monitor also argues that YouTube failed to plead "justifiable reliance" with particularity for its § 512(f) and fraud counterclaims. Mem. 14–15. Pirate Monitor is wrong for multiple reasons.

To begin, Pirate Monitor seems to be inventing a pleading standard. It cites no court holding that justifiable reliance must be separately pled as part of a § 512(f) claim. *See* Mem. 14–15. The only authorities on the issue are to the contrary. *See Curtis v. Shinsachi Pharm., Inc.*, 45 F. Supp. 3d 1190, 1199 (C.D. Cal. 2014) (plaintiff "adequately pleaded all of § 512(f)'s elements" without requiring justifiable reliance); *Enttech Media Grp.*, 2020 U.S. Dist. LEXIS 222489, at *12–15 (same). But even where justifiable reliance must be pleaded, courts generally apply a plausibility standard. *See, e.g.*, *Radware, Inc. v. United States Telepacific Corp.*, 2020 U.S. Dist. LEXIS 29188, at *14 (N.D. Cal. Feb. 20, 2020) (counterclaimant sufficiently pleaded justifiable reliance based on plausible allegation that it relied upon counter-defendant's

---

[4] While the allegations in the counterclaims suffice, should the Court think it necessary, YouTube could certainly add facts to what it has already pled about Pirate Monitor's agents. These additional facts are set out in YouTube's interrogatory response (as detailed above), and they are irrefutable evidence of Pirate Monitor's misconduct. Harold Decl. Ex. 1.

1  representation); *Brock v. Concord Auto. Dealership LLC*, 2016 U.S. Dist. LEXIS 27380, at *7
2  (N.D. Cal. Mar. 3, 2016); *see also 625 3rd St. Assocs. v. Alliant Credit Union*, 633 F. Supp. 2d
3  1040, 1052 (N.D. Cal. 2009).

4  Under any standard, YouTube amply pleaded facts showing that it justifiably relied on the representations made by Pirate Monitor and its agents. "Generally, a plaintiff will be denied recovery only if his [reliance] is manifestly unreasonable in the light of his own intelligence or information." *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*, 157 Cal. App. 4th 835, 865 (Cal. App. Ct. 2007); *accord Mitsui O.S.K. Lines Ltd. v. SeaMaster Logistics, Inc.*, 618 F. App'x 304, 306 (9th Cir. 2015) ("reliance was justified because [defendants'] misrepresentations were not 'preposterous,' or 'so patently and obviously false that [plaintiff] must have closed its eyes to avoid discovery of the truth.'"). This is a particularly easy case for justifiable reliance: Each of the misrepresentations at issue would expose someone not telling the truth to legal liability. The uploading agents represented that the videos did not infringe anyone's copyrights, that the uploader was authorized to post the videos, and that the uploader would indemnify YouTube for any claim arising from or relating to them. CC ¶¶ 17–21, 26–31, 38–39, 46–53, 59, 63–65. Not only were these representations in a legally binding agreement, the uploader would be subjecting itself to civil and potentially criminal liability if the uploaded material was in fact infringing. The Ninth Circuit has established that parties may reasonably rely on others "to obey statutes" and "written agreements, . . . and representations made under oath." *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 363 (9th Cir. 2005).[5]

---

[5] Pirate Monitor's authorities do not say otherwise. *See, e.g., Noll v. eBay*, 282 F.R.D. 462, 468 (N.D. Cal. 2012) (dismissing fraud claims with leave to amend where plaintiff eBay seller failed to allege "which exact misrepresentation Plaintiff relied on, whether that misrepresentation induced Plaintiff's decision to use [the eBay listings feature], or whether Plaintiff would have acted differently had there been no misrepresentation"—all of which YouTube alleged here); *Xia Bi v. McAuliffe*, 927 F.3d 177, 185 (4th Cir. 2019) (plaintiffs failed to adequately plead justifiable reliance because, *inter alia*, they did not identify which of the 27 named plaintiffs relied on each statement "or where or how any specific plaintiff heard or learned of the alleged statements"). Pirate Monitor cites no case suggesting that it is unreasonable to rely on statements
(continued...)

That is equally true of the representations in Pirate Monitor's DMCA takedown notices. Those notices expressly averred that specific videos were infringing copyright and that the notices were "accurate" and made, under penalty of perjury, on behalf of the rightful copyright owner. CC ¶ 63; 17 U.S.C. § 512(c)(3)(A). YouTube alleged that, but for those representations, it would not have removed the content that was the subject of the takedown notices. CC ¶¶ 28, 65. That reliance was entirely justified. Indeed, the very purpose of a DMCA notice is to induce the service provider to rely on it by removing the material identified as infringing. *See* 17 U.S.C. § 512(c)(1)(C). And someone sending a false takedown notice risks liability under § 512(f). *See, e.g., Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1154 (9th Cir. 2015); *accord Bauer Bros. LLC v. Nike Inc.*, 2011 U.S. Dist. LEXIS 23025, at *5, 16–17 (S.D. Cal. Mar. 8, 2011) (justifiable reliance based on sworn statement in trademark registration application). Given those circumstances, Pirate Monitor cannot credibly argue it was unreasonable for YouTube to have relied on its notices to remove the videos that Pirate Monitor claimed were infringing.

### III.   DEFENDANTS HAVE STANDING TO SEEK INJUNCTIVE RELIEF

Pirate Monitor argues that YouTube does not have standing to seek injunctive relief preventing Pirate Monitor from continuing its fraudulent operations. Mem. 16. As an initial matter, there is no obvious reason why this needs to be addressed now. YouTube is not presently asking the Court to enter an injunction; it has merely reserved its right to seek injunctive relief if it ultimately prevails on its claims. Taking up this issue at this stage would not serve any case management purpose or narrow discovery, particularly since the same factual allegations underlie YouTube's claim for damages under § 512(f), as well as its affirmative defense of unclean hands. *See* Mem. 15 (conceding YouTube's "Article III standing to seek money damages").

---

made in binding agreements, pursuant to express statutory requirements, or that subject those who make them to civil liability. Under these circumstances, it makes no difference whether YouTube knew the actual identity of the uploader. *See* Mem. 14–15; *see also Doran*, 2012 U.S. Dist. LEXIS 42805, at *14–19.

1       In any event, YouTube has alleged "a reasonable likelihood of future harm." Mem. 18. Pirate Monitor has yet to admit what it did, much less forsworn similar misconduct in the future. Again, Pirate Monitor sent *thousands* of false DMCA takedown notices as part of an artifice "to gain access to YouTube's powerful copyright management tools." CC ¶¶ 32, 34, 46. It still seeks that access—filing this lawsuit to demand it. ECF 1 at ¶ 150. Absent an unprecedented order compelling YouTube to approve access, Pirate Monitor could only get it by establishing "a history of properly using the DMCA takedown request process." CC ¶ 34. Without some check on its behavior, Pirate Monitor's motives, its demonstrated willingness to conceal its identity, its failure to accept responsibility, and the clear harm its misconduct has caused, amply demonstrate the potential need for injunctive relief. *See Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) ("where the defendants have repeatedly engaged in the injurious acts in the past, there is a sufficient possibility that they will engage in them in the near future."); *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012) ("pattern" and "practice" of wrongful conduct makes repetition "sufficiently likely" to warrant injunctive relief). At this preliminary stage, and given Pirate Monitor's machinations to date, there is no reason to doubt the prospect of future harm. *See Armstrong*, 275 F.3d at 861.

## CONCLUSION

For these reasons, Pirate Monitor's motion to dismiss should be denied.

Respectfully submitted,

Dated: December 18, 2020

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: */s/ David H. Kramer*
        David H. Kramer

Attorneys for Defendants and Counterclaimants
YOUTUBE, LLC and GOOGLE LLC