George A. Zelcs (*pro hac vice*)
  gzelcs@koreintillery.com
Randall P. Ewing, Jr. (*pro hac vice*)
  rewing@koreintillery.com
Ryan Z. Cortazar (pro hac vice)
  rcortazar@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601
Tel.: (312) 641-9750 / Fax: (312) 641-9751

Stephen M. Tillery (*pro hac vice*)
  stillery@koreintillery.com
Steven M. Berezney, CA Bar #329923
  sberezney@koreintillery.com
Carol O'Keefe (*pro hac vice*)
  cokeefe@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Tel.: (314) 241-4844 / Fax: (314) 241-3525

Joshua Irwin Schiller, CA Bar #330653
  jischiller@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery St., 41st Floor
San Francisco, CA  94104
Tel.: (415) 293-6800 / Fax: (415) 293-6899

Philip C. Korologos (*pro hac vice*)
  pkorologos@bsfllp.com
Joanna Wright (*pro hac vice*)
  jwright@bsfllp.com
Demetri Blaisdell *(pro hac vice forthcoming)*
  dblaisdell@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY  10001
Tel.: (212) 446-2300 / Fax: (212) 446-2350

*Attorneys for Maria Schneider, Uniglobe Entertainment, LLC, and AST Publishing Ltd.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated;<br><br>Plaintiffs,<br><br>vs.<br><br>YOUTUBE, LLC; and GOOGLE LLC;<br><br>Defendants. | CASE NO. 3:20-cv-4423<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Maria Schneider, Uniglobe Entertainment, LLC, and AST Publishing Ltd., as and for their Complaint against Defendants YouTube, LLC ("YouTube") and Google LLC ("Google") (collectively, "Defendants"), allege upon personal knowledge as to acts and events taking place in their presence or upon information and belief for all other acts as follows:

**INTRODUCTION**

1.        This case is about copyright piracy. YouTube, the largest video-sharing website in the world, is replete with videos infringing on the rights of copyright holders. YouTube has facilitated and induced this hotbed of copyright infringement through its development and implementation of a two-tiered copyright enforcement system that protects and benefits the most powerful copyright owners—major studios and record labels—at the expense of ordinary owners of copyrighted works, including Plaintiffs and the Class. In the guise of copyright enforcement, YouTube enables a select group to either block the public display of infringing works or to monetize those infringing works by collecting a share of the revenues of advertisements run against them.  Because YouTube collects advertising revenues either way, it does not assess copyright strikes on or terminate the uploaders of the vast majority of infringing videos. In contrast, ordinary copyright owners are denied *any* meaningful opportunity to *prevent* YouTube's public display of works that infringe their copyrights—no matter how many times their works have previously been pirated on the platform. These disparities—created by YouTube and its parent Google—have nurtured a platform where users can repeatedly upload videos that replicate copyrighted works while facing no threat of termination.

2.        The copyright management tool that YouTube provides to the behemoths of the creative industry is Content ID—a digital fingerprint tool that compares videos being uploaded on YouTube to a catalogue of copyrighted material submitted by those entities permitted access to the tool. Paradoxically, YouTube uses Content ID's identification of exact matches of copyright protected works to transfer billions of advertising dollars to the owners of those protected works—yet any work identified as an exact match under the Content ID system is effectively insulated from the DMCA mandated repeat infringer policy.

3.      Defendants Google and YouTube reap billions of dollars annually from the online hosting of videos, including millions of works that infringe on the exclusive copyrights of Plaintiffs and the Class. Defendants permit and facilitate this infringement because it furthers their growth and revenue strategies and because they have determined that Plaintiffs and the Class—unlike YouTube's preferred Content ID partners—lack the resources and leverage necessary to combat copyright infringement on the scale at which it is perpetuated on YouTube.

4.      YouTube has more than 2 billion users worldwide every month, which according to Defendants is "almost one-third of the internet." Users watch more than one billion hours of videos every single day, equating to approximately 5 billion videos viewed each day. YouTube estimates that more than 720,000 hours of videos—more than 82 years' worth—are uploaded every day, equating to more than 500 hours of content uploaded every minute.

5.      However, to become the preferred platform for both uploaders and viewers, Defendants knowingly permitted YouTube also to become a hotbed of piracy. From its start, YouTube recognized that its success was highly dependent on the rapid growth in online postings (or "uploads") of "user-generated content," to be uploaded quickly and with no prepublication diligence, making the unauthorized upload of copyrighted material unavoidable. Google purchased YouTube with full knowledge of YouTube's rampant copyright piracy, yet Google chose to foster YouTube's growth rather than protect copyright holders; Google even refused to implement anti-piracy tools it had previously developed on another video sharing platform designed to curb such infringement.

6.      Given the two-sided market YouTube functions in—where it wants to drive both viewers and content uploaders—Defendants' motives are obvious. The ready availability of pirated content is the source of "network effects." A vast library of pirated content draws users to the site, and the growth in users incentivizes the posting of more content on YouTube, which in turn enables Defendants to reap more advertising revenue. Building extensively on the backs of copyright holders who never gave authorization for their works to be displayed on YouTube, Defendants report that they now derive $15 billion in revenue from advertising on YouTube, as

well as unspecified billions from subscriptions, other YouTube services, and the exploitation and monetization of personal data harvested from all of its users.

7.     In addition to the billions of dollars of direct advertising revenue, the Google search and advertising platform independently gains massive value capitalizing on the rapid upload of materials, much of which infringes on class members' copyrights. Every time a viewer engages with the YouTube platform, Google harvests valuable information on individual user preferences and aggregate user demographics. This data is used to develop targeted advertising for YouTube, for Google, and further across the internet via Google's AdSense, AdX, and AdManager products and services, each of which generates additional billions of dollars for Defendants. Google is estimated to control 40% of the online advertising market, with much of it built on data it gathers from YouTube viewers drawn to the website by infringing material.

8.     Faced with litigation by major music studios and other significant rights holders, Defendants have crafted distinct and disparate systems of copyright "enforcement" on their platform. For those entities with vast stores of copyrighted material and thus the leverage to require Defendants to appease their copyright management concerns, YouTube created its Content ID program, which allows qualifying copyright owners automatically to identify and manage works on YouTube that have copied their protected content. Videos uploaded to YouTube are scanned against a database of files that have been submitted to Defendants by those qualifying copyright owners. Such owners get to decide what happens when content in a video on YouTube matches a work they own; the available options are (on a country-specific basis) to block the whole infringing video from being viewed, monetize the infringing video by running ads against it (in some cases sharing revenue with the uploader), or track the infringing video's viewership statistics.

9.     Smaller rights holders, including Plaintiffs and the Class, are, however, denied access to Content ID and thus are relegated to vastly inferior and time-consuming manual means of trying to police and manage their copyrights, such as scanning the entirety of YouTube postings, searching for keywords, titles, and other potential identifiers. Plaintiffs and the Class

must then file individual takedown notices with YouTube via a web-form, email, or postal mail for each video their searches identify. Defendants have, in effect, created a two-tiered system whereby the rights of large creators with the resources to take Defendants to court on their own are protected, while smaller and independent creators like Plaintiffs and the Class are deliberately left out in the cold.

10.     The inequities of these disparate systems are pervasive. The following table contrasts the protections offered by Content ID with those accorded ordinary copyright enforcers.

| Content ID | Ordinary Rights Enforcers |
| --- | --- |
| Screening is performed at the moment of upload, before a video is published on YouTube, preventing public availability through YouTube of the infringing material. | Copyright holders can search only after infringing material is uploaded, published on YouTube and available to the general public. |
| Screening is performed automatically using the digital fingerprint system provided by YouTube that automatically compares the actual content of each uploaded video with the entire catalog of Content ID-protected works. | Copyright holders must manually search in an attempt to identify infringing works via titles, authors, and keywords attached to the video by the uploader. |
| Content ID automatically imposes the rights holder's enforcement option to block the infringing video from publication on the platform, to monetize the infringing video through advertising revenue, or monitor download statistics of the infringing video. A takedown notice can only be filed through a manual process and only in limited circumstances. | Once the rights holder identifies infringing videos, the rights holder must file a takedown notice with YouTube for each offending video, specifying the URL location of the offending work, and providing evidence of the holder's right to enforce the copyright. After a delay of days or weeks during which the infringing material remains publicly available and the harm caused by the infringement continues, YouTube may suspend or remove the video. |

11.     The superior protections of the Content ID system are completely denied to Plaintiffs and the Class no matter how many times their copyright protected works are infringed on the YouTube platform. If a rights holder does not have the economic clout to qualify for Content ID, YouTube refuses to add their works to the Content ID catalog for prepublication protection even if those works have previously been infringed on YouTube hundreds or even thousands of times. In fact, most of the applications to Content ID are rejected automatically.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Through its use of these systems, YouTube exerts significant control over which infringing videos may be published on its site and which infringing videos are never viewed by the public.

12.     Moreover, Defendants have completely divorced their Content ID system from their legally mandated repeat-infringer policy. The DMCA provides a safe harbor against copyright infringement claims for entities such as YouTube so long as they formulate and reasonably enforce a policy of terminating repeat copyright infringers from their platform. YouTube purports to take advantage of this safe harbor by having a policy that assesses a "copyright strike" against the uploader when an ordinary rights holder files a takedown notice and terminates uploaders when they accrue three active copyright strikes within 90 days. However, when infringing content is uploaded and identified by the Content ID system, no copyright strikes are issued.[1] Thus, when Google brags that 98% of its "copyright issues are resolved via Content ID,"[2] what it really means is that nearly all identified copyright infringing material is entirely insulated from its repeat-infringer policy. This two-tiered system essentially trains YouTube's billions of uploading users that there is essentially no risk that their account will be terminated and they can upload to their hearts' content. And while YouTube's Content ID partners are protected from these repeat infringers because their uploads will always be screened against the Content ID catalog before publication, Plaintiffs and the Class remain at risk of recurring infringement by these same repeat infringers.

13.     While Defendants state that Content ID eligibility is based on a variety of criteria, only five percent or less of all people who apply for Content ID are approved. Plaintiffs have applied and have either been rejected or received no response. In the meantime, Plaintiffs continue to suffer copyright piracy. Plaintiffs have had their exclusive copyrights infringed multiple times, despite having sent prior successful takedown notices for those very same works

---

[1]  YouTube's own Help page expressly states, "Content ID claims don't result in a strike." https://support.google.com/youtube/answer/2814000?hl=en, last visited July 1, 2020.

[2]  "How Google Fights Piracy," p. 30, https://www.blog.google/documents/27/How_Google_Fights_Piracy_2018.pdf, last visited July 1, 2020.

and despite Defendants' having actual and constructive knowledge that YouTube is being used continuously to infringe Plaintiffs' copyrights.

14.     Defendants have forfeited their claim to the DMCA safe harbor protections in other ways as well. For example, rights holders who seek to actively enforce their copyrights by filing numerous takedown notices run the risk of losing access to YouTube's rudimentary tools purportedly designed to facilitate the takedown notification process. Defendants are liable for the copyright piracy on their platform because their current approach to copyright infringement, including the operation of the Content ID system, fails to satisfy the requirements mandated in order to be protected under the DMCA safe harbor.

15.     The overall effect of Defendants' inducement of copyright infringement, manipulation of search, willful blindness, data harvesting, and selective enforcement of copyright screening tools is to depress the value of creators' works and destroy the free marketplace for those works, where willing buyers and willing sellers can transact business. Instead, Defendants have created an alternative and unlawful marketplace, where the advertising revenue and valuable data it derives from publishing those works—free of charge to the consumer—bears no rational relationship to the creator's real cost of producing those works; this significantly injures the creators, but enormously benefits Defendants. The ready availability on YouTube of unauthorized copyrighted materials and the whack-a-mole approach required for creators to remove infringing material works disincentivize the creation of new works and reduce the value of all works.

**PLAINTIFFS**

16.     Plaintiff Maria Schneider, a citizen of the state of New York, is a multiple Grammy award-winning composer and musician. Plaintiff Schneider is the legal and/or beneficial owner of exclusive rights under copyrights to numerous works, including the songs "Hang Gliding," "Green Piece," and "Journey Home."

17.     Plaintiff Uniglobe Entertainment, LLC ("Uniglobe") is a Wyoming limited liability company with its principal place of business in Los Angeles County, California.

Uniglobe is the legal and/or beneficial owner of exclusive rights under copyrights to the films *5 Weddings*, *Americanizing Shelley*, and *1 a Minute*.

18.     Plaintiff AST Publishing Ltd. ("AST") is a Russian book publishing company. AST is the legal and/or beneficial owner of exclusive rights under copyrights to numerous works, including print and audio versions of the books it publishes.

**DEFENDANTS**

19.     Defendant YouTube, LLC, is a Delaware limited liability company with its principal place of business at 901 Cherry Avenue, San Bruno, California 94066. In 2006, YouTube was purchased by Google and since that purchase YouTube has operated as a wholly owned and controlled subsidiary of Google. At all times relevant to this Complaint, the website YouTube.com was operated and controlled by either or both of YouTube, LLC and Google LLC. From time to time, YouTube conducts business as Google. For example, YouTube's support documentation, including an explanation of how the Content ID program works, is hosted on "support.google.com."

20.     Defendant Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Since 2006, Google has wholly owned and controlled YouTube. Google is the alter ego of YouTube. For example, YouTube and Google share user data from their respective websites, youtube.com and google.com, in order to create new content and personalized advertisements on both sites. Google's search engine is the largest preceding source of all visits to YouTube, more than 6 times that of any other website. YouTube and Google also combine both products for purposes of Google's AdWords advertising program, which allows an advertiser to determine that if a person searches for a specific term on Google's search engine (e.g., financial advisor), the advertiser can direct that the next time that user watches a video on YouTube that person will see an advertisement for financial advisory services. Google has also recently begun testing integrating links to its search engine within YouTube's search results.

**JURISDICTION**

7

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

21.     This is a civil action seeking damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*

22.     This Court has original subject matter jurisdiction over all claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

23.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) because the proposed Class contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000 and at least one proposed Class Member is a citizen or subject of a foreign state and Defendants are citizens of the State of California.

24.     This Court has personal jurisdiction over Defendants. YouTube, d/b/a Google LLC, and Google each maintain their headquarters in California and in this District. All Defendants have transacted business within California and contracted to supply goods or services in California in connection with the matters giving rise to this suit. Defendants have also committed copyright infringement causing injury to Plaintiffs and members of the Class in California. Defendants regularly solicit and do business in California and derive substantial revenue from goods used or services rendered. Defendants' address for takedown notices of infringing content on YouTube is in California and in this District.

25.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c) and 1400(a).

26.     YouTube's terms of service provide that all claims relating to the terms of service or arising out of the terms of service shall be litigated in federal or state courts in Santa Clara County, California, USA, and that YouTube consents to personal jurisdiction therein.

## NATURE OF THE ACTION

### I.     The Importance of Copyright and Copyright Enforcement

27.     Copyrights are the means by which creators of original content protect their moral and economic rights in that content. Respecting the financial value of creators' works is such a cornerstone of our democracy that it was enshrined in the U.S. Constitution, which expressly gave Congress the power to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and

Discoveries." U.S. Const. Article I, Section 8. "Copyright law encourages people to create original works and thereby 'ultimately serves the purpose of enriching the general public through access to creative works.'" *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 526 (1994). The Supreme Court of the United States has recognized that by "establishing a **marketable** right to the use of one's expression, copyright supplies the economic **incentive** to create and disseminate ideas." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985) (emphasis added).

28.     The importance of copyright enforcement is not limited to the United States. As far back as the early 1500s, courts in France recognized that only the creators of works, or their assigned heirs, should have the right to publish those works. As early as 1886, more than 10 countries signed or ratified the Berne Convention for the Protection of Literary and Artistic Works, which has a stated purpose to promote the "protection of the rights of authors in their literary and artistic works." The Convention ensures that authors are afforded the same protections in those signatory countries as they would enjoy within their own country, thereby promoting the worldwide distribution of creative works while at the same time ensuring that the rights of the author of a work created in one country will not be circumvented through the infringement of those rights in another country. As of today, 188 countries, including the United States, have signed the Berne Convention.

29.     The 1976 Copyright Act makes it illegal for people to publicly perform, publicly display, distribute, or reproduce a copyrighted work except in limited instances, and provides for statutory damages, willful statutory damages, and the right to recover attorneys' fees. 17 U.S.C. §§ 501 et seq.

30.     YouTube is by far the world's largest "user-generated-content" publishing platform, where billions of users upload and publish not only true user-generated-content, but also works that infringe the copyrights owned by others, including on occasion by Plaintiffs and the Class. Without adequate protection for copyright holders' rights, YouTube poses an existential threat to copyright laws. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 928 (2005) (noting "digital distribution of copyrighted material threatens

copyright holders as never before, because every copy is identical to the original [and] copying is easy"). For that reason, it is critical that YouTube not encourage or promote copyright infringement, act in a willfully blind manner to ignore identifiable copyright infringement on its site, alter or remove metadata that is protected "copyright management information," or deploy its copyright protection tools in an inadequate and selective manner.

31.     Each of the copyright-infringing acts alleged herein has diminished the moral, legal, and economic rights of Plaintiffs and Class members. The infringements have unjustly benefitted Defendants and have eroded the incentive to create new content in the same way by taking away a true marketplace, by misappropriating the revenues that should have been earned by Plaintiffs and the Class through their works, and by diminishing the value of their ownership rights in such works.

## II.     YouTube Was Designed to Enable and Facilitate Copyright Infringement

### A.     YouTube Uses Various Methods to Drive Uploads of Videos for Display on Its Platform and to Drive Views of Such Videos From Its Platform.

32.     YouTube, now the world's most popular online video site, launched in 2005. Users can access the platform in two distinct, yet complimentary roles: as "uploaders"—who publish videos to their unique YouTube pages, known as "channels," and as "viewers"—who watch, review, and comment on the videos published by others.

33.     When a user uploads a video, YouTube automatically transcodes the video file into a variety of formats for streaming to various devices, a procedure that removes all metadata associated with the original file. During the upload process, the uploader has the option of associating "tags" with the video, keyword identifiers such as the title, author, or topic; these tags are metadata that YouTube associates with the publically displayed video files. Following transcoding, the altered video file becomes part of the YouTube library for publication and display through YouTube's website, which Defendants control and directly and indirectly profit from.

34.     YouTube actively encourages viewers to find and play videos on its website in numerous ways. When a viewer enters a search request into YouTube's search bar, Defendants

return a list of matching videos in its library accompanied by thumbnails and other metadata about the video, such as a title chosen by the uploader and the number of YouTube views. A YouTube viewer can then select that video to play by clicking on one of the thumbnails or the accompanying information in the list of videos supplied by Defendants in response to the user's search request. When the user does so, Defendants then display the chosen video by streaming audio and video data from YouTube's servers to the user's computer or phone so that the user can view the selected video. As a video streams, YouTube causes the user's computer or phone to download audiovisual data of the selected video.

35.     YouTube also enables any viewer to "embed" further publishing of any video in the publicly available YouTube library into another website such as Facebook, a blog, or any other website where a user can post video content. The embedding feature is available by default for every video on YouTube, and the embedded video will appear as a picture with the YouTube logo prominently displayed. When someone clicks on the embedded video, it will stream the audio and video from YouTube's servers in the context of the host website; in this way, the YouTube platform is still displaying the video by transmitting the streaming video content from YouTube's own servers to the viewer's computer. Defendants also enable YouTube viewers to "share" videos with others—for example, through email. If a viewer wants to share a video by email, the feature will generate an email with a link to the specific video. Any recipient of that email can click on the link to be brought to the YouTube website in order to view the video.

36.     YouTube's "embed" and "share" features have contributed significantly to YouTube's growth in popularity, number of users, amount of content uploaded, and the data it captures and exploits from its uploaders and viewers. Because YouTube provides its users with the ability to view and listen to copyrighted materials free of charge, when the user would otherwise have to pay for such access, billions of users are naturally drawn to YouTube. Defendants' "free" business model, built on piracy and an abuse of the DMCA safe harbors, has made YouTube the primary outlet for music and video streaming and display. YouTube and Google, in combination, are the predominant means by which the public searches and discovers

music, film, books, and other artistic works. As a result, artists like Plaintiffs and the Class must accede to the overwhelming market power of YouTube, because if you are not on YouTube, you don't exist.

37.     Defendants also drive viewers to view multiple videos on YouTube by generating recommendations based on a closely guarded algorithm and metadata system that recommends additional videos to view next to the selected video as it is being played, and by their "AutoPlay" feature that queues subsequent videos to play sequentially. Since 2016, YouTube's recommendation algorithms have utilized Google Brain to refine and maximize their effectiveness in increasing "user engagement" and viewing time. Defendants recently proclaimed that YouTube has been successful in controlling over 70% of the works viewed by the user through its recommended video algorithm and Autoplay feature.[3] As YouTube's technical lead for YouTube recommendations has put it, "[YouTube] also wanted to serve the needs of people when they didn't necessarily know what they wanted to look for."[4]

38.     As a result of YouTube's recommended video algorithm, search engine algorithm, and Autoplay feature, Defendants exert substantial control over the behavior of YouTube users and content posters. Exercising this control over users has paid off significantly. From the early introduction of its recommendations in 2014 to its refinements as of 2017, the aggregate time users spend watching videos on YouTube increased twentyfold.

39.     As a result, every time a copyright-protected work is uploaded and subsequently viewed on YouTube without authorization, it is more likely than not that Defendants' conduct directed the viewer to the infringing work. Within the time period relevant to this litigation, Defendants automatically caused copyright infringement through the viewing of copyright-protected material without any affirmative action required by a user.

---

[3] *See, e.g.*, https://www.theverge.com/2017/8/30/16222850/youtube-google-brain-algorithm-video-recommendation-personalized-feed.

[4] https://www.theverge.com/2017/8/30/16222850/youtube-google-brain-algorithm-video-recommendation-personalized-feed.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**B. Maximizing the Amount of Online Content—Including Infringing Content— Was, and Remains, Key to the Growth in Viewers on the YouTube Platform.**

40.     Like other online platforms that don't "sell" their services, YouTube was originally designed to bring together its users: content generators who upload videos and content consumers who watch those videos. This basic business model for a platform leverages one of the most powerful forces in the online economy—"network effects"—to scale quickly and maintain momentum. Network effects occur where a service increases in value with the total number of users.[5] YouTube benefits from direct "network effects" in that, as more videos are uploaded, the entire platform becomes more attractive to the watchers of those videos. That attractiveness to those viewing the videos in turn makes the platform more attractive to uploaders who desire to have their uploaded materials viewed by the ever-increasing number of viewers. Defendants benefit economically as a result of network effects because, among other things, as the number of videos increase and the number of video watchers increases, the YouTube platform becomes more attractive to advertisers who, as described below, seek to target and reach watchers by posting advertising associated with videos that are likely to attract the advertisers' targeted audiences. As also described below, Defendants further gain from these effects by monetizing the valuable data about users that YouTube is able to gather from the viewing choices of its users.

41.     Defendants' formula for economic success is simple: more videos, leads to more viewers, leads to more advertising and more data for YouTube to sell. That is, a large number of viewers attracts uploaders who upload more videos; more videos, in turn, attracts more viewers; viewers provide personal information and YouTube collects data on viewers' watching habits. More viewers also attracts advertisers, who purchase advertisements to display before, during, and after uploading videos; and YouTube makes money by selling advertisements in addition to selling the data they gather on viewers, uploaders, and advertisers alike. YouTube requires its users to consent to YouTube collection of individualized data for numerous purposes, including

---

[5] Alec Stapp, "You Can't Understand Big Tech Without Understanding Network Effects. Here's a Road Map." <u>Niskanen Center</u>, Sept. 13, 2018.

the development of new products and personalized advertisements and content. YouTube has substantial incentives to maximize the amount and variety of content that is streamed on its platform, these being to maximize the advertising views and to maximize the amount of data it can harvest. Ignoring copyrights for all but those most able to force YouTube to protect their copyrights—*i.e.*, those who are given access to Content ID—helps Defendants to drive this economic engine to higher levels by using copyright piracy as a key element of YouTube's growth strategy.

42.     This model is ingrained in the very foundation of YouTube. Indeed, one of YouTube's founders urged it to build up its numbers "as aggressively as we can through whatever tactics, however evil." That same founder argued against the company removing obviously infringing videos, claiming that site traffic would drop by 80% if it did so. In February 2006, a YouTube employee estimated that over 70% of the most viewed, most discussed, top-favorited, and top-rated videos contained copyrighted material. That employee later estimated that 75 to 80% of YouTube's views came from copyrighted material posted without authorization. Nevertheless, YouTube continued to enable and facilitate copyright infringement so that it could attract as many users as quickly as possible.

43.     The desire to facilitate and enable copyright infringement did not end with Google's $1.65 billion purchase of YouTube in 2006. At that time, Google operated a competing website, Google Video that, unlike YouTube, engaged in a process of reviewing and screening each uploaded video to avoid infringing content before the upload was publicly performed, displayed, reproduced, or distributed.

44.     Notably, prior to Google's acquisition of YouTube, Google characterized YouTube as "a rogue enabler of content theft" that was "completely sustained by pirated content" and viewed YouTube's success as due to "its liberal copyright policy." Google even found it difficult to compete with YouTube at that time and considered "whether we should relax enforcement of our copyright policies in an effort to stimulate traffic growth" on Google Video.

45.     Instead of competing, however, Google purchased YouTube in October 2006 for $1.65 billion. As part of that transaction, Google's financial advisor Credit Suisse warned Google that over 60% of YouTube's views were of "premium" copyrighted content and that only 10% of that content was licensed. Nonetheless, Google did not apply to YouTube the pre-upload screening process that it used on Google Video; instead, Google chose to continue YouTube's aggressive policy of allowing obviously infringing videos to be uploaded with zero "friction" and no screening, thus allowing infringing and illegally posted videos to be played and monetized by YouTube unless and until a takedown notice was received from the copyright owner.

46.     With over 500 hours of videos uploaded every minute, this "frictionless" policy without screening for the copyrights of Plaintiffs and the Class guarantees that uploaders can infringe their copyrights at a pace that is far greater than the rate at which copyright holders can try to enforce their rights or the rate at which YouTube could ever process takedown requests. One Google employee tasked with responsibility for selecting videos to be prominently displayed on the website noted that they were "running into issues finding enough videos because they have so many copyright violations." In a negotiation with one copyright holder, the Motion Picture Association of America, Google recognized that "the copyrighted content on YouTube was a major lure for their users."

   **C.  With the Growth of the Platform, Google and YouTube Can Maximize Advertising Revenue Through a Combination of Available Content for Advertisement Placement and Superior Advertisement Targeting Through Data Generation.**

47.     As discussed above, YouTube maximizes revenues by having continually more and more content available online. Sustained and ongoing growth of uploaded content provides more online space for advertising to be sold and attracts more viewers who will see such advertising. Additional viewers, in turn, attract both more advertising and more uploads—and the network effects cycle continues.

48.     Defendants have been remarkably successful in this online real estate grab. By one estimate, YouTube holds 70% of the market for online video content in the United States, as measured by the number of domains.[6]

49.     Currently, Defendants earn advertising revenue directly from YouTube's library of videos. First, Defendants earn 100% of the advertising revenue generated through the placement of advertisements on its homepage and search-results pages. The value of these ads is directly related to the number of users Defendants are able to attract and the overall size of its library. The number of users that Defendants can attract is, in turn, increased by the ready availability of unauthorized copyrighted works that can be viewed for free.

50.     In addition, if a YouTube uploader chooses to turn on account monetization, through Defendants' YouTube Partner Program or otherwise, Defendants will automatically place an advertisement within and around the video that is being publicly displayed, with Defendants keeping at least 45% of what Defendants calculate (without transparency) to be their "net income" advertising revenue. The uploading user retains no more than 55% of that "net" figure. The annual "net income" Defendants generated from YouTube in 2019 was recently revealed to include $15 billion in advertising revenue alone, and that does not include the significant value of the user data, which Defendants exploit in manifold ways, or the significant corporate expenses Defendants recover before calculating this "net" figure. Under a recent update to YouTube's Terms of Service, YouTube can now choose to monetize videos even when the uploader does not choose to monetize a certain video.

51.     Defendants also benefit from YouTube's contributions to the growth and financial success of other Google products and services as well. YouTube is now estimated to draw 2 billion regular viewers each month. As users interact with the YouTube platform, including through the posting and viewing of copyright-infringing material, they convey valuable information concerning their preferences for topics, products, and services. Defendants

[6] https://www.datanyze.com/market-share/online-video/United%20States.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    can use the individual and aggregate data they glean from these viewers to improve their entire

2    product empire, ranging from advertisement exchanges, like AdSense and AdX, to Google's

3    third-party advertisement server, Double Click for Publishers. Indeed, YouTube's privacy policy

4    as embedded in its Terms of Service links to a Google privacy policy that discusses both Google

5    and YouTube as one, and that states that the user's data will be shared and utilized to develop

6    new services, fine-tune search results, and create personalized advertisement. Google is now

7    estimated to control 40% of the entire online advertising market, and the data it reaps from

8    YouTube users, including those drawn to the site to view copyright-infringing works, plays a

9    significant role in its growth.

10   **III.    Defendants' Delayed and Tiered Copyright Enforcement Mechanisms Were and
            Are Designed to Maximize Their Revenues and Create "Friction" for Those
11          Seeking to Enforce Their Copyrights.**

12          52.    Defendants' delayed implementation of readily available screening technologies,

13   and their decision to use such technologies in a way that maximizes their revenue from copyright

14   infringement further demonstrates their intent to facilitate and profit from known copyright

15   infringement. Defendants are obligated to comply with the safe harbor provisions of the DMCA

16   in order to earn protection from liability for copyright infringement. Defendants' business model,

17   however, instead embraces such infringement because each infringing work represents

18   additional advertising opportunities and attracts additional viewers to YouTube. Simply put,

19   more stringent enforcement of copyrights would be harmful to Defendants' revenue derived

20   from YouTube—if all infringing material were subject to a pre-upload screening feature like

21   Content ID or to being taken down, YouTube would lose valuable online real estate and viewers.

22          53.    Because YouTube receives a percentage of all advertising revenues, it is

23   indifferent to whether it shares those revenues with the copyright enforcer or the infringing party.

24   However, complete diversion of revenues away from infringing parties and towards copyright

25   enforcers would also undermine YouTube's business model (and thus its revenue maximization).

26   If its net income from unauthorized uploads were also to include a fair share for the content

27   creators, many smaller YouTube channels would lose their economic incentive to continue

28

1    uploading infringing material to the platform. Indeed, Defendants' opposition to the EU's recent

2    copyright protection measures, which will likely require Defendants to pre-screen all videos for

3    copyright infringement prior to upload and/or offer Content ID to everyone who has submitted

4    a prior takedown notice, reflects these very fears.

5         54.     Instead, in order to amplify its profits, YouTube offers different levels of relief to

6    copyright enforcers that is tied to their level of engagement and activity on YouTube. These non-

7    negotiable business terms enable Defendants to maximize the amount of infringing content that

8    remains online by permitting the enforcers with the most resources to protect their rights to

9    monetize the infringing material, while relegating copyright enforcers of more limited means to

10   the issuance and prosecution of individual takedown notices.

11        55.     Since YouTube's inception, there has been readily available and relatively

12   inexpensive content-filtering software to proactively identify and prevent the public display of

13   infringing videos. Critically, however, only a site operator like YouTube can prevent copyright

14   infringement at the time the video is uploaded and before it becomes public. Despite readily

15   available standard tools, YouTube intentionally limits the availability of such content-filtering,

16   and refuses to allow Plaintiffs and the Class such access and use. These content-filtering tools

17   are based on digital fingerprinting technology, a standard technical measure under the DMCA,

18   which Defendants are legally obligated to accommodate and not interfere with.

19        56.     Defendants' Content ID program is the most effective tool for any copyright

20   holders who wish to block unauthorized uploads at the time of upload. Content ID allows the

21   copyright enforcer to submit its copyrighted works (*e.g.*, copyrighted videos or copyrighted

22   songs that might be used in an infringing video) to YouTube, which uses those copyrighted

23   videos to create a digital fingerprint. All videos uploaded to YouTube are then scanned against

24   the database of these digital fingerprints. If Content ID finds material that matches one of the

25   submitted works, the copyright holder can choose to: (1) block a whole video from being viewed;

26   (2) monetize the video by running ads against it, in some cases sharing revenue with the

27   uploader; or (3) simply track the video's viewership statistics.

28

18

57.     Without any explanation as to why, Defendants state that Content ID is intended for "those who own exclusive rights to a large amount of original content (like a record label or movie studio), are submitting a high number of complete and valid takedown requests, and are able to dedicate the resources needed to manage it." This program is highly automated, with YouTube automatically conducting the search and match process upon any upload of a video and allowing the copyright enforcer to pre-select an enforcement mechanism.

58.     But, to the detriment of Plaintiffs and the Class, Defendants refuse to allow this tool to be made available to them, nor is any reasonable substitute provided, thus allowing Defendants to continue to benefit from the prolific infringement of Plaintiffs' and the Class's copyrighted materials. Only approximately five percent or less of all applicants who attempt to sign up for Content ID are approved for its use.

59.     As a bipartisan group of U.S. Senators and Congressional Representatives wrote to Google on September 3, 2019, there are significant "concerns that copyright holders with smaller catalogs of works cannot utilize Content ID, making it more difficult or almost impossible for them to effectively protect their copyrighted works from infringement and, ultimately, impacting their livelihoods." Indeed, these legislators noted that they had "heard from copyright holders who have been denied access to Content ID tools, and, as a result, are at a significant disadvantage to prevent repeated uploading of content that they have previously identified as infringing. They are left with the choice of spending hours each week seeking out and sending notices about the same copyrighted works, or allowing their intellectual property to be misappropriated."

**IV.     Defendants' Treatment of Plaintiffs Reflects Their Intent to Permit Misappropriation of Plaintiffs' Rights Despite Actual and Constructive Knowledge.**

60.     Plaintiff Schneider is the legal and/or beneficial owner of exclusive rights held under copyrights to numerous works, including, *e.g.*, the songs "Hang Gliding," "Green Piece," and "Journey Home." "Hang Gliding" was first published in 2000 and was registered with the United States Copyright Office on May 20, 2003. "Green Piece" was created in 1987 and was

registered with the United States Copyright Office on May 18, 1992. "Journey Home" was first published in 2000 and was registered with the United States Copyright Office on May 20, 2003.[7]

61. The aforementioned songs have, at various times, been posted in full or in part on YouTube and have been viewed by YouTube users.

62. Plaintiff Schneider has twice applied for Content ID and has been rejected both times.

63. Plaintiff Schneider has sent multiple takedown requests to YouTube to remove infringing videos from 2013 to the present, including videos containing each of the aforementioned songs.

64. After submitting the takedown requests, and on numerous occasions, each of the aforementioned songs has been subsequently posted in full or in part on YouTube without Plaintiff Schneider's authorization. For instance, as of the date this lawsuit was first filed, there were several YouTube videos of "Hang Gliding" published by YouTube, with tens of thousands

---

[7] Schneider's claims include the following additional works: "Wyrgly," "Evanescence," "Gumba blue," "Some circles," "Gush," "My lament," "Dance, you monster, to my soft song," "Last season," "El viento," "Scenes from childhood," "Waxwing," "Lately," "The willow," "Bird count," "Nocturne," "Allegresse," "Dissolution," "Sea of Tranquility," "Concert in the garden," "Three romances," "Buleria, solea y rumba," "Divided by two," "Now and then," "In a pinch," "This 'n that," "Coot stew," "Swing street," "Baytrail shuffle," City sunrise," "Samba solstice," "One for Tad," "Espino," "The grail," "Free fall," "Smooth talk," "Prairie Dance," "Anthem," "Finding Flight," "Evelyn," "Tranquilidade," "Recapitulation," "Returning," "Tork's café," "Alchemy," "The blasphemy," "SUE (OR IN A SEASON OF CRIME)," VIKINGS ANTHEM," "Sky Blue," "The Pretty Road," "Cereluean Skies," "Aires de Lando," "Rich's Piece," Winter Morning Walks," "Carlos Drummond de Andrade Stories," "Walking by Flashlight," "The Monarch and the Milkweed," "Arbiters of Evolution," "The Thompson Fields," "Home," "Nimbus," "A Potter's Song," "Lembranca," "A World Lost," "Don't Be Evil," "CQ, Is Anybody There?," "Sputnik," "Data Lords," "Sanzenin," "Stone Song," "Look Up," "Braided Together," "Bluebird," "The Sun Waited for Me," "String Quartet No. 1," and "Willow Lake." Each of these works was registered with the United States Copyright Office prior to the assertion of any copyright claims against YouTube. Schneider has personal knowledge that a number of these works have been uploaded without her permission and were publicly viewable on YouTube within the statute of limitations. For those works for which Schneider does not have personal knowledge of infringement within the statute of limitations, Schneider alleges such infringement on information and belief, as facts that would establish such infringements are exclusively within the possession and control of Defendants.

of cumulative plays, and none of which are uploads authorized by Plaintiff Schneider. By being forced to continuously self-police uploads across YouTube's billions of uploads, as opposed to automatic and preemptive blocking, Plaintiff Schneider is forced to weigh the further financial damage caused to her by alienating performance groups who upload the videos, including those who purchased her music scores.

65.    Both before and after Schneider completed her Content ID application forms, users uploaded and viewed Schneider's works in full and without Plaintiffs' authorization. In all instances, Schneider's takedown notices were deemed sufficiently valid by Defendants for the video to be removed, but each time the video remained available online for an additional 4-6 days before removal.

66.    Uniglobe is the legal or beneficial owner of exclusive rights held under copyrights for the feature films *5 Weddings*, *Americanizing Shelley*, and *1 a Minute*.

67.    The English language version of *5 Weddings* was registered with the U.S. Copyright Office for its dramatic work and music or choreography on May 5, 2016, with a 2016 date of creation, and as a motion picture in October 2016.

68.    *Americanizing Shelley* was registered with the U.S. Copyright Office for its dramatic work and music or choreography on November 18, 2003, with a 2003 date of creation and publication, and as a motion picture in March 2006.

69.    *1 a Minute* was registered with the U.S. Copyright Office as a motion picture on September 3, 2010, with a 2008 date of creation and publication.

70.    Uniglobe also commissioned a Hindi-language translation of *5 Weddings* through a work-for-hire agreement. The Hindi-language version of *5 Weddings* was first published in India and neighboring countries without simultaneous publication in the United States. Therefore, the Hindi-language version of *5 Weddings* is a non-U.S. work exempt from the registration requirements of the Copyright Act with respect to its derivative components.

71.     The aforementioned works, including both the English- and Hindi-language versions of *5 Weddings*¸ have at various times been posted in full or in part on YouTube and have been viewed by YouTube users.

72.     For each of these works, full videos of these feature length films have been uploaded to YouTube without authorization from Uniglobe.

73.     For each of these aforementioned works, Uniglobe sent copyright takedown notices to YouTube.

74.     Some of the aforementioned Uniglobe works were uploaded onto YouTube multiple times after Uniglobe first sent takedown notices concerning those works.

75.     AST is one of the largest publishing houses in Russia. AST is the legal and/or beneficial owner of exclusive rights held under copyrights to numerous print and audio books, including *Selfmama: Life Hacks for a Working Mother*, *Nutty Buddha*, *My Children*, *Children's Book*, *The Life of Wonderful People and Animals: Short Stories About All Sorts of Different Things*, *Pelagia and the Red Rooster*, *Zuleikha Opens Her Eyes*, *History of the Russian State*, and *Spy Novel*.

76.     The above-referenced works subject to AST's exclusive rights have either never been published in the United States or were first published in Russia and/or other foreign countries that are parties to the Berne Convention before the works were published in the United States.

77.     AST has sent successful copyright takedown notices to YouTube for videos that infringed the copyrights of AST's works, and YouTube subsequently removed the infringing videos.

78.     After AST sent successful takedown notices for these works, videos were subsequently uploaded to YouTube that infringed the copyrights in the works that were the subjects of AST's previous successful takedown notices.

79.     Each time Defendants removed the infringing videos, the same person or another person has subsequently re-uploaded Plaintiffs' copyrighted feature-length films, music

recordings, or books. Despite Defendants being aware of prior infringement concerning these very same works, and despite Defendants having the software available to filter subsequent uploads of works that were subject to prior successful takedown notices, they repeatedly allowed further infringing videos (often the exact same videos) to be publicly performed, displayed, reproduced, or distributed until Plaintiffs were able to search and locate the new infringing content, send another takedown notice, and await YouTube's response—a further delay allowing for still more copycat infringing works to be posted which would then have to be found and met with new takedown notices.

80.     Put simply, copyright holders should not be forced to *repeatedly* demand that the *same* platform take down infringing uses of the *same* copyrighted work, while other rights holders are provided access to standard digital fingerprinting and blocking tools. By not allowing Plaintiffs to block the upload of infringing materials at the time of upload, Defendants force Plaintiffs and the Class into a time-consuming, cumbersome, inaccurate, and flawed "manual" process to enforce their copyrights, all to the benefit of Defendants' money-making machine. The inequities of this two-tiered system ensure that, at best, unauthorized YouTube uploads will always outpace the ability of Plaintiffs and the Class to take those videos down.

81.     Indeed, Plaintiffs' repeated, oftentimes successful takedown notices ensure that Defendants have actual or constructive knowledge that uploaded videos infringing Plaintiffs' copyrights are routinely publicly performed, publicly displayed, distributed, and/or reproduced on YouTube. Despite this knowledge, Defendants a) prevent Plaintiffs and those similarly situated from joining Content ID; b) do not create a digital fingerprint of materials that have triggered successful takedown notices to prevent additional infringement or allow Takedown Notice submitters to provide works to create digital fingerprints to be added to the Content ID database; c) prevent Plaintiffs and the Class from sending more than a limited number of takedown notices; and d) prevent Plaintiffs and the Class from using automated tools to help identify infringing works that have been uploaded to Defendants' platform. Again, Defendants

thereby intend and ensure that copyright infringement will outpace the ability to police such infringement, all to the benefit of their bottom line.

**V.    Defendants' Mistreatment of Copyright Management Information Has Enabled, Induced, Concealed, and Contributed to Infringement of Plaintiffs' Works.**

82.    Section 1202 of the DMCA defines "copyright management information" ("CMI") to include information conveyed in connection with digital copies of a work, including the title, author, copyright owner of the work, performers on the work, lyricist, producer, and other similar information providing attribution for, and reflecting the moral rights of, creators.

83.    The recognition and preservation of CMI is vital to the lawful distribution of digital works. The digital versions of files containing musical, audio, and/or video works that are lawfully sold and distributed in the United States routinely contain associated metadata that includes CMI. For example, International Standard Musical Word Codes ("ISWC"), which are a globally recognized standard for the recognition of musical works, can provide the basis for royalty payments to the copyright owners when those works are distributed by streaming platforms, such as Spotify. MP3 files, a common format for the digital distribution of audio works, routinely include a metadata container, namely an ID3 file, which ordinarily holds CMI. So too, the MP4 file format, which is commonly used for some digital videos, includes copyright information as a standard metadata field. However, despite the prevalence of CMI metadata associated with the original protected audio and video works, Defendants and their business model and systems routinely ignore that CMI. When Plaintiffs have found infringing copies of their works on YouTube, the original CMI associated with the digital file is missing, having been removed by either uploading user or by YouTube during the transcoding and publication process.

84.    YouTube neither protects nor encourages the protection of the original CMI metadata during the upload process, even though YouTube knows it exists and its value for protecting the rights of creators. As just one example, where an MP3 may include the internationally recognized International Standard Recording Code ("ISRC") for that recording in its ID3 file, YouTube does not require that its users who are uploading content to transfer the ISRC in the original file to the unauthorized converted video file. Moreover, Google declines to

provide users with audio file conversion software that would automatically retain and encode the CMI associated with protected works. Instead, YouTube simply directs users to a general Wikipedia page listing video editing software. Indeed, a search for the phrase "copyright management information" on the YouTube Help page returns precisely zero results.

85.     Thus, despite having clear knowledge of the pervasive presence of CMI associated with protected works, and the vital role played by CMI in the lawful distribution and economic protection of copyrighted audio and video works, Defendants have created a system that fails to screen for CMI, and removes CMI during the transcoding and publication process. Of course, if YouTube required its users to preserve valuable metadata (like the ISRC) with an upload, it would add considerable "friction," and might also deter a user from uploading if the user were to realize the importance of this statutorily protected metadata.

86.     As a result of the removal and/or alteration of CMI, the purposes of section 1202 have been frustrated. YouTube viewers cannot determine key attribution for many infringing works and cannot determine that Plaintiffs are the copyright owners of their works. The absence of CMI leads YouTube viewers to believe that Plaintiffs' works can be copied, displayed, "shared," embedded, and distributed at will. Defendants are aware that their display and distribution of Plaintiffs' works with missing, incomplete, and/or inaccurate CMI, have induced, enabled, facilitated, and concealed the ongoing and additional infringement of Plaintiffs' rights under the Copyright Act. Defendants have built an entire commercial publication business based on the value of their own metadata and algorithms but have denied Plaintiffs and the Class the value of the original metadata included in the copyrighted works, even though much of that original metadata is protected under § 1202.

**VI.     Defendants Are Not Entitled to the Safe Harbor Protections of the Digital Millennium Copyright Act, 17 U.S.C. § 512.**

87.     The DMCA shields online platform service providers from damages and certain injunctive relief for copyright infringement arising from the storage, at the direction of a user, of infringing material on the service provider's platform provided that the service provider

complies with certain threshold requirements. Because YouTube fails to comply with these requirements, it is not entitled to protections of the DMCA safe harbor.

88.     As a condition of qualification for the DMCA safe harbor, YouTube must designate an agent to receive takedown notifications in a form prescribed by § 512. Pursuant to this section, the takedown notice must identify the copyrighted work claimed to have been infringed, identify the infringing material, and provide "information sufficient to permit the service provider to locate the material." 17 U.S.C. § 512(c)(3)(iii).

89.     YouTube imposes arbitrary limitations on the number and frequency of takedown notifications it will process from rights holders. This limits the ability of Plaintiffs and the Class to enforce their copyrights and imposes additional burdens and delay on them. Where these limits are exceeded, rights holders risk losing access to YouTube's copyright protection tools or having their Content Management System Account terminated, both of which assist the protection of copyrights. By imposing these arbitrary limitations on its notification and takedown procedures, YouTube has violated the requirements of the DMCA and forfeited its safe harbor protections.

90.     YouTube has also recently begun requiring some rights holders to identify the specific start and stop moments within the infringing work where the protected material is embedded. These new requirements also add considerable "friction" on the takedown process, thereby increasing Defendants' profits. For example, while this is an automated process within Content ID, this new requirement places an additional burden on Plaintiffs and the Class. By conditioning these notification and takedown procedures on the provision of additional information—information not required under the DMCA—YouTube has violated the requirements of the DMCA and forfeited its safe harbor protections.

91.     In order to qualify for the DMCA safe harbor, YouTube must further establish that it has adopted and reasonably implemented a policy providing for the termination, in appropriate circumstances, of the accounts of repeat infringers. YouTube has implemented a repeat-infringer policy that provides for the termination of users who receive three copyright

strikes. A copyright strike is assessed when YouTube receives a complete and valid takedown notice issued against the user's channel. Copyright strikes expire after 90 days. Thus, any user can safely upload eight copyright infringing works annually, so long as they are appropriately timed, without any risk of termination. This three-strike policy, as applied, allows for repeat infringement. YouTube has effectively abrogated its repeat-infringer policy and has failed to reasonably implement a policy providing for the termination, in appropriate circumstances, of the accounts of repeat infringers. By erasing copyright strikes after 90 days, YouTube has not satisfied the safe harbor requirements of the DMCA and forfeited its safe harbor protections. Further, even where YouTube has deleted a user's account because of its three-strike policy, nothing prevents that user from creating a new account and YouTube takes no steps to check whether newly created accounts are on behalf of previously terminated users.

92.     Moreover, Defendants have completely divorced their Content ID system from their legally mandated repeat-infringer policy. When infringing content is uploaded and identified by the Content ID system, no copyright strikes are issued—the infringing content is either published and monetized by the rights holder, or blocked. Because the Content ID system is entirely separate from the copyright strike system, YouTube has effectively insulated the vast majority of all copyright infringements from consideration under its repeat-infringer policy. It also creates a general sense of animosity within its ecosystem against those who are forced to serve "take down" notices and thereby generate "strikes" against its users, which intimidates Plaintiff Schneider and similar artists from attempting to enforce their constitutionally protected rights.  Even though those permitted to use Content ID block billions of uploads, they "get to play the good guy," as blocking is done behind the scenes; but because Plaintiffs and the Class need to manually block in a very visible and punitive way, they are forced to "play the bad guy."

93.     The only repercussions a repeat infringer faces when he uploads Content ID-protected materials are the blocking of his upload, or the rights holder's diversion and retention of the advertising revenues associated with the work. Moreover, while YouTube's Content ID partners are protected from these repeat infringers because their uploads will always be screened

against the Content ID catalog before publication, Plaintiffs and the Class remain at risk of infringement by YouTube uploaders with numerous Content ID claims—the quintessential repeat infringers. By segregating nearly all copyright-infringing material from consideration under its repeat-infringer policy while leaving Plaintiffs and the Class subject to violations from those same repeat infringers, YouTube has failed to satisfy the safe harbor requirements of the DMCA and forfeited its safe harbor protections.

94.     As an additional requirement of the DMCA safe harbor protection, YouTube must establish that it has neither actual nor constructive knowledge of the infringements. Constructive knowledge turns on whether a reasonable person would objectively know of the infringements. The protected works of Plaintiffs and the Class have been infringed by repeat infringers who are sheltered by the Content ID system. YouTube has actual knowledge of these repeat infringers but fails to administer copyright strikes to them and fails to keep track of their activities under its repeat-infringer policy; YouTube therefore should objectively know of these infringements. Because YouTube has at least constructive knowledge of infringing material on its site, YouTube has failed to satisfy the safe harbor requirements of the DMCA and thus forfeited its safe harbor protections.

95.     YouTube must also, in order to qualify for DMCA safe harbor protection, establish that it does not financially benefit from infringements that it has the right and ability to control. YouTube financially benefits by receiving 45% of all advertising "net income" generated by infringing works (and 100% of advertising revenue on its home and search pages when users are drawn to those pages in part because of the ready availability of copyright-infringing material), whether that advertising is placed by the uploader or the rights holder through the Content ID program. In addition, Defendants derive significant value from the data acquired from YouTube users, including those users who post and view copyright infringement and those users drawn to the site by the ready availability of pirated material. Further, even where YouTube has profited from unauthorized uploads until a rights holder discovers it and completes

the cumbersome takedown process, YouTube keeps all of the revenue it generated during that period of infringement, and does not share any portion with the rights holder.

96.     Moreover, YouTube has the ability to control this content, and has in fact exerted such control, by screening every single video uploaded to its site for Content ID-protected material prior to publication but not doing so for others even when it has previously received a valid takedown notice. YouTube undertakes to control user behavior when such users are directed to copyright videos through its suggested video algorithms, search algorithms, and Google's search page, which now influence more than 70% of the content viewed by users.

97.     YouTube must also, in order to qualify for continuing DMCA safe harbor protection, establish that it is a passive internet platform, and that it does not undertake to substantially influence user behavior. YouTube's Content ID program, and its partner programs, are indeed specifically designed, however, in myriad ways to substantially influence user behavior. As an example, YouTube imposes upon its viewing community personalized viewing curation, Autoplay, and suggested and recommended videos, all of which are calculated to influence what its users view, and to increase both the viewing community's use of the YouTube platform, and the resulting advertising revenue. Finally, the data Defendants harvest from its users is exploited in manifold ways to influence the behaviors and actions of those users through marketing and advertising. All of these programs and functions directly and substantially influence its users. Thus, YouTube has violated judicially established standards regarding the safe harbor, and as a result, it has forfeited its safe harbor protections.

98.     Because Plaintiffs and the Class have filed takedown notices with YouTube regarding their protected works, YouTube is on notice of these infringements and has access to copies of the protected works for scanning purposes. Further, because YouTube currently scans every uploaded video prior to publication as part of the Content ID program, it has the capacity to screen for the protected works of Plaintiff and the Class as well. By refusing to provide pre-publication screening of previously infringed works belonging to Plaintiff and the Class, YouTube has financially benefitted from infringements that it has the right and ability to control,

1  has violated the requirements of the DMCA, and has therefore forfeited its safe harbor

2  protections.

3    99.    As a further condition of qualification for the DMCA safe harbor, YouTube must

4  establish that it accommodates, and does not interfere with, standard technical measures used to

5  protect copyrighted works. The DMCA defines "standard technical measures," as "technical

6  measures that are used by copyright owners to identify or protect copyrighted works," that "have

7  been developed pursuant to a broad consensus of copyright owners and service providers in an

8  open, fair, voluntary, multi-industry standard process," and that "are available to any person on

9  reasonable and nondiscriminatory terms." 17 U.S.C. § 512(i)(2). Pex and similar companies offer

10 services to copyright holders that enable them to find infringing works on YouTube and other

11 platforms. Similar to Content ID, these companies' services utilize digital fingerprinting

12 technology combined with access to the online platform's content via either an API or data

13 scraping techniques. Given the long-standing and widespread use of digital fingerprinting

14 technology for the identification of infringing material online, such technologies constitute

15 standard technical measures. YouTube fails to accommodate and interferes with third-party

16 digital fingerprinting technology by refusing to allow it to be used on the platform under its

17 Terms of Service.

18    100.    Content ID is YouTube's digital fingerprinting technology. Google itself

19 describes Content ID as an "example of collaboration between [online service providers] and

20 rights-holders facilitated by the DMCA."[8] YouTube also fails to adequately accommodate and

21 interferes with digital fingerprinting technology by intentionally providing its digital

22 fingerprinting technology, Content ID, on a discriminatory basis only to large rights holders,

23 interfering with the technology by preventing the vast majority of copyright holders, including

24 the class, from using it on its platform.

25

26
_____

27 [8] Google Inc.'s Comments in Connection with U.S. Copyright Office Request for Public Comment re:
28 Section 512 Study (April 1, 2016).

30

101.    Defendants also interfere with standard technical measures designed to protect § 1202 CMI. For instance, Defendants know that the ID3 metadata container is an ISO-approved technical measure used primarily to protect copyrighted works and inform listeners of the rights associated with the works. However, rather than build a system that ensures this information stays with any file that is uploaded by a YouTube user, Defendants have developed systems and processes that automatically strip, conceal, and/or alter the information contained in the ID3 or other similar metadata containers.

102.    YouTube has failed to accommodate, and has affirmatively interfered with, Pex and other companies offering standard technical measures to protect copyrighted works. YouTube has denied Pex and other such companies access to its API and has actively interfered with their data-scraping of the YouTube platform by blocking or otherwise impeding their access through a variety of measures. YouTube further prohibits the use of automated tools to access its platform. By interfering with and refusing to accommodate these standard technical measures, YouTube has failed to satisfy the safe harbor requirements of the DMCA and forfeited its safe harbor protections.

## CLASS ACTION ALLEGATIONS

103.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), and 23(b)(1), 23(b)(2), 23(b)(3), and/or 23(c)(4) on behalf of the following proposed classes:

A.  All persons that are legal or beneficial owners of an exclusive right under a copyright to publicly perform, reproduce, publicly display, or distribute film, motion picture, literary, dramatic, or musical works over the internet for works first going into the public domain after December 31, 1977 whose copyrighted works have been uploaded to YouTube within the relevant statute of limitations, whether in their entirety as part of one single upload or where a portion of the copyrighted work has been uploaded to YouTube, where such person has had to submit a successful takedown notice with respect to such work, and where such person's

work has subsequently been infringed or uploaded without permission and where such person has not benefited from the YouTube Content ID program with respect to the infringed work which would have allowed such person to monetize or prohibit that upload from being displayed, copied, distributed and performed on the YouTube site; and

B. All persons that are the legal or beneficial owners of an exclusive right under a copyright to publicly perform, reproduce, publicly display, or distribute film, motion picture, literary, dramatic, or musical works over the internet for works and whose works have been displayed on YouTube without the associated copyright management information within the relevant statute of limitations.

104.    Excluded from the first class, but not the second class, are United States works not registered with the United States Copyright Office and any person who has authorized the Defendants and the uploader to exploit their works;

105.    Excluded from both classes are: (a) Defendants; (b) the subsidiaries and affiliates of Defendants; (c) any person or entity who is a partner, officer, director, employee, or controlling person of any Defendant; (d) any entity in which Defendant has a controlling interest; (e) any rights holder to whom Defendants have directly granted  access to YouTube's Content ID program for acts of infringement occurring after such access began; and (f) the legal representatives, heirs, successors, and assigns of any excluded party.

106.    Numerosity. The members of the Class are so numerous that joinder of all members is impracticable. YouTube has more than 2 billion users every month, which according to Defendants is "almost one-third of the internet." Defendants have launched local versions of YouTube in more than 100 countries, and users can navigate YouTube in more than 80 languages. Users watch more than one billion hours of videos every single day, equating to approximately 5 billion videos viewed each day. YouTube estimates that more than 720,000 hours of content are uploaded every day. In 2007, the New York Times, Credit Suisse, and YouTube employees estimated that 60-70% of content uploaded on YouTube was copyrighted material uploaded without

the owners' consent. Notwithstanding whether that percentage has dropped significantly in the ensuing timeframe, even a 5% infringement rate on 5 billion videos a day would result in more than 250 million individual claims every day.

107.    Typicality. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs hold exclusive rights to copyrighted works that have been posted on YouTube without Plaintiffs' consent and have been publicly performed, displayed, reproduced, or distributed in violation of Plaintiffs' rights. Plaintiffs' claims are also typical in that Plaintiffs have issued takedown notices, have had their works subsequently uploaded to YouTube, and have not been provided access to Content ID. Plaintiffs' claims are also typical of other Class members in that they require injunctive relief to prevent Defendants from continuing to infringe their exclusive rights and in that they reflect that Plaintiffs, like Class members, have sustained damages as a result of Defendants' conduct, including, at their election, statutory damages.

108.    Adequacy. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action litigation and copyright litigation. Plaintiffs are committed to the vigorous prosecution of this action and have no interests that are adverse or antagonistic to the Class.

109.    Superiority. A class action is superior to all other available means for the fair and efficient adjudication of the claims of the members of the Class. The damages suffered by some individual members of the Class may be relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation required to recover from Defendants. It would be virtually impossible or impractical for most, if not all, Class members to redress the wrongs done to them on an individual basis. Furthermore, individual litigation would be unmanageable for the Court system as it would result in hundreds of millions, if not billions, of individual lawsuits creating the risk of inconsistent or contradictory judgments and increasing the delay and expense to all parties and the court system. In contrast, a class action would present far fewer management difficulties. Class action treatment provides the benefits of a single adjudication, economies of scale, and supervision by a single court. The members of the Class are reasonably

ascertainable through methods typical of class action practice and procedure, including through Defendants' own records.

110.    Existence and Predominance of Common Questions of Law and Fact. Numerous questions of law and/or fact are common to Plaintiffs and all members of the Class. These common questions derive common answers for all Class members that impact the resolution of the claims on grounds equally applicable to all Class members. The common questions of law and fact for the Class include, but are not limited to:

A.    Whether Defendants' conduct as alleged constitutes direct infringement of the copyrights held by Plaintiffs and the Class.

B.    Whether Defendants' conduct as alleged constitutes contributory copyright infringement of the copyrights held by Plaintiffs and the Class.

C.    Whether Defendants' conduct as alleged constitutes inducement of copyright infringement of the copyrights held by Plaintiffs and the Class.

D.    Whether Defendants' conduct as alleged constitutes vicarious infringement of the copyrights held by Plaintiffs and the Class.

E.    Whether Defendants acted willfully with respect to the copyright infringements alleged.

F.    Whether Defendants have deliberately avoided taking reasonable precautions to deter copyright infringement on YouTube.

G.    Whether Defendants have reasonably implemented a policy and procedure to prevent repeat infringement of the copyrights held by Plaintiffs and the Class on YouTube.

H.    Whether YouTube was originally designed and/or continues to be maintained for the purpose of facilitating the infringement of copyrights held by Plaintiffs and the Class.

I.    Whether YouTube has actual or constructive knowledge of the infringements of copyrights held by Plaintiffs and the Class.

J.     Whether Defendants have the right and ability to control the infringing activities taking place on YouTube.

K.     Whether Defendants derive financial benefits from the infringement of the copyrights held by Plaintiffs and the Class on YouTube.

L.     Whether technology exists to identify and remove copyrighted material.

M.     If technology exists to identify and remove infringing materials, whether Defendants provide selective access to that technology to increase revenues rather than to prevent acts of infringement.

N.     Whether digital fingerprinting technology, including Content ID, is a "standard technical measure[]" under the DMCA.

O.     Whether Defendants accommodate and do not interfere with "standard technical measures."

P.     Whether Defendants refuse to make their copyright-monitoring tools available to all copyright holders.

Q.     Whether Defendants' refusal to extend the use of Content ID to all copyright holders permits Defendants to earn more revenue from infringing material than they would have earned had those videos not been uploaded at all or had YouTube immediately removed those uploads that would have triggered Content ID.

R.     Whether Defendants' copyright tools, including Content ID, Content Verification Program, and Copyright Match Tool, scan materials before they are uploaded and not after, and, if after, whether Defendants are capable of screening the material before being uploaded.

S.     Whether, upon notification of infringement as set forth in 17 U.S.C. § 512(c)(3), Defendants acted expeditiously to remove or disable access to the material that is claimed to be infringing.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

T.    Whether Defendants restrict the number of takedown notifications that Plaintiffs and the Class can submit on a daily basis regardless of how many acts of infringement occur.

U.    Whether Defendants restrict the number of takedown notifications that Defendants will process from Plaintiffs and the Class on a daily basis regardless of how many acts of infringement occur.

V.    Whether the defenses set forth in 17 U.S.C. § 512 or elsewhere in the Copyright Act are available to Defendants.

W.    Whether YouTube maintains an archive of uploads from within the last three years that have been removed by either Defendants or the uploader.

X.    Whether injunctive relief is appropriate.

Y.    The amount of statutory damages available for each act of infringement based on YouTube's common practices, procedures, intent, and/or willfulness.

Z.    The percentage of revenue earned by YouTube and the infringer for each act of infringement to which the copyright holder is entitled.

AA.  Whether Defendants have knowledge of and/or contribute to the removal or alteration of copyright management information covered by § 1202.

BB.  Whether Defendants distributed or publicly performed works knowing that copyright management information has been removed or altered without the authority of the copyright owner.

CC.  Whether Defendants engage in actions and implement policies that substantially influence the behavior of YouTube users.

111.  Certification is also appropriate under Fed. R. Civ. P. 23(b)(1) and/or (b)(2) because:

A.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

B.     The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

C.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the entire Class.

## CAUSE OF ACTION I

### (Direct Copyright Infringement)

112.    Plaintiffs reincorporate by reference paragraphs 1-111 as if set forth herein.

113.    Plaintiffs are the exclusive copyright owners of the works identified in paragraphs 16-17. These works as well as millions of other works by Plaintiffs and the Class have been reproduced, distributed, displayed, and publicly performed on YouTube without Plaintiffs' and the Class's authorization.

114.    By engaging in acts causing these infringing works to be reproduced, distributed, displayed, and publicly performed on the internet, Defendants are violating Plaintiffs' and the Class's exclusive rights in violation of 17 U.S.C. § 106, including sections 106(1), 106(3), 106(5), 106(6), and 17 U.S.C. § 501.

115.    Defendants' infringements have been willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs and the Class.

116.    As a direct and proximate result of Defendants' infringement of Plaintiffs' and the Class's exclusive copyrights, Plaintiffs and the Class are entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at the election of Plaintiffs and the Class and pursuant to 17 U.S.C. § 504(b), Plaintiffs and the Class shall be entitled to Defendants' profits from the acts of infringement, to be proven at trial.

117.    Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

118.    Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs and the Class great and irreparable injury that cannot fully be compensated. Pursuant to 17 U.S.C. § 502, Plaintiffs and the Class are entitled to a permanent injunction requiring Defendants to employ reasonable methodologies to prevent or limit infringement of Plaintiffs' and the Class's copyrights.

## CAUSE OF ACTION II

### (Inducement of Copyright Infringement)

119.    Plaintiffs reincorporate by reference paragraphs 1-111 as if set forth herein.

120.    YouTube users have infringed and are infringing Plaintiffs' and the Class's rights in their registered copyrighted works by, *inter alia*, uploading and downloading infringing copies of Plaintiffs' and the Class's copyrighted works onto and from YouTube's website and publicly performing, displaying, distributing, and reproducing, or purporting to authorize the public performance, display, distribution, or reproduction of such copyrighted works or infringing videos, all without authorization. YouTube users are therefore directly infringing Plaintiffs' and the Class's exclusive rights of reproduction, distribution, public performance, and public display under U.S.C. §§ 106(1), (3), (4), and (5).

121.    Defendants are liable under the Copyright Act for inducing the infringing acts of YouTube users. Defendants exercise control of and/or influence which videos their users view and which infringing material gets removed or does not get removed. Defendants operate YouTube with the objective of promoting its use to infringe Plaintiffs' and the Class's copyrights and are unlawfully fostering copyright infringement by YouTube users.

122.    Defendants are fully aware, or at least should be aware, that Plaintiffs' and the Class's works are copyrighted and authorized for purchase through various outlets, including numerous lawfully authorized online digital download services. Defendants are equally aware, or at least should be aware, that YouTube users are employing YouTube to unlawfully reproduce, distribute, publicly perform, and publicly display Plaintiffs' and the Class's copyrighted works. Defendants intend for, encourage, and induce YouTube users to employ YouTube in this regard.

123.    Defendants' infringements have been willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs and the Class.

124.    As a direct and proximate result of Defendants' infringement of Plaintiffs' and the Class's exclusive copyrights, Plaintiffs and the Class are entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at the election of Plaintiffs and the Class and pursuant to 17 U.S.C. § 504(b), Plaintiffs and the Class shall be entitled to Defendants' profits from the acts of infringement, to be proven at trial.

125.    Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

126.    Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs and the Class great and irreparable injury that cannot fully be compensated. Pursuant to 17 U.S.C. § 502, Plaintiffs and the Class are entitled to a permanent injunction requiring Defendants to employ reasonable methodologies to prevent or limit infringement of Plaintiffs' and the Class's copyrights.

## **CAUSE OF ACTION III**

### **(Contributory Copyright Infringement)**

127.    Plaintiffs reincorporate by reference paragraphs 1-111 as if set forth herein.

128.    YouTube users have infringed and are infringing Plaintiffs' and the Class's rights in their registered copyrighted works by, *inter alia*, uploading and downloading infringing copies of Plaintiffs' and the Class's copyrighted works onto and from YouTube's website and publicly performing, displaying, distributing, and reproducing, or purporting to authorize the public performance, display, distribution, or reproduction of such copyrighted works or infringing videos, all without authorization. YouTube users are therefore directly infringing Plaintiffs' and the Class's exclusive rights of reproduction, distribution, public performance, and public display under U.S.C. §§ 106(1), (3), (4), and (5).

129.   Defendants are liable as contributory copyright infringers for the infringing acts of YouTube users. Defendants enable, induce, facilitate, and materially contribute to each act of infringement by YouTube users.

130.   Defendants have actual and constructive knowledge that YouTube users are employing YouTube to copy, distribute, publicly perform, and publicly display Plaintiffs' and the Class's copyrighted works. Acting with actual and constructive knowledge, Defendants enable, facilitate, and materially contribute to YouTube users' copyright infringement, which could not occur without Defendants' enablement.

131.   Defendants' infringements have been willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs and the Class.

132.   As a direct and proximate result of Defendants' infringement of Plaintiffs' and the Class's exclusive copyrights, Plaintiffs and the Class are entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at the election of Plaintiffs and the Class and pursuant to 17 U.S.C. § 504(b), Plaintiffs and the Class shall be entitled to Defendants' profits from the acts of infringement, to be proven at trial.

133.   Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

134.   Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs and the Class great and irreparable injury that cannot fully be compensated. Pursuant to 17 U.S.C. § 502, Plaintiffs and the Class are entitled to a permanent injunction requiring Defendants to employ reasonable methodologies to prevent or limit infringement of Plaintiffs' and the Class's copyrights.

## CAUSE OF ACTION IV

### (Vicarious Copyright Infringement)

135.   Plaintiffs reincorporate by reference paragraphs 1-111 as if set forth herein.

136.   YouTube users have infringed and are infringing Plaintiffs' and the Class's rights in their registered copyrighted works by, *inter alia*, uploading and downloading infringing copies

40

of Plaintiffs' and the Class's copyrighted works onto and from YouTube's website and publicly performing, displaying, distributing, and reproducing, or purporting to authorize the public performance, display, distribution, or reproduction of such copyrighted works or infringing videos, all without authorization. YouTube users are therefore directly infringing Plaintiffs' and the Class's exclusive rights of reproduction, distribution, public performance, and public display under U.S.C. §§ 106(1), (3), (4), and (5).

137.    Defendants are vicariously liable for the infringing acts of YouTube users. Defendants have both the right and the ability to supervise YouTube users' infringing conduct and to prevent YouTube users from infringing Plaintiffs' and the Class's copyrighted works.

138.    YouTube significantly and directly benefits from widespread infringement by its users. The availability of a vast collection of infringing copyrighted works on YouTube acts as a substantial draw, attracting users to the website and increasing the amount of time they spend there when they visit. Defendants derive substantial advertising revenue tied directly to the volume of traffic they are able to attract to YouTube.

139.    Defendants' infringements have been willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs and the Class.

140.    As a direct and proximate result of Defendants' infringement of Plaintiffs' and the Class's exclusive copyrights, Plaintiffs and the Class are entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c). Alternatively, at the election of Plaintiffs and the Class and pursuant to 17 U.S.C. § 504(b), Plaintiffs and the Class shall be entitled to Defendants' profits from the acts of infringement, to be proven at trial.

141.    Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

142.    Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs and the Class great and irreparable injury that cannot fully be compensated. Pursuant to 17 U.S.C. § 502, Plaintiffs and the Class are entitled to a permanent injunction

requiring Defendants to employ reasonable methodologies to prevent or limit infringement of Plaintiffs' and the Class's copyrights.

### CAUSE OF ACTION V

**(Removal of Copyright Management Information and Distribution of Altered or Missing Copyright Management Information)**

143.    Plaintiffs reincorporate by reference paragraphs 1-111 as if set forth herein.

144.    Each copy of Plaintiffs' and the Class's works that has been lawfully distributed contains copyright management information on the work, included in the metadata of the digital file of the work, and/or on the packaging of the work. This copyright management information includes, inter alia, the identification of Plaintiffs and the Class as the creators of the works and/or as the copyright owners of the works, the producer, performers on the album, engineers, recording dates, and more. This copyright management information is conveyed in connection with each work and is protected under 17 U.S.C.A. § 1202(b).

145.    On information and belief, in the process of uploading the digital file of Plaintiffs' and the Class's work for unlawful and unauthorized copying, display, and distribution on YouTube, Defendants intentionally and knowingly removed, or caused to be removed, Plaintiffs' and the Class's copyright management information from the digital file of Plaintiffs' and the Class's works.

146.    Defendants thereafter displayed and distributed unauthorized and infringing copies of Plaintiffs' and the Class's works with the intent and knowledge that copyright management information had been intentionally removed therefrom.

147.    Defendants intentionally removed Plaintiffs' and the Class's copyright management information, added additional metadata to be exploited by their own systems, and displayed and distributed the infringing work in those systems knowing, or having reasonable grounds to know, that doing so would induce, enable, facilitate, or conceal the ongoing and additional infringement of Plaintiffs' and the Class's rights under the Copyright Act.

148.   Plaintiffs and the Class have previously filed takedown notices with YouTube, providing Defendants with knowledge that Plaintiffs' and the Class's works contain copyright management information identifying Plaintiffs and the Class as the creators of the works and/or as the copyright owners of the works.

149.   Defendants thereafter displayed and distributed unauthorized and infringing copies of Plaintiffs' and the Class's works with the intent and knowledge that copyright management information had been removed therefrom without the permission of Plaintiffs and the Class, the copyright owners.

150.   Defendants intentionally displayed and distributed the copies of Plaintiffs' and the Class's works that were missing copyright management information, to which they added additional metadata to be exploited by their own systems, knowing, or having reasonable grounds to know, that doing so would induce, enable, facilitate, or conceal the ongoing and additional infringement on its systems of Plaintiffs' and the Class's rights under the Copyright Act.

151.   Defendants engaged in these activities without the consent or authorization of Plaintiffs and the Class.

152.   Plaintiffs and the Class have been injured as a result of these violations of 17 U.S.C.A. § 1202(b) and are entitled to injunctive relief, removal and takedown of the infringing works, damages, costs, and attorneys' fees. Pursuant to 17 U.S.C.A. § 1203(c)(3), Plaintiffs and the Class are entitled to the maximum statutory damages for each violation of 17 U.S.C.A. § 1202(b).

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs, on behalf of themselves and the Class, pray for judgment against Defendants as follows:

153.   Determining that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23 and directing that reasonable notice of this action be provided to the Class pursuant to Rule 23(c)(2).

154.    Granting Plaintiffs and the Class injunctive and other equitable relief enjoining Defendants, their officers, agents, servants, and employees, and all those acting in concert with the aforementioned parties:

    A.    From directly or indirectly reproducing, publicly performing, publicly displaying, or distributing the copyrighted works to which Plaintiffs and the Class have exclusive rights.

    B.    From causing, contributing to, inducing, enabling, facilitating, or participating in the infringement of any of the works referred to in Paragraph A, above.

    C.    To affirmatively adopt, implement, and offer to all persons the technological measures available now, including Content ID, and those that shall become available in the future to identify and protect copyrighted content uploaded without consent and prevent it from being posted or otherwise made available through the facilities owned, operated, or controlled by Defendants.

155.    Awarding Plaintiffs' and the Class's damages and Defendants' profits derived from the infringing acts, and/or statutory damages, in the amount permitted by law with respect to each work infringed, including statutory damages for willful misconduct.

156.    Disgorging Defendants of all profits, direct or indirect, illegally obtained as a result of the conduct alleged herein.

157.    Finding Defendants jointly and severally liable for all monetary damages awarded.

158.    Awarding prejudgment interest to the maximum extent permitted by law.

159.    Awarding Plaintiffs' attorneys' fees, costs, and expenses in this action.

160.    Awarding such other and further relief as the Court may deem just and proper.

## **DEMAND FOR A JURY TRIAL**

161.    In accordance with Fed. R. Civ. P. 38, Plaintiffs hereby demand a trial by jury on all issues so triable.

1

2    Dated: July 2, 2021                          Respectfully submitted,

3

4                                                 By: /s/ Randall P. Ewing, Jr.

5                                                 George A. Zelcs (*pro hac vice*)
                                                  Randall P. Ewing, Jr. (*pro hac vice*)
6                                                 Ryan Z. Cortazar (*pro hac vice*)
                                                  KOREIN TILLERY, LLC
7                                                 205 North Michigan, Suite 1950
                                                  Chicago, IL 60601
8                                                 Telephone: (312) 641-9750
                                                  Facsimile: (312) 641-9751
9

10                                                Stephen M. Tillery (*pro hac vice*)
                                                  Steven M. Berezney, CA Bar #329923
11                                                Carol O'Keefe (*pro hac vice*)
                                                  KOREIN TILLERY, LLC
12                                                505 North 7th Street, Suite 3600
                                                  St. Louis, MO 63101
13                                                Telephone: (314) 241-4844
                                                  Facsimile: (314) 241-3525
14

15                                                Joshua Irwin Schiller, CA Bar #330653
                                                  BOIES SCHILLER FLEXNER LLP
16                                                44 Montgomery St., 41st Floor
                                                  San Francisco, CA 94104
17                                                Telephone: (415) 293-6800
                                                  Facsimile: (415) 293-6899
18

19                                                Philip C. Korologos (*pro hac vice*)
                                                  Joanna Wright (*pro hac vice*)
20                                                Demetri Blaisdell *(pro hac vice forthcoming)*
                                                  BOIES SCHILLER FLEXNER LLP
21                                                55 Hudson Yards, 20th Floor
                                                  New York, NY 10001
22                                                Telephone: (212) 446-2300
                                                  Facsimile: (212) 446-2350
23

24
                                                  *Attorneys   for   Maria   Schneider,   Uniglobe*
25
                                                  *Entertainment, LLC, and AST Publishing Ltd.*
26

27

28
                                                  45
                                    FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED