# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated;

Plaintiffs,

vs. Case No. 3:20-cv-04423-JD

YOUTUBE, LLC; and GOOGLE LLC;

Defendants.
____________________________/

CONFIDENTIAL

30(b)(6) REMOTE VIDEOTAPED DEPOSITION OF KEVIN ZHU

PALO ALTO, CALIFORNIA

TUESDAY, JUNE 21, 2022

STENOGRAPHICALLY REPORTED BY:

ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR

CSR LICENSE NO. 9830

JOB NO. 842689



Page 10

copyright infringement. 09:09
MR. KOROLOGOS: Well, I understand there's no 09:09 removal. 09:10
Q But is there any determination as to whether 09:10 there is infringement other than if a DMCA notice is 09:10 submitted? 09:10
A I -- from my understanding, we are not in a 09:10 position to determine infringement unless a -- a DMCA 09:10 notice is submitted. 09:10
I guess I would say I don't know -- sorry. 09:10 Just to add to that, I'm not sure we're in a position 09:10 to determine infringement, I guess even in the case of 09:10 a DMCA notice. We -- we are -- we -- we -- we comply 09:10 with the requirements of DMCA for assessing notices of 09:10 alleged infringement. 09:11
So I would -- I would say we -- we are -- we 09:11 are in a position to assess whether a notice is 09:11 compliant with those requirements and remove it, yes, 09:11 when -- when that is the case. 09:11
But I don't know if that -- I mean, this -- this 09:11 seems -- sounds like -- I'm not a lawyer, so I 09:11 don't -- I don't know if I am in a position to 09:11 determine what is infringing, what is not. 09:11
I don't really have knowledge -- if I'm 09:11 looking at a particular DMCA notice, I don't 09:11

Page 11

necessarily have all the knowledge of the facts and 09:11 circumstances of the copyright holder's rights or the 09:11 uploader. I only know what the -- you know, what -- 09:11 what the notice says. 09:11
And in my -- in my previous role as manager 09:11 of the copyright operations team, the team's 09:11 responsibility was to compare -- is to compare the -- 09:11 you know, the -- the takedown notices that we receive 09:11 with -- with the requirements of the law. 09:11
Q Okay. Let me -- let me change the word 09:11 "determine" to "count." 09:11
Does -- does YouTube count as infringement 09:12 any conduct by its uploaders other than if it receives 09:12 a DMCA takedown notice? 09:12
MR. WILLEN: Objection to the form. 09:12
THE WITNESS: Sorry. Could you -- can you 09:12 repeat that question again. 09:12
MR. KOROLOGOS: Sure. 09:12
Q Does YouTube count as infringement, for 09:12 purposes of its repeat infringement policy, any 09:12 conduct by YouTube upload- -- uploaders other than if 09:12 YouTube receives a DMCA takedown notice? 09:12
A To the best of my knowledge, no. 09:12
Q So if a video is blocked as a result of 09:12 content ID, that is not counted as infringement? 09:13

Page 12

A To the best of my knowledge, no. 09:13
Q Well, when you say to the best of your 09:13 knowledge, you understand that you are speaking on 09:13 behalf of YouTube; right? 09:13
A Sure, yeah. 09:13
Q And -- and have you undertaken an effort, at 09:13 least within the scope of the topics as identified by 09:13 your counsel, to obtain knowledge about the topics 09:13 we're talking about today on the 30(b)(6)? 09:13
A I have. 09:13
Q Okay. And so when you say to the best of 09:13 your knowledge, that's after you've done some homework 09:13 to try to find out; is that right? 09:13
A Yes, yeah. 09:13
Q Okay. And am I correct that YouTube also 09:13 does not count as infringement a video that is 09:13 monetized as a result of a content ID match? Is that 09:14 right? 09:14
A That's right. 09:14
Q What about if there is a copyright management 09:14 tool match? Does that result in a infringement for 09:14 purposes of YouTube's copyright infringement policy? 09:14
A It does not unless the match is used by the 09:14 owner -- the channel owner who has access to copyright 09:14 initially to send a takedown notice to YouTube. And 09:14

Page 13

if the takedown notice is valid, then the video is 09:14 removed. And -- and then that -- that is counted 09:14 toward the -- the count of copyright strikes toward 09:14 repeat infringement. 09:14
Q When you say unless the match is used by the 09:15 channel owner who has access to the copyright 09:15 management tool, what do you mean? 09:15
A Well, what I mean is, copyright management 09:15 tool is a feature that is available to channels in 09:15 their YouTube studio interface. 09:15
[redacted]
And then that's -- that's -- that's -- 09:16 through that interface, the channel owner can elect to 09:16 a user match and -- and -- and sort of prefill some 09:16 elements of the DMCA takedown notice. 09:16
So they don't necessarily need to provide the 09:16 URL of the video or the timestamps, for example, to -- 09:16

MAGNA LEGAL SERVICES



```
                                              Page 14
 1    to -- it's a way to facilitate an easier way to        09:16
 2    provide a DMCA notice.                                 09:16
 3           And -- and then they can fill out the rest of   09:16
 4    the form, of course, to, you know, send us a notice    09:16
 5    that, you know, then we assess whether it meets the    09:16
 6    DMCA requirements.                                     09:17
 7           The channel owner can also choose to contact    09:17
 8    the uploader or archive the match and just kind of     09:17
 9    make it go away, you know, if they don't want to do    09:17
10    anything, for whatever reason.                         09:17
11    Q    Okay.  Other than channel owners, does            09:17
12    anybody else have access to the copyright management   09:17
13    tool?                                                  09:17
14    A    Other than channel owners, no.  So -- so          09:17
15    having a channel is necessary to be able to operate    09:17
16    the tool, because there is a -- like, these features   09:17
17    that I'm speaking of, such as, you know, showing --    09:17
18    showing matches not just of videos that you've         09:17
19    uploaded, but also videos that you have successfully   09:17
20    taken down through a web form takedown notice          09:17
21    submission.  These are -- it's necessary to have some, 09:17
22    you know, account, just for a technical reason, to tie 09:17
23    these matches to.  So -- so we -- so we do need        09:18
24    someone to have a YouTube channel in order to be able  09:18
25    to do that.                                            09:18
```

```
                                              Page 15
 1           Of course, if you want access to copyright      09:18
 2    management tools, you could have a forwarding channel. 09:18
 3    You don't necessarily have to operate the channel in a 09:18
 4    normal way that the YouTube creator would tend to      09:18
 5    operate the copyright match tool, you -- you know, you 09:18
 6    can take down videos through the web form.  And        09:18
 7    copyright match tool will -- you know, will -- will    09:18
 8    show you potential copies of -- of those videos, as    09:18
 9    well as, you know, for -- you can also upload videos.  09:18
10           Copyright match can also detect potential       09:18
11    copies of videos that are uploaded as private.  So the 09:18
12    original owner doesn't necessarily need to, like,      09:18
13    distribute or show their video on YouTube.             09:18
14    Q    And copyright manage -- match tool is used to     09:19
15    identify re-uploads of videos that either have been    09:19
16    uploaded by some first channel to upload it or that    09:19
17    have been taken down; is that right?                   09:19
18           MR. WILLEN:  Objection to the form.             09:19
19           MR. KOROLOGOS:  Q.  You can answer.             09:19
20    A    Sorry.  I just want to make sure I understand     09:19
21    the question.  Can you -- can you repeat that.         09:19
22    Q    Sure.  The copyright management tool focuses      09:19
23    on re-uploads of videos; is that right?                09:19
24    A    That's right.                                     09:19
25    Q    Okay.  What is YouTube's current repeat           09:19
```

```
                                              Page 16
 1    infringer policy?                                      09:19
 2    A    YouTube's current repeat -- repeat infringer      09:19
 3    policy.                                                09:20
 4           So when YouTube receives takedown notices       09:20
 5    through, you know, a variety of means that are         09:20
 6    available to copyright owners to submit such notices,  09:20
 7    such as the web form or copyright management tool or   09:20
 8    e-mail, fax, you know, a variety of ways, we assess    09:20
 9    the takedown notice against the requirements of the    09:20
10    DMCA.  And if the notice meets those requirements, we  09:20
11    remove the video, and copyright strikes are assessed.  09:20
12    ███████████████████████████████████████                09:20
13    ███████████████████████████████████████                09:20
14    ███████████████████████████████████████                09:20
15    ███████████████████████████████████████                09:20
16    ███████████████████████████████████████                09:20
17           You know, just to provide a -- this is --       09:20
18    this is one of the ways we balance the copyright       09:21
19    strike system so that it's -- it can serve an          09:21
20    educational purpose and not necessarily -- not         09:21
21    necessarily result in consequences for -- for --       09:21
22    potentially disproportionate to the conduct.           09:21
23           Then channel -- then strikes can -- once a      09:21
24    video is taken down and copyright strikes are          09:21
25    assessed, then -- one or more copyright strikes are    09:21
```

```
                                              Page 17
 1    assessed by -- by the notice, then the uploader can -- 09:21
 2    can seek to resolve the strike and get the video       09:21
 3    reinstated either by obtaining a retraction of the     09:21
 4    claim of copyright infringement from the claimant, or  09:21
 5    by filing a counter-notification.                      09:21
 6           And, you know, if they do so, then we assess    09:21
 7    whether the counter-notification is valid.  If it --   09:22
 8    if it's valid, we, you know, follow the process        09:22
 9    described in the DMCA and forward it to the copyright  09:22
10    holder.  And, you know, that, I'm sure, sort of -- you 09:22
11    know, generally, what the -- what the DMCA prescribes  09:22
12    from there.                                            09:22
13           And so if strikes are not resolved through      09:22
14    those two processes, then they continue as active      09:22
15    unless -- until both 90 days have passed, as well as   09:22
16    the channel has completed copyright holds at some      09:22
17    point.  If both of those requirements are met, then    09:22
18    the strike can expire at the end of 90 days.  But if   09:22
19    three or more strikes are accrued, then the -- the     09:23
20    channel is subject to termination.                     09:23
21           There are circumstances in which, you know,     09:23
22    under -- under our repeat infringer policy, you know,  09:23
23    some channels get three -- if they get -- if they --   09:23
24    once they get their third active strike within         09:23
25    90 days, they have a courtesy period of seven days     09:23
```



Page 18

where the channel does not get terminated. And 09:23
then -- and they have that time to, you know, try to 09:23
resolve those strikes. 09:23
They get below the -- the count of -- of 09:23
three, and they can, you know, use the -- the -- that 09:23
would be through the retraction or account 09:23
notification processes. And if they are able to -- 09:23
to -- to do that successfully, then -- then the 09:23
channel does not get terminated. 09:24
So these are channels -- for instance, 09:24
they're -- these are channels that are in the YouTube 09:24
partner program and -- and channels -- channels that 09:24
we have more knowledge of through business 09:24
relationships. 09:24

Page 19

Page 20

Page 21



[redacted]

[redacted]

Q Now, with respect to termination, I believe 09:33
you used the phrase, when I asked about the repeat 09:33
infringer policy, that a channel would be subject to 09:33
termination. 09:33
What's the difference between subject to 09:33
termination or termination? 09:33
A Yeah, so that means the channel is eligible 09:33

for termination. But the -- the reason I described it 09:33
as subject to is that in some cases, the channel is 09:33
immediately terminated due to three strikes. 09:33
Sometimes it is -- it has the seven-day courtesy 09:33
period. 09:33

[redacted]

Q Okay. Any other mechanisms for that? 09:34
A Any other mechanisms for what? 09:34
Q For -- for why it would be subject, as 09:34
opposed to just automatically terminated. 09:34
A That's it. 09:34
Q Okay. And when you mentioned the seven-day 09:34
courtesy period, did I understand you correctly to say 09:34
that is available only for YouTube -- for -- let me 09:34
withdraw that. 09:34
Did I understand you correctly to say that 09:34
the seven-day courtesy period is only available for 09:34
participants in the YouTube partner program? 09:35

A So it's available to -- yeah, it's -- it's 09:35
available to channels that YouTube has a exigent 09:35
degree of review performed, and that has a -- YouTube 09:35
has more information about from -- from being in the 09:35
business relationship. So that includes the YouTube 09:35
partner program. 09:35
Q When you say has a business relationship, 09:35
what kind of business relationship other than being in 09:35
the YouTube partner program? 09:35
That's one business relationship; right? 09:35
A Sorry. What was the -- what was the last 09:35
sentence? 09:36
Q Well, you -- you -- you used the phrase 09:36
"being in the business relationship." And then you 09:36
said "that includes the YouTube partner program." 09:36
What other business relationships other than 09:36
being in the YouTube partner program count for 09:36
purposes of the seven-day courtesy period? 09:36
A There are also channels that are -- have a -- 09:36
a contractual relationship with YouTube outside of the 09:36
business -- outside of the YouTube partner program. 09:36
So the -- the YouTube partner program is -- is -- is 09:36
the -- I believe the vast majority of the channels 09:36
that have access to the courtesy period. 09:36
[redacted] 09:36

MAGNA LEGAL SERVICES



Page 26

Page 27

MR. KOROLOGOS: Let me ask Jeffrey to pull up 09:40

Page 28

Tab 88, which we will mark as Plaintiff's Exhibit 106. 09:40
(Document remotely marked Exhibit 106 09:40
for identification.) 09:40
MR. KOROLOGOS: Jeffrey, are you able to 09:40
bring up 88? 09:40
MR. WALDRON: Yes. It should be visible. Do 09:40
you see it? 09:41
MR. KOROLOGOS: Q. Mr. Zhu, do you see a 09:41
document? 09:41
A One second. I'm looking at Agile Law. I 09:41
don't -- sorry. What is the title of the document? 09:41
Q It's a large document, so it may have taken a 09:41
moment. 09:41
A "How Google Fights Piracy"? 09:41
Or is it something else? 09:41
Q Pardon me? 09:41
A Is the document called how -- is the document 09:41
called: 09:41
"How Google Fights Piracy." 09:41
Q It is. 09:41
A Okay. 09:41
Q Are you familiar with this document? 09:41
A I'm -- I'm pretty familiar with it. 09:41
Q And if you look on the second page of 09:41
Exhibit 106, you see this is from November of 2018? 09:41

Page 29

A Sorry. Yeah, yeah, that's right. 09:42

MAGNA
LEGAL SERVICES

Q So in -- in my example, first, I had "Hang Gliding." That got taken down by Maria Schneider in my hypothetical. That was a copyright strike; right? 09:58
A Where -- where a DMCA takedown notice was sent, yes, uh-huh. 09:58
Q Okay. But where Bruce Springsteen's "Thunder Road" was used as the audio, and that was blocked by a content ID participant, that is not a copyright strike; correct? 09:58
A That's right. 09:58
Q And if I then take the same visual portion of the video and pull out Bruce Springsteen's "Thunder Road," and let's say I put in Queen's "Bohemian Rhapsody," and that goes up, and whoever is or is among the copyright owners for the reference file and content ID, if they choose to monetize, still no copyright strike. But this time, my video stays up on YouTube; is that right? 09:59
A So I just want to make sure. You're -- you're asking about the difference between a takedown notice, a claim that's blocking a video, and a claim that's monetizing a video, and what the resultant copyright strike situation is in which case? 09:59
Q Yes. 09:59
A The monetized claim does not result in the 09:59

copyright strike. 09:59
Q Okay. Now, earlier this morning, you mentioned that the uploader can seek to resolve a takedown notice. And one of the things I believe you referenced there, but correct me if I'm wrong, was that the uploader can submit a counter-notification pursuant to the DMCA; is that correct? 10:00
A Yes, uploader can re- -- can submit a counter-notification in -- in response to a video that's been removed by a DMCA notice. 10:00
Q Okay. When that happens, what does YouTube do to assess the completeness and validity of the counter-notification? 10:00
A So YouTube assesses it against the requirements of a counter-notification in the DMCA. So it has to contain contact information, a full legal name, an address, e-mail address, phone number, I believe. Sorry. I haven't looked at the requirements in a while, but, you know, some -- some -- some forms of contact information specified by the -- by the law and agreed to the -- the DMCA counter-notification legal statements, and specify -- specify a URL. 10:01
[redacted]

[redacted]
MR. KOROLOGOS: Q. Now, we -- we talked a little earlier this morning about termination versus subject to termination, and I want to follow that up a little bit. 10:03
Has YouTube's policy with respect to repeat infringers ever been to suspend a channel as opposed to terminate? 10:03
MR. WILLEN: Objection to form. 10:03

THE WITNESS: What do you mean by "suspend"? 10:03
MR. KOROLOGOS: Q. Well, my understanding of the word "suspend" is that it is temporary as opposed to permanent, and that termination would be permanent. And I -- that -- that's my understanding, and I mean the -- my question in that vein. 10:03
A Okay. Thanks. 10:03
So the question is, has it ever been YouTube's policy to temporarily suspend a channel as a result of three copyright strikes rather than terminating the channel? 10:04
The -- so since I've been at YouTube, which is since 2013, that's -- that's not been -- there has been no policy to temporarily suspend channels as a result of copyright strikes. 10:04
So I will say terminate -- termination is not necessarily permanent. It's permanent if the -- the -- the strikes that cause the termination are unresolved. Of course, it gets resolved through tracking the -- 10:04
THE REPORTER: Okay. I'm sorry. It's not coming in. "Of course, it gets resolved through tracking the" -- 10:04
THE WITNESS: Of course, if it gets resolved through a retraction or counter-notification after the 10:04

MAGNA LEGAL SERVICES



I -- I -- I -- I don't -- I can't really answer that with a simple yes or no, because I -- it's just not an area that I work on. 11:14

MR. KOROLOGOS: Q. Are you aware of any third-party digital fingerprint technology that people are allowed to use on the content that's on YouTube's platform? 11:14

MR. WILLEN: So objection to form, and same objection with respect to scope of the noticed topic. 11:14

MR. KOROLOGOS: And same response to your objection. 11:14

THE WITNESS: I think your question is, what other technologies are people allowed to use or, you know, what is our policy around that? 11:14

I -- I don't know the answer. 11:14

MR. KOROLOGOS: Q. Well, to be clear, my question was, are you aware of any third-party digital fingerprint technology that people are allowed to use to review the content that's on YouTube's platform? 11:15

MR. WILLEN: So same objections. 11:15

MR. KOROLOGOS: Same response. 11:15

THE WITNESS: Yeah, I just want to make -- I just -- I want to make sure I'm answering the right question in that question. 11:15

I -- I think that the -- the -- the part that I don't have, I think, sufficient knowledge of to answer is -- is what -- what other technologies are allowed to be used. So I can't really answer the question due to that part of the question. 11:15

MR. KOROLOGOS: Okay. 11:15

Q But to be clear, I -- I have tried to deal with your concerns about the sufficiency of your knowledge on what other technologies are allowed to simply ask, are you aware of any? 11:16

Whether it's allowed or not, are you aware of any digital fingerprint technology that is not YouTube's digital fingerprint technology that people use on YouTube's content on its platform? 11:16

MR. WILLEN: Same objections. That is a different question than what you asked before. I don't know if that was intended. But same objections. 11:16

MR. KOROLOGOS: Well, it's a question that I'd like an answer to. 11:16

MR. WILLEN: Sure. 11:16

THE WITNESS: So your -- the question you would like me to answer is, am I aware of other -- of non-YouTube third-party fingerprinting technology that people use on YouTube? 11:16

MR. KOROLOGOS: Yes. 11:16

THE WITNESS: I'm aware of the existence of such technologies. I don't know -- I don't have much working knowledge of the specific technologies or, like, their names, what they're capable of. I -- I -- I know generally that they exist. 11:17

MR. KOROLOGOS: Q. And do you know if anybody uses them on content that's on YouTube? 11:17

MR. WILLEN: Same objection. 11:17

THE WITNESS: I don't know if -- I don't know who or if, you know, particular technologies are currently being used on YouTube. 11:17

MR. KOROLOGOS: Okay. 11:17

THE WITNESS: I know they have -- 11:17

MR. KOROLOGOS: Okay. 11:17

Q Now, in what -- let me withdraw that. 11:17

How long has YouTube had a web form that people could submit for takedown notices? 11:17

A How long have people -- has there been a web form for takedown notices? 11:17

Q How long, yeah. 11:18

A At least as long as I've been at YouTube, since 2013. 11:18

Q Okay. 11:18

A Definitely before then. I don't know exactly how long. 11:18

[redacted] 11:18

[redacted]



Page 78

[redacted]

Page 79

[redacted]. 11:21

Q Does YouTube sometimes ask rights holders 11:22
that submit a takedown notice to confirm that they 11:22
have completed a fair use analysis? 11:22

A Some -- sometimes YouTube, in response to a 11:22
takedown request, asks claimants to -- to -- to 11:22
provide an explanation for how they have -- how -- how 11:22
they have assessed that the video doesn't meet 11:22
copyright exception -- potential copyright exceptions, 11:22
[redacted]

Page 80

[redacted]

MR. WILLEN: So it -- it may be that there is 11:24
no way to answer that question without revealing the 11:24
substance of communications. I don't -- I don't know. 11:24
But I -- I certainly would want the witness 11:24
to be cognizant of the -- of the privilege. And if -- 11:24
if there is a way to answer that question without 11:24
revealing the substance of advice that's been given, 11:25
it's okay to answer. 11:25
But if -- if there isn't, then I would 11:25
instruct the witness not to answer the question. 11:25

MR. KOROLOGOS: Well, let me ask you a 11:25
question, Brian: Is it your position that a policy 11:25
that's been adopted by YouTube, even if legal advice 11:25
went into that policy, is privileged? 11:25

MR. WILLEN: Not necessarily. But -- but 11:25
I -- there -- it hasn't been established that there -- 11:25
that there is a policy. So that's assuming something 11:25

Page 81

that may or may not be true. 11:25

MR. KOROLOGOS: Well, your documents show 11:25
that there is. 11:25

MR. WILLEN: Well, you can show him a 11:25
document and ask him a question about it. 11:25

MR. KOROLOGOS: Well, I -- I am asking a 11:25
question about it. I don't need to show the document 11:25
to the witness while I'm asking the question. But I 11:25
press my question. 11:26

MR. WILLEN: Well, can you -- can -- can we 11:26
repeat the question just so we know -- 11:26

MR. KOROLOGOS: Sure. 11:26

MR. WILLEN: -- what we're... 11:26

[redacted]

MAGNA LEGAL SERVICES

[redacted]

[redacted]

MR. KOROLOGOS: Q. Has YouTube looked into 11:29
creating any kind of automated process to flag matches 11:29
that might warrant further consideration in manual 11:29
review by content ID partners for fair use issues? 11:29

MR. WILLEN: So objection to the form. 11:29

And I think that's a yes-or-no question. So 11:29
you can answer yes or no, if you understand the 11:29
question. 11:29

THE WITNESS: Yes, You- -- YouTube has 11:29
attempted to do that. 11:30

MR. KOROLOGOS: Q. When did it attempt to do 11:30
that? 11:30

A At -- the efforts were initially in 2016, I 11:30
believe. 11:30

Q And how long did those efforts last? 11:30

A So there -- there was a -- there was a 11:30
research effort in 2016 which led to a -- which, you 11:30
know, did not really bear very many promising results. 11:30

And then as a result of that research effort, 11:30
a very limited pilot mechanism was established to 11:30
potentially -- to send -- to send us some potential 11:30

content ID claims for manual review before the claims 11:31
are activated in circum- -- in certain circumstances 11:31
for a very limited set of channels. And that -- that 11:31
was established sometime in 2016 or 2017. 11:31

And then since then, there have been no 11:31
concerted efforts in that space. 11:31

Q What was the limited pilot mechanism called? 11:31

A The limited pilot mechanism, we -- we 11:31
referred to it as LFU channels or -- or -- yeah, 11:31
the -- the -- the LFU channel list. 11:31

Q What does "LFU" stand for? 11:32

A LFU stands for likely fair use. 11:32

Q And -- 11:32

A It's based on -- 11:32

Q -- who was involved -- 11:32

A I was going to say it's -- it's just kind of 11:32
an internal code word that's -- that's based on the -- 11:32
it's based on the -- how we call up the -- the e-mail 11:32
template that we send for the -- for the DMCA notices 11:32
where we're asking -- asking claimants to explain to 11:32
us how they've consider fair use. 11:32

Q Who was involved in the research effort in 11:32
2016? 11:32

A So I was one of those people; our -- our 11:32
product counsel at the time, Brian Carver; my -- my 11:32

teammate at the time, Alexandra Muhler; and also a 11:33
content ID operations specialist, Santiago Ripley, who 11:33
is no longer working at Google. 11:33

Q Anybody else? 11:33

A The -- sorry. Any -- anyone else, like, who 11:33
was -- who saw the project or was involved in the 11:33
execution or -- 11:33

Q Well, anybody else involved in the research 11:33
effort that you described started in 2016? 11:33

A That -- that was it, as far -- as far as I -- 11:33
as best -- best I can remember, yeah, according -- 11:33
according to the documents I've seen also, because it 11:33
was a long time ago. Before I was asked for this 11:33
deposition, you know, I -- my memories of this work 11:34
were very hazy, so -- but that's what I saw in the 11:34
document. 11:34

Q What document? 11:34

A There was a -- there's -- there's a -- 11:34
there's a document -- there's a document describing 11:34
the -- the -- the -- the steps or the parameters of 11:34
the research effort, and -- and then the conclusion 11:34
and -- and the recommendations after, you know, the -- 11:34
the recommendations that were provided by legal after 11:34
we presented the findings of -- of the research 11:34
effort. 11:34

MAGNA LEGAL SERVICES



MR. KOROLOGOS: Brian, has that document been produced to us? 11:35

MR. WILLEN: I think he's referring to a document that's almost certainly privileged, but -- so I don't think it's been produced. 11:35

MR. KOROLOGOS: Well, even if it ever was privileged, he just testified that he used it to refresh his recollection. And so we're entitled to that document. 11:35

MR. WILLEN: I don't think that's right. I think he testified that he looked at it, but that doesn't make it not privileged. And if you're going to ask him about the substance of privileged communications, he certainly didn't testify to that, so... 11:35

MR. KOROLOGOS: Well, I ask that the document be produced. 11:35

MR. WILLEN: Okay. Well, we're going to preserve our objections. 11:35

MR. KOROLOGOS: Q. Has YouTube considered expanding or otherwise changing its web form takedown process in, say, the past six years? 11:35

A Can you re- -- sorry. Can you repeat the question. I'm not sure I understood. 11:36

Q Sure. One of the topics that we asked about 11:36

and that you've been presented on is the analysis and the costs and resources of operating and expanding access to the web form takedown. And we asked it about content ID and copyright match, but you were produced only for web form. 11:36

And so I want to know whether there has been any consideration of expanding access. And if so, I'm going to follow up and ask about whether there was any determination of cost of resources for such an expansion. 11:36

A The web form -- 11:36

Q Is that -- do you understand the question? 11:36

A Yeah, I -- 11:36

MR. WILLEN: Objection. 11:36

THE WITNESS: -- think I understand. 11:36

MR. WILLEN: Go ahead. 11:36

Yeah, I -- I'm not sure I understand, so I'm objecting to form. 11:37

But go ahead. 11:37

THE WITNESS: So -- so the -- the web form has been available to anyone with a YouTube channel during the time -- time span you're asking about and -- sorry. Say again. 11:37

MR. KOROLOGOS: I'm sorry. I don't want to interrupt. I was going to finish your sentence, but 11:37

I'll let you finish it. 11:37

THE WITNESS: Yeah. 11:37

So the web form has been available to anyone with a You- -- to -- to anyone with a YouTube channel during that time span. 11:37

That's -- I think you're asking, have we -- have we attempted to -- or have we -- have there been efforts to expand beyond that? 11:37

It's -- it's -- it's a bit -- I think that's as far as we -- it's -- it's feasible to expand it since if that's the base unit of a -- of a -- of a -- you know, as I explained previously, that the channel is the basic unit. 11:38

And we -- we need the channel in order to provide some of the benefits of the web form post-takedown to facilitate easy -- to facilitate, you know, easier submission of -- of -- of DMCA notices for -- for potentially the same content. 11:38

So as I understand the question, I -- the answer is no. 11:38

MR. KOROLOGOS: Okay. Why don't we take another, say, ten-minute break. And then I'll organize my notes, and hopefully, we can finish up the 30(b)(6) portion pretty quickly. 11:38

MR. WILLEN: That sound goods. Thanks, Phil. 11:38

THE VIDEOGRAPHER: Okay. Off the record at 11 -- off the record at 11:38 a.m. 11:38

(Recess taken.) 11:38

THE VIDEOGRAPHER: On the record at 11:59 a.m. 11:59

MR. KOROLOGOS: Q. Well, I can wait one more minute and then say good afternoon, Mr. Zhu, as opposed to good morning. 11:59

Just a -- a -- a few additional questions. 11:59

We talked about the copyright match tool. And if I understand correctly, that is something for which you need to be a YouTube partner participant; is that right? 11:59

A So YouTube partner program channels get access to one feature within copyright match tool, which is showing matches of videos that they have uploaded. 12:00

But anyone who has made a successful takedown through the web form also gets access to the copyright match tool for -- which shows them matches of videos they've taken down. 12:00

The -- the first feature that I talked about which shows you matches of videos that you've uploaded, channels that are not in the YouTube partner program can also apply for access through the 12:00

