DAVID H. KRAMER, SBN 168452
MAURA L. REES, SBN 191698
LAUREN GALLO WHITE, SBN 309075
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email:  dkramer@wsgr.com
        mrees@wsgr.com
        lwhite@wsgr.com

BRIAN M. WILLEN (admitted *Pro Hac Vice*)
CATHERINE R. HARTMAN (admitted *Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
Email:  bwillen@wsgr.com
Email:  chartman@wsgr.com

Attorneys for Defendants and Counterclaimants
YOUTUBE, LLC and GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>YOUTUBE, LLC and GOOGLE LLC,<br><br>    Defendants<br><br>_____<br><br>YOUTUBE, LLC and GOOGLE LLC,<br><br>    Counterclaimants,<br><br>    v.<br><br>PIRATE MONITOR LTD, PIRATE MONITOR LLC, and GÁBOR CSUPÓ,<br><br>    Counterclaim Defendants. | CASE NO.:  3:20-cv-04423-JD<br><br>**[REDACTED VERSION] DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:    December 15, 2022<br>Time:   10:00 a.m.<br>Dept.:   11<br>Judge:  Honorable Judge James Donato |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

ARGUMENT .................................................................................................................... 6

I.     Plaintiffs Have Failed To Carry Their Burden of Showing That Common Questions Predominate For Their Proposed Copyright Infringement Classes. ................................................................................................................ 6

     A.     Individualized questions over ownership and registration preclude certification. ................................................................................................. 7

     B.     Individualized questions over infringement preclude certification. ........... 10

     C.     Individualized questions around secondary liability preclude certification. ............................................................................................... 11

     D.     Takedown notices are no substitute for proof of infringement. ............... 12

     E.     YouTube's defenses also require individualized determinations. ............. 14

II.     Plaintiffs Have Failed to Show That Common Issues Predominate Over Individualized Issues For Their Proposed CMI Classes. ..................................... 18

     A.     Plaintiffs Have Failed to Show That Common Issues Predominate the Question of Liability For the Putative CLFN Class ............................ 19

     B.     Plaintiffs Have Failed to Show That Common Issues Predominate For the Putative ISRC Class. .................................................................... 21

III.    Plaintiffs' Proposed Remedies Cannot Be Established With Common Proof. ...... 23

IV.    Plaintiffs Have Failed To Prove Numerosity or Superiority. ............................... 24

CONCLUSION ............................................................................................................... 25

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**CASES**

4

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.,*
    944 F.2d 971 (2d Cir. 1991).) ........................................................................................................ 9

5

*Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.,*
    69 F.3d 381 (9th Cir. 1995) ........................................................................................................ 11

6

*Amchem Prods. v. Windsor,*
    521 U.S. 591 (1997) ................................................................................................................... 20

7

8

*Auscape Int'l v. Nat'l Geographic Soc'y,*
    2003 WL 23531750 (S.D.N.Y. July 25, 2003) ............................................................................ 7

9

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994) ................................................................................................................... 16

10

11

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013) ..................................................................................................................... 25

12

*CoStar Grp., Inc. v. LoopNet, Inc.,*
    373 F.3d 544 (4th Cir. 2004) ..................................................................................................... 13

13

14

*Cream Recs., Inc. v. Joseph Schlitz Brewing Co.,*
    864 F.2d 668 (9th Cir. 1989) ..................................................................................................... 24

15

*Derek Andrew, Inc. v. Poof Apparel Corp.,*
    528 F.3d 696 (9th Cir. 2008) ..................................................................................................... 23

16

17

*Ennio Morricone Music Inc. v. Bixio Music Grp. Ltd.,*
    936 F.3d 69 (2d Cir. 2019) ........................................................................................................... 8

18

*Estate of Berlin v. Stash Records, Inc.,*
    1996 WL 374176 (S.D.N.Y. July 2, 1996) ................................................................................. 7

19

20

*Fitzgerald Publ'g Co. v. Baylor Publ'g Co., Inc.,*
    807 F.2d 1110 (2d Cir. 1986) .................................................................................................... 23

21

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.,*
    2015 WL 4776932 (C.D. Cal. May 27, 2015), .......................................................................... 18

22

23

*Football Assoc. Premier League Ltd. v. YouTube. Inc.,*
    297 F.R.D. 64 (S.D.N.Y. 2013) ............................................ 2, 7, 8, 11, 13, 16, 17, 18, 25

24

*Fourth Estate Pub. Benefit Corp. v. Wall-Street.com,*
    139 S. Ct. 881 (2019) ................................................................................................................... 9

25

26

*Harrington v. Pinterest, Inc.,*
    2022 WL 4348460 (N.D. Cal. Sept. 19, 2022) ............................................................... 20, 21, 22

27

*In re Google Inc. Gmail Litig.,*
    2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ......................................................................... 14

28

*In re Napster, Inc. Copyright Litig.*,
　　2005 WL 1287611 (N.D. Cal. June 1, 2005) ........................................................ 18

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
　　153 F.3d 82 (2d Cir. 1998) ...................................................................................... 8

*Kihn v. Bill Graham Archives LLC*,
　　2022 WL 18935 (9th Cir. Jan. 3, 2022) ......................................................... 2, 14, 18

*Kipp Flores Architects, LLC v. Pradera SFR, LLC*,
　　2022 WL 1105751 (W.D. Tex. Apr. 13, 2022) ..................................................... 21

*Luvdarts, LLC v. AT&T Mobility, LLC*,
　　710 F.3d 1068 (9th Cir. 2013) ............................................................................... 11

*Mays v. Wal-Mart Stores, Inc.*,
　　804 F. App'x 641 (9th Cir. 2020) .......................................................................... 25

*McCarty v. SMG Holdings, I, LLC*,
　　2022 WL 913092 (N.D. Cal. Mar. 29, 2022) ................................................... 24, 25

*MRT Const. Inc. v. Hardrives, Inc.*,
　　158 F.3d 478 (9th Cir. 1998) ................................................................................. 13

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
　　971 F.3d 1042 (9th Cir. 2020) ............................................................................... 16

*Palmer Kane LLC v. Scholastic Corp.*,
　　2012 WL 2952898 (S.D.N.Y. July 16, 2012) ...................................................... 14

*Peer Int'l Corp. v. Pausa Records, Inc.*,
　　909 F.2d 1332 (9th Cir. 1990) ............................................................................... 23

*Perfect 10, Inc. v. Amazon.com, Inc.*,
　　508 F.3d 1146 (9th Cir. 2007) ......................................................................... 11, 12

*Perfect 10, Inc. v. CCBill LLC*,
　　488 F.3d 1102 (9th Cir. 2007) ......................................................................... 13, 18

*Perfect 10, Inc. v. Giganews, Inc.*,
　　847 F.3d 657 (9th Cir. 2017) .......................................................................... 11, 12

*Resnick v. Copyright Clearance Ctr., Inc.*,
　　2003 WL 22176619 (D. Mass. Sept. 22, 2003) ..................................................... 7

*Robert Stark Enters., Inc. v. Neptune Design Grp., LLC*,
　　2017 WL 1345195 (N.D. Ohio Apr. 12, 2017) ..................................................... 21

*SA Music LLC v. Apple, Inc.*,
　　2022 WL 836304 (N.D. Cal. Mar. 21, 2022) ......................................................... 7

*Sanford v. MemberWorks, Inc.*,
　　625 F.3d 550 (9th Cir. 2010) ................................................................................ 21

*Sell Pool Supplies Online, LLC v. Ugly Pools Ariz., Inc.*,
　　804 F. App'x 668 (9th Cir. 2020) .......................................................................... 19

*Skidmore v. Led Zeppelin,*
    952 F.3d 1051 (9th Cir. 2020) (en banc),.................................................................. 10

*Stevens v. CoreLogic, Inc.,*
    899 F.3d 666 (9th Cir. 2018).................................................................................21, 22

*Subafilms, Ltd. v. MGM–Pathe Commc'ns Co.,*
    24 F.3d 1088 (9th Cir. 1994) (en banc)......................................................................24

*TD Ameritrade, Inc. v. Matthews,*
    2022 WL 2128897 (9th Cir. June 14, 2022) ................................................................7

*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n,*
    953 F.3d 638 (9th Cir. 2020).......................................................................................16

*Tyson Foods, Inc. v. Bouaphakeo,*
    577 U.S. 442 (2016) ......................................................................................................6

*Utopia Entm't, Inc. v. Claiborne Par.,*
    2006 WL 8435006 (W.D. La. Jan. 10, 2006) ...............................................................7

*Ventura Content, Ltd. v. Motherless, Inc.,*
    885 F.3d 597 (9th Cir. 2018).................................................................................17, 18

*Viacom Int'l, Inc. v. YouTube, Inc.,*
    676 F.3d 19 (2d Cir. 2012)...........................................................................................18

*Viacom Int'l Inc. v. YouTube, Inc.,*
    940 F. Supp. 2d 110 (S.D.N.Y. 2013) .........................................................................17

*Vulcan Golf, LLC v. Google Inc.,*
    254 F.R.D. 521 (N.D. Ill. 2008) ...................................................................................9

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ...............................................................................................6, 14

*WB Music Corp. v. Rykodisc,*
    1995 WL 631690 (E.D. Pa. Oct. 26, 1995) .................................................................7

*Wu v. Pearson Educ. Inc.,*
    2012 WL 6681701 (S.D.N.Y. Dec. 21, 2012)........................................................7, 14

**STATUTES**

17 U.S.C. § 101 ....................................................................................................................10

17 U.S.C. § 201 ......................................................................................................................7

17 U.S.C. § 410 ....................................................................................................................10

17 U.S.C. § 411 .................................................................................................................9, 10

17 U.S.C. § 412 .................................................................................................................5, 10

17 U.S.C. § 501 ......................................................................................................................7

17 U.S.C. § 504 .........................................................................................................23, 24, 25

1    17 U.S.C. § 505 .................................................................................................... 25

2    17 U.S.C. § 507 .................................................................................................... 16

3    17 U.S.C. § 512 ................................................................................. 8, 13, 14, 18

4    17 U.S.C. § 1202 ............................................................................ 18, 19, 20, 21, 22

5    17 U.S.C. §§ 1501-11 .......................................................................................... 25

6                                            **RULES**

7    Fed. R. Civ. P. 23 ............................................................................................ 6, 24

8    Fed. R. Evid. 803.................................................................................................... 9

9                                    **OTHER AUTHORITIES**

10   4 Nimmer on Copyright § 12A.10 (2022) ............................................................ 22

11   H.R. Rep. 105-551(I), (1998) .............................................................................. 13

12   S. Rep. 105-190 (1998) ........................................................................................ 13

13   Standard Technical Measures and Section 512, 87 Fed. Reg. 25,050 (April 27,
        2022)................................................................................................................ 18

15   U.S. Copyright Office Circular 22, *How to Investigate the Copyright Status of a
        Work* ................................................................................................................. 8

16   U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 602.4(C)
        (3d ed. 2021) .................................................................................................... 8

18   U.S. Copyright Office, *Copyright and the Music Marketplace* (Feb. 2015).................. 8

**INTRODUCTION**

Plaintiffs ask this Court to certify a sprawling copyright class action against YouTube that would involve a virtually unascertainable collection of copyright owners from around the world and an endless "claims process" consisting of innumerable separate litigations. As revealed through the discovery process and confirmed by the recent summary judgment proceedings, Plaintiffs' claims are rife with individualized questions as to every putative class member, every copyrighted work, and every alleged infringement that might be put at issue.

Plaintiffs' hand waving motion does not even grapple with this fatal predominance problem, but every alleged copyright infringement claim would require individualized answers to at least the following questions: (i) Who owns the allegedly infringed work? (ii) Was the work registered with the U.S. Copyright Office? (iii) Is the accused video substantially similar to the copyrighted work? (iv) Did the copyright owner or its agents authorize the use of the work? (v) Is the alleged infringement a fair use? (vi) Was YouTube or the user licensed or authorized to use the work on the service? (vii) Did YouTube have knowledge of the alleged infringement? (viii) Did YouTube have the ability to control the alleged infringement and earn a direct financial benefit from it? (ix) Is the claim time barred because the copyright owner knew or should have known about the alleged infringement? and (x) Does the Digital Millennium Copyright Act ("DMCA") safe harbor (itself involving many individual questions) bar the claim?

Nor can Plaintiffs' claims alleging improper removal of copyright management information ("CMI") be addressed on a classwide basis. CMI claims involve a morass of individualized questions that defeat predominance, including: (i) What copyrighted work is implicated and who owns it? (ii) Does a particular YouTube video contain that work? (iii) Was CMI ever present in the metadata of that video? (iv) If present, was that CMI removed or instead preserved with the displayed video? (v) Did YouTube remove CMI with knowledge of its existence as required for it to be intentional? (vi) Was any removal of CMI authorized by, for example, one of thousands of blanket license agreements or the YouTube Terms of Service? and (vii) Did YouTube remove CMI knowing that its removal would foment infringement? None of these questions is susceptible to classwide proof. Further, even if some class member could

1   establish an infringement or CMI violation, they would still have to engage with myriad work-

2   specific and claim-specific questions to establish any entitlement to damages.

3       Plaintiffs' inability to establish predominance should end the certification inquiry. But

4   Plaintiffs have also failed to show the required numerosity or that a class action is superior to the

5   alternatives given the Copyright Act's numerous mechanisms for encouraging individual claims.

6       Plaintiffs' motion flies in the face of the great weight of authority. Earlier this year, the

7   Ninth Circuit reversed certification of a copyright infringement class, holding that "individual

8   issues of license and consent" were, by themselves, sufficient to preclude certification. *Kihn v.*

9   *Bill Graham Archives LLC*, 2022 WL 18935, at *2 (9th Cir. Jan. 3, 2022). The individualized

10  issues here are far more plentiful and complex than in *Kihn*. Other courts have resoundingly

11  rejected putative copyright class actions, including one in a virtually identical case against

12  YouTube, *Football Assoc. Premier League Ltd. v. YouTube. Inc.*, 297 F.R.D. 64, 65 (S.D.N.Y.

13  2013) ("*Premier League*"). That court properly (and colorfully) described a copyright class

14  action like this one as a "Frankenstein monster posing as a class action." *Id.*

### BACKGROUND

16      Discovery has shown that this case is exceptionally ill-suited for class treatment.

17      ***Maria Schneider.***   YouTube's summary judgment motion highlighted the numerous

18  dispositive—and individualized—flaws in Schneider's copyright claims. *See* Dkt. 164. Her

19  copyright infringement claims are barred because her publisher, Modern Works, licensed

20  Schneider's entire catalog of compositions to YouTube. *See* Dkt. 164 at 10-13. Schneider also

21  created a YouTube account to publicize her works, thereby licensing YouTube and its users to

22  make use of the content she, her agents, and her licensees uploaded. *See* Dkt. 164 at 14-16. These

23  issues alone present serious obstacles to class certification as their resolution just for Schneider

24  required "a mountain of work" that the Court recognized it could not undertake "for everybody."

25  Declaration of Paul N. Harold ("Harold") Ex. 15 (October 13, 2022 Hr'g Tr.) at 27:19-24.

26      But Schneider's licenses are just the beginning of the individualized issues in her claims.

27  Schneider admits she had actual knowledge of 73 alleged infringements long before she sued,

28  and she had constructive knowledge of hundreds more. Dkt. 164 at 22-23. Those claims are time

barred. Schneider has offered no evidence that she suffered actual harm from any supposed

infringement, and she is ineligible for statutory damages on many claimed infringements because

she did not first register the works at issue. Harold ¶¶ 6-7 & Exs. 2 (Rog. Resp. No. 12), 4-5. In

many cases, Schneider also failed to mitigate damages by sending DMCA takedown notices.

Schneider's CMI removal claim is also rife with individualized issues. YouTube's

summary judgment motion demonstrated that YouTube did not remove supposed CMI from an

obscure, embedded metadata field (the "CLFN" field) found in just nine of the videos Schneider

put at issue.[1] The same information (*i.e.*, the song name) is still publicly available in the video

titles on the service. Foucu ¶ 7. No better is Schneider's alternative claim based on International

Standard Recording Codes (ISRCs). Schneider could not identify a single YouTube video

containing a sound recording that once carried an ISRC, much less one where YouTube knew an

ISRC had been removed. *See* Harold Ex. 15 at 37:22-42:9. Worse, her own expert refuted her

central premise that those recordings necessarily carry ISRCs, admitting that he purchased and

downloaded official MP3 files for one of Schneider's albums that contained none of Schneider's

ISRCs. *See* Harold Ex. 37 (Jessop Dep. Tr.) at 116:5-118:2.

Schneider's CMI theories also fail on the element of authorization, as her agent, Modern

Works, authorized YouTube to reformat any videos containing Schneider's works. *See* Dkt. 164

at 21. And Schneider was unable to offer proof that Defendants knew that CMI was ever

embedded in a given video (assuming that it was), or that Defendants knew the absence of some

invisible CMI would foment infringement of Schneider's work. Finally, Schneider's individual

CMI claims are also time-barred because she had actual knowledge of YouTube's metadata

practices since at least March 2017. *See id.* at 24.

***Uniglobe Entertainment.***  Uniglobe's claims suffer from different, but equally serious,

problems. Just getting Uniglobe to identify the copyrighted works at issue in this case has been

arduous. It asserted motion pictures in the Amended Complaint, falsely claiming to hold

copyright registrations for them. Dkt. 99 ¶¶ 66-69; *see* Harold Ex. 18 (Uniglobe Dep. Tr.) at

---

[1] This CLFN field is not a standard metadata field. It is apparently unique to videos created using one specific editing program. Based on a sample, the field is populated with data in less than one tenth of one percent of videos on YouTube, and even then, the data is often meaningless. Declaration of Thierry Foucu ("Foucu") ¶¶ 4-6.

54:4-57:11; 66:5-20 (admitting registration allegations were "not entirely correct"). It has since tried to substitute claims based on screenplays that its pleading does not mention. Harold ¶ 23 & Ex. 17. Even as to the screenplays and the remaining motion pictures, Uniglobe's ownership is dubious at best. Discovery has revealed hundreds of work-made-for-hire agreements related to those works, various assignments between previous owners and Uniglobe, and conflicting evidence about whether the plaintiff entity, Uniglobe Entertainment (Delaware) (as opposed to a same-named entity in Wyoming), is party to these agreements. *See, e.g.*, Harold Ex. 18 (Uniglobe Dep. Tr.) at 69:4-13; 82:4-12; 93:6-94:16; 94:17-20; 101:17-23; 112:19-22; Ex. 16 (Rog. Resp. Nos. 1-2). Even now, its CEO could not say which entity owns the relevant works. Harold Ex. 18 (Uniglobe Dep. Tr.) at 77:6-10; 93:6-94:16.

Uniglobe's infringement allegations are equally dubious. It admitted it has hundreds of licensees and sublicensees worldwide, and testified it would have to "go back and review each individual contract" to determine what rights it granted, and consult with its licensees to determine whether they or someone they authorized uploaded a given YouTube video. Harold Ex. 16 (Rog. Resp. Nos 5-6 (referring Defendants to Uniglobe's Gross Contract Sales and Ex. A to Rog. Resp.)); Harold Ex. 18 (Uniglobe Dep. Tr.) at 141:2-6, 148:5-14; Ex. 19 at 300:9-23. In addition, Uniglobe itself created a YouTube channel for promotional purposes, uploaded movies in full along with dozens of clips, and permitted several others to do the same, thereby licensing YouTube to use any of that content under the Terms of Service. Harold Ex. 18 (Uniglobe Dep. Tr.) at 123:16-19; 125:8-18; 132:23-134:24; 139:11-15; Ex. 16 (Rog. Resp. No. 7). As for time bars, Uniglobe had actual knowledge of 191 alleged infringements at least one year before the filing of the complaint, and 83 at least three years before. Harold Ex. 16 (Rog. Resp. No. 12. Uniglobe chose not to pursue claims it knew or should have known about. Finally, Uniglobe has not identified any CMI claim at all. *Id.* (Rog. Resp. No. 9).

**AST Publishing.** AST's claims are similarly fraught with individualized defects. It originally alleged infringement of "print and audio books." (Dkt. 99 ¶ 75). When pressed, AST dropped all infringement claims relating to print books, and now asserts claims only on Russian-language audiobooks it supposedly owns. *See* Harold ¶ 30 & Ex. 17 at 1, 3-4. But AST did not

author the audiobooks either. Instead, AST claims to own the copyrights through a complex web of (1) agreements with the books' authors, assigns or licensees; and (2) questionable work-for-hire agreements with audio file creators. *See id.* Exs. 20 (Rog. Resp. No. 2); 23 (AST Dep. Tr.) at 95:11-14; 97:3-16; 112:23-113:6. Unpacking and refuting AST's claimed rights would be complicated if it were a domestic company, but it is far more challenging because most of the relevant agreements are written in Russian, and AST has redacted the names of all parties and signatories, supposedly to comply with Russian privacy law. *Id.* ¶ 30. Resolving just the question of AST's ownership will be laborious at best.

Beyond ownership, AST's claims present other unique issues. AST asserts that its audiobooks are all unregistered foreign works first published in Russia. *Id.* Ex. 23 (AST Dep. Tr.) at 113:10-16. AST is thus ineligible for statutory damages, as Plaintiffs concede. 17 U.S.C. § 412; Dkt. 110 at 12. Further, AST has offered no evidence that any allegedly infringing YouTube video was uploaded or viewed in the United States, and thus no evidence of actionable infringement at all. *Id.* Ex. 24 (AST Dep. Tr.) at 126:13-127:19: 129:20-25. And many of its accused videos do not implicate AST's audiobooks. For example, AST inexplicably claims infringement over videos of people reading print books aloud. *See id.* ¶ 32.

AST also faces serious licensing obstacles. AST created two YouTube channels to promote its audiobooks, thereby licensing YouTube to freely use any content that AST or its agents uploaded. *Id.* Ex. 23 (AST Dep. Tr.) at 177:1-179:11; 182:19-22; 185:19-186:1. Those licenses bar a host of its claims, as do AST's licenses to various third parties authorizing them or their sublicensees to upload AST's works to YouTube. *Id.* Ex. 20 (Rog. Resp. No. 7); Ex. 23 (AST Dep. Tr.) at 180:12-22, 198:20-199:4; Ex. 24 (AST Dep. Tr.) at 124:2-13.

AST faces time bars as well. It had actual and constructive knowledge of alleged infringements more than one year before the case was first filed, but chose not to pursue them. *Id.* Ex. 21 (Rog. Resp. No. 12). And like Uniglobe, AST has not even attempted to pursue a CMI claim. *Id.* Ex. 20 (Rog. Resp. No. 9).

***Pirate Monitor.***  Pirate Monitor, one of the two original plaintiffs and putative class representatives in this case, further illustrates that individualized issues are endemic to the

asserted claims. Pirate Monitor orchestrated a wide-ranging fraud against YouTube whereby it uploaded thousands of videos claiming the rights to do so, and shortly afterward sent YouTube DMCA takedown requests for the very same videos, representing that the videos infringed copyrights. *id.* Ex. 26 (Csupo 30(b)(6) Dep. Tr.) at 191:3-12; *id.* Ex. 25 (Rog. Resp. Nos. 2-3). Pirate Monitor later testified that the uploads were, in fact, authorized, meaning the takedown notices that resulted in the removal of thousands of videos were bogus. *See id.* Ex. 26 at 185:20-186:5. Pirate Monitor's machinations gave rise not only to YouTube's counterclaims (Dkt. 160), but also a host of defenses to Pirate Monitor's infringement charges such as unclean hands and estoppel. *See* Dkt. 34. Further, when pressed, Pirate Monitor admitted that it did not own at least one of the three copyrighted works that it had charged YouTube with infringing. Harold ¶ 39 & Ex. 27. Once all this was revealed through discovery, Pirate Monitor dismissed its claims against YouTube with prejudice. Dkt. 66.

**ARGUMENT**

A class cannot be certified where the party seeking certification cannot "affirmatively demonstrate his compliance with [Rule 23—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, [claims that are typical of the class, adequate representatives,] etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); Fed. R. Civ. P. 23(a). Where, as here, a plaintiff seeks to certify a damages class under Rule 23(b)(3) only (*see* Mot. 1), the burden is much greater. The plaintiff must establish that "questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy" in view of "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3) (emphasis added).

**I.      Plaintiffs Have Failed To Carry Their Burden Of Showing That Common Questions Predominate For Their Proposed Copyright Infringement Classes.**

In the predominance analysis, "[a]n individual question is one where 'members of a proposed class will need to present evidence that varies from member to member.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "[A] common question is one where 'the

same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Id.* Plaintiffs do not come close to proving predominance. The elements of a *prima facie* copyright infringement claim—ownership, registration, infringement, knowledge, right and ability to control, and direct financial benefit—all require consideration of "evidence that varies from member to member," work to work, and alleged infringement to alleged infringement. Any individual claims that establish those elements must then survive a gauntlet of claim-specific defenses, including license, statute of limitations and fair use, as well as application of the DMCA's safe harbor. After that, a complex, individualized damages analysis would be required. Unsurprisingly, courts routinely reject certification of copyright classes. *Premier League*, 297 F.R.D. at 65.[2] The number and complexity of individualized questions dwarf whatever common issues might exist.

### A. Individualized questions over ownership and registration preclude certification.

**Ownership.** Only "[t]he legal or beneficial owner of an exclusive right under a copyright" may sue for infringement. 17 U.S.C. § 501(b). Plaintiffs concede they must prove "ownership" on a work-by-work basis. Mot. 10. But their putative classes include untold putative copyright holders the world over, and Plaintiffs have put forth no means of avoiding the need for individualized proof from each one on even this first element of their copyright claim. Proving ownership will require individual mini-trials for each copyrighted work and a resolution of a host of individualized questions. *SA Music LLC v. Apple, Inc.*, 2022 WL 836304, at *6 (N.D. Cal. Mar. 21, 2022) ("the chains of title to any individual composition are often complicated and muddled"); *Premier League*, 297 F.R.D. at 66. In the United States, ownership "vests initially in the author or authors of the work," except in cases of works-for-hire. 17 U.S.C. § 201(a). Ownership may be transferred by assignment. 17 U.S.C. § 201(d). Identifying the authors of a work is necessarily work-specific, intensive, and is often disputed. *See, e.g., TD Ameritrade, Inc.*

---

[2] *See also Wu v. Pearson Educ. Inc.*, 2012 WL 6681701 (S.D.N.Y. Dec. 21, 2012); *Utopia Entm't, Inc. v. Claiborne Par.*, 2006 WL 8435006 (W.D. La. Jan. 10, 2006); *Resnick v. Copyright Clearance Ctr., Inc.*, 2003 WL 22176619 (D. Mass. Sept. 22, 2003); *Auscape Int'l v. Nat'l Geographic Soc'y*, 2003 WL 23531750 (S.D.N.Y. July 25, 2003), *aff'd*, 282 F. App'x 890 (2d Cir. 2008); *Estate of Berlin v. Stash Records, Inc.*, 1996 WL 374176 (S.D.N.Y. July 2, 1996); *WB Music Corp. v. Rykodisc*, 1995 WL 631690 (E.D. Pa. Oct. 26, 1995).

*v. Matthews*, 2022 WL 2128897, at *1 (9th Cir. June 14, 2022). There is no comprehensive database that reflects accurate and up-to-date ownership information, and in many instances, ownership information is completely lacking.[3]

Discovery from just the named plaintiffs in this case has highlighted difficult-to-resolve ownership issues on joint authorship, work-for-hire agreements, transfers and assignments, and territorial rights. Plaintiffs have struggled to prove their own ownership—Uniglobe still cannot. Harold Ex. 18 (Uniglobe Dep. Tr.) at 77:6-10; 93:6-94:16. AST abandoned claims over print books; and Pirate Monitor admitted to baselessly claiming ownership of one of just three works it sued on. Harold ¶¶ 30, 39 & Exs. 17, 27.

Complicating matters still further, every proposed class includes foreign works and ownership of foreign works-in-suit is determined by foreign law. *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 91 n.11 (2d Cir. 1998). The "meaningful differences" in such laws will necessitate significant fact-finding on ownership. *See Ennio Morricone Music Inc. v. Bixio Music Grp. Ltd.*, 936 F.3d 69, 72 (2d Cir. 2019) (distinguishing between U.S. work-for-hire doctrine and Italian counterpart). The questions are nearly impenetrable just as to AST and Uniglobe. *See supra* at 3-5. An entire class of foreign copyright owners would render them exponentially more difficult. *See Premier League*, 297 F.R.D. at 67.

Plaintiffs assert that ownership can be determined by cross-referencing the claimed owner of a work in a DMCA Takedown Notice against certain databases.[4] That is unworkable in the extreme. ***First***, a notice need not identify the work's owner; only an *agent* of that unidentified owner. 17 U.S.C. § 512(c)(3)(a). Scads of notices for works ostensibly owned by the named

---

[3] *See, e.g.*, U.S. Copyright Office Circular 22, *How to Investigate the Copyright Status of a Work*, at 3 (Copyright Office registration records "may be incomplete or lacking entirely"); U.S. Copyright Office, *Copyright and the Music Marketplace* (Feb. 2015), at 62-63 (Copyright Office's registration database "is not a comprehensive resource;" "registration records are far from complete," "will not reflect a change in ownership" and cannot be "reliably linked to registration records"); U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 602.4(C) (3d ed. 2021) ("Ordinarily, the Office does not conduct investigations or make findings of fact to confirm the truth of any statement made in an application").

[4] Plaintiffs rely here and elsewhere on inoperative reports from their "experts," Messrs. Cowan and Singer. Those reports were struck by the Court at the October 13, 2022 hearing and Plaintiffs were directed to "start over." Harold ¶ 49 & Ex. 15 at 46:15-17. Plaintiffs have not yet provided operative reports, and Defendants have not deposed the experts or rebutted them. *Id.*

1  plaintiffs do not identify an owner or mention the plaintiffs. Declaration of Chenyuan Zhu

2  ("Zhu") ¶ 5 & Exs. A-E; Harold ¶ 41 (more than 65 AST takedown notices do not mention

3  AST). *Second*, Plaintiffs admit that proof of ownership at the time of suit, rather than at the time

4  of some notice, is required for their claims and class membership. *See* Dkt. 110 at 7 ("present[]

5  ownership required); Mot. 3 (defining classes as "persons who own"). *Third*, the Copyright

6  Office's registration database at the foundation of Plaintiffs' theory is neither reliable nor

7  conclusive. *See supra*, n. 3. Even where a registration was accurate when filed, transfers,

8  reversions, and name changes would render much public information useless.[5] *Fourth*, even

9  present owners cannot necessarily sue—claims accrue to the owner at the time of infringement

10  and are not transferred unless "expressly included" in the transfer. *ABKCO Music, Inc. v.*

11  *Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991).

12      Finally, no matter what a takedown notice claims, or what information might appear in a

13  database, any ownership claim would be subject to refutation through discovery. Indeed, it is

14  through discovery that YouTube exposed the flaws in named plaintiffs' claims. Even if Plaintiffs

15  could somehow identify a putative class of parties *claiming* copyright ownership, that would not

16  obviate the need for individualized testimony, documents, and ultimately fact-finding regarding

17  those claims. *Cf. Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 528 (N.D. Ill. 2008) (use of

18  government trademark database for putative class would not avoid "time-consuming inquiries

19  regarding ownership").

20      **Registration.**  Registration of a copyrighted work with the Copyright Office is a

21  prerequisite to infringement lawsuits for "any United States work" (17 U.S.C. § 411(a)); *see*

22  *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com*, 139 S. Ct. 881, 886 (2019); a requirement

23  for membership in Plaintiffs' Registered Works Infringement Class (Mot. 3); and a requirement

24

---

25  [5] The proposal is even less tenable for an imaginary class of Unregistered Foreign Works.
   Plaintiffs' putative expert admits "there is no single repository of foreign unregistered works" to

26  consult regarding ownership, suggesting parties could cross-reference takedown notices against
   privately-run "sources that contain data on millions of foreign unregistered works, including MLC,

27  SoundExchange, Spotify, Rovi, MusicBrainz, EIDR, IMDb, and others." Blaisdell Ex. 13 ¶ 61.
   Plaintiffs offer no evidence that these databases are accurate, comprehensive, or even admissible.

28  *See* Fed. R. Evid. 803(6). In reality, they are rife with errors, manifestly incomplete and unreliable.
   Harold ¶ 52 & Exs. 32-36 (operators expressly disclaim any representation of accuracy or
   completeness). As an example, no record for most of the foreign works the named plaintiffs have
   put at issue in this case can be found in the databases Plaintiffs identify. *Id.* ¶¶ 50-51.

1   for statutory damages or attorneys' fees for any work (17 U.S.C. § 412). The evidence here

2   shows, and Plaintiffs do not dispute, that registration is an individualized inquiry.

3        Plaintiffs' notion of comparing takedown notices with Copyright Office registration

4   records (Mot. 10) is fraught with burden and error. Schneider, for example, purportedly

5   registered multi-movement compositions under a single title without listing individual

6   movements. *See* Harold ¶ 8 & Ex. 6 at 1 (claiming that "'Choro Dancado,' 'Pas de Deux,' and

7   'Danca Illusoria,' … are movements of 'Three Romances'"). She then sent takedown notices for

8   the individual movements without mentioning the registered work. *See, e.g.*, Harold Exs. 7-9.

9   Nothing in the takedown notices or Copyright Office records could connect the notices with a

10  registration—evidence from Schneider would be required. Similarly, it took considerable

11  investigation by YouTube to expose Uniglobe's false claim to have registrations for two motion

12  pictures asserted. Harold Ex. 18 (Uniglobe Dep. Tr.) at 54:4-57:11. Discovery would

13  undoubtedly reveal similar issues with putative class members' registrations. *See, e.g.*, 17 U.S.C.

14  § 410 (registrations are evidence of facts they contain only if "made before or within five years

15  after first publication of the work"); § 411(b)(1) (registrations invalid for material inaccuracies).

16       Plaintiffs also seek to represent a class of holders of "foreign works" for which a U.S.

17  copyright registration would not be required. Mot. 4. But only those works that were first

18  published outside the United States even potentially qualify. 17 U.S.C. § 411(a). Plaintiffs say

19  nothing about how they would show, on a classwide basis, an individual work's place of first

20  publication. That inquiry would require gathering evidence for each work about the first

21  "distribution" or "offer[] to distribute" copies of the work (17 U.S.C. § 101 (defining

22  "publication")) and evidence on whether the work otherwise qualifies as a "United States work"

23  because, for example, it was published "simultaneously" in the United States. *Id.*

24       **B.    Individualized questions over infringement preclude certification.**

25       Infringement requires each putative class member to show copying of protectable

26  elements of their work—an inquiry that is intensely individualized and routinely subject to

27  protracted litigation. *See, e.g.*, *Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) (en

28  banc), *cert. denied*, 141 S. Ct. 453 (2020). That is particularly true here, where Plaintiffs purport

to represent a class of rights holders in different kinds of copyrightable material—*e.g.*, musical compositions, audiobooks, and screenplays. Schneider and AST, for example, would have to play videos and have the fact finder listen for matches of compositions or sound recordings (for AST, in a foreign language). *See, e.g.*, Harold Ex. 1 (Resp. Rog. 11). Uniglobe would have to find specific language from screenplays in videos. And their allegations, like AST's involving children merely reading from a print book (*id.* ¶ 32), would undoubtedly be contested. Additionally, for each claim, Plaintiffs must prove that "at least one alleged infringement [was] completed entirely within the United States." *Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.*, 69 F.3d 381, 387 (9th Cir. 1995). This showing will be especially troublesome for foreign works like AST's Russian audiobooks. Plaintiffs say nothing about the location of any supposed infringement nor how to prove it classwide. *See* Mot. 8-9 (citing Ex. 52).

### C.   Individualized questions around secondary liability preclude certification.

Plaintiffs' disjointed discourse on secondary liability theories does not speak to the elements of those claims, much less address the additional, individualized issues they entail.

*Contributory Infringement*.  For any secondary liability claim, putative class members first must prove some underlying third-party infringement (with all the claim-specific issues that involves). *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007). They then must prove YouTube: (1) actually knew of the specific underlying infringement; and (2) materially contributed to it. *See Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072-73 (9th Cir. 2013).

Plaintiffs could not prove YouTube's actual knowledge on a classwide basis because the presence or absence of the requisite knowledge "must be resolved upon facts which are particular to that single claim of infringement, and separate from all other claims." *Premier League*, 297 F.R.D. at 66. As for YouTube's material contribution, that requires proof of "simple measures" YouTube could have taken to prevent further harm from a specific infringement it already knows of. *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 671-72 (9th Cir. 2017). There is no such proof, because when YouTube learns of a specific infringing video, it removes the video from the service. Zhu ¶ 2. Plaintiffs point to YouTube's Content ID system (Mot. 13-14), but that is

1   irrelevant here. It is not a simple measure that YouTube can take to prevent further damage *after*

2   it acquires knowledge of a specific infringement. *Giganews,* 847 F.3d at 671-72.[6]

3        ***Vicarious Infringement.***  For this secondary liability theory, class members once again

4   must offer individualized proof of a specific infringement by another party. From there, they

5   must show that YouTube: (1) controlled that infringement and (2) earned a financial benefit

6   directly from it. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d at 1173. Still more claim-

7   specific proof would be required for both elements.

8        Plaintiffs say that they could establish the requisite control by showing an allegedly

9   infringing video was algorithmically surfaced by YouTube's Watch Next or Autoplay

10  functionalities. Mot. 12-13. But even under Plaintiffs' theory, whether a given video was

11  surfaced and then chosen by the user to view is an individualized inquiry. Mot. 13. As to the

12  named plaintiffs themselves, for instance, hundreds of the allegedly infringing videos they have

13  put at issue were never seen via Autoplay. *See* Harold ¶ 47. The direct financial benefit

14  requirement of vicarious liability also requires claim-specific evidence. Eleven of the alleged

15  infringements, for example, were not viewed at all on the service. Harold ¶ 47. Many other

16  alleged infringements likewise generated no revenue whatsoever, let alone revenue directly

17  attributable to Watch Next or Autoplay. *See* Harold ¶ 48.[7]

18       **D.      Takedown notices are no substitute for proof of infringement.**

19

---

20

21  [6] Content ID does not identify ***infringements*** at all. Zhu ¶ 8. The system compares uploaded
    videos to reference files that participants provide and identifies ***matches***, then empowers the
    participants to make claims and take action on the matches as they see fit. *Id.*; Harold Ex. 38
22  (Winograd Dep. Tr.) at 66:7-13. ████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ███████████████████  But AST belatedly identified only *64* of those matches as alleged
    infringements, and did not send YouTube any DMCA notices for them. Harold ¶ 34.

27  [7] Plaintiffs pretend that through some formula (as yet unidentified and untested), their experts
    could opine about a financial benefit YouTube earned from each alleged infringement. *See* Mot.
28  14. That assertion is too incorporeal to address, but it is impossible to see how Plaintiffs could
    show "direct financial benefit" from a specific alleged infringement without offering evidence
    specific to that alleged infringement.

To evade the plethora of individualized questions inherent in a given infringement claim, Plaintiffs assert that YouTube is barred from disputing the truth of anything contained in a takedown notice that it processed, and that the unsworn notices constitute conclusive proof of infringement, ownership, and knowledge because YouTube supposedly "vets" them. *See* Mot. 8-10.[8] Plaintiffs tellingly cite no authority for that proposition. It is unprecedented and frivolous.

DMCA takedown notices, whether honored or not, are not evidence of the unsworn allegations they contain. *See Premier League*, 297 F.R.D. at 68 n.2 (rejecting argument "that YouTube's takedown of a clip was a tacit concession or determination that it infringed"); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007) (The DMCA's "safe harbors limit liability but 'do not affect the question of ultimate liability under the various doctrines of direct, vicarious, and contributory liability'") (citation omitted); *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 555 (4th Cir. 2004) ("DMCA is irrelevant to determining what constitutes a prima facie case of copyright infringement.").[9] The text of the statute itself refutes Plaintiffs' position. *See* 17 U.S.C. § 512(g)(1) (precluding liability for disabling access to materials "*claimed to be infringing ...* regardless of whether the material or activity is *ultimately determined to be infringing*" (emphasis added)). So does its legislative history. *See* H.R. Rep. 105-551(I), at 26 (1998) ("whatever decision is made by a person who has obtained information indicating infringement, whether to remove, disable or block access to the material . . . cannot be used against that person in an infringement suit"); S. Rep. 105-190 at 50 (1998). Even if the allegations of a notice ripened into an actual lawsuit, no one would treat them as conclusive. Rather, the validity of those allegations is what the litigation process reveals.

The Court need only consider the DMCA notices that the named plaintiffs sent in this case to recognize the absurdity of treating those notices as conclusive evidence of infringement. Those notices are often incomplete, inaccurate or false because they: Failed to identify an owner

---

[8] YouTube does not "vet" each takedown notice. Rather, it uses a largely automated process to see if notices contain the information required by the statute. YouTube does not and could not ultimately determine the truth of such information. Zhu ¶¶ 2-3.

[9] Plaintiffs' lone case is an inapposite 24-year old opinion that holds only that certain "bills" relied on by a defendant could be admitted as evidence "under the business records hearsay exception." *MRT Const. Inc. v. Hardrives, Inc.*, 158 F.3d 478, 483 (9th Cir. 1998).

or identifies an incorrect one; (Harold ¶¶ 40-41); Identify the wrong work (*id.* ¶¶ 42-43); Provide an incomplete or wrong title (*id.* ¶ 44 & Ex. 29); Identify a video that clearly does not infringe the work, such as a 20-second clip of the famous 20th Century Fox intro (*id.* ¶¶ 45-46 & Exs. 30-31). Indeed, it bears repeating that, as detailed in YouTube's counterclaims, former plaintiff Pirate Monitor sent ***thousands*** of bogus, but successful takedown notices. Harold Ex. 26; *see also* 17 U.S.C. § 512(f); Dkt. 160 at 44-46. And the named plaintiffs are just a drop in the bucket. The notices sent by unidentified members of a theoretical class will be rife with defects.

Simply put, takedown notices are extrajudicial *allegations* of infringement, not *adjudications* of infringement. They do nothing to obviate the need for each claimant to offer evidence supporting the allegations of a given notice. YouTube would then have the right to take discovery into and litigate over the validity of the allegations (and its defenses, *see infra* 14-18) for each work and each video. Those individualized questions foreclose predominance.

### E.    YouTube's defenses also require individualized determinations.

The Supreme Court has held that "a class cannot be certified" if the proposed method for resolving individual claims would curtail the defendant's right to "litigate its statutory defenses to individual claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011); *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *21 (N.D. Cal. Mar. 18, 2014) (individualized questions on affirmative defense "likely to overwhelm any common issues"). In this case, individual defenses as basic as license, fair use, and time-bars all require individualized proof, as does application of the DMCA safe harbor.

***License.***  In evaluating just the licenses that bar Schneider's claims, the Court saw first hand how individualized and detailed the proof of licensing may be for any given plaintiff, work, or claim. Harold Ex. 15 (10/13/22 Hr'g Tr.) at 27:7-28:10. The existence of a license inherently turns on particular documents, testimony, state (or foreign) law, questions of identity, and more. (Dkt. 164 at 10-16; Dkt. 172 at 6-13; Dkt. 173 at 2-7). Just this year, the Ninth Circuit in *Kihn* held that "individual issues of license and consent" were by themselves sufficient to require reversal of a class certification order in a copyright infringement case. 2022 WL 18935, at *2. Other courts have recognized the same. *E.g.*, *Pearson Educ. Inc.*, 2012 WL 6681701, at *4 ;

*Palmer Kane LLC v. Scholastic Corp.*, 2012 WL 2952898, at \*9 (S.D.N.Y. July 16, 2012). And the issues are far more complicated here, given that YouTube has thousands of licenses sweeping across the music and motion picture industries, and millions more licenses from every party who uploads content to the service. Harold Exs. 13-14; Zhu ¶¶ 10-11.

Knowing this, Plaintiffs propose work-arounds that do not work. *See* Mot. 11. First, Plaintiffs assert (without evidence) that if a takedown notice was successful, YouTube "has, itself, determined that the copyright in question is not licensed to the uploader." Mot. 11. Again, that is baseless. YouTube could not and does not make any such determination. Zhu ¶¶ 2-3; *see supra* 12-14. Second, Plaintiffs contend that YouTube requires that parties to certain licensing agreements provide metadata for licensed works, and that licensing status can be determined by a "simple" consultation of this metadata. *See* Mot. 11. Again, false. Mountains of YouTube's direct and indirect licenses involve no such metadata at all.[10] Zhu ¶ 12. And even for those licenses where metadata is provided, the data is not comprehensive. Schneider's publisher, for instance, provided YouTube with metadata for only some of Schneider's works, while licensing YouTube to use her entire catalog. Dkt. 164-9 at 1. Further, no matter what YouTube's data might say, a class member could dispute the existence, validity, or scope of the license, just as Schneider baselessly tried to do at summary judgment. *See* Dkt. 172 at 5-15.

Plaintiffs also assert that YouTube's Copyright Match Tool could be used to identify whether a particular video was licensed through a previous upload. *See* Mot. 11-12. That is wrong. With the proper inputs, that tool can identify whether a video has previously been *uploaded*, but whether the video is *licensed* is generally a function of the authority of the uploader. Zhu ¶ 7. For that question, the tool does nothing. *Id.* In this case, only by virtue of document discovery, interrogatories, and depositions of Schneider and her cohorts was YouTube able to determine that certain content was uploaded and thus licensed by the named plaintiffs, their agents, and others with authorization. *See* Harold Ex. 10 (Schneider Dep. Tr.) at 98:9-99:23

---

[10] YouTube could have, for example, a license (1) from a class member's publisher, as it does with Schneider; (2) from a class member's licensee, as it does for Uniglobe; (3) under its Terms of Service for works uploaded by a class member, as it does with all Plaintiffs; (4) from an authorized uploader, as it does from Schneider, Uniglobe and AST; or (5) of any of the foregoing via a co-owner of the copyrighted work. In addition, YouTube's users could have all manner of licenses of their own authorizing use of content on the service.

(Schneider admitting that she "forgot" or "missed" authorized uploads in her interrogatory response); *id.* Ex. 24 (AST Dep. Tr.) at 151:15-23, 152:9-153:9 (AST admitting it identified licensed uploads as alleged infringements in this case); *id.* Ex. 18 (Uniglobe Dep. Tr.) at 153:15-154:9 (Uniglobe uploaded videos of movies to its YouTube channel based on oral license from distributor). A similar inquiry would be required for the claims of any putative class member.

**Statutory and Contractual Limitations.**  Conspicuously absent from Plaintiffs' motion is any mention of the statute of limitations or how it could be addressed on a classwide basis. It could not. A three-year statute of limitations applies to both Plaintiffs' claims for copyright infringement and CMI claims. 17 U.S.C. § 507. And any claims by a party to YouTube's Terms of Service must be brought within a year of accrual. Zhu Ex. K § 14; Dkt. 173 at 12-13. Further complicating matters, this Circuit applies a "discovery rule" requiring analysis of when a party "reasonably should have discovered [an] alleged infringement." *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1047 (9th Cir. 2020). Accordingly, each infringement claim will require an individualized determination of when an allegedly infringing video was posted, and when the copyright claimant actually, or should have, discovered it.[11] In this case, YouTube went to great lengths to obtain the information showing hundreds of the named plaintiffs' claims are time barred. Similar efforts would be required for each putative class member.

**Fair Use.**  Plaintiffs do not dispute that fair use is an individualized question that must be decided separately for each allegedly "unauthorized display[]." Mot. 12. It requires "closely examin[ing] the particular facts," (*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 648 (9th Cir. 2020)) and calls for "case- by-case analysis" (*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-79 (1994)) that is uniquely ill-suited for class treatment. *See Premier League*, 297 F.R.D. at 66-67. Plaintiffs' sole argument is that fair use is a "*de minimis* issue." *See* Mot. 12. That is groundless. ████████████████████████

████████████████████████████████████████████

---

[11] Plaintiffs cannot avoid these individualized questions by limiting their proposed infringement classes to successful takedown notices submitted on or after July 2, 2017. *See* Mot. 3-4. The limitations clock does not start with a notice; it starts when a party knew or should have known of an infringing video and it does not reset each time a video is viewed. Dkt. 164 at 22-24; Dkt. 173 at 14-15. Even if it did reset, Plaintiffs would still have to show a video was viewed within the past year or three, again necessitating individualized proof. They have not tried.

1   ███████████████████████████████████ But that grossly understates

2   how often fair use actually exists on YouTube. *Id.* Whether and how a user disputes a ministerial

3   Content ID claim says nothing about whether a user would invoke fair use in a lawsuit where

4   they face actual liability. There is simply no way for Plaintiffs (or Defendants) to know how

5   often fair use arises or would be asserted in litigation in response to infringement claims from an

6   unidentified class of copyright holders.

7        In any event, YouTube itself is entitled to raise fair use where appropriate as a defense to

8   any as of yet unidentified infringement claims of some unknown class. *Premier League*, 297

9   F.R.D. at 67. Here, for example, the named plaintiffs' alleged infringements include numerous

10  patently fair uses—a video review using a 17-second clip of a Schneider song to discuss her

11  concert; a 10-second video of a student band; a 44-second video of a man dancing in a kitchen

12  with background music playing; and a video of children reading and discussing excerpts from

13  what AST claims to be its book. Harold ¶¶ 5, 32. Discovery has shown the need to assess fair use

14  on a claim-by-claim basis is an insurmountable barrier to predominance and certification.

15       ***DMCA.*** The DMCA "places the burden of policing copyright infringement on the

16  copyright owner, not on the person or firm storing and hosting the material." *Ventura Content,*

17  *Ltd. v. Motherless, Inc.*, 885 F.3d 597, 603 (9th Cir. 2018). Once YouTube demonstrates that it

18  meets the qualifications for safe harbor protection (as it did in *Viacom Int'l Inc. v. YouTube, Inc.*,

19  940 F. Supp. 2d 110, 123 (S.D.N.Y. 2013)), each plaintiff must show that their infringement

20  claim is somehow excluded from the DMCA's safe harbor. That would require, for example, a

21  putative class member to make an infringement-specific evidentiary showing that YouTube

22  knew of "the videos that infringed its copyright and are the subject of its claim" or failed to

23  expeditiously remove "the infringing material" after receipt of a takedown notice. *Motherless*,

24  885 at 610, 613. Those issues cannot be addressed on a classwide basis, and class treatment

25  would only "multiply [the DMCA's] difficulties over the normal one-by-one adjudications of

26  copyright cases." *Premier League*, 297 F.R.D. at 66.

27       Like the plaintiffs in *Viacom,* Plaintiffs challenge YouTube's repeat infringer policy and

28  its compliance with what they imagine are "standard technical measures." *See* Mot. 17. Like the

plaintiffs in *Viacom*, their challenges should fail as a matter of law on summary judgment.[12]

While these two issues are common questions as to this single defense, they are not

consequential in the total evaluation of a given copyright infringement claim. They do not begin

to satisfy Plaintiffs' burden of showing that common questions predominate over the long line of

issues requiring individualized proof.[13]

\* \* \*

Copyright infringement claims present individualized factual and legal inquiries that

make them "poor candidates for class-action treatment." *Premier League*, 297 F.R.D. at 65.

Class treatment would risk "obliterat[ing]" the "unique nature of each work and of its

infringement … in a sea of other claims." *Id.* at 67. It would be effectively impossible for

YouTube to challenge individual infringement claims of putative class members or obtain and

present discovery on all of the defenses to a given claim that it might have.

**II.     Plaintiffs Have Failed To Show That Common Issues Predominate Over
          Individualized Issues For Their Proposed CMI Classes.**

Plaintiffs do not cite a single case in which a court has certified a §1202 claim for class

treatment. That's not surprising: like copyright infringement claims, CMI claims are highly

individualized, with a host of issues that prevent classwide treatment. Uniglobe and AST do not

---

[12] The DMCA requires that a service adopt and reasonably implement a repeat infringer policy. 17 U.S.C. § 512(i)(1). But it vests services with broad discretion over what policy to adopt, and "does not require perfection, just 'reasonable' implementation." *Motherless*, 885 F.3d at 618; *see also CCBill LLC*, 488 F.3d at 1109. YouTube easily qualifies. *See Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 40-41 (2d Cir. 2012). And Plaintiffs' critiques of YouTube's approach are both incorrect and irrelevant. As for "standard technical measures," while the safe harbor requires a service to accommodate them, the Copyright Office itself recently recognized that to date, none exists. *See* Standard Technical Measures and Section 512, 87 Fed. Reg. 25,050 (April 27, 2022) ("[I]n the two decades since the passage of the DMCA, no STMs have been identified.").

[13] Plaintiffs point to two decisions that certified supposedly "similar" classes (Mot. 3), but those unpublished district court cases are far afield and did not involve anything like the predominance problems present here. *In re Napster, Inc. Copyright Litig.* applied a lower, pre-*Dukes* predominance standard and had distinct facts, including a single shared licensing agent for the entire class and a single notice letter to Napster that could "arguably establish[]" the defendant's knowledge of 90,000 infringed works. 2005 WL 1287611, at *3 (N.D. Cal. June 1, 2005). In *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2015 WL 4776932, at *8, *11 (C.D. Cal. May 27, 2015), the defendant had "a record" of all recordings it had performed and had conceded that it performed the disputed recordings "without first seeking licenses or paying royalties." Neither case involved material license defenses, which were sufficient to preclude certification in *Kihn*, nor the problems that just the named plaintiffs have with ownership and registration, fair use, statute of limitations, the DMCA safe harbor, and damages.

even try to make out a CMI claim, while Schneider's claims are rife with individualized defects. As to her CLFN theory, it took an expert examining metadata from hundreds of individual video files to identify CMI in just 9 of the 381 allegedly infringing videos put at issue (and even this CMI was not actually removed by YouTube). Schneider's alternative ISRC theory is entirely theoretical. She put only one sound recording at issue for this claim, but she did not identify a single video displayed on YouTube that supposedly contained that work within the statute of limitations. *See* Dkt. 164 at 22 & n.8. For these reasons and others, Schneider's CMI claims fail as a matter of undisputed fact and law. (Dkts. 164 at 16-21; 173 at 8-12). But even if Schneider's claims survive, their individualized nature reveals the folly of certification.

> **A.** **Plaintiffs Have Failed to Show That Common Issues Predominate the Question of Liability For the Putative CLFN Class**

That YouTube's transcoding process allegedly "removes all metadata," including "CLFN metadata," from uploaded video files (Mot. 19) does not remotely establish a § 1202 claim through "common proof." (Dkt. 173 at 8-12). It does not even answer the threshold questions of whether a putative class member owns the copyright in a work they are asserting and whether some associated YouTube video contains that work. Those questions can only be answered for each work and each video. *See supra* at 7-11.

The individualized issues grow from there. Only a tiny fraction of video files uploaded to YouTube (less than one tenth of a percent in a sample) even contain CLFN metadata. Foucu ¶ 5. The Court would thus need to receive evidence showing that the CLFN metadata field of a particular video file actually contained information when it was uploaded to YouTube. But the mere presence of CLFN metadata is not enough. Even when present, information in the CLFN field often is generic (e.g., "My Movie," "Mein Film," "Untitled Project") and fails to identify a particular copyrighted work. *Id.* ¶ 6. Each putative class member would thus need to show that information buried in an embedded CLFN metadata field constitutes CMI for a copyrighted work because it includes meaningful details about that work. *See, e.g., Sell Pool Supplies Online, LLC v. Ugly Pools Ariz., Inc.*, 804 F. App'x 668, 670 (9th Cir. 2020) (no CMI claim where allegedly removed information "was a fictitious name" and thus "was not Plaintiff's CMI").

1        Even if relevant information existed in the CLFN field, each putative class member

2  would have to show that YouTube actually removed that information from a given video—

3  something Schneider herself could not do. In Schneider's case, the CLFN information (*i.e.* song

4  titles) that was present, but inaccessible in the nine video files she identified, was *publicly*

5  *accessible and viewable* in the YouTube video titles. Foucu ¶ 7. Accordingly, Schneider herself

6  is not even a member of the proposed class of copyright holders whose works have been

7  displayed "without including or referencing the associated CLFN or with the copyright

8  management information altered." Mot. 4; *see Amchem Prods. v. Windsor*, 521 U.S. 591, 625

9  (1997) ("[A] class representative must be part of the class."). Schneider's experience only

10  underscores the need for a video-by-video inquiry regarding the alleged removal of alleged CMI.

11        Next, each putative class member would have to show that YouTube *intentionally*

12  removed whatever CMI might be at issue, something they could not do without individualized

13  proof that YouTube knew CMI was ever present. *See* 17 U.S.C. § 1202(b)(1). Schneider herself

14  adduced no such proof of intent. Dkt. 164 at 18. As another court in this District recently

15  recognized, "an allegation of wholesale metadata removal, without more, does not suffice to

16  allege [defendant] intentionally removed CMI." *Harrington v. Pinterest, Inc.*, 2022 WL

17  4348460, at *4 (N.D. Cal. Sept. 19, 2022).

18        A plaintiff must also show that removal of CMI was *without authorization*. Schneider

19  could not make that showing because her publisher expressly authorized YouTube's

20  reformatting. *See* Dkt. 164 at 21. In fact, Modern Works authorized YouTube to reformat not just

21  videos containing Schneider's works but videos using the works of hundreds of other composers

22  it represents as well. *See* Harold ¶ 14 & Ex. 13; Dkt. 164-6 (Coleman Decl.) And that is but one

23  of countless license agreements that may authorize reformatting. In addition, YouTube uploaders

24  authorize YouTube to reformat an uploaded video under YouTube's Terms of Service. *See* Zhu

25  Ex. K § 6(C). The absence of authorization is a key element of a §1202 claim, and Plaintiffs

26  cannot satisfy it without individualized evidence.

27        Nor can Plaintiffs establish the second scienter requirement of a CMI claim—that

28  YouTube knew its removal of CLFN metadata would foment infringement—on a class-wide

basis. Rather, each putative class member must offer proof that YouTube knew that by removing CLFN metadata, it would be fostering specific infringements of their work. *Stevens v. CoreLogic, Inc.*, 899 F.3d 666, 674 (9th Cir. 2018). That inquiry requires a class member to show they were actually using CLFN metadata to police infringement of their works (*id.* at 675), and that YouTube knew of such policing. *Harrington*, 2022 WL 4348460, at *5 ("Harrington does not allege, for example, that he informed Pinterest of his practices"). But Plaintiffs have no such proof. Their own expert testified he "would not expect anybody to be using the CLFN field for metadata – rights management purposes." Harold Ex. 37 (Jessop Dep. Tr.) at 168:13-15. Finally, the fact adduced in discovery, that Schneider's CMI claim rests on the alleged removal of information that was actually retained and presented in YouTube video titles, is particularly damning here. Dkt. 173 at 9. It is unreasonable to conclude that YouTube knowingly foments infringement by removing information from invisible metadata when the same information remained publicly available and searchable on the service. *See Harrington*, 2022 WL 4348460, at *7. There is no way for Plaintiffs to address these issues with common proof.

### B.   Plaintiffs Have Failed to Show That Common Issues Predominate For the Putative ISRC Class.

Plaintiffs separately move to certify a class of persons who own a copyright in a sound recording that contained an ISRC and that was a component of a video displayed on YouTube "on or after July 2, 2017," without including or referencing the associated ISRC.[14] Mot. 4. But Schneider herself is not a member of this theoretical class. She put only one sound recording at issue: *Concert in the Garden*. And nowhere did she identify a YouTube video that contained *Concert in the Garden* and was displayed "on or after July 2, 2017." Harold ¶ 4; Zhu ¶ 4. That alone dooms her class certification request. *See Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 560 (9th Cir. 2010). But that is not all.

---

[14] Plaintiffs' ISRC theory should be void *ab initio* because videos containing sound recordings are merely derivative works of the sound recording and no CMI claim exists where a party fails to add (or carry forward) some CMI from a component audio file to a derivative video file. Dkt. 173 at 9; *see Kipp Flores Architects, LLC v. Pradera SFR, LLC*, 2022 WL 1105751, at *3 (W.D. Tex. Apr. 13, 2022) ("'Removal' of CMI from a copyrighted work is not the same as the failure to add CMI to a nonidentical rendition or a derivative of the protected work."); *Robert Stark Enters., Inc. v. Neptune Design Grp., LLC*, 2017 WL 1345195, at *11 (N.D. Ohio Apr. 12, 2017) (creation of new derivative work without Plaintiff's CMI is not "removal" under §1202).

YouTube's general awareness and use of ISRCs in other contexts (Mot. 18) does not begin to make out a §1202 claim. Each putative class member still must prove both ownership of a given sound recording and the existence of a YouTube video that contains that sound recording. Both are threshold issues requiring individualized inquiries as discussed above. *See supra* at 7-11. The required proof that a given sound recording that once contained an ISRC was used to create a given video is likewise individualized. As Schneider's expert admitted, "not all sound recordings have ISRCs" associated with them. *See* Harold Ex. 37 (Jessop Dep. Tr.) at 186:2-4. Indeed, the official MP3s that he purchased of Schneider's works did not. *Supra* at 3. Thus, each putative class member would need to show that a YouTube video contained a sound recording that in turn once carried an ISRC. There is no common proof for that. Nor could there be common proof that YouTube had actual knowledge that a sound recording that was used in a video once carried an ISRC. *See Harrington*, 2022 WL 4348460, at *4 (claim based on distribution requires "actual knowledge that CMI 'has been removed or altered'").[15] Each putative class member would also need to show that the supposed removal of an embedded ISRC code was unauthorized, and that YouTube actually knew that too. *See* 17 U.S.C. § 1202(b); 4 Nimmer on Copyright § 12A.10 (2022) (defendant "must know of the unauthorized status of the removal or alteration").

Beyond all that, each putative class member would have to satisfy §1202(b)'s second scienter requirement—proving that YouTube knew or should have known that its distribution of a given video without an ISRC embedded in invisible metadata would foment infringement of a specific copyrighted sound recording. *See Stevens*, 899 F.3d at 674; *supra* at 20-21. Here too, Schneider cannot make that showing, in part because she and her agents disclaimed any use of embedded metadata (ISRC or otherwise) as CMI to protect her works from infringement. *See* Harold Exs. 10-12 (Schneider Dep. Tr. at 210:10-15; Le Claire Dep. Tr. at 190:20-25;

---

[15] Plaintiffs rely on the Jessop report to suggest YouTube actually knew ISRCs were missing from uploaded video files. *See* Mot. 6 (citing Ex. 14 ¶¶ 170-72), 18 (citing Ex. 14 ¶ 32). Jessop's view carries no weight. For one thing, this question is an issue of fact, not expert opinion. Further, Jessop admitted he based his view on "common sense or natural inference drawing," not any specialized or scientific expertise that would aid a jury. Harold Ex. 37 (Jessop Dep. Tr.) at 133:21-134:2; *see also id.* at 135:5-22 (admitting that his opinions in paragraphs 170-72 of his report are "not a reported fact" but are "inference[s]" based on "the widespread dissemination of that knowledge and the skills of the engineers at YouTube").

1    Bornheimer Dep. Tr. at 225:12-13, 226:21-23). Finally, YouTube would have individualized

2    defenses. For example, as it showed in its summary judgment motion, Schneider's CMI claims

3    are time barred by her knowledge and inaction. *See* Dkt. 164 at 24. In sum, the infirmities of

4    Schneider's CMI claims show the impossibility of litigating such claims as a class.

5    **III.    Plaintiffs' Proposed Remedies Cannot Be Established With Common Proof.**

6         ***Damages***.  Copyright damages raise numerous individualized questions, both legal and

7    factual. Generally, an infringer is liable for either "statutory damages" or "actual damages and

8    any additional profits of the infringer." 17 U.S.C. § 504(a). But which category of damages an

9    owner can recover, and the method for calculating those damages, varies greatly.

10        Statutory damages requires a work-specific, claim-specific analysis, a point Plaintiffs do

11   not dispute. To even be eligible for statutory damages, a work must be "registered prior to

12   commencement of the infringement" or within three months of first publication. *Derek Andrew,*

13   *Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 699 (9th Cir. 2008). That threshold eligibility

14   determination will require ascertaining whether a work was registered, determining when any

15   infringement commenced and the date of first publication, and comparing those dates to the date

16   of registration. *See id.* In this case, that analysis shows all of AST's claims are ineligible for

17   statutory damages, as are many of the claims Uniglobe and Schneider assert. But even for claims

18   on which statutory damages are available, the court must select an amount that "the court

19   considers just." 17 U.S.C. § 504(c)(1). Plaintiffs offer no method for determining statutory

20   damages on a class-wide basis, particularly given that copyrights vary wildly in value.[16]

21        Plaintiffs' task would be even harder for actual damages and non-duplicative profits.

22   With no more than a cursory "see generally" citation to an improper expert report (*supra* n. 4),

23   Plaintiffs assert that they can calculate actual damages "for each class member on a formulaic

24   basis." Mot. 20 (citing Ex. 12). That is specious. As to profits, a prevailing copyright owner is

25

26   ──────────────

27   [16] The factors that a court must evaluate to determine a statutory award—which must be assessed per infringed work—include: (i) the expenses saved and the profits reaped by the infringers; (ii) revenues lost by the owner of the work; and (iii) the value of the copyright. *Fitzgerald Publ'g*

28   *Co. v. Baylor Publ'g Co., Inc.*, 807 F.2d 1110, 1117 (2d Cir. 1986). "In measuring the damages, the court is to be guided 'by what is just in the particular case, considering the nature of the copyright, the circumstances of the infringement and the like.'" *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990).

1  limited to profits "attributable to the infringement" (17 U.S.C. § 504(b)), which necessarily

2  requires "apportion[ment]" (*Cream Recs., Inc. v. Joseph Schlitz Brewing Co.*, 864 F.2d 668, 669

3  (9th Cir. 1989)). Apportionment here must take into account the value a work "contributed" to

4  the video (*see id.*), which inevitably demands an individualized qualitative assessment of the

5  work and the video's other components. For example, profits from an infringing film would need

6  to be apportioned among its visual components, its screenplay, any sound recordings, underlying

7  musical compositions, and more. No formula, much less Plaintiffs', can account for that.

8  Additionally, Plaintiffs must exclude all damages flowing from alleged infringements outside the

9  U.S. (*see Subafilms, Ltd. v. MGM–Pathe Commc'ns Co.*, 24 F.3d 1088, 1091 (9th Cir. 1994) (en

10  banc)), a legal requirement that Plaintiffs and their model ignores. Finally, any damages

11  assessment must account for an individual plaintiff's failure to mitigate. Schneider, for example,

12  has offered no explanation for why she is only now suing over videos that were uploaded to

13  YouTube over a decade ago, and why she failed to send a DMCA takedown notice for alleged

14  infringements she was aware of all along.

15      ***Injunction.*** For the infringement classes, Plaintiffs vaguely "seek the provision of the

16  digital fingerprinting functions of Content ID to class members based on reasonable terms." Mot.

17  21. But to obtain any injunction, Plaintiffs would first need to make all of the individualized

18  liability showings discussed above. From there, Plaintiffs would need to show how to implement

19  the mandatory Content ID access they imagine for each would-be class member. That would be a

20  significant challenge given that their proposed class definitions include putative members like:

21  (i) Schneider and Uniglobe who already have Content ID access; (ii) AST who disclaimed any

22  interest in it; and (iii) Pirate Monitor who plainly cannot be trusted with it. *See, e.g.,* Harold Exs.

23  10, 18, 23 (Schneider Dep. Tr. at 163:7-12, 193:10-194:23; Uniglobe Dep. Tr. at 160:2-11,

24  161:7-9; AST Dep. Tr. at 235:23-236:7).

25  **IV.    Plaintiffs Have Failed To Prove Numerosity or Superiority.**

26      Predominance aside, Plaintiffs' motion does not satisfy Rule 23(b)(3)'s additional

27  requirements. Plaintiffs have not "'prove[n] that there are *in fact* sufficiently numerous parties'"

28  in each of their four proposed classes. *McCarty v. SMG Holdings, I, LLC*, 2022 WL 913092, at

1  *2 (N.D. Cal. Mar. 29, 2022) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013))

2  (Donato, J.). Plaintiffs' only attempt is their claim that "[a] successful Takedown Notice is

3  required for all four classes" and that there are many such notices. Mot. 5. That is not nearly

4  enough. Each proposed class has multiple additional requirements for membership. Plaintiffs'

5  reliance on the "overinclusive" takedown statistic "leav[es] the court with little concrete basis for

6  assessing numerosity." *Mays v. Wal-Mart Stores, Inc.*, 804 F. App'x 641, 642 (9th Cir. 2020).

7  Plaintiffs offer no estimate as to the size of any class, or even how it would be estimated. This

8  Court has denied certification where "plaintiffs sa[id] not one word about how many people are

9  in" the classes. *McCarty*, 2022 WL 913092, at *3. Plaintiffs here have done no better.

10        Plaintiffs have also failed to carry their burden of showing superiority. Congress

11  "designed" the Copyright Act to facilitate and encourage individual claims. *See Premier League*,

12  297 F.R.D. at 66. It provided for "statutory damages," which "give[s] litigation value to each

13  individual case" (*id.*; 17 U.S.C. § 504(c)), and for attorneys' fees to prevailing parties (17 U.S.C.

14  § 505), which ensures that litigation costs do not deter meritorious claims. Congress went even

15  further in 2020 by establishing the Copyright Claims Board, an administrative tribunal within the

16  Copyright Office for expeditiously resolving individual infringement claims. *See* 17 U.S.C. §§

17  1501-11. As a result, there are ample incentives and procedures for individual copyright owners

18  to assert claims against YouTube. There is no need for class certification and the substantial

19  delays, costs, and management challenges it would carry.

20                                    **CONCLUSION**

21        Plaintiffs cannot mask the fatal flaws in their individual claims by pretending to act on

22  behalf of an imaginary class. Certification should be denied.

23

24                                              Respectfully submitted,

25  Dated:  November 14, 2022                   WILSON SONSINI GOODRICH & ROSATI
                                                Professional Corporation
26

27                                              By: */s/ David H. Kramer*
                                                   David H. Kramer
28                                                 dkramer@wsgr.com

                                                Attorneys for Defendants