# EXHIBIT 74

 

Recording Industry Association of America and
National Music Publishers' Association
Response to
Copyright Office Notification of Inquiry regarding
Standard Technical Measures and Section 512
Docket No. 2022-2

Submitted via regulations.gov

May 27, 2022

The Recording Industry Association of America ("RIAA") and the National Music Publishers' Association ("NMPA") welcome this opportunity to provide comments to the Copyright Office ("Office") in response to its notice of inquiry regarding Standard Technical Measures ("STMs") and Section 512 ("NOI").[1]

The RIAA is the trade organization that supports and promotes the creative and commercial vitality of music labels in the United States, the most vibrant recorded music community in the world.  Our membership – which includes several hundred companies, ranging from small-to-medium-sized enterprises to global businesses – creates, manufactures, and/or distributes sound recordings representing the majority of all legitimate recorded music consumption in the United States.  In support of its mission, the RIAA works to protect the intellectual property and First Amendment rights of artists and music labels; conducts consumer, industry, and technical research; and monitors and reviews state and federal laws, regulations, and policies.

NMPA is the trade association that represents music publishers and songwriters of all catalog and revenue sizes in the United States, from large international corporations to small businesses and individuals.  Compositions owned or controlled by NMPA members account for the vast majority of the market for musical composition licensing in the United States.  NMPA protects and advances the interests of music publishers and songwriters in matters relating both to domestic and international protection of music copyrights, including aiding our members in enforcement efforts.

---

[1] 87 FR 25049.

## Introduction

It takes the investment and creativity of sound recording artists, songwriters, musicians, producers, recording engineers, and countless other participants in the music industry to bring music to life.  The United States boasts over one million revenue-generating sound recording artists and songwriters.[2]  And their music, across all genres and styles, is protected by copyright, which is both recognized in the U.S. Constitution[3] and in the U.N. Universal Declaration of Human Rights.[4]

Overall, the music industry contributes $170 billion to the nation's economy, supports 2.47 million jobs, and accounts for over 236,000 businesses in the United States.[5]  The music industry is also a leader in driving digital commerce.  Digital sources of music revenue have come to account for 87% of the total music market by value in 2021, while physical products amount to about 11%.[6]  Paid subscriptions to digital music services were the strongest contributors to revenue growth in 2021, with approximately 84 million paid subscriptions to on-demand music services.[7]

However, in inflation-adjusted dollars, our industry's revenues in 2021 remain 37% below the record high of $14.6 billion reported in 1999.[8]  This period of time coincides with the rise of broadband and digital piracy generally.  As noted in the 2022 Special 301 Report, while the "increased availability of broadband Internet connections around the world, combined with increasing accessible and sophisticated mobile technology, has been a boon to the U.S economy and trade," these "technological developments have also made the Internet an expressly efficient vehicle for disseminating pirated content that competes unfairly with legitimate e-commerce and distribution services that copyright holders and online platforms use to deliver licensed content."[9]  To that end, since 2012, we have sent notices of over 100 million infringements to U.S.-based service providers.  In short, copyright infringement continues to cause significant harm to the U.S. music industry.

Technological advancements in the identification and protection of copyrighted works online offer great potential in mitigating this harm but have thus far failed to realize their promise.  This is in part because of interpretations of Section 512 that disincentivize cooperation and

---

[2] Source: http://50statesofmusic.com/?USimpact.

[3] U.S. Const. art. 1, § 8, cl. 8 ("To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries").

[4] Art. 27, § 2 ("Everyone has the right to the protection of the moral and material interests resulting from any scientific, literary or artistic production of which he is the author").

[5] Source: http://50statesofmusic.com/?USimpact.

[6] Source:  RIAA, Year-end 2021 RIAA Revenue Statistics, available at https://www.riaa.com/wp-content/uploads/2022/03/2021-Year-End-Music-Industry-Revenue-Report.pdf.

[7] Id.

[8] Id.

[9] 2022 Special 301 Report, April 27, 2022, p. 20, available at https://ustr.gov/sites/default/files/IssueAreas/IP/2022%20Special%20301%20Report.pdf.

progress in this area.  We agree with the Office that a complete consensus across industries and one-size-fits-all technical solutions are unlikely to emerge under current conditions.

With this background in mind, we offer the following responses to some of the questions posed in the NOI.[10]

**<u>Comments</u>**

***Questions about existing technologies***

<u>*Question 1 & 2 – Existing Technologies*</u> - We believe there are existing technologies that meet the statutory definition of STMs in Section 512(i).  For example, there are the technical messaging standards developed by DDEX to share metadata about music being licensed in the value chain.[11]  These messaging standards include standards for identifying who claims rights to the music, and can express what permissions are granted in connection with the music.[12]  Members in DDEX, who are eligible to work on developing the standards, include a broad multi-stakeholder group of digital music participants, including Amazon, Apple, ASCAP, BMI, Meta, Google, GEMA, Kobalt Music, Pandora, PPL, SACEM, Sony Music, Warner Music, Universal Music, Tencent Entertainment, Spotify, SoundExchange, 7Digital Group, Netflix, Audible Magic, Open Play, Inc., Pex, Musio.AI, ByteDance, British Library, CD Baby, Songtrust, SoundCloud, Deezer, Downtown Music Publishing, Sony Music Publishing, Gracenote, Tidal, Merlin, and many others.  DDEX messaging standards are available to any person on reasonable and nondiscriminatory terms.

Another example is the technical specification developed by the Coalition of Content Provenance and Authenticity (C2PA).[13]  As noted in the overview of those specifications, they were developed to provide content provenance and authenticity, including information such as authorship, in a secure, tamper-evident, and standardized way across platforms.[14]  Per C2PA, who developed the specification and whose members include Adobe, arm, BBC, intel, Microsoft, Sony, RIAA, Truepic, and Twitter, the specification is an open, technical standard providing publishers, creators, and consumers the ability to trace the origin of different types of media.

---

[10] We note the Copyright Office's admonition that these consultations on the voluntary identification and implementation of technical measures are separate from the Copyright Office's forthcoming notice of inquiry on Standard Technical Measures which will focus specifically on section 512(i) of the DMCA.  Accordingly, we do not comment on section 512(i) here, but intend to address it in response to the forthcoming notice of inquiry.

[11] Source:  DDEX, available at https://ddex.net.

[12] For example, see the DDEX standards known for recording data and rights.  These standards, known as the RDR standards, are used to send information about rights in sound recordings.  For more information, see https://ddex.net/standards/recording-data-and-rights/.

[13] A public draft of the C2PA technical specifications is available at https://c2pa.org/public-draft/.

[14] Id. at Section 1.1.

There are also technical measures, such as audio fingerprinting, a type of automatic content recognition (ACR) technology, which have been developed and are used broadly in the marketplace to identify copyrighted sound recordings. These technologies and their use have been discussed in an asynchronous fashion among various stakeholders in the internet ecosystem for music, including rights holders, such as RIAA and NMPA members; service providers, including YouTube, Facebook, Tumblr and others; and companies that provide audio fingerprinting services, including ACR Cloud and Audible Magic. While some service providers have elected to develop in-house solutions based on audio fingerprinting technical measures, other service providers license third-party audio fingerprinting solutions. We believe this technology should also qualify as an STM.

Another example of a widely used technical measure that should qualify as an STM is encryption-based content protection. Marketplace implementations of this technical measure include protection systems owned by Apple (Fairplay), Microsoft (PlayRead), and Google (Widevine), or encryption algorithms standardized by the U.S. government (AES-128). AES-128 was ratified by the National Institute of Standards and Technology (NIST) after an open consultation process. The others listed above have been discussed in a bilateral asynchronous fashion and reached broad consensus through major marketplace adoption. These technologies are used in all major video streaming services, such as Hulu, Netflix, HBO, Disney+, etc., as well as in most music streaming services.

Please see our statement of interest dated February 8, 2022 in response to the Office's notice of inquiry regarding technical measures for more of examples of technologies that are used by copyright holders to identify or protect copyrighted works that have been developed through formal or informal multistakeholder processes.

In each of these cases, the technical measures are or can be used to identify or protect copyrighted works and are available on reasonable and non-discriminatory terms. These technical measures do not impose substantial costs on service providers, as service providers have already implemented the technology or are active in the development of the technical measure. And they have been reached through either a more formal standards setting process or an informal, de facto multi-industry standards process given the widespread adoption of the technical measure among rights holders and service providers.

That being said, we acknowledge the Office's observation that several participants in the Office's DMCA study felt that no STMs have been identified under section 512(i).[15] We believe this is in part because of disincentives for service providers to acknowledge any technical measure as an STM under section 512(i), and because section 512(i) has been misconstrued to require that a technical measure must be expressly identified as an STM under section 512(i) by a broad consensus of stakeholders.

---

[15] 87 FR at 25050.

Solutions to address this problem could include (i) having a regulatory agency such as the Copyright Office identify technologies that qualify as an STM, (ii) clarifying the definition of section 512(i) to explicitly provide that technologies that are widely used to identify or protect a particular class of copyrighted works with a particular class of service providers also qualify as STMs, and/or (iii) otherwise clarifying the definition of STMs to disavow the "veto" power service providers believe they currently enjoy to stop any technology from being recognized as an STM.

### Questions about Section 512(i)

Question 3 – Process under the current statute – The current statute does not call for a formal process for an adoption of an STM.  This view is buttressed not only by the plain meaning of the statute, but also by the legislative history of section 512(i).  Per the Senate Judiciary Report on the Digital Millennium Copyright Act of 1998, Report 105-190, dated May 11, 1998, the Senate Judiciary Committee "believed that technology is likely the solution to many of the issues facing copyright owners and service providers in the digital age."[16]  In fact, the committee strongly urged "all affected parties expeditiously to commence voluntary, interindustry discussions to agree upon and implement the best technological solutions to achieve these goals."[17]  Further, the Committee anticipated that STMs could be developed "both in recognized open standard setting bodies or in ad hoc groups" so long as the process is "open, fair, voluntary, and multi-industry".[18]  As an example, the Committee noted with approval the ad hoc process used to develop copy protection technology for use in connection with DVD.[19]  Clearly, Congress intended that copyright holders and service providers come together cooperatively to come up with flexible, practical solutions to address pervasive infringement online.

Given this legislative history, it seems clear that an "ad hoc" process should be sufficient under the statute, as should a process developed in open standard setting bodies.  Such a process could be convened or facilitated by a variety of parties, including the International Organization for Standardization (ISO), Internet Engineering Task Force (IETF), World Wide Web Consortium (W3C), governments, service providers, or rights holders.  Likewise, the process could take the form of a traditional standards body setting approach (such as that used in ISO or IETF), or an informal, asynchronous process among stakeholders.  All that matters is that the development of the technical measure was pursuant to a process that was open, fair, voluntary, included relevant stakeholders, and received broad consensus from copyright owners and service providers.  And while it would be useful to have a regulatory agency or standards body of the group of copyright holders and service providers that reach broad consensus of the technical measure publicly recognize that technical measure as a "standard technical measure" under 512(i), such public recognition is not necessary under the statute.

---

[16] Senate Judiciary Report on the Digital Millennium Copyright Act of 1998, Report 105-190, May 11, 1998, p. 52
[17] Id.
[18] Id.
[19] Id.

*Question 4 – International Organizations* – Yes, technologies developed or used by international organizations or entities could become STMs for purposes of section 512(i).  As noted above, all that is needed is that the technical measure is used by copyright owners to identify or protect copyrighted works, that the technical measure has received broad consensus from copyright owners and service providers, and that the process to develop the technical measure, whether formal or informal, was open, fair, voluntary, and included relevant stakeholders.

*Question 5 – Consensus* – While the statute does not define consensus, at minimum, it is clear that broad consensus does not require full consensus.  Other organizations that have defined some form of consensus in the standards context likewise clarify that it does not require unanimity.  For example, ISO defines consensus to mean "general agreement where there is no sustained opposition to substantial issues by any important part of the concerned interests, in a process that seeks to take into account the views of all parties concerned."[20]  IETF uses the term "rough consensus" and under its process, does not require that all participants agree, but rather that a large majority of those who care must agree.[21]  Their simple version of the definition for rough consensus provides that strongly held objections must be debated until most people are satisfied that these objections are wrong.[22]  And the Merriam-Webster dictionary provides a similar definition for consensus as "the judgment arrived at by most of those concerned."[23]  Under any of these definitions, broad consensus can be achieved without unanimity, and over the objections of any bad faith or unreasonable holdout.  As discussed above, broad consensus can also be achieved in an informal, asynchronous basis, as evidenced by marketplace adoption of various implementations of the technical measure (such as what is evidenced in connection with audio fingerprinting and encryption-based content protection), as well as through more formal approaches.

The term "multi-industry" merely means involving or relating to more than one industry.[24]  It does not require all classes of copyright holders and all classes of service providers to participate to qualify as "multi-industry."  Thus, a "multi-industry" process could include one copyright-dependent industry, such as music, and one class of service providers, such as 512(c) hosting providers.

Further, when considering this clear meaning of "multi-industry", along with the limitation on the definition of consensus noted above to "those concerned", it seems reasonable to interpret the statute to permit STMs to be limited to a particular class of copyrighted works and/or a particular class of service providers.  Under this interpretation, the service provider's safe harbor is only conditioned on accommodating and not interfering with those STMs that apply to its type or class of service provider.

---

[20] See https://www.iso.org/glossary.html.
[21] See https://www.ietf.org/about/participate/tao/, section 4.2.
[22] Id.
[23] See https://www.merriam-webster.com/dictionary/consensus.
[24] See https://www.merriam-webster.com/dictionary/multi-industry.

_Question 8 – Internet service provider responsibilities_ – Under the statute, service providers must make and allow use of STMs on their platforms.  While the statute does not define "accommodate," the Merriam-Webster dictionary defines the term to include "to provide with something desired, needed or suited" or "to make fit."[25]  Thus, the "accommodate" provision should be read as requiring proactive activity on the part of the service provider to make the applicable STM work or fit within its systems or network, including adopting and effectively implementing the STM on its system or network, as applicable.  As noted above, these provisions should be read in the context of practical solutions, noting that some STMs may be applicable for certain classes of copyrighted works and service providers, but not others.  If the term "accommodate" is not interpreted in this fashion, the term should be defined, or the provision amended to make it clear that service providers must adopt, implement, accommodate, and not interfere with STMs.

### Questions about potential changes to Section 512

_Question 9 – Definition_ – As noted above, a reasonable interpretation of section 512(i) should permit technical measures for a subset of copyright holders and a subset of service providers to qualify as STMs, regardless of whether broad consensus for the technical measure was developed pursuant to a formal or informal voluntary process.  It also should require that service providers engage proactively to make those technical measures work within their systems or network.  That said, we are not aware of any court case that has addressed whether a technical measure qualifies as an STM under section 512(i), and we acknowledge that several service providers are resistant to calling any technical measure, however broadly adopted, an STM under section 512(i).  Because of this, the definition of STMs in section 512(i) could be clarified to expressly confirm the  interpretations of the meaning of section 512(i) noted above.[26]

_Question 10 – Obligations_ – In light of the goals of section 512(i) noted above, and the extraordinary limitations of liability permitted by the DMCA, it is reasonable for safe harbors to be on the line for a service provider that does not comply with these obligations.

_Question 11 – Adoption through rulemaking_ – As noted above, given the lack of formal recognition of existing STMs, regulatory authority could be used to provide transparency over what technical measures the regulatory authority believes have met the statutory definition under existing section 512(i).  Alternatively, section 512(i) could be amended or a new law adopted to give a regulatory body the power to identify or designate widely used technical measures that should be implemented by applicable service providers.  Under this alternative scenario, the regulatory body would be a "decision maker," subject to statutory guidelines, in

---

[25] See https://www.merriam-webster.com/dictionary/accommodate.

[26] We note that S. 3880, the SMART Copyright Act of 2022, Section 2, available at https://www.congress.gov/bill/117th-congress/senate-bill/3880/text, already includes some helpful clarifications to the definition of "standard technical measures" that should be considered.

determining what technical measures must be used by relevant service providers.  This would remove the perceived "veto" power service providers currently enjoy in having technical measures formally proclaimed an STM.  It would also further incentivize the development and adoption of effective tools to address online piracy while giving platforms clarity, and further the goals of Congress that creators and platforms work together to protect copyright online.

_Question 12 – Alternatives_ – Senators Leahy and Tillis recently introduced legislation known as the SMART Copyright Act of 2022,[27] which provides an additional proposal to achieve Congress's original goals for section 512(i).  Among other things, it provides an alternative process outside of the DMCA safe harbors to identify and obligate service providers to adopt technical measures that are found to meet certain criteria.  This thoughtful proposal promises a big step toward balancing the interests of creators and tech companies in today's integrated commercial marketplace and should be carefully considered.

* * *

We thank the Office for the opportunity to share these views on STMs and section 512.  We look forward to continuing this conversation with the Office and other policy makers.

---

[27] S. 3880 – SMART Copyright Act of 2022, available at https://www.congress.gov/bill/117th-congress/senate-bill/3880/text.