# EXHIBIT 79

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---


MARIA SCHNEIDER, UNIGLOBE
ENTERTAINMENT, LLC, and
AST PUBLISHING LTD.,
individually and on behalf
of all others similarly
situated;

        Plaintiffs,

vs.                       Case No. 3:20-cv-04423-JD

YOUTUBE, LLC; and GOOGLE
LLC;

        Defendants.

_____/


C O N F I D E N T I A L

DEPOSITION OF CHRIS TING

SAN FRANCISCO, CALIFORNIA

WEDNESDAY, JUNE 29, 2022



STENOGRAPHICALLY REPORTED BY:

ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR

CSR LICENSE NO. 9830

JOB NO. 846000



Page 6

| | | |
|---|---|---|
| 1 | DEPOSITION PROCEEDINGS | 08:44 |
| 2 | WEDNESDAY, JUNE 29, 2022 | 08:44 |
| 3 | 8:58 A.M. | 08:44 |
| 4 | | 08:44 |
| 5 | | 08:44 |
| 6 | THE VIDEOGRAPHER:  We are on the record. | 08:58 |
| 7 | This begins videotape No. 1 in the deposition of Chris | 08:58 |
| 8 | Ting. | 08:58 |
| 9 | In the matter of Maria Schneider, et al., | 08:58 |
| 10 | versus YouTube LLC, et al.  In the Northern District | 08:58 |
| 11 | of California, San Francisco Division.  Case | 08:58 |
| 12 | No. 3:20-CV-04423 JD. | 08:58 |
| 13 | Today is June 29th, 2022, and the time is | 08:58 |
| 14 | 8:58. | 08:58 |
| 15 | This deposition is being taken at Boies, | 08:58 |
| 16 | Schiller & Flexner, LLP, 44 Montgomery Street, | 08:58 |
| 17 | 41st Floor, San Francisco, California 94104, at the | 08:58 |
| 18 | request of Boies, Schiller & Flexner, LLP. | 08:59 |
| 19 | The videographer is Keigo Painter of Magna | 08:59 |
| 20 | Legal Services, and the court reporter is Andrea | 08:59 |
| 21 | Ignacio of Magna Legal Services. | 08:59 |
| 22 | Will counsel and all parties present state | 08:59 |
| 23 | their appearances and whom they represent. | 08:59 |
| 24 | MS. O'KEEFE:  I am Carol O'Keefe from Korein | 08:59 |
| 25 | Tillery, appearing on behalf of the plaintiffs. | 08:59 |

Page 7

| | | |
|---|---|---|
| 1 | With me is Ryan Cortazar, also of Korein | 08:59 |
| 2 | Tillery. | 08:59 |
| 3 | MR. BLAISDELL:  Demetri Blaisdell of Boies, | 08:59 |
| 4 | Schiller & Flexner, LLP, for the plaintiffs. | 08:59 |
| 5 | MR. WILLEN:  Brian Willen from Wilson | 08:59 |
| 6 | Sonsini, representing the defendants. | 08:59 |
| 7 | With me is Nathalie Gorman, also from Wilson | 08:59 |
| 8 | Sonsini. | 08:59 |
| 9 | MR. REED DIPPO:  Samuel Reed Dippo of Google | 08:59 |
| 10 | LLC. | 08:59 |
| 11 | THE VIDEOGRAPHER:  Okay.  Would the court | 08:59 |
| 12 | reporter please swear in the witness. | 08:59 |
| 13 | | |
| 14 | CHRIS TING, | |
| 15 | having been sworn as a witness | |
| 16 | by the Certified Shorthand Reporter, | |
| 17 | testified as follows: | |
| 18 | | |
| 19 | EXAMINATION | |
| 20 | BY MS. O'KEEFE: | |
| 21 | Q  Good morning, Mr. Ting. | 08:59 |
| 22 | A  Good morning. | 09:00 |
| 23 | Q  Could you please tell me what your roles have | 09:00 |
| 24 | been at Google. | 09:00 |
| 25 | A  Yes.  I -- I am currently the -- a people | 09:00 |

Page 8

| | | |
|---|---|---|
| 1 | manager on the copyright review ops team.  Previously | 09:00 |
| 2 | to that, I was an individual contributor on the same | 09:00 |
| 3 | team.  And previous to that, I was a contractor for | 09:00 |
| 4 | YouTube. | 09:00 |
| 5 | Q  Okay.  And when did you begin in your role as | 09:00 |
| 6 | a contractor for YouTube? | 09:00 |
| 7 | A  I began my role in 2012. | 09:00 |
| 8 | Q  And what were your responsibilities as a | 09:00 |
| 9 | contractor? | 09:00 |
| 10 | A  As a contractor, I reviewed and processed | 09:00 |
| 11 | DMCA takedown requests. | 09:00 |
| 12 | Q  And did you -- were you hired directly by | 09:00 |
| 13 | YouTube, or did you work for a vendor? | 09:00 |
| 14 | A  As a contractor? | 09:01 |
| 15 | Q  Yes. | 09:01 |
| 16 | A  As a contractor, I worked for a vendor. | 09:01 |
| 17 | Q  And what was the name of the vendor that you | 09:01 |
| 18 | worked for? | 09:01 |
| 19 | A  I have worked for multiple vendors. | 09:01 |
| 20 | Q  And what were the names of the vendors that | 09:01 |
| 21 | you worked for? | 09:01 |
| 22 | A  I can't remember the first one, but the | 09:01 |
| 23 | second one was Adecco, and the third one was Vaco. | 09:01 |
| 24 | Q  And how long were you with Adecco? | 09:01 |
| 25 | A  I -- I don't recall exactly how long. | 09:01 |

Page 9

| | | |
|---|---|---|
| 1 | Q  Okay.  So how many years altogether did you | 09:01 |
| 2 | work as a contractor at YouTube? | 09:01 |
| 3 | A  I don't recall exactly.  I can estimate, if | 09:02 |
| 4 | that's -- probably about three or -- between three and | 09:02 |
| 5 | four. | 09:02 |
| 6 | Q  Three and four years? | 09:02 |
| 7 | A  Three and four years.  Correct. | 09:02 |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | Q  And when were you hired by YouTube? | 09:02 |
| 21 | A  2016. | 09:02 |
| 22 | Q  Okay.  And what was your position when you | 09:03 |
| 23 | were hired by YouTube? | 09:03 |
| 24 | A  My position when I was hired by YouTube was | 09:03 |
| 25 | copyright operations specialist. | 09:03 |



3  (Pages 6 to 9)

Page 10

1      Q   And what are the duties and responsibilities      09:03
2   of a copyright operations specialist?                    09:03
3      A   Generally, the duties are to review legal         09:03
4   requests, such as DMCA takedown requests and             09:03
5   counter-notifications.  And in addition, we -- the       09:03
6   copyright operations specialists will support            09:03
7   questions from the -- the vendor team.                   09:03
8      Q   Any other duties or responsibilities for          09:03
9   copyright operations specialist?                         09:03
10     A   There is some project work, such as the           09:03
11  improvement of tools, ensuring that, you know, the --    09:03
12  the tools meet the needs of the -- the program as a      09:04
13  whole, and making sure we meet our -- our metrics.       09:04
14

Page 11

1

09:07

Page 12

1      Q   Okay.  And so that would have gone until          09:07
2   about 2020; is that right?                               09:07
3      A   Sounds right.                                     09:07
4      Q   Okay.  And what was your next position at         09:07
5   YouTube?                                                 09:07
6      A   My next position was copyright operations         09:07
7   team lead on the same team, the copyright operations     09:07
8   review -- sorry -- the review ops team.                  09:07
9      Q   Okay.  And what are your responsibilities in      09:07
10  that role?                                               09:07
11     A   The responsibilities are largely the --           09:07
12  they're similar.  I -- the work is similar.  Excuse       09:07
13  me.  It -- the -- the main difference is, I have          09:07
14  copyright operations specialists reporting to me, so     09:07
15  I'm sort of overseeing their work.  But if -- they are   09:07
16  doing the same work that I had previously been doing.    09:07
17

Page 13

1



Page 14

Page 15

09:12

```
 6    Q   So is your role limited to the processing of      09:12
 7   DMCA takedowns?                                        09:12
 8    A   That is the primary role, yes.                    09:12
 9    Q   What do you do in addition to that?               09:12
10    A   So in addition to looking at -- to reviewing      09:12
11   at scale our DMCA -- incoming DMCA takedown requests,     09:12
12   we also support our vendor team with questions they    09:12
13   may have.  And should a vendor reviewer escalate a     09:12
14   DMCA takedown request, then our team will -- will      09:12
15   review and make a decision.                            09:12
16    Q   And does your team evaluate the sufficiency       09:12
17   of the DMCA takedown notice?                           09:12
18    A   That -- that is one portion of the review of      09:12
19   a DMCA takedown request.                               09:13
20    Q   And does your team, when it finds that a DMCA     09:13
21   notice is sufficient, re- -- remove the video from the   09:13
22   platform?                                              09:13
23      MR. WILLEN:  Objection to the form.                 09:13
24      THE WITNESS:  So -- so there is -- that is          09:13
25   one portion of the review process.  You know, if we    09:13
```

Page 16

```
 1   receive a DMCA takedown request, one part of the       09:13
 2   review is to ensure that the DMCA takedown request has    09:13
 3   fulfilled or met the statutory requirements.           09:13
 4       Beyond that, we do -- we check for other           09:13
 5   things, such as ensuring that the takedown is -- is    09:13
 6   not fraudulent and not abusive.                        09:13
 7       And -- and -- and beyond that, we also check       09:13
 8   to -- to ensure that there are -- we -- we look to see    09:13
 9   if there are any exceptions to -- to copyright which   09:14
10   may exist.                                             09:14
11      MS. O'KEEFE:  Q.  What exceptions to                09:14
12   copyright does your team examine?                      09:14
13    A   We examine copyright exceptions such as fair      09:14
14   use.                                                   09:14
15
```

Page 17



Page 18

1

Page 19

1

Page 20

1

24   MR. WILLEN:  Why don't we take a sidebar so I   09:20
25   can under- -- I think I need to understand what he's   09:20

Page 21

1   talking about --                              09:20
2        MS. O'KEEFE:  Okay.                       09:20
3        MR. WILLEN:  -- so that we can see if he can   09:20
4   answer your questions.                         09:20
5        MS. O'KEEFE:  Okay.                       09:20
6        MR. WILLEN:  So why don't we go off the    09:20
7   record and do that.                            09:20
8        MS. O'KEEFE:  Off the record, please.     09:20
9        THE VIDEOGRAPHER:  We are going off the   09:20
10   record.  The time is 9:20.                     09:20
11        (Recess taken.)                           09:20
12        THE VIDEOGRAPHER:  We are back on the record.   09:24
13   The time is 9:24.                              09:24
14        MR. WILLEN:  So I think the last question   09:24
15   was, what systems do you use to accomplish that?  And   09:24
16   I think that question may have just been a little bit   09:24
17   confusing.                                     09:24
18        I think if what you're asking is about the   09:24
19   sort of physical mechanics of the review, and not kind   09:24
20   of the legal determinations or legally informed   09:25
21   determinations that go into the review, I think he can   09:25
22   answer that question.                          09:25
23        So if that's what you're asking, I think you   09:25
24   can -- you can try to give an answer to it, but --   09:25
25        MS. O'KEEFE:  Okay.  Before we --         09:25



6  (Pages 18 to 21)

1    MS. O'KEEFE:  Q.  Is it nearly 100 percent?    10:03
2    A  Your question is, are 100 percent of the --    10:03
3  potentially the cases where they have potential fair    10:03
4  use or some copyright exception cases where --    10:03
5    Q  Simply fair use.  We're talking about just    10:03
6  fair use right now.                    10:03
7        When you have examined videos for fair use,    10:03
8  how frequently do you have a complete copy of the    10:03
9  original work provided by the DMCA takedown claimant?    10:03
10    MR. WILLEN:  Objection to the form.    10:03
11    THE WITNESS:  I -- I don't know.    10:03
12    MS. O'KEEFE:  Okay.            10:03
13    THE WITNESS:  I -- I'm just, like --    10:03
14    MS. O'KEEFE:  Q.  Is it more than 10 percent    10:03
15  of the time?                    10:03
16    A  It could be.  I -- I just -- I -- total    10:04
17  speculation if I answered this question.  So I don't    10:04
18  have a sense of the percentage in this case.    10:04
19    Q  When was the last time you consulted legal    10:04
20  counsel regarding a fair use determination?    10:04
21    A  Myself personally?            10:04
22    Q  Uh-huh.                10:04
23    A  Maybe in the last two weeks.        10:04
24    Q  And how many times in the last month have you    10:04
25  consulted legal counsel for a fair use determination?    10:04

1    A  Myself personally?            10:04
2    Q  Yourself personally.            10:04
3    A  I -- I would, I guess, remind -- remind you    10:04
4  that I -- I -- I'm a people manager, so I am not    10:04
5  participating in individual work as frequently as --    10:04
6  as some other people on the team.  So I may not be    10:05
7  myself processing many takedown requests at any given    10:05
8  time.                        10:05
9        So with that in mind, the question was, how    10:05
10  many times per month?                10:05
11    Q  How many times in the last month have you    10:05
12  consulted with legal counsel on a fair use question?    10:05
13    A  I -- I don't have an exact number.    10:05
14    Q  What's your best estimate?        10:05
15    A  I would say likely less than ten.    10:05
16    Q  Less than five?            10:05
17    A  I'm not sure about less than five.    10:05
18    Q  And how many DMCA takedown notices have you    10:05
19  processed this month?                10:05
20    MR. WILLEN:  Objection to the form.    10:05
21    THE WITNESS:  I think similarly to my    10:05
22  previous response, again, I'm a people manager, so    10:06
23  I -- I don't participate very much these days in    10:06
24  actioning DMCA requests myself.  So I -- I do not    10:06
25  remember how many I've processed in the last month.    10:06

1    MS. O'KEEFE:  Q.  Can -- can you give me your    10:06
2  best estimate?                    10:06
3    A  I would also say less -- less than ten.    10:06
4    Q  Less than ten?                10:06
5    A  (Witness nods head.)            10:06
6    Q  You've -- you've -- you've examined less than    10:06
7  ten DMCA takedown notices in the last month?    10:06
8    A  Myself personally?            10:06
9    Q  Yourself personally, yeah.        10:06
10    A  Yes.                    10:06
11    Q  What is the policy -- strike that.    10:06
12        How does a member of the copyright operations    10:06
13  team determine whether to review a particular takedown    10:07
14  notice for fair use?                10:07
15    MR. WILLEN:  Objection to the form.    10:07
16    THE WITNESS:  So I think we would -- a member    10:07
17  of the copyright operations team would review a DMCA    10:07
18  takedown notice by going through certain steps.    10:07
19        Number one is to determine whether the    10:07
20  takedown meets the statutory requirements, whether    10:07
21  the -- as required by the DMCA, there are some    10:08
22  elements there that need to be present.    10:08
23        And after that, the copyright operations team    10:08
24  would look to see whether the -- there's any abuse of    10:08
25  the process.  For instance, if the claimant does    10:08

1  not -- is submitting a DMCA takedown request for    10:08
2  content that they are not -- they do not own or are    10:08
3  falsifying information on the legal form.    10:08
4        And then the last step would be to    10:08
5  determine -- to -- to -- to evaluate potential copyright    10:08
6  exceptions, such as fair use.            10:08
7    MS. O'KEEFE:  Okay.            10:08
8    Q  Do you evaluate every single takedown notice    10:08
9  for copyright exceptions?            10:08
10    A  We -- there are a portion of -- so we have --    10:08
11  we have some degree of automation.        10:09
12        So a -- a classifier will evaluate a certain    10:09
13  subset of DMCA takedown requests.  And per the logic    10:09
14  of the classifier, if there are signals in -- that it    10:09
15  detects which potentially would flag it for manual    10:09
16  review, for human review, then it would send it over    10:09
17  to human review.  And as part of human review,    10:09
18  reviewers will evaluate for copyright exceptions.    10:09
19    Q  What is your best understanding of the    10:09
20  classifiers that will send a takedown notice for    10:09
21  manual review?                    10:09
22    A  My best understanding of the classifiers?    10:09
23        Unfortunately, that is -- it's kind of the    10:10
24  domain of the product team.  Like, I -- I myself    10:10
25  and -- and my team, we -- we don't -- we don't set the    10:10



1 logic of -- of how the classifiers work. So that --   10:10
2 it's a bit outside my expertise.   10:10
3    Q   Okay.  I understand that you don't set the   10:10
4 logic.   10:10
5       Do you have an understanding of the logic of   10:10
6 how the classifiers work?   10:10
7    A   Broadly.   10:10
8    Q   Can you please provide me with your broad   10:10
9 understanding of the logic of how those classifiers   10:10
10 work.   10:10
11    A   So similar to how I've described the overall   10:10
12 review process where, you know, our -- any given DMCA   10:10
13 takedown request is evaluated for completeness on the   10:10
14 basis of the DMCA statutory requirements, as well as,   10:10
15 you know, ruling out potential abuse, and then taking   10:10
16 into consideration copyright exceptions such as   10:11
17 fair -- fair use, a -- the classifier will similar --   10:11
18 similarly try to take some of these into account.   10:11
19       So if the classifier is uncertain -- this is   10:11
20 to my best knowledge.  Again, I -- I'm not an expert   10:11
21 in this on the product side.  But to my best   10:11
22 knowledge, if the classifier is uncertain that one of   10:11
23 these requirements has been met, then it will route it   10:11
24 for a human to take a look at.   10:11
25    Q   Okay.  Does YouTube ever find a DMCA notice   10:11

1 to be insufficient without a manual review?   10:11
2    A   If the classifier finds that it is uncertain,   10:11
3 again, to the best of my knowledge, as I am not a   10:12
4 product specialist or have expertise in -- in the   10:12
5 product or the classifier itself, my understanding is   10:12
6 that if the classifier is uncertain, and there is the   10:12
7 possibility that a DMCA notice is incomplete in some   10:12
8 way, it will route to human review.  And the human   10:12
9 will there -- will complete the task and review all   10:12
10 the -- all the elements as I've described.   10:12
11    Q   To the best of your knowledge, does the   10:12
12 classifier consider the number of views on the video?   10:12
13    A   I -- I do not know the answer to that.   10:12
14    Q   Do you know whether the classifier considers   10:12
15 the number of subscribers to the channel on which the   10:12
16 video is posted?   10:12
17    A   I -- I don't know.  These are --   10:12
18    Q   Who --   10:13
19    A   -- questions for the product team.   10:13
20    Q   Yeah.   10:13
21       Who is on the product team that would deal   10:13
22 with the classifier, if you know?   10:13
23    A   I -- I believe Kevin Zhu is -- would -- would   10:13
24 be -- he -- he's familiar with the product side.   10:13
25    Q   Okay.  I believe Mr. Zhu has moved to   10:13

1 content ID.   10:13
2       So who would be -- who else would be on   10:13
3 the --   10:13
4    A   I believe that is --   10:13
5    Q   -- the team?   10:13
6    A   -- that's the same team.   10:13
7    Q   That's the same team?   10:13
8    A   (Witness nods head.)   10:13
9    Q   Okay.  Who else is on that team besides Kevin   10:13
10 Zhu?   10:13
11    A   I -- I believe Julian Bill is on that team.   10:13
12    Q   And who else is on that team?   10:13
13    A   I believe he reports to David Rosenstein.   10:13
14    Q   Okay.  Going back to the factors for fair   10:13
15 use, when the DMCA takedown notice does not include a   10:14
16 copy of the original work, how do you determine how   10:14
17 much of the original work has been used?   10:14
18    A   It's a case-by-case basis.  In certain cases,   10:14
19 the claimants may provide a link to a work on a   10:14
20 different site -- their -- their work on a different   10:14
21 site which we may be able to access and -- and view.   10:14
22       In cases where the claimant provides a   10:14
23 description of the work, it may be so well known that   10:14
24 we understand to some degree what -- what is the --   10:14
25 the extent of that work; for instance, if it's a   10:14

1 well-known film.   10:15
2    Q   And in the absence of those resources, how do   10:15
3 you determine how much of the work is used?   10:15
4    A   We have -- in -- in the UI, there is -- the   10:15
5 review UI, there is a section where timestamps --   10:15
6 where we allow the claimant to pro- -- to provide   10:15
7 timestamps where the original -- where they believe   10:15
8 their -- their original work is used in the targeted   10:15
9 work.   10:15
10    Q   So that would allow you to determine how much   10:15
11 of the targeted work -- strike that.   10:15
12       So that would allow you to determine what   10:15
13 portion of the targeted work is represented by the   10:16
14 original work; correct?   10:16
15       MR. WILLEN:  Objection to the form.   10:16
16       THE WITNESS:  So that would -- that   10:16
17 provide -- that information is -- provides us with   10:16
18 what the claimants believe -- what timestamps the   10:16
19 claimant believes their original work exists in the   10:16
20 targeted work.   10:16
21       It may be correct, it may be incorrect, but   10:16
22 it gives us a guidepost to -- to look at the targeted   10:16
23 work and determine whether -- you know, after looking   10:16
24 at it ourselves, whether that content, in fact -- the   10:16
25 claimant's content, in fact, is likely to -- to   10:16



Page 50

1 exist at those timestamps.                                    10:17
2      MS. O'KEEFE:  Q.  In making a fair use        10:17
3 determination where the DMCA claimant has not provided  10:17
4 a copy of the original work, does the copyright        10:17
5 operations team ever request that the claimant provide  10:17
6 a copy of the original work?                              10:17
7      A  If the complaint is incomplete from a DMCA    10:17
8 statutory requirement perspective, then we will ask    10:17
9 the claimant to provide additional details about their  10:17
10 original copyrighted work.                              10:17
11      The claimant may provide a copy of the          10:17
12 original work, or ultimately, they may provide a      10:17
13 description or a better description of the copyrighted  10:17
14 work.                                                    10:17
15      Q  Does the YouTube copyright operations team    10:17
16 ever request specifically that the claimant provide a  10:17
17 copy of the original work?                              10:18
18      MR. WILLEN:  Objection to the form.            10:18
19      THE WITNESS:  In the response that I          10:18
20 previously described, it -- it is an option that the    10:18
21 claimant provides a copy.  But there -- that -- that    10:18
22 is one -- one question that we ask.                    10:18
23      MS. O'KEEFE:  Q.  What question do you ask      10:18
24 specifically?                                            10:18
25      A  I would need to -- I don't have -- I don't    10:18

Page 51

1 recall the exact wording of this canned response.      10:18
2      If I had to broadly describe it, I -- I          10:18
3 believe questions that are asked when we push back for  10:18
4 a better description of the copyrighted work may        10:18
5 include if the claimant can provide a copyright        10:18
6 registration number or the type of copyrighted work,  10:18
7 who is the author of the copyrighted work, when was --  10:19
8 when was it created.  These are some of the questions,  10:19
9 for example.                                            10:19
10      Q  If a copyright owner provides a registration  10:19
11 number, do you enter that into your copyright owner    10:19
12 database?                                                10:19
13      MR. WILLEN:  Objection to the form.            10:19
14      THE WITNESS:  If we -- so I -- there is --      10:19
15 there's a public database for -- for U.S. copyright    10:19
16 registered works.  That is a potential place we could  10:19
17 check.                                                  10:19
18      MS. O'KEEFE:  Okay.                            10:19
19      Q  So my question is if, as part of the DMCA    10:19
20 takedown process, the copyright owner at any point    10:19
21 provides you with a copyright registration identifier,  10:19
22 do you enter that information into your database?      10:19
23      MR. WILLEN:  Objection to the form.            10:20
24      THE WITNESS:  Can -- can you explain what you    10:20
25 mean by "your database."                              10:20

Page 52

1      MS. O'KEEFE:  Q.  I mean either the takedown    10:20
2 notice table, the takedown notice -- actually, strike  10:20
3 that.                                                    10:20
4      I believe the name of it is the copyright        10:20
5 complaint table, the copyright complaint video table,  10:20
6 the copyright strike table, or the suspension table.    10:20
7      A  So I -- this is -- the -- the tables and      10:20
8 databases are outside of my area of expertise.  I      10:20
9 think that's -- another team would -- would have more  10:20
10 information about what goes into those tables.          10:20
11      Q  Okay.  Do you have access to the copyright    10:20
12 registration number within your user interface if the  10:20
13 copyright claimant has provided that information?      10:20
14      MR. WILLEN:  Objection to the form.            10:21
15      THE WITNESS:  The copyright -- there is no      10:21
16 copyright registration number in -- in a -- in our    10:21
17 review user -- in our user interface -- review user    10:21
18 interface.                                              10:21
19      MS. O'KEEFE:  I understand that there is no      10:21
20 specific field for that.                              10:21
21      Q  But if the -- if the copyright claimant      10:21
22 provides a copyright registration number, are you able  10:21
23 to access that information?                            10:21
24      MR. WILLEN:  Objection to the form.            10:21
25      THE WITNESS:  I'm still a little confused.      10:21

Page 53

1      If the -- so you -- you said if the copyright    10:21
2 claimant provides a registration number, are you able  10:21
3 to access that information?                            10:21
4      We -- as I mentioned before, if the claimant    10:21
5 provides a copyright registration number, we -- we can  10:21
6 look it up in a -- through -- through the copyright    10:22
7 office database.                                        10:22
8      MS. O'KEEFE:  Q.  But you can actually see      10:22
9 the number that the copyright claimant has provided?  10:22
10 Yes?                                                    10:22
11      MR. WILLEN:  Objection to the form.            10:22
12      THE WITNESS:  If in response to a canned --    10:22
13 one of our pushbacks, or if the claimant provides a    10:22
14 copyright registration number on their own volition,    10:22
15 it will be in the e-mail thread, and we will -- and we  10:22
16 will see it there.                                      10:22
17      MS. O'KEEFE:  Okay.  Thank you.                10:22
18      Q  Have you ever made -- strike that.          10:22
19      In making a fair use evaluation, is there any    10:23
20 minimum amount of the copyrighted work that your      10:23
21 policies require to be present in the uploaded work in  10:23
22 order to have a finding of fair use?                  10:23
23      MR. WILLEN:  Objection to the form.            10:23
24      And I think we may be getting close to a        10:23
25 privilege issue.  I'm not totally sure I understand    10:23



1    the question.                                    10:23
2        But I would just admonish the witness that if      10:23
3    you can answer that question without revealing the    10:23
4    substance of attorney-client communications, you can  10:23
5    give an answer if you understand the question.        10:23
6        But please don't reveal communications that       10:24
7    you had with counsel in connection with an answer to  10:24
8    this question.                                   10:24
9        THE WITNESS:  In terms of the amount of the       10:24
10   original copyrighted work used in the targeted work,  10:24
11   it is a case-by-case basis.  There are factors that   10:24
12   come into play which may influence whether there is a  10:24
13   greater likelihood of there being a copyright         10:24
14   exception.  The amount used is one of those factors,  10:24
15   and it -- it -- it -- it really depends on the case.  10:24
16       MS. O'KEEFE:  Okay.                          10:24
17    Q   Are there any numerical guidelines that you      10:24
18   utilize in examining the amount used?               10:24
19       MR. WILLEN:  Same objections and admonitions.    10:24
20       THE WITNESS:  I don't think I can provide         10:24
21   any -- I -- I can't provide a number in this case.    10:25
22       MS. O'KEEFE:  Okay.                          10:25
23    Q   Do your training materials provides a number     10:25
24   on that factor?                                  10:25
25    A   So --                                       10:25

1        MR. WILLEN:  Same objections; same            10:25
2    admonitions.                                    10:25
3        THE WITNESS:  You know, as I mentioned,        10:25
4    the -- it's -- it's highly dependent upon the context,  10:25
5    upon the case, upon the facts of the specific DMCA    10:25
6    takedown request, and whether -- I'm sorry.  It       10:25
7    just -- it depends on the facts of the case.         10:25
8        So if there -- it may be that in certain         10:25
9    cases, a -- a shorter numerical duration of the work  10:25
10   being used could -- could increase the likelihood --  10:25
11   could be a copyright exception, and in other cases it  10:26
12   could be a longer use.                           10:26
13       MS. O'KEEFE:  Q.  Do your training materials    10:26
14   provide any numerical guidelines in connection with   10:26
15   the evaluation of how much of the copyrighted work is  10:26
16   used?                                          10:26
17       MR. WILLEN:  Object as to form, and similar     10:26
18   admonitions.                                    10:26
19       THE WITNESS:  I -- I don't recall if there is   10:26
20   any numerical number in -- in the training.         10:26
21       MS. O'KEEFE:  Okay.                          10:26
22    Q   How do you evaluate impact, the third factor    10:26
23   that you listed in your fair use evaluation?         10:26
24       MR. WILLEN:  So objection to the form.          10:26
25       And I'm not going to repeat everything I said   10:26

1    before.  But again, if -- if you can answer that      10:27
2    question without getting into the substance of        10:27
3    communications you've had with counsel, you -- you can  10:27
4    answer the question.  But please don't reveal          10:27
5    attorney-client communications.                   10:27
6        THE WITNESS:  By "impact," I -- I believe       10:27
7    you -- you mean impact on the mark-- market impacts?  10:27
8        MS. O'KEEFE:  Yes.                           10:27
9        THE WITNESS:  So I think broadly, we look to    10:27
10   see whether the targeted work will have a negative   10:27
11   impact on the original copyrighted work if they share  10:27
12   the same marketplace for -- for sale, for instance.   10:27
13       And so I think one question that is kind of     10:27
14   typically asked is whether the targeted work, you    10:27
15   know, directly competes and -- with the original work  10:28
16   such that someone who wanted to consume that content  10:28
17   would go to the targeted work instead of the -- and   10:28
18   watch or view the -- the targeted work instead of the  10:28
19   original work.                                   10:28
20       MS. O'KEEFE:  Q.  And what guidelines do you    10:28
21   have for determining whether the two works are in    10:28
22   same market?                                    10:28
23       MR. WILLEN:  So again, I think this question    10:28
24   is going to trudge fairly close to substance of       10:28
25   potential legal advice.                           10:28

1    So I don't know if you can answer the             10:28
2    question without revealing that substantive advice.   10:28
3    But if you can, you're welcome to -- to try.         10:29
4        THE WITNESS:  Well, I'm not sure what the       10:29
5    guidelines for works being in the same market are.   10:29
6        Broadly speaking, I think one situation to      10:29
7    think about would be if the -- the works are being   10:29
8    used in -- for the same -- in -- in sort of the same  10:29
9    market, such as -- maybe an example would be helpful.  10:29
10       If we -- if it's a photograph, for instance,    10:29
11   and there's a license market for the photograph, and  10:30
12   if the photograph appears in a way that could be --   10:30
13   you know, like, would -- would bypass the license    10:30
14   market, that -- that is something that kind of broadly  10:30
15   would -- may -- may not -- may detract from a        10:30
16   copyright exception argument.                      10:30
17       MS. O'KEEFE:  Q.  Do you consult YouTube's     10:30
18   own content roster for determining whether the two   10:30
19   works are in the same market?                      10:30
20       MR. WILLEN:  Objection to the form.             10:30
21       THE WITNESS:  I'm not sure what YouTube's      10:30
22   content roster is.                               10:31
23       MS. O'KEEFE:  Q.  Any of the services that     10:31
24   YouTube offers.                                  10:31
25       MR. WILLEN:  Objection to the form.             10:31

