Exhibit 5

to the Declaration of Catherine Hartman

Public Redacted Version

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated;<br><br>                    Plaintiffs,<br><br>v.<br><br>YOUTUBE, LLC; and GOOGLE LLC,<br><br>                    Defendants. | Case No. 3:20-cv-4423 |

**EXPERT REPORT OF JOSEPH M. WINOGRAD FOR PLAINTIFFS**

September 1, 2022

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................ 4

   A.   ENGAGEMENT .................................................................................. 4

   B.   QUALIFICATIONS .............................................................................. 5

   C.   COMPENSATION ............................................................................... 8

   D.   MATERIALS CONSIDERED ................................................................. 8

   E.   TERMINOLOGY ................................................................................ 8

   F.   ASSUMPTIONS ................................................................................. 8

II.     SUMMARY OF CONCLUSIONS AND OPINIONS ........................... 9

III.    CONTENT ID IS HIGHLY EFFECTIVE IN FINDING COPYRIGHT
        INFRINGEMENT ON YOUTUBE. .................................................. 10

   A.   CONTENT ID AUTOMATICALLY FINDS INFRINGING VIDEOS USING DEFENDANTS' POWERFUL
        MATCHING SYSTEM ........................................................................ 10

   B.   DEFENDANTS' MATCHING SYSTEM ENABLES CONTENT ID TO FIND A RANGE OF INFRINGING
        MATERIAL ..................................................................................... 14

   C.   DEFENDANTS' MATCHING SYSTEM IS APPLIED COMPREHENSIVELY TO VIDEOS ON
        YOUTUBE ..................................................................................... 19

IV.     THE TOOLS DEFENDANTS PROVIDE TO ORDINARY COPYRIGHT OWNERS
        ARE DESIGNED IN A MANNER THAT PREVENTS THE IDENTIFICATION OF
        MANY TYPES OF INFRINGING VIDEOS. ..................................... 24

   A.   THE TOOLS PROVIDED TO ORDINARY COPYRIGHT OWNERS ARE DRAMATICALLY LESS
        EFFECTIVE AT FINDING COPYRIGHT INFRINGEMENT THAN THOSE PROVIDED TO CONTENT ID
        PARTNERS ..................................................................................... 24

   B.   YOUTUBE SEARCH CANNOT DETECT A WIDE RANGE OF TYPICAL COPYRIGHT
        INFRINGEMENTS AND ITS DEDUPLICATION FEATURE PREVENTS USERS FROM FINDING
        MULTIPLE SIMILAR VIDEOS THAT INFRINGE THEIR WORKS ................ 26

      1.   YouTube Search cannot find infringing videos that are not annotated with text that
            specifically identifies the infringed work ................................ 30

      2.   YouTube Search is ineffective at finding videos that infringe works identified by
            generic or non-unique descriptions ......................................... 31

      3.   Infringing videos on YouTube with a privacy setting of unlisted or private are shielded
            from discovery using YouTube Search ..................................... 33

   C.   MANUAL COPYRIGHT SEARCH IS DESIGNED TO FIND INFRINGING VIDEOS ON YOUTUBE BUT
        IS NOT AVAILABLE TO MOST ORDINARY COPYRIGHT OWNERS. ......... 35

D.  COPYRIGHT MATCH TOOL PROVIDES AN INFERIOR MATCHING TOOL TO A LIMITED NUMBER OF ORDINARY COPYRIGHT OWNERS. .......................................................... 36

    1.  **Copyright Match Tool was developed to protect YouTube's popular YouTube Partner channels** ..................................................................................... 37

    2.  **Defendants limited the utility of the Copyright Match Tool extended to filers of successful DMCA takedown notices.** ................................................ 41

V.  **DEFENDANTS COULD PROVIDE THE PLAINTIFF CLASS WITH FULL ACCESS TO THEIR MATCHING SYSTEM AT LIMITED ADDITIONAL COST** ............................... 43

A.  DEFENDANTS HAVE ALREADY BUILT AND ARE OPERATING THE CAPABILITIES NEEDED TO ENABLE ORDINARY COPYRIGHT OWNERS TO EFFECTIVELY FIND INFRINGING VIDEOS ON YOUTUBE ......................................................................................... 43

B.  PROVIDING ORDINARY COPYRIGHT OWNERS WITH EFFECTIVE TOOLS TO FIND INFRINGING VIDEOS ON YOUTUBE IS WITHIN DEFENDANTS' EXISTING CAPABILITIES AND BUDGET FOR SUCH ACTIVITIES AND COULD BE EXECUTED WITH LITTLE TECHNICAL RISK.......................... 46

C.  DEFENDANTS CAN PROVIDE ORDINARY COPYRIGHT OWNERS WITH ACCESS TO CONTENT ID'S MATCHING CAPABILITIES WITHOUT INCREASING ABUSE AND INVALID USE .................. 48

VI.  **THROUGH YOUTUBE'S AUTOPLAY AND WATCHNEXT VIDEO RECOMMENDATION SYSTEMS, DEFENDANTS ACTIVELY PROMOTE AND CONTROL THE PRESENTATION OF INFRINGING CONTENT TO VIEWERS.** ..... 53

A.  DEFENDANTS' WATCHNEXT RECOMMENDATIONS ARE THE ▇▇▇▇▇▇▇▇▇▇▇▇ OF WHAT VIDEO IS WATCHED ON YOUTUBE ............................................................... 53

B.  DEFENDANTS EXERT EXPLICIT CONTROL OVER WHAT VIDEOS ARE RECOMMENDED BY WATCHNEXT, AND CONSEQUENTLY WHAT VIDEOS YOUTUBE VISITORS WATCH .................. 59

C.  DEFENDANTS' DESIGN OF WATCHNEXT AND AUTOPLAY AND THEIR WITHHOLDING OF EFFECTIVE COPYRIGHT MANAGEMENT TOOLS FROM ORDINARY COPYRIGHT OWNERS HAVE ENABLED THEM TO PROMOTE INFRINGING VIDEOS ON YOUTUBE TO VIEWERS WITH THE STRONGEST INTEREST ................................................................................. 67

**Exhibit A.**       **Curriculum Vitae** ............................................................. 71

**Exhibit B.**       **List of Materials Considered** .......................................... 77

**Exhibit C.**       **Glossary of Terms** .......................................................... 83

**Exhibit D.**       **Capabilities Summary of YouTube Copyright Management Tools** ........ 86

CONFIDENTIAL

## I.     <u>Introduction</u>

### A.     Engagement

[1] I have been engaged by plaintiffs Maria Schneider, Uniglobe Entertainment, LLC, and AST Publishing Ltd. ("Plaintiffs") in the above-captioned matter brought by Plaintiffs against defendants YouTube, LLC and Google, LLC ("Defendants") to provide expert testimony as set forth below. My engagement by Plaintiffs was made solely in my personal capacity and has been conducted independently and without involvement of any kind by my employer, Verance Corporation.

[2] I have been asked by Plaintiffs to provide expert opinions on (a) the effectiveness of YouTube's Content ID system in finding copyright infringement; (b) the inadequacy of the tools Defendants provide to Ordinary Copyright Owners seeking to find infringing works on the YouTube platform; (c) the role played by Defendants' Autoplay and WatchNext video recommendation systems in serving copyright infringing videos to YouTube viewers; and (d) the costs associated with providing Content ID's matching capability to the plaintiff class.

[3] My opinions are based in part on more than 25 years of active development and operation of content identification technologies for the entertainment industry, including widely used industry standard technologies for copyright management of video and music. These technologies have been applied to many thousands of commercial works and incorporated in over 500 million consumer devices. Throughout my career, I have worked in close concert on content identification and copyright management issues with technical, legal, and business representatives of the film, television broadcasting, radio

4

CONFIDENTIAL

broadcasting, feature music, non-feature music, advertising, performing rights, computer

system, computer software, silicon chip, and consumer electronics industries.

**[4]** In addition to my personal knowledge, background, and experience in the field, my

opinions are based on an independent examination of documents and materials produced

in the matter to date. Should additional relevant information become available, I

respectfully reserve the right to amend or supplement my opinions as necessary.

**[5]** This Expert Report ("Report") has been prepared in connection with the above-

referenced matter.

**[6]** If called upon as a witness in this matter, I could and would provide the following

testimony.

### B.      Qualifications

**[7]** I currently serve as the Executive Vice President and Chief Technology Officer of

Verance Corporation ("Verance"). Verance is a technology development and licensing

company whose primary business activity is providing content identification solutions for

the media and entertainment, computer, and consumer electronics industries. I am a

founder of the company and have been engaged in this capacity by Verance and its

predecessor company, ARIS Technologies, Inc., since 1995. My role at Verance includes

executive-level responsibility for technology development, product development, product

strategy, intellectual property, industry standards, and product evangelism. Under my

leadership, Verance's content identification solutions have been adopted as multi-

industry standards for music, film, and television and commercially deployed as follows.

5

CONFIDENTIAL

[8] In 1999, Verance's *VCMS/A* audio watermarking technology (also marketed under the names *ARIS-SOLANA-4C* and *VERANCE-4C*) was selected as a multi-industry standard for copyright protection of commercial sound recordings by the 200-member Secure Digital Music Initiative consortium. The purpose of this standard is to provide a means for personal computer applications, such as personal music library software, and consumer electronic devices such as portable music and optical disc players and recorders, to automatically identify and limit the use of unauthorized copies of copyrighted sound recordings. As a result of this selection, in partnership with the 4C Entity, LLC (a consortium controlled by Intel, IBM, Matsushita (Panasonic), and Toshiba), the technology was in 2001 made a mandatory component of the DVD-Audio consumer electronics format and incorporated in over 50 million consumer optical disc recorders and players.

[9] Between 2000 and 2006, Verance operated the *ConfirMedia* service that use audio watermarking technology to automatically identify and measure the use of audio and audiovisual works in radio and television broadcasts. The service was used by over 100 advertisers, programmers, broadcast networks, performing rights organization, and non-feature (background) music to obtain next-day measurement confirmation of the inclusion of their works on national and local radio and television broadcasts across the 100 largest U.S. markets.

[10]     In 2006, Verance's *Cinavia* audio watermarking technology (also marketed under the name *VCMS/AV*) was selected as a multi-industry standard by the AACS LA, LLC (a consortium controlled by The Walt Disney Company, Intel, Microsoft, Matsushita (Panasonic), Warner Bros. Entertainment, IBM, Toshiba, and Sony Corp.) for copyright

6

CONFIDENTIAL

protection of movies, television programs, and other commercial audiovisual works. The purpose of this standard is to provide a means for consumer electronics devices and computer systems to automatically identify and limit the use of unauthorized copies of copyrighted audiovisual works. As a result of this selection, the technology was in 2011 made a mandatory component of the Blu-ray Disc consumer electronics format and incorporated in over 500 million Blu-ray Disc players, personal computers, and game consoles, including Sony PlayStation 3, 4 and 5, and Microsoft Xbox 360, One, and Series X. The *Cinavia* technology has been applied to protect hundreds of theatrical and home entertainment titles, including releases from Warner Bros., Universal Studios, Twentieth-Century Fox Films, The Walt Disney Company, Lions Gate Entertainment, and Sony Pictures Entertainment.

[11]      In 2015, Verance's *VP1* audio and video watermarking technologies (also referred to by the standards numbers ATSC A/334 and ATSC A/336 and marketed under the tradename *Aspect*) were selected as multi-industry standards by the Advanced Television Systems Committee (the governing body of the North American television broadcast system) and the DVB (the governing body of the international television broadcast standard used across Europe and in 40 other countries worldwide) to enable content identification of broadcast video for the purpose of enabling interactive applications to be incorporated within traditional broadcast television services. The first television sets incorporating these standards were launched by LG Electronics in 2022, with the FOX network as the first national broadcast network deploying the technology.

[12]      I am the recipient of a Technical and Engineering Emmy award from the National Academy of Television Arts and Sciences for my contributions to advancements in

content identification technologies and I am the inventor of 63 issued U.S. Patents and an additional 81 published U.S. Patent Applications in the field. All this work has been performed in my capacity as the founder and Chief Technology Officer of Verance.

**[13]**     My patent and publication lists are included in my curriculum vitae, a copy of which is attached to the Report as Exhibit A.

### C.     Compensation

**[14]**     My work on this matter is being billed at the rate of $750.00 per hour. My compensation is not contingent upon, dependent upon, or related in any way to the outcome of the matters.

### D.     Materials Considered

**[15]**     In preparation for the Report and expert testimony that I may be called on to provide, I have considered the materials listed in Exhibit B.

### E.     Terminology

**[16]**     Certain terminology is used in this report with a specific meaning that differs from its general English usage. Such terminology is written with its first letter capitalized and is listed, with a definition of my intended meaning, in Exhibit C.

### F.     Assumptions

**[17]**     Counsel has informed me that there are two elements to establish copyright infringement: (1) ownership of the copyrighted work; and (2) violation of at least one exclusive right in the copyrighted work.[1]   For purposes of this report, counsel has asked

---

[1] 17 U.S.C. § 501(a).

CONFIDENTIAL

me to assume that copyright infringement occurs when a copyrighted work is contained in a video uploaded to YouTube without the copyright owner's permission.[2]

## II.  <u>Summary of Conclusions and Opinions</u>

[18]      YouTube stores a massive collection of videos uploaded by its users and presents them together with paid advertising to an equally massive global audience. Defendants provide a small group of copyright owners a tool called Content ID that enables them to find and assert Claims against the large number of uploaded videos to YouTube that infringe their copyrights. Content ID employs a powerful Matching System that comprehensively scans videos on YouTube and can automatically find a wide range of infringing material. (Part III)

[19]      Copyright owners that are denied access to Content ID and the full infringement discovery capabilities of Defendants' Matching System are relegated to the use of inferior tools, designed by Defendants in a manner that makes them ineffective at finding many types of infringing videos on YouTube. (Part IV)

[20]      Defendants have already built and are operating the capabilities that would allow copyright owners denied access to Content ID to effectively find videos on YouTube that infringe their works and could provide the necessary access at limited additional cost and without increasing abuse and invalid use of their tools. (Part V)

[21]      At the same time Defendants are impeding the discovery of infringing videos on YouTube, they operate the WatchNext recommendation system that will select those

---

[2] *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001) (holding that uploading files to peer-to-peer site without copyright owner's permission constituted copyright infringement).

CONFIDENTIAL

same videos for promotion and automatic presentation to viewers. This recommendation system is the primary determinant of what video is watched on YouTube and makes its selections using methods that demonstrate Defendants' explicit intent, including the intent that the infringing videos be promoted and automatically presented to viewers with the greatest interest in watching them.  (Part VI)

### III.   Content ID is highly effective in finding copyright infringement on YouTube.

#### A.   Content ID automatically finds infringing videos using Defendants' powerful Matching System

[22]        YouTube collects,[3] organizes,[4] promotes[5] and presents[6] a body of audiovisual content (which Defendants refer to as "video")[7] on a global basis.[8] Videos are uploaded to the YouTube system by third parties (Uploaders), some of whom are commercial partners of Defendants (YouTube Partners)[9] and others of whom are simply members of the general public who have created an account with Defendants and clicked-through an agreement accepting the YouTube Terms of Service.[10] No payment or other qualification is required to become an Uploader. Uploaded videos are generally published and

---

[3] "YouTube Help: Upload videos in YouTube Studio," https://support.google.com/youtube/answer/57407.
[4] "YouTube Help: Watch different types of videos," https://support.google.com/youtube/topic/9257410.
[5] "YouTube Product Features: Recommended Videos," https://www.youtube.com/howyoutubeworks/product-features/recommendations/.
[6] YouTube, https://www.youtube.com.
[7] To avoid confusion, I will use the term "video" to refer to audiovisual content in the same manner as Defendants. I will use the terms "video component" and "audio component" when referring to an audiovisual work's constituent parts.
[8] "YouTube for Press: YouTube by the Numbers," https://blog.youtube/press/.
[9] Participation in the YouTube Partner program is available to uploaders who publish works on the service and have demonstrated success at attracting an audience. To qualify, the uploader must have at least 1,000 subscribers to their "channel" and their videos must have at least 4,000 qualifying watch hours over a one-year period ("YouTube Help: YouTube Partner Program overview and eligibility," https://support.google.com/youtube/answer/72851). In 2021, there were more than 2 million YouTube Partners ("YouTube Blog: Responsibility is good for business and for the creator economy," https://blog.youtube/inside-youtube/responsibility-good-business-and-creator-economy/).
[10] "YouTube Help: Upload videos in YouTube Studio," https://support.google.com/youtube/answer/57407.

CONFIDENTIAL

available for viewing by YouTube users in a matter of minutes.[11] YouTube has been in operation since 2005[12] and, while its scale of usage and content varies daily, there is no question that the total content available is enormous: recent reports indicate that the service maintains a corpus of over ▮ billion videos[13] and that more than 500 hours of additional video are uploaded to the site every minute of every day.[14]

[23]      Viewing of videos on YouTube is widely accessible via Defendants' website YouTube.com and their applications on dozens of devices, digital media adapters, and smart televisions.[15] YouTube videos can also be included in third-party websites. This capability, which is referred to as *embedding*, enables a web page on the third-party site to include and present videos directly from YouTube to its visitors using computer code freely provided by Defendants.[16] Viewing of YouTube videos by users and embedding of uploaded videos into third-party websites requires no account registration, payment, or other qualification.[17] YouTube's massive collection of uploaded videos has attracted an equally massive audience; more than 2 billion users from 100 countries log into the site each month and each day they collectively spend more than a billion hours watching more than 2 billion YouTube videos.[18]

---

[11] "YouTube Help: 4k video uploads and processing time," https://support.google.com/youtube/thread/1626616.
[12] "YouTube Blog: Here's to eight great years," May 19, 2013, https://blog.youtube/culture-and-trends/heres-to-eight-great-years/.
[13] Goodrow depo., p. 16 ln. 18-p. 17 ln. 22.
[14] "YouTube for the Press: YouTube by the Numbers," https://blog.youtube/press/.
[15] "YouTube Help: Watch videos on different devices," https://support.google.com/youtube/topic/9257096.
[16] "YouTube Help: Embed videos & playlists," https://support.google.com/youtube/answer/171780.
[17] YouTube also offers an ad-free paid tier of access to its uploaded videos but its user base is so small that the company only discloses its subscriber count combined together with its streaming music service and free trial memberships. ("YouTube Official Blog: 50 Million," https://blog.youtube/news-and-events/50-million/)
[18] "YouTube for the Press: YouTube by the Numbers," https://blog.youtube/press/.

CONFIDENTIAL

[24]    The experience that a visitor is presented with upon arrival at YouTube is that of an unlimited smorgasbord of free entertainment. An example of what YouTube presents to a new website visitor is given in Figure 1.



*Figure 1. YouTube website. (https://www.youtube.com)*

[25]    YouTube's policy of allowing any user to upload video has also encouraged copyright infringement. In 2007, following complaints from large copyright holders,[19] YouTube introduced the first generation of a copyright management tool that is now known as Content ID.[20]

---

[19] "Viacom files $1 billion lawsuit against YouTube and Google," *New York Times*, May 13, 2007. https://www.nytimes.com/2007/03/13/business/worldbusiness/13iht-viacom.4892466.html.
[20] "Google Official Blog: Latest content ID tool for YouTube," October 15, 2007, https://googleblog.blogspot.com/2007/10/latest-content-id-tool-for-youtube.html.

CONFIDENTIAL

[26]     Content ID analyzes the contents of videos uploaded to YouTube to find

reproductions of copyrighted works and permits copyright owners to assert copyright

claims on those videos.[21] It is now YouTube's primary copyright management tool, being

the source of more than 99% of all copyright assertions on the site in 2021.[22]

[27]     YouTube maintains strict control over who can use the tool and as of December

2021, a select group of 9,196 commercial partners of Defendants (Content ID Partners)

had access to the tool.[23]  Yet during that year, the tool was used to assert a remarkable *1.4

billion* copyright Claims[24] on videos uploaded to YouTube, fewer than 1% of which were

disputed by the Uploader.[25]

[28]     How was this small group of Content ID Partners able to find so many

infringements? Content ID's effectiveness as a copyright management tool derives from

its ability to automatically find infringing videos using Defendants' powerful matching

system.

[29]     The task of a copyright management tool on YouTube can be understood to entail

two steps: a *discovery* step followed by a *rights management* step. The purpose of the

discovery step is to find uses of copyrighted works in uploaded videos (or "finding

---

[21] "YouTube Help: How Content ID Works," https://support.google.com/youtube/answer/2797370.
[22] Aggregate value from Exhibit 1.2 in each of the two half-year 2021 YouTube Copyright Transparency Reports (https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-1-1_2021-6-30_en_v1.pdf, https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf).
[23] "YouTube Copyright Transparency Report H2 2021" p. 5, Exhibit 1.1. https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf.
[24] Aggregate values for the first and second halves of 2021 (722,649,569 and 759,540,199 claims and 3,698,019 and 3,810,395 disputes, respectively) according to the YouTube Copyright Transparency Reports for H1 and H2 2021 (https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-1-1_2021-6-30_en_v1.pdf, https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf) for those periods.
[25] Aggregate values from Ibid., p. 6.

CONFIDENTIAL

infringing videos"). The purpose of rights management is to decide what action to take (if any) when use of a copyrighted work is found. Whether the rights management step occurs at all is entirely contingent on the discovery step being successful, making the discovery step of primary importance to the tool's effectiveness.

[30]        Content ID provides two methods for finding infringing videos: matching and text-based search. Of the 1.4 billion Claims asserted with Content ID in 2021, more than 99% were found using a system that Defendants refer to as *matching*.[26] This high degree of reliance on matching is not simply a matter of convenience but is rather due to the disparate capabilities of these two approaches. The remainder of Part III describes the capabilities of Defendants' Matching System. Part IV.C describes the capabilities of Content ID's text-based search system.

### B.        Defendants' Matching System enables Content ID to find a range of infringing material

[31]        Defendants' Matching System is a specialized search engine designed for automated discovery of uses of copyrighted works. It functions similarly to a text-based search engine like Google Search (http://www.google.com) with which we are all familiar; however, instead of finding matching text, this system finds matching digital media including video, audio, and musical compositions (or "melodies," as they are called by Defendants).[27]

---

[26] Aggregate values from YouTube Copyright Transparency Reports for H1 and H2 2021, Exhibit 3.1 (https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-1-1_2021-6-30_en_v1.pdf, https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf)
[27] GOOG-SCHNDR-00000924, at -929.

CONFIDENTIAL

[32]      An illustration of how Defendants' text-based search engines and Matching System follow a generic archetype is given in Figure 2.  The archetypal search engine (see Figure 2(a)) first builds a searchable index from a corpus of objects. Upon receipt of a Query, it uses the index to produce results that identify objects from the corpus that match the Query.[28]



*Figure 2. (a) Search engine archetype; (b) text-based search engine; (c) Matching System.*

[33]      A text-based search engine (see Figure 2(b)) obviously fits the model neatly, searching an index of documents (*e.g.*, web pages) to find those with text that matches given Query terms. The index functions like the one found in the back of a reference book, but compiled across all the documents, identifying where in the corpus each word can be found, by document and location within the document. When a Query is entered, the search function can look up each word in the index to build a list of documents where each can be found. Once the locations of the terms are found, the search results may be subsequently filtered to apply rules such as *and, or,* and *exact phrase* that winnow the

---

[28] "Google Search Central: In-depth guide to how Google Search works," https://developers.google.com/search/docs/advanced/guidelines/how-search-works.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

results, and then the results are *ranked* to determine the order in which the filtered results will be presented.

[34]     Defendants' Matching System (see Figure 2(c)) applies this same concept to audiovisual content, which Defendants refer to as "video."[29]  The function of a video Matching System is to find which videos in the corpus contain a copy of (*i.e.*, "match") all or part of a video provided as a Query.[30] Because digital media types are so large, matching indices and matching processes don't work on direct representations of the content—they instead use statistical descriptions of the media known as Fingerprints[31] that are designed to capture essential characteristics of a part of the video in a compact form. The index contains Fingerprints generated from each of the videos from the corpus and matching is performed by searching the index for Fingerprints that match the Fingerprints calculated from the Query video. While the illustration in Figure 2(c) shows use of audiovisual content as the search Query and corpus, Defendants' Matching System is also capable of matching video components, audio components, and melodies[32] contained within audio components separately.[33] This is because these components are all sufficiently different in character that each is Fingerprinted, indexed, and matched separately using a different matching technology.

---

[29] GOOG-SCHNDR-00000924, at -012.

[30] In some contexts, Defendants refer to the Query video as a "probe."

[31] The term Fingerprint in the context of matching systems is intended as an analogy to the fingerprints that you *have* that are used to uniquely identify a person as opposed to the fingerprints that you *leave* that are used to identify a person's actions.

[32] While Audio Matching will find videos that contain a copy of the original recording of Bruce Springsteen performing his song "Born to Run," Melody Matching will find videos with audio that contain the melody of "Born to Run," regardless of who is singing or performing the work (Magagna depo., p. 16 ln. 17-p. 17 ln. 21). Defendants also call their Melody Matching technology "covercat" (GOOG-SCHNDR-00001411, at -413).

[33] GOOG-SCHNDR-00000924, at -929.

CONFIDENTIAL



*(a)*

*(b)*

*Figure 3. (a) Example of matching video X against an index of videos A-H to find matches in videos C, D, and H. (b) Example of matching results showing location, duration, and type of each match found.*

[35]     Figure 3 provides an example of how Defendants' Matching System is used.[34] In Figure 3(a), an index has been populated with Fingerprints from the 8 videos labeled A through H. Matching is performed using a video X (a TV show) as the search Query and the videos C, D, and H are found to match video X. Figure 3(c) illustrates, in the context of this example, the type of detailed information that Defendants' Matching System produces.[35] The audio component of video C was found to consist, in its entirety, of a copy of the opening theme music in video X (an "audio match"). No matches were found

---

[34] GOOG-SCHNDR-00000924, at -012.
[35] "YouTube Content ID API: Claims," https://developers.google.com/youtube/partner/docs/v1/claims.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

in the first half of video D but the second half is a copy of a show segment from video X, including both video and audio components (an "audiovisual match"). Video H was found to contain a recording of the closing theme song from show X; not the recording from the show, but a recording of the song performed by a different artist (a "melody match").

[36]     Of particular note in this example is that Defendants' Matching Systems do not treat the Query video as a whole, finding only complete and intact copies, but rather as a combination of components (video, audio and melody) and segments of time that can each be matched individually.[36] This is analogous to a text-based search performed with an *or* rule (which finds documents that match any term in the Query) rather than *exact phrase* logic (find documents that match the Query terms taken as a whole phrase).



[37]     The capability of finding videos that match individual components or segments enables Defendants' Matching System to be used to find many types of infringements that would otherwise be extremely difficult to discover. This includes full copies of works, full copies of works incorporated into other content, partial copies of works, partial copies of works incorporated into other content, and performances of full or partial works.

---

[36] "YouTube Content ID API: Claims," https://developers.google.com/youtube/partner/docs/v1/claims.
[37] Magagna depo., p. 43 ln. 5-p. 46 ln. 13.

[38]     Copyright infringement takes on many forms. Content ID's use of Defendants'

Matching System automatically identifies a broad range of infringements.

### C.     Defendants' Matching System is applied comprehensively to videos on YouTube

[39]     Content ID enables Content ID Partners to find and Claim videos on the YouTube

platform that infringe the Partner's copyright protected works.[38] Content ID Partners can

protect a variety of copyrighted works including movies, TV shows, music recordings,

and musical compositions. Content ID Partners provide Defendants with digital copies

(Reference Files) and text descriptions of the works they own; Defendants refer to these

as Assets.[39] When matching is performed with an Asset, Content ID uses Video, Audio,

and Melody Matching as appropriate to the type of work that the Asset represents.[40]

Defendants' Matching System is applied comprehensively to videos on YouTube, and

Content ID Partners are given broad control over and access to their results.

[40]     As new Assets are received, their Reference Files are added to a reference index

which currently contains more than 90 million references.[41] As each new video is

uploaded to the YouTube platform, it is matched against the current reference index as

described in Part III.B to find out if there are any Assets it might infringe.[42]

[41]     This is one of the ways that matching is used to find infringing videos for Content

ID Partners, but it is not the only way. It provides only a *future* discovery capability, in

---

[38] "YouTube Copyright Transparency Report H2 2021," https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf.
[39] "YouTube Help: Create an asset," https://support.google.com/youtube/answer/3011552.
[40] Video matching is applicable to audiovisual and video-only assets. Audio matching is applicable to audiovisual and audio-only assets (Bill depo., p. 113 ln. 9-p. 114 ln. 15; "YouTube Help: Create a policy: Claim dubbed versions of my content," https://support.google.com/youtube/answer/106964). Melody matching is applicable to musical composition assets (GOOG-SCHNDR-00001411, at -413).
[41] Magagna depo., p. 12 ln. 22-p. 13 ln. 22.
[42] Magagna depo., p. 10 ln. 12-p. 11 ln. 8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the sense that it will only find infringing videos that are uploaded after the Asset has been provided to Defendants by the Content ID Partner. At the time the Asset is provided, there may already be infringing videos among the billions already on the service.

**[42]**     In order to find infringing videos from the *past*, Defendants perform matching using three additional search methods that they call



---

43 Magagna depo., p. 80 ln. 8-p. 82 ln. 7.
44 GOOG-SCHNDR-00054295, at -298, para. 1.
45 GOOG-SCHNDR-00054327, at -329. GOOG-SCHNDR-00054295, at -297-98.
46 Magagna depo., p. 82 ln. 15-p. 83 ln. 3.
47 Magagna depo., p. 83 ln. 21-p. 84 ln. 14. Also "YouTube Help: Using Content ID,"
https://support.google.com/youtube/answer/3244015.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

[43]        The results of matching an Asset are filtered to determine whether they meet

eligibility criteria of the Defendants and the Content ID Partner. Content ID Partners can

assign explicit Match Conditions to Assets describing what types of uses in uploaded

videos they would like to Claim; matches that don't conform to those rules are ignored.[48]

Match Conditions are a set of rules that include the match type and amount of use of an

Asset that the Content ID Partner wants to find. The match type in a rule can be specified

as audiovisual, video only, or audio only. The amount of use in a rule can be specified as

duration of Reference File, percentage of Reference File, duration of uploaded video, or

percentage of uploaded video.[49] ███████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

██████████████████████████████████[50] Content ID Partners are also able to identify segments

of their Reference Files that should be excluded from matching (Excluded Segments).

This avoids finding matches for parts of their Assets that they are not interested in

protecting, such as those that include content they do not own (*e.g.*, a song licensed from

another content owner) or that is of little commercial interest (*e.g.*, a studio logo sequence

or movie credits).[51] Defendants apply additional automated and manual filtering of

matches to determine, for example, whether they meet their criteria for asserting a Claim

without prior review by the rightsholder[52] and to detect abuse or invalid use of the tool.[53]

---

[48] "YouTube Help: Upload and Match Policies," https://support.google.com/youtube/answer/107129.
[49] "YouTube Help: Create a policy," https://support.google.com/youtube/answer/106964.
[50] Magagna depo., p. 43 ln. 5-p. 46 ln. 13.
[51] Content ID Partners are required to exclude segments that do not meet certain conditions of eligibility for matching via Content ID. ("YouTube Help: Content Eligible for Content ID," https://support.google.com/youtube/answer/2605065).
[52] Magagna depo., p. 23 ln. 9-p. 25 ln. 19.
[53] GOOG-SCHNDR-00001442, at -443.

**[44]**      Matching results are made known to Content ID Partners for their Assets through the YouTube Content Management System (CMS), a web site accessible through a user-interface or direct data feed.[54] The CMS provides Content ID Partners the ability to obtain the URL of uploaded videos that match their Assets, learn who posted the matched video, access detailed matching results, review matched segments from the uploaded videos and Reference Files side-by-side, and control whether Claims are asserted on individual matched uploaded videos. The user interface provided for review of match results is shown in Figure 4.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[54] GOOG-SCHNDR-00040244, at -266. "YouTube Help: View your claims," https://support.google.com/youtube/answer/106990.  "YouTube Content ID API: Claims," https://developers.google.com/youtube/partner/docs/v1/claims?hl=en. "YouTube Operations Guide: Using Content ID," https://support.google.com/youtube/answer/3244015.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



*Figure 4. YouTube Content Management System user interface for reviewing matches. Match type, location, duration, percentage of video, percentage of reference are shown to the user and the longest match in the video is identified. The uploaded video and Reference File can be played back side-by-side to assist the user in reviewing the match (image from GOOG-SCHNDR-00040244, at -266).*

**[45]**     In summary, the three factors that make Content ID effective at finding infringing videos—enabling 9,196 Content ID Partners to make 1.4 billion Claims on videos uploaded to YouTube in 2021—are:

- Defendants' powerful Video, Audio, and Melody Matching technologies;

- the ability of Content ID Partners to select which of their Assets are matched, how their match results are filtered, and to gain access to detailed match results; and

- Defendants' comprehensive use of their Matching System to find reproductions of those Assets in videos on YouTube.

## IV.   The tools Defendants provide to Ordinary Copyright Owners are designed in a manner that prevents the identification of many types of infringing videos.

### A.   The tools provided to Ordinary Copyright Owners are dramatically less effective at finding copyright infringement than those provided to Content ID Partners

[46]      The primary copyright enforcement mechanism Defendants provide to Ordinary Copyright Owners who lack access to Content ID is the submission of a DMCA takedown notice.[55] The DMCA takedown notice must identify each individual infringing video by its unique web address (or URL)—meaning the content owner must first find the infringing video.

[47]        The only tool for finding infringing videos that Defendants make available to all Ordinary Copyright Owners is YouTube Search—the text-based search engine provided to all YouTube users for finding videos to watch. Defendants provide a small group of copyright owners with access to a more capable text-based search tool that I will refer to as Manual Copyright Search.[56] And during the pendency of this lawsuit, Defendants

---

[55] "YouTube Help: Submit a copyright takedown request," https://support.google.com/youtube/answer/2807622.
[56] YouTube refers to this capability by a variety of different names in the materials that I have reviewed. It is referred to variously as "Copyright Search" (GOOG-SCHNDR-00042071, at -096), "Content ID search" (Zhu 30(b)(1) depo., p. 26 ln. 12-13 and p. 40 ln. 18), "Content Management System Tool" (Bill depo., p. 53 ln. 6-p. 54 ln. 12), "Manual Claiming Tool" ("YouTube Help: Use the Manual Claiming Tool," https://support.google.com/youtube/answer/9346683), and the "Content Verification Tool" ("YouTube Help: Use the Content Verification Tool," https://support.google.com/youtube/answer/3010500). In this report I will use the term Manual Copyright Search which describes its use and purpose.

extended the availability of a very limited matching tool, the Copyright Match Tool, to a small group of Ordinary Copyright Owners.[57]

**[48]**      The tools provided to Ordinary Copyright Owners are dramatically less effective at discovering copyright infringement than those provided to Content ID Partners. The difference in infringement discovery capabilities between these tools and Content ID is so stark that searching for infringing videos for an Ordinary Copyright Owner can be likened to searching for needles in a haystack by hand while, with the full power of Defendants' Matching System, Content ID Partners are able to search with a powerful electromagnet.

**[49]**      In their public explanation of their copyright management policies, Defendants state these tools are appropriate for "users who hold few copyrights and scarcely find it on YouTube"[58] and whose frequency of claims is "infrequent (a few times a year)" or "occasional (a few times a month)" while the powerful Content ID tool is reserved for rightsholders who have demonstrated that they can make claims "daily."[59] When Defendants deny an Ordinary Copyright Owner access to Content ID, they advise them that "the best course of action for any rightsholder is to make use of the tools we do provide them in order to illustrate that there exists an issue for which they need a more scaled tool to fully address."[60] It is a cruel irony that Defendants use the fact that an

---

[57] "YouTube Blog: YouTube's approach to copyright," August 31, 2021, https://blog.google/around-the-globe/google-europe/youtubes-approach-to-copyright/.

[58] "YouTube Copyright Transparency Report H2 2021," https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf.

[59] This characterization of who Defendants deem deserving of Content ID is further supported by YouTube's internal policy document regarding Content ID Partner eligibility which lists "*100s claims/month*" among the "*mandatory criteria.*" (GOOG-SCHNDR-00001188, at -196).

[60] "YouTube Copyright Transparency Report H2 2021," p. 5, https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Ordinary Copyright Owner is unable to *find* sufficient numbers of infringements of their works on YouTube as justification for withholding access to the matching capabilities required to find those infringing works.

**[50]**    A summary table comparing the capabilities of the Matching System employed by Content ID against the capabilities of the tools available to Ordinary Copyright Owners for finding infringing videos is provided for reference in Exhibit D.

**B.    YouTube Search cannot detect a wide range of typical copyright infringements and its deduplication feature prevents users from finding multiple similar videos that infringe their works**

**[51]**    YouTube Search is available to all YouTube users—Uploaders and viewers alike—on the home page of the YouTube website and is readily accessible within YouTube mobile and television applications. Its purpose is to help users of YouTube find relevant and useful videos to watch.[61]

**[52]**    YouTube Search takes a text-based search Query entered by the user, searches an index of text annotations associated with each publicly viewable video on YouTube, rank orders the results, and displays search results to the user as a list of videos. The index of text annotations is populated from the following sources:[62]



---

[61] "YouTube Search," https://www.youtube.com/howyoutubeworks/product-features/search/.
[62] GOOG-SCHNDR-00034775, at -791-794.

CONFIDENTIAL



**[53]**      Defendants have recognized that what constitutes "relevant results" to an

Ordinary Copyright Owner who is looking for infringing videos on YouTube is

materially different from those of a YouTube user who is looking for a video to watch for

information or entertainment.[63] A copyright owner, for example, may be seeking to find

all videos that are copies of their work. A YouTube user, by contrast, may find a list of

duplicate copies of the same work unhelpful and prefer a selection of results that includes

only one copy of the work identified in the search Query together with other results that

are related or similar videos of interest.

**[54]**      For this reason, Defendants have designed YouTube Search to remove all

duplicate videos from its results.[64] This is of particular importance when the same

infringing video has been posted to YouTube more than once and the Ordinary Copyright

Owner would like to find them all. If they are using YouTube Search, they can find only

one at a time and will be completely unable to find any of the others so long as the first is

---

[63] Zhu 30(b)(1) depo., p. 41 ln. 11-p. 42 ln. 3. Goodrow depo., p. 122 ln. 3-16.
[64] Goodrow depo., p. 75 ln. 20-p. 76 ln. 13.

CONFIDENTIAL

deemed "more relevant" to their interests by the YouTube Search ranking algorithm. This clearly places Ordinary Copyright Owners at a particular disadvantage in finding infringing videos on YouTube, a fact that is presumably understood well enough by Defendants to have motivated the development of the additional tool, the Manual Copyright Search tool, discussed in Part IV.C.[65] However, this limitation is not discussed in the YouTube Help pages relating to copyright enforcement through the DMCA takedown process. Defendants do not inform Ordinary Copyright Owners that the only search tool provided on the YouTube platform is designed to *not* find multiple copies of infringing videos.

**[55]**    Figure 5 shows how the results of such a search are presented to the user. The images shown on this results page include a Thumbnail image as a "quick snapshot" of each video that was either selected by the Uploader or by YouTube's automatic algorithms.[66] The text shown on the results page includes the video title, video description (truncated), channel name, and playlist name entered by the Uploader for each video. Also shown for each video are the duration, elapsed time since it was uploaded, and number of views.  The user can click on a video from the results, and it will begin playing.

---

[65] Zhu 30(b)(1) depo., p. 41 ln. 11-p. 42 ln. 3.
[66] "YouTube Help: Add video thumbnails on YouTube," https://support.google.com/youtube/answer/72431.



*Figure 5. Search results for the search term "cat" using the text-based YouTube Search tool (image from https://www.youtube.com/results?search_query=cat).*

**[56]**      The user can scroll through the list looking for information in the text and images that suggest that a video might infringe their rights. In some cases, the suggestion can be strong, for example if the Thumbnail contains a readily identifiable image from a copyrighted movie or if the title of the video clearly matches the artist and title of a copyrighted sound recording. In other cases, the suggestion of infringement could be weaker, and the user may have to play the video and examine various portions of it in order to determine whether it contains one of their copyrighted works. For an Ordinary Copyright Owner with a meaningful body of copyrighted works, the reviewing process will be laborious and painstaking work.

**[57]**      But of greater concern is that for YouTube Search to find an infringing video, it must have associated text annotations that the search engine can match to the user's

entered Query string and, if matches are found, those infringing videos must be ranked high enough in the results list (among the billions of potentially matching videos on the service) that any reasonable amount of scanning could reach them. Unfortunately for the Ordinary Copyright Owner, there are many typical forms of copyright infringement where YouTube Search, indeed any text-based keyword search tool, does not suffice.

### 1.   YouTube Search cannot find infringing videos that are not annotated with text that specifically identifies the infringed work

[58]      YouTube Search is ineffective at finding infringing videos that are not annotated with text that specifically identifies the infringed work. There are many common copyright infringement scenarios where this will be the case. Consider, for example, a video of a live performance of a musical composition owned by an Ordinary Copyright Owner. The video may be annotated in good faith by the Uploader with text that identifies the performer, location, and date of the performance, but in many cases it will not include a list of songs performed or their composers. This video will not be surfaced by text-based searches that identify the musical composition because no matching annotation is associated with it.



[59]      A second example relates to so-called "nonfeature" content; a significant category of creative works intended for inclusion in other works rather than as a standalone work.

---

67 GOOG-SCHNDR-00034775, at -793.
68 The Melody Matching technology used by Content ID Partners *could* recognize the composition in the video, in which case the annotation would be applied to the video to enable text-based searching, and in this case the rightsholder (a Content ID Partner) could also be notified automatically of the match through Content ID. But Defendants' Melody Matching is denied the Ordinary Copyright Owner, ensuring that annotations with distinctive works description will not be made and the work will not be discoverable in this way.

CONFIDENTIAL

Nonfeature music includes jingles, themes, intros, interludes, outros, walk-on music, and background music. Nonfeature video works includes stock footage and documentary footage. Nonfeature content is used in almost every high-quality video production and there is a robust market for creation and licensing of copyrighted nonfeature material.[69] It would only in the rarest cases be acknowledged in a text description of work in which it is used with authorization; even less likely so for an infringing use. As with the prior example, the fact that the infringing video lacks any text annotation associated with the infringed nonfeature work renders unfindable using any text-based search term that the content owner can conceivably know. And again, Defendants' Matching System could automatically find and notify its users of this type of infringing uses of their works.

[60]      As a final example, infringing videos may be uploaded to YouTube using a text description specifically intended to thwart its discovery by a rightsholder with access to only text-based search.  They can render the video discoverable to its intended audience using descriptive terms (*e.g.*, video identified as "top summer romance movie") or by circulating specialized knowledge through other means (*e.g.*, post to their social media followers: "I have uploaded the full Maria Schneider catalog to YouTube tagged as '*airam redienhcs*'; go have a listen!"[70]). For Content ID Partners, Defendants' Matching System finds videos posted in this way and reports their existence automatically.

### 2.      YouTube Search is ineffective at finding videos that infringe works identified by generic or non-unique descriptions

---

[69] See, for example, Getty Images (https://www.gettyimages.com).

[70] "ariam redienhcs" is Maria Schneider spelled backwards, but any string sufficiently unique to allow the knowing viewer to find the infringing upload with YouTube Search and that the rightsholder doesn't know will achieve the uploaders aim of thwarting its discovery by the rightsholder.

CONFIDENTIAL

[61]     YouTube Search is also ineffective at finding videos that infringe works identified by generic or non-unique descriptions. The ASCAP/BMI Songview repertory includes over 5,700 distinct copyrighted musical compositions whose title is "Tonight,"[71] over 4,800 titled "Stay,"[72] and over 2,300 titled "Baby."[73] An attempt by the rightsholder of any of these more than 10,000 distinct musical compositions to use a text-based search tool to find infringing videos that include performances of these compositions (*e.g.*, using the search term "tonight song") would yield a list of videos associated with the search term, ordered by the search engine's ranking metric. The composer of a song that is not among the most popular compositions sharing the name would be required to individually examine so many videos as to make this effort unreasonable. In the case of "Tonight," Google Search reports over 45 million pages with matching text on the YouTube site.[74]

[62]     Defendants' Melody Matching technology learns the musical composition from analysis of a sound recording of its performance, not from the work's name, and can find and present to the owner of the work a list of just the specific videos in which it is used.

[63]     The issue of generic or non-unique descriptions is not only an issue for music composition owners; YouTube is overflowing with categories of legitimately copyrightable content described and discovered using such terms: "how to fry an egg," "beginner's yoga," "5 minute workout," "skateboard tricks," etc.

---

71 https://www.ascap.com/repertory#/ace/search/title/tonight?at=false&searchFilter=SVW&page=1
72 https://www.ascap.com/repertory#/ace/search/title/stay?at=false&searchFilter=SVW&page=1
73 https://www.ascap.com/repertory#/ace/search/title/baby?at=false&searchFilter=SVW&page=1
74 https://www.google.com/search?q=site%3Ayoutube.com+%22tonight%22. Google Search is used to obtain an estimate of the number of videos on YouTube because YouTube Search does not report a count of matches.

CONFIDENTIAL

[64]      Consider, for example, a rightsholder in videos based on the telling of traditional fairy tales. Such videos may be infringed in videos uploaded to YouTube and a search performed by entering a descriptive text Query such as "Three Little Pigs" into a text-based search of YouTube will similarly result in an impractically long list of results for manual review, wherein infringing videos are mixed among a vast number of other distinct videos telling the same fairy tale. At the time of writing this report, Google Search reports over 100,000 pages with text matching the term "Three Little Pigs" on the YouTube site.[75]

[65]      Again, using Defendants' Matching System, Content ID will reliably locate and notify a Content ID Partner of infringing videos containing copies of their works, regardless of how many similarly titled works exist on YouTube. For the Ordinary Copyright Owner, the text-based search tools are of little use in locating infringements of this type of content.

### 3.      Infringing videos on YouTube with a privacy setting of *unlisted* or *private* are shielded from discovery using YouTube Search

[66]      Infringing videos on YouTube with a privacy setting of *unlisted* or *private* are shielded from discovery using YouTube Search. YouTube allows Uploaders to apply a privacy setting to each uploaded video that is *public, private,* or *unlisted.*[76] A video whose privacy setting is *public* is included in the YouTube Search index and recommendations systems and available for viewing by any YouTube user.

---

[75] https://www.google.com/search?q=site%3Ayoutube.com+%22three+little+pigs%22. Google Search is used to obtain an estimate of the number of videos on YouTube because YouTube Search does not report a count of matches.

[76] "YouTube Help: Change video privacy settings," https://support.google.com/youtube/answer/157177.

CONFIDENTIAL

[67]      A video whose privacy setting is *unlisted* is not included in the YouTube Search

index or recommendation systems but is available for public viewing on the YouTube

website by anyone with whom the Uploader has shared the URL of the video. Unlisted

videos can also be embedded for playback on any third-party website by anyone with the

URL and the embedded video can be viewed by any visitor to that website. A video

whose privacy setting is *private* is similarly not included in the YouTube Search index or

recommendation systems but can be viewed only by logged-in YouTube users whose

YouTube accounts were given specific authorization by the Uploader.[77]

[68]      Designating a video as *unlisted* or *private* provides Uploaders a means to infringe

the rights of many Ordinary Copyright Owners without recourse because even if the

infringing video is annotated with keywords that would otherwise enable their discovery

with text-based search, those annotations are not included in a searchable index that they

can access.

[69]      No such limitation applies to Content ID Partners because unlisted and private

videos are not similarly shielded from the Content ID's matching; such matching videos

will be found by the Content ID system and the rightsholder notified.

[70]      This is far from a theoretical concern. Matching performed by Defendants for the

Plaintiffs in the course of discovery in this matter identified a significant number of

videos on YouTube that had been designated by the Uploader as *unlisted* or *private* and

matched all or a part of Plaintiffs' copyrighted works.[78]

---

[77] "YouTube Help: Change video privacy settings," https://support.google.com/youtube/answer/157177.
[78] Defendants did not identify the particular *unlisted* or *private* videos that were matched nor did they provide
detailed information on the individual matches (*e.g.*, duration of match) that would be necessary for Plaintiffs to

CONFIDENTIAL

### C. Manual Copyright Search is designed to find infringing videos on YouTube but is not available to most Ordinary Copyright Owners.

[71]     Like YouTube Search, Manual Copyright Search is a text-based keyword search tool, and so it suffers from the same limitations with respect to finding infringing videos, including those described in Parts IV.B.1-IV.B.3.[79]

[72]     Unlike YouTube Search, however, Manual Copyright Search was designed for the express purpose of finding copyright infringing videos on the YouTube platform and uses a different ranking algorithm. Defendants have designed Manual Copyright Search to provide results that include multiple videos with the same content that match the Query,[80] whereas YouTube Search will remove all duplicate videos from its results.[81] This is of particular importance when the same infringing video has been posted to YouTube more than once, each with text annotations that make it amenable to text-based searching, and the Ordinary Copyright Owner would like to find them all. Using the Manual Copyright Search tool, one search could potentially accomplish this task.

[73]     Moreover, as illustrated in Figure 6, when using the Manual Copyright Search tool, additional images chosen automatically from the video by YouTube's algorithms are shown which reduce the likelihood of a misleading Thumbnail image chosen by the Uploader hiding the true contents of the video from a copyright owner.

---

determine how many of these matched videos were infringements of Plaintiffs' copyrights (see *Schneider_v_YouTube_CID Data Extraction_complete.xlsx*).

[79] One possible exception to this exists with respect to Manual Copyright Search's inability to search text annotations associated with *unlisted* videos. The information available to me is ambiguous on this capability. GOOG-SCHNDR-00000924, at -009 states that it can search through "publicly available YouTube videos." It is unclear whether Defendants consider *unlisted* videos to be publicly available and allow their text annotations to be searched using this tool.

[80] Zhu 30(b)(1) depo., p. 41 ln. 11-p. 42 ln. 3.

[81] Goodrow depo., p. 75 ln. 20-p. 76 ln. 13.



*Figure 6. Search results for the search term "cat" using the text-based Manual Copyright Search tool (image from GOOG-SCHNDR-00001066, at -094).*

**[74]**     While this makes it more useful for finding infringing videos, Defendants do not make this tool available to most Ordinary Copyright Owners. Manual Copyright Search is made available only to YouTube partners with Content Management System access,[82] which includes YouTube Partners,[83] Content ID Partners,[84] and Content Verification Program Partners.[85]

### D.     Copyright Match Tool provides an inferior matching tool to a limited number of Ordinary Copyright Owners.

**[75]**     Defendants have provided some Ordinary Copyright Owners with a limited ability to find infringing videos on YouTube using their Matching Systems through the

---

[82] GOOG-SCHNDR-00042071, at -096.
[83] "YouTube Help: Set up your Content Manager," https://support.google.com/youtube/answer/6301188.
[84] "YouTube Help: Use the Manual Claiming Tool," https://support.google.com/youtube/answer/9346683.
[85] "YouTube Help: Use the Content Verification Tool," https://support.google.com/youtube/answer/3010500.

36

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Copyright Match Tool. The capabilities provided by this tool are inferior to those of Content ID in several important respects.

### 1.    Copyright Match Tool was developed to protect YouTube's popular YouTube Partner channels

[76]    Copyright Match Tool was originally deployed in 2018 as a means of protecting YouTube Partners from having new videos that they have published on YouTube copied and re-uploaded to YouTube by competing channels.[86]

[77]    The Copyright Match Tool uses the same Matching System employed by Content ID to check videos uploaded to YouTube for matches against an index of copyrighted videos.[87]   However, Defendants have incorporated restrictions in the function of the tool that limit the tool's capabilities to finding only a few narrowly defined types of infringement.

[78]    Defendants describe this original intended use of the Copyright Match Tool in their public documentation as follows (emphasis added):

> *"For partners in the YouTube Partner Program (YPP), or any channel that's filled out this form and shown a need for an advanced rights management tool, **the Copyright Match Tool will scan for full reuploads of your videos** on other YouTube channels. **The tool scans videos uploaded after yours, so it's important you're the first one to upload the content to YouTube**."[88]*

[79]    Three important limitations of the tool are embedded subtly within this description, one in the first highlighted phrase and another two in the second.

---

86 "YouTube Official Blog: Helping creators protect their content," July 11, 2018, https://blog.youtube/news-and-events/helping-creators-protect-their-content/.
87 Magagna depo., p. 10 ln. 4-10. Bill depo., p. 30 ln. 3-22.
88 "YouTube Help: Use the Copyright Match Tool," https://support.google.com/youtube/answer/7648743.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**[80]**      The meaning of "it's important you're the first one to upload the content to YouTube" in the second highlighted phrase is the most significant of the limitations on the Copyright Match Tool. Defendants apply a condition of eligibility to videos submitted for protection using the Copyright Match Tool that I will refer to as First to Upload. Defendants determine whether a rightsholder is the First to Upload a video by matching their uploads against the pre-existing YouTube Corpus using video component and audio component matching.[89] An uploaded video is disqualified from protection using the Copyright Match Tool if the majority of the video (by duration) is found to match an existing video on the site.[90] The nefarious logic of this rule is that Defendants are using the fact that they have found potentially infringing matches of a video on the site as the basis for excluding the video from protection against infringement with the tool. And further, the potentially infringing matches that the tool has used as the basis for disqualifying the rightsholder's work from protection are identified in the match results and fully known to the Defendants—but, importantly, they are neither disclosed nor identified to the rightsholder. Defendants apply no such exclusion to Assets provided by Content ID Partners for matching in the Content ID system. In fact, the ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ functions described in Part III.C were created specifically for the purpose of ensuring that previously uploaded videos that match Assets newly introduced to the Content ID system are found and exposed to rightsholder Claims as rapidly as possible.[91]

---

[89] Rosenstein depo., p. 198 ln. 2-p. 200 ln. 6. "YouTube Help: Use the Copyright Match Tool: I'm a musician, can I use this tool to find uploads of my songs?," https://support.google.com/youtube/answer/7648743.
[90] Magagna depo., p. 77 ln. 7-p. 78 ln. 11.
[91] GOOG-SCHNDR-00054327, at -329-330. GOOG-SCHNDR-00054295, at -295-296.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

[81]     The second important limitation relates to the meaning of "full reuploads" in the first highlighted phrase. This means that the Copyright Match Tool will only find infringing videos that match ███ or more of the duration of the video that the rightsholder is seeking to protect.[92] Infringing videos that match less than this duration of the protected video may have been discovered by the Defendants' Matching System but, if so, those matches will be ignored by the tool and the rightsholder will not be notified of the match. This renders the tool ineffective against infringing videos that include only a portion of a work. Not only does this ignore the common infringement scenarios that use excerpts of a work without permission such as a critical scene from a film, but an Uploader whose infringing video is found and removed from YouTube using the tool can simply divide their upload into two parts—each with half of the complete work—and while the Matching System may still find the copies, neither of the two halves constitute a Full Reupload so they are given a free pass by the tool. Notably, Defendants do not limit matching results in this way in Content ID, which finds infringing videos with ███████████████████████████████████████████ and reports them to Content ID Partners.[93]

[82]     The meaning of "the tool scans videos uploaded after yours" in the second highlighted phrase is plainly that matching for Full Reuploads is only performed prospectively, against uploads to YouTube that are made after the copyrighted work is uploaded to YouTube by the Copyright Match Tool user. Infringing videos that were uploaded to YouTube prior to the rightsholder's upload, even if they are Full Reuploads,

---

[92] Magagna depo., p. 73 ln. 21-p. 74 ln. 25.
[93] Magagna depo., p. 43 ln. 5-p. 46 ln. 13.

are ignored by the Copyright Match Tool and the rightsholder will not be notified,[94] even
when such matches would be found through Defendants' ongoing matching for other
purposes.[95]  Again, Defendants' Content ID system does not limit matching in this way.
Content ID performs ███████████████████████████████ as
described in Part III.C to match each new Reference File against the entire pre-existing
YouTube Corpus, finding infringing videos on behalf of Content ID Partners regardless
of when they were uploaded to the site.

**[83]**      There is also a fourth limitation associated with Copyright Match Tool that is not
disclosed in Defendants' public documentation, which is that the videos uploaded by
Copyright Match Tool simply bypass the use of Defendants' melody match system.[96]  As
a result, Copyright Match Tool provides rightsholders in musical compositions with no
ability to discover infringing videos containing original performances of those works,
even if they are future uploads of the full work. Contrast this with Content ID, which uses
melody match to find infringing performances of musical compositions of ██████████
█████[97] in both past and future uploaded videos.

**[84]**      With this analysis of these four limitations understood, none of which are applied
to Content ID Partners, the narrow capabilities of the original intended use of the
Copyright Match Tool can be more clearly understood.  It can aid a rightsholder in
finding future uploaded videos (but not previous videos) that contain full copies (but not

---

[94] Rosenstein depo., p. 205 ln. 18-p. 206 ln. 11.
[95] Rosenstein depo., p. 202 ln. 21-p. 204 ln. 4. Goodrow depo., p. 75 ln. 20-p. 76 ln. 13.
[96] Bill depo., p. 59 ln. 16-p. 60 ln. 7.
[97] Magagna depo., p. 43 ln. 5-p. 46 ln. 13.

partial copies) of video and audio components (but not melodies) from copyrighted works that are not already being infringed on the YouTube site.

### 2. Defendants limited the utility of the Copyright Match Tool extended to filers of successful DMCA takedown notices.

[85]     The functionality of the Copyright Match Tool was expanded in 2021, during the pendency of this litigation, to enable Ordinary Copyright Owners who had successfully used the DMCA takedown process to prevent copies of that same infringing video from being re-uploaded.[98] Defendants describe this version of the Copyright Match Tool[99] in their public documentation as follows (emphasis added):

> "The Copyright Match Tool is available to any YouTube user who's submitted a valid copyright takedown request. Once your takedown request is approved, **the Copyright Match Tool will start scanning YouTube uploads for potential matches to the videos reported in your takedown**. We'll surface these potential matches to you so you can decide what action to take next."

[86]     There are four important limitations on the function of the Copyright Match Tool for this intended use; two implied in the highlighted phrase and two not included in the public documentation.

[87]     The first and most serious limitation is implied by the text "potential matches to the videos reported in your takedown." This means that the tool will check only for matches of the specific infringing videos that the rightsholder has already discovered on YouTube in some other way and successfully taken down.[100] Any other distinct video that infringes their work, for example one that comprises a different portion of the

---

[98] "YouTube Copyright Transparency Report H1 2021," p. 2, para. 4,
https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-1-1_2021-6-30_en_v1.pdf.
[99] This version of the Copyright Match Tool is also referred to by Defendants as "takedown/staydown" (Bill depo., p. 29 ln. 10-23) and in the public YouTube help pages as "prevent copies" ("YouTube Help: Prevent reuploads of removed videos," https://support.google.com/youtube/answer/10298392).
[100] Rosenstein depo., p. 202 ln. 21-p. 204 ln. 4.

CONFIDENTIAL

infringed work or that places their full work within different content, will not be matched. Copyright Match Tool is thus only applicable to the re-discovery of uploads of an infringing video that the rightsholder has already discovered on YouTube in some other way.

[88]     The second limitation, which is implied by the text "scanning YouTube uploads" means that only future uploads are checked for matches, not videos already present on YouTube.[101] As a result of this limitation, while an Ordinary Copyright Owner who has found and successfully taken down an infringing video from YouTube may be protected by the Copyright Match Tool against future re-uploads of that same infringing video, additional copies of that same infringing video that were uploaded prior to the takedown will remain and must be discovered and taken down individually by using another means.

[89]     It is hard to understand why Defendants would arbitrarily limit the efficacy of this tool in this way. Since the rightsholder has already filed a successful DMCA takedown notice, Defendants have already accepted the rightsholder's claim that the video is infringing. Moreover, Defendants' comprehensive matching activities have *already identified* which pre-existing videos match the video that was the subject of the successful DMCA takedown.[102] This matching is performed in YouTube's ordinary course of operation and supports several of the previously mentioned functions, including the First to Upload feature of the Copyright Match Tool (see Part IV.D.1) and the de-duplication feature of YouTube Search (see Part IV.B). So, without performing any additional matching analysis, for each video removed from the YouTube platform

---

[101] Rosenstein depo., p. 205 ln. 18-p. 206 ln. 11.
[102] Rosenstein depo., p. 198 ln. 9-p. 200 ln. 6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

through a successful DMCA takedown process, YouTube may have already identified—and could easily inform the Ordinary Copyright Owner of—any other videos on the platform that are known to match infringing portions of the taken-down video and allow the copyright owner to review those videos to determine whether they also infringe their copyrighted work. This failure to inform the copyright owner of known potential infringements is compounded by the YouTube Search tool's removal of such duplicates from search results,[103] impeding any effort to locate other matching instances.

[90]     Like the version of the Copyright Match Tool provided to YouTube Partners, the tool provided to successful DMCA takedown claimants also ignores re-uploads of successfully taken down videos that are less than "full copies" (*i.e.*, they match less than ███ of the duration of the taken down video)[104] and does not check for melody matches against the taken-down work.[105] The implications of these limitations make this intended use of the Copyright Match Tool equally deficient at enabling Ordinary Copyright Owners to discover infringing videos on YouTube.

## V.     Defendants could provide the plaintiff class with full access to their Matching System at limited additional cost

### A.     Defendants have already built and are operating the capabilities needed to enable Ordinary Copyright Owners to effectively find infringing videos on YouTube

[91]     It is not the purpose of this report to design a copyright management tool for use by Defendants nor to recommend any remedy from the court on behalf of Plaintiffs. However, if I am to address the costs associated with providing Content ID's matching

---

[103] Goodrow depo., p. 75 ln. 20-p. 76 ln. 13.
[104] Magagna depo., p. 74 ln. 1-25 and p. 76 ln. 14-p. 77 ln. 5.
[105] Bill depo., p. 59 ln. 16-p. 60 ln. 7.

capabilities to Plaintiffs, I must first provide some description of what would be necessary to accomplish this. I will do so by considering how the existing capabilities within YouTube discussed in Parts III and IV of this report could meet the need. This will demonstrate that Defendants have already built and are operating the capabilities needed to enable Ordinary Copyright Owners to effectively find infringing videos on YouTube.

**[92]**    Consider the operation of the Copyright Match Tool as it is currently implemented by Defendants for YouTube Partners (see Part IV.D.1). A Copyright Match Tool user uploads a video to YouTube and can designate it as *private* so it will not be published. This *private* video is matched against the existing YouTube Corpus using Defendants' Matching System to determine if the user is First to Upload the video.[106] This *private* video is matched against the existing Content ID reference corpus and future additions to the Content ID reference corpus to determine if there are any Content ID Partner Claims on the video and the user is notified of such Claims as they are found.[107] If the video is deemed eligible for protection using the Copyright Match Tool, it is then matched against future uploads to YouTube in order to determine if they are copies.[108] For each future upload found to be a Full Reupload of an eligible video, the Copyright Match Tool user is notified of the matching video and provided the opportunity to review it and choose to either archive the notification, contact the Uploader of the matching video, or submit a DMCA takedown notice.[109]

---

[106] Rosenstein depo., p. 198 ln. 2-p. 200 ln. 6. "YouTube Help: Use the Copyright Match Tool: I'm a musician, can I use this tool to find uploads of my songs?," https://support.google.com/youtube/answer/7648743.
[107] Rosenstein depo., p. 199 ln. 15-17. Magagna depo., p. 83 ln. 21-p. 84 ln. 14. "YouTube Help: Using Content ID," https://support.google.com/youtube/answer/3244015. "YouTube Help: Learn about Content ID claims," https://support.google.com/youtube/answer/6013276.
[108] Rosenstein depo., p. 205 ln. 18-p. 204 ln. 4.
[109] "YouTube Help: Use the Copyright Match Tool," https://support.google.com/youtube/answer/7648743.

CONFIDENTIAL

[93]     Defendants could provide a version of the Copyright Match Tool that enables Ordinary Copyright Owners to access the same matching capabilities made available to Content ID Partners that varies from the tool provided to YouTube Partners in only the following ways:

- When the user uploads a video to YouTube, permit them to specify match conditions[110] and Excluded Segments[111] for the video in the same manner such capabilities are made available to Content ID Partners. This would allow users to exclude content in their copyrighted work that is in the public domain, or which is licensed from another copyright owner.

- Do not disqualify the video from eligibility based on the First to Upload test. Instead, perform matching against videos already present on YouTube in accordance with the match conditions and Excluded Segments the user has designated.

- Notify the user of the match results for previously uploaded videos and facilitate side-by-side review of the matches. This would enable the user to locate infringing videos that are already present on the YouTube platform.

- When the user's video is matched against the future uploads to YouTube, perform matching in the same manner it is performed for Content ID Partners, in accordance with the match conditions and Excluded Segments that the user has designated.

---

[110] "YouTube Help: Upload and Match Policies," https://support.google.com/youtube/answer/107129.
[111] GOOG-SCHNDR-00000924, at -945

- Notify the user of these match results and facilitate side-by-side review of the matches. This would again allow the user to identify infringing videos.

**[94]**     Extending those capabilities to users of the Copyright Match Tool only involves using functions and systems that Defendants *have already built and are operating* for existing users of Copyright Match Tool and Content ID; it is simply a reconfiguration of those capabilities, taking capabilities already built for Content ID and incorporating them into the existing Copyright Match Tool.

**B.     Providing Ordinary Copyright Owners with effective tools to find infringing videos on YouTube is within Defendants' existing capabilities and budget for such activities and could be executed with little technical risk**

**[95]**     I have not conducted an analysis of the scope of effort required to reconfigure the capabilities of the Copyright Match Tool to enable expanded access to matching results as described in Part V.A; to do so would require that it first be specified in greater detail than the outline provided here and would also require more information about Defendants' product development process and costs than have been provided to me. But based on my review of Defendants' existing copyright management tools and their historical copyright management tool feature development activities and expenditures[112] and my 25 years of experience in overseeing the development and delivery of copyright management tools, it is my opinion that providing Ordinary Copyright Owners with effective tools to find infringing videos on YouTube is within Defendants' existing capabilities and budget for such activities and could be executed with little technical risk.

---

[112] GOOG-SCHNDR-00040616. GOOG-SCHNDR-00053786.

46

[96]     As to the operating costs of this capability, let us consider what additional load this would place on the systems that the feature relies on: the uploading of content to YouTube and the matching of this content by Ordinary Copyright Owners that might otherwise not have been uploaded. I have not been provided with information that could be used to project the amount of additional content that this would attract to the service nor the associated monetary or computational resource costs that Defendants would consequently bear.[113] However, the described use demands little in the way of new matching on uploaded videos; every video uploaded to YouTube is already matched against all other videos, public or private[114] and every taken-down work is already matched against future uploads if the copyright owner has requested it.

[97]     Defendants clearly operate their business in a manner intended to encourage growth in scale, placing no meaningful limit on the amount of any relevant user activities. In particular, Defendants' policies that apply to all Uploaders, including Copyright Match Tool users, place no limit on the number or total duration of videos uploaded to the YouTube Corpus[115] and consequently introduced into Defendants' comprehensive matching activities. The policies that apply to Content ID Partners place no limit on the number or duration of audiovisual, video, audio, or composition Assets that are introduced for matching into the Content ID reference corpus.[116]

---

[113] The most precise cost estimate I have reviewed for the matching of an additional work is "extremely small to tiny." (Magagna depo., p. 32 ln. 18-p. 33 ln. 9.) I have also not received any information on the costs associated with additional uploads to YouTube.
[114] Rosenstein depo., p. 199 ln. 21-p. 200 ln. 3.
[115] "YouTube Policies," https://www.youtube.com/howyoutubeworks/policies/overview/.  Individual videos for accounts with verified phone numbers are limited to a 12 hour duration.
[116] "YouTube Help: Policies for Content ID," https://support.google.com/youtube/answer/9142671.

CONFIDENTIAL

### C.   Defendants can provide Ordinary Copyright Owners with access to Content ID's matching capabilities without increasing abuse and invalid use

[98]      Another potential cost that I will address is the cost of abuse and misuse (or "invalid use", as Defendants call it) of the Defendants' copyright management tools. Defendants justify denying access to Content ID to Ordinary Copyright Owners on the basis that "we must balance the need to protect creators, viewers, and other rightsholders from the significant disruption that can result from the abuse or otherwise invalid use of our tools."[117] From a review of evidence presented regarding the causes and controls of these issues, Defendants can provide Ordinary Copyright Owners with access to Content ID's matching capabilities without increasing abuse and invalid use.

[99]      Defendants highlight as a "key point" in their Copyright Transparency Report that "when we make a tool available to everyone without any eligibility requirements, we see high levels of abuse,"[118] emphasizing that they observe a "30x higher abuse rate in webform[119] than in takedown tools with limited access."[120] This is unsurprising for the simple reason that for a tool with unlimited access an abuser is free to repeat their abusive behavior, whereas for a limited-access tool the abuser's access can be revoked.

[100]      When Defendants defend their exclusionary practices with explanations like "the limited availability of Content ID…limits abuse of the tool,"[121] they fail to acknowledge that Content ID Partners are required to adhere to Defendants' strict policies regarding its

---

[117] "YouTube Copyright Transparency Report H2 2021," p. 6.   https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf.
[118] Ibid.
[119] "Webform" refers to YouTube's publicly available web page for submitting a DMCA takedown notice.
[120] Ibid.
[121] Ibid.

use and risk having their use of the tool limited, suspended, or revoked for violations.[122] Given Content ID's essentiality to defending works from copyright infringement on YouTube, it stands to reason that those with access would go to great lengths to avoid any act that would put their continued ability to protect their works at risk. This same imperative that ensures that today's Content ID Partners adhere to Defendants' policies also exists for Ordinary Copyright Owners. The low rate of abuse of Content ID may, in fact, have little to do with the copyright owners whom Defendants deny access to the tool and much to do with Defendants' ability to revoke access of those who abuse it.

**[101]** Defendants further justify their limiting of access to Content ID on the basis that while "one bad copyright webform notice can result in a handful of videos being temporarily removed from YouTube[, in] Content ID the impact is multiplied due to its automated nature; one bad reference file can impact hundreds or even thousands of videos across the site."[123] The automation they are referring to here, though, isn't that of their Matching System automatically finding copies. Finding matches causes no harm whatsoever in Content ID. The problem is that a subset of Content ID users is permitted to automate the assertion of copyright Claims based on matches made to their Assets. It is only in the case of automated *claiming* that the described harm exists.

**[102]** Defendants clearly recognize this distinction; their Content ID system provides a so-called "safe mode" of operation in which matching is performed on a copyright owners' Assets and they are required manually to review each potential Claim before it is

---

[122] "YouTube Help: Content Manager Policies & Policies for Content ID," https://support.google.com/youtube/answer/9142671.
[123] "YouTube Copyright Transparency Report H2 2021," p. 6. https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf.

CONFIDENTIAL

asserted.[124] In fact, every new content owner given access to Content ID is placed in this mode and is only provided with automated Claiming once they have made ███████████ ████████████████████[125]

**[103]**    I agree that large-scale automated claiming poses a risk of large-scale invalid assertions and that some measure of limiting access to the feature is warranted. I disagree, however, that this risk provides a justification for excluding copyright owners from accessing Defendants' Matching System for the purpose of finding and reviewing videos that include their copyrighted works.

**[104]**    The access to matching for infringement discovery described in Part V.A is neither a takedown nor a Claiming tool. It is rather a search tool for locating matching items of interest within the vast library of videos on YouTube.  Searching for information is a separable step from the assertion of rights through a DMCA takedown notice or Claim, and one that Defendants have built their empire upon. Google's stated corporate mission is "to organize the world's information and make it universally accessible and useful."[126]  Not only do Defendants provide access to their eponymous text-based search engine without limitation, but they similarly provide an image matching feature called "Google Search with an Image" that enables any visitor to upload an image and find matches throughout the web.[127] Defendants' own actions demonstrate that permitting unlimited access to search capabilities, including those based on content matching, is not by itself untenable.

---

[124] Bill depo., p. 46 ln. 1-13.
[125] GOOG-SCHNDR-000001112, at -113.
[126] "About Google," https://about.google/intl/ALL_us/.
[127] "Google Search Help: Search with an image on Google," https://support.google.com/websearch/answer/1325808.

CONFIDENTIAL

**[105]**     This is because abuse and misuse derive not from search or matching results, but from the second step mentioned above: the processes and incentives for assertion of rights via DMCA takedown notice or Claiming.

**[106]**     The connection between abuse, misuse and the rights assertion process is supported by Defendants' justification that "limited availability of Content ID also helps to limit abuse of that tool… because claiming can happen automatically, and while one copyright request removal made from the webform impacts only one (or a handful) of videos, just one invalid reference file in Content ID can impact thousands of videos and users."[128] The abuse risk from this tool emanates from the fact that Content ID can instantly replicate a bad Claim across thousands of videos without human review, not that its users have a better search engine.

**[107]**     Also consider the incentives for abuse that Defendants highlight:

> *"**Impersonator:** Uses a fake name/email address to get away with submitting fake requests*
> *__Reputation Manager:__ Uses Copyright webform to remove allegedly defamatory content*
> *__Competitor:__ Submits requests on legitimate content to target their competitors*
> *__Backdater:__ Pretends to have created content first…in order to remove other people's content"[129]*

**[108]**     In each of these cases, the abuser is motivated to act against a target already in their sights and seeking to perform a fraudulent assertion of rights. There is little to suggest that having the ability to access Content ID's matching capability would provide additional opportunity or incentive to engage in these behaviors. Said another way, none

---

[128] "YouTube Copyright Transparency Report H2 2021," p. 6. https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf..
[129] Ibid., p. 7.

CONFIDENTIAL

of these forms of abuse are impeded in any apparent way by the lack of ability to find matching content, so there is no reason to expect that the ability to access Content ID's matching capability would provide additional opportunity or incentive to engage in these behaviors.

[109]     It is true that if Ordinary Copyright Owners have the ability to find more infringing videos on YouTube by gaining access to Content ID's matching capabilities, it is to be expected that there will be an increase in the number of rights assertions made, which will lead to an increase in both the number of valid and invalid rights assertions. The increase in the number of valid assertions will be evidence of the access to Content ID's matching capability achieving the goal of permitting Ordinary Copyright Owners to protect their interests. The rate at which the number of invalid rights assertions grows relative to this depends on factors that are under Defendants' control and at which they have substantial experience, including establishing criteria and oversight for allowing access to different rights assertion capabilities, and providing tools and training that support efficient and accurate review of matching results as they have already done for Content ID Partners (see, for example, the side-by-side match review feature shown in Figure 4 on page 23 and the training certifications[130] that Defendants require Content ID Partners earn prior to use of the tool).[131]

[110]     If Defendants are able to successfully apply these resources to constrain the rate of growth in invalid assertions to not exceed the rate of growth in valid assertions, and if

---

[130] "YouTube Help: YouTube Certified program overview: Content Owner Course & Music Rights Management Course," https://support.google.com/youtube/answer/6145904#zippy=%2Ccontent-ownership-course%2Cmusic-rights-management-course.

[131] GOOG-SCHNDR-00001188, at -196.

CONFIDENTIAL

the total amount of abuse stays constant for the reasons described above, the net effect

will be to reduce the rate of abuse and misuse that is observed, improving the overall

accuracy of their copyright management tools.

## VI.     Through YouTube's Autoplay and WatchNext video recommendation systems, Defendants actively promote and control the presentation of infringing content to viewers.

### A.     Defendants' WatchNext recommendations are the ███████████ of what video is watched on YouTube

[111]       YouTube's primary business is advertising, earning its parent company Alphabet

over $28 billion in advertising revenues for 2021.[132] A typical ad on YouTube is a brief

commercial video that is similar in presentation to a traditional television ad and is

presented to the viewer before, during, or after the uploaded video the viewer wants to

watch.[133] The financial success of YouTube's advertising business is, without a doubt,

directly linked to its ability to engage the largest possible audience of viewers; having

more viewers watching YouTube videos for longer periods of time creates more

opportunities for presentation of the paid advertising. Defendants have an intrinsic

motivation to maximize engagement from viewers.

[112]       The original designers of YouTube recognized early on that while a visitor to the

service may arrive with a specific desire – to search for a video or to watch a video from

a direct link – once that desire is fulfilled, what then? As early as November 2005, just

six months following its launch, the service began including a list of "related videos" on

each webpage that was displaying the video that a visitor had chosen to watch.[134] The

---

[132] "2021 Alphabet Annual Report," p. 29, https://abc.xyz/investor/static/pdf/2021_alphabet_annual_report.pdf.
[133] "YouTube Help: YouTube advertising formats," https://support.google.com/youtube/answer/2467968.
[134] "Waiting till 9 a.m for XBox 360! Wooo!!!," video watch page from YouTube.com, Nov. 24, 2005.
https://web.archive.org/web/20061215205212/http://www.youtube.com/watch.php?v=0oBXDc9Opug.

benefit to the visitor of these recommendations was to ensure that at the end of the video they had chosen, or at any time if they found the onscreen video unsatisfying, they would have a list of alternatives in front of them and be a single click away from another video. The benefit to the service was to retain their audience for increasing lengths of time. In July 2006 the service announced that it was delivering 100 million videos per day.[135] Three months later, YouTube was acquired by Google, which launched its in-video advertising business in August 2007.[136]

[113]     Since 2007, the role of recommendations in YouTube has expanded to the point that it now influences every step of the viewer journey.[137] The YouTube home page, each video viewing page, and each video end slate all include a collection of automatically generated recommendations of "next" videos for the user to watch.[138] YouTube calls the system that generates these recommendations WatchNext.[139]

[114]     But WatchNext recommendations are also now more than just a short list of choices. In 2013, YouTube introduced a feature called Autoplay into its television apps[140] that chooses the next video to play and begins playing it automatically shortly after the previous video ends.[141] With Autoplay, the visitor only has to select a single video to get

---

[135] "YouTube serves up 100 million videos a day online," *CBS News*, July 16, 2006. https://usatoday30.usatoday.com/tech/news/2006-07-16-youtube-views_x.htm.
[136] "Google aims to make YouTube profitable with ads," *New York Times,* Aug. 22, 2007. https://www.nytimes.com/2007/08/22/technology/22iht-22google.7206224.html.
[137] In all materials I have reviewed, YouTube maintains a distinction between the YouTube Search feature, in which the visitor expresses interest directly via a text Query, and YouTube recommendations, in which the visitor's interest must be predicted. I will preserve that distinction and exclude YouTube Search from my consideration here.
[138] GOOG-SCHNDR-00040865, at -867-870.
[139] Goodrow depo., p. 9 ln. 24-p. 10 ln. 4.
[140] GOOG-SCHNDR-00040840, at -843.
[141] "YouTube Help: Autoplay Videos," https://support.google.com/youtube/answer/6327615.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

things started, and, subsequently, video after video will play.  The feature was rolled out broadly across YouTube in 2015.[142]

**[115]**     The presentation format of WatchNext recommendations will vary depending on how the viewer is accessing YouTube (*i.e.*, website, mobile app, television app, etc.). On the website, they will appear as a list of suggestions alongside the currently watched video while it is played (see Figure 7(a)).

**[116]**     After the current video ends, unless Autoplay has been deactivated, the Thumbnail of the video selected by Autoplay—infringing or not—will be shown automatically (see Figure 8(b)) and proceed to play unless the viewer takes some affirmative step to stop it.

**[117]**     If Autoplay is not active or if the viewer dismisses the Autoplay video, the viewer is presented with a collection of Thumbnails from the most highly ranked videos from the recommendations list as a prompt to select one (see Figure 7(c)). The viewer's response to the video, including if they do nothing and allow the Autoplay video to play, will be recorded and used to inform and improve future predictions and recommendations made for the video, and potentially also for the user, by the components of the WatchNext system.

---

[142] GOOG-SCHNDR-00040865, at -882.

CONFIDENTIAL



(a)

(b)

(c)

*Figure 7. The presentation on YouTube.com of: (a) WatchNext recommendations placed alongside a video being watched (b) a pending Autoplay video after a video has just ended; (c)*

56

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*ranked WatchNext recommendations at the end of a video if Autoplay is turned off or if the Autoplay selection has been dismissed.*

[118]     WatchNext has not just become an integral part of the YouTube user experience;

██████████████████████████████████████████████████████████████

███████████████████████████████████ Figure 8 is from a 2017 WatchNext

engineering review and shows how visitors arrive at the videos they watch.  The report

states that the ████ of time spent viewing videos selected by the Watch Next system in

2017 amounted to ████████ watch hours per day.[143]



*Figure 8. For each of 5 different methods by which a YouTube visitor could choose which video to watch, the percentage of total video watch time due to videos chosen using that method from mid-2015 to mid-2017. The five methods are: direct link into YouTube, next item in a selected playlist, selected from YouTube Search results, selected from Home page, or resulting from a Watch Next recommendation. (GOOG-SCHNDR-00052174, at -186)*

---

[143] 2017 is the most recent year in which I have been provided data on the percentage of video watch time by method of selection. I have also reviewed data from 2019 for WatchNext indicating that it was responsible for ████ of watch time at that time. ██████████████████████████████████████████████████████

[119]     It is no accident that WatchNext (including Autoplay) became so influential over

YouTube viewers' choices. Defendants have brought their world-class expertise in

optimization and Machine Learning to the task, leveraging the billions of data points they

collect from all visitor interactions with the service to predict how a visitor is likely to

respond to an individual video recommendation.[144] Being able to make these predictions

allows its designers to direct the video recommendations made by the algorithms at

achieving clearly defined objectives in viewer behavior.

[120]     The primary objectives that the WatchNext engineers directed the system to

pursue have changed over time. In 2007, the primary objective that guided the system's

actions was to choose recommendations predicted to result in the highest likelihood of

the viewer choosing to start playing one of the recommended videos (optimizing for

"clicks").[145] In 2012, the objective was changed to choose recommendations predicted to

keep the viewer watching one of the recommended videos for the longest amount of time

(optimizing for "engagement").[146] In 2018, the objective was changed to choose

recommendations predicted to keep the viewer on YouTube for the longest period of time

while maintaining high viewer satisfaction ("valued watch time") as determined through

behavioral indications such as ratings, likes, dismissals, shares, and complaints.[147]

[121]     While these top-line objectives are not all the same, they all align understandably

with Defendants' commercial interest of having the largest possible audience to whom

they can deliver advertisements. While information that I have reviewed indicates that the

---

[144] Froehle depo., p. 127 ln. 2-p. 128 ln. 7.
[145] GOOG-SCHNDR-00051798, at -801.
[146] Ibid., at -802.
[147] GOOG-SCHNDR-00051628, at -629. GOOG-SCHNDR-00051863, at -870-872. GOOG-SCHNDR-00051798, at -804-811.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Watch Next team does not optimize for advertising revenues, there is also no evidence to suggest that maximizing the number of clicks, watch time, or valued watch time that a visitor spends watching YouTube videos serves any purpose other than this, however altruistic Defendants claim their motives to be.[148]

[122]     Defendants are clearly not blind to this alignment. Prior to the launch of Autoplay on the desktop in 2015, Defendants performed an experiment to measure its potential impact. The results showed that the Autoplay function increased both the number of videos viewed by visitors on the YouTube site and the time spent watching these videos by +███[149] The experiments also measured the impact on ad viewing. The number of ads watched due to Autoplay also increased +███, while the amount of time spent watching ads increased substantially more—over +███[150] Unsurprisingly, YouTube now automatically activates Autoplay for all users who have not self-identified as minors[151] and in 2021 the feature remained enabled for ███ of them.[152] And, as a matter of course, before each launch of changes to the recommendation system, the YouTube vice president of engineering in charge of recommendations will notify the vice president in charge of advertising of any changes that could impact their part of the product.[153]

### B.     Defendants exert explicit control over what videos are recommended by WatchNext, and consequently what videos YouTube visitors watch

[123]     The period 2011-2021 has been labeled by Jeffrey Dean, Google's Senior Vice President of Research, "a golden age of machine learning," and much of the progress has

---

[148] "YouTube Blog: On YouTube's recommendation system," September 15, 2021, https://blog.youtube/inside-youtube/on-youtubes-recommendation-system/.
[149] GOOG-SCHNDR-00040840, at -845-846.
[150] Ibid.
[151] "YouTube Help: Autoplay Videos," https://support.google.com/youtube/answer/6327615.
[152] GOOG-SCHNDR-00040723, at -725.
[153] Froehle 30(b)(6) depo., p. 70 ln. 13-p. 73 ln. 23.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

been due to Google's own investments and innovation in the technology.[154] Its
accomplishments have enabled remarkable recent advances in both highly visible
applications, such as autonomous driving and facial recognition, and less visible but
equally important ones, such as medical diagnosis, drug development, and flood
forecasting.

**[124]**    The WatchNext recommendation system's design has benefited from its
proximity to this work, adopting new discoveries early[155] and in some cases being the
application whose demand for new capabilities drove progress.[156] WatchNext relies
heavily on Machine Learning in its operation.[157]

**[125]**    Machine Learning systems are trained by presenting them with large numbers of
examples of a type of problem (each a possible input) and their solution (for each input,
an output). If provided with enough examples, they can automatically learn to generalize
and obtain the ability to solve entirely new instances of the problem.[158]

**[126]**    Machine Learning predictions, while important, are only a small part of how a
video comes to be recommended by WatchNext. There are many other steps in the
process, most of which use traditional computer programming techniques whose logic is
fully transparent and for which Defendants' intent is overt and clearly expressed.[159]
Considering the WatchNext recommendation system as a whole, Defendants exert

---

[154] Jeffrey Dean, "A Golden Decade of Deep Learning: Computing Systems & Applications," Daedalus, Spring 2022. https://www.amacad.org/sites/default/files/publication/downloads/Daedalus_Sp22_04_Dean.pdf.
[155] GOOG-SCHNDR-00034975.
[156] "Inside Sibyl, Google's Massively Parallel Machine Learning Platform," *Datanami,* July 17, 2014. https://www.datanami.com/2014/07/17/inside-sibyl-googles-massively-parallel-machine-learning-platform/.
[157] Froehle 30(b)(6) depo, p. 14 ln. 25-p. 15 ln. 21.
[158] "Machine learning, explained," https://mitsloan.mit.edu/ideas-made-to-matter/machine-learning-explained.
[159] GOOG-SCHNDR-00052429.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

explicit control over what videos are recommended by WatchNext, and consequently what videos YouTube visitors watch. To understand why, I will discuss in detail the process of how WatchNext recommendations are produced for a single user on a single video watch page. The purpose of this explanation is to make clear that YouTube's recommendation system is not an opaque "black box" making decisions of its own accord. Each step in the process—nomination strategies, filtering, scoring, and packing—carries a clear imprint of explicit design intent.

**[127]**    Each time a YouTube user visits a video watch page, the process of generating the recommendations of next videos is begun anew.[160] The process takes into consideration information known about the current video, information known about the user, such as their viewing history, age, country, and language setting, and the context of the viewing session, such as the viewing device.[161]

**[128]**    Defendants have a Machine Learning model that can predict the user's interest level in a particular video based on this information, but it would be far too much work to calculate this for each of the billions of videos on the service in an exhaustive search for the optimal selection. Instead, a collection of independent software components called



[160] GOOG-SCHNDR-00052429, at -431.
[161] Ibid., at -431-433.
[162] Ibid., at -432.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



---

[163] GOOG-SCHNDR-00052429, at -433. Also Froehle 30(b)(6) depo., p. 64 ln. 11-p. 65 ln. 19.
[164] Froehle 30(b)(6) depo., p. 52 ln. 11-p. 53 ln. 23.
[165] GOOG-SCHNDR-00035026, at -032.
[166] Froehle 30(b)(6) depo., p. 49 ln. 14-p. 52 ln. 10.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



---

167 GOOG-SCHNDR-00052429, at -433.
168 Froehle 30(b)(6) depo., p. 67 ln. 12-p. 70 ln. 5.
169 Froehle 30(b)(6) depo., p. 83 ln. 3-p. 84 ln. 19.
170 I was provided with information (GOOG-SCHNDR-00035026, at -036) that identified only 12 of the more than 200 scoring model inputs.
171 GOOG-SCHNDR-00035026, at -036.



---

[172] GOOG-SCHNDR-00051628, at -629.
[173] GOOG-SCHNDR-00052315, at -318.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



[137]    When Autoplay is active, a particular process is applied to select a video to be automatically played when the present video ends if the viewer takes no action. This process includes the following:[178]

- 

---

174 GOOG-SCHNDR-00052429, at -436.
175 GOOG-SCHNDR-00051628, at -632-633. GOOG-SCHNDR-00035026, at -037.
176 Defendants operate a Machine Learning system that automatically classifies videos uploaded to YouTube with respect to "authoritativeness" and "borderline" adherence to community guidelines ("YouTube Official Blog: On YouTube's recommendation system," September 15, 2021, https://blog.youtube/inside-youtube/on-youtubes-recommendation-system/).
177 Goodrow depo., p. 120 ln. 8-25.
178 GOOG-SCHNDR-00051950, at -956-962.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



**[138]**     With the recommendation selection and ranking now complete, the videos are ready for presentation to the viewer as described in Part VI.A.

**[139]**     The business imperative of growing audience to serve the advertising business is clearly a dominant factor in the design of the WatchNext recommendation algorithm, but it is not the only factor. The interests of creators are considered, for whom they create opportunities of exposure throughout the lifecycle of a video. The interests of society are also considered through explicit mechanisms including filtering of age-related,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

borderline, and authoritative content. As discussed in Part VI.A, the influence of WatchNext over what YouTube viewers are watching—and, by extension, not watching—is tremendous. Through their design of the YouTube's recommendation system, Defendants decide what content is promoted and what content is not. Where WatchNext's design strategies lead, YouTube viewing follows.

**C.**   **Defendants' design of WatchNext and Autoplay and their withholding of effective copyright management tools from Ordinary Copyright Owners have enabled them to promote infringing videos on YouTube to viewers with the strongest interest**

[140]   As discussed in Part VI.B, each visit by a viewer to the watch page of a video is effectively an experiment performed by WatchNext on each recommended video's ability to attract Defendants' desired response of the viewer playing, watching to completion, and "liking" the video. Each experiment adds new predictive information to the system about the relationship between the visited video, the recommended videos, and the viewer themself that is fed back into the system to improve its decisions in future experiments. For new videos, the WatchNext system is capable of bootstrapping itself from small bits of knowledge – *e.g.,* ███████████████████████████████████ ███████████████████████ With the ability to perform and learn from this experiment billions of times each day, it can ultimately predict viewers' appetite for particular videos with sufficient accuracy to dictate in large measure what viewers watch.

[141]   Defendants' actions demonstrate their recognition that viewers' appetites may in some instances be unhealthy. Because of the limited data on which WatchNext's viewer engagement predictions are built, Defendants have incorporated "business and policy logic" into the WatchNext systems in the form of filters that use external data sources

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

(e.g. classifiers for "borderline" and "authoritative" content) to reduce or remove recommendations that could be harmful to viewers, society, and their reputation.[179]

**[142]**      So, what about the harm done by the WatchNext system due to promotion of copyright infringing videos? WatchNext does not need to know who holds rights in a video in order to do its job well; it only needs to determine who wants to watch it. While it will use specific information about the works or the publisher of a video when those annotations are available, this information is not essential; it has the ability to find the interested audience for a video from much more ambiguous information, such as its general topic or what other videos are being watched by its viewers. It has no "business and policy logic" for copyright.[180]

**[143]**      As discussed in Part III, Defendants have provided a select group of copyright holders with access to their Content ID tool, which automatically finds videos on YouTube that infringe their works using a powerful Matching System. Matching is essential because finding copyright infringement requires great specificity. In a pool of over █ billion videos, it is far from enough to know that a video is related to a particular topic like "contemporary jazz music" for a rightsholder to determine whether it might infringe an owned work—there would be far too many such videos to review—even though that could be sufficient for WatchNext to narrowly target the video to its most interested audience—*e.g.,* fans of the specific performer whose work is infringed.

---

[179] GOOG-SCHNDR-00052429, at -436. GOOG-SCHNDR-00051628, at -632-633. GOOG-SCHNDR-00035026, at -037.
[180] Autoplay has previously avoided selecting videos whose audio had been muted due to copyright infringement, but it no longer does this. (Froehle depo., p. 42 ln. 20-p. 43 ln. 20.)

CONFIDENTIAL

**[144]**    I will illustrate this in more detail with an example work from a Plaintiff: Uniglobe's Bollywood romantic comedy feature, "5 Weddings."[181] Suppose an infringing copy of this movie has been uploaded to YouTube in two parts, each containing half of the film, and the Uploader has entered the video titles: "Bollywood movie part 1" and "Bollywood movie part 2." For a content owner with access to Content ID who has uploaded an active Reference File, these infringing videos, and any others including copies of the movie of ▮▮▮▮▮▮▮▮▮▮▮, would be discovered automatically, often within minutes of being uploaded (see Part III.C). But for an Ordinary Copyright Owner, the Copyright Management Tool will not find the infringing videos because they are not complete copies as that tool requires (see Part IV.D) and the text-based search tools will not surface them because they have only generically identifiable text annotations (see IV.B.1).

**[145]**    These infringing uploads will also not be easily findable by its fans using text-based search but this is not necessary because WatchNext can bring it to them automatically, as follows. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A subset of these viewers will accept the recommendation and a subset of those will watch it to completion. (They can easily move

---

[181] Note that data provided by Defendants indicated that a single infringing copy of "5 Weddings" on YouTube had more than 9 million views, 20,000 of which were due to Autoplay (GOOG-SCHNDR-00050365). I was not provided with data indicating the number of times it was viewed pursuant to a recommendation to the viewer by WatchNext or what text annotations may have been associated with each particular upload that would have facilitated its discovery by viewers or Uniglobe via YouTube Search.

CONFIDENTIAL

from the first to the second part of the movie by selecting the Uploader's "channel" if the two are not recommended in sequence.) The particular subsets that make these two selections will not escape notice of the WatchNext algorithm, whose Nominators can observe the particular affinities of the viewers to whom it is of interest. The movie, for example, may be of interest not only to people who like Bollywood but also to people who have been watching wedding-themed movies generally. WatchNext will observe these correlations and can begin recommending the video to viewers who are watching wedding movies but would otherwise not be watching Bollywood films. By careful observation and many experiments, WatchNext can find new communities of interest for the movie that are not suggested by the upload annotations at all; *e.g.*, viewers of movies with themes of transpacific cultural exchange, romantic comedy, and more. Machine Learning algorithms are able to discover and extend these associations in many directions automatically and implicitly, proliferating the movie to Defendants' benefit while the content owner, without access to the matching technology to uncover the infringement of their copyrights, remains blind to it all.

Joseph M. Winograd

September 1, 2022

CONFIDENTIAL

# Exhibit A.   Curriculum Vitae

### JOSEPH M. WINOGRAD, PH.D.

## SUMMARY

Emmy-winning technology leader and executive specializing in technology development and licensing for the digital media, entertainment, consumer electronics and computer industries.

- Technology innovator with a track record of entrepreneurial leadership and success.
- Comprehensive expertise in digital and broadcast media technology and markets.
- Significant experience in advanced technology, R&D, product strategy and development, intellectual property development and licensing, industry standardization and corporate partnership initiatives.

## EXPERIENCE

**VERANCE CORPORATION, San Diego, CA,** *September 1995-Present*
Verance is a developer of enabling technologies to enhance the value of media content and platforms. The company was formed in October 1999 following the acquisition of ARIS Technologies, Inc. by Solana Technology Development Corporation.

***Executive Vice President and Chief Technology Officer***, *November 2008-Present*
***Chief Technology Officer***, *October 1999-November 2008*

- Responsible for corporate technology assets, strategy, and partnerships, including technology and product strategy, product architectures, core technology and intellectual property development, technical business development, and external technical representation of the company.  Reporting to CEO.
- Led efforts to establish company's digital watermarking technology as a global industry standard component of the Xbox, PlayStation, Blu-ray Disc, DVD, SD card, ATSC/NextGen TV, and DVB/HbbTV, consumer entertainment platforms.
- Developed and readied for market Aspect, a system for enabling the delivery of interactive application experiences for broadcast television services. Consumer launch scheduled for 2022.
- Developed and brought to market Cinavia, a system for identifying and limiting the use of unauthorized copies of filmed entertainment content.  Licensed products to over 100 companies in the entertainment, consumer electronics, semiconductor, and computer industries.  Incorporated in over 500 million consumer products since 2004, including Xbox and PlayStation.  Customers include Universal Studios, Sony Pictures Entertainment, Warner Bros. Entertainment, 20th Century Fox Films, Panasonic, Sony, Samsung, Pioneer, Microsoft, Intel, Analog Devices, Broadcom, MediaTek and Sigma Designs.
- Developed and brought to market ConfirMedia, a nationwide radio and television broadcast monitoring network and information service delivering proof-of-performance solutions to advertising, programming, music, and broadcast industry participants.  Tracked over 120 million broadcast events during 2001-2006.  Clients included The Coca Cola Company, General Motors, A&E Television Networks, Premiere Radio Networks, Turner Broadcasting and SESAC.
- Developed and brought to market the Verance Copy Management System (VCMS), a system for identifying and limiting the use of unauthorized copies of commercial sound recordings.  Licensed products to over 50 companies in the entertainment, consumer electronics, semiconductor, and computer industries.  Incorporated in over 100 million consumer products since 1999.  Customers currently include Universal Music Group, Warner Music Group, Sony BMG Music, EMI Music, Panasonic, Sony, Toshiba, Samsung, Pioneer, Philips, Microsoft, Creative Technologies, Intel, Texas Instruments, Hitachi, Cirrus Logic, ST Microelectronics, Zoran, and National Semiconductor.
- Led research and development and associated IP portfolio (currently over 61 issued patents and 80 pending patent applications).  Authored 10 patent applications.
- Developed corporate technology licensing strategy, business model, and programs.
- Managed growth of engineering staff from headcount of 7 to 45 full-time employees.
- Represented company in industry standards groups and consortia and served as the primary company spokesman to industry and the media.
- Served on the Board of Directors of ConfirMedia, Inc. (Japan), a joint venture with Toshiba, Video Research, Inc. (Japan), Constellation Ventures (Japan).
- Managed patent infringement litigation involving 13 patents; negotiated settlement of all claims and counterclaims.

**ARIS TECHNOLOGIES, INC., Cambridge, MA,** *September 1995-October 1999*
ARIS Technologies (now Verance) was a R&D-oriented pioneer in the development and commercialization of digital audio watermarking technologies. ARIS invented and commercialized the core technology currently employed in Verance products.

***Chief Technology Officer,*** *February 1997-October 1999*

- Responsible for corporate technology strategy, research & development, intellectual property protection, and engineering management. Report to CEO.

CONFIDENTIAL

- Led successful effort to establish company's proprietary technology as worldwide industry standard within Secure Digital Music Initiative (interim standard) and DVD-Audio (final standard) products.
- Managed growth of engineering staff from headcount of 1 to 7 FTEs.
- Authored 4 patents.
- Developed technologies for audio watermarking, including novel signal modulation techniques, psychoacoustic modeling and testing, digital communications protocols for noisy and fading channels, system component and protocol security analysis, compressed audio format processing.

***Technical Consultant***, *September 1995-February 1997*
- Digital audio watermarking algorithm research and development.

**THE MATHWORKS, INC., Natick, MA**, *June 1993-September 1993*
***Intern, Applications Group***
- Developed algorithms for color map reduction, image dithering, stereoscopic rendering and other functions for the *Matlab* technical computing environment and *Matlab Image Processing Toolbox*.

**GEORGIA INSTITUTE OF TECHNOLOGY, Atlanta, GA,** *March 1992-June 1993*
***Research Assistant***, *DSP Laboratory, Dept. of EE*
- Developed extensions to the *Mathematica* technical and scientific computing environment that support the design and analysis of signal processing systems.  These extensions are included in the *Signals and Systems* package for *Mathematica* sold by Wolfram Research, Inc.

**SLEEP RESEARCH LABORATORY, INC., Atlanta, GA**, *January 1992-June 1996*
***Software Engineer***
- Developed software for the collection, management, and analysis of sleep research data.

**OCEAN TECHNOLOGY, INC., Burbank, CA,** *November 1990-January 1992*
***Software Engineer***
- Lead software engineer of a real-time RISC-based multiprocessor graphics workstation with stereo displays.

**GEORGIA INSTITUTE OF TECHNOLOGY, Atlanta, GA,** *September 1986-November 1990*
***Software Engineer***, ***Human Cognition and Aging Laboratory***
- Developed software for the collection, management, and analysis of human perception data.


**EDUCATION**
Ph.D. Electrical Engineering, Boston University, 1997.
M.S. Electrical Engineering, Boston University, 1994.
B. Computer Engineering, Georgia Institute of Technology, 1993.
B.S. Information and Computer Science, Georgia Institute of Technology, 1990.

**HONORS AND AWARDS**
2015 Technology & Engineering Emmy Award, "Steganographic Technologies for Audio/Video."
1999 POV Magazine Top 50 Entrepreneurs Under 35.
1998 DISCOVER Award for Technological Innovation.

**TESTIMONY**
None in the last four years.

**PATENTS**
U.S. Patent 5,940,135.  Apparatus and method for encoding and decoding information in analog signals
U.S. Patent 6,145,081.  Method and apparatus for preventing removal of embedded information in cover signals
U.S. Patent 6,175,627.  Apparatus and method for embedding and extracting information in analog signals using distributed signal features
U.S. Patent 6,737,957.  Remote control signaling using audio watermarks
U.S. Patent 7,369,677.  System reactions to the detection of embedded watermarks in a digital host content
U.S. Patent 7,616,776.  Methods and apparatus for enhancing the robustness of watermark extraction from digital host content
U.S. Patent 7,644,282.  Pre-processed information embedding system
U.S. Patent 7,788,684.  Media monitoring, management and information system
U.S. Patent 8,005,258.  Methods and apparatus for enhancing the robustness of watermark extraction from digital host content
U.S. Patent 8,020,004.  Forensic marking using a common customization function

CONFIDENTIAL

U.S. Patent 8,103,049. System reactions to the detection of embedded watermarks in a digital host content
U.S. Patent 8,106,744. Remote control signaling using audio watermarks
U.S. Patent 8,106,745. Remote control signaling using audio watermarks
U.S. Patent 8,321,679. Pre-processed information embedding system
U.S. Patent 8,340,348. Methods and apparatus for thwarting watermark detection circumvention
U.S. Patent 8,451,086. Remote control signaling using audio watermarks
U.S. Patent 8,538,066. Asymmetric watermark embedding/extraction
U.S. Patent 8,549,307. Forensic marking using a common customization function
U.S. Patent 8,745,404. Pre-processed information embedding system
U.S. Patent 8,791,789. Remote control signaling using audio watermarks
U.S. Patent 8,806,517. Media monitoring, management and information system
U.S. Patent 8,811,655. Circumvention of watermark analysis in a host content
U.S. Patent 8,838,977. Watermark extraction and content screening in a networked environment
U.S. Patent 8,838,978. Content access management using extracted watermark information
U.S. Patent 8,869,222. Second screen content
U.S. Patent 9,009,482. Forensic marking using a common customization function
U.S. Patent 9,055,239. Signal continuity assessment using embedded watermarks
U.S. Patent 9,153,006. Circumvention of watermark analysis in a host content
U.S. Patent 9,189,955. Remote control signaling using audio watermarks
U.S. Patent 9,208,334. Content management using multiple abstraction layers
U.S. Patent 9,251,322. Signal continuity assessment using embedded watermarks
U.S. Patent 9,251,549. Watermark extractor enhancements based on payload ranking
U.S. Patent 9,323,902. Conditional access using embedded watermarks
U.S. Patent 9,547,753. Coordinated watermarking
U.S. Patent 9,558,526. Signal continuity assessment using embedded watermarks
U.S. Patent 9,571,606. Social media viewing system
U.S. Patent 9,596,521. Interactive content acquisition using embedded codes
U.S. Patent 9,602,891. Service signaling recovery for multimedia content using embedded watermarks
U.S. Patent 9,607,131. Secure and efficient content screening in a networked environment
U.S. Patent 9,639,911. Watermark detection using a multiplicity of predicted patterns
U.S. Patent 9,648,282. Media monitoring, management and information system
U.S. Patent 9,681,203. Interactive content acquisition using embedded codes
U.S. Patent 9,704,211. Signal continuity assessment using embedded watermarks
U.S. Patent 9,769,543. Enhanced metadata and content delivery using watermarks
U.S. Patent 9,805,434. Content management based on dither-like watermark embedding
U.S. Patent 9,854,331. Interactive content acquisition using embedded codes
U.S. Patent 9,854,332. Interactive content acquisition using embedded codes
U.S. Patent 9,942,602. Watermark detection and metadata delivery associated with a primary content
U.S. Patent 9,990,688. Signal continuity assessment using embedded watermarks
U.S. Patent 10,110,971. Interactive content acquisition using embedded codes
U.S. Patent 10,178,443. Enhanced metadata and content delivery using watermarks
U.S. Patent 10,218,994. Watermark recovery using audio and video watermarking
U.S. Patent 10,257,567. Watermark based content recognition improvements
U.S. Patent 10,277,959. Service signaling recovery for multimedia content using embedded watermarks
U.S. Patent 10,354,354. Content synchronization using watermark timecodes
U.S. Patent 10,445,848. Content management based on dither-like watermark embedding
U.S. Patent 10,477,285. Watermark-based data recovery for content with multiple alternative components
U.S. Patent 10,499,120. Interactive content acquisition using embedded codes
U.S. Patent 10,504,200. Metadata acquisition using embedded watermarks
U.S. Patent 10,820,065. Service signaling recovery for multimedia content using embedded watermarks
U.S. Patent 10,848,821. Watermark based content recognition improvements
U.S. Patent 11,297,398. Watermark-based metadata acquisition and processing
U.S. Patent 11,368,766. System and method for signaling security and database population

## PENDING PATENT APPLICATIONS

U.S. Patent App. 20210382929. MULTIMEDIA CONTENT TAGS
U.S. Patent App. 20210127179. SYSTEM AND METHOD FOR SIGNALING SECURITY AND DATABASE
    POPULATION
U.S. Patent App. 20210076095. WATERMARK-BASED DYNAMIC AD INSERTION
U.S. Patent App. 20210058681. WATERMARK-BASED DATA RECOVERY FOR CONTENT WITH MULTIPLE
    ALTERNATIVE COMPONENTS

CONFIDENTIAL

U.S. Patent App. 20200128303. WATERMARK-BASED METADATA ACQUISITION AND PROCESSING
U.S. Patent App. 20200065322. MULTIMEDIA CONTENT TAGS
U.S. Patent App. 20190356965. SERVICE SIGNALING RECOVERY FOR MULTIMEDIA CONTENT USING EMBEDDED WATERMARKS
U.S. Patent App. 20190318061. DEVICE AUTHENTICATION IN COLLABORATIVE CONTENT SCREENING
U.S. Patent App. 20190306567. WATERMARK BASED CONTENT RECOGNITION IMPROVEMENTS
U.S. Patent App. 20190222554. CONTENT IDENTIFICATION AND PROCESSING INCLUDING LIVE BROADCAST CONTENT
U.S. Patent App. 20190132652. SYSTEM AND METHOD FOR SIGNALING SECURITY AND DATABASE POPULATION
U.S. Patent App. 20190090033. INTERACTIVE CONTENT ACQUISITION USING EMBEDDED CODES
U.S. Patent App. 20180220200. WATERMARK-BASED DATA RECOVERY FOR CONTENT WITH MULTIPLE ALTERNATIVE COMPONENTS
U.S. Patent App. 20180192163. INTERACTIVE CONTENT ACQUISITION USING EMBEDDED CODES
U.S. Patent App. 20180167630. WATERMARK RECOVERY USING AUDIO AND VIDEO WATERMARKING
U.S. Patent App. 20180146245. WATERMARK BASED CONTENT RECOGNITION IMPROVEMENTS
U.S. Patent App. 20180089790. SIGNAL CONTINUITY ASSESSMENT USING EMBEDDED WATERMARKS
U.S. Patent App. 20180018748. CONTENT MANAGEMENT BASED ON DITHER-LIKE WATERMARK EMBEDDING
U.S. Patent App. 20170374434. ENHANCED METADATA AND CONTENT DELIVERY USING WATERMARKS
U.S. Patent App. 20170316189. OBJECT-BASED WATERMARKING
U.S. Patent App. 20170280205. INTERACTIVE CONTENT ACQUISITION USING EMBEDDED CODES
U.S. Patent App. 20170272839. INTERACTIVE CONTENT ACQUISITION USING EMBEDDED CODES
U.S. Patent App. 20170251282. SERVICE SIGNALING RECOVERY FOR MULTIMEDIA CONTENT USING EMBEDDED WATERMARKS
U.S. Patent App. 20170251254. TRACING PIRACY OF LIVE BROADCASTS
U.S. Patent App. 20170140493. SIGNAL CONTINUITY ASSESSMENT USING EMBEDDED WATERMARKS
U.S. Patent App. 20160241932. INTERACTIVE CONTENT ACQUISITION USING EMBEDDED CODES
U.S. Patent App. 20160225116. SIGNAL CONTINUITY ASSESSMENT USING EMBEDDED WATERMARKS
U.S. Patent App. 20160182973. SERVICE SIGNALING RECOVERY FOR MULTIMEDIA CONTENT USING EMBEDDED WATERMARKS
U.S. Patent App. 20160162858. SCREENING ARCHITECTURES ENABLING REVOCATION AND UPDATE
U.S. Patent App. 20160150297. ENHANCED METADATA AND CONTENT DELIVERY USING WATERMARKS
U.S. Patent App. 20160148334. WATERMARK DETECTION AND METADATA DELIVERY ASSOCIATED WITH A PRIMARY CONTENT
U.S. Patent App. 20160073148. MEDIA CUSTOMIZATION BASED ON ENVIRONMENTAL SENSING
U.S. Patent App. 20160057317. CONTENT SYNCHRONIZATION USING WATERMARK TIMECODES
U.S. Patent App. 20160055607. CONTENT MANAGEMENT BASED ON DITHER-LIKE WATERMARK EMBEDDING
U.S. Patent App. 20160055606. WATERMARK DETECTION USING A MULTIPLICITY OF PREDICTED PATTERNS
U.S. Patent App. 20150324947. METADATA ACQUISITION USING EMBEDDED WATERMARKS
U.S. Patent App. 20150286809. FORENSIC MARKING USING A COMMON CUSTOMIZATION FUNCTION
U.S. Patent App. 20150269362. SIGNAL CONTINUITY ASSESSMENT USING EMBEDDED WATERMARKS
U.S. Patent App. 20150264429. INTERACTIVE CONTENT ACQUISITION USING EMBEDDED CODES
U.S. Patent App. 20150261753. METADATA ACQUISITION USING EMBEDDED CODES
U.S. Patent App. 20150121534. CONTENT MANAGEMENT USING MULTIPLE ABSTRACTION LAYERS
U.S. Patent App. 20150036873. CIRCUMVENTION OF WATERMARK ANALYSIS IN A HOST CONTENT
U.S. Patent App. 20150030200. WATERMARK EXTRACTOR ENHANCEMENTS BASED ON PAYLOAD RANKING
U.S. Patent App. 20150016228. REMOTE CONTROL SIGNALING USING AUDIO WATERMARKS
U.S. Patent App. 20140325550. REAL-TIME ANTI-PIRACY FOR BROADCAST STREAMS
U.S. Patent App. 20140279549. REFERRED SALE SYSTEM
U.S. Patent App. 20140279296. REFERRED SALE SYSTEM
U.S. Patent App. 20140074855. MULTIMEDIA CONTENT TAGS
U.S. Patent App. 20140071342. SECOND SCREEN CONTENT
U.S. Patent App. 20140067950. SOCIAL MEDIA VIEWING SYSTEM
U.S. Patent App. 20140029786. FORENSIC MARKING USING A COMMON CUSTOMIZATION FUNCTION
U.S. Patent App. 20130339029. REMOTE CONTROL SIGNALING USING AUDIO WATERMARKS
U.S. Patent App. 20130152210. COORDINATED WATERMARKING
U.S. Patent App. 20130151856. CONDITIONAL ACCESS USING EMBEDDED WATERMARKS
U.S. Patent App. 20130151855. WATERMARK EMBEDDING WORKFLOW IMPROVEMENTS
U.S. Patent App. 20130142382. PRE-PROCESSED INFORMATION EMBEDDING SYSTEM
U.S. Patent App. 20130011006. ASYMMETRIC WATERMARK EMBEDDING/EXTRACTION
U.S. Patent App. 20130007462. CIRCUMVENTION OF WATERMARK ANALYSIS IN A HOST CONTENT
U.S. Patent App. 20120130719. REMOTE CONTROL SIGNALING USING AUDIO WATERMARKS

CONFIDENTIAL

U.S. Patent App. 20120072731. SECURE AND EFFICIENT CONTENT SCREENING IN A NETWORKED ENVIRONMENT

U.S. Patent App. 20120072730. CONTEXT ACCESS MANAGEMENT USING WATERMARK EXTRACTION INFORMATION

U.S. Patent App. 20120072729. WATERMARK EXTRACTION AND CONTENT SCREENING IN A NETWORKED ENVIRONMENT

U.S. Patent App. 20120026393. MEDIA MONITORING, MANAGEMENT AND INFORMATION SYSTEM

U.S. Patent App. 20120017091. METHODS AND APPARATUS FOR THWARTING WATERMARK DETECTION CIRCUMVENTION

U.S. Patent App. 20110311056. FORENSIC MARKING USING A COMMON CUSTOMIZATION FUNCTION

U.S. Patent App. 20110286625. SYSTEM REACTIONS TO THE DETECTION OF EMBEDDED WATERMARKS IN A DIGITAL HOST CONTENT

U.S. Patent App. 20110068898. REMOTE CONTROL SIGNALING USING AUDIO WATERMARKS

U.S. Patent App. 20100287579. MEDIA MONITORING, MANAGEMENT AND INFORMATION SYSTEM

U.S. Patent App. 20100228857. MEDIA MONITORING, MANAGEMENT AND INFORMATION SYSTEM

U.S. Patent App. 20100146286. Pre-Processed Information Embedding System

U.S. Patent App. 20100111355. METHODS AND APPARATUS FOR ENHANCING THE ROBUSTNESS OF WATERMARK EXTRACTION FROM DIGITAL HOST CONTENT

U.S. Patent App. 20080310673. System reactions to the detection of embedded watermarks in a digital host content

U.S. Patent App. 20080002854. Signal continuity assessment using embedded watermarks

U.S. Patent App. 20070247278. Remote control signaling using audio watermarks

U.S. Patent App. 20070012782. Forensic marking using a common customization function

U.S. Patent App. 20060239503. System reactions to the detection of embedded watermarks in a digital host content

U.S. Patent App. 20060239502. Methods and apparatus for enhancing the robustness of watermark extraction from digital host content

U.S. Patent App. 20060239501. Security enhancements of digital watermarks for multi-media content

U.S. Patent App. 20060005029. Pre-processed information embedding system

U.S. Patent App. 20040169581. Remote control signaling using audio watermarks

U.S. Patent App. 20040073916. Media monitoring, management and information system

## PUBLICATIONS

Author of 6 technical journal articles, 10 technical conference papers, and 1 United States Air Force technical report in the areas of digital signal processing, real-time systems design, and computer graphics algorithms.

### Journal Articles (6)

R. Petrovic, J.M. Winograd, K. Jemili, E. Métois, "Data Hiding within Audio Signals," *Facta Universitatis* (NIS), Series: Electronics and Energetics, vol.12, No.2 (1999), pp.103-122.

S. H. Nawab, A. V. Oppenheim, A. P. Chandrakasan, J. M. Winograd and J. T. Ludwig, "Approximate Signal Processing," *J. VLSI Signal Processing*, vol. 15, no. 1, pp. 177-200, January 1997.

J. M. Winograd and S. H. Nawab, "Probabilistic Complexity Analysis for a Class of Approximate DFT Algorithms," *J. VLSI Signal Processing*, vol. 14, no. 2, pp. 193-205, December 1996.

J. M. Winograd and J. H. McClellan, "How to Use a Computer Algebra System for Reconstruction of Functions from Parallel-Line Projections," *Computers in Physics*, vol. 9, no. 2, pp. 156-164, March 1995.

J. M. Winograd and S. H. Nawab, "Incremental Refinement of DFT and STFT Approximations," *IEEE Signal Processing Letters*, vol. 2, no. 2, pp. 1-3, February 1995.

S. J. Adelson, J. B. Bentley, I. S. Chong, L. F. Hodges, and J. M. Winograd, "Simultaneous Generation of Stereoscopic Views," *Computer Graphics Forum*, vol. 10, no. 1, pp. 3-10, March 1991.

### Conference Papers (10)

R. Petrovic, B. Tehranchi, and J. M. Winograd, "Security of Copy Control Watermarks," *TELSIKS 2007,* Sept. 2007.

R. Petrovic, B. Tehranchi, and J. M. Winograd, "Digital Watermarking Security Considerations," *Proc. 8th ACM Wkshp. Multimedia & Security,* (Geneva), Sept. 2006.

J. M. Winograd and S. H. Nawab, "Probabilistic Complexity Analysis of Incremental DFT Algorithms," *Proc. IEEE Int. Conf. Acoustics, Speech, and Signal Processing*, (Munich), April 1997.

J. M. Winograd, J. T. Ludwig, S. H. Nawab, A. V. Oppenheim, and A. P. Chandrakasan, "Flexible Systems for Digital Signal Processing," *Proc. AAAI Symposium on Flexible Computation*, (Cambridge, MA), November, 1996.

R. Mani, S. H. Nawab, J. M. Winograd, and B. L. Evans, "Integrated Numeric and Symbolic Signal Processing in a Heterogeneous Design Environment," *Advanced Signal Processing Algorithms*, (ed. F. T. Luk) Proc. SPIE, (Denver, CO), August 1996.

CONFIDENTIAL

J. M. Winograd, S. H. Nawab, and A. V. Oppenheim, "FFT-Based Incremental Refinement of Suboptimal Detection," *Proc. IEEE Int. Conf. Acoustics, Speech, and Signal Processing*, (Atlanta, GA), May 1996.

J. M. Winograd, J. T. Ludwig, S. H. Nawab, A. Chandrakasan and A. V. Oppenheim, "Approximate Processing and Incremental Refinement Concepts," *Proc. Second ARPA RASSP Conf.*, (Washington D.C.), July 1995.

J. M. Winograd and S. H. Nawab, "Mixed-Radix Approach to Incremental DFT Refinement," *Advanced Signal Processing Algorithms*, (ed. F. T. Luk), Proc. SPIE 2563, (San Diego, CA), July 1995.

J. M. Winograd and S. H. Nawab, "A C++ Software Environment for the Development of Embedded Signal Processing Systems," *Proc. IEEE Int. Conf. Acoustics, Speech, and Signal Processing*, vol. 4, pp. 2715-2718, (Detroit), May 1995.

S. H. Nawab and J. M. Winograd, "Approximate Signal Processing Using Incremental Refinement and Deadline-Based Algorithms," *Proc. IEEE Int. Conf. Acoustics, Speech*, and Signal Processing, vol. 5, pp. 2857-2860, (Detroit), May 1995.

**Technical Reports (1)**

J. M. Winograd, "IPUS C++ Platform User's Manual."  In *High Level Adaptive Signal Processing Architecture with Applications to Radar Non-Gaussian Clutter*, Technical Report RL-TR-95-164, Rome Laboratory Air Force Materiel Command, Griffiss Air Force Base, NY, Sep. 1995.

CONFIDENTIAL

## Exhibit B.      List of Materials Considered

### Deposition Transcripts

Bill, Julian – 2022.06.22
Froehle, Brad (30(b)(6) portion) – 2022.06.30
Froehle, Brad (individual portion) – 2022.06.30
Goodrow, Cristos – 2022.06.28
Magagna, Fabio (Winograd excerpts) – 2022.07.05
Rosenstein, David – 2022.07.01
Suk, Joanne – 2022.07.14
Wu, Amy – 2022.05.24
Zhu, Kevin (30(b)(1) portion) (Winograd excerpts) – 2022.06.21

### Public Documents

"2021 Alphabet Annual Report," p. 29,
https://abc.xyz/investor/static/pdf/2021_alphabet_annual_report.pdf.
About Google," https://about.google/intl/ALL_us/.
ASCAP/BMI Songview Repertory, https://www.ascap.com/repertory#/.
"Cloudflare Blog: In 2021, the Internet went for TikTok, space and beyond,"
https://blog.cloudflare.com/popular-domains-year-in-review-2021/.
Getty Images, https://www.gettyimages.com.
"Google AI: Responsibilities," https://ai.google/responsibilities/.
"Google aims to make YouTube profitable with ads," *New York Times*, Aug. 22, 2007.
https://www.nytimes.com/2007/08/22/technology/22iht-22google.7206224.html.
"Google Knowledge Graph Search API," https://developers.google.com/knowledge-graph.
"Google Official Blog: Latest content ID tool for YouTube,"
https://googleblog.blogspot.com/2007/10/latest-content-id-tool-for-youtube.html.
"Google Search Central: In-depth guide to how Google Search works,"
https://developers.google.com/search/docs/advanced/guidelines/how-search-works.
"Google Search Help: Search with an image on Google,"
https://support.google.com/websearch/answer/1325808.
"Google's Next Generation Music Recognition," https://ai.googleblog.com/2018/09/googles-next-generation-music.html.
"Inside Sibyl," Google's Massively Parallel Machine Learning Platform,"
https://www.datanami.com/2014/07/17/inside-sibyl-googles-massively-parallel-machine-learning-platform/.
Jeffrey. Dean, "A Golden Decade of Deep Learning: Computing Systems & Applications," Daedalus, Spring 2022.
https://www.amacad.org/sites/default/files/publication/downloads/Daedalus_Sp22_04_Dean.pdf.
"Take YouTube Certified Courses," https://support.google.com/youtube/answer/7380223.
"Viacom files $1 billion lawsuit against YouTube and Google,"
https://www.nytimes.com/2007/03/13/business/worldbusiness/13iht-viacom.4892466.html.
"Waiting till 9 a.m for XBox 360! Wooo!!!," video watch page from YouTube.com, Nov. 24, 2005.
https://web.archive.org/web/20061215205212/http://www.youtube.com/watch.php?v=0oBXDc9Opug.
YouTube, https://www.youtube.com.

CONFIDENTIAL

"YouTube Advertising Policies: Copyright," https://support.google.com/adspolicy/answer/6018015.

"YouTube Advertising Policies: Review Process," https://support.google.com/adspolicy/topic/1316546.

"YouTube Blog: Here's to eight great years," https://blog.youtube/culture-and-trends/heres-to-eight-great-years/.

"YouTube Blog: On YouTube's recommendation system," September 15, 2021, https://blog.youtube/inside-youtube/on-youtubes-recommendation-system/.

"YouTube Blog: Responsibility is good for business and for the creator economy," https://blog.youtube/inside-youtube/responsibility-good-business-and-creator-economy/.

"YouTube Blog: YouTube's approach to copyright," August 31, 2021, https://blog.google/around-the-globe/google-europe/youtubes-approach-to-copyright/.

"YouTube Community: Updates to YouTube's Terms of Service (November '20)," https://support.google.com/youtube/thread/83733719.

"YouTube Composition Share Asset," https://support.google.com/youtube/answer/6175220.

"YouTube Content ID API," https://developers.google.com/youtube/partner.

"YouTube Content ID API: Claims," https://developers.google.com/youtube/partner/docs/v1/claims.

"YouTube Copyright and rights management," https://support.google.com/youtube/topic/2676339.

"YouTube Copyright Transparency Report H1 2021," https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-1-1_2021-6-30_en_v1.pdf.

"YouTube Copyright Transparency Report H2 2021," https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf.

"YouTube Creators: How to Prevent Videos You've Taken Down From Being Reuploaded," https://www.youtube.com/watch?v=DP0zLUVeevg.

"YouTube Creators: How to use YouTube's Copyright Match Tool," https://www.youtube.com/watch?v=5-2R-IZITZ8.

"YouTube for Content Managers," https://support.google.com/youtube/topic/9153648.

"YouTube for Press: YouTube by the Numbers," https://blog.youtube/press/.

"YouTube for the Press: YouTube by the Numbers," https://blog.youtube/press/.

"YouTube Help: 4k video uploads and processing time," https://support.google.com/youtube/thread/1626616.

"YouTube Help: Access to YouTube tools and features," https://support.google.com/youtube/answer/9890437.

"YouTube Help: Add video thumbnails on YouTube," https://support.google.com/youtube/answer/72431.

"YouTube Help: Autoplay Videos," https://support.google.com/youtube/answer/6327615.

"YouTube Help: Change video privacy settings," https://support.google.com/youtube/answer/157177.

"YouTube Help: Content Eligible for Content ID," https://support.google.com/youtube/answer/2605065.

"YouTube Help: Content Manager Policies," https://support.google.com/youtube/answer/9142671.

"YouTube Help: Content Verification Program," https://support.google.com/youtube/answer/6005923.

"YouTube Help: Create a policy," https://support.google.com/youtube/answer/106964.

"YouTube Help: Create an asset," https://support.google.com/youtube/answer/3011552.

"YouTube Help: Dispute a Content ID claim," https://support.google.com/youtube/answer/2797454.

"YouTube Help: Embed videos & playlists," https://support.google.com/youtube/answer/171780.

"YouTube Help: Exclude parts of your references," https://support.google.com/youtube/answer/4389910.

"YouTube Help: How Content ID Works," https://support.google.com/youtube/answer/2797370.

"YouTube Help: Learn about Content ID claims," https://support.google.com/youtube/answer/6013276.

CONFIDENTIAL

"YouTube Help: Let us know your copyright management needs!,"
https://support.google.com/youtube/contact/copyright_management_tools_form.
"YouTube Help: Policies for Content ID," https://support.google.com/youtube/answer/9142671.
"YouTube Help: Prevent reuploads of removed videos,"
https://support.google.com/youtube/answer/10298392.
"YouTube Help: Qualify for Content ID," https://support.google.com/youtube/answer/1311402.
"YouTube Help: Requirements for copyright infringement notifications: Videos,"
https://support.google.com/youtube/answer/6005900.
"YouTube Help: Set up email notifications," https://support.google.com/youtube/answer/2811709.
"YouTube Help: Submit a copyright counter notification,"
https://support.google.com/youtube/answer/2807684.
"YouTube Help: Submit a copyright takedown request,"
https://support.google.com/youtube/answer/2807622.
"YouTube Help: Upload and Match Policies," https://support.google.com/youtube/answer/107129.
"YouTube Help: Upload videos in YouTube Studio," https://support.google.com/youtube/answer/57407.
"YouTube Help: Use the Content Verification Tool,"
https://support.google.com/youtube/answer/3010500.
"YouTube Help: Use the Copyright Match Tool," https://support.google.com/youtube/answer/7648743.
"YouTube Help: Use the Manual Claiming Tool," https://support.google.com/youtube/answer/9346683.
"YouTube Help: Verify your YouTube Account," https://support.google.com/youtube/answer/171664.
"YouTube Help: View your claims," https://support.google.com/youtube/answer/106990.
"YouTube Help: Watch different types of videos," https://support.google.com/youtube/topic/9257410.
"YouTube Help: Watch videos on different devices," https://support.google.com/youtube/topic/9257096.
"YouTube Help: YouTube advertising formats," https://support.google.com/youtube/answer/2467968.
"YouTube Help: YouTube Certified Program overview,"
https://support.google.com/youtube/answer/6145904.
"YouTube Help: YouTube Certified program overview: Content Owner Course and Music Rights
Management Course," https://support.google.com/youtube/answer/6145904#zippy=%2Ccontent-
ownership-course%2Cmusic-rights-management-course.
"YouTube Help: YouTube Channel Monetization Policy,"
https://support.google.com/youtube/answer/1311392.
"YouTube New "Checks" Step in the Upload Flow on Desktop,"
https://support.google.com/youtube/thread/102365314.
"YouTube Official Blog: 50 Million," https://blog.youtube/news-and-events/50-million/.
"YouTube Official Blog: Helping creators protect their content," https://blog.youtube/news-and-
events/helping-creators-protect-their-content/.
"YouTube Operations Guide," https://support.google.com/youtube/answer/6084146.
"YouTube Operations Guide: Using Content ID," https://support.google.com/youtube/answer/3244015.
"YouTube Partner Program overview & eligibility," https://support.google.com/youtube/answer/72851.
"YouTube Policies," https://www.youtube.com/howyoutubeworks/policies/overview/.
"YouTube Product Features: Recommended Videos,"
https://www.youtube.com/howyoutubeworks/product-features/recommendations/.
"YouTube Search," https://www.youtube.com/howyoutubeworks/product-features/search/.
"YouTube serves up 100 million videos a day online," CBS News, July 16, 2006.
https://usatoday30.usatoday.com/tech/news/2006-07-16-youtube-views_x.htm.

CONFIDENTIAL

**Production Documents**

GOOG-SCHNDR-00000859
GOOG-SCHNDR-00000918
GOOG-SCHNDR-00000924
GOOG-SCHNDR-00001059
GOOG-SCHNDR-00001066
GOOG-SCHNDR-00001112
GOOG-SCHNDR-00001129
GOOG-SCHNDR-00001188
GOOG-SCHNDR-00001252
GOOG-SCHNDR-00001279
GOOG-SCHNDR-00001283
GOOG-SCHNDR-00001354
GOOG-SCHNDR-00001411
GOOG-SCHNDR-00001442
GOOG-SCHNDR-00002131
GOOG-SCHNDR-00002146
GOOG-SCHNDR-00021221
GOOG-SCHNDR-00030913
GOOG-SCHNDR-00034775
GOOG-SCHNDR-00034975
GOOG-SCHNDR-00035026
GOOG-SCHNDR-00038640
GOOG-SCHNDR-00038782
GOOG-SCHNDR-00038808
GOOG-SCHNDR-00038834
GOOG-SCHNDR-00038863
GOOG-SCHNDR-00038876
GOOG-SCHNDR-00038910
GOOG-SCHNDR-00038932
GOOG-SCHNDR-00038946
GOOG-SCHNDR-00038961
GOOG-SCHNDR-00038966
GOOG-SCHNDR-00039024
GOOG-SCHNDR-00039051
GOOG-SCHNDR-00039064
GOOG-SCHNDR-00039095
GOOG-SCHNDR-00039113
GOOG-SCHNDR-00040244
GOOG-SCHNDR-00040515
GOOG-SCHNDR-00040616
GOOG-SCHNDR-00040619
GOOG-SCHNDR-00040623

CONFIDENTIAL

GOOG-SCHNDR-00040661
GOOG-SCHNDR-00040721
GOOG-SCHNDR-00040723
GOOG-SCHNDR-00040751
GOOG-SCHNDR-00040756
GOOG-SCHNDR-00040761
GOOG-SCHNDR-00040840
GOOG-SCHNDR-00040860
GOOG-SCHNDR-00040865
GOOG-SCHNDR-00041318
GOOG-SCHNDR-00041330
GOOG-SCHNDR-00041383
GOOG-SCHNDR-00041389
GOOG-SCHNDR-00041457
GOOG-SCHNDR-00041470
GOOG-SCHNDR-00041477
GOOG-SCHNDR-00041492
GOOG-SCHNDR-00042066
GOOG-SCHNDR-00042071
GOOG-SCHNDR-00042424
GOOG-SCHNDR-00042486
GOOG-SCHNDR-00042564
GOOG-SCHNDR-00042607
GOOG-SCHNDR-00042619
GOOG-SCHNDR-00043717
GOOG-SCHNDR-00043860
GOOG-SCHNDR-00043864
GOOG-SCHNDR-00044022
GOOG-SCHNDR-00046791
GOOG-SCHNDR-00048006
GOOG-SCHNDR-00048014
GOOG-SCHNDR-00048018
GOOG-SCHNDR-00048040
GOOG-SCHNDR-00050365
GOOG-SCHNDR-00050398
GOOG-SCHNDR-00051628
GOOG-SCHNDR-00051657
GOOG-SCHNDR-00051743
GOOG-SCHNDR-00051798
GOOG-SCHNDR-00051824
GOOG-SCHNDR-00051863
GOOG-SCHNDR-00051907
GOOG-SCHNDR-00051950

CONFIDENTIAL

GOOG-SCHNDR-00051976
GOOG-SCHNDR-00052063
GOOG-SCHNDR-00052099
GOOG-SCHNDR-00052174
GOOG-SCHNDR-00052315
GOOG-SCHNDR-00052341
GOOG-SCHNDR-00052429
GOOG-SCHNDR-00052970
GOOG-SCHNDR-00053129
GOOG-SCHNDR-00053190
GOOG-SCHNDR-00053221
GOOG-SCHNDR-00053226
GOOG-SCHNDR-00053523
GOOG-SCHNDR-00053529
GOOG-SCHNDR-00053755
GOOG-SCHNDR-00053764
GOOG-SCHNDR-00053786
GOOG-SCHNDR-00054239
GOOG-SCHNDR-00054245
GOOG-SCHNDR-00054286
GOOG-SCHNDR-00054295
GOOG-SCHNDR-00054327
GOOG-SCHNDR-00054372
GOOG-SCHNDR-00054373
Schneider_v_YouTube_CID Data Extraction_complete.xlsx

CONFIDENTIAL

## Exhibit C.      <u>Glossary of Terms</u>

The following terms are used in this report with a specific technical meaning that differs from their general English usage.

**Asset:** Digital copies of copyrighted works ("Reference Files") and descriptive text provided to Defendants by Content ID Partners of works that they own.

**Audio Matching:** A technology that finds audio containing a copy of another audio recording for which it has previously generated an audio Fingerprint.

**Autoplay:** A feature of YouTube wherein after the viewer has selected a first video to view, a sequence of videos selected by the WatchNext recommendation system are automatically played for viewers without any further interaction required.

**Candidate:** A video selected by a WatchNext Nominator for potential recommendation to the user.

**Claim:** A copyright assertion made using the Content ID tool.

**Content ID:** A YouTube copyright management tool that provides matching and claiming functions to Content ID Partners.

**Content ID Partner:** A copyright owner who has been granted access to Content ID by Defendants.

**Excluded Segment:** A temporal segment of a video or audio component (or both) of a video that should be excluded from matching.

**Fingerprint:** A statistical description of a digital media item (e.g. video, audio, or a "melody" aka musical composition) that is designed to capture its essential characteristics in a compact form.

**First to Upload:** A policy of the Copyright Match Tool wherein a video is disqualified from protection if the majority of the video (by duration) is found to match an existing video on YouTube.

**Full Reupload:** A policy of the Copyright Match Tool whereby the tool will only find infringing videos that match ▮▮▮ or more of the duration of the video that the rightsholder is seeking to protect



CONFIDENTIAL

**Knowledge Graph:** Google's data model for everything, either physical or abstract, in the real world.

**Machine Learning:** A technology for problem-solving wherein an algorithm is trained by presenting it with large numbers of examples of a type of problem (each a possible input) and their solution (for each input, the desired output). If provided with enough examples, it can automatically learn to generalize and obtain the ability to solve entirely new instances of the problem.

**Manual Copyright Search:** A feature of the YouTube Content Management System with which Defendants permits a subset of copyright owners employ a text-based search engine designed to assist in finding infringing videos.

**Match Conditions:** A set of rules assigned to an Asset by a Content ID Partner that describes what types of uses in uploaded videos they would like to claim; matches that don't conform to those rules are ignored.

**Matching System:** A specialized search engine designed for automated discovery of uses of copyrighted works using Video Matching, Audio Matching, and Melody Matching.

**Melody Matching:** A technology that finds Videos whose audio component contains a performance of a musical composition for which it has previously generated a melody Fingerprint.

**Nominator:** A software component in the WatchNext recommendation system that pursues a particular strategy for identifying a few dozen promising Candidates for recommendation to the viewer.

**Ordinary Copyright Owners:** Rightsholders who do not meet Defendants' requirements for eligibility to become a Content ID Partner.

**Query:** An item presented to a search engine for matching against items in the search engine's index.

**Reference File:** A digital copy of a copyrighted work uploaded to Content ID by a Content ID Partner for matching.

**Thumbnail:** A still image associated with a video on YouTube that is displayed to users when the video is listed in YouTube Search results or WatchNext recommendations.

**Uploader:** A YouTube Partner or member of the general public who has uploaded content to YouTube.

**URL:** Uniform Resource Locator; a web address.

CONFIDENTIAL

**Video Matching:** A technology that finds videos whose video component contains a copy of another video component for which it has previously generated a video Fingerprint.

**WatchNext:** YouTube's recommendation system that selects videos to promote to users.

**Webform:** YouTube's publicly available web page for submitting a DMCA takedown notice.

**YouTube Corpus:** The collection of videos on YouTube that are eligible for presentation to users.

███████████████████████████████████████████████

**YouTube Partner:** Uploaders who have entered into a commercial partnership with YouTube.

**YouTube Search:** The text-based search engine provided to all YouTube users for finding videos to watch.

CONFIDENTIAL

## Exhibit D.    Capabilities Summary of YouTube Copyright Management Tools

| Infringing Video Characteristics | | Copyright Management Tool Efficacy | | | | | | | |
| Type of Infringement | Type of Annotation | Content ID | | Copyright Match Tool | | Copyright Search | | YouTube Search | |
| | | Past | Future | Past | Future | Past | Future | Past | Future |
|---|---|---|---|---|---|---|---|---|---|
| Full copy | Specific | Yes | Yes | No | Yes, if first to upload or previously discovered and taken down | Yes | No | Yes, one instance at a time | No |
| Full copy | Generic | Yes | Yes | No | Yes, if first to upload or previously discovered and taken down | No | No | No | No |
| Full copy | Unrelated | Yes | Yes | No | Yes, if first to upload or previously discovered and taken down | No | No | No | No |
| Full copy, incorporated | Specific | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | Yes | No | Yes, one instance at a time | No |
| Full copy, incorporated | Generic | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | No | No | No | No |
| Full copy, incorporated | Unrelated | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | No | No | No | No |
| Partial copy | Specific | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | Yes | No | Yes, one instance at a time | No |
| Partial copy | Generic | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | No | No | No | No |
| Partial copy | Unrelated | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | No | No | No | No |
| Partial copy, incorporated | Specific | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | Yes | No | Yes, one instance at a time | No |
| Partial copy, incorporated | Generic | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | No | No | No | No |
| Partial copy, incorporated | Unrelated | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | No | No | No | No |
| Performance | Specific | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | Yes | No | Yes, one instance at a time | No |
| Performance | Generic | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | No | No | No | No |
| Performance | Unrelated | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | No | No | No | No |

**Definitions**

*Types of Infringement:*

| | |
|---|---|
| Full copy | Infringing videos whose video and/or audio consist solely of a complete copy of the infringed work |
| Full copy, incorporated | Infringing videos whose video and/or audio incorporate a full copy of the infringed work in addition to other content |
| Partial copy | Infringing videos whose video and/or audio consist solely of a copy of a portion of the infringed work |
| Partial copy, incorporated | Infringing videos whose video and/or audio incorporate a copy of a portion of the infringed work in addition to other content |
| Performance | Infringing videos that includes a performance of all or a part of the infringed musical composition |

*Types of Annotation:*

| | |
|---|---|
| Specific | Infringing videos that are annotated with text that specifically identifies the infringed work in a unique way |
| Generic | Infringing videos that are annotated with text that generically identifies the infringed work or for which the specific identifies the work in a non-unique way |
| Unrelated | Infringing videos that are annotated with text unrelated to the infringed work |

*Types of Efficacy:*

| | |
|---|---|
| Past | Applicable to infringing videos currently on YouTube that were uploaded to the service in the past |
| Future | Applicable to infringing videos that will be uploaded to YouTube in the future |

*Efficacy:*

| | |
|---|---|
| Yes | Tool is effective at finding typical infringing videos with the given characteristics |
| No | Tool is not effective at finding typical infringing videos with the given characteristics |