# EXHIBIT 18

Before the
LIBRARY OF CONGRESS
United States Copyright Office

| | |
|---|---|
| **In the Matter of** | **Docket No. 2015-7** |
| **Request for Comments** | |
| **on United States Copyright Office** | **Submitted April 1, 2016** |
| **Section 512 Study** | |

**Comments of the Motion Picture Association of America, Inc.**
**Submitted by Jennifer L. Pariser, Vice President, Legal Affairs, MPAA**

**Introduction**

The Motion Picture Association of America, Inc. ("MPAA") welcomes the opportunity to participate in the Copyright Office's public study of section 512 of the Digital Millennium Copyright Act ("DMCA").[1] Section 512 reflects Congress's intent to foster a system of shared responsibility between copyright owners and service providers to deal with the problem of widespread infringement occurring over the Internet. In a number of important areas that delineate this shared responsibility, however, the federal courts have strayed from Congress's language and the overall purposes underlying section 512. It is imperative for all members of the content-creation community, and broadly for all stakeholders interested in a vibrant Internet ecosystem, that the system Congress set forth in section 512 be interpreted and applied as Congress intended. The MPAA appreciates the Copyright Office's attention to these important issues.

The Internet is an extraordinary resource for content creators and audiences to connect in innovative and increasingly flexible ways. The legitimate, licensed marketplace for video programming is burgeoning, with more viewers accessing more content through more dissemination channels than ever before. The MPAA's members have embraced the Internet to offer their content through a wide and growing array of platforms and distributors. The MPAA's members are committed to the continued growth of the online video marketplace.

Unfortunately, the Internet also has made it possible for piracy to flourish on a scale not previously imaginable. More than 15 years after the heyday of the infamous Napster service, copyright owners continue to be under siege from Internet piracy. The scope of infringing

---

[1] Founded in 1922, the MPAA is the not-for-profit trade association that addresses issues of concern to the United States motion picture industry. The MPAA's member companies are Paramount Pictures Corp., Sony Pictures Entertainment Inc., Twentieth Century Fox Film Corp., Universal City Studios LLC, Walt Disney Studios Motion Pictures, and Warner Bros. Entertainment Inc. These companies and their affiliates are the leading producers and distributors of audiovisual works in the theatrical, television and home entertainment markets, in all formats and all channels of distribution, including online distribution.

1

conduct occurring online is vast. Copyright owners spend millions of dollars annually combatting online piracy. This siphons resources away from investments in new content and new forms of distribution and delivery. In calendar year 2015, the MPAA's members sent notices with respect to more than 104.2 million infringing URLs to search operators and sites that host content and enable users to download or stream full-length movies without authorization. To use another barometer, the Google Transparency Report (GTR)—which reports on copyright owner takedown requests for links to infringing content returned through Google searches—shows that copyright owners sent Google more than 83 million takedown notices for infringing content accessible through more than 73,000 websites in March 2016.[2]

These numbers—and other extraordinarily large numbers discussed in these comments—underscore the immense problems that online piracy presents for content creators. To be sure, the numbers also demonstrate that some service providers have established efficient mechanisms for processing the large numbers of takedown notices that copyright owners send. The fact that the numbers continue to be massive year over year, however, shows that the notice-and-takedown process that exists today is entirely reactive and has been implemented in a way that is largely ineffective to address the underlying problem of infringement. The system delineated in the DMCA has been interpreted by courts essentially to require no affirmative action on the part of service providers unless and until a content owner advises them of the presence of an infringing work. The burden of identifying the granular location data for infringing content and formally notifying service providers falls almost entirely on copyright owners.

Moreover, because courts have determined that sites must only remove the specific file or link listed in a particular notice and not all instances of the same copyrighted work, the system fails to combat the larger piracy problem. Although a notice-and-takedown regime may work reasonably well for isolated acts of infringement by individuals who are not intentional infringers, that regime is ineffective at dealing with the problems created by willful infringers. Those who are determined to infringe copyright know very well how to manipulate a notice-and-takedown system—such as by stacking URLs to ensure that when one URL is removed, another automatically appears in its place—to ensure that the infringing content they post is always available.

This is not how Congress intended the system to work. When it enacted the DMCA, Congress realized the Internet's potential both to yield tremendous benefits and to facilitate widespread piracy. Through section 512, Congress intended to foster the former and provide incentives for all interested parties to combat the latter. The cornerstone of this effort was a system of shared responsibility between copyright owners and online service providers in addressing infringing content online and limiting its presence. Congress intended section 512 to protect innocent service providers from liability, without shielding those who intentionally benefit from or facilitate copyright infringement. The statute was never intended to be only a notice-and-takedown regime for online infringement. Congress certainly did not intend for

---

[2] Google Transparency Report (accessed Apr. 1, 2016), *available at* https://www.google.com/transparencyreport/.

section 512 to create an endless game of "Whac-A-Mole," having no real substantive impact on the overall availability of infringing content online.

In many areas, however, the courts have not followed the statute's language or given effect to Congress's purpose.  Courts' interpretation of the statutory "safe harbor" sections has shielded from liability even service providers who have built their entire business around copyright infringement—including by willfully blinding themselves to rampant infringement occurring on their sites—so long as the service provider responds to takedown notices.  A notice-and-takedown regime on its own, however, cannot significantly reduce the vast amount of copyright infringement online.  As soon as a content owner identifies one infringing copy of its work and the relevant service provider has taken it down, another copy—or, often, more than one other copy—is put online in its place.  Far from the cooperative system that Congress envisioned, the prevailing interpretations of section 512 have created a system in which (a) content creators bear almost all of the burden of dealing with online infringement, and (b) non-innocent service providers claim protection from liability through ineffective notice-and-takedown policies while welcoming and even building businesses around infringing activity.

Congress did not intend to incentivize the creation of notice-and-takedown processes for their own sake.  Congress intended to create *effective* measures—not merely efficient processes—to incentivize service providers as well as copyright owners to work together to prevent copyright infringement.  That clearly has not happened.  Courts have essentially transformed section 512 into a pure notice-and-takedown statute.  The large number of takedown notices sent and responded to is not a sign that the system is working as intended; it is a sign that the system is failing.  The law as construed provides the wrong incentives to service providers, places disproportionate burdens on copyright owners, serves to protect bad actors, and undermines congressional intent.[3]

**General Effectiveness of Safe Harbors**

    **1.    Are the section 512 safe harbors working as Congress intended?**

The section 512 limitations on liability are *not* working as Congress intended.  Congress hoped to protect innocent service providers and "preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that

---

[3] *See, e.g.*, *The Copyright Infringement Liability of Online and Internet Service Providers: Hearing on S. 1146 Before the S. Comm. on the Judiciary*, 105th Cong. 1-2 (1997) (statement of Sen. Hatch) (stating that the Internet had the potential to "recklessly facilitate infringement" and that Congress aimed to "best combat the risk of copyright infringement facing content providers on the Internet"); 144 Cong. Rec. 9239 (1998) (statement of Sen. Ashcroft) ("Billions of dollars in pirated material is lost every year and [a]n impact is felt directly to our national bottom line."); 144 Cong. Rec. 10615 (1998) (statement of Rep. Dreier) ("[A]s we look at the problems that we face as a Nation, and as we move rapidly towards this global economy, it is difficult to imagine an issue that is much more important than theft of intellectual property.").

review, is a reasonable response to the magnitude of infringing content available online. It must be noted that service providers similarly rely on automated processes to process and catalog the large volume of material they maintain. Automation in turn has been a key basis for the protections that service providers have obtained in judicial interpretations of section 512.[61]

Third-party vendors have developed sophisticated software that "crawls" the Internet for long-form infringing content. The MPAA's members utilize what the software industry calls "business rules" to establish the type of content that the software will identify. Such rules can include, for example, the duration of the identified material or other markers that indicate the material copies all or large portions of the copyrighted work. The use of business rules and regular reviews of the software's efficacy strengthen the reliability of such automated processes for identifying infringing content.

While automated review mechanisms, such as content recognition technology, are indispensable tools for combatting mass online infringement, such technology cannot find all infringing content. Unfortunately, those who profit from online infringement have the incentive and the means to develop and utilize software and other techniques to disguise infringing content and frustrate anti-piracy operations. This necessitates constant upgrading and modification of third-party vendors' anti-piracy software, all of which increases the cost and limits the effectiveness of automated review. Copyright owners' use of automated processes should not relieve service providers of their own obligations to deal with infringing content available on or through their services.

**10.** **Does the notice-and-takedown process sufficiently address the reappearance of infringing material previously removed by a service provider in response to a notice? If not, what should be done to address this concern?**

The notice-and-takedown process as currently interpreted by the courts does little to address the reappearance of infringing material previously removed by a service provider in response to a takedown notice. In order for anti-piracy efforts to be effective, infringing content that is taken down must stay down.

Infringing content can be propagated rapidly online. It therefore is imperative that service providers respond to takedown notices expeditiously, in accordance with the condition to maintain eligibility for the sections 512(c) and (d) limitations on liability.[62] Judicial interpretations of these provisions, however, have afforded service providers considerable leeway in responding to takedown notices. As a result, copyright owners generally find that as soon as one infringing copy is removed or blocked, numerous additional copies have taken its place, often on the same website. Thus, Fox sent more than 57,000 takedown notices to Uploaded.net regarding the film "Kingsman: The Secret Service" between April 22, 2015 and July 21, 2015 alone. And the number of takedown notices that it sent per day did not decrease over time. On April 30, 2015, Fox sent 697 takedown notices; on July 21, 2015, Fox sent 881

---

[61] *See* Response to Question 19.

[62] 17 U.S.C. § 512(c)(1)(A)(iii), (d)(1)(C).

17

takedown notices regarding the same work. The experience of the MPAA's members in this regard is not unique. Textbook publisher Reed Elsevier, for example, had one of its textbooks uploaded to the same website 571 times.[63]

The reappearance of infringing material as soon as it is removed poses huge burdens on copyright owners. For smaller owners, the phenomenon may well make the notice-and-takedown exercise cost prohibitive. One independent film maker, for example, had to send 56,000 takedown notices regarding her film, and that volume of notices did not result in the film's permanent removal.[64] For some content owners, the expense of combatting digital piracy may be so great that it no longer makes sense to create *any* content at all.

This problem is not unsolvable. First, if courts interpreted section 512's knowledge, representative list, and expeditious removal requirements as Congress intended, the notice-and-takedown process would be more effective. As discussed below, courts have construed service providers' obligations to combat copyright infringement exceedingly narrowly, essentially immunizing them from liability so long as they remove or block access to infringing content found at specific URLs identified by copyright owners in some amount of time. Even if the service provider knows that large parts of a website are devoted almost entirely to infringing material, the courts' prevailing interpretation of section 512 relieves those service providers of the obligation to act on that knowledge. And even if service providers know about specific infringing material located at a specific URL, many providers still believe they can wait for a period of several days (or more) before taking the infringing material down. If service providers had to respond to infringing activity that was apparent to them, or to take action in response to representative lists of infringing material (both of which the statute on its face requires)—and if service providers had to act right away on such knowledge—that would limit the number of users who could download and repost the infringing material.

Second, voluntary cooperation between content owners and service providers could go a long way to solving this problem. Indeed, some service providers are already implementing some version of a system intended to prevent infringing works that have been removed from being reposted. For example, a number of copyright owners (including MPAA members) and UGC services have signed on to the *Principles for User Generated Content Services* ("*UGC Principles*"). The *UGC Principles* set forth standards intended to combat infringing content and to allow for uploads of original user-generated content. The *UGC Principles* call for UGC services to implement "effective content identification technology," whereby content owners provide "reference data" for content that service providers then use to identify user-uploaded audio and video content matching that data; once a match is identified, the content owner specifies how matches should be treated, including in some cases the blocking of matched content.[65] YouTube, which did not sign on to the *UGC Principles*, uses a Content ID system that

---

[63] Stephen Carlisle, *DMCA "Takedown" Notices: Why "Takedown" Should Become "Take Down and Stay Down" and Why It's Good for Everyone* (July 23, 2014), *available at* http://copyright.nova.edu/dmca-takedown-notices/.

[64] *Id.*

[65] *UGC Principles*, *available at* http://www.ugcprinciples.com/.

18

is very similar to those described in the *UGC Principles*. YouTube's system scans videos uploaded to YouTube against a database of files submitted to YouTube by rightsholders.[66] If there is a match, content owners are given several options, including muting the audio, blocking the entire video, monetizing the video by running advertisements, or tracking the video's viewership statistics. YouTube has discretion over granting content owners access to the system.

These content identification systems are not perfect—would-be infringers are continually coming up with new ways to circumvent filtering technologies. The *UGC Principles* seek to address this problem by obligating services providers to "enhance or update" their information technology as commercially reasonable; and by requiring content owners and service providers to cooperate to test new content identification technologies, "informed by advances in technology, the incorporation of new features, variations in patterns of infringing conduct, changes in users' online activities and other appropriate circumstances."[67] The members of the MPAA welcome the opportunity to continue to work with service providers to develop best practices to ensure that once infringing content is taken down, it stays down.

Third, as discussed below in response to Question 25, there are a number of fingerprinting and filtering technologies that could be considered standard technical measures and that could help ensure that infringing content that is taken down stays down.

> **11.   Are there technologies or processes that would improve the efficiency and/or effectiveness of the notice-and-takedown process?**

As discussed above,[68] copyright owners are currently using various technologies focused on long-form infringing content to facilitate the notice-and-takedown process, and they continue to refine and improve those technologies.

Technologies that make it easier to send or respond to takedown notices, however, are only part of the solution. As discussed above, the DMCA's goal is to encourage copyright owners and service providers to work together to combat copyright infringement, not to create a process for notices and takedowns for their own sake. Our benchmark for success is combatting piracy more systematically, reducing the number of notices we need to send—not making the notice-and-takedown regime better.

> **12.   Does the notice-and-takedown process sufficiently protect against fraudulent, abusive or unfounded notices? If not, what should be done to address this concern?**

Section 512 includes detailed procedures for counter-notices and the "put-back" of material in response to such counter-notices. The statutory procedures properly balance the

---

[66] YouTube, *How Content ID Works*, (accessed Apr. 1, 2016) *available at* https://support.google.com/youtube/answer/2797370?hl=en.

[67] *UGC Principles*, *available at* http://www.ugcprinciples.com/.

[68] *See* Response to Questions 9 and 10.

19

4. Digital Citizens Alliance, *Good Money Still Going Bad: Digital Thieves and the Hijacking of the Online Ad Business* (May 2015), *available at* http://www.digitalcitizensalliance.org/cac/alliance/content.aspx?page=GMGB2.

5. Chris Dodd, *New Study Finds Vast Majority of Top Films and TV Shows Available Legally Online in the US* (Sept. 24, 2014), *available at* http://www.mpaa.org/new-study-finds-vast-majority-of-top-films-and-tv-shows-available-leally-online-in-the-us/#.VtZ-2OY9fWK.

6. NetNames Report, *Sizing the Piracy Universe* (Sept. 2013), *available at* https://copyrightalliance.org/sites/default/files/2013-netnames-piracy.pdf.

7. Liye Ma, Alan Montgomery, Michael D. Smith, *The Dual Impact of Movie Piracy on Box-Office Revenue: Cannibalization and Promotion* (Feb. 2016), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2736946.

8. Bruce Boyden, *The Failure of the DMCA Notice and Takedown System: A Twentieth Century Solution to a Twenty-First Century Problem* (Dec. 2013), *available at* http://cpip.gmu.edu/wp-content/uploads/2013/08/Bruce-Boyden-The-Failure-of-the-DMCA-Notice-and-Takedown-System1.pdf.

9. MilwardBrown Digital, *Understanding the Role of Search in Online Piracy*, (accessed Apr. 1, 2016) *available at* https://copyrightalliance.org/content/understanding_role_search_online_piracy.

The MPAA has attached an additional relevant study, SNL Kagan, *U.S. Availability of Film and TV Titles in the Digital Age* (March 2016), in the Appendix to this submission.

**30.   Please identify and describe any pertinent issues not referenced above that the Copyright Office should consider in conducting its study.**

The MPAA believes that the Copyright Office's list of questions and issues is very comprehensive. The MPAA once again expresses its appreciation for the Copyright Office's attention to these important issues.

Respectfully submitted,

*Jennifer L. Pariser*

Jennifer L. Pariser
Vice President, Legal Affairs
Motion Picture Association of America, Inc.
1600 Eye Street, N.W.
Washington, D.C. 20006
(202) 378-9134