Exhibit 4

to the Declaration of Catherine Hartman

Public Redacted Version

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC and AST PUBLISHING, LTD, individually and on behalf of all others similarly situated;<br>Plaintiffs, | CASE NO. 3:20-cv-04423-JD |
| vs. | EXPERT REPORT OF<br>HAL J. SINGER, PH.D.<br>FOR PLAINTIFFS |
| YOUTUBE, LLC; GOOGLE LLC;<br>Defendants | **November 17, 2022** |

Table of Contents

Introduction and Assignment ................................................................................. 3

Limited Data Availability ........................................................................................ 6

Summary of Opinions ........................................................................................... 10

Qualifications ........................................................................................................ 11

I.    Industry Background and the Nature of the Challenged Conduct ..................... 13
      A.      Overview of YouTube ........................................................................ 14
              1.    Advertising Revenue ............................................................... 15
              2.    Subscription Revenue ............................................................. 22
      B.      YouTube Is a Multi-Sided Platform ................................................... 23
              1.    Direct and Indirect Network Effects ...................................... 24
              2.    Advertisers as Subsidizers of the Provider-Consumer Interaction ............... 29

II.   Impact and Disgorgement of Revenues from Infringing Content ..................... 33
      A.      Theoretical Framework for My Econometric Models ......................... 35
      B. Empirical Estimation of Econometric Models ..................................... 39
              1.    Effect of Infringing Content on Overall YouTube Revenues ...................... 43
              2.    Effect of Infringing Content on User Engagement with YouTube .............. 47
      B.      Econometric Estimate of YouTube Advertising Revenues Subject to
              Disgorgement ..................................................................................... 49

Conclusion ............................................................................................................ 58

Appendix A: Materials Relied Upon ...................................................................... 60

Appendix B: Curriculum Vitae .............................................................................. 70

CONFIDENTIAL
-3-

## INTRODUCTION AND ASSIGNMENT

1.      I understand that Plaintiffs allege copyright infringement on the part of Defendants YouTube, LLC ("YouTube") and its parent company Google LLC ("Google") (collectively, "Defendants"). Specifically, Plaintiffs allege that Defendants engaged in acts causing videos that infringed the works of Plaintiffs and the putative Classes ("Infringing Content") to be reproduced, distributed, displayed, and publicly performed on the internet ("the Challenged Conduct").[1]

2.      YouTube offers a video-streaming service as well as a music service titled "YouTube Music" that offers similar services to Apple Music and Spotify. I understand that the Challenged Conduct at issue deals only with YouTube's video-streaming service. Thus, for purposes of this report, I use the term "YouTube" to refer only to the video-streaming service.

3.      I also understand that, *inter alia*, Plaintiffs seek disgorgement of any profits that Defendants derived from the Challenged Conduct.[2] Such profits fall into two main categories: (1) advertising or subscription revenues that YouTube obtained from the playback of videos that included the Infringing Content; and (2) incremental YouTube profits from the presence of non-infringing content resulting from the spillover effects to which the Infringing Content contributed, allowing YouTube to increase viewership and thus attract additional non-infringing content.

4.      Profits in the second category flow from the display of the subset of non-infringing content that is amplified by the display of Infringing Content—profits that would not have occurred absent the spillover effects that Infringing Content created. For example, such spillover

---

1.  First Amended Class Action Complaint ("Complaint"), Dkt. 99, ¶114.
2.  *Id*. ¶156.

CONFIDENTIAL

-4-

effects can occur through the use of YouTube's recommendation engine.[3] As Google researchers observe:

> Many hours' worth of videos are uploaded each second to YouTube. Recommending this recently uploaded ("fresh") content is extremely important for YouTube as a product. We consistently observe that users prefer fresh content, though not at the expense of relevance.[4]

Thus, spillover effects could occur when a content provider uploads a video that contains Infringing Content, a user views the video, then receives recommendations from YouTube for non-infringing content. In other words, videos that contain Infringing Content can serve as the basis for YouTube's recommendation of non-infringing content. As Cristos Goodrow, Vice President of Engineering at YouTube, explains, "Recommendations drive a significant amount of the overall viewership on YouTube, even more than channel subscriptions or search."[5] YouTube benefits from such spillover effects by serving ads on non-infringing content and gathering user behavior information that can inform its ad serving throughout the Google ad platform.

    5.    Defendants' revenues and profits subject to disgorgement that I estimate in this report cover both categories (1) and (2) described above. Google owns YouTube, and has done so since 2006.[6] In this report, I focus on YouTube, as the alleged infringement occurred either within

---

3.    Paul Covington, Jay Adams, Emre Sargin, *Deep Neural Networks for YouTube Recommendations*, Google Research, presentation paper at The ACM Conference Series on Recommender Systems ('RecSys'), 2016, *available at* https://static.googleusercontent.com/media/research.google.com/en//pubs/archive/45530.pdf ("YouTube is the world's largest platform for creating, sharing and discovering video content. YouTube recommendations are responsible for helping more than a billion users discover personalized content from an ever-growing corpus of videos.… During candidate generation, the enormous YouTube corpus is winnowed down to hundreds of videos that may be relevant to the user.")

4.    *Id.*

5.    Cristos Goodrow, *On YouTube's recommendation system*, YOUTUBE BLOG, Sept. 15, 2021, [hereafter "Goodrow 2021"] *available at* https://blog.youtube/inside-youtube/on-youtubes-recommendation-system/ ("You can find recommendations at work in two main places: your homepage and the 'Up Next' panel. Your homepage is what you see when you first open YouTube—it displays a mixture of personalized recommendations, subscriptions, and the latest news and information. The Up Next panel appears when you're watching a video and suggests additional content based on what you're currently watching, alongside other videos that we think you may be interested in.").

6.    Nicholas Jackson, *Infographic: The History of Video Advertising on YouTube*, The Atlantic, August 3, 2011, *available at* https://www.theatlantic.com/technology/archive/2011/08/infographic-the-history-of-video-advertising-on-youtube/242836/.

CONFIDENTIAL

-5-

its website or through the embedding of content uploaded to YouTube on third-party sites.[7] By focusing on YouTube, I do not intend to imply that Plaintiffs do not seek damages from Google itself. Google serves the ads that occur on YouTube.[8]

6.      Plaintiffs' motion for class certification identifies four putative classes: two Copyright Infringement ("CI") Classes and two Copyright Management Information ("CMI") Classes.[9] My report focuses on disgorgement of profits from the effects of the Challenged Conduct on the CI Classes in the first instance. I understand from counsel that the CI Classes will include U.S. registered works ("the Registered Works Infringement Class") and foreign unregistered works ("the Foreign Unregistered Works Infringement Class"). I further understand that the compensation to members of the Registered Works Infringement Class and CMI Class members may take the form of statutory damages. I also understand that one factor in assessing statutory damages includes the profits gained by the Defendants from the entirety of their course of conduct, and the amounts needed to deter Defendants from future infractions. My report quantifies the profits that Defendants have earned as a result of the Challenged Conduct, and so may also be relevant to the question of statutory damages. I also summarize the overall profitability of Defendants' businesses over time, and the revenues generated by YouTube, as obtained through production in this litigation.

7.      I offer no opinion on whether infringement occurred, or on whether record documents support an inference of infringement. For purposes of my assignment, I assume Plaintiffs' allegations regarding infringement are true. Counsel have asked me to propose a

---

7.  Embedding refers to adding a YouTube video or playlist to a website or blog by including the relevant HTML code. *See, e.g.,* https://support.google.com/youtube/answer/171780?hl=en. I understand that the embedding feature is available for any video that appears on YouTube.
8.  https://ads.google.com/home/campaigns/video-ads/.
9.  ECF No. 190.

CONFIDENTIAL

-6-

common and reliable methodology by which, if the factfinder determines that infringement occurred, then impact to Class Members may be reliably evaluated with common methods and evidence. Plaintiffs' counsel have also asked me to calculate damages in this matter in the form of disgorgement of YouTube's revenues and profits that resulted from the Challenged Conduct.

8.      The opinions expressed in this report reflect my review of the evidence, data, testimony, and other relevant materials to date. The materials upon which I rely for this report appear in Appendix A. I reserve the right to supplement or amend my opinions should new materials or information become available that warrant my doing so.

## LIMITED DATA AVAILABILITY

9.      I understand that Defendants maintain the requisite data I need to perform my assignment. Because Defendants have only produced a very limited portion of such data, however, I supplemented my analysis with publicly-available data where possible. I understand that Counsel for Plaintiffs have requested various data from Defendants that could inform the existence of network effects and quantify their financial impacts on the company. In the event that Defendants produce additional data, I reserve the right to supplement my report accordingly.

10.     For purposes of this report and the calculations contained herein, the most salient data that Defendants initially produced reflect monthly advertising revenues, costs, and profits for the four-year period from January 2017 through December 2020. Pursuant to a Court order, Defendants also produced additional limited data on October 7, 2022. I understand that the Court directed Defendants to produce the following: (1) Plaintiff-requested takedown notice data from a random sampling of 90 days; (2) the percentage of disputed Content ID claims for the year 2021 where the user selected fair use as the ground for the dispute; (3) Plaintiff-requested Content ID statistics for the United States on August 1 of 2017, 2018, 2019, and 2020; and (4) Plaintiff-

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
-7-

requested CMI data from a random sampling of 30 days.[10] Of these additional data that Defendants produced, only the takedown notice data and Content ID statistics are relevant to the issues I address in this report.[11] As I explain subsequently, the results indicate that takedown notices have increased along with YouTube's visits and revenues. The subsequent regressions that I estimate support the inference that Infringing Content, as proxied by takedown notices, has a causal impact on YouTube revenues via network effects.

11.     To my knowledge, Defendants have not produced any YouTube traffic data such as viewership and content metrics (e.g., number of content views, ad impressions, ad revenue by channel, number of channels, number of videos uploaded, total video minutes uploaded) by time period (e.g., weekly, monthly, etc.) that correspond to the YouTube monthly revenue and cost data noted above.[12]

12.     Such traffic data function, *inter alia*, as explanatory factors, or economic drivers, of YouTube revenues. The relationship between viewers and content providers also informs the indirect network effects that characterize the YouTube platform: content (on one side of the

---

10.  ECF No. 165. *See also*, letter from Lauren Gallo White to Carol O'Keefe dated October 7, 2022.

11.  In the event that Defendants are ordered to produce both the numerator and denominator values for the Content ID statistics, I would use both the total number of videos on the platform, and the number of publicly-displayed videos on the platform in my analysis.

12.  In light of Defendants' limited production, my staff and I pursued potential sources of reliable, publicly available information that could function as a provisional substitute for YouTube's data. My staff and I identified Comscore as one such possibility. I understand that Defendants have entered deals to provide Comscore with YouTube data. On August 22, 2011, Comscore introduced YouTube Partner Reporting as part of its Video Metrix product, explaining that, "This new capability allows Comscore to report on the video-viewing audiences cultivated by specific partners within the YouTube universe – an increasingly important component of the online video-viewing landscape." Comscore also detailed various benefits of its YouTube Partner Reporting feature that provides substantial data on viewership and demographics overall by month and by channel. See, e.g., Comscore, *Comscore Introduces YouTube Partner Reporting in Video Metrix*, Comscore Blog, August 22, 2011, *available at* https://www.comscore.com/Insights/Blog/comScore-Introduces-YouTube-Partner-Reporting-in-Video-Metrix.    At the request of Plaintiffs' Counsel, I attempted to purchase such data and was informed that while Comscore sells such information for research purposes (e.g., a university subscription), a third-party purchase raises additional questions that would involve approval from its legal department. After an approximate two-week delay, the legal department denied approval for our requested subscription. Thus, neither YouTube nor the third-party data collection firm to which it provides the same data that I understand Plaintiffs' counsel has requested would make the necessary information available, not even for a fee.

CONFIDENTIAL

-8-

platform) draws viewers (on the other side of the platform), who in turn draw more content, and so on, illuminating the self-reinforcing nature of such effects.[13] The literature has recognized the potential influence of network effects on the economics of intellectual property since before the advent of YouTube, Facebook, and other digital media platforms.[14]

13.     In pursuing other available avenues of data, I located similar data through the online visibility management and content marketing Software as a Service (SaaS) platform, Semrush.[15] I understand that technology firms work with Semrush, a publicly-traded firm, to evaluate online

---

13. *See, e.g.,* Lianfei Qui, Qian Tang, and Andrew Whinston, *Two Formulas for Success in Social Media: Learning and Network Effects*, 32(4) JOURNAL OF MANAGEMENT INFORMATION SYSTEMS 78-108, 78 (2015) [hereafter Qui et al. 2015] ("Using a unique data set from YouTube, we empirically identify learning and network effects separately, and find that both mechanisms have statistically and economically significant effects on video views; furthermore, the mechanism that dominates depends on the video type."); Anjana Susarla, Jeong-Ha Oh, and Yong Tan, *Social Networks and the Diffusion of User-Generated Content: Evidence from YouTube*, INFORMATION SYSTEMS RESEARCH 1-19, 1 (2011) ("The networked structure of interactions on YouTube and the tremendous variation in the success of videos posted online lends itself to an inquiry of the role of social influence. Using a unique data set of video information and user information collected from YouTube, we find that social interactions are influential not only in determining which videos become successful but also on the magnitude of that impact.") https://pubsonline.informs.org/doi/epdf/10.1287/isre.1100.0339; Peter Menell, *Economic Analysis of Network Effects and Intellectual Property*, 34 BERKELEY TECHNOLOGY LAW JOURNAL 219-322, 232-3 (2019) ("Network effects have allowed one or a few firms to dominate many Internet markets, including search (Google), social networks (Facebook), mobile (iOS, Android), commerce (Amazon, eBay), content streaming (YouTube, Netflix, Spotify), payment systems (PayPal), and sharing networks (Airbnb, Uber)."). *Id.* at 322 ("Perhaps most significantly, social media platforms, such as Facebook, Instagram, YouTube, and Twitter, are increasingly important not only to economic activity but also to social mobilization, electoral processes, and the functioning of democracy. These platforms are driven by network effects but are also notable for their polarizing tendencies.").

14. National Research Council. *The Digital Dilemma: Intellectual Property in the Information Age*. Washington, DC: The National Academies Press (2000) at 17 ("Research should be conducted to characterize the economic impacts of copyright. Such research might consider, among other things, the impact of network effects in information industries and how digital networks are changing transaction costs."), *available at* https://nap.nationalacademies.org/catalog/9601/the-digital-dilemma-intellectual-property-in-the-information-age.

15. Semrush, *Our message, available at* https://www.semrush.com/company/. Semrush explains that "Semrush Traffic Analytics is based on petabytes of clickstream data that comes from multiple proprietary and 3rd party data sources, Semrush's proprietary AI and machine learning algorithms and Big Data technologies. The data is accumulated and approximated from the user behavior of over 200 million real internet users and over a hundred different apps and browser extensions. We offer our 'estimated accuracy' metric at the top of the report so you can gauge how accurate the reported numbers are." For a review of Semrush's internal testing of its data accuracy, see https://www.semrush.com/blog/us-search-volume-update/.

CONFIDENTIAL

marketing goals.[16] From Semrush, I purchased a subscription to its Traffic Analytics Report[17], through which I obtained monthly clickstream data for YouTube as well as other video platforms over the period from January 2017, the earliest month available, through September 2022.[18] Such clickstream data reflect user behavior but do not capture server-side information such as the total number of pages available, number of channels, the number of subscriptions on each channel, and so on. Such limitations notwithstanding, clickstream data are widely employed in the industry to support marketing and analytic efforts.[19] A sample of these data for April 2017 appears below.[20]

TABLE 1: SEMRUSH TRAFFIC ANALYTICS DATA FOR YOUTUBE AND SELECTED VIDEO SITES, APRIL 2017

| Target | Target type | Visits | Unique Visitors | Pages / Visit | Avg. Visit Duration | Bounce Rate |
|---|---|---|---|---|---|---|
| youtube.com | root domain | 8,685,745,225 | 691,441,692 | 9.73 | 41:50 | 25.32% |
| facebook.com | root domain | 4,528,701,672 | 386,402,252 | 9.87 | 35:56 | 30.45% |
| vimeo.com | root domain | 90,729,711 | 50,929,237 | 4.88 | 11:09 | 45.36% |
| tiktok.com | root domain | n/a | n/a | n/a | n/a | n/a |
| twitch.com | root domain | 9,164 | 8,616 | 2.08 | 03:45 | 54.41% |

14.      Relying on these data, I demonstrate the existence of indirect network effects and quantify their impact on YouTube's advertising revenues. My proposed methodology employs a

---

16. *See, e.g.*, Domenica D'Ottavio, 2021 Data-Backed Digital Marketing Predictions, *available at* https://www.frac.tl/2021-data-backed-digital-marketing-predictions/. *See also* Amanda Milligan, *Three strategies for elevating brand authority in 2021*, TECHCRUNCH, Feb. 19, 2021, *available at* https://techcrunch.com/2021/02/19/how-to-elevate-brand-authority-in-2021/.

17. *Traffic Analytics Overview Report*, Semrush, *available at* https://www.semrush.com/kb/895-traffic-analytics-overview-report.

18. Semrush indicates that it collects clickstream data from various providers. Clickstream data represent a record of an individual's clicks while navigating the internet. See, Alexander S. Gillis, Definition: clickstream data (clickstream analytics)("Clickstream data and clickstream analytics are the processes involved in collecting, analyzing and reporting aggregate data about which pages a website visitor visits -- and in what order. The path the visitor takes through a website is called the clickstream."), *available at* https://www.techtarget.com/searchcustomerexperience/definition/clickstream-analysis-clickstream-analytics. Semrush explains that "we leverage petabytes of clickstream data received by 3rd party providers, along with machine learning algorithms and Big Data technologies." *Available at* https://www.semrush.com/blog/what-is-clickstream-data/.

19. For an overview of clickstream data, see BillAlbert, TomTullis, DonnaTedesco, BEYOND THE USABILITY LAB – CONDUCTING LARGE-SCALE ONLINE USER EXPERIENCE STUDIES 107-119 (Elsevier 2010), *available at* https://www.sciencedirect.com/topics/computer-science/clickstream-data.

20. I understand that monthly data represent the most granular data available through the Semrush Traffic Analytics tool.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
-10-

similar approach to that used in the research literature, including work that investigates advertising effectiveness published by Google's own research team.[21]

## SUMMARY OF OPINIONS

15.     In this report, I rely on common economic evidence and methods for the preliminary conclusions I reach.

16.     First, my analysis empirically confirms the observation ubiquitous in the research literature that YouTube benefits from indirect network effects. Such effects allow YouTube to earn higher advertising revenues on non-infringing content because the presence of Infringing Content attracts more consumer attention and increases the amount of user-specific and cohort-based preference and interest data generated by the platform as a whole.

17.     Second, I conclude that a formulaic methodology common to all members of each class can be utilized to estimate the YouTube revenues generated by the Challenged Conduct, including: (1) advertising or subscription revenues that YouTube obtained from the playback of videos that included the Infringing Content; and (2) incremental YouTube profits from the presence of non-infringing content resulting from the spillover effects to which the Infringing Content contributed, allowing YouTube to increase viewership and thus attract additional non-infringing content.

18.     Third, I have performed the requisite calculations and applied the methodologies detailed herein to Defendants' data (or estimated using a combination of Defendants' and third-party data) as I describe in this report. Such calculations do not require individualized inquiry.

---

21. Jouni Kerman, Peng Wang, and Jon Vaver, Estimating Ad Effectiveness using Geo Experiments in a Time-Based Regression Framework, Google, March 2017, [hereafter Kerman et al], *available at* https://static.googleusercontent.com/media/research.google.com/en//pubs/archive/45950.pdf.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
-11-

YouTube maintains the critical data needed for the application of the common methodology that I propose.

19.     Fourth, based on my performance of the requisite calculations and the applied methodologies, I have estimated the profits garnered by Defendants from the Challenged Conduct for the period from July 2017 through approximately September 2022 using three discrete inputs:

- Utilizing the total number of unique infringing URLs included in the YouTube takedown data sample as a proxy for the total Infringing Content (videos that infringed the works of Plaintiffs and the putative Classes), I estimate that Infringing Content accounts for ███% of time spent on the site  and has generated profits of approximately ███ million;

- Utilizing a publicly available estimate that 2% of videos on the platform are infringing, I estimate that all infringing videos account for 2% of views and generated profits of approximately $1.49 billion;

- Utilizing a publicly available estimate that 6% of videos on the platform are infringing, I estimate that all infringing videos account for 6% of views and generated profits of approximately $4.48 billion.

20.     The methodological framework and analysis in this report can be applied to a broader scope of data should YouTube make such data available. Once Plaintiffs' expert Dr. Charles Cowan has calculated the number of unique URLs subject to recovery for each of the CI Classes, I can apply this same methodological framework and analysis to estimate the profits generated by the unique URLs subject to recovery for each of the CI Classes.

## QUALIFICATIONS

21.     I am a managing director at Econ One, an economic consulting firm that provides expert economic and econometric analysis for antitrust cases. I am also an adjunct professor at the

CONFIDENTIAL

-12-

McDonough School of Business at Georgetown University, where I teach advanced pricing to MBA candidates. I am also an Adjunct Professor of Economics at the University of Utah and the director of the Utah Project, an inter-disciplinary center devoted to the study of antitrust and consumer protection issues.

22.    I am an applied microeconomist with an emphasis on industrial organization and regulation. In an academic capacity, I have published several books and book chapters, spanning a range of industries and topics, and my articles have appeared in dozens of legal and economic journals. My competition-related articles have appeared in multiple American Bar Association (ABA) Antitrust Section journals, and I have been a panelist at several ABA Antitrust events. In a consulting capacity, I have been nominated for antitrust practitioner of the year among economists by the American Antitrust Institute (AAI) for my work in *Tennis Channel v. Comcast*, and AAI named me as co-Honoree in the same category in 2018 for my work *In Re Lidoderm Antitrust Litigation*. I have specific experience and expertise in technology markets, such as the one here. For example, I am currently the expert for Plaintiffs in the *Carr v. Google* litigation. And I am the Federal Trade Commission's expert in its challenge of Meta's acquisition of fitness app maker Within.

23.    I have testified as an economic expert in state and federal courts, as well as before regulatory agencies. I also have testified before the House Judiciary Subcommittee on Antitrust and the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights on the interplay between antitrust and sector-specific regulation. Federal courts have relied on my

CONFIDENTIAL
-13-

work in certifying seven classes in antitrust matters,[22] and two classes in consumer protection matters.[23]

24.     I earned M.A. and Ph.D. degrees in economics from Johns Hopkins University and a B.S., *magna cum laude*, in economics from Tulane University. My full curriculum vitae appears as Appendix B to this report and reflects a full list of the cases in which I have served as a testifying expert since 2014 and a list of publications I have authored in the last ten years.

25.     Neither Econ One nor I have a financial stake in the outcome of this case. Econ One is being compensated for my work in this matter at my standard rate of $885 per hour, regardless of whether Plaintiffs prevail or not.

## I. INDUSTRY BACKGROUND AND THE NATURE OF THE CHALLENGED CONDUCT

26.     In this section, I summarize my understanding of YouTube's video platform, the methods that YouTube uses to monetize traffic, and how the alleged infringement generated revenues that YouTube would not have otherwise enjoyed. I do not intend this section to represent a comprehensive discussion or testimony regarding the factual background of this case but rather to serve as a frame of reference for the economic opinions that follow. I am aware of the following

---

22. *See Meijer, Inc. v. Abbott Laboratories*, No. C 07-5985 CW, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008) (Order Granting Plaintiffs' Motion for Class Certification); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intl., Ltd.*, 262 F.R.D. 58 (D. Mass. 2008) (Granting Motion to Certify Class); *Southeast Missouri Hospital and St. Francis Medical Center v. C.R. Bard*, No. 1:07cv0031 TCM, 2008 WL 4372741 (E.D. Mo. Sept. 22, 2008) (Granting in Part Motion for Class Certification); *Johnson v. Arizona Hosp. and Healthcare Assoc.* No. CV 07-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz. July 14, 2009) (Granting in Part Motion for Class Certification); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 665 (N.D. Ga. 2016) (Granting Motion to Certify Class); and *In re Lidoderm Antitrust Litig.*, No. 12-md-02521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) (Order Granting Motions for Class Certifications and Denying Daubert Motions); *Cung Le, et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship*, Minute Entry, 2:15-cv-01045-RFB-BNW (D. Nev. Dec. 10, 2020), ECF No. 781 (announcing the court's intention to grant the Plaintiffs' Motion for Class Certification). As of the time of this report, the court has not issued the written opinion certifying the class in *Zuffa*.

23. *See In Re: MacBook Keyboard Litigation,* Case No. 5:18-cv-02813-EJD, 2021 WL 1250378 (N.D. Cal., Mar. 8, 2021) (Order Granting Motion to Certify Class); *In Re: JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, Case No. 19-md-02913-WHO (N.D. Cal., Dec. 5, 2021) (Tentative Opinions on Motion for Class Certification, Daubert Motions, and Motion to Dismiss Bellwether Claims).

facts and allegations regarding this matter based on documents related to this case and publicly available information.

## A.     Overview of YouTube

27.     YouTube is an online video-sharing and social-media platform created in 2005 and acquired by Google in the following year for $1.65 billion.[24] According to Similarweb, YouTube currently ranks as the second-most frequently visited site on the internet, behind only Google.com.[25] As shown in Figure 1, YouTube enjoys the highest average visit duration (slightly less than 22 minutes) among the top 50 most frequently visited sites.[26]



FIGURE 1: AVERAGE VISIT DURATION AT TOP 50 MOST-FREQUENTLY-VISITED SITES

---

24. Associated Press, *Google buys YouTube for $1.65 billion,* NBC NEWS, Oct. 9, 2006, *available at* https://www.nbcnews.com/id/wbna15196982.

25. Similarweb, https://www.similarweb.com/top-websites/.

26. *Id.*

Other factors equal, the more time an individual spends viewing videos on YouTube, the more preference data YouTube can acquire about users, and the greater the potential exposure to advertising. Among the top 50 sites, YouTube ranks third in pages-per-visit (12.63), behind only social media sites *naver.com* (popularly known as the "Korean Google") and *vk.com* (a site used primarily by Russian speakers).

28.     YouTube generates revenues from two primary sources: advertising and subscriptions, with the former representing the primary revenue stream. For example, in 2019, YouTube earned approximately $15 billion in advertising revenues. In comparison, according to data reported by Google CEO Sundar Pichai in the fourth quarter 2019 earnings call, YouTube garnered $3 billion in subscription and other non-advertising revenue.[27] YouTube's advertising revenues have continued to increase. In 2021, YouTube generated $28.8 billion in ad revenues.[28] As detailed in this report, ill-gotten advertising revenues represent a primary source of damages to Plaintiffs and represent the primary focus of my damages calculation.

### 1.     Advertising Revenue

29.     In August 2007, Google began allowing in-video advertisements on YouTube, then increased the number of available ad formats to seven in January 2009.[29] By 2011, users uploaded more video content to YouTube in 60 days than the three major U.S. networks had created in the prior 60 years.[30] Since approximately 2015, YouTube has operated on a "freemium" pricing

---

27. Google earnings call for the period ending December 31, 2019, *available at* https://www.fool.com/earnings/call-transcripts/2020/02/03/alphabet-inc-goog-googl-q4-2019-earnings-call-tran.aspx?awc=12195_1659300481_165a41071357b32aeb117cb69d0ef02a&campaign=143466&pc_source=TheMotleyFool_Awin&utm_source=aw&utm_campaign=143466.

28. Mansoor Iqbal, *YouTube Revenue and Usage Statistics (2022)*, THE BUSINESS OF APPS, June 30, 2022, available at https://www.businessofapps.com/data/youtube-statistics/.

29. Nicholas Jackson, *Infographic: The History of Video Advertising on YouTube*, THE ATLANTIC, *August 3, 2011*, *available at* https://www.theatlantic.com/technology/archive/2011/08/infographic-the-history-of-video-advertising-on-youtube/242836/.

30. *Id.*

strategy that consists of both "free" and "premium" plans.[31] Its basic plan does not levy a monetary charge to consumers to view videos on its site; rather, YouTube serves advertisements and collects data on users' behavior, both with regard to the videos watched and in response to the ads served. YouTube explains that it collects such information to improve the services it provides to all its users, including advertisers.[32] Such data permits Google to improve its targeted advertising on YouTube and improve the quality of the data it provides to advertisers and publishers who use its advertising tools.[33]

30.     Advertisements placed on YouTube form part of the Google Ads network, through which the company offers advertisers various ad targeting methods.[34] Google explains that,

---

31.  Andrew     Bindelglass,     *YouTube     Going     Freemium*,    Oct.    23,    2015,    *available    at* https://www.techzone360.com/topics/techzone/articles/2015/10/23/411881-youtube-going-freemium.htm.

32.  *See* Google Privacy & Terms, ("We collect information to provide better services to all our users — from figuring out basic stuff like which language you speak, to more complex things like which ads you'll find most useful, the people who matter most to you online, or which YouTube videos you might like. The information Google collects, and how that information is used, depends on how you use our services and how you manage your privacy controls. When you're not signed in to a Google Account, we store the information we collect with unique identifiers tied to the browser, application, or device you're using. This allows us to do things like maintain your preferences across browsing sessions, such as your preferred language or whether to show you more relevant search results or ads based on your activity…. For example, if you watch videos about baking on YouTube, you may see more ads that relate to baking as you browse the web. We also may use your IP address to determine your approximate location, so that we can serve you ads for a nearby pizza delivery service if you search for 'pizza.'"), *available at* https://policies.google.com/privacy?hl=en-US#infocollect.

33.  Consumers who want to avoid such advertisements may use an ad blocker or sign up for YouTube's premium service. *See also*, Andes Lerner, *The Economics of Network Effects and User Data in the Provision of Search, Search Advertising, and Display Ad Intermediation*, Google Submission 3 to Australian Competition & Consumer Commission,    May    15,    2019,    [hereafter,    Lerner    2019]    *available    at* https://www.accc.gov.au/system/files/Google%20Submission%203%20%28May%202019%29.pdf. ("'Cross-side' network effects (sometimes called 'indirect' network effects) also do not give rise to entry barriers for search platforms. Cross-side network effects arise when the presence of members of one user group on the platform (*e.g.*, merchants in a shopping mall or online marketplace) attract members of *another* user group (shoppers). But such a dynamic does not exist between users and advertisers on a search platform. While advertisers seek users, user demand for a platform is not driven by the availability of ads. Many (if not most) users ignore ads, and many place negative value on having too many ads."). I understand that Google engaged Dr. Lerner and his firm, CompassLexecon, as consultants on advertising issues, including during a Federal Trade Commission investigation. See Ryan Lynch, *Why Google    Felt    Lucky    At    FTC*,    FORBES,    March    31,    2016,    *available    at* https://www.forbes.com/sites/mergermarket/2015/03/31/why-google-felt-lucky-at-ftc/?sh=37b41bab3c44.

34.  Google explains its advertising revenue method as follows: "Our customers generally purchase advertising inventory through Google Ads, Google Ad Manager, and Google Marketing Platform, among others. We offer advertising by delivering both performance and brand advertising. We recognize revenues for performance advertising when a user engages with the advertisement, such as a click, a view, or a purchase. For brand advertising, we recognize revenues when the ad is displayed, or a user views the ad." Alphabet S.E.C. Form 10-K, Q4, 2021 at 54 *available at* https://abc.xyz/investor/static/pdf/20220202_alphabet_10K.pdf?cache=fc81690.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Video campaigns run on YouTube and across the web through Google Ads. By targeting your Video campaigns on YouTube and Google video partners, you can advertise to people at moments that matter. With a wide variety of targeting methods available to you, such as demographic groups, interests, placements, and your data segments, you can reach specific or niche audiences based on who they are, what they're interested in, or what content they're viewing.[35]

31.     YouTube Premium began as an ad-free music subscription service titled "Music Key" in November 2014.[36] Originally available by invitation only, the service offered ad-free music, background listening, and off-line playback.[37] Initial customers received six free months of service, with a $7.99 monthly charge thereafter. Approximately one year later, Google launched YouTube Red, which offered such services to all consumers for a $9.99 monthly fee.[38] In June 2018, Google rebranded YouTube Red as the current YouTube Premium service, raising the price to $11.99 per month for new subscribers. Thus, any subscription revenue that Google may have earned resulting from the Challenged Conduct in this matter would cover approximately the period of 2015 to the present. I understand that the Statute of Limitations Period covers the time period from July 2, 2017, to the present.

32.     In 2021, YouTube earned $28.8 billion in advertising revenue, approximately a 46 percent increase from the $19.8 billion in YouTube ad revenue it earned in 2020.[39] This advertising

---

35.  https://support.google.com/youtube/answer/2454017?hl=en. *See also* Lerner, 2019 at 40 ("Audience-targeted display ads: in contrast to contextual targeting, audience-targeted display ads are targeted to individual users based on user data. There are three main mechanisms for audience-based targeting: (1) remarketing (sometimes called "retargeting"), which targets a particular user based on prior interaction with the advertiser; (2) demographic/interest segmentation, which targets a group of users  based on known attributes; and (3) behavioral targeting, which attempts to target the users most likely to interact with a display ad ( *e.g.* , click on an ad or purchase a product.").

36.  Todd Spangler, *YouTube Launches 'Music Key' Subscription Service with More Than 30 Million Songs*, VARIETY, Nov. 12, 2014, *available at*  https://variety.com/2014/digital/news/youtube-launches-music-key-subscription-service-with-more-than-30-million-songs-1201354498/.

37.  https://web.archive.org/web/20141113030240/http://www.youtube.com/musickey.

38.  Matt Leske, *Meet YouTube Red, the ultimate YouTube experience*, YOUTUBE OFFICIAL BLOG, October 21, 2015, *available at* https://blog.youtube/news-and-events/red/.

39.  Google 2021 10-K at 33-34 ("YouTube ads revenues increased $9.1 billion from 2020 to 2021. Growth was driven by our direct response and brand advertising products. Growth for our direct response advertising products was primarily driven by increased advertiser spending as well as improvements to ad formats and delivery. Growth for our brand advertising products was primarily driven by increased spending by our advertisers and the adverse effect of COVID-19            on            2020            revenues."),            *available            at*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

-18-

occurs in many forms. Currently, YouTube offers seven advertisement formats: skippable in-stream, non-skippable in-stream, bumper, in-feed video, overlay, masthead and outstream ads. These types of advertisements not only appear differently to the consumer, but also are paid for by advertisers based on different metrics.[40]

33.     Skippable in-stream ads play before, during, or after the content video but allow viewers to skip the ad after five seconds. Advertisers then pay only if the viewer watched 30 seconds or more of the advertisement (or the entire ad if it was under 30 seconds).[41] This is also called TrueView advertising, as consumers must view or interact with the ad for the advertiser to be charged.[42] A survey of marketing professionals found these TrueView advertisements to be seen as the most effective type of ad available on YouTube.[43] Google attributes the increased effectiveness to the proposition that advertisers are reaching a more receptive and targeted audience who has chosen to watch the ad, thereby saving advertisers money.[44]

34.     Alternatively, non-skippable in-stream ads display before, during, or after the content video for fifteen seconds or less, but viewers do not have the option to avoid the ad. Advertisers then pay based on the number of times the ad appears, a monetization method known

https://www.sec.gov/Archives/edgar/data/1652044/000165204422000019/goog-20211231.htm. *See also* GOOG-SCHNDR-00054422.

40.  Lerner, 2019 at 39 ("Moreover, it is estimated that two-thirds of Google display ad revenue is from YouTube, which Google owns and operates.").

41.  YouTube Help, *About video ad formats*, accessed Jun. 28, 2022, *available at* https://support.google.com/youtube/answer/2375464?hl=en.

42.  Jami Oetting, *YouTube Ads for Beginners: How to Launch & Optimize a YouTube Video Advertising Campaign*, HUBSPOT, updated Apr. 20, 2022, *available at* https://blog.hubspot.com/marketing/youtube-video-advertising-guide.

43.  29% of surveyed marketing professionals listed pre-roll skippable ads as the most effective advertising format on YouTube. STATISTA, *Most effective advertising formats on YouTube according to marketing professionals worldwide as of May 2019*, released Mar. 2020, *available at* https://www.statista.com/statistics/1102764/effective-youtube-ad-formats-world/.

44.  Ivy Wigmore, *TrueView ads*, TECH TARGET, updated Sep. 2012, *available at* https://www.techtarget.com/whatis/definition/TrueView-Ad.

CONFIDENTIAL

as cost-per-mille, or "CPM."[45] Another form of non-skippable ad appears between content videos, for up to six seconds: these are "bumper ads," which are also priced by impressions.[46] Bumper ads contrast with "overlay ads," which appear over a section of the content video as opposed to before or between videos.[47]

35.    Not all video advertisements are played after a specific content video is selected. In-feed video ads are displayed as thumbnail videos with some text. They appear next to related videos, on the YouTube search results page, or on the YouTube homepage. Advertisers pay if viewers actively click on their video.[48] These ads are also known as "discovery ads."[49]

36.    Overlay ads appear across the bottom 20 percent of a video and may be text- or image-based.[50] Also on the YouTube homepage are "Masthead ads," which play automatically for 30 seconds. These advertisements appear when YouTube is opened on a desktop, mobile device, or television. Advertisers are then charged on a cost-per-thousand impressions basis (CPM).[51]

37.    Advertisers choose YouTube as an advertising platform for this variety of advertising methods and the targeted capabilities Google provides.[52] Since 2017, Google has

---

45. YouTube Help, *About video ad formats*, [hereafter "YouTube Help, *About video ad formats*"] accessed Jun. 28, 2022, *available at* https://support.google.com/youtube/answer/2375464?hl=en. Cost-per-mille, refers to the cost per one thousand impressions (as mille is the Latin word for thousand).

46. YouTube Help, *About video ad formats*, accessed Jun. 28, 2022, *available at* https://support.google.com/youtube/answer/2375464?hl=en. The number of impressions reflects the number of times the ad is shown. Google explains that, "An impression is counted each time your ad is shown on a search result page or other site on the Google Network." *See* https://support.google.com/google-ads/answer/6320?hl=en.

47. Jami Oetting, *YouTube Ads for Beginners: How to Launch & Optimize a YouTube Video Advertising Campaign*, HUBSPOT, updated Apr. 20, 2022, *available at* https://blog.hubspot.com/marketing/youtube-video-advertising-guide.

48. YouTube Help, *About video ad formats*, accessed Jun. 28, 2022, *available at* https://support.google.com/youtube/answer/2375464?hl=en.

49. Jami Oetting, *YouTube Ads for Beginners: How to Launch & Optimize a YouTube Video Advertising Campaign*, HUBSPOT, updated Apr. 20, 2022, *available at* https://blog.hubspot.com/marketing/youtube-video-advertising-guide.

50. YouTube advertising formats, *available at* https://support.google.com/youtube/answer/2467968?hl=en.

51. YouTube Help, *About video ad formats*, accessed Jun. 28, 2022, *available at* https://support.google.com/youtube/answer/2375464?hl=en.

52. YouTube Advertising, Reach your customers – and discover new ones, *available at* https://www.youtube.com/intl/en_us/ads/how-it-works/set-up-a-campaign/audience/ ("People come to YouTube to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
-20-

allowed YouTube advertisers to target advertisements using Google user profile data, such as search history and demographic information, in addition to YouTube watch and search history.[53] Improvements to advertisers' available data regarding user engagement followed this effort.[54] These increases in data availability form part of Google's efforts to improve the effectiveness of YouTube advertising, particularly on mobile devices where over 50 percent of YouTube viewing occurs.[55]

38.     In some instances, YouTube splits its ad revenue with content providers—the creators and uploaders of videos to the platform—and refers to the shared portion of ad revenue as content acquisition costs (CAC).[56] Estimates of content providers' revenue share range from between 50 and 55 percent of the advertising revenue associated with their content.[57] The data that YouTube has provided and shown in Figure 2 below shows that the revenue share paid to content providers has ████████████████████████████████████████████

████████████████████[58]

laugh, learn, and dig deep into the things they care about. And because we know what our viewers care about, we can help you connect when it counts.")

53. Diya Jolly, *Making YouTube Better in a Mobile, Cross-Screen World*, Google Ads & Commerce Blog, Jan. 20, 2017, *available at* https://www.blog.google/products/ads/making-youtube-better-in-mobile-cross/.

54. Jami Oetting, *YouTube Ads for Beginners: How to Launch & Optimize a YouTube Video Advertising Campaign*, HUBSPOT, updated Apr. 20, 2022, *available at* https://blog.hubspot.com/marketing/youtube-video-advertising-guide.

55. Diya Jolly, *Making YouTube Better in a Mobile, Cross-Screen World*, GOOGLE ADS & COMMERCE BLOG, Jan. 20, 2017, *available at* https://www.blog.google/products/ads/making-youtube-better-in-mobile-cross/.

56. Julia Alexander, *YouTube videos keep getting longer*, THE VERGE, July 26, 2019, *available at* https://www.theverge.com/2019/7/26/8888003/youtube-video-length-contrapoints-lindsay-ellis-shelby-church-ad-revenue, hereafter ["Verge, 2019"].

57. MORGAN STANLEY, *YouTube may be Google's next $20b revenue business*, May 15, 2013 ("Industry experts and media outlets have reported that YouTube shares approximately 50% of advertising revenue with content owners and creators."). *See also* Todd Spangler, *YouTube Tops 2 Million Creators in Ad-Revenue Sharing Program*, VARIETY, Aug. 23, 2021, *available at* https://variety.com/2021/digital/news/youtube-partner-program-2-million-creators-1235045674/ ("Under YouTube's standard revenue-sharing terms for YPP [YouTube Partner Program], partner channels keep 55% of the money generated from ads on their videos."). *See also* Andrew Hutchinson, *YouTube Generated $28.8 Billion in Ad Revenue in 2021, Fueling the Creator Economy*, SOCIAL MEDIA TODAY, Feb. 2, 2022, *available at* https://www.socialmediatoday.com/news/youtube-generated-288-billion-in-ad-revenue-in-2021-fueling-the-creator/618208/#:~:text=YouTube%20does%20share%2055%25%20of,cut%20than%2055%25%20of%20its ("around 55% of YouTube ad revenue [goes] to creators[.]").

58. GOOG-SCHNDR-00054422.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
-21-

FIGURE 2: YOUTUBE MONTHLY ADVERTISING REVENUES
AND REVENUE SHARE PAID TO CONTENT PROVIDERS



[59]

TABLE 2: YOUTUBE'S ANNUAL ADVERTISING GROSS PROFIT MARGIN, BY YEAR

| Year | Revenues | Content Acquisition Costs | Other Cost of Sales & Infra | Gross Profit | Gross Profit Margin (%) |
|------|----------|---------------------------|------------------------------|--------------|--------------------------|
| 2017 | $8.23B | | | | |
| 2018 | $11.33B | | | | |
| 2019 | $15.12B | | | | |
| 2020 | $19.61B | | | | |

---

59.  GOOG-SCHNDR-00054422.

39.     Content providers' ability to monetize their channels is contingent upon qualifying for the YouTube Partner Program (YPP) and creating an AdSense account. Google indicates that content providers do not automatically earn a pre-set share or amount; rather, their revenue share depends on the terms outlined in their respective revenue share agreement with Google.[60] Content providers can monetize their videos in ways other than direct advertising, including YouTube Premium subscriptions, channel memberships, merchandise, Super Chat and Super Stickers, and YouTube Shorts.[61] However, even if content providers choose not to monetize their channels, YouTube reserves the right to place advertisements on those videos. In 2020, YouTube updated its terms to allow advertising on videos not associated with YPP.[62] This means that despite ads occurring on content videos, the content providers will not receive any revenue share, effectively permitting Google to retain the entire revenue stream.

## 2.     Subscription Revenue

40.     In addition to advertising, YouTube monetizes content through subscription services. YouTube has several subscription products: YouTube Kids, YouTube TV, YouTube Music Premium, and YouTube Premium. YouTube Kids is an app limited to age-appropriate content with offline capabilities and no advertisements.[63] YouTube TV is a live TV subscription service with recording abilities.[64] YouTube Music is a free music-subscription service, which

---

60. YouTube Help, *YouTube partner earnings overview*, accessed Jun. 28, 2022, *available at* https://support.google.com/youtube/answer/72902?hl=en#zippy-%2Chow-do-i-earn-revenue%2Cwhats-my-revenue-share%2Chow-can-i-get-paid%2Cwhen-can-i-get-paid.

61. *Id. See also* Andrew Hutchinson, *YouTube Generated $28.8 Billion in Ad Revenue in 2021, Fueling the Creator Economy*, SOCIAL MEDIA TODAY, Feb. 2, 2022, *available at* https://www.socialmediatoday.com/news/youtube-generated-288-billion-in-ad-revenue-in-2021-fueling-the-creator/618208/#:~:text=YouTube%20does%20share%2055%25%20of,cut%20than%2055%25%20of%20its.

62. Andrew Hutchinson, *YouTube Will Start Inserting Ads into Non-Monetized Content, Updated Rules Around Facial Recognition*, SOCIAL MEDIA TODAY, Nov. 18, 2020, *available at* https://www.socialmediatoday.com/news/youtube-will-start-inserting-ads-into-non-monetized-content-updates-rules/589310/.

63. YouTube, *YouTube Premium*, accessed Jun. 28, 2022, *available at* https://www.youtube.com/premium.

64. Vann Vicente, *What Is YouTube Premium, and Is It Worth It?*, HOW-TO GEEK, Mar. 9, 2020, *available at* https://www.howtogeek.com/659597/what-is-youtube-premium-and-is-it-worth-it/.

replaced Google Play's music-streaming service as a competitor to Spotify and Apple Music.[65] The paid version, YouTube Music Premium, includes ad-free music, downloadable music, and streaming when the screen is off or YouTube is in the background of another app. YouTube Premium includes these features as well, but for all video content, not exclusively music.[66] YouTube Premium, formerly known as YouTube Red, costs $11.99 per month, while YouTube Music Premium costs $9.99 per month.[67]

## B.    YouTube Is a Multi-Sided Platform

41.    Multi-sided platforms such as YouTube, Sony PlayStation, Microsoft Xbox, and others facilitate interactions between distinct groups of customers who benefit from each other in some fashion.[68] Critically, indirect network effects flow in both directions between constituencies that interact via the platform, from each group to the other. For example, game developers and game players can interact with each other through Xbox; players benefit from the variety of games that developers create and, in turn, developers benefit from the players who purchase their products. Thus, multi-sided platforms solve a transaction-cost problem by serving as "matchmaker" and enabling the different constituencies (developers and players in the Xbox example) to interact with each other.[69]

---

65.  Aric Jenkins, *Google Is Breaking Up YouTube Red Into 2 New Subscription Services For Music and Video*, FORTUNE, May 17, 2018, *available at* https://fortune.com/2018/05/17/youtube-red-youtube-music-youtube-premium-google/.

66.  YouTube, *YouTube Premium*, accessed Jun. 28, 2022, *available at* https://www.youtube.com/premium.

67.  Aric Jenkins, *supra*.

68.  David S. Evans and Richard Schmalensee, *The Industrial Organization of Markets with Two-Sided Platforms*, 3(1) COMPETITION POLICY INTERNATIONAL 151 (Spring 2007). *See also* David S. Evans and Richard Schmalensee, *The Antitrust Analysis of Multisided Platform Businesses*, in 1 THE OXFORD HANDBOOK OF INTERNATIONAL ANTITRUST ECONOMICS 404 (Roger Blair and D. Daniel Sokol, eds. Oxford Univ. Press, 2015) [hereafter, Evans & Schmalensee 2015] ("Multisided platforms create value by bringing two or more different types of economic agents together and facilitating interactions between them that make all agents better off. These platforms play critical roles in many economically important industries including payments, mobile phones, financial exchanges, advertising-supported media, and various Internet-based industries.").

69.  A strict commonly accepted definition of "multi-sided" does not currently exist. Rysman offers the following definition, "Broadly speaking, a two-sided market is one in which 1) two sets of agents interact through an

### 1.     Direct and Indirect Network Effects

42.     Economists refer to the benefits that flow between two different groups of constituencies as "indirect network effects" to distinguish them from direct network effects, which I explain subsequently. Where such indirect network effects exist, a platform can serve as an intermediary and thus internalize the network externalities. As Rochet and Tirole observe in their seminal paper, "Many if not most markets with network externalities are two-sided."[70]

43.     Substantive, not merely semantic, differences exist between the concepts of "network effects" and "network externalities."[71] Liebowitz and Margolis define the latter as a special case of the former, "in which the equilibrium exhibits unexploited gains from trade regarding network participation."[72] In other words, if two groups do not fully internalize the gains from interacting with each other, then the platform can "bridge the gap" and profit from internalizing them. YouTube exemplifies this process by matching consumers and content

---

intermediary or platform, and 2) the decisions of each set of agents affects the outcomes of the other set of agents, typically through an externality." Marc Rysman, *The Economics of Two-Sided Markets*, 23(4) JOURNAL OF ECONOMIC PERSPECTIVES 125-143, 143 (2009). Rochet and Tirole explain that "Under multisidedness, platforms must choose a price structure, not only a price level for their service." Jean-Charles Rochet and Jean Tirole. *Platform Competition in Two-Sided Markets*, 1(4) JOURNAL OF THE EUROPEAN ECONOMIC ASSOCIATION 990–1029 (2003) [hereafter "Rochet & Tirole 1993"]. Evans & Schmalensee, explain two-sided platforms as those that "cater to two or more distinct groups of customers. Members of one customer group need members of the other group for a variety of reasons…The platform helps these customers get together…and thereby creates value for these customers that they could not readily obtain without the coordination provided by the platform." David Evans and Richard Schmalensee. *The Industrial Organization of Markets with Two-Sided Platforms*. NBER Working Paper, Working Paper 11603, September 2005.

70. Jean-Charles Rochet and Jean Tirole. *Platform Competition in Two-Sided Markets*, 1(4) JOURNAL OF THE EUROPEAN ECONOMIC ASSOCIATION, 990-1029, 990 (2003) [hereafter "Rochet & Tirole 1993"] ("Buyers of video game consoles want games to play on; game developers pick platforms that are or will be popular among gamers… More generally, many if not most markets with network externalities are characterized by the presence of two distinct sides whose ultimate benefit stems from interacting through a common platform. Platform owners or sponsors in these industries must address the celebrated 'chicken-and-egg problem' and be careful to 'get both sides on board.'").

71. S.J. Liebowitz & Stephen Margolis, *Network Externalities (Effects)*, in THE NEW PALGRAVE'S DICTIONARY OF ECONOMICS AND THE LAW (MacMillan, 1998) ("Network effects should not properly be called network externalities unless the participants in the market fail to internalize these effects… Although the individual consumers of a product are not likely to internalize the effect of their joining a network on other members of a network, the owner of a network may very well internalize such effects. When the owner of a network (or technology) is able to internalize such network effects, they are no longer externalities.").

72. S.J. Liebowitz and Stephen E Margolis, *Network Externality: An Uncommon Tragedy*, 8(2) JOURNAL OF ECONOMIC PERSPECTIVES 133-150, 135 (1994).

CONFIDENTIAL

-25-

providers and deriving economic benefit from their interaction by serving advertisements or selling subscriptions.

44.     The economic literature distinguishes between direct and indirect network effects, the latter of which serve as the focus of this report.[73] Direct network effects occur when an individual user of a platform benefits from additional users on the same side of the platform. Katz and Shapiro explain that "There are many products for which the utility that a user derives from consumption of the good increases with the number of other agents consuming the good… The consumption externalities may be generated through a direct physical effect of the number of purchasers on the quality of the product."[74] The authors proffer the now classic example of such direct, or same-side, effects: the benefits that an individual obtains from using a telephone system increase as the number of adopters of the telephone network grows.

45.     In a more modern example, the direct network effects characterize the relationship between users of an email network or a social media platform. Likewise, in cooperative or competitive games or apps, each player gains greater utility with increasing player numbers. Direct network effects also exist on YouTube. Content providers can benefit from content uploaded by other providers; when displaying videos, YouTube's recommendation engine lists other videos that content consumers may enjoy. Thus, such network effects can propagate throughout the platform, benefiting content providers and increasing YouTube's revenues. As noted earlier, when a user views a video that contains Infringing Content, YouTube generally recommends other videos, including those that contain only non-infringing content. When a user chooses to follow

---

73.  For a more detailed discussion, *see* S.J. Liebowitz & Stephen Margolis, *Network Externalities (Effects)*, in THE NEW PALGRAVE'S DICTIONARY OF ECONOMICS AND THE LAW (MacMillan, 1998). *See also* S.J. Liebowitz & Stephen E. Margolis, *Network Externality: An Uncommon Tragedy*, 8(2) JOURNAL OF ECONOMIC PERSPECTIVES 133-150 (1994).

74.  Michael L. Katz and Carl Shapiro, *Network Externalities, Competition, and Compatibility*, 75(3) AMERICAN ECONOMIC REVIEW 424-440, 424 (1985).

that recommendation and subsequently views the video with non-infringing content, YouTube can then benefit from ads served on that content.[75]

46.      To summarize, direct network effects, or "same side" effects, occur between agents who belong to the same group: video game players who benefit from having other players participate, app users, students at a university who benefit from peer effects, and so on. In contrast, indirect network effects, often referred to as "cross-side" or "other side" effects, occur between agents of a group who benefit from interacting with another group altogether, such as consumers and developers of apps that interact through a common platform such as Apple's App Store or the Google Play Store, buyers and sellers on the Amazon Marketplace, and so on.[76] The economic platform literature has focused its attention on instances where no same-side effects occur; for example, consumers may not care how many others view particular content.[77]

47.      In the face of nonexistent or weak indirect network effects, an analysis of the market in which the platform operates typically focuses on a single side. Thus, the presence of an intermediary does not distinguish multi-sided platforms from their single-sided counterparts; intermediaries can characterize the latter as well, as I subsequently explain in regard to advertisers on YouTube. The substantive distinction between single- and multi-sided platforms lies in the extent to which the network effects flow in both directions.

48.      The presence of indirect network effects renders YouTube a multi-sided platform serving two primary groups: consumers on one side and providers of video content on the other, though either party can occupy both sides simultaneously (*i.e.*, a content provider can be a viewer

75.  Goodrow 2021, https://blog.youtube/inside-youtube/on-youtubes-recommendation-system/.

76.  Rochet & Tirole, *supra*, at 990 ("More generally, many if not most markets with network externalities are characterized by the presence of two distinct sides whose ultimate benefit stems from interacting through a common platform."). *Id.* at 992, Table 1.

77.  Simon P. Anderson and Bruno Jullien, *The advertising-financed business model in two-sided media markets*, in 1 HANDBOOK OF MEDIA ECONOMICS 41-90 (Elsevier 2015).

Case 3:20-cv-04423-JD   Document 233-10   Filed 01/17/23   Page 28 of 81

CONFIDENTIAL

as well). Consumers benefit from additional content providers and the variety they provide.[78] Likewise, content providers benefit from additional consumers in various ways, including advertising revenue, brand enhancement from increased attention, and subscription revenue share.

49.    Content providers can earn a share of advertising revenues on YouTube by participating in the YouTube Partner Program (YPP). To enroll in YPP, content providers must upload their content to YouTube and make it available for public viewing. In addition, YouTube imposes additional eligibility criteria for YPP, which it has updated over time.[79]

50.    For example, YouTube imposed relatively few eligibility criteria at the beginning of 2014, requiring channels only to 1) maintain good standing, 2) upload original, advertiser-friendly content, 3) comply with the terms of service, and 4) review the copyright education materials.[80] On January 16, 2018, YouTube announced new eligibility requirements for the YPP; it would review an application for membership only after the submitting channel reaches 4,000 watch hours in the previous twelve months *and* 1,000 subscribers.[81] In justifying the additional eligibility criteria, Google indicated that its change would help it "drive more ad revenue" to content providers.[82] In August 2021, YouTube again revised its eligibility criteria, adding the requirement that the applicant channel also have a linked AdSense account.

---

78. Alphabet Earnings Call, February 4, 2019 (Alphabet CEO, Sundar Pichai, explains how content attracts viewers: "In the long run, I think for me, YouTube is a place where we see users not only come for entertainment. They come to find information. They're coming to learn about things. They're coming to discover, to research. And so, being able to match that intent over time in a way that we can bring the right value for our users and advertisers I think is a long-run opportunity. And we are taking all the right foundational steps to realize it."), *available at* https://seekingalpha.com/article/4238032-alphabet-inc-cl-c-goog-ceo-sundar-pichai-on-q4-2018-results-earnings-call-transcript.

79. Google, YouTube Partner Program Overview & Eligibility, *available at* https://support.google.com/youtube/answer/72851?hl=en.

80. Google, Criteria for YouTube partnership, *archived at* https://web.archive.org/web/20130925035130/https://support.google.com/youtube/answer/82839?hl=en&ref_topic=14965#.

81. Google, YouTube Partner Program overview, *archived at*, https://web.archive.org/web/20180307021520/https://support.google.com/youtube/answer/72851?hl=en.

82. *Id.*

51.    YouTube benefits from the indirect network effects by internalizing the externalities created in the form of advertising revenue, subscription revenue, and data gathering that it uses to improve ad targeting and/or resell. The YouTube platform involves three sides, though indirect network effects flow primarily between content consumers and providers, while advertisers subsidize the interaction between them.[83]

52.    Content consumers represent individuals who view or listen to content on YouTube. Such consumers may either listen to the ad-supported ("free") version or the premium (paid) version. The latter avenue is a subscription service and the combination of the two represents a "freemium" model.

53.    YouTube does not charge non-subscribers a pecuniary fee, because such consumers provide YouTube material value in the form of personal data.[84] While I offer no opinion on the law, I concur with the economic relationship explained by Judge Koh in the *Klein v. Facebook* litigation:[85]

---

83.  OECD (2018) Rethinking Antitrust Tools for Multi-Sided Platforms at 189 ("Multi-sided markets have at least two distinct groups or sides that rely on the platform to connect them directly or indirectly to each other. For example, YouTube is a three-sided on-line video market connecting three distinct groups: (i) users (i.e. subscribers or end-user consumers), (ii) content/service providers, and (iii) advertisers. While the three sides are distinct, members of one side may participate in multiple facets of the market simultaneously. Users that share content are also content providers to other users, and content providers might also be advertisers if they pay the platform or other content providers to carry their ads to users with whom they are not yet connecting.") *available at* www.oecd.org/competition/rethinking-antitrust-tools-for-multi-sided-platforms.htm.

84.  Bodo Herzog, *Valuation of Digital Platforms: Experimental Evidence for Google and Facebook*, 6(4) INTERNATIONAL JOURNAL OF FINANCIAL STUDIES (2018) ("The stock market value of digital firms is mainly derived from targeted advertising revenues. One example would be the short advertisements at the beginning of most YouTube videos. This is the main channel for profits, because the price of using digital services is the provision of personalized data from customers to the platform.") *available at* https://www.mdpi.com/2227-7072/6/4/87/pdf?version=1539747767.

85.  *Klein v. Facebook, Inc.*, No. 20-cv-08570 (N.D. Cal. Jan. 14, 2022), Order Granting in Part and Denying in Part Motion to Dismiss with Leave to Amend, ECF No. 214 at 69. On January 28, 2022, I, along with a group of economists that included Nobel Laureate Joseph Stiglitz, filed a brief as *amici curiae* in support of plaintiffs-appellants and reversal of *State of New York, et al. v. Facebook* (D.D.C.). We cited Judge Koh's argument in the brief as accurately reflecting the significant value that users provide to Facebook despite the fact that the platform may not levy a monetary fee on them. The brief is available at https://www.cohenmilstein.com/sites/default/files/New%20York%20v%20Facebook%20-%20Economists%20Amicus%20-%20Filed%2001282022.pdf.

> In other words, users provide significant value to Facebook by giving Facebook their information—which allows Facebook to create targeted advertisements—and by spending time on Facebook—which allows Facebook to show users those targeted advertisements. If users gave Facebook less information or spent less time on Facebook, Facebook would make less money.[86]

54.     Content providers represent any entities that create content and/or upload content to YouTube. Content can include musical, instructional, educational, and other material. Such content providers have their own "channels" to which they can either live stream content or upload content that consumers can view asynchronously at their discretion. As an analogy, the same process occurs with online instruction, which students may attend live via the internet (synchronous instruction) or watch after the lecture has concluded at their own leisure (asynchronous instruction).

55.     By permitting ad serving on the videos on their channels, content providers can monetize their channels and obtain a share of the ad revenue. The amount of advertising revenue received from their content depends on the amount of viewership the content attracts. To qualify for content monetization, a channel must garner at least 1,000 subscribers and 4,000 hours of annual video watch time.[87] The ad revenue and brand enhancement that results from increased viewership in turn motivates providers to produce more content, thus reflecting the indirect network externalities.

### 2.     Advertisers as Subsidizers of the Provider-Consumer Interaction

56.     While advertisers also participate in the multi-sided interaction that occurs on YouTube, they have limited influence on the indirect network effects that characterize the platform. As such, I focus my analysis of these effects on the relationship between the two key constituencies—namely, content users on one side and content providers on the other.

---

86. *Id.*, at 68.
87. https://support.google.com/youtube/answer/72851?hl=en.

57.     The role of advertisers on YouTube reflects the subsidy-based relationship that
mediates the nexus between providers and consumers of content that exists on the platform.
However, nonexistent or weak indirect network effects characterize the association between
advertisers and content consumers.[88] Such network effects primarily, if not exclusively, flow in
one direction: advertisers benefit from more consumers, but consumers gain little utility from more
advertisers.[89] Economic evidence indicates that consumers often regard advertising as a
disamenity, as evidenced by the use of ad blockers. Publishers have observed this market reality
by reminding or even requiring users to disable ad blockers before reading. Some publishers, or
platforms such as YouTube, offer consumers the option of avoiding advertising altogether in
exchange for a subscription fee.[90]

58.     In their note for the Organization for Economic Cooperation and Development
"Hearing on Re-thinking the use of traditional antitrust enforcement tools in multi-sided markets,"
Shelanski, Knox, and Dhilla distinguish between service-based and subsidy-based platform
relationships, explaining:

> [A] subsidy-based relationship exists when one side indirectly defrays another side's costs
> of using the platform but does not offer an additional service that directly attracts users to
> that platform. Facebook, Twitter, YouTube…are examples of multisided markets
> involving subsidy-based relationships. Each of these entities connects users (or readers,

---

88. Lapo Filistrucchi, Damien Geradin, Eric van Damme, Pauline Affeldt, *Market Definition in Two-Sided Markets: Theory and Practice*, 10(2) JOURNAL OF COMPETITION LAW AND ECONOMICS 293-339, 297 (2014) ("In media markets, advertisers' demand for advertisements on a media outlet increases with the number of consumers of content (viewers, readers, listeners, and the like), while viewers, readers, and listeners might also be positively or negatively affected by the quantity of advertising."). *See also id.* at 315 ("As claimed above, in media markets such as newspapers or TV, which are two-sided non-transaction markets, two interrelated markets—one for each side—should be defined.").

89. Benjamin Klein, Andres V. Lerner, Kevin M. Murphy and Lacey L. Plache, *Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees*, 73(3) ANTITRUST LAW JOURNAL 571-626, 583 (2006) ("Thus, in contrast to a situation like the newspaper example discussed above in which network effects operate primarily in one direction, that is, from increased readers to increased advertising value, payment cards have significant network effects in both directions.").

90. That YouTube serves ads does not necessarily mean the individual sees them; the use of an ad blocker can prevent ad service and thus monetization. Likewise, an ad may be served but not monetized if the individual does not spend sufficient time interacting with the ad or skips it.

viewers, and listeners) with advertisers, and each gives users below-cost (and often free) access to the platform and its services because of payments from advertisers.

Where a subsidy-based relationship exists, the larger multisided market will have at least three sides: subsidizers (*e.g.*, advertisers), suppliers (*e.g.*, content/service providers), and users (*e.g.*, subscribers). Subsidizers do not typically attract users to a platform on their own because they do not usually offer a good or service that users specifically seek out. A distinct service-based relationship is therefore required to bring users into the market.[91]

59.     I understand that courts have applied the same logic to evaluate advertisers and users as belonging to separate markets, a reflection of the negligible indirect effects between the two groups.[92] I summarize the relationship between the three constituencies—content consumers, content providers, and advertisers—through the path diagram in Figure 3 below.

FIGURE 3: MULTI-SIDED INTERACTION BETWEEN CONSTITUENCIES ON YOUTUBE PLATFORM



---

91.  Howard Shelanski, Samantha Knox and Arif Dhilla, *Network Effects and Efficiencies in Multisided Markets*, submitted for Item 8 at the 127th meeting of OECD Competition Committee on 21-23 June 2017, *available at* https://one.oecd.org/document/DAF/COMP/WD(2017)40/FINAL/en/pdf.

92.  *See*, *e.g.*, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) at 12-13 ("Newspapers that sell advertisements, for example, arguably operate a two-sided platform because the value of an advertisement increases as more people read the newspaper. But in the newspaper-advertisement market, the indirect networks effects operate in only one direction; newspaper readers are largely indifferent to the amount of advertising that a newspaper contains. Because of these weak indirect network effects, the market for newspaper advertising behaves much like a one-sided market and should be analyzed as such."). *See also Times-Picayune Pub. Co. v. United States*, 345 U.S. 594 (1953), ("But every newspaper is a dual trader in separate though interdependent markets; it sells the paper's news and advertising content to its readers; in effect, that readership is, in turn, sold to the buyers of advertising space.").

CONFIDENTIAL

60.     Because my assignment in this matter involves determining the incremental causal effect of the Infringing Content on advertising revenues that YouTube obtained from the non-infringing content, I use the diagram in Figure 3 to trace this effect through the platform. This process also informs the econometric methodology I apply in the subsequent section.

61.     I begin with the striped, blue arrows that flow from content providers, through YouTube (which functions as the intermediary), to content consumers. I identify these arrows with the letter "**A**" to reflect the network effects commencing with the upload and display of content, which then attracts users. The dotted, red arrows—which I identify with the letter "**B**" —reflect the network effects in the opposite direction, as content consumers then attract even more content providers, with YouTube again acting as the intermediary. Content providers thus benefit from these bidirectional network effects reflected by the "**A**" and "**B**" arrows in various ways other than any personal satisfaction they derive, including from name recognition and brand enhancement, and thus potential financial remuneration outside of YouTube.

62.     Content consumers also draw advertisers to the YouTube platform, as reflected in the red, checkered line "**C**" that runs between these two groups, from the content consumers to advertisers. The potential for consumers to view ads attracts advertisers; advertisers benefit from a greater number of monetized visits (when ads appear) and/or from longer visit duration to the extent the consumer can see more ads per time spent on YouTube.[93] Note that no corresponding

---

93.   Verge, 2019, "Longer videos have more room for ads, and more ads mean an increase in revenue for creators. Breaking that 10-minute mark is particularly important: that's the point at which YouTube begins letting creators insert ads into the middle of their videos, rather than just running an ad at the beginning. One YouTuber, Shelby Church, found that she made three times as much revenue for videos that ran over 10 minutes than those that were shorter…. Not only are longer videos more valuable, but they're favored by YouTube.") *See also*, Geoff Weiss, *YouTube Lowering Minimum Video Length For Mid-Roll Ads From 10 To 8 Minutes*, TUBEFILTER, July 7, 2020 ("Right now, only videos longer than 10 minutes are eligible for mid-rolls, which appear in the midst of videos as a commercial break of sorts. But beginning later this month, YouTube is changing that minimum threshold to eight-minute videos."), *available at* https://www.tubefilter.com/2020/07/07/youtube-lowering-minimum-video-length-mid-roll-ads/.

line exists in the opposite direction (from advertisers to consumers), reflecting the one-way nature of the effects between consumers and advertisers, which I described previously. Further, consumers may also view advertising as a nuisance, as evidenced by the use of ad blockers and the fact that platforms offer subscription services to consumers in exchange for avoiding ads.

63.     The solid, green line—labeled "**D**"—flows from advertisers to YouTube, reflecting the nature of the financial arrangement, whereby entities pay YouTube for the right to serve ads on the platform. The second solid, green line—labeled "**E**"—flows from YouTube to the content providers, reflecting the portion of the platform's revenue that it shares with the latter. This line reflects the benefits that content providers derive from the presence of advertisers, which YouTube mediates.

64.     Note that no reverse line exists from content providers to advertisers, highlighting the unidirectional nature of the effects. In other words, holding user visits and visit duration constant, we do not expect any substantive change in advertising from a change in the number of providers, as YouTube only realizes such revenues when consumers visit the content that includes ads. Advertisers on YouTube want to attract consumers' attention. Thus, more content or additional content providers only benefit advertisers to the extent that the former draw additional consumers that advertisers seek to reach. Consumers, in turn, do not seek out advertisers, but rather the content providers supply. Thus, content providers serve as the vehicle through which advertisers reach consumers, and YouTube provides the platform where these three groups interact.

## II.  IMPACT AND DISGORGEMENT OF REVENUES FROM INFRINGING CONTENT

65.     In this section, I calculate disgorgement of YouTube's monetization of the incremental portion of non-infringing content generated as result of the total network effects (direct and indirect) that the Infringing Content propagated. The economics of network effects explains

that the addition of Infringing Content attracts the attention of existing viewers and/or draws in new viewers. Such increased attention in turn encourages other content providers (either creators and/or uploaders) to join the platform, forming a self-reinforcing cycle.[94]

66.     I use the results from the model presented in this section to calculate disgorgement based on estimates of Infringing Content on YouTube from public sources. I understand that, at this point in the litigation, Plaintiffs and putative class members have not yet elected between statutory damages and Defendants' profits.[95] For that reason, the final disgorgement-of-profits calculation is subject to revision once all Plaintiffs and putative class members make their damages election. For Plaintiffs and putative class members who elect to seek Defendants' profits ("disgorgement of profits class members"), the number of infringing works and views related to those class members can serve as an input to the model below to calculate a final disgorgement-of-profits figure.

67.     I further understand that Defendants' profits "in connection with the infringement" are relevant to a court's determination of the amount of statutory damages.[96] For Plaintiffs and putative class members who elect statutory damages ("statutory damages class members"), I can use the number of infringing works and views related to those class members to determine Defendants' profits "in connection with the infringement" of the works of statutory damages class members. I can also use publicly available estimates relating to the total percentage of infringing

---

94.  Lerner 2019 at 8, acknowledging that such self-reinforcing effects can also create anticompetitive concerns, ("The potential competitive concern regarding network effects is that they can give rise to a positive 'feedback loop,' a self-reinforcing phenomenon where the large become larger and smaller providers and new entrants cannot catch up and compete effectively. For instance, there could be incentives for members of group *A* (*e.g*., Uber riders) to use the platform with the greatest participation by members of group *B* (Uber drivers). The concentration of members of group *B* on that platform could then create incentives for members of group *A* to use that platform also. This process might continue until all members of group *A* and group *B* converged on a single platform.").

95.  17 U.S.C. § 504(c)(1) ("[T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages").

96.  *Sony Computer Entm't Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068, 1074–75 (N.D. Cal. 2005).

CONFIDENTIAL

videos on the platform to estimate Defendants' profits derived from all infringing works, including those that remain undetected, and those for which no takedown notice has been filed. This estimate can assist the trier of fact in determining the amount of statutory damages for statutory damages class members.

## A.      Theoretical Framework for My Econometric Models

68.      The econometric models that I propose relate attributes of YouTube's platform and other economic factors with the resulting monetary value created through advertisements.[97] To estimate these models, I rely on regression analysis, a common technique that empirical economists use regularly and that Google researchers have employed to estimate the effectiveness of advertising interventions.[98] The methodology I apply here aims to isolate the revenues that YouTube obtained as a result of the presence of Infringing Content on its site. Such revenues result through either of the two avenues I described in paragraph three of this report: (1) from advertisements that YouTube served on Infringing Content, and (2) from advertisements that YouTube served on non-infringing content that YouTube would not have obtained but-for the presence of Infringing Content. Revenues in the latter category result from both direct and indirect network effects.

69.      In my regression analysis, monthly YouTube advertising revenue represents the dependent variable, with various measures of user engagement and other economic factors serving as independent (explanatory) variables. Because YouTube's main source of income consists of

---

97. YouTube has only produced monthly advertising revenue and profitability data covering the 2017-2020 period, for a total of 48 observations.

98. Jouni Kerman, Peng Wang, and Jon Vaver, Estimating Ad Effectiveness using Geo Experiments in a Time-Based Regression Framework, Google, March 2017, [hereafter Kerman et al], *available at* https://static.googleusercontent.com/media/research.google.com/en//pubs/archive/45950.pdf.

CONFIDENTIAL

advertising revenue, this dependent variable will also reflect the direct and indirect network effects more clearly than subscription revenue.[99]

70.     YouTube earns advertising revenue whenever a monetized "impression" occurs, *i.e.*, when YouTube charges an advertiser for ad placement. Such revenue generally equals the product of (1) number of impressions and (2) the cost per impression. The model seeks to estimate the incremental advertising revenue that YouTube derives from each additional increment of time spent platform, controlling for all other variables that influence YouTube's advertising revenues. As explained above, the model not only aims to identify the presence of direct and indirect network effects, but also to quantify their contribution to the advertising revenues that YouTube earns on non-infringing content.

71.     I begin by translating the diagram in Figure 3, which I described in the previous section, into an econometric model that can identify a causal nexus between YouTube content, its consumers, and advertising revenues that the platform obtains.

72.     Next, I differentiate between the two types of YouTube advertising revenues to which Infringing Content contributed: revenues from ads served on Infringing Content and revenues from ads served on non-infringing content. With regard to the former, Plaintiffs posit that the Infringing Content uploaded to YouTube attracted views to that content. I understand that YouTube monetized these views by serving ads on videos that included the Infringing Content. I refer to such revenues as "proximate disgorgement revenues."

73.     YouTube garnered revenues not only through monetized views of Infringing Content, but also through monetized views of non-infringing content that Infringing Content generated. In other words, a subset of the non-infringing content can mediate the effect of

---

99.  https://www.youtube.com/howyoutubeworks/our-commitments/sharing-revenue/.

CONFIDENTIAL

Infringing Content not captured by either proximate disgorgement revenues or non-infringing content revenues. Thus, the effects of Infringing Content on total YouTube advertising revenues can flow through non-infringing content, as a result of network effects. I refer to such revenues as "network effect disgorgement revenues."[100]

74.    Subject to the availability of the requisite data, separating these two sources of YouTube revenue subject to Plaintiffs' theory of disgorgement poses no empirical hurdles. *First*, each source requires distinguishing infringing from non-infringing content, a process that YouTube performs on a regular basis using its copyright management tools and has done so for well over a decade. *Second*, using YouTube's own data, the pages, views and revenue associated with ads served on the Infringing Content can be extracted. Although I did not have access to such data, I attempted to mitigate this limitation by pursuing publicly available sources that could potentially inform the separate metrics associated with infringing and non-infringing content on YouTube.

75.    The remaining revenues arise from non-infringing content. A significant portion of such revenues occurs independently of any Infringing Content. In other words, YouTube would have retained the majority of the revenues on non-infringing content even if the Infringing Content were never uploaded to the site. I refer to such revenues, which are not subject to Plaintiffs' theory of disgorgement, as "independent non-infringing content revenues." I understand that Plaintiffs claim no disgorgement of such revenues.

76.    Figure 4 below describes the framework that generates the three sources of YouTube advertising revenues described above.

---

100.    As an analogy, consider the following simplified example. Suppose a store sells counterfeit Rolex watches in addition to a variety of other trinkets, t-shirts, and other soft goods. The counterfeit watches contribute to the store's revenues in two ways: (1) through the watch sales themselves, and (2) by attracting the attention of consumers who buy additional products that they would not have purchased had the store not offered counterfeit watches for sale.

FIGURE 4: FRAMEWORK OF YOUTUBE ADVERTISING REVENUES



77.     The arrows above identify the three sources of revenues I have described. The sequential numbers adjacent to each arrow in the graph above designate the order of interactions. The solid red arrows, numbered 1 and 2, reflect proximate disgorgement revenues. The large, block arrow represents the remaining effects, once proximate disgorgement revenues have been removed and is comprised of independent non-infringing content revenues (the black shaded portion of the block arrow, numbered 4) and indirect network effect disgorgement revenues (the light blue shaded portion thereof, numbered 9). The solid black arrow, numbered 3, and the portion of the large, block arrow labeled 4, reflect the total independent non-infringing content revenues. The straight, blue, dashed arrows—5, 6, 7, and 8—follow the effects of Infringing Content either directly on non-infringing content (arrow 7) or indirectly through views (arrows 5 and 6) then flowing to revenues (arrow 8 and the portion of the large block arrow shaded in light blue and numbered 9). This pathway represents the indirect network effect disgorgement revenues, summarized by the curved arrow labeled $\beta_{5-6-7-8-9}$ between infringing conduct and revenues. In summary, the methodology I apply in this report aims to recover the portion of YouTube revenues

that flow from the portion of the large block arrow shaded in light blue and represented by the number 9.

78.    Network effects predicate that Infringing Content will affect views, then affect non-infringing content (arrows 5 and 6), but the effect may occur directly (arrow 7).[101] For estimation purposes, we can elide these two effects as we are interested in the total effect (direct plus mediated) of Infringing Content on non-infringing content, and, subsequently, monetized views on the latter. As I explain subsequently, separation of YouTube content and views (or another measure of user engagement) into infringing and non-infringing categories could permit the simplification of these equations into a single step that relies on OLS regression.

## B. Empirical Estimation of Econometric Models

79.    With Defendants' data, the analysis could proceed as follows:

(i)     Separate total content, views, time spent, and advertising revenues into infringing and non-infringing components.

(ii)    Subtract infringing revenues from total revenues, leaving only revenues from non-infringing content.

(iii)   Per the Complaint, YouTube allegedly treated Infringing Content as though it were non-infringing. Thus, the next step estimates the relationship between total content and revenues from non-infringing content. The result yields the incremental effect of Infringing Content on revenues from non-infringing content.

80.    After Steps (i)-(iii), the relationship illustrated in Figure 4 reduces to that shown in Figure 5 below. Only estimation of the relationship between views and YouTube advertising revenues remains necessary.[102] This analysis readily lends itself to the application of OLS regression.

---

101.   This effect can occur when awareness of the presence and monetization of Infringing Content on YouTube prompts other content providers to upload non-infringing content.

102.   I use the term views in a broad sense as a general measure of user engagement that encompasses, for example, the total time spent on the site.

FIGURE 5: ESTIMATION OF SIMPLIFIED RELATIONSHIP RESULTING FROM LIMITED DATA AVAILABILITY



81.     As of the preparation of this report, I did not have access to YouTube data that provided separate metrics for infringing and non-infringing content.[103] YouTube provided a limited dataset, however, containing takedown notices submitted through means other than Content ID. These data, which I incorporate into my analysis, can serve as a proxy for the amount of Infringing Content on YouTube.

82.     On approximately October 7, 2022, Defendants produced a data file that contains takedown notice data from a random sampling of 90 days. Defendants indicated that "this sampling includes information from takedown notices received through any channel other than through YouTube's Content ID system."[104] As Defendants indicated, the data consisted of approximately 1.8 million records covering 90 randomly selected days over the five-year period from August 2017 through July 2022.

83.     Because YouTube provided monthly revenue data, I needed to match takedown notices to the revenue data at the monthly level. Although I understand that the sampling plan

103.    Economists frequently face limited data availability in practice, necessitating assumptions that permit the completion of the analysis. Given the dearth of data provided by YouTube, I follow the same approach here. *See, e.g.,* Marc Rysman, *Competition Between Networks: A Study of the Market for Yellow Pages*, 71 REVIEW OF ECONOMIC STUDIES 483-512 (2004) [hereafter Rysman 2004] at Section 3.1.
104.    Gallo White October 7, 2022 letter to Carol O'Keefe. I understand from counsel that this data sample may include takedown notices that were filed as a result of a Content ID match. I do not exclude such takedown notices from my analysis; However, given that this analysis aims to quantify the impact of infringing videos generally, I have no reason to believe that the means used to find the infringing video would substantively modify the result. If Defendants were to provide data identifying takedown notices resulting from a Content ID match, I could incorporate such data into my model.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
-41-

selected days without replacement (i.e., each day could only be chosen once), in some months multiple days could have been included in the sample while other months included no chosen days. The results conformed to this expectation, although only three out of the 41 months from August 2017 through December 2020 (the last month for which YouTube provided revenue data) did not have any days included in the sample, thus yielding a match rate of approximately 93 percent. For months that included more than one sampled day, I calculated the average daily number of takedown notices over the sampled days.

84.     Next, I compared YouTube's revenue data with the monthly takedown requests. The two monthly series show a positive and statistically significant correlation of approximately 72 percent from August 2017 through December 2020, the last month for which Defendants produced monthly YouTube ad revenues.[105] Because (1) monthly gaps exist and (2) to smooth the daily variation to which the daily sampling nature of the takedown notice data contributes, I computed the three-month moving average of both revenues and takedown requests.

85.     Finally, I calculated the quarterly totals from the above data. I did so for two reasons: (1) while Defendants did not provide monthly data after 2020, I could obtain quarterly total YouTube advertising revenues from Alphabet's quarterly filings until the 3rd quarter 2022. Because YouTube's takedown data sample extended through the 2nd quarter 2022, I could extend my analysis of the relationship between YouTube revenues and takedown notices, a proxy for the amount of Infringing Content on YouTube not subject to challenge via Content ID, through 2nd quarter 2022. Figure 6 below illustrates this quarterly relationship.

---

105.     *See*, 4 - Set Up FULLREG Regression Dataset.sas.



FIGURE 6: YOUTUBE QUARTERLY REVENUE AND QUARTERLY TAKEDOWN NOTICES OUTSIDE OF CONTENT ID (COMPUTED FROM 3-MONTH MOVING AVERAGES)



86.     In addition, I also observe a high, positive and statistically significant correlation of approximately 68 percent between the average number of daily takedown requests and the total time spent on YouTube (calculated as number of visits multiplied by the average visit duration). This result suggests a positive association between the amount of Infringing Content on YouTube and the total amount of time that YouTube users spend on the site; in other words, through network effects, Infringing Content keeps YouTube users on the site, and increases YouTube's ad revenues. Similarly, a nearly identical positive and statistically significant correlation of 67 percent exists between the average number of daily unmonetized takedown requests and the total time spent on the site. This result also points to the existence of network effects; to the extent that unmonetized Infringing Content drives user engagement with non-infringing content, YouTube benefits through increased opportunity to monetize that engagement. Together, these results support the conclusion

that network effects permit YouTube to benefit from infringing content beyond simply serving ads on that content.

87.     As the above figure indicates, YouTube takedown requests outside of Content ID track closely with overall YouTube advertising revenues. Next, I investigated (1) whether this effect remains after controlling for potential confounding variables and (2) whether such takedown requests explain changes in YouTube revenue from non-infringing content alone. A positive answer on either or both would provide empirical support for network effects that allow YouTube to earn revenues on non-infringing content based on the presence of Infringing Content on its site.

### 1.      Effect of Infringing Content on Overall YouTube Revenues

88.     To investigate the presence of network effects, I began by estimating any impact that Infringing Content may have on overall YouTube revenues, aside from the revenues that YouTube earns by monetizing such content by serving ads on its playbacks. I calculated the latter revenue figure by totaling the ad revenue that YouTube reported for the sample of videos included in its takedown request sample by day. In months with more than one day included in the sample, I averaged the figures by day. To arrive at a monthly total, I multiplied the daily average by the number of days in each month. Then, I calculated the estimated YouTube revenue from non-infringing content by subtracting this number from the total YouTube ad revenues.[106]

89.     Table 3 below provides the summary statistics of the variables I use in the regression models that I estimate in the subsequent sections.

---

[106]    I do not opine that this metric captures the totality of YouTube revenues from all Infringing Content on the platform, but rather only the portion subject to takedown requests. The metric I use here does not include any monetized Infringing Content that went unreported. For purposes of this report, I assume that any additional such revenue would occur in proportion to the reported takedown revenue. In other words, such additional revenue would affect the total amount but not its distribution across months. The fact that the data were extracted via a random sample lends statistical support to my assumption.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TABLE 3: DESCRIPTIVE STATISTICS FOR VARIABLES INCLUDED IN ECONOMETRIC ANALYSIS

| Variable | Mean | Standard Deviation | Minimum | Maximum | 1st Quartile | Median | 3rd Quartile |
|---|---|---|---|---|---|---|---|
| YouTube Ad Revenue | $1,131,005,661 | $446,879,724 | $493,416,471 | $2,483,930,465 | $790,549,711 | $1,107,879,327 | $1,354,228,523 |
| Avg. Daily Takedown Requests | 18,890 | 10,118 | 4,070 | 38,945 | 9,498 | 16,625 | 26,635 |
| Monthly Rev. on Takedown Videos | 408,791 | 211,247 | 43,735 | 1,063,059 | 269,738 | 385,968 | 521,054 |
| Monthly Time on YouTube (mins) | 7.43153E+11 | 6.98397E+11 | 2.84661E+11 | 4.136E+12 | 3.70289E+11 | 4.78686E+11 | 7.48198E+11 |
| YouTube Visits | 22,469,171,196 | 19,775,809,827 | 6,898,673,658 | 69,086,810,952 | 9,040,688,495 | 12,869,727,913 | 27,574,882,220 |
| YouTube Pages | 1.05376E+11 | 75745112531 | 48683137085 | 4.52893E+11 | 66048962014 | 94106974817 | 1.09926E+11 |
| Avg. Visit Duration on YouTube | 130383.48 | 26490.24 | 85500 | 215520 | 121620 | 132960 | 147420 |
| Facebook Visits | 8542016919 | 2983658147 | 2906790057 | 13465643601 | 6993893657 | 8591793683 | 11263298936 |
| Covid-19 Pandemic Flag | 0.1 | 0.3 | 0 | 1 | 0 | 0 | 0 |
| 4th Quarter Flag | 0.23 | 0.42 | 0 | 1 | 0 | 0 | 0 |
| Quarter-end Month | 0.33 | 0.47 | 0 | 1 | 0 | 0 | 1 |
| UM Consumer Sentiment | 86.41 | 14.14 | 50 | 101.4 | 75.45 | 93.6 | 98.1 |
| Manufacturer Orders | 1723.07 | 131.44 | 1494 | 2182 | 1632.5 | 1717 | 1790.5 |
| PPI Internet Advertising | 65.2 | 5.58 | 53.4 | 79.01 | 61 | 63.7 | 69.2 |
| Non-Farm Payroll Employment | 147615257.1 | 4371799.57 | 130513000 | 153308000 | 145960000 | 148560000 | 150843000 |
| BLS Misery Index | 8.11 | 2.63 | 5.23 | 15.06 | 5.97 | 6.7 | 10.74 |

Such an analysis would motivate the estimation of the following model, where YouTube ad revenues are a function of (1) user engagement with Infringing Content, (2) estimated YouTube monetization of Infringing Content, and (3) a vector of explanatory variables that aim to control for exogenous economic factors.

$$Rev_t = f\left(InfE_t, InfAdrev_t, \sum_{1}^{n} \beta_n X_{tn}\right) \qquad Eq.\,1$$

*Where:*

Rev$_t$ =       YouTube advertising revenue in month *t*.

InfE$_t$ =       User engagement with Infringing Content in month *t*. Because of limited data availability, I relied on the data sample of takedown requests that YouTube produced to calculate the number of takedown requests via copyright management tools other than Content ID. I used this variable as a proxy for the amount of Infringing Content on YouTube over time.

InfAdRev$_t$       Estimated ad revenue from Infringing Content subject to takedown requests. I estimated this variable using the sample takedown request data that YouTube provided. To do so, I calculated the average ad revenue per day from the takedown sample, then multiplied this figure by the total number of days in a given month to arrive at a monthly total. I understand that this figure does not capture all ad revenue from Infringing Content but only the ad revenue from Infringing Content subject to a non-Content ID takedown request.

$\sum_1^n \beta_n X_{tn} =$      An $n \times t$ matrix consisting of $n$ control variables (columns) and $t$ months (rows). In Equation 2 (below), these control variables capture any exogenous factors, such as economic indicators, that may confound the relationship between the dependent variable (ad revenue) and the key independent variables in this equation.

90.      I specify the OLS regression equation that I use to estimate disgorgement of YouTube revenues on non-infringing content through indirect network effects generated by Infringing Content in Equation 2 below. I use the logarithmic functional form for the dependent variable as well as independent variables where theory supports the use of this specification.[107] Further, I note that because this regression used takedown request data, estimation used only 38 observations rather than the 48 data points for which YouTube provided ad revenue data (12 months x 4 years). This limitation followed from the fact that takedown sample data began in August 2017 rather than January 2018, a loss of seven data points, and, as I explained earlier, the sample did not include data for three additional months. Nonetheless, the limited data can provide insight into the effects of Infringing Content on YouTube revenues as reflected in Equation 2.

$$\boldsymbol{LUNINFREV_t} = \propto_1 + \ \beta_1 \boldsymbol{LVisits\_YT_t} + \beta_2 \boldsymbol{LVisits\_FB_t} + \beta_3 \boldsymbol{LTDR_t} +$$

$$.... + \sum_1^n \beta_n X_{tn} + \varepsilon \qquad\qquad Eq.2$$

where:

LUNINFREV$_t =$      Natural logarithm of difference between total YouTube advertising revenues and the revenues monetized by videos subject to takedown requests through means other than Content ID, in month $t$. This figure aims to capture the revenues from non-infringing content.

LVisits_YT$_t, =$      Natural logarithm of total visits on YouTube in month $t$

LVisits_FB$_t, =$      Natural logarithm of total visits on Facebook in month $t$

---

107.      Georg M. Goerg, Christoph Best, Sheethal Shobowale, Nicolas Remy, Jim Koehler, Advertising on YouTube and TV: A Meta-analysis of Optimal Media-mix Planning, Google, Inc., Dec. 3, 2015 at 15 ("In many cases we also use variables on log-scale to account for multiplicative effects (which is especially important for socio-economic quantities such as budget and population sizes."), *available at* https://static.googleusercontent.com/media/research.google.com/en//pubs/archive/44291.pdf. The logarithmic functional form also permits interpretation of the coefficients as percentage effects. Also see, Qiu et al. 2015 at 89, ("The viewer's information set includes two pieces of information: (1) the characteristics of YouTube providers (channels) before time 1, including the log of total views of channel j's videos, lvviews").

| | |
|---|---|
| $LTDR_t =$ | Natural log of the daily average number of takedown requests in month $t$ |
| $\sum_1^n \beta_n X_{tn} =$ | *Economic control variables as follows:* |
| COVID = | An indicator flag that includes months from March through December 2020, the last month of advertising revenue data that YouTube provided. |
| Q4 = | Flag for 4th quarter, including the month where advertising generally increases as a result of the holidays. |
| QEM = | An indicator flag for the quarter-end month. I understand that companies set advertising budgets on a quarterly basis, so the last month of the quarter may reflect advertiser intent to spend the remaining budget. |
| UMCSENT = | Consumer sentiment index reported by the Univ. of Michigan |
| LNMANUF_ORD = | Natural logarithm of monthly manufacturer orders of capital goods |
| PPI_IADS = | Producer Price Index for Internet Ad Sales |
| LNNFPE = | The natural logarithm of non-farm payroll employment |
| MISERYINDEX = | The BLS "Misery Index", calculated as the sum of the unemployment rate and the Consumer Price Index. |

91.    The results of this regression appear in Table 4 below. My findings confirm that the amount of Infringing Content on YouTube, as proxied by the number of takedown requests via methods other than Content ID, has a positive, economically significant, and statistically significant effect on YouTube ad revenues from non-infringing content, even after controlling for other relevant factors.

TABLE 4: FACTORS AFFECTING YOUTUBE AD REVENUES FROM NON-INFRINGING CONTENT

| Variable | Coefficient | Standard Error | t-Value | Pr > \|t\| |
|---|---|---|---|---|
| *Intercept* | -34.269 | 90.250 | -0.38 | 0.7072 |
| *Log YouTube Pages Visited* | 0.073 | 0.175 | 0.42 | 0.6791 |
| *Log Facebook Pages Visited* | -0.122 | 0.106 | -1.16 | 0.2575 |
| *Log Takedown Requests* | 0.265 | 0.067 | 3.97 | 0.0005 |
| *Covid-19 Pandemic Flag* | -0.198 | 0.079 | -2.50 | 0.0191 |
| *4th Quarter Flag* | 0.277 | 0.033 | 8.44 | <.0001 |
| *Quarter-end Month* | 0.185 | 0.038 | 4.91 | <.0001 |
| *UM Consumer Sentiment* | -0.023 | 0.007 | -3.30 | 0.0028 |
| *Log Manufacturer Orders* | 0.601 | 0.352 | 1.71 | 0.0997 |
| *PPI Internet Advertising* | -0.032 | 0.011 | -2.97 | 0.0063 |
| *Log Non-Farm Payroll Employment* | 2.839 | 4.648 | 0.61 | 0.5466 |
| *BLS Misery Index* | 0.001 | 0.066 | 0.02 | 0.987 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

-47-

| | |
|---|---|
| R-square: | 0.907 |
| Adjusted R-square: | 0.868 |
| F-statistic | 23.03 |
| Prob(F) | <.0001 |
| Number of Observations | 38 |

92.     Economic theory posits that Infringing Content would have an indirect effect on YouTube revenues. In other words, Infringing Content could influence YouTube revenues by affecting user engagement with the site; if the presence of Infringing Content exhibits a positive association with user time spent on YouTube, we can posit that this association benefits YouTube's revenues. Indeed, as explained earlier in this report, such a conclusion comports with YouTube's economic strategy of increasing video length in an attempt to increase user engagement.

## 2.      Effect of Infringing Content on User Engagement with YouTube

93.     To investigate the presence of a relationship between Infringing Content and user engagement on YouTube, I again applied regression analysis. Using user engagement, as reflected in the total time spent on YouTube has several empirical and theoretical benefits. *First*, as noted above, the model reflected in Table 4, which regressed YouTube revenues on the number of takedown requests, resulted in a loss of 10 out of 48 data points for which YouTube provided revenue data, over a 20 percent reduction in the sample size; this outcome resulted from the fact that the periods for which such data were available did not fully overlap.

94.     *Second*, examining the relationship between time spent on YouTube and the number of takedown requests, a proxy for Infringing Content, allows me to isolate the effect of additional content on user engagement. *Third*, this analysis makes use of a total of 52 observations, because I have Semrush data from January 2017 through September 2022 (69 monthly observations) and takedown request sample data for a total of 52 of those months. Applying this analysis allows me to maximize the usefulness of the sample takedown data and extend the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

-48-

investigation of network effects throughout the relevant period, which I understand covers approximately August 2017 to August 2022.

95.     To perform the analysis above, I estimated a log-log model, regressing the total time spent on YouTube against the average number of daily takedown requests submitted to YouTube, the total number of unique pages visited on YouTube, the total number of unique pages visited on Facebook, and a variable flagging the March-September 2020 initial period of the COVID-19 pandemic. The results indicate that the presence of Infringing Content, proxied by the number of takedown requests, has a positive, economically significant, and statistically significant relationship with the total time spent on YouTube. This result again informs the presence of network effects, which enable YouTube to profit from Infringing Content beyond any pecuniary remuneration it receives from serving ads on that content. These results appear in Table 5 below.

TABLE 5: REGRESSION OF TIME SPENT ON YOUTUBE ON INFRINGING CONTENT
AND OTHER CONTROL FACTORS

| Variable | Coefficient | Standard Error | t-Value | Pr > \|t\| |
|---|---|---|---|---|
| *Intercept* | 0.387 | 3.097 | 0.13 | 0.901 |
| *Log Takedown Requests* | 0.418 | 0.056 | 7.48 | <.0001 |
| *Log YouTube Pages Visited* | 1.040 | 0.125 | 8.32 | <.0001 |
| *Log Facebook Pages Visited* | -0.146 | 0.058 | -2.53 | 0.0147 |
| *R-square:* | 0.853 | | | |
| *Adjusted R-square:* | 0.844 | | | |
| *F-statistic* | 92.68 | | | |
| *Prob(F)* | <.0001 | | | |
| *Number of Observations* | 52 | | | |

96.     The results in Table 5 corroborate the widely-acknowledged existence of network effects on YouTube and the influence of Infringing Content on YouTube engagement. My analysis reveals these effects are economically significant, despite the limited data that Defendants have produced in this matter. Such results also comport with similar findings in the literature that platforms such as YouTube benefit financially from network effects. YouTube's ability to internalize such externalities allow it to profit from the existence of Infringing Content. The next section of this report provides an estimate of the revenues that YouTube has obtained from such content.

**B.     Econometric Estimate of YouTube Advertising Revenues Subject to Disgorgement**

97.     In this section, I estimate a log-log regression equation that captures the relationship illustrated in Figure 6 above using YouTube revenues from non-infringing content as the dependent variable, time on the site as the key independent variable (and the dependent variable

in the model whose results appear in Table 5)[108], and other economic factors that may affect advertiser behavior and ad prices as control factors.[109] In other words, such a model attempts to recover the effect of Infringing Content on YouTube's revenues, controlling for factors that may confound the effect.[110] The previous section motivates the use of the time on site as the key independent variable, as this reflects the network effects propagated by the presence of Infringing Content.[111] Further, YouTube has indicated that, for a YouTube channel to monetize its content, it must have more than 4,000 public watch hours in the last twelve months, underscoring the nexus between revenues and watch time.[112] This specification appears as Equation 2 below.[113]

98.    I specify the OLS regression equation that I use to estimate disgorgement of YouTube revenues on non-infringing content through network effects generated by Infringing Content in Equation 3 below. I use the logarithmic functional form for the dependent variable as well as independent variables where theory supports the use of this functional form.[114]

---

108. For example, studies have found a positive relationship between a YouTube video's watch time and its ranking. Justin Briggs, YouTube SEO Ranking Factor Study, BriggsBy, March 26, 2018, available at https://www.briggsby.com/reverse-engineering-youtube-search. See also https://backlinko.com/hub/youtube/watch-time.

109.    Shiyu Yang, Dominique Brossard, Dietram A. Scheufele, and Michael A. Xenos, *The science of YouTube: What factors influence user engagement with online science videos?*, 17(5) PLoS ONE, 2022, 1-19.

110.    David Arbour, Dan Garant, and David Jensen, Inferring Network Effects from Observational Data, 22nd ACM SIGKDD Conference on Knowledge Discovery and Data Mining, Aug. 13-17, 2016, [hereafter "Arbour et al. 2016"] available at https://www.kdd.org/kdd2016/papers/files/rfp0878-arbourA.pdf, ("Fortunately, a variety of methods have been devised for inferring causal effects from observational data. Classical methods for causal inference from observational data consist of two steps. First, an adjustment set is identified, which consists of variables that are causally related to both the prospective cause variable (termed a treatment) and the potential effect variable (termed an outcome). Second, a procedure such as regression or matching is used to estimate the direct effect of treatment on outcome, correcting for the effects of the adjustment set.")

111.    *Id.* ("Additionally, modeling network effects is of central importance – time on site is a function of the privacy settings of an entire sub-network of friends rather than the privacy setting of an individual… Users are connected to potentially many other users, each of which has a time on site, disposition, and privacy setting attribute.").

112.    YouTube Partner Program overview & eligibility https://support.google.com/youtube/answer/72851?hl=en.

113.    See Rysman 2004 at 156, equation 6 for a similar model.

114.    Georg M. Goerg, Christoph Best, Sheethal Shobowale, Nicolas Remy, Jim Koehler, Advertising on YouTube and TV: A Meta-analysis of Optimal Media-mix Planning, Google, Inc., Dec. 3, 2015 at 15 ("In many cases we also use variables on log-scale to account for multiplicative effects (which is especially important for socio-economic quantities such as budget and population sizes."), *available at* https://static.googleusercontent.com/media/research.google.com/en//pubs/archive/44291.pdf. The logarithmic

$$LRev_t = \alpha_1 + \beta_1 LVisits\_YT_t + \beta_2 LVisits\_FB_t + \beta_3 LTime\_YT_t +$$

$$.... + \sum_{1}^{n} \beta_n X_{tn} + \varepsilon \qquad\qquad Eq. 3$$

where:

| | |
|---|---|
| $LRev_t =$ | Natural logarithm of total YouTube advertising revenues in month $t$ |
| $LVisits\_YT_t, =$ | Natural logarithm of total visits on YouTube in month $t$ |
| $LVisits\_FB_t, =$ | Natural logarithm of total visits on Facebook in month $t$ |
| $LTime\_YT_t =$ | Natural logarithm of total number of minutes spent on YouTube in month $t$ |
| $\sum_{1}^{n} \beta_n X_{tn} =$ | Economic control variables as follows: |
| COVID = | An indicator flag that includes months from March through December 2020, the last month of advertising revenue data that YouTube provided. |
| Q4 = | Flag for 4th quarter, including the month where advertising generally increases as a result of the holidays. |
| QEM = | An indicator flag for the quarter-end month. I understand that companies set advertising budgets on a quarterly basis, so the last month of the quarter may reflect advertiser intent to spend the remaining budget. |
| UMCSENT = | Consumer sentiment index reported by the Univ. of Michigan |
| LNMANUF_ORD = | Natural logarithm of monthly manufacturer orders of capital goods |
| CPI = | Consumer Price Index, all urban consumers |
| LNNFPE = | The natural logarithm of non-farm payroll employment |
| MISERYINDEX = | The BLS "Misery Index", calculated as the sum of the unemployment rate and the Consumer Price Index. |

99.    For this regression, I used the total YouTube revenues. Subtracting out the estimated infringing revenues from the total would have resulted in the loss of ten of the 48 observations for reasons I noted previously. As I explain subsequently, for purposes of calculating damages, disaggregation of revenues subject to disgorgement from total revenues can occur after estimation. The results of this regression model appear below.[115]

TABLE 6: REGRESSION OF YOUTUBE REVENUE – LOG-LOG MODEL FOR DISGORGEMENT

---

functional form also permits interpretation of the coefficients as percentage effects. Also see, Qiu et al. 2015 at 89, ("The viewer's information set includes two pieces of information: (1) the characteristics of YouTube providers (channels) before time 1, including the log of total views of channel j's videos, lvviews").

115. Tables presented in this report reflected heteroskedasticity-consistent standard errors. In addition, I have computed both Huber-White and Newey-West standard errors which are heteroskedasticity and autocorrelation corrected. Use of these corrections maintains the statistical significance of the coefficient of interest: the natural log of time spent on YouTube. For estimation code and results see the program, *5- Econometric Modeling-with Table Output.sas*.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

-52-

| Variable | Coefficient | Standard Error | t-Value | Pr > \|t\| |
|---|---|---|---|---|
| *Intercept* | -69.075 | 58.020 | -1.19 | 0.2416 |
| *Log YouTube Pages Visited* | -0.839 | 0.150 | -5.61 | <.0001 |
| *Log Facebook Pages Visited* | 0.039 | 0.069 | 0.57 | 0.5726 |
| *Log Time Spent on YouTube* | 0.781 | 0.161 | 4.85 | <.0001 |
| *Covid-19 Pandemic Flag* | -0.262 | 0.083 | -3.16 | 0.0032 |
| *4th Quarter Flag* | 0.226 | 0.029 | 7.93 | <.0001 |
| *Quarter-end Month* | 0.146 | 0.033 | 4.41 | <.0001 |
| *UM Consumer Sentiment* | -0.019 | 0.006 | -3.03 | 0.0046 |
| *Log Manufacturer Orders* | -0.321 | 0.238 | -1.35 | 0.1861 |
| *PPI Internet Advertising* | -0.030 | 0.009 | -3.33 | 0.002 |
| *Log Non-Farm Payroll Employment* | 5.051 | 3.029 | 1.67 | 0.1041 |
| *BLS Misery Index* | 0.005 | 0.043 | 0.13 | 0.9001 |

| | | | | |
|---|---|---|---|---|
| *R-square:* | *0.932* | | | |
| *Adjusted R-square:* | *0.911* | | | |
| *F-statistic* | *44.97* | | | |
| *Prob(F)* | *<.0001* | | | |
| *Number of Observations* | *48* | | | |

100.     Total time spent on YouTube reflects the key variable of interest in explaining variations in YouTube advertising revenue. Economic theory as well as YouTube's marketing strategy posit that additional time spent on the site should have a positive effect on YouTube advertising revenues. This variable captures two key factors: the number of visits to YouTube multiplied by the time per visit.[116] I understand that Google considers the average amount of time

---

116.     YouTube presentation, "Watch Next Overview" (January 22, 2016), GOOG-SCHNDR-00040865 at -912 ("Views == revenue"); Deposition Testimony of Amy Wu, Product Manager at Google at 67-68 ("It's my understanding that -- that, yes, creators are interested in -- in their view count on their videos…Views could generate more revenue, and some creators may care about that. They may also care about views because, you know, they -- they like getting their message out to as many people as possible…More views could generate more revenue, you know. And I think to the extent that, you know, some creators care about revenue, then, you know, they would also care about views.") Also, *Id.* at 79-80, ("in my personal opinion, I mean, again it's, you know -- you know, increases in views across, you know, a product tends to be correlated, you know, with an increase, you know, in -- in revenue.")

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
-53-

that users spend on YouTube per visit to reflect user satisfaction with the YouTube product.[117] I include the pages variable to proxy the effects of additional content.[118] I understand that this variable captures the number of unique pages visited. I also include various economic variables, a common approach in the network effects literature.[119] I estimate this equation using OLS regression, the results of which appear below.[120]

101.    The results of my econometric model conform to economic theory. The amount of time spent on YouTube shows a positive, economically significant and statistically significant relationship with revenues, as theory would predict.[121] This result also reflects YouTube's strategy of keeping users on its site for as long as possible, a common goal of revenue-maximizing publishers.[122] Because both the revenue and visits appear in logarithmic form in the model, we can interpret the coefficient as the percentage effect on revenues from a one percent change in the number of visits. In other words, a one percent increase in the amount of time spent on YouTube results in a 0.78 percent increase in revenues.

---

117.    Deposition of Amy Wu at 76 ("Counsel: And why does YouTube measure effectiveness of different changes within the Watch Next function of YouTube frequently on the basis of view time per visitor? Ms. Wu: Because it is an indication that the visitor or the user is more satisfied and happy with the product.").

118.    Semrush appears to define page as any individual landing page within a domain. So, "page" may refer to the main page for a channel or to a page within that channel that contains an individual video. See https://www.semrush.com/kb/975-traffic-analytics-top-landing-pages. See also Semrush Traffic Analytics for pages within YouTube at https://www.semrush.com/analytics/traffic/top-pages/youtube.com.

119.    Oliver Hinz, Thomas Otter & Bernd Skiera, *Estimating Network Effects in Two-Sided Markets*, 37(1) JOURNAL OF MANAGEMENT INFORMATION SYSTEMS 2-38, 27 (2020) ("To address this problem of endogeneity, we added various control variables on the market, industry and company levels that might also influence the acquisition of buyers and sellers and their decisions to leave the platform. On the market level, we controlled for the gross domestic product (GDP), which might influence both sides of the market. Further, to control for strong seasonal effects around Christmas, we included a variable that marks the Christmas trade season in the different years.").

120.    Results show heteroskedasticity-consistent (White) standard errors. Results using Huber-White (robust) standard errors do not alter the statistical significance of the variable of interest.

121.    Statistical significance denotes a probability of obtaining a result as large or larger (in absolute) terms, assuming that no effect exists. In other words, the probability of obtaining an effect that a 1% change in visits yields a 1.43% change in views, assuming no relationship existed between the two, is less than 0.0001 (one in ten thousand). A commonly-used cutoff for statistical significance is 0.05, or 5%.

122.    Michael Keenan, *How The YouTube Algorithm Works (+ Tips to Improve Your Reach)*, SHOPIFY, March 13, 2022, *available at* https://www.shopify.com/blog/youtube-algorithm.

102.   The model I estimate yields an $R^2$ of 93%, meaning that the model explains approximately 93 percent of the variation in the dependent variable (YouTube revenues). The F-score statistic indicates that the model explains significantly more variation in monthly revenues than using just the average revenue alone.

103.   Nonetheless, the total disgorgement calculation requires the separation of the time on YouTube attributable to the Infringing Content. I understand that plaintiffs have engaged another expert, Dr. Charles Cowan, to identify the members of the copyright infringement classes and estimate the number of videos on YouTube that have infringed the copyrights of members of those classes and provide a basis for assessing damages. When Dr. Cowan has calculated the number of unique URLs subject to recovery for each of the CI Classes, I can apply this same methodological framework and analysis to estimate the profits generated by the unique URLs subject to recovery for each of the CI Classes.

104.   As a proxy for purposes of this report, I have identified the number of unique URLs included in YouTube's takedown notice sample and have extrapolated that value across the relevant period[123] to arrive at 39,675,944 as the total estimated number of unique infringing URLs over the period from July 2017-October 2022. Based on an estimate of █ billion videos on the platform,[124] this proxy for Infringing Content videos represents ██████ of all videos. I further assume that such content is responsible for the same percentage of time that viewers spend on YouTube. Hence, I assume that this proxy for Infringing Content videos likewise accounts for ████ % of all viewer time spent on the platform.

---

123.   I performed this analysis as follows. After removing duplicate URLs, I calculated the average number of daily takedown requests in a given month. In months for which the sample included one of the days, I then multiplied that daily average by the number of days in the month to arrive at the monthly total. If the sample included no days in that month, then I calculated a predicted total. I estimated such a predicted value by regressing the monthly totals where data were available against a linear trend. As such I interpolated the missing data based on a trend analysis.

124.   Goodrow Dep. Tr. at 17:8-22. Mr. Goodrow testified that he did not know how many videos there are on YouTube, though he believed that the total lies between ███████████ billion.

105.    I selected this proxy for Infringing Content as the best available based on the data

that YouTube has provided. However, this proxy for Infringing Content underestimates Infringing

Content because counsel informs me that Defendants have destroyed takedown notice data and

have not quantified the amount of such destroyed and missing data that reflects Infringing Content.

I also understand that this proxy further underestimates Infringing Content because the Content ID

runs performed on Plaintiffs' copyrighted works reveal that Infringing Content exists on the

platform beyond that which has been identified and removed through a successful takedown. The

proxy overestimates Infringing Content because it includes takedown notices filed on behalf of

copyright claimants who are not members of either the Registered Works Infringement Class or

the Foreign Unregistered Works Infringement Class.

106.    For purposes of assessing statutory damages, Counsel for the putative Plaintiff

Class has also asked me to estimate the revenue attributable to all videos on the platform that

infringe copyrighted works, regardless of whether they have been identified and removed from the

platform through the takedown notice process. This disgorgement calculation requires the

separation of the time on YouTube attributable to the effects of infringing content generally, from

other content.

107.    Having no such data from YouTube, I investigated publicly available information

that could provide a reliable estimate. *Digital Music News*, cites estimates from Midia Research

that two percent of content on YouTube is infringing.[125] Another site, *Digital Trends*, suggests that

---

125. Paul Resnikoff, *99.5% of All Infringing Music Videos are Resolved by Content ID, YouTube Claims*, DIGITAL MUSIC NEWS, August 8, 2016, *available at* https://www.digitalmusicnews.com/2016/08/08/copyright-problems-resolved-content-id/# ("Most recently, Midia Research noted that just 2% of music video content on YouTube is actually infringing. The rest, about 98%, are not only completely authorized, about 75% of them are high-quality and supplied by the labels themselves through Vevo, according to the same dataset. So if the music industry is so irate about piracy and devaluation, why not simply rip their content down using Content ID? That remains a persistent question, though YouTube critics point to a constant game of cat-and-mouse fueled by the DMCA. In that familiar routine, a music video gets ripped down, only to appear minutes later, thanks to continued efforts of millions

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

-56-

six to ten percent of the content on YouTube may be infringing based on a study of popular videos.[126]

108.    Based on the low end of the estimates cited above, I provide calculations that assume that Infringing Content represents two to six percent of the content on YouTube. I further assume that such content is responsible for the same percentage of time that viewers spend on YouTube. For each of these estimates, I calculated YouTube's predicted revenues, assuming that the Infringing Content would not have been uploaded to YouTube.

TABLE 7: CALCULATION OF REVENUES SUBJECT TO DISGORGEMENT –
JULY 2017 THROUGH DECEMBER 2020

|  | Revenues | Damages |
|---|---|---|
| Actual | $50,720,411,716 | |
| Predicted (with smearing adjustment)[127] | $50,602,738,580 | |
| Predicted (2% Infringing) | $49,810,301,336 | $910,110,380 |
| Predicted (6% Infringing) | $48,214,695,505 | $2,505,716,211 |
| ████████████ | ██████████ | ████████ |

109.    Table 7 above captures the difference between actual YouTube advertising revenues and the revenues that it would have obtained absent the Infringing Content through December 2020. Likewise, Table 8 below captures the difference between actual YouTube advertising revenues and the revenues that it would have obtained absent the Infringing Content through September 2022. Because YouTube only provided data from January 2017 through December 2020, I did not have actual data to calculate this difference for subsequent periods.

---

of uploading users. YouTube is now disagreeing with those accusations by pointing to a highly functional Content ID system that prevents re-uploads, a counter-argument the music industry has yet to effectively rebut. And what about smaller content owners? That group, which includes many DMN readers, have pointed to a Content ID system that only caters to the biggest players, not the little guy. All of which means that indie and unsigned artists, ie., those with the fewest resources to combat piracy, are those most affected by YouTube's top-heavy, exclusionary policies around Content ID.").

126.  Geoff Duncan, Infringing Videos Not Big on YouTube?, DIGITAL TRENDS, April 5, 2007, *available at* https://www.digitaltrends.com/home/infringing-videos-not-big-on-youtube/.

127.  Naihua Duan, *Smearing Estimate: A Nonparametric Retransformation Method,* 78(383) Journal of the American Statistical Association, 605-610 (1983).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
-57-

Nonetheless, I have data for the independent variables, which do not rely on YouTube's production. I can use these publicly-obtained data in my regression model to predict monthly YouTube actual revenues and revenues "but-for" infringement for the period September 2022.

110.    To clarify, the predictions post-2020 represent out-of-sample forecasts. The regression uses the relationship between the dependent variable and the independent variables estimated during the four-year period that contains data for all such variables. It then applies that estimate to the actual, monthly values of the independent variables in 2021 and 2022 to predict YouTube revenues during the corresponding months.

TABLE 8: CALCULATION OF REVENUES SUBJECT TO DISGORGEMENT –
JULY 2017 THROUGH SEPTEMBER 2022

|  | Revenues | Damages |
|---|---|---|
| Predicted | $94,965,746,739 | |
| Predicted (2% Infringing) | $93,478,585,902 | $1,487,160,837 |
| Predicted (6% Infringing) | $90,484,125,464 | $4,481,621,275 |
| ███████████████ | ██████████ | ██████████ |

111.    As Tables 7 and 8 demonstrate, my model is flexible to alternative Infringing Content percentage inputs. If Google provides accurate Infringing Content metrics, I can recalculate disgorgement based on such figures. Further, my model can accommodate different monthly Infringing Content percentages, should such data change over time. Finally, my analysis permits apportionment to Class members in proportion to the total time viewers spent on videos that infringed on their content, views, or other possible metrics.

112.    Finally, to test the out-of-sample predictive accuracy of my econometric model, I compared the predicted revenues it generated to the actual revenues that YouTube reported in its financial statements for 2021 and the first two quarters of 2022. YouTube reported approximately $43.05 billion in revenues over these six quarters. My regression model, which is based on 2017-2020 data, predicts it would have garnered $41.38 billion over this same period. Thus, my model

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

-58-

predicts actual YouTube revenues with higher than 96 percent accuracy.[128] The predicted YouTube advertising revenues from my model represent a conservative estimate of disgorgement profits.[129]

## CONCLUSION

113.    In this report, I demonstrate that common methods and evidence can inform the disgorgement of YouTube profits from the presence of Infringing Content on its site. Such profits flow both from ads that YouTube serves on Infringing Content and through indirect network effects. The latter represent additional attention that such Infringing Content generates, which allows YouTube to gain additional attention and increase its revenues from ads served on non-infringing content.

114.    The methodology I use in this report follows similar approaches commonly employed in the literature. I recognize the limited YouTube data available, and I have mitigated empirical limitations from the lack of data production from Google by pursuing additional sources of public data for completeness. With access to more YouTube data, I could perform a more granular and detailed analysis. I understand that Google maintains granular data at the channel level, which enable it to determine the share of revenues that each content provider receives. Such detailed data could permit the same type of detailed analysis that Google researchers can perform themselves.

115.    The public data to which I have purchased subscription access enabled me to reliably estimate the model I present in this report. The model results show an economically and

---

128.    See HJS Report Figures and Tables – 11-17-2022.xlsx, tab "10-Q data".

129.    To the extent that the revenue data relied upon reflect what Defendants have termed "Net Ad Revenue" for YouTube as defined in the YouTube Publishing License Agreement, GOOG-SCHNDR-00002434, these data may underestimate the gross revenues received by all Defendants. As stated in GOOG-SCHNDR-00002434, "For the avoidance of doubt, Net Ad Revenues do not include (a) third party buyer-side advertising fees." Counsel informs me that Google's charges to advertisers for use of its ad buying tools to purchase ads on the YouTube platform constitute either direct or indirect revenues received by YouTube that would be attributable to the copyright infringement and recoverable in this action.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
-59-

statistically significant relationship between YouTube advertising revenues and time spent on the site, indicating that additional time on site that Infringing Content generated yielded pecuniary benefits to YouTube.

116.    Apportionment of any disgorgement can occur on a formulaic basis. Google already determines ad revenue for each channel and video where such ad serving occurred, as it must share such revenues with content providers. YouTube revenues obtained thorough indirect network effects that resulted from Infringing Content can be distributed to each class member in proportion to various engagement metrics, including time on site. This approach is consistent with the results of my regression model.

Respectfully Submitted This Day of November 17, 2022,

_____

Hal J. Singer, Ph.D.

CONFIDENTIAL

APPENDIX A: MATERIALS RELIED UPON

**BATES DOCUMENTS**

    GOOG-SCHNDR-00054422

    GOOG-SCHNDR-00002434

**DEPOSITIONS**

    Deposition of Amy Wu

**LEGAL DOCUMENTS**

    *17 U.S.C. § 504(c)(1)*

    *Cung Le et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship,* Minute Entry, 2:15-cv-01045-RFB-BNW (D. Nev. Dec. 10, 2020), ECF No. 781

    *In re Delta/AirTran Baggage Fee Antitrust Litig., 317 F.R.D. 665 (N.D. Ga. 2016)*

    *In re Lidoderm Antitrust Litig., No. 12-md-02521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017)*

    *In Re: JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation, Case No. 19-md-02913-WHO (N.D. Cal., Jun. 28, 2022)*

    *In Re: MacBook Keyboard Litigation, Case No. 5:18-cv-02813-EJD, 2021 WL 1250378 (N.D. Cal., Mar. 8, 2021)*

    *Johnson v. Arizona Hosp. and Healthcare Assoc. No. CV 07-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz. July 14, 2009)*

    *Klein v. Facebook, Inc., No. 20-cv-08570-LHK (N.D. Cal. Jan. 14, 2022)*

CONFIDENTIAL

-61-

*Meijer, Inc. v. Abbott Laboratories*, No. C 07-5985 CW, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008)

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intl., Ltd.*, 262 F.R.D. 58 (D. Mass. 2008)

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018)

*Sony Computer Entm't Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068, 1074–75 (N.D. Cal. 2005)

*Southeast Missouri Hospital and St. Francis Medical Center v. C.R. Bard*, No. 1:07cv0031 TCM, 2008 WL 4372741 (E.D. Mo. Sept. 22, 2008)

*Times-Picayune Pub. Co. v. United States*, 345 U.S. 594 (1953)

*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012)

## LITERATURE

Arthur Lewbel, *The Identification Zoo: Meanings of Identification in Econometrics*, 57(4) Journal of Economic Literature 835-903 (2019), *available at* https://pubs.aeaweb.org/doi/pdfplus/10.1257/jel.20181361

Arnold Zellner, *An Efficient Method of Estimating Seemingly Unrelated Regressions and Tests for Aggregation Bias*, Journal of the American Statistical Association,57(298) (1962), 348-368.

Peter Kennedy, A Guide to Econometrics, 4th Ed., MIT Press, 1998.

Sebastian Voigt and Olivier Hinz, *Network effects in two-sided markets: why a 50/50 user split is not necessarily revenue optimal*, Business Research, 8, (2015), 139-170 at 159-151.

Oliver Hinz, Thomas Otter & Bernd Skiera, *Estimating Network Effects in Two-Sided Markets*, Journal of Management Information Systems, 37(1), (2020), 12-38

CONFIDENTIAL

Benjamin Klein, Andres V. Lerner, Kevin M. Murphy and Lacey L. Plache, *Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees*, 73(3) Antitrust Law Journal 571-626 (2006)

Bodo Herzog, *Valuation of Digital Platforms: Experimental Evidence for Google and Facebook*, 6(4) International Journal of Financial Studies (2018), *available at* https://www.mdpi.com/2227-7072/6/4/87/pdf?version=1539747767

David Evans and Richard Schmalensee. *The Industrial Organization of Markets with Two-Sided Platforms,* NBER Working Paper, Working Paper 11603, September 2005

David S. Evans and Richard Schmalensee, *The Antitrust Analysis of Multisided Platform Businesses*, in 1 The Oxford Handbook of International Antitrust Economics 404 (Roger Blair and D. Daniel Sokol, eds. Oxford Univ. Press, 2015)

David S. Evans and Richard Schmalensee, *The Industrial Organization of Markets with Two-Sided Platforms*, 3(1) Competition Policy International 151 (Spring 2007)

Howard Shelanski, Samantha Knox and Arif Dhilla, *Network Effects and Efficiencies in Multisided Markets*, submitted for Item 8 at the 127th meeting of OECD Competition Committee on 21-23 June 2017, *available at* https://one.oecd.org/document/DAF/COMP/WD(2017)40/FINAL/en/pdf

Jean-Charles Rochet and Jean Tirole, *Platform Competition in Two-Sided Markets,* 1(4) Journal of the European Economic Association 990–1029 (2003)

Jouni Kerman, Peng Wang, and Jon Vaver, *Estimating Ad Effectiveness using Geo Experiments in a Time-Based Regression Framework,* Google, March 2017, *available at* https://static.googleusercontent.com/media/research.google.com/en//pubs/archive/45950.pdf

Lapo Filistrucchi, Damien Geradin, Eric van Damme, Pauline Affeldt, *Market Definition in Two-Sided Markets: Theory and Practice,* 10(2) Journal of Competition Law and Economics 293-339 (2014)

CONFIDENTIAL

-63-

Marc Rysman, *Competition Between Networks: A Study of the Market for Yellow Pages*, 71 Review of Economic Studies 483-512 (2004)

Marc Rysman, *The Economics of Two-Sided Markets*, 23(4) Journal of Economic Perspectives 125-143 (2009)

Michael L. Katz and Carl Shapiro, *Network Externalities, Competition, and Compatibility*, 75(3) American Economic Review 424-440 (1985)

Naihua Duan, *Smearing Estimate: A Nonparametric Retransformation Method,* 78(383) Journal of the American Statistical Association, 605-610 (1983)

S.J. Liebowitz & Stephen Margolis, *Network Externalities (Effects)*, in The New Palgrave's Dictionary of Economics and the Law (MacMillan, 1998)

S.J. Liebowitz and Stephen E Margolis, *Network Externality: An Uncommon Tragedy*, 8(2) Journal of Economic Perspectives 133-150 (1994)

Shiyu Yang, Dominique Brossard, Dietram A. Scheufele, and Michael A. Xenos, *The science of YouTube: What factors influence user engagement with online science videos?*, 17(5) PLoS ONE (2022)

Simon P. Anderson and Bruno Jullien, *The advertising-financed business model in two-sided media markets*, in 1 Handbook of Media Economics 41-90 (Elsevier 2015)

## PUBLICLY AVAILABLE MATERIALS

*Alphabet Inc (GOOG) (GOOGL) Q4 2019 Earnings Call Transcript*, The Motley Fool, Feb. 3, 2020, *available at* https://www.fool.com/earnings/call-transcripts/2020/02/03/alphabet-inc-goog-googl-q4-2019-earnings-call-tran.aspx?awc=12195_1659300481_165a41071357b32aeb117cb69d0ef02a&campaign=143466&pc_source=TheMotleyFool_Awin&utm_source=aw&utm_campaign=143466

Amanda Milligan, *Three strategies for elevating brand authority in 2021*, TechCrunch, Feb. 19, 2021, *available at* https://techcrunch.com/2021/02/19/how-to-elevate-brand-authority-in-2021/

Amir M. Bohlooli, *How Much Does YouTube Pay Per View?,* Make Use Of, Apr. 2, 2022, *available at* https://www.makeuseof.com/how-much-does-youtube-pay-per-view/

Andes Lerner, *The Economics of Network Effects and User Data in the Provision of Search, Search Advertising, and Display Ad Intermediation*, Google Submission 3 to Australian Competition & Consumer Commission, May 15, 2019, *available at* https://www.accc.gov.au/system/files/Google%20Submission%203%20%28May%202019%29.pdf

Andrew Bindelglass, *YouTube Going Freemium*, Oct. 23, 2015, *available at* https://www.techzone360.com/topics/techzone/articles/2015/10/23/411881-youtube-going-freemium.htm

Andrew Hutchinson, *YouTube Generated $28.8 Billion in Ad Revenue in 2021, Fueling the Creator Economy*, Social Media Today, Feb. 2, 2022, *available at* https://www.socialmediatoday.com/news/youtube-generated-288-billion-in-ad-revenue-in-2021-fueling-the-creator/618208/#:~:text=YouTube%20does%20share%2055%25%20of,cut%20than%2055%25%20of%20its

Andrew Hutchinson, *YouTube Will Start Inserting Ads into Non-Monetized Content, Updated Rules Around Facial Recognition,* Social Media Today, Nov. 18, 2020, *available at* https://www.socialmediatoday.com/news/youtube-will-start-inserting-ads-into-non-monetized-content-updates-rules/589310/

Aric Jenkins, *Google Is Breaking Up YouTube Red Into 2 New Subscription Services For Music and Video*, Fortune, May 17, 2018, *available at* https://fortune.com/2018/05/17/youtube-red-youtube-music-youtube-premium-google/

Associated Press, *Google buys YouTube for $1.65 billion,* NBC News, Oct. 9, 2006, *available at* https://www.nbcnews.com/id/wbna15196982

CONFIDENTIAL

-65-

Comscore Press Release, *Comscore Releases July 2011 U.S. Online Video Rankings - Comscore Announces Availability of New YouTube Partner Reporting*, August 22, 2011, *available at* https://www.comscore.com/Insights/Press-Releases/2011/8/comScore-Releases-July-2011-US-Online-Video-Rankings

Comscore, *Comscore Introduces YouTube Partner Reporting in Video Metrix*, Comscore Blog, August 22, 2011, *available at* https://www.comscore.com/Insights/Blog/comScore-Introduces-YouTube-Partner-Reporting-in-Video-Metrix

Comscore, *YouTube Partner Reporting, Comscore Video Metrix, archived at* https://web.archive.org/web/20111230055935/http://www.videometrix2.com/YouTube.html

Crisp, *Why Bulk Uploading is a Bad Video Marketing Strategy, available at* https://crisp.co/bulk-uploading-bad-video-marketing-strategy/

Diya Jolly, *Making YouTube Better in a Mobile, Cross-Screen World*, Google Ads & Commerce Blog, Jan. 20, 2017, *available at* https://www.blog.google/products/ads/making-youtube-better-in-mobile-cross/

Domenica D'Ottavio, *2021 Data-Backed Digital Marketing Predictions, available at* https://www.frac.tl/2021-data-backed-digital-marketing-predictions/

Eugene Levin, *Volume Update! Why Semrush Search Volume Is the Most Accurate on the Market (Study)*, Semrush Jun. 22, 2022, *available at* https://www.semrush.com/blog/us-search-volume-update/

Geoff Duncan, *Infringing Videos Not Big on YouTube?,* DigitalTrends, April 5, 2007, *available at* https://www.digitaltrends.com/home/infringing-videos-not-big-on-youtube/

Georg M. Goerg, Christoph Best, Sheethal Shobowale, Nicolas Remy, Jim Koehler, *Advertising on YouTube and TV: A Meta-analysis of Optimal Media-mix Planning*, Google, Inc., Dec. 3, 2015, *available at* https://static.googleusercontent.com/media/research.google.com/en//pubs/archive/44291.pdf

*Google 10-K, available at*
https://www.sec.gov/Archives/edgar/data/1652044/000165204422000019/goog-20211231.htm


Google Ads Help, *Impressions: Definition, available at*
https://support.google.com/google-ads/answer/6320?hl=en


Google Ads, *Bring your story to life with Video ads, available at*
https://ads.google.com/home/campaigns/video-ads/


*Google Privacy & Terms, available at* https://policies.google.com/privacy?hl=en-US#infocollect


Google, *Criteria for YouTube partnership, archived at*
https://web.archive.org/web/20130925035130/https://support.google.com/youtube/answer/828
39?hl=en&ref_topic=14965#


Google, *YouTube Partner Program overview, archived at*
https://web.archive.org/web/20180307021520/https://support.google.com/youtube/answer/728
51?hl=en


https://www.cohenmilstein.com/sites/default/files/New%20York%20v%20Facebook%
20-%20Economists%20Amicus%20-%20Filed%2001282022.pdf


Ivy Wigmore, *TrueView ads,* Tech Target, updated Sep. 2012, *available at*
https://www.techtarget.com/whatis/definition/TrueView-Ad


Jami Oetting, *YouTube Ads for Beginners: How to Launch & Optimize a YouTube Video Advertising Campaign*, HubSpot, updated Apr. 20, 2022, *available at*
https://blog.hubspot.com/marketing/youtube-video-advertising-guide


Julia Alexander, *YouTube videos keep getting longer*, The Verge, July 26, 2019, *available at* https://www.theverge.com/2019/7/26/8888003/youtube-video-length-contrapoints-lindsay-ellis-shelby-church-ad-revenue

Matt Leske, *Meet YouTube Red, the ultimate YouTube experience,* YouTube Official Blog, October 21, 2015, *available at* https://blog.youtube/news-and-events/red/

Michael Keenan, *How The YouTube Algorithm Works (+ Tips to Improve Your Reach),* Shopify, March 13, 2022, *available at* https://www.shopify.com/blog/youtube-algorithm

Morgan Stanley, *YouTube may be Google's next $20b revenue business*, May 15, 2013

Nicholas Jackson, *Infographic: The History of Video Advertising on YouTube,* The Atlantic, August 3, 2011, *available at* https://www.theatlantic.com/technology/archive/2011/08/infographic-the-history-of-video-advertising-on-youtube/242836/

OECD, *Rethinking Antitrust Tools for Multi-Sided Platforms,* Apr. 6, 2018, *available at* www.oecd.org/competition/rethinking-antitrust-tools-for-multi-sided-platforms.htm

Patrick van Kessel, Skye Toor, and Aaron Smith, *A Week in the Life of Popular YouTube Channels,* Pew Research Center, July 25, 2019, *available at* https://www.pewresearch.org/internet/2019/07/25/a-week-in-the-life-of-popular-youtube-channels/

Paul Resnikoff, *99.5% of All Infringing Music Videos are Resolved by Content ID, YouTube Claims*, Digital Music News, August 8, 2016, *available at* https://www.digitalmusicnews.com/2016/08/08/copyright-problems-resolved-content-id/#

Ryan Lynch, *Why Google Felt Lucky At FTC,* Forbes, March 31, 2016, *available at* https://www.forbes.com/sites/mergermarket/2015/03/31/why-google-felt-lucky-at-ftc/?sh=37b41bab3c44

Seeking Alpha, *Alphabet , Inc. Ci C (GOOG) CEO Sundar Pichai On Q4 2018 Results - Earnings Call Transcript,* Feb. 4, 2019, *available at* https://seekingalpha.com/article/4238032-alphabet-inc-cl-c-goog-ceo-sundar-pichai-on-q4-2018-results-earnings-call-transcript

Semrush, *Our message, available at* https://www.semrush.com/company/

SimilarWeb, *Top Websites Ranking, available at* https://www.similarweb.com/top-websites/

Statista, *Most effective advertising formats on YouTube according to marketing professionals worldwide as of May 2019*, released Mar. 2020, *available at* https://www.statista.com/statistics/1102764/effective-youtube-ad-formats-world/

Todd Spangler, *YouTube Launches 'Music Key' Subscription Service with More Than 30 Million Songs,* Variety, Nov. 12, 2014, *available at* https://variety.com/2014/digital/news/youtube-launches-music-key-subscription-service-with-more-than-30-million-songs-1201354498/

Todd Spangler, *YouTube Tops 2 Million Creators in Ad-Revenue Sharing Program, Variety*, Aug. 23, 2021, *available at* https://variety.com/2021/digital/news/youtube-partner-program-2-million-creators-1235045674/

Vann Vicente, *What Is YouTube Premium, and Is It Worth It?,* How-To Geek, Mar. 9, 2020, *available at* https://www.howtogeek.com/659597/what-is-youtube-premium-and-is-it-worth-it/

Werner Geyser, *How Much do YouTubers Make? – A YouTuber's Pocket Guide [Calculator]*, Influencer Marketing Hub, June 2, 2022 *available at* https://influencermarketinghub.com/how-much-do-youtubers-make/

YouTube Advertising, *Reach your customers – and discover new ones, available at* https://www.youtube.com/intl/en_us/ads/how-it-works/set-up-a-campaign/audience/

YouTube Help, *About targeting for Video campaigns*, *available at* https://support.google.com/youtube/answer/2454017?hl=en

YouTube Help, *About video ad formats*, accessed Jun. 28, 2022, *available at* https://support.google.com/youtube/answer/2375464?hl=en

YouTube Help, *Embed videos & playlists*, *available at* https://support.google.com/youtube/answer/171780?hl=en

YouTube Help, *YouTube advertising formats*, *available at* https://support.google.com/youtube/answer/2467968?hl=en

YouTube Help, *YouTube partner earnings overview*, accessed Jun. 28, 2022, *available at* https://support.google.com/youtube/answer/72902?hl=en#zippy=%2Chow-do-i-earn-revenue%2Cwhats-my-revenue-share%2Chow-can-i-get-paid%2Cwhen-can-i-get-paid

YouTube Help, *YouTube Partner Program overview & eligibility*, *available at* https://support.google.com/youtube/answer/72851?hl=en

YouTube, *How does YouTube make money?*, *available at* https://www.youtube.com/howyoutubeworks/our-commitments/sharing-revenue/

YouTube, *YouTube Music Key*, archived Feb. 1, 2015, *available at* https://web.archive.org/web/20141113030240/http://www.youtube.com/musickey

YouTube, *YouTube Premium*, accessed Jun. 28, 2022, *available at* https://www.youtube.com/premium

## TRIAL DOCUMENTS

First Amended Class Action Complaint, Dkt. 99

CONFIDENTIAL
-70-

## APPENDIX B: CURRICULUM VITAE



**Hal J. Singer**

> Econ One Research
>
> Suite 510 805 15th St., N.W.
> Washington, D.C. 20005
> Phone: 202.312.3065
>
> hsinger@econone.com

**Education**

> Ph.D., The John Hopkins University, 1999; M.A. 1996, Economics
>
> B.S., Tulane University, *magna cum laude*, 1994, Economics. Dean's Honor Scholar (full academic scholarship). Senior Scholar Prize in Economics.

**Current Positions**

> ECON ONE, Washington, D.C.: Managing Director 2018-present.
>
> UNIVERSITY OF UTAH, Adjunct Professor of Economics
>
> GEORGETOWN UNIVERSITY, MCDONOUGH SCHOOL OF BUSINESS, Washington, D.C.: Adjunct Professor 2010, 2014, 2016, 2018, 2019, 2020, 2021, 2022.
>
> GEORGE WASHINGTON UNIVERSITY, SCHOOL OF PUBLIC POLICY, GEORGE WASHINGTON INSTITUTE FOR PUBLIC POLICY, Washington, D.C.: Senior Fellow 2016-present.

**Employment History**

> ECONOMISTS INCORPORATED, Washington, D.C.: Principal 2014-2018.
>
> NAVIGANT ECONOMICS, Washington, D.C.: Managing Director, 2010-2013.
>
> EMPIRIS, L.L.C., Washington, D.C.: Managing Partner and President, 2008-2010.
>
> CRITERION ECONOMICS, L.L.C., Washington, D.C.: President, 2004-2008. Senior Vice President, 1999-2004.
>
> LECG, INC., Washington, D.C.: Senior Economist, 1998-1999.

CONFIDENTIAL

U.S. SECURITIES AND EXCHANGE COMMISSION, OFFICE OF ECONOMIC ANALYSIS, Washington, D.C.: Staff Economist, 1997-1998.

THE JOHNS HOPKINS UNIVERSITY, ECONOMICS DEPARTMENT, Baltimore: Teaching Assistant, 1996-1998.

**Honors**

Honoree, Outstanding Antitrust Litigation Achievement in Economics, American Antitrust Institute, *In re Lidoderm Antitrust Litigation,* Oct. 9, 2018.

Finalist, Outstanding Antitrust Litigation Achievement in Economics, American Antitrust Institute, *Tennis Channel v. Comcast*, Dec. 4, 2013.

**Authored Books and Book Chapters**

*Do Municipal Broadband Networks Stimulate or Crowd Out Private Investment? An Empirical Analysis of Employment Effects*, in THE IMPACT OF THE INTERNET ON JOBS (Lorenzo Pupillo, ed. Palgrave 2017).

THE NEED FOR SPEED: A NEW FRAMEWORK FOR TELECOMMUNICATIONS POLICY FOR THE 21ST CENTURY, co-authored with Robert Litan (Brookings Press 2013).

*Net Neutrality Is Bad Broadband Regulation*, co-authored with Robert Litan, in THE ECONOMISTS' VOICE 2.0: THE FINANCIAL CRISIS, HEALTH CARE REFORM AND MORE (Aaron Edlin and Joseph Stiglitz, eds., Columbia University Press 2012).

*Valuing Life Settlements as a Real Option*, co-authored with Joseph R. Mason, in LONGEVITY TRADING AND LIFE SETTLEMENTS (Vishaal Bhuyan ed., John Wiley & Sons 2009).

*An Antitrust Analysis of the World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, co-authored with J. Gregory Sidak, in HANDBOOK OF TRANS-ATLANTIC ANTITRUST (Philip Marsden, ed. Edward Elgar 2006).

BROADBAND IN EUROPE: HOW BRUSSELS CAN WIRE THE INFORMATION SOCIETY, co-authored with Dan Maldoom, Richard Marsden and J. Gregory Sidak (Kluwer/Springer Press 2005).

*Are Vertically Integrated DSL Providers Squeezing Unaffiliated ISPs (and Should We Care)?*, co-authored with Robert W. Crandall, in ACCESS PRICING: THEORY, PRACTICE AND EMPIRICAL EVIDENCE (Justus Haucap and Ralf Dewenter eds., Elsevier Press 2005).

CONFIDENTIAL

## Journal Articles

*Alston v NCAA: lessons American college athletics can offer about concentration and monopsony power in labour markets*, JOURNAL OF ANTITRUST ENFORCEMENT (2022), co-authored with Ted Tatos.

*The Abuse of Offsets as Procompetitive Justifications: Restoring the Proper Role of Efficiencies After Ohio v. American Express and NCAA v. Alston*, GEORGIA STATE LAW REVIEW (2022), co-authored with Ted Tatos.

*Antitrust Anachronism: The Interracial Wealth Transfer in Collegiate Athletics Under the Consumer Welfare Standard,* ANTITRUST BULLETIN (2021), co-authored with Ted Tatos.

*Competing Approaches to Antitrust: An Application in the Payment Card Industry,* 27(3) GEORGE MASON LAW REVIEW (2020), co-authored with Kevin Caves.

*Understanding the Economics in the Dispute Between the Writers' Guild of America and the Big Four Talent Agencies,* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2020), co-authored with Ted Tatos.

*Antitrust Out of Focus: The FTC's Myopic Pursuit of 1-800 Contacts' Trademark Settlements,* ANTITRUST SOURCE (2019), co-authored with Geoff Manne and Josh Wright.

*Countervailing Coordination Rights in the News Sector Are Good for the Public (A Response to Professor Yun),* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2019), co-authored with Sanjukta Paul.

*When the Econometrician Shrugged: Identifying and Plugging Gaps in the Consumer Welfare Standard,* 26 GEORGE MASON LAW REVIEW (2019), co-authored with Kevin Caves.

*Applied Econometrics: When Can an Omitted Variable Invalidate a Regression?,* ANTITRUST SOURCE (2017), co-authored with Kevin Caves.

*Paid Prioritization and Zero Rating: Why Antitrust Cannot Reach the Part of Net Neutrality Everyone Is Concerned About,* ANTITRUST SOURCE (2017).

*The Curious Absence of Economic Analysis at the Federal Communications Commission: An Agency in Search of a Mission,* INTERNATIONAL JOURNAL OF COMMUNICATIONS (2017), co-authored with Gerald Faulhaber and Augustus Urschel.

*On the Utility of Surrogates for Rule of Reason Cases,* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2015), co-authored with Kevin Caves.

*Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,"* ANTITRUST SOURCE (2015), co-authored with Kevin Caves.

*Econometric Tests for Analyzing Common Impact,* 26 RESEARCH IN LAW AND ECONOMICS (2014), co-authored with Kevin Caves.

*Life After Comcast: The Economist's Obligation to Decompose Damages Across Theories of Harm,* ANTITRUST (Spring 2014), co-authored with Kevin Caves.

*Is the U.S. Government's Internet Policy Broken?*, 5 POLICY AND INTERNET (2013), co-authored with Robert Hahn.

*Avoiding Rent-Seeking in Secondary Market Spectrum Transactions*, 65 FEDERAL COMMUNICATIONS LAW JOURNAL (2013), co-authored with Jeffrey Eisenach.

*Vertical Integration in Multichannel Television Markets: A Study of Regional Sports Networks*, 12(1) REVIEW OF NETWORK ECONOMICS (2013), co-authored with Kevin Caves and Chris Holt.

*Assessing Bundled and Share-Based Loyalty Rebates: Application to the Pharmaceutical Industry*, 8(4) JOURNAL OF COMPETITION LAW AND ECONOMICS (2012), co-authored with Kevin Caves.

*Lessons from Kahneman's Thinking Fast and Slow: Does Behavioral Economics Have a Role in Antitrust Analysis?*, ANTITRUST SOURCE (2012), co-authored with Andrew Card.

*Assessing Competition in U.S. Wireless Markets: Review of the FCC's Competition Reports*, 64 FEDERAL COMMUNICATIONS LAW JOURNAL (2012), co-authored with Gerald Faulhaber and Robert Hahn.

*An Empirical Analysis of Aftermarket Transactions by Hospitals*, 28 JOURNAL OF CONTEMPORARY HEALTH LAW AND POLICY (2011), co-authored with Robert Litan and Anna Birkenbach.

*Economic Evidence of Common Impact for Class Certification in Antitrust Cases: A Two-Step Analysis*, ANTITRUST (Summer 2011).

*Addressing the Next Wave of Internet Regulation: Toward a Workable Principle for Nondiscrimination*, 4 REGULATION & GOVERNANCE (2010), co-authored with Robert Hahn and Robert Litan.

CONFIDENTIAL

-74-

*Class Certification in Antitrust Cases: An Economic Framework*, 17 GEORGE MASON LAW REVIEW (2010), co-authored with Robert Kulick.

*The Economic Impact of Eliminating Preemption of State Consumer Protection Laws*, 12 UNIVERSITY OF PENNSYLVANIA JOURNAL OF BUSINESS LAW 781 (2010), co-authored with Joseph R. Mason and Robert B. Kulick.

*Net Neutrality Is Bad Broadband Regulation*, THE ECONOMISTS' VOICE, Sept. 2010, co-authored with Robert Litan.

*Why the iPhone Won't Last Forever and What the Government Should Do to Promote its Successor*, 8 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECHNOLOGY LAW 313 (2010), co-authored with Robert W. Hahn.

*What Does an Economist Have to Say About the Calculation of Reasonable Royalties?*, 14 INTELLECTUAL PROPERTY LAW BULLETIN 7 (2010), co-authored with Kyle Smith.

*Is Greater Price Transparency Needed in the Medical Device Industry?*, HEALTH AFFAIRS (2008), co-authored with Robert W. Hahn and Keith Klovers.

*Evaluating Market Power with Two-Sided Demand and Preemptive Offers to Dissipate Monopoly Rent*, 4 JOURNAL OF COMPETITION LAW & ECONOMICS (2008), co-authored with J. Gregory Sidak.

*Assessing Bias in Patent Infringement Cases: A Review of International Trade Commission Decisions*, 21 HARVARD JOURNAL OF LAW AND TECHNOLOGY (2008), co-authored with Robert W. Hahn.

*The Effect of Incumbent Bidding in Set-Aside Auctions: An Analysis of Prices in the Closed and Open Segments of FCC Auction 35*, 32 TELECOMMUNICATIONS POLICY JOURNAL (2008), co-authored with Peter Cramton and Allan Ingraham.

*A Real-Option Approach to Valuing Life Settlement Transactions*, 23 JOURNAL OF FINANCIAL TRANSFORMATION (2008), co-authored with Joseph R. Mason.

*The Economics of Wireless Net Neutrality*, 3 JOURNAL OF COMPETITION LAW AND ECONOMICS 399 (2007), co-authored with Robert W. Hahn and Robert E Litan.

*Vertical Foreclosure in Video Programming Markets: Implication for Cable Operators*, 3 REVIEW OF NETWORK ECONOMICS 348 (2007), co-authored with J. Gregory Sidak.

CONFIDENTIAL

*The Unintended Consequences of Net Neutrality*, 5 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECH LAW 533 (2007), co-authored with Robert E. Litan.

*Does Video Delivered Over a Telephone Network Require a Cable Franchise?*, 59 FEDERAL COMMUNICATIONS LAW JOURNAL 251 (2007), co-authored with Robert W. Crandall and J. Gregory Sidak.

*The Competitive Effects of a Cable Television Operator's Refusal to Carry DSL Advertising*, 2 JOURNAL OF COMPETITION LAW AND ECONOMICS 301 (2006).

*Uberregulation without Economics: The World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, 57 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2004), co-authored with J. Gregory Sidak.

*The Secondary Market for Life Insurance Policies: Uncovering Life Insurance's "Hidden" Value*, 6 MARQUETTE ELDER'S ADVISOR 95 (2004), co-authored with Neil A. Doherty and Brian A. O'Dea.

*Do Unbundling Policies Discourage CLEC Facilities-Based Investment?*, 4 TOPICS IN ECONOMIC ANALYSIS AND POLICY (2004), co-authored with Robert W. Crandall and Allan T. Ingraham.

*Foreign Investment Restrictions as Industrial Policy*, 3 CANADIAN JOURNAL OF LAW AND TECHNOLOGY 19 (2004), co- authored with Robert W. Crandall.

*Regulating the Secondary Market for Life Insurance Policies*, 21 JOURNAL OF INSURANCE REGULATION 63 (2003), co- authored with Neil A. Doherty.

*Interim Pricing of Local Loop Unbundling in Ireland: Epilogue*, 4 JOURNAL OF NETWORK INDUSTRIES 119 (2003), co-authored with J. Gregory Sidak.

*The Benefits of a Secondary Market for Life Insurance*, 38 REAL PROPERTY, PROBATE AND TRUST JOURNAL 449 (2003), co- authored with Neil A. Doherty.

*The Empirical Case Against Asymmetric Regulation of Broadband Internet Access*, 17 BERKELEY TECHNOLOGY LAW JOURNAL 954 (2002), co-authored with Robert W. Crandall and J. Gregory Sidak.

*How Can Regulators Set Nonarbitrary Interim Rates? The Case of Local Loop Unbundling in Ireland*, 3 JOURNAL OF NETWORK INDUSTRIES 273 (2002), co-authored with J. Gregory Sidak.

CONFIDENTIAL

*Vertical Foreclosure in Broadband Access*, 49 JOURNAL OF INDUSTRIAL ECONOMICS (2001) 299, co-authored with Daniel L. Rubinfeld.

*Open Access to Broadband Networks: A Case Study of the AOL/Time Warner Merger*, 16 BERKELEY TECHNOLOGY LAW JOURNAL 640 (2001), co-authored with Daniel L. Rubinfeld.

*Cable Modems and DSL: Broadband Internet Access for Residential Customers*, 91 AMERICAN ECONOMICS ASSOCIATION PAPERS AND PROCEEDINGS 302 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Residential Demand for Broadband Telecommunications and Consumer Access to Unaffiliated Internet Content Providers*, 18 YALE JOURNAL ON REGULATION 1 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Determining the Source of Inter-License Synergies in Two-Way Paging Networks*, 18 JOURNAL OF REGULATORY ECONOMICS 59 (2000).

*A General Framework for Competitive Analysis in the Wireless Industry*, 50 HASTINGS LAW REVIEW 1639 (2000), co- authored with J. Gregory Sidak and David Teece.

*Capital Raising in Offshore Markets*, 23 JOURNAL OF BUSINESS AND FINANCE 1181 (1999), co-authored with Ian Gray and Reena Aggarwal.

## Expert Testimony Since 2012

Fusion Elite All Stars et al v. Varsity Brands, LLC et al, Case No. 2:20-CV-03390 (SHL-tmp) (W.D. Tenn.)

In Re: Pork Antitrust Litigation, Case No. 0:18-cv-01776 (JRT-HB) (D. Minn.)

(Im)Balance of Power: How Market Concentration Affects Worker Compensation and Consumer Prices (U.S. House  Committee on Economic Disparity and Fairness in Growth)

In re Google Play Consumer Antitrust Litigation, Case No. 3:20-cv-05761-JD (N.D. Cal)

Reviving Competition, Part 1: Proposals to Address Gatekeeper Power and Lower Barriers to Entry Online (U.S. House of Representatives Subcommittee on Antitrust)

Breaking the News – Journalism, Competition, and the Effects of Market Power

CONFIDENTIAL

on a Free Press (U.S. Senate Subcommittee on Competition Policy)

In Re: London Silver Fixing, Ltd. Antitrust Litigation, Case No. 1:14-md-02573-VEC (S.D. N.Y.)

In Re: JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation, Case No. 19-md-02913-WHO (N.D. Ca.)

Paul Weidman et. al v. Ford Motor Company, Case No. 18-cv-12719 (E.D. Mich.)

Leinani Deslandes et al v. McDonald's USA, LLC, Case No. 17-cv-04857 (N.D. IL)

In Re: Macbook Keyboard Litigation, Case No.: 5:18-cv-02813-EJD (N.D. Ca.)

Estate of Beverly Berland v. Lavastone Capital LLC, Case No. 1:18-cv-02002-CFC (D. Del.)

Donald Conrad et al. v. Jimmy John's Franchise LLC, et al., No. 3:18-cv-00133-NJR (S.D. Ill.)

Zydus Pharmaceuticals Inc. and Cadila Healthcare Limited v. Takeda Pharmaceutical Company Limited et al., No. 18-01994 (FLW)(TJB) (D. N.J.)

In Re GSE Bonds Antitrust Litigation, No. 1:19-cv-01704-JSR (S.D. N.Y.)

beIN Sports, LLC v. Comcast Cable Communications, LLC, File No. CSR-8972-P (FCC)

Chelsea Jensen, et al. v. Samsung Electronics et al., Court File No. T-809-18 (Federal Court in Canada)

Estate of Phyllis Malkin v. Wells Fargo Bank, N.A., No. 17-cv-23136 (S.D. Fl.)

In Re Capacitors Antitrust Litigation, Master File No. 3:14-cv-03264-JD (N.D. Ca.)

In re Foreign Exchange Benchmark Rates Antitrust Litigation, Case No. 1:13-cv-07789-LGS (S.D. N.Y.)

Massachusetts Technology Park Corporation v. Axia Netmedia Corporation, KCST USA, Inc., No. 01-17-0004-3049 (American Arbitration Association)

Cung Le et al. v. Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, Case No.: 2:15-cv-01045-RFB-(PAL) (D. Nev.)

The Ohio State University v. New Par D/B/A Verizon Wireless, Case No. 2:15-cv-2866 (S.D. Oh.)

Authenticom, Inc. v. CDK Global, LLL; and The Reynolds And Reynolds Company, Case No. 17-cv-318 (W.D. Wis.)

Manmohan Dhillon et al. v. Anheuser-Busch, LLC et al. Case No. 14CECG03039 MBS (Cal. Fresno)

In re Lidoderm Antitrust Litigation, MDL Dkt. No. 14-md-02521-WHO (N.D. Cal.)

Maxon Hyundai Mazda et al. v. Carfax Inc., Case No. CV 2680 (AJN) (RLE) (S.D. N.Y.)

Philip R. Loy and Sharon Loy v. Womble Carlyle Sandridge & Rice, et al., Case No. 2014-cv-254012 (Ga. Super.)

In re MyFord Touch Consumer Litigation, Case No. 13-cv-3072-EMC (N.D. Cal.)

Sun Life Assurance Company of Canada v. U.S. Bank National Association, Case No. NO. 2:14-cv-04703-SJF-GRB (E.D. N.Y.)

Sun Life Assurance Company of Canada v. U.S. Bank National Association and Larry Bryan, Case No. 14-CIV-62610-BLOOM/VALLE (S.D. Fla.)

In the Matter of Flat Wireless, LLC, for and on behalf of its Operating Subsidiaries, v. Cellco Partnership d/b/a Verizon Wireless, and its Operating Subsidiaries, File No. EB-15-MD-005 (Federal Communications Commission)

Omni Healthcare et al. v. Health First Inc. et al, Case No. 6:13-CV-01509-RBD-DAB (M.D. Fla.)

Schuylkill Health System et al. v. Cardinal Health 200, LLC & Owens & Minor Distribution, Inc., Case No. 12-cv-07065-JS (E.D. Pa.)

Meda Pharmaceuticals Inc. v. Apotex, Inc and Apotex Corp., Case No. 01-14-0001-6315 (Am. Arbitration Ass'n)

Mark S. Wallach, et al v. Eaton Corporation, et al, Case No. 10-260-SLR (D. Del.)

STB Ex Parte No. 722 Railroad Revenue Adequacy (Surface Transportation Board)

In the Matter of 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, MB Docket No. 14-50 (Federal Communications Commission)

CONFIDENTIAL

-79-

Lindsay Kamakahi and Justine Levy, et al v. American Society for Reproductive Medicine and Society for Assisted Reproductive Technology, Case No.: 3:11-CV-1781 JCS (N.D. Cal.)

Salud Services, Inc. et al v. Caterpillar, Inc., Case No.: 1:12-cv-23927 (S.D. Fla.)

Gnanh Nora Krouch v. Wal-Mart Stores, Inc., Case No. CV-12-2217 (N.D. Cal.)

In the Matter of Petition for Rulemaking to Eliminate the Sports Blackout Rule, MB Docket No. 12-3 (Federal Communications Commission)

In the Matter of Review of Wholesale Services and Associated Policies, File No. 8663-C12-201313601 (Canadian Radio-Television and Telecommunications Commission)

Crafting a Successful Incentive Auction: Stakeholders' Perspectives (U.S. Senate, Committee on Commerce, Science, and Transportation)

Altergy Systems v. Enersys Delaware, Inc., Case No. 74-198-Y-001772-12 JMLE (American Arbitration Association)

In re New York City Bus Tour Antitrust Litigation, Master Case File No. 13-CV-07I1 (S.D. N.Y.)

SOCAN Tariff 22.A (Online Music Services, 2011-2013), CSI Online Music Services (2011-2013), SODRAC Tariff 6 - Online Music Services, Music Videos (2010-2013) (Copyright Board Canada)

Imperial Premium Finance, LLC, v. Sun Life Assurance Company of Canada (S.D. Fla.)

The Satellite Television Law: Repeal, Reauthorize, or Revise? (U.S. House of Representatives, Committee on Energy and Commerce)

Marchbanks Truck Service, et al. v. Comdata Network Inc., et al., Civil Action No. 07-1078-JKG (E.D. Pa.)

Patricia Reiter v. Mutual Credit Corporation, et al., Case No. 8:09-cv-0081 AG (RNBx) (C.D. Cal.)

In re Photochromic Lens Antitrust Litigation, MDL Docket No. 2173 (M.D. Fla.)

In the Matter of the Arbitration Between Washington Nationals Baseball Club v. TCR Sports Broadcasting Holdings, L.L.P. (Major League Baseball Revenue Sharing Definitions Committee)

Miguel V. Pro and Davis Landscape et al. v. Hertz Equipment Rental Corporation, No. 2:06-CV-3830 (DMC) (D.N.J.)

CONFIDENTIAL

Game Show Network, LLC v. Cablevision Systems Corp., File No. CSR-8529-P (Federal Communications Commission)

Apotex, Inc., v. Cephalon, Inc., Barr Laboratories, Inc., Mylan Laboratories, Inc., Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., Ranbaxy Laboratories, Ltd., and Ranbaxy Pharmaceuticals, Inc., Case No. 2:06-cv-02768-MSG (E.D. Pa.)

In Re Airline Baggage Fee Antitrust Litigation, Civil Action No. 1:09-Md-2089-Tcb (N.D. Ga.)

**Memberships**

American Economics Association

American Bar Association Section of Antitrust Law

**Reviewer**

Journal of Risk and Insurance

Journal of Competition Law and Economics

Journal of Risk Management and Insurance Review

Journal of Regulatory Economics

Managerial and Decision Economics

Telecommunications Policy