Exhibit 17

to the Declaration of Catherine Hartman

Public Redacted Version

# PUBLISHING LICENSE AGREEMENT

This Publishing License Agreement, including the exhibits attached hereto and incorporated by reference herein (the "**Agreement**"), is entered into as of the date of full execution of this Agreement. below (the "**Effective Date**") by and between "A" Side Music LLC d/b/a Modern Works Music Publishing with offices located at 260 West 35th Street, 13th Floor, New York, NY 10001 ("**Publisher**") and Google Inc., a Delaware corporation, and its affiliates, with offices located at 1600 Amphitheatre Parkway, Mountain View, CA, 94043 ("**Google**").

1. **DEFINITIONS.** Unless otherwise defined in the Agreement, capitalized terms will have the meanings set forth in **Exhibit A** attached hereto.

2. **LICENSE.**

    a. **Publisher Composition License.** Publisher grants to Google with respect to both the Free Service and Premium Service, during the Term, and solely with respect to Publisher's share of rights in each Publisher Composition, a nonexclusive, nontransferable, nonsublicensable, royalty-bearing, limited right and license, to (i) Store, Reformat, make On-Demand Streams of, make Conditional Downloads of, and Display Publisher Compositions as have been embodied in (A) User Videos, (B) Art-Tracks, (C) Audio-Only Tracks, and (D) Label Videos and to make available Publisher Compositions on and through the Google Services and Embedded YouTube Video Players; and (ii) reproduce, distribute, and prepare derivative works (including synchronization rights) based upon the Publisher Compositions, solely to the extent necessary for the purpose of engaging in the activities described in the preceding clause (i). The foregoing license will also include all necessary rights for Google to (and to pass through such rights to Users as applicable) include Publisher Compositions embodied in master recordings in its AudioSwap Library (or any successor product thereto which is owned or controlled by Google) which will consist of master recordings any of which Users may add to their User Videos solely through the Google Services; provided, such master recordings are authorized for inclusion in the AudioSwap Library by the owner or administrator thereof. Google will also have the rights to (and to pass through such rights to Labels and Users as applicable) create Art Tracks using Publisher Content.

    b. **Publisher Composition License Ex-U.S.** Outside the U.S. and its territories and possessions, at Google's election, on a country-by-country basis, the Publisher Composition License set forth above will only apply if: (i) Google receives notice from Publisher of its request to enter into a direct license for a given region and (ii) Publisher has the full scope of rights necessary to grant to Google such license, including the terms set forth in Exhibit C . To the extent that Google agrees to a direct license from Publisher for such country(ies), Exhibit C will be incorporated into this Agreement.

    c. **Reservation of Rights.** Nothing in this Agreement will authorize or permit any use of a Publisher Composition except as expressly set forth herein, and all other rights in the Publisher Compositions are hereby expressly reserved to Publisher. This Agreement does not give rise to any implied license. Nothing in this Agreement will prohibit Google, in Google's sole discretion, from obtaining rights in any Video or Audio-Only Track from a party that purports to own, control or be authorized to license the rights to any composition embodied in such Video or Audio-Only Track, including licenses from Labels or other content providers, where such content provider (including a collection society or performing rights society) represents that it has, all or some portion of the rights granted herein and the right to "pass through" such rights to Google, in which case Google will report and pay the license fees due under such "pass-through" license to the licensing party, rather than to Publisher. Further, nothing herein will limit Google's reliance on any statutory rights and nothing herein implies an acknowledgement of what constitutes the "necessary rights" in Section 2(a) above. As between Google and Publisher, Google has the sole right and decision-making authority with respect to the design, appearance, functionality, hosting, performance, and maintenance of the YouTube Website, and all other Google Services. This Agreement does not affect any right or defense that either party would have had, or will have, independent of the Agreement including rights under the U.S. Copyright Act or analogous laws in

other jurisdictions.

      d.    **Advertising.** Publisher acknowledges and agrees that Google may serve advertising on any and all Google Services, including the display of ads on the Playback Pages and within the YouTube Video Player, in conjunction with the display or playback of Publisher Content. Google has sole discretion over the style and format of the ads, which may be modified from time to time. Publisher will not include any advertisements, promotions, or sponsorships as part of the Publisher Content. Google reserves the right to remove from display to Users any Publisher Content containing promotions, sponsorships or other advertisements. Publisher also acknowledges that Google may (but is in no way obligated to do so) automatically place (a) buy buttons from vendors approved by Google and (b) Publisher branding and links on claimed User Videos and other audiovisual content, provided that Publisher provides Google with the data necessary for such matching and placement.

3.    **PUBLISHER OBLIGATIONS.**

      a.    **Publisher Content Delivery and YouTube Content Owner Account.** During the Term, Publisher will deliver to Google the Publisher Content in accordance with Google's then-current specifications as may be updated from time to time during the Term by Google. In connection with the delivery, Google will create a YouTube Content Owner Account(s) with which delivered Publisher Content will be associated.

      b.    **Catalogue Commitment and Monetization.** It is understood that Publisher's entire digitally available catalogue of Publisher Compositions will be available for the Premium and Free Services and will be set to a default policy of Monetize for both the Premium and Free Services.

      c.    **Third Party Clearances.** Publisher will be responsible for procuring and paying for all necessary rights, licenses and clearances, including any required payments to writers, composers, producers, co-publishers (where applicable) and all other royalty participants arising from Google's authorized uses and exploitation of the Publisher Content, excluding any rights controlled exclusively by a collection society or with respect to the AudioSwap Library, the Master Recordings contained therein. If a third party provides Google with a claim of ownership of any material contained within Publisher Content, then (i) the Publisher Content may be blocked from the YouTube Website and the YouTube Video Player, (ii) payments accruing to Publisher pursuant to Section 5 of this Agreement may be suspended or cancelled, and (iii) if Publisher disputes the third party claim, Publisher will participate in a procedure to resolve the dispute.

      d.    **Publisher Data.** Publisher will provide Google with the metadata (via the Metadata Feed or other Google provided interface to the metadata) required by Google's then-current specifications, including ISWC, ISRC, title, territorial restrictions, and writer and composer data including ownership splits, within thirty (30) days of the Effective Date, and monthly thereafter for Google to fulfill its calculation, payment, geo-filtering and reporting obligations hereunder.

      e.    **Claims.** Publisher will only use the System to "claim" audiovisual content that embodies Publisher Content and will not "claim" any audiovisual works that do not embody any Publisher Content.

4.    **GOOGLE OBLIGATIONS.**

      a.    **Content Identification.** During the Term, Google will make available to Publisher the System, subject to the terms and conditions set forth in the CIMA, executed by the Parties.

      b.    **Publisher Takedowns.** For any reason specified in this Agreement, including but not limited to a bona fide artist issue or an actual legal claim, Publisher may initiate removal of content containing a Publisher Composition from the Google Services in one or more regions in the Territory by means of the System or by providing updates to Google in the Metadata Feed. If a Publisher Composition continues to appear on the Google Services more than five (5) business days after



Publisher successfully initiates removal of such Publisher Composition, Publisher will notify Google by sending an email with the URL to the content containing the Publisher Composition to ytads@support.youtube.com or such other address as Google may designate. Google will use commercially reasonable efforts to disable access to the Publisher Composition in the applicable region(s) in the Territory, as soon as commercially practicable following receipt of such notice, subject to any of Google's processes and policies in respect thereof.

    c.    **Disputes.** Google may establish procedures to resolve disputes with respect to Publisher claims and takedowns and Publisher will cooperate with Google to resolve such disputes. If, during the course of evaluating whether Publisher has rights to specific content, Publisher reviews content designated as private by the User, Publisher will not disclose the content to any third party except as necessary for this process or a judicial proceeding.

    d.    **Google Takedowns.** Google has no obligation to carry Videos or Audio-Only Tracks of the Publisher Compositions. Further, while Google does not intend, and does not undertake, to monitor Publisher Content, if Google is notified by Publisher or otherwise becomes aware and determines in its sole discretion that: (i) the Publisher Content (A) violates the intellectual property rights or any other rights of any third party, (B) violates any applicable law or is subject to an injunction, (C) is pornographic, obscene or otherwise violates Google's hosting policies or other terms of service as may be updated by Google from time to time in its sole discretion, (D) is being distributed by Publisher improperly, or (E) may create liability for Google; or (ii) the display of the Publisher Content is impacting the integrity of Google servers (i.e., Users are unable to access such content or otherwise experience difficulty), Google may withdraw from, not display or cease displaying that Publisher Content in the Google Services with no liability to Google.

    e.    **Hosting, Serving, Storage, and Indexing.** Except as set forth in Section 4(b) and 4(d), above and provided that Publisher is in compliance with its obligations hereunder, Google will store Publisher Content on servers owned or controlled by Google, and will protect such servers with commercially reasonable security.

    5.    **PAYMENTS, TAXES, REPORTING.**

    a.    **Royalty Terms.** In the United States and its territories and possessions, the parties agree to the royalty terms set forth in Exhibit B. Outside the United States and its territories and possessions, to the extent that a direct license is granted pursuant to Section 2(b) above, the royalty terms set forth in Exhibit C will apply.

    b.    **Third Party License.** To the extent that Google licenses any of the rights herein from a third party, Google will pay license fees directly to such third party and no royalty obligations will be owed to Publisher in connection therewith.

    c.    **Reservation.** Google reserves the right to retain all other revenues derived from the Google Services, including any revenues from advertisements that may appear on any search results page.

    d.    **Payment Terms.** Google will send to Publisher the Royalties owed hereunder within approximately sixty (60) days after the end of any calendar month, provided that Publisher's earned balance is One Hundred United States Dollars ($100) or more. When Publisher's monthly earned balance is less than One Hundred United States Dollars ($100), there will be no payment and the balance will accumulate until it exceeds One Hundred United States Dollars ($100), at which time the balance will be paid to Publisher in accordance with the preceding sentence. The number of queries, impressions of and clicks on ads, as reported by Google to the applicable advertiser, will be the number used in calculating payments hereunder. Payments to Publisher will be made in the manner Google pays its partners.

e. **Miscellaneous Payment Information.** Google will create an account for Publisher, where Publisher will be able to access information about advertising revenue payments to Publisher under this Agreement. Publisher understands and agrees that this account is made available to Publisher for this purpose only, and that the account may not be used for any other purpose unless expressly agreed to in writing by Publisher and Google. To ensure proper payment, Publisher is solely responsible for providing and maintaining accurate contact and payment information associated with its account. For U.S. taxpayers, this information includes without limitation a valid U.S. tax identification number and a fully-completed Form W-9. For non-U.S. taxpayers, this information includes without limitation a fully-completed Form W-8 or other form, which will likely require a valid U.S. tax identification number, as required by the U.S. tax authorities. Any bank fees related to returned or cancelled checks due to a contact or payment information error or omission may be deducted from the newly issued payment. All payments made in connection with this Agreement are exclusive of taxes imposed by governmental entities of whatever kind and imposed with respect to the transactions for services provided under this Agreement.

f. **Prohibited Acts.** Publisher will not, and will not directly authorize or encourage any third party to directly or indirectly generate queries, impressions of or clicks on any ad(s) or to obtain access to Publisher Content through any automated, deceptive, fraudulent or other invalid means, including repeated manual clicks, the use of robots or other automated query tools, computer generated search requests, or the fraudulent use of other search engine optimization services or software. Google reserves the right to investigate any activity that may violate this Agreement and Publisher will cooperate with Google in any investigation of suspected violative activities.

g. **Taxes.** Google will be responsible for any taxes relating to payments it makes under or related to this Agreement other than taxes based on Publisher's income. If Google is required to deduct or withhold taxes from any payments made to Publisher and remit such taxes to the local taxing jurisdiction, then Google will duly withhold such taxes and will pay to Publisher the remaining net amount after the taxes have been withheld. Publisher will be responsible for any taxes relating to payments it makes to third parties related to this Agreement.

h. **Reporting.** Google will use commercially reasonable efforts to provide Publisher with usage reports in the form generally made available to similarly situated Google partners at that time within sixty (60) days of the end of each calendar month. Such reports will contain, at a minimum, on a per Audio-Only Track and Video or Publisher Composition basis for all Publisher Content for both the Free and Premium Service (i) the total plays and revenue generated for that month; (ii) the daily plays generated; and (iii) the total plays and revenue generated on a country-by-country basis, where applicable.

6. **REPRESENTATIONS AND WARRANTIES.** Each party represents and warrants that it has full power and authority to enter into the Agreement and that upon execution and delivery hereof, this Agreement will constitute the valid and binding obligations of the party. Publisher represents and warrants (a) it has and will maintain throughout the Term all rights, authorizations and licenses that are required in order for it to (i) fully perform its obligations hereunder, (ii) grant the rights and licenses granted herein, (iii) permit Google to exploit the Publisher Content as contemplated herein, and (iv) designate the Usage Policies and (b) Google's authorized use thereof does not infringe any third party right, including rights arising from contracts between Publisher and third parties, copyright, trademark, trade secret, moral rights, privacy rights, rights of publicity, or any other intellectual property or proprietary rights.

7. **DISCLAIMERS.** THE PARTIES MAKE NO WARRANTIES OTHER THAN THE EXPRESS WARRANTIES STATED IN THIS AGREEMENT. THE PARTIES DISCLAIM ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING (A) IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE (B) WARRANTIES AS TO THE QUALITY OR PERFORMANCE OF THE MATERIALS, INFORMATION, GOODS, SERVICES, TECHNOLOGY AND CONTENT PROVIDED UNDER OR IN CONNECTION WITH THIS AGREEMENT,



INCLUDING THE DELIVERY OR AVAILABILITY OF ANY ADVERTISEMENTS, AND ANY LIMITATIONS ON USER ACCESS TO OR USE OF CONTENT; AND (C) WARRANTIES AS TO THE PERFORMANCE OF COMPUTERS, TECHNOLOGY, NETWORKS OR ADS (INCLUDING ALL WARRANTIES REGARDING POSITIONING, LEVELS, QUALITY OR TIMING OF (I) AVAILABILITY AND DELIVERY OF ANY IMPRESSIONS, CREATIVE, OR TARGETS; (II) CONVERSIONS OR OTHER RESULTS FOR ANY ADS OR TARGETS; (III) THE ACCURACY OF ANY PUBLISHER DATA (E.G., REACH, SIZE OF AUDIENCE, DEMOGRAPHICS OR OTHER PURPORTED CHARACTERISTICS OF AUDIENCE); AND (IV) THE ADJACENCY OR PLACEMENT OF ADS). GOOGLE MAKES NO WARRANTY THAT GOOGLE SERVICES WILL BE UNINTERRUPTED, TIMELY OR ERROR-FREE OR THAT THE RESULTS OR INFORMATION OBTAINED FROM USE OF GOOGLE SERVICES WILL BE ACCURATE OR RELIABLE.

8. **INDEMNIFICATION.**

a. **Publisher Indemnity.** Publisher will indemnify, defend and hold harmless Google and its affiliates and syndication partners, and any of their respective directors, officers, employees, agents, contractors, and licensees from and against any and all claims, demands, causes of action, debt or liability, including reasonable attorneys fees ("**Losses**") incurred in connection with any third party claim based upon or otherwise arising out of (i) Google's authorized use of any Publisher Content or any other content or materials (including all writer, composer and publishing splits information) made available by Publisher to Google under this Agreement; (ii) a claim alleging facts that would constitute a breach of Publisher's covenants, representations and warranties; (iii) a claim that the Publisher Content contains content that is defamatory, obscene, or otherwise illegal; or (iv) a claim that the Publisher Site (including products and services therein) violates or encourages violation of any applicable laws. Google syndication partners will be deemed third party beneficiaries of this indemnity.

b. **Google Indemnity.** Google will indemnify, defend, and hold harmless Publisher and its affiliates and its and their directors, officers, employees, and agents from and against any and all Losses arising from any third-party claim that Google's technology used to provide the Google Services infringes any United States trademark, copyright or trade secret of such third party. In no event will Google have any obligations or liability under this Section 8(b) arising from any content, technology, information or data provided or made available to Google by Publisher, Users, or any third parties.

c. **Procedure.** The obligation to indemnify will be contingent upon the indemnified party: (i) providing the indemnifying party with prompt written notice for any claim for which indemnification is sought, (ii) cooperating fully with the indemnifying party, and (iii) allowing the indemnifying party to control the defense and settlement of such claim (provided the indemnifying party will not settle or resolve any such claim in a manner that imposes any liability or obligation on the indemnified party or affects the indemnified party's rights in connection therewith without the advance written approval of the indemnified party, which will not be unreasonably withheld, conditioned or delayed). The indemnified party may, at its own expense, assist in the defense if it so chooses. The indemnified party may, at any time, take over control of the defense of a claim, and, beginning at such time, the indemnifying party will no longer have a continuing obligation to indemnify pursuant to this section with respect to that claim.

9. **LIMITATION OF LIABILITY.** EXCEPT FOR (A) AMOUNTS PAYABLE PURSUANT TO THE PARTIES' INDEMNIFICATION OBLIGATIONS UNDER SECTION 8, (B) PAYMENT OBLIGATIONS UNDER SECTION 5, AND (C) BREACHES OF CONFIDENTIALITY UNDER SECTION 11(D): (I) NEITHER PARTY HERETO WILL BE LIABLE TO THE OTHER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, LIQUIDATED, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES OR PENALTIES INCLUDING, LOSSES OF BUSINESS, REVENUE OR ANTICIPATED PROFITS; (II) GOOGLE WILL NOT BE LIABLE TO PUBLISHER FOR DIRECT OR INDIRECT DAMAGES IN ANY AMOUNT ARISING OUT OF THE DISPLAY OR PUBLICATION OF ANY MATERIALS ON OR BY ANY CONTENT ID PARTICIPANT PLATFORM, INCLUDING ANY CONTENT ID PARTICIPANT FILE DETERMINED TO MATCH A PUBLISHER ID FILE; AND (III) IN NO EVENT WILL EITHER PARTY'S TOTAL AGGREGATE LIABILITY FOR ANY AND ALL CAUSES OF ACTION ARISING OUT OF OR RELATED TO THIS



AGREEMENT EXCEED THE NET AMOUNT SUCH PARTY HAS ACTUALLY RECEIVED AND RETAINED (AFTER ACCOUNTING FOR ALL DEDUCTIONS, AND OTHER OFFSETS PROVIDED FOR UNDER THE AGREEMENT) FROM ADVERTISING SALES AS PROVIDED FOR UNDER THIS AGREEMENT DURING THE SIX (6) MONTHS IMMEDIATELY PRECEDING THE DATE ON WHICH SUCH CLAIM ARISES. THE LIMITATIONS OF LIABILITY SET FORTH IN THIS SECTION 9 WILL APPLY REGARDLESS OF THE CAUSE OF ACTION UNDER WHICH SUCH DAMAGES ARE SOUGHT, WHETHER FOR BREACH OF CONTRACT, NEGLIGENCE, STRICT LIABILITY, OR OTHER TORT, WHETHER OR NOT THE PARTIES WERE OR SHOULD HAVE BEEN AWARE OR ADVISED OF THE POSSIBILITY OF SUCH DAMAGE, AND REGARDLESS OF WHETHER ANY REMEDY FAILS OF ITS ESSENTIAL PURPOSE. THE PARTIES AGREE THAT THE MUTUAL AGREEMENTS MADE IN THIS SECTION REFLECT A REASONABLE ALLOCATION OF RISK, AND THAT EACH PARTY WOULD NOT ENTER INTO THE AGREEMENT WITHOUT THESE LIMITATIONS ON LIABILITY.

10. **TERM AND TERMINATION.**

   a. **Term.** This Agreement will commence on the Effective Date and will continue for a period of four (4) years (the "**Initial Term**") after which this Agreement will automatically renew for additional three (3) month terms unless either party gives at least sixty (60) days written notice of its intent not to renew (the Initial Term and all renewal terms, collectively, the "**Term**").

   b. **Termination.** Either party may terminate this Agreement: (i) immediately upon written notice to the other party if (1) the other party files a petition for bankruptcy, becomes insolvent, or makes an assignment for the benefit of its creditors, or a receiver is appointed for the other party or its business, or (2) the other party breaches Section 11(d) of this Agreement (Confidentiality); or (ii) with thirty (30) days prior written notice for any other breach, if such breach is not cured within the notice period. Google may terminate this Agreement immediately upon written notice to Publisher if Publisher breaches its representations and warranties in Section 6 of this Agreement.

11. **GENERAL.**

   a. **Assignment.** Neither party may assign or transfer any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other party, which will not unreasonably be withheld; provided, however, that Google may assign this Agreement, in whole or in part, without consent to an affiliate but only if (a) the assignee agrees in writing to be bound by the terms of this Agreement and (b) the assigning party remains liable for obligations under the Agreement. Any attempted assignment, delegation or transfer in derogation hereof will be null and void. This Agreement will be binding upon the successors and permitted assigns of both parties.

   b. **Notices.** Unless provided for to the contrary in this Agreement, any and all notices or other communications or deliveries required or permitted to be made under this Agreement will be in English and in writing and (i) if sent to Google to: Google Inc., 1600 Amphitheatre Parkway, Mountain View, CA, 94043, with a copy to Attn: Legal Department at the same address and (ii) if sent to Publisher to the address set forth in the Preamble of this Agreement attention: Legal & Business Affairs. Notice will be deemed given (1) upon receipt when delivered personally or by overnight courier (signature required upon receipt), (2) upon verification of receipt of registered or certified mail or (3) upon verification of receipt via facsimile, provided that such notice is also sent simultaneously via first class mail. Contact information must be updated in writing.

   c. **Change of Control.** Upon a change of control (for example, through a stock purchase or sale, merger, or other form of corporate transaction), (i) the party experiencing the change of control will provide written notice to the other party within thirty (30) days after the change of control, and (ii) the other party may immediately terminate this agreement any time between the change of control and thirty (30) days after it receives the written notice in subsection (i).



d.  **Confidentiality.** The recipient of Confidential Information will not disclose it, except to affiliates, employees, agents or professional advisors who need to know it and who have agreed in writing (or in the case of professional advisors are otherwise bound) to keep it confidential. Further, Google will may make certain limited disclosures of Confidential Information to effectuate the purposes of this Agreement, provided, any such disclosures are made subject to binding confidentiality obligations. The recipient will ensure that those people and entities use the received Confidential Information only to exercise rights and fulfill obligations under this Agreement, while using reasonable care to keep it confidential. The recipient may also disclose Confidential Information when required by law after giving reasonable notice to the discloser if allowed by law.

e.  **Covenant Not to Sue.** In consideration of Google's entering into this Agreement, effective upon the Effective Date and through the end of the Term, Publisher covenants and agrees, for itself and its respective agents and representatives, solely with respect to the shares of Compositions owned or controlled by Publisher (and no other shares) not to bring, assert, pursue, maintain, join in or directly or indirectly support, assist, fund, lend resources to, or otherwise participate in any litigation, throughout the world, involving or asserting any claim based upon or alleging any form of copyright infringement arising from Google's exploitation of the rights licensed by Publisher to Google herein through the operation of the Google Services, and in accordance with this Agreement, that Publisher has, had or may have against Google prior to the Effective Date or during the Term; provided, however, that such covenant not to sue will apply to and be binding on a third party solely to the extent Publisher has the legal authority to grant the covenant not to sue herein on behalf of such third party without violation of any legal or contractual obligation to such party (such as, without limitation, an agreement with a songwriter, composer, rights collection society, co-publisher or sub-publisher), and further, except with respect to any countries in the Ex-U.S. Region, provided that this covenant not to sue does not extend to any legal claim arising from the public performance of any musical work on the YouTube Website or elsewhere. Subject to the following sentence, the foregoing covenant not to sue does not include any legal claim to be asserted against any party other than Google, including, (i) any legal claim against any third party arising from the incorporation or use of a musical work in a Video or failure to pay royalties or other consideration due to any publisher or copyright owner for use of a musical work in a Video; or (ii) any legal claim against any third party (including a User) arising from the incorporation or use of a musical work in a Video (regardless of whether such Video is a User Video). Publisher further covenants not to sue any User who synchronizes and makes available any Publisher Composition in a Video uploaded to the YouTube Website, to the extent Publisher's claim is based on the alleged infringement of rights or authorized uses granted by Publisher to Google herein solely on the YouTube Website.

f.  **Other Google Subscription Services.** Google may offer another Google or Google Play paid or paid-for premium subscription audio service inclusive of music that is operated partially or wholly separately from the Premium Service, and for which Publisher Compositions would be licensed separately from this Agreement ("**Other Google Subscription Service**"). Subscribers of such Other Google Subscription Service will be able to access the Premium Service, and play activity of such Other Google Subscription Service subscribers that occurs within the Premium Service will be counted towards usage of Publisher Compositions hereunder for purposes of the royalty calculation set forth in Exhibits B and C. Premium Service Users will be able to access the Other Google Subscription Service and play activity that occurs within such Other Google Subscription Service will be accounted for pursuant to the license for the Other Google Subscription Service or statutory accounting, as applicable.

g.  **Miscellaneous.** The parties hereto are and will remain independent contractors, and nothing herein will be deemed to create an agency, partnership, or joint venture between the parties hereto. Except for Section 8(a) above, there are no third-party beneficiaries to this Agreement. Nothing in this Agreement will limit either party's ability to seek equitable relief. Neither party will be liable for inadequate performance of its obligations resulting from any condition beyond its reasonable control, including governmental action, acts of terrorism, earthquake, fire, flood or other acts of God, labor conditions, power failures, and Internet or other network disturbances. If any provision of this Agreement will be adjudged by any court of competent jurisdiction to be unenforceable or invalid, or if compliance



with any provision in this Agreement is inconsistent with any court order imposed directly on a party to this Agreement, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement will otherwise remain in full force and effect and remain enforceable between the parties. The failure of either party to act in the event of a breach of this Agreement by the other will not be deemed a waiver of such breach or a waiver of future breaches.  This Agreement supersedes any other prior or collateral agreements, whether oral or written, with respect to the subject matter hereof. This Agreement sets forth the entire understanding and agreement between the parties and, except as otherwise set forth herein, may be amended only in a writing signed by both parties, expressly stating it is amending this Agreement.  This Agreement will be construed as if jointly drafted by the parties.  This Agreement will be governed exclusively by the laws of the State of California (excluding California's choice of law rules) and applicable federal U.S. laws. Any litigation hereunder will be brought in any state or federal court of competent jurisdiction in Santa Clara County, California; the parties agree that venue will be proper in, and consent to the exclusive personal jurisdiction of, such courts. All exhibits and attachments to this Agreement are hereby made a part hereof and incorporated by reference herein. This Agreement may be executed in one or more counterparts and delivered by facsimile, each of which will be deemed an original and all of which, when taken together, will constitute one and the same instrument.  The provisions of 7, 8, 9, 10(b), and 11 will survive any expiration or termination of this Agreement.

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties as of the later date indicated below.

**Google Inc.**

BY:
NAME: Nikesh Arora
TITLE: President, Global Sales and Business Development Google Inc.
DATE: 2014.04.29 17:58:28 -07'00'

**A Side Music LLC dba Modern Works Music Publishing**

BY:
NAME: DAN COLEMAN
TITLE: MANAGING PARTNER
DATE: 24 APRIL 2014

**Google Commerce Limited**

BY:
NAME:
TITLE: Clare Twomey For, Graham Law (Board Director)
DATE: 2014.04.30 08:30:55 +01'00'

**Google Ireland Limited**

BY:
NAME:
TITLE: Clare Twomey For, Graham Law (Board Director)
DATE: 2014.04.3 0 08:30:40 +01'00'

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                   GOOG-SCHNDR-00002441

## EXHIBIT A
## DEFINITIONS

**"Art Track"** means a Video comprised of a complete master sound recording that is played back to a User with an accompanying image(s), a sequential series of still images or lyrics, that is, in each case, in timed relation with the master sound recording and designated by a Label (or by Google on Label's behalf) using tools, including auto-generation tools, provided by Google. For clarity, sound recordings combined with a single static image or otherwise not in timed-relation to the visual will not comprise Art Tracks and instead may be treated as Audio Only Tracks.

**"Audio-Only Allocation"** means, with respect to each accounting period hereunder, a fraction, the numerator of which is the number of On-Demand Streams of Publisher Audio-Only Tracks embodying Identified Publisher Compositions via the Premium Service during such accounting period and the denominator of which is the total number of On-Demand Streams of all Audio-Only Tracks and Videos via the Premium Service during such accounting period.

**"Audio-Only Track"** means digital files, materials or content containing musical works made available as an audio experience which may appear with one or more static images which may contain metadata, graphics, lyrics, editorial or other similar information but images or visuals, including without limitation lyrics, provided such additional media will not be synchronized with music (i.e. background listening). Any Video (including User Videos) may be rendered in audio only format.

**"AudioSwap Library"** means the collection of Publisher Compositions licensed to Google and made available to Users for use with Google's AudioSwap Tools.

**"AudioSwap Tools"** means the tools made available by Google that allows Users to synchronize songs from the AudioSwap Library with User Videos upon the User's request, including Google's video editing tools.

**"CIMA"** means the separate Content Identification and Management Agreement, signed by the parties.

**"Composition"** means a copyrighted, non-dramatic musical composition.

**"Conditional Download"** means a digital transmission to a User of a digital file embodying a Composition that results in a specifically identifiable, tethered (but obfuscated) reproduction of such digital file (including a cache copy), which is available to such User for off-line playback on an authorized device for up to thirty-one (31) consecutive days.

**"Confidential Information"** means any inventions, ideas, strategies, techniques, and all other business, technical and financial information (including the terms of this Agreement) relating to the other party that either party develops, learns or obtains, during the course of and in connection with this agreement or that are received by or for the other party in confidence.

**"Display"** means to publicly display the written lyrics of a Composition in a User Video, in whole or in part.

**"Effective Date"** has the meaning attributed to it in the preamble.

**"Embed"** means the offering of a User Video, Label Video, Art Track or Audio-Only Track, such that a User is able to access and play back such audio and audiovisual content from YouTube Website servers

as an On-Demand Stream via Google or a third-party service using an Embedded YouTube Video Player, where Google is able to control, and report on revenues from, or shares in the revenue from, any advertising in or on such User Video or Embedded YouTube Video Player.

**"Embedded YouTube Video Player"** means an embed code that enables display of Videos within the YouTube Video Player in non-YouTube-branded products, services and applications, including those of third parties, and in Google Services in conformity with YouTube's terms of service and without a separate syndication agreement between YouTube and the third-party website.

**"Free Service"** means the free-to-the consumer portion of the Google Services, which is ad-supported as of the Effective Date, and which may include On-Demand Streams of the various music content types set forth herein (i.e., User Videos, Art Tracks, Audio-Only Tracks and Label Videos) and Conditional Downloads of the same. The Free Service does not include the Premium Service or Free Trials.

**"Free Service Ad Revenue"** means, with respect to each accounting period hereunder, Net Ad Revenue attributable to the Free Service.

**"Free Trial"** has the meaning set forth in Exhibit B of this Agreement.

**"Free Trial User"** means a User who signs up for a Free Trial.

**"Google Services"** means the YouTube Website and any features of such YouTube Website made available by Google to Users (including Free Service Users and Premium Service Users) through Google-authorized or Google-approved application programming interfaces (or "apps," as such term is commonly understood in the technology industry), and any other product, device or service (including mobile devices), including Embeds and Playback Pages, capable of accessing the Videos and Audio-Only Tracks made available on or through the YouTube Website, even if accessed through a means other than the YouTube Website.

**"ID File"** has the meaning attributed to it in the CIMA.

**"Identified Publisher Composition"** means a Publisher Composition(s) that has been identified in Google's systems as being owned or controlled by Publisher.

**"Label"** means an entity that owns or controls the rights to a master recording, and provides Google with (i) master recordings and/or Label Videos for exploitation on the Google Services and (ii) metadata and other information (including ISRCs and/or other identifying information adequate to license) that it and other similarly-situated master recording owners are required to provide to Google in connection with such exploitation (e.g., a "record label").

**"Label Video"** means a music video provided to Google by or on behalf of a Label that embodies a master recording, excluding User Videos and Art Tracks.

**"Metadata Feed"** means data associated with Publisher Content provided to Google in accordance with Section 3.

**"Monetize"** has the meaning attributed to it in the CIMA.

**"Net Ad Revenues"** means, with respect to each accounting period hereunder, recognized revenues from ads provided by Google or a Google-approved third party and displayed or streamed on the Playback Pages, or in the Embedded YouTube Video Player, less, off the top, VAT (if any) and buyer-side advertising fees. Net Ad Revenues specifically exclude any e-commerce and referral fees received by Google from music-related "upsells" (e.g., subscription revenue, royalties for a CD or sheet music sale, etc.). For the avoidance of doubt, Net Ad Revenues do not include (a) third party buyer-side advertising fees, (b) any funds from ads that are rejected by Google because they violate Google's



general ad policies and terms and conditions, (c) Net Subscription Revenues, or (d) Other Google Subscription Service revenue.

**"Net Subscription Revenue"** means with respect to each accounting period hereunder, recognized revenues from fees charged to or paid on behalf of Premium Service Users for access to the Premium Service, including those received for bundled offers (pro-rated to reflect the portion of the bundled offer applicable to the Premium Service), less, off the top, any applicable taxes such as VAT, paid by or on behalf of a Premium Service User in consideration of the Premium Service (if any). Net Subscription Revenue specifically excludes any e-commerce and referral fees received by Google from music-related "upsells" (e.g., royalties for a CD or sheet music sale, etc.). For the avoidance of doubt, Net Ad Revenue will not be included in Net Subscription Revenue.

**"On-Demand Stream"** means the digital transmission through the Internet (or any successor global computer network) or any other wired or wireless communication network, using streaming technology, upon a request of a User at a time chosen by the User, of a single Video or Audio-Only Track from a server owned or controlled by Google to a computer or device of the User, where such transmission is (a) made contemporaneously or substantially contemporaneously with the playback of the requested item of content and (b) is configured such that it is not intended to result in a permanent reproduction or a substantially complete reproduction other than a Conditional Download or a temporary cache or buffer copy used solely to facilitate the delivery of such On-Demand Stream. Notwithstanding the foregoing, On-Demand Streams include the playback of Conditional Downloads.

**"Paid Channel"** means a YouTube partner channel that requires a separate payment by or on behalf of Users to access certain content or features on such channel.

**"Playback Page"** means a page on the YouTube Website from which a User can directly access and play back on such page Videos or Audio-Only Tracks containing Publisher Compositions.

**"Premium Service"** means the portion of the Google Services consisting of a portable music subscription service paid for by or on behalf of Users (excluding Paid Channels).

**"Premium Service Ad Revenue"** means, with respect to each accounting period hereunder, Net Ad Revenue attributable to the Premium Service during such accounting period.

**"Premium Service User"** means either a registered (i) paid or paid-for User or (ii) Free Trial User of the Premium Service.

**"Publisher Art Track"** means an Art Track that embodies one or more Publisher Composition(s).

**"Publisher Art Track Allocation"** means, with respect to a given accounting period hereunder, a fraction, the numerator of which is the number of On-Demand Streams of Publisher Art Tracks embodying Identified Publisher Compositions via the Premium Service during such accounting period and the denominator of which is the total number of On-Demand Streams of all Audio-Only Tracks and Videos via the Premium Service during such accounting period.

**"Publisher Audio-Only Track"** means an Audio-Only Track consisting of one or more Publisher Compositions.

**"Publisher Composition"** means a Composition that is owned or controlled by Publisher.

**"Publisher Content"** means, collectively, the Publisher Compositions, the Metadata Feed, and all other data and information contained within or provided to Google by Publisher in association with the provision of such content, including text, lyrics, images, closed captioning, metadata, and any copies that Google makes of any or all of the foregoing in connection with this Agreement.



"**Publisher Label Video**" means a Label Video that embodies one or more master recordings containing one or more Publisher Compositions.

"**Publisher Label Video Allocation**" means, with respect to each accounting period hereunder, a fraction, the numerator of which is the number of On-Demand Streams of Publisher Label Videos embodying Identified Publisher Compositions via the Premium Service during such accounting period and the denominator of which is the total number of On-Demand Streams of all Audio-Only Tracks and Videos via the Premium Service during such accounting period.

"**Reformat**" means to digitally re-encode, without modification of the content therein, for the purpose of facilitating its transmission in the form of an On-Demand Stream or Conditional Download.

"**Store**" means to store and reproduce musical works as embodied in Videos or Audio-Only Tracks on computer servers or other storage media owned or controlled by YouTube, whether now known or hereafter developed, for the purpose of enabling and facilitating the making of Conditional Downloads and On-Demand Streams through the Google Services.

"**System**" has the meaning attributed to it in the CIMA.

"**Territory**" means the U.S. and its territories and possessions, plus any additional regions added pursuant to Section 2(b) of this Agreement.

"**Total Allocation**" means, with respect to each accounting period hereunder, a fraction, the numerator of which is the total number of On-Demand Streams of Publisher Art Tracks, Publisher Audio-Only Tracks, Publisher Label Videos, User Cover Videos, and User Videos with Commercial Sound Recordings, in each case, that embody Identified Publisher Compositions via the Premium Service during such accounting period, and the denominator of which is the total number of all On-Demand Streams of Audio-Only Tracks and Videos via the Premium Service during such accounting period.

"**Transaction**" means, in a given accounting period, a payment by or on behalf of a Premium Service User for access to the Premium Service during such period (which payment may be attributed to such period by Google where, for example, such User made a payment for access to the Premium Service for multiple periods).

"**User**" means a user of the Google Services.

"**User Cover Videos**" means a User Video that incorporates a sound recording that is owned or controlled by the User, but which embodies a Publisher Composition.

"**User Cover Video Allocation**" means, with respect to each accounting period hereunder a fraction, the numerator of which is the number of On-Demand Streams of User Cover Videos embodying Identified Publisher Compositions via the Premium Service during such accounting period and the denominator of which is the total number of On-Demand Streams of all Audio-Only Tracks and Videos via the Premium Service during such accounting period.

"**User Video**" means any video submitted to the YouTube Website by a User, including User Videos that include Publisher Content (i.e., User Cover Videos and User Videos with Commercial Sound Recordings).

"**User Video with Commercial Sound Recordings**" means a User Video that embodies at least one commercially released or distributed master recording that has been delivered to Google by a Label (or a Label's authorized agent or representative) of a Publisher Composition (e.g. a person appearing in the Video lip-syncing the words to a song while the original, commercially-released version of the song is heard).



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    GOOG-SCHNDR-00002445

**"User Video with Commercial Sound Recording Allocation"** means, with respect to each accounting period hereunder, a fraction, the numerator of which is the number of On-Demand Streams of User Videos with Commercial Sound Recordings embodying Identified Publisher Compositions via the Premium Service during such accounting period and the denominator of which is the total number of On-Demand Streams of all Audio-Only Tracks and Videos via the Premium Service during such accounting period.

**"Videos"** means any video on the YouTube Website, including User Videos.

**"YouTube Content Owner Account"** means an account or accounts that Google creates on behalf of Publisher with respect to the YouTube Website and with which Publisher Content will be associated. Such YouTube Content Owner Account will provide various functionalities to, by way of example and not limitation, permit Publisher to manage Publisher Content on the YouTube Website.

**"YouTube Video Player"** means one or more computer program players made available to users which is used or useful in the transmission, performance or playback of multimedia content so that the digital data that embodies the audio or audiovisual recording concerned can be perceived by and communicated to a user of such computer program when used in conjunction with the aid of a machine or device.

**"YouTube Website"** means the Google Service known as YouTube located at http://www.youtube.com, including all mirror and derivative sites, including mobile, all replacements or successor versions thereof, and all international versions thereof.



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY   GOOG-SCHNDR-00002446

## EXHIBIT B

## U.S. ROYALTY TERMS

The following terms will be applicable to the Free and Premium Service in the United States and its territories and possessions. Any references to Publisher's "pro rata share" below will be calculated as set forth in Section 8 of this Exhibit B.

1. **Publisher Label Videos.** With respect to each accounting period hereunder (and subject to Section 2(c) of the Agreement), Google will pay to Publisher, Publisher's pro-rata share of:

   a. **Publisher's Share of Net Ad Revenues:** ▇▇ of Net Ad Revenues with respect to exploitations of Identified Publisher Compositions in On-Demand Streams of Publisher Label Videos during such accounting period; and

   b. **Publisher's Share of Net Subscription Revenue:** ▇▇ of Net Subscription Revenue during such accounting period multiplied by the Publisher Label Video Allocation during such accounting period.

2. **User Cover Videos.** With respect to each accounting period hereunder, Google will pay to Publisher, Publisher's pro-rata share of:

   a. **Publisher's Share of Net Ad Revenues:** ▇▇ (reduced by up to ▇▇ as determined in Google's sole discretion, if Google enters into a revenue sharing arrangement with the User that uploaded the User Video to the YouTube Website) of Net Ad Revenues with respect to exploitations of Identified Publisher Compositions in On-Demand Streams of User Cover Videos during such accounting period; and

   b. **Publisher's Share of Net Subscription Revenue:** ▇▇ (reduced by up to ▇▇, as determined in Google's sole discretion, if Google enters into a revenue sharing arrangement with the User that uploaded the User Video to the YouTube Website) of Net Subscription Revenue during such accounting period multiplied by User Cover Video Allocation during such accounting period.

3. **User Videos with Commercial Sound Recordings.** With respect to each accounting period hereunder, Google will pay to Publisher, Publisher's pro-rata share of:

   a. **Publisher's Share of Net Ad Revenues:** ▇▇ of Net Ad Revenues with respect to exploitations of Identified Publisher Compositions in On-Demand Streams of User Videos with Commercial Sound Recordings during such accounting period; and

   b. **Publisher's Share of Net Subscription Revenue:** ▇▇ of Net Subscription Revenue during such accounting period multiplied by the User Videos with Commercial Sound Recording Allocation during such accounting period.

4. **Publisher Art Tracks.** With respect to each accounting period hereunder, Google will pay to Publisher, Publisher's pro-rata share of:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY    GOOG-SCHNDR-00002447

a. **Publisher's Share of Net Ad Revenues:** ▇ of Net Ad Revenues with respect to exploitations of Identified Publisher Compositions in On-Demand Streams of Publisher Art Tracks during such accounting period; and

b. **Publisher's Share of Net Subscription Revenue:** ▇ of Net Subscription Revenue during such accounting period multiplied by the Publisher Art Track Allocation during such accounting period.

5. **Publisher Audio-Only Tracks.** With respect to each accounting period hereunder, Google will pay to Publisher:

   a. **Publisher's Share of Free Service Ad Revenues:** Publisher's pro-rata share of ▇ of Free Service Ad Revenues with respect to exploitations of Identified Publisher Compositions in On-Demand Streams of Publisher Audio-Only Tracks during such accounting period, less any royalties paid to performing rights societies; and

   b. **Publisher's Share of Premium Service Revenues:** (X) minus (Y) where:

      i. "(X)" means the greater of:

         A. Publisher's pro-rata share of ▇ of the Premium Service Ad Revenue with respect to On-Demand Streams of Publisher Audio-Only Tracks embodying Identified Publisher Compositions via the Premium Service during such reporting period, plus Publisher's pro-rata share of ▇) of the Audio-Only Allocation during such accounting period multiplied by Net Subscription Revenue during such accounting period; and

         B. the lesser of Publisher's pro-rata share of: (1) the Audio-Only Allocation multiplied ▇) of the amounts expensed by Google to Labels solely in respect of On-Demand Streams of Publisher Audio-Only Tracks embodying Identified Publisher Compositions via the Premium Service during the applicable reporting period; or (2) the Audio-Only Allocation multiplied by ▇) times the total number of Premium Service Users who have executed a Transaction during the applicable reporting period, excluding Free Trial Users and users of any Other Google Subscription Service.

      ii. "(Y)" means the applicable public performance royalties that have been or will be expensed by Google in connection with Publisher Audio-Only Tracks embodying Identified Publisher Compositions through the Premium Service during the applicable reporting period.

6. **U.S. Premium Service Royalties Minimum.** With respect to each accounting period hereunder, the "**U.S. Premium Service Minimum**" will equal: the Total Allocation during such accounting period multiplied by ▇ multiplied by the number of Premium Service Users who have executed a Transaction during such accounting period, excluding Free Trial Users and users of any Other Google Subscription Service. If the sum of (a) Publisher's share of Premium Service Ad Revenue for Publisher Label Videos, User Cover Videos, User Videos with Commercial Sound Recordings and Publisher Art Tracks (i.e., the portion of Publisher's advertising revenue share relating to the Premium Service calculated pursuant to Sections 1(a) 2(a), 3(a), and 4(a) above, respectively), (b) Publisher's Share of Net Subscription Revenue for Publisher Label Videos, User Cover Videos, User Videos with Commercial Sound Recordings, Publisher Art Tracks (as calculated in Sections 1(b), 2(b), 3(b) and 4(b) above, respectively), and (c) the result of the revenue share calculations for Publisher Audio-Only Tracks as calculated in Section 5(b) above, is less than the U.S. Premium Service Minimum, then Google will pay to Publisher the U.S. Premium Service Minimum. Google's payment of the U.S. Premium Service Minimum will be in lieu of any other payments to Publisher with respect to the Premium Service (i.e., in



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY   GOOG-SCHNDR-00002448

the event that the U.S. Premium Service Minimum applies, Publisher will receive the U.S. Premium Service Minimum and will not be paid Premium Service Ad Revenues).

7.  **Free Trial.**  Google may offer on a royalty-free basis, free trials of the Premium Service to prospective users of the Premium Service (each a **"Free Trial"**). In addition to the foregoing, Publisher will generally make available to Google the same or better terms relating to free trial offers (for similar limited periods of time) that it makes available to any other digital music service provider on a country-by-country basis throughout the Territory. Free Trial Users will have all of the rights of Premium Service Users with respect to the Premium Service for the duration of their Free Trial. No royalties will be due to Publisher for Free Trials. Nonetheless, for the avoidance of doubt, On-Demand Streams of Audio-Only Tracks and Videos originating from a Free Trial will be used in all Art Track, Audio-Only, Publisher Label Video, User Cover Video and User Video with Commercial Sound Recording Allocation calculations.

8.  **Ownership Share Pro-ration.**  All calculations of license fees payable to Publisher hereunder will be pro-rated to account for (a) Publisher's share of rights in each Publisher Composition claimed by Publisher hereunder (as determined by data provided by Publisher to Google hereunder) and (b) the total number of claimed Compositions within On-Demand Streams of each Audio-Only Track and Video hereunder.  The pro-ration described in subsection (b) will be calculated on a per-claim basis (divided evenly across such claims), and Google may adjust such pro-ration to account for the duration of each claimed Composition (provided that Google will use the same methodology for all licensors of musical works on the Google Services).

9.  **Rate Change.**  To the extent that one (1) major publisher (as well as any collection society in the relevant country with respect to Exhibit C) agrees to any rates for the Google Services that are lower than the rates hereunder (including with respect to bundling), then, following thirty (30) days written notice to Publisher, Google will have the right to replace the rates hereunder (and in Exhibit C as applicable) with such lower rates; provided that, the rates under this Agreement will only be lowered with respect to the same rates and for the same usages reduced under the agreements with the major publishers, and the rate reduction will be for the same effective time period and in the same territory or territories granted by the major publishers.



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY     GOOG-SCHNDR-00002449

## EXHIBIT C

## ADDITIONAL EX-U.S. TERMS

The following terms will be applicable to all regions outside the United States and its territories and possessions, for which Google accepts a direct license pursuant to Section 2(b) of the Agreement (collectively the "Ex-U.S. Region").

1.   ADDITIONAL DEFINITIONS.

"**Electronic Sell Through Service (EST Service)**" means that portion of the Google Services, excluding the Paid Channels and the Free and Premium Services, where a General Entertainment User pays a fee for the right to permanently download or permanently access Google's partner EST content in response to such User's request to view such content for an unlimited number of times. No time limit will apply to the user's entitlement to retain or access content acquired via the EST Service. The EST Service may be branded with one or more Google brands or tradenames.

"**General Entertainment Revenue**" means for each calendar month, recognized revenues from ala carte and access fees (including payments that have been amortized to cover such period) charged to or paid on behalf of General Entertainment Users of the TVOD, SVOD and EST Services, including those received for bundled offers (pro-rated to reflect the portion of the bundled offer applicable to the TVOD, SVOD or EST Service), less, off the top, any applicable taxes such as VAT, paid by or on behalf of General Entertainment Users in consideration of the TVOD, SVOD, or EST Services (if any) and buyer-side advertising fees. General Entertainment Revenue specifically excludes any e-commerce and referral fees received by Google from music-related "upsells" (e.g., royalties for a CD or sheet music sale, etc.), as well as any Net Ad Revenue, Net Subscription Revenue, and Paid Channel Net Revenue.

"**General Entertainment User**" means either a registered (i) paid or paid-for User or (ii) free trial User of the SVOD, TVOD or EST Services.

"**General Entertainment Video**" means Videos, which constitute Non-Music Content in Google's system, including, Video On-Demand ("VOD") and Electronic Sell Through ("EST") Videos.

"**Live Stream**" means a simultaneous real-time broadcast (non-interactive) stream of a live event using live streaming technology.  A Live Stream will require an active connection to the Internet via a wi-fi, cellular or other network, including cable.

"**Music Content**" means any Video on Google Services identified as including a Composition (i) embodied in a master recording or Label Video (ii) identified by Google's content management tools as a match to a master recording or Label Video or (iii) claimed directly by a Publisher in Google's system.

"**Non-Music Content**" means any Video which is not identified as Music Content in Google's system.

"**Paid Channel Net Revenue**" means for each calendar month, recognized revenues from fees (including payments that have been amortized to cover such period) charged to or paid on behalf of Paid Channel Users, including but not limited to those received for bundled offers (pro-rated to reflect the

portion of the bundled offer applicable to the Paid Channel), less, off the top, any applicable taxes such as VAT, paid by or on behalf of Paid Channel Users in consideration of the Paid Channels (if any) and buyer-side advertising fees. Paid Channel Net Revenue specifically excludes any e-commerce and referral fees received by Google from music-related "upsells" (e.g., royalties for a CD or sheet music sale, etc.), as well as any Net Ad Revenue, Net Subscription and General Entertainment Revenue.

"**Paid Channel User**" means a registered user of the Paid Channels.

"**Paid Channel Video**" means videos which are available via the Paid Channels.

"**Stream**" means collectively Live Streams and On-Demand Streams.

"**Subscription Video On Demand Service (SVOD Service)**" means that portion of the Google Services, excluding the Paid Channels and the Free and Premium Services, where a General Entertainment User pays a subscription fee for the right to access and On-Demand Stream Google's partner VOD content for an unlimited number of times during a specified period. The SVOD Service may be branded with one or more Google brands or tradenames.

"**Transactional Video On Demand Service (TVOD Service)**" means that portion of the Google Services excluding the Paid Channels and the Free and Premium Services, whereby a General Entertainment User pays a fee for the right to access and On-Demand Stream Google's partner TVOD content for an unlimited number of times during a specified period. The TVOD Service may be branded with one or more Google brands or tradenames.

2. **ADDITIONAL RIGHTS.** In addition to the rights set forth in Section 2(a) of the Agreement, in the Ex-U.S. Region, Publisher hereby grants to Google the non-exclusive right to transmit, reproduce, publicly perform, communicate and make available to the public On-Demand Streams and Live Steams of Publisher Compositions, via the Google Services regardless of platform, device, content type, means of access, and business model.

3. **DATA REQUIREMENTS.** Publisher will provide to Google sufficient data for Google to fully operationalize the rights granted in this Agreement on a per Publisher Composition, country-by-country basis. At Google's option and depending on the requirements necessary for Google to operationalize the rights set forth herein, Publisher will either: (a) populate the data fields required by Google via a data exchange on a monthly basis or (b) provide Google with the metadata (via the metadata feed or other Google provided) required by Google's then-current specifications, including ISWC, ISRC, title, territorial restrictions, and writer and composer data including ownership splits, within thirty (30) days of the effective date of a direct license for each applicable country in the Ex-U.S. Region and monthly thereafter. Such data will at a minimum enable Google to fulfill its calculation, payment, geo-filtering and reporting obligations hereunder (which will include direct composition ownership data as opposed to aggregated administrator or other third party data).

4. **ROYALTIES.** In the Ex-U.S. Region, on a country-by-country basis, in a given accounting period hereunder, Google will pay to Publisher as follows during the Term (the "Royalties"):

   a. **Ad-Funded Revenue.**
      i. **Music Content:** ▮▮▮ of Publisher's pro-rata share of Net Ad Revenues attributable to exploitations of Publisher Compositions (adjusted to reflect fractional interests) in views by Users of Music Content in the applicable country of the Ex-U.S. Region.

      ii. **Non-Music Content:** ▮▮▮ of Net Ad Revenues attributable to Non-Music Content multiplied by a fraction, the numerator of which will be the number of views by Users of Music Content in the applicable country of the Ex-U.S. Region identified as embodying Publisher Compositions (adjusted to reflect fractional

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY  GOOG-SCHNDR-00002451

    interests) and the denominator will be the total number of views by Users of all Music Content in such country.

   iii. **Live Streams**: With regard to Music Content that is Live Streamed on the Google Services:

      A. ▮ of Publisher's pro-rata share of Net Ad Revenues attributable to the applicable Live Stream event multiplied by a fraction, the numerator of which will be the number of views by Users of Music Content in the applicable country of the Ex-U.S. Region identified as embodying Publisher Compositions (adjusted to reflect fractional interests) and the denominator will be the total number of views by Users of all Music Content in such country; or

      B. When applicable (e.g., a worldwide sponsorship) for sponsored Live Streams of content on Google Services, Publisher's pro-rata share (adjusted to reflect fractional interests) of ▮ of Net Ad Revenues attributable to the applicable Live Stream, shall be calculated by dividing the number of views of the applicable Live Stream by Users in the applicable country of the Territory by the total number of views of the Live Stream for the entire Territory.

  b. **Premium Service Royalties.** In a given accounting period hereunder, Google will pay to Publisher ▮ of Publisher's pro-rata share of Net Subscription Revenue multiplied by the Total Allocation directly attributable to On-Demand Streams of Videos and Audio-Only Tracks via the Premium Service in the Ex-U.S. Region on a country-by-country basis.

  c. **Paid General Entertainment Royalties.** In a given accounting period hereunder with respect to Streams of General Entertainment Videos, Google will pay to Publisher ▮ of General Entertainment Revenue multiplied by a fraction, the numerator of which will be the number of On-Demand Streams of Music Content identified as embodying the Publisher Compositions (adjusted to reflect fractional interests) via the Free Service in the Ex-U.S. Region on a country-by-country basis and the denominator will be the total number of On-Demand Streams of Music Content via the Free Service in the Ex-U.S. Region on a country-by-country basis.

  d. **Paid Channel Royalties.** In a given accounting period hereunder with respect to Streams of Paid Channel Videos, Google will pay to Publisher ▮ of Paid Channel Revenue multiplied by a fraction, the numerator of which will be the number On-Demand Streams of Music Assets identified as embodying the Publisher Compositions (adjusted to reflect fractional interests) via the Free Service in the Ex-U.S Region on a country-by-country basis and the denominator will be the total number of On-Demand Streams of Music Content via the Free Service in the Ex-U.S. Region on a country-by-country basis.

  e. **Clarification.** Inclusion of playbacks of Conditional Downloads in royalty calculations (and any overpayments associated therewith) will not constitute an acknowledgment by Google of an implied public performance or communication to the public right in any way and will hold no precedential value whatsoever, including a continued payment obligation. Further, to the extent that Google can operationalize the separation of Conditional Download playbacks, Google may exclude Conditional Download playbacks from its calculations.



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY     GOOG-SCHNDR-00002452