Exhibit 19

to the Declaration of Catherine Hartman

Public Redacted Version

George A. Zelcs (pro hac vice)
  *gzelcs@koreintillery.com*
Randall P. Ewing, Jr. (pro hac vice)
  *rewing@koreintillery.com*
Ryan Z. Cortazar (pro hac vice)
  *rcortazar@koreintillery.com*
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601
Telephone: (312) 641-9750

Stephen M. Tillery (pro hac vice)
  *stillery@koreintillery.com*
Steven M. Berezney, CA Bar #329923
  *sberezney@koreintillery.com*
Carol O'Keefe (pro hac vice)
  *cokeefe@koreintillery.com*
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Telephone: (314) 241-4844

Joshua Irwin Schiller, CA Bar #330653
  *jischiller@bsfllp.com*
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street
41st Floor
San Francisco, CA  94104
Telephone: (415) 293-6800

Philip C. Korologos (pro hac vice)
  *pkorologos@bsfllp.com*
Joanna Wright (pro hac vice)
  *jwright@bsfllp.com*
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY 10001
Telephone: (212) 446-2300

*Attorneys for Plaintiffs Maria Schneider,*
*Uniglobe Entertainment, LLC, and AST Publishing Ltd.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING, LTD., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>YOUTUBE, LLC and GOOGLE LLC,<br><br>Defendants. | Case No. 3:20-cv-04423-JD<br><br>**PLAINTIFFS' PROFFER OF EVIDENCE CONCERNING DMCA FACTUAL DISPUTES** |
| YOUTUBE, LLC and GOOGLE LLC,<br><br>Counterclaimants,<br><br>v.<br><br>PIRATE MONITOR LTD,<br><br>Counterclaim Defendants. | |

**PLAINTIFFS' PROFFER OF EVIDENCE CONCERNING DMCA FACTUAL DISPUTES**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

I.     YouTube's Repeat Infringer Policy Does Not Satisfy DMCA Eligibility
       Conditions. ............................................................................................................. 2

       A.     YouTube Prevents Collection of Necessary Information. ....................... 3

       B.     YouTube Fails to Assess Strikes in "Appropriate Circumstances". ...... 4

II.    YouTube Does Not Accommodate and Interferes with Standard Technical
       Measures. ............................................................................................................... 7

III.   Factual Disputes Exist on the Additional DMCA Requirements. ....................... 8

       A.     YouTube Controls and Profits from Infringement. ................................. 8

       B.     YouTube Has Actual and Red Flag Knowledge of Plaintiffs' Infringements. ...... 9

       C.     Allowing Uploads Instead of Blocking Infringements Prevents Expeditious
              Removal. ............................................................................................... 10

CONCLUSION ................................................................................................................. 10

PLAINTIFFS' PROFFER OF EVIDENCE CONCERNING DMCA FACTUAL DISPUTES

1

## <u>TABLE OF AUTHORITES</u>

2
**Cases**

3
*A&M Records v. Napster,*
239 F.3d 1004 (9th Cir. 2001) ............................................................................9

4
*A&M Records v. Napster,*
No. C 99-05183 MHP, 2000 WL 573136 (N.D. Cal. May 12, 2000) ...................2

5
*Arista Records v. Myxer Inc.,*
No. CV 08-03935 GAF JCX, 2011 WL 11660773 (C.D. Cal. Apr. 1, 2011) ...............10

6

7
*Columbia Pictures Indus. v. Fung,*
710 F.3d 1020 (9th Cir. 2013) ........................................................................2, 9

8
*EMI Christian Music Group v. MP3tunes,*
844 F.3d 79 (2d Cir. 2016) ................................................................................2

9
*Fonovisa v. Cherry Auction,*
76 F.3d 259 (9th Cir. 1996) ...............................................................................9

10

11
*Mavrix Photographs v. Livejournal,*
873 F.3d 1045 (9th Cir. 2017) ...........................................................................9

12
*OpenTV v. Netflix,*
76 F. Supp. 3d 886 (N.D. Cal. 2014) ...............................................................10

13
*Peasley v. Spearman,*
No. 15-CV-01769-LHK, 2017 WL 5451709 (N.D. Cal. Nov. 14, 2017) ...........10

14
*Perfect 10 v. CCBill,*
488 F.3d 1102 (9th Cir. 2007) ........................................................................1, 3

15
*Perfect 10 v. Giganews,*
993 F. Supp. 2d 1192 (C.D. Cal. 2014) ..........................................................1, 4

16

17
*UMG Recordings v. Shelter Cap. Partners,*
718 F.3d 1006 (9th Cir. 2013) .........................................................................10

18
*Ventura Content v. Motherless,*
885 F.3d 597 (9th Cir. 2018) ..........................................................................1-8

19
*Viacom Int'l v. YouTube,*
718 F. Supp. 2d 514 (S.D.N.Y. 2010) .............................................................6, 7

20

21
*Viacom Int'l v. YouTube,*
940 F. Supp. 2d 110 (S.D.N.Y. 2013) .............................................................7, 9

22
*Viacom Int'l. v. YouTube,*
676 F.3d 19 (2d Cir. 2012)…………………………………………………………7

**Statutes**

23
17 U.S.C. § 512 ...........................................................................................passim

24

25

26

27

28

PLAINTIFFS' PROFFER OF EVIDENCE CONCERNING DMCA FACTUAL DISPUTES

1

2     Plaintiffs and the putative class respectfully submit this proffer of evidence pursuant to this

3     Court's order [ECF 219] and in opposition to Defendants' December 19, 2022, letter [ECF 218]

4     requesting leave to file successive summary judgment motions ("Letter" or "Def. Ltr.").

5                                    **INTRODUCTION**

6          YouTube is only eligible for safe harbors under 17 U.S.C. § 512(c) if it first satisfies the

7     DMCA's two "Conditions for Eligibility" required by section 512(i).  Thus, YouTube is eligible

8     for safe harbor "only if" it (1) "has adopted and reasonably implemented" a "policy that provides

9     for the termination in appropriate circumstances of subscribers and account holders of the service

10    provider's system or network who are repeat infringers" *and* (2) "accommodates and does not

11    interfere with standard technical measures."  17 U.S.C. § 512(i)(1)(A)-(B).  The failure to satisfy

12    *either* of these threshold conditions makes Defendants ineligible for DMCA safe harbors.

13    *Perfect 10 v. Giganews*, 993 F. Supp. 2d 1192, 1196 (C.D. Cal. 2014) ("To be eligible for any of

14    the four safe harbors stated in § 512(a)-(d), a service provider must first meet the threshold

15    conditions set out in § 512(i).").  Both eligibility conditions are in dispute in this case.

16         The parties dispute whether YouTube has implemented a repeat infringer policy because a

17    service provider may "'not actively prevent copyright owners from collecting information needed

18    to issue'" a DMCA takedown notification.  *Ventura Content v. Motherless,* 885 F.3d 597, 617 (9th

19    Cir. 2018) (quoting *Perfect 10 v. CCBill*, 488 F.3d 1102, 1109 (9th Cir. 2007)).  YouTube,

20    however, blocks copyright holders from identifying infringements in numerous ways, including,

21    *e.g.*, by failing to provide all results to a copyright holder who searches for their name or song

22    title.  Further, to be reasonably implemented, a repeat infringer policy must "under 'appropriate

23    circumstances'" result in termination of "users who repeatedly or blatantly infringe copyright".

24    *Id*. Yet, YouTube's policy has "loopholes" allowing it to increase its profits by avoiding assessing

25    copyright strikes.  The parties dispute whether Content ID identifies infringements and, if it does,

26    whether it is reasonable to forego copyright strikes for the billions of infringements it catches.

27    YouTube only assesses strikes for infringements identified by a DMCA-compliant takedown

28    notice, yet nothing in the DMCA allows such a restriction.  Independently, the parties dispute

PLAINTIFFS' PROFFER OF EVIDENCE CONCERNING DMCA FACTUAL DISPUTES

whether digital fingerprinting technology is a standard technical measure ("STM").  There is no dispute that YouTube fails to accommodate and inhibits such technology making clear that the factual dispute of whether such technology is an STM controls YouTube's eligibility under the DMCA's second condition.  17 U.S.C. § 512(i)(1)(B).

*Only if* Defendants satisfy both threshold conditions, do the DMCA's three separate and additional requirements come into play as forth in 17 U.S.C. § 512(c)(1)(A)-(C) and listed in the Court's order [ECF 219].  *See Motherless*, 885 F.3d at 614 ("Congress promulgated subsection (i) to limit the eligibility for safe harbor treatment.").  In essence, these additional requirements consider whether Defendants receive a financial benefit from infringing activity that they control or whether they had actual or red flag knowledge of infringement and failed expeditiously to remove it.  17 U.S.C. § 512(c)(1)(A)-(C).  Disputes of material fact pervade these additional considerations including, *e.g.*, whether the launch of Autoplay in 2015 (Ex. 17 at -882[1]) establishes that YouTube has control over and benefits from infringing activity given that YouTube selects and displays videos, including infringing videos, without users' involvement.

Numerous factual disputes exist precluding an award of summary judgment on the DMCA and Defendants' request for leave should be denied.  *EMI Christian Music Group v. MP3tunes*, 844 F.3d 79, 90–91 (2d Cir. 2016) (fact issue precluded summary judgment on DMCA issue); *Columbia Pictures Indus. v. Fung*, 710 F.3d 1020, 1044 (9th Cir. 2013) (affirming summary judgment holding defendant did not qualify for DMCA safe harbor); *A&M Records v. Napster*, No. C 99-05183 MHP, 2000 WL 573136, at *10 (N.D. Cal. May 12, 2000) (denying motion for summary judgment on DMCA issue).

## I.  YOUTUBE'S REPEAT INFRINGER POLICY DOES NOT SATISFY DMCA ELIGIBILITY CONDITIONS.

YouTube may only invoke DMCA safe harbors if it first "adopts" and "reasonably implements" a policy that terminates "in appropriate circumstances" "subscribers and account holders" of YouTube "who are repeat infringers."  *Motherless,* 885 F.3d at 614; *see also* 17 U.S.C.

---

[1] All numerical exhibits cited herein ("Ex. __") are attached to the Declaration of Joanna Wright in Support of Plaintiffs' Proffer of Evidence Concerning DMCA Factual Disputes.

1   § 512(i).  The parties dispute whether YouTube has reasonably implemented such a policy.

2                  **A.      YouTube Prevents Collection of Necessary Information.**

3          The Ninth Circuit has held "that 'a service provider implements a policy' only if it "'does

4   not actively prevent copyright owners from collecting information needed to issue'" DMCA

5   takedown notifications.  *Motherless,* 885 F.3d at 617 (quoting *CCBill,* 488 F.3d at 1109).

6   Plaintiffs contend that YouTube "actively prevents" copyright owners from "collecting

7   information" necessary to identify infringement on the platform and submit a takedown notice.

8          *First*, when copyright holders who do not have Content ID engage in searches for

9   infringements across the *billions* of videos on YouTube's platform (Ex. 19 at -191; Ex. 3—

10  Goodrow Dep. at 17:2-22), they are limited to using keyword searches that may or may not

11  capture words listed with the infringing videos (Ex. 10—Winograd Rpt. at ¶¶ 47-52, 58-60,

12  Exh. D; Ex. 29—Transparency Report for H1 2022 at 2 (YouTube recognizing that search is

13  required for takedown via the webform);).  When the copyright holder succeeds in selecting

14  keywords that do match an infringement, however, YouTube's search algorithm withholds an

15  untold number of infringements that hit on those keywords by deduplicating search results.  (*See*

16  Ex. 10—Winograd Rpt. at ¶¶ 52-54, 72, 89; Ex. 3—Goodrow Dep. at 75:20-76:13; Ex. 7—Zhu

17  Dep. at 41:11-42:5.)  This deduplication prevents a copyright holder from identifying all

18  infringement on the platform that would otherwise turn up through a keyword search thus

19  preventing the collection of information (the identification of infringing URLs) necessary for a

20  takedown notice.  *Second*, YouTube's search algorithm does not search videos that have been

21  marked private or unlisted, meaning that the copyright holder has *no* ability to identify infringing

22  material that can be viewed by anyone with a link to the unlisted video.  (Ex. 10—Winograd Rpt.

23  at ¶¶ 66-70; Ex. 7—Zhu Dep. at 46:19-23; Ex. 2—Bill Dep. at 125:17-126:14; 127:17-128:7.)

24  *Third*, YouTube's Terms of Service ("TOS") does not allow copyright holders to use "automated

25  means" to search the *billions* of YouTube videos which prevents the use of third-party digital

26  fingerprinting technology (irrespective of whether that technology is an STM) to find

27  infringement.  (Ex. 14—YT Terms of Service at § 4(H)).  At the same time, YouTube prevents

28  the use of web-scraping tools which would create a copy of some or all of the YouTube platform

1    to allow third-party digital fingerprinting technology to be run on that copy (rather than directly on

2    the YouTube platform) to identify instances of infringement.  (*See* Ex. 13—RFA Nos. 61-62.)

3         **B.     YouTube Fails to Assess Strikes in "Appropriate Circumstances".**

4         The implementation of a policy "is reasonable if, under 'appropriate circumstances,' the

5    service provider terminates *users* who repeatedly or blatantly infringe copyright." *Motherless*, 885

6    F.3d at 617 (emphasis added); *Giganews*, 993 F. Supp. 2d at 1196.  YouTube's policy, however, is

7    crafted to avoid assessing copyright strikes in many instances, thereby failing to terminate "repeat

8    infringers" in "appropriate circumstances".  17 U.S.C. § 512(i)(1).

9         *First*, YouTube does not assess copyright strikes for any infringements caught by

10   Content ID.  (Ex. 31 at -096.)  Content ID catches approximately *1.5 billion instances of copyright*

11   *infringement per year*, constituting "over 99% of all copyright actions on YouTube" regardless of

12   whether the rightsowner has chosen to block or monetize the infringing video.  (Ex. 27—

13   Transparency Report for H1 2021 at 4 ("over 99%"), 10; Ex. 29—Transparency Report for H2

14   2021 at 4 ("over 98%"), 10.)  Thus, *nearly all* of the infringement caught on YouTube is insulated

15   from its repeat infringer policy and "subscribers and account holders" who upload infringements

16   caught by Content ID are not assessed copyright strikes.  (Ex. 31 at -096.)  Defendants dispute the

17   unreasonableness of this exemption arguing that "Content ID does not identify ***infringements*** at

18   all."  [ECF 198 at 12 n.6 (emphasis in original)]; *see also* Ex. 8—Zhu 30(b)(6) Dep. at 30:17-

19   32:2.)  This assertion contradicts Defendants' own documents, however: "Content ID detects

20   copyright violations."  (Ex. 25 at -783; *see also* Exs. 27-29—Transparency Reports at 12

21   ("Content ID's systems automatically detect potential infringement"); Ex. 24—How Google

22   Fights Piracy at 14, 23, 25 ("To avoid claiming videos which may not be infringing", "Through

23   Content ID, creators and rightsholders can earn money even when their work hasn't been properly

24   licensed by the uploader.".)  Indeed, Defendants' assertion is also belied by the billions of

25   instances where YouTube (i) monetizes an upload caught by Content ID, which diverts revenue to

26   the rightsholder and away from the uploader or (ii) blocks at the direction of the rightsholder an

27   upload caught by Content ID; both such actions are legitimate only if the upload caught by

28   Content ID was an infringement by the uploader.  (*See* Ex. 29—Transparency Report for H1 2022

PLAINTIFFS' PROFFER OF EVIDENCE CONCERNING DMCA FACTUAL DISPUTES

1    at 1 ("$7.5 billion to rightsholders from ads alone as of December 2021, from content claimed and

2    monetized through the tool", *i.e.*, through Content ID.).)

3        *Second*, YouTube assesses strikes against channels, not "subscribers and account holders",

4    17 U.S.C. § 512(i)(1)(A), or "users", *Motherless*, 885 F.3d at 617, who can have multiple

5    channels—a flaw in its policy that YouTube has itself identified as a "loophole" that allows users

6    with multiple channels to upload infringements simultaneously without termination.  (Ex. 22 at -

7    384; Ex. 8—Zhu 30(b)(6) Dep. at 20:8-25; Ex. 21 at -918.)  During the class period, YouTube

8    estimates that this loophole protected at least 33,890 channels that should have otherwise been

9    terminated.  (Ex. 22 at -387.)  YouTube admits it implemented this policy for the purpose of

10   "reducing legal risk" (Ex. 20 at -390, -391) after "major labels" complained that this loophole

11   made it "easy for alleged infringers to continue their unlawful activity".  (Ex. 22 at -384; *see also*

12   Ex. 20 at -391; Ex. 21 at -918) ("Leaving these channels live with all their content online poses a

13   risk to our repeat infringer policy.  Additionally, we've received vocal complaints from partners

14   about live channels that are clearly related to channels that have been suspended for copyright.").)

15   The parties also dispute whether YouTube "fixed" this problem by changing its policy during the

16   class period to terminate more, but not necessarily all, channels operated by the same user when

17   one of those channels is terminated.  (Ex. 23 at -059, -064.) ████████████████

18   ███████████████████████████████████████████████████

19   ███████████████████████████████████████████████████

20   ████████████████████████████ (Ex. 12—Am. Resp. to Rog. 4 (confirming "three-

21   strike" policy); Ex. 23 at -059 ███████████████████████████████;

22   Ex. 8—Zhu 30(b)(6) Dep. at 23:12-17.)

23       *Third*, an entire category of YouTube users, the "Trusted Enterprise Partners," is exempt

24   from termination regardless of how many copyright strikes are assessed.  YouTube, itself, has

25   explained that these "Trusted Enterprise Partners" are "treated differently under YouTube's repeat

26   infringer policy."  (Ex. 12—Am. Resp. to Rog. 4 at 7-8.)  For these entities, "the copyright strikes

27   do not lead to the automatic termination of those channels."  (Ex. 8—Zhu 30(b)(6) Dep. at 18:15-

28   20:6; *see also* Ex. 5—Ting Dep. at 83:6-22.)

These facts also collectively raise whether YouTube's policies encourage infringement on its platform. (Ex. 10—Winograd Rpt. at ¶ 97; Ex. 9—Singer Rpt. at ¶¶ 16, 65). This concern is hardly conjecture; Defendants' own cases worry that without an appropriate repeat infringer policy as called for by "subsection (i), an unscrupulous website might take down infringing material as soon as it received a proper takedown notice identifying it, yet still operate as a pirate site." *Motherless,* 885 F.3d at 614. Yet, YouTube assesses copyright strikes only upon submission of a "complete and valid takedown notice". (Ex. 12—Am. Resp. to Rog. 4 at 6; Ex. 8—Zhu 30(b)(6) Dep. at 49:25-50:13.) That limitation, however, is nowhere justified in the DMCA which obligates YouTube to terminate users "who are repeat infringers" without saying that only applies to infringers against whom a DMCA takedown is submitted (which limitation is used elsewhere in the DMCA). *Compare* 17 U.S.C. § 512(i)(1)(A) *with, e.g.,* 17 U.S.C. § 512(d)(3).

Indeed, YouTube highlights a copyright holder's ability to profit from infringement:

> "Thanks to the different options that Content ID gives copyright owners, *it's not just an anti-piracy solution, but also a revenue-generation tool. Through Content ID, creators and rightsholders can earn money even when their work hasn't been properly licensed by the uploader.* In 2017, rightsholders choose to monetize 90% of all Content ID claims, opening up a multitude of new revenue streams for themselves. In the music industry, rightsholders choose to monetize over 95% of Content ID claims." (Ex. 24—How Google Fights Piracy at 25 (emphasis added).)

(*See also* Ex. 31 at -095 (Content ID "means that rights holders don't need to submit copyright takedowns" "and instead have the opportunity to monetize and run ads in exchange for the videos being live.").) Notably, YouTube receives a 50-55% share of advertising revenue generated by Content ID monetizations. (Ex. 1—Agrawal Dep. at 69:5-70:24.)

Defendants' December 19 Letter suggests that YouTube's repeat infringer policy has "already received judicial approval," citing *Viacom I*, careful not to state that the policy had been ruled upon as it has not. (Def. Ltr. at 2.) *Viacom I*, an out-of-circuit district court opinion, was decided on the factors set forth in § 512(c); the *Viacom* plaintiffs did not move under § 512 (i), rendering commentary on the repeat infringer policy dicta. *See Viacom I*, 718 F. Supp. 514, 516 (S.D.N.Y. 2010). In any event, *Viacom I* is inapposite. There, Defendants claimed and the Court believed that copyright strikes would be assessed for at least some content blocked through

Content ID.  *See id.*, 718 F. Supp. 2d at 528 (finding "reasonable" YouTube's "initial hesitation" in assigning strikes to manual blocks matched by Content ID but assuming strikes would be assessed going forward).  Today, YouTube does not assess any strikes for any content blocked through Content ID.  (Ex. 31 at -096; Ex. 12—Am. Response Rog. 4 at 6; Ex. 8—Zhu 30(b)(6) Dep at 51:25 – 52:21.)  Moreover, two of the threshold issues the Plaintiffs here litigate were not raised in *Viacom*, namely (1) whether YouTube's policies and algorithms block copyright holders from locating infringements to issue takedown notices (see Part I.A) and (2) whether digital fingerprinting technology was an STM.  *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 41 (2d Cir. 2012) (*Viacom II*).  With respect to the 512(c) issues the *Viacom* that the court did consider, in *Viacom III* the court held that a provider forfeits the safe harbor where it "influence[s] or participate[s] in the infringement."  *See Viacom Int'l v. YouTube*, 940 F. Supp. 2d 110, 118 (S.D.N.Y. 2012) (*Viacom III*).  With the subsequent 2015 launch of Autoplay, YouTube began directly to participate in infringements displayed on its platform and no court has yet opined on this fact.  *See* Section III.A, below.

## II.    YOUTUBE DOES NOT ACCOMMODATE AND INTERFERES WITH STANDARD TECHNICAL MEASURES.

YouTube cannot invoke the safe harbor for the independent reason that it does not "accommodate[]" and instead "interfere[s] with standard technical measures."  17 U.S.C. § 512(i)(1)(B).  The DMCA provides criteria defining STMs (§ 512(i)(2)).  The parties dispute whether third party digital fingerprinting technology (similar to Content ID) is an STM.  Industry leaders have clearly asserted that digital fingerprinting technology is an STM.  (Ex. 30—May 27, 2022, Comments from RIAA and NMPA to USCO at 4; Ex. 18—Comments of the MPAA at 19.)  YouTube relegates this material factual dispute to a footnote in which it misleadingly claims that the U.S. Copyright Office ("USCO") has "recognized to date" that no STMs exist.  (Def. Ltr. 2 n.2.)  Yet, the USCO has no role in determining whether an STM exists, and it certainly is not dispositive.  17 U.S.C. § 512(i)(2).  Rather than "accommodate" these STMs as it must, YouTube "interferes" with them as noted above at pages 3-4.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.    FACTUAL DISPUTES EXIST ON THE ADDITIONAL DMCA REQUIREMENTS.

Once a service provider is eligible under § 512(i), it must still satisfy three additional safe harbor conditions for each infringement.  17 U.S.C. § 512(c)(1); *Motherless,* 885 F.3d at 603-04.

#### A.    YouTube Controls and Profits from Infringement.

If YouTube "'receive[s] a financial benefit directly attributable to the infringing activity'" which it "'has the right and ability to control'", it cannot assert the safe harbor as a defense. *Motherless,* 885 F.3d at 603-04 (quoting 17 U.S.C. § 512(c)(1)(B)).  The parties dispute whether Autoplay establishes Defendants' control.  (Ex. 13—RFA Nos. 10-12.)  YouTube's Autoplay is "a playback which starts *without an explicit user action* associated with that specific video."  (Ex. 15 at -720 (emphasis added); s*ee also* Ex. 16 ("After you watch a YouTube video, we'll automatically play another related video based on your viewing history."); Ex. 3—Goodrow Dep. at 12:7-18 (Autoplay automatically plays the next video identified by Watch Next).)  Autoplay is the default setting for users over 18 and over 87% of all web users leave Autoplay enabled. (Ex. 26 at -725; Ex. 6—Wu Dep. at 108:6-8, 109:5-118:7.)  Defendants' own cases support Plaintiffs on this.  In *Motherless*, *e.g.*, the court found the absence of control where the website "did not curate uploaded content in any meaningful way."  885 F.3d at 613.  Here, Autoplay and Watch Next do exactly that by using algorithms to select what will automatically play next for a user creating factual issues for all infringements played on Autoplay.  (Ex. 26—Autoplay Deep Dive (generally how Autoplay works and showing no filtering for potential infringement); Ex. 6— Wu Dep. at 97:7-98:1 (Autoplay ceased excluding videos that had "copyright muted" portions), 17:10-20:8 (WatchNext supports Autoplay to play "what we", i.e., YouTube "thinks the user might want to watch"), 36:9-19 (Autoplay is based off of WatchNext); Ex. 3—Goodrow Dep. 15:13-16:4; 125:20-126:20 (WatchNext surfaces videos that the "user was unaware existed on YouTube");  Ex. 32(showing Autoplay views for the infringements at issue in this case.)

Independent of Autoplay, YouTube agreements require users of Content ID to monetize, rather than block, infringing content.  (Ex. 33—SRAV at § 3(b)(i); Ex. 34—PLA at § 3(b); Ex. 4—Suk Dep. at 109:6-110:15, 149:9-150:10).  By preventing blocking, YouTube's contractual requirements control and require the continued display of uploaded videos that were infringing (as

1    they otherwise would not be monetized by Content ID) and YouTube makes money off of them.

2           As held in *Viacom*, "The concept is that a service provider, even without knowledge of

3    specific infringing activity, may so influence or participate in that activity, while gaining a

4    financial benefit from it, as to lose the safe harbor." *Viacom III*, 940 F. Supp. 2d at 118.

5           Defendants also dispute that they profit from infringements played on Autoplay despite

6    internal documents stating that (1) "Views == revenue" (Ex. 17 at -912) and (2) Autoplay

7    dramatically increased user view time (*id.* at -882 ("+█% viewtime/visitor" upon launch of

8    Autoplay)).  Moreover, Plaintiffs' expert established (and Defendants dispute) that infringements

9    increase view time thereby increasing the profitability of non-infringing content.  (*Compare*

10   Ex. 9—Singer Rpt. at ¶ 16 *with,* Ex. 11—Peterson Rpt. at ¶¶ 41-43.)  Defendants' own employees

11   support Mr. Singer's view.  (Ex. 6—Wu Dep. at 80:4-81:6.)  Defendants' Letter (at 3) focuses on

12   advertisements "run before or after", but not during, these infringements but misses the point.

13   Where a platform's ecosystem is set to promote infringement from which it profits, financial

14   benefit may be demonstrated "where infringing performances enhance the attractiveness of a

15   venue." *See A&M Records v. Napster*, 239 F.3d 1004, 1023 (9th Cir. 2001) (quoting *Fonovisa v.*

16   *Cherry Auction*, 76 F.3d 259, 263 (9th Cir. 1996)); *see also Fung*, 710 F.3d at 1044-45 (same).

17          **B.    YouTube Has Actual and Red Flag Knowledge of Plaintiffs' Infringements.**

18          "Red flag knowledge arises when a service provider is aware of facts that would have

19   made the specific infringement objectively obvious to a reasonable person." *Mavrix Photographs*

20   *v. Livejournal*, 873 F.3d 1045, 1057 (9th Cir. 2017) (internal quotation marks omitted).  YouTube

21   has the ability to identify infringement of Plaintiffs' works on its platform via Content ID.  This

22   ability is not theoretical.  In March 2022, Plaintiffs provided Defendants with reference files of the

23   works at issue that Defendants used to run Content ID on the platform.  (Ex. 35).  After

24   Defendants provided the results of their running Content ID (final results were provided in August

25   2022), multiple infringements of Maria Schneider's works at issue have been uploaded to

26   YouTube, including as recently as December 2022, despite Defendants' ability to identify these

27   infringements prior to upload and block them.[2]  (Ex. 36). The Ninth Circuit has noted, "a service

28   ───────────────────────
     [2]   These infringements were first uploaded to YouTube in December 2022 and thus could not

1  provider cannot willfully bury its head" to avoid obtaining knowledge of infringement.  *UMG*
2  *Recordings v. Shelter Cap. Partners*, 718 F.3d 1006, 1023 (9th Cir. 2013).  Here, Defendants have
3  done exactly that.

**C.      Allowing Uploads Instead of Blocking Infringements Prevents Expeditious
          Removal.**

Whether removal is "expeditious" as required by the DMCA (§ 512(c)(1)), turns on a
platform's capabilities.  *See Arista Records v. Myxer Inc*., No. CV 08-03935 GAF JCX, 2011 WL
11660773, at \*27 (C.D. Cal. Apr. 1, 2011).  Because YouTube already uses Content ID to match
all uploaded videos to those previously removed by a takedown notice but fails to inform
rightsowners of matches found through such process (Ex. 10—Winograd Rpt. at ¶¶ 89, 76-84), a
factual dispute exists on whether YouTube expeditiously removes infringing content.

                            *          *          *

"As a general rule, multiple rounds of summary judgment motions will not be entertained
absent a showing of significant judicial economy in such an approach."  *OpenTV v. Netflix*, 76 F.
Supp. 3d 886, 887 n.1 (N.D. Cal. 2014); *Peasley v. Spearman*, No. 15-CV-01769-LHK, 2017 WL
5451709, at \*3 (N.D. Cal. Nov. 14, 2017) (same).  The disputed issues of fact identified above
further establish that Defendants should not be permitted to file another motion for summary
judgment on issues on which they previously could have moved.

## CONCLUSION

For all the reasons stated above, the Court should deny Defendants' request for leave to
file successive summary judgment motions.

Dated: January 9, 2023                           Respectfully submitted,

                                                 */s/ Philip Korologos*
                                                 Philip C. Korologos (pro hac vice)
                                                 Joanna Wright (pro hac vice)
                                                 BOIES SCHILLER FLEXNER LLP
                                                 55 Hudson Yards, 20th Floor

---

have been included on the February 25, 2022, list of infringements.  Plaintiffs are nonetheless
cognizant of the Court's January 5, 2023, ruling [ECF 222 n. 1] that Plaintiffs may not pursue in
this action infringements not included on the February 25, 2022, list but include this fact to show
Defendants' continued failure to act on red flag knowledge.

PLAINTIFFS' PROFFER OF EVIDENCE CONCERNING DMCA FACTUAL DISPUTES

1

New York, NY 10001
Phone: (212) 446-2300
Fax: (212) 446-2350

2

3

Joshua Irwin Schiller, CA Bar #330653
BOIES SCHILLER FLEXNER LLP
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Phone: (415) 293-6800
Fax: (415) 293-6899

4

5

6

7

George A. Zelcs (pro hac vice)
Randall P. Ewing, Jr. (pro hac vice)
Ryan Z. Cortazar (pro hac vice)
KOREIN TILLERY, LLC
205 North Michigan, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

8

9

10

11

Stephen M. Tillery (pro hac vice)
Steven M. Berezney, CA Bar #329923
Carol O'Keefe (pro hac vice)
KOREIN TILLERY, LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

12

13

14

15

16

*Attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:20-cv-04423-JD

PLAINTIFFS' PROFFER OF EVIDENCE CONCERNING DMCA FACTUAL DISPUTES