# EXHIBIT 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - - - x

MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated,

Plaintiffs,

Case No. 3:20-cv-04423-JD

-against-

YOUTUBE, LLC; and GOOGLE LLC;

Defendants.

- - - - - - - - - - - - - - - - - - - - x

**CONFIDENTIAL**

Videotaped oral deposition of FRANCOIS-XAVIER NUTTALL, taken pursuant to notice, was held at the law offices of BOIES SCHILLER & FLEXNER LLP, 55 Hudson Yards, New York, New York 10001, commencing September 30, 2022, 9:03 a.m., on the above date, before Leslie Fagin, a Court Reporter and Notary Public in the State of New York.

- - -

MAGNA LEGAL SERVICES
320 West 37th Street, 12th Floor
New York, New York 10018
(866) 624-6221



**APPEARANCES:**

KOREIN TILLERY, LLC
Attorneys for Plaintiffs
205 North Michigan, Suite 1950
Chicago, Illinois 60601
BY: CAROL O'KEEFE, ESQUIRE
GEORGE ZELES, ESQUIRE (Appearing telephonically.)
-and-
BOIES SCHILLER & FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, New York 10001
BY: PHILIP C. KOROLOGOS, ESQUIRE
DEMETRI BLAISDELL, ESQUIRE
WALESKA SUERO GARCIA, ESQUIRE
ROBERT DWYER, ESQUIRE

WILSON SONSINI GOODRICH & ROSATI
Attorneys for Defendants
650 Page Mill Road
Palo Alto, California 94304-1050
BY: ELI RICHLIN, ESQUIRE
KELLY KNOLL, ESQUIRE

ALSO PRESENT:

PAUL JESSOP

PAUL GLAUBERSON, Videographer
Magna Legal Services

**THE VIDEOGRAPHER:** We are now on the record.

This begins video No. 1 in the deposition of Francois-Xavier Nuttall in the matter of Maria Schneider, et al., versus YouTube, LLC et al., in the United States District Court, Northern District of California, 3:20-cv-04423-JD.

Today is September 30, 2022 and the time is 9:03 a.m.

This deposition is being taken at Boies Schiller Flexner LLP, 55 Hudson Yards, New York, New York.

The videographer is Phil Glauberson of Magna Legal Services and the court reporter is Leslie Fagin of Magna Legal Services.

Will counsel state their appearances and whom they represent, after which, the court reporter will swear in the witness.

**MR. KOROLOGOS:** Phil Korologos with Boies Schiller Flexner for the

plaintiffs and the punitive class.

MS. O'KEEFE: Carol O'Keefe of Korein Tillery for the plaintiffs and punitive class.

**MR. BLAISDELL:** Demetri Blaisdell, Boies Schiller Flexner for the plaintiffs and punitive class.

**MS. GARCIA:** Waleska Suero Garcia, Boies Schiller Flexner for the plaintiffs and punitive class.

**MR. RICHLIN:** Eli Richlin, Wilson Sonsini for the defendants and the witness and I'm joined by my colleague, Kelly Knoll.

I will note Paul Jessop is in the room and who is on the line right now?

**MR. KOROLOGOS:** George Zelcs.

**MR. ZELCS:** George Zelcs on behalf of the plaintiffs and the punitive class.

**MR. DWYER:** And Robert Dwyer on behalf plaintiffs and the punitive class.

F R A N C O I S - X A V I E R N U T T A L L, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
**MR. KOROLOGOS:**

**Q. Good morning.**
A. Good morning, sir.
**Q. Have you been deposed before?**
A. Yes, I have, sir.
**Q. When was that?**
A. That was about 10 years ago.
**Q. Only one time?**
A. Yes, only one time.
**Q. What kind of case was that?**
A. That was a patent litigation.
**Q. That's the patent litigation you mention in your report?**
A. I do not recall mentioning that patent litigation.
**Q. Do you recall your report identifies that you acted as an expert witness in a patent litigation --**



are closely related?
A. They are, sir.
**Q. Then with respect to the Paris Music platform, I asked you about metadata that was available to the user and you described it, some of the metadata available to the user.**
**Is there other metadata that would not be viewable by the user?**
A. Yes, there was.
**Q. What metadata would not be viewable by the user?**
A. It is what I would call rights management metadata. It is the metadata used to identify the content, to monitor the transactions of content usage and to generate reports for the rights holders who have ownership in that content.
**Q. Anything else?**
A. It would have been connected to financial services and financial payment systems to collect the end user's payments and organize the distribution of the royalties.

**Q. Anything else?**
A. Not that I can think of.
**Q. When you say, writes management metadata, are you breaking it into two categories of metadata; first, rights management metadata and second, descriptive metadata?**
A. That is correct.
**Q. Any other categories of metadata?**
A. Not that were stored or made available to the end user.
**Q. With respect to the Paris Music platform?**
A. That is correct.
**Q. You still have your report in front of you?**
A. I do, sir.
**Q. If you look at paragraph 2-A, please.**
**Did you find it?**
A. Yes, I did.
**Q. You state in your report there, The transcoding process can be performed without reference to annotative embedded metadata and**

need not review or utilize such metadata to prepare a transcoded video available for viewing on a platform that hosts user-generated content.
Do you see that?
A. I do see that.
**Q. When you stated that the transcoding process need not review or utilize such metadata, is it your opinion that the transcoding process cannot review or utilize such metadata?**
A. No, I didn't say cannot, I said need not.
**Q. When you opine that the transcoding process can be performed without reference to annotative embedded metadata, is it your opinion that the transcoding process can be performed with reference to annotative embedded metadata?**
A. It can be performed both ways, you can perform with and without. There is no dependency.
**Q. Let's go back to paragraph 25 on page 7, please.**

A. Yes.
**Q. The second sentence of paragraph 25 in the report states, As part of the transcoding process, the service does not need to open or view such metadata.**
**Do you see that?**
A. I do, sir.
**Q. Are you offering an opinion that the service cannot open or view such metadata as part of the transcoding process?**
A. This is not what I said.
**Q. Further down in that paragraph, you say, YouTube does not need to import the optional annotative and manipulable metadata that may be embedded in the video files that users upload into the transcoded files that other users can stream on the platform.**
**Do you see that?**
A. I do, sir.
**Q. Is it your opinion that YouTube cannot do that?**
A. No, it is my opinion that YouTube does not need to import.
**Q. We talked a little bit about this**



point earlier. The last sentence of paragraph 25, you say that according to a sworn statement of the company's tech program lead, YouTube does not do so.

Do you see that?

A. I do, sir.

**Q. When you say, does not do so, you are referencing what you state in the immediately prior sentence, is that right, that YouTube does not need to import the optional annotative and manipulable metadata that may be embedded in the video files that users upload into the transcoded files that other users can stream on the platform, is that right.**

A. The opinion I'm putting forth here is that I'm stating that you YouTube does not need to do it and this is confirmed by Google's tech team who actually says they do not do it, yet, they manage to perform the transcoding process.

**Q. In your answer just now, when you used the word, it, you were talking about what you describe in that second to last**

sentence of 25, is that right?

A. Sorry, I don't exactly get your question.

**Q. Sure. Let me ask it this way. You first established that the only source for your statement in the last sentence of paragraph 25 is the declaration we talked about earlier from Mr. Foucu that is referenced in footnote 17, is that right?**

**MR. RICHLIN:** Objection to form.

A. That is not correct.

My opinion is based on technical knowledge on the transcoding process first and then my opinion is just confirmed by a Google engineer.

**Q. Right now, I'm only asking about confirmation from the Google engineer of what YouTube does or does not do. I'm not asking about your opinion right now. I'm asking solely about the last sentence of paragraph 25.**

**Do you understand that?**

A. What I understand is that a lead engineer at YouTube states that they can

successfully perform a transcoding process without needing to look or import or read the annotative metadata.

**Q. That's the extent of your understanding?**

**MR. RICHLIN:** Objection to form.

**Q. You can answer.**

A. I take that as expert value, what the YouTube programmer says.

**Q. And your understanding of what that YouTube programmer says is what you just testified to?**

A. I do not understand the question, sorry.

**Q. Sure. So you just told me that you take as expert value what the YouTube programmer says.**

**That's Mr. Foucu, right?**

A. Yes.

**Q. And your understanding of his statement, Mr. Foucu's statement is that they can successfully perform a transcoding process without needing to look or import or read the annotative metadata, is that right?**

**MR. RICHLIN:** Objection to form.

A. Because that was a long question, I may rephrase it in my own terms.

**Q. Please.**

A. I independently analyzed that you could perform a transcoding successfully without looking at metadata and this is confirmed by a YouTube engineer.

**Q. How did you independently analyze that you could perform a transcoding successfully without looking at metadata?**

A. I first have a deep knowledge of the file formats that are being used for transcoding and I have experienced myself that process, so I, myself, have been successful achieving such a functionality.

**Q. Anything else that you did to analyze that you could perform a transcoding successfully without looking at metadata?**

A. I think the two reasons I gave before are sufficient.

**Q. Well, they may be sufficient in your mind. I want to make sure I get all of the reasons, so I want to get to**



by the user in connection with the upload?
**MR. RICHLIN:** Objection to form.
**Q. You can answer.**
A. I believe I responded before, the first process where the user has a manual control over the end user provided metadata, give them a chance to review and curate as necessary and the other process where it's embedded and annotative metadata, there is no way to verify or curate the information provided.
**Q. And the first process of user-entered metadata that you just talked about requires -- I'm sorry, the first process that relates to user-entered metadata relies on the user being willing to accurately enter the information, correct?**
A. I mean the expected behavior is to enter meaningful information and accurate, but, either way, it doesn't change anything. If somebody is mischievous, he will do it any way he want, the best we can do is put some control over it.
**Q. Let's talk about ISRC codes.**

**MR. RICHLIN:** If you are going into a new area, we've been going about an hour. Do you want to take five?
**THE VIDEOGRAPHER:** This will end video 5. The time is 4:34.
(Recess.)
**THE VIDEOGRAPHER:** We are back on the record at 4:56. This will begin video 6.
**Q. Mr. Nuttall, let's turn to ISRC codes and you have a section of your report that starts at paragraph 37 about ISRC, right?**
A. That is correct.
**Q. In paragraph 42, you state in your report that you are aware of no video editing software that automatically retained ISRC codes for music that may be a component of a video.**
**Do you see that?**
A. Yes, I do.
**Q. And that is the first stated reason for the support of the sentence prior to that, the last sentence in paragraph 41 which**

says, Even if one were to accept that faulty premise of Mr. Jessop's opinion that you must conclude that ISRCs have been removed from such edited videos still is incorrect, is that right?
A. That is correct.
**Q. In paragraph 42, when you say you are not aware of any editing software that automatically retains ISRC codes for music that may be a component of a video.**
**Does that mean it's your understanding that all of the available video editing software removes ISRC codes for music that might be a component of a video?**
**MR. RICHLIN:** Objection to form.
A. I've never said that all video editing software. There might be some that I have eluded my research, but I have worked on quite a lot of different editing software.
As I said before, I also wrote some audio extraction tools and the retention of the ISRC is just not present in all those processes.
**Q. So another way to ask this would be**

to say, am I correct that your -- let me withdraw that.
Am I correct that -- first of all, are you aware of a lot of video editing software, correct?
A. That is correct.
**Q. Of all the video editing software you are aware of, none of that software retains ISRC codes for music that may be a component of a video?**
A. That's correct.
**Q. And how long have you had that understanding?**
A. Since I edited video content, 20 odd years ago.
**Q. And presumably your knowledge base of different video editing software has grown over the past 20 years as you used different products?**
A. Definitely.
**Q. So that's something you were aware of when you worked at Google, is that right?**
A. The video editing software was not part of my tasks with Google, that was only



personal experience.
**Q. But when you were at Google, you had that understanding?**
A. Yes.
**Q. Now, in that first sentence, you use the word automatically.**
**Do you see that?**
A. Correct.
**Q. What do you mean by that, the use of that term?**
A. For the ISRC to be present in the final version, there is a manual intervention required in order to enter the ISRC code manually.
**Q. Okay. In paragraph 42, you refer to FFmpeg.**
**Do you see that?**
A. That's correct.
**Q. And you state that YouTube's transcoding process is based on FFmpeg, is that correct?**
A. That is correct.
**Q. What is the basis of that understanding?**

A. It's recollection from my past work.
**Q. When you were at Google?**
A. When I was at Google.
**Q. Anything else?**
A. I believe, sorry to be imprecise, it is in the Foucu description.
**Q. Anything else?**
A. No.
**Q. It's your understanding that FFmpeg makes no use of and does not retain ISRC, as you say in the third sentence of paragraph 42, right?**
A. That is correct.
**Q. Do you know whether FFmpeg extracts any metadata and stores it anywhere?**
**MR. RICHLIN:** Objection to form.
A. What was the question?
**Q. Do you know whether FFmpeg extracts any metadata from sound recordings in the transcoding or editing process of a video?**
A. Yes.
**Q. And, yes, that it does extract that metadata?**

A. So let me be specific. FFmpeg has a -- first of all, FFmpeg is a video transcoding tool, but FFmpeg has a side library which is dedicated to metadata conversion and that library does not support ISRC in any way, shape or form. The reason being, that the metadata conversion tool can only support the most commonly used fields across all the formats and it is very seldom when the ISRC is supported and, therefore, it's not part of the MPEG metadata library.
**Q. Is that information about FFmpeg generally known to people that design transcoding processes?**
**MR. RICHLIN:** Objection to form.
**Q. You can answer.**
A. FFmpeg is a very well-documented open source software and the documentation on the metadata handling is part of the general documentation of FFmpeg.
**Q. Would that documentation include that FFmpeg does to the retain ISRC codes?**
A. That is correct.
**Q. What documentation is that?**

A. It's the module called FFmpeg metadata and it has the list of all the supported fields for every video format.
**Q. How would I find that?**
A. Google FFmpeg, you will find it right away.
**Q. In paragraph 43, you say, A platform like YouTube would have no way of knowing that metadata may or may not have been attached or added to components of a video prior to use of the video editing software.**
**Do you see that?**
**MR. RICHLIN:** I think you said that metadata. It's what metadata.
**MR. KOROLOGOS:** Thank you. I will withdraw that.
**Q. Mr. Nuttall, do you see paragraph 43?**
A. I do see paragraph 43.
**Q. It states, A platform like YouTube would have no way of knowing what metadata may or may not have been attached or added to components of a video prior to use of the**



sound recording?

**MR. RICHLIN:** Objection to form.

A. That is outside of the scope of this discussion and I --

**Q. You just raised it though?**

A. I raised the fact that you can't assume that the video editing software used the version of the recording that, A, has an ISRC extractable field and; second, that it is the same exact version of the recording -- it's not another interpretation of the same work that would have another ISRC.

So, again, we are piling up assumptions, assumptions, assumptions, but there are many, many scenarios or use cases where it could be completely different.

**Q. Anything else? Are you finished with your answer?**

A. Yes, for this scenario, yes.

**Q. And you are well familiar with fingerprinting technology for sound recordings, correct?**

**MR. RICHLIN:** Objection to form.

A. It's not my area of expertise at

all.

**Q. You are aware they exist?**

A. Definitely.

**Q. You've heard of content ID?**

A. I have so, yes.

**Q. And that allows you to match works to see if they're the same, correct?**

**MR. RICHLIN:** Objection to form.

A. I don't know more of the details of the content ID. This is not my domain of expertise.

**Q. Are you more familiar with any other digital fingerprinting technology?**

A. I know them by their product offering, that's how I know them.

**Q. In paragraph 44, in the third sentence, you say, Even as to professionally recorded music, (used in the background of a video, for example) it is well-known that the use of ISRCs is far from universal.**

**Do you see that?**

A. Yes, I do.

**Q. What's your basis for that?**

A. My basis is that ISRC is allocated

and used in one very specific domain, which is the commercial expectation of digital audio content in the online environment, that's the most specific field. There are other domains where ISRCs do not get allocated.

Take a TV show. America's Got Talent. I am not aware that they ever allocate an ISRC to those performances.

Take ambient music as part of a movie soundtrack. There may be some part of the soundtrack that gets allocated, but definitely not other parts of the audio visual content.

There are many instances where even professionally recorded music does not ultimately get an ISRC because there is no business case to have one. That's what I mean.

**Q. When you say, far from universal, what do you mean by far?**

A. I mean that the content which is, again, commercially available on a digital platform, may not represent the globality of

recorded music in general.

**Q. How far away from universal are you asserting that ISRC's coverage for sound recordings is?**

A. I don't have any specific numbers. The intent of this quote is to say that not all professionally recorded music has an ISRC.

**Q. If someone that you trusted to be accurate were to say to you that the coverage of ISRCs in professionally recorded music was really good, would that change your opinion that even for professionally recorded music, the use of ISRCs is far from universal?**

A. That would not change my opinion.

**Q. How about if someone you trusted to be accurate were to say that the coverage for ISRCs and professionally recorded music was higher than 75 percent, would you say that's still far from universal?**

A. Can you restate the question, please.

**Q. Sure. If somebody that you trusted to be accurate were to say that the coverage**



of ISRCs in professionally recorded music was higher than 75 percent, would that change your opinion about whether it is well-known that the use of ISRCs is far from universal?

A. I will rephrase. Experimentally, I would say that the number is lower, meaning, that it would be less than 75 percent, and I would say even, hopefully, in the sense that ISRC has a limited range of combinations and if we were to expand ISRC to all exploitations of professionally recorded music, the numbering system would explode.

So if you start designing rules whereby every single piece of recorded music for television or for audio books or for podcast or all these other usages, you would not have been able to use the ISRC for that purpose.

**Q. So your belief is that it's less than 75 percent, is that what you are saying?**

A. My belief is that the audio files that get allocated an ISRC are less than 75 percent of all the audio files that are being used.

**Q. If someone you trusted to be accurate were to say that the coverage of ISRCs was higher than 75 percent, would that change your opinion?**

**MR. RICHLIN:** Objection. Which particular opinion?

**MR. KOROLOGOS:** The opinion that it is well-known that the use of ISRCs is far from universal.

A. I want to make sure it's well understood, the use of ISRCs for content available for consumption on digital platforms as pay services is very high, it is in the range of 98 percent.

What I'm saying here is that there is also a very large set of audio content that has been professionally recorded that is not necessarily eligible or does not require an ISRC.

**Q. How many ISRC codes have been used, do you know?**

A. One hundred and thirty-five million.

**Q. And it's a 12-digit code, is that**

**right?**

A. It's a 12 alphanumeric.

**Q. How many digits -- let me withdraw that.**

**How many different alphanumeric codes are possible for 12 alphanumeric places?**

A. I don't have the figure in mind.

**Q. But we can calculate it, right?**

A. We can calculate it, but it's not relevant because there are reserved values. There are fields that can only have a very limited number of values, so you have to take into account every single character and see how many values it can have.

I say that the ISRC has a limited span because the existing ISRC system has already been saturated in its existing syntax, an extension already been granted to allow for more numbers and we are not unlimited in the number of ISRCs that can be allocated.

**Q. What is the limit?**

A. Sorry?

**Q. What is the limit?**

A. In 20 years, we've saturated the existing syntax. Ten years ago, we've extended the syntax which would last us another 10 years, so we have to continue. If we completely change the syntax, then maybe we can go way further, but we lose completely the original design of the ISRC system.

**Q. Was the extension that you mentioned a change that lost the original design of the ISRC system?**

A. Yes, it has.

**Q. How?**

A. The origin of the ISRC, you can infer some knowledge based on the syntax of the ISRC.

As an example, the two first characters were an ISO 3166 country code and every country was allocated its country code, plus the rest. The three following digits were the registry codes where you can have quite a lot and then you have the year of publication or fixation.

So all these are constraints and



Witness: Francois-Xavier Nuttall — September 30, 2022 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)
Job No. 876151

**Errata Sheet**

| **Page:Line** | **Change** | **Reason** |
|---|---|---|
| 20:25 | Replace <WinAMP> with <Winamp> | To correct transcription errors |
| 21:6 | Replace <ASFS 5> with <ASFS file> | To correct transcription errors |
| 21:8 | Insert <them> between <protected> and <from> | To clarify the record |
| 24:11 | Replace <not, it> with <not. It> | To correct transcription errors |
| 25:14 | Replace <functionalities,> with <functionalities.> | To correct transcription errors |
| 25:15 | Replace <the software> with <The software> | To correct transcription errors |
| 26:11 | Insert <,> after <players> | To correct transcription errors |
| 27:3 | Insert <,> after <processors> | To correct transcription errors |
| 28:13 | Replace <V-R-T-U-O-S-A> with <V-I-R-T-U-O-S-A> | To clarify the record |
| 29:8 | Replace <WinAMP> with <Winamp> | To correct transcription errors |
| 29:21-29:22 | Replace <AudioSoft secure a file system> with <AudioSoft Secure File System> | To correct transcription errors |
| 29:24 | Replace <WinAMP> with <Winamp> | To correct transcription errors |
| 38:23 | Insert <,> between <does> and <an audio> | To correct transcription errors |
| 38:25 | Replace <need, but does not need or> by <not read, but does not read or> | To clarify the record |
| 43:15 | Replace <that explain mainly> with <they explain -- mainly> | To correct transcription errors |
| 46:11 | Replace <itself, the picture, the audio, you> with <itself -- the picture, the audio; you> | To correct transcription errors |

Witness: Francois-Xavier Nuttall — September 30, 2022 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)
Job No. 876151

| | | |
|---|---|---|
| 46:13 | Insert <;> between <video> and <and> | To correct transcription errors |
| 60:16 | Replace <majority are actually> with <majority actually> | To clarify the record |
| 62:8 | Insert <to> between <as> and <what> | To clarify the record |
| 77:9 | Replace <it should> with <the "should"> | To correct transcription errors |
| 77:20 | Replace <they still> with <is still> | To correct transcription errors |
| 78:10 | Replace <wording, used must never> with <wording used, "must never"> | To correct transcription errors |
| 82:10 | Replace <less> with <rights> | To correct transcription errors |
| 83:14 | Replace <, it should be> with <website> | To clarify the record |
| 84:10 | Replace <audio video> by <audio visual> | To clarify the record |
| 84:16-84:17 | Replace <one, but last> with <next to last> | To clarify the record |
| 89:4 | Replace <Katherine> with <Catherine> | To correct transcription errors |
| 89:6 | Replace <Katherine> with <Catherine> | To correct transcription errors |
| 89:12 | Replace <concise> with <precise> | To correct transcription errors |
| 96:6 | Replace <Van Der> with <van der> | To correct transcription errors |
| 104:18 | Replace <other> with <"other" --> | To correct transcription errors |
| 104:20 | Replace <Elysee> with <Élysée> | To correct transcription errors |
| 105:4 | Replace <'98> with <'88> | To clarify the record |
| 105:18 | Replace <date> with <update> | To correct transcription errors |
| 108:13 | Replace <baccalaureat> with <baccalauréat> | To correct transcription errors |
| 108:14 | Replace <time, science> with <time: science> | To correct transcription errors |
| 108:18 | Replace <Elysee de Chanel> by <Lycée | To correct transcription errors |

| | international de> | |
|---|---|---|
| 109:6 | Replace <basic> with <basics> | To clarify the record |
| 109:21 | Replace <Elysee> by <the lycée> | To correct transcription errors |
| 112:6 | Replace <of> by <over> | To correct transcription errors |
| 117:16 | Replace <services, Mathematica> with <services. Mathematica> | To correct transcription errors |
| 117:18 | Replace <reserve and> with <research, and> | To correct transcription errors |
| 124:4 | Replace <IRAA> with <RIAA> | To correct transcription errors |
| 125:8-9 | Replace <of which ISWC, ISTC> with <including ISWC and ISTC> | To clarify the record |
| 128:8 | Replace <what to put you at the beginning> with <where to put you at the beginning> | To clarify the record |
| 129:3 | Insert <and> between <provided,> and <defining> | To clarify the record |
| 129:5 | Replace <claims, then> with <claims. Then> | To correct transcription errors |
| 129:6-129:7 | Replace <data, meaning, the activity on the platform, the streams and> with <data -- meaning, the activity on the platform, the streams -- and> | To correct transcription errors |
| 129:11-129:12 | Replace <those performing in mechanical rights> with <either performing or mechanical rights> | To clarify the record |
| 129:14 | Insert <and> after <functionally,> | To clarify the transcript |
| 129:15 | Replace <defined> with <define> | To clarify the transcript |
| 130:4 | Replace <fragment> with <fragmented> | To correct transcription errors |
| 130:9 | Replace <effective> with <respective> | To clarify the record |

| | | |
|---|---|---|
| 131:5 | Replace <published licenses,> with <publishers license> | To correct transcription errors |
| 131:20 | Replace <ISRC> with <ISWC> | To correct transcription errors |
| 135:4 | Replace <DSB> by <DSP> | To correct transcription errors |
| 142:19 | Replace <DSBs> by <DSPs> | To correct transcription errors |
| 148:4 | Replace <topic, security> with <topic. Security> | To correct transcription errors |
| 148:5 | Replace <high matter, computer> with <important matter. Computer> | To clarify the record |
| 168:18 | Replace <name, a clip> with <name – a clip> | To correct transcription errors |
| 168:19 | Replace <name, nothing in this definition hints me> with <name. Nothing in this definition hints to me> | To clarify the record |
| 169:20 | Replace <long> with <on> | To correct transcription errors |
| 169:20 | Replace <to 15,000 tags, 10, 15,000, 20,000 tags> with <to 10,000 tags -- 15,000 20,000 tags --> | To correct transcription errors and clarify the record |
| 178:5 | Replace <BCMI> with <CMI> | To clarify the record |
| 178:5 | Insert <for> between <is> and <rights> | To clarify the record |
| 178:6 | Replace <purposes for financial claims and this is> with <purposes -- for financial claims -- and this is> | To correct transcription errors |
| 178:9 | Replace <process is> with <processes> | To correct transcription errors |
| 180:10 | Replace <to> with <two> | To correct transcription errors |
| 189:6 | Insert <on> between <work> and <on> | To clarify the record |

| | | |
|---|---|---|
| 190:13 | Insert <do> after <not> | To clarify the record |
| 193:24 | Replace <void> with <devoid> | To clarify the record |
| 199:24 | Replace <sentence> with <sense> | To correct transcription errors |
| 201:16 | Replace <scientific or research> with <scientific research> | To correct transcription errors |
| 202:6 | Insert <,> between <process> and <where> | To correct transcription errors |
| 202:8 | Replace <give> with <gives> | To correct transcription errors |
| 202:9 | Insert <,> between <process> and <where> | To correct transcription errors |
| 204:18 | Remove <I> after <that> | To correct transcription errors |
| 208:12 | Replace <MPEG> with <FFmpeg> | To clarify the record |
| 210:14 | Replace <or dramatically> with <automatically> | To correct transcription errors |
| 210:16 | Replace <floor> with <tool> | To correct transcription errors |
| 218:9 | Replace <that, A,> with <that, first,> | To clarify the record |
| 218:10 | Replace <and; second, that> with <and, second, that> | To correct transcription errors |
| 220:3 | Replace <expectation> with <exploitation> | To correct transcription errors |
| 227:6-227:7 | Replace <an as easy> with <as easy a> | To clarify the record |
| 228:21 | Replace <IRAA> with <RIAA> | To correct transcription errors |
| 236:10 | Replace <content, trying to persuade you> with <content. I'm trying to persuade YouTube> | To correct transcription errors |
| 236:12 | <YouTube, it's very> with <YouTube. It's very> | To correct transcription errors |

Witness: Francois-Xavier Nuttall — September 30, 2022 Deposition
*Schneider v. YouTube, LLC,* No. 3:20-cv-04423-JD (N.D. Cal.)
Job No. 876151

FXN Subject to the above changes, I certify that the transcript is true and correct.

__________ No changes have been made. I certify that the transcript is true and correct.

____________________ November 4th 2022
(signature) (date)

Witness: Francois-Xavier Nuttall — September 30, 2022 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)
Job No. 876151

ACKNOWLEDGMENT OF DEPONENT

I, Francois-Xavier Nuttall, do hereby certify that I have read and examined the foregoing testimony, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

[signature] November 4th 2022

(signature) (date)