# EXHIBIT 20

Pages 1 - 31

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO, JUDGE

```
MARIA SCHNEIDER, et al.,          )
                                  )
             Plaintiffs,          )
                                  )
   VS.                            )  NO. 20-cv-04423-JD
                                  )
YOUTUBE, LLC, et al.,             )
                                  )   San Francisco, California
             Defendants.          )
                                  )
_____   )
```

Thursday, April 28, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

> BOIES SCHILLER FLEXNER LLP
> 55 Hudson Yards
> 20th Floor
> New York, New York  100 10001
> **BY:  PHILIP C. KOROLOGOS, ESQ.**
> **DEMETRI B. BLAISDELL, ESQ.**

> BOIES SCHILLER FLEXNER LLP
> 44 Montgomery Street
> 41st Floor
> San Francisco, California  94104
> **BY:  JOSHUA I. SCHILLER, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
          Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED**:

For Plaintiffs:

                  KOREIN TILLERY LLC
                  205 North Michigan Plaza
                  Suite 1950
                  Chicago, Illinois  60601
          **BY:  GEORGE A. ZELCS, ESQ.**

For Defendants:

                  WILSON SONSINI GOODRICH & ROSATI, PC
                  6050 Page Mill Road
                  Palo Alto, California  90304-1050
          **BY:  DAVID H. KRAMER, ESQ.**
                  **MAURA L. REES, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
                  Official Reporter, U.S. District Court

| | |
|---|---|
| 1 | **Thursday - April 28, 2022**                    **10:15 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **THE COURTROOM DEPUTY:**  Calling Civil 20-4423, |
| 4 | Schneider versus YouTube, LLC. |
| 5 | Counsel? |
| 6 | **MR. KOROLOGOS:**  Good morning, Your Honor.  Phil |
| 7 | Korologos with Boies Schiller Flexner for -- |
| 8 | **THE COURT:**  Can I get the sheet, Lisa? |
| 9 | (Document handed up to the Court) |
| 10 | **THE COURT:**  Okay.  Thank you.  Okay.  I'm sorry.  Go |
| 11 | ahead. |
| 12 | **MR. KOROLOGOS:**  Phil Korologos from Boies Schiller |
| 13 | Flexner for the plaintiffs.  Also with me from Boies Schiller |
| 14 | is Josh Schiller and Demetri Blaisdell.  And from the Korein |
| 15 | Tillery firm, co-counsel George Zelcs. |
| 16 | **THE COURT:**  All right. |
| 17 | **MR. KRAMER:**  Good morning, Your Honor.  Dave Kramer |
| 18 | from Wilson, Sonsini.  Maura Rees from my firm is with me. |
| 19 | **THE COURT:**  Okay.  So, when I saw you in March you |
| 20 | were working out the -- |
| 21 | **MR. KOROLOGOS:**  Content ID issue. |
| 22 | **THE COURT:**  Yes.  It's all done?  All set? |
| 23 | **MR. KOROLOGOS:**  Well, we began to receive some of the |
| 24 | data. |
| 25 | **THE COURT:**  Yep. |

1      **MR. KOROLOGOS:**  We've received thousands of matches

2   from the computer system.  We've begun to go through those to

3   identify -- there are actually 9,500 unique matches.  But we

4   are weeding through those to see which of those might be

5   issues.

6      And, you know, we got our first batch last week.  We got

7   another batch two days ago.  We expect to receive additional

8   batches.  So that seems to be rolling along.

9      **THE COURT:**  Okay.  Good.

10      **MR. KOROLOGOS:**  We also -- I think, to cut a little

11   deeper into your pile that is in front of you, as small as that

12   is, we wrote a letter concerning Autoplay issues.

13      **THE COURT:**  Before we do that.  So we're done now with

14   the issues we talked about on March 10th.  Is that right?

15      **MR. KOROLOGOS:**  Well, close, Your Honor.  There are

16   going to be some followup issues that I think Mr. Kramer and I

17   need to discuss with respect to the Content ID information,

18   including some additional data with respect to that.  His

19   discussions -- his and my discussions concerning the

20   registration dates and the impacts of registration dates on

21   some of the works, and the scope of the works in the --

22      **THE COURT:**  You're going to process all of this, and

23   then you're going to confer on the registration issues.  Right?

24      **MR. KOROLOGOS:**  We continue to do that.  Yes,

25   Your Honor.

1    **THE COURT:**  Okay.  Good.  Now, what's going to happen

2    after that?  Are you going to drop some things or --

3    **MR. KOROLOGOS:**  Well, I think on registrations, what

4    we'll be able to do is to agree to a variety of facts.

5    **THE COURT:**  Good.  All right.

6    **MR. KOROLOGOS:**  And say, you know, these -- maybe it's

7    a before-and-after a date of the complaint, maybe it's a

8    before-and-after a date of interrogatory answers, or something

9    like that, as to registration dates and things like that.

10   **THE COURT:**  Good.

11   **MR. KOROLOGOS:**  So I think -- I think there are a

12   variety of parameters with respect to that.

13       I think one area we are continuing to discuss is whether

14   we will be able to reach agreement on the impact of those

15   facts, rather than to have the impact of those facts await

16   further motion practice at the end of discovery.

17   **THE COURT:**  Well, that would be great.  And, and

18   however you want to do it is fine.  You can just do a joint

19   statement.  Or a joint stipulation.  Whatever you want to do,

20   to present it to me.

21       Don't get hung up on formalities.  Just --

22   **MR. KOROLOGOS:**  Okay.  To that end --

23   **THE COURT:**  -- keep the train moving.

24   **MR. KOROLOGOS:**  Yeah.  To that end, what I would

25   recommend, we have a plaintiffs' letter before Your Honor --

```
 1              THE COURT:  Let me ask you, I have one -- Docket

 2     No. 126.  Hm.  Okay, that's you.  Something about AST?

 3              MR. KOROLOGOS:  That should be the next one.

 4              THE COURT:  Oh, no, Autoplay.  Okay, what is the

 5     issue?

 6              MR. KOROLOGOS:  Autoplay and AST.  On the Autoplay, we

 7     think we're entitled to more than we have received so far.

 8     But, but let me -- I am happy to discuss that and to argue that

 9     now.

10         However, I think what may be the best approach is for

11     Mr. Kramer and I to meet over the next two to three weeks, in

12     person or by Zoom, on those issues as well as about -- I think

13     there are six or seven issues, total, including those two

14     letters that he and I have exchanged correspondence about,

15     being issues that we could discuss.

16              THE COURT:  Okay.

17              MR. KOROLOGOS:  And then --

18              THE COURT:  Always the right thing to do.  You hear

19     that, Mr. Kramer?

20              MR. KRAMER:  Certainly, Your Honor.

21              THE COURT:  Okay.  All right.  So you're going to take

22     care of 126, so I'll give you three weeks.  How much time do

23     you want?  It doesn't matter to me.

24              MR. KOROLOGOS:  Here's what I would suggest,

25     Your Honor.  I suggest we set another conference for either
```

1  four or five weeks out.  That's May 26 or June 2.

2      And that a week prior to that next conference, we report

3  back to Your Honor either with it being resolved or if not,

4  what issues remain to be resolved with the Court at the next

5  conference.

6          **THE COURT:**  Okay.

7          **MR. KOROLOGOS:**  That would be on the two issues that

8  are before Your Honor on the two letters.  As well as the other

9  issues that Mr. Kramer and I have identified that each of us at

10 least thinks may be ripe, and are checking with our respective

11 opposite sides whether they are ripe for us to seek some

12 resolution on.

13         **THE COURT:**  That sounds fine.

14     Are you okay with that, Mr. Kramer?

15         **MR. KRAMER:**  Perfectly, Your Honor.

16         **THE COURT:**  Okay.  You two are going to continue to

17 meet and confer on Docket Nos. 126 and 127.  You're going to

18 round out the issues that we talked about on March 10th, and do

19 some type of a joint filing on that.

20     And let's see, what is the first Thursday in June?

21 Ms. Clark?

22         **MR. KOROLOGOS:**  I believe that is June 2, Your Honor.

23         **THE COURT:**  One second.

24         **THE COURTROOM DEPUTY:**  June 2nd.

25         **THE COURT:**  Okay.  I'll set it for June 2nd.  You

1    certainly can settle it if you've worked everything out, okay?

2        But at least a week before that -- well, by the -- the

3    prior Thursday, file a statement about what you want to do.  If

4    you want to cancel it, just do a one-line thing saying the

5    parties don't need to come in.

6        Otherwise, just do a single filing -- no more letters.

7    Just do a joint filing.  Just say:  Here are the issues.  And,

8    if you can reference the docket numbers:  For Docket No. 127 we

9    resolved everything but this.  And you can ground it in

10   something that I already have.

11       If there are any new issues, you can just bullet-point

12   them at the end, and we will take them up.  Okay?

13       Anything else for today?  Plaintiffs?

14           MR. KOROLOGOS:  Not from the plaintiffs.

15           THE COURT:  Defendants?

16           MR. KRAMER:  The only issue, Your Honor, is the

17   pendency of the motion to dismiss not on the registration

18   issues, but Your Honor said that you were taking the issue of

19   the 1202 claim under submission.

20           THE COURT:  Yes.

21           MR. KRAMER:  And I just wanted to remind the Court

22   that that's still out there.  That's --

23           THE COURT:  I'm well aware that it is out there, and

24   you'll get the order when you get the order.  I can't guarantee

25   when you're going to get it.

1          **MR. KRAMER:**  Yes, Your Honor.

2          **THE COURT:**  One other thing, I think I asked this last

3     time, but I've forgotten the answer.  What are you doing to

4     resolve this?

5          **MR. KOROLOGOS:**  We have had one mediation largely near

6     the beginning of the case, with Judge Scheindlin, formerly out

7     of the Southern District of New York.

8          **THE COURT:**  Oh, okay.

9          **MR. KOROLOGOS:**  And we agreed after that one, we would

10    likely need to have another one.  And that would be most

11    productive to do so either as we approached or perhaps after

12    motion for certification for summary judgment.

13         **THE COURT:**  Why do you need to wait that long?

14         **MR. KOROLOGOS:**  Well, I think, I think at least we

15    need to wait for more of the fact discovery to occur.

16         **THE COURT:**  I was thinking, how about August?  Or July

17    or August?

18         **MR. KOROLOGOS:**  Happy to schedule something in that

19    timeframe, Your Honor.

20         **THE COURT:**  I think you should.  I wouldn't wait so

21    long.

22         **MR. KRAMER:**  So Your Honor, the one thing I would

23    suggest is that the area of principal disagreement between the

24    parties, not surprisingly, is whether this case can proceed as

25    a class action.  That was the principal source of disagreement

1  at the last mediation.

2      Obviously, the stakes in the case vary wildly, depending

3  on whether a case is certified -- a class is certified.  We

4  don't think it can be.  The plaintiffs believe it can.  I'm not

5  sure that second --

6      **THE COURT:**  What would be -- just, not tying anyone's

7  hands, but Rule 23 is something I've spent a lot of time

8  thinking about, as many judges do.

9      What is the idea -- I thought this was a common policy,

10  applicable to all YouTube posters.

11      **MR. KRAMER:**  No, Your Honor.  This is a claim for

12  copyright infringement.  And we have already seen all kinds of

13  individualized issues associated with the individual claims of

14  the individual plaintiffs.

15      The last time a court looked at a case like this, a

16  putative class action for copyright infringement against

17  YouTube, it called it a Frankenstein monster posing as a class

18  action, and summarily denied certification, citing dozens of

19  individualized issues that are present in that kind of case.

20      So we've seen them here, too.  Whether the work is

21  registered; whether there's proper ownership; whether there's a

22  license; whether it's fair use; what the damages might be; what

23  YouTube's knowledge was; its individual defenses of statute of

24  limitations, estoppel, and failure to mitigate --

25      **THE COURT:**  I thought the issue was you all had some

1   sophisticated program that you have made available to some

2   people, and not others.

3          **MR. KRAMER:**  Your Honor, we do have a program called

4   "Content ID."  That's what we are talking about here in

5   connection with this case.

6          **THE COURT:**  Right.

7          **MR. KRAMER:**  There is a question, I suppose, about the

8   decision that YouTube has made to offer that tool to those who

9   need it.  And the concerns about why others might misuse it, or

10  might cause problems for the service if they had access to it.

11  But even there, we've got individualized issues.

12      For example, plaintiff Maria Schneider has had access to

13  this tool through her publishing agent for years, and has used

14  it to claim and monetize and block content on the service.

15  There are a host of individualized issues, even with respect to

16  that one question.

17      But resolving that one question won't advance the ball,

18  because each plaintiff would then still need to come to court

19  and prove:  I own this work, it's registered, it appeared, it

20  was infringing, it wasn't authorized.  And that there are a

21  host of related defenses that are inapplicable.

22          These kinds of claims don't lend themselves to class

23  certification.  The Ninth Circuit in the *Kihn* case just --

24          **THE COURT:**  So you're saying your client would prefer

25  to have 9,000 separate cases?

1          **MR. KRAMER:**  No, Your Honor.

2          **THE COURT:**  Don't you all just want to do this in one

3    fell swoop, and get it over -- I mean, listen.  There's a new

4    trend right now -- I'm sure you are aware of it -- where

5    there's tremendous buyer's remorse on class waivers for

6    example, and consumer agreements.

7          My understanding is -- don't quote me on this, but my

8    understanding is at least one company, I believe it's Amazon,

9    that said they're not going to do it anymore because they're

10   getting killed with these individuals -- they're getting

11   thousands of individual arbitration demands.

12         People say:  Okay, you want it that way, we'll do that.

13   And now they're saying:  We don't want it that way.  We would

14   rather have everybody in one case.

15         So, you know, they're not going to go away.  The only

16   issue is are you going to do this here, once?  Or are you going

17   to do it 9,000-plus times?

18         **MR. KRAMER:**  Well, Your Honor, we've litigated the

19   fundamental issue in this case against Viacom and a putative

20   class, a decade ago.  And YouTube prevailed in that action, as

21   a matter of law, on the Digital Millennium Copyright Act.

22         As a result of that decision, and since it was issued,

23   there have been only a handful of claims against YouTube

24   alleging copyright infringement.  The plaintiffs are the first,

25   really, in a decade.

So I'm not sure that there would be thousands of individual claims brought against YouTube for copyright infringement, because the merits of YouTube's defenses to those claims are pretty straightforward, and established by both the Southern District and the Second Circuit in the *Viacom* case.

So we see this case as one in which there are individual plaintiffs who want to pursue individual and very different claims of copyright infringement against YouTube.  We think those claims are without merit, and barred, among other reasons, by the DMCA.

But, the plaintiffs want to pursue this on behalf of copyright holders everywhere.  And the individualized issues associated with their claims should preclude that.

**THE COURT:**  Well, how about the -- Mr. Korologos, anything to add?

**MR. KOROLOGOS:**  Yes, Your Honor.  We think this case is --

**THE COURT:**  We're all just talking among friends.  No one's hands are being tied.  None of this will be usable against anybody.

Go ahead.

**MR. KOROLOGOS:**  I understand, Your Honor.

We think this case is very appropriate for class certification.  We are working -- one of the reasons we are pursuing the discovery we're pursuing is to identify the way,

1    the means of making the various questions that Mr. Kramer had

2    raised binary, so that they can be easily decided from either

3    public records, such as registration filings with the Copyright

4    Office or --

5              THE COURT:  It occurred to me that that could be

6    automated.  Right?

7              MR. KOROLOGOS:  Right.

8              THE COURT:  You have the number; if you just run it

9    through a database --

10             MR. KOROLOGOS:  Ultimately, not much different -- a

11   little more complicated, but not much different than:  Do you

12   own the stock or not, in a securities fraud case.

13             THE COURT:  Right.

14             MR. KOROLOGOS:  And, with respect to either those

15   kinds of publicly-available documents or information within

16   YouTube's database and this system Content ID.

17        For instance, we received these 9,500, through the first

18   two batches of Content ID matches for a bunch of these works.

19   Your Honor may recall we came up with 745 on the list I shared

20   with Your Honor last time, based on manual searches.

21        One of the things we're going to be discussing with

22   Mr. Kramer that we knew was going to be an issue in advance of

23   getting those results is getting the information about the

24   quality of the match.  Is it a 100 percent match?  Is it a

25   2 percent match?  Is it a 3-second match, or is it an hour-long

1    match?  Those --

2             **THE COURT:**  Is that technically possible?

3             **MR. KOROLOGOS:**  It is.  And that's information that is

4    provided to Content ID users now, with different parameters.

5    We see that on their website as available information for

6    Content ID users.

7         So we believe those kinds of things can help -- if not

8    eliminate, substantially reduce, within the framework of

9    Rule 23, any individualized issue so that this case can

10   proceed.

11        Just one --

12            **THE COURT:**  Do you agree with your colleague that the

13   class issue is sort of the make-or-break thing for settlement?

14            **MR. KOROLOGOS:**  Um, I think it is a major issue,

15   Your Honor.

16            **THE COURT:**  How about this?  Let's talk out loud.

17        I'm perfectly fine doing something early.  It could be a

18   tentative.  It doesn't necessarily have to be a full class cert

19   thing.

20        One possibility just coming to mind now -- and you two

21   will have, I'm sure, much better thoughts as you talk with each

22   other.  But one possibility would be, you know, you could

23   assume that the claims as they're -- as they're currently

24   framed will go forward.  And don't worry about -- you know,

25   don't worry about proof of the claims, but just these issues

1   for Rule 23.  Okay?

2        Now, keeping in mind, for example, ascertainability is

3   typically not a bar to certification.  Commonality is, of

4   course.  Maybe there's some typicality issues.  Maybe the

5   plaintiff class members -- putative class members aren't

6   similarly situated.  I doubt -- it doesn't seem to me like

7   that's going to be a conflict.  That's usually what typicality

8   craters on.  But maybe they're so disparately situated that

9   there's no conflict; it doesn't make sense.

10       Remember, the class exercise is quite straightforward.

11  And you're here now, so you should read my decisions on them,

12  as I've put a lot of time on them.  It's just really:  Can you

13  answer this in an efficient, fair, due-process fashion?  That's

14  it.

15       We don't know what the answer's going to be.  I'm not

16  answering that on class -- don't do that on class

17  certification.  It's not a mini trial or summary judgment.

18  But, you can just say it doesn't make sense.

19       So, are the people common enough?  Is the proof going to

20  be, you know, more or less universal?  It doesn't have to be

21  perfect; you all know that.  I'm not going to pick any numbers.

22  But 80 percent, if you can get 80 percent, you can do it.

23  Maybe even less, 75, 70.  Those are just guidelines, not, by

24  any means, bright lines.  Maybe we can do that.

25       Do you want me to do just an early tentative thing on

 1   class, and that'll help you with your settlement, maybe?

 2           **MR. KOROLOGOS:**  I think it may, Your Honor.  I think

 3   the timing becomes part of the question.  Because I think we

 4   still need some of the discovery we're seeking, just for

 5   purposes --

 6           **THE COURT:**  That's fine.  You could do something -- we

 7   could do something in July or August.  And, you know, we have

 8   to think this through, because I don't want to do it twice,

 9   because I don't have time.

10           **MR. KOROLOGOS:**  Right.

11           **THE COURT:**  But at the same time, I don't want to do

12   anything that's binding on an incomplete record.  So --

13           **MR. KOROLOGOS:**  Why don't Mr. Kramer and I add that to

14   our list to report back at the next conference.

15           **THE COURT:**  Yeah.  You can think of it almost as a --

16           **MR. KRAMER:**  Early neutral evaluation.

17           **THE COURT:**  I was going to say -- I was going to say

18   "ENE-plus."  But once I do the work, I'm going to use at least

19   some of it.  So that's the plus.  I'm not going to just ignore

20   it.

21       I mean, you'll have a chance, maybe -- maybe there'll be a

22   supplemental shorter one later.  You can tell me:  Here's a new

23   change, here's something that we didn't have before.  You know:

24   Here's why, or maybe there's been a case law development.  But,

25   you know, we would probably do most of it the first round, and

1   then let you have some closing comments a little bit later.

2   But, that might be one way of doing it.

3       I just don't have the resources, and your client shouldn't

4   have to pay for two full rounds.  I just can't do that.  Plus,

5   it introduces too many potential variables that I will regret

6   as the case goes on.

7       But, I'm happy to do that.  I'm happy to do it.  I mean,

8   sounds like you already know what the fact issues are going to

9   be.  Right?

10          **MR. KRAMER:**  We would welcome that, Your Honor.  In

11  fact, we would be thrilled if the formal process was moved up.

12  But we're happy to have the Court's insights on class

13  certification early.

14          **THE COURT:**  I could move the whole thing.  I usually

15  don't like doing that because I have had bad experiences, and

16  this is why I religiously set close of fact discovery before

17  everything else, because people always file these footnotes

18  saying:  Well, of course, who knows what we'll find discovery

19  in the next three months.  So, that's why I don't do it.

20      I can make -- if this is your main settlement stick-up --

21  in other words, you can't talk to the mediator productively

22  until one of you has an understanding of what I'm going to

23  do -- then I can -- we can do that.

24          **MR. KOROLOGOS:**  I think there may be a second issue in

25  that regard, which is the DMCA safe harbors.

1          **THE COURT:**  Safe harbors.

2          **MR. KOROLOGOS:**  And Mr. Kramer was just referencing

3    from the *Viacom* case.  This is different.  It has been a

4    decade.

5          For instance, Autoplay, which is their selection of what

6    gets played automatically to a YouTube user without any user

7    input, and they make money off of it, those two facts, taken --

8          **THE COURT:**  I have to tell you, I don't use any social

9    media.  I kind of count -- YouTube's not, strictly speaking,

10   social media, but it's in the ballpark.

11         What, you log into YouTube and you just get a video --

12         **MR. KOROLOGOS:**  Let's say Your Honor wanted to watch a

13   video about how to change a very high light bulb (Indicating).

14         **THE COURT:**  Okay.

15         **MR. KOROLOGOS:**  And you can go on YouTube, and you

16   say: I want to search for videos --

17         **THE COURT:**  I'm not logging in or anything, just

18   searching the internet?

19         **MR. KOROLOGOS:**  Not logging in.  Google, with their

20   technology, knows it's your IP address, and they may be able to

21   match that to other things you've searched, and therefore,

22   target ads and things like that.  But you're going to search

23   for:  How do I change that light bulb up there.

24         And then it'll come up with a video.  And unless you

25   select to turn off Autoplay, if you don't touch your computer,

1    another video is going to play after what you asked for it to

2    be played.  And that is selected automatically from algorithms

3    that YouTube has.  And they have algorithms that they run that

4    pick what might be a video that your IP address may be

5    interested in.

6        Maybe you were searching for running shoes yesterday.

7            THE COURT:  I don't think I've ever had that happen.

8    Am I not watching all the video?  It happens only if you watch

9    all the way through?

10           MR. KOROLOGOS:  If you watch through to the end, and

11   then there may be an ad at the end, and then it starts playing

12   again.

13           THE COURT:  And another video is going to pop up.

14           MR. KOROLOGOS:  It is exactly what it says:  Autoplay.

15   So it's playing automatically.

16       And the DMCA provides safe harbors.  But not if the

17   platform controls the display, and makes money off of that,

18   which YouTube does.  Because they make ad revenue off of those

19   videos that are played through Autoplay, without any user

20   input.

21       So that's an issue that wasn't even before the Southern

22   District, because Autoplay didn't come into being until 2014.

23           THE COURT:  You two can't agree on this?

24           MR. KRAMER:  On this issue, I don't think we can,

25   Your Honor.  Obviously, we disagree with the characterization

 1   and the import --

 2        **THE COURT:**  You can tell me -- how do you think

 3   Autoplay works?

 4        **MR. KRAMER:**  Oh, I think that the way Autoplay works

 5   is if a user opts to have video -- it's much like a television

 6   station.  After your program that you chose to watch ends,

 7   there may be another -- there is going to be another program on

 8   that follows.

 9        This program that follows on YouTube or --

10        **THE COURT:**  Can I just share my experience?  Because I

11   do look periodically for self-help.  Like:  How do I do X,

12   right?

13        I had to change -- this actually happened.  A real-life

14   example.  I had to change the oven light in my oven.  I have an

15   interesting but obscure oven brand, and it was really hard for

16   me to figure out how to do it.  So I went to YouTube -- it's a

17   couple of months ago -- typed in my oven brand, said:  How to

18   change light.  A video came up.

19        I wasn't asked anything.  I'm not a YouTube -- I don't

20   sign in, I don't log in.  This is all just anonymous,

21   quote-unquote -- because I know how the internet works,

22   quote-unquote, anonymous use.

23        I watched the video.  And I can tell you exactly what the

24   screen -- the video's in the middle.  There's some commentary

25   at the bottom, there are some ads.  And on the right-hand side

1   there are like ten other video options more or less related to

2   the topic I requested.

3       And I watched it all the way through, and it stopped.

4   Nothing happened.  And then I looked on the side, and I saw one

5   other one.  And I tried that one, and I watched that.

6       I've never seen Autoplay.  I've never had a video just

7   spontaneously play on YouTube.

8           MR. KOROLOGOS:  It does happen.  And it happens by

9   design.  And in fact --

10          THE COURT:  Why isn't it happening to me?

11          MR. KOROLOGOS:  I'm not sure why it hasn't --

12          THE COURT:  I don't click anything.  I never heard of

13  Autoplay; I've never turned it off or on.  The only box I

14  get -- literally, the only YouTube box I've ever seen says:

15  Would you like a free month's subscription?  dismiss, Accept.

16      And I always say no.  That's the only box I've ever seen.

17          MR. KOROLOGOS:  I promise not to depose Your Honor or

18  ask for your computer to be produced to figure that out.

19          THE COURT:  No, it's a standard Apple laptop.

20          MR. KOROLOGOS:  But, one key fact here.  In 2014,

21  after they implemented this, their ad revenue on YouTube went

22  dramatically up, which is what its design was, to increase view

23  numbers.  And -- and --

24          THE COURT:  No, I understand the concept.  I'm just

25  saying, you know, under *Twombly* and *Iqbal*, a judge's experience

1  informs the decisions.  And in my experience, I've never had a

2  video shoved down my throat.

3          **MR. KOROLOGOS:**  It's happened to me --

4          **THE COURT:**  I'm going to go do it right now, so I'm

5  going to go look.  You know, I'm going to do that.

6      But in any event, but, Autoplay is still one step away or

7  two steps away from your putative class.  Because you still

8  have to show --

9          **MR. KOROLOGOS:**  Well, two issues.

10         **THE COURT:**  Right.

11         **MR. KOROLOGOS:**  Is a class to be certified?  And then,

12  if there is, are there safe harbors that prevent -- whether

13  it's a class or individual claims from being pursued --

14         **THE COURT:**  But for Rule 23, that doesn't necessarily

15  have to be complicated.  I mean, --

16         **MR. KOROLOGOS:**  Yeah, no --

17         **THE COURT:**  You understand what I'm saying.

18         **MR. KOROLOGOS:**  I do.

19         **THE COURT:**  You just carve it out.  You define the

20  class in a way depending on how that issue --

21         **MR. KOROLOGOS:**  Including --

22         **THE COURT:**  Either they're in or they're out.

23         **MR. KOROLOGOS:**  Including for injunctive relief, which

24  creates very different issues as to individuality, because the

25  injunction is going to apply across the board.

1          **THE COURT:**  You're asking -- you're going to ask for a

2   (b)(3) class, and then have injunctive relief attached to that,

3   right?  I would encourage you to do that.  I would encourage

4   you not to ask for a (b)(2) and a (b)(3).  You can get

5   injunctive relief in the context of a (b)(3) class.  That's

6   ancillary relief.

7          If you ask for (b)(2), you're telling me you don't think

8   your case is mainly about damages.  It's actually not -- it's

9   not like alternative pleading of causes of action.  They're

10  antithetical to each other.

11         So --

12         **MR. KOROLOGOS:**  I understand that, Your Honor.

13         **THE COURT:**  -- we just went through this in a couple

14  of cases.  You may want to look this up.  But there is a

15  possibility, if you don't -- things don't go the way you would

16  expect, I would certify a (b)(2) and you wouldn't get any

17  damages because you can't get damages except for a very, very

18  tiny amount --

19         **MR. KOROLOGOS:**  Understood.

20         **THE COURT:**  -- in the (b)(2) class.  And if you do

21  that, I suspect your view of the case will be dramatically

22  different from what you've set it out to be.

23         You can get injunctive relief in a (b)(3) context.  You

24  are not barred from that.

25         **MR. KOROLOGOS:**  Understood.

1          **THE COURT:**  So just please think that through, okay?

2   Save yourself maybe a lot of work.  It's up to you.  You may

3   have good reasons; I don't know.  But just think it through.

4          **MR. KOROLOGOS:**  One thing we litigated in New York was

5   the Visa, MasterCard and American Express classes, which

6   resulted in the *In Re: Payment Cards* decision out of the Second

7   Circuit with the conflict between the (b)(2) and the (b)(3)

8   counsel.  So I'm well aware of --

9          **THE COURT:**  All right, very good.  All right.

10      Well, why don't you add to your list a discussion of how

11  we might get this done early, because I would like to get you

12  -- this is going to be tremendously expensive.  And it's going

13  to create a fact record that's going to be very difficult to

14  work with, after a certain point.

15      So if you want -- this is totally up to you.  I have a --

16  I did your scheduling order, didn't I?

17         **MR. KOROLOGOS:**  Yes, Your Honor.

18         **THE COURT:**  You have a date.  So if you don't want to

19  do anything, we'll just live with that date.  That's fine with

20  me.  I set it, and I'm fine with that.

21      If you want to move it along, and you want to do something

22  creative along the lines that we've discussed, I'm happy to

23  consider it.  And, and if it's a good idea, I'm certain I'll do

24  it.

25      But you two, why don't you take some time to think about

1    that.  And if it's -- if you just -- even if you -- you know,

2    what you could do is -- and this is even more useful -- you

3    could just issue-spot a couple of Rule 23 things, and ask me

4    for some initial -- I'll call them "tentatives," although I may

5    end up adopting them.  Please, don't -- I want to be clear.

6    Even if it's a tentative, I may end up just doing what I say.

7          But if you wanted to lay out four things, like, you know,

8    safe harbor, how to determine registration status if a class is

9    certified, you know, things like that, I could also do it that

10   way, too.  Okay?

11         **MR. KOROLOGOS:**  Okay.

12         **THE COURT:**  We could do anything that you think would

13   help you get a productive mediation going.  Because I imagine

14   the damages -- what do you think the damages are, roughly?

15         Say you hit a home run, you know, reasonable home run.

16   You're not -- you're not getting a lottery ticket, but you win

17   your case on reasonable -- what do you think the damages are,

18   just roughly?

19         **MR. KOROLOGOS:**  Unfortunately, I don't really have a

20   number, but it's a huge number, when you factor in statutory

21   damages.

22         **THE COURT:**  How -- how -- well, okay.  So you're going

23   to do statutory damages?

24         **MR. KOROLOGOS:**  Yeah.  Again, I think statutory

25   damages allows for -- you know, more conducive to a class,

```
 1   including if you just -- just take the minimum statutory,
 2   because there's a range within the statute.  You take the
 3   minimum --
 4           THE COURT:  Yeah.  No willfulness.  Just the minimum,
 5   yeah.
 6           MR. KOROLOGOS:  -- and spread that across the class,
 7   that, itself, is a huge number.
 8           THE COURT:  And is it over -- is it over ten -- nine
 9   figures?
10           MR. KOROLOGOS:  It's at least nine figures.
11           THE COURT:  At least nine figures.
12           MR. KOROLOGOS:  Yes.  Maybe ten.
13           THE COURT:  Okay.  Maybe ten.
14           MR. KRAMER:  Your Honor has hit on exactly why that
15   issue needs to be resolved.
16           THE COURT:  Wait.  Ten figures is a billion, right?
17           MR. KOROLOGOS:  Pardon me?  Yes.
18           MR. KRAMER:  Yes.
19           THE COURT:  Okay.
20           MR. KRAMER:  Your Honor has hit on exactly why this
21   issue is gating for purposes of mediation.
22           THE COURT:  Yeah.
23           MR. KRAMER:  I would point out, there is a recent
24   Ninth Circuit decision on class certification in the copyright
25   context that says the sole issue of authorization, license, is
```

1  this supposed to be there, do I consent to this being there?

2          THE COURT:  Is this the one that Judge Smith just did?

3          MR. KRAMER:  I believe so.  It's the Kihn versus the

4  Grateful Dead -- *Kihn versus Bill Graham Productions*.

5          THE COURT:  Oh, okay.

6          MR. KRAMER:  So it's a straightforward reversal of a

7  class certification for copyright infringement, saying:  Wait a

8  second, we have to -- just this individual issue alone is

9  enough to require decertification.

10      We have 25 individualized issues, and a huge

11  ascertainability problem as well.  So we would welcome the

12  opportunity to address these class issues as soon as possible

13  in the case.

14      We're scheduled for briefing in October, briefing --

15  briefing in September, and a hearing in October.  If we want to

16  move that up, great.  But if not, we're happy to go with that.

17          THE COURT:  Well, okay.  I'll leave it up to you, all

18  right?  I mean, actually I thought it was farther away.  It's

19  not that far away.  But --

20          MR. KOROLOGOS:  We appreciate Your Honor's suggestion

21  on --

22          THE COURT:  How about this?  You can give me five

23  issues, if you think that's 60 percent of the way to having a

24  productive chat.  Now, it's only useful if you internalize what

25  I say.

1        I mean, if whoever doesn't like what I say just says:

2    Well, we're just going to appeal it, then it's a waste of time,

3    okay?  So you have to make a commitment not to me, but to

4    yourself and your clients and to each other that this is

5    actually going to be a meaningful data input, and not just:

6    Oh, the dopey Judge got it wrong; we're still not going to

7    settle.

8        So if you're willing to do that, I won't ask you to pledge

9    that to me, but if you ask me to do this I will assume that is

10   the premise.  Otherwise, this is a waste of my time and I don't

11   want to do it.  So --

12        **MR. KOROLOGOS:**  We don't want to waste your time any

13   more than we want to waste ours.

14        **THE COURT:**  Good.  Or your clients' money.

15        **MR. KOROLOGOS:**  Exactly.

16        **THE COURT:**  So if you'd like, I'm happy to take up a

17   reasonable number of gating issues if you want to do it that

18   way.  And we can do some preliminary, tentative-style

19   discussions about it, and I can tell you how I'm leaning.  And

20   the way I'm leaning will almost certainly be the way I come

21   out.  I mean, it's not going to be -- or if I can't make a

22   decision, I'll let you know, too.  Just say:  This one I just

23   can't get a handle on.  We can do that.

24        If you want to go back and see the settlement judge again,

25   it -- just tell me what you want to do.  And if you don't want

1   to do it it's perfectly fine.  If you say:  You know, we're not

2   into it now, that is not a problem.  Don't hesitate to say

3   that.

4        But add it to your list, okay, for May 26th.  Why don't

5   you do it as an agenda.  If you want to meet on the 26th, just

6   give me a proposed agenda of all the issues.

7             **MR. KOROLOGOS:**  I think we're meeting on June 2.

8             **THE COURT:**  I'm sorry.

9             **MR. KOROLOGOS:**  But by the 26th, we will provide

10  Your Honor --

11            **THE COURT:**  Whatever that week is, before.  Yeah.

12  Yeah.  I mean, I can't answer anything.  I mean, I'm not going

13  to be able to answer your issues on a week's notice.  But at

14  least I'll know you want to talk about it.

15            **MR. KOROLOGOS:**  I think we would tell Your Honor what

16  issues remain, and then we'd come back in and see whether we

17  can resolve them with the Court's assistance.

18            **THE COURT:**  Well, no; I was thinking more of the class

19  issues.

20            **MR. KOROLOGOS:**  Oh, those issues.

21            **THE COURT:**  Yeah.  If you just want to identify them,

22  I would like to have a good understanding of what you think

23  would be useful.  How about that?  That's all -- I can't answer

24  for you on a week's notice.

25       But you just tell me, you know:  We've talked, and if we

```
 1   got some guidance on the following three, five, maybe six

 2   issues -- not -- please, not too many --

 3           MR. KOROLOGOS:  Yeah, I think we would do --

 4           THE COURT:  -- that would help us a lot.

 5           MR. KOROLOGOS:  I think there are two things we would

 6   end up discussing.

 7           THE COURT:  Your colleague said 25.

 8           MR. KOROLOGOS:  I mean, two procedural issues.

 9           THE COURT:  Oh.

10           MR. KOROLOGOS:  One is:  What are the issues that we

11   think might be helpful to get some feedback from Your Honor on,

12   that might be the gating issues to resolve.  That may be one

13   issue; it may be 25.  Whatever number that is.

14       The second is how to have those issues put before

15   Your Honor, for a fair description.

16           THE COURT:  Yeah.  That's perfectly fine.  Okay.  That

17   sounds great.

18       All set?

19           MR. KOROLOGOS:  Thank Your Honor.

20           MR. KRAMER:  Thank you, Your Honor.

21           THE COURT:  Thank you for coming in.

22           THE COURTROOM DEPUTY:  All rise.  Court's in recess.

23       (Proceedings concluded)

24

25
```

CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____/s/ Belle Ball_____

Belle Ball, CSR 8785, CRR, RDR

Monday, May 2, 2022