# EXHIBIT 30

Google Inc.
25 Massachusetts Avenue, NW
9th Floor
Washington, DC 20001

Main 202 346.1100
Fax 202 346.1101
www.google.com



February 21, 2017

The Honorable Karyn Temple Claggett
Acting Register of Copyrights
U.S. Copyright Office
101 Independence Avenue, SE
Washington, DC 20559-6000

**Re:   Section 512 Study: Request for Additional Comments
<u>Docket No. 2015-7 (November 08, 2016)</u>**

**Dear Acting Register Claggett:**

Google Inc. ("Google") appreciates the opportunity to submit additional comments in connection with the U.S. Copyright Office (the "Office") Request, *Section 512 Study: Notice and Request for Public Comment*, 80 Fed. Reg. 251.* We share the Office's interest in ensuring the efficiency and effectiveness of the safe harbor provisions contained in 17 U.S.C. § 512 for owners, online intermediaries, and users of copyrighted works. Our initial comments ("Google's April 1 Comments") explained why the stable safe harbor framework established by Section 512 is crucial not only to Google's many online products and services but to the growth of the Internet, and shared some of the steps we have taken to combat piracy online. In these reply comments, we take the opportunity to explain the workings of Content ID, and to address certain of the Office's additional questions.

<u>Introduction</u>

Section 512's notice-and-takedown regime has met Congress's twin goals: it has "facilitate[d] the robust development and world-wide expansion of electronic commerce, communications, research, development, and education," S. Rep. 105-190 at 1, while also providing copyright owners with a useful tool to protect their works at scale without having to hire a lawyer or register works.[1] Moreover, Section 512 has produced a stable body of law[2] on which those who invest in the next generation of online service

---

* Google submitted these comments on February 21, 2017 (COLC-2015-0013-92473). This submission corrects (on page 7) the total percentage of all URLs processed from our Trusted Copyright Removal Program in January 2017 that were not in our index to 81.82%.

[1] *See* Google's April 1 Comments, at 1-4.

[2] *See id.* at 5, 12-16.

Google Inc.
25 Massachusetts Avenue, NW
Washington, DC 20001



Main 202.346.1100
Fax 202.346.1101
www.google.com

providers ("OSPs") rely.[3] Section 512 has laid a foundation, atop which established OSPs have developed innovative systems (like YouTube's Content ID and other measures described in our April 1 Comments)[4] that go far beyond what the DMCA requires and enable copyright owners to monetize uploads of their content by third parties. At the same time, Section 512 preserves flexibility for less established platforms without the resources to develop and implement such systems.[5]

While the DMCA has not by itself eliminated rogue sites exploiting the copyrighted work of others, it has succeeded in fostering collaboration and economic growth, and in driving many rogue actors from the marketplace. The judicial record is clear, moreover, that rogue sites have found no shelter in the DMCA's safe harbors. Instead, this activity has successfully been driven out of the United States. The vast majority of the remaining rogue sites have moved offshore, out of the reach of the DMCA; further tinkering with the U.S. copyright regime is therefore unlikely to impact their behavior. As Ian Ballon put it at the San Francisco Roundtable, the issue of rogue sites is not a DMCA safe harbor issue.[6] Online service providers and rightsholders have nevertheless continued to collaborate to develop voluntary cross-industry efforts, such as supply-side initiatives (making more lawful content available), coupled with follow-the-money strategies, to address these ongoing challenges.[7] Early evidence suggests that these efforts are proving successful.[8]

In short, the DMCA has proven successful at fostering ongoing collaboration between rightsholders and online service providers, a collaboration that continues to pay dividends both in the U.S. and in international contexts.

**Content ID**

As described in our April 1 Comments, Content ID on YouTube is one example of the voluntary measures Google has taken, above and beyond the requirements of the DMCA safe harbors, to collaborate with and address the concerns of rightsholders.[9] As a voluntary measure, Content ID is not directly

---

[3] *See id.* at 17-18.

[4] *Id.* at 13.

[5] *See id.* at 3-4.

[6] Transcript of May 12, 2016 Section 512 Public Roundtable, at 263 (comments of Ian Ballon, Stanford Law Sch. Ctr. for E-Commerce), available at https://www.copyright.gov/policy/section512/public-roundtable/transcript_05-12-2016.pdf ("There's a very big problem with rogue sites, but that's a separate problem from the DMCA, and I think that that's important.").

[7] *See* Google's April 1 Comments, at 7-8.

[8] A Bunch of Weak Anti-Piracy Measures Are Still a Pest to Pirates, TorrentFreak (Jan. 7, 2017), available at https://torrentfreak.com/a-bunch-of-weak-anti-piracy-measures-are-still-a-pest-to-pirates-170107/.

[9] *See* How Google Fights Piracy, Google, available at https://drive.google.com/file/d/0BwxyRPFduTN2TmpGajJ6TnRLaDA/view.

GOOG-SCHNDR-00030304



Google Inc.  
25 Massachusetts Avenue, NW  
Washington, DC 20001

Main 202.346.1100  
Fax 202.346.1101  
www.google.com

relevant to the Office's inquiry regarding Section 512. Nevertheless, because Content ID was mentioned by several parties in the written and oral commentary presented to the Office in connection with the Section 512 Study, it may be helpful to provide additional facts about the system and its use in practice.

In order to use Content ID, rightsholders identify the works they own or control by providing reference files of those works, along with metadata defining the scope of their copyright rights in those works. Those reference files are fingerprinted such that even small portions can be identified even if major changes are made to them (e.g., changes in dimensions, positioning, colors, or speed of playback). New user videos uploaded to YouTube are compared against that database of fingerprints, and YouTube then applies the business rules chosen by the relevant rightsholders. YouTube also scans the corpus of previously uploaded videos in order to locate matches against new reference files provided by rightsholders.

Using Content ID, rightsholders set various thresholds for declaring a match on their own content, as well as what to do with matches. Rightsholders can decide to block content from ever appearing on YouTube in the first place, to track usage of their material but otherwise take no action, or to monetize the claimed content by placing advertising against it. Although the use of Content ID is not conditioned on licensing any content for use on YouTube, more than 90% of all claims result in this third option, monetization. In fact, the major record labels opt to monetize their content more than 95% of the time. To put it another way, while Content ID today offers rightsholders the option to exercise "takedown-staydown" of their works, the overwhelming majority of rightsholders prefer to use Content ID to "leave-up-and-get-paid."

Content ID is currently used by more than 8,000 partners representing hundreds of thousands of rightsholders. The system contains more than 50 million reference files, and has allowed rightsholders to claim more than 400 million videos. YouTube has paid more than $2 billion to rightsholders from Content ID alone, over and above other YouTube payments to rightsholders. After nearly a decade of constant improvement, Content ID can now match on video, sound recording, and even the melodies of musical compositions, each of which may be subject to different claims with different rules.[10]

While Content ID is being used by thousands of partners, Content ID is not a tool that is appropriate for everyone. It is an enterprise tool, providing a complex set of controls with platform-wide reach. Tools this powerful and complex can have significant consequences when misapplied. For example, a local news service that routinely claimed its news broadcasts forgot to exclude from its claim embedded NASA footage relating to the Mars rover landing. This resulted in mistaken claims on many other stories using the same, public-domain footage, and even a Content ID claim barring the video from appearing on

---

[10] We note also that many of the examples offered by other commenters concerning Content ID's operation are years old. As you might expect from any ongoing software project, the Content ID of 2007 or 2010 is barely relevant to the performance of the current Content ID, which continues to evolve.

GOOG-SCHNDR-00030305

Google Inc.
25 Massachusetts Avenue, NW
Washington, DC 20001

Main 202.346.1100
Fax 202.346.1101
www.google.com



NASA's own site.[11] For this reason, YouTube carefully evaluates applications from those who want to become Content ID partners. In reviewing these applications, we take many factors into account, including how popular the applicant's works are on the platform, how many DMCA notices have been sent on their behalf, the quality of the DMCA notices previously sent, and whether a significant portion of the applicant's catalog is already represented by existing Content ID partners.

For rightsholders who are not good candidates to be Content ID partners directly, a growing number of existing Content ID partners act as aggregators, representing smaller rightsholders.[12] Examples in the music field include The Orchard Music, AdRev, CD Baby, Believe Music, Ingrooves, Kontor New Media Music, Merlin, and Rumblefish. These are just a few of more than 30 such service providers operating on YouTube, who collectively manage more than 13 million sound recordings on YouTube on behalf of smaller rightsholders.

While Content ID has been a great success on YouTube, it is worth stressing again that its success is closely tied to its development as a voluntary measure, suited to the particular context of YouTube. As we explained in our April 1 Comments, the technical feasibility of such an automated system depends on the nature of the online service and the nature of the works to be identified.[13] What is technically feasible for a public video hosting service like YouTube is not necessarily feasible for a private, encrypted messaging or file lockering service, for a service that hosts non-video content, or for a service that primarily relies on sharing links rather than hosting content. For this reason, "staydown" obligations on service providers generally are better left to voluntary efforts, rather than legal mandates. In fact, Facebook, Tumblr, Twitch, SoundCloud, DailyMotion, and Scribd have all described similar voluntary efforts in their submissions to this Study.

**The U.S. Copyright Office's Additional Questions**

*Characteristics of the Current Internet Ecosystem*

**Question 1: As noted above, there is great diversity among the categories of content creators and ISPs who comprise the Internet ecosystem. How should any improvements in the DMCA safe harbor system account for these differences? For example, should any potential new measures, such as filtering or stay-down, relate to the size of the ISP or volume of online material hosted by it? If so, how? Should efforts to improve the accuracy of notices and counter-notices take into account**

---

[11] Timothy Lee, As Curiosity Touches Down on Mars, Video Is Taken Down from YouTube, Ars Technica (Aug. 6, 2012), available at https://arstechnica.com/tech-policy/2012/08/as-curiosity-touches-down-on-mars-video-is-taken-down-from-youtube.

[12] For more information, see the YouTube Creator Services Directory, available at https://servicesdirectory.withyoutube.com/.

[13] Google's April 1 Comments, at 10.

GOOG-SCHNDR-00030306