# EXHIBIT 46

Before the
**U.S. Copyright Office**
**Library of Congress**
Washington, D.C. 20559

| | | |
|---|---|---|
| *In re*: | ) | |
| | ) | |
| Standard Technical Measures | ) | Docket No. 2022–2 |
| and Section 512 | ) | |
| | ) | |

**Comments of Pex**
**on the Development and Use of Standard Technical Measures**
**for the Protection and Identification of Copyrighted Works**

Cesar Fishman, Vice President
Business and Government Affairs
Pex
Pex.com

Neil Fried, Counsel to Pex
Founder and Principal
DigitalFrontiers Advocacy
DigitalFrontiersAdvocacy.com

May 27, 2022

# Table of Contents

I.      Overview ................................................................................................... 1

        A.      *Section 512(i) Has Not Accomplished Congress's Goal of Promoting Standard Technical Measures for Identifying and Protecting Copyrighted Works* .............. 1

        B.      *Web Crawling and Content Fingerprinting Meet the STM Definition* ................. 2

        C.      *No Technical Measures Have Been Recognized as STMs Because Misapplication of the Section 512 Liability Limitations Disincentivizes OSP Cooperation, Because Section 512(i)(2)'s Criteria for Qualifying Technical Measures as STMs are Ambiguous, and Because Section 512(i)(2) Does Not Designate a Decisionmaker or Create an Action-Forcing Mechanism* .............................................................. 7

        D.      *Congress Should Promote Implementation of STMs by Fixing Application of the Liability Limitations, Clarifying the STM Qualifications, and Authorizing the Copyright Office to Recognize STMs in Response to Petitions* ............................. 8

II.     Responses to Questions ......................................................................... 9

        A.      *Questions About Existing Technologies as STMs* .................................................. 9

                Q1.     Are there existing technologies that meet the current statutory definition of STMs in section 512(i)? If yes, please identify. If no, what aspects of the statutory definition do existing technologies fail to meet? ........................ 9

                Q2.     What has hindered the adoption of existing technologies as STMs? Are there solutions that could address those hindrances? ............................... 10

        B.      *Questions About Section 512(i)* ........................................................................... 17

                Q3.     Process Under the Current Statute .......................................................... 17

                        (a)     *Formal Process*: Does section 512(i) implicitly require a formal process for adoption of an STM? If so, what are the requirements for such a process, and what should such a process entail? .......... 17

                        (b)     *Informal Process*: If the statute does not require a formal process, is an informal process appropriate or necessary? What type of informal process would facilitate the identification and adoption of an STM, and what should such a process entail? ........................................ 17

                        (c)     *Entities*: What entity or entities would be best positioned to convene the process, whether formal or informal? What, if anything, is needed to authorize such an entity to convene the process? Is there any role under section 512(i) for third parties, such as regulatory agencies or private standard-setting bodies, to determine whether a particular technology qualifies as an STM? If so, what is the nature of that role? How would the third party determine that a particular technology qualifies as an STM? What would be the effect of such a determination? ......................................................................... 18

                        (d)     *Courts*: What role, if any, do or should courts play in determining whether a particular technology qualifies as an STM under section 512(i)? How would a court determine that a particular technology

qualifies as an STM? What would be the effect of such a determination? For example, would such a determination be binding or advisory? Would it bind non-parties or apply outside of the court's jurisdiction? What would be the effect of pending appeals or inconsistent determinations across jurisdictions? ........................ 18

Q4.   *International Organizations*: Could technologies developed or used by international organizations or entities become STMs for purposes of section 512(i)? If so, through what process? ........................................................ 19

Q5.   *Consensus*: Under section 512(i)(2)(A), a measure can qualify as an STM if it has been "developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process." ................................................................................................... 19

    (a)   What level of agreement constitutes a "broad consensus"? .......... 19

    (b)   What groupings qualify as "multi-industry"? .............................. 19

    (c)   Can the phrase "multi-industry" as used in the statute mean a grouping within a subset of industries? Could such sub-industry divisions adopt separate STMs? What would be appropriate sub-industry divisions? ........................................................................ 19

Q6.   Availability ............................................................................................... 19

    (a)   Under section 512(i)(2)(B), an STM must also be "available to any person on reasonable and nondiscriminatory terms." Is this a threshold requirement for a technology to qualify as an STM or an obligation to make a technology available on reasonable and nondiscriminatory terms once it is designated as an STM? .......... 19

    (b)   How has concern over the potential availability and accessibility of a technology affected the adoption of STMs? What terms would be reasonable and nondiscriminatory for STMs? In what ways would it be possible to enforce these terms? ............................................... 20

Q7.   *Costs and burdens*: Under section 512(i)(2)(C), an STM must not "impose substantial costs on service providers or substantial burdens on their systems or networks." How should the substantiality of costs and burdens on internet service providers be evaluated? Should this evaluation differ based on variations in providers' sizes and functions? ............................. 20

Q8.   *Internet service provider responsibilities*: Section 512(i)(1)(B) states that an internet service provider must "accommodate[ ] and [ ] not interfere" with STMs to qualify for the statutory safe harbor. What actions does this standard require service providers to take or to affirmatively avoid taking? Must all internet service providers have the same obligations for every STM? What obstacles might prevent service providers from accommodating STMs? What could ameliorate such obstacles? ............. 20

C.   *Questions About Potential Changes to Section 512* .............................................. 21

Q9.   *Definition*: How could the existing definition of STMs in section 512 of Title 17 be improved? ............................................................................... 21

Q10.   *Obligations*: Currently, section 512(i)(1) conditions the safe harbors established in section 512 on an internet service provider accommodating and not interfering with STMs. ................................................................. 21

    (a)   Is the loss of the section 512 safe harbors an appropriate remedy for interfering with or failing to accommodate STMs? If not, what would be an appropriate remedy? .................................................. 21

    (b)   Are there other obligations concerning STMs that ought to be required of internet service providers? ......................................... 21

    (c)   What obligations should rightsholders have regarding the use of STMs? ....................................................................................... 21

Q11.   Adoption through rulemaking ..................................................... 22

    (a)   What role could a rulemaking play in identifying STMs for adoption under 512(i)? ................................................................. 22

    (b)   What entity or entities would be best positioned to administer such a rulemaking? ............................................................................. 22

    (c)   What factors should be considered when conducting such a rulemaking, and how should they be weighted? ........................... 22

    (d)   What should be the frequency of such a rulemaking? ................. 22

    (e)   What would be the benefits of such a rulemaking? What would be the drawbacks of such a rulemaking? ........................................... 22

Q12.   *Alternatives*: Are there alternative approaches that could better achieve Congress's original goals in enacting section 512(i)? ............................. 22

D.   *Other Issues* ........................................................................................ *22*

Q13.   Please identify and describe any pertinent issues not referenced above that the Copyright Office should consider. ..................................... 22

## I.    Overview

The time has come to fix section 512(i) of the Copyright Act, as well as to recognize web crawling and content fingerprinting technologies as standard technical measures in light of their near ubiquitousness. Indeed, both technologies meet the statutory criteria for recognition as STMs, with the only holdup being no process by which to call the question. As the Copyright Office has noted, "web crawling technology is widely used across industries, including by many OSPs to locate and index content on the internet. Thus, it is unclear what prevents such technology being designated an STM (other than lack of any group or forum for officially voting to recognize web crawlers as STMs)."[1] Fingerprinting, too, "has been adopted and employed by OSPs and rightsowners within various industries."[2]

The reasons crawling, fingerprinting, and other technical measures have not been recognized as STMs despite their wide availability are threefold: 1) OSPs have little incentive to support recognition of STMs because overbroad judicial application of the section 512 liability limitations enables OSPs to safely profit from user engagement with copyright-infringing content; 2) section 512(i)(2)'s criteria for qualifying technical measures as STMs are ambiguous; and 3) section 512(i)(2) does not designate a decisionmaker or create an action-forcing mechanism.

To address the lack of OSP incentive, Congress should: a) clarify the red flag knowledge and willful blindness standards for determining when OSPs must act to curb infringement and whether they qualify for the section 512 liability limitations; b) create a notice and staydown requirement; and c) condition OSPs' liability limitations on taking reasonable steps to prevent infringing dissemination of copyrighted works in the first place. To address the statutory ambiguity, Congress should amend section 512(i)(2) to clarify: a) the standards process by which a technical measure must have been developed to qualify as an STM; b) the requirement that the technical measure must be available on reasonable and non-discriminatory terms; and c) the requirement that the technical measure not impose substantial costs or burdens on OSPs. To address section 512(i)'s lack of a specified decisionmaker or an action-forcing mechanism, Congress should supplement the current voluntary process by authorizing the Copyright Office to designate technical measures as STMs in response to petitions.

### A.    *Section 512(i) Has Not Accomplished Congress's Goal of Promoting Standard Technical Measures for Identifying and Protecting Copyrighted Works*

In structuring online service providers' liability limitations for copyright infringement by their users, Congress meant the standard technical measures provisions of section 512 to be a lynchpin.[3] Indeed, with section 512, Congress sought to "preserve[ ] … strong incentives for

---

[1]U.S. COPYRIGHT OFFICE, SECTION 512 OF TITLE 17: A REPORT OF THE REGISTER OF COPYRIGHTS 177 n.946 (2020) (Section 512 Report).

[2]*Id*. at 177.

[3]*See* Letter from Sens. Thom Tillis and Patrick Leahy to Shira Perlmutter, Register of Copyrights, U.S. Copyright Office 1 (June 24, 2021) (stating that "[w]hen Congress set up the safe harbors for OSPs over twenty years ago, it envisioned industry working together to identify standard technical measures (STMs) that service

service providers and copyright owners to cooperate to detect and deal with copyright infringements."[4] Thus, section 512 limits the liability of an OSP only if, among other things, the OSP "accommodates and does not interfere with standard technical measures."[5] Congress defined STMs in section 512(i)(2) as:

> technical measures that are used by copyright owners to identify or protect copyrighted works and—(A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process; (B) are available to any person on reasonable and nondiscriminatory terms; and (C) do not impose substantial costs on service providers or substantial burdens on their systems or networks.[6]

Unfortunately, "Congress' vision of broad, open, cross-industry standards-setting for the creation of standard technical measures has not come to pass" and "few widely-available tools have been created and consistently implemented across the internet ecosystem."[7] Although technical measures to protect and identify copyrighted works in user-generated content abound,[8] not all OSPs use them, accommodate them, or apply them equally to the works of all copyright holders.[9] Some OSPs even interfere with the use of standard web crawling technology to locate infringing material—thereby limiting copyright holders' ability to protect their works at scale—despite the fact that OSPs themselves use web crawling to index content.[10] The reason such interference is not unlawful under section 512 is that, to date, no technical measures have been recognized as STMs.[11]

### B.    Web Crawling and Content Fingerprinting Meet the STM Definition

Despite their lack of recognition, technical measures exist today that meet the STM definition. Web crawling and content fingerprinting are two examples.

Web crawling doesn't just enable search engines to create clickable indexes so internet users can discover and access specific content online. Copyright holders or their agents crawl the

---

providers would accommodate."), *available at* https://digitalfrontiersadvocacy.com/copyright-law-issues/section-512-safe-harbors/section-512-reform/standard-technical-measures/6-24-21-tillis-leahy-section-512i-stm-letter/; SECTION 512 REPORT, *supra* note 1, at 176 (stating that "[i]nherent in [section 512(i)] is Congress' primary intent for the section 512 framework to encourage cooperation between creators and OSPs.").

[4] DIGITAL MILLENNIUM COPYRIGHT ACT, H.R. REP. NO. 105-796, at 72 (1998) (Conf. Rep.).

[5] 17 U.S.C. § 512(i)(1), (i)(1)(B).

[6] *Id.*, § 512(i)(2).

[7] SECTION 512 REPORT, *supra* note 1, at 66 n.352, 67.

[8] *See, e.g.*, *id.*, at 67 n.355, 177 (stating that "[s]takeholders across industries already employ a wide variety of technological tools to facilitate operations within the section 512 framework for particular types of works, such as audio or audiovisual works"; pointing to a number of examples, such as Google's Content ID and Facebook's Rights Manager, as well as technologies used by SoundCloud, Twitch, Vimeo, and Verizon Wireless).

[9] *See id.*, at 42-46; U.S. Copyright Office, *In re* Technical Measures: Public Consultations, Docket No. 2021–10, *Notification of Inquiry*, 86 Fed. Reg. 72,638, 72,639. (Dec. 22, 2021).

[10] *See* SECTION 512 REPORT, *supra* note 1, at 177 n.946.

[11] *See id.*, at 67, 95 n.501.

web to discover infringing uses of copyrighted works. The copyright holders can then decide whether to try to license the works to the user or stop the infringing use. Protocols for the design and use of crawling have developed pursuant to consensus- and standards-based processes throughout the private sector, academia, and organizations such as the Internet Engineering Task Force.[12] Anyone can build a web crawler, and companies such as Pex make crawling available to copyright holders and OSPs on reasonable and nondiscriminatory terms for purposes of discovering copyrighted works.[13] The internet community has created conventions to ensure crawling does not impose burdensome costs or unreasonable congestion on web sites that are being crawled.[14]

Content fingerprinting also meets the section 512(i)(2) definition. Fingerprinting is often discussed in the video or audio context,[15] but photography, art, and text can be identified online through similar methods. Although consumers sometimes use fingerprinting merely to identify content—for example by launching the Shazam application to determine the title and artist of a song playing in a bar, restaurant, or on television[16]—companies such as Pex employ fingerprinting to also help protect, attribute, and license copyrighted works. Pex does so by comparing material that someone has uploaded to the internet (or is in the process of uploading) against fingerprint data of copyright holders' works.[17] A match triggers further investigation to determine if the upload was (or would be) lawful, and to potentially lead to a licensing agreement where necessary.[18] As with web crawling, content fingerprinting methods are in wide use[19] and have evolved through consensus-based processes by the private sector, academia, and standards bodies—for example in the world of trust and safety, where such methods are used regularly.[20]

---

[12]See, for example, CHRISTOPHER D. MANNING ET AL., INTRODUCTION TO INFORMATION RETRIEVAL ch. 20 (online ed. 2009), https://nlp.stanford.edu/IR-book/pdf/irbookonlinereading.pdf, and WIKIPEDIA, "Web crawler," https://en.wikipedia.org/wiki/Web_crawler (last viewed May 6, 2022), along with the sources cited within each.

[13]See U.S. Copyright Office, In re Technical Measures: Public Consultations, Docket No. 2021–10, *Comments of Pex*, at 1, 4-7 (Feb. 8, 2022), https://www.regulations.gov/comment/COLC-2021-0009-5371.

[14]See, e.g., WIKIPEDIA, "Sitemaps," https://en.wikipedia.org/wiki/Sitemaps (last viewed May 9, 2022); INTERNET ENGINEERING TASK FORCE, NETWORK WORKING GROUP, ROBOTS EXCLUSION PROTOCOL, DRAFT-KOSTER-REP-08 (work in progress May 5, 2022), https://datatracker.ietf.org/doc/html/draft-koster-rep.

[15]See, e.g., WIKIPEDIA, "Digital video fingerprinting," https://en.wikipedia.org/wiki/Digital_video_fingerprinting (last viewed May 9, 2022); id. "Acoustic fingerprint," https://en.wikipedia.org/wiki/Acoustic_fingerprint (last visited May 9, 2022).

[16]See https://www.shazam.com/home (last visited May 15, 2022).

[17]See https://pex.com (last visited May 17, 2022).

[18]See SECTION 512 REPORT, *supra* note 1, at 177-78.

[19]See, e.g., id., at 43 n.218, 54 n.283, 365 n.71, 177 (quoting comments of c3 and the Intellectual Property Owners Association for the propositions that "YouTube's Content ID system now enables rights holders to limit infringing files, which are technologically matched via fingerprint-based content recognition technology, from being made available via YouTube"; noting that "German company ivitec has developed market-ready video fingerprinting and automatic content recognition software solutions"; recognizing "that the availability of third-party services like Audible Magic, which offer digital fingerprinting solutions as a service for OSPs, could help obviate the need for new entrants to develop their own in-house equivalent of Content ID"; observing that companies such as Facebook, SoundCloud, Twitch, Vimeo, and Verizon Wireless use fingerprinting).

[20]See, e.g., OLIVER HELLMUTH ET AL., AUDIO ENGINEERING SOCIETY, CONVENTION PAPER 5961, USING MPEG-7 AUDIO FINGERPRINTING IN REAL-WORLD APPLICATIONS (2003), https://www.aes.org/e-lib/browse.cfm?elib=12342; INTERNATIONAL ORGANIZATION FOR STANDARDIZATION, *ISO/IEC TR 21000-*

Companies like Pex offer fingerprinting services on reasonable and non-discriminatory terms and in a manner that is neither cumbersome nor costly.[21]

To the extent web crawling and content fingerprinting are now—or are recognized in the future to be—STMs, OSPs seeking the benefit of the section 512 liability limitations must accommodate and not interfere with their use by copyright holders to identify and protect copyrighted works.[22]

Because section 512(i) requires OSPs not just to refrain from interfering with STMs, but also to accommodate them, recognizing crawling and fingerprinting as STMs means OSPs seeking to invoke the liability limitations must: 1) make application programming interfaces available that allow copyright holders (or their agents) to crawl the OSPs' sites in search of content that meets the copyright holders' fingerprint data; and 2) anticipatorily look for fingerprint-matching content that OSP users seek to upload or otherwise disseminate on the services, when copyright holders or their agents enable a means for comparing the user content to the fingerprint data. In each case, the OSP would then be obligated, as instructed by the copyright holders, to: a) take down or prevent the initial dissemination of any copyrighted works in the user-generated content, and prevent future uploads of the copyrighted works; b) enable the copyright holders to seek a license from the user for the copyrighted works, or itself enter into a license agreement with the copyright holders on behalf of its users, including possibly sharing any advertising revenue associated with the copyrighted works in the user-generated content; or c) allow dissemination of the copyrighted works.

To avoid interfering with web crawling and content fingerprinting STMs, OSPs would need to: 1) not make any changes in their services or API's that would prevent the capabilities discussed above, or communicate such changes with the STM providers; 2) work with the STM providers to resolve any problems the changes would cause, and allow the STM providers enough time to change their own services before the OSPs implement their changes; 3) not impose unreasonable terms or conditions that would prevent the STM providers from providing the capabilities discussed above.

Requiring OSPs to anticipatorily look for copyrighted works in accommodating web crawling and content fingerprinting STMs does not run afoul of section 512(m). Section 512(m)(1) does state that "[n]othing in [section 512] shall be construed to condition the applicability of [the liability limitations in] subsections (a) through (d) on … a service provider monitoring its service or affirmatively seeking facts indicating infringing activity."[23] Section 512(m)(1) carves out,

---

*11:2004(en) Information technology—Multimedia framework (MPEG-21)—Part 11: Evaluation Tools for Persistent Association Technologies*, at §§ 1.1, 3.4 (discussing use of the MPEG-21 standard for fingerprinting), https://www.iso.org/obp/ui/#iso:std:iso-iec:tr:21000:-11:ed-1:v1:en.

   [21]*See* U.S. Copyright Office, In re Technical Measures: Public Consultations, Docket No. 2021–10, *Comments of Pex*, at 1, 4-7 (Feb. 8, 2022), https://www.regulations.gov/comment/COLC-2021-0009-5371.

   [22]*See* 17 U.S.C. § 512(i)(1), (1)(B) (stating that "[t]he limitations on liability established by this section shall apply to a service provider only if," among other things, "the service provider—accommodates and does not interfere with standard technical measures.").

   [23]*Id.*, § 512(m), (m)(1).

however, actions "consistent with a standard technical measure complying with the provisions of subsection [512](i)."[24] This STM carveout demonstrates Congress' intent for OSPs to take proactive steps to prevent even an initial infringement where technologically feasible, not just to take retroactive steps upon receiving notice from a copyright holder. Similarly, section 512(m)(2) does state that "[n]othing in [section 512] shall be construed to condition the applicability of [the liability limitations in] subsections (a) through (d) on … a service provider gaining access to, removing, or disabling access to material."[25] But that caveat is limited to "cases in which such conduct is prohibited by law."[26] Indeed, as the Copyright Office has observed, courts and skeptics of copyright enforcement often misconstrue section 512(m), which neither trumps the obligation of OSPs to take action in response to STMs, actual knowledge, or red flag knowledge, nor abrogates the willful blindness doctrine.[27]

The requirement to accommodate and not interfere with web crawling and content fingerprinting as STMs would not mean that the use of either is always lawful in other circumstances. Even when a technical measure has been recognized as an STM, it is only an STM when a *copyright holder or its agent* use the measure *to identify and protect copyrighted works*.[28] If an entity other than a copyright holder or its agent was using crawling or fingerprinting for that or any other purpose, section 512(i) would neither authorize or require accommodation by an OSP, nor prohibit an OSP from interfering. And since section 512(i)(1)(B) only applies to OSPs, it can neither authorize or require any other entity to use or accommodate crawling or fingerprinting, nor prohibit the entity from interfering. The lawfulness or unlawfulness of using or interfering with crawling and fingerprinting for other purposes or by other entities would depend on application of other law.

---

[24]*Id.*, § 512(m)(1).

[25]*Id.*, § 512(m), (m)(2).

[26]*Id.*, § 512(m)(2).

[27]*See* SECTION 512 REPORT, *supra* note 1, at 3-4, 26, 106 n.560, 111 n.591, 122, 127 (stating that "courts have struggled to articulate the appropriate relationship between section 512(m)'s intent to avoid the imposition of a duty to monitor on OSPs, with section 512(c) and (d)'s knowledge requirements"; that although "courts have adopted a standard for willful blindness that is modified from the traditional common law standard … in an effort to reconcile the doctrine with section 512(m), the result may be in some tension with what appears to be Congress' original intent"; that "OSPs are not free to ignore infringement of which they have actual or red flag knowledge"; that section 512(m) "says only that OSPs do not have an affirmative duty to 'monitor[] its service or affirmatively seek[] facts indicating infringing activity' or to access material when to do so would violate another law, such as the Electronic Communications Privacy Act, but does not say that OSPs may simply ignore information of potential repeated infringement on their system once obtained"; that "[t]he existence of some obligation to take action to investigate further upon obtaining evidence of infringement is entirely consistent with legislative history"; that "Congress … intended … 'red flags' to create some limited duty of inquiry for an OSP to determine whether there is 'objectively obvious' infringement"; that "[s]uch a limited duty would not contravene section 512(m)'s bar on a general duty to monitor, but would only be triggered in specific situations by awareness 'of facts or circumstances from which infringing activity is apparent'"); and that "[u]sing section 512(m) as the starting point for interpreting all other parts of section 512 has resulted in a willful blindness standard that is difficult to square with Congress' original intent.").

[28]*See* 17 U.S.C. § 512(i)(2) (limiting the definition of STMs to "technical measures that," among other things, "are used by copyright owners to identify or protect copyrighted works.").

The Ninth Circuit's recent web-crawling related decision in *hiQ Labs v. LinkedIn* does not hold otherwise, as it was not a final decision on the merits of web crawling's legality. Rather, it upheld a lower court order that preliminarily enjoins LinkedIn from blocking HiQ's crawling of LinkedIn users' public profiles pending resolution of a dispute between the companies.[29] The Ninth Circuit upheld the preliminary injunction only on the the grounds "that hiQ has raised serious questions about whether LinkedIn may invoke the Computer Fraud and Abuse Act ("CFAA") to preempt hiQ's possibly meritorious tortious interference claim," and because hiQ also met the other requirements for a preliminary injunction.[30]

Thus, depending on the circumstances, including even in the *hiQ* case, web crawling when not being used as an STM still may or may not be found to violate the Computer Fraud and Abuse Act, the Copyright Act, or other law.[31] That does not change the fact, however, that OSPs must accommodate and not interfere with crawling if and when used by copyright holders as an STM, if they wish the benefit of section 512's liability limitations.

Nor would using web crawling and content fingerprinting as STMs break the internet, invade users' privacy, or lead to a rash of "false positives." Crawling and fingerprinting are already in widespread use, including by Google and Facebook, as discussed above, and the internet continues to function. OSPs are certainly allowed to have and enforce terms of service that prohibit their users from engaging in unlawful activity, including unlawful use of copyrighted content, and disclosure of those terms of service would help inform users and mitigate privacy concerns. In addition, Congressional testimony indicates that false positives are rare.[32] Moreover, dispute resolution processes such as those offered by Pex provide additional assurances that all parties' rights will be respected and that erroneous decisions will be minimized.[33] Companies such as Pex

---

[29]*See* hiQ Labs v. LinkedIn, No. 17-16783 (9th Cir. Apr. 18, 2022), https://cdn.ca9.uscourts.gov/datastore/opinions/2022/04/18/17-16783.pdf.

[30]*See id.*, slip. op. at 7, 14-43.

[31]*See id.*, slip. op. at 20 (stating that the court was expressing no opinion as to claims other than those of hiQ under intentional interference with contract or unfair competition, and those of LinkedIn under the Computer Fraud and Abuse Act; that as to hiQ and LinkedIn's interference with contract, unfair competition, and CFAA claims it was only expressing an opinion on *likely* (not ultimate) meritoriousness; and that it was not addressing claims under the Digital Millennium Copyright Act, or the trespass and misappropriation doctrines).

[32]*See* The Role of Private Agreements and Existing Technology in Curbing Online Piracy: Hearing Before the Subcomm. on Intell. Prop. of the S. Comm. on the Judiciary, 116th Cong., *Written Testimony of Katherine Oyama*, at 9 (Dec. 15, 2020) (Oyama Testimony) (indicating that uploaders disputed less than one percent of the Content ID claims made on YouTube from January through June 2020 and that only slightly more than half of those disputes were resolved in the uploaders favor, suggesting an initial takedown error rate of approximately one-half percent, but then resulting in reposting of the content), https://www.judiciary.senate.gov/imo/media/doc/Oyama%20Testimony.pdf.

[33]*See* U.S. Copyright Office, *In re* Technical Measures: Public Consultations, Docket No. 2021–10, *Comments of Pex*, at 5-6 (Feb. 8, 2022) (explaining that when Pex informs an OSP that a copyright holder wishes to prevent upload of user-generated content, the user may dispute that the content use would infringe copyright, arguing for example that it constitutes a fair use; that the copyright holder and the user can then agree to have the claim sent to an expert identified by organizations such as the World Intellectual Property Organization for human review; and that the expert provides a non-binding opinion of whether a court is likely to find the use infringing, which will give parties a sense of whether they are likely to prevail, helping them make a cost-benefit analysis of whether to accept

also make crawling and fingerprinting available to companies that do not have the resources to provide it themselves, ensuring all OSPs can comply with the obligation to accommodate the STMs.

Some OSPs and copyright opponents argue that the STM provision amounts to a technology mandate. But OSPs can't ignore the accommodation requirement of the statute just because they dislike the concept of STMs, which Congress adopted as a central part of the section 512 balance. The criticism is also inaccurate. OSPs can choose not to accommodate STMs if they don't want to accept the liability limitation bargain. Congress could also ameliorate concerns by clarifying that technical measures are categories of content protection methods—such as fingerprinting or watermarking—not specific entities' particular technological implementations of those methods, as Pex suggests below in Part I.D. and in response to Question 2.

C.   *No Technical Measures Have Been Recognized as STMs Because Misapplication of the Section 512 Liability Limitations Disincentivizes OSP Cooperation, Because Section 512(i)(2)'s Criteria for Qualifying Technical Measures as STMs are Ambiguous, and Because Section 512(i)(2) Does Not Designate a Decisionmaker or Create an Action-Forcing Mechanism*

One reason why no technical measures have been recognized as STMs is that OSPs have a disincentive to see that happen. Overbroad judicial application of the section 512 liability limitations enables OSPs to safely profit from user engagement with copyright-infringing content.[34] From such a perspective, OSPs do better in the absence of STMs so that they can continue to generate revenue until copyright holders discover infringing use themselves and send a takedown notice. That limits the widespread adoption of powerful content identification and protection technology.

Other problems include section 512(i)(2)'s ambiguity regarding the criteria for qualifying a technical measure as an STM, its silence regarding who rules whether a solution meets the criteria, and its lack of any action-forcing mechanism to drive a ruling. How many copyright holders and service providers must agree to constitute broad consensus? Must they represent every type of copyright holder and OSP or is a consensus among subsets sufficient? What constitutes an open, fair, voluntary, multi-industry standards process? Must it be run by a formal standards body? For a technical measure to be available on reasonable and non-discriminatory terms, must the terms of service be identical for everyone or can technical measure providers, OSPs, and copyright owners negotiate different terms? Can the terms change going forward, either for existing or new users of the STM? Do the "substantiality of costs and burdens" analyses vary by the size of the OSP and the amount of infringing use of copyrighted works on the service? Who answers these questions?

OSPs' disincentive, combined with the ambiguous criteria, the silence regarding the decisionmaker, and the lack of action-forcing mechanism in section 512(i)(2), mean OSPs can and

---

the original result or continue the dispute outside of Pex's system), https://www.regulations.gov/comment/COLC-2021-0009-5371.
   [34] *See* Section 512 Report, *supra* note 1, at 81-82. *See also* answer to Question 2 at footnotes 35 to 39 and accompanying text.

do read the STM accommodation requirement out of the statute by frustrating the development and recognition of STMs or simply opting out of the process.

>   D.   *Congress Should Promote Implementation of STMs by Fixing Application of the Liability Limitations, Clarifying the STM Qualifications, and Authorizing the Copyright Office to Recognize STMs in Response to Petitions*

To promote implementation of STMs, Pex recommends Congress take the following actions, as discussed in more detail below in response to the questions.

- Restore the OSP incentives by: 1) clarifying the red flag knowledge and willful blindness standards; 2) creating a notice and staydown requirement; and 3) conditioning OSPs' liability limitations on taking reasonable steps to prevent infringing dissemination of copyrighted works in the first place.

- Resolve the ambiguities in the STM criteria by providing that:

  o   a standard technical measure is an overall category of copyright protection method, such as fingerprinting or watermarking, not a particular technological implementation of that method;

  o   section 512(i)(2)(A) no longer requires "a "broad consensus of copyright owners and service providers" or the process to be "multi-industry," but still requires the process to be "open, fair, and voluntary";

  o   the "open, fair, and voluntary process" analysis applies to the way a technical measure was developed, not to the recognition of a technical measure as an STM;

  o   a process is "open, fair, and voluntary" if those entities that would be affected by a technical measure and have relevant expertise were afforded an opportunity to be represented and have their views heard;

  o   the standards process by which the technical measure was developed can be formal or informal;

  o   for a technical measure to be available on reasonable and non-discriminatory terms, the terms of availability need not be identical for all OSPs, but can vary based on factors such as market forces, the size of the OSP, and the use case;

  o   the substantiality of the costs and burdens are to be evaluated taking into account whether they would be proportional to: the size and resources of OSPs; the amount of revenues the OSPs generate from copyrighted works in user-generated content; the potential quantity of infringement and amount of harm to copyright holders that would be avoided; the costs and burdens imposed on copyright holders in the absence of recognition of the technical measure as an STM; and any savings in costs or burdens to the OSPs that would result from recognition of the technical measure as an STM (such as in a reduced amount of notices and takedowns that

8

must be processed, or the increased availability of the technical measure in the marketplace); and

    o    a technical measure can be recognized as an STM for subsets of content, subsets of copyright holders, and subsets of OSPs.

- Resolve section 512(i)(2)'s silence regarding who determines whether a technical measure meets the STM criteria, and its lack of any action-forcing mechanism, by authorizing the Copyright Office to recognize technical measures as STMs in response to petitions, while continuing to allow segments of industry to come together to recognize a technical measure as an STM through a voluntary process.

Ultimately, these changes would restore Congress' intended section 512 balance and be good for everyone. Copyright holders large and small would be better positioned to protect their works and to license them for OSP subscribers' use, thereby creating new revenue streams and ensuring fair remuneration. New and smaller OSPs could economically reduce risk of copyright liability while providing more content for their subscribers' authorized use. OSPs wouldn't need to take down as much content—reducing the burden of notice and takedown for all parties—and could increase their advertising or other revenue. OSP users would gain access to additional copyrighted works and—copyright holder permitting—have greater opportunities to lawfully incorporate those works into content they create on the online service. In addition, OSP users would have a simpler way of protecting their own copyrights in the user-generated content they create.

Broad adoption of STMs could also spawn a variety of applications and services. Better identification of copyrighted works, for example, might help create more accurate commercial databases of ownership and license rights. That, in turn, might improve copyright protection, registration, licensing, recordation, and dispute resolution. The same technologies would also help related efforts by the private sector and internet safety groups to identify and moderate other unlawful behavior online, and assist authorities in law enforcement efforts. Pex is working with these organizations today to facilitate such efforts.

## II.    Responses to Questions

    *A.    Questions About Existing Technologies as STMs*

    Q1.    Are there existing technologies that meet the current statutory definition of STMs in section 512(i)? If yes, please identify. If no, what aspects of the statutory definition do existing technologies fail to meet?

Amending the statute could provide clarity and certainty, but technical measures exist—such as web crawling and content fingerprinting—that potentially meet the section 512(i) STM definition today, as discussed above in Part I.B.

Q2.     What has hindered the adoption of existing technologies as STMs? Are there solutions that could address those hindrances?

The main impediments to recognition of existing technical measures as STMs have been: 1) the disincentive overbroad court application of section 512's liability limitations has created for OSPs to discover, protect, attribute, and license copyrighted works their users disseminate on the services; 2) section 512(i)(2)'s ambiguity regarding the qualifications for standard technical measures; and 3) section 512(i)'s absence of a designated decisionmaker and a lack of an action-forcing mechanism.

Unless the Copyright Office's current consultations on voluntary identification and implementation of technical measures[35] result in a breakthrough, Congress will likely need to revise section 512 in three ways to help achieve the collaboration around technical measures it intended section 512 to promote.[36] First, Congress should amend the section 512 liability limitations to ensure the limitations are meeting Congress' objectives, including by correcting courts' overbroad interpretations. Second, it should revise section 512(i)(2)'s criteria for recognizing technical measures as STMs. Third, Congress should supplement the current voluntary process by authorizing the Copyright Office to recognize technical measures as STMs in response to petitions. These revisions could accomplish the balance Congress sought to create with section 512—a balance that the Copyright Office's 2020 section 512 report concludes "has been tilted askew."[37]

<u>The Disincentive to Discover, Protect, Attribute, and License Copyrighted Works</u>: Courts' overbroad application of the liability limitations in section 512 enable OSPs to safely profit from their users' unlawful dissemination of copyrighted works on the services. Indeed, courts have erroneously applied section 512 in a way that suggests OSPs: 1) need not seek to prevent their users' initial, infringing posts or other dissemination of copyrighted works on the service;[38] 2) nor search for or remove unauthorized, copyrighted works their users have already disseminated on the services, until the copyright holders have discovered the works and requested the OSPs take them down.[39]

---

[35]*See* U.S. Copyright Office, *In re* Technical Measures: Public Consultations, Docket No. 2021–10, *Notification of Inquiry*, 86 Fed. Reg. 72,638 (Dec. 22, 2021).

[36]*See* SECTION 512 REPORT, *supra* note 1, at 66 (stating that "Congress envisioned a system where content owners and ISPs would continue to work together to develop new technologies and best practices for addressing infringement on the internet, rather than creating a static system that locked in place the anti-piracy toolkit of the 1990s.").

[37]*Id.*, at 1.

[38]*See supra* note 27.

[39]*See, e.g.*, SECTION 512 REPORT, *supra* note 1, at 111-12 n. 591, 113 (stating that *UMG Recordings, Inc. v. Shelter Capital Partners LLC,* 718 F.3d 1006 (9th Cir. 2013), erroneously suggests that section 512(m) "not only protects OSPs from being subject to an affirmative monitoring obligation, but also protects them from having any duty to act upon evidence of infringement of which they become aware, absent receipt of a takedown notice"; that "Congress intended OSPs to have an obligation to act upon information regarding infringing activity even in the absence of a takedown notice under some circumstances"; and that "a takedown notice is not a prerequisite for an ISP to obtain either actual or red flag knowledge," and thus have an obligation to act to remain within the safe harbors) (citing DIGITAL MILLENNIUM COPYRIGHT ACT, H.R. REP. NO. 105-551, PART 2, at 26 (1998) (stating that

As a result, infringing use of copyrighted works can generate revenues for OSPs and users—such as through advertising connected with user posts—until a copyright holder discovers the infringing use, the copyright holder asks the OSP to take the content down, and the OSP does so. Because technology makes user-generated content quickly and widely available, and readily subject to further dissemination by others, the ill-gotten gains the user and OSP generate from the infringing use of the copyrighted works, and the harm to the copyright holder, can be substantial.

The OSPs are in a better position than users and copyright holders to help initially discover, protect, attribute, and license copyrighted works included in user-generated content. A user may not even realize that incorporation and dissemination of the copyrighted work into his or her post requires a license. The OSPs are also likely larger and better resourced than their users. They may even be larger and better resourced than the copyright holders. In addition, the OSPs are more likely than users to have or develop copyright expertise. And the OSPs have more control than users or copyright holders over the content, mechanisms, and safeguards on the services.

Copyright holders of course have a role to play. For example, copyright holders wishing to use crawling and fingerprinting to discover, protect, and attribute their content will enable a way, such as through Pex, to compare user-generated content to the fingerprint reference files for their copyrighted works.[40] But because OSPs intermediate between users and copyright holders—often at mass scale—OSPs are at the tip of the spear when it comes to identifying and combatting infringing use of copyrighted works.

When an OSP helps discover, protect, attribute, and license copyrighted works in user-generated content, however, some of any revenue the user and OSP generate goes to the copyright holders. The OSPs may therefore view recognition of standard technical measures as increasing costs and reducing revenues, and thus prefer to wait until copyright holders discover infringing use and send a takedown notice, rather than recognize STMs and be required to accommodate them. Consequently, section 512 as currently applied by the courts disincentivizes OSPs from recognizing technical measures as STMs.

Some OSPs do incorporate technical measures to proactively help discover, protect, attribute, and license copyrighted works. When they do so, however, they often use their own solutions. That makes it hard for copyright holders to determine how much infringing use of

---

although section 512 "'shall not be construed to condition the limitation [on liability] on monitoring a network for infringement or searching out suspicious information[, o]nce one becomes aware of such information, … one may have an obligation to check further'"); *id.* at 54 (stating that "a service provider wishing to benefit from the limitation on liability under new subsection (c) must 'take down' or disable access to infringing material residing on its system or network in cases where it has actual knowledge or that the criteria for the 'red flag' test are met—even if the copyright owner or its agent does not notify it of a claimed infringement"); DIGITAL MILLENNIUM COPYRIGHT ACT, S. REP. NO. 105-190, at 45 (1998) (stating that "'[a] service provider wishing to benefit from the limitation on liability under subsection (c) must 'take down' or disable access to infringing material residing on its system or network of which it [has or should have knowledge] even if the copyright owner or its agent does not notify it of a claimed infringement.'")).

   [40]*See* SECTION 512 REPORT, *supra* note 1, at 178 (observing that successful fingerprinting depends on a robust set of fingerprint files).

copyrighted works slips through, and puts copyright holders in a "take it or leave it" situation. If they complain about the efficacy of the OSP technical measures or the terms under which the OSPs make the measures available, the copyright holders may lose what benefit the measures do provide. Moreover, OSPs that do proactively use their own technical measures often do not employ them universally. For example, some refuse to use them for the works of smaller copyright holders, as the Copyright Office has observed.[41]

Ambiguity of Section 512(i)(2): To qualify as an STM, a technical measure must have: 1) been "developed pursuant to a broad consensus of copyright owners and service providers"; 2) been developed through "an open, fair, voluntary, multi-industry standards process"; 3) be "available to any person on reasonable and nondiscriminatory terms"; and 4) "not impose substantial costs on service providers or substantial burdens on their systems or networks."[42] These provisions leave too much room for interpretation, as discussed above.

Statutory provisions always require interpretation, of course. But section 512(i) does not indicate who does the interpreting. Is it left to copyright holders and OSPs? Can the Copyright Office make a determination? At a minimum, it would seem a party could ask a court to determine if a technical measure qualifies as an STM under section 512(i)(2) as part of a ruling on whether an OSP has lost its liability limitations by violating the section 512(i)(1)(B) requirement to accommodate and not interfere with STMs. But if that is the only option, it is a slow, piecemeal, expensive, and inefficient way to identify and implement STMs.

Lack of Action-Forcing Mechanism: Section 512(i) also provides no action-forcing mechanism. This is problematic considering OSPs' disincentive to see a technical measure recognized as an STM. By preventing recognition of STMs, OSPs can read section 512(i)(1)(B) out of the statute. That guts Congress' intent behind section 512, which was to grant OSPs the liability limitations only if they collaborated with copyright holders to curb infringing use of copyrighted works, including through the recognition of STMs.

Solutions

*Ensuring the Section 512 Liability Limitations Operate as Congress Intended.* Righting application of the section 512 liability limitations might better incentivize OSPs' to recognize technical measures as STMs, consistent with Congress's objectives. Congress could accomplish this by clarifying the red flag knowledge and willful blindness standards; creating a notice and staydown

---

[41] *See id.*, at 42-46, 67 (surveying technical measures and stating that "more than twenty years after passage of the DMCA, although some individual OSPs have deployed DMCA+ systems that are primarily open to larger content owners, not a single technology has been designated a 'standard technical measure'" and "few widely-available tools have been created and consistently implemented across the internet ecosystem"); Justin Sanders, *YouTube's Content ID is Great Copyright Protection But Not for Those Who Need it Most (Which is Most of Us)*, CREATIVEFUTURE, Aug. 14, 2019 (discussing YouTube's refusal to make Content ID available to smaller copyright holders), https://www.creativefuture.org/youtube-content-id/. *See also* SECTION 512 REPORT, *supra*, at 179 (stating that "[t]he Office believes that one of the goals of section 512(i) and STMs is to develop big tools for small creators.").

[42] See 17 U.S.C. § 512(i)(2).

requirement; and conditioning OSPs' liability limitations on taking reasonable steps to prevent infringing dissemination of copyrighted works in the first place.[43]

Even short of a notice from a copyright holder or other actual knowledge of infringing content, Congress intended OSPs to take action in the presence of "red flag knowledge," which is awareness of "facts or circumstances" that would make "infringing activity … apparent to a reasonable person operating under the same or similar circumstances."[44] Yet, as the Copyright Office has explained:

> the current interpretations of red flag knowledge [] effectively remov[e] the standard from the statute in some cases, while carving an exceptionally narrow path in others that almost requires a user to 'fess up' before the OSP will have a duty to act. … [C]ourts have set too high a bar for red flag knowledge, leaving an exceptionally narrow space for facts or circumstances that do not qualify as actual knowledge but will still spur an OSP to act expeditiously to remove infringing content. … Such a narrow interpretation of red flag knowledge … protects activities that Congress did not intend to protect. The end result is a shift in the balance that Congress originally struck."[45]

Courts have also misapplied the willful blindness standard. Again, according to the Copyright Office:

> courts have adopted a standard for willful blindness that is modified from the traditional common law standard and requires that the willful blindness involve deliberate avoidance of *specific* incidences of infringement, rather than avoidance of acts of infringement generally. While courts have reached this conclusion in an effort to reconcile the doctrine with section 512(m), the result may be in some tension with what appears to be Congress' original intent.[46]

Going further, the Office said the judicial interpretation "that willful blindness may be imputed to an OSP only if they have evidence of a specific incidence of infringement occurring at a specific URL [ ] is unsupported by either the text of section 512 or the contours of the common law standard for willful blindness."[47]

---

[43]*See, e.g.*, Section 512 Report, *supra* note 1, at 184 (noting that "[i]n one rightsholder's view, it is particularly unfair for large OSPs whose 'business model is predicated on monetizing user-generated content (not vetted for copyright),' to place the burden of identifying infringements on the rightsholder, arguing instead that such 'OSP[s] should be required, by law, to implement some form of digital fingerprinting to prevent infringing material from being uploaded in the first place.'").

[44]Digital Millennium Copyright Act, S. Rep. No. 105-190, at 44 (1998); Digital Millennium Copyright Act, H.R. Rep. No. 105-551, Part 2, at 53 (1998).

[45]Section 512 Report, *supra* note 1, at 123.

[46]*Id.*, at 3.

[47]*Id.*, at 127.

Establishing a notice-and-staydown system could help address the Copyright Office's observation that "the notice-and-takedown system does not effectively remove infringing content from the internet; it is, at best, a game of whack-a-mole."[48] The speed with which a removed piece of infringing content reappears has made notice-and-takedown little more than a costly, time-consuming, and fruitless administrative process. No matter how many notices copyright holders send and how many times OSPs take the content down, an ocean of identical infringing copies continues to fill the bottomless cup. The answer is establishing a notice-and-staydown process, by which "notice from a rightsholder generally triggers a duty for the service provider to proactively identify and remove all instances of the infringing content and prevent future uploads," such as through the use of fingerprinting.[49]

By the same token, Congress should condition OSPs' liability limitations on taking reasonable steps to prevent infringing dissemination of copyrighted works in the first place. Because of the size of today's online services, one infringing upload at one location is quickly consumed by a wide audience. Moreover, the speed and breadth of today's internet means one infringing copy at one online location quickly becomes many infringing copies at many online locations, exponentially exacerbating the infringement. Thus, by time a notice and takedown occur for the initial infringing use, the damage has already been done.

Fixing application of the red flag knowledge and willful blindness standards, creating a notice and staydown requirement, and conditioning OSPs' liability limitations on taking reasonable steps to prevent infringing dissemination of copyrighted works in the first place would encourage OSPs to take a more proactive role, consistent with Congress's objective.[50] In addition, doing so would also appropriately give OSPs a greater incentive to help develop a marketplace of STMs to meet their obligations and qualify for the liability limitations, as Congress also intended.[51]

There is a chance, nonetheless, that OSPs would still rather avoid the section 512(i) obligation to accommodate and not interfere with the technical measures of others, preferring instead to rely voluntarily and exclusively on technical measures they control. Restoring the section 512 liability limitations to their intended scope would thus be helpful, but not sufficient, in encouraging OSP to recognize technical measures as STMs.

---

[48] *Id.*, at 33.

[49] *Id.*

[50] *Id.*, at 8 (stating that "[i]n exchange for cooperating with copyright owners to expeditiously remove infringing content, OSPs received a series of limitations on copyright liability under section 512—referred to as 'safe harbors'—so long as they met certain conditions.").

[51] *See* Letter from Sens. Thom Tillis and Patrick Leahy to Shira Perlmutter, Register of Copyrights, U.S. Copyright Office 1 (June 24, 2021) (stating that "[w]hen Congress set up the safe harbors for OSPs over twenty years ago, it envisioned industry working together to identify standard technical measures (STMs) that service providers would accommodate."), *available at* https://digitalfrontiersadvocacy.com/copyright-law-issues/section-512-safe-harbors/section-512-reform/standard-technical-measures/6-24-21-tillis-leahy-section-512i-stm-letter/; SECTION 512 REPORT, *supra* note 1, at 176 (stating that "[i]nherent in [section 512(i)] is Congress' primary intent for the section 512 framework to encourage cooperation between creators and OSPs.").

*Amending Section 512(i)*. To truly promote the recognition of technical measures as STMs, Congress should add more specificity to section 512(i) and create an action-forcing mechanism. Many of the ideas discussed here and in response to the succeeding questions can also be found in the SMART Copyright Act, introduced by Sens. Tillis and Leahy.[52]

First, Congress should authorize the Copyright Office to recognize technical measures as STMs in response to a petition,[53] as described in more detail in answers to the questions below. That would address the current lack of an action-forcing event.

The Copyright Office process should be in addition to, rather than in lieu of, the existing process, however. A voluntary process for recognizing STMs has certain advantages. It can potentially be more flexible, for example, and more easily incorporate multiple rounds of negotiation and compromise. A voluntarily recognized STM may receive more community buy-in. The possibility for the Copyright Office to grant or deny STM petitions may also create an added incentive for OSPs to voluntarily recognize technical measures as STMs, because they would potentially have more input and control over the process, as well as over the implementation of the recognized STM. The voluntary process may also reduce the workload for the Copyright Office process, or at least help develop a record should the voluntary process stall and require resolution by the Copyright Office.

Second, to make the voluntary and Copyright Office recognition processes work, Congress should resolve the ambiguities in the criteria for recognizing a technical measure as an STM by codifying the following determinations.

- A standard technical measure is an overall category of copyright protection method—such as fingerprinting or watermarking—not a particular STM provider's specific technological implementation of that method. Such a clarification would ameliorate concerns about technology mandates and also spur a competitive market for solutions implementing individual STMs, providing more choices for copyright holders and OSPs.

- Section 512(i)(2)(A) no longer requires "a "broad consensus of copyright owners and service providers" or the process to be "multi-industry,"[54] but still requires the process to be "open, fair, and voluntary." The "broad consensus" requirement is unworkable, is the reason no STMs have been recognized, and is unnecessary. The "multi-industry" requirement does not make sense, since a particular STM may be relevant to only a single industry. So long as the "open, fair, and voluntary" requirement still applies, everyone's interests will be protected.

- The "open, fair, and voluntary" requirement applies to the way a technical measure was developed, not to the determination that a technical measure is an STM. This can be seen

---

[52]*See* the Strengthening Measures to Advance Rights Technologies Copyright Act of 2022, S. 3880, 117th Cong.

[53]*See* SECTION 512 REPORT, *supra* note 1, at 179 (stating that "Congress may also wish to provide the Copyright Office with regulatory authority to oversee the development of STMs.").

[54]*Cf. id.*, at 179 (stating that "Congress may want to amend the provision to broaden the language so as to avoid any perceived requirement that measures must be achieved only by the consensus of every industry involved in the digital ecosystem.").

from the language of section 512(i)(2)(A), in which "open, fair, and voluntary" is used to describe the manner in which a technical measure must have been developed to meet the STM definition.

- A process is "open, fair, and voluntary" if those entities that would be affected by a technical measure and have relevant expertise were afforded an opportunity to be represented and have their views heard. This ensures that the interests of stakeholders are protected while keeping the process manageable.

- For a technical measure to be available on reasonable and non-discriminatory terms, the terms of availability need not be identical for all OSPs, but can vary across and even within technical measure providers over time, based on factors such as market forces, the size of the OSP, and the use case. This interpretation would ensure the market for STMs is viable, as well as promote competition in the provision of STMs.

- The substantiality of the costs and burdens are to be evaluated taking into account whether they would be proportional to: the size and resources of OSPs; the amount of revenues the OSPs generate from copyrighted works in user-generated content; the potential quantity of infringement and amount of harm to copyright holders avoided; the costs and burdens imposed on copyright holders in the absence of recognition of the technical measure as an STM; and any savings in costs or burdens to the OSPs that would result from recognition of the technical measure as an STM (such as in a reduced amount of notices and takedowns that must be processed, or the increased availability of the technical measure in the marketplace). This reflects the fact that the accommodation and non-interference obligations were meant to help strike the balance between minimizing OSP costs by mitigating litigation risk, and minimizing copyright holder costs by mitigating online infringement.[55] If it turns out later that accommodating and not interfering with an STM would unduly burden a particular OSP, the OSP could seek a waiver from the Copyright Office in the petition process.

- A technical measure can be recognized as an STM for subsets of content, subsets of copyright holders, and subsets of OSPs. This would recognize that STMs, copyrighted works, copyright holders, and OSPs are not one-size-fits-all.

These clarifications are necessary to avoid bogging down development of STMs and to ensure no entity can exercise a pocket veto and stop the process by not engaging. The fact that the Copyright Office would be reviewing petitions for recognition of an STM, as well as any challenges to an STM recognized in the voluntary process, should allay concerns that these interpretations would prejudice any stakeholders. The fact that courts could review the Copyright Office determinations, and could also review the recognition of a technical measure as an STM in any claim that an OSP violated its section 512(i) accommodation and non-interference obligations, would provide additional safeguards.

---

[55] *See* DIGITAL MILLENNIUM COPYRIGHT ACT, H.R. REP. NO. 105-796, at 72 (1998) (Conf. Rep.); *id.,* S. REP. NO. 105-190, at 8, 20, 40; SECTION 512 REPORT, *supra* note 1, at 1, 21.

B.      *Questions About Section 512(i)*

Q3.      Process Under the Current Statute

(a)      *Formal Process*: Does section 512(i) implicitly require a formal process for adoption of an STM? If so, what are the requirements for such a process, and what should such a process entail?

Although an STM certainly *can* be adopted through a formal process, in the sense that one or a set of copyright holders has chosen to use an STM pursuant to a process that has a defined set of procedural rules, nothing in section 512(i) imposes such a condition. Indeed, the statute is silent on the process by which STMs are adopted, setting instead criteria for how a technical measure must have been *developed* in order to be recognized as an STM.

And even there, the development process may be informal. Nothing in section 512(i)(2) imposes any type of formality requirement or demands an "official" standards body, although the process must be open and fair.[56] To impose a formality requirement would chill development of STMs. If concerns arise that the informality of the standards process prejudiced the rights of a stakeholder, that issue could be reviewed by the Copyright Office in the new STM recognition process. Moreover, although informal standards processes should not be ruled out, the Copyright Office could create a rebuttable presumption in such reviews that a technical measure developed by a formal standards body meets the "open, fair, and voluntary" requirements, without extending that presumption to informal standards processes.

Whether *recognition* of a technical measure as an STM can take place through an informal process is a different matter, which Pex answers in response to the next question.

(b)      *Informal Process*: If the statute does not require a formal process, is an informal process appropriate or necessary? What type of informal process would facilitate the identification and adoption of an STM, and what should such a process entail?

As discussed above, a technical measure can be recognized as an STM even if *adopted* through an informal and unilateral process by a copyright holder, and even if developed through an informal standards process. Moreover, even the *recognition* of an STM can be informal, as the statue is silent as to who determines whether a technical measure meets the qualifications for an STM and how the evaluation is conducted. The informality of that process is one reason we have yet to see any technical measures recognized as STMs, which is why Pex supports creation of an additional STM recognition process at the Copyright Office, as discussed above and in response to the next question.

---

[56] 17 U.S.C. § 512(i)(2)(A).

(c)     *Entities*: What entity or entities would be best positioned to convene the process, whether formal or informal? What, if anything, is needed to authorize such an entity to convene the process? Is there any role under section 512(i) for third parties, such as regulatory agencies or private standard-setting bodies, to determine whether a particular technology qualifies as an STM? If so, what is the nature of that role? How would the third party determine that a particular technology qualifies as an STM? What would be the effect of such a determination?

As discussed above, Congress should amend section 512 to create a process by which the Copyright Office may recognize a technical measure as an STM, which would be in addition to the voluntary process by which technical measures can currently be recognized as STMs. Third-party roles would be confined to the formal or informal standards process used to develop voluntarily recognized or Copyright Office recognized STMs. The Copyright Office process would be analogous to the current triennial review of exceptions to the section 1201 anti-circumvention provisions. The process could run on the same or a separate timeline. Under the new process, entities would be allowed to file a petition arguing that:

- an existing technical measure should be recognized as an STM;

- a voluntarily recognized STM does not meet the qualifications of section 512(i); or

- a previously voluntarily recognized or Copyright Office recognized STM should no longer be recognized as one.

(d)     *Courts*: What role, if any, do or should courts play in determining whether a particular technology qualifies as an STM under section 512(i)? How would a court determine that a particular technology qualifies as an STM? What would be the effect of such a determination? For example, would such a determination be binding or advisory? Would it bind non-parties or apply outside of the court's jurisdiction? What would be the effect of pending appeals or inconsistent determinations across jurisdictions?

A court could hear a challenge to a Copyright Office decision that a technical measure qualifies to be recognized as an STM. A court could also review a voluntary or Copyright Office recognition of a technical measure as an STM in the process of reviewing a claim that an OSP has violated section 512(i) by failing to accommodate or by interfering with a voluntarily recognized or Copyright Office recognized STM. The court would need to receive evidence from the parties to determine whether recognition of the technical measure as an STM was valid. It could also receive input from the Copyright Office. In doing so, the court might grant a rebuttable presumption that a technical measure is an STM when recognized by the Copyright Office, but not grant such a presumption when the STM was recognized through the voluntary process. A court review of a Copyright Office decision recognizing a technical measure as an STM could invalidate the Copyright Office decision. A court decision on the validity of an STM in the context of a

complaint that an OSP had violated section 512(i) might be relied upon by the Copyright Office or other courts in other contexts.

      Q4.    *International Organizations*: Could technologies developed or used by international organizations or entities become STMs for purposes of section 512(i)? If so, through what process?

Parties could point to the international development or use of a technical measure to buttress their petitions for the Copyright Office to recognize a technical measure as an STM or their arguments before a court that an OSP was in violation of section 512(i). The Copyright Office could also create a rebuttable presumption that a technical measure developed or used abroad meets some or all of the criteria in section 512(i)(2), for purposes of its review of STM petitions.

      Q5.    *Consensus*: Under section 512(i)(2)(A), a measure can qualify as an STM if it has been "developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process."

      (a)    What level of agreement constitutes a "broad consensus"?

As discussed above, the "broad consensus" requirement should be removed.

      (b)    What groupings qualify as "multi-industry"?

As discussed above, the "multi-industry" requirement should be removed.

      (c)    Can the phrase "multi-industry" as used in the statute mean a grouping within a subset of industries? Could such sub-industry divisions adopt separate STMs? What would be appropriate sub-industry divisions?

As discussed above, the "multi-industry" requirement should be removed. If only a segment of the copyright industry (*e.g.*, movie, television, music, print, photography) or the OSP industry (*e.g.*, video platform, music platform, text platform, photo platform) would be affected by the recognition of the technical measure as an STM, it is sufficient if those segments were afforded an opportunity to be represented in the development of the technical measure.

      Q6.    Availability

      (a)    Under section 512(i)(2)(B), an STM must also be "available to any person on reasonable and nondiscriminatory terms." Is this a threshold requirement for a technology to qualify as an STM or an obligation to make a technology available on reasonable and nondiscriminatory terms once it is designated as an STM?

The "availability" language creates a threshold requirement for what technical measures can be recognized as STMs, not an ongoing requirement. Section 512(i)(2) is retrospective, not prospective. It speaks of "technical measures" that already "are used by copyright owners to

identify or protect copyrighted works" and already "have been developed."[57] Moreover, clarifying, as Pex recommends above, that a technical measure is a category of content protection method, not a specific entity's particular technological implementation of that method, means all section 512(i)(2)(B) requires is that all relevant OSP have at least one source for obtaining the technical measure on reasonable and non-discriminatory terms at the time that the technical measure is recognized as an STM. Under that approach, section 512(i)(2)(B) does not require the Copyright Office to ensure that every particular provider of every specific technological implementation of every STM is making the STM available on reasonable and non-discriminatory terms.

If, however, a technical measure previously recognized as an STM in the voluntary or Copyright Office process is no longer available from any STM provider on reasonable and non-discriminatory terms, and the OSP cannot self-provide the technical measure in a manner that meets the substantial costs and burdens test, an OSP could petition the Copyright Office to rule that the technical measure is no longer an STM. When investigating whether technical measures are available on reasonable and non-discriminatory terms, the Copyright Office should keep competitively sensitive information confidential.

> (b)     How has concern over the potential availability and accessibility of a technology affected the adoption of STMs? What terms would be reasonable and nondiscriminatory for STMs? In what ways would it be possible to enforce these terms?

Pex is not aware of any concerns over the availability and accessibility of the technical measures it provides: web crawling and content fingerprinting. As discussed above, web crawling and fingerprinting technologies are widely available. Pex makes its services available under reasonable and non-discriminatory terms. We assist not only larger, well-established entities, but also smaller, newer entrants in the marketplace. By working with us, they avoid costly compliance products and can grow alongside our service.

> Q7.     *Costs and burdens*: Under section 512(i)(2)(C), an STM must not "impose substantial costs on service providers or substantial burdens on their systems or networks." How should the substantiality of costs and burdens on internet service providers be evaluated? Should this evaluation differ based on variations in providers' sizes and functions?

See discussion of the "substantial costs and burdens" test in response to Question 2.

> Q8.     *Internet service provider responsibilities*: Section 512(i)(1)(B) states that an internet service provider must "accommodate[ ] and [ ] not interfere" with STMs to qualify for the statutory safe harbor. What actions does this standard require service providers to take or to affirmatively avoid taking? Must all internet service providers have the same obligations for every

---

[57] 17 U.S.C. § 512(i)(2), (2)(A).

STM? What obstacles might prevent service providers from accommodating STMs? What could ameliorate such obstacles?

Pex offers two technical measures: web crawling and fingerprinting. See *supra* text accompanying note 22 for Pex's view on what the accommodation and non-interference obligations would require to the extent that web crawling and content fingerprinting are—or are recognized in the future to be—STMs. Ordinarily, all OSPs would have these same obligations. If an OSP believes that circumstances prevent it from complying with these obligations, it could petition the Copyright Office for a waiver.

C.    *Questions About Potential Changes to Section 512*

Q9.    *Definition*: How could the existing definition of STMs in section 512 of Title 17 be improved?

See response to Question 2.

Q10.    *Obligations*: Currently, section 512(i)(1) conditions the safe harbors established in section 512 on an internet service provider accommodating and not interfering with STMs.

(a)    Is the loss of the section 512 safe harbors an appropriate remedy for interfering with or failing to accommodate STMs? If not, what would be an appropriate remedy?

Loss of the section 512 safe harbor is an appropriate remedy. Congress's objective all along has been to incentivize OSPs to curb copyright infringement online and to collaborate with copyright holders on STMs. One of Congress's mechanisms for doing so was to condition OSP's liability limitations on their accommodating and not interfering with STMs.

(b)    Are there other obligations concerning STMs that ought to be required of internet service providers?

Pex believes at this time that the obligations it has described above are both necessary and sufficient.

(c)    What obligations should rightsholders have regarding the use of STMs?

The only obligations section 512(i) creates are for OSPs to accommodate and not interfere with standard technical measures. Copyright holders that wish in a specific instance to use web crawling and fingerprinting as STMs to discover, protect, attribute, and license a copyrighted work will choose to enable—either themselves or by a third-party such as Pex—a comparison between user-generated content and a fingerprint reference file for that copyrighted work. As the Copyright Office has observed, successful fingerprinting depends on a robust set of fingerprint files.[58]

---

[58]*See* SECTION 512 REPORT, *supra* note 1, at 178.

Q11.   Adoption through rulemaking

(a)   What role could a rulemaking play in identifying STMs for adoption under 512(i)?

As discussed above, Pex believes that Congress should authorize a new Copyright Office STM recognition process. Copyright rulings on STM petitions would provide an action-forcing mechanism, provide more certainty, and also enable review of decisions in the voluntary process to recognize or not recognize STMs.

(b)   What entity or entities would be best positioned to administer such a rulemaking?

The Copyright Office is the right entity to administer such rulemakings because of its copyright expertise, its role in administering the Copyright Act, and its experience with the analogous section 1201 anti-circumvention triennial review.

(c)   What factors should be considered when conducting such a rulemaking, and how should they be weighted?

In conducting such rulemakings, the Copyright Office should focus on (in order of priority): 1) restoring the section 512 balance Congress sought to establish to encourage collaboration between copyright holders and OSPs in curbing online infringement of copyrighted works; 2) promoting recognition and implementation of STMs; and 3) administrative efficiency.

(d)   What should be the frequency of such a rulemaking?

Pex recommends that the Copyright Office accept petitions in the new STM recognition process once every three years, akin to the triennial review process.

(e)   What would be the benefits of such a rulemaking? What would be the drawbacks of such a rulemaking?

Such rulemakings could restore the balance Congress intended section 512 to strike, promote implementation of STMs, and provide certainty.

Q12.   *Alternatives*: Are there alternative approaches that could better achieve Congress's original goals in enacting section 512(i)?

At the moment, Pex does not have alternative approaches to recommend.

D.   *Other Issues*

Q13.   Please identify and describe any pertinent issues not referenced above that the Copyright Office should consider.

At the moment, Pex does not have additional issues it wishes to address.