# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - - - - x

MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated,

Plaintiffs,

Case No. 3:20-cv-04423-JD

-against-

YOUTUBE, LLC; and GOOGLE LLC;

Defendants.

- - - - - - - - - - - - - - - - - - - - - x

**CONFIDENTIAL**

Videotaped oral deposition of FRANCOIS-XAVIER NUTTALL, taken pursuant to notice, was held at the law offices of BOIES SCHILLER & FLEXNER LLP, 55 Hudson Yards, New York, New York 10001, commencing September 30, 2022, 9:03 a.m., on the above date, before Leslie Fagin, a Court Reporter and Notary Public in the State of New York.

- - -

MAGNA
LEGAL SERVICES



**APPEARANCES:**

KOREIN TILLERY, LLC
Attorneys for Plaintiffs
205 North Michigan, Suite 1950
Chicago, Illinois 60601
BY: CAROL O'KEEFE, ESQUIRE
GEORGE ZELES, ESQUIRE (Appearing telephonically.)
-and-
BOIES SCHILLER & FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, New York 10001
BY: PHILIP C. KOROLOGOS, ESQUIRE
DEMETRI BLAISDELL, ESQUIRE
WALESKA SUERO GARCIA, ESQUIRE
ROBERT DWYER, ESQUIRE

WILSON SONSINI GOODRICH & ROSATI
Attorneys for Defendants
650 Page Mill Road
Palo Alto, California 94304-1050
BY: ELI RICHLIN, ESQUIRE
KELLY KNOLL, ESQUIRE

ALSO PRESENT:

PAUL JESSOP

PAUL GLAUBERSON, Videographer
Magna Legal Services

**THE VIDEOGRAPHER:** We are now on the record.

This begins video No. 1 in the deposition of Francois-Xavier Nuttall in the matter of Maria Schneider, et al., versus YouTube, LLC et al., in the United States District Court, Northern District of California, 3:20-cv-04423-JD.

Today is September 30, 2022 and the time is 9:03 a.m.

This deposition is being taken at Boies Schiller Flexner LLP, 55 Hudson Yards, New York, New York.

The videographer is Phil Glauberson of Magna Legal Services and the court reporter is Leslie Fagin of Magna Legal Services.

Will counsel state their appearances and whom they represent, after which, the court reporter will swear in the witness.

**MR. KOROLOGOS:** Phil Korologos with Boies Schiller Flexner for the

plaintiffs and the punitive class.

MS. O'KEEFE: Carol O'Keefe of Korein Tillery for the plaintiffs and punitive class.

**MR. BLAISDELL:** Demetri Blaisdell, Boies Schiller Flexner for the plaintiffs and punitive class.

**MS. GARCIA:** Waleska Suero Garcia, Boies Schiller Flexner for the plaintiffs and punitive class.

**MR. RICHLIN:** Eli Richlin, Wilson Sonsini for the defendants and the witness and I'm joined by my colleague, Kelly Knoll.

I will note Paul Jessop is in the room and who is on the line right now?

**MR. KOROLOGOS:** George Zelcs.

**MR. ZELCS:** George Zelcs on behalf of the plaintiffs and the punitive class.

**MR. DWYER:** And Robert Dwyer on behalf plaintiffs and the punitive class.

F R A N C O I S - X A V I E R N U T T A L L, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
**MR. KOROLOGOS:**

**Q. Good morning.**
A. Good morning, sir.
**Q. Have you been deposed before?**
A. Yes, I have, sir.
**Q. When was that?**
A. That was about 10 years ago.
**Q. Only one time?**
A. Yes, only one time.
**Q. What kind of case was that?**
A. That was a patent litigation.
**Q. That's the patent litigation you mention in your report?**
A. I do not recall mentioning that patent litigation.
**Q. Do you recall your report identifies that you acted as an expert witness in a patent litigation --**



A. I did, I did not mention which case.
**Q. What was the name of that case?**
A. I cannot specifically recall. It was 10 odd years ago.
**Q. Do you recall any of the parties?**
A. If I were provided the names, I may recall one of them.
**Q. You don't recall them sitting here now?**
A. I don't know.
**Q. Who retained you for that case?**
A. A U.S. based company called Macrovision.
**Q. Macrovision.**
**When would that have been?**
A. That would have been possibly 2002.
**Q. Was Macrovision a party to the patent litigation?**
A. Yes, they were the defendants.
**Q. Were they the sole defendant?**
A. I believe they were.
**Q. Do you recall what patent was involved?**

A. I could not specify the patent number.
**Q. What was the subject matter of the patent?**
A. The subject matter was about digital rights management platforms.
**Q. What jurisdiction had issue?**
A. I do not recall, sir.
**Q. Was it a European jurisdiction?**
A. The case was dealt with in Washington, D.C.
**Q. Was it a United States patent?**
A. I do not recall, sir.
**Q. Let me show you a document that's been marked as Plaintiffs' Exhibit 164.**
**(Plaintiffs' Exhibit 164, copy of Francois-Xavier Nuttall's expert report, marked for identification.)**
**Q. Is that a copy of your expert report in this case?**
A. It is, sir.
**Q. In preparation for your deposition today, have you had a chance to reread your report and its appendices since you signed it**

**on September 22nd?**
A. I have, sir.
**Q. And are there any corrections you wish to make to the report?**
A. I do not, sir.
**Q. Do you consider your report a complete statement of all of the opinions you will express in this case?**
A. I will say that all the opinions I have on the Jessop report are reflected in the document.
**Q. Are there any opinions other than your opinions with respect to the Jessop report that you intend to offer as an expert witness in this case?**
A. Not at this stage.
**Q. And do you consider your report to be a complete statement of the bases and reasons for your opinions as contained in the report?**
**MR. RICHLIN:** Objection as to form.
You can answer.
A. May I ask that you repeat the question, please, sir.

**MR. KOROLOGOS:** Can you read it back, please.
(Record read.)
A. I'm sorry, can you rephrase the question so I can understand it better.
**Q. Did you understand that in offering expert testimony in this case, you not only needed to disclose your opinions, but the bases and reasons for those opinions?**
**MR. RICHLIN:** Objection to form.
You can answer.
A. Yes, to that, I agree.
**Q. And does your report achieve that? In other words, we've established it has opinions in it. Is it a complete statement of the bases and reasons for your opinions?**
**MR. RICHLIN:** Objection to form.
A. I believe I've provided sufficient argumentation to support my opinions.
**Q. Are there any bases or reasons to support your opinions that you have not put in your report?**
**MR. RICHLIN:** Objection to form.
A. There may be additional arguments



management information does serve a function for copyright owners?
MR. RICHLIN: Objection to form.
A. I do when properly presented.
**Q. Do you believe that annotative embedded metadata serves a function for copyright owners?**
MR. RICHLIN: Objection to form.
MR. KOROLOGOS: What's the basis of your objection?
MR. RICHLIN: Serves as a function is vague.
MR. KOROLOGOS: Pardon me?
MR. RICHLIN: Vagueness, serves a function.
**Q. Do you see, Mr. Nuttall, in paragraph 32 of your report, which your counsel helped edit, you use the phrase, served no function?**
MR. RICHLIN: Objection to form.
**Q. Do you see that, first sentence?**
A. Yes, I do.
**Q. Let me ask again.**
A. Yes, please.

**Q. Do you believe that annotated embedded metadata serves no function for copyright owners?**
MR. RICHLIN: Objection to form.
MR. KOROLOGOS: What's the basis of your objection?
MR. RICHLIN: I think you are mischaracterizing the report and what he says in the report.
**Q. You can answer.**
A. Under the present data structure that is in UGC uploaded files, it's not possible to rely on the information provided for copyright management purposes.
**Q. Why not?**
A. Because the annotative data, as I said before, does not have a properly documented format, it does not have a predictable behavior, it does not have a well-defined function for every field.
**Q. Any other reason?**
A. There may be, but I think these three are already sufficient.
**Q. When you say, it's not possible to**

**rely on the information, are you saying that information cannot serve any function for copyright owners?**
MR. RICHLIN: Objection to form.
A. I didn't say that.
**Q. Would you disagree with that?**
MR. RICHLIN: Same objection.
A. Under the way the data is currently presented, it's not possible to use it for copyright management purposes.
**Q. When you say, currently presented, what do you mean?**
A. In the data formats that are received by YouTube, there are data structures which are, again, not documented, not reliable and as long as those datasets do not provide predictable data, they cannot be used.
**Q. Would you agree with me that in this case, we've seen examples where metadata in the clip file name field has been identified by YouTube in user-generated content that was uploaded to YouTube?**
MR. RICHLIN: Objection to form.

A. Sorry, can you repeat the question.
**Q. Sure. Would you agree with me that in this case, there are examples where metadata in the clip file name field, CLFN field, has been identified by YouTube in user-generated content that was uploaded to YouTube?**
MR. RICHLIN: Objection to form.
A. Yes, that is correct.
**Q. And if you assume that a user uploads a video to YouTube that has a clip file name that identifies the sound recording, that is one of the components of the user-generated content. Are you with me so far?**
A. I heard what you said.
**Q. Do you understand the assumption I'm asking you to assume.**
A. Let me rephrase.
Some end users would provide data into the CLFN field and you are asking me if that data would identify a sound recording?
**Q. I'm asking you to assume that. Let me give you a specific example to assume.**

MAGNA LEGAL SERVICES



**Q. Do you see in the abstract on the first page where it says, Abstract methods systems and media for determining and presenting information related to embedded sound recordings are provided and some embodiments the method comprises identifying and a video sharing service, a first video content item that includes an embedded sound recording?**
**Do you see that?**
A. I do.
**Q. It goes on to say, Identifying a composition associated with the embedded sound recording.**
**Do you see that?**
A. I do.
**Q. Further down, it says, Identifying one or more artists associated with the composition based on a group of metadata associated with the composition.**
**Do you see that?**
A. Okay.
**Q. Do you see that part?**
A. Yes, I do.

**Q. Now, in your report at -- do you recall earlier today we talked about your CV and the Smart Metadata Project?**
A. Yes.
**Q. You started that initiative, I believe, when you were at CISAC right?**
A. That is correct.
**Q. You remember giving a speech in 2010 where you talked about how, among other things, you could use fingerprinting technology and a database of metadata to help identify works?**
A. I don't recall specifically this conference.
**Q. If you look at footnote 4, I think it is -- I'm sorry, 3, you gave the keynote speech at the Smart Metadata MidemNet Academy?**
A. That is correct.
**Q. Do you remember that speech?**
A. I remember that speech.
**Q. Have you looked at it recently?**
A. I've parsed it for the purpose of refreshing the content, but I haven't looked

at it in its entirety.
**Q. So well before you were even at Google, you were thinking about these issues, right?**
A. Oh, yes, well before.
**Q. And if you look over at the page numbered 1 on the patent which is the second page of the document, third page of the document.**
A. Yes.
**Q. Do you see on the background, that it talks -- about five lines down, it says, Additionally, artists associated with the musical content may want an acknowledgment of their work to be presented to a user viewing a video that includes their work.**
**Do you see that?**
A. Yes, I do.
**Q. And that you understood was some of the background that you and the Smart Metadata Project you were working on was trying to solve?**
**MR. RICHLIN:** Objection to form.
**Q. Is that right?**

A. Not specifically.
**Q. Why not?**
**MR. RICHLIN:** You can answer.
**Q. Why not?**
A. I didn't get that part. Here, we talk about attribution, we talked about presenting to the end user the name of the contributors and it says, acknowledgment of their work, so we call this attribution, but this doesn't have the status of CMI. This is descriptive metadata, it's not rights management metadata.
**Q. Are you saying that the information of who the artist is for work is not CMI?**
**MR. RICHLIN:** Objection to form.
A. The list of contributors could have two forms. One is an informative form which is for acknowledgment and attribution, but that does not grant the cited contributors any specific financial benefit as opposed to CMI provided information where that grants them effective recognition of ownership.
**Q. Do you understand that the name of the copyright owner of a work is CMI?**



MR. RICHLIN: Objection to form.
A. I just explained there are two contexts. One is informative and that was not BCMI, and one is rights management purposes for financial claims and this is CMI.
**Q. What's the basis of that statement?**
A. The process is to derive informative information and rights management information are different. The legal liability behind each is different. The legal background for providing such data is different.
**Q. What's the basis of that understanding?**
A. My experience.
**Q. So are you saying that CMI is limited only to information that can be used to engage in rights management for financial claims?**
MR. RICHLIN: Objection to form.
A. CMI qualifies for recognition of ownership and financial benefits on the use and whereby informative information for

display does not qualify for that.
**Q. Is the title of a work CMI?**
MR. RICHLIN: Objection to form.
MR. KOROLOGOS: What's the basis of your objection?
MR. RICHLIN: Calls for a legal conclusion.
MR. KOROLOGOS: He has been talking and volunteering what CMI is for the last 10 minutes.
MR. RICHLIN: Because you have been asking him.
MR. KOROLOGOS: He volunteered it. Look at the transcript.
MR. RICHLIN: Same objection, whether or not he did not volunteer the word, CMI, it's improper testimony.
MR. KOROLOGOS: If he is comfortable saying what CMI is using a document cited in his report that you edited, he can answer the question.
MR. RICHLIN: I'm not directing him not to answer, but the objection still stands.

**Q. The lawyers have had their fun. Let me ask the question again.**
A. Please do so.
**Q. Is the title of a work, CMI, in your understanding?**
MR. RICHLIN: Same objection.
**Q. You can answer.**
A. Same answer. There are two sets of data that are provided on to different frameworks, legal frameworks and technical frameworks. They qualify as CMI.
If they are bound to warranty of accuracy -- may I rephrase.
In a CMI context, the party providing the information takes legal responsibility for the accuracy.
**Q. So does that mean that you understand the title of a work to be CMI or not?**
MR. RICHLIN: Objection to form.
A. Again, it depends in which context the title is provided.
**Q. So there are contexts where the title of a work is not CMI, in your view?**

MR. RICHLIN: Objection to form.
A. That is correct.
**Q. Are there contexts where the name of the author of a work is not CMI, in your view?**
MR. RICHLIN: Objection to form.
A. That is, again, correct.
**Q. Are there contexts where the name of the copyright owner of a work is not CMI, in your understanding?**
MR. RICHLIN: Objection to form.
A. Again, there are different contexts for different purposes.
**Q. So that's a yes, that there are contexts where the name of the copyright owner of a work is not CMI?**
MR. RICHLIN: Objection to form.
A. That is correct.
MR. KOROLOGOS: You have to give your lawyer a chance to object.
THE WITNESS: I'm sorry, I will.
**Q. Based on your understanding, are there contexts where the name of -- I withdraw that.**



Do you see paragraph 5 on page 2 of the patent which is Plaintiffs' Exhibit 169?
A. Yes, I do.
**Q. This describes -- this patent concerns a method of identifying in a video sharing service and YouTube is a video sharing service, correct?**
A. That is correct.
**Q. A first video content item, what do you understand that to mean?**
A. It means that we are designating a first element and that's all I can derive.
**Q. Then it goes on to say, That includes an embedded sound recording identifying a composition associated with the embedded sound recording wherein the embedded sound recording is a particular version of the composition.**
**Do you see that?**
A. Yes, I do.
**Q. And is it your understanding that these were -- let me withdraw that.**
**Down at paragraph 6, same page, it says, In some embodiments, the composition**

associated with the embedded sound recording is identified based on an audio fingerprint associated with the embedded sound recording.
Do you see that?
A. That is correct.
**Q. Do you know how YouTube was able to determine a method to do that?**
A. I do not know.
**Q. Is that something that you worked on?**
A. No, it is not.
**Q. What's your understanding of the next paragraph, In some embodiments identifying that one or more artists based on the group of metadata comprises identifying one or more artists that occur most frequently in the group of metadata?**
A. I would have to carefully finish reading the first paragraph to respond because it refers to the first paragraph.
**Q. In paragraph 9, it talks about a method for identifying a stage name for at least one artist.**
**Do you see that?**

A. That is correct.
**Q. Do you know how the methods patented by Google would do that?**
A. No, that was beyond my section.
**Q. But you see that's what the method is designed to do, correct?**
A. That is the intention, but I don't know what the method behind is.
**Q. Let's go over to page 6 and there, you see in paragraph 22.**
**Are you with me?**
A. Yeah.
**Q. In some embodiments, the song information and/or the artist information can be identified in any suitable manner, for example, in some embodiments, a particular sound recording can be identified as embedded within a video content item based on any suitable audio and fingerprinting techniques.**
**Do you see that?**
A. I do.
**Q. It says, As another example, in some embodiments, the mechanisms described herein can retrieve and/or extract metadata**

indicating artists associated with the identified sound recording and/or a composition associated with the identified sound recording.
Do you see that?
A. I do.
**Q. And that, again, is what you understand that is the intent of the methods patented by Google for YouTube?**
A. It is correct.
**Q. Is that an area that you worked on?**
A. Within the patent you mean?
**Q. Yes.**
A. I worked on a very specific subprocess which is described in paragraph 51.
**Q. Anything else?**
A. Paragraph 49, 50, 52, 53, 54, 55, 56. For the rest, that was a little beyond my scope.
**Q. Over on page 12 of the patent, paragraph 46, down at the bottom, do you see where it says, For example, in some embodiments, Process 400 can determine an**



**Q. Google, YouTube is one of those clients?**
A. It's one of them.
**Q. Approximately what percentage of your revenue comes from your relationship, your consulting relationship with Google and YouTube?**
A. YouTube represented about 25 percent of our revenue last year.
**Q. Mr. Nuttall, do you recall that you were asked by Mr. Korologos where you had heard the term, annotative embedded metadata before?**
A. Yes, I remember.
**Q. I'm going to read for you from the declaration of Thierry Foucu in support of YouTube and Google's reply and support of motion for summary judgment.**
**You recall, sir, that's cited in footnote 17 on page 7 of your report?**
A. Yes, I do.
**Q. From paragraph 4. The term, metadata, can be used to refer to several distinct types of data. The term, metadata,**

can be used to describe the sort of annotative embedded metadata that I referred to above which consists of optional fields, including, and then there is a series of fields.
Do you recall reviewing that declaration for the purposes of preparing your report?
A. Yes, I do.
**Q. Mr. Nuttall, do you recall being shown printouts from -- wait a second before you grab anything.**
**Do you recall being shown printouts from embeddedmetadata.org earlier today?**
A. Yes, I recall.
**Q. You were asked whether you agreed with certain opinions that were expressed on those web pages?**
A. Yes, I recall.
**Q. Did you understand the opinions expressed in those -- the embeddedmetadata.org website to represent standards or opinions by the publishing website?**

A. These are forward-looking opinions expressed by this consortium.
**Q. Mr. Nuttall, earlier you were asked about the CLFN metadata field, correct?**
**Do you recall being asked by Mr. Korologos a question in which the phrase, CLFN being identified by YouTube was used?**
A. I recall this sentence.
**Q. Are you aware of any facts that demonstrate or provide you with knowledge that YouTube is aware of CLFN being collected or the values within the CLFN metadata field?**
A. I don't believe there was any awareness. The CLFN appeared in the PB files provided to me for the drafting of this report and this is where I inferred that they had stored somewhere the CLFN field.
**Q. Earlier today you were asked a series of questions and answered a series of questions using the term, CMI or copyright management information. Do you recall that testimony, sir?**
A. Yes, I recall that.
**Q. When you were testifying about**

copyright management information, were you using a legal definition of that term?
A. No, I was not.
**Q. What definition were you using?**
A. I'm using the definition of the metadata elements that are used for processing royalty payments, very specifically, at the exclusion of descriptive metadata. I would qualify it as what is called the authoritative data.
**Q. Can you pull up Plaintiffs' Exhibit 169, which was the patent.**
**You've never seen this document before, correct?**
A. No, I have never.
**Q. Are you aware of whether or not the process described by this patent has ever been implemented by YouTube?**
A. Not to my knowledge, no.
**Q. The front page of the document, the first inventor listed is Kevin Zhu.**
**Do you see that, sir?**
A. Yes.
**Q. To your knowledge, what was or is**



Mr. Zhu's role at YouTube?
A. He is an engineer, part of the music publishing team.
**Q. To your knowledge, does the Kevin Zhu referenced here, has he ever had any roles in the copyright operations structure at YouTube?**
A. Not to my knowledge.
**Q. I want to direct you to language in a couple of pages and then I will ask the question. Looking within the abstract on the front page.**
A. Yes.
**Q. In the middle of the abstract, I want to direct your attention to the clause wherein each item of metadata is provided by a content owner that has provided a sound recording associated with a composition to the video sharing service.**
**Do you see that, that text?**
A. Yes, I see that text.
**Q. Just keep the phrase, content owner in mind. I'm going to ask you about it again.**

If you then go to the page marked No. 2 at the bottom under paragraph 5.
A. Yes.
**Q. Again, about in the middle of the paragraph, we see a similar clause wherein each item of metadata is provided by a content owner.**
**Do you see that?**
A. I see that, yes.
**Q. Let's go to page 6 within paragraph 22.**
A. Yes.
**Q. In the middle of that paragraph, again, language, the metadata can be retrieved from information submitted by multiple content owners that have uploaded versions of the identified sound recording.**
**Do you see that?**
A. Yes.
**Q. To your understanding, that metadata provided by content owner as used in this patent, does it refer to metadata from an embedded annotated metadata from a user upload or metadata from a different source?**

**MR. KOROLOGOS:** Objection to the form of the question.
**MR. RICHLIN:** What's the basis of the objection?
**MR. KOROLOGOS:** You've got an inconsistency in your questioning in asking him whether he has ever seen the document to imply he doesn't have the ability to understand it and now you are asking for his understanding. The document speaks for itself.
**MR. RICHLIN:** You can answer the question.
A. The content owner clearly identifies the licensed record labels that are providing the data and through the rights management channels and not the annotative metadata channels.
**Q. What's the basis of that understanding?**
A. This is common language at YouTube.
**Q. One last question. Earlier you were asked about the preparation of your report and the writing of your report.**

Do you recall testifying about that, sir?
A. Yes, I do.
**Q. What was the purpose of you preparing your report in the manner that you described?**
**MR. KOROLOGOS:** Objection to the form of the question.
**Q. Let me say it again. It wasn't a very good question. Withdrawn.**
**Why was the report prepared in the manner that it was?**
A. We had very -- I had very, very little time, as I said, it was presented about 10 days ago. I'm not an original English speaker and I needed assistance to help me put the document together, find a proper terminology that was compliant with today's environment and, therefore, I had to call for assistance of my legal counsel.
**Q. At the end of the process, does the report that's been marked Plaintiffs' 164, and that is your expert report, does it accurately reflect your opinions?**

A. They fully reflect, throughout the document, all my opinions, yes.

**MR. RICHLIN:** Defendants designate the entire transcript of today's deposition as confidential and we further request the right to review the final transcript.

With that, we will pass the witness.

**BY MR. KOROLOGOS:**

**Q. Mr. Nuttall, Eli just asked you some questions and I want to ask a few follow-ups to the questions he asked. One of those questions was asking you whether you are aware of any facts that demonstrate or provide you with knowledge that YouTube is aware of CLFN being collected with the values within the CLFN metadata field and your answer started with, I don't believe there was any awareness.**

**What's the basis of that statement?**

A. The annotated metadata is usually not parsed and not analyzed, so on that basis, they would not have been able to know

the existence of such field.

**Q. But you don't know, one way or the other, whether YouTube did or did not analyze that?**

A. That's correct.

**Q. You haven't talked to anybody at YouTube whether they have or have not analyzed that, is that right?**

A. That is correct.

**Q. You were also asked --**

A. May I ask --

**MR. RICHLIN:** Were you done?

**Q. If you are not finished with your answer, you can finish your answer, but it sounded to me like you were finished.**

A. No, I wanted to ask that the Foucu states that this data is not looked at, so it's not just speculative, it's based on the report by Foucu.

**Q. Based on anything else?**

A. No.

**Q. Eli asked you whether when you were testifying about copyright management information, you were using a legal**

**definition of that term and you said you were not.**

**Do you recall that testimony?**

A. Yes, I do.

**Q. When you in your report used the term, copyright management information or the letters, CMI, were you using the same nonlegal definition that you gave Eli a moment ago?**

A. That is correct.

**MR. KOROLOGOS:** No further questions.

**THE WITNESS:** Thank you, sir.

**THE VIDEOGRAPHER:** This will end video 7 in the deposition of Francois-Xavier Nuttall and conclude the deposition. We are going off the record at 6:30 p.m., September 30, 2022.

(Time noted: 6:30 p.m.)

- - -

I N D E X

- - -

| FRANCOIS-XAVIER NUTTALL | PAGE |
| --- | --- |
| By Mr. Korologos | 5, 245 |
| By Mr. Richlin | 236 |

- - -

E X H I B I T

- - -

| PLAINTIFFS' EXHIBIT | PAGE |
| --- | --- |
| Exhibit 164 Copy of Francois-Xavier Nuttall's expert report | 7 |
| Exhibit 165 Printout of a web page bearing the URL embeddedmetadata.org/social-media-test-results.php | 52 |
| Exhibit 166 Printout of a web page bearing the URL embeddedmetadata.org/why-metadata-matters.php | 72 |
| Exhibit 167 Printout of a web page bearing the URL embeddedmetadata.org/embeddedmetadatamanifesto.php | 74 |



**Errata Sheet**

| **Page:Line** | **Change** | **Reason** |
|---|---|---|
| 20:25 | Replace <WinAMP> with <Winamp> | To correct transcription errors |
| 21:6 | Replace <ASFS 5> with <ASFS file> | To correct transcription errors |
| 21:8 | Insert <them> between <protected> and <from> | To clarify the record |
| 24:11 | Replace <not, it> with <not. It> | To correct transcription errors |
| 25:14 | Replace <functionalities,> with <functionalities.> | To correct transcription errors |
| 25:15 | Replace <the software> with <The software> | To correct transcription errors |
| 26:11 | Insert <,> after <players> | To correct transcription errors |
| 27:3 | Insert <,> after <processors> | To correct transcription errors |
| 28:13 | Replace <V-R-T-U-O-S-A> with <V-I-R-T-U-O-S-A> | To clarify the record |
| 29:8 | Replace <WinAMP> with <Winamp> | To correct transcription errors |
| 29:21-29:22 | Replace <AudioSoft secure a file system> with <AudioSoft Secure File System> | To correct transcription errors |
| 29:24 | Replace <WinAMP> with <Winamp> | To correct transcription errors |
| 38:23 | Insert <,> between <does> and <an audio> | To correct transcription errors |
| 38:25 | Replace <need, but does not need or> by <not read, but does not read or> | To clarify the record |
| 43:15 | Replace <that explain mainly> with <they explain -- mainly> | To correct transcription errors |
| 46:11 | Replace <itself, the picture, the audio, you> with <itself -- the picture, the audio; you> | To correct transcription errors |

| 46:13 | Insert <;> between <video> and <and> | To correct transcription errors |
|---|---|---|
| 60:16 | Replace <majority are actually> with <majority actually> | To clarify the record |
| 62:8 | Insert <to> between <as> and <what> | To clarify the record |
| 77:9 | Replace <it should> with <the “should”> | To correct transcription errors |
| 77:20 | Replace <they still> with <is still> | To correct transcription errors |
| 78:10 | Replace <wording, used must never> with <wording used, “must never”> | To correct transcription errors |
| 82:10 | Replace <less> with <rights> | To correct transcription errors |
| 83:14 | Replace <, it should be> with <website> | To clarify the record |
| 84:10 | Replace <audio video> by <audio visual> | To clarify the record |
| 84:16-84:17 | Replace <one, but last> with <next to last> | To clarify the record |
| 89:4 | Replace <Katherine> with <Catherine> | To correct transcription errors |
| 89:6 | Replace <Katherine> with <Catherine> | To correct transcription errors |
| 89:12 | Replace <concise> with <precise> | To correct transcription errors |
| 96:6 | Replace <Van Der> with <van der> | To correct transcription errors |
| 104:18 | Replace <other> with <“other” --> | To correct transcription errors |
| 104:20 | Replace <Elysee> with <Élysée> | To correct transcription errors |
| 105:4 | Replace <’98> with <’88> | To clarify the record |
| 105:18 | Replace <date> with <update> | To correct transcription errors |
| 108:13 | Replace <baccalaureat> with <baccalauréat> | To correct transcription errors |
| 108:14 | Replace <time, science> with <time: science> | To correct transcription errors |
| 108:18 | Replace <Elysee de Chanel> by <Lycée | To correct transcription errors |

| | | |
|---|---|---|
| | international de> | |
| 109:6 | Replace <basic> with <basics> | To clarify the record |
| 109:21 | Replace <Elysee> by <the lycée> | To correct transcription errors |
| 112:6 | Replace <of> by <over> | To correct transcription errors |
| 117:16 | Replace <services, Mathematica> with <services. Mathematica> | To correct transcription errors |
| 117:18 | Replace <reserve and> with <research, and> | To correct transcription errors |
| 124:4 | Replace <IRAA> with <RIAA> | To correct transcription errors |
| 125:8-9 | Replace <of which ISWC, ISTC> with <including ISWC and ISTC> | To clarify the record |
| 128:8 | Replace <what to put you at the beginning> with <where to put you at the beginning> | To clarify the record |
| 129:3 | Insert <and> between <provided,> and <defining> | To clarify the record |
| 129:5 | Replace <claims, then> with <claims. Then> | To correct transcription errors |
| 129:6-129:7 | Replace <data, meaning, the activity on the platform, the streams and> with <data -- meaning, the activity on the platform, the streams -- and> | To correct transcription errors |
| 129:11-129:12 | Replace <those performing in mechanical rights> with <either performing or mechanical rights> | To clarify the record |
| 129:14 | Insert <and> after <functionally,> | To clarify the transcript |
| 129:15 | Replace <defined> with <define> | To clarify the transcript |
| 130:4 | Replace <fragment> with <fragmented> | To correct transcription errors |
| 130:9 | Replace <effective> with <respective> | To clarify the record |

Witness: Francois-Xavier Nuttall — September 30, 2022 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)
Job No. 876151

| 131:5 | Replace <published licenses,> with <publishers license> | To correct transcription errors |
|---|---|---|
| 131:20 | Replace <ISRC> with <ISWC> | To correct transcription errors |
| 135:4 | Replace <DSB> by <DSP> | To correct transcription errors |
| 142:19 | Replace <DSBs> by <DSPs> | To correct transcription errors |
| 148:4 | Replace <topic, security> with <topic. Security> | To correct transcription errors |
| 148:5 | Replace <high matter, computer> with <important matter. Computer> | To clarify the record |
| 168:18 | Replace <name, a clip> with <name – a clip> | To correct transcription errors |
| 168:19 | Replace <name, nothing in this definition hints me> with <name. Nothing in this definition hints to me> | To clarify the record |
| 169:20 | Replace <long> with <on> | To correct transcription errors |
| 169:20 | Replace <to 15,000 tags, 10, 15,000, 20,000 tags> with <to 10,000 tags -- 15,000 20,000 tags --> | To correct transcription errors and clarify the record |
| 178:5 | Replace <BCMI> with <CMI> | To clarify the record |
| 178:5 | Insert <for> between <is> and <rights> | To clarify the record |
| 178:6 | Replace <purposes for financial claims and this is> with <purposes -- for financial claims -- and this is> | To correct transcription errors |
| 178:9 | Replace <process is> with <processes> | To correct transcription errors |
| 180:10 | Replace <to> with <two> | To correct transcription errors |
| 189:6 | Insert <on> between <work> and <on> | To clarify the record |

| | | |
|---|---|---|
| 190:13 | Insert <do> after <not> | To clarify the record |
| 193:24 | Replace <void> with <devoid> | To clarify the record |
| 199:24 | Replace <sentence> with <sense> | To correct transcription errors |
| 201:16 | Replace <scientific or research> with <scientific research> | To correct transcription errors |
| 202:6 | Insert <,> between <process> and <where> | To correct transcription errors |
| 202:8 | Replace <give> with <gives> | To correct transcription errors |
| 202:9 | Insert <,> between <process> and <where> | To correct transcription errors |
| 204:18 | Remove <I> after <that> | To correct transcription errors |
| 208:12 | Replace <MPEG> with <FFmpeg> | To clarify the record |
| 210:14 | Replace <or dramatically> with <automatically> | To correct transcription errors |
| 210:16 | Replace <floor> with <tool> | To correct transcription errors |
| 218:9 | Replace <that, A,> with <that, first,> | To clarify the record |
| 218:10 | Replace <and; second, that> with <and, second, that> | To correct transcription errors |
| 220:3 | Replace <expectation> with <exploitation> | To correct transcription errors |
| 227:6-227:7 | Replace <an as easy> with <as easy a> | To clarify the record |
| 228:21 | Replace <IRAA> with <RIAA> | To correct transcription errors |
| 236:10 | Replace <content, trying to persuade you> with <content. I'm trying to persuade YouTube> | To correct transcription errors |
| 236:12 | <YouTube, it's very> with <YouTube. It's very> | To correct transcription errors |

Witness: Francois-Xavier Nuttall — September 30, 2022 Deposition
*Schneider v. YouTube, LLC,* No. 3:20-cv-04423-JD (N.D. Cal.)
Job No. 876151

FXN Subject to the above changes, I certify that the transcript is true and correct.

_______ No changes have been made. I certify that the transcript is true and correct.

(signature)

November 4th 2022
(date)

Witness: Francois-Xavier Nuttall — September 30, 2022 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)
Job No. 876151

ACKNOWLEDGMENT OF DEPONENT

I, Francois-Xavier Nuttall, do hereby certify that I have read and examined the foregoing testimony, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

[signature]
(signature)

November 4th 2022
(date)