# EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated, | ) Case No.<br>) 3:20-cv-04423-JD<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| vs. | )<br>) |
| YOUTUBE, LLC and GOOGLE LLC, | )<br>) |
| Defendants. | )<br>) |
| YOUTUBE, LLC and GOOGLE LLC, | )<br>) |
| Counterclaimants, | )<br>) |
| vs. | )<br>) |
| PIRATE MONITOR LTD, PIRATE MONITOR LLC, and GÁBOR CSUPÓ, | )<br>)<br>) |
| Counterclaim Defendants. | )<br>) |

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

GÁBOR CSUPÓ, 30(B)(6) OF PIRATE MONITOR LTD


Remotely Testifying from Los Angeles, California


Stenographically Reported By:

Hanna Kim, CLR, CSR 13083

Job No. 5301969-A

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
 5    MARIA SCHNEIDER, UNIGLOBE    ) Case No.
      ENTERTAINMENT, LLC, and AST  ) 3:20-cv-04423-JD
 6    PUBLISHING LTD., individually and )
      on behalf of all others similarly )
 7    situated,                    )
                                   )
 8        Plaintiffs,              )
                                   )
 9        vs.                      )
                                   )
10    YOUTUBE, LLC and GOOGLE LLC, )
                                   )
11        Defendants.              )
      _____ )
12    YOUTUBE, LLC and GOOGLE LLC, )
                                   )
13        Counterclaimants,        )
                                   )
14        vs.                      )
                                   )
15    PIRATE MONITOR LTD, PIRATE MONITOR )
      LLC, and GÁBOR CSUPÓ,        )
16                                 )
          Counterclaim Defendants. )
17    _____ )
18          Virtual videoconference video-recorded
19    deposition of GÁBOR CSUPÓ, testifying as a 30(B)(6)
20    witness of PIRATE MONITOR LTD, taken on behalf of
21    the Defendants and Counterclaimants and pursuant to
22    the stipulations of counsel thereof, on Tuesday,
23    July 5, 2022, commencing at 10:47 a.m. and ending at
24    6:19 p.m., before Hanna Kim, CLR, Certified
25    Shorthand Reporter, No. 13083.
```

Page 3

```
 1    REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:
 2
 3    For Plaintiffs and the Witness:
 4        KOREIN TILLERY, LLC
 5        BY:  RANDALL P. EWING, JR., ESQ.
 6        BY:  GEORGE ZELCS, ESQ.
 7        205 North Michigan, Suite 1950
 8        Chicago, Illinois 60601
 9        312.641.9750
10        rewing@koreintillery.com
11
12    For Defendants and Counterclaimants:
13        WILSON SONSINI GOODRICH & ROSATI
14        Professional Corporation
15        BY:  CATHERINE R. HARTMAN, ESQ.
16        BY:  QIFAN HUANG, ESQ.
17        1301 Avenue of the Americas, 40th Floor
18        New York, New York 10019-6022
19        212.999.5800
20        chartman@wsgr.com
21
22    Also Present:
23        JULIO PENA, Videographer
24
25
```

Page 4

```
 1               INDEX OF EXAMINATION
 2
 3    WITNESS:  GÁBOR CSUPÓ
 4    EXAMINATION                          PAGE
 5    BY MS. HARTMAN:                       13
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                INDEX OF EXHIBITS
 2
 3    CSUPÓ DEPOSITION EXHIBITS              PAGE
 4    Exhibit 1    Defendants and Counterclaimants  16
 5                 YouTube, LLC and Google LLC's
 6                 Notice for Depositions of
 7                 Pirate Monitor LTD and Gábor
 8                 Csupó; 7 pages
 9    Exhibit 2    Counter-Defendant Pirate     42
10                 Monitor's Supplemental
11                 Objections and Responses to
12                 YouTube and Google's Fourth and
13                 Ninth Interrogatories; 6 pages
14    Exhibit 3    Counter-Defendant Gábor Csupó's  51
15                 Second-Amended Objections and
16                 Responses to YouTube and
17                 Google's First and Second
18                 Interrogatories; 8 pages
19    Exhibit 4    "Written Resolution of the   66
20                 Directors"; Bates nos.
21                 PIRATEMONITOR_0000000050
22    Exhibit 5A   Document; Bates nos.         69
23                 PIRATEMONITOR_0000000060
24                 through '61
25
```

Page 6

INDEX OF EXHIBITS (CONTINUED)

CSUPÓ DEPOSITION EXHIBITS                    PAGE

| | | |
|---|---|---|
| Exhibit 5B | Translation certificate; E-mail | |
| | dated 7/1/2020; Bates nos. | |
| | PIRATEMONITOR_0000000060 | |
| Exhibit 6A | Document; Bates nos. | 78 |
| | PIRATEMONITOR_0000000031 through | |
| | '42 | |
| Exhibit 6B | Translation certification; e-mail | 79 |
| | from Gábor Csupó, 1/17/2020; | |
| | Bates nos. | |
| | PIRATEMONITOR_0000000031; 2 pages | |
| Exhibit 7A | Document; Bates nos. | 87 |
| | PIRATEMONITOR_0000000206 through | |
| | '211 | |
| Exhibit 7B | Translation certificate; e-mail | 87 |
| | set, with top e-mail from Gábor | |
| | Csupó, 3/10/2020; Bates nos. | |
| | PIRATEMONITOR_0000000206 through | |
| | '211 | |
| Exhibit 8 | Document; E-mail from Gábor | 99 |
| | Csupó, 3/24/2020 Bates nos. | |
| | PIRATEMONITOR_0000000022 through | |
| | '25 | |

Page 7

INDEX OF EXHIBITS (CONTINUED)

CSUPÓ DEPOSITION EXHIBITS                    PAGE

| | | |
|---|---|---|
| Exhibit 9A | Document; Bates nos. | 114 |
| | PIRATEMONITOR_0000000135 | |
| Exhibit 9B | Translation certificate; e-mail | 114 |
| | set, with top e-mail from Gábor | |
| | Csupó, 11/14/2018; Bates nos. | |
| | PIRATEMONITOR_0000000135 | |
| Exhibit 10A | Document; Bates nos. | 118 |
| | GOOG-SCHNDR-00000370 through | |
| | '392. | |
| Exhibit 10B | Translation certificate; | 119 |
| | Takedown notice correspondence | |
| | with YouTube dated April 12th, | |
| | 2019, through April 17, 2019; | |
| | Bates nos. GOOG-SCHNDR-'370 | |
| | through '392 | |
| Exhibit 11 | E-mail set, with top e-mail | 137 |
| | from Gábor Csupó, 4/29/2019; | |
| | Bates nos. IPLLC_00000000'22 | |
| | through '26 | |

Page 8

INDEX OF EXHIBITS (CONTINUED)

CSUPÓ DEPOSITION EXHIBITS                    PAGE

| | | |
|---|---|---|
| Exhibit 12 | Counter-Defendant Gábor Csupo's | 148 |
| | Amended Objections and Responses | |
| | to YouTube and Google's First, | |
| | Second, Fourth, Fifth, and Ninth | |
| | Interrogatories; 10 pages | |
| Exhibit 13A | Document; Bates nos. | 151 |
| | IPLLC_0000000122 through '126 | |
| Exhibit 13B | Translation certificate; | 151 |
| | "Contract of Services"; Bates | |
| | nos. IPLLC_0000000122 through | |
| | '126 | |
| Exhibit 14A | Document; Bates nos. | 155 |
| | IPLLC0000000142 through '149 | |
| Exhibit 14B | Translation certificate; e-mail | 155 |
| | set, with top e-mail from Gábor | |
| | Csupó, 4/3/2019; Bates nos. | |
| | IPLLC0000000142 through '149 | |
| Exhibit 15 | License agreement between MEGA | 165 |
| | FILM and Pirate Monitor LTD; | |
| | Bates nos. | |
| | PIRATEMONITOR_0000000046 through | |
| | '48 | |

Page 9

INDEX OF EXHIBITS (CONTINUED)

CSUPÓ DEPOSITION EXHIBITS                    PAGE

| | | |
|---|---|---|
| Exhibit 16A | Document; Bates nos. | 168 |
| | PIRATEMONITOR_0000000143 | |
| Exhibit 16B | Translation certificate; e-mail | 168 |
| | from Gábor Csupó, 1/8/2020; | |
| | Bates nos. | |
| | PIRATEMONITOR_0000000143 | |
| Exhibit 17A | Document; Bates nos. | 176 |
| | PIRATEMONITOR_0000000136 through | |
| | '140 | |
| Exhibit 17B | Translation certificate; e-mail | 176 |
| | and attachment from Mr. Holman | |
| | to Mr. Csupó, dated January 8th, | |
| | 2020; PIRATEMONITOR_'136 through | |
| | '140 | |
| Exhibit 18A | Document; Bates nos. | 182 |
| | PIRATEMONITOR_0000000165 | |
| Exhibit 18B | Translation certificate; e-mail | 182 |
| | chain between Mr. Csupó and | |
| | Mr. Kálomista dated | |
| | September 28, 2020, through | |
| | September 29, 2020; Bates nos. | |
| | PIRATEMONITOR_0000000165 | |

Page 22

1    Q.  In the past five years?
2    A.  I don't -- I don't recall it.
3    Q.  How many employees has Grand Allure
4  Entertainment had?
5    A.  I mostly work with freelance artists, so
6  it's really hard to estimate.  Full-time employees,
7  I -- I don't believe I had.  Freelance artists.
8    Q.  Can you name any of those freelance
9  artists?
10   A.  One would be Max Micheli.
11   Q.  Anyone else?
12   A.  I can't -- I can't remember anybody else.
13  I have a staff who [verbatim] paying the invoices
14  and bills.
15   Q.  Can you name of the staff members?
16   A.  Yeah.  Karen Ber- -- Beruzela [phonetic]
17  who is my CPA.
18   Q.  Anyone else?
19   A.  She works with a bunch of people in her
20  office.
21   Q.  Can you name them?
22   A.  No.
23   Q.  What is the nature of the bus- -- of the
24  business of Grand Allure Entertainment?
25   A.  Exactly, entertainment business.

Page 23

1    Q.  Can you provide more details?
2    A.  Sure.  Movies, music, films, commercials,
3  mu- -- music videos.
4    Q.  But what do --
5    THE COURT REPORTER:  Music what?  What was
6  the last word, please.
7    THE WITNESS:  I'm sorry?
8    THE COURT REPORTER:  I have "movies,
9  music, films, commercials, music videos."
10   THE WITNESS:  Yes.  TV shows.
11  BY MS. HARTMAN:
12   Q.  And what does the company do with respect
13  to movies, music, films, et cetera?
14   A.  With all of that.
15   Q.  What -- what business does the company
16  conduct?
17   A.  Entertainment business, ma'am.
18   Q.  What does that mean?
19   A.  It means everything is inside
20  entertainment.
21   Q.  Does it produce movies?
22   A.  That's right.
23   Q.  What else does it do?
24   A.  Music, commercials, NFT projects.
25   Q.  Are you employed by any other company?

Page 24

1    A.  Sorry?
2    Q.  Are you employed by any other company?
3    A.  No.
4    Q.  Do you own any other company?
5    A.  Yes.
6    Q.  What other companies do you own?
7    A.  Inkhead Studios; IP LLC; Pirate Monitor
8  LTD; and I was in the past, Klasky Csupó
9  Incorporated.
10   Q.  What is the nature of the business of NCAT
11  [verbatim] Studios?
12   A.  NFT projects.
13   Q.  Are you the sole owner of NCAT [verbatim]
14  studios?
15   A.  No.
16   Q.  Who else is an owner?
17   A.  My son Brandon Csupó and Gabriel Pap from
18  Sweden.
19   Q.  Does NCAT [verbatim] Studios have any
20  employees?
21   A.  Freelance employees.
22   Q.  Are you the sole owner of Csupó
23  Incorporated?
24   MR. ZELCS:  Objection.  Form.
25   You can go ahead and answer --

Page 25

1    THE WITNESS:  I don't remem- --
2    MR. ZELCS:  -- if you can.
3    THE WITNESS:  -- I -- I don't remember
4  that corporation, ma'am.
5    MR. ZELCS:  Catherine, I think you
6  misstated the name of the company, just for your
7  help.
8  BY MS. HARTMAN:
9    Q.  You identified a number of entities that
10  you owned.
11   You identified NCAT [verbatim] Studios;
12  right?
13   A.  Yes.
14   Q.  And IP, LLC; correct?
15   A.  That's right.
16   Q.  Pirate Monitor LTD; right?
17   A.  That's right.
18   Q.  And what was the other entity you
19  identified?
20   A.  I said in -- I was a past owner of Klasky
21  Csupó Incorporated.
22   Q.  Thank you.
23   You're an owner of Pirate Monitor LTD;
24  right?
25   A.  That's right.

Page 26

1  Q.  Are you the sole owner?
2  A.  Yes.
3  Q.  And what are your duties at Pirate Monitor
4  LTD?
5  A.  I'm sorry.
6  Q.  What are your duties at Pirate Monitor
7  LTD?
8  A.  To require -- inquire content and promote
9  it [verbatim].
10  Q.  For how long have you been the owner of
11  Pirate Monitor LTD?
12  A.  Since January 2020.
13  Q.  And are you the sole share owner of Pirate
14  Monitor LTD?
15  A.  Absolutely, hundred percent.
16  Q.  And are you the sole director of Pirate
17  Monitor LTD?
18  A.  I'm sorry?
19  Q.  Are you the sole director of Pirate
20  Monitor LTD?
21  A.  Yes.
22  Q.  And are you the sole owner of Intellectual
23  Property LLC?
24  A.  Yes.
25  Q.  For how long have you been an owner of

Page 27

1  Intellectual Property LLC?
2  A.  I don't recall it exactly.  Probably a few
3  years before I -- I -- I purchased Pirate Monitor
4  LTD; around 2019, my estimation would be.
5  Q.  Are you the sole share owner of
6  Intellectual Property LLC?
7  A.  Yes.
8  Q.  And are you the sole director of
9  Intellectual Property LLC --
10  A.  Yes.
11  MR. ZELCS:  Again, please let her finish
12  the question before you start to answer or we're
13  going to have a bad record.
14  THE WITNESS:  Okay.
15  BY MS. HARTMAN:
16  Q.  You currently live in Encino, California;
17  correct?
18  A.  Correct.
19  Q.  And you gave your address as 5277 Shoshone
20  Avenue, Encino, California; correct?
21  A.  Correct.
22  Q.  For how long have you lived there?
23  A.  Twelve years.
24  Q.  Were you involved in any steps to preserve
25  evidence in connection with this lawsuit?

Page 28

1  A.  I'm sorry?
2  Q.  Were you involved in any steps to preserve
3  evidence in connection with this lawsuit?
4  A.  I -- I don't understand the question.
5  Can you please rephrase it another way.
6  I -- I don't -- I don't understand.
7  Q.  In connection with this lawsuit, have you
8  saved evidence?
9  MR. ZELCS:  Objection.  Form.
10  BY MS. HARTMAN:
11  Q.  In connection with this lawsuit, did you
12  identify documents and information that may be
13  responsive to this lawsuit?
14  A.  You mean if I looked at e-mails or
15  documents?
16  Q.  Yes.
17  A.  Yes.
18  Q.  And in the beginning of the lawsuit, did
19  you take steps to save that information?
20  A.  It was on my computer.  Not much saving to
21  do about it.
22  Q.  So you didn't do anything to save the
23  information --
24  A.  I --
25  Q.  -- related to this lawsuit --

Page 29

1  MR. ZELCS:  Objection.  Form.
2  Please let her finish the question before
3  you start to answer or you're going to have the
4  court reporter trying to take down two people
5  talking at the same time, which doesn't read
6  accurately.
7  THE COURT REPORTER:  Counsel, I didn't get
8  the full question, please.
9  BY MS. HARTMAN:
10  Q.  So you didn't do anything -- you -- strike
11  that.
12  You didn't take any steps to save
13  information in connection with this lawsuit?
14  MR. ZELCS:  Objection.  Form.
15  BY MS. HARTMAN:
16  Q.  You can answer.
17  A.  I -- I -- I -- I don't understand it.
18  It's on my computer.  I didn't do anything extra.
19  Q.  Okay.  Did you instruct anyone to preserve
20  documents in connection with this case?
21  A.  I don't think so.  I don't remember.
22  Q.  Did you ever receive instructions from
23  anyone regarding searching for responsive documents
24  for this lawsuit?
25  A.  I don't remember.

Page 30

1    Q.  You don't remember if anyone told you to
2  search for responsive documents?
3         MR. ZELCS:  Objection.  Form.
4         THE WITNESS:  I don't remember, ma'am; no.
5  BY MS. HARTMAN:
6    Q.  Have you produced documents in this
7  litigation?
8    A.  Anything my attorneys asked for, I did,
9  yes.
10   Q.  How did you identify documents to be
11  produced?
12   A.  Anything related to IP, LLC; Pirate
13  Monitor LTD.
14   Q.  Was anyone else involved in identifying
15  documents that were responsive to this litigation?
16   A.  Yes.
17   Q.  Who?
18   A.  Endre Holman and his entities and his
19  companies.
20   Q.  What was Endre Holman's role in finding
21  responsive documents in this litigation?
22   A.  He is the authorized agent to -- to act
23  behalf of both of these companies [verbatim].
24   Q.  And what did he do to find responsive
25  documents?

Page 31

1    A.  I can only estimate it, ma'am.  Probably
2  searched his computer.
3    Q.  Did anyone else help find responsive
4  documents to this lawsuit?
5    A.  Not to my knowledge, no.
6    Q.  Did you search your own computer for
7  responsive documents in this lawsuit?
8    A.  Yes.
9    Q.  And what did you find in your computer?
10   A.  Relevant documents to the lawsuit.
11       (Interruption in audio/video.)
12       THE COURT REPORTER:  Could you please
13  repeat, sir.
14       THE WITNESS:  Relevant documents to this
15  lawsuit.
16  BY MS. HARTMAN:
17   Q.  Did you look anywhere else for responsive
18  documents for this lawsuit?
19   A.  I'm sorry?
20   Q.  Did you look anywhere else, apart your
21  computer, for responsive documents for this lawsuit?
22       MR. ZELCS:  Catherine, may I -- may I just
23  make a suggestion.  Could you slow down a little
24  because it's hard to follow --
25       MS. HARTMAN:  Sure.

Page 32

1         MR. ZELCS:  -- your questions on the
2  system that we have here.  Just a suggestion.  You
3  can, obviously, do whatever you want.
4         MS. HARTMAN:  Sure.
5         THE WITNESS:  Your audio, it is not
6  exactly perfect, so I apologize if I ask again the
7  question.
8         I'm sorry.  What was the question?
9  BY MS. HARTMAN:
10   Q.  Apart from your computer, did you look
11  anywhere else for responsive documents for this
12  lawsuit?
13   A.  I don't believe so.
14   Q.  Did you identify individuals in Hungary
15  who have responsive documents to YouTube's requests?
16   A.  Not myself besides Endre Holman.
17   Q.  You identified Endre Holman as having
18  responsive documents; correct?
19   A.  Yes.
20   Q.  Did you identify Zoltán Búzás as having
21  relevant documents to this lawsuit?
22   A.  Yes, but I -- I don't -- I don't have
23  evidence that he has anything else besides what I
24  had on my computer.
25   Q.  Are there any other -- go ahead.

Page 33

1    A.  I'm sorry.  No, nothing.
2    Q.  Are there any other individuals who have
3  responsive documents relevant to this lawsuit?
4    A.  I have no idea.
5    Q.  You don't know whether anyone has
6  responsive documents to this lawsuit for Pirate
7  Monitor LTD?
8    A.  I don't know.
9         MR. ZELCS:  Objection.
10       Please let me have time to make
11  objections.
12       Objection.  Form.
13  BY MS. HARTMAN:
14   Q.  You can answer.
15   A.  I don't know.
16   Q.  Did you identify individuals in Hungary
17  who have responsive documents to YouTube's subpoena
18  requests to Intellectual Property LLC?
19   A.  I'm confused.  I'm sorry.  I don't
20  understand.
21       MR. ZELCS:  Cath- -- Catherine, is -- is
22  this a question that's intended to go to him
23  personally or as a corporate representative of
24  Pirate Monitor Limited?
25       MS. HARTMAN:  As a corporate

1 strike that.
2      Did you identify another client?
3      A.  No.
4      Q.  So MEGA FILM is Pirate Monitor LTD's only
5 client; correct?
6      A.  At the present moment, yes.
7      Q.  Has Pirate Monitor LTD had other clients?
8      A.  No.
9      MS. HARTMAN:  Qifan, please mark as an
10 exhibit from Tab 3.
11      (Csupó Deposition Exhibit 4 was marked
12 electronically.)
13 BY MS. HARTMAN:
14      Q.  I'm showing you what has been marked as
15 Exhibit 4.  It is a Written Resolution of the
16 Directors for Pirate Monitor LTD that was produced
17 in this action with the Bates number
18 PIRATEMONITOR_'50.
19      Is that your signature at the bottom of
20 the document?
21      A.  Yes.
22      Q.  Do you recognize this document as a
23 Written Resolution of the Directors of Pirate
24 Monitor LTD?
25      A.  Yes.

1      Q.  Does this document confirm that you are
2 the sole director of Pirate Monitor LTD?
3      A.  Yes.
4      Q.  The first paragraph in this document
5 reads "That effective as of August 7, 2015 the
6 Company's business activities are webmarketing,
7 online advertising and software development
8 services, but the Company is dormant, actually it
9 doesn't conduct any activities."
10      See that?
11      A.  Yes.
12      Q.  And "Company" refers to Pirate Monitor
13 LTD; right?
14      A.  That's right.
15      Q.  What is meant by this first paragraph?
16      MR. ZELCS:  Objection.  Form.
17 BY MS. HARTMAN:
18      Q.  I'll rephrase.
19      Is that an accurate statement of the
20 company's business activities as of August 7, 2015?
21      A.  I have no knowledge of -- of that time
22 since I didn't own that moment that company, ma'am.
23      Q.  Paragraph 3 says "That the financial
24 period of the company is June 30th, 2019, through
25 June 30th, 2020."  [As read]

1      See that?
2      A.  I see that.
3      Q.  And you signed this document; right?
4      A.  Right.
5      Q.  So is the statement in paragraph 1
6 accurate?
7      MR. ZELCS:  Objection.  Form.
8      THE WITNESS:  As far as my knowledge, yes,
9 because that was presented to me.
10 BY MS. HARTMAN:
11      Q.  What do you mean that was presented to
12 you?
13      A.  When I purchased the company, this was
14 presented to me that this is the case.
15      Q.  By whom?
16      A.  By the company who sold it to me.
17      Q.  By József Kovács?
18      A.  That's right.
19      Q.  What does it mean that Pirate Monitor LTD
20 is dormant?
21      A.  It means at that moment of time which is
22 stated in Number 1 -- under Number 1, the company
23 is -- at that moment did not actually do any
24 activities.
25      Q.  But you signed this document; correct?

1      A.  I believe I answered three times already.
2 You're correct.
3      Q.  Does the company conduct any activities?
4      A.  After I purchased it, absolutely.
5      Q.  What activities did it conduct?
6      A.  It purchased movies.  It monitored
7 fraudulent activities on YouTube, and did takedown
8 notices and promoted the certain material.
9      Q.  And when did it begin doing that?
10      A.  Why?
11      Q.  When?
12      A.  When.  In 2020.
13      Q.  Do you know when you signed this document?
14      A.  I must have signed it after I acquired the
15 company, ma'am, yes.
16      Q.  So at the time you signed this document,
17 Pirate Monitor was not conducting any activities;
18 right?
19      A.  Right.
20      MR. ZELCS:  Objection.  Form.
21      THE WITNESS:  Yes.
22      MS. HARTMAN:  Qifan, please mark as an
23 exhibit from Tab 4.
24      (Csupó Deposition Exhibit 5A was marked
25 electronically.)

1    (Csupó Deposition Exhibit 5B was marked
2    electronically.)
3        THE WITNESS:  Exhibit what?
4        MR. EWING:  It's not up yet.
5        THE WITNESS:  Oh.
6        MR. EWING:  Sometimes they take a minute.
7    BY MS. HARTMAN:
8        Q.  I'm -- I'm showing you what has been
9    marked as Exhibit --
10        MR. ZELCS:  Catherine, it's not up yet.  I
11   don't think --
12        THE WITNESS:  It just popped up.
13        MR. ZELCS:  Oh, it is?  Okay.
14        THE WITNESS:  It just popped up.
15        MR. ZELCS:  It's not up on mine.  Sorry.
16   I apologize.  Go ahead.
17   BY MS. HARTMAN:
18        Q.  I'm showing you what has been marked as
19   Exhibit 5.  It is an e-mail and attachment produced
20   in this action with the Bates numbers
21   PIRATEMONITOR_'60 through '61.  I'm also showing you
22   a translation of the document, Bates stamped
23   PIRATEMONITOR_'60.
24        A.  Yes, I see it.
25        Q.  I think we're waiting for the translation

1    to go up.
2        A.  Yes, I see it now.
3        I don't have the same thing.  That's all I
4    have.
5        MR. ZELCS:  Cat- -- Catherine --
6        MR. EWING:  Go back.  And then 5B.
7        THE WITNESS:  Mm-hmm.
8        MR. ZELCS:  You have a translation in
9    English?  I don't see one.
10        Catherine, what we have is Exhibit B, is
11   one page from the translator saying I've translated
12   from Hungarian to English.  And then the second page
13   is the Hungarian version, but we don't have the
14   third, or the English page.  If -- if Mr. Csupó has
15   a different version on his screen, he can say so, or
16   Mr. Ewing.
17        THE WITNESS:  No, but I totally understand
18   Hungarian.
19        MS. HARTMAN:  Yeah, I know.  We're pulling
20   up the English version.
21        MR. ZELCS:  Okay.  Sorry to bother you.
22        MS. HARTMAN:  It's all right.
23        THE WITNESS:  It just cut off again, but I
24   clicked on that link.
25        MR. EWING:  Yeah, just go back.

1        MS. HARTMAN:  Please look at Exhibit 5C.
2        THE COURT REPORTER:  Counsel, may we go
3    off the record, please.
4        MR. ZELCS:  Sure.
5        THE VIDEOGRAPHER:  The time is 12:24, and
6    we're going off the record.
7        (Off the record.)
8        THE VIDEOGRAPHER:  The time is 12:25, and
9    we're back on the record.
10   BY MS. HARTMAN:
11        Q.  Mr. Csupó, please look at Exhibit 5B,
12   which is the English translation of the document
13   Bates stamped PIRATEMONITOR_'60.
14        A.  Yes.
15        Q.  Do you recognize this document as an
16   e-mail from you dated July 1st, 2020?
17        A.  It's not from me.
18        Q.  Sorry.
19        To you?
20        A.  Yes.
21        Q.  The subject matter of the e-mail is "Sign
22   and return - ASAP"; right?
23        A.  That's right.
24        Q.  Do you see that it attaches the written
25   resolution we just discussed?

1        A.  I'm sorry?
2        Q.  If you go back to Exhibit 5A, which is the
3    Hungarian version of the e-mail.
4        A.  Yes.  Asking me if this translation
5    [verbatim] accurate?
6        MR. ZELCS:  No, she's not.  Please listen
7    to her question.
8        THE WITNESS:  Okay.
9    BY MS. HARTMAN:
10        Q.  Exhibit 5A is an e-mail from Mr. Búzás to
11   you dated July 1st, 2020, in Hungarian; correct?
12        A.  Correct.
13        Q.  Do you recognize this e-mail?
14        A.  Yes.
15        Q.  And the attachment is the Written
16   Resolutions [verbatim] of the Directors that we just
17   discussed; correct?
18        A.  Correct.
19        Q.  But it's not signed yet; correct?
20        A.  Correct.
21        Q.  So you signed the written resolutions
22   identified in Exhibit 4 after receiving this e-mail
23   from Mr. Búzás; right?
24        A.  Right.
25        Q.  Looking on the first page, the document

Page 110

1    MS. HARTMAN: My mistake. I'll withdraw
2    that question.
3        MR. ZELCS: Thank you.
4    BY MS. HARTMAN:
5        Q. What was Wowster's role in connection with
6    takedown notices submitted by IPLLC?
7        A. Since I was the principal -- one of the
8    principals in both companies -- I mean, a full
9    principal of IPLLC but partner in Wowster,
10   obviously, I was the bridging entity who would
11   [verbatim] communicated to IPLLC for us to be
12   able to function successfully as a streaming
13   channel, we cannot have millions of illegally
14   uploaded copies on YouTube, so IPLLC started to hunt
15   this down.
16       Q. Did Wowster identify content?
17       A. Yes.
18       Q. Please explain.
19       A. I had -- IPLLC had contract with
20   practically a hundred percent of all Hungarian
21   content ever produced. IPLLC had a contract with
22   the Hungarian Film Fund, which is the government
23   based film institute who practically owns 99 percent
24   of all Hungarian movies.
25       And I had outside other independent

Page 111

1    producers one by one signed up [verbatim] that we
2    would get the rights to their movies on Wowster, if
3    we are successfully removing the illegally infringed
4    material across the board from YouTube channel.
5        Q. IPLLC sent takedown notices for content on
6    YouTube; correct?
7        A. Correct.
8        Q. How did Wowster help IPLLC send those
9    takedown no- -- takedown notices?
10       A. I got a list of movies, which we would
11   have the right to put on Wowster. And then I -- I
12   give that list to IPLLC and its authorized agents.
13   And I asked them to start to hunt it down and send
14   in removal notices, if they find anything not
15   authorized.
16       Q. And how did IPLLC find those works online?
17       A. By a -- a software called Pirate Monitor.
18   And it's not the Pirate Monitor LTD, but the
19   software itself called Pirate Monitor, which was
20   under the supervision and ownership of Endre Holman.
21       Q. And how did that software work?
22       A. It scanned the internet and find it
23   immediately, all the uploaded versions across the
24   universe, all Torrent sides, all everywhere, of
25   e-mail or YouTube. Anything. It's -- it's -- it's

Page 112

1    a software which I have no idea how it works, but
2    it's a genius software. In two or three seconds, it
3    pulls up thousands of -- any title you mention, and
4    we illustrated that successfully to Hollywood
5    Studios, as well.
6        Q. And is IPLLC still using the Pirate
7    Monitor software?
8        A. I believe the case activities after the
9    file -- filing of our lawsuit.
10       Q. I don't understand your response.
11       Is IPLLC still using the Pirate Monitor
12   software?
13       A. I explained, ma'am. If I understood
14   correctly the question, that the way I see it is,
15   that after the lawsuit filed, we cased [verbatim]
16   activity with the Pirate Monitor software as well.
17       Q. You stopped using the Pirate Monitor
18   software after this lawsuit was initiated; correct?
19       A. That's right.
20       Q. Why?
21       A. Why? Because we lost the contract with
22   the Hungarian Film Fund and with the producers
23   because we couldn't show results. Enough. We -- we
24   succeeded to a very small amount of level, but it
25   wasn't enough to -- to be constantly on top of the

Page 113

1    illegal material on YouTube.
2        Q. Is that why Wowster is no longer
3    operating?
4        A. No. The reason is that I sold the company
5    to the Hungarian Film Fund because they basically
6    cased [verbatim] the contract with us. They stopped
7    the contract, saying you didn't deliver on your
8    promise that -- for IPLLC, that you couldn't take
9    down all the -- all the list of films we gave you.
10   We gave you thousands and thousands of movies and
11   you succeeded to remove maybe three or four.
12       Q. Why weren't you able to remove the content
13   online for your clients?
14       A. Because YouTube was sabotaging our efforts
15   through our whole time.
16       Q. How was YouTube sabotaging your efforts?
17       A. That's a good question. Please ask your
18   bosses.
19       Q. I'm asking you.
20       A. I -- I can only assume it that they saw
21   money in it, and they didn't want to help their bank
22   accounts shrink a little bit by having all the
23   illegal material up and selling commercials on them.
24   It's to their benefit to keep it up as long as
25   possible.

Page 114

1    Q.  Are you familiar with a company called
2  World Web Data Kft?
3    A.  No.
4    MS. HARTMAN:  Qifan, can you mark the next
5  exhibit from Tab 8?
6    (Csupó Deposition Exhibit 9A was marked
7    electronically.)
8    (Csupó Deposition Exhibit 9B was marked
9    electronically.)
10    THE WITNESS:  Exhibit 9 or 8?
11    MR. ZELCS:  She'll -- she'll tell you when
12  it gets there.
13    THE WITNESS:  Oh, okay.  Sorry.
14    Exhibit 9A.
15  BY MS. HARTMAN:
16    Q.  I'm showing you what has been marked as
17  Exhibits 9A and 9B, which is an e-mail chain dated
18  November 14th, 2018, that was originally produced in
19  this action with the Bates number
20  PIRATEMONITOR_'135.  It was sub- -- subsequently
21  reproduced on July 3rd, 2022, with IPLLC_801.
22    Please open Exhibit 9A.
23    A.  Still on this one?
24    MR. EWING:  9A.  Yep.
25    THE WITNESS:  This is it, yeah?  Okay.

Page 115

1  I --
2  BY MS. HARTMAN:
3    Q.  Do you recognize -- do you recognize this
4  as an e-mail you received from an individual named
5  Jennifer Rácz at World Web Data Kft?
6    A.  Yes.
7    Q.  Please open up Exhibit 9B, which is an
8  English translation of 9A.
9    Let me know when you're ready.
10    A.  I am ready.
11    Q.  Who is Jennifer Rácz?
12    A.  I have no idea.  It says in the e-mail.
13  I -- I -- I assume that she is what she's saying she
14  is.
15    Q.  Do you recognize this e-mail?
16    A.  Yes.
17    Q.  Ms. Rácz states in the e-mail that she is
18  the project manager at WWDH and Pirate Monitor, with
19  PirateMonitor one word.
20    See that?
21    A.  Yes, I see that.
22    Q.  And WWDH stands for World Web Data Kft;
23  correct?
24    A.  I have no idea, ma'am.  Could be.
25    Q.  The bottom of the e-mail under Ms. Rácz's

Page 116

1  signature it says World Web Data Kft --
2    A.  Yes.
3    Q.  -- right?
4    A.  Yes.
5    Q.  What does the term "PirateMonitor" written
6  as one word referring to?
7    MR. ZELCS:  Objection.  Form.
8    THE WITNESS:  I'm sorry, ma'am, what is
9  the question?  Why is it one word?
10  BY MS. HARTMAN:
11    Q.  The term "PirateMonitor" written as one
12  word, do you see that?
13    A.  Yes.
14    Q.  What is that referring to?
15    MR. ZELCS:  Same objection.  Form.
16    THE WITNESS:  I'm not sure if that's
17  for -- for -- most likely for the software, because
18  I don't think Pirate Monitor LTD existed then.
19  BY MS. HARTMAN:
20    Q.  So Ms. Rácz is a project manager at WWDH
21  and at the company that owns the software
22  PirateMonitor?
23    A.  I --
24    MR. ZELCS:  Objection.  Form.
25    THE WITNESS:  I assume so.  And she must

Page 117

1  be working for Endre Holman, again.
2  BY MS. HARTMAN:
3    Q.  Does this refresh your recollection about
4  the company World Web Data Kft?
5    A.  I -- I don't have a -- a -- a
6  recollection, remembering this name.
7    Q.  Do you recall why you received -- received
8  this e-mail?
9    A.  No, I don't recall it why [verbatim].  I
10  can read it now and it explains it, but I still
11  don't understand why.  Probably it was a requirement
12  and, again, we always wanted to do everything clean
13  and legal.  So my associates were always top of
14  everything [verbatim], and every time they --
15  something needed to be changed per law, they
16  corrected it and -- and organized it and sent it
17  back.  That's how I interpret this e-mail.
18    Q.  Are you familiar with a company called
19  Pirate Monitor LLC?
20    A.  I don't believe the company like that
21  exists, ma'am.  But I saw it in -- in reviewing some
22  documents, yes.
23    Q.  Is Pirate Monitor LLC a registered legal
24  entity?
25    A.  No.

Page 118

1      Q.  Did you ever have a relationship with an
2  entity called Pirate Monitor LLC?
3      A.  No.
4      Q.  Have you ever held a position at an entity
5  called Pirate Monitor LLC?
6      A.  No.
7      Q.  You used the name Pirate Monitor LLC in
8  communications with YouTube; right?
9      A.  Not me personally, ma'am.  Never.
10     Q.  Who did?
11        MR. ZELCS:  Objection.  Form.
12        THE WITNESS:  I only know this because I
13  reviewed some documents before this deposition, and
14  I saw it that Zoltán Búzás used it in communication.
15  BY MS. HARTMAN:
16     Q.  What communication are you referring to?
17     A.  I don't remember.  I just saw it some --
18  on some e-mails that he used that.
19        MS. HARTMAN:  Qifan, please pull the next
20  exhibit from Tab 10.
21        MR. HUANG:  Sorry, a second.  Tab 10?
22        MS. HARTMAN:  Yes.
23        (Csupó Deposition Exhibit 10A was marked
24        electronically.)
25        (Csupó Deposition Exhibit 10B was marked

Page 119

1        electronically.)
2  BY MS. HARTMAN:
3     Q.  I'm showing you what has been marked as
4  Exhibits 10A and 10B.  Exhibit 10A is a takedown
5  notice correspondence with YouTube dated April 12th,
6  2019, through April 17, 2019, that was produced in
7  this action as GOOG-SCHNDR-'370 through '392.
8        And Exhibit 10B is an English translation
9  of that document.
10        Please open Exhibit 10A.
11     A.  10A?  The Hungarian version?
12     Q.  Yes.
13     A.  Okay.  I see that.
14     Q.  Please turn to page 2 of the PDF of
15  Exhibit A --
16     A.  Yes.
17     Q.  -- 10A.
18        Do you see your electronic signature on
19  this document?
20     A.  Yes.
21     Q.  So do you recognize this document as
22  containing a takedown notice with your electronic
23  signature?
24     A.  Yes.
25     Q.  If you scroll to the first page, you can

Page 120

1  see that it identifies MEGA FILM.
2        You see that?
3     A.  Yes.
4     Q.  So you sent this takedown notice to
5  YouTube on behalf of MEGA FILM; correct?
6     A.  Correct.
7     Q.  Please turn to Exhibit 10B.
8        Let me know when you're ready.
9     A.  Yes.
10     Q.  On the first page, which is stamped
11  GOOG-SCHNDR-'370 in the box it says full name, Gábor
12  Csupó.
13     A.  On the top of page 5?
14     Q.  Page 2.
15     A.  Page 2.  I don't see -- are they talking
16  about confirmation of copyright infringement
17  notification?
18     Q.  Yes.
19     A.  Okay.  I see that.
20     Q.  Then it says "Full name (pseudonym,
21  username or initials may not be used):  Gábor
22  Csupó."
23        Do you see that?
24     A.  I don't see Gábor Csupó.  I see my address
25  and I see MEGA FILM and I see Pirate Monitor,

Page 121

1  intellectual --
2        MR. ZELCS:  Just -- just above your
3  address.  Just look in the paragraph --
4        THE WITNESS:  I don't have -- I don't have
5  anything that -- oh, I see.  "Full name."
6        Yes, I see it.  Yes.  Yes.
7  BY MS. HARTMAN:
8     Q.  And you are listed as the authorized
9  representative in this takedown notice; correct?
10     A.  Absolutely, yes.
11     Q.  And below that is your residential address
12  in Encino, California; right?
13     A.  That's right.
14     Q.  Below that it says "User name:  Pirate
15  Monitor LLC"; correct?
16     A.  Where is that?
17     Q.  Below the address it says "User name:
18  Pirate Monitor LLC"; correct?
19     A.  Oh, yes, I see that.  Yes.
20     Q.  Why did you invoke the name Pirate Monitor
21  LLC in this takedown notice to YouTube?
22     A.  Because I didn't fill this out.
23     Q.  Who did?
24     A.  Zoltán Búzás, and he had my authorization
25  to do this.  That's why he put my name on it.

Page 130

1    That part is hundred percent true. The
2    rest is -- doesn't matter.
3         Q.  It's true that Pirate Monitor LLC is the
4    authorized representative of MEGA FILM?
5         A.  Gábor Csupó is.
6         Q.  Is Pirate Monitor LLC the authorized
7    representative of MEGA FILM Kft?
8         A.  Sorry?
9         Q.  Is Pirate Monitor LLC the authorized
10   representative of MEGA FILM Kft?
11        A.  Again, it's --
12        MR. ZELCS:  Hold on, please.
13        Objection.  Form.  He -- he's told you
14   repeatedly that there is no Pirate LLC, but you keep
15   wasting time asking if a nonexistent entity is an
16   authorized representative.  Obviously you have the
17   right to take this deposition any way you want, but
18   I'm not sure what the point here is.  I apologize
19   for interrupting.
20        MS. HARTMAN:  Okay.  Your objection is
21   sufficient.  Thank you.
22        THE WITNESS:  Would you like to answer --
23   me to answer the question?  If so, then please
24   repeat it.  I don't know what I [verbatim] supposed
25   to answer or not.

Page 131

1    BY MS. HARTMAN:
2         Q.  Is Pirate Monitor LLC the authorized
3    representative of MEGA FILM Kft?
4         MR. ZELCS:  Objection.  Form.
5         THE WITNESS:  No such an entity exists.
6    That was a mistake by Zoltán Búzás.  And I don't
7    know what else to tell you.
8    BY MS. HARTMAN:
9         Q.  Mr. Csupó, when was IPLLC incorporated?
10        A.  I believe in the very beginning of 1990,
11   if I remember correctly.
12        Q.  In 1990; correct?  I just misheard you.
13        A.  Or 2019.
14        Q.  In 2019.
15        Where was IPLLC incorporated?
16        A.  Well, originally in Singapore, and then I
17   bought that company from -- also from Mr. Kovács.
18   Or I'm sorry, the incorporation itself must have
19   happened a lot later.  I purchased IPLLC in -- in
20   2019.
21        Q.  Does IPLLC have a physical office?
22        A.  Most likely in Singapore, but I -- I've
23   never been there.
24        Q.  So you're not sure whether IPLLC has a
25   physical office; correct?

Page 132

1         A.  I'm not sure.  It -- its representatives
2    have a lot of offices.
3         Q.  Who are its representatives?
4         A.  Endre Holman and his entities.
5         Q.  Does IPLLC have a parent company?
6         A.  Not to my knowledge.
7         Q.  Does IPLLC have any subsidiaries?
8         A.  Not to my knowledge.
9         Q.  You were the sole owner of Pi- -- let me
10   withdraw that.
11        You were the sole owner of IPLLC; correct?
12        A.  Correct.
13        Q.  And you were the sole shareholder of
14   IPLLC; correct?
15        A.  Correct.
16        Q.  And you were the sole managing director of
17   IPLLC; correct?
18        A.  Correct.
19        Q.  Why did you obtain ownership in IPLLC?
20        A.  Because I needed a company to monitor the
21   material I needed to fill my needs for Wowster
22   Corporation.
23        Q.  Why did you need a separate entity from
24   Wowster to do that?
25        A.  Because Wowster was a streaming channel,

Page 133

1    not a -- a -- a -- a company who hunts down illegal
2    material.
3         Q.  Did you at any point share ownership in
4    IPLLC?
5         A.  Sorry?
6         Q.  Did you at any point share ownership in
7    IPLLC?
8         A.  I don't think so.  Not to my knowledge,
9    no.  I purchased it, and since them I'm the sole
10   owner.
11        Q.  Please identify all of IPLLC's employees.
12        A.  I can't list up all of them, but it's the
13   same as for Pirate Monitor LTD.  It's Endre Holman
14   and all the control- -- controlled entities under
15   him, including Zoltán Búzás.
16        Q.  So Pirate Monitor LTD and IPLLC have the
17   same employees; correct?
18        A.  Yes.  Not necessarily all been the same,
19   but overlappingly yes.
20        Q.  Who works for IPLLC that doesn't work for
21   Pirate Monitor LTD?
22        A.  That is a question only Endre Holman could
23   answer because he allocates people for both
24   companies.
25        Q.  What type of work does Mr. Búzás perform

1   for IPLLC?
2       A.   Everyday day-to-day operations.
3       Q.   Such as what?
4       A.   Taking orders from Endre Holman, what to
5   do, filling out paperwork, being sure that
6   everything is correct and legally represented and
7   things like that.  And sometimes if Endre instructs
8   him to do certain tasks, such as uploading or
9   promoting or taking down material, then he would
10  function as the -- the manager of that task.
11      Q.   And when did he begin performing work for
12  IPLLC?
13      A.   I'm sorry?
14      Q.   When did Mr. Búzás begin performing work
15  for IPLLC?
16      A.   Mr. Búzás is a long-time employee of Endre
17  Holman.  And soon as IPLLC started operations, he
18  immediately became to be part of the board member.
19      Q.   Mr. Búzás is a board member of IPLLC?
20      A.   No.  I -- I meant it to come under
21  [verbatim] board of -- of the operational people.
22  And he might as be well.  I -- I'm not sure because,
23  again, Endre Holman is running these two companies
24  for me.
25      Q.   Is Mr. Holman a former owner of IPLLC?

1       A.   No, not to my knowledge.  I -- I believe I
2   bought it from Mr. Kovács and he might have some
3   association with -- with Mr. Kovács, but to my
4   knowledge, he was not an owner.
5       Q.   Please identify any independent
6   contractors who performed work for IPLLC.
7       A.   All the same as I mentioned before, Endre
8   Holman and all his entities.
9       Q.   Do the same independent contractors
10  perform work for IPLLC that perform work for Pirate
11  Monitor LTD?
12      A.   Same?
13      Q.   Yes.
14      A.   Mostly the same, but there are overlapping
15  differences.
16      Q.   What are the differences?
17      A.   There are people who work [verbatim]
18  for only one company and other people only working
19  for that, and a bunch of people working for both
20  companies.
21      Q.   Who only works for IPLLC?
22      A.   I have no idea.  It's a question to
23  Mr. Holman.
24      Q.   Who works only for Pirate Monitor LTD?
25      A.   Same answer.

1       Q.   Please turn to -- let me withdraw that.
2           MS. HARTMAN:  Qifan, please pull the next
3   exhibit from Tab 16.
4           THE WITNESS:  I see it here.  It's not it.
5           MR. EWING:  Close that.
6           THE WITNESS:  Close this?
7           This one, close it?  Veritext is where we
8   [verbatim] supposed to be on?
9           MR. EWING:  No.
10          THE WITNESS:  No.
11          MR. EWING:  Is this the only window open?
12          THE WITNESS:  Well, right now this is --
13  oh, may be there.  Oh, yeah.
14          MR. EWING:  Right there.
15          THE WITNESS:  Sorry.
16          Okay.
17  BY MS. HARTMAN:
18      Q.   Are you there?
19      A.   Yes.  Exhibit 11, yeah?
20      Q.   Yes.  I'm showing you what has been marked
21  as Exhibit 11, which is an e-mail chain beginning
22  with an e-mail on April 29, 2019, that was produced
23  in this action as IPLLC_'23 -- excuse me, '22
24  through '26.
25          (Csupó Deposition Exhibit 11 was marked

1   electronically.)
2   BY MS. HARTMAN:
3       Q.   Please turn to page 4 of the PDF which is
4   stamped IPLLC_'25.
5       A.   Page 4 of the PDF, yeah?
6       Q.   Yes.
7       A.   Okay.
8       Q.   And if you scroll up slightly to page 3,
9   that's where the e-mail begins.
10          Do you see that?
11      A.   Yes.
12      Q.   Do you see your name in the copy line of
13  the April 29, 2019, e-mail?
14      A.   To Jacobson, Craig or what?  I'm sorry,
15  where are we?
16      Q.   Yes.  You're copied on the e-mail;
17  correct?
18      A.   Where are we?  I'm sorry, I'm lost.
19  What -- what am I supposed to look at, what tag
20  line?
21          MR. EWING:  Bottom of page 4 is what she's
22  asking about.
23          THE WITNESS:  Bottom, this one?
24          MR. EWING:  Oh, no, sorry.  Yeah, right,
25  asked about that --

Page 138

1    THE WITNESS:  Yes.
2    MR. EWING:  -- right there.
3    THE WITNESS:  Yes.
4    CC'd, yes.
5  BY MS. HARTMAN:
6    Q.  Do you recognize this as an e-mail that
7  Tracy Kramer sent to Craig Jacobson copying you?
8    A.  That's right.
9    MR. ZELCS:  Please read the e-mail before
10  you testify about it.
11    THE WITNESS:  (Witness reviews.)
12  BY MS. HARTMAN:
13    Q.  Please let me know when you're ready.
14    A.  Okay.
15    Q.  If you turn to page 4, in the second
16  paragraph it says that Mr. Holman "is engaged in the
17  cutting edge technology and his company has
18  developed a revolutionary anti-piracy program."  [As
19  read]
20    Do you see that?
21    A.  Yes.
22    Q.  What program is this referring to?
23    A.  Named PirateMonitor.
24    Q.  The next sentence says, "PirateMonitor can
25  not only track any pirate -- pirated film, it can do

Page 139

1  it throughout the world, refreshing it's content
2  every few minutes."  [As read]
3    Do you see that?
4    A.  That's right.
5    Q.  How does it track pirate -- pirated films?
6    A.  It's a technical question.  Please ask
7  Endre Holman.  He's the one who developed it.  I
8  don't know.
9    Q.  Was PirateMonitor used to track content on
10  YouTube?
11    A.  Sorry?
12    Q.  Was PirateMonitor the software used to
13  track content on YouTube?
14    A.  Yes.
15    MR. ZELCS:  Objection.
16    Hold on.  Let me -- I guess it doesn't
17  matter now.  I made it too late.  Go ahead.
18    THE WITNESS:  I'm sorry.
19    MR. ZELCS:  It's all right.
20  BY MS. HARTMAN:
21    Q.  In the fifth paragraph on that same page
22  it says, "PirateMonitor would offer the studios free
23  monitoring and immediate removal of all their
24  illegally uploaded feature films (any content for
25  that matter) in exchange for 50% of collected fees

Page 140

1  on short content profits by YouTube, Facebook, Vimeo
2  et cetera?"
3    Do you see that?
4    A.  No, I'm getting lost in the document.
5  Where is it?  In this same e-mail?
6    Q.  The fifth paragraph.
7    A.  Yes.
8    Q.  Can you explain how Pirate Monitor, the
9  software, would complete the immediate removal of
10  illegally uploaded content?
11    A.  I believe it can only identify and -- and
12  immediate removal would be taken care of by it
13  [verbatim] or sending in takedown notices or -- or
14  sending in notifications of -- in this instant, it
15  doesn't only talk about YouTube.  It's Facebook,
16  Vimeo, anywhere, by -- by basically requiring the
17  provider to -- to take it down because it's
18  illegally up there.  That's my understanding.
19    Q.  And can you explain how Pirate Monitor
20  would earn 50 percent of the collected fees from
21  YouTube?
22    A.  I'm not quite sure.  I -- I think Endre
23  and Tracy might have figured out some sort of a
24  business model.  I'm not sure I understand what is
25  50 percent here exactly means.  It can be

Page 141

1  interpreted several different ways.
2    Q.  How did you intend to make money from the
3  PirateMonitor software?
4    A.  By licensing it to the studios or actually
5  performing the -- the -- the work and then make some
6  sort of arrangement for the studios.
7    Q.  Did you intend to make money from
8  advertising on YouTube?
9    A.  Me?  No.  It never even crossed my mind.
10    Q.  Who is Tracy Kramer?
11    A.  My business manager and personal artist
12  manager who is the head of Toltec Artists.
13    Q.  What is Toltec Artists?
14    A.  It's a talent management company.
15    Q.  Was the PirateMonitor software licensed?
16    A.  Licenses is that you don't sell the -- the
17  software itself, you just loan it to the studios to
18  a certain amount of time.
19    Q.  And did that happen?
20    A.  Sorry?
21    Q.  And did that happen?
22    A.  We were in a process of -- of negotiating
23  further, but the studio's response was to prove
24  yourself first.  And that's why we tried our -- our
25  software and efficiency in the Hungarian film

Page 142

1  market.
2     **Q.**  Does IPLLC have any clients?
3     A.  Any what?
4       **MR. ZELCS:**  I'm sorry.  I'm sorry.  Could
5  the court reporter read back the question, please.
6       **THE COURT REPORTER:**  Question: "Does
7       IPLLC have any clients?"
8       **THE WITNESS:**  Clients?
9     Yes.  IPLLC had a lot of clients, ma'am.
10  All -- all -- practically all Hungarian film
11  maker -- film makers, starting with the Hungarian
12  Film Fund [verbatim], they have several thousands
13  of movies; the Hungarian film archive which belongs
14  under them; 41 independent famous Hungarian
15  producers; plus MEGA FILM, which is biggest
16  independent Hungarian film production and TV
17  production company.  And they were all our clients.
18  **BY MS. HARTMAN:**
19     **Q.**  How many clients does IPLLC have?
20     A.  I'm sorry.  I just -- I just told you.
21     **Q.  I'm asking how many.**
22     A.  I -- I -- I'm not adding machine, ma'am.
23  I don't know.  Forty-one, 43, 45, 40- -- it's around
24  40-something clients.
25     **Q.  Does IPLLC generate revenue?**

Page 143

1     A.  No.
2     **Q.  How is IPLLC funded?**
3     A.  By me buying it for a dollar, so I owned
4  it.
5     **Q.  Does IPLLC have any expenses?**
6     A.  Yes.  It was covered all by Endre Holman
7  and his -- his colleagues.
8     **Q.  So who pays for the expenses of IPLLC?**
9     A.  Endre Holman and his -- his colleagues.
10     **Q.  Do you reimburse him?**
11     A.  I didn't have to.  I had a -- I had a
12  50/50 deal with him.
13     **Q.  Can you explain what you mean?**
14     A.  I meant it's not 49 percent and not
15  51 percent.  It's 50/50.
16     **Q.  Do you have a written agreement to that**
17  **effect?**
18     A.  I believe so -- or actually, I don't
19  remember if it we written down or it was a handshake
20  deal.  But since he controlled the software which
21  belonged a hundred percent to him, and I controlled
22  the -- all my connections in the industry, both of
23  us would benefit from our -- our collaboration.  And
24  there was just a -- a, most likely, handshake deal.
25  I -- I don't quite remember if it was put down in

Page 144

1  writing or not.
2     **Q.  So if IPLLC has expenses, Mr. Holman pays**
3  **for them --**
4     A.  That's right.
5     **Q.  -- correct?**
6     A.  Yes.  He was part of -- technically, was
7  part of the company, yes.
8     **Q.  How is he part of the company?**
9     A.  He was an associate agent, authorized
10  agent to act [verbatim] behalf of -- of the
11  corporation.
12     **Q.  How much cash is on IPLLC's balance sheet?**
13     A.  Zero.  Thanks to YouTube.
14     **Q.  What do you mean?**
15     A.  That's what I mean because you guys
16  sabotage -- not -- not you.  I'm sorry.  YouTube
17  sabotaged our activity and we could not succeed.
18     **Q.  In what way?**
19     A.  Sorry?
20     **Q.  In what way?**
21     A.  In what way?  Boycotting our -- our
22  efforts to take down all the illegal material by
23  coming up with all kind of bullshit excuses.
24     **Q.  Does IPLLC have a corporate bank account?**
25     A.  Nope.

Page 145

1     **Q.  Does IPLLC have any assets?**
2     A.  Nope.
3     **Q.  Does IPLLC have any liabilities?**
4     A.  No.
5     **Q.  Does IPLLC hold board meetings?**
6     A.  Again, we confer regularly about issues.
7     **Q.  Who attends meetings of IPLLC?**
8     A.  Myself, Endre Holman, Zoltán Búzás, and
9  sometimes some attorneys involved, Hungarian
10  attorneys.
11     **Q.  How often are these meetings held?**
12     A.  I would say at least once a month.
13     **Q.  And are these the same meetings that are**
14  **held for Pirate Monitor LTD?**
15     A.  I'm sorry?
16     **Q.  Are these the same meetings that are held**
17  **for Pirate Monitor LTD?**
18       **MR. ZELCS:**  Objection.  Form.
19       **THE WITNESS:**  Hmm.  We conducted a bunch
20  of conference calls and -- and video chat meetings.
21  And sometimes we covered one company, another
22  meeting the other.  And -- and there was several
23  meetings where we covered both companies'
24  activities, especially when Pirate Monitor LTD was
25  purchased by me after that.  Until that, it was only

Page 146

1    IPLLC on the -- on the -- on the agenda.
2    BY MS. HARTMAN:
3        Q.   How often did you discuss Pirate Monitor
4    LTD and IPLLC at the same meeting?
5        A.   Well, since Pirate Monitor LTD is a lot
6    newer company, it was -- it was just a couple of
7    times after, the two companies overlapped.
8        Q.   Does IPLLC keep contemporaneous minutes
9    for board meetings?
10       A.   I hope so.  I believe so, that they took
11   everything down what was talked about.  Endre Holman
12   might have those.
13       Q.   Were those minutes produced in this
14   lawsuit?
15       A.   Minutes produced in what?
16       Q.   In this lawsuit.
17       A.   Oh.  I -- I -- I don't think so, no.
18       Q.   Why not?
19       A.   Because I -- I'm not in charge of what --
20   what was asked for, and I don't -- if I don't have a
21   copy of it, then you don't have a copy of it.  If I
22   have a copy of it, you have a copy of it.
23       Q.   But there are documents located in Hungary
24   regarding IPLLC; correct?
25       MR. ZELCS:  Objection.  Form.

Page 147

1        THE WITNESS:  I have no idea.
2    BY MS. HARTMAN:
3        Q.   You don't know if there are documents
4    located in Hungary about IPLLC?
5        A.   No --
6        MR. ZELCS:  Objection.  Form.
7        THE WITNESS:  -- I don't.
8    BY MS. HARTMAN:
9        Q.   Does IPLLC have its own website?
10       A.   I'm not sure if Endre set something up for
11   some reason.  I don't know.
12       Q.   Does IPLLC issue invoices?
13       A.   No.
14       Q.   Does IPLLC have its own corporate
15   letterhead?
16       A.   I'm not sure.
17       Q.   Have you sent a letter for IPLLC?
18       A.   Well no one is sending physical letters
19   these days.  Everything going through e-mails.
20       Q.   Does Pirate Monitor LTD provide services
21   to IPLLC?
22       A.   Pirate Monitor LTD?
23       Q.   Yes.
24       A.   No.
25       Q.   Does IPLLC provide services to Pirate

Page 148

1    Monitor LTD?
2        A.   No, not to my knowledge.
3        Q.   Has Pirate Monitor LTD used the
4    PirateMonitor software to scan YouTube for content?
5        A.   My estimation is yes.  But it's, again, a
6    question of -- of -- of Endre Holman, how did he
7    find the -- the material, if he scanned it
8    individually or by using the software.
9        Q.   Have you used the PirateMonitor software
10   to scan for content on YouTube?
11       A.   Not me, myself, never.  It's not in my
12   possession.  The software is not in my possession.
13       MS. HARTMAN:  Qifan, can you pull the next
14   exhibit from Tab 18.  Maybe we already did that one.
15       THE WITNESS:  Do we need to go there,
16   then?
17       (Csupó Deposition Exhibit 12 was marked
18        electronically.)
19   BY MS. HARTMAN:
20       Q.   Please turn to Exhibit 12.
21       A.   Yes.
22       Q.   I'm showing you what has been marked as
23   Exhibit 12.  This is Gábor Csupó "AMENDED OBJECTIONS
24   TO YOUTUBE AND GOOGLE'S FIRST, SECOND, FOURTH AND
25   NINTH INTERROGATORIES" dated June 7, 2022.  [As

Page 149

1    read]
2        Is that your signature on page 8?
3        A.   Yes.
4        Q.   And the information in these interrogatory
5    responses are true and accurate to the best of your
6    knowledge, information, and belief; correct?
7        A.   That's correct.
8        Q.   What is the nature of the -- let me
9    withdraw that.
10       What is the nature of the relationship
11   between MEGA FILM and Pirate Monitor LLC?
12       A.   Pirate Monitor LTD?
13       Q.   No.  Pirate Monitor LLC?
14       A.   Where do you see that in this document?
15       Q.   I'm just asking you a question.  It's not
16   about that document.
17       A.   Oh.  What -- is this a trick question?  We
18   explained to you, ma'am, that there is no such an
19   entity exists.  MEGA FILM exists and -- and Pirate
20   Monitor LLC was a mistake by Zoltán Búzás.  So there
21   can't be any relationship.
22       Q.   Let's discuss MEGA FILM and IPLLC.
23       A.   Okay.
24       Q.   Has MEGA FILM assigned any of its
25   copyrighted works to IPLLC?

Page 150

1   A.  Yes.
2       Q.  What works has MEGA FILM assigned to
3   IPLLC?
4       A.  They authorized IPLLC to monitor --
5       (Interruption in audio/video.)
6       THE COURT REPORTER:  Excuse me.  I didn't
7   get the first word of your answer.  Could you please
8   start again.
9       THE WITNESS:  MEGA FILM authorized IPLLC
10  to monitor and -- and find all the uploaded material
11  on YouTube.  And if they find any infringement, had
12  a hundred percent right to remove it.  And we have a
13  contract for that.  It shows that he authorizes all
14  of his movies controlled by IPLLC.
15  BY MS. HARTMAN:
16      Q.  My question was whether MEGA FILM assigned
17  any of its copyrighted works to IPLLC?
18      A.  Not to IPLLC.  "Assigned," meaning just
19  giving it to us?  I -- I don't understand the
20  question.
21      Q.  Did MEGA FILM transfer its rights in any
22  copyrighted works to IPLLC?
23      A.  MEGA FILM had copyrights on all their
24  material, and they authorized us to govern all of
25  it.

Page 151

1       They technically didn't transfer ownership
2   rights to IPLLC, if that's what you're asking.  If
3   not, then I apologize.  I don't understand the
4   question.
5       MS. HARTMAN:  Qifan, please pull the next
6   exhibit from Tab 19.
7       THE WITNESS:  How come I don't have 12?
8       MR. EWING:  It's not up yet.
9       THE WITNESS:  Oh.
10      (Csupó Deposition Exhibit 13A was marked
11      electronically.)
12      (Csupó Deposition Exhibit 13B was marked
13      electronically.)
14  BY MS. HARTMAN:
15      Q.  I'm showing you what has been marked as
16  Exhibits 13A and 13B.
17      A.  Okay.
18      Q.  13A is a contract that was produced in
19  this action as IPLLC -- Bates stamped as IPLLC '122
20  through '126.
21      A.  Mm-hmm.
22      Q.  Exhibit 13B contains an English
23  translation of that document.
24      Please open Exhibit 13A and let me know
25  when you're ready.

Page 152

1       Are you ready?
2       A.  Yeah, I'm still reading.  It's a long
3   document.
4       Okay.  I'll just say I'm ready.  I mean,
5   I -- I can't keep everything in my head.  But yeah,
6   you want to compare this to the English version,
7   yeah?
8       Q.  Well, do you recognize this document?
9       A.  Yes, absolutely.
10      Q.  What is it?
11      A.  It's a contract between IPLLC and MEGA
12  FILM.
13      Q.  If you turn to page 3 of the contract,
14  which is Bates stamped IPLLC '124, there's a
15  signature for MEGA FILM; correct?
16      A.  That's right.
17      Q.  Did IPLLC also execute this agreement?
18      A.  I'm sorry?
19      Q.  Did IPLLC also execute this agreement?
20      A.  "Execute," you mean signed it?
21      Q.  Yes.
22      A.  Yes.  In the very end, I did sign it, yes.
23      Q.  Did you produce the signed version of this
24  agreement in this action?
25      A.  Produced where, in this law- --

Page 153

1       Q.  In this lawsuit, yes.
2       A.  I -- I only produced whatever I could
3   find, and maybe that was the only version I had.
4   And the original version may be over at MEGA FILMs
5   [verbatim], I don't know.  If I produced it with a
6   signature, then you must have it.
7       Q.  This contract authorizes IPLLC to enforce
8   MEGA FILM's copyrights on YouTube; right?
9       MR. ZELCS:  Objection.  Form.
10      THE WITNESS:  What does that mean?
11  BY MS. HARTMAN:
12      Q.  Why did IPLLC enter into this agreement
13  with MEGA FILM?
14      A.  Because MEGA FILM had a problem with all
15  his movies being illegally uploaded on -- on
16  YouTube, and wanted us to have control and
17  authorization to take care of the problem.
18      Q.  What do you mean by, "take care of the
19  problem"?
20      A.  By taking on all the infringements from
21  YouTube.  You know, find it, organize it, sometimes
22  upload it and build the Kálomista's own legal
23  channel.  But it had no reason to start it until
24  [verbatim] removed all the illegal versions.
25      Otherwise, it had no purpose of doing

1   something for mon- -- monetizing reasons when people
2   could watch the same thing for free in any infringed
3   version.
4       Q.   Did this agreement authorize IPLLC to send
5   notices to YouTube to take down MEGA FILM's content
6   that was on YouTube?
7       A.   Amongst other things, yes.
8       Q.   What else did it authorize IPLLC to do?
9       A.   To find it and to build an own- -- and --
10  and I believe it's also in this contract.  If not,
11  that was in a separate contract that we could build
12  a -- MEGA FILM's own channel, once all the illegally
13  uploaded material is re- -- been removed -- have
14  been removed.
15      Q.   So this contract authorized IPLLC to
16  upload videos containing MEGA FILM's works to
17  YouTube; correct?
18      A.   I believe so.  If not, there must be
19  another contract.  But I know I had the rights to it
20  because Gábor and I talked about this for a long
21  time and he -- he authorized IPLLC to -- to do that.
22      Q.   IPLLC was authorized to upload videos to
23  YouTube of MEGA FILM's works --
24      A.   That's right.
25      Q.   -- correct?

1           MS. HARTMAN:  Qifan, can you pull the next
2   exhibit from Tab 20, please.
3           (Csupó Deposition Exhibit 14A was marked
4               electronically.)
5           (Csupó Deposition Exhibit 14B was marked
6               electronically.)
7   BY MS. HARTMAN:
8       Q.   I'm showing you what's been marked as
9   Exhibits 14A and 14B.  14A is correspondence dated
10  April 3rd, 2019, between Mr. Csupó and YouTube and
11  attachments that we produced in this action as IPLLC
12  '142 through '149.
13      A.   Yes.
14      Q.   I'm also showing you a translation of a
15  cover e-mail that's Bates stamped IPLLC '142 through
16  '143, and that's Exhibit 14B.
17          Please open Exhibit 14A.
18      A.   Yes.
19      Q.   Do you recognize this correspondence
20  between you and YouTube?
21      A.   Well, yes, I can recognize it.  It was
22  sent out by Zoltán under my authorization with my
23  signature on it, yes, my digital signature on it,
24  yes.
25      Q.   And this takedown notice was sent to

1   YouTube for a video containing the work "Zimmer
2   Feri"; correct?
3       A.   That's right.
4       Q.   And this takedown notice was sent on
5   behalf of MEGA FILM; right?
6       A.   That's right.
7       Q.   Please open Exhibit 14B.
8       A.   Yes, I've opened it.
9       Q.   The top -- thank you.
10          The top e-mail is from you; right,
11  Mr. Csupó?
12      A.   It is the same version, just in English?
13  Yeah?
14      Q.   Correct.
15          In this e-mail --
16      A.   Please --
17          (Simultaneous speaking.)
18          (Interruption in audio/video.)
19      Q.   Sorry?
20      A.   No.  I'm -- I'm just saying, please ask
21  the question.
22      Q.   In this e-mail, you tell YouTube YouTube
23  that you're authorized to send the takedown notice
24  on behalf of MEGA FILM; right?
25      A.   That's right.

1       Q.   And you provide attachments to this
2   e-mail; correct?
3       A.   What?
4       Q.   You provided attachments to the e-mail;
5   correct?
6       A.   Patch -- patch way [verbatim]?
7           MR. ZELCS:  Attachments.
8           THE WITNESS:  Attachments.  Oh.
9   Attachments.  Signed -- oh, yes, yes, yes.
10  BY MS. HARTMAN:
11      Q.   And you sent those attachments to YouTube
12  to show that you had authorization to send the
13  takedown notice --
14      A.   That's right.
15      Q.   -- correct?
16      A.   That's right.
17      Q.   Please turn in Exhibit 14A, to page 3 of
18  the PDF, which is stamped IPLLC '144 and through
19  '145.
20      A.   Mm-hmm.  Yes.
21      Q.   And this is an -- an attachment to your
22  e-mail to YouTube; right?
23      A.   Yes.
24      Q.   And this is a proxy; correct?
25      A.   Sorry?

Page 158

1    Q. A proxy.
2    A. What does that mean?
3    Q. Well, what is this document?
4    A. Oh. Proxy, yes. Okay. And now you see
5    my signature on the contract. So it was actually
6    submitted to you, since you're just showing it to
7    me.
8    Q. This is a different document; right?
9    A. No. It's the same document. This is a
10   signed version of the unsigned version, which you
11   showed me before that was not signed.
12        Now you're showing me the signed version
13   and asked me earlier why I didn't supply this to
14   you. So it is supplied because you're just showing
15   it to me.
16   Q. This is a two-page document; correct?
17   A. That's right.
18   Q. What is this?
19   A. It's the contract between IPLLC and MEGA
20   FILM.
21   Q. It is --
22   A. It's the same one you showed me before.
23   Q. Please turn to Exhibit 13A.
24   A. That's where I am on.
25   Q. 13A?

Page 159

1    A. Yeah.
2    MR. EWING: No.
3    THE WITNESS: No? This is B?
4    MR. EWING: This is 14A.
5    THE WITNESS: Oh, 13A. Okay.
6    MR. EWING: She's wants you to go --
7    THE WITNESS: Fine. Okay.
8    BY MS. HARTMAN:
9    Q. 13A is the contract we discussed; correct?
10   A. Sorry?
11   Q. 13A contains the contract we discussed
12   between MEGA FILM and Intellectual Property LLC;
13   correct?
14   A. Yes. Okay.
15        Yes.
16   Q. Do you see that this is different --
17   A. No, it's not different. If you scroll
18   down the bottom of the page, that's the signature
19   page, exactly what was attached to the YouTube
20   e-mail.
21   Q. Please open Exhibit 14A.
22   A. Yes.
23   Q. Please turn to page 5, which is stamped
24   IPLLC '146.
25   A. Oh, the small stuff. Yeah. Okay.

Page 160

1    Q. You can zoom in.
2    A. Thank you. It's a good idea.
3        Okay.
4    Q. And this document is from IPLLC '146 to
5    '149.
6        Do you see that?
7    A. Yeah.
8    Q. What is this?
9    A. It's a confidential document, it says, on
10   the bottom and the top of the page. I don't know
11   what this is. I need to study it.
12   Q. This was an attachment to your e- --
13   e-mail to YouTube about the takedown notice;
14   correct?
15   A. If you're telling me, I believe you, yes.
16   Q. You tell me.
17   A. If -- if that's what it is, I -- I -- I
18   have no way of verification. I mean, this is a
19   document, you're sending it to me. And it seems
20   like making sense, but I can't verify if this was
21   exactly sent or not by Zoltán.
22   Q. If you turn to the first page of
23   Exhibit 14A, this is an e-mail that's coming from
24   you; correct?
25   A. 14A.

Page 161

1        Okay. So this was part of the same
2    attachment to that e-mail?
3    Q. It is an attachment to that e-mail.
4    A. Okay. Well, in that case, it -- it must
5    be.
6    Q. And this contains a list of MEGA FILM
7    works; correct?
8    A. Mm-hmm. Yes.
9    Q. And this contains a list of all the works
10   for which MEGA FILM authorized you to force its
11   copyrights on YouTube; correct?
12   A. Correct.
13   Q. Turn to page 6 of the PDF, please.
14   A. Sorry?
15   Q. Page 6 of the PDF, please --
16   A. Oh, page 6.
17   Q. -- which is stamped IPLLC_147'.
18   A. Yeah.
19   Q. This list identifies the films "Zimmer
20   Feri" and "Csak szek és más semmi" --
21   A. Right.
22   Q. -- correct?
23   A. Yes.
24   Q. So MEGA FILM authorized you to send
25   takedown notices with respect to those two films;

Page 162

1  correct?
2      A.  When?  I mean, I -- I don't understand the
3  logic of the questioning.  I'm sorry.  I -- I -- I
4  understood that we could monitor anything which is
5  in this list and if we find any illegal versions of
6  them, then we had the right to take it down.  That's
7  my understanding.  It's nothing beyond anything like
8  that.
9      Q.  So you were authorized to ask YouTube to
10  remove videos containing any of the works identified
11  in this list; correct?
12      A.  That's right.
13      Q.  And you were authorized by MEGA FILM to
14  upload any videos containing the works in this list;
15  correct?
16      A.  To the channel after we took down the
17  illegal version of the same thing, yes.
18      Q.  To what channel?
19      A.  To MEGA FILM's channel.
20      Q.  Could you upload any of these videos to
21  any other YouTube channel?
22      A.  I could, but I wouldn't.
23      Q.  Were you authorized to do so?
24      A.  It didn't authorize me just to put it up
25  randomly.  It authorized me to put it up under his

Page 163

1  channel once the illegal version is taken down.
2      Q.  Okay.
3          MS. HARTMAN:  Qifan, please pull the
4  document from Tab 21.
5          THE COURT REPORTER:  And, Counsel, perhaps
6  after this exhibit, we can take a break, please.
7          MS. HARTMAN:  We can take a break now.
8  Why don't we do that.
9          MR. ZELCS:  Okay.  How long?
10          THE VIDEOGRAPHER:  The time is -- the time
11  is 3:35, and we're going off the record.
12          (Short recess taken.)
13          THE VIDEOGRAPHER:  The time is 3:47, and
14  we're back on the record.
15  BY MS. HARTMAN:
16      Q.  Hi, Mr. Csupó.  Did you have any
17  substantive conversations with your attorneys during
18  the break?
19      A.  Yes.
20      Q.  What did you discuss with your attorneys?
21      A.  How long this deposition might go on and
22  if George can catch his flight in time or not.
23      Q.  Did you discuss anything else?
24      A.  If I should have more coffee or not.
25      Q.  Did you discuss the substance of your

Page 164

1  testimony?
2      A.  No.
3      Q.  Is there a relationship between MEGA FILM
4  and Pirate Monitor LTD?
5      A.  Other than both of the owners are the
6  same, I don't believe so.
7      Q.  Who is the owner of MEGA FILM?
8      A.  Gábor Kálomista.
9      Q.  Is he the sole owner of MEGA FILM?
10      A.  I believe so, yes.  He got married to
11  the -- to the lady who was running his company.  And
12  maybe she become part owner based on the -- the --
13  this new relationship, I'm not sure.  But to my
14  knowledge, he's the sole owner, yes.
15      Q.  And is he also an owner of Pirate Monitor
16  LTD?
17      A.  I'm sorry?
18      Q.  Is he -- Mr. Kálomista also an owner of
19  Pirate Monitor LTD?
20      A.  No, no.
21      Q.  Has MEGA FILM assigned any of its
22  copyrighted works to Pirate Monitor LTD?
23      A.  Yes.
24      Q.  MEGA FILM assigned Pirate Monitor rights
25  to "Zimmer Feri 2," "Immigrants" and "Vakvagányok";

Page 165

1  right?
2      A.  That's right.
3          MS. HARTMAN:  Qifan, please pull up the
4  document from Tab 22.
5          (Csupó Deposition Exhibit 15 was marked
6  electronically.)
7  BY MS. HARTMAN:
8      Q.  I'm showing you what has been marked as
9  Exhibit 15.  This is a license agreement between
10  MEGA FILM and Pirate Monitor LTD that has been
11  produced in this action as a document Bates stamped
12  PIRATEMONITOR_'46 through '48.
13      A.  Yes.
14      Q.  Do you recognize your name and signature
15  at the bottom of this document?
16      A.  Yes.
17      Q.  And do you recognize this as a license
18  agreement between MEGA FILM and Pirate Monitor LTD?
19      A.  Yes.
20      Q.  With this agreement, MEGA FILM granted
21  rights to the listed films to Pirate Monitor LTD;
22  correct?
23      A.  Correct.
24      Q.  Turning to the first page of the license
25  agreement, which is stamped PIRATEMONITOR -- let --

Page 170

1    Q.  Have you created any YouTube channels on
2    YouTube?
3        A.  Has Pirate Monitor?
4    Q.  Has Pirate Monitor LTD created any YouTube
5    channels on YouTube?
6        A.  Not -- not under my knowledge, not -- not
7    with the name "Pirate Monitor," but maybe they --
8    they created a new channel for -- for MEGA FILM.
9    I'm -- I'm not -- I don't remember correctly.
10    Q.  Who would know?
11        A.  I should know it.  But honestly, I -- I --
12    I don't remember right now.
13    Q.  Is there someone else that would have that
14    information?
15        A.  Endre Holman most likely.  If I -- if I
16    gave the -- the job to them to do it, then they
17    would know it or -- or do it.  But again, if -- if
18    you see any evidence that we created something,
19    please show it to me, and I can verify it or -- or
20    tell you it's not correct.
21    Q.  Has IPLLC created any YouTube channels on
22    YouTube?
23        A.  It's the same answer, maybe we uploaded
24    some stuff for MEGA FILM's channel, but IPLLC never
25    created an IPLLC channel on YouTube.

Page 171

1    Q.  But you're not sure whether IPLLC created
2    any YouTube channels --
3        A.  I'm almost positive we didn't create it
4    under IPLLC's name.
5    Q.  What name would you have created it under?
6        A.  Maybe MEGA FILM's channel.
7    Q.  Who would know?
8        A.  I should know, and Endre should know.
9    Q.  Mr. Holman; correct?
10        A.  Yes, Mr. Holman.
11    Q.  Have you created any YouTube channels on
12    YouTube personally?
13        A.  Yes.
14    Q.  How many channels have you created?
15        A.  One.
16    Q.  When was that channel created?
17        A.  I don't remember.  Ten years ago.
18    12 years ago.
19    Q.  And what's the name of the channel?
20        A.  It's just my name, Gábor Csupó.
21    Q.  And what is the intended purpose of the
22    channel?
23        A.  To show my work to the world, or share
24    familiar moments with friends -- friends and family.
25    Q.  Have you uploaded videos to YouTube?

Page 172

1        A.  Yes, otherwise I couldn't have a channel.
2    Q.  Have you uploaded videos to YouTube on
3    behalf of Pirate Monitor LTD?
4        A.  Not me, personally, no.
5    Q.  Has anyone uploaded videos on behalf of
6    Pirate Monitor LTD?
7        A.  To my own channel?
8    Q.  To YouTube, in general.
9        A.  Have private -- I'm sorry, Pirate Monitor
10    LTD ever uploaded any material to YouTube, that's
11    the question?
12    Q.  Yes.
13        A.  Yes, of course, yes.
14    Q.  To what channel did Pirate Monitor LTD
15    upload videos?
16        A.  To MEGA channel -- MEGA FILM's channel,
17    the three movies we got rights to upload.
18    Q.  Did Pirate Monitor LTD upload videos to
19    YouTube anywhere else?
20        A.  Not to my knowledge, no.
21    Q.  Has IPLLC uploaded videos to YouTube?
22        A.  Yes.
23    Q.  Through which channel has IPLLC uploaded
24    videos?
25        A.  Again, probably MEGA FILM channel, but

Page 173

1    that is the channel I know about, yes.  And mostly,
2    we just had problems with -- with illegal material,
3    not -- not -- our main reason to exist was not to
4    build channels but to monitor.  Besides Wowster
5    would be the reason to -- to have streaming with
6    ours.  IPLLC's main reason was to -- to take care of
7    the excess material which was not authorized to be
8    on YouTube.
9    Q.  Did IPLLC upload videos to YouTube
10    anywhere else apart from MEGA FILM's channel?
11        A.  I only know this because now I -- I --
12    I -- I read all the documents, and -- and -- and I'm
13    familiar of -- of what happened through the years.
14    My answer right now, based on my knowledge, yes.
15    Q.  Where else did IPLLC upload videos?
16        A.  I got authorization from Kálomista and
17    MEGA FILM to upload and promote their movies with
18    shorter pieces all over -- all over, I believe, the
19    internet.  But mostly, the -- the -- the -- the
20    full-length movies he authorized us to upload to his
21    own channel.  And the short version promotional
22    stuff, everywhere to be able to find to promote his
23    movies, mostly commercials or trailers.
24    Q.  So IPLLC was authorized by MEGA FILM to
25    upload short clips of MEGA FILM's works on YouTube;

Page 174

1  correct?
2      A.  As well as full-length movies as well, but
3  we wouldn't do that until we took down all the
4  illegal versions and -- and we were ready to build
5  his own channel, but we never really got to that
6  point.
7      Q.  Did you direct anyone to create YouTube
8  channels on YouTube?
9      A.  No.
10     Q.  Did you direct anyone to upload videos to
11 YouTube?
12     A.  No.  I mean, let me put it this way:  When
13 Kálomista told me to promote his movies, his --
14 his -- his legacy, his -- his library of movies,
15 which was in his opinion on his channel, he
16 authorized me to -- to promote it.  And you see the
17 contract, technically, I could have done anything
18 with any of his material I choose to.  And so, I --
19 I -- I authorized my associates and acting
20 agents, Endre Holman and his entities and his
21 companies, to promote and to scan for illegally
22 uploaded versions, anything we needed to do to -- to
23 clean out the slate for our path.
24     Q.  Did Mr. Holman upload videos to YouTube on
25 behalf of IPLLC?

Page 175

1      A.  I don't think he personally did anything.
2  He is too big of a guy.  He has hundreds of
3  employees.  He gave out the task to his people,
4  and -- and he probably instructed them what to do.
5      Q.  Are you aware of any instance in which
6  Mr. Holman instructed anyone to upload videos to
7  YouTube?
8      A.  Yes, when I told him to promote
9  Kálomista's films with short snippets and -- and
10 with -- with commercials or trailers, then he
11 probably authorized his people to do it.
12     Q.  And were those videos, in fact, uploaded
13 to YouTube?
14     A.  Now I know it because I read all the up --
15 you know, documents in this -- in this dispute.  Now
16 I have knowledge that, yes, they've been uploaded.
17     Q.  When were videos of MEGA FILM's work
18 uploaded to YouTube by IPLLC?
19     A.  When?
20     Q.  Yes.
21     A.  Oh, I -- I don't remember the exact dates.
22 Either in -- in 19- -- 9 -- I mean, 2019 or the
23 early part of 2020.  I don't remember.  But probably
24 the second half of -- of 2019.  Or even -- even
25 earlier.  I just remember the year.

Page 176

1      MS. HARTMAN:  Qifan, can you pull the
2  document from Tab 25 for the next exhibit.
3      (Csupó Deposition Exhibit 17A was marked
4      electronically.)
5      (Csupó Deposition Exhibit 17B was marked
6      electronically.)
7  BY MS. HARTMAN:
8      Q.  I'm showing you what has been marked
9  Exhibits 17A and 17B.  17A is an e-mail and
10 attachment from Mr. Holman to Mr. Csupó, dated
11 January 8th, 2020, that was produced in this action
12 as a document Bates stamped PIRATEMONITOR_'136
13 through '140.  I'm also showing you a translation of
14 the cover e-mail Bates stamped PIRATEMONITOR_'136.
15     Please open Exhibit 17A.
16     A.  Okay.
17     Q.  Do you recognize your name on this e-mail?
18     A.  Yes.
19     Q.  And do you recognize this as an e-mail
20 that Mr. Holman sent to you on January 8th, 2020?
21     A.  Yes.
22     Q.  Please turn to Exhibit 17B.
23     Please let me know when you're ready.
24     A.  Yes, ready.
25     Q.  This is the English translation of 17A.

Page 177

1      A.  Yes.
2      Q.  The e-mail from Mr. Holman says, "Hi
3  Gábor, the Paki kid uploaded only "Csak szex és más
4  semmi" and "Zimmer Feri 1."
5      Do you see that?
6      A.  Yes.
7      Q.  MEGA FILM owns the works "Csak szex és más
8  semmi" and "Zimmer Feri 1"; Correct?
9      A.  Yes, but we were authorized agents to
10 handle his -- his whole library.
11     Q.  You were authorized to enforce MEGA FILM's
12 copyrights with respect to certain works; correct?
13     A.  And, also, we were authorized to upload it
14 to his channel, yes.
15     Q.  And specifically, you were authorized to
16 upload the "Csak szex és más semmi" and "Zimmer Feri
17 1" videos to YouTube; correct?
18     A.  No.  We were specifically authorized to
19 upload anything we wanted from his whole library.
20 And you'll see the attachment, all his work,
21 including all these films you were mentioning in
22 this e-mail, we were authorized to upload or take
23 down or to find infringed material then.
24     Q.  And that includes the two works listed in
25 this e-mail; correct?

Page 178

1    A.  That's right.
2        Q.  Who is the "Paki kid" referenced here?
3        A.  Somebody who -- one of his -- he also
4    hired some of his employees --
5        (Interruption in audio/video.)
6        THE COURT REPORTER:  Could you please
7    repeat that, sir.
8        THE WITNESS:  The question was, who is --
9    who is the Paki kid means [verbatim] to me.  I
10   believe that he is one of the -- the -- the persons
11   Endre Holman and his companies hired for a certain
12   task like uploading things like that, because he was
13   less expensive workforce than the guys in Hungary.
14   BY MS. HARTMAN:
15       Q.  Do you know his name?
16       A.  No.
17       Q.  And the individual referenced as the "Paki
18   kid" was involved in uploading videos to YouTube
19   that contained MEGA FILM's works; right?
20       A.  I'm sorry?
21       Q.  The individual identified as the "Paki
22   kid" in this e-mail --
23       A.  Yes.
24       Q.  -- was involved in uploading videos to
25   YouTube that contained MEGA FILM's works; right?

Page 179

1    A.  Yes, yes, yes.  Not only him, others --
2    probably other people too, but he was one of them,
3    yes.
4        Q.  And he was based in Pakistan?
5        A.  Since the name suggest it, I assume so.
6        Q.  And he was hired by Mr. Holman; correct?
7        A.  Correct.  Not by him personally, but he
8    probably told his workers, find a cheap tech guy.
9    And I think now by reading the documents, I saw that
10   they -- they find him on freelance.com where he sold
11   himself as a -- a technical person who knows about
12   the internet.  That's why they find him.
13       Q.  Why was he hired to upload videos
14   containing MEGA FILM's works to YouTube?
15       A.  Why was he hired?
16       Q.  Yes.
17       A.  Please ask that to Mr. Holman.  I didn't
18   instruct Holman to hire anybody.
19       Q.  But IPLLC hired this individual to upload
20   videos to MEGA FILM; correct?
21       MR. ZELCS:  Objection.  Form.
22       THE WITNESS:  I don't think so because
23   IPLLC did not know about it.  I am the shareholder
24   and the owner, and I did not know about this.
25   BY MS. HARTMAN:

Page 180

1        Q.  When did you first learn about this?
2        A.  After the lawsuit filed and I started to
3    see corresponding documents.
4        Q.  Did you ask Mr. Holman about it?
5        A.  Oh, yes.
6        Q.  And what did he tell you?
7        A.  We've hired him because he was cheap, and
8    we had a hundred percent rights to -- to do this.
9    So we just paid him, and he did what we told him to
10   do.
11       Q.  And what did -- and what was this
12   individual from Pakistan told to do?
13       MR. ZELCS:  Objection.  Form.
14       THE WITNESS:  I don't know firsthand, but
15   I believe that they gave him a list of stuff to do,
16   and he performed it for a certain amount of money.
17   BY MS. HARTMAN:
18       Q.  Who instructed the individual from
19   Pakistan identified in this e-mail to upload videos
20   to YouTube?
21       MR. ZELCS:  Objection.  Form.
22   I'm sorry, I --
23       THE WITNESS:  Did they hear you?
24       MR. ZELCS:  Objection.  Form.
25       THE WITNESS:  I'm sorry.  I didn't -- now

Page 181

1    I -- I -- I'm -- I'm confused.  I'm really
2    apologizing.  Please repeat the question.
3    BY MS. HARTMAN:
4        Q.  Who instructed the individual identified
5    in this e-mail as the "Paki kid" to upload videos to
6    YouTube?
7        A.  Who instructed?  I -- I -- I was telling
8    you that Mr. Holman probably instructed the --
9    Búzás, Zoltán to take care of this assignment from
10   MEGA FILM.  And from there on, I can only assume
11   that he hired this guy because now I know he hired
12   the guy because I saw the documents relating to it.
13   But if your question [verbatim] did I hire the guy,
14   then definitely not.
15       Q.  Do you know an individual named "Zonbor
16   Oshlansky [phonetic]"?
17       A.  I'm sorry, what?
18       Q.  Do you know an individual named "Zonbor
19   Oshlansky [phonetic]"?
20       A.  Oh, not -- not at all.  Never met him.
21   I -- again, to be honest with you, I saw his name
22   after some documents surfaced in front of me during
23   this lawsuit.  But before that, I never even heard
24   his name in my life.
25       Q.  Which document are you referring to?

Page 182

1    A.  I don't remember.  Something about his
2  involvement through Búzas, Zoltán, and there were
3  some tasks he -- he -- he performed under Holman,
4  Endre's instructions.  I don't remember the exact
5  document, but his name popped up.
6       Q.  Did you discuss his involvement with
7  Mr. Holman?
8       A.  No.
9       MS. HARTMAN:  Qifan, can you pull the next
10  document from Tab 26.
11       (Csupó Deposition Exhibit 18A was marked
12        electronically.)
13       (Csupó Deposition Exhibit 18B was marked
14        electronically.)
15  BY MS. HARTMAN:
16       Q.  Sorry, before we switch to the next
17  exhibit, I have a couple more questions.
18       A.  Sure.
19       Q.  Looking back at Exhibit 17B, what was your
20  understanding as to why Mr. Holman was telling you
21  that the Paki kid uploaded certain films?
22       A.  What was my -- what was my understanding?
23       Q.  Yes.
24       A.  My understanding was that he acted on
25  behalf of MEGA FILM's instruction, when he -- when

Page 183

1  Kálomista told us to promote his -- his material.
2  That was my understanding.  And the Paki guy
3  uploaded only "Csak szek és más semmi" and "Zimmer
4  Feri."  And, specifically, my understanding was
5  these are full movies which was authorized by
6  Kálomista to upload it to -- to his own channel.
7  And by reading this e-mail, my take was that so they
8  hired the cheap labor to upload these two movies to
9  his own channel.
10       Q.  And it was IPLLC that was authorized to
11  upload the videos on behalf of MEGA FILM; correct?
12       A.  That's right.
13       Q.  Okay.  Please open Exhibit 18A.  I'm
14  showing you what has been marked as Exhibit 18A and
15  18B.  18A is an e-mail chain between Mr. Csupó and
16  Mr. Kálomista dated September 28, 2020, through
17  September 29, 2020, that was produced in this action
18  as a document Bates stamped PIRATEMONITOR_'165.  And
19  Exhibit 18B is an English translation of that
20  e-mail.
21       Please open Exhibit 18A.
22       A.  Yes.  I -- I can verify that it's in
23  Hungarian, and it's exactly the same thing which the
24  English translation says.
25       Q.  And do you recognize this e-mail chain?

Page 184

1       A.  Yes.
2       Q.  If you scroll to the bottom, the first
3  e-mail, which is September 28, 2020, Mr. Kálomista
4  sent you a link; correct?
5       A.  That's right.
6       Q.  And that link was about YouTube's claims
7  in this action; correct?
8       A.  That's right.
9       Q.  And you responded to his e-mail that same
10  day; correct?
11       A.  That's right.
12       Q.  Please open Exhibit 18B.
13       A.  I have it open.
14       Q.  In your e-mail dated September 28, 2020,
15  you said, "Half of this is true, half is not."
16       A.  That's right.
17       Q.  "There's a big lawsuit, as I said, it's
18  true, YouTube, because it's a class-action lawsuit,
19  is very pissed off, they're trying to bring
20  everything against PM."
21       Do you see that?
22       A.  Yes.
23       Q.  You're referring to this lawsuit; correct?
24       A.  I'm referring against Pirate Monitor as
25  PM, yes.

Page 185

1       Q.  YouTube's claims against Pirate Monitor;
2  right?
3       A.  That's right.
4       Q.  And "PM" stands for Pirate Monitor in this
5  e-mail?
6       A.  Yes.
7       Q.  What did you mean when you said that
8  YouTube is trying to bring everything against PM?
9       A.  By turning the -- the -- the whole claim
10  around and trying to blame their fraudulent activity
11  on a company who's actually trying to fight
12  fraudulent activity.
13       Q.  In the next sentences you say, "Pirate
14  Monitor is clean.  The company called IPLLC, who has
15  a contract with you and the Hungarian Film Fund,
16  acted as a full agent for the rights holder when it
17  uploaded those film clips to YT."  [As read]
18       Do you see that?
19       A.  Yes.  To YouTube, yes.
20       Q.  You were saying that it was IPLLC that
21  uploaded the videos to YouTube that are the subject
22  of YouTube's claims against Pirate Monitor; correct?
23       A.  That's right.
24       Q.  And you were saying that IPLLC was
25  authorized to upload those videos; right?

---

Page 186

1    A.   That's right.  And it's true.

2    Q.   IPLLC was authorized to upload those

3 videos by MEGA FILM; correct?

4    A.   And the Hungarian Film Fund and a bunch of

5 other producers, yes.

6    Q.   The next sentence reads "(only a couple of

7 minutes of film clips were uploaded so that we can

8 prove to our clients that YT is not doing anything,

9 despite our efforts to get them to let us know)."

10    Do you see that?

11    A.   That's right.

12    Q.   You were saying that the videos that were

13 uploaded to YouTube were only short clips of the

14 MEGA FILM's works; right?

15    A.   Gábor already knew, Kálomista already knew

16 that the -- the full-length videos were uploaded to

17 his channel.  So we just explaining that this --

18 this dispute -- about this issue between PM and --

19 and YouTube.

20    Q.   You were saying that short clips of MEGA

21 FILM's videos were uploaded to YouTube --

22    A.   That's right.

23    Q.   -- right?

24    A.   We -- we could do anything we wanted

25 with --

---

Page 187

1    MR. ZELCS:  Please, please, please allow

2 her to finish her question.

3    THE WITNESS:  I thought she did.

4    MR. ZELCS:  You have to wait for --

5    THE WITNESS:  I -- I thought --

6    (Interruption in audio/video.)

7    THE COURT REPORTER:  One -- one person at

8 a time, please.

9    MR. ZELCS:  Please let her finish her

10 question before you start to answer.  Otherwise,

11 we'll have an incredibly difficult time --

12    MS. HARTMAN:  Mr. Zelcs --

13    MR. ZELCS:  -- making --

14    MS. HARTMAN:  -- an objection is

15 sufficient.

16    MR. ZELCS:  I'm sorry, I didn't hear you.

17 What?

18    MS. HARTMAN:  An objection is sufficient.

19    MR. ZELCS:  Thank you.

20 BY MS. HARTMAN:

21    Q.   What did you mean when you said "we can

22 prove to our clients that YT is not doing anything

23 despite our efforts to get them to let us know"?

24    A.   What I mean by that is that we had to show

25 our contractual clients that YouTube is sabotaging

---

Page 188

1 our efforts by not removing when we asked them to do

2 so, although we proved them with evidence that we

3 had the right to do so.

4    Q.   So what is exactly YouTube not doing?

5    MR. ZELCS:  Objection.  Form.

6    THE WITNESS:  Can I answer this or not?

7    MR. ZELCS:  Sure, you can answer.

8    THE WITNESS:  Yes, what is exactly YouTube

9 not doing?  YouTube is not removing millions of

10 infringed material from their site.

11 BY MS. HARTMAN:

12    Q.   And how would uploading short clips of

13 films show that?

14    A.   That was just part of the process.  We

15 were in the -- in the direction of achieving our

16 goals by actually monitoring and -- and the taking

17 down illegally uploaded material.  And YouTube kept

18 sabotaging us all the way.

19    Q.   So you wanted to upload clips of MEGA

20 FILM's works and send takedown notices for those

21 clips; right?

22    MR. ZELCS:  Objection.  Form.

23    THE WITNESS:  Not me personally, not at

24 all.

25 BY MS. HARTMAN:

---

Page 189

1    Q.   Who did?

2    MR. ZELCS:  Objection.

3    THE WITNESS:  Nobody.

4    MR. ZELCS:  Form.

5    Again, please let me get an objection

6 before you answer.

7    THE WITNESS:  Nobody.

8 BY MS. HARTMAN:

9    Q.   The next sentence reads, "This right of

10 the IPLLC cannot be challenged by YT as a third

11 party, its counterclaim is therefore without merit

12 in several respects."

13    Do you see that?

14    A.   That's right.

15    Q.   What did you mean by that?

16    A.   Because IPLLC had the rights to do

17 anything with authorized material which was in its

18 possession.  And it cannot be challenged because we

19 had the contract signed and stamped by all of our

20 clients.  That's what I mean.

21    Q.   YouTube alleges that Pirate Monitor

22 uploaded videos to YouTube and sent takedown notices

23 for those same videos; correct?

24    MR. ZELCS:  Catherine, when -- when you

25 use the term "Pirate Monitor" in that question, are

---

Page 190

1  you referring to Pirate Monitor LTD?
2      MS. HARTMAN: Yes.
3      MR. ZELCS: Thank you.
4      THE WITNESS: Did Pirate Monitor LTD
5  upload movies or shorts or what -- what is the
6  question, I'm sorry?
7  BY MS. HARTMAN:
8      Q. YouTube claims in this lawsuit that Pirate
9  Monitor LTD uploaded videos to YouTube and then sent
10  notices to YouTube requesting that it take down
11  those same videos; correct?
12      A. Correct. And it's wrong.
13      Q. How is it wrong?
14      A. Because Pirate Monitor LTD never uploaded
15  any shorts.
16      Q. Who did?
17      A. IPLLC and its authorized agents.
18      Q. Who are the authorized agents?
19      A. Are we joking now or what? I mean, I -- I
20  think this question went over and over about hundred
21  times, and I explained. Endre Holman and all his
22  entities. He was the authorized agents [verbatim]
23  for IPLLC.
24      Q. You're saying that IPLLC had the right to
25  upload the videos to YouTube that are the subject of

Page 191

1  YouTube's counterclaims; correct?
2      A. Absolutely.
3      Q. And after those videos were uploaded,
4  IPLLC sent takedown notices to YouTube for those
5  same videos; right?
6      A. I only know this about reading the lots of
7  documents. I did not know that beforehand.
8      Q. Do you know it to be true now?
9      A. About the takedown notices.
10      I'm sorry, say it again.
11      Q. Do you know that to be true now?
12      A. I know that was done, yes.
13      Q. How do you know that IPLLC sent takedown
14  notices for videos IPLLC itself uploaded to YouTube?
15      A. I found it out after the fact that we read
16  all the correspondent documents in this lawsuit.
17  What happened is, Mr. Kálomista, after longest time,
18  we couldn't maintain his -- his own material on
19  YouTube without successfully removing all the
20  infringements. He basically told me to take down
21  everything. And I called up Endre and I said, "Take
22  them all down."
23      I never said to him to file takedown
24  notices. All I said, "I got instructions from my
25  client to take all the materials down, what you guys

Page 192

1  uploaded."
2      That's all I said. And that -- that's the
3  very last thing I got involved with this whole
4  thing.
5      Q. Did you discuss this issue with
6  Mr. Holman?
7      A. Oh, yes. I just told you that I called
8  him up and said, "Please take down everything."
9      Q. Did Mr. Holman tell you -- let me withdraw
10  that question.
11      The takedown notices were sent very soon
12  after the videos were uploaded to YouTube; correct?
13      A. I don't know. I mean, did I read the
14  documents saying this afterwards? Yes. But at that
15  moment, I did not know.
16      MS. HARTMAN: Qifan, please pull up the
17  document from Tab 27.
18      (Csupó Deposition Exhibit 19A was marked
19  electronically.)
20      (Csupó Deposition Exhibit 19B was marked
21  electronically.)
22      THE WITNESS: 19A?
23  BY MS. HARTMAN:
24      Q. I'm showing you what has been marked as
25  Exhibits 19A and 19B.

Page 193

1      19A is an e-mail chain dated September 28,
2  2020, through September 29, 2020, that was produced
3  in this action as a document Bates stamped
4  PIRATEMONITOR_'162 to '164.
5      And Exhibit 19B is an English translation
6  of that e-mail.
7      Please op- -- open Exhibit 19A.
8      A. Hmm. I don't remember ever seeing this,
9  to be honest with you. I know that my iCloud
10  account is up here, but I don't remember seeing
11  this.
12      Should we go to the English version?
13      Q. Yeah. Let's look at Exhibit 19B.
14      You see at the top that it says that the
15  e-mail is from Mr. Búzás and to Endre Holman and --
16      A. Yes.
17      Q. -- Gábor Csupó?
18      A. Yes.
19      Q. Do you recognize this e-mail chain?
20      A. No.
21      Q. Do you have any reason to believe you did
22  not receive this e-mail?
23      A. What I'm seeing right now, it seems brand
24  new to me. And -- and 99 percent -- I -- I do have
25  bad memory, but 99 percent, I -- I think I never

Page 198

1    "However, only we can see and know that the YT is
2    seriously factually wrong about the main charges
3    against the PM.  Namely YT is being sued by the PM,
4    but PM is being accused of the IPLLC's actions."
5        Do you see that?
6        A.  Yes, I see it now.  Yes.
7        Q.  When Mr. Búzás refers to YT, you
8    understood him to be referring to YouTube; right?
9        A.  Yes.
10       Q.  And when he refers to PM, you understood
11   him to be referring to Pirate Monitor LTD; right?
12       A.  Yes.
13       Q.  What did you understand Mr. Búzás to mean
14   when he said that Pirate Monitor LTD is being
15   accused of IPLLC's actions?
16       MR. ZELCS:  Objection.  Form.
17       THE WITNESS:  I don't have any
18   understanding of that correctly.  I -- I -- I don't
19   know what exactly he means.  Again, honestly, I
20   don't recall at all to seeing this e-mail before.
21   I'm reading it now, and I tried to figure out what
22   he's trying to say.
23   BY MS. HARTMAN:
24       Q.  He's saying that it was IPLLC that
25   uploaded the videos that contain MEGA FILM's works

Page 199

1    to YouTube; right?
2        MR. ZELCS:  I'm sorry, Catherine, was that
3    a question or a statement on your part?
4        MS. HARTMAN:  That was a question.
5        MR. ZELCS:  Okay.  Could you read that
6    back?  I may have missed the end of it.
7        THE COURT REPORTER:  Question: "He's
8           saying that it was IPLLC that uploaded the
9           videos that contain MEGA FILM's works to
10          YouTube; right?"
11       MR. ZELCS:  I apologize.  I missed the
12   "right."  I didn't hear that.  Thank you.
13       THE WITNESS:  Right.
14   BY MS. HARTMAN:
15       Q.  And those are the videos that are the
16   subject of YouTube's counterclaims; right?
17       A.  That's what it says, yes.
18       Q.  The next sentence reads, "However, IPLLC
19   has not committed any infringement, so YT's
20   accusations are both false and YT is now acting as a
21   rights holder on behalf of MegaFilm against PM,
22   which it has no right to do."
23       Do you see that?
24       A.  I'm sorry, can you point it to me, because
25   I'm lost now in this?  Where is that sentence in

Page 200

1    here?
2        A.  Okay.
3        (Reading.)
4        All right.  So I'm sorry, I just read
5    this.  What is the question?  If I -- I understand
6    it or -- or what?
7        Q.  Did you understand Mr. Búzás to mean that
8    IPLLC was authorized to upload the videos to YouTube
9    on behalf of MEGA FILM?
10       A.  Yes, I understand.  And I know still it's
11   absolutely correct about that.  We were authorized.
12       Q.  Let's discuss the submission of takedown
13   notices to YouTube.
14       A.  It's a new document coming?
15       Q.  Not yet.
16       A.  Oh, okay.
17       Q.  Who prepared the takedown notices that
18   were sent to YouTube that had your electronic
19   signature?
20       A.  I believe Bu- -- Búzás Zoltán.
21       Q.  Did anyone else?
22       A.  Maybe he instructed some -- for some help.
23   I don't know.
24       Q.  Who would know for sure?
25       A.  Endre Holman.

Page 201

1        Q.  Was Mr. Holman involved in the sending of
2    takedown notices to YouTube that contained your
3    electronic signature?
4        A.  He was involved to the fact that he
5    probably gave instructions.  But I don't think he
6    ever does anything personally.  He's too big of a
7    guy, not by body weight, but his status.
8        Q.  How many takedown notices has Pirate
9    Monitor LTD sent to YouTube?
10       A.  I have no idea.
11       Q.  How many takedown notices has IPLLC sent
12   to YouTube?
13       A.  No recollection.  I'm sure more than once.
14       Q.  Can you provide an estimate for how many
15   takedown notices IPLLC has sent to YouTube?
16       A.  Estimation?  I don't know.  I saw a bunch
17   of e-mails, and some of it were successful, and most
18   of it not.  I don't know.  I would say 20, 30, 40,
19   50 times.
20       Q.  Who would know how many takedown notices
21   IPLLC sent to YouTube with your electronic
22   signature?
23       A.  I think you might know it because you have
24   copies of all of it.
25       Q.  Anyone else?

Page 202

1   A.  Zoltán, Búzás; Endre Holman and his --
2   his -- his people, his -- yeah, his -- his -- his
3   acting agents.
4   Q.  What was MEGA FILM's role in connection
5   with the submission of takedown notices to YouTube
6   for videos containing MEGA FILM's works?
7   A.  By which company, IPLLC or -- or Pirate
8   Monitor LTD?
9   Q.  What was MEGA FILM's role in connection
10  with the submission of takedown notices for videos
11  containing its work for takedowns sent by Pirate
12  Monitor LTD?
13  A.  MEGA FILM's role was by just authorizing
14  us to find the infringement area, so he told us to
15  do so.
16  Q.  What was MEGA FILM's role in conn- --
17  connection with takedown notices sent by IPLLC for
18  videos containing MEGA FILM's works?
19  A.  His connection was that he called me up.
20  And after unsuccessfully trying to govern his
21  material, he told me to take down everything.  So I
22  called up Endre Holman and I told him that's the
23  instruction I got from my client, take down
24  everything.  I didn't specify anything by -- by
25  title.  I just said any MEGA FILM material, I just

Page 203

1   got the instruction from the owner, and his wishes,
2   although we still controlling the material right
3   now, he wants everything off.
4   Q.  You -- you testified that MEGA FILM -- let
5   me withdraw that question.
6   You testified that Mr. Kálomista on behalf
7   of MEGA FILM instructed you to send notices to
8   YouTube to take all videos containing MEGA FILM's
9   works off of YouTube; correct --
10  (Simultaneous speaking.)
11  (Interruption in audio/video.)
12  A.  That's correct.
13  MR. ZELCS:  Objection.  Form.  You're
14  mischaracterizing his testimony.
15  Could I have that question back, please.
16  THE COURT REPORTER:  Question: "You
17  testified that Mr. Kálomista on behalf of
18  MEGA FILM instructed you to send notices
19  to YouTube to take all videos containing
20  MEGA FILM's works off of YouTube;
21  correct?"
22  MR. ZELCS:  All right.  When you use the
23  term "you," Catherine, are you referring to Pirate
24  Monitor Limited or Mr. Csupó individually?
25  MS. HARTMAN:  Okay.  An objection is

Page 204

1   sufficient, but I will clarify.
2   MR. ZELCS:  Well, I -- I -- an objection
3   wouldn't clarify the problem because you're not
4   making your question clear.  This is supposed to
5   be --
6   MS. HARTMAN:  Understood.
7   MR. ZELCS:  -- 30(b)(6) than an you
8   individual.  So I'm trying to figure out what one
9   you're asking.
10  BY MS. HARTMAN:
11  Q.  Mr. Csupó, did MEGA FILM instruct -- let
12  me withdraw that question.
13  What entity was instructed to remove all
14  of MEGA FILM's content from YouTube?
15  A.  Mr. Kálomista called me up personally as
16  the representative and acting agent of IPLLC, and he
17  told me at that time to remove all of his material.
18  Q.  And when was that?
19  A.  I don't remember the exact date.
20  Somewhere around the -- the end -- end of 2019.
21  Q.  And were the takedown notices sent in
22  accordance with that instruction?
23  A.  Instruction of what?  I mean, I called --
24  I -- I explained this, that I made a phone call to
25  Endre, and I said our client wishes to remove his

Page 205

1   material from YouTube.  Anything is up in this
2   second [verbatim], anything you can find infringed
3   or even things we loaded up, he [verbatim] asking us
4   to remove it.  That's what I told him.  I did not
5   instruct him to do individually takedown notices.
6   All I instructed him to remove the material, or call
7   up his people and tell them to do it.
8   Q.  And were the takedown notices sent?
9   A.  When?
10  Q.  Were they?
11  A.  Were?  Where they started, they -- if they
12  actually start --
13  MR. ZELCS:  Hold -- hold -- hold on,
14  please.
15  Could I have the question back?  It --
16  it -- it's -- are -- are we still talking about
17  takedown notices being sent after Kálomista talks to
18  Mr. Csupó --
19  MS. HARTMAN:  Yes.
20  MR. ZELCS:  -- or a certain -- other point
21  in time?
22  MS. HARTMAN:  Yes.
23  MR. ZELCS:  Okay.  So could you read back
24  the question, please.
25  THE COURT REPORTER:  Question: "And were

Page 206

1    the takedown notices sent?"
2    THE WITNESS:  After -- after the
3  instruction?  I believe so, yes.  And especially
4  now, that reading all the material available, I can
5  see that it was started, yes.
6  BY MS. HARTMAN:
7    Q.  And the instruction from Mr. Kálomista
8  came around the end of 2019; correct?
9    A.  I believe so, yes.
10    Q.  When did you begin monitoring MEGA FILM's
11  copyrights on YouTube?
12    A.  As soon as we signed the contract with him
13  in the beginning.
14    MR. ZELCS:  Again, Catherine, to the
15  extent that you can, please identify who you're
16  asking about, whether it's IPLLC, Pirate Monitor
17  Limited, Mr. Csupó, individually or what.  Thank
18  you.
19    MS. HARTMAN:  Understood.  An objection is
20  fine.  Thank you.
21  BY MS. HARTMAN:
22    Q.  Mr. Csupó, the takedown notices that were
23  sent following Mr. Kálomista's instruction to remove
24  all of MEGA FILM's content in videos on YouTube --
25  let me withdraw that question.

Page 207

1    Mr. Kálomista of MEGA FILM instructed you
2  to remove unauthorized videos containing MEGA FILM's
3  works; right?
4    A.  Depends what moment we're talking about.
5  In the very beginning, he authorized me to remove
6  all fraudulently uploaded material, so illegally
7  uploaded materials.
8    And later on, when we couldn't perform
9  because YouTube sabotaged that action, then he asked
10  me to remove everything.
11    Q.  Why would Mr. Kálomista not want you to
12  remove everything from the beginning?
13    MR. ZELCS:  Objection.  Form.
14    THE WITNESS:  He authorized us to keep
15  uploading legally to his channel.  And we have
16  all -- the contract, which shows that all those
17  movies, which you very kindly shared back with me on
18  the document.  We had the rights to handle all of
19  that.
20    Basically, it says you can do anything
21  with it, upload it, take it down, upload it, take it
22  down, anything we wanted -- promote it, put it
23  sideways, anything we wanted.  Okay?  A hundred
24  percent rights to it.  Not that we owned anything,
25  but that we had the authorization to -- to basically

Page 208

1  promote it, upload it, anything.
2    In the beginning, we tried to clear up all
3  the illegally uploaded materials so we could really
4  cleanly build his own channel with leg- --
5  legally -- legally uploaded stuff, which we would do
6  for him.
7    And at the same time, we were monitoring
8  the illegally uploaded materials, which we kept
9  sending takedown notices to YouTube very
10  unsuccessfully.
11    And when he saw that it didn't work, then
12  month and month [verbatim] later, he called me up
13  and, you know what, you guys can't function.  And I
14  understand because I sent him copies of -- of
15  that -- the -- YouTube's responses where they said
16  that -- that, you know, we're not going to take it
17  down or your account is frozen or whichever reason,
18  they -- they boycotted our activities I sent him.
19    And he said, You know what, just take down
20  everything.  And -- and including the -- the legally
21  uploaded and the illegally uploaded stuff.  He just
22  wanted off -- everything off of YouTube.  So I
23  called up Endre, and they instructed him.
24  BY MS. HARTMAN:
25    Q.  So you're saying that you instructed

Page 209

1  Mr. Holman to remove all unauthorized videos on
2  YouTube containing MEGA FILM's works?
3    A.  Everything, not just unauthorized; even
4  the one we uploaded legally.
5    Q.  Okay.
6    MS. HARTMAN:  Qifan, please pull the
7  document from Tab 28.
8    (Csupó Deposition Exhibit 20A was marked
9    electronically.)
10    (Csupó Deposition Exhibit 20B was marked
11    electronically.)
12  BY MS. HARTMAN:
13    Q.  I'm showing you what has been marked as
14  Exhibits 20A and 20B.  20A is a document dated
15  November 12th, 2019, through November 13, 2019, that
16  was produced in this action as a document Bates
17  stamped GOOD-SCHNDR '10898 through '10901.
18    And Exhibit 20B is an English translation
19  of that document.
20    A.  I'm just going to look at the...
21    Yes.
22    Q.  Please turn to the bottom of Exhibit 20A.
23    A.  I'm on 20B now.  It's the English version
24  I'm looking at, but we can just go straight there.
25    Q.  Please open to 20A just for a moment.

Page 214

1   his team.
2       Q.  Looking toward the bottom of page 2 of the
3   PDF, the second bullet point says "I have a good
4   faith belief that the use of the material in the
5   manner complained of is not authorized by the
6   copyright owner, its agent, or the law."
7       Do you see that?
8       A.  I see that.
9       Q.  In submitting the takedown notice, you
10  were agreeing -- you were agreeing with this
11  statement; correct?
12      A.  Correct.
13      Q.  And you believed in good faith that the
14  material subject to the takedown notice reflected an
15  unauthorized use of the material; correct?
16      A.  Correct.  It was by the judgment of --
17  of -- of Búzás Zoltán and Endre or -- or they find
18  an illegal copy, and that was my understanding that
19  it needed to be taken down.
20      Q.  And if you submitted a takedown notice for
21  material that is authorized by the copyright owner
22  to be on YouTube, you would not be able to make the
23  above statement; correct?
24      A.  That's correct.
25      Q.  Do you see the language stating the

Page 215

1   information in "This notification is accurate"?
2       A.  Yes.
3       Q.  And when you submit a takedown notice,
4   you're agreeing with this statement; right?
5       A.  Yes.
6       Q.  You're saying to YouTube that the
7   information in the takedown notice is accurate;
8   correct?
9       A.  Correct.
10      Q.  And in response to this takedown notice,
11  YouTube removed the video; right?
12      A.  If there is a paper trail showing that,
13  then yes.  I -- I didn't get that far.
14      Q.  If you turn to page 4 of Exhibit 20B --
15      A.  Okay.
16      Q.  -- which is stamped GOOG-SCHNDR '10898.
17  At the top it says, "Dear Pirate Monitor
18  LLC, thank you for the notification!  The content
19  has been removed."
20      Do you see that?
21      A.  Yes.
22      Q.  Does that refresh your recollection as to
23  whether the content was removed in response to the
24  takedown notice?
25      A.  Yeah.  I mean, my recollection is that we

Page 216

1   got a -- a few notices where YouTube says, Yes, we
2   did, and a hundred notices where they refused.  So,
3   yes, there was a few.  No question.  Good covering
4   YouTube's ass.
5       Q.  How many takedown notices were sent to
6   YouTube between August 2019 and November 2019 that
7   contained your authorized signature?
8       MR. ZELCS:  By whom, in -- in -- in terms
9   of who was sending them?
10      MS. HARTMAN:  I'm asking for any takedown
11  notices that contained his authorized signature that
12  were sent to YouTube between August 2019 and
13  November 2019.
14      MR. ZELCS:  Thank you.
15      THE WITNESS:  No idea.
16  BY MS. HARTMAN:
17      Q.  Can you estimate?
18      A.  No.
19      Q.  Who would know the answer to that
20  question?
21      A.  The people who actually filled out the
22  takedown notice and the people who actually find
23  the -- the -- the material needed to be removed.
24      Q.  And who is that?
25      A.  Endre Holman and his companies and his

Page 217

1   employees.  I'm mostly referring to -- to General
2   Digital, because they're the one who -- who -- who
3   mostly, they're authorized to -- to deal with this
4   specific matter.
5       And if anything outside of that company
6   falling toward that territory, then Endre decided
7   who to assign to certain tasks.  But General Digital
8   is the one who -- who, basically, did all this.
9       Q.  And who at General Digital would be
10  responsible for sending takedown notices to YouTube
11  with your electronic signature?
12      A.  Well, Endre Holman was IPLLC's authorized
13  agent to be the -- to -- to act on behalf of -- of
14  my instructions.  Endre Holman, in fact, then went
15  to his own company, General Digital, and assigned
16  his employees the certain task to deal with it.
17      And inside of this -- inside of his
18  companies, Búzás Zoltán was -- was his main source
19  where he -- you know, Búzás Zoltán knew -- knew most
20  about this stuff because he was an assigned person
21  to -- to the YouTube situation.
22      So he's the one who would most likely know
23  most about it, and he's the one who handled most of
24  the takedown notices.
25      Q.  Can you name any other individuals that

Page 218

1  were involved?
2      A.  Not to my knowledge, no.
3          MS. HARTMAN:  Qifan, please pull the
4  document from Tab 29 for the next exhibit.
5          MR. ZELCS:  Could -- could we get the
6  reporter to give us an elapsed time number, just so
7  I can work on my planning.
8          THE COURT REPORTER:  Actually, if I may
9  defer to the videographer, please.
10         MR. ZELCS:  I'm not picky.  Whoever can do
11 it, that will work.
12         THE VIDEOGRAPHER:  I just need a second to
13 calculate it.
14         MS. HARTMAN:  Why don't we go off the
15 record.
16         MR. ZELCS:  Okay.  That's fine.  Thank
17 you.
18         THE VIDEOGRAPHER:  The time is 5:15, and
19 we're going off the record.
20         (Short recess taken.)
21         THE VIDEOGRAPHER:  The time is 5:30, and
22 we're back on the record.
23 BY MS. HARTMAN:
24     Q.  Mr. Csupó, do you have any substantive
25 conversations with your attorneys about your

Page 219

1  deposition testimony?
2      A.  Not at all.  Mr. Zelcs offered me a -- a
3  che- -- a string cheese.  That was about it,
4  honestly.
5      Q.  Were there any other conversations?
6      A.  No.
7          MS. HARTMAN:  Qifan, please pull the
8  document from Tab 29 for the next exhibit.
9          (Csupó Deposition Exhibit 21 was marked
10             electronically.)
11         MR. HUANG:  If you're referring to
12 Exhibit 21, I think it was already up there before
13 the break.
14         MS. HARTMAN:  Great.  Thank you.
15 BY MS. HARTMAN:
16     Q.  I'm showing you what has been marked
17 Exhibit 21.  It is a document dated March 24th,
18 2020, through March 25th of 2020, that was produced
19 in this action as a document Bates stamped
20 PIRATEMONITOR '14 through '15.
21     A.  Is this 21?  Yes?
22         MR. EWING:  Yes.  Exhibit 21.
23         THE WITNESS:  Okay.
24 BY MS. HARTMAN:
25     Q.  Please scroll to the bottom of that

Page 220

1  exhibit and let me know when you're ready, please.
2      A.  I'm ready.
3      Q.  Your authorized signature is at the bottom
4  of the document.
5          Do you see that?
6      A.  Yes, I see that.
7      Q.  Do you recognize this as a takedown notice
8  you sent to YouTube?
9      A.  If this is the form and it's filled out
10 correctly, yes, I do recognize it.
11         THE COURT REPORTER:  Counsel, may we go
12 off the record so that...
13         MS. HARTMAN:  Sure.
14         THE VIDEOGRAPHER:  The time is 5:32, and
15 we're going off the record.
16         (Off the record.)
17         THE VIDEOGRAPHER:  The time is 5:33, and
18 we're back on the record.
19 BY MS. HARTMAN:
20     Q.  And we're discussing Exhibit 21; right,
21 Mr. Csupó?
22     A.  Yes.
23     Q.  If you turn to page 2 of the document, at
24 the top, it lists the copyright owner as "Pirate
25 Monitor LTD. "

Page 221

1          Do you see that?
2      A.  Yes.
3      Q.  And under that, your full name is listed
4  and your residential address; right?
5      A.  Yes.
6      Q.  And your phone number is listed further
7  below; right?
8      A.  Yes.
9      Q.  And that's your personal phone number?
10     A.  Yes, and business phone numbers
11 [verbatim], yes.
12     Q.  In connection with what copyrighted work
13 was this takedown notice sent to YouTube?
14     A.  Where is it?  I can't see it.
15     Q.  If you look in the center of the page, it
16 says "Title of original video:  Immigrants Joska
17 Menni Amerika."
18         Do you see that?
19     A.  Yes, I see that.  Okay.
20     Q.  So is that the copyright at issue
21 identified in this -- let me withdraw that.
22         Is that the copyrighted work?
23     A.  Yes.
24     Q.  Does Pirate Monitor LTD own the copyrights
25 to "Immigrants Joska Menni Amerika"?

Page 250

1    identify agents that performed work for Pirate
2    Monitor LTD.
3         MR. ZELCS:  Sure he has?  He's --
4         THE WITNESS:  Yeah.
5         MR. ZELCS:  -- he's talked about Endre
6    Holman and his affiliated companies.  I mean, I -- I
7    can -- I don't -- you know, if you don't want to
8    debate this, I'm just trying to clarify for you in
9    case you want to ask further questions.
10        MS. HARTMAN:  Okay.  We don't need to
11   debate it.
12        MR. ZELCS:  I mean, I'd be happy to direct
13   you to how he's answered your questions if you
14   missed any of it or if there's been confusion in the
15   event of any language problems or anything.
16        MS. HARTMAN:  You're free to say you
17   disagree.  We're all set.
18        MR. ZELCS:  Okay.
19        MS. HARTMAN:  Okay.  I'm done asking
20   questions about Pirate Monitor LTD.
21        MR. ZELCS:  We'll now start the individual
22   depo?
23        MS. HARTMAN:  Let's take a five-minute
24   break.
25        MR. ZELCS:  Why don't we make it ten.

Page 251

1         MS. HARTMAN:  Okay.
2         THE VIDEOGRAPHER:  The time is 6:19, and
3    we're going off the record.
4              (Proceedings concluded, 6:19 p.m., PDT, on
5    July 5, 2022.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 252

1              JURAT
2
3         I, GÁBOR CSUPÓ, do hereby certify under
4    penalty of perjury that I have read the foregoing
5    transcript of my deposition remotely taken on
6    Tuesday, July 5, 2022; that I have made such
7    corrections as appear noted herein in ink, initialed
8    by me; that my testimony as contained herein, as
9    corrected, is true and correct.
10
11        Dated this _____ day of _____, 2022,
12   at _____.
13
14
15
16        _____
             GÁBOR CSUPÓ
17
18
19
20
21
22
23
24
25

CERTIFICATE OF REPORTER

1              CERTIFICATE OF REPORTER
2         I, Hanna Kim, a Certified Shorthand
3    Reporter, do hereby certify:
4              That prior to being examined, the witness
5    in the foregoing proceedings was by me duly sworn to
6    testify to the truth, the whole truth, and nothing
7    but the truth;
8              That said proceedings were taken before me
9    at the time and place therein set forth remotely and
10   were taken down by me in shorthand and thereafter
11   transcribed into typewriting under my direction and
12   supervision;
13             I further certify that I am neither
14   counsel for, nor related to, any party to said
15   proceedings, not in anywise interested in the
16   outcome thereof.
17             Further, that if the foregoing pertains to
18   the original transcript of a deposition in a federal
19   case, before completion of the proceedings, review
20   of the transcript [x] was [ ] was not requested.
21             In witness whereof, I have hereunto
             subscribed my name.
22   Dated:  12th day of July, 2022
23
24             <%6538,Signature%>
             Hanna Kim
25             CLR, CSR No. 13083