DAVID H. KRAMER, SBN 168452
MAURA L. REES, SBN 191698
LAUREN GALLO WHITE, SBN 309075
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email:  dkramer@wsgr.com
        mrees@wsgr.com
        lwhite@wsgr.com

BRIAN M. WILLEN (admitted *Pro Hac Vice*)
CATHERINE R. HARTMAN (admitted *Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
Email:  bwillen@wsgr.com
Email:  chartman@wsgr.com

Attorneys for Defendants and Counterclaimants
YOUTUBE, LLC and GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>YOUTUBE, LLC and GOOGLE LLC,<br><br>        Defendants<br>―――――――――――――――――<br>YOUTUBE, LLC and GOOGLE LLC,<br><br>        Counterclaimants,<br><br>    v.<br><br>PIRATE MONITOR LTD, PIRATE MONITOR LLC, and GÁBOR CSUPÓ,<br><br>        Counterclaim Defendants. | CASE NO.:  3:20-cv-04423-JD<br><br>**DEFENDANTS AND COUNTERCLAIMANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFFS' PROPOSED EXPERTS CHARLES D. COWAN AND HAL J. SINGER AND SUPPORTING MEMORANDUM OF LAW**<br><br>**PUBLIC VERSION**<br><br>Date:   April 13, 2023<br>Time:  10:00 a.m.<br>Dept.:  11<br>Judge:  Hon. James Donato |

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

NOTICE OF MOTION AND MOTION ......................................................................................... 1

INTRODUCTION ......................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

    I.      COWAN'S REPORT AND TESTIMONY MUST BE EXCLUDED ................... 2

          A.     Cowan's Opinions Were Not Timely Disclosed. ...................................... 2

          B.     Cowan's Testimony Is Not Based On A Reliable Methodology. ............... 6

          C.     Cowan's Novel And Rudimentary "Methodology" Is Unreliable. ............ 7

    II.     SINGER'S REPORT AND TESTIMONY MUST BE EXCLUDED ................. 10

          A.     Singer's Damages Model Must Be Excluded Because It Depends On
                  Cowan's Untimely And Unreliable Opinions. ......................................... 11

          B.     Singer's Damages Analysis Must Be Excluded Because It Relies On
                  A Fundamentally Flawed Assumption With No Empirical Support........ 12

          C.     Singer's Damages Model Does Not Fit Plaintiffs' Underlying
                  Theory Of Liability And Must Be Excluded............................................ 14

CONCLUSION ............................................................................................................................ 15

1

## TABLE OF AUTHORITIES

Page(s)

2

3

### CASES

4

*Am. Booksellers Ass'n. v. Barnes & Noble, Inc.*,
    135 F. Supp. 2d 1031 (N.D. Cal. 2001) ...............................................................12

5

6

*Asetek Danmark A/S v. CMI USA, Inc.*,
    2014 WL 6997670 (N.D. Cal. Dec. 9, 2014) ........................................................5

7

8

*Carbrera v. Cordis Corp.*,
    134 F.3d 1418 (9th Cir. 1998) ...............................................................................12

9

10

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ...........................................................................................14, 15

11

*Cream Recs., Inc. v. Joseph Schlitz Brewing Co.*,
    754 F.2d 826 (9th Cir. 1985) .................................................................................15

12

13

*Cty. of Cook v. Bank of Am. Corp.*,
    584 F. Supp. 3d 562 (N.D. Ill. 2022) ....................................................................10

14

15

*Cty. of Cook v. Wells Fargo & Co.*,
    2022 WL 17752387 (N.D. Ill. Dec. 19, 2022) .....................................................10

16

*CZ Servs., Inc. v. Express Scripts Holding Co.*,
    2020 WL 4518978 (N.D. Cal. Aug. 5, 2020) .......................................................10

17

18

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) .....................................................................................1, 12, 14

19

*DZ Res. v. Meta Platforms, Inc.*,
    2022 WL 912890 (N.D. Cal. Mar. 29, 2022) .....................................................9, 12

20

21

*Edwards Lifesciences Corp. v. Meril Life Scis. Pvt.*,
    2022 WL 254348 (N.D. Cal. Jan. 27, 2022) .......................................................5, 6

22

23

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2004) ...............................................................................10

24

*Goodman v. Staples The Office Superstore, LLC*,
    644 F.3d 817 (9th Cir. 2011) ...................................................................................5

25

26

*Hoffman v. Constr. Protective Servs., Inc.*,
    541 F.3d 1175 (9th Cir. 2008) .................................................................................3

27

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
    2017 WL 10434367 (N.D. Cal. Jan. 23, 2017) ...................................................12

28

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig. v. Countrywide Fin. Corp.*,
    984 F. Supp. 2d 1021 (C.D. Cal. 2013)................................................................8

*In re Macbook Keyboard Litig.*,
    2021 U.S. Dist. LEXIS 65812 (N.D. Cal. Mar. 8, 2021) ....................................14

*Jarritos, Inc. v. Reyes*,
    345 F. App'x 215 (9th Cir. 2009)........................................................................6

*M.H. v. Cty. of Alameda*,
    2015 WL 894758 (N.D. Cal. Jan. 2, 2015) .........................................................6

*Mariscal v. Graco, Inc.*,
    52 F. Supp. 3d 973 (N.D. Cal. 2014) ..................................................................3

*McGlinchy v. Shell Chemical Co.*,
    845 F.2d 802 (9th Cir. 1988)..............................................................................12

*Mission Viejo Florist Inc. v. Orchard Supply Co.*,
    2019 WL 13045054 (C.D. Cal. Feb. 28, 2019) ..................................................14

*Ollier v. Sweetwater Union High School Dist.*,
    768 F. 3d 843 (9th Cir. 2014)..............................................................................5

*Open Text S.A. v. Box, Inc.*,
    2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ......................................................14

*Percelle v. Pearson*,
    2016 WL 6427883 (N.D. Cal. Oct. 31, 2016) .....................................................7

*Perfect 10, Inc. v. Yandex N.V.*,
    962 F. Supp. 2d 1146 (N.D. Cal. 2013) .............................................................15

*Petrella v. MGM Inc.*,
    572 U.S. 663 (2014) ...........................................................................................15

*Polar Bear Prods., Inc. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004)..............................................................................10

*River Cross Land Co. v. Seminole Cty.*,
    2021 WL 2291344 (M.D. Fla. June 4, 2021) .......................................................8

*Rovid v. Graco Children's Prods.*,
    2018 WL 5906075 (N.D. Cal. Nov. 9, 2018)........................................................7

*Sapan v. Yelp, Inc.*,
    2021 WL 5302908 (N.D. Cal. Nov. 15, 2021)......................................................7

*Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*,
    24 F.3d 1088 (9th Cir. 1994)..............................................................................15

1

2

*Wong v. Regents of Univ. of Cal.*,
    410 F.3d 1052 (9th Cir. 2005)........................................................................3, 6

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001)...............................................................................2

3

4

**STATUTES**

5

17 U.S.C. § 504 .........................................................................................................10, 15

17 U.S.C. § 512 ...................................................................................................................8

6

7

**RULES**

8

Fed. R. Civ. P. 26 ........................................................................................................2, 3, 5

Fed. R. Civ. P. 37 ........................................................................................................2, 3, 6

Fed. R. Evid. 702....................................................................................................1, 8, 12, 14

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on April 13, 2023 at 10:00 a.m., Defendants YouTube, LLC and Google LLC ("YouTube") will move the Court for an order excluding testimony from Plaintiffs' proposed experts Charles D. Cowan and Hal J. Singer pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

**INTRODUCTION**

Plaintiffs rely on Charles Cowan and Hal Singer to establish the supposed existence of putative classes, and to devise a viable damages model that yields a windfall without requiring individualized proof. Dkt. No. 245 at 4, 23-24. But Plaintiffs' proposed experts fail at both tasks. Their reports are so plainly incomplete and unreliable that they do not satisfy the standard for admissible expert testimony under Federal Rule of Evidence 702. *See generally Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993).

Cowan was granted a five-week extension to re-do his original, substanceless report. Yet, his revised version fails to identify a single member of any class or to articulate a viable method for such identification. Tellingly, Cowan conceded that even his latest report is still very much a "work in progress." Decl. of Kelly M. Knoll ("Knoll Decl.") Ex. C, Dep. of Charles D. Cowan, Jan. 17, 2023 ("Cowan Tr.") 159:2-3. To mask this failure of proof, Cowan later tried to smuggle in new opinions via his deposition testimony. That is plainly impermissible.

Singer's report is a victim of consequence. His initial report indicated he planned to rely on Cowan's class identifications in order to inform a damages model. His revised version still points to Cowan to "identify the members of the copyright infringement classes and estimate the number of videos on YouTube that have infringed the copyrights of members of those classes and provide a basis for assessing damages." Knoll Ex. D, Expert Report of Hal J. Singer, Ph.D., Nov. 17, 2022 ("Singer Rep.") ¶ 103. But without any actual inputs from Cowan, Singer's report is necessarily incomplete and unreliable.

Each proffered expert's opinions suffer additional, fatal flaws. Cowan's report is rife with unsupported conclusions. He describes his supposed identification methodologies in only vague terms, rendering them untestable, and he fails to evaluate or defend the reliability of the very data

1  sources he proposes using—issues that have led other courts to exclude his testimony.

2  Singer fares little better. He starts from the unfounded assumption that someone else will

3  determine which and how many YouTube videos infringe a party's copyrights (which no one has

4  done or could do). From there, he purports to calculate the reduction in YouTube's ad revenue

5  that would have resulted if the theoretical, unidentified allegedly infringing videos had not been

6  present. But at the core of his hypothesis is an assumption that is unsupported and false. And

7  even if it were not, Singer's damages model is unusable because it neither tracks Plaintiffs'

8  remaining copyright theories nor even considers the critical concepts of extraterritoriality and

9  apportionment. As a result, his model simply does not fit the case.

10  ## ARGUMENT

11  ## I.   COWAN'S REPORT AND TESTIMONY MUST BE EXCLUDED

12  Plaintiffs originally tasked Charles Cowan, a statistician and economist, with developing

13  a methodology for estimating class size and damages. Cowan then dropped the damages

14  analysis, but still says he will scope each of Plaintiffs' four putative classes by identifying that

15  putative class's copyrighted works and allegedly infringing videos. Cowan claims he can

16  accomplish this by employing "matching" methodologies that involve "cross-referencing"

17  information from DMCA takedown notices with third-party databases and metadata files.

18  Because neither his view on class size nor his "methodology" was timely disclosed, and because

19  they suffer from myriad foundational errors, they must be excluded.

20  ### A.   Cowan's Opinions Were Not Timely Disclosed.

21  The Court should exclude Cowan's testimony before even considering its substantive

22  flaws because he failed to timely disclose his views. The Federal Rules are unambiguous—an

23  expert must timely disclose "all opinions the witness will express and the basis and reasons for

24  them," as well as "the facts or data considered by the witness in forming them," by the date

25  directed by the Court. Fed. R. Civ. P. 26(a)(2)(B)(i), (ii). "Rule 37(c)(1) gives teeth to these

26  requirements by forbidding the use at trial of any information required to be disclosed by Rule

27  26(a) that is not properly disclosed." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d

28  1101, 1106 (9th Cir. 2001). Rule 37(c)(1)'s exclusion sanction applies unless "the failure to

disclose is substantially justified or harmless." *Id.* (finding the party facing sanctions has the burden to prove either justification or harmlessness). Rule 37(c)(1) imposes "a self-executing, automatic sanction to provide a strong inducement for disclosure of material." *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008). Expert discovery and other disclosure deadlines "permit the court and the parties to deal with cases in a thorough and orderly manner, and they must be allowed to enforce them." *Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1062 (9th Cir. 2005).

Expert disclosures in this case were due by September 1, 2022. Dkt. No. 155. On that date, Cowan produced an empty report. It indicated only that upon receiving data from a 90-day sample of takedown notices, "I will develop a methodology to estimate the size of the classes." *See* Knoll Ex. A, Original Cowan Report, Sept. 1, 2022, ¶ 6. On October 13, the Court granted Plaintiffs and Cowan five additional weeks to submit a new report accounting for the data he had then received. Dkt. No. 188. Cowan provided a revised report on November 17. *See* Knoll Ex. B, Expert Report of Charles D. Cowan, Ph.D., November 17, 2022 ("Cowan Rep.").

Cowan's revised report was required to contain a "***complete*** statement of ***all*** opinions" that Cowan proposes to express at trial. Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added); *see Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 983 (N.D. Cal. 2014) ("Defendant was entitled to a ***complete*** disclosure of all opinions—not a sneak preview of a moving target."). It did not. It contained neither a size estimate for any putative class, nor any defined methodology on how to estimate that size. Instead, Cowan baldly asserted that "there exists a reliable methodology to ascertain class members," but failed to describe that methodology with any specificity. *Id.* ¶¶ 9, 12, 79-98. He also asserted that he could apply a method "to identify and quantify the number of infringing video URLs," but provided no description of that methodology either (other than it involved "totaling"). *Id.* ¶ 13. Likewise, he claimed to have "tested" and "concluded that the methodologies are sound and can be applied uniformly across all classes," but did not indicate what tests he performed or how they validated his methodologies. *Id.* ¶¶ 14, 78. Cowan alluded to "filters" and "cleaning" methods as well, but those were no better explained. *Id.* ¶¶ 29, 79, 81-83, 96.

***Critically, Cowan gave no indication in his report that he had ever applied his unspecified "methodologies" to identify any actual class members***. *See* Plaintiffs' Nov. 18 Letter Brief, Dkt. No. 199 (claiming Plaintiffs' expert had been "prevented . . . from executing the automated screening methodologies" to "identify and quantify Class members"). Rather, after receiving the data sample he requested (and a lengthy extension), Cowan wrote that "[t]he limited sample size combined with the [then-current] requirement of two takedown notices to qualify for the Copyright Infringement Classes ***precludes a reliable estimate of the size of the classes***." Cowan Rep. ¶ 64 (emphasis added); *see also id.* ¶ 57 (blaming "near mathematical impossibility of finding multiple takedown notices," and data that "doesn't permit realistic matching to third party data sources"); ¶ 63 ("Even if the data were perfect, I have concluded that there would be no reliable way to estimate the number of class members and works associated to each class when one has only 90 days sampled out of 1,826 days in the investigation period."). Simply stated, Cowan admitted he had not estimated, and could not estimate, the size of the class. Nor did he identify a single class member.

Defendants' rebuttal expert, Greg Halm, criticized Cowan for failing to identify any members of any putative class. That caused Cowan to change course. He claimed at his deposition—***for the first time***—that he had already determined, but not disclosed in his report, the identities of 40 supposed class members. *E.g.*, Cowan Tr. 141:11-142:6. He also claimed—***for the first time***—to have extrapolated the "lower bound" of each putative class size, as well as the number of allegedly infringing videos and works. *See id.* 146:22-148:8, 278:23-279:6. Cowan admitted, however, that none of this information was disclosed in his report—even though he testified that he knew the information when the report was prepared:

> Q. [Y]our report doesn't disclose any opinion on the number of class members amongst any of the four classes, correct? A. It does not. Q. And, similarly, your report doesn't provide any estimates with any confidence intervals of the size of any of the four classes that you address in the report, correct? A. That is correct. . . . Q. Had you determined the lower bound prior to November 17, when this report was submitted? A. Yes.

*Id.* 148:23-149:24. Cowan also took umbrage at Defendants' rebuttal expert for highlighting Cowan's omission of the key information:

> Mr. Halm doesn't know [that I identified any class members] because I didn't
> include them in my report. So he assumes I didn't identify any. He's incorrect. I
> did identify some. I gave you the numbers earlier [in my testimony]. So I'm not
> sure why Mr. Halm feels that he can say that I haven't identified any when, in
> fact, he doesn't really know . . .

*See* Cowan Tr. 290:4-19.

In an effort to defend his non-disclosure, Cowan gestured to a single paragraph of his report where he supposedly presented his model, but that paragraph largely described methods that Cowan could ***not*** use and modeling he could ***not*** do. *See id.* 154:11-12, 155:5-156:7. Just as troubling, Cowan testified that many of his conclusions rested on results of undisclosed testing. *See*, *e.g.*, *id.* 159:21-166:7; *see also id.* 144:2-24 (indicating records of matching processes used to identify class members existed, but were neither produced nor disclosed in his report).

Cowan's failure to disclose these opinions and explanations until his deposition—two months after his revised report and almost three weeks after Defendants' rebuttal report—is exactly the sort of sandbagging that Rule 26 is intended to prevent. *See, e.g., Ollier v. Sweetwater Union High School Dist.*, 768 F. 3d 843, 862 (9th Cir. 2014) (timely disclosures "encourage parties to try cases on the merits, not by surprise, and not by ambush"). The Federal Rules are clear that "subsequently-given deposition testimony is not a substitution for adequate disclosure in the expert's original report." *Edwards Lifesciences Corp. v. Meril Life Scis. Pvt.*, 2022 WL 254348, at *7 (N.D. Cal. Jan. 27, 2022); *see also Asetek Danmark A/S v. CMI USA, Inc.*, 2014 WL 6997670, at *2 & n.1 (N.D. Cal. Dec. 9, 2014) ("deposition testimony does not cure the 'ambush' of a late-disclosed opinion").

Nor were Cowan's untimely disclosures either justified or harmless. Cowan's lack of justification is manifest, as he acknowledged having formed these opinions at the time of his report, but opted not to disclose them. In doing so, Cowan knowingly deprived Defendants' rebuttal expert of the opportunity to address them in his report and prevented Defendants' counsel from adequately preparing to depose Cowan regarding his surprise testimony. In *Goodman v. Staples The Office Superstore, LLC*, the Ninth Circuit agreed that plaintiff's untimely expert disclosures, which forced defendant's experts to "develop[] their opinions and wr[i]te their reports without knowing the scope of [plaintiff's] experts' opinions," constituted

"obvious prejudice." 644 F.3d 817, 827 (9th Cir. 2011). Defendants' prejudice is magnified here because Plaintiffs' class certification motion is upon us (and indeed heavily relies on Cowan's report), while trial is only three months away. *See Jarritos, Inc. v. Reyes*, 345 F. App'x 215, 217 (9th Cir. 2009) ("When the order establishing an expert disclosure deadline also sets a deadline for pretrial motions, we have held that '[d]isruption to the schedule of the court and other parties is not harmless,' even if, as here, 'the ultimate trial date was still some months away.'" (quoting *Wong,* 410 F.3d at 1062).

Given the obvious harm to Defendants, opinions Cowan first offered only in his deposition must be excluded—including his claimed identification of class members; his estimates of class size and number of infringing videos or infringed works; and his claimed development and testing of his potential matching process and models (*see generally* Cowan Tr. 141:11-142:6, 146:22-148:18, 150:14-151:24, 156:9-159:18, 245:5-16, 285:13-25; 286:13-287:13). *See, e.g.*, *Edwards Lifesciences*, 2022 WL 254348, at *7 (plaintiff's "surprise tactics at the expert depositions were not 'substantially justified' or 'harmless' under Rule 37 because they left [defendant's] counsel unable to effectively prepare for those depositions"); *M.H. v. Cty. of Alameda*, 2015 WL 894758, at *2 (N.D. Cal. Jan. 2, 2015). But that is not all: because Cowan admitted that he drew the conclusions in his report from undisclosed tests of his matching processes (*see generally* Cowan Tr. 162:5-166:7; Cowan Rep. ¶¶ 12-15), those conclusions too are inadmissible and properly excluded. *See infra* n.1.

**B.     Cowan's Testimony Is Not Based On A Reliable Methodology.**

The purposeful tardiness of Cowan's testimony is only the beginning of its problems. Neither Cowan's report nor his belated deposition revelations provide a meaningful description of how Cowan claims to be identifying class members from the data he has. Months after submitting his revised report, Cowan testified that his methodology is "a work in progress." *E.g.*, Cowan Tr. 159:2-3; 145:10-15 ("We're still in the process of writing the algorithms to do the match of the hundreds of thousands of takedown notices into the different databases."); 291:19-23 ("I was conducting research to figure out how to write computer programs. But that doesn't mean that I don't have a methodology. What it means is that it's a work in progress that I'm

getting there."). Cowan could not even answer basic questions as to the matching process he is supposedly working on. *See, e.g.*, Cowan Tr. 198:20-22 ("Q. What method did you cho[o]se? A. Oh, I don't know. That's a programming question."); 188:23-189:13 ("Q. And what was the score that you arrived at? A. Oh, I don't know. My staff did this."); 191:19-192:21 ("I'd have to go look at the computer code to figure that out."); 200:10-201:14 ("I don't know how we dealt with that.").[1] Thus Cowan still has not disclosed a fully-formed methodology, let alone demonstrated whatever he plans to do is "reliable and trustworthy." *Rovid v. Graco Children's Prods.*, 2018 WL 5906075, at *13 (N.D. Cal. Nov. 9, 2018).

At bottom, Cowan's proposed method is analogous to the "generic" and "highly general" proposed method to identify class members that this Court rejected in *Sapan v. Yelp, Inc.*, 2021 WL 5302908, at *3 (N.D. Cal. Nov. 15, 2021) (Donato, J.). Much like Cowan, the expert in *Sapan* proposed to analyze phone numbers "in a rather unclear fashion to see if any had been called twice within a twelve-month period," then cross check the results against a public database and the results "would presumably constitute the class." *Id.* Neither Cowan nor the expert in *Sapan* actually did the work required to offer developed opinions based on the litigation record, but merely posited that it is ***possible*** to use their method to identify class members. This Court emphasized, however, that promises of future data analysis were irrelevant because the plaintiff in *Sapan* did not have the evidence in hand and the time for them to obtain it was long past. *Id.* (finding expert's opinion of "no utility" and "of questionable reliability and validity"). The same is true here, and Cowan's testimony must be excluded.

### C.   Cowan's Novel And Rudimentary "Methodology" Is Unreliable.

To the extent it can be discerned at all, Cowan's "highly general" methodology is far from reliable. To identify class members at some unknown future point, Cowan says he will begin by matching the contents of DMCA takedown notices to information he says he can find in various public, third-party online databases (or, in the case of the supposed "CLFN" class, to

---

[1] Cowan's failure to disclose the results of his supposed testing only exacerbates this problem. *See Rovid*, 2018 WL 5906075, at *13 (excluding expert report, in part, for failure to disclose the results of any testing); *Percelle v. Pearson*, 2016 WL 6427883, at *2 (N.D. Cal. Oct. 31, 2016) (precluding expert from providing testimony about undisclosed test).

1   information in video metadata files). But this matching process is unreliable at best. First, Cowan

2   contends takedown notices accurately identify copyright owners in all instances. They need not

3   and regularly do not. Second, he wrongly assumes that the information in third-party databases

4   and "CLFN" metadata fields (to which he seeks to match notices) is accurate.[2] It is not. As a

5   result, Cowan's matching "methodology" is little more than keyword searches and guesswork.

6           Cowan's fundamental assumption that DMCA takedown notices accurately identify

7   copyright owners is unfounded. The law does not require a complaining party to list the

8   copyright owner in a notice. 17 U.S.C. § 512(c). Many of the takedown notices the named

9   Plaintiffs sent in this case did not name the copyright owner.[3] Further, even where a copyright

10  owner is identified in a notice, such information may be wrong, or worse, fraudulent. *See, e.g.*,17

11  U.S.C. § 512(f) (recognizing potential for misrepresentation in notices and creating a cause

12  action for it). Cowan dismisses such issues as infrequent, seemingly based only on the say-so of

13  Plaintiffs' counsel (*see* Cowan Tr. 269:21-270:25 ("I don't believe it occurs that frequently")).

14  As Cowan knows from prior cases excluding his testimony, his failure to account for such issues

15  (*e.g.*, Cowan Rep. ¶ 47; Cowan Tr. 268:23-272:22), and his admission that variability renders

16  any estimate of class size unreliable (*e.g.*, Cowan Tr. 279:7-16), are grounds for exclusion. *See*

17  *River Cross Land Co. v. Seminole Cty.*, 2021 WL 2291344, at *28 (M.D. Fla. June 4, 2021)

18  (excluding Cowan's testimony and methodology as "not reliable" because, like here, he admitted

19  that his methodology "contained 'variability' or error he 'hope[d] washe[d] out' in the end"); *In*

20  *re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig. v. Countrywide Fin. Corp.*, 984 F. Supp. 2d

21  1021, 1038, 1040 (C.D. Cal. 2013) (finding Cowan's report "inadmissible under Rule 702

22  because the underlying data is insufficient and the sampling methodology cannot be reliably

23  applied due to systematic error").

24  

---

25      [2] Cowan admitted that before this case he was unaware of many of the databases that he
26  relies on as trustworthy to form his opinions. Cowan Tr. 66:2-70:13. He also admits he had no
    prior knowledge of "CLFN" metadata. *Id.* 236:7-237:11.

27      [3] *See, e.g.*, UNIGLOBE_0000013042 (Dkt. No. 197-8) (takedown notice identifying
28  "Nayomi Cooper," not Uniglobe, as the owner of the copyright in "5 Weddings"); GOOG-
    SCHNDR-00040030 (Dkt. No. 198-3) (takedown notice submitted regarding AST works, which
    do not mention AST or identify it as the copyright owner).

There are more problems. Cowan offers conjecture that the data sources he intends to use to match information from takedown notices is accurate. But his speculation is unsupported. As to the public, online (and sometimes volunteer-compiled) databases on which Cowan hopes to rely, he admits he did nothing meaningful to investigate their reliability. *See* Cowan Tr. 178:15-182:15 (describing only limited inquiries to database providers "about [the database's] usage, could we download it, how frequently did people ask about downloads and things like that"). Nor did he compare records of one database against the records of another to verify their accuracy. *Id.* 210:16-19, 212:4-13. Rather, he accepted the databases at face value because lots of people use them. *Id.* 178:15-182:15.[4]

Even less reliable is the "CLFN" metadata, the provenance of which Cowan knows nothing about. *Id.* 238:5-7. The contents of that data field, if any, are often meaningless. *See* Decl. of Thierry Foucu, Dkt. No. 198-1, ¶ 6 (in the rare instances in which CLFN metadata is present, that information is often generic, such as "MyMovie," "Mein Film," or "Untitled Project"). While Cowan says he employed some sort of "cleaning process" (Cowan Rep. ¶ 96), he failed to describe a detailed and reliable methodology of what that entailed, and his total unfamiliarity with copyright management information (let alone CLFN metadata) render him unqualified to assess what is and is not valid data.[5]

The matching process Cowan says he is undertaking apparently has not been undertaken by anyone else. Rather, it is something that he and counsel devised for this case. It has no indicia

---

[4] Cowan's report contains descriptions of the online databases, often taken directly from an informational "About Us" page on the relevant website (Cowan Rep. ¶¶ 51-54, 56 & nn.19-22, 24-26), and Cowan's interpretation of YouTube's takedown process, derived from public webpages and documents produced in this case (*id.* ¶¶ 34-42). Those portions of Cowan's report are not a proper subject for expert testimony. *See DZ Res. v. Meta Platforms, Inc.*, 2022 WL 912890, at *9 (N.D. Cal. Mar. 29, 2022) (Donato, J.) ("The documents [the expert] interprets are reasonably intelligible to a jury without special assistance. Consequently, exclusion of [the expert's] opinions and report is required.").

[5] Cowan concedes that he is not an expert in, and has no meaningful educational or professional experience with, copyright matters or online platforms. *See* Cowan Tr. 10:7-17:18, 19:4-24, 25:24-26:25, 81:7-83:2, 97:19-100:20, 102:13-103:17. He also concedes that neither he nor his team has any unique experience with or knowledge of copyright protection, copyright removal requests, copyright management information, online copyright records, or online music or video databases. *See id.*; *see also* Cowan Tr. 66:17-70:13, 71:23-72:16, 77:11-78:12.

of reliability. *See CZ Servs., Inc. v. Express Scripts Holding Co.*, 2020 WL 4518978, at *7 (N.D. Cal. Aug. 5, 2020) (Donato, J.) (explaining that, where an expert developed her approach "for this litigation," "[t]hat is a 'very significant fact' that cuts against a finding that the method 'comports with the dictates of good science'"); *see also Cty. of Cook v. Bank of Am. Corp.*, 584 F. Supp. 3d 562, 583 (N.D. Ill. 2022) (excluding Cowan where "plaintiffs fail[ed] to identify *anyone*—any government agency, any compliance professional . . . , any academic researcher or other commentator—who uses or endorses Dr. Cowan's aggregated methodology"); *Cty. of Cook v. Wells Fargo & Co.*, 2022 WL 17752387, at *6 (N.D. Ill. Dec. 19, 2022) (excluding Cowan for failure to show his "analysis" was "generally accepted").

## II.    SINGER'S REPORT AND TESTIMONY MUST BE EXCLUDED

Searching for a viable damages theory, Plaintiffs turned to Hal Singer, an economist claiming to have devised a class-wide method to determine YouTube's supposed profits caused by class members' allegedly infringing videos. But most individual videos are inconsequential to YouTube—it earns virtually no revenue, much less profit, from videos that are seldom viewed. And many videos are never viewed at all. So rather than looking at what revenue specific videos actually generated, if any, Singer tries to imagine what revenue an abstract group of videos might theoretically generate. That abstraction disconnects his analysis from the specific videos at issue, and ignores the requirement for proof that a specific infringement ***caused*** an infringer to generate specific revenue/profit. *See* 17 U.S.C. § 504(b); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004) ("a causal link between the infringement and the monetary remedy sought is a predicate to recovery of both actual damages and profits … [and] a plaintiff in a § 504(b) action must establish this causal connection"); *see also Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004). While this failure of proof renders the analysis unhelpful to a jury, and highly prejudicial, it is only the beginning of the fatal infirmities in Singer's analysis.

Singer seeks to estimate the revenue/profit from some group of allegedly infringing videos, but he does not know the composition or size of that group. He fully relies on Cowan to "identify the members of the copyright infringement classes and estimate the number of videos on YouTube that have infringed the copyrights of members of those classes and provide a basis

for assessing damages." Singer Rep. ¶ 103; Knoll Ex. E, Dep. of Hal J. Singer Ph.D., Jan. 13, 2023 ("Singer Tr.") 152:2-5. Cowan has failed in that foundational task. *See supra* 2-10. Because Cowan's testimony must be excluded, so too must Singer's, which is predicated upon it.

Lacking input from Cowan, Singer develops a "proxy" for the number of allegedly infringing videos on YouTube: 1.32% of all videos, a figure Singer admits to be "merely a placeholder" not connected by evidence to the case or the service. Singer Tr. 29:17; Singer Rep. ¶ 104. Singer then assumes that this group of videos is responsible for the same amount of time that users spend on YouTube ("watch time") as any other group. Singer Rep. ¶¶ 104, 108. But that is fiction. It is not only unsupported, but contrary to all evidence. *See*, *e.g.*, Dkt. No. 244-8 (GOOG-SCHNDR-00034775), at -785 ("90% of videos uploaded to YouTube . . . account for less than 1% of total watch time" and "10% of the . . . videos uploaded to YouTube . . . account for more than 99% of total watch time."). Still, with his manufactured assumption, Singer then says that a given percentage of watch time has historically been worth a given percentage of YouTube's revenue. So the assumed 1.32% of watch time for which those videos are supposedly responsible, would, based on historical analysis, generate roughly 1% of YouTube's revenue. The problem is that, without evidentiary support for a jump from a percentage of allegedly infringing videos to a percentage of watch time, the entire calculation is worthless. And Singer cannot offer anything to justify that jump. His model is thus speculative and unreliable.

Finally, Singer's approach to modeling YouTube's theoretical liability is a square peg that does not fit within the scope of the case. Specifically, the Court has ruled that, as to many works and claims of infringement, any direct infringement theory is barred by licenses YouTube received from the named Plaintiffs. *See* Dkt. No. 222 at 13-15. But Singer does not account for the dismissal of such claims in his analysis. Nor does Singer's analysis account for non-actionable conduct outside the United States, or grapple with the requisite apportionment or failures to mitigate. In other words, his model does not reflect the realities of this case.

### A.    Singer's Damages Model Must Be Excluded Because It Depends On Cowan's Untimely And Unreliable Opinions.

Singer freely admits that, without Cowan's identification of class members and videos

1   that allegedly infringe their works he cannot apply his model to calculate damages for a putative

2   classes. *See* Singer Rep. ¶¶ 20, 103; Singer Tr. 29:8-14; 151:13-152:5 (regarding the number of

3   videos belonging to the Copyright Infringement Classes, testifying: "Dr. Cowan is going to make

4   those calls. I'm not going to make those calls. Those are an input to the model."); 156:17-18

5   ("the infringing share is going to be crafted, ultimately, by Dr. Cowan"). Because the testimony

6   from Cowan on which Singer intends to rely must be excluded (*supra* 2-10), Singer's testimony

7   must be excluded as well. *See*, *e.g.*, *DZ Res. v. Meta Platforms, Inc.*, 2022 WL 912890, at *8-9

8   (N.D. Cal. Mar. 29, 2022) (Donato, J.) (excluding one expert's testimony along with any other

9   expert's testimony that depended on the excluded testimony); *In re: Cathode Ray Tube (CRT)*

10  *Antitrust Litig.*, 2017 WL 10434367, at *2 (N.D. Cal. Jan. 23, 2017) ("Where an expert bases her

11  opinion on—or simply repeats—the unreliable opinion of another expert, a district court may

12  properly exclude the first expert's testimony.").

13      **B.      Singer's Damages Analysis Must Be Excluded Because It Relies On A**

14          **Fundamentally Flawed Assumption With No Empirical Support.**

15          Even assuming Singer could rely on Cowan, Singer's damages analysis must be excluded

16  because it is not based on reliable data or well-founded assumptions. Properly supported expert

17  opinions have a "basis in the record," *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 807 (9th

18  Cir. 1988), and are buttressed by "real-world evidence," *Am. Booksellers Ass'n. v. Barnes &*

19  *Noble, Inc.*, 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001). An opinion based on "unsubstantiated

20  and undocumented information is the antithesis of the scientifically reliable expert opinion

21  admissible under *Daubert* and Rule 702." *Carbrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th

22  Cir. 1998). Here, Singer's damages model relies on his unsupported assumption that the

23  percentage of allegedly infringing content on YouTube is "responsible for the same percentage

24  of time that viewers spend on YouTube" as any other content. Singer Rep. ¶ 104. In other words,

25  if 1.32% of videos on YouTube are allegedly infringing, Singer assumes that removing these

26  videos would cause a 1.32% drop in watch time on YouTube. This assumption is critical to

27  Singer's damages regression—set out in Table 6 of his report (*see* Singer Tr. 262:3-8)—as he

28  purports to measure not the causal relationship between ***infringing content*** on YouTube and

YouTube's ad revenue, but some correlation between *watch time* on YouTube and YouTube's ad revenue. *See* Singer Rep. ¶ 97. Indeed, Singer admitted that "only after I make that assumption can I use the model to come up with a damages estimate." Singer Tr. 126:4-10; 127:5-8 ("It was [the] only way I could get to a damages estimate.").

Despite the centrality of this assumption, Singer cited no evidence in the record for it in his report. As Defendants' rebuttal expert, Steven Peterson, explained, not only is the assumption unsubstantiated, it directly contradicts record evidence showing that the allegedly infringing videos are viewed *less* than average or typical content on YouTube. *See* Knoll Ex. F, Expert Report of Steven R. Peterson, Ph.D., Dec. 29, 2022 ("Peterson Rep.") ¶¶ 60-70.[6]

Still more evidence refutes Singer's central assumption. If allegedly infringing videos are watched at the same rate as others, they would be associated with ad revenue at the same rate. But that is not remotely the case. Accepting Singer's placeholder that 1.32% of all videos on YouTube were infringing, Peterson calculated (and Singer agreed) that YouTube's ad revenue generated in relation to those videos was roughly ███████ between July 2017 and December 2020.[7] *See* Peterson Rep. ¶ 64; Singer Tr. 169:11-24. But a truly representative sample of 1.32% of all videos on YouTube would be expected to earn $670 million of ad revenue—YouTube's ad revenue between July 2017 and December 2020 was $50.7 billion; 1.32% of $50.7 billion is $670 million—not ███████ over that time period. Peterson Rep. ¶ 64. Plainly, allegedly infringing videos are not nearly as popular and do not generate nearly the views, ad revenue, or watch time as others.[8] In short, Singer's core assumption is indefensible.

---

[6] Singer's assumption also fails to account for the obvious content substitution that would occur—if a particular allegedly infringing video was removed, a user would watch a different one; in many cases, another, authorized copy of the same video. Peterson's analysis of the sample of videos subject to takedown notices shows that in 35.6% of the entries, the purported copyright owner indicated that the title of the allegedly infringed copyrighted work was another YouTube video, meaning that another video showing the same or similar content already existed on YouTube in non-objectionable form. Peterson Rep. ¶ 63. Thus, the requested removal of the allegedly infringing videos would not result in a one-to-one reduction in YouTube watch time because viewers would be free to watch another copy of the same or similar video. *Id.*

[7] This is based on extrapolating the ad revenue for the 90-day sample that YouTube produced in this action to that 3.5 year time period.

[8] In Singer's world, viewing an allegedly infringing video causes a user to watch dozens of

(continued...)

Because Singer's damages model is built on an unsupported assumption that is contradicted by all record evidence, it "fails to meet the requirements of Rule 702 and *Daubert*" and must be excluded. *Mission Viejo Florist Inc. v. Orchard Supply Co.*, 2019 WL 13045054, at *4 (C.D. Cal. Feb. 28, 2019); *see also Open Text S.A. v. Box, Inc.*, 2015 WL 349197, at *4 (N.D. Cal. Jan. 23, 2015) (Donato, J.) (excluding expert because nothing was "presented to explain or justify" a crucial figure).

### C.      Singer's Damages Model Does Not Fit Plaintiffs' Underlying Theory Of Liability And Must Be Excluded.

Singer's damages model also does not match up with Plaintiffs' theories of liability. "The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event." *Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013) (cleaned up). Courts routinely reject damages models that, like Singer's here, do not "fit" the underlying alleged wrongful conduct. *See*, *e.g. In re Macbook Keyboard Litig.*, 2021 U.S. Dist. LEXIS 65812, at *13 (N.D. Cal. Mar. 8, 2021) (excluding Singer's damages regression model because it "does not accurately relate to Plaintiffs' theory of damages"); *Mission Viejo Florist Inc.*, 2019 WL 13045054, at *3 (excluding expert testimony because the expert "fail[ed] to connect her damages calculation to the allegedly harmful acts").

***Singer's opinions do not fit Plaintiffs' liability theories.*** Plaintiffs contend that when users access videos surfaced through YouTube's Watch Next and Autoplay functionalities, that is sufficient to demonstrate direct infringement as well as "direct financial benefit" for vicarious infringement. Dkt. No. 245 at 11, 15-16. But that is obviously not so for videos that were never seen via Watch Next or Autoplay, or for views of a video not attributable to those functions. A damages model that conforms to Plaintiffs' underlying liability theories must exclude those videos or views. Singer's damages model does not do so; rather, it treats ***every view*** of an

---

(...continued from previous page)

non-infringing videos, thereby generating exponentially greater "indirect" profits for YouTube. Singer then conveniently attributes any profit from views of other videos to the alleged infringements, rather than to the non-infringing videos actually watched. The premise is deeply misguided. If every video watched was responsible for generating the profits from dozens of other videos, YouTube would be earning dozens of times the profit it actually earns.

allegedly infringing video the same. That approach renders the model unsuitable for the claims Plaintiffs actually advance.

      ***Singer should be prohibited from offering any testimony on damages because he failed to consider extraterritorial infringement, mitigation, or apportionment.*** Singer fails to distinguish between views of videos that took place in the U.S. and those that had no connection with the U.S. *See* Singer Tr. 192:9-12; 193:18-194:7; 237:12-238:7. But any acts of alleged infringement, as well as any secondary liability claims that are premised on direct infringement outside the U.S., are "extraterritorial acts of infringement [] not cognizable under the Copyright Act" and must be excluded from Singer's damages model. *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1090, 1093 (9th Cir. 1994) (en banc); *Perfect 10, Inc. v. Yandex N.V.*, 962 F. Supp. 2d 1146, 1157-58 (N.D. Cal. 2013) (no direct liability to support secondary infringement "if third-party activity is extraterritorial"). Singer's model also fails to account for any failure to mitigate by copyright owners, *see Petrella v. MGM Inc.*, 572 U.S. 663, 668 (2014),[9] or to allow for the separation of "elements of profit attributable to factors other than the copyrighted work," 17 U.S.C. § 504(b). Singer did not even consider the need to apportion profits between the infringing and non-infringing parts of a video. *See* Singer Tr. 225:7-25 (acknowledging neither he nor model have considered apportionment); 228:2-14 (same); *see Cream Recs., Inc. v. Joseph Schlitz Brewing Co.*, 754 F.2d 826, 828-29 (9th Cir. 1985) (requiring apportionment of alleged infringer's profits based on contributions of copyrighted work). For these reasons as well, Singer's model does not fit the case. *See Comcast*, 569 U.S. at 35.

## **CONCLUSION**

      For these reasons, YouTube respectfully requests that the Court exclude the proffered expert testimony of Charles D. Cowan and Hal J. Singer, in full or in specified part, from pending motions and at trial, including in connection with Plaintiffs' motion for class certification.

---

    [9] Plaintiff Maria Schneider's failure to submit takedown notices for the alleged infringements still at issue reveals a clear need to develop a model that could reduce profits based on a failure to mitigate, but Singer did not even contemplate this possibility. *See* Singer Tr. 236:17-237:11 (agreeing his model does not take mitigation into consideration).

1

2

Dated:  March 3, 2023

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI

Professional Corporation


By: _____/s/ David H. Kramer_____
        David H. Kramer
        dkramer@wsgr.com

Attorneys for Defendants and Counterclaimants
YOUTUBE, LLC and GOOGLE LLC