Exhibit A

to the Declaration of Kelly M. Knoll ISO
Defendants' Motion to Exclude Testimony
from Charles D. Cowan and Hal J. Singer

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated;

    Plaintiffs,

vs.

YOUTUBE, LLC; and GOOGLE LLC;

    Defendants.

CASE NO. 3:20-CV-4423

## EXPERT REPORT OF CHARLES D. COWAN, Ph.D.
### September 1, 2022

CONFIDENTIAL

# Table of Contents

I.      Introduction ............................................................................................................ 2

II.     Summary of Opinions ........................................................................................... 4

III.    Professional Qualifications and Compensation ................................................... 6

    A.    Professional Experience ................................................................................. 6

    B.    Experience in Academia ................................................................................. 7

    C.    Publications ..................................................................................................... 7

    D.    Professional Societies ..................................................................................... 7

    E.    Compensation .................................................................................................. 7

IV.     Documents and Databases Relevant to My Analysis ........................................... 8

    A.    The YouTube DMCA takedown and counter-notification process. ................ 8

    B.    Defendants' Databases and Documents ........................................................ 12

    C.    The U.S. Copyright Registration Database ................................................... 12

    D.    Publicly-available databases and sources .................................................... 13

V.      Methodology to Identify Members of the Copyright Infringement Class ......... 15

    A.    Methodology Common to Registered Works Class and Unregistered Works Class ...... 15

    B.    Methodology Specific to Registered Works Class ........................................ 16

    C.    Methodology Specific to Foreign Unregistered Works Class ........................ 19

VI.     Methodology to Determine Damages for Copyright Infringement Class ........... 20

    A.    Statutory damages ......................................................................................... 21

    B.    Direct ad revenues ......................................................................................... 22

VII.    Identification of the CMI Class .......................................................................... 22

    A.    CLFN Class .................................................................................................... 22

    B.    ISRC Class ..................................................................................................... 23

    C.    Damages for CMI Class ................................................................................ 24

CONFIDENTIAL

## I.  Introduction

1.  I have been retained by Boies Schiller Flexner LLP and Korein Tillery LLC, co-counsel for the proposed class in this action against YouTube, LLC ("YouTube") and Google LLC.  I was asked to develop a reliable methodology to ascertain class members and estimate the damages that Plaintiffs, and in general putative class members, suffered due to the alleged copyright infringement and the display of the alleged infringing works without copyright management information ("CMI") on the YouTube platform.

2.  I understand that Plaintiffs' First Amended Complaint proposes a Copyright Infringement Class and a Copyright Management Information ("CMI") Class.[1]

3.  This Report encompasses the following tasks: (1) develop a methodology using data to be provided by Defendants and databases commonly used in the industry to identify the members of the Copyright Infringement Class;[2] (2) build a model to calculate, using methods common to the Class, the amount of damages owed to members of the Copyright Infringement Class; and (3) develop a methodology using Defendants' data and databases commonly used in the industry to identify the members of, and calculate damages owed to, the CMI Class.[3]

---

[1] First Amended Complaint, Dkt. 99, para. 103. I understand that Plaintiffs and the putative class will submit proposed class definitions with their motion for class certification, due October 17, 2022. To the extent there are modifications to the class definitions stated in the First Amended Complaint, I will be able to alter my methodology accordingly.

[2] I understand from counsel that the Copyright Infringement Class will include U.S. registered works ("Registered Works Class") and foreign unregistered works ("Foreign Unregistered Works Class").  The methodologies described herein allow me to determine whether U.S. registered works and foreign unregistered works are part of the Copyright Infringement Class.

[3] I understand from counsel that the relevant CMI metadata fields at issue in this care are International Standard Recording Code ("ISRC") and Clip Filename ("CLFN").  The methodologies described herein allow me to determine whether works displayed without ISRC codes ("ISRC Class") and/or CLFN metadata ("CLFN Class") are part of the CMI Class.

CONFIDENTIAL

4. I understand that, in order to apply my proposed methodologies, Defendants will be producing data consistent with the Court's Order of August 30, 2022, consisting of two samples. One of 90 sampled days of Takedown Data that includes the date of the takedown notice, claimant information, copyright owner information, copyrighted work infringed, URL of the infringing video, counter-notification data, and Google gross ad revenue associated with the video. A second sample will come from CMI Data consisting of 30 sampled days including the populated CLFN metadata and the URL of the video. I am informed by Counsel that the populated CLFN field metadata may identify a copyrighted work that is included as a component of the uploaded video.

5. These samples will be selected according to standard sampling procedures and may allow for the measurement of trends over time. For instance, the 90-day sample can be spread throughout the class period, covering each month in the year, and also be spread over the week to see if some days are more active than others. Once that sample is defined, the 30-day sample should be selected from the 90-day sample. I expect to develop a sample methodology following the Court's Order of August 30, 2022; I will provide Plaintiffs' attorneys with samples of 90 and 30 days as directed by the Court in its order.

6. Once I receive data from the sampled days for each of the samples, I will develop a methodology to estimate the size of the classes and class-wide damages. This is a necessary last step to complete my class-wide damages calculation tasks.

7. This report summarizes analyses I have conducted thus far and the conclusions I have developed based on the materials I have received. The materials on which I relied for purposes of this report are listed in Exhibit 3. A summary of my opinions is included in Section II.

CONFIDENTIAL

8.   I reserve the right to supplement this Report and to modify my methodology and opinions as needed, including following receipt and analysis of the data Defendants have been ordered to produce.

## II.  <u>Summary of Opinions</u>

9.   I conclude that I am able to develop a methodology to identify the members of, and calculate damages owed to, each of the classes described above.

10.  For the Registered Works Class, I will identify members of the class by cross-referencing Defendants' Takedown Data with the U.S. Copyright Registration database.  For members of the Registered Works Class that elect statutory damages, the damages calculation is simple: I would simply multiply the number of works in the Registered Works Class by the per-work statutory damages award.

11. For the Foreign Unregistered Works Class, I will identify members of the class by cross-referencing Defendants' Takedown Data with publicly-available sources and databases that contain publication and ownership information on millions of foreign works.   To determine damages for the Foreign Unregistered Works Class and members of the Registered Works Class who do not elect statutory damages, I have developed a three-step methodology to calculate direct advertising revenues attributable to the infringement of their works.[4]  First, based on Defendants' data and publicly-available databases, I will compile a list of infringing URLs that I will attribute to specific copyrighted works owned by specific members of the Class by filtering the Takedown Data. Second, for each copyrighted work, I will total the advertising revenues earned by

---

[4] I understand that members of Foreign Unregistered Works Class and members of the Registered Works Class that do not elect statutory damages may also be entitled to indirect profits.  A method to calculate indirect profits is outside of the scope of this report.

CONFIDENTIAL

Defendants for all infringing videos containing that work, as evidenced in successful takedown notices, excluding the revenues from the first infringing video that was the subject of a successful DMCA takedown. Third, for each Class member, I will total the advertising revenues earned by their works as calculated in Step 2.

12. For the ISRC Class, I will identify members of the class by cross-referencing Defendants' Takedown Data with publicly-available databases that include ISRC codes by work and copyright owner.  For each member of the ISRC class, I will then determine the number of violations that qualify for a statutory award by totaling, from the Takedown Data, the number of infringing videos uploaded to YouTube for each of the ISRC code works. The damages calculation for the ISRC Class is straightforward: I would simply multiply the number of violations in the ISRC Class by the per-violation statutory damages award.

13. For the CLFN Class, I will identify members of the class by cross-referencing the CMI Data first with the Takedown Data and then with publicly-available databases. My methodology will identify the number of violations by totaling, for each CLFN class member, the number of videos from which YouTube removed their CMI in the form of a CLFN field that identified their copyrighted work. The damages calculation for the CLFN Class is straightforward: I would simply multiply the number of violations in the CLFN Class by the per-violation statutory damages award.

14. Further, I will develop a methodology to estimate, from the 90 and 30 day samples provided:  the size of each Class, the total damages for the Copyright Infringement Class, the total number of possible statutory violations for the Registered Works Class, and the total number of possible statutory violations for the ISRC Class and CLFN Class based on standard sampling methodologies.

CONFIDENTIAL

15. Each of the methodologies described in this Report can be refined if additional documents and information are obtained, including during the claims administration process.

### III. Professional Qualifications and Compensation

16. I have over fifty years of experience in statistical research and design.  I received my Bachelor of Arts degree in Economics from the University of Michigan, my Master of Arts degree in Economics from the University of Michigan, and my doctorate in Mathematical Statistics from the George Washington University.  I currently consult for numerous public and private sector entities on the design, implementation, and evaluation of research, and the synthesis of statistical and sampling techniques for measurement.  My professional experience and academic tenure are included in my curriculum vitae, a true and correct copy of which is attached as Exhibit 1.

### A.  Professional Experience

17. I have designed numerous large and complex research programs.  These include the Post Enumeration Program for the U.S. Census Bureau to evaluate the Decennial Census, the Economic Cash Recovery valuations conducted by the Resolution Trust Corporation ("RTC"), and evaluation studies conducted for the Department of Justice, the Department of Defense, and the Department of the Treasury.

18. From January 2002 to the present, I have been a Member of Analytic Focus LLC.  My firm provides analytic services in the public and private sectors.  My firm has multiple projects with the federal government involving audits and other review services.  The firm helps businesses and nonprofits optimize their operations and estimate the economic impact of their activities.  Included in the firm offerings are expert witness and consulting services in litigation.  A list of cases in which I have given expert testimony during the previous four years is attached as Exhibit 2.

CONFIDENTIAL

### B. Experience in Academia

19. I have taught graduate and undergraduate courses in sampling theory, statistics, and computational methods for analysis.

20. I served as a Visiting Research Professor at the Survey Research Laboratory of the University of Illinois from 1983 to 1989, and as an Associate Professor of Statistics at George Washington University from 1993 to 1998. I was on the faculty of the School of Public Health at the University of Alabama at Birmingham from 2002 to approximately 2017. I had the title of Professor at the time of my retirement.

### C. Publications

21. I have co-authored two books: one on evaluation of survey and census methods, and one on econometric measures related to the welfare of the U.S. economy. I also have written numerous articles on statistical methods, sampling, rare and elusive population research, and optimization techniques. A listing of these publications is included at pages 4 to 7 of my curriculum vitae, attached as Exhibit 1.

### D. Professional Societies

22. I am a member of the American Statistical Association and have held memberships in other professional societies. My positions on professional committees are listed at page 3 of my curriculum vitae, attached as Exhibit 1.

### E. Compensation

23. My firm is being compensated for my work on this engagement at the rate of $975 per hour for my time. The payment of these fees is not contingent on the opinions I express in connection with this engagement.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## IV. Documents and Databases Relevant to My Analysis

### A. The YouTube DMCA takedown and counter-notification process.

24.  Defendants take the position that YouTube provides a set of tools intended to protect copyrighted work that is aligned with a DMCA (Digital Millennium Copyright Act) notice-and-takedown system.  "There are three main tools that make up our Copyright Management Suite: the webform, Copyright Match, and Content ID."[5, 6]  "Movie studios, service providers, and other publishers that have heavy reposting of copyrighted content"[7] are the users of the most efficient, thorough, and automated copyright tool that YouTube offers: Content ID.  For the vast majority of its users, however, including the Plaintiffs, YouTube offers "the public webform where rightsholders or their representatives search YouTube and manually file a takedown request for content that potentially infringes their copyright."[8]

25. For ordinary copyright holders, the takedown process begins with claimants searching YouTube for videos that include unauthorized copies of their copyright-protected work.  Once users find infringing videos, they manually submit a copyright takedown request, called a DMCA Takedown Notice.

26. To submit a DMCA Takedown Notice, YouTube requires that the copyright owner or their authorized agent provide certain information about the infringing video through an online webform.[9]  In the first step of the webform, the claimant must select the type of work, the title of the work, and include the URL(s) of the infringing video(s).

---

[5] GOOG-SCHNDR-00041492 "YouTube Copyright Transparency Report H1 2021."
[6] By July 1st, 2018, Google had five copyright tools: Webform, Email, Content Verification Program (CVP), Content ID, and Copyright Match Tool.  However, the Copyright Match Tool was launched in April 2018, while the CVP was to be deprecated on July 16th, 2018.  See GOOG-SCHNDR-00038941.
[7] GOOG-SCHNDR-00041492 "YouTube Copyright Transparency Report H1 2021."
[8] GOOG-SCHNDR-00041492, at -493 "YouTube Copyright Transparency Report H1 2021."
[9] https://support.google.com/youtube/answer/2807622?hl=en

CONFIDENTIAL



27. Next, the claimant must provide certain identifying information, such as the name of the copyright owner, country, phone number, email address, and street address.



CONFIDENTIAL

28. In the third step, the claimant can select the type of removal requested: a Scheduled removal or a Standard removal.  If the claimant selects the "Scheduled" removal option, "[o]nce the request is validated, YouTube gives the uploader 7 days to remove the video and avoid a copyright strike. If they don't the video is removed after 7 days."  If the claimant selects the Standard removal option, "YouTube process the video after validating the request."



29. In the fourth and final step, the claimant must attest to several things: (i) that they have a good faith belief that the use of the material in the video(s) at issue is not authorized by the copyright owner, its agent, or the law; (ii) that the information submitted is accurate; (iii) that, under penalty of perjury, the claimant is the copyright owner or an agent authorized to act on behalf of the owner; and (iv) that they understand that abuse of the webform tool may result in termination of their YouTube account.  The claimant must also submit an electronic signature that contains their full legal name as stated on a government-issued ID.

CONFIDENTIAL

---

**4. Legal agreements**

☐ I have a good faith belief that the use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

☐ The information in this notification is accurate, and under penalty of perjury, I am the owner, or an agent authorized to act on behalf of the owner, of an exclusive right that is allegedly infringed.

☐ I understand that abuse of this tool, such as submitting removal requests for content I do not own, may result in termination of my YouTube account.

Signature (required)

ⓘ Make sure your signature contains your full legal name, which is usually your first and last name as stated on a government-issued ID. YouTube won't be able to process your request without this info.

---

30. YouTube assesses the adequacy of the DMCA Takedown Notice for each video URL listed in the request and, if all of the required information is provided, and the Takedown Notice is approved, the video is removed from the platform.[10]

31. Subsequently, YouTube notifies the channel-user who uploaded the infringing video that it has been removed.  The person who uploaded the infringing video may contest the removal by filing a counter-notification.

32. YouTube reviews submitted counter-notifications "for completeness and to ensure they have a clear explanation for why the uploader believes they have all necessary rights for the removed video.  If we [YouTube] accept the counter notification, a copy of the notice is sent to the claimant who requested removal of the video(s).  After receiving a counter notification, the

---

[10] In the Copyright Transparency Report, YouTube states: "We have a team dedicated to processing copyright removal requests, and when necessary, we request additional information or deny the request altogether." (GOOG-SCHNDR-00041492, at -498 "YouTube Copyright Transparency Report H1 2021.").  YouTube's review team also assess whether DMCA Takedown Notices are "abusive," which YouTube explains is a DMCA Takedown Notice "assessed by our review team as a likely false assertion of copyright ownership." (GOOG-SCHNDR-00052970, at -975 "YouTube Copyright Transparency Report H2 2021.")

CONFIDENTIAL

claimant has 10 business days to provide evidence they've initiated a court action to keep the content down, otherwise, we [YouTube] will reinstate the content."[11]

### B. Defendants' Databases and Documents

33. I understand that Defendants store information submitted via DMCA Takedown Notices and information submitted via counter-notifications in various databases that they maintain in the regular course of business based on sample tables[12] and schema[13] produced in this litigation. I further understand that Defendants are able to query these databases to generate a more tailored report, such as information for DMCA Takedown Notices submitted on a certain day.[14]

34. I have reviewed sample data and schema produced by Defendants in the litigation, as listed in Exhibit 3. Based on my review of that data, and of the data compiled by YouTube from the DMCA Takedown webform, I have formulated methodologies as described in this report that will allow me to identify members of the Class described above. Where necessary, I rely on reasonable assumptions or inferences that I made based on my understanding of the data, schema files, and documents produced by Defendants.

### C. The U.S. Copyright Registration Database

35. The Registered Works Class only includes persons whose works were registered with the U.S. Copyright Office. The U.S. Copyright Office houses information on all registrations since January 1, 1978, in a database that it makes available for purchase and download. The U.S. Copyright Office also has a publicly-available "Copyright Public Records Portal" where one can search for copyright information for works from pre- and post-1978.[15]

---

[11] GOOG-SCHNDR-00041500 "YouTube Copyright Transparency Report H1 2021."
[12] GOOG-SCHNDR-00043865, -866, -867, -868.
[13] GOOG-SCHNDR-00043855, -856, -859, -862.
[14] Gallo White letter to O'Keefe of July 15, 2022, p. 2.
[15] "Search Copyright Records: Copyright Public Records Portal," https://www.copyright.gov/public-records/

CONFIDENTIAL

    D. **Publicly-available databases and sources**

36. The Foreign Unregistered Works class only includes works that were first published outside of the United States.  The ISRC Class only includes works that have an associated ISRC code.

37. There are multiple publicly-available sources that contain metadata and other information on millions of works relevant to determining membership of the Foreign Unregistered Works class and the ISRC Class.  Among other examples, publicly-available sources include the Mechanical Licensing Collective ("MLC"), SoundExchange, Spotify, Rovi Data Service, MusicBrainz, Entertainment Identifier Registry Association ("EIDR"), and the Internet Movie Database ("IMDb").

38. According to its website, "[t]he Mechanical Licensing Collective (The MLC) is a nonprofit organization designated by the U.S. Copyright Office pursuant to the historic Music Modernization Act of 2018…. The MLC has built a publicly accessible musical works database, as well as The MLC Portal that creators and music publishers can use to submit and maintain their musical works data. These tools will help ensure that creators and music publishers are paid properly."[16]

39. SoundExchange states that it is "designated by the U.S. government to administer the Section 114 sound recording license" and that it "collects and distributes digital performance royalties on behalf of 570,000 music creators and growing."[17]  SoundExchange also offers a

---

[16] "The MLC: Frequently Asked Questions," https://www.themlc.com/faqs/categories/mlc
[17] "Sound Exchange: Who We Are," https://www.soundexchange.com/who-we-are/#about-us

CONFIDENTIAL

publicly-available ISRC Search feature on its website.[18]    I understand from counsel that SoundExchange was used in at least one other copyright class action to identify class members.[19]

40.    Spotify is a popular streaming service with millions of musical works on its platform.[20] Spotify offers an API (Application Programming Interface) that allows users to query metadata for the works on Spotify.  According to its website, "the Spotify Web API endpoints return JSON metadata about music artists, albums, and tracks, directly from the Spotify Data Catalogue."[21]

41. Rovi Data Service's website states it is "one of the world's largest, continuously updated collections of entertainment information."[22]  Rovi offers an API that allows a user to "locate[] the songs, albums, movies, people, and TV shows a user is looking for[.]"[23]

42. MusicBrainz "collects music metadata and makes it available to the public."[24]  It offers an extensive database of musical works that are compiled by "volunteers and verified by peer review to ensure it is consistent and correct."[25]  Among other things, MusicBrainz's database contains information on release date by country.

43. EIDR is a "not-for-profit industry association that was founded by MovieLabs, CableLabs, Comcast and TiVo to meet a crucial need across the entertainment supply chain for universal identifiers for a broad array of audio visual objects."[26]  EIDR states the following about its database, the EIDR Registry: "The Registry receives and processes registration requests from

---

[18] "SoundExchange ISRC Search," https://isrc.soundexchange.com/#!/search
[19] *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 13-5693 PSG (RZX), 2015 WL 4776932, at *7-8 (C.D. Cal. May 27, 2015).
[20] "Spotify: About Us," https://www.spotify.com/us/about-us/contact/
[21] "Spotify for Developers: Web API," https://developer.spotify.com/documentation/web-api/
[22] "Rovi: Rovi Data," http://prod-doc.rovicorp.com/mashery/index.php/Rovi-Data
[23] "Rovi: Rovi Search," http://prod-doc.rovicorp.com/mashery/index.php/Rovi-Search/APIs/TV-Movies-Music
[24] "MusicBrainz," https://musicbrainz.org/
[25] "MetaBrainz," https://metabrainz.org/
[26] "What is EIDR?," https://www.eidr.org/about-us/

CONFIDENTIAL

registrants. Users and applications can look-up and search the Registry. Registrants and lookup users can use the web user interface or web services API to interact with the Registry…. EIDR uses a sophisticated deduplication system to insure that the object submitted to the Registry has not already been registered while allowing the registration of similar and related objects. The centralized registry structure guarantees the uniqueness of objects being registered. If no duplicate object exists, the Registry generates an EIDR for the object and stores the new EIDR and the corresponding metadata in the Registry."[27] The EIDR database contains information on release date and country of origin, among other fields.

44. According the IMDb website, "Launched online in 1990 and a subsidiary of Amazon.com since 1998, IMDb is the world's most popular and authoritative source for movie, TV and celebrity content, designed to help fans explore the world of movies and shows and decide what to watch. Our searchable database includes millions of movies, TV and entertainment programs and cast and crew members."[28]  The IMDb database contains information on release date and country of origin, among other fields.

## V.  Methodology to Identify Members of the Copyright Infringement Class

### A.  Methodology Common to Registered Works Class and Unregistered Works Class

45. Utilizing the Takedown Data to be produced by Defendants, I will first narrow the dataset by excluding entries in five steps:

---

[27] "What is EIDR?," https://www.eidr.org/about-us/
[28] "What is IMDb?," https://help.imdb.com/article/imdb/general-information/what-is-imdb/G836CY29Z4SGNMK5?ref_=helpart_nav_1#

CONFIDENTIAL

   a.  First, I would exclude any DMCA Takedown Notices submitted before July 2, 2017, which I understand to be the relevant period for damages.

   b.  Second, I would exclude any DMCA Takedown Notices that were rejected by YouTube.

   c.  Third, I would exclude any DMCA Takedown Notices submitted via Content ID.

   d.  Fourth, I would exclude any DMCA Takedown Notices where a valid counter-notification was submitted and the video was reinstated.

   e.  Fifth and finally, I would filter the list by claimant, copyright owner, and copyrighted work. I would exclude any Takedown Notice that was the sole Takedown Notice for a given copyrighted work submitted by a given copyright claimant or on behalf of a given copyright owner.

46. At this point, my dataset would only include works that may qualify for one of the Copyright Infringement Classes. That is, these works were (i) displayed on YouTube without permission (as evidenced by the first DMCA Takedown Notice); (ii) removed from YouTube as the result of a Webform or Freeform takedown notice submitted to YouTube on or after July 2, 2017; and (iii) subsequently displayed on YouTube following the successful takedown notice (as evidenced by the second DMCA Takedown Notice).

47. I propose below separate methodologies to determine which of the works identified in Paragraph 46 qualify for the Registered Works Class and Foreign Unregistered Works class, respectively.

   **B.  Methodology Specific to Registered Works Class**

48. In order to verify that a video specified in a DMCA Takedown Notice is infringing upon a claimant's registered copyright, one must first verify that the work being claimed has a registered

CONFIDENTIAL

copyright with the U.S. Copyright Office.  In this section I present a method to perform this task, which I developed assuming that I will develop from the Takedown Data (i) a list that includes the names of each copyright owner in the putative class and the titles of works corresponding to each of them, and (ii) the U.S. Copyright Office registration database which is available for purchase and download.

49. I would perform this validation by cross-referencing the claimed work with the U.S. Copyright Office database.  This matching process can be performed in bulk, by utilizing an archive of the U.S. Copyright Office registration database to perform SQL queries, and record linkage algorithms to match a claimed work of art to a registered copyright at scale.

50. The first step in performing this validation would be to review and clean the dataset that contains the required fields from claimant's works that are in question.  These required fields will include the title of the work as well as the claimant's name as registered with the U.S. Copyright Office.  I would perform standard data-cleaning operations including validating that fields are populated, validating data is structured correctly, as well as standardizing names and titles where applicable.  Some of the data standardization steps would include techniques such as standardizing abbreviations and punctuation in applicable fields, standardizing or removing initial articles such as "A", "An", and "The", as well as standardizing spacing and other grammatical abnormalities.  Once this dataset cleaning has been completed the dataset would be imported into a database to perform the matching process.

51. The next step in the matching process would be to import the U.S. Copyright Office copyright registration database.  This dataset will include copyright registration data for all works registered since 1978.  The relevant fields from the copyright database which I would review for matching include:

CONFIDENTIAL

   a.  Type of Work: The registered type for the work (Ex: Sound Recording, Music, Motion Picture)
   b.  Title: Registered title of the copyrighted work
   c.  Copyright Claimant: The claimant of the registered copyright
   d.  Content: This field may include further details on the work, such as individual songs within a musical album.
   e.  Registration Number / Date: Copyright registration number and date of registration

52. These fields would be imported into a database for analysis and matching.  This process would also include standard data structure review and data cleaning methods necessary to eliminate any outliers in the data or other data abnormalities which may interfere with the quality of the dataset or matching process.

53. After importing both datasets into a common database and structure, one may then begin the process of matching claimant's works of art with their corresponding copyright registration information.  The goal of this matching process is to assess each individual work and provide its copyright registration number and date.  This matching process would use custom SQL queries to perform these comparisons across both datasets, along with record-linkage algorithms to determine the accuracy of these matches as well as reduce the number of false positives.

54. The matching process would begin by searching for copyrighted works registered to the specific claimant.  This claimant could be an individual or entity.  The claimant's name will be the first filter in determining whether a match is found.  I will use algorithms developed to check for matches for possible variations of this name to determine whether the claimant has registered works in the U.S. Copyright Office database.

55. Once the works registered by the claimant have been identified, I will search the relevant U.S. Copyright Office fields, including "Title" and "Content", for the work that has been identified

CONFIDENTIAL

by the plaintiff as being infringed. If this work is found within the subset of registered works for the claimant, the details for the matching copyright registration will be assigned to the work and this registered copyright will be considered a match.

56. I understand that given the possible non-uniformity of the datasets in question, there would be instances where both false-positive and false-negative matches may occur. The matching process will include quality control processes in which a random sample of both matches and non-matches will be taken and manually reviewed to improve and validate the matching process. During this process, I will examine the rate of false-positive and false-negative matches found between the defendant dataset and the Copyright Database to implement improvements in the matching algorithm as well as calculate a final error-rate to demonstrate the accuracy of the data matching process.

57. The dataset from the U.S. Copyright Office is comprised of copyright registration from 1978 to present. I will only be able to perform this automated matching process on items that have been registered in that timeframe.

58. Due to the nature of the datasets at hand, I am only able to perform this matching process using the text titles and names provided. In instances where the provided title or copyright owner name are ambiguous, such as a description of a movie scene, picture, etc., an accurate match back to a registered copyright would depend on the title and name given in the dataset matching its description and details registered at the U.S. Copyright Office.

### C. Methodology Specific to Foreign Unregistered Works Class

59. To identify members of the Foreign Unregistered Works Class, I will first exclude the members of the Registered Works Class.

CONFIDENTIAL

60. I understand from counsel that for a foreign work to qualify for copyright protection, it must have been first released outside of the United States.  To determine where a work was first released, I will cross-reference the data set with publicly-available sources and databases that publish information on release date and country.

61. While there is no single repository of foreign unregistered works, there are multiple publicly-available sources that contain data on millions of foreign unregistered works, including MLC, SoundExchange, Spotify, Rovi, MusicBrainz, EIDR, IMDb, and others.  These publicly-available databases and sources are discussed in greater detail in Section IV.D. above.  These sources provide, among other things, information on the copyright owner, the name of the copyrighted work, release date, and country of origin for millions of works.

62. Based on these publicly-available databases, I can (i) exclude works that were first released in the United States, (ii) exclude works that were released simultaneously in the United States and elsewhere, and (iii) only include works that were first released outside of the United States.[29]

63. Following this process, the dataset will only include works that qualify for the Foreign Unregistered Works Class.

## VI. Methodology to Determine Damages for Copyright Infringement Class

64. Damages for members of the Copyright Infringement Class will be a combination of: (i) statutory damages for members of the Registered Works Class that elect statutory damages; and

---

[29] I understand from counsel that members of the Foreign Unregistered Works Class could be asked to verify certain information demonstrating their entitlement to copyright protection during the claims administration process.

CONFIDENTIAL

(ii) direct ad revenues for members of the Foreign Unregistered Works Class and members of the Registered Works Class who do not elect statutory damages.[30]

### A. Statutory damages

65. For members of the Registered Works Class that elect statutory damages, I understand that class members are entitled to receive a per-work statutory damages award in the range of $750 to $30,000 per work.[31]  I further understand that an award of statutory damages may be decreased to $200 per work if the infringement was innocent or increased to $150,000 per work if the infringement was willful.[32]

66. I understand that the amount of statutory damages per work is an issue for the trier of fact and accordingly I offer no opinion on the proper amount of statutory damages per work.  Further, my current model assumes that an award of statutory damages can be made with respect to each individual Registered Work.  If the Court holds otherwise as a matter of law, I will revise my calculations accordingly.  Finally, I offer no opinion on whether Defendants' copyright infringement was innocent or willful.

67. Once the amount of statutory damages per work is determined, it will be a simple calculation to determine the total amount of statutory damages.  It can be calculated by multiplying the number of works in the Registered Works Class that elect statutory damages by the per-work statutory damages award.  As I mentioned in paragraph 6, I will develop a methodology that follows standard statistical procedures to estimate the size of the class once I receive the sampled database.

---

[30] I understand that members of Foreign Unregistered Works Class and members of the Registered Works Class that do not elect statutory damages may also be entitled to indirect profits.  Calculations of indirect profits are outside of the scope of this report.

[31] 17 U.S.C. § 504(c).

[32] 17 U.S.C. § 504(c).

CONFIDENTIAL

### B. Direct ad revenues

68. I understand that copyright owners that elect statutory damages are not entitled to actual damages or Defendants' profits.[33]  Accordingly, for purposes of determining direct ad revenue, I would exclude works of the Registered Works Class where the parties elect statutory damages.

69. I will obtain each Class member's direct revenues by summing up the revenues associated with each infringing URL for which a specific claimant or copyright owner has filed a successful takedown notice.

70. I will add up the revenues corresponding to each video URL across title-works claimed by copyright owners, then, I will obtain individuals' direct revenues by summing up the revenues associated to all title-works of a given class member in each Copyright Infringement Class.[34]  The sample class-wide direct revenues would be obtained by aggregating individuals' direct revenues.

## VII. Identification of the CMI Class

### A. CLFN Class

71. I understand Defendants will be providing CMI Data consisting of 30 sampled days including the populated CLFN metadata and the URL of the video. Based on sample data provided by Defendants, I understand that the CLFN data field is stored in individual files named PB files. These PB files contain metadata pertaining to technical information related to a video and one of the properties that may be contained within this PB file is the CLFN field. I will analyze this CLFN field by creating an automated script to process and sanitize these individual PB files to extract this CLFN field into a database than can then be used in my comparison process. Once this

---

[33] 17 U.S.C. § 504(c)(1).

[34] In the case that a given protected work has more than one owner, I would divide the revenues associated to the said protected work equally among the number of owners or the number of class members, or in a pro-rated manner if YouTube provides me with the information to do so—e.g., percentage of each URL video that includes the infringed work.  That is, for each protected work and owner(s), I would have the portion of the revenues allocated to its owner(s).

CONFIDENTIAL

database has been created, I will then perform a data cleaning process on both the CLFN title names as well as the name of the copyrighted work to minimize inaccuracies or false positives due to abbreviations, punctuation, and other abnormalities that would be expected when comparing text fields of this nature.

72. For URLs that appear with the Takedown Data, the contents of these populated CLFN fields will be compared to the name of the copyrighted work to identify instances in which the CLFN metadata identifying a copyrighted work was removed by YouTube during the upload process.

73. For URLs that do not appear within Takedown Data, I will cross-reference the CLFN metadata with the copyrighted works from publicly-available databases. I will then filter by copyrighted works and copyright owner.

74. I will utilize the resulting list of video URLs described to identify the CMI Class and determine the number of violations found for each class members' works. As I mentioned in paragraph 6, I will develop a methodology that follows standard statistical procedures to estimate the size of the class once I receive the sampled database.  The number of violations found can then be utilized by the jury in determining the number of statutory damages awards to be made.

**B.  ISRC Class**

75. For the ISRC Class, I will first cross-reference the copyrighted work infringed, takedown notice claimant, and copyright owner with publicly available databases containing ISRC codes to identify which infringing video URLs contained works that were distributed with ISRC codes. I will then screen by ISRC code owner to identify the ISRC Class. I will then compile, for each member of the ISRC Class the number of infringing videos uploaded that contained their ISRC Code identified works. This will reflect the number of violations. As I mentioned in paragraph 6,

CONFIDENTIAL

I will develop a methodology that follows standard statistical procedures to estimate the size of the class once I receive the sampled database. The number of violations found can then be utilized by the jury in determining the amount of statutory damages to be awarded.

### C.  Damages for CMI Class

76. I understand that for the CMI Class, the range of damages will be $2,500 to $25,000 per violation.[35]   I take no position on the proper amount of statutory damages per violation.

77.  Once the amount of statutory damages per violation is determined, it will be a simple calculation to determine the total amount of statutory damages.  It can be calculated by multiplying the number of violations by the per-violation statutory damages award.

September 1, 2022
San Antonio, TX

Charles D. Cowan, Ph.D.

---

[35] 17 USC 1203(c)(3)(B).

# CHARLES D. COWAN, Ph.D.

ANALYTIC FOCUS LLC



## KEY QUALIFICATIONS

Charles D. Cowan is Managing Partner of ANALYTIC FOCUS LLC.  Dr. Cowan has 40 years of experience in statistical research and design.  He consults for numerous public and private sector entities on the design, implementation, and evaluation of research and the synthesis of statistical and sampling techniques for measurement.

Dr. Cowan has designed some of the largest and most complex research programs conducted by the Federal Government, including the Post Enumeration Program conducted by the Bureau of the Census to evaluate the 1980 Decennial Census, the Economic Cash Recovery valuations conducted by the Resolution Trust Corporation in 1990-95, and many evaluation studies conducted for the Justice Department, the Department of Defense, the Department of Housing and Urban Development, and the Treasury Department.  He has provided expert advice to corporations and government agencies on the incorporation of complex research designs in demographic and economic measurement problems, including:

- Development of procedures used by the Resolution Trust Corporation and the FDIC for determination of the value of all assets held by the RTC\FDIC taken from failed banks and S&Ls.   Results from this research were used in quarterly reports to Congress on the loss to the American taxpayer that resulted from these failures.  These estimates of anticipated recoveries on assets were also used by the RTC and FDIC for financial reporting.

- Establishment of audit and sampling methods to determine the completeness and reliability of reporting and record systems.  These procedures were used to both expand and streamline bank examinations for safety and soundness and also compliance measurement for the FDIC.   These sampling techniques are applied in the audit of Federal agencies concerned with regulatory review of operations and systems, and related systems for banks, regulatory agencies, and law firms;

- Application of econometric and biometric procedures for measurement of credit risk in large portfolios of loans.  These models are frequently used for a variety of purposes within financial institutions, such as the pricing of loans, the management of customers long term, decision making on workouts for delinquent loans, and for establishment of economic and regulatory reserves.

**CHARLES D. COWAN**

(Page 2)

---

- Evaluation of research conducted for the Department of Defense, for the National Institutes of Health, and for the Department of Agriculture, each in response to Congressional inquiries on the validity of published results, and also for defendants in lawsuits involving evidence proffered by plaintiffs in furtherance of their suit.

- Model fitting and development of projection methods to measure the likelihood of loss or errors in recording in loans held by banks or put up for auction; measurement of the likelihood of fraud and/or noncompliance in systems, including bank holding companies, trading activities for brokers, and systems for compliance with health department and judicial requirements;

- Development of procedures used by the Bureau of the Census for apportionment of population for revenue sharing purposes and the estimation of the undercount in the Decennial Census of Population and Housing.  These procedures include application of capture-recapture methods to measure the size of the undercount in the decennial census, use of network sampling as an alternative measure for population size, and measurement of the reliability of data collected in the Census.

- Development of statistical methods to quantify the size of populations, including nomadic populations for the Census of Somalia, the undercount and overcount in the Census of Egypt, the number of missing children in Chicago, IL, and the number of homeless persons and families needing services in several large cities with transient populations.

Dr. Cowan teaches graduate and undergraduate courses in survey methods, statistics, and computer methods for analysis.  He is the co-author of two books, one on evaluation of survey and census methods and one on econometric measures related to the welfare of the U.S. economy.  He has written numerous articles on statistical methods, sampling, rare and elusive population research, and optimization techniques.

Prior to cofounding ANALYTIC FOCUS LLC, Dr. Cowan was a Director with ARPC and with Price Waterhouse, where he specialized in financial research and audit sampling.  From 1991 to 1996, Dr. Cowan was the Chief Statistician for the Resolution Trust Corporation and the Federal Deposit Insurance Corporation, where he designed research necessary to measure the loss from the Savings & Loan Crisis of the late 1980's.  Dr. Cowan also served as the Chief Statistician for the U.S. Department of Education, where he designed large-scale surveys of educational institutions to measure resource needs and availability, and for Opinion Research Corporation, where he designed predictive models of demand for automobile manufacturers, banks, and large horizontally diverse firms like GE and AT&T.  Dr. Cowan worked for the U.S. Bureau of the Census, where he was the Chief of the Survey Design Branch and developed many of the techniques in use today for the evaluation of coverage in surveys and censuses.

---

**CHARLES D. COWAN**

(Page 3)

---

## EDUCATION

Ph.D., Mathematical Statistics, The George Washington University, 1984
M.A., Economics, The University of Michigan, 1973
B.A., English and B.A., Economics, The University of Michigan, 1972

## PROFESSIONAL EXPERIENCE

Co-Founder, ANALYTIC FOCUS LLC, January, 2002 to present.
Director, ARPC, November, 1999 to December, 2001.
Director, PricewaterhouseCoopers LLP, January 1997 to November, 1999.
Chief Statistician, Federal Deposit Insurance Corporation / RTC, 1991 to 1996.
Chief Statistician, Opinion Research Corporation, 1989 to 1991.
Chief Statistician, National Center for Education Statistics, US Dept. of Education, 1986 to 1989.
Bureau of the Census: Assistant Division Chief, International Statistical Programs Center, 1984 to 1986; Staff Liaison for Statistical Litigation Support, 1983 to 1984; Chief, Survey Design Branch, Statistical Methods Division, 1978 to 1983; Acting Chief, Survey Analysis and Evaluation Branch, Demographic Surveys Division, 1976 to 1978; Office of the Chief, Statistical Research Division, 1975 to 1976
Survey Research Center, Oregon State University: Manager, 1974 to 1975
Institute for Social Research, U. of Michigan: Assistant Study Director, 1972 to 1974.

## PROFESSIONAL ASSOCIATIONS

Professor, Statistics, University of Alabama – Birmingham
Associate Professor, Statistics, George Washington University
Visiting Research Professor, Survey Research Laboratory, U. of Illinois

## PROFESSIONAL SOCIETIES – MEMBERSHIPS

American Statistical Association (ASA)

## PROFESSIONAL SOCIETIES - POSITIONS

President, Research Industry Coalition, 1999-2000
Council Member, Research Industry Coalition, Representative from ASA, 1995-2000
President, Washington/Baltimore Chapter of AAPOR, 1998
Program Chair, American Association for Public Opinion Research, 1991-1992
Program Chair, Section on Survey Research Methods, ASA, 1989-90
Secretary-Treasurer, AAPOR, 1985-1986
Associate Secretary-Treasurer, AAPOR, 1984-1985
Editorial Board, Public Opinion Quarterly, 1980-1984
Editorial Board, Marketing Research, 1989-2000
Chair, Conference Committee, AAPOR, 1982-1989
Chair, Committee on Privacy and Confidentiality, ASA, 1980-1981

---

**CHARLES D. COWAN**
(Page 4)

---

## PUBLICATIONS

Strumpel, Burkhard; Cowan, Charles; Juster, F. Thomas; and Schmiedeskamp, Jay; editors, <u>Surveys of Consumers 1972-73, Contributions to Behavioral Economics</u>, Ann Arbor: The Institute for Social Research, 1975.

Duncan, Greg, and Cowan, Charles D., "Labor Market Discrimination and Nonpecuniary Work Rewards" in <u>Surveys of Consumers 1972-73, Contributions to Behavioral Economics</u>, Ann Arbor: The Institute for Social Research, 1975.

Curtin, Richard T. and Cowan, Charles D. "Public Attitudes Toward Fiscal Progress" in <u>Surveys of Consumers 1972-73, Contributions to Behavioral Economics</u>, Ann Arbor: The Institute for Social Research, 1975.

Goldfield, Edwin D.; Turner, Anthony G.; Cowan, Charles D.; Scott, John C., "Privacy and Confidentiality as Factors in Survey Response" in <u>Public Data Use</u>, Vol. 6, No 4, July 1978.

Cowan, Charles D., and Spoeri, Randall K., "Statistical Distance Measures and Test Site Selection: Some Considerations", <u>Proceedings of the Computer Science and Statistics: Eleventh Annual Symposium on the Interface, 1978</u>.

Bushery, John R., Cowan, Charles D., and Murphy, Linda R., "Experiments in Telephone-Personal Visit Surveys", <u>Proceedings of the Amer. Stat. Assoc., Sect. on Survey Research Methods, 1978</u>.

Spoeri, Randall K., and Cowan, Charles D., "On the Use of Distance Measures in Test Site Selection: A Practical Application Using Census Data", <u>Proceedings of the American Statistical Association, Section on Business and Economic Statistics, 1978</u>.

Cowan, Charles D.; Murphy, Linda R.; Wiener, Judy, US Bureau of the Census, "Effects of Supplemental Questions on Victimization Estimates from the National Crime Survey" in <u>Proceedings of the</u> <u>American Statistical Association, Sect. on Survey Research Methods</u>, 1978.

Bateman, David V.; Cowan, Charles D., US Bureau of the Census, "Plans for the 1980 Census Coverage Evaluation" in <u>Proceedings of the American Statistical Association, Section on Survey Research Methods</u>, 1979.

Hogan, Howard, and Cowan, Charles D., "Imputations, Response Errors, and Matching in Dual System Estimation", <u>Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980</u>.

Schwartz, Sidney H., Cowan, Charles D., and Sausman, Kenneth R., "Optimization in the Design of a Large-Scale State Sample", <u>Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980</u>.

---

**CHARLES D. COWAN**

(Page 5)

Cowan, Charles D., "Modifications to Capture-Recapture Estimation in the Presence of Errors in the Data" presented at the meetings of the American Statistical Association, Biometrics Section, 1982 (no proceedings).

Fay, Robert; Cowan, Charles, US Bureau of the Census, "Missing Data Problems in Coverage Evaluation Studies" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1983.

Cowan, Charles D.; Fay, Robert E., "Estimates of Undercount in the 1980 Census" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1984.

Cowan, Charles D. "Interviews and Interviewing", The Social Science Encyclopedia, Routledge and Kegan Paul, Publishers, The Netherlands, 1984.

Wei, L. J. and Cowan, Charles D. "Selection Bias", Encyclopedia of Statistical Science, John Wiley and Sons, New York, N.Y., 1984.

Cowan, Charles D. and Malec, Donald J. "Capture-Recapture Models When Both Sources Have Clustered Observations", Journal of the American Statistical Association, June 1986, Vol. 81, # 394, pp. 347-353, and Proceedings of the American Statistical Association, Section on Survey Research Methods, 1984.

Cowan, Charles D., The Effects of Misclassification on Estimates from Capture-Recapture Studies. Unpublished doctoral dissertation, The George Washington University, September 1984.

Sudman, Seymour; Cowan, Charles D., "Questionnaire Design Activities in Government Statistics Offices" in Special Issue on Questionnaire Design, Jour. of Official Statistics, Vol. 1, No. 2, 1985.

Cowan, Charles D. "Misclassification of Categorical Data", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1985.

Cowan, Charles D., Biemer, Paul P., Magnani, Robert J., and Turner, Anthony G., Evaluating Censuses of Population and Housing, Statistical Training Document, ISP-TR-5, U.S. Department of Commerce, Bureau of the Census, 1985.

Cowan, Charles D., Turner, Anthony G., and Stanecki, Karen "Design of the Somali Post Enumeration Survey (1986-1987)", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986.

**CHARLES D. COWAN**

(Page 6)

---

Cowan, Charles D. and Malec, Donald J. "Sample Allocation for a Multistage, Multilevel, Multivariate Survey", <u>Proceedings of the Fourth Annual Research Conference (ARC IV)</u>, U.S. Bureau of the Census, 1988.

Frey, Carolin M., McMillen, Marilyn M., Cowan, Charles D., Horm, John W., and Kessler, Larry G.. "Representativeness of the Surveillance, Epidemiology, and End Results Program Data:  Recent Trends in Mortality Rates", <u>Journal of the National Cancer Institute</u>, Vol. 84, # 11, June 3, 1992.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless, A Review" in <u>Homelessness, Health, and Human Needs</u>.  Institute of Medicine, National Academy Press, National Academy of Sciences, Washington, D.C., 1988.

Cowan, Charles D., "Standards for Statistical Surveys in the Federal Government:  Practices in the Center for Education Statistics", <u>Proceedings of the American Statistical Association, Section on Survey Methods Research, 1988</u>.

Sudman, Seymour, Sirken, Monroe G., and Cowan, Charles D., "Sampling Rare and Elusive Populations", <u>Science</u>, Vol. 240, pp. 991-996, May 20, 1988.

Cowan, Charles D., "Mall Intercepts and Clinical Trials:  The Philosophy of Inference from Different Types of Research Designs" in <u>Marketing Research: A Magazine of Management & Applications</u>, Vol. 1, No. 1, March 1989.

Cowan, Charles D., "Mall Intercepts:  Principles of Design for Research" in <u>Proceedings of the Seventh Annual Advertising Research Foundation Research Quality Workshop</u>, Sept. 1989.

Cowan, Charles D., "Estimating Census and Survey Undercounts Through Multiple Service Contacts" in <u>Housing Policy Debate:  Counting the Homeless: The Methodologies, Policies, and Social Significance Behind the Numbers</u>, Volume 2, Issue 3, pp. 869-882, 1991.

Cowan, Charles D., "Ratio vs. Regression Estimators in a Large Scale Survey of S&L's" in <u>Proceedings of the Section on Survey Research Methods, American Statistical Assoc., 1992.</u>

Cowan, Charles D., "A Longitudinal Survey and Reality Check for the Value of Financial Assets" in <u>Proceedings of Statistics Canada Symposium 92: Design and Analysis of Longitudinal Surveys</u>, November 1992.

Cowan, Charles D., and Wittes, Janet, "Intercept Studies, Clinical Trials, and Cluster Experiments: To Whom Can We Extrapolate?" in <u>Controlled Clinical Trials</u>, Vol.15, pp.24-29, 1994.

---

**CHARLES D. COWAN**
(Page 7)

Cowan, Charles D.; Klena, Mathew J., Resolution Trust Corp, "Allocation of Proceeds from Bulk Auctions to Individual Assets" in <u>Proceedings of the American Statistical Association, Section on Business and Economic Statistics</u>, 1995.

Cowan, Charles D. "Statistical Sampling as a Management Tool in Banking" in <u>FDIC Banking Review</u>, 1997, Vol. 10, No. 1.

Cowan, Charles D., "Coverage, Sample Design, and Weighting in Three Federal Surveys" in <u>Journal of Drug Issues</u>, October 2001.

Cowan, Charles D., "Use of Mass Appraisals in Toxic Tort Litigation Involving Loss of Value" in <u>Proceedings of the International Association of Assessment Officers</u>, October 2002.

Cowan, Adrian M. and Cowan, Charles D., "Default Correlation:  An Empirical Investigation of a Subprime Lender", <u>The Journal of Banking and Finance</u>, March 2004.

Cowan, Charles D. and Cowan, Adrian M., "A Survey Based Assessment of Financial Institution Use of Credit Scoring for Small Business Lending", <u>SBA Report 283</u>, Nov. 2006

Keith, Scott W., Wang, Chenxi, Fontaine, Kevin R., Cowan, Charles D. and Allison, David B.  "Body Mass Index and Headache Among Women: Results From 11 Epidemiologic Datasets", <u>Obesity</u>, Volume 16, Issue 2 (February 2008) 16: 377-383; doi:10.1038/oby.2007.32

Cowan, Adrian M. and Cowan, Charles D., "The Dynamics of Credit Quality and Implications for the Pricing of Small Business Loans", <u>The International Journal of Banking and Finance</u>, 2007/08 (March) Vol. 5. Number 2:2008: 31-60

Brock, David W., Thomas, Olivia, Cowan, Charles D., Hunter, Gary R., Gaesser, Glenn A., and Allison, David B., "Association between Physical Inactivity and Prevalence of Obesity in the United States", <u>Journal of Physical Activity and Health</u>, January, 2009

Cowan, Adrian M. and Cowan, Charles D., Disparate Impact Analyses: Relevant Numbers, Relevant Populations (August 3, 2009). Available at SSRN: https://ssrn.com/abstract=1443560 or http://dx.doi.org/10.2139/ssrn.1443560

Cowan, Charles D., "Use of Statistical Analysis to Measure Damages", in <u>Comprehensive Guide to Economic Damages, Fourth Edition</u>, Business Valuation Resources, LLC, Portland, ME, April, 2016.  Revised and republished in Fifth Edition, 2018.  Revised and republished in Sixth Edition, 2021.

Cowan, Charles D., "Qui Custodiat Custodiens?", <u>International In-House Counsel Journal</u>, Cambridge, England, October 20, 2021.

**Exhibit 2: Past Testimony, Charles D. Cowan**

**Financial:**
MBIA v Credit Suisse. Worked for plaintiff.  Deposed in January 2016.  Trial in July 2019.

Christopher S. Porrino, Attorney General of New Jersey on behalf of Amy G. Kopleton, Deputy Chief of the New Jersey Bureau of Securities, v.  Credit Suisse Securities (USA) LLC, Credit Suisse First Boston Mortgage Securities Corp., and DLJ Mortgage Capital, Inc., Worked for plaintiff. Deposed in November 2018.

Federal Home Loan Bank of Boston v. Nomura; Federal Home Loan Bank of Boston v. Credit Suisse Securities (USA) LLC, Credit Suisse First Boston Mortgage Securities Corp., Worked for plaintiff. Deposed in January 2019, day 1, February 2019, day 2.

Financial Guaranty Insurance Company v. Morgan Stanley ABS Capital I Inc. and Morgan Stanley Mortgage Capital Holdings LLC, as successor to Morgan Stanley Mortgage Capital Inc., Worked for plaintiff.  Deposed in May 2019.

AMBAC Assurance Corporation et al v. First Franklin et al. Worked for plaintiff.  Deposed in December 2019.

FDIC v. First Horizon Asset Securities Et al. Worked for plaintiff. Deposed in April 2021.

AMBAC Assurance Corporation et al v. Nomura et al. Worked for plaintiff.  Deposed in May 2021.

**Financial - non RMBS**
Charles Baird and Lauren Slayton, as individuals, and on behalf of all others similarly situated, and on behalf of the BlackRock Retirement Savings Plan v. BlackRock Institutional Trust Company, N.A.; BlackRock, Inc.; The BlackRock, Inc. Retirement Committee; The Investment Committee of the Retirement Committee; The Administrative Committee of the Retirement Committee; The Management Development & Compensation Committee, Catherine Bolz, Chip Castille, Paige Dickow, Daniel A. Dunay, Jeffrey A. Smith; Anne Ackerley, Amy Engel, Nancy Everett, Joseph Feliciani Jr., Ann Marie Petach, Michael Fredericks, Corin Frost, Daniel Gamba, Kevin Holt, Chris Jones, Philippe Matsumoto, John Perlowski, Andy Phillips, Kurt Schansinger, Tom Skrobe; Kathleen Nedl, Marc Comerchero, Joel Davies, John Davis, Milan Lint, Laraine McKinnon, and Mercer Investment Consulting.  Worked for plaintiffs.  Deposed in May 2019.

**Disparate Impact \ Discrimination:**
River Cross Land Company, LLC v. Seminole County, FL.  Worked for plaintiff.  Deposition, Oct. 2019.

County of Cook v. Bank Of America Corporation.  Worked for plaintiff.  Deposition, February 2021.

County of Cook v. Wells Fargo Corporation.  Worked for plaintiff.  Deposition, November 2021.

**Other Cases:**

Pudlowski v. St. Louis Rams.  Worked for plaintiff.  Deposed in September 2017.  Deposed again in October 2018.

In Re: Dicamba Herbicides Litigation.  Worked for plaintiffs.  Deposition, March 2019.

Otter Products et al, v. Phone Rehab et al.   Worked for plaintiff.  Deposed in November 2019.

Thomas Allegra et al v. Luxottica Retail North America.  Worked for plaintiff.  Deposed Dec. 2019.

Westgate Resorts v. Reid Hein & Associates, dba Timeshare Exit Team.  Tortious Interference case.  Worked for plaintiffs.  Deposition, March 2020.

Donald Melosh, et al. v. Western Pacific Housing, Inc., JAMS Case No.: 1100091610, Construction Defects.  Worked for defense. Deposition, March 2020.

Charles Copley et al Bactolac Pharmaceutical, Inc. et al.  Worked for Plaintiffs, Deposed August 2020.

Mildred Clemmons et al v. Samsung Electronics of America, Inc.  Worked for plaintiffs. Deposed in October 2020.

Epic Tech, LLC v. Fusion Skill, Inc. et al.  Worked for defendant.  Deposition in Jan. 2021.

Jason R. Sheldon, Steven Hunsberger, et al. v. State Farm Mutual Automobile Insurance Company et al.  Worked for plaintiffs. Deposition in March 2021.

Office of the Attorney General, District of Columbia v. SCF Management, LLC and Jefferson 11th Street, LLC.  Worked for Plaintiff.  Deposition, April 2021.

Monster Energy Company v. Vital Pharmaceuticals, Inc. and John H. Owoc.  Worked for Plaintiff.  Deposition, June 2021.

In re:  Purdue Pharma et al, debtors.  Worked for West Virginia.  Deposition, July 2021. Hearing, August 2021.

District of Columbia v. Town Sports International, LLC. Worked for defendant.  Deposed in March 2022.

Brianna Arredondo et al. v. The University of La Verne.  Worked for plaintiffs.  Deposition, April 2022.

Nicholas Bergeron & Nick Quattrociocchi v. Rochester Institute of Technology.  Worked for plaintiffs.  Deposition, July 2022.

City of Seattle v. Monsanto Company, Solutia, Inc., Pharmacia Corp. et al. Worked for plaintiffs, Deposed, July 2022.

Jacob Healey, Larry Louis Hibbs, Jr., James Michael Jarvis, Jr., Allen Goodfleisch, Cynthia Dawn Yates, and Betty Melloan, v. Jefferson County, Kentucky, And Louisville Metro Government.  Worked for defendant.  Hearing, August 2022.

Grayson et al. v. Lockheed Martin Corporation.  Worked for plaintiffs, Deposed, August 2022.

In Re:  University of Miami COVID-19 Tuition and Fee Refund Litigation.  Worked for plaintiffs.  Deposition, August 2022.

**Exhibit 3: Materials Relied On**

<u>Documents</u>

- First Amended Class Action Complaint, dated November 17, 2021
- "You Tube Copyright Transparency Report H1 2021" (GOOG-SCHNDR-00041492-504)
- "You Tube Copyright Transparency Report H2 2021" (GOOG-SCHNDR-00052970-982)
- "How Google Fights Piracy" (GOOG-SCHNDR-00021221-284)
- "YouTube Landing: CVP Migration to CID FE" (GOOG-SCHNDR-00038941-945)
- 2022-07-15 Letter to Carol O'Keefe from Lauren Gallo White.pdf
- *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 13-5693 PSG (RZX), 2015 WL 4776932, at *7-8 (C.D. Cal. May 27, 2015)

<u>Data and data-related files provided by Defendants</u>

- GOOG-SCHNDR-00043855
- GOOG-SCHNDR-00043856
- GOOG-SCHNDR-00043859
- GOOG-SCHNDR-00043862
- GOOG-SCHNDR-00043865
- GOOG-SCHNDR-00043866
- GOOG-SCHNDR-00043867
- GOOG-SCHNDR-00043868
- All PB files that were produced by Defendants in this action

<u>Websites and Online Source of Information</u>

- https://support.google.com/youtube/answer/2807622?hl=en
- https://www.copyright.gov/public-records/
- https://www.themlc.com/faqs/categories/mlc
- https://www.soundexchange.com/who-we-are/#about-us
- https://isrc.soundexchange.com/#!/search
- https://www.spotify.com/us/about-us/contact/
- https://developer.spotify.com/documentation/web-api/

- http://prod-doc.rovicorp.com/mashery/index.php/Rovi-Data
- http://prod-doc.rovicorp.com/mashery/index.php/Rovi-Search/APIs/TV-Movies-Music
- https://musicbrainz.org/
- https://www.eidr.org/about-us/
- https://help.imdb.com/article/imdb/general-information/what-is-imdb/G836CY29Z4SGNMK5?ref_=helpart_nav_1#