Exhibit B

to the Declaration of Kelly M. Knoll ISO Defendants' Motion to Exclude Testimony from Charles D. Cowan and Hal J. Singer

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated;<br><br>    Plaintiffs,<br><br>vs.<br><br>YOUTUBE, LLC; and GOOGLE LLC;<br><br>    Defendants. | CASE NO. 3:20-CV-4423 |

---

## EXPERT REPORT OF CHARLES D. COWAN, Ph.D.

### November 17, 2022

---

# Table of Contents

I.   Introduction ....................................................................................................3

II.  Summary of Opinions ........................................................................................5

III. Professional Qualifications and Compensation ....................................................9

  A.  Professional Experience .................................................................................9

  B.  Experience in Academia ................................................................................9

  C.  Publications..................................................................................................10

  D.  Professional Societies ...................................................................................10

  E.  Compensation ..............................................................................................10

IV.  Class Definitions...............................................................................................10

  A.  The Copyright Infringement Classes ..............................................................10

  B.  The CMI Classes ..........................................................................................12

V.   Documents and Databases Relevant to My Analysis ...........................................13

  A.  The YouTube DMCA takedown and counter-notification process. ....................13

  B.  Defendants' Documents.................................................................................17

  C.  Sampled Takedown Data ...............................................................................18

  D.  U.S. Copyright Data ......................................................................................19

  E.  MusicBrainz..................................................................................................20

  F.  EIDR ...........................................................................................................20

  G.  IMDb ...........................................................................................................21

  H.  YouTube API.................................................................................................21

  I.  SoundExchange ...........................................................................................21

VI.  Deficiencies in the Sampled Takedown Notice Data Preclude a Reliable Estimation of the Size of the Classes and the Number of Works Associated to Each Class....................22

**A.    Finding Multiple Takedown Notices** .......................................................................**22**

**B.    Missing Data** ...........................................................................................................**24**

**C.    Impoverished Data** .................................................................................................**25**

**VII. Methodology** ............................................................................................................**28**

**A.    The Copyright Infringement Classes** ...................................................................**28**

**1.    Cleaning the Sampled Takedown Notice Data** ...................................................**29**

**2.    Identifying Works with Multiple Takedown Notices** .........................................**29**

**4.    Identifying Foreign Unregistered Works** ...........................................................**30**

**5.    Identifying the number of videos that qualify as Infringing Content for the
calculation of damages** ...................................................................................................**31**

**6.    Identify the number of unique works that qualify for a statutory award for
members of the Registered Works Infringement Class** .................................................**31**

**B.    The CMI Classes** ....................................................................................................**31**

**1.    Identifying Works with ISRC Codes** ..................................................................**32**

**2.    Quantifying the number of infringing URLs for which damages may be assessed
for the ISRC Class.** ........................................................................................................**32**

**3.    Identifying Works for the CLFN Class** ..............................................................**32**

**4.    Quantifying the number of URLs for which damages may be assessed for the
CLFN Class.** ..................................................................................................................**33**

CONFIDENTIAL

## I.  **Introduction**

1.      I have been retained by Boies Schiller Flexner LLP and Korein Tillery LLC, co-counsel for the proposed class in this action against YouTube, LLC ("YouTube") and Google LLC. I was asked to develop a reliable methodology to ascertain class members, determine the number of class members in each class, and determine the number of infringing videos or infringed works associated with each class.

2.      I understand that class members may belong to one or more of the following: the Registered Works Infringement Class, the Foreign Unregistered Works Infringement Class, the ISRC Class, and the CLFN Class ("the Classes"). The combination of the Registered Works Infringement Class and Foreign Unregistered Works Infringement Class is referred to as the Copyright Infringement Classes. The combination of the ISRC Class and CLFN Class is referred to as the CMI Classes.

3.      In order to qualify for one of the Copyright Infringement Classes, the work must meet the following requirements:   (i) it was displayed on YouTube without permission (as evidenced by the first DMCA Takedown Notice); (ii) it was removed from YouTube as the result of a DMCA Takedown Notice submitted to YouTube on or after July 2, 2017; and (iii) it was subsequently displayed on YouTube in a distinct video URL following the successful takedown notice (as evidenced by the second DMCA Takedown Notice).

4.      After meeting these requirements, works that correspond to works registered in the U.S. Copyright Office's data are considered part of the Registered Works Infringement Class. Other works that meet the requirements in the previous paragraph but are not part of the Registered Works Infringement Class and correspond to works released exclusively outside the U.S. or

CONFIDENTIAL

released outside the U.S. prior to a U.S. release are considered part of the Foreign Unregistered Works Infringement Class.

5.      I understand that works where the title of the work and the name of the copyright owner can be linked to an existing ISRC code will be considered part of the ISRC Class.

6.      I understand that works where Defendants had access to CLFN metadata for copyrighted works that also appeared in YouTube videos which used the copyrighted work without permission will be considered part of the CLFN Class.

7.      This report encompasses the following tasks: (1) present and test a methodology using data provided by Defendants and databases commonly used in the industry to identify members of the Classes; (2) build a model to calculate, using methods common to all members of the Copyright Infringement Classes, the number of videos that qualify as Infringing Content for the calculation of damages; (3) build a model to calculate the number of works owned by members of the Registered Works Infringement Class qualifying for statutory damages; and (4) build a model to calculate, using methods common to all members of the CMI Classes, the number of infringing URLs for which statutory damages may be assessed.

8.      At the Court's order, Defendants produced data for a sample of 90 days. Therefore, I received a sample of takedown data that included information about the copyright owner, the title of the work, the revenue from the allegedly infringing videos and any CLFN metadata from the infringing videos. For purposes of this report, I refer to the data provided by Defendants as the "Sampled Takedown Notice Data".

9.      Based on the Sampled Takedown Notice Data and the methodologies discussed herein, I conclude that there exists a reliable methodology to ascertain class members, determine

the number of class members in each class, determine the number of registered works for the Registered Works Infringing Class, and determine the number of infringing videos or removed-CMI videos associated with each class.

10.     Because of significant deficiencies in the Sampled Takedown Notice Data (discussed in further detail below), however, I am unable to calculate reliable estimates for these values. I conclude, however, that I can calculate such estimates if Defendants produce the entire requested takedown notice database.

11.     The materials on which I relied for purposes of this report are listed in Exhibit 3. A summary of my opinions is included in Section II. I reserve the right to supplement this Report and to modify my methodology and opinions as needed should new information become available in the case.

## II.  Summary of Opinions

12.     First, I developed and tested a methodology to identify members of each of the classes described above. I conclude that a formulaic methodology using common statistical methods can be applied to identify the members of each class.

      a.     For the Registered Works Infringement Class, I can identify members of the class by cross-referencing Defendants' Takedown Data with the U.S. Copyright Registration database.

      b.     For the Foreign Unregistered Infringing Works Class, I can identify members of the class by cross-referencing Defendants' Takedown Data with publicly available sources and databases that contain publication and ownership information on

CONFIDENTIAL

millions of foreign works, including MusicBrainz, EIDR, and IMDb, as described later in this report.

c.      For the ISRC Class, I can identify members of the class by cross-referencing Defendants' Takedown Data with publicly available databases that include ISRC codes by work and copyright owner.

d.      For the CLFN Class, I can identify a subset of the members of the class by cross-referencing the CMI Data first with the Takedown Data. This subset of the class consists of class members who initiated the takedown of infringing videos even after Defendants should have acted based upon the CMI Defendants had received.[1]

13.     Second, for each Class, I developed and tested a methodology to identify and quantify the number of infringing video URLs that qualify for an award of either actual or statutory damages.  I conclude that a formulaic methodology using common statistical methods can be applied to identify and quantify the number of infringing video URLs that qualify for an award of either actual or statutory damages.

a.      For each member of the Copyright Infringement Classes, I can identify the number of videos that qualify as Infringing Content for the calculation of damages.

b.      For members of the Registered Works Infringement Class that elect statutory damages, I can identify the number of works that qualify for statutory damages. This will provide the information required for a simple statutory damages calculation: the

---

[1] If provided with additional CLFN data, I could expand my estimation of class members and the number of uploaded videos qualifying for damages.  It is not necessary that copyrighted works and their owners have filed a takedown notice to be part of this class.  However, I was only provided CLFN data for videos that were the subject of takedown notices in the Sampled Takedown Notice Data. Given the artificial constraints of that dataset, my estimate would likely understate the number of class members and the number of video URLs qualifying for damages.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

jury can simply multiply the number of works in the Registered Works Infringement Class by the per-work statutory damages award the jury deems just, within the statutory range.[2]

      c.      For each member of the ISRC class, I can determine the number of violations that qualify for a statutory award by totaling, from the Takedown Data, the number of infringing videos uploaded to YouTube for each of the ISRC code works. The damages calculation for the ISRC Class is straightforward: the jury would simply multiply the number of violations in the ISRC Class by the per-violation statutory damages award the jury deems just, within the statutory range.

      d.      For each CLFN class member, my methodology can identify the number of violations by totaling the number of videos from which YouTube removed their CMI in the form of a CLFN field that identified their copyrighted work.  The damages calculation for the CLFN Class is straightforward: the jury would simply multiply the number of violations in the CLFN Class by the per-violation statutory damages award the jury deems just, within the statutory range.

14.    Third, I tested each of the methodologies herein utilizing the Takedown Notice Sample Data and concluded that the methodologies are sound and can be applied uniformly across all the classes. However, based on that testing, I further concluded that the Takedown Notice Sample Data in its current form does not permit a robust estimation of the values sought.

      a.      The deficiencies in the data fields provided, including the elimination of the copyright_complaint_id field, and the simplification from UNIX time to a simple date in

---

[2] 17 U.S.C. § 504(c).

CONFIDENTIAL

the date created field prevent the identification of discrete takedown notices as required to apply the Copyright Infringement Classes definitions.

b. The omission of the country of origin and type of work infringed fields severely compromise the identification of the Foreign Unregistered Works Class and the ISRC Class.

c. The provision of CLFN metadata only for video URLs subjected to takedown notices on the sampled dates instead of all videos uploaded on those dates truncates the data and precludes accurate identification of the CLFN class.

d. The requirement of two takedown notices as part of the definition for the Copyright Infringement Classes renders any sampling methodology problematic because there is no discernible pattern to the frequency or timing of subsequent takedown notices for a given work. Thus, the use of sampling will prevent identification of a significant number of the members of the Copyright Infringement Classes.

15. While the data included in the Sampled Takedown Notice Data does not permit a robust estimation of the values sought, each of the values sought can be determined if the additional fields cited herein and the entirety of the takedown notice data are provided. Defendants possess all of the data required to identify and quantify the number of class members in each class and determine the number of infringing videos or infringed works associated with each class. Each of the methodologies described in this Report can be refined if additional documents and information are obtained, including during the claims administration process.

CONFIDENTIAL

### III. Professional Qualifications and Compensation

16.     I have over fifty years of experience in statistical research and design.  I received a Bachelor of Arts degree in Economics from the University of Michigan, my Master of Arts degree in Economics from the University of Michigan, and my doctorate in Mathematical Statistics from the George Washington University.  I currently consult for numerous public and private sector entities on the design, implementation, and evaluation of research, and the synthesis of statistical and sampling techniques for measurement.  My professional experience and academic tenure are included in my curriculum vitae, a true and correct copy of which is attached as Exhibit 1.

#### A.  Professional Experience

17.     I have designed numerous large and complex research programs.  These include the Post Enumeration Program for the U.S. Census Bureau to evaluate the Decennial Census, the Economic Cash Recovery valuations conducted by the Resolution Trust Corporation ("RTC"), and evaluation studies conducted for the Department of Justice, the Department of Defense, and the Department of the Treasury.

18.     From January 2002 to the present, I have been a Member of Analytic Focus LLC.  My firm provides analytic services in the public and private sectors.  My firm has multiple projects with the federal government involving audits and other review services.  The firm helps businesses and nonprofits optimize their operations and estimate the economic impact of their activities.  Included in the firm offerings are expert witness and consulting services in litigation.  A list of cases in which I have given expert testimony during the past four years is attached as Exhibit 2.

#### B.  Experience in Academia

19.     I have taught graduate and undergraduate courses in sampling theory, statistics, and computational methods for analysis.

CONFIDENTIAL

20.     I served as a Visiting Research Professor at the Survey Research Laboratory of the University of Illinois from 1983 to 1989, and as an Associate Professor of Statistics at George Washington University from 1993 to 1998.  I was on the faculty of the School of Public Health at the University of Alabama at Birmingham from 2002 to approximately 2017.  I had the title of Professor at the time of my retirement.

### C.  Publications

21.     I have co-authored two books: one on evaluation of survey and census methods, and one on econometric measures related to the welfare of the U.S. economy.  I also have written numerous articles on statistical methods, sampling, rare and elusive population research, and optimization techniques.   A listing of these publications is included at pages 4 to 7 of my curriculum vitae, attached as Exhibit 1.

### D.  Professional Societies

22.     I am a member of the American Statistical Association and have held memberships in other professional societies.  My positions on professional committees are listed at page 3 of my curriculum vitae, attached as Exhibit 1.

### E.  Compensation

23.     My firm is being compensated for my work on this engagement at the rate of $975 per hour for my time.  The payment of these fees is not contingent on the opinions I express in connection with this engagement.

## IV. Class Definitions

### A.  The Copyright Infringement Classes

24.     I understand the Copyright Infringement Classes consist of two classes: the Registered Works Infringement Class and the Foreign Unregistered Works Infringement Class.

CONFIDENTIAL

25.     The Registered Works Infringement Class is defined to include: All persons who own copyrights in one or more works: 1) registered with the United States Copyright Office; 2) contained in a video that was displayed on YouTube and then removed from YouTube due to a successful Takedown Notice; and 3) contained in a video that was displayed on YouTube subsequent to the first successful Takedown Notice and then removed from YouTube due to a second successful Takedown Notice that was submitted on or after July 2, 2017.

26.     The Foreign Unregistered Works Infringement Class is defined to include: All persons who own copyrights in one or more works: 1) first published outside the United States; 2) contained in a video that was displayed on YouTube and then removed from YouTube due to a successful Takedown Notice; and 3) contained in a video that was displayed on YouTube subsequent to the first successful Takedown Notice and then removed from YouTube due to a second successful Takedown Notice that was submitted on or after July 2, 2017.

27.     Thus, in order to qualify for either of the Registered Works Infringement Class or the Foreign Unregistered Works Infringement Class it is required that the work was (i) displayed on YouTube without permission (as evidenced by the first DMCA Takedown Notice); (ii) removed from YouTube as the result of a Webform or Freeform takedown notice submitted to YouTube on or after July 2, 2017; and (iii) subsequently displayed on YouTube in a different video URL following the successful takedown notice (as evidenced by the second DMCA Takedown Notice).

28.     After meeting this requirement, works that correspond to works registered in the U.S. Copyright Office's data are considered part of the Registered Works Infringement Class. Other works that meet the requirement in the previous paragraph but are not part of the Registered Works Infringement Class and correspond to works released exclusively outside the U.S. or

CONFIDENTIAL

released outside the U.S. prior to a U.S. release are considered part of the Foreign Unregistered Works Class.

### B. **The CMI Classes**

29.     I understand the CMI Classes consist of two classes: the International Standard Recording Code Class ("ISRC Class") and the Clip Filename Class ("CLFN Class").

30.     The ISRC Class is defined to include: All persons who own copyrights in one or more digital form sound recordings of musical works that: 1) contained an ISRC code; 2) were a component of a video that was displayed on YouTube and then removed from YouTube due to a successful Takedown Notice; and 3) on or after July 2, 2017, were displayed on YouTube with respect to a video that included such sound recordings of musical works without including or referencing the associated ISRC code.

31.     Hence, I understand that works where the title of the work and the name of the copyright owner can be linked to an existing ISRC code will be considered part of the ISRC Class.

32.     The CLFN Class is defined to include: All persons who own copyrights in one or more works: 1) contained in a video that was displayed on YouTube and then removed from YouTube due to a successful Takedown Notice;  2) on or after July 2, 2017, contained in a video uploaded to YouTube that had an associated Clip Filename ("CLFN") field populated with copyright management information; and 3) displayed on YouTube with respect to a video that included such work(s) without including or referencing the associated CLFN or with the copyright management information altered.

33.     Hence, I understand that works where Defendants had access to CLFN metadata for copyrighted works that also appeared in YouTube videos which used the copyrighted work without permission will be considered part of the CLFN Class.

## V. Documents and Databases Relevant to My Analysis

### A. The YouTube DMCA takedown and counter-notification process.

34.     Defendants take the position that YouTube provides a set of tools intended to protect copyrighted work that is aligned with a DMCA (Digital Millennium Copyright Act) notice-and-takedown system.  "There are three main tools that make up our Copyright Management Suite: the webform, Copyright Match, and Content ID."[3, 4]  "Movie studios, service providers, and other publishers that have heavy reposting of copyrighted content"[5] are the users of the most efficient, thorough, and automated copyright tool that YouTube offers: Content ID.  For the vast majority of its users, however, including the Plaintiffs, YouTube offers "the public webform where rightsholders or their representatives search YouTube and manually file a takedown request for content that potentially infringes their copyright."[6]

35.     For ordinary copyright holders, the takedown process begins with claimants searching YouTube for videos that include unauthorized copies of their copyright-protected work.  Once users find infringing videos, they manually submit a copyright takedown request, called a DMCA Takedown Notice.

---

[3] GOOG-SCHNDR-00041492 "YouTube Copyright Transparency Report H1 2021."
[4] By July 1, 2018, Google had five copyright tools: Webform, Email, Content Verification Program (CVP), Content ID, and Copyright Match Tool.  However, the Copyright Match Tool was launched in April 2018, while the CVP was to be deprecated on July 16, 2018.  See GOOG-SCHNDR-00038941.
[5] GOOG-SCHNDR-00041492 "YouTube Copyright Transparency Report H1 2021."
[6] GOOG-SCHNDR-00041492 "YouTube Copyright Transparency Report H1 2021."

36.     To submit a DMCA Takedown Notice, YouTube requires that the copyright owner or their authorized agent provide certain information about the infringing video through an online webform.[7]  In the first step of the webform, the claimant must select the type of work, the title of the work, and include the URL(s) of the infringing video(s).



37.     Next, the claimant must provide certain identifying information, such as the name of the copyright owner, country, phone number, email address, and street address.

---

[7] https://support.google.com/youtube/answer/2807622?hl=en.



38.     In the third step, the claimant can select the type of removal requested: a Scheduled removal or a Standard removal.  If the claimant selects the "Scheduled" removal option, "[o]nce the request is validated, YouTube gives the uploader 7 days to remove the video and avoid a copyright strike. If they don't the video is removed after 7 days."  If the claimant selects the Standard removal option, "YouTube processes the video removal after validating the request."



39.     In the fourth and final step, the claimant must attest to several things: (i) that they have a good faith belief that the use of the material in the video(s) at issue is not authorized by the

CONFIDENTIAL

copyright owner, its agent, or the law; (ii) that the information submitted is accurate; (iii) that, under penalty of perjury, the claimant is the copyright owner or an agent authorized to act on behalf of the owner; and (iv) that they understand that abuse of the webform tool may result in termination of their YouTube account.  The claimant must also submit an electronic signature that contains their full legal name as stated on a government-issued ID.



40.     YouTube assesses the adequacy of the DMCA Takedown Notice for each video URL listed in the request and, if all of the required information is provided, and the Takedown Notice is approved, the video is removed from the platform.[8]

41.     Subsequently, YouTube notifies the channel-user who uploaded the infringing video that it has been removed.  The person who uploaded the infringing video may contest the removal by filing a counter-notification.

---

[8] In the Copyright Transparency Report, YouTube states: "We have a team dedicated to processing copyright removal requests, and when necessary, we request additional information or deny the request altogether."  (GOOG-SCHNDR-00041492, at -498 ("YouTube Copyright Transparency Report H1 2021.").  YouTube's review team also assesses whether DMCA Takedown Notices are "abusive," which YouTube explains is a DMCA Takedown Notice "assessed by our review team as a likely false assertion of copyright ownership."  (GOOG-SCHNDR-00052970, at -975 "YouTube Copyright Transparency Report H2 2021.")

42.     YouTube reviews submitted counter-notifications "for completeness and to ensure they have a clear explanation for why the uploader believes they have all necessary rights for the removed video.  If we [YouTube] accept the counter notification, a copy of the notice is sent to the claimant who requested removal of the video(s).  After receiving a counter notification, the claimant has 10 business days to provide evidence they've initiated a court action to keep the content down, otherwise, we [YouTube] will reinstate the content."[9]

### B.  Defendants' Documents

43.     I understand that Defendants store information submitted via DMCA Takedown Notices and information submitted via counter-notifications in various databases that they maintain in the regular course of business based on sample tables and schema produced in this litigation.[10]  I further understand that Defendants are able to query these databases to generate a more tailored report, such as information for DMCA Takedown Notices submitted on a certain day.[11]

44.     I have reviewed sample data and schema produced by Defendants in the litigation, as listed in Exhibit 3. Based on my review of that data, and of the data compiled by YouTube from the DMCA Takedown webform, I formulated methodologies as described in this report that will allow me to identify members of the Classes described above.  Where necessary, I rely on reasonable assumptions or inferences that I made based on my understanding of the data, schema files, and documents produced by Defendants.

---

[9] GOOG-SCHNDR-00041500 "YouTube Copyright Transparency Report H1 2021."
[10] GOOG-SCHNDR-00043865, GOOG-SCHNDR-00043866, GOOG-SCHNDR-00043867, GOOG-SCHNDR-00043868, GOOG-SCHNDR-00043855, GOOG-SCHNDR-00043856, GOOG-SCHNDR-00043859, GOOG-SCHNDR-00043862.
[11] Gallo White letter to O'Keefe of July 15, 2022, p. 2.

### C. Sampled Takedown Data

45.     The Court ordered Defendants to produce a 90-day sample of the data. Defendants provided three files containing information on takedown notices and the associated videos. The data received was only for takedown notices associated with takedowns received through channels other than YouTube's Content ID system.[12]

46.     The first file contained takedown notice data, including the following fields: "date_of_notice",  "name_of_claimant",  "name_of_copyright_owner", "title_of_copyrighted_work",  "removed_video_url",  and  "counternotification_received?".[13] There is one record for every infringing video included in each takedown notice. This file contained 1,789,656 records.

47.     Elements for the data structure are not always clearly defined. When this occurs, I must rely on reasonable assumptions to apply the structure to the data. I identify Copyright Owners using the values in the "name_of_copyright_owner" field. I identify Works using the combination of values in the "title_of_copyrighted_work" and Copyright Owners. Finally, I identify Notices using the combination of values in the "date_of_notice" field and Works. I understand that the Defendants have more accurate ways to capture unique notices from my review of the data schema. For example, I understand they have both complaint IDs as well as timestamps that memorialize in UNIX format when a particular complaint was submitted.[14] However, Defendants have not produced this information. It is likely that some Copyright Owners submitted multiple complaints on the same date. Therefore, any count of unique complaints from the Sample Data is understated.

---

[12] Gallo White letter to O'Keefe of October 7, 2022, p.1.
[13] Takedown Notice Data_HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.csv, Total Ad Revenue Data_HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.csv, CLFN Metadata_HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.csv.
[14] GOOG-SCHNDR-00043856.

However, with the appropriate data (e.g., complaint ID or timestamp included in the original data sample), I could correctly identify unique complaints.

48.     The second file contained revenue data for the videos which appear in the takedown notice data file.[15] This file contained two fields: "video_url" and "total_revenue_usd". I understand values in the field "total_revenue_usd" to represent the total advertising revenue associated with each removed URL.[16] This file contained 1,783,269 records.

49.     The third file "includes all metadata contained in any clfn field for the entire 90-day sample of allegedly infringing videos to the extent that metadata exists in a readily accessible database."[17] This file contained two fields: "vid" and "clfn".[18] This file contained 649 records.

50.     I combine these three data fields using their respective video identifiers. I refer to the combined data in this report as the Sampled Takedown Notice Data.

### D.  U.S. Copyright Data

51.     The U.S. Copyright Office houses information on all registrations since January 1, 1978, in a database that is available for purchase. We have purchased this database and can use the U.S. Copyright data to qualify works for the Registered Works Class and provide proof as to the date of registration.

---

[15] Total Ad Revenue Data_HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.csv
[16] Gallo White letter to O'Keefe of October 7, 2022, p.1.
[17] Gallo White letter to O'Keefe of October 7, 2022, p.5 (internal quotes omitted). The file is named CLFN Metadata_HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.csv.
[18] I note that the clfn field contains encoding errors that make it difficult to match to other databases that were encoded appropriately.

E. **MusicBrainz**

52.    MusicBrainz is a service that collects music metadata from around the world and makes it available to the public. It offers an extensive database of musical works that are compiled by "volunteers and verified by peer review to ensure it is consistent and correct."[19]  This metadata is made available via their website at musicbrainz.org, where you can search their music database for many points of data including artist details, album release details, track recording details, and many other pieces of data for millions of works of art. MusicBrainz also offers this entire database for download under open licensing. Among other things, MusicBrainz's database contains information on release date by country.

F. **EIDR**

53.    EIDR is a "not-for-profit industry association that was founded by MovieLabs, CableLabs, Comcast and TiVo to meet a crucial need across the entertainment supply chain for universal identifiers for a broad array of audio-visual objects."[20] EIDR states the following about its database, the EIDR Registry: "The Registry receives and processes registration requests from registrants. Users and applications can look-up and search the Registry. Registrants and lookup users can use the web user interface or web services API to interact with the Registry…. EIDR uses a sophisticated deduplication system to [ensure] that the object submitted to the Registry has not already been registered while allowing the registration of similar and related objects. The centralized registry structure guarantees the uniqueness of objects being registered. If no duplicate object exists, the Registry generates an EIDR for the object and stores the new EIDR and the

---

[19] https://metabrainz.org/.

[20] "What is EIDR?," https://www.eidr.org/about-us/.

CONFIDENTIAL

corresponding metadata in the Registry."[21] The EIDR database contains information on release date and country of origin, among other fields.

### G. IMDb

54.     According to the IMDb website, "Launched online in 1990 and a subsidiary of Amazon.com since 1998, IMDb is the world's most popular and authoritative source for movie, TV and celebrity content, designed to help fans explore the world of movies and shows and decide what to watch. Our searchable database includes millions of movies, TV and entertainment programs and cast and crew members."[22] The IMDb database contains information on release date and country of origin, among other fields.

### H. YouTube API

55.     Google provides public access to the YouTube Data API which allows users to retrieve different data resources from the YouTube platform.[23] I used the YouTube Data API to retrieve information about specific YouTube videos to clean and supplement the data provided by Defendants.

### I. SoundExchange

56.     SoundExchange states that it is "designated by the U.S. government to administer the Section 114 sound recording license" and that it "collects and distributes digital performance royalties on behalf of 570,000 music creators and growing."[24]   SoundExchange also offers a publicly available ISRC Search feature on its website.[25]   I understand from counsel that

---

[21] "What is EIDR?," https://www.eidr.org/about-us/.
[22] "What is IMDb?," https://help.imdb.com/article/imdb/general-information/what-isimdb/G836CY29Z4SGNMK5?ref_=helpart_nav_1#.
[23] https://developers.google.com/youtube/v3/docs/videos/list.
[24] https://www.soundexchange.com/who-we-are/#about-us.
[25] https://isrc.soundexchange.com/#!/search.

SoundExchange was used in at least one other copyright class action to identify class members.[26] I used SoundExchange to determine if Works have associated ISRC codes.

## VI. Deficiencies in the Sampled Takedown Notice Data Preclude a Reliable Estimation of the Size of the Classes and the Number of Works Associated to Each Class.

57.     There are multiple issues that make the task of estimating the number of owners and the number of works posted on YouTube very difficult.  I conclude that the problems are so onerous that, despite my best efforts, some problems could not be overcome, given the existing data and information.  The issues I face fall into three major categories:

    a.     The near mathematical impossibility of finding multiple takedown notices for a work in a 90-day sample;

    b.     Missing data, and in particular a very noticeable discontinuity in the number of takedown notices for the latter half of 2018;

    c.     Impoverished data that doesn't permit realistic matching to third party data sources.

58.     I address these here to give a sense of how the limitations on the data impacted the task of developing reliable estimates.

### A.  Finding Multiple Takedown Notices

59.     It is nearly impossible to find multiple takedown notices in a sample of 90 days, no matter how carefully the sample is designed.  If there is only one takedown notice, there's only a 4.9% chance (90/1,826) of that takedown notice appearing in the sample.  When dealing with a requirement for multiple takedown notices, finding the multiple takedown notices becomes a near

---

[26] *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 13-5693 PSG (RZX), 2015 WL 4776932, at *7-8 (C.D. Cal. May 27, 2015).

mathematical impossibility.  With a probability of only 4.9% of observing a particular takedown notice, the probabilities become infinitesimal when I move to two, three, four and so on for finding takedown notices.

60.     If two takedown notices result from a particular work, then there is a 90.4% chance of not observing either of the takedown notices, a 9.4% chance of only observing only one of the two takedown notices, and only a 0.2% chance (2 in one thousand) of observing both in the sample.

61.     While one would expect that an increasing number of takedown notices would help the investigation, the truth is that for 3 takedown notices, there is only a 0.7% chance of observing either two or three takedown notices out of the 3.  For four, there is only a 1.3% chance of observing 2 takedown notices, and virtually no chance of observing 3 or 4 takedown notices.  This trend continues – even with 10 takedown notices, in the sample of 90 out of 1,826 days has only a 7.3% chance of observing 2, and a 1.0% chance of observing 3.

62.     When observing 1 takedown notice in the sample, unmatched with any other takedown notice, there is no way to know whether the takedown notice is actually the 2nd (3rd, 4th, …) notice because of earlier notices.  When observing 1 takedown notice in the sample, if it is the first takedown notice (which we don't know), we don't know if there is a 2nd (3rd, 4th, …) notice that follows because the probabilities of observing multiple takedown notices are so tiny.

63.     Traditional sampling theory is not equipped to deal with this problem.  More advanced areas of probability theory, such as latent structure theory, need more information to be able to be put into practice.  Even if the data were perfect, I have concluded that there would be no reliable way to estimate the number of class members and works associated to each class when one has only 90 days sampled out of 1,826 days in the investigation period.

64.    The limited sample size combined with the requirement of two takedown notices to qualify for the Copyright Infringement Classes precludes a reliable estimate of the size of the classes. Because there is no discernible pattern in the timing of filing successive takedown notices, I cannot devise a methodology to reliably estimate the increased incidence of the two takedown notice requirement being met over the entire takedown notice database. However, if I were to receive the entirety of the takedown notice database, the sizes of the Copyright Infringement Classes could be accurately determined based on the data matching and cross-referencing methodologies set forth herein.

## B.  Missing Data

65.    Unfortunately, the data produced is far from perfect.  It is severely flawed in two ways.

66.    First, there is an inexplicable dip in the data in the latter half of 2018, which would have a ripple effect on matching from records we didn't receive to later records.  If the first one that should be there is not present, then there is nothing to match.  The previous paragraphs in this section noted that it is already difficult to find 2 or more takedown notices when multiple takedown notices are submitted.  It becomes mathematically impossible to match later records when some of the earlier records expected aren't there.

67.    The downturn or dip in the number of takedown notices may be a legitimate downturn, but there seems to be no reason for a dip at that time in the notices received by YouTube. Further, it is inconsistent with a clear trend of increasing takedown notices being submitted.  I can only conclude that some records are missing that cause an artificial understatement of multiplicity in takedown notices.  The problem caused by the missing records is compounded by the two takedown notice requirement, as described above.

68.     I am informed by counsel that Defendants may have destroyed some unquantified number of successful takedown notices.  Absent quantification of the extent of the destruction, I am again unable to estimate the size of the Registered Works Infringement Class and the Foreign Unregistered Works Infringement Class.

69.     The data I did receive is rife with missing information, such as blanks in the title of the work.  While Defendants may have received a form with missing information, this doesn't mean that Defendants didn't find and store this data subsequently while executing the takedown notice on a URL.  There are misspellings, illegible entries, and other such problems that would make it impossible to match one takedown notice with another.  Two such flawed takedown notices might be found and compared, but not matched, meaning that I wouldn't know that the takedown notices were for the same work.  I would believe that they were separate takedown notices for two different works, causing me to grossly underestimate the class size for either the Registered Works Infringement Class or the Foreign Unregistered Works Infringement Class.

## C.  Impoverished Data

70.     The takedown notices, reproduced in this report and required by YouTube, capture much more information on the notices than has been shared with me for the records we did receive.  Location of the submission, the time of the submission, the copyright complaint ID, and other variables clearly captured on the form or included within Defendants' databases[27] are not included in the production.

71.     This lack of fulsome production introduces two problems.  One is that different notices for the same work may be difficult to match since more information is needed to ensure

---

[27] GOOG-SCHNDR-00043867.

that the two notices are for the same work.  Again, this leads to an underestimate of the number of works with 2+ takedown notices – it makes it seem that there are two different works since the other information needed to find or confirm a match hasn't been produced.

72.     The lack of some of this key information, as well as the lack of production of the cleaned fields mentioned in the previous section, impedes my ability to link a takedown notice to a listing for that work in the United States Copyright Office registry of copyrights.  The same is true for matching a takedown notice to a listing of a work on MusicBrainz, EIDR, or IMDb. Moreover, it makes it more difficult to automate the comparison of millions of records in the sample to the millions of records on the Copyright database or the millions of records on MusicBrainz, EIDR, or IMDb.  Automation of processes requires consistency of inputs.

73.     The resolution to all of these problems is to compel production of the full data base and all relevant and necessary fields.  Not making this data available to Plaintiffs undercuts any effort to get to the truth of the number of infringing notices.

74.     There are also deficiencies in the Sampled Takedown Notice Data fields that have precluded me from producing reliable estimates. The absence of any means of identifying discrete takedown notices would require me to assume that all takedown notice entries filed by a given claimant on a single day were included in a single takedown notice. Had I been provided either the copyright_complaint_id field, or the create_time field in UNIX format, as included in the original sample data,[28] I could have identified the URLs challenged in discrete takedown notices.

75.     The failure to include the claimant country of origin field would require me to perform a far more blunt screening analysis aimed at identifying members and works included in

---

[28] GOOG-SCHNDR-00043865.

the Foreign Unregistered Infringing Works Class. The failure to include the dropdown field that identifies the type of work infringed hindered identification of the ISRC Class and the Foreign Unregistered Works Infringement Class because those classes are identified using databases keyed to the type of work.

76.     Most or all of these challenges could be rectified if I were to receive the entirety of the takedown notice database. With access to the complete dataset, cross-referencing and matching would be smooth and complete, estimation errors would not come into play, and sizes of the Infringement Classes could be accurately determined based on the data matching and cross-referencing methodologies set forth herein.

77.     Finally, the failure to include CLFN data for all videos uploaded on a sample date, instead limiting that data to videos for which takedown notices were filed on a sample date, artificially reduces the size of the CLFN Class to an unfathomable degree. While a bit over 6 thousand takedowns were filed daily on average, based on the Sampled Takedown Notice Data, I understand that hundreds of thousands or millions of videos may be uploaded to YouTube on any given day.[29]  Thus, the data produced does not allow me to provide a reliable estimate of the size of the CLFN class.

78.     Despite these deficiencies, I was able to use the Sampled Takedown Notice Data to evaluate and consider the methodologies herein.  The methodologies are effective and will be completely effective when applied to a complete database.

---

[29]  YouTube states that "More than 500 hours of content are uploaded to YouTube every minute[.]" https://blog.youtube/press/.  This works out to 720,000 hours of content uploaded to YouTube each day.

## VII.   Methodology

### A. The Copyright Infringement Classes

79.     Utilizing Defendants' Takedown Data, I can narrow the dataset by excluding entries in four steps:

      a.      First, I would exclude any DMCA Takedown Notices that were rejected by YouTube.

      b.      Second, I would exclude any DMCA Takedown Notices submitted via Content ID.

      c.      Third, I would exclude any DMCA Takedown Notices where a valid counter-notification was submitted, and the video was reinstated.

      d.      Fourth and finally, I would filter the list by claimant, copyright owner, and copyrighted work. I would exclude any Takedown Notice that was the sole Takedown Notice for a given copyrighted work submitted by a given copyright claimant or on behalf of a given copyright owner.

80.     At this point, my dataset would only include works that may qualify for one of the Copyright Infringement Classes.  All works that qualify for damages for the Registered Works Infringement Class must (a) be registered with the U.S. Copyright Office; and (b) must have been the subject of a successful takedown notice filed with YouTube on at least two occasions, with at least one notice filed on or after July 2, 2017, resulting in removal of the video from the platform. Works that qualify for the Foreign Unregistered Works Infringement Class are those that (a) did not qualify for the U.S. Registered Class; (b) were released outside of the U.S. only or released first outside of the U.S.; and (c) must have been the subject of a successful takedown notice filed

CONFIDENTIAL

with YouTube on at least two occasions, with at least one notice filed on or after July 2, 2017, resulting in removal of the video from the platform.[30]

### 1. Cleaning the Sampled Takedown Notice Data

81.     As previously discussed, videos initially identified in takedown notices can be reinstated through the counter-notification process.  I was provided with takedown data without clear information as to whether those takedowns were successful – meaning they resulted in the video being permanently taken down from the YouTube platform. Thus, as a first step, I can eliminate from the population takedown data where the infringing videos appear to remain active on the YouTube platform.  I can accomplish this by using information from the YouTube Data API.

82.     I also can remove any records where the title of the copyrighted work was blank or only contained a single hyphen. These records cannot be reliably matched to the U.S. Copyright data using only the copyright owner name.

83.     Based on the remaining data, I defined unique works as I described earlier, by combining the title of the copyrighted work and the copyright owner.

### 2. Identifying Works with Multiple Takedown Notices

84.     The initial operation I conducted was determining which records had more than one takedown notice in the sample data. This created two categories. The first was for works observed only once; the second was for works observed two or more times.

### 3. Matching Works to U.S. Copyright Data

---

[30] I understand from counsel that members of the Foreign Unregistered Works Class could be asked to verify certain information demonstrating their entitlement to copyright protection during the claims administration process.

85.     I am able to use the Copyright Data to search for potential matches to all identified unique works. In some instances, where information on owner or artist is evident, I can run two queries:  one for artist and title, and another for owner and title.  Following this process, I can match and identify works that qualify for the Registered Works Infringement Class.

### 4.   Identifying Foreign Unregistered Works

86.     To determine foreign works, I search for works not previously found to match the Copyright Data. I then match these works to a dataset I created that contains works released exclusively outside the U.S. or released outside the U.S. prior to a U.S. release. I created this dataset from information obtained from MusicBrainz.  I also tested the potential use of EIDR and IMDb.  I describe the construction of this dataset in more detail in Appendix 1.

87.     To determine potential matches, I created a full-text search vector of the dataset which allowed me to quickly query and select potential matches. My analysis and identification of the Foreign Unregistered Works Class would be aided by additional fields such as claimant country of origin and type of copyrighted work.

88.     Defendants constrained their production by omitting fields that had been included in the schema and data samples that I relied upon in producing my original report, such as claimant country of origin and type of copyrighted work.  The claimant country of origin field would allow me to isolate works that are likely members of the foreign unregistered works class.  The type of copyrighted work would enable me to know what type of work is at issue and accordingly which database should be assessed (e.g., MusicBrainz for musical works and IMDB for motion pictures). To the extent Defendants later produce such data, I reserve the right to supplement my report accordingly.

**5. Identifying the number of videos that qualify as Infringing Content for the calculation of damages.**

89.     For each member of the Copyright Infringement Classes, I can identify the number of videos that qualify as Infringing Content for the calculation of damages.

90.     I am informed that while a takedown notice filed prior to July 2, 2017 can provide notice of infringement and hence can be considered in identifying the CI Classes, such notices cannot provide a basis for awarding damages.  Hence, to calculate the number of unique URLs that constitute Infringing Content, I would total only the second and subsequent takedown notices filed after on or after July 2, 2017.

**6. Identify the number of unique works that qualify for a statutory award for members of the Registered Works Infringement Class.**

91.     I understand that statutory damages awarded to the Registered Works Infringement Class are limited to a single statutory award for each registered work. Since I identify the Registered Works Infringement Class through a matching of the Copyright Register Data with discrete Work and Claimant combinations, I can total for each Claimant the number of discrete Works that qualify for a statutory award, and I can total for the class, the total number of discrete registered works that would qualify for a statutory award.

**B. The CMI Classes**

92.     I understand that works where the title of the work and the name of the copyright owner can be linked to an existing ISRC code will be considered part of the ISRC Class.  I understand that works where Defendants had access to CLFN metadata containing CMI for copyrighted works that also appeared in YouTube videos which used the copyrighted work without permission will be considered part of the CLFN Class.

### 1. Identifying Works with ISRC Codes

93.     To determine works that have at least one ISRC code, I tested the search for works using the search tool on the SoundExchange website. For each work I can query the copyright owner name (or the artist's name) and the title of the copyrighted work. From the top 100 results presented by the SoundExchange search tool, I choose, if available, a single ISRC code where the both the artist's name (or copyright owner) and the title match.

94.     I note in many instances there are multiple unique ISRC codes that are associated with similar titles and artists. This is because multiple versions of the same work may exist. For example, a live recording and a studio recording of the same copyrighted musical work may have two distinct ISRC codes. I cannot determine which version(s) were infringed upon from the takedown data.

### 2. Quantifying the number of infringing URLs for which damages may be assessed for the ISRC Class.

95.     For each work that has an identified ISRC code, I can tally the number of takedown notices reflecting the same artist's name (or copyright owner) and title match. I can then total, for the ISRC Class, the number of infringing URLs for which statutory damages may be assessed.

### 3. Identifying Works for the CLFN Class

96.     I was provided CLFN metadata for 649 videos. This represents only 0.04% of all the videos in the Sampled Takedown Notice Data.  From this set, 137 were removed from the Sampled Takedown Data through the cleaning process. For the remaining 512 videos, using all the CLFN metadata provided by Defendants for the Sampled Takedown Notice Data, I compared the CLFN data from the infringing videos to the title and name of the copyright owner from the Sampled Takedown Data. I determined a violation occurred when either (a) the name of the

CONFIDENTIAL

copyright owner was completely included in the CLFN metadata or (b) the title was completely included in the CLFN metadata.

97.     I was only provided with CLFN data associated with videos in the Sampled Takedown Notice Data. Utilizing this methodology, however, I can identify other infringing videos which have not been yet subject to the takedown notice. In order to do this, I would need CLFN data for videos beyond those already taken down from the YouTube platform.

### 4.   Quantifying the number of URLs for which damages may be assessed for the CLFN Class.

98.     For the CLFN Class, each match of CMI metadata contained in the CLFN field represents a URL for which statutory damages may be assessed. I can then total, for the CLFN Class, the number of infringing URLs for which statutory damages may be assessed.

November 17, 2022
San Antonio, TX

_____
Charles D. Cowan, Ph.D.

**Appendix 1: Foreign Works Data Processing**

I used MusicBrainz to determine which works from the Sampled Takedown Notice Data were either 1) Released in a foreign country prior to being released in the United States or 2) Released in a foreign country but were never released in the United States. I determined this using album release date information in the MusicBrainz database that is grouped by country. I used this album release data to create a subset of the MusicBrainz database that contains the album title, album release date, artist, and song title for all releases that met these two criteria.

To create this subset of the MusicBrainz database, I had to first determine whether a release was released in a foreign country prior to being released in the U.S. The MusicBrainz database contains multiple iterations of releases. What would be called an album is segmented into multiple types of releases. For instance, that album may have been released once on vinyl, once as a deluxe edition CD, and once as a 10th anniversary edition re-master.

I did not have enough data in the Sampled Takedown Data to determine which edition or version of a work of art may have violated copyright. To simplify this, I created a dataset that retrieved the release dates and countries for each track contained on each release, and deduplicated the dataset using a combination of the name of the track and the name of the artist attributed to the track.

I then retrieved the corresponding release dates and release countries for that release and track and used that information to determine the earliest dates that each track was released in the US or abroad. I searched this dataset for all tracks that were released in the United States, then checked to see if there were any foreign releases of the same track prior to the earliest reported US release.[1] If this foreign track was released prior to the US release, it was included in our final dataset. Similarly, if a track was found to have never been released in the United States, that release was also included in our dataset.

After I created our dataset, I then prepared the dataset for searching. This was done by creating a full-text search vector in the database, which indexes the fields and allows us to perform searches against the database. I used this search vector to perform searches on fields from the Sampled Takedown Notice Data to determine whether each sampled item from the Sampled Takedown Notice Data was included within our subset of the MusicBrainz dataset which contained only foreign works.

---

[1] There were instances in which a release date only contained a year. I chose to be conservative for those releases and chose the earliest day of the year, January 1st as the release date for US releases and the latest day of the year, December 31st as the release date for foreign releases. By selected the dates the dates in this manner, only releases that were confirmed to have been released in a foreign country prior to being released in the United States would be included in our dataset.

# CHARLES D. COWAN, Ph.D.
ANALYTIC FOCUS LLC



## KEY QUALIFICATIONS

Charles D. Cowan is Managing Partner of ANALYTIC FOCUS LLC.  Dr. Cowan has 40 years of experience in statistical research and design.  He consults for numerous public and private sector entities on the design, implementation, and evaluation of research and the synthesis of statistical and sampling techniques for measurement.

Dr. Cowan has designed some of the largest and most complex research programs conducted by the Federal Government, including the Post Enumeration Program conducted by the Bureau of the Census to evaluate the 1980 Decennial Census, the Economic Cash Recovery valuations conducted by the Resolution Trust Corporation in 1990-95, and many evaluation studies conducted for the Justice Department, the Department of Defense, the Department of Housing and Urban Development, and the Treasury Department.   He has provided expert advice to corporations and government agencies on the incorporation of complex research designs in demographic and economic measurement problems, including:

• Development of procedures used by the Resolution Trust Corporation and the FDIC for determination of the value of all assets held by the RTC\FDIC taken from failed banks and S&Ls.   Results from this research were used in quarterly reports to Congress on the loss to the American taxpayer that resulted from these failures.  These estimates of anticipated recoveries on assets were also used by the RTC and FDIC for financial reporting.

• Establishment of audit and sampling methods to determine the completeness and reliability of reporting and record systems.   These procedures were used to both expand and streamline bank examinations for safety and soundness and also compliance measurement for the FDIC.    These sampling techniques are applied in the audit of Federal agencies concerned with regulatory review of operations and systems, and related systems for banks, regulatory agencies, and law firms;

• Application of econometric and biometric procedures for measurement of credit risk in large portfolios of loans.  These models are frequently used for a variety of purposes within financial institutions, such as the pricing of loans, the management of customers long term, decision making on workouts for delinquent loans, and for establishment of economic and regulatory reserves.

**CHARLES D. COWAN**

(Page 2)

---

- Evaluation of research conducted for the Department of Defense, for the National Institutes of Health, and for the Department of Agriculture, each in response to Congressional inquiries on the validity of published results, and also for defendants in lawsuits involving evidence proffered by plaintiffs in furtherance of their suit.

- Model fitting and development of projection methods to measure the likelihood of loss or errors in recording in loans held by banks or put up for auction; measurement of the likelihood of fraud and/or noncompliance in systems, including bank holding companies, trading activities for brokers, and systems for compliance with health department and judicial requirements;

- Development of procedures used by the Bureau of the Census for apportionment of population for revenue sharing purposes and the estimation of the undercount in the Decennial Census of Population and Housing.  These procedures include application of capture-recapture methods to measure the size of the undercount in the decennial census, use of network sampling as an alternative measure for population size, and measurement of the reliability of data collected in the Census.

- Development of statistical methods to quantify the size of populations, including nomadic populations for the Census of Somalia, the undercount and overcount in the Census of Egypt, the number of missing children in Chicago, IL, and the number of homeless persons and families needing services in several large cities with transient populations.

Dr. Cowan teaches graduate and undergraduate courses in survey methods, statistics, and computer methods for analysis.  He is the co-author of two books, one on evaluation of survey and census methods and one on econometric measures related to the welfare of the U.S. economy.  He has written numerous articles on statistical methods, sampling, rare and elusive population research, and optimization techniques.

Prior to cofounding ANALYTIC FOCUS LLC, Dr. Cowan was a Director with ARPC and with Price Waterhouse, where he specialized in financial research and audit sampling.  From 1991 to 1996, Dr. Cowan was the Chief Statistician for the Resolution Trust Corporation and the Federal Deposit Insurance Corporation, where he designed research necessary to measure the loss from the Savings & Loan Crisis of the late 1980's.  Dr. Cowan also served as the Chief Statistician for the U.S. Department of Education, where he designed large-scale surveys of educational institutions to measure resource needs and availability, and for Opinion Research Corporation, where he designed predictive models of demand for automobile manufacturers, banks, and large horizontally diverse firms like GE and AT&T.  Dr. Cowan worked for the U.S. Bureau of the Census, where he was the Chief of the Survey Design Branch and developed many of the techniques in use today for the evaluation of coverage in surveys and censuses.

---

**CHARLES D. COWAN**

(Page 3)

---

## EDUCATION

Ph.D., Mathematical Statistics, The George Washington University, 1984
M.A., Economics, The University of Michigan, 1973
B.A., English and B.A., Economics, The University of Michigan, 1972

## PROFESSIONAL EXPERIENCE

Co-Founder, ANALYTIC FOCUS LLC, January, 2002 to present.
Director, ARPC, November, 1999 to December, 2001.
Director, PricewaterhouseCoopers LLP, January 1997 to November, 1999.
Chief Statistician, Federal Deposit Insurance Corporation / RTC, 1991 to 1996.
Chief Statistician, Opinion Research Corporation, 1989 to 1991.
Chief Statistician, National Center for Education Statistics, US Dept. of Education, 1986 to 1989.
Bureau of the Census: Assistant Division Chief, International Statistical Programs Center, 1984 to 1986; Staff Liaison for Statistical Litigation Support, 1983 to 1984; Chief, Survey Design Branch, Statistical Methods Division, 1978 to 1983; Acting Chief, Survey Analysis and Evaluation Branch, Demographic Surveys Division, 1976 to 1978; Office of the Chief, Statistical Research Division, 1975 to 1976
Survey Research Center, Oregon State University: Manager, 1974 to 1975
Institute for Social Research, U. of Michigan: Assistant Study Director, 1972 to 1974.

## PROFESSIONAL ASSOCIATIONS

Professor, Statistics, University of Alabama – Birmingham
Associate Professor, Statistics, George Washington University
Visiting Research Professor, Survey Research Laboratory, U. of Illinois

## PROFESSIONAL SOCIETIES – MEMBERSHIPS

American Statistical Association (ASA)

## PROFESSIONAL SOCIETIES - POSITIONS

President, Research Industry Coalition, 1999-2000
Council Member, Research Industry Coalition, Representative from ASA, 1995-2000
President, Washington/Baltimore Chapter of AAPOR, 1998
Program Chair, American Association for Public Opinion Research, 1991-1992
Program Chair, Section on Survey Research Methods, ASA, 1989-90
Secretary-Treasurer, AAPOR, 1985-1986
Associate Secretary-Treasurer, AAPOR, 1984-1985
Editorial Board, Public Opinion Quarterly, 1980-1984
Editorial Board, Marketing Research, 1989-2000
Chair, Conference Committee, AAPOR, 1982-1989
Chair, Committee on Privacy and Confidentiality, ASA, 1980-1981

---

**CHARLES D. COWAN**
(Page 4)

---

## PUBLICATIONS

Strumpel, Burkhard; Cowan, Charles; Juster, F. Thomas; and Schmiedeskamp, Jay; editors, Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor:  The Institute for Social Research, 1975.

Duncan, Greg, and Cowan, Charles D., "Labor Market Discrimination and Nonpecuniary Work Rewards" in Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor:  The Institute for Social Research, 1975.

Curtin, Richard T. and Cowan, Charles D. "Public Attitudes Toward Fiscal Progress" in Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor:  The Institute for Social Research, 1975.

Goldfield, Edwin D.; Turner, Anthony G.; Cowan, Charles D.; Scott, John C., "Privacy and Confidentiality as Factors in Survey Response" in Public Data Use, Vol. 6, No 4, July 1978.

Cowan, Charles D., and Spoeri, Randall K., "Statistical Distance Measures and Test Site Selection: Some Considerations", Proceedings of the Computer Science and Statistics:  Eleventh Annual Symposium on the Interface, 1978.

Bushery, John R., Cowan, Charles D., and Murphy, Linda R., "Experiments in Telephone-Personal Visit Surveys", Proceedings of the Amer. Stat. Assoc., Sect. on Survey Research Methods, 1978.

Spoeri, Randall K., and Cowan, Charles D., "On the Use of Distance Measures in Test Site Selection: A Practical Application Using Census Data", Proceedings of the American Statistical Association, Section on Business and Economic Statistics, 1978.

Cowan, Charles D.; Murphy, Linda R.; Wiener, Judy, US Bureau of the Census, "Effects of Supplemental Questions on Victimization Estimates from the National Crime Survey" in Proceedings of the American Statistical Association, Sect. on Survey Research Methods, 1978.

Bateman, David V.; Cowan, Charles D., US Bureau of the Census, "Plans for the 1980 Census Coverage Evaluation" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1979.

Hogan, Howard, and Cowan, Charles D., "Imputations, Response Errors, and Matching in Dual System Estimation", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980.

Schwartz, Sidney H., Cowan, Charles D., and Sausman, Kenneth R., "Optimization in the Design of a Large-Scale State Sample", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980.

---

**CHARLES D. COWAN**

(Page 5)

Cowan, Charles D., "Modifications to Capture-Recapture Estimation in the Presence of Errors in the Data" presented at the meetings of the American Statistical Association, Biometrics Section, 1982 (no proceedings).

Fay, Robert; Cowan, Charles, US Bureau of the Census, "Missing Data Problems in Coverage Evaluation Studies" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1983.

Cowan, Charles D.; Fay, Robert E., "Estimates of Undercount in the 1980 Census" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1984.

Cowan, Charles D. "Interviews and Interviewing", The Social Science Encyclopedia, Routledge and Kegan Paul, Publishers, The Netherlands, 1984.

Wei, L. J. and Cowan, Charles D. "Selection Bias", Encyclopedia of Statistical Science, John Wiley and Sons, New York, N.Y., 1984.

Cowan, Charles D. and Malec, Donald J. "Capture-Recapture Models When Both Sources Have Clustered Observations", Journal of the American Statistical Association, June 1986, Vol. 81, # 394, pp. 347-353, and Proceedings of the American Statistical Association, Section on Survey Research Methods, 1984.

Cowan, Charles D., The Effects of Misclassification on Estimates from Capture-Recapture Studies. Unpublished doctoral dissertation, The George Washington University, September 1984.

Sudman, Seymour; Cowan, Charles D., "Questionnaire Design Activities in Government Statistics Offices" in Special Issue on Questionnaire Design, Jour. of Official Statistics, Vol. 1, No. 2, 1985.

Cowan, Charles D. "Misclassification of Categorical Data", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1985.

Cowan, Charles D., Biemer, Paul P., Magnani, Robert J., and Turner, Anthony G., Evaluating Censuses of Population and Housing, Statistical Training Document, ISP-TR-5, U.S. Department of Commerce, Bureau of the Census, 1985.

Cowan, Charles D., Turner, Anthony G., and Stanecki, Karen "Design of the Somali Post Enumeration Survey (1986-1987)", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986.

**CHARLES D. COWAN**

(Page 6)

Cowan, Charles D. and Malec, Donald J. "Sample Allocation for a Multistage, Multilevel, Multivariate Survey", Proceedings of the Fourth Annual Research Conference (ARC IV), U.S. Bureau of the Census, 1988.

Frey, Carolin M., McMillen, Marilyn M., Cowan, Charles D., Horm, John W., and Kessler, Larry G.. "Representativeness of the Surveillance, Epidemiology, and End Results Program Data: Recent Trends in Mortality Rates", Journal of the National Cancer Institute, Vol. 84, # 11, June 3, 1992.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless, A Review" in Homelessness, Health, and Human Needs. Institute of Medicine, National Academy Press, National Academy of Sciences, Washington, D.C., 1988.

Cowan, Charles D., "Standards for Statistical Surveys in the Federal Government: Practices in the Center for Education Statistics", Proceedings of the American Statistical Association, Section on Survey Methods Research, 1988.

Sudman, Seymour, Sirken, Monroe G., and Cowan, Charles D., "Sampling Rare and Elusive Populations", Science, Vol. 240, pp. 991-996, May 20, 1988.

Cowan, Charles D., "Mall Intercepts and Clinical Trials: The Philosophy of Inference from Different Types of Research Designs" in Marketing Research: A Magazine of Management & Applications, Vol. 1, No. 1, March 1989.

Cowan, Charles D., "Mall Intercepts: Principles of Design for Research" in Proceedings of the Seventh Annual Advertising Research Foundation Research Quality Workshop, Sept. 1989.

Cowan, Charles D., "Estimating Census and Survey Undercounts Through Multiple Service Contacts" in Housing Policy Debate: Counting the Homeless: The Methodologies, Policies, and Social Significance Behind the Numbers, Volume 2, Issue 3, pp. 869-882, 1991.

Cowan, Charles D., "Ratio vs. Regression Estimators in a Large Scale Survey of S&L's" in Proceedings of the Section on Survey Research Methods, American Statistical Assoc., 1992.

Cowan, Charles D., "A Longitudinal Survey and Reality Check for the Value of Financial Assets" in Proceedings of Statistics Canada Symposium 92: Design and Analysis of Longitudinal Surveys, November 1992.

Cowan, Charles D., and Wittes, Janet, "Intercept Studies, Clinical Trials, and Cluster Experiments: To Whom Can We Extrapolate?" in Controlled Clinical Trials, Vol.15, pp.24-29, 1994.

**CHARLES D. COWAN**

(Page 7)

Cowan, Charles D.; Klena, Mathew J., Resolution Trust Corp, "Allocation of Proceeds from Bulk Auctions to Individual Assets" in <u>Proceedings of the American Statistical Association, Section on Business and Economic Statistics</u>, 1995.

Cowan, Charles D. "Statistical Sampling as a Management Tool in Banking" in <u>FDIC Banking Review</u>, 1997, Vol. 10, No. 1.

Cowan, Charles D., "Coverage, Sample Design, and Weighting in Three Federal Surveys" in <u>Journal of Drug Issues</u>, October 2001.

Cowan, Charles D., "Use of Mass Appraisals in Toxic Tort Litigation Involving Loss of Value" in <u>Proceedings of the International Association of Assessment Officers</u>, October 2002.

Cowan, Adrian M. and Cowan, Charles D., "Default Correlation:  An Empirical Investigation of a Subprime Lender", <u>The Journal of Banking and Finance</u>, March 2004.

Cowan, Charles D. and Cowan, Adrian M., "A Survey Based Assessment of Financial Institution Use of Credit Scoring for Small Business Lending", <u>SBA Report 283</u>, Nov. 2006

Keith, Scott W., Wang, Chenxi, Fontaine, Kevin R., Cowan, Charles D. and Allison, David B.  "Body Mass Index and Headache Among Women: Results From 11 Epidemiologic Datasets", <u>Obesity</u>, Volume 16, Issue 2 (February 2008) 16: 377-383; doi:10.1038/oby.2007.32

Cowan, Adrian M. and Cowan, Charles D., "The Dynamics of Credit Quality and Implications for the Pricing of Small Business Loans", <u>The International Journal of Banking and Finance</u>, 2007/08 (March) Vol. 5. Number 2:2008: 31-60

Cowan, Charles D. and Sellman, Steven W., "Improving the quality of NAEP socioeconomic status information: Report on research activities". Alexandria, VA: Human Resources Research Organization (HumRRO).  2008  http://www.humrro.org/corpsite/publication/improving-quality-naep-socioeconomic-status-information-report-research-activities.  Research funded by the National Center for Education Statistics, U.S. Department of Education.

Brock, David W., Thomas, Olivia, Cowan, Charles D., Hunter, Gary R., Gaesser, Glenn A., and Allison, David B., "Association between Physical Inactivity and Prevalence of Obesity in the United States", <u>Journal of Physical Activity and Health</u>, January, 2009

Cowan, Adrian M. and Cowan, Charles D., Disparate Impact Analyses: Relevant Numbers, Relevant Populations (August 3, 2009). Available at SSRN: https://ssrn.com/abstract=1443560 or http://dx.doi.org/10.2139/ssrn.1443560

**CHARLES D. COWAN**

(Page 8)

---

Charles D. Cowan, Robert M. Hauser, Robert A. Kominski, Henry M. Levin, Samuel R. Lucas, Stephen L. Morgan, Margaret Beale Spencer, and Chris Chapman, "Improving the Measurement of Socioeconomic Status for the National Assessment of Educational Progress: A THEORETICAL FOUNDATION", National Center for Education Statistics, U.S. Department of Education, 2012.

Cowan, Charles D., "Use of Statistical Analysis to Measure Damages", in Comprehensive Guide to Economic Damages, Fourth Edition, Business Valuation Resources, LLC, Portland, ME, April, 2016.  Revised and republished in Fifth Edition, 2018.  Revised and republished in Sixth Edition, 2021.

Cowan, Charles D., "Qui Custodiat Custodiens?", International In-House Counsel Journal, Cambridge, England, October 20, 2021.

Past Testimony, Charles D. Cowan

**Financial:**

MBIA v Credit Suisse. Worked for plaintiff.  Deposed in January 2016.  Trial in July 2019.

Federal Home Loan Bank of Boston v. Nomura; Federal Home Loan Bank of Boston v. Credit Suisse Securities (USA) LLC, Credit Suisse First Boston Mortgage Securities Corp., Worked for plaintiff. Deposed in January 2019, day 1, February 2019, day 2.

Financial Guaranty Insurance Company v. Morgan Stanley ABS Capital I Inc. and Morgan Stanley Mortgage Capital Holdings LLC, as successor to Morgan Stanley Mortgage Capital Inc., Worked for plaintiff.  Deposed in May 2019.

AMBAC Assurance Corporation et al v. First Franklin et al. Worked for plaintiff.  Deposed in December 2019.

FDIC v. First Horizon Asset Securities Et al. Worked for plaintiff. Deposed in April 2021.

AMBAC Assurance Corporation et al v. Nomura et al. Worked for plaintiff.  Deposed in May 2021.

**Financial - non RMBS**

Charles Baird and Lauren Slayton, as individuals, and on behalf of all others similarly situated, and on behalf of the BlackRock Retirement Savings Plan v. BlackRock Institutional Trust Company, N.A.; BlackRock, Inc.; The BlackRock, Inc. Retirement Committee; The Investment Committee of the Retirement Committee; The Administrative Committee of the Retirement Committee; The Management Development & Compensation Committee, Catherine Bolz, Chip Castille, Paige Dickow, Daniel A. Dunay, Jeffrey A. Smith; Anne Ackerley, Amy Engel, Nancy Everett, Joseph Feliciani Jr., Ann Marie Petach, Michael Fredericks, Corin Frost, Daniel Gamba, Kevin Holt, Chris Jones, Philippe Matsumoto, John Perlowski, Andy Phillips, Kurt Schansinger, Tom Skrobe; Kathleen Nedl, Marc Comerchero, Joel Davies, John Davis, Milan Lint, Laraine McKinnon, and Mercer Investment Consulting.  Worked for plaintiffs.  Deposed in May 2019.

**Disparate Impact \ Discrimination:**

River Cross Land Company, LLC v. Seminole County, FL.  Worked for plaintiff.  Deposition, Oct. 2019.

County of Cook v. Bank Of America Corporation.  Worked for plaintiff.  Deposition, February 2021.

County of Cook v. Wells Fargo Corporation.  Worked for plaintiff.  Deposition, November 2021.

**Other Cases:**

In Re: Dicamba Herbicides Litigation.  Worked for plaintiffs.  Deposition, March 2019.

Otter Products et al, v. Phone Rehab et al.   Worked for plaintiff.  Deposed in November 2019.

Thomas Allegra et al v. Luxottica Retail North America.  Worked for plaintiff.  Deposed Dec. 2019.

Westgate Resorts v. Reid Hein & Associates, dba Timeshare Exit Team.  Tortious Interference case.  Worked for plaintiffs.  Deposition, March 2020.

Donald Melosh, et al. v. Western Pacific Housing, Inc., JAMS Case No.: 1100091610, Construction Defects.  Worked for defense. Deposition, March 2020.

Charles Copley et al Bactolac Pharmaceutical, Inc. et al.  Worked for Plaintiffs, Deposed August 2020.

Mildred Clemmons et al v. Samsung Electronics of America, Inc.  Worked for plaintiffs. Deposed in October 2020.

Epic Tech, LLC v. Fusion Skill, Inc. et al.  Worked for defendant.  Deposition in Jan. 2021.

Jason R. Sheldon, Steven Hunsberger, et al. v. State Farm Mutual Automobile Insurance Company et al.  Worked for plaintiffs. Deposition in March 2021.

Office of the Attorney General, District of Columbia v. SCF Management, LLC and Jefferson 11th Street, LLC.  Worked for Plaintiff.  Deposition, April 2021.

Monster Energy Company v. Vital Pharmaceuticals, Inc. and John H. Owoc.  Worked for Plaintiff.  Deposition, June 2021.  Testimony at Trial, September 2022.

In re:  Purdue Pharma et al, debtors.  Worked for West Virginia.  Deposition, July 2021. Hearing, August 2021.

District of Columbia v. Town Sports International, LLC. Worked for defendant.  Deposed in March 2022.

Brianna Arredondo et al. v. The University of La Verne.  Worked for plaintiffs.  Deposition, April 2022.

Nicholas Bergeron & Nick Quattrociocchi v. Rochester Institute of Technology.  Worked for plaintiffs.  Deposition, July 2022.

City of Seattle v. Monsanto Company, Solutia, Inc., Pharmacia Corp. et al. Worked for plaintiffs, Deposed, July 2022.

Jacob Healey, Larry Louis Hibbs, Jr., James Michael Jarvis, Jr., Allen Goodfleisch, Cynthia Dawn Yates, and Betty Melloan, v. Jefferson County, Kentucky, And Louisville Metro Government.  Worked for defendant.  Hearing, August 2022.

Grayson et al. v. Lockheed Martin Corporation.  Worked for plaintiffs, Deposed, August 2022.

In Re:  University of Miami COVID-19 Tuition and Fee Refund Litigation.  Worked for plaintiffs.  Deposition, August 2022.

One Paraiso Condominium Association, Inc., v. Thirty-First Street Property Owner, LLC and Plaza Construction Group Florida, LLC.  Worked for the defense.  Deposition, September 2022.

Josephine Loguidice and Emilie Norman v. Gerber Life Insurance Company.  Class action.  Worked for defendant.  Deposed in November 2022.

**Exhibit 3: Materials Relied On**

<u>Documents</u>

- First Amended Class Action Complaint, dated November 17, 2021
- Plaintiffs' Motion for Class Certification, ECF No. 190
- GOOG-SCHNDR-00041492 ("YouTube Copyright Transparency Report H1 2021")
- GOOG-SCHNDR-00041493 "YouTube Copyright Transparency Report H1 2021.")
- GOOG-SCHNDR-00052970-982  ("You Tube Copyright Transparency Report H2 2021")
- GOOG-SCHNDR-00041498 ("YouTube Copyright Transparency Report H1 2021")
- GOOG-SCHNDR-00041500 ("YouTube Copyright Transparency Report H1 2021")
- GOOG-SCHNDR-00021221-284 ("How Google Fights Piracy")
- GOOG-SCHNDR-00038941-945 ("YouTube Landing: CVP Migration to CID FE")
- 2022-07-15 Letter to Carol O'Keefe from L. White.pdf
- 2022-10-7 Letter to C. O'Keefe from L. White.pdf
- 2022-10-25 Letter to C. O'Keefe from L. White.pdf

<u>Data and data-related files provided by Defendants</u>

- GOOG-SCHNDR-00043855
- GOOG-SCHNDR-00043856
- GOOG-SCHNDR-00043859
- GOOG-SCHNDR-00043862
- GOOG-SCHNDR-00043865
- GOOG-SCHNDR-00043866
- GOOG-SCHNDR-00043867
- GOOG-SCHNDR-00043868
- All PB files that were produced by Defendants in this action
- Takedown Notice Data_HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.csv
- Total Ad Revenue Data_HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.csv
- CLFN Metadata_HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.csv

Websites and Online Source of Information

- https://support.google.com/youtube/answer/2807622?hl=en
- https://www.copyright.gov/public-records/
- https://www.soundexchange.com/who-we-are/#about-us
- https://musicbrainz.org/
- https://www.eidr.org/about-us/
- https://help.imdb.com/article/imdb/general-information/what-is-imdb/G836CY29Z4SGNMK5?ref_=helpart_nav_1#
- https://developers.google.com/youtube/v3/docs/videos/list