# Exhibit C

to the Declaration of Kelly M. Knoll ISO Defendants' Motion to Exclude Testimony from Charles D. Cowan and Hal J. Singer

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
2                  UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF CALIFORNIA
3

     MARIA SCHNEIDER,              :
4    UNIGLOBE ENTERTAINMENT,       : CASE NO.
     LLC, and AST PUBLISHING       : 3:20-cv-04423-JD
5    LTD, individually and on      :
     behalf of all others          :
6    similarly situated; et        :
     al.,                          :
7             Plaintiffs,          :
                                   :
8             v.                   :
                                   :
9    YOUTUBE, LLC and GOOGLE       :
     LLC,                          :
10            Defendants.          :
     ------------------------
11
12               VIDEOTAPE DEPOSITION OF:
13                CHARLES D. COWAN, Ph.D.
14                 NEW YORK, NEW YORK
15                TUESDAY, JANUARY 17, 2023
16
17
18
19
20
21
22
23
24    REPORTED BY:
      SILVIA P. WAGE, CCR, CRR, RPR
25    JOB NO. 5648019

                                            Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1            HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2

3

                                    January 17, 2023
4                                    9:00 a.m.
5            Videotape deposition of CHARLES D.
6       COWAN, Ph.D., held at the offices of WILSON
7       SONSINI GOODRICH & ROSATI, 1301 Avenue of the
8       Americas, 40th Floor, New York, New York,
9       pursuant to agreement before SILVIA P. WAGE, a
10      Certified Shorthand Reporter, Certified Realtime
11      Reporter, Registered Professional Reporter, and
12      Notary Public for the States of New Jersey, New
13      York, and Pennsylvania.

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  2

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2       A P P E A R A N C E S:
 3
         BOIES SCHILLER FLEXNER LLP
 4       Attorneys for Plaintiffs
         55 Hudson Yards, 20th Floor
 5       New York, New York  10001
         (212) 446-2359
 6       Jwright@bsfllp.com
         Pkorologos@bsfllp.com
 7       BY:  JOANNA WRIGHT, ESQ.
 8
         KOREIN TILLERY, LLC
 9       Attorneys for Plaintiffs
         505 North 7th Street, Suite 3600
10       St. Louis, Missouri 63101
         (314) 241-4844
11       Cokeefe@koreintillery.com
         Gzelcs@koreintillery.com
12       Aellis@koreintillery.com
         BY:  CAROL O'KEEFE, ESQ.
13       BY:  GEORGE ZELCS, ESQ. (VIA TELECONFERENCE)
         BY:  ANDREW ELLIS, ESQ. (VIA TELECONFERENCE)
14
15       WILSON SONSINI GOODRICH & ROSATI
         Attorneys for Defendants
16       1301 Avenue of the Americas, 40th Floor
         New York, New York  10019
17       (212) 999-5800
         Erichlin@wsgr.com
18       Kknoll@wsgr.com
         Akramer@wsgr.com
19       BY:  ELI RICHLIN, ESQ.
         BY:  KELLY KNOLL, ESQ.
20       BY:  ANDREW KRAMER, ESQ.
21
         A L S O   P R E S E N T:
22
23       GREG HALM
         DEFENDANT'S EXPERT
24
         PAUL BAKER
25       VIDEOGRAPHER
```

Page  3

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY | |
| 2 | EXAMINATION BY MR. RICHLIN: | 09:05:52 |
| 3 | Q.  And, Dr. Cowan, it's Cowan, correct, | 09:05:52 |
| 4 | not Cohen? | 09:05:55 |
| 5 | A.  Cowan. | 09:05:56 |
| 6 | Q.  Cowan, great. | 09:05:56 |
| 7 | Dr. Cowan, I understand you've been | 09:05:58 |
| 8 | deposed many times in the past.  So overall the | 09:06:01 |
| 9 | proceeding should be familiar. | 09:06:04 |
| 10 | Approximately, how many times have | 09:06:06 |
| 11 | you been passed in the past? | 09:06:07 |
| 12 | A.  Over a hundred. | 09:06:09 |
| 13 | Q.  Alright.  Is there any reason why the | 09:06:10 |
| 14 | testimony that you provide today is not going to | 09:06:15 |
| 15 | be truthful and accurate, to the best of your | 09:06:18 |
| 16 | abilities? | 09:06:20 |
| 17 | A.  It will be truthful and accurate, to | 09:06:21 |
| 18 | the best of my abilities. | 09:06:23 |
| 19 | Q.  Thank you. | 09:06:25 |
| 20 | And I understand you have some back | 09:06:26 |
| 21 | issues and we'll need to take breaks during the | 09:06:28 |
| 22 | day; is that correct, sir? | 09:06:31 |
| 23 | A.  Please. | 09:06:32 |
| 24 | Q.  I will do my best to accommodate and | 09:06:32 |
| 25 | I will only ask that before we take any breaks, | 09:06:32 |

Page 9

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY | |
| 2 | you answer any question that's pending, okay? | 09:06:36 |
| 3 | A.  Yes.  Thank you. | 09:06:37 |
| 4 | Q.  You're welcome. | 09:06:39 |
| 5 | And I just want to ask you a few | 09:06:40 |
| 6 | questions on your background. | 09:06:47 |
| 7 | Have you ever done any consulting | 09:06:49 |
| 8 | work relating to online copyright management | 09:06:53 |
| 9 | tools. | 09:06:59 |
| 10 | A.  No. | 09:06:59 |
| 11 | Q.  Have you ever done any consulting | 09:06:59 |
| 12 | work on online platform in connection with | 09:07:01 |
| 13 | copyright removal requests? | 09:07:04 |
| 14 | A.  No. | 09:07:06 |
| 15 | Q.  Do you have any experience analyzing | 09:07:08 |
| 16 | user submissions to social media platforms? | 09:07:11 |
| 17 | A.  No. | 09:07:21 |
| 18 | Q.  Do you have any expertise in the area | 09:07:23 |
| 19 | of copyright protection? | 09:07:25 |
| 20 | A.  No. | 09:07:28 |
| 21 | Q.  Do you have any expertise in the area | 09:07:32 |
| 22 | of copyright management information? | 09:07:33 |
| 23 | A.  No. | 09:07:36 |
| 24 | Q.  Have you ever written any articles | 09:07:40 |
| 25 | that have been published and relate to online | 09:07:43 |

Page 10

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2    copyright management tools?                          09:07:50

3          A.   No.                                       09:07:51

4          Q.   Have you ever written any published       09:07:51

5    articles that relate to online platforms?           09:07:53

6          A.   No.                                       09:08:01

7          Q.   Have you ever written any articles        09:08:04

8    that relate to copyright management information?     09:08:06

9          A.   Could we go back to the previous          09:08:14

10   question?   When you said, "online platforms,"       09:08:15

11   that was kind of broad.                              09:08:19

12          So I have written things about online         09:08:21

13   platforms related to use of census data, but I       09:08:23

14   don't think that's what you're concerned about.      09:08:26

15          Q.   To be more specific, have you written     09:08:32

16   any articles that relate to online platforms        09:08:34

17   which host user-generated contents?                 09:08:38

18          A.   Well, keeping in mind that the census     09:08:48

19   is pretty much user generated.   If you're talking   09:08:50

20   about, specifically, generated to be put online,    09:08:55

21   no.                                                  09:08:59

22          Q.   Okay.   By "online platforms," I'm        09:08:59

23   going to use a definition that is a platform that   09:09:04

24   allows individual users to post content online,     09:09:08

25   not people who are employed by a service such as    09:09:14

Page 11

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2      the Census or employed by private company.          09:09:16

3              Can we agree on that definition for          09:09:19

4      online platforms?                                   09:09:22

5          A.   Sure.                                       09:09:23

6          Q.   Using that definition, have you             09:09:23

7      written any articles that relate to online          09:09:28

8      platforms as we have defined them?                  09:09:30

9          A.   No.                                         09:09:32

10             I'm sorry.   I interrupted you follow        09:09:39

11     on question, so...                                  09:09:43

12         Q.   We'll both do our best not to              09:09:44

13     interrupt.                                          09:09:46

14             Do you have any expertise in the area       09:09:47

15     of online copyright records?                        09:09:51

16         A.   No.                                         09:09:53

17         Q.   So you've never written any articles       09:09:55

18     that relate to online copyright records?            09:09:57

19         A.   I have not.                                 09:10:00

20         Q.   Do you have any expertise in the area      09:10:02

21     of databases that store online copyright records?   09:10:06

22         A.   No.                                         09:10:13

23         Q.   Do you have any expertise in how           09:10:16

24     online music databases work?                        09:10:19

25         A.   No.                                         09:10:25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2        Q.   Do you have any expertise in whether          09:10:27

3   online music databases or registries are             09:10:30

4   reliable?                                             09:10:36

5        A.   I don't know what that means.                09:10:38

6        Q.   Have you studied the reliability of          09:10:41

7   data that is stored on online music databases?       09:10:44

8        A.   The reason I'm confused is that the          09:10:54

9   -- well, there's two reasons.  So, just as you       09:10:58

10   defined "online platforms," statisticians use the   09:11:01

11   word "reliability" to indicate variability or the   09:11:05

12   lack of variability.  So it's a very technical       09:11:09

13   concept within statistics and mathematics.  So I    09:11:17

14   don't believe that's what you're asking me.  But    09:11:26

15   then the second part of is this is that you asked   09:11:29

16   me about online databases for music.                09:11:32

17        Q.   Uh-huh.                                     09:11:36

18        A.   Well, if music is posted, that's           09:11:37

19   reliable.  So are you asking me about the music     09:11:39

20   or are you asking me about something else?          09:11:41

21        Q.   Sir, let's break that apart.               09:11:44

22             So, by "online music databases," I'm      09:11:46

23   referring to a database that is available, hosted   09:11:57

24   on the Internet and records data or records about   09:12:00

25   musical compositions, songs, works.                 09:12:09

Page 13

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1              HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
2                      Do you understand that definition,    09:12:13
3         sir?                                               09:12:16
4              A.  I do, you know, like Pandora does         09:12:16
5         that.                                              09:12:18
6              Q.  And I'm not referring to a platform       09:12:20
7         that allows for music to be played.  I'm           09:12:21
8         referring to a database that provides information  09:12:24
9         only about musical works.                          09:12:26
10             A.  Oh, it's the information about the         09:12:31
11        musical works, not the musical works themselves.   09:12:34
12             Q.  So I want to distinguish between a         09:12:37
13        platform that hosts content and a database that    09:12:38
14        hosts records about content.                       09:12:40
15             A.  Thank you.  Okay.                          09:12:42
16             Q.  Okay.                                      09:12:43
17             A.  That's why I was confused.                 09:12:44
18             Q.  And I appreciate you giving voice to       09:12:46
19        your confusion so we can clear it up.               09:12:48
20             A.  Good.                                      09:12:50
21             Q.  So let's go back to online music           09:12:50
22        databases, as we've defined them.                  09:12:54
23                 Do you have any expertise in online        09:12:56
24        music databases?                                   09:13:01
25             A.  No.                                        09:13:04
```

Page 14

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2              Q.   How about online video databases?        09:13:05

 3              A.   No.                                       09:13:07

 4              Q.   Have you ever studied the reliability     09:13:09

 5         of such databases?                                 09:13:12

 6              A.   In the common English sense or            09:13:19

 7         statistical sense?                                 09:13:21

 8              Q.   Let's do both.                            09:13:22

 9              A.   Okay.  Which would you like.              09:13:23

10              Q.   Have you ever studied the reliability     09:13:24

11         of online music or video databases in the common   09:13:27

12         English sense?                                     09:13:31

13              A.   No.                                       09:13:32

14              Q.   Have you ever studied the reliability     09:13:33

15         of online music or video databases in the          09:13:35

16         technical statistical sense of reliability?        09:13:39

17              A.   No.                                       09:13:43

18              Q.   Have you written any articles about       09:13:53

19         online music or video databases?                   09:13:55

20              A.   No.                                       09:14:04

21              Q.   Have you ever taught any courses          09:14:05

22         relating to online copyright management tools?     09:14:12

23              A.   No.                                       09:14:17

24              Q.   Have you ever taught any courses          09:14:18

25         relating to copyright removal requests?            09:14:20
```

Page 15

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2              A.   No.                                    09:14:24

3              Q.   Have you ever taught any courses        09:14:25

4    relating to submissions to social media               09:14:27

5    platforms?                                             09:14:30

6              A.   No.                                    09:14:31

7              Q.   Have you ever taught any courses        09:14:32

8    relating to copyright protection?                      09:14:33

9              A.   No.                                    09:14:36

10             Q.   You ever taught any courses relating   09:14:36

11   to copyright management information?                   09:14:38

12             A.   No.                                    09:14:40

13             Q.   Have you ever taught any courses        09:14:42

14   relating to copyright records?                         09:14:45

15             A.   No.                                    09:14:46

16             Q.   Have you ever taught any courses        09:14:46

17   relating to online music or video databases?           09:14:48

18             A.   No.                                    09:14:52

19             Q.   Have you ever made any presentations   09:14:56

20   at a conference relating to online copyright           09:15:00

21   management tools?                                      09:15:05

22             A.   No.                                    09:15:05

23             Q.   Have you ever made any presentations   09:15:06

24   to a conference relating to social media               09:15:08

25   platforms?                                             09:15:09

Page 16

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2              A.   No.                                  09:15:10
 3              Q.   Have you ever made any presentations  09:15:11
 4    to a conference relating to copyright protection    09:15:13
 5    tools?                                              09:15:17
 6              A.   No.                                  09:15:17
 7              Q.   Have you ever made any presentations  09:15:18
 8    to a conference relating to copyright management    09:15:19
 9    information?                                        09:15:23
10              A.   No.                                  09:15:23
11              Q.   Have you ever made any presentations  09:15:25
12    at a conference relating to online copyright        09:15:27
13    records?                                            09:15:31
14              A.   No.                                  09:15:32
15              Q.   Have you ever made any presentations  09:15:33
16    to a conference relating to online music or video  09:15:35
17    databases?                                          09:15:40
18              A.   No.                                  09:15:40
19              MR. RICHLIN:  Let's mark as Exhibit 1    09:15:46
20    a copy of the expert report of Charles D. Cown     09:15:50
21    dated November 17th, 2022.                          09:15:53
22              (Deposition Exhibit Cowan 1, Expert      09:15:53
23    Report of Charles D. Cowan, Ph.D. dated November   09:15:53
24    17, 2022, was marked for identification.)          09:16:21
25              Q.   Sir, we've marked as Exhibit 1 a    09:16:21
```

Page 17

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2     document which states on the cover page, "Expert    09:16:25

 3     Report of Charles D. Cown Ph.D.," dated             09:16:29

 4     November 17, 2022.                                  09:16:32

 5              Do you recognize Exhibit 1 as a true       09:16:33

 6     and correct copy of the expert report that you      09:16:36

 7     wrote and submitted for this case?                  09:16:40

 8        A.  As far as I can tell, without reading         09:16:43

 9     every page, yes.                                    09:16:46

10        Q.  Okay.  If you go to Page 33, that's           09:16:47

11     your signature, correct, sir?                       09:16:51

12        A.  Yes.                                          09:17:00

13        Q.  Okay.  Let's go to -- please go to            09:17:07

14     your CV, which is towards the back.  It's not       09:17:13

15     page numbered, but it's after the pages of your     09:17:17

16     report.                                             09:17:19

17        A.  (The witness complies.)                       09:17:27

18        Q.  And I want to focus on your                   09:17:35

19     education, which is Page 3 of your CV.              09:17:38

20              Do you see that, sir?                       09:17:40

21        A.  Yes.                                          09:17:46

22        Q.  So you have a BA in English and               09:17:48

23     economics from University of Michigan, an MA in     09:17:51

24     economics from University of Michigan and a Ph.D.   09:17:54

25     in mathematical statistics from George              09:17:56
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2      Washington, correct?                          09:18:00
 3              A.  Yes.                               09:18:00
 4              Q.  Did any of the coursework that you 09:18:01
 5      took for any of the degrees that's reflected  09:18:06
 6      pertain in any way to copyright management tools? 09:18:10
 7              A.  No.                                09:18:17
 8              Q.  Did any of the coursework that's   09:18:21
 9      reflected as part of your education relate in any 09:18:23
10      way to user submission to social media platforms? 09:18:26
11              A.  They didn't exist at the time so, no. 09:18:31
12              Q.  Correct.                           09:18:34
13                  Did you do any coursework at anytime 09:18:34
14      in the area of copyright protection?          09:18:40
15              A.  No.                                09:18:42
16              Q.  Have you ever done any coursework in 09:18:42
17      copyright management information?             09:18:47
18              A.  No.                                09:18:47
19              Q.  Have you ever done any coursework   09:18:48
20      that relates in any way to copyright records? 09:18:49
21              A.  No.                                09:18:53
22              Q.  Have you ever done any coursework   09:18:54
23      that relate to music or video databases?      09:18:56
24              A.  No.                                09:19:00
25              Q.  Are you currently pursuing any     09:19:03
```

Page 19

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2     degrees, sir?                                      09:19:06
 3          A.  No.                                       09:19:07
 4          Q.  So you're not currently doing any         09:19:09
 5     coursework in any of the areas that we've talked   09:19:12
 6     about previously, correct?                         09:19:15
 7          A.  I am not.                                 09:19:17
 8          Q.  Okay.  When were you first retained       09:19:18
 9     as an expert in this matter?                       09:19:23
10          A.  Either very late August or very early     09:19:29
11     September of last year.                            09:19:33
12          Q.  Of 2022?                                  09:19:34
13          A.  Yes, sir.                                 09:19:35
14          Q.  And who retained you as an expert?        09:19:37
15          A.  I was called by both -- Counsel from      09:19:43
16     both law firms, Korein Tillery and Boies           09:19:48
17     Schiller.                                          09:19:51
18          Q.  Had you ever worked with either           09:19:51
19     Korein Tillery or Boies Schiller in the past?      09:19:56
20          A.  With both.                                09:19:58
21          Q.  And how many other cases have you         09:20:00
22     worked with Boies Schiller before?                 09:20:02
23          A.  One.                                      09:20:05
24          Q.  How many other cases have you worked      09:20:05
25     with Korein Tillery before?                        09:20:08
```

Page 20

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2              Q.  Have you ever worked of Uniglobe        09:23:56

 3      Entertainment LLC?                                  09:23:59

 4              A.  No.                                      09:23:59

 5              Q.  Had you ever heard of AST Publishing    09:24:04

 6      limited?                                            09:24:06

 7              A.  No.                                      09:24:06

 8              Q.  Have you ever heard of Pirate           09:24:07

 9      Monitor?                                            09:24:10

10              A.  No.                                      09:24:10

11              Q.  Have you ever heard of someone named    09:24:21

12      Gabe Csupo, C-S-U-P-O?                              09:24:24

13              A.  No.                                      09:24:27

14              Q.  Have you ever used the YouTube          09:24:31

15      platform?                                           09:24:32

16              A.  On occasion.                            09:24:34

17              Q.  How have you used it?                    09:24:35

18              A.  There are only a couple of ways.        09:24:44

19      Every Wednesday evening my wife and I watch a       09:24:46

20      sermon on YouTube.  There is lots of sermons        09:24:51

21      loaded up on YouTube.  And that's our Wednesday     09:24:55

22      evening practice to have dinner and watch a         09:24:59

23      half-hour sermon.                                   09:25:03

24                  In addition, she has a particular       09:25:06

25      fondness for animal videos.  So we wind up          09:25:10
```

Page 24

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2     watching animal videos.  And I think that the        09:25:16
 3     final thing was that the entire two or three         09:25:20
 4     seasons of the Nero Wolfe Mysteries were on          09:25:25
 5     YouTube, which I didn't really expect, but I         09:25:30
 6     watched all of those.                                09:25:36
 7          Q.  The Nero Wolfe series, can you just         09:25:40
 8     explain that?                                        09:25:43
 9          A.  Nero is N-E-R-O.                            09:25:43
10          Q.  Uh-huh.                                     09:25:45
11          A.  Wolfe is W-O-L-F-E.  He's a fictional       09:25:46
12     detective and, I think, it was 73 books by a guy     09:25:51
13     named Rex Stoudt, S-T-O-U-D-T.                       09:25:56
14          Q.  When did you begin watching content         09:26:07
15     on YouTube?                                          09:26:12
16          A.  Probably about five years ago.             09:26:25
17          Q.  Have you ever uploaded content to          09:26:31
18     YouTube?                                             09:26:34
19          A.  No.                                         09:26:34
20          Q.  Do you know anyone who has ever            09:26:35
21     uploaded content to YouTube?                         09:26:37
22          A.  No.                                         09:26:39
23          Q.  So I'll take it as a -- strike that.       09:26:41
24              Have you ever used YouTube's               09:26:46
25     copyright management tools?                          09:26:49
```

Page 25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2          A.   No.                                           09:26:50

3          Q.   When did you first become aware that          09:26:54

4     YouTube has copyright management tools?                 09:26:56

5          A.   After I was engaged for this case.            09:26:58

6          Q.   So, other than your work on this              09:27:11

7     case, you have no experience with YouTube's             09:27:12

8     copyright management tools; is that correct?            09:27:15

9          A.   I agree.                                       09:27:19

10         Q.   Prior to your work on this case, were          09:27:27

11    you familiar with what a takedown notice was?           09:27:31

12         A.   No.                                           09:27:33

13         Q.   Have you ever submitted a takedown            09:27:37

14    notice in any context?                                  09:27:39

15         A.   No.                                           09:27:40

16         Q.   Other than your work in this case,            09:27:42

17    have you ever reviewed takedown notices?                09:27:44

18         A.   No.                                           09:27:46

19         Q.   Other than your work on this case,            09:27:51

20    have you ever analyzed takedown notices?                09:27:52

21         A.   No.                                           09:27:55

22         Q.   Other than your work in this case,            09:27:56

23    have you ever analyzed a database of multiple           09:27:58

24    takedown notices?                                       09:28:04

25         A.   No.                                           09:28:05

Page  26

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1              HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2              Q.  Have you ever used Google as a          09:28:14

3        product, sir?                                     09:28:17

4                  MS. O'KEEFE:  Objection as to form.     09:28:18

5                  MR. RICHLIN:  I'll restate it.          09:28:20

6              Q.  Are you aware of what Google is, sir?   09:28:21

7              A.  Well, I -- that still seems kind of     09:28:32

8        broad.  I use the Google search engine, so I'm    09:28:38

9        aware of that.  But as I understand it, Google    09:28:41

10       itself is a company.                              09:28:45

11             Q.  And are you aware that in addition to   09:28:51

12       Google search, Google offers various products?    09:28:54

13             A.  Oh, yes.                                 09:29:00

14             Q.  And you've already testified that you   09:29:03

15       use the Google search engine.                     09:29:04

16                 How often do you use the search         09:29:07

17       engine?                                           09:29:07

18             A.  Maybe once or twice a day.              09:29:12

19             Q.  Are there any other Google products     09:29:14

20       that you have used?                               09:29:17

21             A.  It depends on whether you count, for    09:29:23

22       example, Google Maps as being part of the Google  09:29:28

23       search engine or if it's a separate product.  So  09:29:32

24       I've used Google Maps.                            09:29:34

25             Q.  Anything else?                          09:29:36
```

                                               Page 27

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2      back from you, they sent everything that they    10:23:14

 3      were able to send, correct?                      10:23:17

 4            A.  Well, I wouldn't know that.  I mean,   10:23:18

 5      how would I know that?                           10:23:22

 6            Q.  To your knowledge, has Counsel         10:23:23

 7      provided everything that you've asked for that   10:23:26

 8      they are able to provide?                        10:23:29

 9            A.  Oh, to my knowledge, yes.              10:23:30

10            Q.  Okay.  Let's turn to the back of your  10:23:32

11      Exhibit 3 to your report where websites and      10:23:37

12      online sources of information are listed.        10:23:39

13            A.  Thank you.                             10:23:41

14            Q.  Alright.  Do you see that, sir?        10:23:44

15            A.  I do.                                  10:23:46

16            Q.  How were these sources of information  10:23:47

17      selected for you to rely on for purposes of      10:23:49

18      forming your opinion that you're offering here?  10:23:52

19            A.  Well, I selected all of them because   10:23:55

20      I used them to learn about the various databases 10:23:58

21      that were available that might be useful for the 10:24:03

22      work that we were doing.  And then in a couple of 10:24:09

23      cases, they are references to information about  10:24:18

24      the takedown notices that are on the Google      10:24:22

25      support pages.                                   10:24:28
```

Page 65

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2        Q.  Okay.  You said, sir, "I used them to        10:24:33

3    learn about the various databases that were        10:24:44

4    available that might be useful for the work that   10:24:46

5    we were doing."                                     10:24:48

6            How did you use these sources of            10:24:49

7    information to learn about various databases?       10:24:53

8        A.  Well, each one is a website that is,        10:24:59

9    essentially, the support page or the descriptive   10:25:04

10   page that describes a particular type of           10:25:10

11   database.  And so I relied on this information to  10:25:18

12   tell me what the database was, what information    10:25:21

13   was available, could I access the database, how    10:25:27

14   would I access the database and questions telling  10:25:31

15   me the specifics about each of these databases     10:25:35

16   that I reference in the body of my report.         10:25:40

17       Q.  Prior to being engaged as an expert        10:25:48

18   in this case, had you ever accessed the website    10:25:50

19   -- it's No. 2 on your list here, the               10:25:56

20   Copyright.gov website?                             10:25:59

21       A.  No.                                         10:26:00

22       Q.  How about No. 2, the                        10:26:08

23   SoundExchange.com, had you ever accessed that      10:26:10

24   website prior to your being engaged in this case?  10:26:12

25       A.  No.                                         10:26:15

Page 66

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2          Q.   Had you ever accessed the                10:26:16

3     MusicBrainz.org website prior to being engaged in  10:26:21

4     this case?                                          10:26:24

5          A.   No.                                       10:26:24

6          Q.   Had you ever accessed the EIDR.gov        10:26:25

7     website prior to being engaged in this case?        10:26:31

8          A.   No.                                       10:26:33

9          Q.   Have you ever accessed the IMDb.com       10:26:33

10    website for purposes -- for any purposes before     10:26:37

11    being engaged in this case?                         10:26:39

12         A.   Oh, many times.                           10:26:41

13         Q.   And when had you done so, for what        10:26:43

14    purposes?                                           10:26:47

15         A.   I was working with two -- I don't         10:26:48

16    know how to describe them -- two entrepreneurs in   10:26:58

17    California on their construction of a new           10:27:02

18    database that would be predictive of the success    10:27:05

19    or failure of a movie based on a variety of         10:27:11

20    inputs like who the actors might be or what the     10:27:18

21    plot line was or the setting or how it was filmed   10:27:24

22    or where it was filmed.   And the goal was to       10:27:30

23    provide information to investors who invest in      10:27:34

24    movies as to the likelihood of success and a        10:27:41

25    return on movies.                                   10:27:47

Page 67

```
 1           HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2                     And so I relied quite a bit on IMDb    10:27:50
 3      to collect information about past movies so that     10:27:55
 4      I could develop a predictive model.                  10:28:05
 5           Q.   When was that engagement?                  10:28:09
 6           A.   During the last decade.                    10:28:13
 7           Q.   Anymore specificity?                       10:28:17
 8           A.   Well, it was on and off; so, no.           10:28:20
 9           Q.   When was the last time you did any         10:28:22
10      work with respect to that engagement?                10:28:24
11           A.   Pre-COVID.                                 10:28:27
12           Q.   So, not in the last two and a half,        10:28:28
13      three years?                                         10:28:30
14           A.   That's correct.                            10:28:31
15           Q.   Were you able to develop the               10:28:36
16      predictive model that you were engaged to            10:28:39
17      explore?                                             10:28:41
18           A.   No, not fully.                             10:28:47
19           Q.   And other than that work, had you          10:28:48
20      ever used the IMDb.com website before?               10:28:50
21           A.   Well, on occasion, I'll look up a          10:28:57
22      movie to look at who the cast members are, when a    10:29:00
23      movie was released.  Sometimes there's something     10:29:03
24      about revenues and revenues in the US versus         10:29:10
25      revenues overseas.  So, typically, if I have been    10:29:13
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2     watching a movie I'm interested in, some of the       10:29:19

3     background details.                                    10:29:21

4          Q.   And that's for personal purposes,           10:29:23

5     correct?                                               10:29:25

6          A.   Yes.                                         10:29:25

7          Q.   Have you ever used the IMDb.com             10:29:26

8     website or the data reflected there                    10:29:30

9     professionally other than for the predictive           10:29:32

10    model that you testified to?                           10:29:36

11         A.   No.                                          10:29:37

12         Q.   How did you decide to select                10:29:39

13    Copyright.gov, SoundExchange.com, MusicBrainz.org     10:29:45

14    and EIDR.org, if you've ever accessed those web        10:29:49

15    pages prior to your engagement here?                   10:29:52

16         A.   Well, I was aware of the                     10:29:56

17    Copyright.gov database well before this case           10:29:59

18    simply because of other work that I had done in        10:30:05

19    patent trademarks.  I recognize this is                10:30:12

20    copyright, not patent and trademark.  But, you         10:30:15

21    know.  While you're working on that, you learn         10:30:18

22    about other databases.                                 10:30:20

23         With respect to SoundExchange,                    10:30:21

24    MusicBrainz, EIDR and IMDb -- well, I already          10:30:24

25    knew about IMDb.  But for the other three, I           10:30:28

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2    asked my research team to go out and look for        10:30:35
 3    databases that might give us information about       10:30:39
 4    information that would be information related to      10:30:47
 5    when a particular work was produced, the             10:30:55
 6    potential for copyright information and potential    10:31:01
 7    for ISRC information.  So I was, essentially,        10:31:04
 8    casting a wide net to find out what was              10:31:12
 9    available.                                           10:31:15
10          Q.  Besides asking your research team to       10:31:17
11    go out and look for databases, was there anything    10:31:19
12    else that you did to look for such databases?        10:31:22
13          A.  No.                                        10:31:32
14          Q.  Did Counsel for Plaintiffs direct you      10:31:44
15    to any database to review for purposes of --         10:31:45
16          MS. O'KEEFE:  Objection, privilege.            10:31:50
17          MR. RICHLIN:  Let me finish the                10:31:52
18    question first.                                      10:31:54
19          Q.  Did Counsel for the Plaintiffs direct      10:31:57
20    you to any database to review for purposes of        10:31:59
21    producing the opinion that's reflected in this       10:32:06
22    report?                                              10:32:08
23          MS. O'KEEFE:  Objection, privilege.            10:32:08
24          [INSTRUCTION] Eli, I'm going to                10:32:09
25    direct him to answer whether he says yes or no,      10:32:10
```

Page 70

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2     he's revealing the substance of communications    10:32:12
 3     with Counsel.                                      10:32:15
 4          Q.  Are you going to take your attorney's     10:32:16
 5     direction and refuse to answer the question?       10:32:18
 6          A.  Respectfully.                             10:32:21
 7              Mr. Richlin --                            10:32:27
 8          Q.  Yes.                                      10:32:27
 9          A.  -- is this a good time to break or        10:32:28
10     would you like to ask a couple more questions?     10:32:30
11          Q.  Do you need to take a break, sir?         10:32:33
12          A.  I don't "need" to, but you were           10:32:34
13     between questions so I thought I would.            10:32:36
14          Q.  Yeah, I would like to do a few more       10:32:38
15     here, if you can.  But if you need to take a       10:32:40
16     break, that's fine.                                10:32:42
17          A.  No, no, that's fine.  I just want to      10:32:43
18     alert you so -- but you're on a roll.  I don't     10:32:45
19     want to --                                         10:32:47
20          Q.  Yeah, we're coming to it?                 10:32:47
21          A.  Yeah.                                     10:32:47
22          Q.  Appreciate it.                            10:32:49
23              I do want to ask about the team           10:32:50
24     members who you stated did research under your     10:32:53
25     direction to find these databases.                 10:32:59
```

Page 71

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2               Did any of them have any background      10:33:01
 3    in copyright management records?                    10:33:07
 4          A.  Not that I'm aware.                        10:33:12
 5          Q.  Do you know whether any of them had       10:33:17
 6    ever used any of these databases before?            10:33:19
 7          A.  Well, with IMDb I discussed it with       10:33:25
 8    Mr. Smith to understand database structures;        10:33:29
 9    otherwise, I'm not aware that they had any other    10:33:35
10    experience.                                          10:33:37
11          Q.  So, to the best of your knowledge,        10:33:38
12    your team was working on a blank slate and then     10:33:40
13    from that blank slate identified                     10:33:43
14    SoundExchange.com, MusicBrainz.org, EIDR.org, at    10:33:47
15    least?                                               10:33:53
16          A.  Yes.                                       10:33:53
17          Q.  Okay.                                      10:33:53
18          A.  This is common for my firm.  They         10:33:55
19    start with a blank slate and see what we can        10:33:57
20    find.                                                10:34:03
21          Q.  Okay.  And did you conduct any            10:34:03
22    interviews in forming your expert opinion?          10:34:14
23          A.  I'm a little confused by your            10:34:24
24    question.                                            10:34:27
25               "Interviews" with whom?                  10:34:27
```

Page 72

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2            Q.  With anyone.                          10:34:28

 3            A.  Well, we had an extensive back and    10:34:29

 4     forth with each of these sources to discover what 10:34:32

 5     database they had available, was it publically    10:34:37

 6     available, was it for sale, could it be           10:34:41

 7     downloaded, under what conditions.                10:34:45

 8             So, with the exception of IMDb where      10:34:48

 9     I already knew the answers, we had lots of        10:34:53

10     conversations.  I don't think I'd call them       10:34:57

11     "interviews," but I would call them discussions   10:35:00

12     about the technical aspects of all of these.      10:35:03

13            Q.  When you say -- were these oral        10:35:08

14     communications or written communications?         10:35:12

15            A.  They were oral communications with    10:35:16

16     the exception of the Library of Congress, who     10:35:18

17     maintains the Copyright.gov.  Those were mostly   10:35:24

18     oral conversations.  But we did have to submit    10:35:32

19     forms to apply to receive the -- their database.  10:35:35

20            Q.  Okay.  And so did you or your team     10:35:41

21     have an oral communication with a representative  10:35:47

22     of SoundExchange.com?                             10:35:51

23            A.  Yes, one of my team did.              10:35:53

24            Q.  And how about with MusicBrainz.org?    10:36:00

25            A.  Definitely.                            10:36:04
```

Page 73

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY | |
| 2 | conversations with Counsel at the Library of | 10:39:07 |
| 3 | Congress to determine that we could provide the | 10:39:14 |
| 4 | Defendants with a copy of the database that we | 10:39:20 |
| 5 | purchased from the Library of Congress. | 10:39:23 |
| 6 | Q.  Other than with representatives from | 10:39:26 |
| 7 | these sources of information that you just | 10:39:30 |
| 8 | testified to, did you or your team have any | 10:39:32 |
| 9 | conversations with third parties in connection | 10:39:34 |
| 10 | with your opinion here? | 10:39:38 |
| 11 | A.  Not that I know of, no. | 10:39:42 |
| 12 | MR. RICHLIN:  Okay.  Let's go off the | 10:39:44 |
| 13 | record. | 10:39:46 |
| 14 | THE VIDEOGRAPHER:  Please stand by. | 10:39:47 |
| 15 | The time is 10:39 a.m.  We are off | 10:39:48 |
| 16 | the record. | 10:39:51 |
| 17 | (Recess taken 10:39 to 10:55 a.m.) | 10:55:22 |
| 18 | THE VIDEOGRAPHER:  The time is | 10:55:22 |
| 19 | 10:55 a.m.  We are back on the record. | 10:55:24 |
| 20 | You may proceed. | 10:55:26 |
| 21 | Q.  Dr. Cowan, I want to talk a little | 10:55:30 |
| 22 | bit of the expertise of your team members and | 10:55:32 |
| 23 | here I'm talking about the team members that | 10:55:35 |
| 24 | you've testified to that provided assistance in | 10:55:37 |
| 25 | this matter, okay? | 10:55:39 |

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2        A.  Sure.                                    10:55:40

 3        Q.  At the first part of today's             10:55:42

 4   deposition I asked about your experience in a     10:55:44

 5   number of different areas including with online   10:55:46

 6   copyright management tools, online platforms.     10:55:49

 7           Do you recall that testimony?             10:55:51

 8        A.  I do.                                     10:55:52

 9        Q.  So now I want to apply those             10:55:53

10   questions to your team teams, okay?               10:55:55

11           To your knowledge and this is all         10:56:02

12   based on your knowledge, do any of your team      10:56:04

13   members have experience professionally doing any  10:56:07

14   work relating to online copyright management      10:56:10

15   tools?                                            10:56:13

16        A.  Not to my knowledge.                     10:56:13

17        Q.  Do any of your team members have         10:56:15

18   professional experience with respect to           10:56:18

19   submissions to social media platforms?            10:56:20

20        A.  Not to my knowledge.                     10:56:25

21        Q.  Do any of your team members have         10:56:26

22   professional experience in the area of copyright  10:56:29

23   protection?                                       10:56:32

24        A.  Not to my knowledge.                     10:56:32

25        Q.  Do any of your team members have         10:56:33
```

Page 77

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2     expertise in the area of copyright management      10:56:36

 3     information?                                         10:56:40

 4          A.  Not to my knowledge.                       10:56:40

 5          Q.  Do any of your team members have           10:56:44

 6     expertise in the area of online copyright           10:56:48

 7     records?                                             10:56:51

 8          A.  Not to my knowledge.                       10:56:51

 9          Q.  To any of your team members have           10:56:53

10     expertise in the area of online music or video      10:56:58

11     databases?                                           10:57:03

12          A.  Not to my knowledge.                       10:57:04

13          Q.  And you said, sir, there are no            10:57:16

14     notes, to your knowledge, of the oral               10:57:18

15     communications that your team members had with      10:57:22

16     representative of the various websites, correct?    10:57:24

17          A.  No, that's not what I said.                10:57:27

18          Q.  Okay.  Are there notes of the oral         10:57:29

19     communications that your team members had with      10:57:34

20     representatives of the various websites?            10:57:37

21          A.  I understood your question to be that      10:57:39

22     there were no notes and my earlier response was I   10:57:42

23     don't know.  They've never shown me any.            10:57:47

24          Q.  Okay.  You've never reviewed any           10:57:49

25     notes of the communications that your team          10:57:52
```

Page 78

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2     members had with representatives of the websites    10:57:55

 3     that are reflected in the materials relied on in    10:57:57

 4     your report?                                        10:58:01

 5          A.  Again, your question is assuming that      10:58:01

 6     there are such notes.  I don't even know if there   10:58:03

 7     are.                                                10:58:06

 8          Q.  Whether they exist or not, you've          10:58:08

 9     never reviewed any potential notes or the absence   10:58:11

10     thereof, correct?                                   10:58:14

11          A.  Especially the ones that don't exist,      10:58:14

12     yes.                                                10:58:17

13          Q.  Especially those.                          10:58:17

14          Did your team create any memos of the          10:58:20

15     communications that they had with representatives   10:58:29

16     of the websites that you've provided?               10:58:33

17          A.  I'm sorry, you asked me about memos?       10:58:42

18     No.                                                 10:58:45

19          Q.  Before I asked you about notes, which      10:58:45

20     potentially are more informal.                      10:58:48

21          I'm now asking you about a formal              10:58:50

22     memo.                                               10:58:52

23          A.  Oh.  No, I've not seen anything.           10:58:53

24          Q.  Do you know whether such memos exist?      10:59:01

25          A.  I think I would know if they existed.      10:59:10
```

Page 79

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2    So, no, I don't know if they exist, but I think    10:59:14

 3    it's highly unlikely.                              10:59:17

 4        Q.  Did your team consult any third-party      10:59:20

 5    sources other than those websites themselves to    10:59:30

 6    determine whether or not these websites should be  10:59:36

 7    relied upon for purposes of your report?           10:59:42

 8        A.  Not that I'm aware of, no.                  10:59:45

 9        Q.  Did they review any peer-reviewed          10:59:47

10    academic literature that relates in any way to     10:59:52

11    those websites?                                    10:59:54

12        A.  They did not.                               10:59:57

13        Q.  Did they review any professional           10:59:58

14    level literature that relates to those websites?   11:00:00

15        A.  Not that I'm aware of.                      11:00:05

16        Q.  Did they review any source at all          11:00:09

17    that relates to those websites, other than those   11:00:12

18    websites themselves?                               11:00:17

19        A.  Not that I'm aware of.                      11:00:18

20        Q.  And have you reviewed any source at        11:00:48

21    all that relates to these websites other than the  11:00:51

22    websites themselves?                               11:00:56

23        A.  I have not.                                 11:00:57

24        Q.  And you personally have not discussed      11:01:06

25    those websites with anyone besides the members of  11:01:08
```

Page 80

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2     your team and Plaintiffs' Counsel, correct?      11:01:11
 3          A.  I have not.                              11:01:16
 4          Q.  And did you personally speak with any   11:01:17
 5     other representatives of the websites?           11:01:21
 6          A.  I did not.                               11:01:23
 7          Q.  Alright.  Let's turn back to your       11:01:33
 8     report and I want to go to your CV, which follows 11:01:36
 9     the report itself.  So it comes right after      11:01:42
10     Page 33 of your report and in the appendix.      11:01:46
11          A.  I'm there.  Thank you.                  11:01:54
12          Q.  Is this a true and accurate copy of     11:01:58
13     your CV?                                          11:02:00
14          A.  Yes.                                     11:02:10
15          Q.  And does this accurately summarize      11:02:11
16     your employment history?                         11:02:14
17          A.  Yes.                                     11:02:16
18          Q.  Does this fully and accurately          11:02:18
19     summarize your education background?             11:02:20
20          A.  Yes.                                     11:02:22
21          Q.  And your CV does not describe any       11:02:30
22     professional experience with respect to          11:02:33
23     user-generated content platforms, correct?      11:02:36
24          A.  Well, with the -- if you remember the   11:02:40
25     discourse we had during the first half hour where 11:02:44
```

Page 81

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY | |
| 2 | I talked about Census Bureau. | 11:02:47 |
| 3 | Are you excluding those types of... | 11:02:53 |
| 4 | Q.  Yeah, I'm using the same definition | 11:02:57 |
| 5 | we talked about earlier where I'm using as a | 11:02:58 |
| 6 | definition of "user-generated content platform" a | 11:03:02 |
| 7 | platform that hosts that anyone can post, not | 11:03:06 |
| 8 | specific employees or census workers. | 11:03:09 |
| 9 | So, with that definition, does your | 11:03:13 |
| 10 | CV contain any or reflect any experience with | 11:03:16 |
| 11 | respect to user-generated content platforms? | 11:03:21 |
| 12 | A.  No, it does not. | 11:03:24 |
| 13 | Q.  And your CV, similarly, does not | 11:03:28 |
| 14 | describe any experience with online databases of | 11:03:31 |
| 15 | either music or video works, correct? | 11:03:34 |
| 16 | A.  That is correct, it does not. | 11:03:39 |
| 17 | Q.  Your CV does not describe any field | 11:03:41 |
| 18 | in the field of copyright management, correct? | 11:03:43 |
| 19 | A.  I'm sorry, I missed one word in that. | 11:03:47 |
| 20 | Did you say copyright? | 11:03:49 |
| 21 | Q.  Yes. | 11:03:50 |
| 22 | A.  Ah.  No, it does not. | 11:03:51 |
| 23 | Q.  And your CV does not describe any | 11:03:55 |
| 24 | experience with respect to copyright databases, | 11:03:56 |
| 25 | right? | 11:04:00 |

Page 82

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2          A.  It does not.                    11:04:00
 3          Q.  Turning back to Analytic Focus, the    11:04:04
 4     company which we talked about earlier.    11:04:06
 5              What percentage of your time is spent  11:04:08
 6     as an expert witness?                     11:04:14
 7          A.  It varies from year to year depending  11:04:18
 8     on what else is going on.  Typically, it's in the  11:04:21
 9     50 to 60 percent range.                   11:04:27
10          Q.  Is that true over the past five   11:04:29
11     years?                                    11:04:32
12          A.  During the -- no.  During the RMBS    11:04:34
13     days, which I would characterize as going through  11:04:44
14     2015, 2016, it was higher.  It was probably  11:04:48
15     closer to 75 percent.  And then subsequently it's  11:04:53
16     tapered off with more of my time being spent on  11:04:57
17     work for the federal government or for private  11:05:03
18     sector companies.                         11:05:07
19          Q.  What are the average annual revenues  11:05:20
20     of Analytic Focus over the past five years?  11:05:23
21          A.  We're talking about gross revenues?  11:05:30
22          Q.  Uh-huh.                          11:05:32
23          A.  I would say probably 5 to 6 million.  11:05:33
24          Q.  Annually?                        11:05:39
25          A.  Annually.                        11:05:40
```

Page 83

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2              Q.  And are you -- do you take a salary    11:05:42

 3      from Analytic Focus or do you -- is your          11:05:44

 4      compensation via some other vehicle of payment?   11:05:49

 5              A.  You can keep asking me questions that  11:05:56

 6      give me two alternatives and the answer to that   11:05:58

 7      one is, yes, both.                                11:06:02

 8              Q.  Okay.  What is your salary from        11:06:04

 9      Analytic Focus?                                   11:06:06

10              A.  I believe that is 420,000 a year.      11:06:09

11              Q.  And has that remained constant over    11:06:14

12      the past five years?                              11:06:17

13              A.  I believe it went from 400,000 to      11:06:19

14      420,000 about three years ago.                    11:06:22

15              Q.  And do you also take a share of        11:06:27

16      profits from Analytic Focus?                      11:06:30

17              A.  Yes.                                   11:06:31

18              Q.  What has been your average profits     11:06:34

19      over the past five years?                         11:06:36

20              A.  Somewhere in the range of 50 percent   11:06:39

21      of the total gross.                               11:06:41

22              Q.  And is that shared between you and     11:06:44

23      your wife?                                        11:06:46

24              A.  Yes, with her getting the bigger       11:06:48

25      piece.  I just want to make sure it's on the      11:06:50
```

Page 84

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1            HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2            A.  Sorry.  Now you're interrupting me.    11:24:28

 3            Q.  Sir, no, sir -- sir, you're answering  11:24:31

 4       a question I didn't ask you, okay.              11:24:32

 5            A.  You did ask me that.  You said, did I  11:24:34

 6       say that and I said, no --                      11:24:36

 7            MS. O'KEEFE:  If he wants -- if he          11:24:38

 8       wants to explain the context in which -- when you 11:24:39

 9       asked him the question, did you say that, he     11:24:44

10       said, no, Mr. Selendy said that and, in fact, I  11:24:46

11       want to read what was said.  I think he's        11:24:49

12       entitled to do that.                             11:24:51

13            Q.  If you want to read it, you can read    11:24:53

14       it to yourself.  I don't need your reading it    11:24:55

15       into the record.  That's not my question.        11:24:56

16            MS. O'KEEFE:  He's entitled -- that         11:24:57

17       was your question.                               11:24:59

18            MR. RICHLIN:  That's not my question.       11:24:59

19            MS. O'KEEFE:  Did you say that?  That       11:25:01

20       is his answer.                                   11:25:02

21            Did you say that?                           11:25:02

22            No, Mr. Selendy said it, and I want         11:25:03

23       to read what was said.                           11:25:05

24            Q.  I am directing you not to read it       11:25:08

25       into the record.  It's already been read into the 11:25:10
```

Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2     record.  Okay.                                   11:25:13
 3          A.  Actually, it hasn't been read into      11:25:14
 4     the record.  I'm sorry.                           11:25:16
 5          Q.  If you want to read it later, I'm        11:25:23
 6     sure Counsel will provide you an opportunity when 11:25:25
 7     she redirects, if she chooses to do so.           11:25:27
 8            Let's go back to Exhibit 3 -- excuse       11:25:31
 9     me, Exhibit 1, which is your report.              11:25:34
10          A.  (The witness complies.)                  11:25:45
11          Q.  I want to focus on your publications,    11:25:51
12     sir.  Let me know when you're there.              11:25:53
13          A.  I'm there.                               11:25:58
14          Q.  Okay.  Does this provide a full and      11:25:59
15     complete list of all your publications that you   11:26:04
16     have offered in the last ten years?               11:26:08
17          A.  As far as I know.                        11:26:11
18          Q.  And it actually goes back further.       11:26:14
19            So is this a full complete list of         11:26:15
20     all the publications that you've offered in your  11:26:19
21     professional career?                              11:26:22
22          A.  Yes, as far as I know.                   11:26:22
23          Q.  Okay.  Can you please identify which     11:26:26
24     of these publications, if any, concern copyright  11:26:28
25     issues?                                           11:26:31
```

Page 97

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1            HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2            A.   None of them do.                        11:26:34

 3            Q.   And do any of them concern online       11:26:37

 4       rights management?                                11:26:41

 5            A.   None of them do.                        11:26:41

 6            Q.   Do any of them relate to online         11:26:46

 7       platforms not including the census?              11:26:51

 8            A.   Well, going back to the definition      11:27:00

 9       that you gave me at the beginning of our          11:27:01

10       discussion, none of them do with respect to those 11:27:04

11       types of online platforms.                        11:27:07

12            Q.   Okay.   Have you ever served on any      11:27:09

13       peer-reviewed journals?                           11:27:12

14            A.   Yes, a number of them.                  11:27:14

15            Q.   Anything relating to copyright          11:27:16

16       issues?                                           11:27:19

17            A.   No.                                     11:27:20

18            Q.   Anything relating to copyright          11:27:22

19       records?                                          11:27:27

20            A.   No.                                     11:27:27

21            Q.   Have you ever served on the editorial   11:27:29

22       board of any journal?                             11:27:31

23            A.   Yes.                                    11:27:33

24            Q.   Anything relating to copyright          11:27:34

25       issues?                                           11:27:38
```

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2              A.   No.                                    11:27:38

3              Q.   Or copyright management information?   11:27:38

4              A.   No.                                    11:27:41

5              Q.   Have you ever been affiliated as a     11:27:45

6         professor of a university?                       11:27:48

7              A.   Yes.                                   11:27:49

8              Q.   And are those reflected on your CV     11:27:49

9         under professional associations?                 11:27:52

10             A.   Some of them are.                      11:27:55

11             Q.   Are there others that are not          11:27:56

12        reflected?                                       11:27:58

13             A.   Harvard.                               11:27:59

14             Q.   What was your -- excuse me.            11:28:04

15                  What was your position at Harvard?     11:28:06

16             A.   I was serving as an adjunct professor  11:28:07

17        for a graduate students to be able to conduct    11:28:10

18        research, you know, using surveys and statistics. 11:28:14

19             Q.   When was this?                         11:28:19

20             A.   I think it was like 2017, 2018.  It    11:28:23

21        was two years.                                   11:28:25

22             Q.   Are you still affiliated with          11:28:26

23        Harvard?                                         11:28:28

24             A.   No.                                    11:28:28

25             Q.   Are you currently affiliated with any  11:28:29

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2   university?                                       11:28:31
 3        A.   No.                                     11:28:32
 4        Q.   When were you affiliated with           11:28:38
 5   University of Illinois?                           11:28:39
 6        A.   In 1984 through 1986 or 1987.           11:28:43
 7        Q.   And were your responsibilities at the   11:28:54
 8   University of Illinois in relation to statistics? 11:28:57
 9        A.   Yes.                                    11:29:01
10        Q.   Have you ever provided any              11:29:04
11   professional level instruction in the area of     11:29:08
12   copyright?                                        11:29:11
13        A.   No.                                     11:29:11
14        Q.   In the area of copyright databases?     11:29:12
15        A.   No.                                     11:29:15
16        Q.   Have you ever spoken at a conference    11:29:18
17   that relates to copyright issues?                 11:29:20
18        A.   I believe you asked me these            11:29:25
19   questions earlier this morning and at the time I  11:29:27
20   said, no.                                         11:29:29
21        Q.   Okay.  Alright.  Let's turn to your     11:29:30
22   past testimony, which is a little bit further     11:29:37
23   down in your CV.                                  11:29:39
24        A.   (The witness complies.)                 11:29:41
25        Q.   It looks like this is -- only           11:29:57
```

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2      reflects cases from, approximately, 2016 on.      11:30:01
 3              Is this the -- does this provide all      11:30:05
 4      testimony that you provided in your professional  11:30:08
 5      career or only for the past few years?           11:30:12
 6          A.  Past four years.                          11:30:14
 7          Q.  Okay.  So there's other testimony        11:30:15
 8      that you provided beyond the past four years just 11:30:18
 9      not reflected on your CV, correct?               11:30:20
10          A.  That is correct.                          11:30:22
11          Q.  Is it a full and accurate listing of     11:30:23
12      all testimony that you've provided in the past   11:30:25
13      four years?                                       11:30:28
14          A.  As of the time I wrote this report,      11:30:28
15      yes.                                              11:30:30
16          Q.  Have you provided any testimony          11:30:30
17      subsequent to the submission of this report in   11:30:32
18      November?                                         11:30:35
19          A.  I believe I have.                         11:30:36
20          Q.  Okay.  And what is that?                  11:30:38
21          A.  I'm trying to remember.                   11:30:39
22              I had another deposition.  I can't        11:30:56
23      remember what the university was, but it had to  11:30:58
24      do with tuition and fee refund due to the        11:31:00
25      university closing due to COVID.                 11:31:06
```

Page 101

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2          Q.  Do you remember any of the party          11:31:14

3    names in that case?                                  11:31:16

4          A.  No, I was trying to remember the           11:31:17

5    university.                                          11:31:19

6          Q.  Was that deposition testimony or           11:31:24

7    trial testimony?                                     11:31:25

8          A.  Deposition.                                11:31:26

9          Q.  Anything else that's within the last       11:31:29

10   four years that's not reflected on this part of      11:31:31

11   your CV?                                             11:31:34

12         A.  I don't believe so.                        11:31:37

13         Q.  Do any of these cases that are             11:31:50

14   reflected on your CV as being testimony from the     11:31:52

15   past four years involve claims of copyright          11:31:56

16   infringement?                                        11:32:02

17         A.  No.                                        11:32:02

18         Q.  Other than these cases that are            11:32:06

19   reflected, returning to your expert experience       11:32:07

20   that predates the last four years, do any of         11:32:11

21   those cases involve claims of copyright              11:32:14

22   infringement?                                        11:32:17

23         A.  No.                                        11:32:19

24         Q.  So this is your first time serving as      11:32:20

25   an expert witness in a case involving claims of      11:32:23

                                                Page 102

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
2     copyright infringement, correct?                  11:32:26
3          A.  Yes.                                     11:32:27
4          Q.  For purposes of any expert witness       11:32:33
5     experience that you've ever had in the past four  11:32:35
6     years or otherwise, have you ever reviewed any    11:32:38
7     copyright management databases?                   11:32:45
8          A.  No.                                      11:32:46
9          Q.  For purposes of the opinions and         11:33:00
10    testimony you provided in any case other than for 11:33:05
11    today, did you review any databases consisting of 11:33:08
12    user-generated content?                           11:33:15
13              And by "user-generated content," I'm    11:33:18
14    referring not to census data or data that was     11:33:20
15    compiled by an employee, but data from individual 11:33:26
16    users not employed by the database itself.        11:33:32
17         A.  No.                                      11:33:39
18         Q.  Have you ever testified regarding a      11:33:49
19    methodology for identifying members of a          11:33:52
20    potential class?                                  11:33:55
21         A.  Yes.                                     11:33:58
22         Q.  In one case or more than one case?       11:34:02
23         A.  More than one.                           11:34:04
24         Q.  Are any of those cases reflected on      11:34:05
25    this CV that's part of Exhibit 1?                 11:34:07
```

Page 103

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2            A.  I'm sorry, I have to take a look.       11:34:10

 3                Okay.  So, if I could direct you to     11:35:10

 4        Page 1 of -- that's headed, "Past Testimony    11:35:16

 5        Charles D. Cown."                              11:35:21

 6            Q.  Uh-huh.                                 11:35:22

 7            A.  County of Cook versus Bank of America   11:35:24

 8        -- well, I'm sorry.  I'm going to withdraw that 11:35:28

 9        because County of Cook was actually the Plaintiff 11:35:38

10        on behalf of people who lived in Cook County.   11:35:41

11        But, actually, the only name -- the only        11:35:47

12        Plaintiff period was the County.                11:35:49

13                In Sheldon Hunsberger versus State      11:36:15

14        Farm, I did have to identify -- I had to develop 11:36:20

15        a model to identify.  I didn't have to identify. 11:36:25

16        We developed a model to identify class          11:36:27

17        Plaintiffs.  That's the only one within the last 11:36:31

18        four years that I can point to.                 11:37:14

19                Going back to Cook County and the       11:37:17

20        similar work for the county, I had to determine 11:37:22

21        who was harmed within the county.  In other     11:37:28

22        words, the county was bringing the suit.  So I  11:37:31

23        don't know if that's responsive to your question 11:37:34

24        or not.                                          11:37:35

25            Q.  Okay.  And other than the Sheldon       11:37:36
```

Page 104

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2              MS. O'KEEFE:  Objection, form.      12:43:08

 3              MR. RICHLIN:  What's the basis of the  12:43:14

 4    objection?                                      12:43:16

 5              MS. O'KEEFE:  I don't know if you're  12:43:17

 6    using "ascertain" in the legal context or -- I'm  12:43:18

 7    not sure how you're using the word "ascertained."  12:43:23

 8    I think it's capable of multiple interpretation.  12:43:27

 9              MR. RICHLIN:  I'm reading from the    12:43:30

10    report which uses the word.                     12:43:33

11              MS. O'KEEFE:  Okay.                   12:43:34

12         Q.  And, sir, with that, I will clarify   12:43:34

13    that I'm using the word "ascertain," as you use  12:43:37

14    it in your report.                              12:43:40

15              MS. O'KEEFE:  Okay.                   12:43:41

16              MR. RICHLIN:  Does that resolve the  12:43:42

17    objection?                                      12:43:43

18              MS. O'KEEFE:  Yes, it does.           12:43:44

19              MR. RICHLIN:  Okay.                   12:43:45

20         A.  Just to make sure that we're all      12:43:46

21    talking about the same thing, since I didn't    12:43:50

22    realize there was a legal interpretation to the  12:43:52

23    word "ascertain."                               12:43:54

24              I was asked to identify class         12:43:56

25    members.                                        12:43:58
```

Page 140

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2          Q.  Okay.                                  12:43:59
 3          A.  That's what I meant by "ascertain."    12:44:00
 4          Q.  Were you asked to determine the        12:44:03
 5   number of class members in each class?            12:44:05
 6          A.  Yes.                                    12:44:09
 7          Q.  Were you asked to determine the        12:44:10
 8   number of infringing videos or infringed works    12:44:12
 9   associated with each class?                        12:44:15
10          A.  Yes.                                    12:44:16
11          Q.  Have you identified any class          12:44:18
12   members?                                           12:44:20
13          A.  Yes.                                    12:44:20
14          Q.  What class members have you            12:44:22
15   identified?                                        12:44:24
16          A.  Well, I don't recall their names.      12:44:25
17   However, in the work that I describe that I was    12:44:28
18   doing, I was able to in the 2,000 work, sample     12:44:32
19   working -- this means the works that are posted    12:44:41
20   on YouTube -- I was able to identify,              12:44:44
21   approximately, 23 people who were class members    12:44:51
22   in the registered works infringement class, 2 in  12:44:58
23   the foreign unregistered works infringement        12:45:05
24   class, 7 in the ISRC class and 23 in the CLFN      12:45:09
25   class.                                             12:45:12
```

Page 141

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2          Q.  Dr. Cowan, can you point me to the      12:45:16
 3     place in your report where you list the class    12:45:20
 4     members that you've identified among any of the  12:45:23
 5     said classes?                                     12:45:27
 6          A.  I don't list the individual.            12:45:28
 7          Q.  Can you point to me the place in your   12:45:31
 8     report where you disclose that you have, in fact, 12:45:34
 9     identified any members of any class?             12:45:38
10          A.  Well, what I said in my report -- and  12:45:43
11     I'd have to go back and read through my report.  12:45:49
12     But the short answer to your question is I say   12:45:51
13     that I have undertaken a match of the 2,000 work 12:45:54
14     sub-sample that I selected from the 90-day sample 12:46:01
15     and matched it into multiple databases; in       12:46:03
16     particular, the copyright office, the MusicBrainz 12:46:08
17     database and SoundExchange for the registered    12:46:14
18     works, the foreign works and ISRC class.         12:46:19
19          I did something similar with the CLFN       12:46:30
20     class, but I did that by using a different       12:46:32
21     dataset that was provided by the Defendants.     12:46:38
22          But I say quite clearly that I             12:46:40
23     employed numerous people to do these matches so  12:46:45
24     that I could learn how to write the matching     12:46:48
25     algorithm.  So, clearly, if I'm doing that type 12:46:51
```

Page 142

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2     of matching, I must have identified individuals   12:46:54

 3     so that I'd be able to go forward and do the      12:46:56

 4     algorithm development.                            12:47:02

 5          Q.  Well, sir, I -- respectfully, it's       12:47:09

 6     not clear to me, because there is nowhere in your 12:47:12

 7     report that either, No. 1, lists any member of    12:47:15

 8     any class that you've identified or, No. 2,       12:47:20

 9     states the number of class members that have been 12:47:23

10     identified for any class or, No. 3, states that   12:47:26

11     you've identified any members for any class.      12:47:30

12          And so I'm not going to ask you to go        12:47:33

13     back through your report right now.  I will       12:47:35

14     invite you to go back through your report when we 12:47:38

15     take our lunch break and at that time when we     12:47:41

16     come back from launch, I'll give you an           12:47:43

17     opportunity to point me to anywhere in your       12:47:45

18     report where you disclose any of that             12:47:47

19     information.  That's not a question.  I'm just    12:47:51

20     going to -- I'll just tell you that.              12:47:53

21          Let me ask you this.                         12:48:05

22          Who on your team engaged in this             12:48:07

23     matching process that you just testified about?   12:48:11

24          A.  Myself plus the three individuals I      12:48:14

25     mentioned before.                                 12:48:17
```

Page 143

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2            Q.  Did you create records of engaging      12:48:19

 3    this matching process?                              12:48:23

 4            A.  Yes.                                     12:48:26

 5            Q.  Are those records produced and          12:48:29

 6    contained in your report?                           12:48:32

 7            A.  No.                                      12:48:34

 8            Q.  Have you provided those records to      12:48:35

 9    your Counsel?  Excuse me, let me restate that.      12:48:37

10            Have you provided those records to          12:48:42

11    Plaintiffs' Counsel?                                12:48:45

12            A.  I don't think so.  I'm not a hundred    12:48:50

13    percent sure of that, but I don't think so.         12:48:52

14            Q.  And you're not aware of those records   12:48:54

15    having been provided to Defendants' Counsel,        12:48:56

16    correct?                                            12:48:59

17            A.  I don't know what's been provided to    12:49:02

18    Defendants' Counsel.                                12:49:04

19            Q.  Well, you know that your report has     12:49:09

20    been provided to us, correct?                       12:49:11

21            A.  Yes.  But, on the other hand, there's   12:49:12

22    a ton of backup materials that went with that       12:49:17

23    that I know were provided to you, but they're not   12:49:20

24    in the report either.                               12:49:22

25            Q.  Okay.  Well -- so it would be           12:49:23
```

Page 144

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2     helpful, I guess, to -- and I'll just ask you.      12:49:36

 3               Your team created records of having       12:49:39

 4     conducted a matching process to identify class      12:49:45

 5     members, correct?                                   12:49:47

 6          A.  Yes.                                       12:49:48

 7          Q.  Are there other records that your          12:49:51

 8     team created to test the methodology that you've    12:49:53

 9     designed that have not been produced?               12:49:59

10          A.  No.  We're still in the process of         12:50:08

11     writing the algorithms to do the match of the       12:50:12

12     hundreds of thousands of takedown notices into      12:50:20

13     the different databases we just discussed.  So      12:50:22

14     there's testing embedded in that, but we haven't    12:50:27

15     finished developing the algorithms.                 12:50:30

16          Q.  When you say, "the hundreds of             12:50:33

17     thousand takedown notices," do you mean the         12:50:34

18     dataset that you originally had or are you          12:50:37

19     talking about the supplemental dataset?             12:50:42

20          A.  The original dataset.                      12:50:44

21          Q.  What is your purpose of continuing to      12:50:57

22     write the algorithm to do the match of "hundreds    12:51:00

23     of thousands of takedown notices" into the          12:51:03

24     different databases?                                12:51:05

25          A.  Could you repeat the question?             12:51:11
```

Page 145

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2               (Whereupon, the question is read back   12:51:11

 3        as follows:                                    12:51:11

 4               "Question:  What is your purpose of     12:50:57

 5        continuing to write the algorithm to do the match  12:50:59

 6        of "hundreds of thousands of takedown notices"  12:51:02

 7        into the different databases?")                12:51:05

 8            A.  I was asked by Counsel to continue to  12:51:26

 9        work on finishing those algorithms.            12:51:29

10            Q.  Do you currently expect to describe    12:51:38

11        those algorithms in some sort of supplemental  12:51:41

12        report?                                        12:51:44

13            A.  I haven't been asked to do that, so I  12:51:45

14        don't know.                                    12:51:48

15               MR. RICHLIN:   Okay.  [RESERVATION]     12:51:49

16        I'll object again to any supplemental algorithm  12:51:52

17        that's described and the basis of continued    12:51:57

18        testing and to Dr. Cowan's ability to testify as  12:52:01

19        to any such is outside the expert discovery    12:52:08

20        schedule.                                      12:52:11

21            Q.  Again, not a question for you, sir.    12:52:13

22               Going back to Paragraph 1, have you     12:52:29

23        determined the number of class members in each  12:52:33

24        class?                                         12:52:37

25            A.  So I've determined -- so let me        12:52:37
```

Page 146

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2    remind you that I'm doing statistics.              12:52:42
 3              So what I say later in this report is    12:52:45
 4    that if I have a concern about the variability of  12:52:48
 5    the maximum likelihood estimates, that would be    12:52:57
 6    the estimates of class members.  But I have been   12:53:05
 7    able to ascertain the lower bounds of the ranges,  12:53:07
 8    in other words, the minima that would be           12:53:13
 9    proscribed by the 95 percent confidence interval   12:53:17
10    on the estimates.  And so, because of that, at     12:53:21
11    least, I know that I have thousands or tens of     12:53:23
12    thousands of class members in the full             12:53:27
13    population.  But I'm applying that to the          12:53:31
14    1826 days that were in the original court order.   12:53:34
15         Q.  And is that for each subclass or if       12:53:41
16    you're combining the different classes, when you   12:53:42
17    say, "thousands or tens of thousands"?             12:53:44
18         A.  It's for each of the -- each of the       12:53:47
19    four classes.                                      12:53:53
20         Q.  So, for each of the four classes,         12:53:55
21    you've determined that there are "thousands or     12:53:58
22    tens of thousands" of members in each of those     12:54:00
23    classes?                                           12:54:03
24         A.  Yes.  So, for example, for CLFN, it       12:54:04
25    would be thousands.  But for the registered        12:54:07
```

Page 147

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2   works, it would be -- oh, I came up with          12:54:15

 3   somewhere between 10 and 20,000, as the           12:54:20

 4   95 percent lower bound.  The same is true for all 12:54:23

 5   the numbers that I have.                          12:54:27

 6             And then lower numbers for the          12:54:29

 7   foreign unregistered class and for the ISRC but   12:54:35

 8   still, at least, into the thousands.              12:54:44

 9         Q.  Your report does not provide those      12:54:49

10   findings, correct?                                12:54:54

11         A.  That's right.  Because what I was       12:54:57

12   asked to ascertain was the -- an estimate of the  12:55:00

13   number of class members.  And what I just recited 12:55:06

14   to you was the lower bound on the number, but     12:55:09

15   that's not the same as providing an estimate of   12:55:11

16   the total size or the best estimate as a maximum  12:55:14

17   likelihood estimate of the class size for each of 12:55:22

18   the four classes.                                 12:55:25

19         Q.  Okay.  Well, let's just unpack that.    12:55:26

20             Between what your report does or        12:55:29

21   doesn't do and what you were asked to do and then 12:55:31

22   why, okay?                                        12:55:33

23             Sticking with what the report           12:55:34

24   actually discloses, your report doesn't disclose  12:55:36

25   any opinion on the number of class members        12:55:39
```

Page 148

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | |
|---|---|
| 1 | HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY |
| 2 | amongst any of the four classes, correct? | 12:55:45 |
| 3 | A.  It does not. | 12:55:50 |
| 4 | Q.  And, similarly, your report doesn't | 12:55:51 |
| 5 | provide any estimates with any confidence | 12:55:54 |
| 6 | intervals of the size of any of the four classes | 12:55:56 |
| 7 | that you address in the report, correct? | 12:56:01 |
| 8 | A.  That is correct. | 12:56:03 |
| 9 | Q.  So your report does not itself | 12:56:12 |
| 10 | determine the number of class members in each | 12:56:15 |
| 11 | class, correct? | 12:56:17 |
| 12 | A.  Well, so here's the difficulty I have | 12:56:21 |
| 13 | as a statistician.  It doesn't present the | 12:56:25 |
| 14 | maximum likelihood estimate as an estimate, | 12:56:29 |
| 15 | because I said that there's a great deal of | 12:56:34 |
| 16 | variability that is associated with those | 12:56:38 |
| 17 | numbers.  However, I was still able to ascertain | 12:56:42 |
| 18 | a lower bound number on those ranges, because | 12:56:48 |
| 19 | that's the way statistics work.  But I don't | 12:56:51 |
| 20 | present those numbers within this report. | 12:56:55 |
| 21 | Q.  Had you determined the lower bound | 12:57:02 |
| 22 | prior to November 17, when this report was | 12:57:07 |
| 23 | submitted? | 12:57:11 |
| 24 | A.  Yes. | 12:57:13 |
| 25 | Q.  Okay.  Did you determine the number | 12:57:19 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2      of infringing videos or infringed works           12:57:24

3      associated with each class?                        12:57:28

4          A.  In the same way I described before,        12:57:40

5      yes.                                               12:57:43

6          Q.  What were the number of infringing         12:57:46

7      videos or infringed works that you determined?     12:57:48

8          So let me withdraw that question.              12:57:52

9      I'll ask it in a moment.                           12:57:54

10         Your report does not disclose any              12:57:56

11     number of infringing videos or infringed works     12:57:59

12     associated with each class, correct?               12:58:02

13         A.  That is correct.                           12:58:04

14         Q.  Did you determine the number of            12:58:08

15     infringing videos or infringed works associated    12:58:11

16     with each class prior to November 17th, when you   12:58:13

17     submitted this report?                             12:58:18

18         A.  Yes.                                        12:58:19

19         Q.  What is the number of infringing           12:58:21

20     videos or infringed works associated with each     12:58:23

21     class?                                             12:58:25

22         A.  I don't recall the numbers for the         12:58:30

23     videos.                                            12:58:33

24         In terms of the works, I believe,              12:58:34

25     that those are the numbers that I gave you before  12:58:41
```

Page 150

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2     when I said I estimated the lower bound.  So I   12:58:44

3     recited some numbers.  The ones I remember the   12:58:50

4     best are CLFN, which was in the thousands, I   12:58:54

5     believe, around 5,000.   12:58:59

6           Oh, yeah.  And I'm sorry.  For CLFN,   12:59:07

7     the number of works is 2,000.  The number of   12:59:16

8     videos is higher.   12:59:20

9           For the unregistered -- I'm sorry.   12:59:22

10    For the registered works, the US Copyright Office   12:59:28

11    matches.  What I said was that that number was   12:59:32

12    somewhere between 10 and 20,000.  I believe the   12:59:35

13    number is probably closer to 16,000.   12:59:40

14          With respect to the foreign works   12:59:44

15    class, it's a smaller number but it is along   12:59:47

16    10,000 and above, I believe, 8,000.   12:59:52

17          And for the ISRC, the number is   12:59:59

18    slightly higher.  I think it's a little bit over   13:00:01

19    10,000.   13:00:04

20      Q.  And as we stated before in the   13:00:07

21    identification of class members context, those   13:00:10

22    numbers are nowhere contained in your report; is   13:00:12

23    that correct?   13:00:15

24      A.  That is correct.   13:00:15

25      Q.  Turning to Paragraph 7 of your   13:00:22

Page 151

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2    report.                                        13:00:24
 3         A.  (The witness complies.)               13:00:24
 4         Q.  Sub No. 2, 3 and 4 all describe in    13:00:31
 5    your report -- you know, encompasses building a 13:00:38
 6    model and then there are -- you know, it        13:00:40
 7    describes various different models, correct?    13:00:42
 8         A.  Yes.                                   13:00:44
 9         Q.  Is the model that you describe         13:00:45
10    disclosed in this report?                       13:00:48
11         A.  In the sense that I described it as a  13:00:54
12    model based on sampling theory where I          13:00:56
13    extrapolate from the 2,000 work sample to the   13:01:00
14    2,000 works that I reviewed in terms of matching 13:01:06
15    to the different data sources and extrapolating  13:01:10
16    that to the 90-day sample and then from the      13:01:15
17    90-day sample up to the 1826-day sample.  I don't 13:01:20
18    think there's a formal model statement in as I   13:01:29
19    didn't present the math, but that's what I       13:01:32
20    described I was doing.                           13:01:34
21         Q.  Can you point to me where in your      13:01:38
22    report you describe that model?                  13:01:40
23         A.  I'll have to read it during lunch as   13:01:41
24    you...                                           13:01:44
25         Q.  Okay.  Sitting here right now, would   13:01:45
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2     you be able to point me to it without flipping      13:01:49

 3     through each page?                                   13:01:51

 4          A.  No.                                         13:01:55

 5          Q.  But you didn't do a formal model           13:02:07

 6     statement where you present the math to go up        13:02:09

 7     from 2,000 work sample to 90-day sample to           13:02:11

 8     1826-day full population, correct?                   13:02:16

 9          A.  That is correct.                            13:02:20

10          Q.  Okay.                                       13:02:21

11          A.  Are we close to a lunch break?             13:02:32

12          Q.  We can be.                                  13:02:36

13              Would you like to take a lunch break,      13:02:38

14     sir?                                                 13:02:40

15          A.  May we?                                     13:02:40

16          Q.  Yes.                                        13:02:40

17              MR. RICHLIN:  Let's go off the             13:02:41

18     record.                                              13:02:42

19              THE VIDEOGRAPHER:  Please stand by.        13:02:42

20              The time is 1:02 p.m.  We are off the      13:02:43

21     record.                                              13:02:46

22              (Lunch recess taken 1:02 to 2:01           13:02:46

23     p.m.)                                                14:01:09

24              THE VIDEOGRAPHER:  The time is             14:01:09

25     2:01 p.m.  We are back on the record.               14:01:10
```

Page 153

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2             Q.  Dr. Cowan, before we broke for lunch,   14:01:13

 3    we had discussed the model that you testified    14:01:19

 4    having developed and you were going to go back   14:01:24

 5    and take a look at your report during our lunch  14:01:28

 6    break to refresh yourself about it.              14:01:30

 7             Did you have an opportunity to review    14:01:33

 8    your report during our lunch break?              14:01:34

 9             A.  I did.  And what I discovered was    14:01:36

10    that I didn't give a very fulsome description.   14:01:39

11    But in Paragraph 63, I've got a one-line         14:01:43

12    description of what it is that I'm doing.         14:01:46

13             MR. RICHLIN:  Let's go off the record   14:02:01

14    for one moment.                                  14:02:03

15             THE VIDEOGRAPHER:  Stand by.  The        14:02:04

16    time is 2:02 p.m.  We are off the record.        14:02:05

17             (Recess taken 2:02 to 2:03 p.m.)        14:03:52

18             THE VIDEOGRAPHER:  The time is           14:03:52

19    2:03 p.m. and we're back on the record.          14:03:53

20             MR. RICHLIN:  Thank you.                 14:03:56

21             Q.  Alright.  Can you turn to            14:03:57

22    Paragraph 63 in Exhibit 1, your report?          14:03:59

23             A.  (The witness complies.)             14:04:04

24             Q.  Are you there, sir?                 14:04:05

25             A.  Yes.                                14:04:07
```

Page 154

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2              Q.  Okay.                              14:04:07

 3              A.  I had my report.                   14:04:07

 4              Q.  You had yours, excellent.          14:04:09

 5                  Is Paragraph 63 where you describe 14:04:10

 6          your model?                                14:04:15

 7              A.  Well, it doesn't fully describe a  14:04:17

 8          model.  It describes the -- where I'm going with 14:04:19

 9          the estimation process.  But it -- in terms of 14:04:25

10          describing mathematical model, you would have to 14:04:30

11          put together different pieces of the report to be 14:04:36

12          able to figure out how I'm going to implement a 14:04:40

13          latent structure model.                    14:04:45

14              Q.  Okay.                              14:04:47

15              A.  Latent, l-a-t-e-n-t.               14:04:48

16              Q.  Paragraph 63 does not disclose any 14:04:50

17          math in going from a sub-sample to a 90-day 14:04:57

18          sample to the 1826-day investigation period, 14:05:01

19          correct?                                   14:05:04

20              A.  It does not.                       14:05:06

21              Q.  In fact, Paragraph 63 states that  14:05:09

22          you've concluded there would be no reliable way 14:05:13

23          to estimate the number of class members and works 14:05:15

24          associated to each class, correct?         14:05:18

25              A.  With the understanding -- if you   14:05:20
```

Page 155

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2      remember, we had a discussion this morning about      14:05:23

3      my use of the word "reliable."  So perhaps a          14:05:25

4      better description would be there's no way to do      14:05:29

5      this without having a high level of variability      14:05:32

6      because to a statistician, "reliable" is an           14:05:37

7      indication of how variable the results are.           14:05:42

8           Q.  I'm a little confused, sir.                  14:05:51

9                Is it your opinion that there's no           14:05:52

10     reliable way to estimate the number of class          14:05:55

11     members and works associated to each class, which     14:05:58

12     is what you say in your report, or is it your         14:06:00

13     opinion that the number of class members is as        14:06:03

14     you've testified today with lower bound levels        14:06:08

15     of, at least, several thousand?                       14:06:11

16           A.  The latter.  So, as I explained very        14:06:14

17     early during the deposition, statisticians use        14:06:17

18     the word "reliable" to indicate how variable an       14:06:22

19     outcome is.  So, if I am doing an audit for the       14:06:25

20     General Accounting Office, what they're called        14:06:30

21     now the General Accountability Office, there are      14:06:33

22     certain standards that I have to meet to be able      14:06:37

23     to conduct the audit to present what the GAO          14:06:39

24     refers to as "reliable results."                      14:06:47

25                Well, "reliable," in this instance         14:06:49

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2     and in statistics in general, refers to the        14:06:52

 3     confidence range around an estimate.               14:06:57

 4              And what I'm saying here is that           14:06:59

 5     there isn't a way with this sample and the data    14:07:02

 6     that I've got and, as I explain in Paragraph 12    14:07:05

 7     of this report, there isn't a way to do that       14:07:08

 8     without having a very high variability.  And       14:07:11

 9     that's what I mean by "reliable."                  14:07:14

10          Q.  Dr. Cowan, a few questions just to        14:07:24

11     follow up.                                         14:07:26

12              Did you consider whether to disclose      14:07:26

13     in your report that you had, in fact conducted an  14:07:30

14     analysis and determined even with the very high    14:07:37

15     variability level the outward bounds of the        14:07:40

16     number of class members?                           14:07:45

17          A.  Okay.  I don't -- so I'm sorry.  I        14:07:48

18     got your question mostly, except that "outward     14:07:52

19     bounds" is not a term anywhere in statistics       14:07:55

20     so --                                              14:07:58

21          Q.  "Lower bound" is that the better          14:07:58

22     word?                                              14:08:00

23          A.  Thank you.                                14:08:00

24          Q.  Okay.                                     14:08:01

25          A.  Yes, thank you.                           14:08:02
```

Page 157

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
2          Q.   Okay.   I'm going to rephrase the          14:08:03
3     question but sub in the word "lower bounds"          14:08:04
4     instead of outer bounds.                            14:08:06
5          A.   Thank you.                                14:08:09
6               No, I didn't consider it.   Are you       14:08:10
7     asking me if I considered putting that              14:08:12
8     description in?                                     14:08:15
9          Q.   Yes.                                      14:08:16
10         A.   No.                                       14:08:17
11         Q.   Did you consider disclosing in your       14:08:22
12    report the number of class members that you had     14:08:26
13    identified?                                         14:08:32
14         A.   No.                                       14:08:35
15         Q.   Did you consider disclosing in your       14:08:37
16    report the number of class members not that you     14:08:39
17    estimated but that you had actually matched?        14:08:43
18         A.   Oh, I'm sorry, how is that different      14:08:47
19    from the last question?   I thought that that was   14:08:50
20    what I answered.                                    14:08:52
21         Q.   Okay.   I'll ask the other one then.      14:08:54
22              Did you consider disclosing in your       14:08:57
23    report the number of class members that you'd       14:08:59
24    estimate to be part of the class as a whole using   14:09:01
25    statistical analysis?                               14:09:04
```

Page 158

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1            HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2            A.   No, I considered this to be a work in    14:09:07
 3    progress.   At the time that I was writing this, I    14:09:11
 4    expected to get more data, more information and I      14:09:14
 5    think I had already been notified I was going to       14:09:20
 6    get more fields from the takedown data.                14:09:23
 7            So I considered this to be an initial          14:09:29
 8    description of what the four classes were, how I       14:09:33
 9    would determine if somebody was in a class and         14:09:41
10    the matching that I was doing.   But I did not         14:09:46
11    expect, for example, to describe an algorithm          14:09:53
12    because I was getting more information then I          14:09:56
13    would have to modify my algorithm based on the        14:09:58
14    new data.                                              14:10:01
15            So I considered this to be at the             14:10:03
16    time I wrote it a work in progress simply because      14:10:05
17    I knew I was going to be getting more                 14:10:08
18    information.                                           14:10:10
19            Q.   Okay.   Let's go back to Paragraph 12.   14:10:14
20            A.   Thank you.   I'm there.                  14:10:31
21            Q.   Okay.   Alright.   And I want to focus    14:10:36
22    on the word "tested" in the first line there of       14:10:42
23    Paragraph 12, which is that, "First, I developed      14:10:48
24    and tested some methodology to identify members       14:10:51
25    of each of the classes described above."              14:10:53
```

Page 159

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2              When you write, "tested," there, are        14:10:56

3    you referring to the matching exercise that you      14:11:00

4    testified about through which some number of         14:11:04

5    class members were identified?                       14:11:11

6        A.  Yes.                                          14:11:14

7        Q.  Is there something else that you're          14:11:15

8    referring to by the word "tested" in                 14:11:16

9    Paragraph 12?                                         14:11:20

10       A.  In this case, I'm only talking about          14:11:21

11   the development of a matching algorithm, which is     14:11:25

12   done with the first 2,000 records that I sampled.     14:11:33

13   So that I would learn how to write the algorithm      14:11:39

14   based on the information I had at the time that I      14:11:43

15   employed these people to do this.                     14:11:47

16             So "testing" here means that I              14:11:51

17   developed and I tested a methodology to identify      14:11:56

18   members, which just means that I tested how I         14:12:00

19   would match into the different databases and the      14:12:03

20   copyright office database, MusicBrainz,               14:12:09

21   SoundExchange and so on.  And that's all I'm          14:12:12

22   referring to here.                                    14:12:15

23       Q.  Is this -- I just want to make sure I         14:12:21

24   understand what you mean by "tested."  Because        14:12:22

25   you had earlier testified that there was a            14:12:25

Page 160

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2    process through which you and your team              14:12:27
 3    identified a small number of class members, 23        14:12:29
 4    from one of the classes, a couple of others from     14:12:33
 5    the other classes?                                    14:12:35
 6         A.  Yes.                                         14:12:36
 7         Q.  Do you remember that testimony?             14:12:37
 8         A.  I do.                                        14:12:38
 9         Q.  By the word "tested" here, are you          14:12:39
10    referring to that exercise, having used your         14:12:42
11    methodology through the 2,000 record sample to       14:12:45
12    identify a set of class members?                      14:12:50
13         A.  Yes.                                         14:12:52
14         Q.  Okay.  Where in your report do you          14:12:53
15    disclose that you used 2,000 records as a sample     14:13:01
16    size?                                                 14:13:03
17         A.  I looked for that at lunch and I            14:13:03
18    could not find it.  I'm sorry.                        14:13:05
19         Q.  So you -- you don't have to                 14:13:07
20    apologize.                                            14:13:10
21             You concluded that your report does        14:13:10
22    not disclose that you used a 2,000 record sample     14:13:12
23    size set, correct?                                    14:13:15
24         A.  That is correct.  Although I have to        14:13:17
25    tell you I don't recall what's in the backup         14:13:23
```

Page 161

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2     materials we also provided.  But so, if it's in     14:13:26
 3     there, I don't know about it.  But it's not in      14:13:30
 4     this report.                                        14:13:33
 5          Q.  Okay.  The second line in                  14:13:34
 6     Paragraph 12 is that you conclude that a            14:13:40
 7     formulaic methodology using common statistical      14:13:45
 8     methods can be applied to identify the members of   14:13:47
 9     each class.                                         14:13:49
10          Do you see that, sir?                          14:13:50
11          A.  Yes.                                       14:13:51
12          Q.  Is that conclusion informed by the         14:13:52
13     tests that we've just discussed?                    14:13:55
14          A.  Yes.                                        14:13:59
15          Q.  Alright.  Let's go to Paragraph 13.        14:13:59
16     Excuse me, sorry, before we go there.               14:14:06
17          Then there are a number of sub                 14:14:07
18     paragraphs beneath 12.  There's sub A, B, C and     14:14:11
19     D.                                                  14:14:15
20          Are each of the conclusions that are           14:14:15
21     represented within A, B, C and D informed by the    14:14:17
22     tests that you and your team conducted?             14:14:23
23          A.  Well, for A, B and C, that's true.         14:14:27
24     For D, the CLFN class, we relied on the third       14:14:30
25     database that was provided by Defendants that was   14:14:36
```

Page 162

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2     the -- had to do with the metadata that was on        14:14:44

3     the -- excuse me -- on the videos in the 30-day       14:14:53

4     sample.                                                14:14:57

5          Q.  Okay.  Is your conclusion in 12D             14:14:59

6     similarly informed and based on, at least, in         14:15:04

7     part the tests that you and your team conducted?      14:15:09

8          A.  Yes.  But it's a different test just         14:15:12

9     in the sense that I took the dataset and              14:15:15

10    processed it electronically.  I didn't have to go     14:15:19

11    and do anything further than just a straight          14:15:21

12    processing of that.                                    14:15:24

13         Q.  You didn't have to go and look to            14:15:25

14    some other third-party database; is that what        14:15:27

15    you're saying?                                         14:15:29

16         A.  I did not.  But I did have to relate         14:15:30

17    Database 3, the one we just talked about, back to     14:15:34

18    Database 1, which was the takedown data, which        14:15:39

19    I'm pretty sure I described it here.                   14:15:42

20         Q.  Okay.  So that's as a separate test          14:15:44

21    that your team conducted?                              14:15:46

22         A.  Yes.                                          14:15:48

23         Q.  Okay.  Let's look in Paragraph 13.           14:15:48

24    In Paragraph 13, again, the first line describes      14:15:55

25    that you "developed and tested a methodology here     14:16:01

Page 163

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2    to identify and quantify the number of infringing    14:16:03

3    video URLs that qualify for an award of either       14:16:06

4    actual or statutory damages."                        14:16:08

5            Your reference to "tests" there in           14:16:11

6    Paragraph 13, are those the same tests that          14:16:15

7    you've already testified to here today?              14:16:17

8            A.  Yes.                                      14:16:27

9            Q.  Okay.  And did you rely on those         14:16:27

10   tests in forming the conclusions that you            14:16:31

11   describe in Paragraph 13?                            14:16:33

12           A.  Yes.                                      14:16:34

13           Q.  And that includes all of the             14:16:39

14   conclusions in Subparagraphs A, B, C and D below     14:16:41

15   Paragraph 13, correct?                               14:16:46

16           A.  Yes, with the one qualification we       14:16:50

17   talked about for D, which is a slightly different    14:16:53

18   operation but, yes.                                  14:16:56

19           Q.  Okay.  And then Paragraph 14, again,     14:16:57

20   you use the word "tested."  It says, "I tested       14:17:02

21   each of the methodologies herein utilizing the       14:17:07

22   takedown notice sample data and concluded that       14:17:10

23   the methodologies are sound and can be applied       14:17:11

24   uniformly across all the classes."                   14:17:14

25           For purpose of Paragraph 14 and the          14:17:18
```

Page 164

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2     conclusions that you draw that are reflected in      14:17:20

3     Paragraph 14, are those relying on the same tests     14:17:23

4     that you've testified about here today?      14:17:26

5          A.   Yes.      14:17:30

6          Q.   And when you review the report at      14:17:43

7     lunchtime, you confirmed for yourself, sir, that      14:17:44

8     you did not disclose the results of any of those      14:17:47

9     tests in the report itself, correct, sir?      14:17:51

10          A.   That would be correct.  I did not      14:17:57

11     find them in my report.      14:17:58

12          Q.   Okay.      14:17:59

13          A.   Could I amend my last answer?      14:18:12

14          Q.   Yes.      14:18:16

15          A.   Okay.  So I didn't provide the      14:18:16

16     numeric results of the testing.  What I did      14:18:20

17     provide is actually in Paragraph 14, which is a      14:18:23

18     summarization of some of the other outcomes.  So      14:18:29

19     if I can point to 14B on Page 8, I point out that      14:18:36

20     the admission of country of origin and type of      14:18:42

21     work infringe fields compromises the      14:18:45

22     identification of the foreign unregistered work      14:18:47

23     class.  That is ISRC.  So that's also an outcome.      14:18:50

24     It's just not a numeric outcome.      14:18:54

25               So my earlier answer was with respect      14:18:57

Page 165

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2    to the numeric outcomes.  But I also had        14:19:00

 3    qualitative outcomes that I've described in the 14:19:05

 4    report.                                          14:19:07

 5         Q.  Okay.  Anything else to amend, sir?     14:19:07

 6         A.  No.  But thank you for letting me do    14:19:10

 7    that.                                            14:19:13

 8         Q.  Just to make sure we're on the same     14:19:29

 9    page, in terms of classes, if you turn to        14:19:31

10    Section 4 of your report.                        14:19:33

11         A.  (The witness complies.)                 14:19:37

12         Q.  It starts on the bottom of Page 10.     14:19:38

13         A.  Thank you.                              14:19:40

14         Q.  Yup.                                    14:19:41

15         Section 4 addresses the different           14:19:43

16    subclasses that you focused on for purpose of    14:19:49

17    your report, correct?                            14:19:53

18         A.  Yes.                                    14:19:54

19         Q.  And that includes the copyright         14:19:55

20    infringement classes, which itself is broken into 14:19:57

21    two subclasses, and the CMI class is also broken 14:20:00

22    into two subclasses, correct?                    14:20:03

23         A.  Yes.                                    14:20:05

24         Q.  Other than these classes, your report   14:20:13

25    does not propose a methodology for identifying   14:20:17
```

Page 166

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2     members of any other class, correct?          14:20:20
 3          A.  I'm not aware that there is any other 14:20:23
 4     class.                                         14:20:25
 5          Q.  Well, have you reviewed the original 14:20:25
 6     complaint that Plaintiffs filed back in July of 14:20:29
 7     2020?                                          14:20:33
 8          A.  A long time ago I did.               14:20:34
 9          Q.  Have you endeavored to identify      14:20:39
10     members of the classes as defined in that     14:20:42
11     complaint?                                     14:20:45
12          A.  No.                                   14:20:45
13          Q.  Have you reviewed the summary        14:20:48
14     judgment order that the Court in this case issued 14:20:50
15     a couple of weeks ago on January 5?            14:20:54
16          A.  I have not reviewed it.  I've been   14:20:56
17     told about it.  But I have not reviewed it     14:20:59
18     myself.                                        14:21:02
19          Q.  So, obviously, that came after your  14:21:02
20     report.  So your report doesn't take into account 14:21:04
21     any limitations or other effect of that order, 14:21:07
22     correct?                                       14:21:10
23          A.  Yes, that's correct that it doesn't. 14:21:10
24          Q.  Okay.  Have you otherwise considered 14:21:14
25     whether the methodologies proposed in your report 14:21:19
```

Page 167

| | | |
|---|---|---|
| 1 | HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY | |
| 2 | tests, correct? | 14:36:54 |
| 3 | A.  Well, in part.  So, in conducting -- | 14:36:59 |
| 4 | so there was a predicate to the test.  And the | 14:37:05 |
| 5 | predicate to the test is that there has been | 14:37:08 |
| 6 | methodology for matching processes that have been | 14:37:10 |
| 7 | around for decades, since the 1970s and on which | 14:37:13 |
| 8 | I worked when I was at the Census Bureau, because | 14:37:20 |
| 9 | part of my role was determining if somebody was | 14:37:22 |
| 10 | in or not in the census. | 14:37:25 |
| 11 | So there's a long history of matching | 14:37:27 |
| 12 | methodologies and determining when you have a | 14:37:31 |
| 13 | match with a sufficient level of confidence that | 14:37:35 |
| 14 | you can say it's a match. | 14:37:39 |
| 15 | So the testing I did was within the | 14:37:41 |
| 16 | framework of those matching methodologies. | 14:37:46 |
| 17 | Q.  Your report does not describe those | 14:37:51 |
| 18 | "matching methodologies" that have been in place | 14:37:54 |
| 19 | for decades, correct? | 14:37:59 |
| 20 | A.  Well, there's tens of thousands of | 14:38:00 |
| 21 | published works that didn't -- on that process. | 14:38:02 |
| 22 | So I didn't feel it was necessary to go back over | 14:38:08 |
| 23 | those. | 14:38:11 |
| 24 | Q.  Just a simple question, sir.  Your | 14:38:12 |
| 25 | report doesn't describe -- | 14:38:15 |

Page 177

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2          A.  Oh, I'm sorry.  I didn't answer your    14:38:17

 3     question.                                        14:38:18

 4              No, it doesn't.                          14:38:19

 5          Q.  Let's just get it straight.             14:38:20

 6              Your report doesn't describe any of     14:38:22

 7     those "matching methodologies," correct?         14:38:25

 8          A.  It does not.                            14:38:28

 9          Q.  In fact, your report doesn't even       14:38:29

10     cite to a single one of them, correct?           14:38:31

11          A.  "A single one of them" matching         14:38:33

12     methodologies or to the papers?                  14:38:36

13          Q.  Any of them.                            14:38:38

14          A.  No.                                     14:38:39

15          Q.  Okay.  Did you form an opinion as to    14:38:43

16     the degree of accuracy of the third-party        14:39:05

17     databases that you contemplate matching to?      14:39:08

18          A.  Beyond the fact that they're            14:39:16

19     publically used databases that have been in use  14:39:17

20     for a while that -- and in some cases are        14:39:21

21     developed or sanctioned by the federal government 14:39:26

22     and are -- as they've been used in the public, in 14:39:29

23     general, by lots of people, I accepted them as   14:39:40

24     systems of record that other people rely on and  14:39:46

25     that have been reviewed over and over and that to 14:39:49
```

Page 178

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2   me is one means of determining the level of          14:39:53
 3   reliability within the data.                         14:39:57
 4        Q.   From what source did you determine         14:40:03
 5   how many people rely upon the Copyright Office's     14:40:05
 6   database?                                            14:40:12
 7        A.   Oh, I actually got that from talking       14:40:12
 8   to the Copyright Office, not me personally but my    14:40:15
 9   staff.                                               14:40:19
10        Q.   And what did they tell your staff?         14:40:20
11        A.   They said they get requests for the        14:40:22
12   database all the time plus on a daily basis there    14:40:25
13   are thousands of people who use the copyright        14:40:28
14   database by going into the web portal.               14:40:32
15        Q.   Was there anything else that formed        14:40:35
16   your opinion as to the reliability of the            14:40:38
17   Copyright Office's database?                         14:40:41
18        A.   Well, just my general understanding        14:40:45
19   of the requirements on the Library of Congress       14:40:47
20   and the -- any oversight by the Congressional        14:40:52
21   Research Service on Congressional activities, no.    14:41:01
22        Q.   How about SoundExchange, on what           14:41:11
23   basis did you determine how many people use          14:41:12
24   SoundExchange?                                       14:41:15
25        A.   Again, that was -- I don't know the        14:41:17
```

Page 179

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2    exact number.  I just spoke to people at          14:41:20

3    SoundExchange when I was talking to them about    14:41:25

4    their data.  And I'm now using the royal I.  I'm  14:41:28

5    talking about people, you know, in my office who  14:41:33

6    talked to them about getting SoundExchange.  But  14:41:39

7    we were told a number of people had asked for     14:41:41

8    downloads of database and the use of the database 14:41:45

9    by individuals to get a sense of, you know, is    14:41:50

10   this like some obscure database or are people     14:41:53

11   actually using this.                              14:41:57

12          And what we discovered was that there      14:41:58

13   were lots of people and that they had standards   14:42:01

14   for who could get or not get the SoundExchange    14:42:04

15   database, that there were certain rules in        14:42:09

16   applying that they put in place to understand     14:42:13

17   what the usages of the SoundExchange database     14:42:18

18   would be.                                         14:42:22

19          Q.  How many people were granted access    14:42:26

20   to the SoundExchange database?                    14:42:30

21          A.  You know, I didn't ask that.  I don't  14:42:32

22   know.                                             14:42:34

23          Q.  Beyond the conversations by you or     14:42:37

24   your team and SoundExchange, is there any other   14:42:40

25   foundation as to your opinion as to the           14:42:47

                                            Page 180

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1            HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
2       reliability of the SoundExchange database?          14:42:52
3            A.   Nothing I can think of right now.         14:42:56
4            Q.   Okay.  Let's talk about MusicBrainz.       14:42:58
5                 How did you form an opinion about how      14:43:03
6       many people use the MusicBrainz database?           14:43:10
7            A.   I'm going to give the same answer I        14:43:14
8       just gave for SoundExchange.  In terms of asking    14:43:17
9       them about its usage, could we download it, how     14:43:19
10      frequently did people ask about downloads and       14:43:24
11      things like that.                                   14:43:27
12                The people at MusicBrainz, again, you      14:43:30
13      know, very cooperative, but we didn't ask them      14:43:37
14      specific questions about foreign works or I         14:43:43
15      didn't ask a question like, well, how many          14:43:51
16      people, you know, do you actually send this to.     14:43:54
17      So these are general conversations about how the    14:43:57
18      database is developed, how it's maintained, how     14:44:02
19      it's updated, things like that.                     14:44:07
20           Q.   So you don't know how many people         14:44:09
21      have downloaded the MusicBrainz database in full    14:44:13
22      or record from it, correct?                         14:44:17
23           A.   I do not.                                 14:44:19
24           Q.   You don't know how many people use it     14:44:20
25      on a daily basis, correct?                          14:44:22
```

Page 181

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2         A.  I don't.  Although that may have been    14:44:27
 3    something that my staff would have asked.          14:44:29
 4         Q.  And other than the conversations that     14:44:35
 5    you've just described, there's nothing else that   14:44:36
 6    you've done to form an opinion as to the           14:44:40
 7    reliability or any issues within the MusicBrainz   14:44:43
 8    database, correct?                                 14:44:47
 9         A.  That is correct.                          14:44:49
10         Q.  Okay.  EIDR -- the same story for         14:44:51
11    EIDR?                                              14:44:59
12         A.  Yes.  But we were less aggressive in      14:45:01
13    terms of calling them and pursuing.  So we talked  14:45:03
14    to people at EIDR and IMDb, but we didn't try to   14:45:06
15    download the database or acquire a copy.           14:45:11
16         Q.  Let's go back to Paragraph 14 of your     14:45:37
17    report.                                            14:45:40
18         A.  (The witness complies.)                   14:45:40
19         Q.  Paragraph 14, the second sentence         14:45:50
20    reads that you concluded "the takedown notice      14:45:54
21    sample data in its current form does not permit a  14:45:59
22    robust estimation of the value sought."            14:46:02
23         By "robust estimation," are you               14:46:05
24    referring there to variability and the lower       14:46:07
25    bound estimates that you described earlier or are  14:46:11
```

Page 182

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2      you referring to something else?              14:46:14

3          A.  Actually, the lower bound would be a  14:46:18

4      robust estimate.  I was referring to the maximum  14:46:20

5      likely estimates and the fact that it is      14:46:23

6      difficult to estimate the maximum likely values  14:46:26

7      because of a high variability.                14:46:35

8          Q.  Okay.  Just going back to EIDR and    14:46:45

9      IMDb.                                          14:46:49

10         Did either of them say whether you         14:46:49

11     could download a copy of their data?          14:46:51

12         A.  I pursued that in the past with IMDb   14:46:56

13     and you can, but it is expensive.             14:46:58

14         For EIDR, I just don't remember.  We       14:47:03

15     weren't actively trying to pursue that like we  14:47:08

16     were with MusicBrainz and SoundExchange so...  14:47:11

17         Q.  Because you did not download a copy    14:47:14

18     of either EIDR or IMDb for purposes here, did you  14:47:19

19     conduct any testing against those datasets?   14:47:22

20         A.  No.                                    14:47:26

21         Q.  Do you know whether MusicBrainz has a  14:47:46

22     requirement -- has a process, excuse me, for   14:47:48

23     verifying information that's submitted to its  14:47:51

24     database?                                      14:47:56

25         A.  I don't recall.                        14:47:56
```

Page 183

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2     a noun.  Okay.  I just want to make sure we...      14:53:26

 3            Q.   Uh-huh.                                 14:53:29

 4            A.   And I probably should have used the     14:53:30

 5     word "identify," as opposed to "select."           14:53:32

 6                 The -- and what I'm referring to        14:53:38

 7     there is the fact that there may be -- when I do    14:53:41

 8     the query, each potential match is also assigned    14:53:48

 9     a numerical value that tells me the quality of      14:53:57

10     the match.  So, if I get a hundred percent match,   14:54:01

11     that's the one I select.  If I get a 97 percent     14:54:04

12     match and that's the highest number I get, that's   14:54:09

13     the one I select.  So that's what I'm referring     14:54:12

14     to.                                                 14:54:14

15            Q.   Did you and your team go through the    14:54:18

16     process of creating those numerical scores for      14:54:19

17     part of your testing and identification of          14:54:23

18     matches?                                            14:54:26

19            A.   Yes.                                    14:54:27

20            Q.   And did you rely on having created      14:54:32

21     those scores and identified matches for purposes    14:54:35

22     of forming your conclusions?                        14:54:41

23            A.   I'm sorry.  I'm getting a little        14:54:46

24     tired.  Could you ask me that question again?       14:54:48

25                 MR. RICHLIN:  Silvia.                   14:54:51
```

Page 187

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2              (Whereupon, the question is read back   14:54:51

 3        as follows:                                   14:54:51

 4              "Question:  And did you rely on         14:54:32

 5        having created those scores and identified    14:54:34

 6        matches for purposes of forming your          14:54:40

 7        conclusions?")                                14:54:43

 8              A.  Well, within the testing protocol,  14:55:07

 9        yes.                                          14:55:09

10              Q.  Your report does not disclose that  14:55:11

11        you created numerical scores for purposes of  14:55:16

12        evaluating and identifying matches, correct?  14:55:21

13              A.  It does not.  It's a standard       14:55:25

14        methodology.                                  14:55:28

15              Q.  Your report does not disclose the   14:55:32

16        numerical score dividing line between when    14:55:34

17        something would or would not be considered a  14:55:39

18        match, correct?                               14:55:41

19              A.  Oh, that's something that we're still 14:55:42

20        determining.  That's part of the overall testing 14:55:45

21        process to tell you when there is a separation 14:55:47

22        point.                                        14:55:51

23              Q.  Did you set that line on a          14:55:59

24        preliminary basis for purposes of determining the 14:56:02

25        class member identifications and numbers that you 14:56:11
```

Page 188

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2     earlier testified about?                          14:56:13
 3          A.   Well, I did.   I had to be able to      14:56:16
 4     determine when the difference between things that 14:56:19
 5     were above the threshold versus below the         14:56:25
 6     threshold; so, yes.                               14:56:28
 7          Q.   And what was the score that you         14:56:34
 8     arrived at?                                       14:56:35
 9          A.   Oh, I don't know.   My staff did this.  14:56:36
10          Q.   But that score, that dividing line is   14:56:43
11     similarly not in the report, correct?            14:56:46
12          A.   It's not.   It's just a test value      14:56:49
13     that we used to make a determination.            14:56:52
14          Q.   Okay.   Sir, would you like to take a   14:56:54
15     break?                                            14:57:11
16          A.   I would.   Thank you.   How did you     14:57:11
17     know?                                             14:57:13
18               THE VIDEOGRAPHER:   Hold on one         14:57:13
19     moment.   Stand by.                               14:57:14
20               MR. RICHLIN:   Go off the record.       14:57:15
21               THE VIDEOGRAPHER:   The time is         14:57:17
22     2:57 p.m.   We are off the record.                14:57:18
23               (Recess taken 2:57 to 3:17 p.m.)        15:17:32
24               THE VIDEOGRAPHER:   The time is         15:17:32
25     3:17 p.m.   We are back on the record.            15:17:37
```

Page 189

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2              Q.  Dr. Cowan, can you turn to the          15:17:44

3      appendix, Appendix 1 to your expert report      15:17:47

4      please?  That's just after Page 33.             15:17:50

5              A.  I'm there.                           15:17:52

6              Q.  Okay.  And, actually, right before I   15:17:54

7      ask about the appendix.                         15:17:59

8                  Earlier we were discussing           15:18:02

9      SoundExchange.                                  15:18:03

10                 Did you obtain a full download of the   15:18:04

11     SoundExchange database from the SoundExchange   15:18:07

12     website?                                        15:18:09

13             A.  No.  I was still negotiating with    15:18:10

14     them.  I was told I could, but it was more --   15:18:13

15     well, it wasn't as complicated as the Copyright   15:18:19

16     Office, but it was definitely more complicated   15:18:23

17     than MusicBrainz.  So I'm in the process of doing   15:18:27

18     that.  So I know I have not obtained the full    15:18:30

19     database that I requested.                      15:18:32

20             Q.  Are you still discussing obtaining    15:18:33

21     that database with SoundExchange?               15:18:35

22             A.  I think it's more my CFO is trying to   15:18:39

23     figure out how to get the money so they will send   15:18:43

24     it to us.                                       15:18:46

25             Q.  Okay.  Do you know how much          15:18:46

Page 190

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1           HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2      SoundExchange is proposing to charge you for that    15:18:48

3      download?                                            15:18:51

4           A.  No, they don't let me know stuff like       15:18:52

5      that.                                                15:18:54

6           Q.  Okay.                                        15:18:54

7           A.  They try to keep me away from money.        15:18:55

8           Q.  Okay.  Alright.  Back to Appendix 1.        15:18:58

9               So Appendix 1 provides further              15:19:03

10     description about your use of the MusicBrainz        15:19:07

11     database, correct?                                   15:19:09

12          A.  Yes.                                         15:19:10

13          Q.  And then it describes creating a            15:19:15

14     subset of the MusicBrainz database, correct?         15:19:17

15          A.  Yes.                                         15:19:20

16          Q.  So let's just call that the                 15:19:22

17     MusicBrainz subset, okay?                            15:19:24

18          A.  Sure.                                        15:19:26

19          Q.  Does the MusicBrainz subset include         15:19:28

20     works that were released in a foreign country        15:19:33

21     prior to being released in the United States or      15:19:36

22     released in a foreign country but were never         15:19:39

23     released in the United States?                       15:19:43

24          A.  I believe it's both.  I am certain          15:19:49

25     that it is released in a foreign country prior to    15:19:52
```

Page 191

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2    being released in the United States.  I'm less      15:19:55

 3    certain about whether it was released in a          15:19:59

 4    foreign country and never released in the United    15:20:02

 5    States and I think there -- I'd have to go back      15:20:07

 6    and look at the computer code to figure it out.      15:20:17

 7         Q.  I was really just referring to the         15:20:19

 8    first sentence here in Appendix 1 where after        15:20:21

 9    one, "released in a foreign country prior to         15:20:25

10    being released in the US" --                         15:20:27

11         A.  Oh, yes, that's definitely true.           15:20:29

12         Q.  Okay.  So let's just -- to get a            15:20:31

13    clear record...                                      15:20:35

14            Does the MusicBrainz subset include         15:20:36

15    works that were either, "one, released in a          15:20:39

16    foreign country prior to being released in the       15:20:42

17    US, or two, released in a foreign country and        15:20:45

18    never released in the US"?                           15:20:47

19         A.  So, for No. 1, it's a definite yes.        15:20:49

20    For No. 2, I believe so, but I'd have to go look     15:20:53

21    at the computer code to figure that out.             15:20:56

22         Q.  And then your method was to compare         15:21:03

23    the MusicBrainz subset to the sample takedown         15:21:07

24    data to search for potential matches, correct?       15:21:12

25         A.  Yes.                                        15:21:16
```

Page 192

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2              Q.  And that's the testing that you          15:21:17

 3         described earlier, correct?                       15:21:18

 4              A.  Yes.                                      15:21:20

 5                  MR. RICHLIN:  Alright.  Let's mark as     15:21:23

 6         Exhibit 9...                                       15:21:33

 7                  (There is a discussion off the           15:21:33

 8         record.)                                          15:21:34

 9                  MR. RICHLIN:  Exhibit 9, not 11.          15:21:34

10                  (Deposition Exhibit Cowan 9,             15:21:34

11         released_foreign_deduped_final.txt - Notepad, was 15:21:34

12         marked for identification.)                       15:22:12

13              Q.  We've marked as Exhibit 9 an excerpt     15:22:15

14         from a dataset that we received from Plaintiffs'  15:22:17

15         attorneys as being something that you created.    15:22:21

16                  And you can see in the very top, it      15:22:26

17         reads "released_foreign_de-dupe_final.txt."       15:22:28

18                  Do you recognize this data?              15:22:36

19              A.  Yes, this is just a summary of what      15:22:38

20         we received from MusicBrainz.                     15:22:40

21              Q.  So this is part of the distilled         15:22:44

22         subset that you created and your team created     15:22:46

23         from what you received from MusicBrainz; is that  15:22:48

24         correct?                                          15:22:50

25              A.  Yes.                                      15:22:51
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2    the artists.                                    15:26:35
 3           But because it's a hierarchical          15:26:35
 4    database, you could also think about this as like 15:26:38
 5    a giant shoebox.  And if you turn the shoebox a  15:26:41
 6    different direction so that you're looking at it 15:26:45
 7    a different way, you're now looking at artists   15:26:47
 8    and figuring out linkages from artists back to   15:26:50
 9    songs and from songs back up to albums.          15:26:54
10           So I'm struggling with your question      15:26:58
11    because there is no need to do what you said and 15:27:00
12    we didn't do that.                               15:27:02
13           Q.  Okay.  Let's go to the next paragraph 15:27:03
14    in Appendix 1 where the second sentence          15:27:05
15    describes, "creating a dataset, retrieves or     15:27:10
16    release dates in countries for each track        15:27:15
17    contained on each release and de-duplicated a    15:27:16
18    dataset using a combination of the name of the   15:27:19
19    track and the name of the artist attributed to   15:27:21
20    the track."                                      15:27:23
21           A.  Yes.                                   15:27:24
22           Q.  Do you see that, sir?                  15:27:25
23           A.  I do.                                   15:27:26
24           Q.  Okay.  Can you describe to me the      15:27:26
25    de-duplication process that you refer to in      15:27:28
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2     Appendix 1?                              15:27:31

 3          A.   Okay.  Well, that's a pretty standard   15:27:32

 4     method.  What happens is that in MusicBrainz you   15:27:37

 5     can also find that you've got the same entry    15:27:42

 6     multiple times, but it relates to the release by   15:27:45

 7     country.  And so, you know, if it's released in   15:27:48

 8     every country in Europe, you may have 20 entries.   15:27:52

 9     I've lost track of how many countries are in the   15:27:59

10     EU, but let's go with that.                 15:28:01

11          And so -- but you don't want to count   15:28:04

12     all of them.  You just want to count the ones   15:28:06

13     that were -- you only one want record.  So    15:28:09

14     there's -- you can de-duplicate one of two ways.   15:28:13

15     One is to take subsequent records that are the   15:28:17

16     same work, same person and so on and just     15:28:20

17     eliminate them from the database.  The other way   15:28:25

18     is to put a flag on them to say that this is a   15:28:27

19     duplicate record.                           15:28:30

20          Q.   What method did you chose?         15:28:31

21          A.   Oh, I don't know.   That's a        15:28:33

22     programming question.                       15:28:35

23          Q.   Turning back to Exhibit 9, which is   15:28:42

24     the --                                      15:28:44

25          A.   Ah, thank you.                     15:28:45
```

Page 198

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2            Q.  -- the chart or the excerpt where it    15:28:46

 3      reads the title on the very top exhibit,         15:28:48

 4      "de-duped."                                      15:28:53

 5            Does this reflect that this is the         15:28:53

 6      subset that you created following the            15:28:57

 7      de-duplication process?                          15:28:59

 8            A.  Yes.                                    15:29:02

 9            Q.  Okay.  In the middle of the page,      15:29:03

10      there are a number of records relating to what  15:29:11

11      looks like a track called "Everlong" by the Foo 15:29:18

12      Fighters.  And if you see "Everlong acoustic     15:29:22

13      version," "Everlong acoustic," "Everlong live,"  15:29:26

14      "Everlong outro."                                15:29:30

15            Do you see those records?                  15:29:32

16            A.  Yes.                                    15:29:34

17            Q.  And a few above it, maybe ten rows     15:29:34

18      above it, you'll just "Everlong" Foo Fighters    15:29:37

19      just by itself.                                  15:29:41

20            A.  I saw that.                            15:29:42

21            Q.  Okay.  And then there are dates after  15:29:43

22      the what I take to be the artist title.          15:29:50

23            A.  Yeah.                                   15:29:53

24            Q.  What do those dates reflect?           15:29:54

25            A.  Those are the release dates for that   15:29:57
```

Page 199

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2     particular version.  So there's two acoustic        15:29:59

 3     versions for the Foo Fighters, even though one is   15:30:03

 4     called an acoustic version and the other one is     15:30:09

 5     acoustic.  But they're from different dates.  So    15:30:11

 6     one was from 2009 in October and the other is       15:30:15

 7     2010 in February.                                   15:30:18

 8               So "Everlong" was released at two         15:30:20

 9     different times, just the acoustic version.         15:30:26

10          Q.  Going to the first "Everlong" entry,       15:30:30

11     the one that's by itself, you know, ten rows        15:30:32

12     above the set of them?                              15:30:34

13          A.  Yes.                                       15:30:36

14          Q.  The date there is listed as               15:30:37

15     2022/12/31, which actually post dates the report.  15:30:43

16               Why is that, sir?                         15:30:46

17          A.  I don't know.                              15:30:49

18          Q.  Is that an error in the dataset?           15:30:50

19          A.  I don't know.                              15:30:52

20          Q.  Do you think it reflects an error in       15:30:53

21     the underlying MusicBrainz database?                15:30:56

22          A.  Well, I don't know that it's an error      15:30:58

23     at all.  It could be reflecting a statement about  15:31:01

24     when it's going to be released.                     15:31:03

25          Q.  Is that your opinion, sir?                 15:31:06
```

Page 200

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2          A.  No.  My opinion was I don't know what     15:31:08
 3     it is.                                             15:31:09
 4          Q.  Okay.  Did you catch this error in        15:31:10
 5     the -- if it is an error -- in the course of       15:31:13
 6     designing the methodologies that you describe in   15:31:19
 7     your report?                                       15:31:24
 8          A.  Well, the -- so the way that the          15:31:30
 9     matching would work would be that part of the      15:31:37
10     matching is based on date, if we have the          15:31:42
11     information, and also that -- no, this is          15:31:45
12     de-duped.                                          15:32:01
13          So I don't know how we dealt with            15:32:02
14     that.                                              15:32:03
15          Q.  Okay.  Dr. Cowan, are you familiar        15:32:19
16     with the search portal for MusicBrainz, the        15:32:19
17     public search portal on the website?               15:32:26
18          A.  I know that there is one.                 15:32:30
19          Q.  Have you used it before?                  15:32:31
20          A.  I haven't personally.                     15:32:32
21          MR. RICHLIN:  Alright.  I'm going to          15:32:34
22     mark as Exhibit 10 an output from the MusicBrainz  15:32:35
23     public search portal.                              15:32:42
24          (Deposition Exhibit Cowan 10, output          15:32:42
25     from search on MusicBrainz.com, was marked for     15:32:42
```

Page 201

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2         identification.)                              15:32:42

3                (There is a discussion off the         15:32:42

4         record.)                                      15:33:11

5              Q.  Dr. Cowan, we've marked as           15:33:11

6         Exhibit 10, the output from a search performed on  15:33:14

7         the MusicBrainz website for a search of the song  15:33:17

8         "Everlong" and the artist Foo Fighters.  And as  15:33:21

9         you'll see, at least, on the date that this was  15:33:25

10        conducted it found 3,957 results.             15:33:30

11               Do you see that, sir?                  15:33:32

12             A.  Yes.                                 15:33:34

13             Q.  Do searches in this format look      15:33:34

14        familiar to you?  Have you ever seen a search  15:33:39

15        page of this type?                            15:33:42

16             A.  I've seen a search page.             15:33:42

17             Q.  And do you see even just on the first  15:33:47

18        page that there are multiple results for a song  15:33:49

19        titled simply, "Everlong," by the Foo Fighters?  15:33:51

20             A.  Yes, it's titled "Everlong," not     15:33:57

21        "simply Everlong."                            15:33:59

22             Q.  Yeah, I --                           15:33:59

23             A.  Simply titled, "Everlong," okay.     15:34:01

24             Q.  As modified by your corrected answer.  15:34:04

25        It's titled, "Everlong," by the Foo Fighters?  15:34:08
```

Page 202

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2            Q.  Yes.                                    15:46:24

 3            A.  Sorry to interrupt you, but that's      15:46:25

 4     what you were trying to say.                       15:46:27

 5            Q.  Yes.  So, again, just so I'm clear,     15:46:29

 6     the date entries for the first three rows is       15:46:31

 7     different, correct?                                15:46:34

 8            A.  Yes, it is.                              15:46:35

 9            Q.  Okay.  Based upon your methodology,     15:46:35

10     would the song "Everlong" from "The Color and the 15:46:40

11     Shape" be something that would be for potential    15:46:44

12     inclusion in your foreign works class or your US   15:46:50

13     works class?                                       15:46:54

14            A.  So, first of all, it would qualify      15:47:04

15     for the foreign works class because of the fact    15:47:08

16     that it was released in Japan ten days before it   15:47:10

17     was released in the US and, actually, eight days   15:47:13

18     before in Great Britain before it was released in  15:47:18

19     the US.                                            15:47:21

20            And I apologize.  I just don't              15:47:26

21     remember if something that is in the -- if it's    15:47:28

22     also copyrighted in the US, whether it would       15:47:39

23     immediately fall into that category and only that  15:47:45

24     category or if it could exist in both categories.  15:47:47

25            Q.  Well, again, turning back to            15:47:51
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
2     Exhibit 9, you have "Everlong Foo Fighters" in      15:47:55
3     your foreign de-dup dataset, correct?               15:48:01
4          A.  Yes.                                        15:48:04
5          Q.  And, again, for Appendix 1, which was       15:48:06
6     Appendix 1 to your expert report, you state that,   15:48:11
7     "If the foreign track was released prior to the     15:48:16
8     US release, it was included in our final           15:48:18
9     dataset," correct?                                  15:48:22
10         A.  Yes.                                        15:48:24
11         Q.  So can I take that to be that you           15:48:27
12    concluded the song "Everlong" belongs in the        15:48:30
13    foreign works class?                                 15:48:33
14         A.  Yes, for the reasons I stated               15:48:36
15    earlier.                                             15:48:38
16         Q.  Okay.  And you didn't compare this          15:48:38
17    against records from other databases, correct?      15:48:42
18         A.  No, for the purposes of the class           15:48:46
19    cert, I just looked at MusicBrainz.                  15:48:49
20         Q.  Okay.  Alright.  So let's now mark as       15:48:50
21    Exhibit 12 --                                        15:49:05
22              (There is a discussion off the             15:49:05
23    record.)                                             15:49:19
24              (Deposition Exhibit Cowan 12, output       15:49:19
25    from search from the Copyright Office, was marked   15:49:19
```

Page 210

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2      for identification.)                          15:49:43

 3          Q.  Marked as Exhibit 12 output from the  15:49:43

 4      US Copyright Office's records.                15:49:47

 5              Sir, have you conducted searches from  15:49:53

 6      the US Copyright Office's records.            15:49:56

 7          A.  Yes.                                   15:49:58

 8          Q.  Do you recognize this as similar to   15:49:59

 9      outputs from queries against their public     15:50:01

10      catalog?                                       15:50:05

11          A.  Yes.                                   15:50:05

12          Q.  And here under "Title of Their Work,"  15:50:08

13      do you see "The Color and the Shape" by the Foo 15:50:14

14      Fighters and then under the "Contents" the song 15:50:17

15      "Everlong" is the third to last.              15:50:19

16              Do you see that?                       15:50:21

17          A.  Yes.                                   15:50:22

18          Q.  And the date of publication is         15:50:24

19      May 8th, 1997, correct?                        15:50:27

20          A.  Yes.                                   15:50:29

21          Q.  And that's earlier than the date of    15:50:30

22      publication that's listed for the US release on 15:50:34

23      the MusicBrainz.  If you need to go back to it -- 15:50:38

24          A.  No, I've got it in front of me.        15:50:41

25          Q.  You've got it in front of you in       15:50:43
```

Page 211

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
2     Exhibit 11.                                    15:50:45
3            A.  Thank you.                          15:50:46
4            Q.  And so, in compiling your dataset,  15:50:48
5     you didn't consider potentially conflicting    15:50:51
6     information from other datasets that you relied 15:50:55
7     upon, correct?                                 15:50:57
8            A.  That is -- well, I haven't yet.  But 15:51:07
9     I haven't done this specific comparison.       15:51:17
10           Q.  Okay.  That comparison is not       15:51:21
11    something that's described in your Appendix 1 or 15:51:23
12    otherwise in your report, correct?             15:51:25
13           A.  It is not.                          15:51:27
14           Q.  Based upon the information that's now 15:51:30
15    in front of you, does "Everlong" by the Foo    15:51:32
16    Fighters belong in your foreign works subset?  15:51:35
17           A.  Well, I don't know because I don't  15:51:40
18    know the reason why there would be a difference 15:51:42
19    between MusicBrainz and the Copyright Office.  So 15:51:44
20    I would have to investigate this before I can  15:51:47
21    draw a conclusion.                             15:51:50
22            You've given me one anecdote.  I       15:51:51
23    would go back to MusicBrainz and give them     15:51:54
24    examples, if I can find more examples, and say, 15:51:57
25    okay, why does this happen, and also with respect 15:52:01
```

Page 212

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY | |
| 2 | to the Copyright Office, ask them why this | 15:52:05 |
| 3 | happened. | 15:52:09 |
| 4 | But you're asking me to draw a | 15:52:10 |
| 5 | conclusion based on something that I haven't | 15:52:12 |
| 6 | researched and wasn't germane to the work I was | 15:52:17 |
| 7 | doing initially in determining how to find a | 15:52:20 |
| 8 | match. | 15:52:25 |
| 9 | Q.  And that process that you just | 15:52:25 |
| 10 | described of having to go back to MusicBrainz and | 15:52:27 |
| 11 | the Copyright Office to resolve discrepancies in | 15:52:30 |
| 12 | the data, is that the process that you would | 15:52:34 |
| 13 | undertake to resolve data discrepancies? | 15:52:36 |
| 14 | A.  Well, it depends on the type of data | 15:52:41 |
| 15 | discrepancies.  So suppose that I've got two | 15:52:44 |
| 16 | different dates, as you just pointed out.  There | 15:52:46 |
| 17 | may be one consistent reason across the board for | 15:52:49 |
| 18 | MusicBrainz versus the Copyright Office having | 15:52:54 |
| 19 | differences.  In which case, I'd apply that in | 15:53:00 |
| 20 | all cases, not on anecdote-by-anecdote basis. | 15:53:03 |
| 21 | Q.  Let's turn back to Exhibit 10. | 15:53:16 |
| 22 | A.  (The witness complies.) | 15:53:22 |
| 23 | Q.  Among these 3,957 results, you | 15:53:33 |
| 24 | de-duplicated to produce the five results that | 15:53:38 |
| 25 | are in Exhibit 9; is that correct? | 15:53:42 |

Page 213

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY | |
| 2 | demonstrable, that after a successful takedown | 16:40:50 |
| 3 | notice, that the song could be reinstated.  So, | 16:40:55 |
| 4 | if somebody claims, for example, a fair use, an | 16:41:02 |
| 5 | exemption to those rules and YouTube could then | 16:41:10 |
| 6 | repost the particular work, in which case it | 16:41:19 |
| 7 | would be included from my dataset anyway. | 16:41:26 |
| 8 | So it's just not that I'm -- my | 16:41:29 |
| 9 | consideration of fair use and licensing depends | 16:41:32 |
| 10 | on, No. 1, whether or not there is a successful | 16:41:37 |
| 11 | takedown notice and, No. 2, as to whether or not | 16:41:41 |
| 12 | there was a counterclaim against that.  Somebody | 16:41:43 |
| 13 | has a license and there is a successful takedown | 16:41:46 |
| 14 | and they don't file anything back, then they've | 16:41:50 |
| 15 | abandoned their license.  If there is a | 16:41:54 |
| 16 | successful takedown and nobody claims fair use, | 16:41:57 |
| 17 | then, again, there isn't any basis under which to | 16:42:01 |
| 18 | say that there is a fair use claim. | 16:42:04 |
| 19 | So I'm relying on the interaction of | 16:42:07 |
| 20 | YouTube with whoever posted the video in the | 16:42:14 |
| 21 | first place as to whether or not there's a valid | 16:42:16 |
| 22 | license or whether there's a fair use claim. | 16:42:20 |
| 23 | There is no reason for me to make any further | 16:42:24 |
| 24 | assumptions, other than the fact that if a person | 16:42:27 |
| 25 | has gone to the bother of getting a license and | 16:42:31 |

Page 235

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2      the video is taken down, that they will argue for    16:42:36
 3      its reinstatement.                                    16:42:39
 4           Q.  Thank you, sir.                              16:42:41
 5                Well, let's talk about CLFN and the         16:42:42
 6      CLFN class.                                           16:42:45
 7                When was the first time you ever            16:42:46
 8      heard of "CLFN"?                                      16:42:48
 9           A.  Well, the term -- so I knew that             16:42:53
10      there was metadata on works.  I just didn't know     16:42:55
11      the term "CLFN."  So the first time I heard the       16:42:58
12      term "CLFN" was with respect to this case.            16:43:03
13           Q.  Okay.  So, prior to being engaged in         16:43:05
14      this case, you never heard of the term "CLFN,"        16:43:12
15      correct?                                              16:43:17
16           A.  No.  As I said before, I was familiar        16:43:17
17      with the metadata associated with various songs,      16:43:20
18      but I was not familiar with that specific term.       16:43:23
19           Q.  Are you aware of whether CLFN is used        16:43:27
20      by any entity for digital rights management?          16:43:29
21           A.  I don't know.                                16:43:37
22           Q.  Are you aware of how common it is for        16:43:38
23      CLFN to exist in a digital audio file?                16:43:40
24           A.  I believe it's not real common, but          16:43:47
25      it cost exist.                                        16:43:52
```

                                                    Page 236

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2            Q.   Are you aware how common it is for      16:43:53
 3    CLFN to exist in a digital video file, if it        16:43:56
 4    contains both audio and visual?                     16:44:00
 5            A.   No.                                     16:44:03
 6            Q.   Are you aware of how values for CLFN    16:44:04
 7    are set?                                            16:44:06
 8            A.   You mean how the metadata is           16:44:11
 9    populated?                                          16:44:13
10            Q.   Where CLFN comes from, correct.        16:44:13
11            A.   No.                                     16:44:21
12            Q.   Turning to Paragraph 96 of your        16:44:37
13    report and you find that there was CLFN metadata    16:44:39
14    in 649 videos, 0.04 percent of all the videos in    16:44:47
15    the sampled takedown notice data.                   16:44:53
16            And that percentage is actually            16:44:58
17    rounding up a little bit, correct?                  16:44:59
18            A.   Maybe.  I would have to sit down and   16:45:04
19    do the calculation to answer your question.         16:45:06
20            Q.   Okay.  If I told you that the actual   16:45:11
21    figure is .0362 percent, it sounds like you         16:45:15
22    wouldn't disagree with me.                          16:45:21
23            A.   I don't have a basis for doing that    16:45:22
24    until I pull out a calculator.                      16:45:26
25            Q.   Okay.  Whether it's .04 or .0362,      16:45:27
```

Page 237

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2     what does that translate to as a fraction, one in    16:45:31

 3     how many videos?                                      16:45:34

 4          A.  So 4 in 10,000.                              16:45:40

 5          Q.  You did not test for the accuracy of         16:45:50

 6     CLFN data in any way, correct?                        16:45:53

 7          A.  No.                                          16:45:56

 8          Q.  You did not consult with any database        16:45:57

 9     to determine whether CLFN metadata present in the     16:45:59

10     sample reflects copyright management information,     16:46:04

11     correct?                                              16:46:10

12          MS. O'KEEFE:  Objection, form.                   16:46:10

13          A.  Well, I apologize, because I                 16:46:16

14     understood that CLFN, the Clip File Notes, was        16:46:18

15     copyright management information.                     16:46:24

16          Q.  Is that an assumption, sir, a                16:46:25

17     conclusion?                                           16:46:27

18          A.  Well, that was my conclusion from            16:46:30

19     seeing which class it was in, the copyright           16:46:32

20     management information class.  But I don't know       16:46:38

21     what the specific -- I know what some of the          16:46:40

22     specific fields are because I use them.  But I        16:46:43

23     don't -- I'm not an expert in copyright               16:46:46

24     management.  So I couldn't say whether they were      16:46:51

25     used in copyright management or not.                  16:46:53
```

Page 238

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1            HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2            Q.  Apart from your work in looking at        16:46:55

 3       the sample and looking at CLFN data in the 649     16:46:57

 4       videos of the total sample set, you have no        16:47:01

 5       experience with CLFN at all, correct?             16:47:06

 6            A.  That is correct.                          16:47:08

 7            Q.  And you've never looked at any            16:47:09

 8       secondary literature regarding the prevalence or   16:47:11

 9       use of CLFN, correct?                              16:47:14

10            A.  That is correct.                          16:47:15

11            Q.  Of those 649 CLFN entries that you        16:47:20

12       identified, how many were either My Movie or My    16:47:24

13       Movie followed by a number?                        16:47:29

14            A.  I don't know.                             16:47:32

15            Q.  Is it more than a hundred?                16:47:34

16            A.  Well, we removed 137 from -- through      16:47:36

17       the cleaning process.  So I don't know how many    16:47:41

18       were My Movie and My Movie and some number.  But   16:47:44

19       I would expect that some of those would be         16:47:48

20       removed through the cleaning process.  I just      16:47:51

21       don't know what the number was.                    16:47:54

22            Q.  Did your cleaning process include         16:47:57

23       manual review of that data to strip out entries    16:48:01

24       that you concluded were unlikely to constitute     16:48:07

25       copyright management information?                   16:48:13
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2    not a potential match was indeed a match?        16:54:44
 3            A.  I did and it's the same or very      16:54:46
 4    similar scoring system.  But in this particular  16:54:50
 5    case now I mention at the end of Paragraph 96    16:54:55
 6    that I was matching the name of the copyright    16:55:00
 7    owner or the title being completely included in  16:55:05
 8    the CLFN metadata.  So the mechanism of the      16:55:09
 9    matching was the same, but there's less to match 16:55:15
10    to.                                              16:55:19
11            So my answer to your question is the     16:55:20
12    mechanism is the same, but it's reduced because  16:55:25
13    I've got less information available through CLFN. 16:55:28
14            Q.  And that's part of the testing and   16:55:33
15    application process that you described earlier?  16:55:35
16            A.  Well, that's actually just a fact    16:55:38
17    that I've got less information because the        16:55:40
18    metadata includes less information.  So but then 16:55:43
19    as part of the testing, I recognize that and     16:55:49
20    think about how I pursue the process to still do 16:55:54
21    the best job I can given that I've got a reduced 16:55:59
22    amount of data that may also include establishing 16:56:03
23    a different threshold than I might have used for 16:56:07
24    the foreign unregistered works or for ISRC,      16:56:11
25    simply because I'm looking at something          16:56:14
```

Page 244

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2    mathematically the same in terms of the matching      16:56:19
 3    but different in terms of the volume of               16:56:21
 4    information available.                                16:56:23
 5         Q.  Okay.  And you, in fact, conducted           16:56:27
 6    tests of whether you could match the clean CLFN       16:56:29
 7    data with any of the takedown notices, correct?       16:56:35
 8         A.  I mentioned earlier that I was               16:56:37
 9    actually able to match 23, in terms of owners.        16:56:40
10         Q.  And that No. 23 is not disclosed in          16:57:09
11    your report, correct?                                 16:57:13
12         A.  It is not.                                   16:57:14
13         Q.  And your threshold for when you would        16:57:15
14    deem a match to have been identified was not          16:57:17
15    disclosed in your report, correct?                    16:57:19
16         A.  It was not.                                  16:57:21
17         Q.  And your use of a matching                   16:57:23
18    methodology, the precise matching methodology was     16:57:25
19    not disclosed and described in your report,           16:57:29
20    correct?                                              16:57:32
21         MS. O'KEEFE:  Objection, form.                   16:57:32
22         A.  I can't answer your question anyway,         16:57:36
23    because I don't know what you mean about the          16:57:37
24    "precise matching methodology."                       16:57:39
25         Could you ask me the question a                  16:57:44
```

Page 245

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2      different way so I can understand what you're      16:57:47
 3      asking?                                            16:57:49
 4          Q.  You know, I'll just withdraw it.           16:57:49
 5      It's okay.                                         16:57:51
 6              Your report also describes the             16:58:17
 7      potential to use CLFN data from videos that had    16:58:19
 8      not been taken down to identify potential members  16:58:26
 9      of the class, correct?                             16:58:30
10          A.  Yes.                                       16:58:32
11          Q.  But your report only describes             16:58:37
12      identifying a class member with reference to the   16:58:39
13      takedown dataset.  And, again, I'm sure it         16:58:43
14      because you'll say that's all you had.             16:58:47
15              So my question is --                       16:58:50
16          A.  This is great.  I don't need to -- I       16:58:52
17      don't need to be here.  You can answer the         16:58:55
18      questions for me.                                  16:58:57
19          Q.  I just wanted to get that potential        16:58:58
20      answer out of the way.                             16:59:01
21          A.  Thank you.                                 16:59:02
22          Q.  My question is, does your report           16:59:04
23      describe what other databases you would use to     16:59:07
24      identify members of the CLFN class without a       16:59:12
25      potential takedown notice for reference?           16:59:19
```

Page 246

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2     the reason why you have or haven't done          17:46:53

 3     something.  I just want -- it will go a little   17:46:55

 4     faster if you can just answer the questions.     17:46:57

 5         A.  Oh, well, I'm sorry.  I'm                17:46:59

 6     differentiating between questions where it would 17:47:01

 7     be physically possible for me to do something, as 17:47:04

 8     opposed to that question where if it's not       17:47:06

 9     available, I can't do it.  So I thought my answer 17:47:09

10     was more than adequate in terms of saying, no, I 17:47:13

11     didn't do it because it's not there.             17:47:16

12         Q.  Okay.  Your understanding is that        17:47:18

13     values for the title of copyrighted work come    17:47:35

14     from takedown notices that users have entered,   17:47:39

15     correct?                                         17:47:42

16         A.  Yes.                                     17:47:42

17         Q.  And you're aware, for example, that      17:47:44

18     many hundreds of records in the takedown sample  17:47:47

19     data say things like "My Sample" or "My Movie,"  17:47:50

20     correct?                                         17:47:53

21         A.  Yes.                                     17:47:53

22         Q.  And so it's your understanding that,     17:47:53

23     in fact, many of the records in the takedown     17:47:56

24     database do not actually provide information on a 17:47:59

25     work that can be identified, correct?            17:48:04
```

Page 267

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2               MS. O'KEEFE:  Objection, form.         17:48:06
 3          A.  Well, I don't know what you mean by     17:48:13
 4      "be identified."                                17:48:16
 5               So, clearly, somebody identified a     17:48:17
 6      work because they submitted a takedown notice and  17:48:23
 7      gave a specific URL.  That identifies the work as  17:48:25
 8      far as YouTube is concerned.                    17:48:30
 9               If you're asking about whether the     17:48:32
10      work could be identified with the title, my video  17:48:34
11      over on the copyright database, then, no, it    17:48:39
12      could not be identified on the -- but on the    17:48:43
13      other hand that just means I'm not matching to  17:48:49
14      something that didn't make sense in the first   17:48:52
15      place if it should have been.  If for some      17:48:55
16      bizarre reason there would be something on the  17:48:58
17      copyright database that does say my video, which  17:49:01
18      I find hard to believe, then I'd either match it  17:49:06
19      if the artist match also or I wouldn't match it.  17:49:13
20      And if you're telling me that I should have match  17:49:16
21      it, then it's an underestimate and makes it     17:49:19
22      conservative and in favor of the Defendants.    17:49:21
23          Q.  Are you aware of something called      17:49:24
24      "takedown notice abuse"?                        17:49:28
25          A.  Takedown notice of use?                17:49:30
```

Page 268

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2              Q.   "Abuse," A-B-U-S-E, abuse.              17:49:31

3              A.   Oh, abuse.   I'm sorry.                 17:49:35

4              Q.   Yes.                                    17:49:35

5              A.   Yes, I've read about that.             17:49:37

6              Q.   And, to your understanding, that's     17:49:38

7      where a party misuses the takedown notice process  17:49:40

8      to file a takedown notice with the intent not to    17:49:44

9      request a takedown of a video that may own          17:49:51

10     copyright to but a video that they want taken       17:49:54

11     down for some other reason?                         17:49:57

12             A.   Yes.                                    17:49:59

13             MS. O'KEEFE:   Objection, form.             17:49:59

14             THE WITNESS:   Oh, I'm sorry.               17:50:01

15             Q.   You can answer.                         17:50:02

16             A.   Well, actually, I think that's what     17:50:03

17     it says on the website.                             17:50:05

18             Q.   What's your understanding of the        17:50:06

19     takedown notice of use?                             17:50:08

20             A.   What you just said.                     17:50:10

21             Q.   Okay.   Do you account for the          17:50:11

22     potential of takedown notice of use in your         17:50:17

23     methodology?                                        17:50:24

24             A.   No.   I don't believe it occurs that   17:50:24

25     frequently, No. 1, and then No. 2, I believe that  17:50:27

Page 269

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
```

| | | |
|---|---|---|
| 2 | there were restrictions imposed by YouTube that | 17:50:31 |
| 3 | if somebody engages in taking down of use too | 17:50:34 |
| 4 | frequently, that they themselves are in effect | 17:50:39 |
| 5 | taken down.  They're not allowed to submit | 17:50:46 |
| 6 | anymore.  So that would limit the impact that | 17:50:48 |
| 7 | that -- that takedown abuse would have across the | 17:50:51 |
| 8 | hundred have thousands of takedown notices that | 17:50:56 |
| 9 | are received in the first 90-day sample. | 17:50:59 |
| 10 | Q.  What is the basis for your belief | 17:51:03 |
| 11 | that takedown abuse does not occur that | 17:51:05 |
| 12 | frequently? | 17:51:08 |
| 13 | A.  Mostly, because if somebody is | 17:51:09 |
| 14 | abusing the takedown notice process, YouTube has | 17:51:12 |
| 15 | restrictions in place to make sure that that | 17:51:21 |
| 16 | person stops doing it.  So on -- so I'm making an | 17:51:23 |
| 17 | assumption that YouTube enforces that. | 17:51:29 |
| 18 | Q.  Are you aware that YouTube has | 17:51:34 |
| 19 | alleged that one of the original Plaintiffs in | 17:51:36 |
| 20 | this case submitted thousands of fake takedown | 17:51:38 |
| 21 | notices? | 17:51:42 |
| 22 | A.  No, I wasn't aware of that. | 17:51:44 |
| 23 | Q.  And that YouTube has then asserted | 17:51:49 |
| 24 | counterclaims against that party? | 17:51:51 |
| 25 | A.  I wasn't aware of that. | 17:51:56 |

Page 270

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
```

 2          Q.  Do any of your methodologies consider        17:52:13

 3     whether the copyright owner identified in the          17:52:16

 4     takedown notice owned the work described at the        17:52:18

 5     time the lawsuit was filed?                            17:52:25

 6          A.  No.                                           17:52:30

 7          Q.  Do any of the methodologies that you         17:52:34

 8     described consider whether copyright owners            17:52:36

 9     identified in the takedown notice transferred          17:52:39

10     their works -- their rights to that work by            17:52:41

11     assignment?                                            17:52:44

12          A.  So I know what you're talking about          17:52:46

13     because I know it can be done.  It does not            17:52:48

14     consider that.  So, in a hypothetical, if the          17:52:51

15     original copyright owner filed a takedown notice       17:52:57

16     but the rights were held by somebody else, they        17:53:03

17     have the ability to get the video or work that         17:53:06

18     was removed reinstated.  So I'm assuming that if       17:53:14

19     there is a transfer from one to the other, from        17:53:19

20     -- I'm sorry, from the original copyright holder       17:53:25

21     to a new copyright holder, that the new copyright      17:53:27

22     holder having invested in the copyright would          17:53:32

23     also be concerned about either reinstating a           17:53:39

24     video or doing something to protect their              17:53:44

25     copyright.  So that's one assumption I'm making.       17:53:48

Page 271

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2               I did ask how frequently this          17:53:51

3      occurred, the change from the copyright holder to   17:53:56

4      a new copyright holder and my understanding was    17:54:01

5      that it was like less than 1 percent of           17:54:04

6      copyrights.                                        17:54:07

7          Q.  How did you perform that                  17:54:10

8      understanding?                                     17:54:13

9          A.  I asked Counsel and that's what they      17:54:14

10     told me.  I don't know where they came up with    17:54:16

11     that one.                                          17:54:20

12         Q.  Okay.  Is there anything else that        17:54:20

13     you did to form that assumption?                  17:54:22

14         A.  Well, I gave you two.  So which one       17:54:28

15     are you asking about?                             17:54:31

16         Q.  The assumption as to the frequency       17:54:31

17     and change of copyright holders.                  17:54:33

18         A.  No, I didn't do anything with it.        17:54:35

19         Q.  Okay.  Did you test your methodology     17:54:37

20     against the takedown notices submitted to YouTube  17:54:40

21     by any of the named Plaintiffs in this case?      17:54:43

22         A.  No.                                       17:54:45

23         Q.  Let's turn back to Exhibit 2, which      17:55:20

24     is your initial -- the initial report that is    17:55:23

25     dated September 1st.                              17:55:29

                                        Page  272

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2              A.  (The witness complies.)              17:55:33
 3              Q.  Are you there, sir?                  17:55:47
 4              A.  Well, I have it.  I don't know where 17:55:48
 5          we're going.                                 17:55:50
 6              Q.  Okay, Paragraph 4 on Page 3.         17:55:51
 7              A.  I'm there.                           17:55:59
 8              Q.  Okay.  Okay.  And Paragraph 4 that   17:56:00
 9          you wrote at that time, in order to apply your 17:56:07
10          proposed methodologies, Defendants will be  17:56:10
11          producing data consistent with the Court's order 17:56:13
12          of August 30th including a 90 sample days of 17:56:15
13          takedown data, correct?                     17:56:21
14              A.  Yes.                                 17:56:23
15              Q.  And then in Paragraph 5 you say, Once 17:56:26
16          that sample is defined, a 30-day sample should be 17:56:29
17          selected from the 90-day sample and that you will 17:56:34
18          develop a sample methodology and provide    17:56:37
19          Plaintiffs' attorneys with samples of 90 and 17:56:39
20          30 days, as directed by the Court in its order, 17:56:42
21          correct?                                     17:56:45
22              A.  Yes.                                 17:56:45
23              Q.  In Paragraph 6, you then go on and   17:56:50
24          state that you will "develop a methodology to 17:56:52
25          estimate the size of the classes and class-wide 17:56:54
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2    you?                                          18:01:17

 3         A.  I did not.                           18:01:18

 4         Q.  Okay.  And you also didn't cap in    18:01:19

 5    reliability as reliability, meaning, highly   18:01:23

 6    variable, correct?                            18:01:27

 7         A.  Well, I always meant that.  The      18:01:31

 8    problem I've got as a statistician is I use   18:01:33

 9    certain words in terms of my ambit and sometimes 18:01:38

10    I forget that other people don't speak my jargon. 18:01:42

11         Q.  Dr. Cowan, let's go back in time to  18:01:46

12    September 1 when you completed and signed your 18:01:47

13    initial expert report.                        18:01:50

14            At that time, it was your expectation 18:01:51

15    that with 90 days of sample data, you would fully 18:01:54

16    be able to estimate the size of the classes,  18:01:57

17    correct?                                       18:02:00

18         A.  With some assumptions in the back of 18:02:02

19    my head, yes.                                  18:02:04

20         Q.  Okay.  And then you got the data for  18:02:05

21    90 days, correct?                              18:02:07

22         A.  I did.                                18:02:10

23         Q.  And you ran tests to attempt to apply 18:02:10

24    the matching process you developed, correct?   18:02:13

25         A.  I did.                                18:02:18
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2            Q.  And then you resulted -- you produced    18:02:19

 3    very small numbers of identified matches,           18:02:22

 4    correct?                                            18:02:26

 5            A.  Well, let's remember that the very       18:02:29

 6    small numbers were because I had the sub-sample     18:02:30

 7    2,000 out of the 489,000 works.  So, of course,     18:02:34

 8    it was small numbers because it was only out of     18:02:37

 9    2,000, not out of 489,000.                          18:02:41

10            Q.  So you agree, sir, that based upon       18:02:47

11    the data that you received, based upon the tests    18:02:49

12    that you ran, you only identified a very small      18:02:52

13    number of potential matches, correct?              18:02:55

14            A.  Well, not the way you're wording it.     18:02:57

15    I don't agree with the presentation you're          18:03:00

16    making.                                             18:03:03

17            Out of the data I received and the           18:03:03

18    sub-sample that I reviewed, I was only able to do   18:03:06

19    a limited number of matches.  But that's because    18:03:11

20    it's a very limited dataset, limited by the fact    18:03:13

21    that I'm still developing the matching              18:03:17

22    algorithms.                                         18:03:21

23            Q.  The total number of matches across       18:03:21

24    all four classes that you identified, sir, is,      18:03:23

25    approximately, what?                                18:03:26
```

                                            Page 278

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2          A.  Forty.                                   18:03:29

 3          Q.  Forty, okay.                             18:03:30

 4              And you didn't disclose that in your     18:03:32

 5     operative report, did you, sir?                   18:03:35

 6          A.  No.                                       18:03:38

 7          Q.  Instead you changed course and you       18:03:38

 8     said that there's no reliable way to estimate the 18:03:41

 9     number of class members, correct?                 18:03:43

10          A.  What I said was that there is no          18:03:50

11     reliable way -- oh, yeah.  I mean, that's the     18:03:52

12     sentence that you just read with the             18:04:00

13     understanding that after I received the data and 18:04:02

14     looked at the distribution of the data that I    18:04:07

15     got, there isn't a reliable way, meaning, that   18:04:10

16     the results are highly variable.                 18:04:15

17          Q.  You could have just written that you     18:04:22

18     didn't like the way the data came out and so you 18:04:24

19     didn't want to tell anyone what you found from   18:04:27

20     your tests, right?                                18:04:29

21          MS. O'KEEFE:  Objection, form.               18:04:30

22          A.  That seems so inelegant.  Actually, I    18:04:32

23     couldn't have written that.  What I wrote was in 18:04:44

24     conformance with the standard scientific methods 18:04:47

25     that I use, which talk about the reliability of  18:04:52
```

Page 279

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2      the estimates.  But the reliability of the      18:04:55

 3      estimates has to do with variability, which I've 18:04:57

 4      said multiple times today and the fact that my   18:05:00

 5      original assumptions of -- in the first report   18:05:06

 6      had to do with the distribution of matches that I 18:05:11

 7      would get between takedown notices, without      18:05:16

 8      regard to matching to the copyright database or   18:05:27

 9      MusicBrainz or SoundExchange.                    18:05:36

10            So, if you think about the matching        18:05:38

11      to be able to count up the number of times that  18:05:39

12      you have 2, 3, 4 matches of takedown notices,    18:05:42

13      what I got back was that over 95 percent of the  18:05:54

14      records only had one takedown notice and that    18:06:00

15      there were only less than 5 percent that had 2,  18:06:04

16      3, 4 and on up to 72 takedown notices.           18:06:09

17            So that wasn't what I anticipated.         18:06:13

18      That tells me that the underlying assumptions    18:06:17

19      that I had regarding the process that we were    18:06:20

20      using in the first report didn't fit the sample  18:06:25

21      distribution that I anticipated getting from what 18:06:30

22      I understood were takedown notices.              18:06:33

23            So that being the case what I said in      18:06:36

24      the first report about relying on the 90-day     18:06:40

25      sample that was ordered by the Court turned out  18:06:43
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY | |
| 2 | occurrence is a unique occurrence and doesn't | 18:11:08 |
| 3 | relate to any of the other occurrences.  Or if it | 18:11:11 |
| 4 | does, then the process of discovering sampling is | 18:11:14 |
| 5 | completely undercut, because if there is a | 18:11:19 |
| 6 | correlation between items, what happens there is | 18:11:21 |
| 7 | the probabilities that are computed in discovery | 18:11:24 |
| 8 | sampling rely on binomial distribution, that the | 18:11:27 |
| 9 | binomial distribution is derived assuming that | 18:11:30 |
| 10 | there are no correlations between any of the | 18:11:33 |
| 11 | items. | 18:11:37 |
| 12 | I'm not doing any of that.  I'm | 18:11:37 |
| 13 | trying to determine the number of times that a | 18:11:40 |
| 14 | takedown discovery, takedown notice has been | 18:11:48 |
| 15 | posted and I need to do that to demonstrate, | 18:11:50 |
| 16 | No. 1, that it's two -- at least, two times. | 18:11:54 |
| 17 | Then besides that with respect to ISRC, I want to | 18:11:58 |
| 18 | know the actual number because those go towards | 18:12:01 |
| 19 | statutory damages. | 18:12:04 |
| 20 | So, in either of those cases, I am | 18:12:05 |
| 21 | doing something completely different than the | 18:12:08 |
| 22 | discovery sampling.  This is a useless quote | 18:12:11 |
| 23 | because it has nothing to do with the particular | 18:12:15 |
| 24 | process that's being employed here, which is why | 18:12:18 |
| 25 | I say in my Paragraph 63, traditional sampling | 18:12:23 |

Page 284

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2      theory is not equipped to deal with this problem,   18:12:28

 3      okay, which goes directly counter to this because   18:12:31

 4      a discovery sampling is a traditional sampling      18:12:34

 5      process.                                            18:12:40

 6              So I talked about more advance areas        18:12:40

 7      of probability such as latent structure theory      18:12:42

 8      require more information to be able to or needed,   18:12:45

 9      first of all, just to make estimates because what   18:12:49

10      you're doing is, as I said, counting the number    18:12:52

11      of times that you get one, two, three multiple      18:12:55

12      discovery notices.                                  18:13:05

13              So this is much more like either the       18:13:05

14      Poisson distribution, P-O-I-S-S-O-N, or use of     18:13:10

15      the hypergeometric distribution, H-Y-P-E-R-G -- I  18:13:13

16      lost track where I was --                          18:13:19

17      H-Y-P-E-R-G-E-O-M-E-T-R-I-C -- two completely      18:13:21

18      different probability distributions.  And then     18:13:29

19      besides that, you have to have a latent structure  18:13:31

20      because you don't know how frequently in the       18:13:33

21      population takedown notices are issued.  So you    18:13:35

22      have to have a structure that would pop up,        18:13:39

23      discovery notices based on whether or not there    18:13:43

24      were two in the population, three in a             18:13:45

25      population, four in a population.                   18:13:47
```

Page 285

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2                    Traditional sampling, particularly,      18:13:49

3      discovery sampling has nothing to do with that.        18:13:52

4      So, you know, if you'd like to look at a text           18:13:55

5      that actually addresses what we're trying to do         18:13:57

6      here, I would suggest you look at all the stuff         18:14:00

7      that I've published on capture recapture methods       18:14:04

8      where you are trying to count things that occur        18:14:08

9      two or more times in a population, as opposed to       18:14:11

10     discovery sampling, which relates only to unique       18:14:14

11     instances that are uncorrelated.                        18:14:17

12                   Did that help?                             18:14:21

13              Q.  Dr. Cowan, can you point to me where       18:14:22

14     in your report, your operative report, you              18:14:25

15     describe why the failure to identify multiple           18:14:31

16     takedown notices within the sample dataset that         18:14:38

17     you reviewed should be considered more akin to          18:14:42

18     latent structure, Poisson theory, hypergeometric,       18:14:47

19     as opposed to traditional sampling theory?              18:14:52

20              MS. O'KEEFE:  Objection, form.                  18:14:56

21              A.  I thought I just did, but I will try       18:15:00

22     again.                                                  18:15:02

23                   Okay.  So let's go --                      18:15:02

24              Q.  Before you start, I -- the question        18:15:05

25     was, can you point me to where in your report,          18:15:08
```

Page 286

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2     feels that I have abandoned the use of              18:19:07

3     statistical sampling and I don't understand how     18:19:10

4     he says that there's no element of my methodology   18:19:13

5     that uses statistics, since that's, obviously,      18:19:16

6     incorrect.                                          18:19:19

7              He also says that I'm incorrect when       18:19:20

8     I opine that a formulaic methodology using common   18:19:24

9     statistical methods can be applied to the           18:19:28

10    identity -- to identify the members of each class   18:19:29

11    and the number of infringing video URLs that        18:19:33

12    qualify for an award.  And I don't use              18:19:37

13    statistical formulas.                               18:19:42

14             Well, I don't reference the                18:19:44

15    mathematics, because I don't believe that the       18:19:46

16    mathematics should be part of the statistical       18:19:48

17    methods.  But I do talk about latent structure      18:19:52

18    models.  I talk about the use of the                18:19:55

19    hypergeometric to determine the frequency with      18:19:59

20    which matches could occur based on the number of    18:20:02

21    takedown notices.  Those are all common             18:20:07

22    statistical methods and ones that I applied         18:20:09

23    within my own report that he says that my opinion   18:20:13

24    about statistical methods is incorrect.             18:20:17

25             Let's move on.                             18:20:21

                                                   Page 289

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2          Q.   Okay.  Any other principle areas of      18:20:24
 3     disagreement with Mr. Halm's report?               18:20:29
 4          A.   Well, he makes a bunch of blanket        18:20:31
 5     statements that say that I failed to identify a    18:20:35
 6     single member.                                     18:20:39
 7               (Stenographer clarification.)            18:20:40
 8          A.   Mr. Halm doesn't know because I          18:20:41
 9     didn't include them in my report.  So he assumes   18:20:44
10     I didn't identify any.  He's incorrect.  I did     18:20:46
11     identify some.  I gave you the numbers earlier.    18:20:51
12               So I'm not sure why Mr. Halm feels       18:20:53
13     that he can say that I haven't identified any      18:20:56
14     when, in fact, he doesn't really know and, you     18:21:00
15     know, I've been able to demonstrate today that I   18:21:07
16     was able to do matching from the 2,000 sample      18:21:10
17     process that we've used and I employed a large     18:21:15
18     number of people to do the matching into three     18:21:21
19     different databases.                               18:21:25
20               So, again, it is a statement that is     18:21:26
21     repeated multiple times in here and is just        18:21:30
22     incorrect and unsupported.                         18:21:35
23               With respect to implementing a           18:21:41
24     quality control process where I manually review    18:21:44
25     results, every quality control process, I would    18:21:48
```

Page 290

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2     be taken to task by Defendants if I didn't        18:21:52

 3     include a quality control process.  Quality       18:21:58

 4     control processes involve using a small subset of 18:22:01

 5     a process to determine whether or not it's        18:22:08

 6     operating correctly.  Furthermore, Google itself  18:22:10

 7     uses those types of processes to train artificial 18:22:14

 8     intelligence systems that it employs in another   18:22:20

 9     subsidiary Deep Mind.                             18:22:24

10           So I don't state that in my report,         18:22:25

11     because I don't think that what Google does with  18:22:30

12     Deep Mind is necessarily relevant to my own work. 18:22:32

13     But I would like to point out that what he states 18:22:35

14     here is directly contrary to Google's own regular 18:22:40

15     practices.                                        18:22:43

16           And now I agree that he says that           18:22:49

17     it's not possible that my methodology hasn't been 18:22:51

18     fully developed or finalized and the reason is    18:22:56

19     because I was conducting research to figure out   18:22:59

20     how to write computer programs.  But that doesn't 18:23:05

21     mean that I don't have a methodology.  What it     18:23:09

22     means is that it's a work in progress that I'm    18:23:11

23     getting there.  But there's very limited amount   18:23:14

24     of time between the time that I received data     18:23:17

25     from YouTube Defendants and the time that I wrote 18:23:20
```

Page 291

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2      my report and I'm still getting data.            18:23:22

 3              Mr. Halm says repeatedly that I am       18:23:26

 4      not using an automated methodology even though I 18:23:29

 5      did use an automated methodology for matching to 18:23:33

 6      SoundExchange, because that's the data,          18:23:37

 7      MusicBrainz definitely because I had that dataset 18:23:42

 8      and the CLFN.                                    18:23:46

 9              With respect to the first class, I'm     18:23:50

10      developing the algorithms, but it took a while to 18:23:56

11      figure out how to match using the dataset that is 18:23:58

12      online and I received the large dataset, which I 18:24:05

13      produced to Defendants three days before this    18:24:09

14      report was due.  So I operated in parallel trying 18:24:12

15      to move forward with the time constraints that I 18:24:15

16      had.                                             18:24:18

17              I have a number of other concerns        18:24:23

18      about Mr. Halm's in terms of misstatements,      18:24:25

19      mischaracterizations, but I think I'll stop      18:24:27

20      there.                                           18:24:30

21              MR. RICHLIN:  Okay.  Let's go off the    18:24:33

22      record.                                          18:24:34

23              THE VIDEOGRAPHER:  Please stand by.      18:24:35

24              The time is 6:24 p.m.  We are off the    18:24:36

25      record.                                          18:24:39
```

Page 292

Witness: Charles Cowan, January 17, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

**Errata Sheet**

| Page: Line | Change | Reason |
|---|---|---|
| 7:9 | Replace <Cown> with <Cowan> | To correct transcription errors |
| 9: 11 | Replace <passed> with <deposed> | To correct transcription errors |
| 12:10 | Replace <you> with <your> | To correct transcription errors |
| 21:7 | Insert <are> between <or> and <the> | To correct transcription errors |
| 23:24 | Replace <worked> with <heard> | To clarify the record |
| 24:2 | Replace <worked> with <heard> | To clarify the record |
| 24:12 | Replace <Gabe> with <Gabor> | To clarify the record |
| 24:20 | Replace <is> with <are> | To correct transcription errors |
| 25:13 | Replace <Stoudt, S-T-O-U-D-T> with <Stout, S-T-O-U-T> | To clarify the record |
| 40:25 | Replace <tomography> with <demography> | To correct transcription errors |
| 44:3 | Replace <have> with <off the> | To correct transcription errors |
| 52:23 | Delete <is> | To correct transcription errors |
| 61:3 | Replace <is> with <are> | To correct transcription errors |
| 67:6 | Replace <EIDR.gov> with <EIDR.org> | To clarify the record |
| 69:14 | Replace <ever> with <never> | To correct transcription errors |
| 70:3-4 | Delete <information about information that would be> | To clarify the record |
| 77:10 | Delete <teams> | To correct transcription errors |
| 89:25 | Delete <to look them> | To clarify the record |
| 93:18 | Replace <ling> with <line> | To correct transcription errors |
| 104:5 | Replace <Cown> with <Cowan> | To correct transcription error |
| 105:6 | Replace <punitive> with <putative> | To correct transcription errors |
| 107:3 | Insert <a> between <It's> and <timing> | To correct transcription errors |
| 114:17 | Replace <list> with <less> | To correct transcription errors |
| 120:19 | Replace <north> with <North> | To correct transcription errors |

Witness: Charles Cowan, January 17, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

| 124:20 | Replace <PDM> with <PBM> | To correct transcription errors |
|---|---|---|
| 129:14 | Replace <cripple> with <crippled> | To clarify the record |
| 145:17 | Replace <thousand takedown> with <thousands of takedowns> | To clarify the record |
| 147:9 | Replace <proscribed> with <prescribed> | To correct transcription errors |
| 148:3 | Replace <10> with <10,000> | To clarify the record |
| 150:19-151-10 | I reversed words "videos" and "works" in this sequence – following changes rectify this | 150:19-151-10 |
| 150:23 | Replace <videos> with <works> | To correct a misstatement |
| 150:24 | Replace <works> with <videos> | To correct a misstatement |
| 151:7 | Replace <works> with <videos> | To correct a misstatement |
| 151:8 | Replace <videos> with <works> | To correct a misstatement |
| 151:12 | Replace <10> with <10,000> | To clarify the record |
| 156:21 | Replace <General> With <Government> | To clarify the record |
| 165:21 | Replace <infringe> with <infringed> | To correct transcription errors |
| 185:18 | Replace <tech> with <text> | To correct transcription errors |
| 198:13 | Replace <one want> with <want one> | To correct transcription errors |
| 214:24 | Replace <assistance> with <uses> | To correct transcription errors |
| 215:3 | Replace <Album> with <album> | To correct transcription errors |
| 219:19 | Replace <White> with <Wight> | To correct transcription errors |
| 220:6 | Replace <White> with <Wight> | To correct transcription errors |
| 225:7 | Insert <what> after <know> | To correct transcription errors |
| 229:24 | Replace <There's> with <They're> | To correct transcription errors |
| 235:7 | Replace <included> with <excluded> | To correct transcription errors |
| 236:25 | Replace <cost> with <does> | To correct transcription errors |
| 243:16 | Replace <value> with <values> | To correct transcription errors |
| 251:25 | Replace <is> with <are> | To correct transcription errors |
| 254:24 | Replace <new> with <strong> | To clarify the record |

Witness: Charles Cowan, January 17, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

| 261:21 | Replace <He> with <I> | To correct transcription errors |
|--------|------------------------|--------------------------------|
| 268:20 | Replace <match> with <matched> | To correct transcription errors |
| 269:18 | Delete <the> | To correct transcription errors |
| 269:19 | Replace <of use> with <abuse> | To correct transcription errors |
| 269:22 | Replace <of use> with <abuse> | To correct transcription errors |
| 270:3 | Replace <of use> with <abuse> | To correct transcription errors |
| 270:8 | Replace <hundred have thousands> with <hundreds of thousands> | To correct transcription errors |
| 274:9 | Replace <basis> with <bases> | To correct transcription errors |
| 276:2 | Replace <7> with <6> | To clarify the record |
| 287:24 | Insert <do> after <doesn't> | To correct transcription errors |
| 290:2 | Replace <principle> with <principal> | To correct transcription errors |
| 292:12 | Replace <I> with <was> | To correct transcription errors |
| 293:7 | Replace <designation> with <designate> | To correct transcription errors |
| 296:7 | Replace <Cown> with <Cowan> | To correct transcription errors |

_____x_____     Subject to the above changes, I certify that the transcript is true and correct.

_____     No changes have been made. I certify that the transcript is true and correct.

_____
(Signature)

February 20, 2023
(Date)

3

Witness: Charles Cowan— January 17, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

<div align="center">ACKNOWLEDGMENT OF DEPONENT</div>

I, Charles D. Cowan, do hereby certify that I have read and examined the foregoing testimony, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
(Signature)

February 20, 2023
(Date)