# Exhibit E

to the Declaration of Kelly M. Knoll ISO Defendants' Motion to Exclude Testimony from Charles D. Cowan and Hal J. Singer

Public Redacted Version

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD individually and on behalf of all others similarly situated; et al.,

Plaintiffs,

v.

YOUTUBE, LLC and GOOGLE LLC,

Defendants.

------------------------

CASE NO. 3:20-cv-04423-JD

VIDEOTAPE DEPOSITION OF:
HAL J. SINGER, Ph.D.
NEW YORK, NEW YORK
FRIDAY, JANUARY 13, 2023

REPORTED BY:
SILVIA P. WAGE, CCR, CRR, RPR
JOB NO. 5647971

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

January 13, 2023
9:11 a.m.

Videotape deposition of HAL J. SINGER, Ph.D., held at the offices of WILSON SONSINI GOODRICH & ROSATI, 1301 Avenue of the Americas, 40th Floor, New York, New York, pursuant to agreement before SILVIA P. WAGE, a Certified Shorthand Reporter, Certified Realtime Reporter, Registered Professional Reporter, and Notary Public for the States of New Jersey, New York, and Pennsylvania.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A P P E A R A N C E S:

BOIES SCHILLER FLEXNER LLP
Attorneys for Plaintiffs
55 Hudson Yards, 20th Floor
New York, New York 10001
(212) 446-2359
Jwright@bsfllp.com
Pkorologos@bsfllp.com
BY: JOANNA WRIGHT, ESQ.
BY: PHILIP C. KOROLOGOS, ESQ. (VIA TELECONFERENCE)

KOREIN TILLERY, LLC
Attorneys for Plaintiffs
505 North 7th Street, Suite 3600
St. Louis, Missouri 63101
(314) 241-4844
Cokeefe@koreintillery.com
Gzelcs@koreintillery.com
Aellis@koreintillery.com
BY: CAROL O'KEEFE, ESQ.
BY: GEORGE ZELCS, ESQ. (VIA TELECONFERENCE)
BY: ANDREW ELLIS, ESQ. (VIA TELECONFERENCE)

WILSON SONSINI GOODRICH & ROSATI
Attorneys for Defendants
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
(212) 999-5800
Acandido@wsgr.com
Qhuang@wsgr.com
BY: AMY CANDIDO, ESQ.
BY: QIFAN HUANG, ESQ.

A L S O P R E S E N T:

STEVEN PETERSON, Ph.D.
PLAINTIFF'S EXPERT
PAUL BAKER
VIDEOGRAPHER

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Is Exhibit 1 your -- which is your November 17, 2022 report, a full -- in combination with your errata -- a full and complete statement of all of the opinions that you intend to offer in this case and the bases for that opinion? 09:39:23 09:39:26 09:39:32 09:39:33 09:39:35 09:39:41

A. No. 09:39:41

Q. I'm sorry that was? 09:39:42

A. No. 09:39:43

Q. "No," okay. 09:39:44

Why not? 09:39:44

A. Well, because since I filed my report, I received a rebuttal report from Dr. Peterson and I have many opinions relating to his report and how it's wrong. And I do intend to explain those to the judge or to a jury, if given the opportunity. 09:39:46 09:39:48 09:39:51 09:39:54 09:39:59 09:40:02

Q. Other than those opinions regarding Dr. Peterson's report, do you have any other opinions that you intend to offer that are not set forth in your November 17 report as modified by your errata? 09:40:11 09:40:14 09:40:17 09:40:20 09:40:24

A. I don't think they would constitute a new opinion per se. But I do expect to get 09:40:25 09:40:27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

better data on what -- on one of the key 09:40:30
parameters that drives the damages model, which I 09:40:35
like to refer to as the infringement share or to 09:40:38
spare the Court Reporter, I might refer to IS -- 09:40:42
just as an abbreviation -- IS or the infringement 09:40:45
share. 09:40:48

I'm expecting to get better data from 09:40:48
Defendants and then, ultimately, from Dr. Cowan 09:40:54
as to the measurement of what portion of videos 09:40:57
at anytime during the statute of limitations 09:41:00
constitute class members episodes, you know, of 09:41:05
infringement. And I think that these could be 09:41:09
measured with better data and more precisely. 09:41:13

And the 1.3 percent of videos 09:41:18
estimate that I have in my class cert report is 09:41:21
merely a placeholder to demonstrate how the 09:41:25
methodology would work. But I don't intend that 09:41:29
that would be the ultimate measure of the IS. 09:41:30

Q. Is your understanding that you would 09:41:36
sort of receive that better data after a class 09:41:37
was certified and a process of sort of class 09:41:44
notification or the process that Dr. Cowan 09:41:50
reports on took place and you received his data; 09:41:52
is that what you're envisioning? 09:41:55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A. I don't think I have a very specific understanding as to when in the process before or after class certification. But it is my understanding that better data on this point is forthcoming and when it is ultimately produced, I would intend to use that to fine tune the measure of the infringement share. 09:41:56 09:41:59 09:42:02 09:42:05 09:42:12 09:42:18 09:42:21

Q. To date have you received any new data? 09:42:25 09:42:27

A. I have. I think that very recently maybe a few days ago I am aware that data came through that would improve, for example, on the placeholder denominator that I used of █ billion videos as the corpus -- we're going to go back to the favorite word -- as the corpus of videos on the site. 09:42:28 09:42:31 09:42:35 09:42:39 09:42:43 09:42:46 09:42:48

My understanding is that YouTube recently produced a replacement for that input about two days ago and did it by year, which was nice. I think that, ultimately, if I could -- if I could ask or script this, I would like to be a little more granular. But I'm not expecting it to bounce around too much from month to month. But if that series could be produced on a monthly 09:42:49 09:42:51 09:42:56 09:43:01 09:43:05 09:43:08 09:43:11 09:43:13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

So, when you say you're assuming this in order to get damages, I just think it's an unfair characterization of what I'm offering -- what opinion I'm offering at this point. 12:32:31 12:32:36 12:32:38 12:32:41

Q. Can you look at Page 108 of your -- I'm sorry, Paragraph 108 of your report please. 12:32:47 12:32:50

A. Yes, I saw it. 12:33:14

Q. Okay. So the first sentence is utilizing your calculations or pulling in the calculations of infringing content where there's a range and you would have corrected this of 1.32 to 6 percent of the content on YouTube. And then you go on to say, "I further assume that such content is responsible for the same percentage of time that viewers spend on YouTube." 12:33:15 12:33:19 12:33:24 12:33:29 12:33:32 12:33:35 12:33:38 12:33:40

Do you see that? 12:33:43

A. I see it. 12:33:44

Q. And then from there you go on to calculate YouTube's predicted revenues assuming that the infringing content would not have been uploaded to YouTube resulting in the disgorgement damages calculations, right? 12:33:45 12:33:47 12:33:51 12:33:54 12:33:58

A. I see it, yes. 12:34:00

Q. So that assumption is built into the 12:34:02

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

disgorgement damages methodology that you're offering, correct? 12:34:07 12:34:09

A. For the purposes of this class cert report, in which I didn't have any better data to refine the estimate of the infringement share, the infringing share, I am forced to make that assumption and only after I make that assumption can I use the model to come up with a damages estimate. 12:34:11 12:34:14 12:34:16 12:34:18 12:34:22 12:34:24 12:34:27

But I think it would be a mistake for you to interpret this to be my ultimate damages estimate of the merits. It's not. 12:34:27 12:34:30 12:34:34

What I'm offering up is a methodology, which is -- if we go out and measure as best we can the infringing share -- and I hope Dr. Peterson and I can even agree on what it is. It's not that controversial -- that we can then go and reduce the actual watch time in the real world by that amount to figure out the ill-gotten gains and revenues. 12:34:35 12:34:36 12:34:40 12:34:43 12:34:45 12:34:49 12:34:53 12:34:56

Q. Absent different data, however, the methodology -- strike that. 12:34:59 12:35:02

The methodology you've offered up in your report involves this assumption, assuming 12:35:04 12:35:07

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

that content is responsible for the same percentage of time that viewers spend on YouTube, right? 12:35:12 12:35:14 12:35:17

A. I think that in the class cert report, as I said, given the data limitations, I was forced to make that assumption. It was only way I could get to a damages estimate. 12:35:17 12:35:19 12:35:22 12:35:25

But the purposes of this report is not to offer you a damages estimate. I just want to make that crystal clear, right. The purposes of the report is to show you the methodology, which is the common to the class, as to how I would go about estimating damages at the merits phase. 12:35:27 12:35:28 12:35:31 12:35:33 12:35:35 12:35:38 12:35:41

Q. And that methodology involves that assumption? 12:35:41 12:35:43

A. It really doesn't. The methodology will not involve that assumption of the merits phase. That -- in the class cert report I was forced to make that assumption, because that's the only estimate we have in the record of what the infringing share is. 12:35:44 12:35:46 12:35:49 12:35:53 12:35:55 12:35:57

Q. But you did not disclose in this report that you were intending to use a different 12:35:59 12:36:02

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

methodology at the merits phase, right? 12:36:05

A. I don't think that's true. I think that I made it clear that I was forced to make a whole bunch of assumptions in this report by virtue of the data limitations. In fact, I lead off with the section titled, "Limitations of the data," and here's what it's going to force me to do as a result. 12:36:09 12:36:11 12:36:13 12:36:16 12:36:19 12:36:22 12:36:23

Q. I understand that. 12:36:24

But the new methodology that you're describing that you would potentially use at the merits phase is not described in this report, would you agree with that? 12:36:25 12:36:27 12:36:34 12:36:36

A. I don't think I would agree with it. But I just want to be clear that -- let me go back and see if I gave a preview of what I would like to do in terms of the infringing share. 12:36:37 12:36:39 12:36:42 12:36:45

But I think this is very fair, that economists generally doesn't like to make assumptions. Like, the fewer assumptions you have to make, the better. And the only reason I have to make this assumption here is because of the lack of data given YouTube's unwillingness to turn over the data, right. 12:36:48 12:36:51 12:36:53 12:36:55 12:36:57 12:36:59 12:37:02

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MS. O'KEEFE: Objection, calls for a legal conclusion. 13:10:29 13:10:31

A. It's not my understanding because I -- the way that I interpret it -- and, again, this isn't all that important for my opinions, because you're asking me to, I think, weigh in on -- 13:10:31 13:10:33 13:10:36 13:10:39 13:10:40

Q. Well, it sounded like you were going to provide an opinion that there was infringement. So it seems reasonably fair that I get to ask -- 13:10:40 13:10:41 13:10:43 13:10:45

A. Absolutely, ask away. 13:10:45

Q. Yeah. 13:10:46

A. There are no bad questions today. They've all been wonderful. 13:10:47 13:10:49

What I -- what my opinion was is that we see that Google has set up a -- or YouTube has set up a regime that permits monetization of what would otherwise be an infringement of someone's copyright. I see it as compensation for the infringement. I don't see it as the negation. Because so long as an agreement doesn't exist between the content creator who is infringing and the original copyright owner, I don't see how 13:10:51 13:10:55 13:10:58 13:11:03 13:11:06 13:11:09 13:11:12 13:11:14 13:11:17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

that can -- how that can square with my understanding, at least, of the definition of infringement. I think these are infringements. They're just the copyright holder is just being compensated for permitting the infringement. 13:11:21 13:11:24 13:11:25 13:11:28 13:11:31

Q. So, in forming your opinions, you assumed that the takedown notices submitted to YouTube can serve as a proxy for the amount of infringing content on YouTube, you agreed with that? 13:11:53 13:11:57 13:12:01 13:12:05 13:12:08

A. Yes. 13:12:08

Q. And by doing so your model assumes that the URLs identified in the takedown notices provided to you in the data sample are infringing works that are part of the infringement classes; is that right? 13:12:10 13:12:14 13:12:22 13:12:25 13:12:28

A. I don't think I'm going to go so far as -- you added, part of the infringing class. 13:12:30 13:12:32

What, ultimately, my understanding of the role of Dr. Cowan is to figure out what portion of these takedowns map both into the copyright register and also into the class members', you know, portfolio of content, of copywritten content. 13:12:36 13:12:37 13:12:40 13:12:45 13:12:49 13:12:52

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

So I'm going to take those calls -- let's put it this way. Dr. Cowan is going to make those calls. I'm not going to make those calls. Those are an input to the model. 13:12:53 13:12:55 13:12:57 13:12:59

Q. Did you assume that all of the URLs identified in the takedown notice sample are actually infringing? 13:13:02 13:13:04 13:13:09

A. I don't think I am going to make an assumption or an opinion as to whether any particular takedown constituted infringement. But this is what I do know is that YouTube assesses each and every takedown and approves or disapproves the takedown. And I think they've -- these are takedowns that YouTube has studied and approved with something like an 80 percent approval rate. And I also know that very few of these taken down videos reappear. 13:13:11 13:13:14 13:13:17 13:13:19 13:13:27 13:13:32 13:13:35 13:13:38 13:13:40 13:13:45

I think the percentage that I saw in the record was something on the order of 2 percent who are actually successfully challenged and put back up. So I think all of that suggests to me that a successful takedown notice, which is what these are, are strongly indicative that an infringement occurred from all 13:13:48 13:13:50 13:13:52 13:13:54 13:13:57 13:14:01 13:14:04

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

parties' perspective, from YouTube's perspective and from the content creators -- sorry, from the copyright holder's perspective. 13:14:08 13:14:10 13:14:15

Beyond that, I don't know what more you would want from me as an economist to kind of verify that it was, in fact, infringing. I don't want to adverse step on this question of violation. I'm not going to offer any opinions about violation, in particular. 13:14:16 13:14:19 13:14:22 13:14:26 13:14:28 13:14:30

But I do think the takedowns are a reasonable approximation of infringing activity for all the reasons I've spelled out in my report. 13:14:31 13:14:34 13:14:36 13:14:38

Q. So you're aware that not all the videos in the takedown sample were, in fact, taken down? 13:14:38 13:14:43 13:14:48

A. No, that's not my understanding. I think that they -- these are successful takedowns is what -- is my understanding as what I'm looking at. I recognize that some of them could have been reposted, but I don't think they make it into the data if YouTube in the first instance disapproved of the takedown. I think Google has approved of these takedowns. 13:14:52 13:14:54 13:14:59 13:15:01 13:15:03 13:15:05 13:15:10 13:15:12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q. Fair enough. That was -- I phrased that incorrectly. 13:15:14 13:15:18

So you're aware that the videos from the takedown sample, some of them were put back up? 13:15:19 13:15:26 13:15:29

A. My -- the record evidence suggests that 2 percent of these videos on average that are taken down are successfully challenged and put back up. 13:15:29 13:15:31 13:15:36 13:15:38

But I also understand that Dr. Cowan when we get to the merits phase will be able to employ a certain matching algorithm. I think it might involve APIs. But this, again, is in his domain. It's not mine. In which case, the correction to the infringing share could be made before it is inputted into my model. 13:15:39 13:15:41 13:15:46 13:15:50 13:15:53 13:15:55 13:15:58

Q. Does the fact that thousands of the videos identified in the takedown notice sample are still available on YouTube change your opinion? 13:16:02 13:16:03 13:16:06 13:16:09

A. No, because thousands would be a tiny share of the total that come down. I think that on average -- I'm going by memory -- 2022 we're looking at 27,000 per day. And then if you 13:16:09 13:16:11 13:16:14 13:16:20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

stretch over a longer period, the average is about 19,000 per day over the sample that I looked at. 13:16:23 13:16:26 13:16:29

And so, then if you were to tell me a couple of thousands got put up, I mean, yeah, that makes sense. Two percent of this gigantic number got put back up. That's all consistent with my understanding. 13:16:30 13:16:32 13:16:34 13:16:38 13:16:41

Q. Would it be relevant to your analysis to know what percentage of revenue this still available videos represent out of the total revenue attributable to the videos in the takedown sample? 13:16:43 13:16:45 13:16:48 13:16:53 13:16:55

A. I do want to get at an accurate sample of what I call approximate disgorgement or direct revenue from the infringing videos. So I don't think we're going to get into a fight over this. I think that we should be able to estimate, you know, down to the less decimal what the direct revenues were of the infringing videos. 13:17:00 13:17:03 13:17:07 13:17:10 13:17:13 13:17:15 13:17:17 13:17:21

And if it changes because certain ones got taken down or put back up, I think that Dr. Cowan is going to account for all of this. 13:17:22 13:17:24 13:17:28

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q. So you're aware that some of the reasons why a takedown video can be back on the service is because the copyright holder retracted their takedown? 13:17:30 13:17:32 13:17:37 13:17:41

MS. O'KEEFE: Objection, outside the scope of his report. 13:17:41 13:17:43

A. I think there can be retractions, yes. 13:17:47 13:17:49

Q. If a user submitted a retraction of their takedown notice, would you still consider the video they identified in their retracted notice to be an infringement? 13:17:52 13:17:56 13:17:58 13:18:02

MS. O'KEEFE: Objection, calls for a legal conclusion. 13:18:04 13:18:05

A. I think I don't have an opinion on that one, because the infringing share is going to be crafted, ultimately, by Dr. Cowan. He's going to be looking at things like retractions and successful challenges and all of that is my understanding is going to be accounted before he gives me the input. 13:18:08 13:18:11 13:18:15 13:18:19 13:18:21 13:18:28 13:18:29

Q. So, in this instance, the sample that you used did, Dr. Cowan provide it to you? 13:18:31 13:18:34

A. No, I did it because I wanted to show 13:18:36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

the judge how this methodology could be used in a common way in the merits phase. 13:18:38 13:18:42

Q. You just took the sample as it was? 13:18:45

A. Well, I took the sample, but with my understanding of what the sample represented, which was these are successful takedown notice. They represent a reasonable approximation of the ultimate set that we'll be looking at. But I recognize that there are further refinements that we can make to the data to account for things like successful challenges. 13:18:48 13:18:51 13:18:53 13:18:55 13:18:58 13:19:01 13:19:04 13:19:06

Q. So you don't have an opinion with respect to whether a takedown notice belongs in the sample, ultimately, in terms of retractions or counter notices? 13:19:23 13:19:25 13:19:29 13:19:35

MS. O'KEEFE: Objection, calls for a legal conclusion, outside the scope of his report. 13:19:40 13:19:42 13:19:44

A. Yeah, I see that falling in the ambit of Dr. Cowan. And Dr. Cowan most likely is going to follow the guidance of Counsel as to what should be included or not be included when it comes to these specific assumptions. 13:19:45 13:19:47 13:19:50 13:19:53 13:19:58

Q. Right now your regression assumes 13:20:16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

revenue would occur in proportion to the reported takedown revenue -- 14:47:23 14:47:27

MS. O'KEEFE: Objection. 14:47:28

Q. -- is that accurate? 14:47:29

MS. O'KEEFE: Sorry. Objection, form, compound. 14:47:30 14:47:32

A. Let me just read the footnote, so I get it in my head. 14:47:33 14:47:35

So I now have the footnote in my head and I'm merely suggesting that given the random sampling plan, that it's appropriate to make assumptions about the representativeness of the data including for periods in which I don't have such data. 14:47:52 14:47:54 14:47:57 14:48:03 14:48:04 14:48:07

I make a second point too, which is that I don't think that the takedowns necessarily capture all of the monetizing infringing content and some of it was unreported. I think it was a separate point. Those are the two points made in that footnote. 14:48:10 14:48:13 14:48:18 14:48:25 14:48:28 14:48:30

Q. So is one of the points that you assumed that the revenue for the months that you did not have data would occur in proportion to the reported revenue? 14:48:33 14:48:34 14:48:39 14:48:44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A. In proportion to the reported takedown revenue. 14:48:48 14:48:50

Q. Yes. 14:48:51

A. Yes, that's what 106 says, yes. 14:48:51

Q. What was your basis for making that assumption? 14:48:56 14:48:59

A. The fact that the sample was randomly selected allows me to assume that it's representative in the months that I have it. 14:49:04 14:49:08 14:49:10

Q. And, to the best of your recollection, the proximate disgorgement revenues earned by the allegedly infringing videos is in the [REDACTED] range? 14:49:25 14:49:27 14:49:31 14:49:34

A. That's what Dr. Peterson reported based on my work papers. And it seems like if you take that [REDACTED] that we just looked at and you multiply by 10 months you get to [REDACTED] and then you get a couple of those. I think you can get to [REDACTED]. 14:49:37 14:49:40 14:49:43 14:49:47 14:49:51 14:49:53

Q. Okay. 14:49:55

A. I'm sorry, [REDACTED], not [REDACTED]. [REDACTED] times 10 would get you to [REDACTED] and then, yeah, 20 months would get you to [REDACTED]. 14:49:57 14:50:01 14:50:04

Q. The second type of revenue that you 14:50:07

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

say the allegedly infringing content contributed 14:50:12
to is revenues from ads served on the 14:50:16
non-infringing content, which you call network 14:50:19
effect disgorgement revenue; is that right? 14:50:25
A. Correct. 14:50:26
Q. If you take a look at Figure 4 on 14:51:07
Page 38 please. 14:51:10
A. Okay. I got it. 14:51:11
Q. Does No. 9 on Figure 4 represent the 14:51:28
network effect disgorgement revenue? 14:51:35
A. Yes, it is. 14:52:01
Q. In Paragraph 77, you call that 14:52:08
indirect network effect disgorgement revenues; is 14:52:15
that the same thing? 14:52:20
A. Yes. 14:52:21
(There is a discussion off the 14:52:21
record.) 14:53:50
Q. So we've talked about the two 14:53:50
categories of revenue subject to disgorgement, 14:53:52
the proximate disgorgement revenues and the 14:53:57
network effect disgorgement revenues. 14:53:59
On Page 56 in Paragraph 108 of your 14:54:03
report in Table 7, those are your calculations of 14:54:40
the second category of damages, the network 14:54:46

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

looking at revenue per impression. But you know the three regressions and I think that I've accounted for various other factors that would affect revenues -- this is their aggregate revenues for the companywide level by month. And I feel like at 92 percent or 90 something percent r-squared I've accounted for all or almost all the factors that explain variations in ad revenues. 15:28:25 15:28:30 15:28:34 15:28:37 15:28:42 15:28:46 15:28:50 15:28:53 15:28:57

You know, when I go to predict Google's advertising revenues, YouTube's advertising revenue out of sample, I have something like 96 percent accuracy when I go to predict the 2021 and 2022 years. So I feel very confident that whatever is causing fluctuations in ad revenues from month to month, my model's accounting for it. 15:28:57 15:28:59 15:29:01 15:29:03 15:29:06 15:29:11 15:29:14 15:29:18

Q. Did you consider the geographic location of the -- strike that. 15:29:19 15:29:23

If there's a geographic disparity between the revenue generated by the infringing content and the rest of YouTube's revenue, the failure to take into account geographic differences would impact your analysis, correct? 15:29:38 15:30:05 15:30:15 15:30:20 15:30:22

MS. O'KEEFE: Objection, form. 15:30:25

A. It certainly wouldn't affect any of the regressions, right. The regressions are just telling us -- the final regression is telling us when the time spent on the site comes down controlling for all the things, how much is advertising fall. 15:30:29 15:30:31 15:30:33 15:30:35 15:30:39 15:30:42

There's no way in the regression to account or no need to even to account for these geographic differences given how I've set up the model. 15:30:43 15:30:44 15:30:47 15:30:50

And then the other input to the model, of course, is this -- what we've been talking about infringing share. And the infringing share I think that once I get the data that I'm seeking, which is weighting it on a watch time or viewing time -- again, I don't think geographic component goes into that calculus either. So I just don't think that knowing the geographic -- and, in any event, no one has established to me that the infringing content at issue in this case is occurring in certain geographic areas or doing it in a way that's any different than the distribution of all 15:30:53 15:30:55 15:30:59 15:31:00 15:31:03 15:31:06 15:31:11 15:31:14 15:31:17 15:31:20 15:31:22 15:31:26 15:31:29

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

content on the platform. 15:31:32

Q. Have you asked whether there is any geographic differences with respect to the infringing content at issue in this case? 15:31:38 15:31:47 15:31:47

A. I don't really know what you mean by "geographic." 15:31:47 15:31:48

Are you talking about the geography of the person who's posting or the geography of the copyright holder? 15:31:49 15:31:51 15:31:54

Q. I think there is a lot of potential geography questions to ask. 15:31:57 15:32:00

Have you asked any of them? 15:32:02

A. Well, I don't ask questions that don't have any bearing on my analysis. So I don't think that I've asked these. I just don't find them as interesting as Dr. Peterson does. 15:32:03 15:32:05 15:32:07 15:32:10

Q. Would you consider a view of a YouTube video that was uploaded, processed and viewed in India a part of this case? 15:32:54 15:32:57 15:33:01

A. Well, it could be a part of my analysis. I don't know what you mean by, part of the case, when I'm thinking what informed my analysis. When I'm thinking of the aggregate statistics that I'm looking at from Semrush and 15:33:11 15:33:15 15:33:17 15:33:19 15:33:22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

from YouTube, I think, that activity outside of the United States could be occurring -- could be captured by this data when we look at total revenues. I don't think it's just revenues captured in the United States. And then -- so maybe I could just end there. 15:33:24 15:33:27 15:33:30 15:33:32 15:33:35 15:33:40

Does that answer it? 15:33:42

Q. In terms of whether a YouTube video that was uploaded, processed and viewed in India is or should be a part of one of the classes in this case, is that a determination that you would say is up to Dr. Cowan? 15:34:21 15:34:25 15:34:29 15:34:33 15:34:37

MS. O'KEEFE: Objection, form and outside the scope. 15:34:38 15:34:40

A. It's certainly not in my ambit. I'm not even sure it's in Dr. Cowan's ambit. I know there are -- talking about where it's -- the uploader and the viewer was both in India for this hypothetical, I think, is what you want me to assume? 15:34:41 15:34:46 15:34:49 15:34:55 15:34:58 15:35:00

Q. Yes. 15:35:01

A. I still think that it could be -- it could contain content that violates one of the class members' copyrights regardless of where 15:35:13 15:35:16 15:35:21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

it's uploaded or where it's viewed. It seems to me that once it's viewed in India, it has the potentially to certainly be viewed in the United States. 15:35:25 15:35:30 15:35:33 15:35:35

But I just don't -- this hasn't been part of my analysis. And to the extent that it could be anyone's, it could be Dr. Cowan's. But even from my understanding of what Dr. Cowan's doing, you know, he's, for example, matching takedowns notifications with copyright registry to make sure that there is, in fact, a copyright behind the takedowns request. And he's got a separate database to confirm the legitimacy of the takedowns that are made by the foreign, you know, nonregistered works class. 15:35:35 15:35:37 15:35:39 15:35:42 15:35:45 15:35:47 15:35:51 15:35:54 15:35:58 15:36:01 15:36:03

I'm not aware of him throwing out takedowns, because it was only viewed by someone in India or -- I am just not aware of that. 15:36:08 15:36:12 15:36:15

Q. And data like that would definitely have been a part of your dataset, you wouldn't have excluded it? 15:36:22 15:36:27 15:36:29

A. Well, I'm only getting to see monthly aggregate data. So I see, for example, all pages visited in a month on the platform. I can see 15:36:30 15:36:33 15:36:35

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

it and the industry might think about it, I 16:42:57 think, it's artificial to start going in and 16:42:59 slicing up a video into what portion is 16:43:02 infringing and what's not. That's not how ad 16:43:04 revenue is generated. It's done for the ad in 16:43:07 full. And I think that if that argument doesn't 16:43:09 persuade you, I would -- and the fact finder were 16:43:15 to say, you know what, we need to drill down and 16:43:20 whatever Singer said was the infringing share. 16:43:22 We need to reduce it by another slice to account 16:43:24 for the fact that when he does it by watch time, 16:43:28 it's not true to the hundred percent of these 16:43:31 videos were infringing. Some portion was. 16:43:34

My understanding is in that takedown 16:43:36 notice data that the filer must notify YouTube of 16:43:40 the particular slice of time on the video that 16:43:43 they think is infringing. So if we had to do it, 16:43:45 we could do it and we could do it in a calm way. 16:43:49

Q. You mentioned earlier that you had 16:43:55 worked on patent damages cases before, right? 16:43:58

A. Correct. I've been involved in a 16:44:01 bunch of what are called pay for delay cases, in 16:44:03 which case there is a patent in dispute, yes. 16:44:07

Q. Have you had to apportion damages in 16:44:09

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

patent cases? 16:44:12

A. Sitting here I can't think of a particular apportionment exercise, but I've just articulated to you how one would do it here, if one were compelled by the law or by the court. 16:44:17 16:44:20 16:44:22 16:44:26

Q. Do you -- does your disgorgement revenue regression currently apportion YouTube's advertising revenues among the allegedly infringing videos other protected components? 16:44:29 16:44:36 16:44:39 16:44:42

MS. O'KEEFE: Objection to form. 16:44:46

A. I don't know if I followed the question. 16:44:50 16:44:52

Q. To the extent that a video has multiple components that are protected by copyright such as visual components, a screen play, sound recording, musical compositions, et cetera, does your disgorgement regression apportion YouTube's advertising revenues among those allegedly infringing components? 16:44:53 16:45:00 16:45:04 16:45:07 16:45:10 16:45:13 16:45:16

A. So it doesn't. And I wouldn't do it in the first instance to get the pot of damages, the aggregate damage for the class. I think each takedown would be treated as one episode of infringement. 16:45:20 16:45:22 16:45:24 16:45:27 16:45:30

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

I think that if we had gotten to a situation where we had Claimants coming forward and they were basically multiple distinct Claimants -- because I presume that's what your hypothetical is because it's not as exciting if it's all the same person, right. 16:45:30 16:45:35 16:45:37 16:45:40 16:45:41 16:45:45

But let's assume it's multiple people on the same video. I mean, it wouldn't be -- it wouldn't be very difficult to come up with some kind of rule at the allocation phase such that what would otherwise go to one person would be distributed across two or more parties. 16:45:46 16:45:48 16:45:53 16:45:55 16:45:58 16:46:03

Q. What if the video has two parties, one of whom has granted a license and one of whom is a member of the class? 16:46:04 16:46:09 16:46:12

MS. O'KEEFE: Objection, calls for a legal opinion. 16:46:14 16:46:16

A. Yeah, you mention granted a license before. Is this someone whose content is subject to Content ID, because they're not part of the class. 16:46:16 16:46:20 16:46:25 16:46:27

Q. So, if someone who is not part of the class, but has a license agreement with YouTube. 16:46:27 16:46:29

A. Are not part of -- they are part of 16:46:38

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

the class or -- 16:46:40

Q. They are not part of the class because they have a license agreement, but they're entitled perhaps to some form of revenue. 16:46:40 16:46:42 16:46:44

A. What makes them entitled? I mean, I would think the only people who would be eligible -- this is a legal question. 16:46:47 16:46:49 16:46:52

If we have a pot of money and you say, Singer, come up with some formula that allocates to class members, and there's a guy standing outside the class, I mean, it doesn't -- it seems like he would be ineligible by construction for any portion of the pot of money. 16:46:53 16:46:55 16:46:57 16:47:01 16:47:03 16:47:06

Q. Well, I'm not saying he's entitled to the class, to recover from the class. But in the abstract when you're talking about are they entitled to ad revenue on that video, have you considered that question? 16:47:08 16:47:11 16:47:17 16:47:20 16:47:25

MS. O'KEEFE: Objection, form. 16:47:26

A. I haven't considered it because it's just outside my ambit. I've been asked to think how you've come up with aggregate damages for the class and how you would allocate among class members. 16:47:28 16:47:30 16:47:33 16:47:36 16:47:41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q. So you have not considered whether there could be videos in which there are copyrights at issue where one person's copyright might put them in the class and the other person's copyright might put them outside the class? 16:47:41 16:47:42 16:47:45 16:47:48 16:47:50 16:47:53

A. I haven't considered that, no. In fact, the closest I've coming to considering it is this example I told you before was that if it's monetized -- if it's monetized because some other copyright holder with Content ID also had a portion that was infringed, I think, we could deal with that as well. 16:47:55 16:47:58 16:48:01 16:48:05 16:48:08 16:48:12 16:48:15

Q. Which metric do you propose to use to apportion damages between class members? 16:48:19 16:48:23

A. Oh, right. So we did this before, but I'm happy to do it again, right. I thought I was clear, but apparently I wasn't. 16:48:24 16:48:26 16:48:29

Remember we can come up with a class member share based on his or her pro rata share of watch time among the infringing videos. We can do it based on his or her pro rata share of view time among the infringing videos or we could do it just straight up shared videos among the 16:48:31 16:48:32 16:48:35 16:48:39 16:48:41 16:48:44

infringing videos. 16:48:50

Q. Would you apply the same metric, whichever one you ultimately end up using, to apportion YouTube's revenues for the relevant period between the class members and all videos? 16:49:15 16:49:17 16:49:22 16:49:25

MS. O'KEEFE: Objection, form. 16:49:32

A. I'm not sure I follow this one. 16:49:34

Q. So, to the extent that you decide to go with view time, would you be consistent in using view time to separate revenue between all videos and the class and then within the class? Do you feel like it needs to be consistent? 16:49:36 16:49:38 16:49:46 16:49:50 16:49:53

A. I think I'm following, but can I put it in my own words? Which is we have to compute in the first stage this infringement share, right and I've proposed different weights and view time, watch time or no weight, right. 16:49:55 16:49:58 16:50:00 16:50:04 16:50:06

And I think what you're asking is after you've committed to a particular metric or weighting scheme for the pot of aggregate damages, would it make sense to use the same metric when you go to do allocation. I think that's what you're asking. 16:50:09 16:50:10 16:50:15 16:50:18 16:50:20 16:50:22

My inclination is, yes, if we 16:50:24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

calculate the share of the video that was infringing. 16:56:35 16:56:37

Q. Does your disgorgement model take into consideration whether or not the copyright holders have taken steps to mitigate their damages? 16:56:57 16:56:59 16:57:02 16:57:04

MS. O'KEEFE: Objection, calls for a legal conclusion. 16:57:07 16:57:08

A. I think that the very filing of a takedown notice can be understood as mitigation. I mean, that's doing -- you're taking actions to try to limit the damages from someone infringing on your content. 16:57:15 16:57:18 16:57:20 16:57:23 16:57:25

I don't know what other mitigation methods you're thinking of, but maybe you could help me out. I'm just not aware of other mitigation methods besides calling up YouTube and pleading them to take down the infringing video. 16:57:27 16:57:29 16:57:31 16:57:35 16:57:38

Q. Does your disgorgement model take into consideration whether or not the copyright holders have waited years or months after learning of the alleged infringement to file the takedown notice? 16:57:41 16:57:43 16:57:48 16:57:53 16:57:57

A. Certainly, in the current 16:58:00

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2      manifestation, that time between the infringing    16:58:01
 3      event, basically, the posting and the takedown     16:58:07
 4      notice is not taken into consideration.  When we   16:58:09
 5      go to do things like weighting by watch time,      16:58:11
 6      then the longer you weight it -- and it's          16:58:15
 7      possible that you weren't being strategic.  It's   16:58:19
 8      just you didn't find out about it until a certain  16:58:22
 9      period of time.  I think, greater, at least,       16:58:24
10      potential watch time would be, right.  If -- for   16:58:28
11      an episode where you found out about it a second   16:58:29
12      after it was posted, there's really not a          16:58:33
13      potential for watch time.  So I think that that's  16:58:35
14      the closest I would come to accounting for the     16:58:38
15      difference between when it got posted and when     16:58:40
16      the takedown notice was issued.                    16:58:43
17          Q.  But does your disgorgement model           16:58:45
18      currently take into consideration whether or not   16:58:47
19      the copyright holders have delayed taking steps    16:58:51
20      to mitigate their damages?                         16:58:56
21          A.  No, and I don't even know how we           16:58:59
22      could ever learn that they -- that any individual  16:59:02
23      class member delayed.  I mean, all I think we're   16:59:05
24      going to get is the time of notification or time   16:59:07
25      of the takedown order and the time it was posted.  16:59:11
```

Page 236

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

But I think it would be a mistake to infer that the interim was entirely strategic and was caused by a delay, an intentional delay by the copyright holder. I would think that the copyright holder would want it down as soon as they found out. 16:59:16 16:59:18 16:59:22 16:59:25 16:59:27

Remember these are largely non-monetizable videos. So it seems to protect yourself. The way that you do it as soon as you find out your copyright is being infringed, you tell YouTube to knock it off. 16:59:31 16:59:33 16:59:37 16:59:40 16:59:42

Q. In estimating disgorgement damages, have you excluded all YouTube revenues flowing from alleged infringements that took place outside of the United States? 16:59:47 16:59:49 16:59:53 16:59:55

A. I don't think we do that. No, I don't think that -- at least, in the infringing share that I calculated, I'm not throwing out things that are occurring outside of the United States. 16:59:59 17:00:01 17:00:04 17:00:08 17:00:09

And I -- I also, I think we should be specific as what we mean by "outside of US." You mean viewed outside or posted outside by content or creator? It seems to me that regardless of where you post from, so long as it's on the 17:00:13 17:00:15 17:00:18 17:00:22 17:00:25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2     platform, it can be viewed anywhere, anywhere in     17:00:28

 3     the world, at least, these distinctions of           17:00:30

 4     geography.  I don't know how it's going to allay      17:00:34

 5     the concerns of the copyright holder.  And you        17:00:36

 6     can post in India, but someone can watch it from      17:00:38

 7     the United States.                                    17:00:41

 8          Q.  You haven't taken any of those              17:00:42

 9     geographic considerations into consideration?         17:00:45

10          MS. O'KEEFE:  Objection, form.                  17:00:48

11          THE WITNESS:  I would have said asked           17:00:51

12     and answered.                                         17:00:53

13          A.  But I don't have anything more.  I'm        17:00:53

14     sorry.  Carol is getting mad.                         17:00:55

15          I don't anything to add about the               17:00:57

16     geography stuff beyond what I've said.                17:01:00

17          Q.  In order to calculate YouTube's             17:01:01

18     profits attributable to the alleged infringing       17:01:04

19     conduct, you would need to subtract the cost that     17:01:06

20     YouTube incurred to gain the incremental revenue      17:01:09

21     from the allegedly infringing conduct, right?         17:01:12

22          A.  If you have to go from revenue to           17:01:15

23     profits then say by law or by court, I think that     17:01:19

24     one would make an adjustment.  But it would be        17:01:26

25     common and class-wide based on what you thought       17:01:29
```

Page 238

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

the variable costs were. 17:01:32

So Dr. Peterson does an analysis in 17:01:34 which he includes variable and fixed cost for his 17:01:36 correlations. And so the refinement I would make 17:01:38 that is that I wouldn't want to allow fix cost to 17:01:41 enter into the calculus because that would 17:01:44 inflate the true measure of the variable. But 17:01:48 once you got to the accurate measure variable -- 17:01:51 like we've been talking about before, the content 17:01:54 acquisition cost around the order of 55 percent, 17:01:58 I think that that could be done in a common way 17:02:01 using common evidence across the class. It would 17:02:06 be ministerial adjustment to the damages. 17:02:09

Q. You don't dispute at a general level 17:02:13 the subtraction of content acquisition cost from 17:02:21 revenues to get to profit? 17:02:24

MS. O'KEEFE: Objection, calls for a 17:02:26 legal conclusion. 17:02:28

A. I was taking your question to mean 17:02:30 just as an economic matter. If you are going 17:02:33 from revenue to profit, what you would have to 17:02:36 do. You know, if you're going from ill-gotten 17:02:38 revenues to ill-gotten profits, what you would 17:02:41 have to do? 17:02:43

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

motivate the choice of time as the key variable in that regression. Now, we know that takedowns affect time spent on the platform and so now we're going to simulate this but for world by ratcheting down the time spent. So, again, it's more of a predicate than using Table 5 to calculate damages per se. 17:48:13 17:48:18 17:48:22 17:48:24 17:48:27 17:48:30 17:48:34

Q. Is there an explanatory variable that represents all content on YouTube in this regression in Table 5? 17:48:42 17:48:44 17:48:47

A. There is not. And you know that I only got that data -- and it was even by year -- I think, yesterday or two days ago. So I didn't have what we call server side information, like the corpus of videos from YouTube. It just wasn't provided. So it wasn't even feasible at the time that I wrote this. 17:48:49 17:48:50 17:48:54 17:48:59 17:49:01 17:49:03 17:49:08

And I don't know -- I don't know and I would have to think about whether you have a good a priori basis for including it in the regression at all. So we would have to think about that. 17:49:10 17:49:11 17:49:13 17:49:17 17:49:21

Q. Equation 3 on Pages 50 and 51, this is actually on the top of Page 51. 17:50:50 17:50:56

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A. Yes. 17:50:59

Q. And then the resulting Table 6 is the regression that you used to calculate disgorgement damages; is that right? 17:51:00 17:51:05 17:51:06

A. With the caveat that Equation 3 has been modified by the errata to say "pages visited" as opposed to visits. 17:51:08 17:51:12 17:51:15

Q. Looking at Equation 3, is the dependent variable of that regression non-infringing revenue? 17:51:29 17:51:35 17:51:37

A. No, it's total revenue on the site, total advertising revenue on the site. 17:51:40 17:51:43

Q. From the equation -- I'm sorry, from -- yes. 17:52:04 17:52:04

On Page 51, there is a variable that says, "Consumer Price Index." 17:52:09 17:52:14

A. Yes. 17:52:18

Q. Do you see that? 17:52:19

On Page 52 it says, "Producer Price Index," or did I flip those? 17:52:21 17:52:32

Yeah. It says, "Producer Price Index," I believe, on Page 52. 17:52:39 17:52:41

MS. O'KEEFE: Where? 17:52:52

A. Yeah, I think that's right. 17:52:59

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q. Do you see that? 17:53:00

A. I think that's right. What's used in the table or reported in the table is the PPI Internet advertising. I think that's ultimately what got used. 17:53:01 17:53:03 17:53:06 17:53:08

Q. Is there an economic reason for that substitution? 17:53:09 17:53:11

A. I think both could potentially inform variation advertising revenues. I don't know what the results are when you use CPI. But I think I was thinking of CPI as an candidate when I wrote out this list. 17:53:15 17:53:18 17:53:20 17:53:26 17:53:28

Q. You don't know how the results would be different if at all with the Consumer Price Index? 17:53:34 17:53:37 17:53:40

A. As opposed to the producer price? I don't, but I don't think Dr. Peterson reported this. So my surmise is that it doesn't change things. But we would be happy to run it for you. 17:53:41 17:53:43 17:53:46 17:53:49

Q. The regression results reported in Table 6 are the results that you used to estimate the disgorgement damages reported in Table 7 and 8 of your report; is that right? 17:53:55 17:53:57 17:54:02 17:54:05

A. Yeah. Well, the -- that is right. 17:54:07

Witness: Hal Singer, January 13, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

**Errata Sheet**

| Page: Line | Change | Reason |
|---|---|---|
| 6:25 | Replace <my> with <me> | Transcription error |
| 8:7 | Replace <WeWorks> with <WeWork> | Transcription error |
| 10:13 | Replace <export> with <expert> | Transcription error |
| 10:18 | Replace <Exhibit 2 the Expert Report of Hal J. Singer, Ph.D., for Plaintiffs' errata dated January 10, 2023> with <Exhibit 2, the errata dated January 10. 2023 to the Expert Report of Hal J. Singer, Ph.D.> | To clarify the record |
| 14:11 | Replace <this> with <that's—that's> | Transcription error |
| 16:3 | Replace <exist> with <exists> | Transcription error |
| 16:4 | Relace <And I report> with <And my report> | Transcription error |
| 16:9 | Replace <page> with <pages> | Transcription error |
| 16:11 | Replace <some human number> with <some smaller number> | Transcription error |
| 18:25 | Replace <log rhythm> with <logarithm> | Transcription error |
| 19:9 | Replace <that> with <to> | Transcription error |
| 19:14 | Replace <log of YouTube> with <Log YouTube> | To clarify the record |
| 19:14-15 | Replace <log of Facebook> with <Log Facebook> | To clarify the record |
| 20:5 | Replace <was> with <were> | Transcription error |
| 21:4 | Replace <a control> with <"a control"> | To clarify the record |
| 22:10 | Replace <interests> with <interest> | Transcription error |
| 23:6 | Replace <picking> with <pick> | Transcription error |
| 23:25 | Replace <that you> with <that to you> | Transcription error |
| 25:10 | Replace <proceed> with <precede> | Transcription error |
| 27:4 | Replace <in> with <on> | Transcription error |
| 29:12 | Replace <members> with <members'> | Transcription error |

| 30:3 | Replace <process before> with <process - before> | Transcription error |
|---|---|---|
| 36:17 | Replace <sort of> with <on> | Transcription error |
| 39:9-10 | Replace <depositions sort of economic articles> with <depositions, economic articles> | Transcription error |
| 43:12 | Replace <Woo> with <Wu> | Transcription error |
| 43:25 | Delete <that> | Transcription error |
| 44:10 | Replace <Ko> with <Koh> | Transcription error |
| 46:4 | Replace <full-line> with <full-time> | Transcription error |
| 48:23 | Delete <sort of> | Transcription error |
| 49:11 | Replace <we> with <you> | Transcription error |
| 51:6 | Replace <patents> with <patent> | Transcription error |
| 53:6 | Replace <a play store> with <the Play Store> | To clarify the record |
| 53:10 | Replace <within> with <Within> | To clarify the record |
| 54:10 | Replace <the ones> with <those> | Transcription error |
| 55:18 | Replace <which if> with <which, if> | Transcription error |
| 55:19-20 | Replace <impacts to class members> with <impacts to Class Members> | To clarify the record |
| 55:21 | Replace <Plaintiffs' count> with <Plaintiffs' counsel> | Transcription error |
| 56:10 | Replace <against> with <accord> | Transcription error |
| 56:19 | Replace <challenged conduct> with <Challenged Conduct> | To clarify the record |
| 56:20 | Replace "categories. One, advertising> with <categories. 1 advertising> | To clarify the record |
| 56:24 | Replace <in the> with <from the> | Transcription error |
| 57:2 | Replace <infringing content contributing> with <Infringing Content contributed> | Transcription error |
| 59:21 | Replace <Would> with <When> | Transcription error |
| 60:6 | Replace "summing up the ads> with <summing up the revenue from the ads> | To clarify the record |

Witness: Hal Singer, January 13, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

| | | |
|---|---|---|
| 61:2 | Replace <affects> with <effects> | Transcription error |
| 61:2-3 | Replace <infringing content> with <Infringing Content> | To clarify the record |
| 63:12 | Delete <the> | Transcription error |
| 63:18 | Replace <challenge> with <challenged> | Transcription error |
| 63:22 | Replace <disappear> with <disappears> | Transcription error |
| 63:25 | Replace <expert> with <experts> | Transcription error |
| 64:13-14 | Replace <you people it call it counterfactual> with <you people call it counterfactual> | Transcription error |
| 65:24 | Replace <correct> with <keep> | To clarify the record |
| 67:7 | Replace <It’s simple> with <It’s a simple> | Transcription error |
| 67:17 | Replace <it’s> with <it’d> | Transcription error |
| 69:7 | Replace <infringing> with <infringement> | Transcription error |
| 73:4 | Replace <providers were> with <providers that were> | Transcription error |
| 74:6-7 | Replace <instance case but> with <instant case by> | Transcription error |
| 76:2 | Replace <common> with <consumer> | Transcription error |
| 76:22 | Replace <just no> with <just a no> | Transcription error |
| 76:23 | Replace <come> with <comes> | Transcription error |
| 78:20 | Replace <multisided> with <multi-sided> | Transcription error |
| 79:7 | Replace <exist> with <exists> | Transcription error |
| 79:8 | Replace <non-existent> with <nonexistent> | Transcription error |
| 79:12 | Replace <direction. Advertisers> with <direction: advertisers> | To clarify the record |
| 80:6 | Replace <the favor> with <disfavor> | Transcription error |
| 82:9 | Replace <content ID> with <Content ID> | To clarify the record |
| 82:12 | Replace <there are so> with <there is so> | Transcription error |
| 83:5 | Replace <is> with <are> | Transcription error |
| 83:23-24 | Replace <across on all> with <across all> | Transcription error |

| | | |
|---|---|---|
| 85:5 | Replace <Multisided> with <Multi-sided> | Transcription error |
| 85:13 | Replace <then it attracts> with <then attracts> | Transcription error |
| 87:3 | Replace <effects> with <affects> | Transcription error |
| 92:12 | Replace <are subset> with <is a subset> | Transcription error |
| 95:17 | Replace <product> with <products> | Transcription error> |
| 97:4 | Replace <involved> with <involves> | Transcription error |
| 97:7 | Replace <used> with <use> | Transcription error |
| 97:10 | Replace <methodology that I> with <methodology I> | Transcription error |
| 101:9 | Replace <revenue's> with <revenues> | Transcription error |
| 115:25 | Replace <pedaling> with <peddling> | Transcription error |
| 124:22 | Replace <grammars> with <factors> | Transcription error |
| 125:12 | Replace <corrected> with <expected> | Transcription error |
| 134:15 | Replace <Alan> with <Allen> | Transcription error |
| 134:20 | Replace <construction> with <obstruction> | Transcription error |
| 134:21 | Replace <miss-mash> with <mishmash> | Transcription error |
| 135:5 | Replace <better videos> with <better than videos> | Transcription error |
| 135:9 | Replace <expert> with <experts> | Transcription error |
| 137:23 | Replace <four font> with <four-point font> | To clarify the record |
| 139:15 | Replace <fewer videos loss> with <fewer videos with lots> | To clarify the record |
| 145:3 | Replace <people dominant> with <people are dominant> | To clarify the record |
| 145:6 | Replace <books that dominant> with <books that are dominant> | To clarify the record |
| 145:7 | Replace <dominant and> with <are dominant and> | To clarify the record |
| 145:7 | Replace <songs that dominant> with <songs that are dominant> | To clarify the record |
| 145:13 | Replace <Are> with <And> | Transcription error |

Witness: Hal Singer, January 13, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

| 145:15 | Replace <just sat that> with <just sat there> | Transcription error |
|---|---|---|
| 146:11 | Replace <review> with <view> | Transcription error |
| 146:13 | Replace <knot> with <not> | Transcription error |
| 147:9 | Replace <I mea> with <I mean> | Transcription error |
| 147:22 | Replace <decision> with <decision as a> | Transcription error |
| 149:18 | Replace <infringing> with <infringement> | Transcription error |
| 153:8 | Replace <adverse step> with <overstep> | Transcription error |
| 155:20 | Replace <less decimal> with <last decimal> | Transcription error |
| 161:8 | Replace <restating> with <reinstating> | Transcription error |
| 167:10 | Replace <interested> with <interested in> | Transcription error |
| 169:23 | Replace <[redacted]> with <[redacted]> | Transcription error |
| 175:10 | Replace <to> with <for> | Transcription error |
| 180:17 | Replace <infringing> with <infringement> | Transcription error |
| 183:17 | Replace <host> with <a host> | Transcription error |
| 185:24 | Replace <in the firm> with <infirm> | Transcription error |
| 187:3 | Replace <record statement> with <record statements> | Transcription error |
| 188:10 | Delete <of> | Transcription error |
| 189:3 | Replace <advertiser's> with <advertiser> | Transcription error |
| 192:7 | Replace <how much is> with <how much does> | Transcription error |
| 192:10 | Replace <to even to account> with <to even account> | Transcription error |
| 195:4 | Replace <potentially> with <potential> | Transcription error |
| 200:14 | Replace <You are> with <Your> | Transcription error |
| 202:20 | Insert <be> between <to> and <necessarily> | Transcription error |
| 205:20 | Replace <necessarily inferior> with <necessarily be inferior> | Transcription error |
| 207:10 | Delete <and> | Transcription error |

Witness: Hal Singer, January 13, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

| | | |
|---|---|---|
| 208:10 | Delete <music> | Transcription error |
| 208:16 | Replace <a damages> with <damages> | Transcription error |
| 208:21 | Replace <I am not.> with <I have not.” | Transcription error |
| 210:2 | Replace <transform> with <transformation> | Transcription error |
| 214:24 | Replace <challenge> with <challenged> | Transcription error |
| 214:25 | Replace <challenge> with <challenged> | Transcription error |
| 215:11 | Replace <parameters unbiased> with <parameters, unbiased> | Transcription error |
| 218:22 | Replace <di minimus> with <de minimis> | Transcription error |
| 233:13 | Replace <some question> with <your question> | Transcription error |
| 234:10-11 | Replace <that YouTube monetizations> with <that YouTube monetizes> | To clarify the record |
| 234:16 | Replace <down> with <time> | Transcription error |
| 238:15 | Replace <I don’t anything> with <I don’t have anything> | Transcription error |
| 247:19 | Replace <copyright the works> with <copyrighted works> | Transcription error |
| 251:10 | Replace <such key metric> with <such a key metric> | Transcription error |
| 259:5 | Replace <affect> with <affects> | Transcription error |
| 263:10 | Replace <variation advertising> with <variation in advertising> | Transcription error |
| 267:21 | Replace <pages vary visited> with <pages visited> | To clarify the record |
| 268:16 | Replace <model is bias> with <model is biased> | Transcription error |
| 269:5 | Replace <are bias> with <are biased> | Transcription error |
| 269:7 | Replace <if is> with <if it’s a> | Transcription error |
| 269:20 | Replace <are bias> with <are biased> | Transcription error |
| 271:10 | Replace <is reposted now> with <reposted is now> | Transcription error |
| 271:20 | Replace <di minimus> with <de minimis> | Transcription error |

Witness: Hal Singer, January 13, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

| | | |
|---|---|---|
| 272:7 | Replace <di minimus> with <de minimis> | Transcription error |
| 273:17 | Replace <serves> with <served> | Transcription error |
| 277:10 | Replace <Comsport> with <ComScore> | Transcription error |
| 277:13 | Replace <he> with <it> | Transcription error |
| 280:12 | Insert <be> between <all> and <billed> | Transcription error |
| 287:15 | Replace <suffer> with <suffers> | Transcription error |
| 288:14 | Replace <bias> with <biased> | Transcription error |
| 290:2 | Replace <than> with <then> | Transcription error |

___X___ Subject to the above changes, I certify that the transcript is true and correct.

________ No changes have been made. I certify that the transcript is true and correct.

__________________ February 23, 2023
(Signature) (date)