Exhibit F

to the Declaration of Kelly M. Knoll ISO Defendants' Motion to Exclude Testimony from Charles D. Cowan and Hal J. Singer

Public Redacted Version

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>YOUTUBE, LLC AND GOOGLE LLC,<br><br>Defendants<br><br>―――――――――――――――――――<br><br>YOUTUBE, LLC and GOOGLE LLC,<br><br>Counterclaimants,<br><br>v.<br><br>PIRATE MONITOR LTD, PIRATE MONITOR LLC, AND GÁBOR CSUPÓ,<br><br>Counterclaim Defendants.<br>――――――――――――――――――― | CASE NO.: 3.20-cv-04423-JD |

**Expert Rebuttal Report of Steven R. Peterson, Ph.D.**

December 29, 2022

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

YouTube has developed for copyright owners, such as Content ID and Copyright Match Tool.[64] The analysis was also limited to top videos on YouTube, which are not representative of all videos on YouTube.[65] Thus, this study is both stale and narrowly focused on an unrepresentative sample limited to top videos. It cannot be reliably generalized to YouTube as a whole. Moreover, the Vidmeter.com report itself explicitly cautions against generalizing the results of the study to YouTube as a whole: "*This report is not designed to provide any exact numbers which can be extrapolated across YouTube's entire network, but rather to provide general estimates and case studies for the topics covered.*"[66]

59.     In short, Dr. Singer has not provided a reliable basis to extrapolate the percentage of allegedly infringing videos found in these studies across YouTube as a whole during the relevant time.

### 2.     Dr. Singer's Assumption that Viewer Time Is Proportional to His Infringing Content Proxy's Percentage of All Content Is Economically Unfounded

60.     Having developed his 1.32% proxy for the percentage of allegedly infringing content on YouTube, Dr. Singer attempts to determine the effect of the availability of allegedly infringing content on viewer activity as the next step in his counterfactual analysis. Dr. Singer's economic framework describing YouTube as a multisided platform should guide the estimation of the relationship between content and viewer time. See Figure 3. However, Dr. Singer ignores the multisided platform framework that he develops and simply assumes without basis that the

---

[64]     Content ID and Copyright Match Tool were released in October 2007 and July 2018, respectively. See https://googleblog.blogspot.com/2007/10/latest-content-id-tool-for-youtube.html; https://blog.youtube/news-and-events/helping-creators-protect-their-content/.

[65]     Geoff Duncan, "Infringing Videos Not Big on YouTube?" *Digital Trends*, Apr. 5, 2007, https://www.digitaltrends.com/home/infringing-videos-not-big-on-youtube/ ("Vidmeter decided to take a look at YouTube's list of most-watched video clips fourt [sic] times per day between December 9, 2006, and March 22, 2007, pulling down YouTube's own lists of the most-watched videos by day, week, month, and all-time.").

[66]     Bri Holt, Heidi R. Lynn, and Michael Sowers, "Analysis of Copyrighted Videos on YouTube.com," Vidmeter.com, 2007, p. 1.

percentage of viewer time on YouTube attributable to allegedly infringing content is the same as the percentage of allegedly infringing content on YouTube.[67] This assumption also implies that viewer time changes proportionally with changes in YouTube's content.[68]

61.     There are fundamental economic reasons that Dr. Singer's assumption that viewer time falls in proportion to the percentage of allegedly infringing content removed from YouTube is incorrect.

62.     First, allegedly infringing content on YouTube is substitutable with non-infringing content.[69] Therefore, if allegedly infringing content is removed from YouTube, viewers can find similar content to watch, minimizing, if not eliminating, the impact of lost content on viewers' activity.

63.     Second, approximately 35.6% of the allegedly infringed copyrights identified in the Takedown Notice Sample identify only a YouTube URL as the title of the allegedly infringed copyrighted work.[70] In other words, when asked to identify their own work, the copyright holder has pointed to a video on YouTube and then pointed to some other video that allegedly infringes that work. This indicates that removing the allegedly infringing video that is the subject of the takedown notice will generally leave the complainant's own work available on YouTube for users to watch. For example, a YouTube user who uploaded a music video onto his or her channel may find other copies of the same music video on other channels and choose to submit takedown notices against those other videos. But even if the other videos are removed in response to those takedown notices, the original music video, uploaded by the YouTube user on

---

[67]    Updated Singer Report, ¶ 104 ("I further assume that such content is responsible for the same percentage of time that viewers spend on YouTube.").

[68]    Updated Singer Report, ¶ 104 ("Hence, I assume that this proxy for Infringing Content videos likewise accounts for 1.32% of all viewer time spent on the platform.").

[69]    Creators may submit false takedown requests against videos that compete for the same audience. See, *e.g.*, YouTube Copyright Transparency Report, H1 2022, pp. 6-7.

[70]    The "name" of the copyright infringed is a YouTube URL in approximately 35.6% of the sample takedown notices—that is, there are 636,508 takedown requests where the copyright name is simply an URL out of a total 1,789,656 takedown requests. See my workpapers.

23

his or her channel and identified as the allegedly infringed work in their takedown notice, would generally remain on YouTube and be available for others to watch. Moreover, the allegedly infringed works could remain on YouTube in other circumstances, such as when the owner of a sound recording requests that a particular video containing the song be removed from YouTube but has licensed the work to YouTube in another video. Thus, taking down an allegedly infringing video does not necessarily remove the underlying content from YouTube, and other versions of the content may remain on YouTube and continue to attract viewers. The substitutability of YouTube videos and the fact that removing an allegedly infringing video does not necessarily make the underlying content in an authorized form unavailable on YouTube imply that changes in viewership would be less than proportional to the percentage of removed content.

64. Third, allegedly infringing content is demonstrably different from average or typical content on YouTube. Using Dr. Singer's method for scaling the sample of takedown notices to cover the full damages period, it is possible to estimate the revenue earned on allegedly infringing videos that he claims represent 1.32% of all videos on YouTube and compare that estimated revenue to the revenue that YouTube earns on a representative 1.32% of its total corpus of content. Specifically, Dr. Singer calculates that from July 2017 through December 2020, YouTube earned revenue of $50.7 billion.[71] This implies that a representative (*i.e.*, random) sample of 1.32% of YouTube's total corpus of videos would on average generate revenues of approximately $670 million (*i.e.*, $50.7204*0.0132 = ~ $670.8 million). However, the allegedly infringing videos (which Dr. Singer claims represent 1.32% of YouTube's total content) generated approximately ▮▮▮▮▮▮▮ revenue from the ads placed against them during the period from July 2017 through December 2020.[72] See Figure 1. Thus, Dr. Singer's disgorgement result implies that average content would earn roughly ▮ times more direct revenue than the videos subject to takedown notices (*i.e.*, ▮▮▮▮▮▮▮▮▮▮).

---

[71] Updated Singer Report, Table 7.

[72] See my workpapers. The calculation of revenue is based on Dr. Singer's methodology for scaling unique takedown requests to account for months that were not sampled.

24

**Figure 1**
**Comparison of Total Advertising Revenues Corresponding to Average YouTube Content and Allegedly Infringing Videos**
**July 2017 – December 2020**



65. In fact, the difference in monetization between allegedly infringing videos and average videos is even more stark than Dr. Singer's calculations imply. Some of the videos subject to takedown notices were not permanently removed from YouTube, likely because the takedown notices were retracted by the claimant or were rescinded as the result of successful counternotifications.[73] If the 6,547 revenue-earning videos from the Takedown Notice Sample that were not permanently removed from YouTube are excluded from the Takedown Notice Sample, Dr. Singer's method for estimating the total revenue of allegedly infringing videos

---

[73] See my workpapers and Copyright strike basics - YouTube Help (google.com); Retract a claim of copyright infringement - YouTube Help (google.com); Submit a copyright counter notification - YouTube Help (google.com). My calculation of the number of videos in the takedown data sample that remain available is based on evaluating on December 14, 2022, whether that video is still available on YouTube.

25

implies videos that remained unavailable on YouTube earned only ▬▬▬▬ for the period from July 2017 through December 2020.[74] See Figure 2. With this correction, Dr. Singer's methods estimate that average YouTube videos would generate ▬ times more revenue during the period from July 2017 through December 2020 than the videos that were removed from YouTube in response to takedown notices.[75]

**Figure 2**
**Comparison of Total Advertising Revenues Corresponding to Average YouTube Content and Videos Permanently Removed**
**July 2017 – December 2020**



---

[74] After removing the 6,547 revenue-earning videos that were not permanently removed from YouTube, the estimated number of allegedly infringing videos falls slightly below 1.32%.

[75] For the period from July 2017 through September 2022, the total revenue on the allegedly infringing videos is ▬▬▬▬, accounting for videos that were restored to YouTube. Over this period, 1.32% of YouTube's revenues as estimated by Dr. Singer in his Table 8 is $1.25 billion. If the allegedly infringing videos had performed like average videos on YouTube, they should have generated ▬ times more revenue than they did.

26

66. There are multiple reasons that videos subject to takedown requests would earn *less* revenue than average videos, within the framework of Dr. Singer's calculations. First, to the extent allegedly infringing videos are removed from YouTube, they are no longer available to viewers. Given that their time on YouTube is driven by the takedown notices rather than the uploaders' decisions regarding when to remove them, they should not be compared to other videos on a one-to-one basis because doing so will overstate the amount of revenue from allegedly infringing content relative to non-infringing videos. This conclusion is further supported by the finding that among videos in the sample of takedown notices with nonzero revenue, the videos that were restored to YouTube (and thus are still available on the service) have much higher revenue than videos that were removed from YouTube.[76]

67. Second, the revenue that YouTube earns at any point in time (*e.g.*, in a day) depends on viewer activity on that day. To the extent content drives viewer activity, as Dr. Singer asserts, it is the allegedly infringing content available at a point in time that determines YouTube's revenue at that time. As discussed above (see Section V.B.1.c)), the construction of Dr. Singer's "proxy" for allegedly infringing content indicates that it fails to capture the amount of allegedly infringing content on YouTube at any particular point in time. By treating all allegedly infringing videos as having been available for more than five years (July 2017 to October 2022), Dr. Singer's methods overstate the actual amount of allegedly infringing content on YouTube at any single point in time.

68. Third, as YouTube is able to generate higher ad revenue per view in developed countries than in less developed countries, it may be the case that alleged infringement is distributed across the regions in which YouTube operates in proportion to the revenue earned from each region. If infringement is more prevalent in countries where advertising rates are relatively low compared

---

[76] Out of 103,956 revenue-generating URLs in the sample of takedown notices, the 6,547 URLs that were restored to YouTube have average revenue of ▇. The 97,409 URLs that were permanently removed from YouTube have average revenue of ▇ (see my workpapers). The concentration of revenue in a relatively small percentage of videos is unsurprising. Approximately ▇ of videos uploaded to YouTube have been watched fewer than ▇ times and account for less than ▇ of total watch time, while ▇ of the raw number of videos uploaded to YouTube account for more than ▇ of total watch time. GOOG-SCHNDR-00034775: 785.

27

to the United States or other developed regions, Dr. Singer's assumption that allegedly infringing videos perform like average videos would overstate the revenue earned on allegedly infringing videos.[77]

69.     Finally, allegedly infringing content also may differ from average or typical content on YouTube in other ways that Dr. Singer has not considered.  For example, allegedly infringing content may be of different type, character, or quality and draw fewer viewers on average relative to non-infringing content.[78] Allegedly infringing content may also be less likely to meet YouTube's advertising standards and, therefore, may not be eligible to be monetized.[79]  Dr. Singer does not account for these factors.

70.     In short, Dr. Singer's assumption that removing allegedly infringing videos on YouTube would lead to a proportional reduction in YouTube viewer time is contrary to the revenue performance of allegedly infringing videos and is economically baseless.

### 3. Dr. Singer's Multisided-Platform Framework for YouTube Implies His Disgorgement Regression Is Fundamentally Flawed

71.     The key economic feature of Dr. Singer's economic analysis of YouTube is that he models YouTube as a multisided platform.  A multisided platform is a business that facilitates interactions between different types of agents.  In the case of YouTube, the relevant constituencies on the platform are viewers, content creators, and advertisers.  As described below, Dr. Singer claims that his multisided platform framework guides his regression analysis, but it does not.  As a result, his regression analysis is biased and unreliable.

---

[77]  "[D]eveloping markets initially monetize at a lower rate than more mature markets." Alphabet Form 10-K for the fiscal year ended December 31, 2021, p. 28.

[78]  YouTube described efforts to bring premium content to YouTube and to develop a "premium experience" on YouTube in a 2016 earnings call.  Alphabet Q4 2016 Earnings Call, January 26, 2017, p. 16.  This indicates that the type and quality of content is important, not just the volume.

[79]  See https://support.google.com/youtube/answer/6162278?hl=en.

content for allegedly infringing content, which indicates that viewer time would change less than proportionally to changes in YouTube content. In sum, Dr. Singer discards his economic framework and replaces it with an implausible and unreliable assumption.

122. Dr. Singer's analysis does not follow the economic framework that he develops for YouTube and is unreliable and biased as a result. It cannot be used to justify disgorgement damages in any amount. Dr. Singer includes a proxy for all content on YouTube as an explanatory variable in his regression. However, his multisided framework implies that this explanatory variable is unneeded and including it in the regression will bias the regressions' results. The regression coefficients show the effects of this bias. In addition, Dr. Singer's estimate of disgorgement damages fails to account for the reduction in allegedly infringing content that is at the heart of his counterfactual scenario, despite his decision to include the proxy for YouTube content as an explanatory variable in his disgorgement regression. When this error is corrected, Dr. Singer's disgorgement regression analysis shows that YouTube did not earn additional revenue as the result of alleged infringement and that disgorgement damages are zero.

December 29, 2022

Steven R. Peterson