DAVID H. KRAMER, SBN 168452
MAURA L. REES, SBN 191698
LAUREN GALLO WHITE, SBN 309075
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: dkramer@wsgr.com
       mrees@wsgr.com
       lwhite@wsgr.com

BRIAN M. WILLEN (admitted *Pro Hac Vice*)
CATHERINE R. HARTMAN (admitted *Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
Email: bwillen@wsgr.com
Email: chartman@wsgr.com

Attorneys for Defendants and Counterclaimants
YOUTUBE, LLC and GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>YOUTUBE, LLC and GOOGLE LLC,<br><br>Defendants<br><br>———————————————<br><br>YOUTUBE, LLC and GOOGLE LLC,<br><br>Counterclaimants,<br><br>v.<br><br>PIRATE MONITOR LTD, PIRATE MONITOR LLC, and GÁBOR CSUPÓ,<br><br>Counterclaim Defendants. | CASE NO.: 3:20-cv-04423-JD<br><br>**DEFENDANTS AND COUNTERCLAIMANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFFS' PROPOSED EXPERTS JOSEPH M. WINOGRAD AND PAUL JESSOP AND SUPPORTING MEMORANDUM OF LAW**<br><br>Date:   April 13, 2023<br>Time:   10:00 a.m.<br>Dept.:   11<br>Judge:  Hon. James Donato |

1

# TABLE OF CONTENTS

2

**Page**

3

NOTICE OF MOTION AND MOTION ........................................................................ 1

4

INTRODUCTION ......................................................................................................... 1

5

ARGUMENT ................................................................................................................ 2

6

I.      WINOGRAD'S REPORT AND TESTIMONY SHOULD BE EXCLUDED ................. 2

7

      A.     Winograd's Report Is An Improper And Biased Summary Of The Evidence. ....... 2

8

      B.     Winograd Persistently Invokes His "Expertise" But Fails To Establish Its

9

            Relevance Here Or Show How It Influences His Assertions .............................. 4

10

      C.     Winograd's Lone Opinion Is Pure Speculation ........................................... 6

11

II.     JESSOP'S REPORT AND TESTIMONY SHOULD BE EXCLUDED ........................ 7

12

      A.     Jessop's Report Is Inadmissible .................................................................... 8

13

      B.     Jessop Lacks Expertise In The Subjects On Which He Opines ........................... 10

14

      C.     Jessop's Matching Process Is Not The Product Of Any Reliable Or

15

            Scientific Methodology. ............................................................................... 12

16

      D.     Jessop's Testimony Will Not Be Helpful To Jurors And Will Instead

17

            Confuse Or Mislead Them. ........................................................................... 13

18

CONCLUSION ........................................................................................................... 15

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page**

3

4

### CASES

5   *CZ Servs., Inc. v. Express Scripts Holding Co.*,
        2020 WL 4518978 (N.D. Cal. Aug. 5, 2020) ...................................................................9
6

7   *Daubert v. Merrell Dow Pharm., Inc.*,
        509 U.S. 579 (1993) ......................................................................................1, 5, 6, 13
8

*Dolls Kill, Inc. v. Zoetop Bus. Co.*,
9       2022 WL 16961477 (C.D. Cal. Aug. 25, 2022) .................................................................14

10  *DZ Reserve v. Meta Platforms, Inc.*,
        2022 WL 912890 (N.D. Cal. Mar. 29, 2022) ....................................................................3
11

12  *Edwards Lifesciences Corp. v. Meril Life Scis. Pvt.*,
        2022 WL 254348 (N.D. Cal. Jan. 27, 2022) ......................................................................9
13

*Estate of Gonzales v. Hickman*,
14      2007 WL 3237727 (C.D. Cal. May 30, 2007) ....................................................................4

15  *Focal Point Films LLC v. Sandhu*,
        2020 WL 5760355 (N.D. Cal. Sept. 28, 2020) ...................................................................9
16

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*,
17      87 F. Supp. 3d 928 (N.D. Cal. Mar. 31, 2015) ..................................................................5

18  *In re Apollo Grp. Inc. Sec. Litig.*,
        527 F. Supp. 2d 957 (D. Ariz. 2007) ................................................................................9
19

20  *In re Capacitors Antitrust Litig.*,
        2020 WL 870927 (N.D. Cal. Feb. 21, 2020) ...................................................................10
21

22  *In re Ford Tailgate Litig.*,
        2015 WL 7571772 (N.D. Cal. Nov. 25, 2015) .................................................................12

23  *In re Twitter, Inc. Sec. Litig.*,
        2020 WL 9073168 (N.D. Cal. Apr. 20, 2020) .................................................................10
24

25  *Intermedics, Inc. v. Ventritex, Inc.*,
        139 F.R.D. 384 (N.D. Cal. 1991) ......................................................................................4
26

*Kipp Flores Architects, LLC v. Pradera SFR, LLC*,
27      2022 WL 1105751 (W.D. Tex. Apr. 13, 2022) ................................................................13

28  *Kumho Tire Co. v. Carmichael*,
        526 U.S. 137 (1999) ........................................................................................................12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Lord Abbett Mun. Income Fund, Inc. v. Asami*,
  2014 WL 3417941 (N.D. Cal. July 11, 2014) .......................................................4

*Nationwide Transp. Fin. v. Cass Info. Sys.*,
  523 F.3d 1051 (9th Cir. 2008) .........................................................................10

*Open Text S.A. v. Box, Inc.*,
  2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ...............................................5, 6, 7

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
  2018 WL 6511146 (N.D. Cal. Dec. 11, 2018) ............................................4, 9, 10

*Robert Stark Enters., Inc. v. Neptune Design Grp., LLC*,
  2017 WL 1345195 (N.D. Ohio Apr. 12, 2017) ...................................................14

*Synopsys, Inc. v. Mentor Graphics Corp.*,
  2014 WL 6735460 (N.D. Cal. Nov. 26, 2014) .....................................................4

*Waymo LLC v. Uber Techs., Inc.*,
  2017 WL 5148390 (N.D. Cal. Nov. 2, 2017) .......................................................4

*White v. Ford Motor Co.*,
  312 F.3d 998 (9th Cir. 2002) .....................................................................11, 12

**STATUTES**

17 U.S.C. § 1202 .................................................................................... *passim*

17 U.S.C. § 512 ..................................................................................................14

**RULES**

Fed. R. Evid. 702 ...............................................................................1, 10, 11, 13

Fed. R. Evid. 403 ........................................................................................13, 14

1

**NOTICE OF MOTION AND MOTION**

2      PLEASE TAKE NOTICE that on April 13, 2023 at 10:00 a.m., Defendants YouTube,

3  LLC and Google LLC ("YouTube") will move the Court for an order excluding testimony from

4  Plaintiffs' proposed experts Joseph M. Winograd and Paul Jessop pursuant to Rule 702 of the

5  Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

6

**INTRODUCTION**

7      Joseph Winograd and Paul Jessop offer reports on behalf of Plaintiffs that are not expert

8  opinion—rather, they are closing arguments that counsel, not experts, must deliver. Each seeks

9  to serve as a narrator, spinning the evidentiary record as Plaintiffs would like it to be. But

10  allowing them to testify about supposed "facts" and offer slanted descriptions of the evidence

11  usurps the jury's role. For this reason alone, their reports are improper and should be rejected.

12  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

13      Both men filled their factual accounts and deposition testimony with references to their

14  supposed expertise. But neither actually has experience that qualifies them on the issues about

15  which they purport to testify. Winograd's career spent on watermarking software does not give

16  him the requisite "scientific, technical, or other specialized knowledge" to provide insight into

17  YouTube's digital fingerprinting system ("Content ID"), YouTube's search tools, or "Watch

18  Next," a wholly separate video recommendation process. *See* Fed. R. Evid. 702(a). Jessop, a

19  music industry executive, has no knowledge of—much less expertise in—YouTube's technical

20  operations for handling metadata. Nor had he ever even heard of the metadata at the core of

21  Plaintiff Maria Schneider's Section 1202 claim before starting on this case. Yet he testifies about

22  both as if a percipient witness.

23      In the rare instance where they offer actual "opinions" (only once in Winograd's report),

24  they are on matters far beyond their qualifications, and are not based on any discernible

25  methodology. They speculate on what they imagine YouTube *could* do, what YouTube was

26  *thinking*, and why YouTube supposedly violated the law. All of that is properly excluded.

27

28

1

<u>**ARGUMENT**</u>

2

**I.    WINOGRAD'S REPORT AND TESTIMONY SHOULD BE EXCLUDED**

3

Joseph Winograd's report says he plans to provide expert testimony concerning: "the

4

effectiveness of YouTube's Content ID system in finding copyright infringement[;]" the efficacy

5

of the other tools in YouTube's copyright management suite; the role played by Autoplay and

6

Watch Next in surfacing videos that allegedly may infringe copyrights to YouTube users; and the

7

cost of making Content ID available to the general public." Decl. of Kelly M. Knoll ("Knoll

8

Decl."), Ex. 1, Winograd Report, Sept. 1, 2022 ("Winograd Rep.") ¶ 2. But his report amounts

9

only to an evidentiary summary voiced with the advocacy of Plaintiffs' counsel. That is not the

10

province of an expert. Winograd has no expertise regarding copyright management on social

11

media platforms, no experience with YouTube's unique and proprietary technology, and is

12

unable to say how he applied his supposed expertise to provide his evidentiary summary. The

13

*only* opinion he offers over the course of his seventy-page report concerns YouTube's costs to

14

develop expanded access to its copyright management tools. And that opinion lacks any

15

foundation or methodology.

16

**A.    Winograd's Report Is An Improper And Biased Summary Of The Evidence**

17

Winograd's Report is largely just his version of the evidence of record. *See, e.g.*,

18

Winograd Rep. ¶¶ 18-21 ("Defendants provide a small group of copyright owners a tool called

19

Content ID that enables them to find and assert Claims against the large number of uploaded

20

videos to YouTube that *infringe their copyrights*"; "Content ID employs a powerful Matching

21

System that comprehensively scans videos on YouTube and can automatically *find a wide range*

22

*of infringing material*"; "Defendants have already built and are operating the capabilities that

23

would allow copyright owners denied access to Content ID to effectively find videos on

24

YouTube that *infringe their works*….") (emphasis added). Perhaps this is not surprising, as he

25

testified that he believed his job as an expert was to summarize the materials he had reviewed or

26

to restate "facts" provided to him by Plaintiff's counsel:

27

A: I–this sentence has one, two three, four five–six footnoted references in this single sentence, each one of which provides support for each one of those statements. In fact, nearly each word in the sentence is–support is provided and reference is indicated in the footnotes.

28

> Q: Okay. So you're just repeating something that you read in this sentence…
> A: I'm… I've synthesized the information from the material that I've reviewed…

Knoll Decl. Ex. 2, Dep. of Joseph M. Winograd, Sept. 29, 2022 ("Winograd Tr.") 41:8-42:14.

> Q: How did you confirm [this particular video] was an infringing copy of [the work Uniglobe claims to own,] 'Five Weddings'?
> A: I was told that was the case by Plaintiff counsel…
> Q: Did you make any effort to independently confirm the truth of that matter?
> A: I did not.
> Q: So why did you put it in this report as fact?
> A: *Because I–the entirety of the report is created in reliance on the materials that are publicly available, my own expertise, and the materials provided to me from– and direction provided by Plaintiff counsel."*

*Id.* 197:11-198:18 (emphasis added); *see also id.* 181:15-182:2. Winograd repeatedly testified that assertions in his report were "facts" not opinions:

> Q: Paragraph 111 of your report… Is that your opinion or something you think is a fact?
> A: It's not an opinion. It's information that I read cited in the annual report and identified in footnote 132.
> Q: So this sentence is something that you read in a document you found online?
> A: That's right.  *Id.* 180:25-181:14
>
> Q: And is this your expert opinion, or is this simply repeating what you read from [YouTube's] Mr. Rosenstein?
> A: This is, in this case, not me expressing my own opinion. It's me expressing the facts as I understand them from review of the materials provided to me.

*Id.* 55:20-56:1; *see id.* 194:3-14; 197:11-198:13; *see generally* Winograd Rep. ¶¶ 18-21, 22-30, 39-42, 45-50, 53-54, 57, 62-65, 68-73, 78-84, 89-90, 93-97, 118-122, 126, 140-145.

Providing an advocate's summary of evidence and its implications is the province of attorneys, properly reserved for briefs and closing arguments. *DZ Reserve v. Meta Platforms, Inc.*, 2022 WL 912890, at *8 (N.D. Cal. Mar. 29, 2022) (Donato, J.), *appeal filed*, No. 22-15916 (9th Cir. June 21, 2022). This Court made plain in *DZ Reserve* that submitting an evidentiary summary as expert testimony is improper: "Overall, [the] report does not offer any specialized or scientific expertise, or anything beyond the typical knowledge or experience of a jury… Consequently, exclusion of [the expert's] opinions and report is required." *Id.* *9; *see also, e.g.*, *Lord Abbett Mun. Income Fund, Inc. v. Asami*, 2014 WL 3417941, at *13, n.8 (N.D. Cal. July

11, 2014) (expert testimony that "merely summarizes the record evidence and gratuitously interprets it" is improper), *aff'd*, 653 F. App'x 553 (9th Cir. 2016); *Synopsys, Inc. v. Mentor Graphics Corp.*, 2014 WL 6735460, at *1-2 (N.D. Cal. Nov. 26, 2014) (same); *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 2018 WL 651146, at *7 (N.D. Cal. Dec. 11, 2018) (expert cannot "usurp the jury's role in making fact determinations"). Here, Winograd has admitted that his Report serves to "synthesize… information from the material that [he] reviewed" (Winograd Tr. 41:8-42:14); "characterize… [his] understanding of the operation of [YouTube's] system based on review of the cited materials" (*id.* 59:20-60:15); and rely, without any effort at verification, on the "direction provided by Plaintiff counsel" (*id.* 197:11-198:13).

The fact that Winograd's Report is merely an evidentiary summary is grounds enough for exclusion. That it echoes Plaintiffs' counsel's advocacy also renders exclusion necessary to prevent "damage to the integrity of the truth finding process." *See Intermedics, Inc. v. Ventritex, Inc.*, 139 F.R.D. 384, 395-96 (N.D. Cal. 1991) (exclusion required where "testimony that was being presented as the independent thinking of an 'expert' in fact was the product, in whole or significant part, of the suggestions of counsel"); *see also Waymo LLC v. Uber Techs., Inc.*, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 2, 2017) (exclusion required where "the evidence [the proffered expert] relied on can speak for itself, and his only contribution would be to pile on a misleading facade of expertise"); *Estate of Gonzales v. Hickman*, 2007 WL 3237727, at *3 (C.D. Cal. May 30, 2007) ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.").

**B.  Winograd Persistently Invokes His "Expertise" But Fails To Establish Its Relevance Here Or Show How It Influences His Assertions**

Winograd testified over twenty times that his "expertise" supported his various assertions. But it is plain that he has no expertise with real bearing on this case. He has worked exclusively at a company that develops watermarking software, primarily for consumer electronics products. Winograd Rep. ¶ 7-13. Winograd conceded that YouTube does not use watermarking as part of its copyright management systems. Winograd Tr. 39:3-19. He also conceded that he has never worked for an online service that hosts user-generated content, and

1  that he has no personal experience using YouTube's copyright management tools. *Id.* 35:15-17

2  ("Q: Sir, have you ever worked for an online service hosting user-generated content? A: I have

3  not."); 38:20-22 ("I have not assisted a social media service in policing abuse of their copyright

4  management tools."); 55:3-4 ("I have not done work with the matching system that Defendants

5  apply."); 35:23-36:1 ("Q: Did you have any experience using YouTube's copyright management

6  tools before you were engaged by Plaintiffs in connection with this case? A. I did not."); 53:8-10

7  (Q: "Have you personally worked with YouTube's Content ID system? A: I have not.").

8      In short, Winograd's experience concerns a technology that YouTube does not deploy,

9  and he has no experience with the technology YouTube actually uses. Further, though he spends

10  17 pages of his report discussing YouTube's recommendation tools, he offered nothing remotely

11  suggesting that he has any professional knowledge—or even personal experience—with how

12  user-generated content platforms help users find content in which they may be interested. *See,*

13  *e.g.*, Winograd Tr. 245:10-247:14; 250:15-253:5.

14      Winograd's invocations of his "expertise" are no substitute for the requisite specialized

15  knowledge useful to the trier of fact. This Court has specifically rejected vague and repetitive

16  invocations of expertise, finding them insufficient to raise an expert's assertions to the level of

17  opinion because such language does not show the expert's work, i.e., the "methods and

18  procedures of science" whereby they arrived at their conclusions. *Daubert*, 509 U.S. at 590; s*ee*

19  *also Open Text S.A. v. Box, Inc.*, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015). In *Open*

20  *Text*, this Court found that "[e]xclusion [of an expert's testimony was] required because…

21  [r]ather than spelling out the steps she took to go from the data to… [her] opinion], [the expert]

22  cites her 'experience.'" *Id.* *6. That meant her "method [was] a 'black box into which data is fed

23  at one end from which an answer emerges at the other, and the jury cannot see how the pieces fit

24  together or how the data drives the conclusion." *Id.* (cleaned up); *Icon-IP Pty Ltd. v. Specialized*

25  *Bicycle Components, Inc.*, 87 F. Supp. 3d 928, 939 (N.D. Cal. Mar. 31, 2015) ("Reliable

26  testimony must be grounded in the methods and procedures of science and signify something

27  beyond 'subjective belief or unsupported speculation.'" (citing *Daubert*)).

28      Here, as in *Open Text*, Winograd's repeated reference to his expertise cannot bootstrap

his evidentiary summaries into defensible opinions arrived at through sound methodology. Winograd does not "spell[] out the steps [he] took to go from the data to [his] opinion." *Open Text S.A.*, 2015 WL 349197, at *6. Instead, he offers "black box" assertions without substantiation, thereby preventing the jury from "see[ing] how the pieces fit together or how the data drives the conclusion." *Id.*

### C.  Winograd's Lone Opinion Is Pure Speculation

Winograd offers only one actual opinion in his Report: "It is my opinion that providing Ordinary Copyright Owners with effective tools to find infringing videos on YouTube is within Defendants' existing capabilities and budget for such activities and could be executed with little technical risk." Winograd Rep. ¶ 95. But Winograd has no knowledge of the facts required for this opinion and he conceded as much at his deposition. Winograd Tr. 148:25-149:5; 158:17-19; 159:8-16. Moreover, his "methodology" is so simplistic and specious as to disqualify it.

Winograd opines that YouTube could offer Content ID—a tool he admits to having never used—to the world, within its existing capabilities and budget. Winograd Rep. ¶¶ 93-97. Yet Winograd admitted that he did not have any insight into YouTube's budget or operating costs that might support that opinion. Winograd Tr. 148:25-149:5 ("Q:[Y]ou said that YouTube could expand access within its existing capability and budget, but you don't know what their actual budget is, and you don't know what the increased costs would be, right? A: Not with specificity, no."). He opined that this massive undertaking could be done with little "technical risk," but he had no foundation for doing so. *Id.* 158:17-19 ("Q: You've developed copyright management tools for YouTube? A: No. I didn't."); 160:23-161:17 (conceding he could not tell how long it would take YouTube in calendar time or in person hours to develop expanded capabilities).

Grasping for support, Winograd pivoted to what he termed a "hypothetical approach." He noted from a single document reflecting YouTube's engineering accomplishments, that YouTube managed to launch 60 product enhancements of various kinds across its service in 2020. He then claimed that only 5 new features would be necessary to expand access to YouTube's copyright management tools. Because 60 is greater than 5, Winograd opined that YouTube ought to be able to expand tool access within its current budget and capabilities and with limited technical risk.

1    *Id.* 156:5-14.[1] But that approach is sophistry, not science. The fact that YouTube developed

2    certain, unidentified product enhancements in one year does not remotely suggest it should be

3    able to develop the ones Plaintiffs want with proportional dispatch. Even the most basic analysis

4    on this point would require explanation regarding what product enhancements were previously

5    developed, and what level of technical complexity, cost, personnel, and time they consumed, and

6    then a related analysis of those same elements for the new functionalities Plaintiffs imagine.

7    Winograd did not do that, or any other analysis. He just opined based on some unstated

8    "expertise," on what he imagined YouTube could do. *See Open Text S.A.*, 2015 WL 349197, at

9    *6 ("[T]he link, if any, between [Winograd's] inputs and [his] final determination is written in

10   invisible ink."). This opinion, the only one Winograd actually proffers, must be excluded.

11   **II.    JESSOP'S REPORT AND TESTIMONY SHOULD BE EXCLUDED**

12          Plaintiffs fare no better with the report and proposed testimony of Paul Jessop, a record

13   industry executive, offered to manufacture support for Maria Schneider's claim under 17 U.S.C.

14   § 1202. Schneider alleges that YouTube improperly removed copyright management information

15   ("CMI") that may have been embedded in the metadata of videos that other users uploaded to the

16   service. Complaint, Dkt. No. 99, ¶¶ 143-152. Her claim rests first, on an obscure metadata field

17   ("CLFN") automatically generated by a single third-party video editing software program and,

18   second, on International Standard Recording Codes ("ISRCs"), which are sometimes used to

19   identify sound recordings.[2] The CMI claim suffers from intractable problems and Jessop's

20   ───────────────────

21          [1] Winograd described his "method" as follows: "if you were to take each one of these --
     each one of these features and consider them an independent feature, right, it's -- 5/60ths of that
22   annual effort would be likely needed to -- to accomplish this, so a fraction -- I believe it's below
     10 percent -- of their development effort." Winograd Tr. 156:5-14.

23          [2] Plaintiffs first articulated Schneider's ISRC claim in November 2022. Plaintiffs contend
     versions of the two sound recordings Schneider put at issue ***may*** have had ISRCs embedded
24   within them. They theorize a user could have incorporated these sound recordings into a video
     without incorporating the recording's ISRC to the new work.  Next, they reason that because
25   YouTube knows that some sound recordings contain ISRCs, if a video on the service contains
     music without an ISRC in the metadata, the ISRC for that music must have been dropped at
26   some point. Accordingly, they assert that YouTube is (or could be) distributing a video knowing
     that someone, without authorization, removed an ISRC that had been embedded in the sound
27   recording, and YouTube knows or should know that the distribution would foment infringement
     of the relevant recording. This is not a cognizable legal claim under §1202 for a host of reasons
28   that YouTube could not fully present on summary judgment because Plaintiffs only disclosed
     this claim in their opposition brief.  For present purposes, it suffices that Plaintiffs have offered
                                                                                    (continued...)

1   opinions do nothing to solve them.

2          Jessop expounds on the operation and imagined capabilities of YouTube's service,

3   YouTube's state of mind, and the law. None of that is admissible expert testimony. Additionally,

4   Jessop has no expertise on CLFN metadata, or on YouTube's treatment of metadata more

5   broadly. His opinions on those topics and his spin on YouTube's documents and testimony (*e.g.*,

6   Knoll Decl. Ex. 3, Expert Report of Paul Jessop, Sept. 1, 2022 ("Jessop Rep.") ¶¶ 31-32, 104-

7   109, 125, 137, 152-154, 157, 160-162, 165-172) should be excluded. He further describes his

8   process to find anything "interesting" in CLFN metadata that could be connected to one of

9   Schneider's copyrighted works. *E.g.*, *id.* ¶¶ 137-147. But this elementary matching process

10  required no "expertise" at all. Finally, he waxes about ISRCs (*e.g.*, *id.* ¶¶ 32-34, 40, 169-172),

11  but makes no attempt to connect his views to the record in this case. And, to make matters worse,

12  he offers a grossly misleading hypothetical that will confuse rather than help a factfinder

13  understand the actual evidence.

14          **A.  Jessop's Report Is Inadmissible**

15          Like Winograd, much of what Jessop purports to do is narrate facts by reporting on what

16  he read in—and offering his interpretations of—YouTube's documents and witness deposition

17  transcripts, pleadings, and public webpages. *See id.* ¶¶ 30-31, 35, 125, 130, 137, 153-155, 157,

18  160-167; Knoll Decl. Ex 4, Dep. of Paul Jessop, Sept. 28, 2022 ("Jessop Tr.") 104:11-108:11

19  (describing the process of forming his opinions as "com[ing] to conclusions" based on "the

20  natural meaning of the words"); Jessop Rep. ¶¶ 36-40 & Tr. 127:15-128:2 (discussing Jessop's

21  "interpretation of the Complaint"); *see also, e.g.*, Jessop Tr. 173:20-175:10 ("engineer's textual

22  interpretation"). This is improper expert testimony, and such facts are properly presented to the

23  jury by percipient witnesses with actual knowledge of such matters. *See supra* at 3-4; *CZ Servs.,*

24  *Inc. v. Express Scripts Holding Co.*, 2020 WL 4518978, at *2, *4 (N.D. Cal. Aug. 5, 2020)

25  (finding "opinions" consisting of "reports of what [expert] personally saw in visits to various CZ

26  _____

27          (...continued from previous page)
    no evidence that this hypothetical scenario ever unfolded with respect to Schneider's sound
28  recordings, or otherwise. Moreover, claims based on the videos Schneider identified as
    containing one of her sound recordings are time barred. Order re Summ. J., Dkt. 222 at 4 n.2.

1    Pharmacies locations, or in documents she reviewed about CZ Pharmacies' operations" were

2    "much more akin to percipient witness observations than to opinions arrived at through a

3    scientific inquiry or expert analysis" and so "inadmissible as expert testimony").

4         Jessop acknowledges that many of the statements in his report amount to "inferences,"

5    drawn from the documents in this case and "common sense." Jessop Tr. 134:21-135:3

6    (describing "infer[ences] from other capabilities and the relative simplicity of the task at hand");

7    133:21-134:15 ("an inference that's drawn by the application of what one might call common

8    sense or natural inference drawing"); *see also id.* 111:3-112:9, 209:2-212:2, 212:18-213:14

9    (explaining opinions on costs were not based on quantitative estimates, calculations, or any

10   investigation of the actual cost of storing metadata, but rather "common sense analysis based on

11   knowledge of software engineering and similar fields"). Again, this is well out of bounds for an

12   expert. *See supra* at 4-5; *see also Edwards Lifesciences Corp. v. Meril Life Scis. Pvt.*, 2022 WL

13   254348, at *10 (N.D. Cal. Jan. 27, 2022) (excluding opinion that "merely summarizes the record

14   evidence and gratuitously interprets it," where proffered medical expert had "no specialized

15   qualifications that support what amounts to nothing more than a recitation of [plaintiff's] theory

16   of the case") (citation omitted); *Oracle Am., Inc.*, 2018 WL 6511146, at *7 (N.D. Cal. Dec. 11,

17   2018) ("[A]n expert witness is not permitted simply to review deposition testimony and other

18   evidence and then proffer an opinion about 'what actually happened in the case at hand.'"). The

19   jury is "fully capable of understanding the evidence and deciding the issues through the use of its

20   common knowledge and common sense." *In re Apollo Grp. Inc. Sec. Litig.*, 527 F. Supp. 2d 957,

21   962 (D. Ariz. 2007) (citation omitted); *see also Focal Point Films LLC v. Sandhu*, 2020 WL

22   5760355, at *7-*8 (N.D. Cal. Sept. 28, 2020) (excluding expert testimony because the "basic

23   concept" at issue could "easily understood by a jury without expert testimony").

24        Jessop also improperly opines on YouTube's state of mind throughout his report. *See*

25   Jessop Rep. ¶ 137 ("YouTube reads this data in order to delete it, while *knowing* that it is CMI");

26   ¶ 171 ("When YouTube accepts the upload of a video file with music content and without

27   metadata about the music, it must be aware that the metadata (that it *knows* has been present) has

28   been removed at some point.") (emphases added); *see generally id.* ¶¶ 32, 137, 154-155, 157,

168-171. As case after case makes clear, YouTube's knowledge or intent is a determination for the jury—not an expert witness. *See Oracle Am., Inc.*, 2018 WL 6511146, at *3 ("Courts routinely exclude as impermissible expert testimony as to intent, motive, or state of mind.") (citation omitted); *In re Twitter, Inc. Sec. Litig.*, 2020 WL 9073168, at *11 (N.D. Cal. Apr. 20, 2020) ("[T]estimony with respect to whether Twitter's public-disclosure processes were designed for a certain purpose or intent … is subject to exclusion on the ground that it amounts to impermissible testimony regarding Defendants' motives or intent.").

Equally improper are Jessop's forays into statutory interpretation and legal analysis. *See* Jessop Rep. ¶ 165 (opining that, by removing metadata, YouTube "places itself on the wrong side of Section 1202"); Jessop Tr. at 274:7-10 (describing this as "an opinion that is as close as I can come as not being a lawyer"); *see generally* Jessop Rep. ¶¶ 30-31, 104-109, 152, 165. As the Ninth Circuit has explained, "an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law. Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1058 (9th Cir. 2008); *see also, e.g.*, *In re Capacitors Antitrust Litig.*, 2020 WL 870927, at *1 (N.D. Cal. Feb. 21, 2020) (Donato, J.) (finding expert's testimony and opinions "about collusion, violations of antitrust law, or antitrust impact—topics for which he possesses no specialized knowledge, and which likely amount to inadmissible legal opinions—are not reliable and not admissible under Rule 702, and would confuse and mislead the jury").[3]

### B.  Jessop Lacks Expertise In The Subjects On Which He Opines

Jessop has no expertise in the subjects upon which he opines. An expert may be qualified to offer an opinion based upon his scientific training, education, or (as Jessop claims here) field experience. *See* Fed. R. Evid. 702; Jessop Rep. ¶ 5. But to be admissible, that experience must bear on the topics of the testimony. As the Ninth Circuit has explained, "[a] layman, which is what an expert witness is when testifying outside his area of expertise, ought not to be anointed

---

[3] Irrelevant and inadmissible too are Jessop's extensive "personal recommendations" for handling metadata—some directed to YouTube, and others directed to third-party creators or users of video editing software (*see* Jessop Rep. ¶¶ 34, 116-136; Jessop Tr. 179:24-181:13; 204:3-207:23). What Jessop feels YouTube or others "should" do ***in the future*** has no bearing on whether Plaintiffs have ***presently*** shown that YouTube violated Section 1202.

1    with ersatz authority as a court-approved expert witness for what is essentially a lay opinion."

2    *White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002).

3          Jessop opines on YouTube's technology (and on the conduct and motivations of

4    "platforms," "developers," "users," and supposed "infringers") (*see generally* Jessop Rep. ¶¶ 30-

5    31, 35, 75-76, 100-102, 111-115, 125, 127, 129-130, 133, 137, 153-157, 160-172), but he admits

6    to having no experience with or knowledge of YouTube's algorithms or transcoding process.

7    Even more, he testified that he has ***no professional experience with video transcoding generally***

8    ***or with any online search engine or platform for user-generated content***. *See* Jessop Tr. 9:18-

9    13:5 ("no professional expertise in the practice" of video transcoding; transcoding experience

10   limited to "hobbyist, amateur capacity"); 144:1-16 ("Q. And the details of how YouTube's

11   transcoding process works is not something that you can provide firsthand factual testimony

12   about; correct? A. Correct."); 160:23-161:6 ("Q. Ultimately, precisely what the nature of …

13   [YouTube's] transcoding process or otherwise, that's all a matter of fact; correct? A. It's a matter

14   of fact that's not available to me, but somebody somewhere knows what exactly is going on. Q.

15   And that person is not you? A. That person is not me.").

16         Likewise, while Jessop opines on the third-party video editing software that apparently

17   generates CLFN metadata (Jessop Rep. ¶¶ 32, 143-145, 150), he claims expertise in such

18   software only "at a user interface level." *See* Jessop Tr. 13:6-14:22 ("I am not familiar with the

19   internals or what happens within the software package beyond its user interface."). In other

20   words, he is a software user, not an expert. And while Jessop speaks to metadata-processing and

21   other costs (Jessop Rep. ¶¶ 125, 127, 129), he admits that he is ignorant of YouTube's costs (or

22   even the costs of metadata storage and processing generally). Jessop Tr. 111:3-112:9, 209:2-

23   212:2, 212:18-213:14 ("Looking at YouTube in particular, you don't have information, sir, as to

24   the relative cost to YouTube of keeping metadata versus picking and choosing it; correct? A: I

25   have no such information.").

26         A lack of expertise also characterizes Jessop's opinions on metadata itself. While he

27   asserts experience with "technical standards" for metadata and "standard identifier codes," by his

28   own admission, that does not qualify Jessop as an expert on "CLFN" metadata. Jessop Rep. ¶¶

1   147, 151-152; *e.g.*, Jessop Tr. 234:18-237:4. In fact, ***Jessop had not even heard of "CLFN"***

2   ***metadata prior to his work on this case.*** *Id.* ("I would not expect to have heard of it because it's

3   the parameter in a video context, and my expertise is in audio and my experience is in audio").

4   Expert opinion must have "a reliable basis in the knowledge and experience of [the relevant]

5   discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (citation omitted); *accord*

6   *White*, 312 F.3d at 1008-09; *see also In re Ford Tailgate Litig.*, 2015 WL 7571772, at *6 (N.D.

7   Cal. Nov. 25, 2015) ("Even the most qualified expert cannot offer any opinion on any subject;

8   the expert's opinion must be grounded in his or her personal 'knowledge, skill, experience,

9   training, or education.'" (quoting Fed. R. Evid. 702)). That is entirely absent here.

10            **C.  Jessop's Matching Process Is Not The Product Of Any Reliable Or Scientific**
                  **Methodology**
11

12            What little analysis Jessop undertakes is unscientific. He claims to have employed a

13   matching process to identify potential copyright management information within the metadata of

14   video files. *See generally* Jessop Rep. ¶¶ 137-146. Jessop merely looked at the metadata

15   YouTube produced from the videos Plaintiffs originally put at issue (the metadata of 727 videos)

16   for anything "interesting." *Id.*; Jessop Tr. 239:5-240:24, 241:13-246:20. Though he knew nothing

17   about CLFN metadata, he saw that in the metadata for ten of the videos, the CLFN field was

18   populated with text. *See* Jessop Rep. ¶ 146; Jessop Tr. 123:1-12, 242:3-10. In that text, he

19   recognized the titles of nine of Schneider's compositions, then looked at the video to conclude it

20   contained a rendition of that composition. *See* Jessop Rep. ¶ 146; Jessop Tr. 265:11-266:13.[4]

21   This is not expert analysis as contemplated by the Federal Rules. The matching process Jessop

22   undertook—manually identifying titles of Ms. Schneider's songs that appeared within a given

23   metadata field—was no more scientific (and required no more skill) than asking an ordinary

24   observer to spot common text in two separate passages. *See* Jessop Rep. ¶ 165 ("This deleted

25   metadata is not obscure or hidden – a few minutes scanning the files allowed it to be seen ….").

26   _____

27      [4] Jessop also testified that he conducted a "test" of YouTube's technical capabilities by
     running a few Google searches (of which he has no record and about which he could recall little).
28   *See* Jessop Rep. ¶¶ 158-159 (recounting results of his "simple test"); Jessop Tr. 271:10-273:5.
     Unverified Google searches do nothing to render his methodology any more sound or "expert."

1   Equally unscientific was Jessop's process for confirming that certain videos contained Ms.

2   Schneider's works—namely, by listening to them (*see* Jessop Tr. 266:6-13 ("I'm no musicologist

3   … but I'm a jazz fan and I listened to them ….").

### D. Jessop's Testimony Will Not Be Helpful To Jurors And Will Instead Confuse Or Mislead Them

6   Much of Jessop's testimony (as cited below) is separately subject to exclusion because

7   his irrelevant testimony and use of misleading hypotheticals will not help the trier of fact to

8   understand the evidence or to determine a fact in issue, Fed. R. Evid. 702(a), but would instead

9   tend to confuse or mislead the jury—far outweighing any probative value. *See Daubert*, 509 U.S.

10  at 595 (recognizing that Rule 403 has a special significance for proposed expert testimony and

11  that trial courts may "exercise[] more control over experts than over lay witnesses").

12  ***ISRCs.*** In support of Maria Schneider's CMI claim, Jessop opines that (1) ISRCs are

13  often associated with recorded music; (2) video editing software programs often remove

14  metadata (potentially including ISRCs); and (3) YouTube is liable since it must know that videos

15  uploaded ***with*** music, but ***without*** ISRC codes, had that metadata improperly removed by

16  someone. Jessop Rep. ¶¶ 32-34, 165, 169-172. Jessop's testimony is both irrelevant and

17  prejudicial.

18  Jessop's ISRC testimony is *irrelevant* because a host of cases holds that failing to carry

19  CMI forward from one work into another is not cognizable under Section 1202. *See, e.g.*, *Kipp*

20  *Flores Architects, LLC v. Pradera SFR, LLC*, 2022 WL 1105751, at *3 (W.D. Tex. Apr. 13,

21  2022) ("'Removal' of CMI from a copyrighted work is not the same as the failure to add CMI to

22  a nonidentical rendition or a derivative of the protected work."); *Robert Stark Enters., Inc. v.*

23  *Neptune Design Grp., LLC*, 2017 WL 1345195, at *11 (N.D. Ohio Apr. 12, 2017) (creation of

24  new derivative work without Plaintiff's CMI is not "removal" under § 1202; *Dolls Kill, Inc. v.*

25  *Zoetop Bus. Co.*, 2022 WL 16961477, at *3 (C.D. Cal. Aug. 25, 2022) ("The DMCA prohibits

26  removing or altering CMI; it does not prohibit merely omitting CMI from an infringing work.").

27  Jessop's ISRC testimony is *unfairly prejudicial* because it is at odds with the actual facts

28  of the case. As Jessop admits, there are all sorts of music videos on YouTube that never carried

1   ISRCs. For example, the music in videos of orchestral performances (which comprise most of

2   Schneider's alleged infringements) would never contain ISRCs, and thus the video creator would

3   not have removed it from (or failed to add it to) the video. Jessop Tr. 186:20-188:20. Further, as

4   Jessop confessed in deposition, he downloaded an official copy of a Schneider album, but none

5   of the songs bore ISRCs. *See* Jessop Tr. 116:5-118:2. Use of those audio files to create a video

6   likewise would not implicate the removal of ISRCs at all. Most importantly, there is no evidence

7   of even a single instance of anyone using Schneider's music in a video where the music carried

8   an ISRC that the user failed to carry forward into the video. In other words, Jessop's testimony

9   on ISRCs is irrelevant and properly excluded under Rule 403.[5]

10      ***Jessop's Hypothetical.*** Jessop compounds the problem with a protracted hypothetical in

11   his report concerning "Mary Doe," "[r]enowned composer and band leader" of the "Mary Doe

12   Orchestra." Jessop Rep. ¶¶ 42-61. Jessop imagines that Mary Doe's sound recordings are made

13   available for download with ISRC codes embedded in metadata, and that uploaded videos also

14   contain CMI in a "CLFN" metadata field that was subsequently "stripped by YouTube." Jessop

15   imagines Doe searched for this CMI looking for unauthorized copies of her works and was,

16   accordingly, unable to find them. *Id.* ¶¶ 42-61, 126. This thinly-veiled attempt to evoke Maria

17   Schneider describes a materially different set of facts from those present in this case. Indeed,

18   Jessop admitted his hypothetical was not "representative," but rather showcases "the scope and

19   breadth of the opportunities" to use metadata. *See* Jessop Tr. 136:5-24.

20      In reality, Schneider has identified no instance where the removal of "CLFN" metadata

21   rendered her unable to identify any allegedly infringing video on YouTube's service. *See* Defs.'

22   Reply in Supp. of Summ. J., Dkt. No. 173 at 11-12. Jessop tried (and failed) to create a video

23   containing "CLFN" metadata. Jessop Tr. 118:20-119:24, 126:12-127:7. And again, there is no

24

25      [5] Jessop's other "opinions" on ISRCs are also improper. They consist mostly of his musings
    about what YouTube (or others) "could," "should," or "ought" to do. *E.g.*, Jessop Rep. ¶ 121

26   ("YouTube could instruct or require uploaders to include the associated ISRCs or related CMI
    metadata of any component works included in their videos."); ¶ 118 ("There should be a

27   presumption of delivery of metadata down the production chain. Unless a clear harm can be
    shown from delivering it, downstream users should be allowed to use it."); ¶ 119 ("Importantly,
    when a composite or derivative work is created, the metadata from the components ought to be

28   included in the final result."). But again, recommendations about what YouTube could or should
    do have no bearing on YouTube's supposed liability today.

DEFS' MOT TO EXCLUDE WINOGRAD/JESSOP        -14-        CASE NO. 3:20-cv-04423-JD

1   evidence of any allegedly infringing video containing a Schneider sound recording that once

2   carried an ISRC that was not carried forward into a video along the way. Jessop's mishmash of

3   fantasy and supposition is more likely to sow juror confusion than anything else, and should be

4   excluded. *See generally* 56 A.L.R.3d 300 (1974) ("[C]ourts uniformly recognize that the factual

5   assumptions made in a hypothetical question propounded to an expert witness must remain

6   within the range of the issues and include only such matters as are supported by the evidence,

7   directly or inferentially.")

8                                         **CONCLUSION**

9           The Winograd and Jessop reports are Plaintiffs' attempt to fill the record with faux

10  evidence and attorney rhetoric. They are not proper expert testimony. YouTube respectfully

11  requests that this Court exclude the proffered testimony of Joseph Winograd and Paul Jessop in

12  its entirety from all pending motions and at trial, including in connection with Plaintiffs' motion

13  for class certification. In the alternative, YouTube asks the Court to strike the portions of

14  Winograd's and Jessop's reports identified above.

15

16                                              Respectfully submitted,

17  Dated:  March 3, 2023                       WILSON SONSINI GOODRICH & ROSATI

18                                              Professional Corporation

19
                                                By: _____ */s/ David H. Kramer* _____
20                                                     David H. Kramer
                                                       dkramer@wsgr.com
21
                                                Attorneys for Defendants and Counterclaimants
22                                              YOUTUBE, LLC and GOOGLE LLC

23

24

25

26

27

28