Exhibit 2

to the Declaration of Kelly M. Knoll ISO
Defendants' Motion to Exclude Testimony
from Joseph M. Winograd and Paul Jessop

Public Redacted Version

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
 5    _____
                                      )
 6    MARIA SCHNEIDER, UNIGLOBE       )
      ENTERTAINMENT, LLC, and AST     )
 7    PUBLISHING LTD., individually and )
      on behalf of all others similarly )
 8    situated,                       )
                                      )
 9              Plaintiffs,           )
                                      )
10    vs.                             ) No. 3:20-cv-4423
                                      )
11    YOUTUBE, LLC; and GOOGLE LLC,   )
                                      )
12              Defendants.           )
      _____)
13
14
15         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
16         VIDEOTAPED DEPOSITION OF JOSEPH M. WINOGRAD
17                San Francisco, California
18              Thursday, September 29, 2022
19                       Volume I
20
21    Reported by:
      CATHERINE A. RYAN, RMR, CRR, B.S.
22    CSR No. 8239
23    Job No. 5490258
24
25    PAGES 1 - 281
```

                                                    Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
 5   _____
                                       )
 6   MARIA SCHNEIDER, UNIGLOBE         )
     ENTERTAINMENT, LLC, and AST       )
 7   PUBLISHING LTD., individually and )
     on behalf of all others similarly )
 8   situated,                         )
                                       )
 9            Plaintiffs,              )
                                       )
10   vs.                               ) No. 3:20-cv-4423
                                       )
11   YOUTUBE, LLC; and GOOGLE LLC,     )
                                       )
12            Defendants.              )
     _____)
13
14
15
16
17            Videotaped deposition of JOSEPH M.
18   WINOGRAD, Volume I, taken on behalf of Defendants,
19   with the Witness appearing at WILSON SONSINI
20   GOODRICH & ROSATI, One Market Street Spear Tower,
21   Suite 3300, San Francisco, California, beginning at
22   9:13 a.m. and ending at 4:56 p.m., on Thursday,
23   September 29, 2022, before CATHERINE A. RYAN,
24   Certified Shorthand Reporter No. 8239.
25
```

                                                Page  2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES:
 2
 3    For Plaintiffs:
 4        KOREIN TILLERY
          BY:  GEORGE A. ZELCS
 5        Attorney at Law
          205 North Michigan Plaza, Suite 1950
 6        Chicago, Illinois  60601
          (312) 641-9750
 7        (312) 641-9751 Fax
          gzelcs@koreintillery.com
 8
          BY:  ANDREW ELLIS (appearing remotely)
 9        Attorney at Law
          505 North 7th Street, Suite 3600
10        St. Louis, Missouri  63101
          (314) 241-4844
11        aellis@koreintillery.com
12        BOIES SCHILLER FLEXNER LLP
          BY:  ROBERT DWYER (appearing remotely)
13        Attorney at Law
          55 Hudson Yards, 20th Floor
14        New York, New York  10001
          (212) 303-3524
15        (212) 446-2350 Fax
          rdwyer@bsfllp.com
16
17    For Defendants:
18        WILSON, SONSINI, GOODRICH & ROSATI, P.C.
          BY:  DAVID H. KRAMER
19            QIFAN HUANG
          Attorneys at Law
20        650 Page Mill Road
          Palo Alto, California  94304
21        (650) 320-4741 (Mr. Kramer)
          (650) 849-3456 (Mr. Huang
22        dkramer@wsgr.com
          qhuang@wsgr.com
23        lwhite@wsgr.com
24
25    //
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   APPEARANCES (Continued):

 2

 3   For Defendants:

 4        WILSON, SONSINI, GOODRICH & ROSATI, P.C.
          BY:  LAUREN GALLO WHITE

 5        Attorney at Law
          One Market Street

 6        Spear Tower, Suite 3300
          San Francisco, California  94105

 7        (415) 947-2058
          lwhite@wsgr.com

 8
          (Ms. White was not present at the commencement

 9        of the deposition proceedings.)

10

11

12   ALSO PRESENT:

13   PETER YAROSCHUK, Videographer, Veritext

14

15

16

17                    ---o0o---

18

19

20

21

22

23

24

25

                                          Page  4
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | the VP1 audio and video watermarking technologies | 09:50:40 |
| 2 | were part of a package of standards.  The package of | |
| 3 | standards is known -- referred to by ATSC as "ATSC | |
| 4 | 3.0."  It's their third-generation broadcast -- | |
| 5 | terrestrial broadcast system.  And it had many parts | 09:50:58 |
| 6 | to it.  The video and audio watermarking is just one | |
| 7 | part. | |
| 8 | It included new technology for | |
| 9 | transmitting television signals.  It had to undergo | |
| 10 | certain types of FCC review before it could actually | 09:51:15 |
| 11 | go into the market.  It required -- for the -- for | |
| 12 | this -- for these other parts of the system, not for | |
| 13 | the watermarking itself, it required that new chips | |
| 14 | be designed and built, new receiver chips for | |
| 15 | television sets.  The process of designing, testing, | 09:51:31 |
| 16 | and manufacturing that silicon has -- takes some | |
| 17 | time. | |
| 18 | So it's -- it's part of a large program, a | |
| 19 | large effort.  And it took some time for it to, you | |
| 20 | know, go through all of these stages, from | 09:51:44 |
| 21 | standardization to, you know, testing, to design, to | |
| 22 | getting through the manufacturing pipeline and into | |
| 23 | consumers' hands. | |
| 24 | Q    After the standard was approved, was it | |
| 25 | announced publicly? | 09:51:56 |

Page 34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        A    Yes, it was.                               09:51:57

2        Q    By whom?

3        A    ATSC, as -- I assume you're referring to

4   the -- the 2015 standardization of the two documents

5   that are cited, A/334 and A/336?                      09:52:10

6        Q    I am.

7        A    Okay.  Let's just be clear about that.

8             ATSC's practice, because these are open

9   standards, is they post to their website an

10  announcement of every new standard being published.   09:52:26

11            They made an announcement -- it may -- I

12  believe it's also the case that Verance made its own

13  announcement related to those -- that standard

14  selection of our technology.

15       Q    Sir, have you ever worked for an online      09:52:38

16  service hosting user-generated content?

17       A    I have not.

18       Q    What firsthand experience do you have in

19  operating a social media or user-generated content

20  platform?                                             09:52:51

21       A    I have not operated a social media or

22  user-generated content platform.

23       Q    Did you have any experience using

24  YouTube's copyright management tools before you were

25  engaged by Plaintiffs in connection with this case?   09:53:10
```

Page 35

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A    I did not.                                        09:53:13

2        Q    Do you have experience in how social media

3   services other than YouTube approach copyright

4   management?

5        A    I have some familiarity.                          09:53:21

6        Q    Which ones?

7        A    I'm aware that Facebook has a copyright

8   management system.

9        Q    Well, my question wasn't whether you're

10  aware of other copyright management systems.               09:53:33

11            It's:  Do you have experience working with

12  the copyright management systems of other social

13  media services?

14       A    I see.

15            MR. ZELCS:  I thought the question was            09:53:44

16  whether he had familiarity, but the record will

17  show.

18  BY MR. KRAMER:

19       Q    You can answer, sir.

20       A    Okay.  Can you re-ask the question --            09:53:55

21       Q    Sure.

22       A    -- you'd like me to answer?

23       Q    Do -- do you have experience in working

24  with how other social media services other than

25  YouTube approach copyright management?                     09:54:04

Page 36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A      Perhaps we should clarify what you mean by          09:54:11

2  "experience working with."

3      Q      Have you helped develop copyright

4  management tools for social media platforms?

5      A      So the -- I would say the Cinavia          09:54:22

6  technology is applicable to copyright management on

7  social media platforms, although it has not, to

8  date, been applied there.

9      Q      So then you've not worked with any social

10  media platform with respect to their copyright          09:54:35

11  management systems?

12      A      I see.

13          The -- so the question is have I worked

14  with a social media platform on their copyright

15  management system?          09:54:44

16      Q      Yes, sir.

17      A      Not that I recall.

18      Q      Do you have personal knowledge of a social

19  media service, other than YouTube, that has invested

20  hundreds of millions of dollars developing and          09:54:58

21  operating copyright management tools?

22      A      I haven't been exposed to information

23  about what companies, other than YouTube, have spent

24  on developing copyright management tools.

25      Q      So that's a "no"?  You are not aware of          09:55:14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    any other social media service that has invested          09:55:16

 2    hundreds of millions of dollars to develop copyright

 3    management tools?

 4        A    I have not been provided any information

 5    about any amount that they've spent; so, I -- I           09:55:25

 6    don't have information on who's spent more or less

 7    than any amount that you might state.

 8        Q    So my question is:  Are you aware of any?

 9             And since you have no information, the

10    answer is, "no," you're not aware of any other            09:55:37

11    social media service that has spent hundreds of

12    millions of dollars on copyright management tools,

13    right?

14        A    The answer is the answer that I gave you.

15        Q    Given that you've never worked with a            09:55:49

16    social media service on copyright management tools,

17    is it fair to say that you don't have any experience

18    assisting social media services in policing abuse of

19    their copyright management tools?

20        A    I have not assisted a social media service       09:56:09

21    in policing abuse of their copyright management

22    tools.

23        Q    Verance's technology, specifically

24    Cinavia, but I think all of them, use audio and

25    video watermarking, correct?                              09:56:22
```

Page 38

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A     I'm sorry.  Can you ask the question        09:56:25

 2   again?

 3        Q     Well, I'll ask it more simply.

 4              Verance's Cinavia technology is an audio

 5   watermarking technology, right?                        09:56:33

 6        A     That is correct.

 7        Q     Are all of Cinavia's products audio or

 8   video watermarking technologies?

 9        A     Cinavia is an audio watermarking

10   technology.                                            09:56:44

11        Q     Okay.  Are all of Varance's products audio

12   and video watermarking technologies?

13        A     I would say that all of the products that

14   we've built have related to audio or video

15   watermarking.                                          09:57:01

16        Q     To your knowledge, does YouTube's

17   Content ID system use watermarking technology?

18        A     I'm not aware of YouTube's Content ID

19   system using watermarking technology.

20        Q     How many distinct parties use Verance's     09:57:14

21   Cinavia technology?

22        A     I don't know the number.

23        Q     Is it hundreds?

24        A     Yes, I believe so.

25        Q     Is it more than that?                       09:57:23
```

Page 39

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1          A      I don't believe there's -- no, I don't      09:57:25

2    believe there's more than hundreds.

3               MR. KRAMER:  How long have we been going?

4    I don't have a watch.

5               MR. HUANG:  Forty-three minutes.              09:57:35

6               MR. KRAMER:  Let's keep going.

7               Are you okay to keep going for a little

8    bit?

9               THE WITNESS:  Yes.

10              MR. KRAMER:  Let's get marked Exhibit 1 to    09:57:41

11   your deposition your report, the "EXPERT REPORT OF

12   JOSEPH M. WINOGRAD FOR PLAINTIFFS."

13              I see you've got a copy in front of you

14   already, so I'll give you another one, and we'll

15   have one marked for the record.                          09:57:54

16              I'm sorry.

17              (Exhibit 1 was marked for identification

18              by the court reporter.)

19              THE WITNESS:  I should say:  In addition

20   to the answer I just gave to that question, I was        09:58:15

21   answering with respect to users who are using the

22   technology in direct relationship with Verance.

23              There are, of course, hundreds of millions

24   of consumer devices that include the Cinavia

25   technology by which consumers interact with the          09:58:33
```

Page 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   technology if they are using unauthorized copies of          09:58:37

2   copyrighted works protected by Cinavia.

3   BY MR. KRAMER:

4       Q    But Verance has no relationship with those

5   end users, right?                                            09:58:51

6       A    Not a direct business relationship; that's

7   right.

8       Q    If you would open your report, sir --

9            And I see -- you can use the copy that

10  you've got.  That's fine.                                    09:59:04

11      A    Thank you.

12      Q    -- to paragraph 22.

13           Are you there?  Great.

14           The first sentence says, quote:  "YouTube

15  collects, organizes, promotes and presents a body of         09:59:22

16  audiovisual content (which Defendants refer to as

17  'video') on a global basis."

18           Do you see that?

19      A    I do.

20      Q    Is that your opinion, sir?                          09:59:38

21      A    I -- I understand it to be a fact.

22      Q    So that's what you think is a fact?

23      A    Yes, it is.

24      Q    And how do you come by your belief that

25  that statement is true?                                      09:59:54

                                                                 Page 41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A     I -- this sentence has one, two, three,        09:59:57

 2    four, five -- six footnoted references in this

 3    single sentence, each of which provides support for

 4    each one of those statements.   In fact, nearly each

 5    word in the sentence is -- support is provided and       10:00:15

 6    reference is indicated in the footnotes.

 7        Q     Okay.  So you're just repeating something

 8    that you read in this sentence?

 9             MR. ZELCS:  Objection.  Form.

10             THE WITNESS:  I'm -- I'm characterizing          10:00:32

11    YouTube's activities.  I've synthesized the

12    information from material that I've reviewed, and

13    I'm presenting it as I think valuable introductory

14    material for this section III A of my report.

15    BY MR. KRAMER:                                            10:00:56

16        Q    The next sentence says, quote:  "Videos

17    are uploaded to the YouTube system by third parties

18    (Uploaders), some of whom are commercial partners of

19    Defendants (YouTube Partners) and others of whom are

20    simply members of the general public who have           10:01:17

21    created an account with Defendants and

22    clicked-through an agreement accepting the YouTube

23    Terms of Service."

24             Right?  I read that correctly, did I?

25        A    I believe so.                                   10:01:33
```

Page 42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q     Is that your expert opinion?                    10:01:33

2       A     It's my understanding of -- of basic facts

3   of the activities of the -- of users of YouTube and

4   the functions provided by the YouTube system, and,

5   again, providing it as a background and context for    10:01:56

6   this introductory paragraph of section III A of my

7   report.

8       Q     And how do you come by that information

9   that you just reported in that sentence?

10      A     Again, in -- in the case of this sentence,    10:02:07

11  I've provided two footnotes in this sentence

12  identifying supporting material that I've reviewed

13  and synthesized for the purpose of establishing the

14  context of this section.

15      Q     So that's your view of what the documents     10:02:23

16  say that are cited in footnotes 9 and 10 of your

17  report, right?

18      A     I -- that's -- the footnote -- the

19  document cited in footnotes 9 and 10 are the support

20  provided for this -- what I think is useful           10:02:43

21  background information in this introductory

22  paragraph.

23      Q     Do you think a jury could read those

24  documents and understand them?

25      A     These particular documents?  Which           10:02:54

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1            THE WITNESS:  That information is          10:13:37

2   available on this public web page.

3   BY MR. KRAMER:

4       Q    Okay.  Let's take a look at paragraph 36

5   of your report.                                      10:13:46

6            Are you there, sir?

7       A    Yes, I am.  Thank you.

8       Q    The last sentence of paragraph 36 of your

9   report says, quote:  "Defendants' Matching System

10  permits Content ID Partners to find video and audio  10:14:09

11  component matches ███████████████████████

    ██████████████████████████████████████████

    ███████████ "

14           And then there's a citation to footnote

15  37.                                                  10:14:26

16           Is the statement I just read your expert

17  opinion?

18      A    That's my understanding of the operation

19  of the system as characterized by the witness

20  Magagna.                                             10:14:44

21      Q    So this is what you think is a fact, what

22  you've reported there at the last sentence of

23  paragraph 36?

24      A    This is what Magagna represents as the

25  function of the system.  I'm -- I am including the   10:14:54
```

Page 52

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   information that he provided in this section of the      10:14:58

 2   report as, I think, an important piece of

 3   information for understanding the opinions given in

 4   the report, yes.

 5        Q    Do you have firsthand knowledge of this        10:15:13

 6   fact?

 7        A    I do not.

 8        Q    Have you personally worked with YouTube's

 9   Content ID system?

10        A    I have not.                                    10:15:21

11        Q    So the statement about the system's

12   capabilities, the last statement that we just read

13   at the end of paragraph 36, is just your

14   understanding of the deposition testimony you cite

15   in footnote 37, correct?                                 10:15:34

16        A    Without a doubt, the report relies, as

17   stated in Exhibit B, on the materials provided to me

18   for review and assessment.  And to the extent that

19   those information -- that information is unreliable

20   or incorrect information, then I may have, you know,     10:15:55

21   relied on -- on poor guidance.

22             My expectation and operation and creation

23   of the opinion and report was that this information

24   could be relied upon, and so -- and I did so.

25        Q    Make sure that you have the question in        10:16:16
```

Page 53

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    mind.  I'm going to read it back.                    10:16:17

 2             "The statement about the system's

 3          capabilities, the last statement that we

 4          just read at the end of paragraph 36, is

 5          just your understanding of the deposition    10:16:27

 6          testimony you cite in footnote 37,

 7          correct?"

 8          MR. ZELCS:  Objection.  Form.

 9          THE WITNESS:  I believe it's what's stated

10    in the record of that deposition in -- I cite       10:16:38

11    specific page numbers and line numbers.

12    BY MR. KRAMER:

13       Q   In paragraph 39 of your report, the last

14    sentence says, quote:  "Defendants' Matching System

15    is applied comprehensively to videos on YouTube, and  10:17:05

16    Content ID Partners are given broad control over and

17    access to their results."

18             I want to focus on the first phrase,

19    "Defendants' Matching System is applied

20    comprehensively to videos on YouTube."              10:17:21

21             Is that something you have firsthand

22    knowledge of, sir?

23       A   I'm not sure I fully understand your

24    meaning of the use of the term "firsthand

25    knowledge."                                         10:17:37
```

Page 54

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q     Do you know that by virtue of your work        10:17:38

 2   with the matching system that defendants apply?

 3        A     I have not done work with the matching

 4   system that Defendants apply.

 5        Q     So there's no citation for this               10:17:47

 6   proposition in your report, right?

 7        A     There is -- there is a citation in this

 8   report for that -- for that statement.  It's not

 9   attached to this sentence, but I could identify the

10   citation to the deposition of David Rosenstein,         10:18:07

11   where he -- he states that this is the case.

12        Q     So it's your testimony today that this

13   statement, "Defendants' Matching System is applied

14   comprehensively to videos on YouTube," is drawn from

15   the deposition testimony of Mr. Rosenstein?            10:18:24

16        A     That's -- that's -- I -- that's a -- a

17   source of support for this statement that I can

18   identify, sitting here now, for you.  There may be

19   others.

20        Q     And is this your expert opinion, or is        10:18:41

21   this simply repeating what you read from

22   Mr. Rosenstein?

23        A     This is, in this case, not me expressing

24   my own opinion.  It's me expressing the facts as I

25   understand them from review of the materials           10:18:53
```

Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    provided to me.                                    10:18:56

 2        Q    Paragraph 42, sir, of your report, is a

 3    long paragraph about how aspects of YouTube's

 4    Content ID system supposedly work.

 5            I'm going to ask you, if you would,        10:19:10

 6    please, to find for me something in here,

 7    paragraph 42, that you believe constitutes your

 8    expert opinion.

 9            Take your time to read it.

10            (Pause.)                                   10:19:21

11        A    So in this paragraph, I include a number

12    of citations for the various facts stated, and I

13    also characterize the net effect of these different

14    matching functions or search methods, as they're

15    called here, being used in combination.            10:20:37

16            And so I would say that one might view my

17    characterization of the purpose and combined effect

18    of these three search functions -- instant claiming,

19    instant reverse, and legacy scanning -- being used

20    as a matter of my having assessed the factual       10:21:01

21    functions of these three search methods.

22            And based on my knowledge and

23    understanding of how copyright management systems

24    are designed and the function that they need to

25    perform for their users, I applied expertise to --  10:21:25
```

Page 56

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    to characterize the relationship between these three      10:21:31

 2    methods and the -- their purpose and -- and the --

 3    you know, the -- what I understand to be the

 4    relationship and goals of them used in combination.

 5         Q    Where is the opinion, sir, in               10:21:54

 6    paragraph 42?

 7         A    I don't know that I --

 8              MR. ZELCS:  Objection.  Form.

 9              THE WITNESS:  I don't know that I stated

10    that there was an opinion here.  I said that I          10:22:00

11    synthesized these facts together with my expertise

12    to characterize their purpose.

13    BY MR. KRAMER:

14         Q    Were you involved in determining the

15    purpose of the various functionalities that are         10:22:11

16    described in paragraph 42 at YouTube?

17         A    In what respect was I involved?

18              I don't think I understand your question.

19         Q    Were you personally involved in

20    determining what purpose would be served by the         10:22:23

21    various functionalities that are described in

22    paragraph 42 of your report?

23         A    Do you mean --

24              MR. ZELCS:  Objection.  Form.

25              THE WITNESS:  Do you mean was I involved      10:22:31
```

Page 57

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   in -- in designing these systems?                    10:22:32

 2   BY MR. KRAMER:

 3        Q    Yes, sir.

 4        A    No, I was not.

 5        Q    So you wouldn't have firsthand knowledge,   10:22:35

 6   then, of the purpose for which these systems were

 7   designed, right?

 8             MR. ZELCS:  Objection.  Form.

 9             THE WITNESS:  Can you clarify what you

10   mean by "firsthand"?                                  10:22:48

11   BY MR. KRAMER:

12        Q    If you weren't involved in developing the

13   systems, you weren't involved in conversations with

14   people about what the purpose of the systems was,

15   right?                                                10:22:54

16        A    That's correct.  I was not involved

17   working with the people there.

18             So I understand my role as an expert in

19   developing this report and opinion is to take the --

20   the materials and facts and information provided to   10:23:08

21   me and combine that with my expertise and

22   understanding in the field of the design of

23   copyright management systems and the function of the

24   matching technologies, and to present my expert

25   assessment of that information, synthesize the        10:23:26
```

Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    information, and explain it in the clearest possible      10:23:29

 2    fashion as I understand it.

 3            That's -- that's what I've done here.  So

 4    I take facts, and I -- I use my expertise to draw

 5    inferences and -- and present characterizations.        10:23:38

 6        Q    In paragraph 43, sir, there are a series

 7    of factual assertions regarding how Content ID

 8    works.  I want to understand where you got those

 9    assertions from.

10            Is any of the information in paragraph 43       10:23:56

11    information that you have firsthand knowledge of, or

12    is it just stuff that you read?

13            MR. ZELCS:  Just for clarification, every

14    time you ask about firsthand knowledge, you're

15    asking about whether he built these systems and        10:24:10

16    worked at YouTube, right?

17            MR. KRAMER:  Not necessarily.  He could

18    have firsthand knowledge in some other way, but

19    I'm --

20        Q    The question is -- there's a distinction       10:24:19

21    between what you know and what you read somewhere in

22    connection with this case.

23            So with respect to the factual

24    propositions in paragraph 43, do you have any

25    firsthand knowledge of those assertions, or is it      10:24:28
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    just an assimilation or agglomeration of what you        10:24:32

 2    read?

 3         A    Okay.   Thank you.   I'll review

 4    paragraph 43, and then I'll try to answer your

 5    question.                                                 10:24:40

 6              (Pause.)

 7         A    Okay.   I've read the paragraph.

 8              My answer to your question is:   I have

 9    not -- the -- the description given in this

10    paragraph is not based on use of -- personal use of      10:25:55

11    the Content ID tool.   It's based -- this is --

12    characterizes my understanding of the operation of

13    the system based on review of the cited materials

14    and other -- in the document and those identified in

15    Exhibit B.                                                10:26:18

16         Q    Paragraph 57 of your report, sir, offers a

17    summary on how YouTube Search works.

18              Let me give you a second to get there.

19              MR. ZELCS:   Forty-seven?

20              MR. KRAMER:   Fifty-seven.                      10:26:28

21              MR. ZELCS:   Fifty-seven.   Thank you.

22    BY MR. KRAMER:

23         Q    And I'm quoting from the paragraph:   For

24    YouTube Search to find an infringing video, it must

25    have associated text annotations that the search         10:26:45
```

Page 60

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   engine can match to the user's entered query string.      10:26:48

 2           Do you see that in paragraph 57?

 3      A    I do.

 4      Q    Is there a citation to anything for that

 5   assertion in paragraph 57?                                 10:27:05

 6      A    There is not.

 7      Q    Is that something that is your expert

 8   opinion?

 9      A    It's -- it's my understanding based on

10   review of the documentation -- public documentation       10:27:43

11   provided on YouTube Search.  It's cited elsewhere in

12   the document, perhaps not on this sentence.

13      Q    Did you conduct any experiments to

14   establish or assess the validity of that assertion?

15      A    I did not conduct experiments on this            10:28:01

16   assertion.

17      Q    Do you know that statement to be true?

18      A    It's my -- it reflects my understanding,

19   yes.

20      Q    And where did you get that information       10:28:12

21   from, sir?

22      A    The citation -- or the source that I can

23   direct you to in -- sitting here now is the second

24   from the bottom on page 79 of my report in

25   Exhibit B.  It's a document titled "YouTube Search."     10:29:07
```

Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    year-over-year basis, including increasing the scale      13:33:04

 2    of its use of Content ID; and that it's my view,

 3    based on the review of information I've been given,

 4    as well as my expertise and experience leading

 5    technology development and delivery of copyright          13:33:16

 6    management tools, that -- that to expand the use

 7    of -- expand access to matching systems would not,

 8    you know, be a -- be a multiplier on the amount of

 9    costs that they're expending, in particular given

10    that, as the record shows, in particular              13:33:43

11    Rosenstein's deposition, that all of the content

12    that's being uploaded to YouTube in increasing

13    amounts on a daily basis, hundreds of hours of

14    content per minute, are all being matched against

15    each other in the defendants' ordinary course of     13:33:59

16    business; and that in -- in many cases, the

17    additional work would simply be that of exposing

18    information that the defendant's already producing

19    and already has on matches between content that's

20    been identified as infringing or has been identified  13:34:17

21    as owned by a party, it's just a matter of exposing

22    that existing information to the copyright owners.

23            MR. KRAMER:  Move to strike.

24        Q    In paragraph 96 of your report, sir, you

25    say, quote (as read):  I have not been provided with  13:34:30
```

Page 147

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1     information that could be used to project the amount        13:34:32

2     of additional content expand- -- additional content

3     expanding access to Content ID would attract to the

4     service nor the associated monetary or computational

5     costs that Defendants would consequential --               13:34:45

6     consequentially bear.

7              Do you see that?

8        A    You went a little fast for me.

9              Did you start at the beginning of 96, or

10    did you start on the second sentence of 96?               13:34:58

11       Q    I started on the second sentence.

12       A    Thank you.

13       Q    "I have not been provided with information

14    that could be used to project the amount of

15    additional content."                                      13:35:04

16       A    Yes.  Yes, I see that sentence.

17       Q    Is that statement true?

18       A    Yes.

19       Q    So you don't know what the added costs

20    would be, right?                                          13:35:18

21       A    What I don't know is the incremental

22    amount of content that would be added to the system

23    separate and apart from what might ordinarily be

24    added to the system, absent this capability.

25       Q    So back in paragraph 95, you said that            13:35:33
```

Page 148

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    YouTube could expand access within its existing        13:35:36

 2    capability and budget, but you don't know what their

 3    actual budget is, and you don't know what the

 4    increased costs would be, right?

 5         A    Not with specificity, no.                     13:35:51

 6         Q    Okay.  Back on that same sentence in

 7    paragraph 95, you say that YouTube could expand

 8    access to effective tools with little technical

 9    risk.

10              What do you mean by "technical risk"?         13:36:06

11         A    So -- so in -- in the course of my work as

12    the chief technology officer for Verance, I'm often

13    called upon, and have been over the course of my 27

14    years there, to look at different paths of

15    developing product, services, capabilities, and      13:36:27

16    provide an assessment to leadership at the company

17    of:  If we try to do this, will it work?  And that

18    is really:  Can it be done on time, on budget, and

19    will it meet the identified need?

20              And those are the primary components of      13:36:49

21    technical risk.  And to assess that, you'd take into

22    account, you know, your expertise, historical

23    knowledge of both the team's capability of

24    delivering capabilities and the, you know, financial

25    circumstances of the organization.                     13:37:16
```

Page 149

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              And taking into consideration these        13:37:22

 2      factors, as well as the information I've reviewed in

 3      the preparation of this report, much of which is

 4      described herein, that's my assessment.

 5          Q    So if I can parse what you just said, when  13:37:36

 6      you talk about technical risk, you mean can it be

 7      done on time, on budget, and will it meet the

 8      identified need; is that correct?

 9          A    Yes.

10          Q    You told me, though, that you don't know,   13:37:52

11      for example, what Verance's budget is, right?

12          A    I said I don't know that -- if we -- if we

13      have a budget, yes.

14          Q    How can you be called upon to determine

15      whether something is going to be within Verance's    13:38:05

16      tolerances for technical risk if you don't know the

17      budget?

18          A    I didn't say I don't know the budget.

19      What I said is I don't know if the organization as a

20      whole has a budget.                                  13:38:19

21              I'm not in charge of our sales and

22      marketing efforts.  I'm not in charge of our legal

23      efforts.  I'm not in charge of our finance efforts.

24      And so the information that I work with and review

25      is in relation to our developing technologies, doing 13:38:31
```

Page 150

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MR. KRAMER:                                    13:42:09

 2       Q    YouTube could expand access to effective

 3   tools with little technical risk is your opinion,

 4   sir?

 5       A    Yes, sir.                                13:42:17

 6       Q    Have you worked in YouTube engineering,

 7   sir?

 8       A    I have not.

 9       Q    How many engineers would it take for

10   YouTube to develop this system?                   13:42:22

11       A    I wasn't given information on the number

12   of engineers that are working in the organization.

13            I was given information, which I think was

14   important and valuable in this assessment, as to the

15   expenditures and the accomplishments of the        13:42:36

16   engineers based on those expenditures.

17       Q    Is that your way of saying, "I don't know

18   how many engineers it would take"?

19       A    I gave you the answer I gave you, which is

20   I wasn't given information, et cetera, et cetera.  13:42:48

21       Q    How much money would it cost YouTube to

22   develop a system of the kind you envision YouTube

23   rolling out in paragraph 93 of your report?

24       A    Yeah.  So as the -- for the -- the

25   approach -- hypothetical approach that I outline in  13:43:06
```

Page 155

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    93, as I said a few minutes ago in the answer that I        13:43:11

2    think you said was unhelpful, I described these sort

3    of five bullet points as potentially representing

4    five features.

5           And if you were to consider the most             13:43:29

6    recent information about YouTube's ability for their

7    engineering expenditures in 2020 to -- to accomplish

8    their 60 tasks, I would say this represents -- if

9    you were to take each one of these -- each one of

10   these features and consider them an independent         13:43:47

11   feature, right, it's -- 5/60ths of that annual

12   effort would be likely needed to -- to accomplish

13   this, so a fraction -- I believe it's below

14   10 percent -- of their development effort.

15          And that's if these features have an            13:44:05

16   effort associated with them that is comparable -- on

17   average, comparable to the average effort of the

18   features that they had billed during that 2020

19   period.  And that's a methodology for assessing

20   the -- a benchmark for the effort that would be        13:44:25

21   required to accomplish this.

22        Q    Do you have any information to suggest

23   what was involved in developing the features of a

24   development list from 2020 in terms of the features

25   that were listed there?                                 13:44:44
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A     So the analysis -- the logic that I just      13:44:46

 2    gave you is -- doesn't require that I perform an

 3    individual assessment.

 4            What I did was I said, "Let's consider

 5    these features as representing a level of effort        13:45:01

 6    that is comparable to an average feature."

 7            So each one of those 60 features built in

 8    2020 is a 60th of the effort, on average, and you

 9    can apportion that to these features.

10            I, frankly, think that's a generous           13:45:19

11    estimate, because these features are not new

12    capabilities.  Each of the features outlined in

13    paragraph 93, frankly, is a feature that has already

14    been implemented, tested, and is being delivered to

15    customers in the Content ID system.                   13:45:32

16            So I think it may be reasonable to expect

17    that the cost associated with -- with performing

18    this would be less than that average, but I'll --

19    I'll grant the average as a best estimate based on

20    the information available.                            13:45:47

21        Q     You have absolutely no idea of what was

22    involved to develop any of the features on the list

23    of features developed by YouTube in 2020.

24            You weren't there, were you?

25            MR. ZELCS:  Objection.  Form.               13:46:01
```

Page 157

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Argumentative.  It's not a question.  It's a          13:46:01

 2    statement.

 3    BY MR. KRAMER:

 4         Q    Were you working at YouTube in 2020?

 5         A    I was not working at YouTube in 2020.        13:46:08

 6         Q    Do you know what was involved in terms of

 7    resources to develop any of the features on

 8    YouTube's feature list of accomplishments in 2020?

 9         A    I think if asked to do so, I would be able

10    to identify, from the descriptions provided in the    13:46:23

11    cited document, features which are large features,

12    features which are small features, based on, again,

13    my extensive experience over time in building and

14    delivering copyright management tools.

15         Q    For YouTube?                                 13:46:44

16         A    Is that a question?

17         Q    Yes.  You've developed copyright

18    management tools for YouTube?

19         A    No.  I didn't.

20         Q    Okay.                                        13:46:52

21         A    My -- my understanding of YouTube's

22    expenditures comes from their expenditure statement,

23    where I have, side by side in these two documents,

24    cited in footnote 112 the amount that they spent and

25    what they accomplished with that expenditure.         13:47:03
```

Page 158

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q    I'm sorry.  So based on your view of the      13:47:07

 2   expenditure statements, you think you can project

 3   what the technical risk would be for YouTube to

 4   offer four features that it currently doesn't offer?

 5        A    These are features -- I'm sorry -- that      13:47:18

 6   they do offer.  As I've stated, there's five of them

 7   as well.

 8        Q    So without any firsthand information

 9   regarding the level of resources required for any of

10   the development projects YouTube undertook in 2020,      13:47:31

11   you think you can opine that the features identified

12   in paragraph 23 could be developed at some

13   relatively low cost?

14        A    That -- that's -- that is my estimate

15   based on the information provided and my assessment,      13:47:49

16   yes.

17        Q    Okay.  Do you have all the information

18   that's necessary to provide that opinion?

19        A    I believe that the opinion is

20   appropriately tailored to the -- in specificity, as      13:48:03

21   I've identified, I don't have -- I don't have

22   greater specificity than this, than -- to the

23   information available.

24        Q    How long would it --

25        A    That's my best estimate.      13:48:16
```

Page 159

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q      Sorry.                                    13:48:17

 2               How long would it take YouTube to develop

 3      the version of the Copyright Match Tool that you

 4      describe in paragraph 93?

 5        A      Do -- what do you mean by "you"?  Can you   13:48:29

 6      clarify that?

 7        Q      How long would it take YouTube to develop

 8      a version --

 9        A      Oh, YouTube.

10        Q      -- to develop a version of the Copyright   13:48:35

11      Match Tool that you describe in paragraph 93?

12        A      I see.  I understand.  I thought you

13      said --

14               MR. ZELCS:  He did say "you."

15               THE WITNESS:  -- "you too" --             13:48:42

16               MR. ZELCS:  You did say "you."

17               THE WITNESS:  -- "you too."

18               Yeah.  Okay.

19               MR. KRAMER:  I didn't.  The record is --

20               MR. ZELCS:  We'll get there.              13:48:47

21               MR. KRAMER:  Okay.  The record is what it

22      is.

23               THE WITNESS:  How long would it take

24      YouTube to develop this?

25      //
```

                                                Page 160

```
 1    BY MR. KRAMER:                                       13:48:51
 2         Q     Yes.
 3         A     And you mean in -- in elapsed calendar
 4    time?
 5         Q     Sure.  Let's start there.                 13:48:58
 6         A     I don't know.
 7         Q     How about in terms of person hours?
 8         A     I don't know.
 9               To -- to determine that, right, would
10    require additional information.                      13:49:11
11               So we've got the amount of work
12    accomplished and the amount of expense to accomplish
13    it without identifying the number of people that
14    that money was amortized across.
15               So person hours, I don't think can be --  13:49:24
16    can be estimated from that information.  We'd need
17    to know the number of people.
18         Q     You don't know that?
19         A     The number of people?
20         Q     Yes.                                      13:49:36
21         A     No, it's not included in the -- either of
22    the two documents on the subject that I've received,
23    which are both cited in footnote 112.
24         Q     And you don't know how productive those
25    people are, right?                                   13:49:46
```

Page 161

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A    I -- I do from the -- not on an individual        13:49:47

 2   basis, but on an aggregate basis, I do by seeing the

 3   60 features that they delivered in 2020 at an

 4   expense of ▇▇▇▇▇▇▇▇.

 5        Q    What is the relationship between the              13:50:02

 6   features they delivered in 2020 and the features you

 7   describe as desirable in a version of the Copyright

 8   Match Tool in paragraph 93?

 9        A    Yeah.  Well, one relationship is that the

10   features that are identified in paragraph 93 are         13:50:13

11   features they've already built I'm suggesting could

12   be repurposed.

13             So, in fact, I expect the cost, as I've

14   said a few minutes ago, would be less to repurpose

15   an already-built tool than it would be to build a       13:50:24

16   new -- a new feature from scratch.

17        Q    Are you suggesting that the tool that

18   you're describing in paragraph 93 exists today?

19        A    I'm suggesting that the elements of it

20   exist today, but not in this combination.                13:50:34

21        Q    And based on your review of other features

22   that were developed by YouTube in 2020 that may have

23   nothing to do with this, you are willing to say that

24   you think that the engineering time and cost

25   associated with building out the tool you describe       13:50:50
```

Page 162

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    "misuse of those tools," but you don't know what          14:13:13

2    those rates are, do you?

3         A    Again, I -- I said my understanding is

4    based on documents that I'd be happy to look at.  I

5    identified the documents.  We can --                      14:13:22

6         Q    The Transparency Report?

7         A    -- bring them forward, if you'd like, yes.

8         Q    Right.  The one that -- but that doesn't

9    speak about levels of abuse and misuse.  It speaks

10   about numbers of disputes.  And I think you agreed        14:13:29

11   that there was a difference between the two.

12        A    Is there a question?

13        Q    Do you agree that there's a difference

14   between levels of disputes and levels of abuse?

15        A    Yes, I think that is the case.                  14:13:44

16        Q    Okay.  The Copyright Transparency Report

17   measures disputes, right?

18        A    I -- again, I don't have the document in

19   front of me.  We can turn to it, if you'd like, and

20   I can --                                                  14:13:57

21            MR. KRAMER:  Sure.  Let's go off the

22   record for a second.  I'll pull it out.

23            THE WITNESS:  Okay.

24            MR. KRAMER:  We've been going for about an

25   hour since lunch too, haven't we?                         14:14:03

                                              Page 179

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              THE VIDEOGRAPHER:  1:02.              14:14:06

2              MR. KRAMER:  1:02.

3              THE VIDEOGRAPHER:  I'm going to switch

4    media too.

5              This marks the end of Media No. 3 in the   14:14:12

6    deposition of Joseph Winograd.

7              The time is 2:13 p.m.  We are off the

8    record.

9              (Recess.)

10             THE VIDEOGRAPHER:  This marks the         14:20:41

11   beginning of Media No. 4 in the deposition of Joseph

12   Winograd.

13             The time is 2:19 p.m.  We are on the

14   record.

15   BY MR. KRAMER:                                      14:20:54

16      Q    Mr. Winograd, I want to change topics,

17   here, for a minute.

18             Do you have experience -- firsthand

19   experience in how social media services monetize

20   content through advertising -- let me rephrase that.  14:21:05

21             Do you have any work experience with

22   social media services monetizing content through

23   advertising?

24      A    I do not.

25      Q    Paragraph 111 of your report offers as its   14:21:18
```

                                                Page 180

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    first sentence (as read): "YouTube's primary                    14:21:23

2    business is advertising, earning its parent company

3    Alphabet over 28 billion in advertising revenue for

4    2021."

5           Do you see that?                                         14:21:35

6       A    Yes, I do.

7       Q    Is that your opinion or something you

8    think is a fact?

9       A    It's not an opinion.  It's information

10   that I read in the cited annual report and            14:21:43

11   identified in footnote 132.

12      Q    So your -- so this sentence is something

13   that you read in a document you found online?

14      A    That's right.

15      Q    Okay.  And the next sentence in                         14:21:56

16   paragraph 111 (as read):  "The typical ad is a

17   commercial video that is similar in presentation to

18   a traditional television ad and is presented to the

19   viewer before, during, or after the uploaded video

20   the viewer wants to watch."                           14:22:12

21           Again, sir, that's not your opinion, is

22   it?

23      A    No.  That's my understanding of the

24   operation of YouTube's advertising system, as

25   described in the document cited in footnote 133       14:22:22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    and -- and with my own, direct experience in viewing      14:22:28

2    video on the YouTube platform.

3         Q    As an ordinary user of the YouTube

4    platform?

5         A    As an ordinary user of the YouTube           14:22:39

6    platform.

7         Q    So do you think a juror would be unable to

8    read the document you cite at footnote 133 for

9    themselves and understand it?

10        A    I -- honestly, I don't honestly recall all    14:22:48

11   the details of the document.  I think it is intended

12   for an audience of advertising professionals.  I

13   believe it uses quite a bit of terminology that

14   would be unfamiliar to a juror.

15             But I don't believe this document           14:23:01

16   identified in footnote 133 is -- is technically

17   complex or could not be understood by a typical

18   person, perhaps, with some explanation provided.

19        Q    You are not an advertising professional,

20   right?                                                 14:23:21

21        A    I wouldn't characterize myself that way.

22        Q    In the next sentence, you say that the

23   financial success of YouTube's advertising business

24   is, without a doubt, directly linked to its ability

25   to engage the largest possible audience of viewers.    14:23:36

                                                            Page 182

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                  How do you know that statement to be true?    14:23:40

 2        A    Yeah.  So I -- I have enough of an

 3   understanding of the advertising business to

 4   understand that audience reach is a primary

 5   determinant of the value of advertising and the     14:24:02

 6   amount that an advertiser will pay a advertising

 7   platform or a media platform to -- to reach that

 8   audience.

 9            So this is based on my own, I would say,

10   professional understanding and expertise, based on   14:24:22

11   understanding of the advertising business generally,

12   as well as -- as well as, I think, some of the

13   particulars of -- of YouTube's advertising business,

14   wherein, you know, pricing is based on the number of

15   views of an ad and -- and so forth.                  14:24:39

16        Q    Let me see if I understand what you're

17   saying in this sentence.

18            Are you saying that if YouTube has more

19   viewers watching more videos, YouTube is going to

20   make more money?                                     14:24:55

21        A    To the extent that there's advertising in

22   those videos, yes, that's my understanding.

23        Q    Is that your opinion or is that a truism?

24        A    It's -- it's my understanding based on

25   expertise and the facts available to me in the       14:25:10
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    you read about some -- about the intent of the          14:35:57

 2    parties developing the YouTube system?

 3         A    I'm reporting what I know I read about the

 4    intent of the designers of the YouTube system.  It's

 5    explicitly written in many places and acknowledged      14:36:07

 6    in deposition --

 7         Q    Did you --

 8         A    -- testimony.

 9         Q    Did you conduct interviews of those folks?

10         A    No, that was -- my role didn't involve        14:36:13

11    conducting interviews.  I reviewed interviews that

12    were conducted by others.

13         Q    And you've interviewed everyone who was

14    involved in determining what the intent YouTube has

15    in -- in offering its system?                           14:36:24

16         A    As -- as I said, I didn't interview

17    anybody.  I reviewed interviews that were conducted

18    by other people.

19         Q    And you think, as a result of having

20    reviewed deposition testimony, you have the ability     14:36:33

21    to testify as to the intent of the designers of the

22    YouTube system?

23         A    Without question.  And not just based on

24    the testimony, but also based on what's explicitly

25    written in the multiple documents that I've             14:36:45
```

Page 193

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    reviewed, which are -- many of which are cited in          14:36:46

 2    this report.

 3         Q    So you're giving your view of depositions

 4    and documents and coming to a conclusion about what

 5    those depositions and documents say?                       14:36:56

 6         A    Yes.  In some cases, the conclusion is --

 7    is written directly on the page or stated

 8    explicitly, but I -- in all cases, my job is to

 9    synthesize that information, collate it, organize

10    it, apply my expertise to interpret it.  And it's          14:37:14

11    reflected here in the report and in the opinion

12    which I've just stated -- or the understanding which

13    I've stated.  I'm not even sure it rises to an

14    opinion.  I'm not sure there's any question.

15         Q    I'm not sure it does either, sir.  I             14:37:27

16    appreciate your candor there.

17              Let me ask you this:  You say in note 181

18    of your report -- footnote 181, that data provided

19    by Defendants indicated --

20              Let me wait 'til you get there.                   14:37:50

21              MR. ZELCS:  It's page 69.

22              THE WITNESS:  Okay.  Thank you.  Footnote

23    181, you said?

24              MR. KRAMER:  Yes, sir.

25              THE WITNESS:  Thank you.                          14:38:01
```

Page 194

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. KRAMER:                                    14:38:01

 2        Q    You say that:  "Data provided by

 3    Defendants indicated that a single infringing copy

 4    of '5 Weddings' on YouTube had more than 9 million

 5    views, 20,000 of which were due to AutoPlay," and   14:38:10

 6    then you have a citation to a document, right?

 7        A    Yes.  And this morning, in my kind of

 8    opening remarks, I identified a second document that

 9    should be -- also be cited in that parenthetical on

10    the second line of footnote 181.  So I'll just --    14:38:25

11    I'll just remind you of that.

12        Q    Let me ask you a question first, and then

13    we'll go look at those documents, I think.

14             Is that statement, "Data provided by

15    Defendants indicated that a single infringing copy    14:38:36

16    of a version of 'Five Weddings' on YouTube had more

17    than 9 million views, 20,000 of which were due to

18    AutoPlay" -- is that opinion?

19        A    No, I think that specific statement is

20    a -- is a statement of fact in evidence based on      14:38:59

21    the -- looking at that evidence.

22        Q    Okay.  So where did you get that from?

23    I'm trying to --

24        A    Okay.  So you want me to -- so there's a

25    second citation that I had to rely on to get that,    14:39:11
```

Page 195

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | which I'll read to you again.  I read it in my | 14:39:15 |
| 2 | opening remarks.  It is a document with the title | |
| 3 | "2022.01.14 AutoPlay Attachment A with Works.PDF." | |
| 4 |     Q   Is there a number associated with that | |
| 5 | document, sir, a Bates number? | 14:39:38 |
| 6 |        I don't know if you know what a Bates | |
| 7 | number is. | |
| 8 |     A   Yeah, I do know what a Bates number is. | |
| 9 |        There may be.  I did not -- I did not note | |
| 10 | it.  I'm sure it's in the record somewhere.  And -- | 14:39:47 |
| 11 | yeah. | |
| 12 |     Q   Okay.  So -- | |
| 13 |     A   Yeah. | |
| 14 |     Q   So you got this information that's | |
| 15 | reported in footnote 81 from two documents: | 14:40:00 |
| 16 | GOOG50365 and the document you just read to me, | |
| 17 | 2022.01.14 AutoPlay Attachment A, right? | |
| 18 |     A   Yes. | |
| 19 |     Q   Okay.  What did you do to confirm that | |
| 20 | what you report in footnote 181 was, in fact, true? | 14:40:23 |
| 21 |     A   Yes.  So -- so the 50365 document, as I | |
| 22 | recall, is a spreadsheet that includes a list of | |
| 23 | video IDs and, for each video ID, data relating to | |
| 24 | the number of plays and AutoPlays of that video. | |
| 25 |        And then in the document -- the other | 14:41:01 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    document, the 2022.01.04 [sic] document, there is a       14:41:03

 2    table that match- -- that identifies four -- some of

 3    those same video IDs, the specific work that is

 4    owned by different plaintiff parties.

 5            And so by cross-referencing the video IDs         14:41:27

 6    in the two documents, I was able to associate the

 7    plays and AutoPlays in the 50365 document with the

 8    titles of works owned by the plaintiff.

 9            Now, that's my best recollection of the

10    process, not having the documents here before me.        14:41:47

11        Q    How did you confirm that it was an

12    infringing copy of "Five Weddings"?

13        A    I was told that was the case by Plaintiff

14    counsel.

15        Q    Who specifically?                                14:41:59

16        A    I -- I don't recall.

17        Q    So Plaintiffs' counsel told you there was

18    an infringing copy of "Five Weddings" on YouTube

19    with more than 9 million views?

20        A    Plaintiff counsel told me that the list of      14:42:15

21    works in the -- in the 2022.01.14 document were --

22    had been determined to be infringing videos on the

23    YouTube platform.

24        Q    Did you make any effort to independently

25    confirm the truth of that matter?                        14:42:31
```

Page 197

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A   I did not. | 14:42:33 |
| 2 | Q   So why did you put it in this report as | |
| 3 | fact? | |
| 4 | A   Because I -- the entirety of the report is | |
| 5 | created in reliance on the materials that are | 14:42:40 |
| 6 | publicly available, my own expertise, and the | |
| 7 | materials provided to me from -- and direction | |
| 8 | provided by Plaintiff counsel. | |
| 9 | Q   So you're saying you put it in your report | |
| 10 | as fact because you trust Plaintiffs' counsel to get | 14:42:58 |
| 11 | it right? | |
| 12 | A   Yes, I understood that to be correct | |
| 13 | information. | |
| 14 | MR. KRAMER:  Let's take a look at at least | |
| 15 | the first of the documents that you cited.  I'll | 14:43:06 |
| 16 | have it marked as Exhibit 2 to your deposition. | |
| 17 | There you go.  Thanks.  He's getting that | |
| 18 | one. | |
| 19 | (Exhibit 2 was marked for identification | |
| 20 | by the court reporter.) | 14:43:35 |
| 21 | MR. ZELCS:  Who's getting that one? | |
| 22 | MR. KRAMER:  That's for George. | |
| 23 | MR. ZELCS:  That's for me?  Thanks. | |
| 24 | And this is 2? | |
| 25 | MR. KRAMER:  Two. | 14:43:41 |

Page 198

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q    I think this is the document, sir, that        14:43:45

 2   you described.  It bears Bates numbers Google 50365

 3   to 50 -- well, it bears Google 50365 because it's a

 4   printout of a spreadsheet; so, it's only one page of

 5   a Bates number.                                          14:44:05

 6             And it has a column listing "Unique Video

 7   Identifiers," a column for "Views of Each," and a

 8   column for "AutoPlay View" -- "Views" for each.

 9             I see, on row 524, a video ID that reads

10   capital YXWFYP, lower case k11, capital G, capital      14:44:33

11   M -- sorry.  Just capital G, no M.

12             Do you see that?

13        A    Yes.

14        Q    On row 1 -- on row 524?

15        A    Yes.                                           14:44:59

16        Q    And in the column for "Total Views" for

17   that video, it says "9,824,645."

18             Do you see that?

19        A    Yes.

20        Q    And then, in the column for "AutoPlay       14:45:11

21   Views," it says "20,181," right?

22        A    (Witness nods head.)

23        Q    So is this where you got your assertion

24   that a single infringing copy of "Five Weddings" on

25   YouTube had more than 9 million views?                  14:45:24
```

Page 199

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   even further, right?                                 15:57:30

 2           First, there was, I believe, a DMC

 3   takedown notice tool.  Subsequently, Content ID was

 4   added.  Subsequently, the Copyright Match Tool was

 5   added for use by YouTube partners.  Subsequently,    15:57:42

 6   Copyright Match Tool was made available for

 7   copyright owners who successfully had taken down

 8   work.

 9           So I understand that -- that YouTube has

10   had an ongoing effort to build more tools to meet    15:57:57

11   more needs.

12      Q    Are you aware of whether or not YouTube is

13   currently developing increased capabilities for

14   copyright holders to use tools on its service?

15      A    I'm not.                                      15:58:18

16      Q    You don't have any firsthand knowledge of

17   that?

18      A    I do not.

19      Q    But from what you've seen over the history

20   of YouTube, it has consistently broadened access to  15:58:28

21   its copyright management tools, right?

22      A    I don't know that it was -- that it's

23   consistently.  So, for example, in the record, I saw

24   evidence of Project Whittle, a project that was done

25   within Content ID in 2018, under which a substantial 15:58:43
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    number of Content ID users had access reduced or          15:58:47

 2    removed from the system.  So I think the -- the

 3    statement of "consistently" may -- may not hold

 4    scrutiny.

 5        Q    But those users who were affected by            15:58:59

 6    Project Whittle were then able to get access to the

 7    service through intermediaries, right?

 8        A    I don't -- I don't know what became of

 9    the -- the companies affected by Project Whittle.

10        Q    In paragraph 122 of your report, you say        15:59:15

11    that in 2015, Defendants performed an experiment to

12    measure the potential impact of AutoPlay on the

13    desktop -- we talked about this earlier -- or you

14    did -- and that the experiments showed that the

15    number of ads watched due to AutoPlay increased by     15:59:38

16    ██████, while the amount of time watching ads

17    increased substantially more than ████████.

18            Did I -- did I read that right?

19        A    That -- yes, that sounds correct.

20        Q    First, that sentence in paragraph 122          15:59:53

21    refers to, quote, "an experiment," closed quote; and

22    then later, quote, "experiments," closed quote,

23    plural.

24            Which one is it?  One experiment or

25    multiple experiments?                                   16:00:08
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A    I think it's -- I think it could be either        16:00:21
 2   or both.  So it just depends on how you want to
 3   define the word "experiments."
 4        My understanding of the way that the
 5   experiment or experiments is performed is through     16:00:35
 6   A/B testing in which a feature is enabled for a
 7   subset of users and not enabled for another set of
 8   users, and statistics are calculated about
 9   differences in behavior across these two sets of
10   users.                                                16:00:54
11        So there's many instances of users having
12   different experiences.  All of these results are
13   compiled into a summary statistic.
14        So there's one set of results that I'm
15   referring to, but the results are of what could be    16:01:09
16   considered to be many individual experiments on
17   different users.  That's my understanding of it.
18        Q    But you used both.
19        I'm just asking you to agree on which one
20   we should use for purposes of our discussion.         16:01:23
21        A    I see.  I'm comfortable with either one.
22        Q    Okay.
23        A    I think, probably, we can call it
24   "experiment."
25        Q    "Experiment."                               16:01:30
```

Page 246

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1       A     It's probably going to be more clear,        16:01:31
 2   given that you've been confused by the -- by the
 3   language.
 4       Q     Did you participate in this experiment at
 5   YouTube yourself?                                       16:01:38
 6       A     I don't know if I was a subject.  I might
 7   have been a subject.  Any YouTube user might have
 8   been.
 9       Q     Did you participate in designing this
10   experiment?                                             16:01:46
11       A     I did not.
12       Q     Did you participate in conducting the
13   experiment?
14       A     I did not.
15       Q     Okay.  You say that the experiment showed    16:01:57
16   that the number of ads watched due to AutoPlay
17   increased ███████.
18            What are you basing that on?
19       A     The results of the experiment that are
20   included in the cited reference.                        16:02:11
21       Q     Did the experiment show that the number of
22   ads increased by ███████ or that the number of
23   ads increased because of AutoPlay by ███████?
24       A     I believe that they showed they increased
25   because of AutoPlay by ███████.                         16:02:31
```

Page 247

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | So the nature of an A/B experiment is you | 16:02:34 |
| 2 | use large numbers of people.  It's randomly | |
| 3 | selected, and you control the variables that change. | |
| 4 | And the variable that changed in this instance is a | |
| 5 | large number of people got -- a representative | 16:02:46 |
| 6 | sample got an experience with AutoPlay, a | |
| 7 | representative sample gets an experience without | |
| 8 | AutoPlay, and the variable that differs is AutoPlay. | |
| 9 | And so when these types of experiments are | |
| 10 | conducted, one draws conclusions on the assumption | 16:03:02 |
| 11 | that the samples are otherwise identical and that | |
| 12 | the -- the variable that's changed is the cause | |
| 13 | of -- or the -- the -- yeah, is the cause of the -- | |
| 14 | the difference. | |
| 15 | Q    Did YouTube conclude that the increase in | 16:03:28 |
| 16 | the number of ads by ████████ was because of | |
| 17 | AutoPlay, or is that a conclusion you're drawing? | |
| 18 | A    I would say this is the result that | |
| 19 | YouTube report- -- reported. | |
| 20 | Q    So in the document that you're citing as | 16:03:45 |
| 21 | containing the results of this experiment, YouTube | |
| 22 | draws a causal connection or not? | |
| 23 | A    In -- in the document that I'm citing, I'm | |
| 24 | reading the results that YouTube has reported, and | |
| 25 | I'm reporting the results of their experiment here. | 16:04:03 |

Page 248

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q    Does that document contain a causal        16:04:05

 2   connection like the one that you describe in

 3   paragraph 122 of your report?

 4        A    I don't know.

 5        Q    So do you have firsthand knowledge, based   16:04:20

 6   on anything you've seen, that the reason that the

 7   number of ads watched increased was because of

 8   AutoPlay?

 9        A    That's -- that's my interpretation of the

10   results of their experiment that they reported.      16:04:41

11        Q    And to be clear, you're citing for this

12   GOOG40840 in footnote 149?

13        A    Yes.

14        Q    In the next sentence, you say, quote:

15   "Unsurprisingly, YouTube now automatically activates  16:05:16

16   AutoPlay for all users who have not self-identified

17   as minors."

18             Do you see that?

19        A    I do.

20        Q    What do you mean by "unsurprisingly"?       16:05:30

21        A    It's -- it's unsurprising because, as

22   stated in paragraph 111 at the start of this, the

23   financial success of YouTube's advertising business

24   is -- and we discussed earlier today -- is related

25   to its ability to show more ads.                      16:05:57
```

Page 249

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            So if YouTube has a feature that they        16:05:59

 2    understand will allow them to show more ads to more

 3    people, it's unsurprising that they would choose to

 4    propagate that feature to the widest number of

 5    users.                                              16:06:15

 6         Q    So you're suggesting that because YouTube

 7    noticed a correlation between increased numbers of

 8    ads and ad viewing time and AutoPlay, that's why

 9    YouTube enables AutoPlay for most users?

10         A    I think it's -- I think it's -- I think    16:06:32

11    it's a pretty clear direct line from a feature that

12    increases ad watching by ███████ to wide

13    deployment and default activation of that feature

14    for -- for all the users, yes.

15         Q    Have you seen any documents in which       16:06:58

16    YouTube says that the reason to enable AutoPlay for

17    most users is because we want to increase the number

18    of ads watched?

19         A    I have not.

20         Q    Have you seen any documents from YouTube   16:07:09

21    stating that YouTube enables AutoPlay for most of

22    its users by default because it wants to increase ad

23    watch time?

24         A    Not specifically, no, that I can recall.

25         Q    Did you read any testimony from anyone at  16:07:35
```

Page 250

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    YouTube saying, "The reason we are implementing        16:07:38

2    AutoPlay for most users is because we want to

3    increase ads and ad watch time"?

4        A    No.   The -- the metric that YouTube has

5    adopted for its -- at least for its WatchNext          16:07:53

6    system, which is the primary means by which people

7    watch YouTube, is largely focused on the amount of

8    time that people spend on the site or the total

9    amount of time that people spend watching videos,

10   but -- rather than narrowly focused on the            16:08:12

11   ad-watching time, but I think the -- the linkage

12   between the two is -- is not difficult to

13   understand.

14       Q    A juror could understand that?

15       A    I think so.                                   16:08:30

16       Q    You're suggesting as a matter of fact,

17   based on no documents and no testimony, that there

18   was a connection between a desire at YouTube to

19   increase ad time and YouTube's implementation of

20   AutoPlay for most users by default?                    16:08:52

21       A    Can -- can you show me where in my

22   document it states that?

23       Q    No.   I'm asking you:   As you sit here

24   right now, is that what you're -- I mean, that's

25   what I take from your term "unsurprisingly."           16:09:01

Page 251

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              But you've said over the course of your          16:09:05

 2   testimony, not five minutes ago, that you're drawing

 3   a line from the results of this experiment to

 4   YouTube's decision to implement AutoPlay for most

 5   users by default, right?                               16:09:18

 6       A    I think -- I think the -- the relationship

 7   between these -- these two factors is -- is hard to

 8   ignore.

 9       Q    Did you see any document in which YouTube

10   said it was troubled by the increase in ad views and   16:09:33

11   ad watch time shown by the experiment it conducted

12   regarding AutoPlay in 2015?

13       A    I did not.

14       Q    You didn't see documentation showing that

15   YouTube was concerned about the increase in ad views   16:09:43

16   and watch time because there's no reason for there

17   to have been an increase in ad views and ad watch

18   time?

19       A    I -- I did not.

20       Q    Plaintiffs' counsel certainly didn't show     16:09:54

21   you those documents?

22       A    I -- I don't recall seeing that in any

23   documents that I received.

24       Q    So you're just assuming YouTube views an

25   increase in ad views and watch time of ads as a good   16:10:13
```

Page 252

1    thing in the abstract?                                16:10:16

2         A    I think that it's unsurprising that a

3    business that makes its revenues from showing ads

4    would look favorably upon features that result in

5    more ads being shown to users.                        16:10:37

6         Q    Okay.  In paragraph 118 of your report,

7    sir, you include a chart that you apparently found

8    in this document GOOG52174 to GOOG52263.

9              I'm going to have this marked and

10   introduced as Exhibit 3 to your deposition so that    16:11:12

11   you can look at it with me.

12             Oh, I'm so sorry.  There we go.

13             MR. ZELCS:  Thank you.

14             MR. KRAMER:  It's a big one.

15             THE WITNESS:  Do I get one?                  16:11:34

16             MR. KRAMER:  You get that one.

17             THE WITNESS:  Oh, I get that one.  Okay.

18   Great.

19             And then it goes in the basket?

20             MR. KRAMER:  Yes.                            16:11:38

21             THE WITNESS:  It's been a while.

22             MR. ZELCS:  I don't know if -- is 2 in

23   there?  That's the little chart.

24             THE WITNESS:  Did I keep that?  Yeah, I

25   kept that.  Here, into the basket.                     16:11:46

                                                            Page 253

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              (Exhibit 3 was marked for identification      16:11:52

2              by the court reporter.)

3              THE WITNESS:  Thank you.  I have the

4    document.

5              MR. KRAMER:  Okay.                             16:12:00

6         Q    If you turn to the page marked Google

7    52186, this is the chart that you reproduced in your

8    report in paragraph 118, right?

9         A    Yes.

10        Q    You say that this chart shows that ▮▮         16:12:38

11   percent of time spent viewing videos on YouTube was

12   spent viewing videos that were recommended through

13   the WatchNext functionality, right?

14        A    No, that's -- that's not correct.  That

15   statement, I think, is in reference to page 187 of     16:12:56

16   this document.

17        Q    Ah.  Okay.  Got it.

18             So you do say that ▮▮▮▮▮▮▮▮ of watch

19   time, ▮▮▮▮▮▮▮ a year ago, is attributable to

20   WatchNext, but you're not drawing it from the chart    16:13:16

21   that you've copied into paragraph 1- -- 118 of your

22   report, right?

23        A    That's right.  It's -- I'm not copying it

24   from the chart, although it looks like it could be

25   close.  I'm not -- but it's much easier to just read   16:13:33
```

Page 254

**Errata Sheet**

| Page: Line | Change | Reason |
|---|---|---|
| 15:17-18 | Replace <Authority [sic]> with <Administrator> | To correct transcription errors |
| 41:7 | Insert < But Verance does a number of indirect things related to the hundreds of millions of consumers who interact with Cinavia technology.> between <.> and <Q> | To clarify the record |
| 53:22 | Replace <and> with <in the> | To correct transcription errors |
| 80:25 | Replace <subscribers> with <channels> | To clarify the record |
| 85:7 | Replace <knows> with <"knows" –> | To correct transcription errors |
| 118:17 | Insert <, which I now see is on page 6 of that report for the second half of 2021.> between <based> and <.> | To clarify the record |
| 135:25 | Replace <anyone> with <"anyone"> | To correct transcription errors |
| 156:18 | Replace <billed> with <built> | To correct transcription errors |
| 160:15 | Replace <too> with <to> | To correct transcription errors |
| 160:17 | Replace <too> with <to> | To correct transcription errors |
| 164:25 | Replace <threat> with <thread> | To correct transcription errors |
| 173:3 | Insert <,> between <systems> and <are> | To correct transcription errors |
| 173:3 | Insert <not> between <likely> and <to> | To correct transcription errors |
| 197:2 | Replace <four – some> with <for some> | To correct transcription errors |
| 205:4 | Replace < discovery> with <"discovery"> | To clarify the record |
| 205:5 | Replace <rights management> with <"rights management"> | To clarify the record |
| 205:9 | Replace <rights management> with <"rights management"> | To clarify the record |
| 218:14 | Replace <base> with <basis> | To correct transcription errors |
| 221:25 | Replace <machine> with <regime> | To correct transcription errors |
| 244:2 | Replace <DMC> with <DMCA > | To correct transcription errors |

_____X_____   Subject to the above changes, I certify that the transcript is true and correct.

_____   No changes have been made. I certify that the transcript is true and correct.

_____                              11/2/2022
      (Signature)                                      (date)

ACKNOWLEDGMENT OF DEPONENT

     I, Joseph Winograd, do hereby certify that I have read and examined the foregoing testimony, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
(Signature)

11/2/2022
_____
(date)