Exhibit 3

to the Declaration of Kelly M. Knoll ISO
Defendants' Motion to Exclude Testimony
from Joseph M. Winograd and Paul Jessop

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated;<br><br>Plaintiffs,<br><br>v.<br><br>YOUTUBE, LLC; and GOOGLE LLC,<br><br>Defendants. | Case No. 3:20-cv-4423 |

# EXPERT REPORT OF PAUL JESSOP

September 1, 2022

**County Analytics Ltd**
**Founder and Director: Paul Jessop MA CEng FIET MRI**
**Registered in England Number: 8438250**
**Registered Office: County Cottage, 84 Common Road, Kensworth, Dunstable LU6 3RG, UK**

CONFIDENTIAL

# TABLE OF CONTENTS

Section A   Introduction .................................................................................................4

Section B   Qualifications ...............................................................................................8

Section C   Summary of Opinions .................................................................................12

Section D   Background .................................................................................................14

Section E   Metadata – A hypothetical example ...........................................................16

Section F   Metadata Background .................................................................................22

What is metadata?..............................................................................................22

Where does metadata come from? .....................................................................25

How is metadata — including CMI metadata — used? ...........................................26

How is metadata carried?...................................................................................28

Where is metadata stored? .................................................................................29

How is metadata lost?.........................................................................................33

What benefits does metadata bring?...................................................................36

Section G   Metadata principles .....................................................................................39

Collect, curate and deliver .................................................................................39

Standardizing brings many benefits ...................................................................40

Preserve metadata always .................................................................................42

Exercise a presumption of validity.....................................................................43

Section H   Evidence of CMI deleted from files taken down...........................................45

Section I   Impact on creators - current and potential class members ...........................49

Rights owners cannot search for data deleted before upload....................................49

Rights owners cannot search for data deleted by YouTube......................................49

YouTube reads this data before it can delete it .........................................................50

YouTube knows the meaning of the metadata .........................................................52

CONFIDENTIAL

YouTube deletes enormous quantities of useful metadata .........................................54

YouTube can detect music in video soundtracks and is aware that most recording metadata has been stripped ...........................................................................................55

Section J   Annex - List of technical standards consulted ...............................................58

ISO International Standards: ...........................................................................................58

ISO Technical Specifications ..........................................................................................58

Other specifications ........................................................................................................58

Section K   Annex - List of software package documentation consulted .........................59

Section L   Annex - List of papers and reports consulted................................................60

Section M  Annex – List of materials related to the present matter................................61

CONFIDENTIAL

**<u>Section A</u>**          **<u>Introduction</u>**

1.   I am Paul Jessop, sole director of a UK limited company, County Analytics Ltd[1].

Through this company I provide consultancy services to the media sector. I

specialize in technical standards for metadata and standard identifier codes.

2.   Metadata is data about other data, and in particular data about entities that can be

represented or identified digitally. The names of a song and its writer are

metadata, as are the name of a performer who has recorded it and the date its

copyright expires in the US.

3.   Leonardo da Vinci was very well-known to his patrons and Elvis Presley had a

record company that got radio stations to play his records. A creator today

depends on metadata to make his creations known and to put food on the table. To

earn a living (or indeed to get the respect of peers) creators must get their

masterpieces into the hands (or ears) of the end user. Only buskers can do this

alone. Others need the services of intermediaries that include record companies,

publishers, distributors, aggregators, streaming platforms, download shops and

information brokers. A creation must survive and be recognizable in this crowded

chain and it is the metadata that delivers this distinctiveness.

4.   I have been engaged by Plaintiffs Maria Schneider, Uniglobe Entertainment, LLC,

and AST Publishing Ltd., ("Plaintiffs") in the above-captioned matter brought by

Plaintiffs against Defendants YouTube LLC and Google LLC ("Defendants") to

provide expert opinions regarding the use and detection of metadata in connection

---

[1] "LinkedIn profile – Paul Jessop" www.linkedin.com/in/paul-jessop-a7007a1

CONFIDENTIAL

with audio and audiovisual content. The scope of these expert opinions was specified as:

- Analysis of media sector practices with respect to the capture, carriage, and storage of metadata.

- Analysis of the actions of YouTube with respect to metadata made available to, stored on and retrieved from their video sharing platform.

- Analysis of the impact of YouTube's actions on rights owners in creations uploaded to YouTube, and the effect of possible responses.

Other opinions were not requested and are out of scope for this Report.

5.    These opinions are based on over 25 years of experience as a senior technology executive in music trade associations and as a consultant specializing in the specification, curation and exploitation of metadata in the media sector.

6.    Plaintiffs have retained County Analytics Ltd., for my services in this matter at my usual rate of $250 an hour.

7.    I have prepared this Preliminary Expert Report ("Report") to document and summarize my opinions in connection with the matter.

8.    In preparing this Report, I reviewed the Amended Complaint as well as other background documents provided by Plaintiffs' counsel. In addition, I reviewed technical standards documents, documentation for software packages, and broadly scholarly documents relating to the principles of metadata. A complete list of the documents reviewed by me is provided in the Annexes in Section J to Section M.

CONFIDENTIAL

9.      This Report, which is based on my experience and knowledge, details the importance of metadata to creators and others in the media supply chain. It sets out the functions fulfilled by metadata and the benefits it brings at each stage while noting the difficulties that arise when metadata is not collected, or is abandoned, lost, or deleted. It also notes the protection assigned under treaty and statute to certain classes of metadata as "Copyright Management Information" ("CMI") and the benefits this brings to creators. In particular, it reviews the impact on creators of YouTube's operational policies when these lead to the loss of metadata.

10.     It is well established in the media sector that the active management of metadata is part of its lifeblood. Library catalog cards carrying book metadata date from 1780[2], addressing the inflexibility of bound registers. Modern systems built to agreed standards are adopted by essentially the whole sector. However, the importance of metadata as a lubricant of trade sometimes goes unrecognized. In this Report, I explain the need for proper respect for metadata, for its management and for its dissemination. I note circumstances, in particular in the background to this case, when this respect is absent and the consequences that result. Deleting metadata that is likely of value to others is certainly unhelpful and at least disrespectful. When this metadata has the status of CMI, deletion has more serious implications.

---

[2] "1780: The Oldest Card Catalogue" https://www.onb.ac.at/en/about-us/650th-anniversary/timeline/1780-the-oldest-card-catalogue.

CONFIDENTIAL

11.     My opinions are additionally based on a review of documents and materials that include computer files produced in the matter in the context of the above mentioned publicly available technical information relating to media standards and the software that implements them.

12.     I report here on my analysis of a large body of metadata associated with videos posted on the YouTube platform which have been the subject of takedown notices under the Digital Millennium Copyright Act ("DMCA"). I show that this contains CMI metadata documenting the provenance of the component creations used in the generation of these videos.

13.     If called upon as a witness in this matter, I would provide the following testimony.

CONFIDENTIAL

**Section B**          **Qualifications**

14.     I spent three years at Trinity Hall, Cambridge reading Engineering and Computer

Science, and graduated as a Master of Arts. I spent two years at University

College, Oxford as a postgraduate in Management Studies, obtaining a Diploma in

Management Studies on the basis of my work there.

15.     I am a Chartered Engineer and Fellow of the UK's Institution of Engineering and

Technology, which acts as the supervising body for professional engineers across

sectors that include communications, computing, electronics, energy, transport and

manufacturing.

16.     I was supported through my academic studies by British Telecommunications and

benefited from accelerated promotion in the R&D department, through corporate

strategy to consumer marketing where I managed advanced technology consumer

products.

17.     In 1996, I became Chief Technology Officer of the International Federation of the

Phonographic Industry ("IFPI"), later taking my work to its US affiliate, the

Recording Industry Association of America ("RIAA"), and in 2009 established

County Analytics to provide the same services on contract to RIAA.

18.     I was recruited to IFPI to manage technical responses to CD piracy but rapidly

focused on the management of recorded music metadata and the provision of

standard identifiers. I ran the International Standard Recording Code ("ISRC") as

Executive Director of the International ISRC Agency and subsequently acted as

Executive Director of the US ISRC agency. I acted as convenor of the

international working group which revised the ISRC standard, leading to publication of a new standard in 2019.

19. Other clients beyond those noted below have included LG Electronics, Digimarc, SoundExchange, CISAC, Digiciti Networks, the European Union Office of Publications and the World Intellectual Property Organization.

20. I am the Technology Advisor to The DOI Foundation, which operates the Digital Object Identifier (DOI) system. This infrastructure is used in scholarly publishing, Hollywood, the building products sector and (most recently) life sciences repositories to identify biological specimens. This diverse range of applications is a consequence of the long-term persistence of the information associated with the identifier that DOI manages.

21. I serve on the advisory committee of the International Standard Link Identifier (ISLI) which is supervised by the International Information Content Industry Association (ICIA) in Hong Kong.

22. I act *pro bono* as advisor to the supervising body of the International Standard Name Identifier (ISNI) and chair its music sector consultation group – which provides an interface between the body and its users in the music sector. I was involved in drafting the ISO International Standard for ISNI and have been involved in advocacy for its implementation in various creative sectors but especially music.

23. I am a Professional Member of, and act *pro bono* as advisor to, the Producers and Engineers Wing of the Recording Academy, where I serve on the Immersive

CONFIDENTIAL

Audio committee of the Academy which is preparing recommendations for production and documentation of full-sphere audio.

24. I was one of the founding managers of the project that led to the formation of Digital Data Exchange Inc., (DDEX) – an industry standards body which has revolutionized the transport of music files and the associated metadata – and remain active in its work.

25. I was part (and sometimes head) of the UK delegation to the Moving Pictures Experts Group (MPEG) which, as a joint working group of the International Organization for Standardization (ISO) and the International Electrotechnical Commission (IEC), standardized many of the key media technologies such as MP3, Advanced Audio Coding (AAC) and MP4 video.

26. I have since 1996 been part of the UK delegation to the ISO committee dealing with media identifiers (ISO TC 46/SC9) and act (until term limits prevent reappointment in 2022) as the head of the UK delegation to its supervising committee, TC 46.

27. In 2022, the European Union published a book which they had commissioned from me, entitled "Data citation: A guide to best practice". This offers clear advice on how to "footnote" datasets when they are used in scholarly and policy analysis.

28. I am a frequent speaker at conferences such as the Audio Engineering Society[3] and The Reel Thing[4]. I have been invited to make submissions to the US

---

[3] "AES New York 2018 Presenter or Author: Paul Jessop" https://www.aes.org/events/145/presenters/?ID=7548.
[4] "The Reel Thing Technical Symposium 2019" http://www.the-reel-thing.co/wp-content/uploads/2019/08/Reel-Thing-Program-web.pdf

CONFIDENTIAL

Copyright Office[5] and to address their meetings, as well as those of the US Patent and Trademark Office and the World Intellectual Property Organization.

---

[5] "Submission of Paul Jessop, Founder, County Analytics Ltd In response to Library of Congress-US Copyright Office Notice of Inquiry Docket 2013-2 'Technological Upgrades to Registration and Recordation Functions' " https://www.copyright.gov/docs/technical_upgrades/comments/County-Analytics.pdf.

Page 11

CONFIDENTIAL

**Section C**          **Summary of Opinions**

29.     The following opinions relating to the present matter are expressed in this report and are summarized here.

30.     YouTube relies upon metadata, including metadata that constitutes Copyright Management Information as defined in the Digital Millennium Copyright Act to organize, index, and recommend videos on the YouTube platform. As noted at paragraph 157 et seq., Defendants are not just familiar with metadata — it is a cornerstone of Defendants' business.

31.     YouTube deletes large volumes of metadata from uploaded videos during content processing. Paragraph 152 shows that some of this metadata is Copyright Management Information as defined in the Digital Millennium Copyright Act. That the metadata YouTube has deleted is Copyright Management Information is clear, and should be understood by YouTube.

32.     Most recorded music is released in association with its own descriptive metadata (paragraph 169), including International Standard Recording Codes ("ISRCs"), but when this music is assembled into a video, the editing software only sometimes copies the recording metadata into the video. The presence of music and the absence of recording metadata in a video is apparent to YouTube (paragraph 172), which must conclude that it has been removed.

33.     When a video becomes available on the YouTube service without metadata relating to the soundtrack, the owners of rights in the soundtrack lose their ability

CONFIDENTIAL

to search for it (and decide what action to take), materially affecting their ability to exploit their own creations (paragraph 153).

34.   If YouTube required, as suggested in paragraph 121, video uploaders to provide the ISRC of any recorded music or music video contained in their upload, copyright owners would be able to search for these codes and find infringing videos on YouTube.

35.   YouTube has the capacity to screen the metadata associated with uploaded video files, and does indeed screen it for certain purposes. If, as explained in paragraph 155, YouTube were to screen the metadata associated with uploaded video files for populated Clip File Name ("clfn") fields, and were to associate the metadata found in those fields with the uploaded video — just as it associates the metadata provided by the uploader and by YouTube's screening and identification systems — then copyright owners searching for the names of their works on the YouTube platform would be able to find infringing videos where their works are included as components of the video, even where the uploader fails to provide such metadata.

CONFIDENTIAL

**Section D**          **Background**

36.    I understand that in this case[6], the Plaintiffs complain that when content is

uploaded to YouTube, the rights they have under US copyright law cannot be

exercised in practice. Their works are repeatedly taken by YouTube users and

processed to create videos which are uploaded to the YouTube platform. This

creates value for YouTube but detracts from Plaintiffs' ability to control (by

blocking or licensing) how their works are used and hence from their ability to

earn a living by selling and licensing their creations.

37.    Others have access to an automated YouTube system called "Content ID" which

(i) allows the detection of copyrighted works and (ii) enables automated decision

making about how to proceed. They have been refused access to this system and

are forced to adopt other approaches to exercise their rights.

38.    In order to exercise their rights, they must be able to detect that an infringement

has taken place and, in the absence of access to the Content ID system, this

involves searching for and matching the metadata of videos uploaded to YouTube

against the metadata they know is associated with their own creations. This

includes the name of the creator and the name of the work.

39.    The Plaintiffs complain that they are unable to make effective use of this approach

because YouTube removes relevant metadata, (including populated "clfn" fields)

from the upload as it is processed, so that it can be made available on the

YouTube platform. The missing metadata cannot therefore be searched for, and

---

[6] Schneider v. YouTube, Case No. 3:20-cv-4423, First Amended Class Action Complaint.

CONFIDENTIAL

does not even appear to a user (whether human or machine) when a video is accessed.

40.    The Plaintiffs further complain that although they include metadata in their works, including ISRCs, the software tools (typically video editing programs) used by YouTube users often remove that metadata as those tools combine them with other materials to create uploaded videos. They note that YouTube is well aware of this removal.

41.    This report explains the creation, storage, transmission and use of the metadata which could be used by the Plaintiffs to enforce their rights, but for its removal as noted above.

CONFIDENTIAL

**Section E**          **Metadata – A hypothetical example**

42.    With no more detailed definition than that given at the very beginning of this
Report (that metadata is data about other data, and in particular data about entities
that can be represented or identified digitally) and with the promise of more
specific explanation in subsequent sections, I start with a walk-through of how
metadata is of importance to a creator in the music sector of today.

43.    Except for some named organizations, this example is entirely hypothetical. It is,
however, representative of the scope and breadth of the opportunities to capture,
preserve, and exploit metadata, which occur in recording studios, live venue
stages, and indeed back bedrooms occupied by ambitious teenagers. The scale of
operation and financial implications may vary but the principles remain the same.

44.    Renowned composer and band leader Mary Doe has written a new composition,
*Requiem for Rights*. Doe is a member of ASCAP[7] - one of the two largest
Performing Rights Organizations ("PROs") in the US. Doe's publishing company
has registered *Requiem for Rights* with ASCAP which has used an online
connection to the international organization CISAC[8] to assign a unique code (an
ISWC[9]) to the composition so that its exploitation can be tracked.

45.    Doe has a globally unique writer number from ASCAP (an IPI[10]) that will help
route her royalties to her, and another number, an ISNI[11], that will help online

---

[7] "The American Society of Composers, Authors and Publishers" https://www.ascap.com.
[8] "International Confederation of Societies and Authors and Composers" https://www.cisac.org.
[9] "International Standard Musical Work Code" https://www.iswc.org/.
[10] "ASCAP-All About IPI Numbers" https://www.ascap.com/help/registering-your-music/ipi-faqs.
[11] "International Standard Name Identifier" https://isni.org.

CONFIDENTIAL

services catalogue both her compositions and recordings – and assist fans to find them.

46.   Doe and her band arrive at a recording studio. A trusted recording engineer works with her assistant to set up microphones and other equipment to record the new work. It takes a while to get comfortable with it but eventually everyone is happy with the take, and the musicians adjourn to the studio's lounge for coffee.

47.   While the engineer checks the recording carefully to be sure she doesn't need to call the band back to correct a fluffed note, the assistant works on the paperwork. He uses an online web application to enter all the metadata about the recording. He has the composition and writer information from Doe. The band records as the "Mary Doe Orchestra" and has an ISNI of its own. The members of the band have separate ISNIs and also performer numbers (IPNs[12]) that are used by Collective Management Organizations (CMOs) to allocate royalties due from radio and internet plays. The ISNIs allow websites to reference Doe correctly and not confuse her with other artists or composers with similar names.

48.   The assistant also adds the names of the recording engineer and his own name as contributors to the recording, and notes that a photographer took pictures of the session, adding her name to the list of credits. The photographer doesn't have an ISNI yet, but she is glad to have her name cited because her next assignment may depend on a client seeing the prestigious artists she has worked for.

---

[12] "SCAPR-IPD" https://www.scapr.org/tools-projects/ipd/.

49.     The assistant finalizes the metadata entry, the recording engineer checks it, and it
        is saved for future reference. The recording, which has been mixed from the many
        recorded tracks down to stereo, is sent by Dropbox to a mastering engineer to
        work on. He doesn't change the mix but applies subtle audio processing tools to
        bring out the best in the recording. Once done, he sends it back to Doe and adds
        his name to the credits on the web application.

50.     Although some delegate the work to others, Doe manages her own recording
        codes and assigns a unique identifier code (an ISRC[13]) that will thereafter allow
        precise reference to the recording of *Requiem for Rights*.

51.     Doe registers the recording with SoundExchange[14] (the CMO that distributes
        royalties due from satellite broadcasting and webcasting) and includes all the
        recording's metadata including the ISRC. The SoundExchange database is used to
        allocate royalties to her, and the relevant parts of it are public so anyone can look
        up the ISRC that is on file.

52.     Doe doesn't work with a conventional record label but releases her work through
        an online platform SupportTheArtist[15]. She uploads the mastered recording with
        all the metadata from the web application – in fact she doesn't send the metadata
        directly, she just sends a link to the metadata record so SupportTheArtist can look
        it up in a web browser.

---

[13] "The International Standard Recording Code" https://isrc.ifpi.org/.
[14] "SoundExchange" https://www.soundexchange.com.
[15] SupportTheArtist is hypothetical but various organizations exist outside the convention "record label" structure.

CONFIDENTIAL

53.     SupportTheArtist doesn't change the audio at all but prepares versions of the recording file for the public. It prepares a landing page for *Requiem for Rights* and uses the data from the web application to ensure that no spelling mistakes are introduced. It embeds the metadata in the audio files that users will pay to download so that title and artist information appears on their iPods, phones and car stereos. It prepares a web streaming application for a sample extract from the recording that displays to users the accurate metadata. And it creates a database record with all the metadata so that it can report sales and streams.

54.     Periodically, SupportTheArtist reports sales to Doe and uses the metadata provided to ensure that Doe knows which royalty streams relate to which recordings. Having the royalties split out by track, as defined by their metadata, allows her to understand which tracks are most popular.

55.     The metadata included with the recording is used by the various PROs and CMOs that process usage reports to ensure that a share of the license fee finds its way to the correct recipient[16]. Depending on the country of use, these beneficiaries include Doe as the writer, the owner of the recording (which would often be a record label but in this case is Doe herself) and the featured performers – the individual members of the Mary Doe Orchestra.

56.     Doe prefers not to make her recordings available to the major streaming platforms but if she changed her mind, she would provide the recordings, with the full

---

[16] "Congressional Research Service - Money for Something: Music Licensing in the 21st Century" https://sgp.fas.org/crs/misc/R43984.pdf.

CONFIDENTIAL

metadata set, to a distributor such as Tunecore[17] or The Orchard[18] because the major streaming platforms do not deal direct with artists and small labels. They would submit the recording with the data in a structured format (using the well-established DDEX[19] metadata format) to each selected platform. The platforms use this DDEX formatted metadata to respond to requests from their users and to prepare artist pages (using ISNI in particular to avoid confusion). Importantly, they report usage and make a single royalty payment to the distributor, who uses the metadata to distribute the money accurately and pay the label or artist the royalties due.

57.    Gabby's mom likes the track *Requiem for Rights* so much that she uses it as background music for a video of her daughter's gymnastics tumbling. Gabby's mom uses a simple video editing program and does not realize that this software automatically takes some of the metadata of the component tracks and includes it in the metadata tags of the completed video. Thus, the resulting video entitled "Gabby's Tempestuous Tumbling" has tags that identify *Requiem for Rights* as a component clip.

58.    The gymnastics tumbling video is posted to YouTube, which displays the title provided by the uploader, "Gabby's Tempestuous Tumbling". However, the metadata that identified Doe's *Requiem for Rights* is stripped by YouTube during the processing of the upload - so the YouTube video landing page bears only the

---

[17] "Tunecore" https://www.tunecore.com
[18] "The Orchard" https://www.theorchard.com
[19] "DDRX-About us" https://ddex.net/about-ddex/.

CONFIDENTIAL

name of the video creator ("Gabby's Mom"), the title, and a variety of keywords or hashtags chosen by Gabby's Mom to describe the video, including *#tumblingsuperstar* and *#futureolympian.*

59.   Doe wants to ensure she has control over how her art is presented. She searches YouTube and other platforms for her recordings. When she finds videos using her music that she considers unacceptable, she sends takedown notices as required by the Digital Millennium Copyright Act. The videos are removed though they are often re-uploaded by other accounts and further notices have to be sent.

60.   Doe does not find Gabby's Tumultuous Tumbling because it does not bear Doe's name or the name of the track used, *Requiem for Rights.* The CMI metadata identifying *Requiem for Rights* was of course contained as a tag in the video file uploaded to YouTube, but stripped by YouTube in the processing of the video.

61.   If Gabby's Mom had used a different video editor, there might be no CMI metadata included in the Gabby's Tumultuous Tumbling video. Again, Doe would be unable to find the video that uses her recording.

**Section F**          **Metadata Background**

This section sets out the background to the creation and use of metadata – and consequently the disadvantage that is generated by its loss, particularly when content recognition services do not mitigate that loss. The analysis in Section I on the impact on creators of the actions of YouTube in deleting metadata should be read in the context of this foundational information.

**What is metadata?**

62.     An everyday definition of metadata is that it is "data about data". In computer science, a computer file is "data" but information such as its length in bytes, and the date of its creation are "metadata". We now term this "technical metadata" and metadata is the generic term: any descriptive information about an entity.

63.     So, if a coffee cup is red, then "red" is an item of metadata that describes the cup. The attribute that is described is "color" and the value taken by the attribute in this case is "red".

64.     To be useful, metadata must be machine processable and that means it must have structure and well-understood interpretation ("semantics"). Metadata may be descriptive in natural language ("red") or be taken from a limited list – a so-called "controlled vocabulary" (such as "PANTONE Red 032 U" for colors).

65.     Metadata can be categorized into groups with different characteristics and different uses. The following classification is used in this Report. Not everyone agrees with these group's names but the classification is broadly accepted. None of these is exclusive: stating that Jay Anderson played bass on Maria Schneider's

CONFIDENTIAL

*Data Lords* album is principally to ensure he gets paid, but to jazz aficionados, it contextualizes the sound of the rhythm section.

- Reference Metadata[20] (sometimes called Kernel Metadata) serves to positively define the thing described. For a recording this is usually defined as track title and version information, main artist, duration and release date. A change to the recording that makes it different will involve a change to one of these items. This is important for precision in defining (say) the subject of a license. It is also critical (as will be seen) for finding infringements online.

- Rights Management Metadata is all the information that describes the ownership, license status, payment obligations and available licensing terms relating to the use of something.

- Indexing Metadata is descriptive information about something that assists in finding it. Genre is important for creating playlists for example.

- Technical Metadata describes the way something is encoded or represented – whether an audio file is studio quality or heavily compressed for a mobile phone for instance.

- Finally, Administrative Metadata relates principally to the provenance of the metadata.

66.    Metadata can be extensive but for practical purposes, limited subsets with useful information for some particular purpose can be defined.

---

[20] "ISO/TS 22943 Principles of Identification – Terms and definitions" https://www.iso.org/obp/ui/#iso:std:iso:ts:22943:ed-1:v1:en.

Page 23

CONFIDENTIAL

67.    Basic descriptive metadata might include:

    1)  Music album

        a)  Main artist: *Maria Schneider Orchestra*

        b)  Title: *Data Lords*

        c)  Genre: *Jazz*

        d)  Format: *release of sound recordings*

        e)  Tracks: *11*

        f)  Release date: *2020*

        g)  Catalogue Number: *ArtistShare AS0176*

        h)  UPC (CD bar code number): *736952998392*

    2)  Sound Recording

        a)  Main Artist: *Maria Schneider Orchestra*

        b)  Title: *A World Lost*

        c)  Format: *sound recording*

        d)  Duration: *9 mins 41 secs*

        e)  Release date: *2020*

        f)  First release: *Data Lords*

        g)  ISRC: *USDBV2011133*

    3)  Movie

CONFIDENTIAL

      a)  Title: *5 Weddings*

      b)  Production company: *Uniglobe*

      c)  Genre: *Bollywood*

      d)  Duration: *90 mins*

      e)  Release date: *2018*

      f)  Languages: *Hindi, English*

68.    This metadata can be structured into formally specified groups when it is stored or transmitted. This can express the hierarchy seen above where the recording (track) "A World Lost" is part of the release (album) "Data Lords".

**Where does metadata come from?**

69.    To be useful, metadata must be accurate. This accuracy is best assured if it is collected close to the point of creation, while the information is still at hand. Although creators themselves are motivated to gather this metadata, their staff and their representatives are often better placed to capture information. Managers and studio engineers have good access to the information. The emergence of metadata-capture applications and web-based services like Session[21] and VEVA Sound[22] make recording it far easier than in the days when notes were written on tape boxes.

---

[21] "Session-About" https://www.session.id/about-session.
[22] "Veva Sound-Collect and Preserve" https://vevasound.com/collect-and-preserve.

70.     Some data comes from record labels: they may, for instance, decide on the name of a track after recording is complete.

71.     Some metadata is generated by machines. The technical metadata (sample rates, file-size, length) certainly is a category recorded by computers in the course of creating files and streams. But more subjective information such as genre and mood can also be extracted automatically when music is analyzed by appropriately programmed computers.

72.     As well as descriptive metadata, standard identifying codes are assigned to allow robust and unambiguous reference to particular creations and parties. These systems are agreed upon by the industry and implemented by representative bodies – typically trade associations. Compositions are identified by the International Standards Musical Work Code (ISWC), recordings by the International Standard Recording Code (ISRC) and parties (performers, songwriters and technical staff, as well as organizations) by the International Standard Name Identifier (ISNI). By using one of these codes, an entity can be accurately and unambiguously specified. There are many songs called "Let It Go" and many bands called "Atlas", but each can have a distinct code allowing them to be distinguished from each other.

**How is metadata — including CMI metadata — used?**

73.     Metadata is used to facilitate high volume licensing. Industry standards such as DDEX are used to deliver recordings to digital music platforms alongside the associated metadata – including identifiers. This information is used by the platforms in the context of prior agreements providing permission to use the

CONFIDENTIAL

recordings specified in future DDEX feeds, and indicating how usage should be reported back to the owners of the works.

74.     Metadata is also used in low volume but high value situations – for example a synchronization license to use a recording in a movie will cite the relevant metadata (probably including identifiers) to make the subject of the license unambiguous. No label wants to license a song and find on release that a movie contains a live version where they have not cleared the orchestra's rights.

75.     Metadata is the key mechanism for discovery (in a media sector sense) of creations by end users. The direct request for a particular recording is delivered by searching a platform's database for that metadata. Where the user's listening is guided by others (whether the platforms themselves or third parties), the platforms use creation metadata together with what they have learned about the user to select or recommend the next track offered.[23]

76.     Metadata is also used to find the cases where unlicensed use of a creation has occurred.[24] Ironically, because metadata is central to discovery, unauthorized uses often identify an infringing work with accurate metadata relating to the work infringed. For example, a bootleg (unauthorized) video recording of a Bruce Springsteen concert would need to include "Bruce Springsteen" in the searchable metadata if lovers of "The Boss" are to find it. This sort of metadata field can

---

[23] "Digital Music News-Session Wants to Solve the Music Metadata Mess-And Unleash Billions in Missing Royalties"
[24] "Photo Copyright Law-How can I use metadata to protect my photos?" https://photocopyrightlaw.com/how-can-i-use-metadata-to-protect-my-photos/.

CONFIDENTIAL

consequently be detected by content owners – who can use the detection to request or require the removal of that content.

**How is metadata carried?**

77.   To be useful, metadata must somehow be associated with the entity it describes. For digital music files, the simplest way is to include the metadata in the name of the file containing the recorded song.

78.   The metadata can also be carried in a separate file (a so-called "sidecar" file[25]) which allows metadata to be expressed independently of, and without dependence on, the form or format of the described entity. There is no generic structure or naming convention for sidecar files, but specifications can be defined on an application-by-application basis.

79.   Alternatively, the metadata can be embedded within the file containing the content. Most media formats specify where metadata can be placed. Termed "tagging", this ensures that the metadata remains with the entity it describes[26]. Systems such as ID3[27] designed for MP3 files allow the inclusion of many different fields containing descriptive metadata and identifiers.

80.   In the case of both sidecar files and embedded metadata, the specification can allow for highly structured information. The formal recipe or schema for this sets out the fields that are permitted, their relationship with each other, those that are always required and the values each field can take.

---

[25] "Sidecar File" https://en.wikipedia.org/wiki/Sidecar_file.
[26] "MerlinOne-What is Metadata Tagging?" https://merlinone.com/what-is-metadata-tagging/.
[27] "id3-Welcome" https://id3.org.

CONFIDENTIAL

81.  In an alternative approach, the metadata is stored in a database and the creation is assigned a key, typically one of the identifiers mentioned above, as an index to the correct record. This allows governance of the information, imposing quality control. The next section contains more detail on the nature and purpose of these databases.

82.  Finally, the metadata can be hidden in the content itself as a so-called "watermark"[28]. This is intended to be (and usually is) undetectable by users and contains information inserted into the content. Technical factors restrict the volume of information that can be added without compromising detectability, so it is common to include an identifier (often a proprietary identifier given the nature of such systems) and store the metadata separately as described above. Alternatively, very simple rights management metadata can be stored directly, such as the Cinavia watermark[29] on Blu-ray discs, indicating that content should not be freely copied.

**Where is metadata stored?**

83.  Metadata forms the basis of numerous databases in the US and worldwide. Some are maintained for the purpose of managing rights in creations, some are part of proprietary content delivery networks, but others are established to provide access to rich, general-purpose data to enable discovery, enhancement and citation.

---

[28] "Techopedia-What Does Digital Watermark Mean" https://www.techopedia.com/definition/23373/digital-watermark#:~:text=A%20digital%20watermark%20is%20data,rights%20management%20(DRM)%20technology.
[29] "CiNAViA" https://www.cinavia.com/languages/english/pages/technology.html.

84.     In the field of musical works, most Performance Rights Organizations ("PROs")
such as ASCAP[30] and BMI[31] in the US, PRS for Music[32] in the UK, SOCAN[33] in
Canada, etc., maintain databases of the works they represent. This allows them to
match usage reports from broadcasters, venues and online services – and allocate
royalties to the writers of the works stored. These organizations connect their
databases to the central database of their global confederation, CISAC[34], to
coordinate the assignment of International Standard Musical Work Codes[35]
(ISWCs)and share information among themselves.

85.     Some PROs offer a public web-based search or look-up facility. CISAC allows the
ISWC database to be searched.

86.     For sound recordings, the Collective Management Organizations (CMOs) that
manage so-called "neighboring" rights (rights that are in some countries not
regarded as copyrights – such as performers' rights) in each country typically
maintain databases for similar reasons. Some of them offer a web-based search but
all are focused on at least a large extent on national repertoire.

87.     The US-based CMO, SoundExchange[36], provides an ISRC look-up service to the
ISRC information in its databases. It does this on behalf of the registration

[30] "The American Society of Composers, Authors and Publishers"  https://www.ascap.com.
[31] "BMI" https://www.bmi.com.
[32] "PRS for Music" https://www.prsformusic.com.
[33] "SOCAN-SOCAN Reproduction Rights" https://www.socan.com/why-choose-socan-music-rights/.
[34] "CISAC-About" https://www.cisac.org/about.
[35] "ISWC" https://www.iswc.org/.
[36] "SoundExchange IRSC Search" https://isrc.soundexchange.com/#!/search.

authority for ISRC, IFPI[37], which offers its own badged version of the same service.

88.    Composer information is held by Swiss PRO, SUISA[38], on behalf of CISAC. The IPI numbers of the composers are held in this database, but it is not public – although IPI data does appear in other public information sources.

89.    Performer information is held by CMO confederation SCAPR[39] including the IPNs of performers – but it is not public.

90.    The US Music Modernization Act authorized the appointment of The MLC[40] to manage composer and publisher mechanical rights in the US[41]. The statute requires The MLC to publish its database which is being built from such submissions as are made by writers and their publishers. This data includes sound recordings in which compositions have been recorded (including ISRCs), the works themselves (including ISWCs) and writers (including their IPI numbers).

91.    The registration authority for ISNI[42] maintains the database of identities that have had an ISNI assigned. This is public and can be queried from the web and by machines.

92.    For movies, the Entertainment Identifier Registry Association[43], EIDR, maintains a database of identified audiovisual entities (movies, TV programs, edits, subtitles

---

[37] "The International Standard Recording Code" https://isrc.ifpi.org/en/.
[38] "SUISA" https://www.suisa.ch/en/home.html
[39] "SCAPR-About us" https://www.scapr.org/about-us/.
[40] "The MLC" https://www.themlc.com.
[41] "H.R.1551 - Orrin G. Hatch-Bob Goodlatte Music Modernization Act" https://www.congress.gov/bill/115th-congress/house-bill/1551/text.
[42] "ISNI" https://isni.org.
[43] "EIDR" https://www.eidr.org.

CONFIDENTIAL

etc.) and offers open access via the web and machine access[44]. The older ISAN[45] system has a different scope of coverage and offers some access free of charge, with richer information available against a fee.

93.    MusicBrainz[46] is a community-curated service where editors (mostly music fans) maintain a high-quality database covering music works and releases of them. Access is free and open, with the option to hold a synchronized local database[47]. Discogs[48] is again community based and focuses on releases. Neither claims to have complete coverage as community schemes require motivated volunteers to manage data.

94.    Various commercial aggregators of music metadata offer services. Gracenote[49], Allmusic[50] and most recently Jaxsta[51] target different aspects of the market with differentiated products.

95.    Finally, some of the music streaming providers have ancillary services that provide access to metadata rather than the music itself. The best known is the Spotify API[52] but at least Tidal[53] and Qobuz[54] offer interfaces to the information that they hold.

---

44 "EDIR-What is EIDR" https://www.eidr.org/about-us/.
45 "International Standard Audiovisual Number" https://www.isan.org.
46 "MusicBrainz-Welcome to MusicBrainz!" https://musicbrainz.org.
47 "MusicBrainz-About" https://musicbrainz.org/doc/About.
48 "Discogs" https://www.discogs.com.
49 "Gracenote" https://www.gracenote.com.
50 "ALLMUSIC" https://www.allmusic.com.
51 "Jaxsta" https://jaxsta.com.
52 "Spotify for Developers-Web API" https://developer.spotify.com/documentation/web-api/.
53 "TIDAL" https://tidal.com.
54 "GitHub-api documentation" https://github.com/Qobuz/api-documentation.

CONFIDENTIAL

96.   As noted, a substantial proportion of the data is openly available but there are no services that are comprehensive. All have limitations: most such limitations are geographical, but some relate to genre or the interest of volunteer editors.

**How is metadata lost?**

97.   The loss of metadata is like having a library for which the card index has been destroyed. It always restricts the value of the affected creations – either by reducing their utility or attractiveness, or by imposing a cost to re-associate the lost data. Lost metadata may come about through technical incompatibility, failure to appreciate that data exists and has importance, or through deliberate removal.

98.   Sometimes data is moved from one system to another and the target does not support the storage of metadata – which must therefore be archived to a separate system if it is not to disappear. It can then be difficult to associate the metadata with the correct content.

99.   More subtly, systems may not be compatible: if the source contains "date" and the target contains fields for "recording date" and "release date", then any action to transfer date information will in some cases produce a misleading result.

100.  Perhaps more common is that developers of such systems do not appreciate the value of metadata, perhaps because the current generation systems cannot exploit it and they prefer to discard it rather than accept the very small cost of processing it properly.

101.  Developers may regard such data as being untrustworthy because the information cannot be traced back to an authoritative source. They fail to realize that such

information is, on its own, very likely correct and taken as part of a larger corpus of data, certainly valuable and informative.

102.  The final case of deliberate removal is the most worrying and usually indicates a desire to cover tracks (the enthusiast recording the Springsteen bootleg in paragraph 76 will ensure that their own personal information is not included in the version they make available to other fans) or a desire to avoid screening processes which would trigger removal or other adverse consequences.

103.  Missing metadata means that creations are less discoverable than they should be and that reports of their use will be inaccurate, expensive and delayed. Industry standard identifiers will be absent, and inefficiencies will be inevitable.

104.  It was for these reasons that the World Intellectual Property Organization (WIPO) included, in its 1996 treaties[55][56], provisions to protect certain sorts of metadata termed "Rights Management Information" from abuse. The US implementation of these treaties is contained in the Digital Millennium Copyright Act ("DMCA") where Section 1202 contains the provisions around what it calls "Copyright Management Information" or "CMI"[57].

105.  The DMCA defines eight classes of information that are considered CMI[58]:

   1) The title and other information identifying the work, including the information set forth on a notice of copyright.

---

[55] "World Intellectual Property Organization - WIPO Copyright Treaty (WCT)" https://wipolex.wipo.int/en/text/295166.
[56] "World Intellectual Property Organization - WIPO Performances And Phonograms Treaty (WPPT)" https://wipolex.wipo.int/en/text/295578.
[57] 17 U.S. Code § 1202.
[58] 17 U.S. Code § 1202(c.

CONFIDENTIAL

2) The name of, and other identifying information about, the author of a work.

3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

4) With the exception of public performances of works by radio and television broadcast stations, the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work.

5) With the exception of public performances of works by radio and television broadcast stations, in the case of an audio- visual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual work.

6) Terms and conditions for use of the work.

7) Identifying numbers or symbols referring to such information or links to such information.

8) Such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work.

106. Case (1) relates to the name of the work while cases (2) to (5) relate to the names of interested parties: authors, performers, rights owners. These are all reference (kernel) metadata and also rights management data in the terms discussed above

(paragraph 65). Case (6) covering terms and conditions is clearly rights management metadata and case (7) is a rather clear definition of the identifier systems such as ISRC, ISNI and so on that appeared in the example in Section E. The ability to extend the list under the authority of the Register (8) is potentially useful but not yet exploited.

107.    It should be mentioned here that (i) all CMI is metadata but (ii) not all metadata is CMI. All the elements specified in DMCA Section 1202 meet the definition of being data about data. But there are many metadata elements that are not CMI: the genre of a song is important but does not fall into any of the categories in DMCA Section 1202.

108.    There are two different protections offered in DMCA Section 1202. The first relates to the provision, distribution or importation of CMI that is false[59]. The second relates to the removal or alteration of existing CMI[60]. The latter is broadly conditioned on the change being made in connection with copyright infringement.

109.    The DMCA does not specify how the metadata is associated with the content it describes – just that the metadata is affected. Thus, it might be applied equally to metadata in a sidecar, in a tag in the content file itself, or in a watermark.

**What benefits does metadata bring?**

110.    To creators, the most obvious benefit of metadata is discovery, by which I mean the ability to have their work found by those who would want to watch, hear, feel or otherwise experience it. The metadata of the available works is compared with

---

[59] 17 U.S. Code § 1202(a).
[60] 17 U.S. Code § 1202(b).

CONFIDENTIAL

the request of the prospective user and the matches (or at least close matches) are offered. Equally important, metadata allows creators to discover unauthorized uses of their works.

111. Metadata is important because consumers have numerous ways of expressing their choices. Some are detailed: "play me Elvis's Hound Dog", while others are vague: "play some soft jazz". Users often have these vague preferences for content from a particular genre rather than a specific work. Even if they know exactly what they want, they may not know the name. Even though they are looking for exactly the same piece, it is impossible to predict whether a user will search for "Mozart Piano Concerto No 21", "K467" or "The Theme from Elvira Madigan".

112. Metadata that describes a work accurately will allow computer programs to process vague (and even inaccurate) requests with the best chance of delivering the desired experience. It should be noted that useful description may involve the inclusion of information known to be inaccurate (though annotated as such) - if that is known to be  the way that users describe something. Many will ask for Simon and Garfunkel's "Parsley Sage Rosemary and Thyme" when the actual song title is "Scarborough Fair/Canticle", and the herbs actually form the album title.

113. Platforms both generate and utilize metadata to differentiate their products and ensure that users get the best experience possible. They utilize complex algorithms that record and exploit metadata about both the works on the platform and behavior of their users to make recommendations that are popular. This, they

CONFIDENTIAL

hope, provides an engaging selection and consumption processes. Their work involves both classifying the available repertoire and characterizing each user and their selections so that optimal matches can be offered.

114.   Users will vary in how much they are prepared to be surprised when listening to programmed material. While the platforms can learn this from behavior, they need good and accurate metadata to predict what will be "surprising", and to offer just enough of it to keep the user interested.

115.   For the most demanding listeners, the ability to demand exactly the recording they want is critical - especially in the jazz and classical genres where compositions are constantly re-interpreted and re-recorded. Their listening experience will also be enhanced by being able to follow links that result from works having common writers, performers and even recording studios.

**Section G**          **Metadata principles**

116.   In this section I set out the principles that should be followed in the media supply chain in order to avoid the outcomes that have emerged in this case. I make reference to the example in section E ("the Doe Example") to show how these principles apply in that case.

**Collect, curate and deliver**

117.   Metadata is usually quite cheap to collect but quite expensive to recover later. It therefore is critical to collect as much as possible, to record it, to preserve it, and to make it available alongside the work it describes. This is increasingly the norm as creators and supply chain professionals recognize the benefits of having good and comprehensive metadata available. In the Doe Example, the creators and technical staff do this well and give downstream users a straightforward way of using the metadata by entering it into a web-based service.

118.   There should be a presumption of delivery of metadata down the production chain. Unless a clear harm can be shown from delivering it, downstream users should be allowed to use it. Of course, in this case, these users include creators when they search for infringing uses of their creations. In the Doe Example, if the metadata had been delivered to the YouTube service and made available to end-users, Doe would have been able to search for it.

119.   Importantly, when a composite or derivative work is created, the metadata from the components ought to be included in the final result. Because the input metadata describes one of the component works, it implicitly describes the final result. Sometimes this happens (to some extent at least) by default but it should be

CONFIDENTIAL

done explicitly. In this way, the recording used in the Doe Example would have all of its metadata transferred to the gymnastics video by the video editing software. As we have seen, in the example, much of the metadata was removed at this point.

120. There is probably little prospect of video editing software adopting this recommendation as a default, but it remains best practice for users.

121. Assigning standard identifiers to creations and including these in metadata is important. They reduce ambiguity and allow precise reference to the identified work. Similarly, identifying creators prevents confusion. Provided these codes are not deleted, they allow downstream users to know exactly what a media entity is. In the Doe Example, including the ISRC of *Requiem for Rights* in the recording metadata should have made a search for it totally unambiguous except that it was removed by the video editing software, though YouTube would in any case have deleted it at the time it removed the track name. YouTube could instruct or require uploaders to include the associated ISRCs or related CMI metadata of any component works included in their videos.

**Standardizing brings many benefits**

122. Because metadata is about communicating information between disparate parties and interoperability is much enhanced by technical standards, standardization is highly desirable in most of the fields touched by metadata.

123. Standards can be set by international organizations like ISO[61], by industry consortiums like DDEX[62] or on a unilateral basis by respected vendors whose

---

[61] "ISO-About Us" https://www.iso.org/about-us.html.
[62] "DDEX-About DDEX" https://ddex.net/about-ddex/.

specifications are then adopted widely. In the example, DDEX standards would be used to deliver metadata from distributor to platform, ensuring that each field remains associated with the correct information.

124.    The standardization of identifiers is one of the most important aspects of metadata communication. The key systems are published by ISO and managed by industry associations or consortiums. Having systems that use anything other than the ISRC for recordings and ISWC for compositions is unlikely to help anyone. While the ISO-published ISNI is growing in stature, the sector-siloed identifiers for songwriters (IPI)[63] and performers (IPN)[64] remain important in those sectors. Each of these identifiers was fully exploited in the Doe Example, ensuring unambiguous reference to creations and parties.

125.    The definition of metadata structures and messaging systems are in principle separate, but in practice they work tightly together. The use of DDEX standards for each is almost universal, although there are some entrenched sector standards that are outside DDEX at the moment. Using anything other than one of these established standards brings no benefit and will increase costs considerably because of the need for separate interfaces for each business partner. Aside from its intrinsic functionality, the YouTube Content ID system accepts reference recordings using the industry standard DDEX format[65] and thereby benefits from the standardized and structured delivery of reference recordings and associated

---

[63] "CISAC-IPI" https://www.cisac.org/services/information-services/ipi.
[64] "SCAPR-IPD" https://www.scapr.org/tools-projects/ipd/.
[65] "Understanding the YouTube DDEX feed" https://support.google.com/youtube/answer/3503737?hl=en&ref_topic=3505247.

metadata. YouTube's engagement with, and implementation of, such standards speaks to their knowledge of sector metadata practices: they could use these standards to accept Content ID reference recordings from a much wider group of creators, while controlling their costs.

### Preserve metadata always

126.   There is seldom a reason to discard metadata. It is better to preserve it and pass it on, if necessary noting any uncertainties about its accuracy or provenance. In the Doe Example, metadata is scrubbed first in the video editing process, and again in content processing at YouTube.

127.   The costs of storing metadata and transmitting it are small compared to the content it describes – a CD-quality, three-minute track might occupy 16 million bytes (in FLAC[66] format). The data describing it might occupy a few hundred bytes, so the storage and transmission overhead is tiny, although the curation costs are not.

128.   If metadata relates to something that is irrelevant for some purpose, it may be valuable for other reasons. For example, the line-up of musicians recorded in the example is of no interest to the casual listener but can be of interest to a jazz enthusiast and very important to the musicians when they are due performance royalties.

129.   There is seldom a reason to ignore offered metadata. It is actually hard to ignore it because the structures in which it is held, whether in sidecar files or in content tags, mean that it must be identified and, in practice, read in order to skip over it.

---

[66] "What is FLAC?" https://xiph.org/flac/index.html.

It is in practice almost certainly easier and cheaper to keep it all than to pick and choose.

130.   In the Doe Example (and in the analysis in Section H) YouTube deletes metadata that is CMI and archives it separately from the recording, severing the link between recording and description. The effort of writing the information to a separate archive record (provided to me as structured data in a text file but previously unavailable to the Plaintiffs in any form) appears to be greater than just keeping it with the data provided by the uploader.

**Exercise a presumption of validity**

131.   Metadata is not typically cryptographically signed by the originator – which would make it tamper-proof. The choice of "9. Cerulean Skies" as metadata for a recording (see paragraph 146) might have been made capriciously, but judicious application of Occam's Razor[67] leads to the conclusion that the metadata was associated with a recording of "Cerulean Skies".

132.   In many years of working in the dark corners of the music industry I have seen many cases of falsified ownership information. In the past, criminals lied and told CD manufacturing plants they were the owner of the rights needed for the production of CDs – and the infringing discs were made. And I have seen metadata lost or removed in various production processes: someone wants a backing track for their video of skateboarders falling over and they "accidentally" fail to include the title and artist.

---

[67] "Wikipedia-Occam's razor" https://en.wikipedia.org/wiki/Occam%27s_razor.

CONFIDENTIAL

133.    But I do not believe that I have ever seen the <u>descriptive</u> information falsified by alteration. Although it is possible to do so, in general, if someone has gone to the trouble of adding descriptive metadata to content, there is a very high probability that it is accurate.

134.    A recent report[68] published in Music Business Worldwide summarizes problems with metadata quality – noting various nefarious practices aimed at securing unwarranted payments. Rights management metadata is falsified not just to divert revenue but also to dupe recommendation algorithms. Not affected is descriptive information like recording titles.

135.    When asked why Occam is an appropriate tool here, I generally encourage consideration of *cui bono* ("who benefits?"). Ownership falsification might affect remuneration flows but simple alteration of descriptive information benefits no one.

136.    Failure to accept offered metadata at face value, and deleting it rather than passing it along, prevents creators from using it to protect and exploit their rights. As I set forth below, YouTube should screen for and preserve plainly descriptive metadata, such as populated "clfn" fields, and associate that original metadata with the uploaded video — just as YouTube associates the metadata it solicits from video uploaders during the upload process.

---

[68] "MusicBusiness Worldwide-How artists are exploiting lax metadata protections by streaming services"
https://www.musicbusinessworldwide.com/how-artists-are-exploiting-lax-metadata-protections-by-streaming-services/.

**Section H          Evidence of CMI deleted from files taken down**

137.    I was asked to determine whether any CMI metadata had existed in the original
video files uploaded to YouTube that were later the subject of successful DMCA
takedown notices filed by the Plaintiffs. This section simply notes the results of
the investigation. Analysis of the impact on creators of this action is in Section I
which follows. In particular that section shows how creators are disadvantaged by
the deletion that I show here, and how YouTube reads this data in order to delete
it, while knowing that it is CMI.

138.    I was provided with a series of files that I understand had been generated as part of
content processing at YouTube. They contained the metadata that had been
extracted from uploaded video files that had subsequently been the subject of
takedown actions. I was not given details of the technical process which had
created them but was asked to check them for metadata fields that appeared to be
Copyright Management Information.

139.    The 727 files were provided in PDF format showing the structure of the extracted
data and also as plain text files which could be machine processed. Not having
access to the file format definition, I wrote software to extract and summarize the
metadata records which appeared in the files as pairs: field name and its value. I
extracted 75,135 such records, which were then sorted and summarized.

140.    Many of the metadata records contained technical metadata such as the number of
video frames in the file ("number_of_frames") but some contained metadata
relating to the creation of, and rights in, the video. There were 202 distinct field

CONFIDENTIAL

names that appeared in more than one file. I manually flagged the 15 field names associated with values appearing to be rights related.

141.    Some of the records appear to have been inserted by the YouTube uploader, presumably the person creating the video. For instance, the fields called "title" and "com.apple.quicktime.title", contain the title of the video as assigned at the time of creation of the video.

142.    Other records appear to be generated automatically by the creation software. For instance, when (i) the field is called "description" or "com.apple.quicktime.description" and (ii) the value starts "This video is about…", this appears to be a default entry that can be over-written but otherwise contains the project name used in the software.

143.    However, some fields contain metadata that has been inherited from media files used to generate the video. As set out in the example in Section E, video files are the product of video editing software. Some packages are packaged with operating systems at no incremental cost and some are products targeted at advanced consumers, costing a few hundred dollars (or a few hundred dollars per year under subscription models). Others are used in movie studios to make Hollywood blockbusters and are not economic for music enthusiasts to use.

144.    In a typical package, media files are imported to a pool[69]. These include still pictures, video files and audio files that may contain music. These files are used as

---

[69] "Import into Final Cut Pro from your Mac or storage device" - https://support.apple.com/en-gb/guide/final-cut-pro/ver418155a4/mac

CONFIDENTIAL

the components from which the final video is constructed. The user selects from the pool by, for example, dragging components onto a timeline, trimming and resizing them to fit the desired sequence, adding transitions (fades, overlays, wipes etc.) and balancing the color and audio quality to give the desired output.

145.    As noted elsewhere, metadata can be included in tags that are embedded in media files. Such tags may be present when items are added to the pool. The video editing software may read these tags in order to assist the user in selecting the correct item – but may also include them in the tags that the software itself writes into the final product video file. This may be done deliberately, or it may be done by default and without fanfare.

146.    In the metadata files examined, the field named "clfn" contains track numbers and names from an original album, such as "2.Choro dancado" which indeed appears as track 2 of the Maria Schneider Orchestra album "Concert in the Garden". Ten records with name "clfn" appeared in the data provided and many have values associated with Schneider albums:

| 20190510 Allegresse |
| --- |
| 9.Cerulean Skies |
| 2.Choro dancado |
| 6.Bombshelter Beast |
| My Lament - Hart House Jazz Ensemble |
| Wyrgly |
| A Potter\'s Song |
| My Movie 1 |

| My Lament |
| --- |
| 5.Sky Blue |

147.    According to the registration authority for the ISO MP4 file specification[70], "clfn" has been registered by Apple Inc., as a tag[71] for ClipFileName and carries the file name of a clip used as a component of the resulting video. This is consistent with the data above.

148.    This data is further analyzed immediately below where the impact on creators and rights owners is assessed.

---

[70] "MP4REG-Introduction" https://cconcolato.github.io/mp4ra/index.html.
[71] "MP4REG-Registered Types" https://cconcolato.github.io/mp4ra/atoms.html#userdata.

**Section I          Impact on creators - current and potential class members**

149.   I now turn to the relevance of these findings to members of the class. There are

numerous areas where they have been materially and adversely affected by the

actions of YouTube.

**Rights owners cannot search for data deleted before upload**

150.   Although video editing software does sometimes preserve some CMI (see Section

H), it does not include all the available CMI of components in a video file (see

paragraph 119). As a consequence, creators are unable to search for this metadata

when seeking unauthorized uses of their creations. The unauthorized use goes

undetected and creators at best forego income or potentially suffer far worse

consequences as their work is associated with products, activities or causes they

have not had the opportunity to vet.

**Rights owners cannot search for data deleted by YouTube**

151.   It is clear from Section H that when uploaders create unauthorized videos and use

audio assets that carry metadata, some of that metadata can be carried through into

the uploaded file. That metadata sometimes includes the name of the original

creation that is being used without authorization. The mechanisms by which this

happens vary according to the software used by the uploader, but the metadata in

the output video file is the metadata that was in the input audio file. This is clearly

visible in the case of the "clfn" tag. The filename of the input audio file (in these

cases the name of the recording – the track name as originally created) becomes a

part of the video file, giving clear information about where the audio has been

taken from.

152.    The name of the original audio recording that appears in the "clfn" field is

certainly rights management metadata in terms of the definitions used here and it

plainly meets the definition of CMI in the DMCA: it is the metadata field "title of

the work" as originally released.

153.    YouTube admits[72] that it simply removes this information as part of its

transcoding and content preparation process. This means that the information is

not available for searching in the YouTube index of videos and consequently the

rights owners of the audio recording are not able to detect its use, and

consequently have no opportunity to exercise their rights.

**<u>YouTube reads this data before it can delete it</u>**

154.    The nature of embedded metadata tags is that they occupy well specified positions

within the files they describe. They nestle in slots defined by length and location

between other tags and the content itself. They are not hidden or placed in obscure

locations. When YouTube processes a video file it makes full use of some of the

metadata – the technology used to encode the video for instance – without reading

this metadata YouTube cannot read the video data to transcode it for its own

purposes[73]. Similarly, frame rate and frame dimensions are used. These tags have

names that are well defined and understood by YouTube. By necessity,

YouTube's automated processes must read each field contained in the entire

metadata structure to determine whether to utilize each field as part of its analysis.

---

[72] Defendants' Responses to Interrogatory Nos. 1, 5, and 12; Defendants' Corrected Amended Responses to Interrogatory No. 1.
[73] Goodrow Depo. p. 86 ln. 22-p. 87 ln. 7.

CONFIDENTIAL

In short, YouTube must read the "clfn" tag name to determine whether to incorporate or ignore that tag in its processing.

155.   When YouTube checks the tag name and that name is "clfn", YouTube discards the information and fails to index it or associate it with the metadata contained on the video's landing page[74]. But worse than this, YouTube actually retains a copy of the tag name and its contents, as evidenced by the files that were made available to me for the analysis documented in Section H. YouTube appears to recognize that tagged metadata with a well-defined meaning is present and that it is worth archiving, but not worth making available for use as part of the operational metadata. If this were done it would be searchable via YouTube's Search bar and appear on (or via) video landing pages for machine and human consumption. Creators would then be able to find uses of their work, assess their acceptability and decide accordingly how to deal with the attempted use. Without this ability, exercising their rights is compromised.

156.   Of the ten populated "clfn" fields contained in the metadata files provided to me, 9 identify Schneider works. The tenth, "My Movie 1," appears to be a standard filename, possibly created by video software. While associating "My Movie 1" with a video file uploaded to YouTube would not help identify an infringing work, it is similarly unlikely to create confusion. Any "clfn" fields populated with gibberish will not impact the video — they simply will not end up in search results. By contrast, associating the names of Schneider's works that are contained

---

[74] Bornheimer Depo. P.229 ln. 20-p. 230 ln. 12.

CONFIDENTIAL

in the remaining populated "clfn" fields with their uploaded videos would greatly

help in finding infringing works.

**<u>YouTube knows the meaning of the metadata</u>**

157.    Because it is owned by Google, YouTube has access to the world's largest registry

of indexed information and could[75], if it chose to, make inferences from the

metadata it currently elects to discard. The discarded metadata contains the key to

further information already held or indexed by Google.

158.    For example, the contents of the "clfn" tag in the files examined for this report can

be used as the core of a search in Google. In a simple test, some of the contents of

"clfn" tags were surrounded by double quotes (to force a literal search), prefixed

with "recording" and used as Google search terms. The following seven tag

contents produced relevant "hits" in Google's search engine:

| |
|---|
| 9.Cerulean Skies |
| 2.Choro dancado |
| 6.Bombshelter Beast |
| My Lament - Hart House Jazz Ensemble |
| A Potter\'s Song |
| My Lament |
| 5.Sky Blue |

159.    In these seven cases (of the ten values discovered and documented in paragraph

146), the relevant Maria Schneider recording appears in the first page of results –

---

[75] "Google Search-How Google Search organizes information" https://www.google.com/search/howsearchworks/how-search-works/organizing-information/.

sometimes at the very top. Thus, Google's own search engine illustrates Defendants' capacity to identify and recognize CMI metadata in a standard field designed to identify component works of a user-generated video.

160.  I listed databases in the recorded music sector at paragraph 83 et seq. They contain much open information about the recordings whose metadata appears in these videos. This data is available to Google and has presumably already been indexed by them. It may indeed already be stored in their system as part of the indexing process. The available data certainly allows the useful information to be discriminated from the chaff (the technical metadata and so on) and the content status (whether likely infringing or otherwise) to be determined.

161.  In its own operations, Google uses exactly this kind of search to route consumers to paid advertising, monetized videos and sponsored content. It is the market leader in the sector and employs some of the world's best data scientists to ensure that it retains this position[76].

162.  Using the Google search engine with track titles often leads directly to links that are commercially valuable. Some of them are marked as advertising and others are clearly monetized – generating revenue for the uploader and for Google. That Google can do this when it benefits them shows that they could (as suggested above) do similar things including re-creating the entire missing metadata

---

[76] An example: "The Denver Post-Google Maps to put ads inside directions map for first time" https://www.denverpost.com/2016/05/24/google-maps-adds-more-ads/.

collection when presented with content exhibiting stripped metadata or limited

tagged metadata in uploads.

## YouTube deletes enormous quantities of useful metadata

163.   The analysis (see Section H) conducted for this Report covered 727 files. In 2019

it was reported[77] that 500 hours of video were uploaded to YouTube every minute.

The analysis clearly covers a miniscule proportion of the total available video

content. Yet even in these files, nine clear instances of deleted CMI metadata

useful to rights owners were discovered and seven of these linked to Maria

Schneider's work using Google's own information index. The scope of this

analysis was obviously self-selecting in that the videos had been notified for

takedown.

164.   If the average video is 11.7 minutes long[78], then 500 hours per minutes equates to

3.6 million videos per day, all of which apparently have their metadata discarded.

Of course, not all of these will have metadata qualifying as CMI (or even as being

useful to rights owners) but even if a small fraction of these videos contain

metadata that identifies infringed component works, then YouTube's removal of

this metadata is hindering the ability of many ordinary copyright owners to find

infringing videos.

165.   This deleted metadata is not obscure or hidden – a few minutes scanning the files

allowed it to be seen and a limited amount of time writing analysis scripts (which

---

[77] "tubefilter-More Than 500 Hours Of Content Are Now Being Uploaded To YouTube Every Minute"
https://www.tubefilter.com/2019/05/07/number-hours-video-uploaded-to-youtube-per-minute/.
[78] "statista-Average YouTube video length 2018, by category" https://www.statista.com/statistics/1026923/youtube-video-category-average-length/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

would be much reduced in the hands of YouTube's skilled programmers) elicited quantitative information. YouTube cannot reasonably be in doubt that some of the metadata it scrubs is CMI. By deleting it, YouTube not only prejudices the interests of creators and rights owners who cannot find infringements and take action, but places itself on the wrong side of Section 1202 in doing so. When CMI is deleted and that allows an infringement to persist, that must surely be concealment.

**YouTube can detect music in video soundtracks and is aware that most recording metadata has been stripped**

166. YouTube analyses uploads of videos to extract semantic information for its own indexing functions. This is confirmed in document "Life of a YouTube upload"[79]:

> *Golden6 annotates YouTube videos with entities from the Google Knowledge Graph. These annotations tag the video with its subject matter. For example, Golden6 can detect that a video is about an abstract concept like "sports" or "cooking", or a specific entity like "tennis" or "cheesecake". Data from Golden6, as well as Content ID and other analysis, is important later during corpus indexing.*

167. Video analysis software that can determine that the subject matter of a video is "cheesecake" can certainly determine that the soundtrack consists of music.

168. YouTube is one of the largest services dealing in recorded music. It understands the structures and specifications used in the sector because, as noted in paragraph 125, it uses industry-standard DDEX (Digital Data Exchange, LLC) systems to accept recordings and metadata from its partners. Indeed, it is a charter member of

---

[79] GOOG-SCHNDR-00034775

CONFIDENTIAL

DDEX[80] and its representative Greg Quillard sits on the DDEX Executive Committee[81].

169.   YouTube is therefore well aware that electronically released recordings have extensive metadata associated with them when they are released and that some or all of this metadata is usually embedded into downloaded files (for instance in MP3 or FLAC files).

170.   YouTube is also aware that many CDs issued from the launch of the format and most issued since about 2000 have contained ISRC codes in the "subcode"[82] of the format. The industry had production checks that made it hard to have discs manufactured without these codes. The absence of such standardized metadata when such music has been used is necessarily apparent to YouTube.

171.   When YouTube accepts the upload of a video file with music content and without metadata about the music, it must be aware that the metadata (that it knows has been present) has been removed at some point. It is not clear whether it understands the exact mechanisms of this removal, but its absence will be apparent to YouTube.

172.   Since the industry practice is that music recordings are released with metadata associated with them, the absence of metadata describing that music is a clear indication that such metadata has been removed.

---

[80] "Music Week-DDEX consortium adds new charter members" https://www.musicweek.com/news/read/ddex-consortium-adds-new-charter-members/044728.
[81] "DDEX-Executive Board" https://ddex.net/about-ddex/executive-board/.
[82] "Wikipedia-Compact Disc subcode" https://en.wikipedia.org/wiki/Compact_Disc_subcode.

CONFIDENTIAL

Respectfully Submitted This Day Of September 1, 2022,



X

Paul Jessop

CONFIDENTIAL

**Section J            Annex - List of technical standards consulted**

**ISO International Standards:**

173.   ISO 3901:2019 Information and Documentation – International Standard Recording Code (ISRC)

174.   ISO 15707:2001 Information and documentation — International Standard Musical Work Code (ISWC)

175.   ISO 26324:2012 Information and documentation — Digital object identifier system

176.   ISO 27729:2012 Information and documentation — International standard name identifier (ISNI)

**ISO Technical Specifications**

177.   ISO/TS 22943:2022 Information and documentation — Principles of identification

**Other specifications**

178.   Entertainment Identifier Registry Association - EIDR 2.6 DATA FIELDS REFERENCE, available at https://www.eidr.org/documents/EIDR%202.6%20Data%20Fields%20Reference.pdf

179.   RIFF (Resource Interchange File Format), available at https://www.loc.gov/preservation/digital/formats/fdd/fdd000025.shtml

180.   International Telecommunications Union - Radiocommunication Sector - Recommendation ITU-R BS.2088-1 (10/2019) - Long-form file format for the international exchange of audio programme materials with metadata, available at https://www.itu.int/dms_pubrec/itu-r/rec/bs/R-REC-BS.2088-1-201910-I!!PDF-E.pdf

181.   QuickTime File Format Specification, available at https://developer.apple.com/library/archive/documentation/QuickTime/QTFF/QTFFPreface/qtffPreface.html

CONFIDENTIAL

**<u>Section K</u>          <u>Annex - List of software package documentation consulted</u>**

"0xED" binary file editor v1.1.4 (Suavetech)

"Kid3" audio metadata tag editor (Urs Fleisch – GNU General Public License)

"Final Cut Pro" video editor (Apple)

CONFIDENTIAL

**Section L          Annex - List of papers and reports consulted**

182.    The <indecs> metadata framework - Principles, model and data dictionary, Godfrey Rust & Mark Bide, June 2000, available at https://www.doi.org/topics/indecs/indecs_framework_2000.pdf

183.    Embedded Metadata (in WAVE Files), Chris Lacinak (AV Preserve), available at https://www.avpreserve.com/wp-content/uploads/2017/07/AVPS_Lacinak_Embedded_Metadata_MLA_2011.pdf

184.    Linked Content Coalition Principles of identification, Norman Paskin & Godfrey Rust, available at http://www.linkedcontentcoalition.org/phocadownload/LCC%20Principles%20of%20identification%20including%20appendices%20v1.1.pdf

CONFIDENTIAL

## Section M          Annex – List of materials related to the present matter

### Directory DDEX

GOOG-SCHNDR-00000924
GOOG-SCHNDR-00001157
GOOG-SCHNDR-00020003
GOOG-SCHNDR-00020258
GOOG-SCHNDR-00020357
GOOG-SCHNDR-00020396
GOOG-SCHNDR-00020444
GOOG-SCHNDR-00020445
GOOG-SCHNDR-00020481
GOOG-SCHNDR-00020708
GOOG-SCHNDR-00020765
GOOG-SCHNDR-00020825
GOOG-SCHNDR-00020862
GOOG-SCHNDR-00020958
GOOG-SCHNDR-00028283
GOOG-SCHNDR-00028289
GOOG-SCHNDR-00028294
GOOG-SCHNDR-00028316
GOOG-SCHNDR-00028317
GOOG-SCHNDR-00028342
GOOG-SCHNDR-00028348
GOOG-SCHNDR-00028362
GOOG-SCHNDR-00028479
GOOG-SCHNDR-00028498
GOOG-SCHNDR-00028524
GOOG-SCHNDR-00028531
GOOG-SCHNDR-00028540
GOOG-SCHNDR-00033012
GOOG-SCHNDR-00037962
GOOG-SCHNDR-00038782
GOOG-SCHNDR-00038910
GOOG-SCHNDR-00038932
GOOG-SCHNDR-00039729
GOOG-SCHNDR-00039731
GOOG-SCHNDR-00039733

### Directory ISRC ISWC

GOOG-SCHNDR-00000316
GOOG-SCHNDR-00001467
GOOG-SCHNDR-00020553
GOOG-SCHNDR-00020578
GOOG-SCHNDR-00020802
GOOG-SCHNDR-00027991
GOOG-SCHNDR-00028248

CONFIDENTIAL

GOOG-SCHNDR-00029083
GOOG-SCHNDR-00029474
GOOG-SCHNDR-00029477
GOOG-SCHNDR-00029620
GOOG-SCHNDR-00029622
GOOG-SCHNDR-00029769
GOOG-SCHNDR-00029868
GOOG-SCHNDR-00029885
GOOG-SCHNDR-00029911
GOOG-SCHNDR-00029914
GOOG-SCHNDR-00032722
GOOG-SCHNDR-00038808
GOOG-SCHNDR-00038826
GOOG-SCHNDR-00038878
GOOG-SCHNDR-00038946
GOOG-SCHNDR-00040283
GOOG-SCHNDR-00040290
GOOG-SCHNDR-00040293
GOOG-SCHNDR-00040294
GOOG-SCHNDR-00040295
GOOG-SCHNDR-00040299
GOOG-SCHNDR-00040303
GOOG-SCHNDR-00040304
GOOG-SCHNDR-00040305
GOOG-SCHNDR-00040325
GOOG-SCHNDR-00040326
GOOG-SCHNDR-00040340
GOOG-SCHNDR-00040363
GOOG-SCHNDR-00040366
GOOG-SCHNDR-00040371
GOOG-SCHNDR-00040373
GOOG-SCHNDR-00042071
GOOG-SCHNDR-00042888
GOOG-SCHNDR-00050390
GOOG-SCHNDR-00051180
GOOG-SCHNDR-00051189

## **Directory PB**

GOOG-SCHNDR-00043869
GOOG-SCHNDR-00043873
GOOG-SCHNDR-00043877
GOOG-SCHNDR-00043879
GOOG-SCHNDR-00043883
GOOG-SCHNDR-00043887
GOOG-SCHNDR-00043891
GOOG-SCHNDR-00043894
GOOG-SCHNDR-00043898
GOOG-SCHNDR-00043902

CONFIDENTIAL

GOOG-SCHNDR-00043906
GOOG-SCHNDR-00043911
GOOG-SCHNDR-00043915
GOOG-SCHNDR-00043918
GOOG-SCHNDR-00043922
GOOG-SCHNDR-00043925
GOOG-SCHNDR-00043928
GOOG-SCHNDR-00043931
GOOG-SCHNDR-00048045
GOOG-SCHNDR-00048048
GOOG-SCHNDR-00048051
GOOG-SCHNDR-00048053
GOOG-SCHNDR-00048054
GOOG-SCHNDR-00048055
GOOG-SCHNDR-00048058
GOOG-SCHNDR-00048060
GOOG-SCHNDR-00048061
GOOG-SCHNDR-00048064
GOOG-SCHNDR-00048066
GOOG-SCHNDR-00048069
GOOG-SCHNDR-00048071
GOOG-SCHNDR-00048073
GOOG-SCHNDR-00048074
GOOG-SCHNDR-00048077
GOOG-SCHNDR-00048080
GOOG-SCHNDR-00048083
GOOG-SCHNDR-00048086
GOOG-SCHNDR-00048089
GOOG-SCHNDR-00048092
GOOG-SCHNDR-00048094
GOOG-SCHNDR-00048095
GOOG-SCHNDR-00048098
GOOG-SCHNDR-00048101
GOOG-SCHNDR-00048103
GOOG-SCHNDR-00048106
GOOG-SCHNDR-00048108
GOOG-SCHNDR-00048110
GOOG-SCHNDR-00048114
GOOG-SCHNDR-00048117
GOOG-SCHNDR-00048120
GOOG-SCHNDR-00048122
GOOG-SCHNDR-00048125
GOOG-SCHNDR-00048126
GOOG-SCHNDR-00048129
GOOG-SCHNDR-00048132
GOOG-SCHNDR-00048133
GOOG-SCHNDR-00048135
GOOG-SCHNDR-00048137
GOOG-SCHNDR-00048139

CONFIDENTIAL

GOOG-SCHNDR-00048141
GOOG-SCHNDR-00048144
GOOG-SCHNDR-00048146
GOOG-SCHNDR-00048147
GOOG-SCHNDR-00048150
GOOG-SCHNDR-00048153
GOOG-SCHNDR-00048156
GOOG-SCHNDR-00048159
GOOG-SCHNDR-00048163
GOOG-SCHNDR-00048166
GOOG-SCHNDR-00048169
GOOG-SCHNDR-00048172
GOOG-SCHNDR-00048176
GOOG-SCHNDR-00048179
GOOG-SCHNDR-00048182
GOOG-SCHNDR-00048183
GOOG-SCHNDR-00048186
GOOG-SCHNDR-00048189
GOOG-SCHNDR-00048193
GOOG-SCHNDR-00048195
GOOG-SCHNDR-00048196
GOOG-SCHNDR-00048199
GOOG-SCHNDR-00048202
GOOG-SCHNDR-00048205
GOOG-SCHNDR-00048208
GOOG-SCHNDR-00048211
GOOG-SCHNDR-00048213
GOOG-SCHNDR-00048216
GOOG-SCHNDR-00048217
GOOG-SCHNDR-00048219
GOOG-SCHNDR-00048223
GOOG-SCHNDR-00048226
GOOG-SCHNDR-00048230
GOOG-SCHNDR-00048232
GOOG-SCHNDR-00048235
GOOG-SCHNDR-00048238
GOOG-SCHNDR-00048242
GOOG-SCHNDR-00048245
GOOG-SCHNDR-00048247
GOOG-SCHNDR-00048250
GOOG-SCHNDR-00048253
GOOG-SCHNDR-00048255
GOOG-SCHNDR-00048258
GOOG-SCHNDR-00048261
GOOG-SCHNDR-00048262
GOOG-SCHNDR-00048266
GOOG-SCHNDR-00048269
GOOG-SCHNDR-00048270
GOOG-SCHNDR-00048273

CONFIDENTIAL

GOOG-SCHNDR-00048277
GOOG-SCHNDR-00048280
GOOG-SCHNDR-00048281
GOOG-SCHNDR-00048284
GOOG-SCHNDR-00048286
GOOG-SCHNDR-00048288
GOOG-SCHNDR-00048290
GOOG-SCHNDR-00048293
GOOG-SCHNDR-00048296
GOOG-SCHNDR-00048299
GOOG-SCHNDR-00048304
GOOG-SCHNDR-00048307
GOOG-SCHNDR-00048310
GOOG-SCHNDR-00048311
GOOG-SCHNDR-00048314
GOOG-SCHNDR-00048316
GOOG-SCHNDR-00048319
GOOG-SCHNDR-00048321
GOOG-SCHNDR-00048325
GOOG-SCHNDR-00048328
GOOG-SCHNDR-00048331
GOOG-SCHNDR-00048334
GOOG-SCHNDR-00048337
GOOG-SCHNDR-00048340
GOOG-SCHNDR-00048343
GOOG-SCHNDR-00048346
GOOG-SCHNDR-00048349
GOOG-SCHNDR-00048353
GOOG-SCHNDR-00048355
GOOG-SCHNDR-00048358
GOOG-SCHNDR-00048360
GOOG-SCHNDR-00048363
GOOG-SCHNDR-00048366
GOOG-SCHNDR-00048368
GOOG-SCHNDR-00048371
GOOG-SCHNDR-00048374
GOOG-SCHNDR-00048378
GOOG-SCHNDR-00048381
GOOG-SCHNDR-00048383
GOOG-SCHNDR-00048384
GOOG-SCHNDR-00048387
GOOG-SCHNDR-00048390
GOOG-SCHNDR-00048394
GOOG-SCHNDR-00048397
GOOG-SCHNDR-00048399
GOOG-SCHNDR-00048402
GOOG-SCHNDR-00048405
GOOG-SCHNDR-00048408
GOOG-SCHNDR-00048412

CONFIDENTIAL

GOOG-SCHNDR-00048415
GOOG-SCHNDR-00048416
GOOG-SCHNDR-00048418
GOOG-SCHNDR-00048421
GOOG-SCHNDR-00048425
GOOG-SCHNDR-00048428
GOOG-SCHNDR-00048431
GOOG-SCHNDR-00048434
GOOG-SCHNDR-00048437
GOOG-SCHNDR-00048440
GOOG-SCHNDR-00048443
GOOG-SCHNDR-00048446
GOOG-SCHNDR-00048449
GOOG-SCHNDR-00048451
GOOG-SCHNDR-00048454
GOOG-SCHNDR-00048457
GOOG-SCHNDR-00048459
GOOG-SCHNDR-00048460
GOOG-SCHNDR-00048463
GOOG-SCHNDR-00048466
GOOG-SCHNDR-00048467
GOOG-SCHNDR-00048470
GOOG-SCHNDR-00048472
GOOG-SCHNDR-00048475
GOOG-SCHNDR-00048478
GOOG-SCHNDR-00048481
GOOG-SCHNDR-00048484
GOOG-SCHNDR-00048487
GOOG-SCHNDR-00048490
GOOG-SCHNDR-00048493
GOOG-SCHNDR-00048496
GOOG-SCHNDR-00048500
GOOG-SCHNDR-00048504
GOOG-SCHNDR-00048505
GOOG-SCHNDR-00048508
GOOG-SCHNDR-00048511
GOOG-SCHNDR-00048514
GOOG-SCHNDR-00048516
GOOG-SCHNDR-00048520
GOOG-SCHNDR-00048522
GOOG-SCHNDR-00048524
GOOG-SCHNDR-00048527
GOOG-SCHNDR-00048530
GOOG-SCHNDR-00048533
GOOG-SCHNDR-00048535
GOOG-SCHNDR-00048538
GOOG-SCHNDR-00048539
GOOG-SCHNDR-00048541
GOOG-SCHNDR-00048544

CONFIDENTIAL

GOOG-SCHNDR-00048549
GOOG-SCHNDR-00048550
GOOG-SCHNDR-00048551
GOOG-SCHNDR-00048554
GOOG-SCHNDR-00048557
GOOG-SCHNDR-00048560
GOOG-SCHNDR-00048563
GOOG-SCHNDR-00048566
GOOG-SCHNDR-00048569
GOOG-SCHNDR-00048572
GOOG-SCHNDR-00048574
GOOG-SCHNDR-00048577
GOOG-SCHNDR-00048580
GOOG-SCHNDR-00048582
GOOG-SCHNDR-00048585
GOOG-SCHNDR-00048586
GOOG-SCHNDR-00048589
GOOG-SCHNDR-00048592
GOOG-SCHNDR-00048594
GOOG-SCHNDR-00048597
GOOG-SCHNDR-00048604
GOOG-SCHNDR-00048607
GOOG-SCHNDR-00048610
GOOG-SCHNDR-00048612
GOOG-SCHNDR-00048615
GOOG-SCHNDR-00048618
GOOG-SCHNDR-00048621
GOOG-SCHNDR-00048624
GOOG-SCHNDR-00048627
GOOG-SCHNDR-00048629
GOOG-SCHNDR-00048633
GOOG-SCHNDR-00048635
GOOG-SCHNDR-00048637
GOOG-SCHNDR-00048640
GOOG-SCHNDR-00048643
GOOG-SCHNDR-00048646
GOOG-SCHNDR-00048648
GOOG-SCHNDR-00048651
GOOG-SCHNDR-00048652
GOOG-SCHNDR-00048653
GOOG-SCHNDR-00048656
GOOG-SCHNDR-00048658
GOOG-SCHNDR-00048661
GOOG-SCHNDR-00048664
GOOG-SCHNDR-00048668
GOOG-SCHNDR-00048670
GOOG-SCHNDR-00048673
GOOG-SCHNDR-00048675
GOOG-SCHNDR-00048678

CONFIDENTIAL

GOOG-SCHNDR-00048680
GOOG-SCHNDR-00048683
GOOG-SCHNDR-00048686
GOOG-SCHNDR-00048689
GOOG-SCHNDR-00048692
GOOG-SCHNDR-00048694
GOOG-SCHNDR-00048697
GOOG-SCHNDR-00048699
GOOG-SCHNDR-00048702
GOOG-SCHNDR-00048705
GOOG-SCHNDR-00048707
GOOG-SCHNDR-00048710
GOOG-SCHNDR-00048711
GOOG-SCHNDR-00048714
GOOG-SCHNDR-00048717
GOOG-SCHNDR-00048720
GOOG-SCHNDR-00048723
GOOG-SCHNDR-00048726
GOOG-SCHNDR-00048730
GOOG-SCHNDR-00048733
GOOG-SCHNDR-00048736
GOOG-SCHNDR-00048739
GOOG-SCHNDR-00048742
GOOG-SCHNDR-00048744
GOOG-SCHNDR-00048748
GOOG-SCHNDR-00048751
GOOG-SCHNDR-00048754
GOOG-SCHNDR-00048757
GOOG-SCHNDR-00048760
GOOG-SCHNDR-00048763
GOOG-SCHNDR-00048766
GOOG-SCHNDR-00048768
GOOG-SCHNDR-00048770
GOOG-SCHNDR-00048773
GOOG-SCHNDR-00048776
GOOG-SCHNDR-00048779
GOOG-SCHNDR-00048782
GOOG-SCHNDR-00048785
GOOG-SCHNDR-00048788
GOOG-SCHNDR-00048791
GOOG-SCHNDR-00048793
GOOG-SCHNDR-00048796
GOOG-SCHNDR-00048799
GOOG-SCHNDR-00048801
GOOG-SCHNDR-00048802
GOOG-SCHNDR-00048805
GOOG-SCHNDR-00048808
GOOG-SCHNDR-00048810
GOOG-SCHNDR-00048813

CONFIDENTIAL

GOOG-SCHNDR-00048816
GOOG-SCHNDR-00048820
GOOG-SCHNDR-00048822
GOOG-SCHNDR-00048826
GOOG-SCHNDR-00048829
GOOG-SCHNDR-00048833
GOOG-SCHNDR-00048834
GOOG-SCHNDR-00048837
GOOG-SCHNDR-00048840
GOOG-SCHNDR-00048843
GOOG-SCHNDR-00048845
GOOG-SCHNDR-00048847
GOOG-SCHNDR-00048849
GOOG-SCHNDR-00048850
GOOG-SCHNDR-00048853
GOOG-SCHNDR-00048856
GOOG-SCHNDR-00048859
GOOG-SCHNDR-00048861
GOOG-SCHNDR-00048864
GOOG-SCHNDR-00048867
GOOG-SCHNDR-00048870
GOOG-SCHNDR-00048873
GOOG-SCHNDR-00048874
GOOG-SCHNDR-00048877
GOOG-SCHNDR-00048878
GOOG-SCHNDR-00048881
GOOG-SCHNDR-00048884
GOOG-SCHNDR-00048888
GOOG-SCHNDR-00048891
GOOG-SCHNDR-00048895
GOOG-SCHNDR-00048897
GOOG-SCHNDR-00048899
GOOG-SCHNDR-00048901
GOOG-SCHNDR-00048903
GOOG-SCHNDR-00048905
GOOG-SCHNDR-00048907
GOOG-SCHNDR-00048909
GOOG-SCHNDR-00048911
GOOG-SCHNDR-00048914
GOOG-SCHNDR-00048917
GOOG-SCHNDR-00048920
GOOG-SCHNDR-00048923
GOOG-SCHNDR-00048926
GOOG-SCHNDR-00048930
GOOG-SCHNDR-00048934
GOOG-SCHNDR-00048936
GOOG-SCHNDR-00048939
GOOG-SCHNDR-00048942
GOOG-SCHNDR-00048945

CONFIDENTIAL

GOOG-SCHNDR-00048947
GOOG-SCHNDR-00048950
GOOG-SCHNDR-00048953
GOOG-SCHNDR-00048955
GOOG-SCHNDR-00048958
GOOG-SCHNDR-00048961
GOOG-SCHNDR-00048964
GOOG-SCHNDR-00048967
GOOG-SCHNDR-00048970
GOOG-SCHNDR-00048973
GOOG-SCHNDR-00048975
GOOG-SCHNDR-00048978
GOOG-SCHNDR-00048980
GOOG-SCHNDR-00048983
GOOG-SCHNDR-00048986
GOOG-SCHNDR-00048989
GOOG-SCHNDR-00048991
GOOG-SCHNDR-00048994
GOOG-SCHNDR-00048997
GOOG-SCHNDR-00049000
GOOG-SCHNDR-00049002
GOOG-SCHNDR-00049006
GOOG-SCHNDR-00049009
GOOG-SCHNDR-00049012
GOOG-SCHNDR-00049014
GOOG-SCHNDR-00049017
GOOG-SCHNDR-00049020
GOOG-SCHNDR-00049022
GOOG-SCHNDR-00049025
GOOG-SCHNDR-00049027
GOOG-SCHNDR-00049030
GOOG-SCHNDR-00049032
GOOG-SCHNDR-00049034
GOOG-SCHNDR-00049036
GOOG-SCHNDR-00049038
GOOG-SCHNDR-00049039
GOOG-SCHNDR-00049041
GOOG-SCHNDR-00049043
GOOG-SCHNDR-00049045
GOOG-SCHNDR-00049047
GOOG-SCHNDR-00049050
GOOG-SCHNDR-00049053
GOOG-SCHNDR-00049055
GOOG-SCHNDR-00049058
GOOG-SCHNDR-00049062
GOOG-SCHNDR-00049065
GOOG-SCHNDR-00049066
GOOG-SCHNDR-00049069
GOOG-SCHNDR-00049072

CONFIDENTIAL

GOOG-SCHNDR-00049075
GOOG-SCHNDR-00049078
GOOG-SCHNDR-00049081
GOOG-SCHNDR-00049084
GOOG-SCHNDR-00049086
GOOG-SCHNDR-00049090
GOOG-SCHNDR-00049092
GOOG-SCHNDR-00049094
GOOG-SCHNDR-00049097
GOOG-SCHNDR-00049098
GOOG-SCHNDR-00049102
GOOG-SCHNDR-00049106
GOOG-SCHNDR-00049109
GOOG-SCHNDR-00049112
GOOG-SCHNDR-00049115
GOOG-SCHNDR-00049119
GOOG-SCHNDR-00049122
GOOG-SCHNDR-00049125
GOOG-SCHNDR-00049127
GOOG-SCHNDR-00049130
GOOG-SCHNDR-00049133
GOOG-SCHNDR-00049135
GOOG-SCHNDR-00049138
GOOG-SCHNDR-00049140
GOOG-SCHNDR-00049143
GOOG-SCHNDR-00049146
GOOG-SCHNDR-00049150
GOOG-SCHNDR-00049152
GOOG-SCHNDR-00049154
GOOG-SCHNDR-00049156
GOOG-SCHNDR-00049158
GOOG-SCHNDR-00049161
GOOG-SCHNDR-00049164
GOOG-SCHNDR-00049167
GOOG-SCHNDR-00049168
GOOG-SCHNDR-00049171
GOOG-SCHNDR-00049173
GOOG-SCHNDR-00049176
GOOG-SCHNDR-00049177
GOOG-SCHNDR-00049180
GOOG-SCHNDR-00049183
GOOG-SCHNDR-00049185
GOOG-SCHNDR-00049188
GOOG-SCHNDR-00049191
GOOG-SCHNDR-00049193
GOOG-SCHNDR-00049196
GOOG-SCHNDR-00049199
GOOG-SCHNDR-00049200
GOOG-SCHNDR-00049203

GOOG-SCHNDR-00049204
GOOG-SCHNDR-00049206
GOOG-SCHNDR-00049209
GOOG-SCHNDR-00049212
GOOG-SCHNDR-00049215
GOOG-SCHNDR-00049218
GOOG-SCHNDR-00049219
GOOG-SCHNDR-00049222
GOOG-SCHNDR-00049225
GOOG-SCHNDR-00049228
GOOG-SCHNDR-00049231
GOOG-SCHNDR-00049234
GOOG-SCHNDR-00049235
GOOG-SCHNDR-00049239
GOOG-SCHNDR-00049242
GOOG-SCHNDR-00049247
GOOG-SCHNDR-00049249
GOOG-SCHNDR-00049250
GOOG-SCHNDR-00049253
GOOG-SCHNDR-00049256
GOOG-SCHNDR-00049259
GOOG-SCHNDR-00049262
GOOG-SCHNDR-00049265
GOOG-SCHNDR-00049268
GOOG-SCHNDR-00049271
GOOG-SCHNDR-00049274
GOOG-SCHNDR-00049277
GOOG-SCHNDR-00049279
GOOG-SCHNDR-00049282
GOOG-SCHNDR-00049285
GOOG-SCHNDR-00049288
GOOG-SCHNDR-00049290
GOOG-SCHNDR-00049293
GOOG-SCHNDR-00049295
GOOG-SCHNDR-00049298
GOOG-SCHNDR-00049301
GOOG-SCHNDR-00049303
GOOG-SCHNDR-00049306
GOOG-SCHNDR-00049308
GOOG-SCHNDR-00049311
GOOG-SCHNDR-00049313
GOOG-SCHNDR-00049315
GOOG-SCHNDR-00049318
GOOG-SCHNDR-00049321
GOOG-SCHNDR-00049324
GOOG-SCHNDR-00049326
GOOG-SCHNDR-00049329
GOOG-SCHNDR-00049332
GOOG-SCHNDR-00049335

CONFIDENTIAL

GOOG-SCHNDR-00049338
GOOG-SCHNDR-00049341
GOOG-SCHNDR-00049344
GOOG-SCHNDR-00049348
GOOG-SCHNDR-00049352
GOOG-SCHNDR-00049355
GOOG-SCHNDR-00049358
GOOG-SCHNDR-00049359
GOOG-SCHNDR-00049361
GOOG-SCHNDR-00049364
GOOG-SCHNDR-00049367
GOOG-SCHNDR-00049370
GOOG-SCHNDR-00049372
GOOG-SCHNDR-00049375
GOOG-SCHNDR-00049378
GOOG-SCHNDR-00049381
GOOG-SCHNDR-00049385
GOOG-SCHNDR-00049388
GOOG-SCHNDR-00049391
GOOG-SCHNDR-00049394
GOOG-SCHNDR-00049396
GOOG-SCHNDR-00049398
GOOG-SCHNDR-00049401
GOOG-SCHNDR-00049405
GOOG-SCHNDR-00049408
GOOG-SCHNDR-00049411
GOOG-SCHNDR-00049414
GOOG-SCHNDR-00049417
GOOG-SCHNDR-00049419
GOOG-SCHNDR-00049422
GOOG-SCHNDR-00049423
GOOG-SCHNDR-00049425
GOOG-SCHNDR-00049428
GOOG-SCHNDR-00049431
GOOG-SCHNDR-00049433
GOOG-SCHNDR-00049435
GOOG-SCHNDR-00049438
GOOG-SCHNDR-00049441
GOOG-SCHNDR-00049444
GOOG-SCHNDR-00049447
GOOG-SCHNDR-00049449
GOOG-SCHNDR-00049452
GOOG-SCHNDR-00049455
GOOG-SCHNDR-00049458
GOOG-SCHNDR-00049460
GOOG-SCHNDR-00049463
GOOG-SCHNDR-00049467
GOOG-SCHNDR-00049469
GOOG-SCHNDR-00049472

CONFIDENTIAL

GOOG-SCHNDR-00049476
GOOG-SCHNDR-00049480
GOOG-SCHNDR-00049481
GOOG-SCHNDR-00049484
GOOG-SCHNDR-00049487
GOOG-SCHNDR-00049490
GOOG-SCHNDR-00049491
GOOG-SCHNDR-00049494
GOOG-SCHNDR-00049497
GOOG-SCHNDR-00049499
GOOG-SCHNDR-00049504
GOOG-SCHNDR-00049507
GOOG-SCHNDR-00049511
GOOG-SCHNDR-00049514
GOOG-SCHNDR-00049517
GOOG-SCHNDR-00049520
GOOG-SCHNDR-00049524
GOOG-SCHNDR-00049527
GOOG-SCHNDR-00049530
GOOG-SCHNDR-00049533
GOOG-SCHNDR-00049534
GOOG-SCHNDR-00049536
GOOG-SCHNDR-00049538
GOOG-SCHNDR-00049541
GOOG-SCHNDR-00049544
GOOG-SCHNDR-00049547
GOOG-SCHNDR-00049548
GOOG-SCHNDR-00049551
GOOG-SCHNDR-00049554
GOOG-SCHNDR-00049557
GOOG-SCHNDR-00049558
GOOG-SCHNDR-00049561
GOOG-SCHNDR-00049563
GOOG-SCHNDR-00049566
GOOG-SCHNDR-00049569
GOOG-SCHNDR-00049572
GOOG-SCHNDR-00049575
GOOG-SCHNDR-00049576
GOOG-SCHNDR-00049579
GOOG-SCHNDR-00049582
GOOG-SCHNDR-00049585
GOOG-SCHNDR-00049588
GOOG-SCHNDR-00049591
GOOG-SCHNDR-00049594
GOOG-SCHNDR-00049596
GOOG-SCHNDR-00049599
GOOG-SCHNDR-00049601
GOOG-SCHNDR-00049604
GOOG-SCHNDR-00049607

CONFIDENTIAL

GOOG-SCHNDR-00049609
GOOG-SCHNDR-00049612
GOOG-SCHNDR-00049613
GOOG-SCHNDR-00049617
GOOG-SCHNDR-00049620
GOOG-SCHNDR-00049622
GOOG-SCHNDR-00049625
GOOG-SCHNDR-00049628
GOOG-SCHNDR-00049631
GOOG-SCHNDR-00049634
GOOG-SCHNDR-00049636
GOOG-SCHNDR-00049638
GOOG-SCHNDR-00049641
GOOG-SCHNDR-00049644
GOOG-SCHNDR-00049990
GOOG-SCHNDR-00049993
GOOG-SCHNDR-00049996
GOOG-SCHNDR-00049999
GOOG-SCHNDR-00050003
GOOG-SCHNDR-00050007
GOOG-SCHNDR-00050011
GOOG-SCHNDR-00050013
GOOG-SCHNDR-00050017
GOOG-SCHNDR-00050021
GOOG-SCHNDR-00050026
GOOG-SCHNDR-00050029
GOOG-SCHNDR-00050033
GOOG-SCHNDR-00050037
GOOG-SCHNDR-00050040
GOOG-SCHNDR-00050043
GOOG-SCHNDR-00050047
GOOG-SCHNDR-00050050
GOOG-SCHNDR-00050157
GOOG-SCHNDR-00050160
GOOG-SCHNDR-00050163
GOOG-SCHNDR-00050166
GOOG-SCHNDR-00050167
GOOG-SCHNDR-00050168
GOOG-SCHNDR-00050170
GOOG-SCHNDR-00050172
GOOG-SCHNDR-00050176
GOOG-SCHNDR-00050179
GOOG-SCHNDR-00050182
GOOG-SCHNDR-00050183
GOOG-SCHNDR-00050187
GOOG-SCHNDR-00050191
GOOG-SCHNDR-00050194
GOOG-SCHNDR-00050195
GOOG-SCHNDR-00050196

CONFIDENTIAL

GOOG-SCHNDR-00050198
GOOG-SCHNDR-00050200
GOOG-SCHNDR-00050201
GOOG-SCHNDR-00050204
GOOG-SCHNDR-00050206
GOOG-SCHNDR-00050208
GOOG-SCHNDR-00050211
GOOG-SCHNDR-00050212
GOOG-SCHNDR-00050214
GOOG-SCHNDR-00050216
GOOG-SCHNDR-00050217
GOOG-SCHNDR-00050219
GOOG-SCHNDR-00050220
GOOG-SCHNDR-00050221
GOOG-SCHNDR-00050223
GOOG-SCHNDR-00050224
GOOG-SCHNDR-00050227
GOOG-SCHNDR-00050228
GOOG-SCHNDR-00050231
GOOG-SCHNDR-00050232
GOOG-SCHNDR-00050235
GOOG-SCHNDR-00050237
GOOG-SCHNDR-00050239
GOOG-SCHNDR-00050241
GOOG-SCHNDR-00050243
GOOG-SCHNDR-00050244
GOOG-SCHNDR-00050246
GOOG-SCHNDR-00050249
GOOG-SCHNDR-00050250
GOOG-SCHNDR-00050252
GOOG-SCHNDR-00050255
GOOG-SCHNDR-00050258
GOOG-SCHNDR-00050259
GOOG-SCHNDR-00050263
GOOG-SCHNDR-00050266
GOOG-SCHNDR-00050268
GOOG-SCHNDR-00050269
GOOG-SCHNDR-00050272
GOOG-SCHNDR-00050274
GOOG-SCHNDR-00050275
GOOG-SCHNDR-00050276
GOOG-SCHNDR-00050281
GOOG-SCHNDR-00050284
GOOG-SCHNDR-00050285
GOOG-SCHNDR-00050288
GOOG-SCHNDR-00050291
GOOG-SCHNDR-00050294
GOOG-SCHNDR-00050295
GOOG-SCHNDR-00050296

CONFIDENTIAL

GOOG-SCHNDR-00050297
GOOG-SCHNDR-00050299
GOOG-SCHNDR-00050300
GOOG-SCHNDR-00050303
GOOG-SCHNDR-00050306
GOOG-SCHNDR-00050308
GOOG-SCHNDR-00050311
GOOG-SCHNDR-00050313
GOOG-SCHNDR-00050315
GOOG-SCHNDR-00050316
GOOG-SCHNDR-00050318
GOOG-SCHNDR-00050321
GOOG-SCHNDR-00050324
GOOG-SCHNDR-00050327
GOOG-SCHNDR-00050329
GOOG-SCHNDR-00050331
GOOG-SCHNDR-00050333
GOOG-SCHNDR-00050335
GOOG-SCHNDR-00050337
GOOG-SCHNDR-00050339
GOOG-SCHNDR-00050341
GOOG-SCHNDR-00050343
GOOG-SCHNDR-00050345
GOOG-SCHNDR-00050346
GOOG-SCHNDR-00050349
GOOG-SCHNDR-00050352
GOOG-SCHNDR-00050354
GOOG-SCHNDR-00050356
GOOG-SCHNDR-00050358
GOOG-SCHNDR-00050360
GOOG-SCHNDR-00050361

## **Other Produced Documents**

GOOG-SCHNDR-00034775
GOOG-SCHNDR-00034927
GOOG-SCHNDR-00035024
GOOG-SCHNDR-00035050
GOOG-SCHNDR-00035053
GOOG-SCHNDR-00040502
GOOG-SCHNDR-00040513
GOOG-SCHNDR-00040515
GOOG-SCHNDR-00040541
GOOG-SCHNDR-00040547
GOOG-SCHNDR-00040713
GOOG-SCHNDR-00040714
GOOG-SCHNDR-00040717
GOOG-SCHNDR-00040751
GOOG-SCHNDR-00040754

GOOG-SCHNDR-00040756
GOOG-SCHNDR-00040761

**Discovery Responses**

AST Discovery Responses_ Jessop.pdf
Requests For Admissions #64-79_ Jessop.pdf
Schneider Discovery Responses_Jessop.pdf
Uniglobe Discovery Responses_Jessop.pdf
2022-03-07 Defendants and Counterclaimants YouTube LLC and Google LLC's Amended
Response to Interrogatory No. 1.pdf
Defendants' R&Os to Schneider Rogs 1, 5, and 12.pdf

**Infringing Videos**

GOOG-SCHNDR-00042701
GOOG-SCHNDR-00042719
GOOG-SCHNDR-00042905
GOOG-SCHNDR-00042914
GOOG-SCHNDR-00043024
GOOG-SCHNDR-00043025
GOOG-SCHNDR-00043124
GOOG-SCHNDR-00043125
GOOG-SCHNDR-00043204
GOOG-SCHNDR-00043231

**Other**

maria-schneider-class-action-gov.uscourts.cand_.361906.1.0.pdf
Schneider et al v. YouTube, LLC et al, 5_20-cv-04423, No. 1 (N.D.Cal. Jul. 2, 2020).pdf
Schneider et al v. YouTube, LLC et al, 5_20-cv-04423, No. 164 (N.D.Cal. Aug. 26, 2022).pdf
Sample Expert Report re copyright Navarro preliminary.pdf