# EXHIBIT 86

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - - - x

MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated,

Plaintiffs,

-against-

Case No. 3:20-cv-04423-JD

YOUTUBE, LLC; and GOOGLE LLC;

Defendants.

- - - - - - - - - - - - - - - - - - - - x

**CONFIDENTIAL**

Videotaped oral deposition of FRANCOIS-XAVIER NUTTALL, taken pursuant to notice, was held at the law offices of BOIES SCHILLER & FLEXNER LLP, 55 Hudson Yards, New York, New York 10001, commencing September 30, 2022, 9:03 a.m., on the above date, before Leslie Fagin, a Court Reporter and Notary Public in the State of New York.

- - -

MAGNA LEGAL SERVICES
320 West 37th Street, 12th Floor
New York, New York 10018
(866) 624-6221



**APPEARANCES:**

KOREIN TILLERY, LLC
Attorneys for Plaintiffs
205 North Michigan, Suite 1950
Chicago, Illinois 60601
BY: CAROL O'KEEFE, ESQUIRE
GEORGE ZELES, ESQUIRE (Appearing telephonically.)
-and-
BOIES SCHILLER & FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, New York 10001
BY: PHILIP C. KOROLOGOS, ESQUIRE
DEMETRI BLAISDELL, ESQUIRE
WALESKA SUERO GARCIA, ESQUIRE
ROBERT DWYER, ESQUIRE

WILSON SONSINI GOODRICH & ROSATI
Attorneys for Defendants
650 Page Mill Road
Palo Alto, California 94304-1050
BY: ELI RICHLIN, ESQUIRE
KELLY KNOLL, ESQUIRE

ALSO PRESENT:

PAUL JESSOP

PAUL GLAUBERSON, Videographer
Magna Legal Services

**THE VIDEOGRAPHER:** We are now on the record.

This begins video No. 1 in the deposition of Francois-Xavier Nuttall in the matter of Maria Schneider, et al., versus YouTube, LLC et al., in the United States District Court, Northern District of California, 3:20-cv-04423-JD.

Today is September 30, 2022 and the time is 9:03 a.m.

This deposition is being taken at Boies Schiller Flexner LLP, 55 Hudson Yards, New York, New York.

The videographer is Phil Glauberson of Magna Legal Services and the court reporter is Leslie Fagin of Magna Legal Services.

Will counsel state their appearances and whom they represent, after which, the court reporter will swear in the witness.

**MR. KOROLOGOS:** Phil Korologos with Boies Schiller Flexner for the

plaintiffs and the punitive class.

MS. O'KEEFE: Carol O'Keefe of Korein Tillery for the plaintiffs and punitive class.

**MR. BLAISDELL:** Demetri Blaisdell, Boies Schiller Flexner for the plaintiffs and punitive class.

**MS. GARCIA:** Waleska Suero Garcia, Boies Schiller Flexner for the plaintiffs and punitive class.

**MR. RICHLIN:** Eli Richlin, Wilson Sonsini for the defendants and the witness and I'm joined by my colleague, Kelly Knoll.

I will note Paul Jessop is in the room and who is on the line right now?

**MR. KOROLOGOS:** George Zelcs.

**MR. ZELCS:** George Zelcs on behalf of the plaintiffs and the punitive class.

**MR. DWYER:** And Robert Dwyer on behalf plaintiffs and the punitive class.

F R A N C O I S - X A V I E R N U T T A L L, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
**MR. KOROLOGOS:**

**Q. Good morning.**
A. Good morning, sir.
**Q. Have you been deposed before?**
A. Yes, I have, sir.
**Q. When was that?**
A. That was about 10 years ago.
**Q. Only one time?**
A. Yes, only one time.
**Q. What kind of case was that?**
A. That was a patent litigation.
**Q. That's the patent litigation you mention in your report?**
A. I do not recall mentioning that patent litigation.
**Q. Do you recall your report identifies that you acted as an expert witness in a patent litigation --**




A. I did, I did not mention which case.
**Q. What was the name of that case?**
A. I cannot specifically recall. It was 10 odd years ago.
**Q. Do you recall any of the parties?**
A. If I were provided the names, I may recall one of them.
**Q. You don't recall them sitting here now?**
A. I don't know.
**Q. Who retained you for that case?**
A. A U.S. based company called Macrovision.
**Q. Macrovision.**
**When would that have been?**
A. That would have been possibly 2002.
**Q. Was Macrovision a party to the patent litigation?**
A. Yes, they were the defendants.
**Q. Were they the sole defendant?**
A. I believe they were.
**Q. Do you recall what patent was involved?**

A. I could not specify the patent number.
**Q. What was the subject matter of the patent?**
A. The subject matter was about digital rights management platforms.
**Q. What jurisdiction had issue?**
A. I do not recall, sir.
**Q. Was it a European jurisdiction?**
A. The case was dealt with in Washington, D.C.
**Q. Was it a United States patent?**
A. I do not recall, sir.
**Q. Let me show you a document that's been marked as Plaintiffs' Exhibit 164.**
**(Plaintiffs' Exhibit 164, copy of Francois-Xavier Nuttall's expert report, marked for identification.)**
**Q. Is that a copy of your expert report in this case?**
A. It is, sir.
**Q. In preparation for your deposition today, have you had a chance to reread your report and its appendices since you signed it**

**on September 22nd?**
A. I have, sir.
**Q. And are there any corrections you wish to make to the report?**
A. I do not, sir.
**Q. Do you consider your report a complete statement of all of the opinions you will express in this case?**
A. I will say that all the opinions I have on the Jessop report are reflected in the document.
**Q. Are there any opinions other than your opinions with respect to the Jessop report that you intend to offer as an expert witness in this case?**
A. Not at this stage.
**Q. And do you consider your report to be a complete statement of the bases and reasons for your opinions as contained in the report?**
**MR. RICHLIN:** Objection as to form.
You can answer.
A. May I ask that you repeat the question, please, sir.

**MR. KOROLOGOS:** Can you read it back, please.
(Record read.)
A. I'm sorry, can you rephrase the question so I can understand it better.
**Q. Did you understand that in offering expert testimony in this case, you not only needed to disclose your opinions, but the bases and reasons for those opinions?**
**MR. RICHLIN:** Objection to form.
You can answer.
A. Yes, to that, I agree.
**Q. And does your report achieve that? In other words, we've established it has opinions in it. Is it a complete statement of the bases and reasons for your opinions?**
**MR. RICHLIN:** Objection to form.
A. I believe I've provided sufficient argumentation to support my opinions.
**Q. Are there any bases or reasons to support your opinions that you have not put in your report?**
**MR. RICHLIN:** Objection to form.
A. There may be additional arguments

MAGNA
LEGAL SERVICES

that I will make today.
**Q. Anything else?**
A. No.
**Q. Are there any additional arguments beyond what's in your report that you have in mind at this time?**
A. No, not specifically.
**Q. If you look in your report on page 7, there is a paragraph 25.**
**Do you see that?**
A. Yes, I do see.
**Q. And your report states that transcoding is the common process of converting encoded audio and video data into a different encoding format that can work with services systems.**
**Do you see that?**
A. Yes, I do, sir.
**Q. And transcoding is a process that YouTube engages in on its YouTube platform, correct?**
A. Can you repeat the question.
**Q. Sure.**
**You understand that YouTube engages**

in transcoding?
A. Yes, I do.
**Q. What are the steps that YouTube follows in its transcoding process?**
**MR. RICHLIN:** Objection to form.
A. I'm not intimately aware of the exact procedure that YouTube uses for transcoding videos.
**Q. Even if you are not intimately aware, what are you aware of that YouTube does in its transcoding process?**
A. I'm only aware of the input information that is provided to YouTube and the output that YouTube uses.
**Q. When you say, the input information as provided to YouTube, you are talking about the uploaded video that a user on YouTube will send to YouTube to be transcoded?**
A. That is correct.
**Q. When you mention the output that YouTube uses, you are talking about what is streamed from the YouTube system after the transcoding process has taken place?**
A. That is correct.

**Q. So you are not aware of what transpires between those two events, the upload and when the video is transcoded and available for view?**
**MR. RICHLIN:** Objection to form.
**Q. Let me withdraw the question.**
**You are not aware of what transpires between the upload of the video from the user and when a URL is available for streaming after YouTube has engaged in the transcoding process, is that correct?**
**MR. RICHLIN:** Objection to form.
**Q. You can answer.**
A. I have an understanding of some different steps that are taken throughout the process, but I do not have the full knowledge of all the steps that are taken for the process.
**Q. When you say you have an understanding of some different steps that are taken, is that an understanding of steps that are taken by YouTube or just generally for transcoding?**
A. Both, sir.

**Q. What different steps are you aware of that are taken throughout the process?**
**MR. RICHLIN:** Are you asking about YouTube's process or the general process?
**MR. KOROLOGOS:** YouTube's process.
A. So two elements I will mention. First, as you may be aware, I was part of the YouTube music publishing team and to that extent, I've been exposed to some of the engineering information that YouTube uses internally, not intimately, but I have been made aware of; and, second, there are depositions from YouTube engineering team in the current document that provides more technical details about what is happening during the transcoding process.
**Q. When you -- let me withdraw that.**
**Anything else other than those two elements?**
A. I would have a third element is I have some expertise in the general video processing technologies, but they are not specific to YouTube, they are general

MAGNA LEGAL SERVICES





are closely related?
A. They are, sir.
**Q. Then with respect to the Paris Music platform, I asked you about metadata that was available to the user and you described it, some of the metadata available to the user.**
**Is there other metadata that would not be viewable by the user?**
A. Yes, there was.
**Q. What metadata would not be viewable by the user?**
A. It is what I would call rights management metadata. It is the metadata used to identify the content, to monitor the transactions of content usage and to generate reports for the rights holders who have ownership in that content.
**Q. Anything else?**
A. It would have been connected to financial services and financial payment systems to collect the end user's payments and organize the distribution of the royalties.

**Q. Anything else?**
A. Not that I can think of.
**Q. When you say, writes management metadata, are you breaking it into two categories of metadata; first, rights management metadata and second, descriptive metadata?**
A. That is correct.
**Q. Any other categories of metadata?**
A. Not that were stored or made available to the end user.
**Q. With respect to the Paris Music platform?**
A. That is correct.
**Q. You still have your report in front of you?**
A. I do, sir.
**Q. If you look at paragraph 2-A, please.**
**Did you find it?**
A. Yes, I did.
**Q. You state in your report there, The transcoding process can be performed without reference to annotative embedded metadata and**

need not review or utilize such metadata to prepare a transcoded video available for viewing on a platform that hosts user-generated content.
Do you see that?
A. I do see that.
**Q. When you stated that the transcoding process need not review or utilize such metadata, is it your opinion that the transcoding process cannot review or utilize such metadata?**
A. No, I didn't say cannot, I said need not.
**Q. When you opine that the transcoding process can be performed without reference to annotative embedded metadata, is it your opinion that the transcoding process can be performed with reference to annotative embedded metadata?**
A. It can be performed both ways, you can perform with and without. There is no dependency.
**Q. Let's go back to paragraph 25 on page 7, please.**

A. Yes.
**Q. The second sentence of paragraph 25 in the report states, As part of the transcoding process, the service does not need to open or view such metadata.**
**Do you see that?**
A. I do, sir.
**Q. Are you offering an opinion that the service cannot open or view such metadata as part of the transcoding process?**
A. This is not what I said.
**Q. Further down in that paragraph, you say, YouTube does not need to import the optional annotative and manipulable metadata that may be embedded in the video files that users upload into the transcoded files that other users can stream on the platform.**
**Do you see that?**
A. I do, sir.
**Q. Is it your opinion that YouTube cannot do that?**
A. No, it is my opinion that YouTube does not need to import.
**Q. We talked a little bit about this**





point earlier. The last sentence of paragraph 25, you say that according to a sworn statement of the company's tech program lead, YouTube does not do so.

Do you see that?

A. I do, sir.

**Q. When you say, does not do so, you are referencing what you state in the immediately prior sentence, is that right, that YouTube does not need to import the optional annotative and manipulable metadata that may be embedded in the video files that users upload into the transcoded files that other users can stream on the platform, is that right.**

A. The opinion I'm putting forth here is that I'm stating that you YouTube does not need to do it and this is confirmed by Google's tech team who actually says they do not do it, yet, they manage to perform the transcoding process.

**Q. In your answer just now, when you used the word, it, you were talking about what you describe in that second to last**

sentence of 25, is that right?

A. Sorry, I don't exactly get your question.

**Q. Sure. Let me ask it this way. You first established that the only source for your statement in the last sentence of paragraph 25 is the declaration we talked about earlier from Mr. Foucu that is referenced in footnote 17, is that right?**

**MR. RICHLIN:** Objection to form.

A. That is not correct.

My opinion is based on technical knowledge on the transcoding process first and then my opinion is just confirmed by a Google engineer.

**Q. Right now, I'm only asking about confirmation from the Google engineer of what YouTube does or does not do. I'm not asking about your opinion right now. I'm asking solely about the last sentence of paragraph 25.**

**Do you understand that?**

A. What I understand is that a lead engineer at YouTube states that they can

successfully perform a transcoding process without needing to look or import or read the annotative metadata.

**Q. That's the extent of your understanding?**

**MR. RICHLIN:** Objection to form.

**Q. You can answer.**

A. I take that as expert value, what the YouTube programmer says.

**Q. And your understanding of what that YouTube programmer says is what you just testified to?**

A. I do not understand the question, sorry.

**Q. Sure. So you just told me that you take as expert value what the YouTube programmer says.**

**That's Mr. Foucu, right?**

A. Yes.

**Q. And your understanding of his statement, Mr. Foucu's statement is that they can successfully perform a transcoding process without needing to look or import or read the annotative metadata, is that right?**

**MR. RICHLIN:** Objection to form.

A. Because that was a long question, I may rephrase it in my own terms.

**Q. Please.**

A. I independently analyzed that you could perform a transcoding successfully without looking at metadata and this is confirmed by a YouTube engineer.

**Q. How did you independently analyze that you could perform a transcoding successfully without looking at metadata?**

A. I first have a deep knowledge of the file formats that are being used for transcoding and I have experienced myself that process, so I, myself, have been successful achieving such a functionality.

**Q. Anything else that you did to analyze that you could perform a transcoding successfully without looking at metadata?**

A. I think the two reasons I gave before are sufficient.

**Q. Well, they may be sufficient in your mind. I want to make sure I get all of the reasons, so I want to get to**



Page 222

of ISRCs in professionally recorded music was higher than 75 percent, would that change your opinion about whether it is well-known that the use of ISRCs is far from universal?

A. I will rephrase. Experimentally, I would say that the number is lower, meaning, that it would be less than 75 percent, and I would say even, hopefully, in the sense that ISRC has a limited range of combinations and if we were to expand ISRC to all exploitations of professionally recorded music, the numbering system would explode.

So if you start designing rules whereby every single piece of recorded music for television or for audio books or for podcast or all these other usages, you would not have been able to use the ISRC for that purpose.

**Q. So your belief is that it's less than 75 percent, is that what you are saying?**

A. My belief is that the audio files that get allocated an ISRC are less than 75 percent of all the audio files that are being used.

Page 223

**Q. If someone you trusted to be accurate were to say that the coverage of ISRCs was higher than 75 percent, would that change your opinion?**

**MR. RICHLIN:** Objection. Which particular opinion?

**MR. KOROLOGOS:** The opinion that it is well-known that the use of ISRCs is far from universal.

A. I want to make sure it's well understood, the use of ISRCs for content available for consumption on digital platforms as pay services is very high, it is in the range of 98 percent.

What I'm saying here is that there is also a very large set of audio content that has been professionally recorded that is not necessarily eligible or does not require an ISRC.

**Q. How many ISRC codes have been used, do you know?**

A. One hundred and thirty-five million.

**Q. And it's a 12-digit code, is that**

Page 224

**right?**

A. It's a 12 alphanumeric.

**Q. How many digits -- let me withdraw that.**

**How many different alphanumeric codes are possible for 12 alphanumeric places?**

A. I don't have the figure in mind.

**Q. But we can calculate it, right?**

A. We can calculate it, but it's not relevant because there are reserved values. There are fields that can only have a very limited number of values, so you have to take into account every single character and see how many values it can have.

I say that the ISRC has a limited span because the existing ISRC system has already been saturated in its existing syntax, an extension already been granted to allow for more numbers and we are not unlimited in the number of ISRCs that can be allocated.

**Q. What is the limit?**

A. Sorry?

Page 225

**Q. What is the limit?**

A. In 20 years, we've saturated the existing syntax. Ten years ago, we've extended the syntax which would last us another 10 years, so we have to continue. If we completely change the syntax, then maybe we can go way further, but we lose completely the original design of the ISRC system.

**Q. Was the extension that you mentioned a change that lost the original design of the ISRC system?**

A. Yes, it has.

**Q. How?**

A. The origin of the ISRC, you can infer some knowledge based on the syntax of the ISRC.

As an example, the two first characters were an ISO 3166 country code and every country was allocated its country code, plus the rest. The three following digits were the registry codes where you can have quite a lot and then you have the year of publication or fixation.

So all these are constraints and



Witness: Francois-Xavier Nuttall — September 30, 2022 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)
Job No. 876151

**Errata Sheet**

| **Page:Line** | **Change** | **Reason** |
|---|---|---|
| 20:25 | Replace <WinAMP> with <Winamp> | To correct transcription errors |
| 21:6 | Replace <ASFS 5> with <ASFS file> | To correct transcription errors |
| 21:8 | Insert <them> between <protected> and <from> | To clarify the record |
| 24:11 | Replace <not, it> with <not. It> | To correct transcription errors |
| 25:14 | Replace <functionalities,> with <functionalities.> | To correct transcription errors |
| 25:15 | Replace <the software> with <The software> | To correct transcription errors |
| 26:11 | Insert <,> after <players> | To correct transcription errors |
| 27:3 | Insert <,> after <processors> | To correct transcription errors |
| 28:13 | Replace <V-R-T-U-O-S-A> with <V-I-R-T-U-O-S-A> | To clarify the record |
| 29:8 | Replace <WinAMP> with <Winamp> | To correct transcription errors |
| 29:21-29:22 | Replace <AudioSoft secure a file system> with <AudioSoft Secure File System> | To correct transcription errors |
| 29:24 | Replace <WinAMP> with <Winamp> | To correct transcription errors |
| 38:23 | Insert <,> between <does> and <an audio> | To correct transcription errors |
| 38:25 | Replace <need, but does not need or> by <not read, but does not read or> | To clarify the record |
| 43:15 | Replace <that explain mainly> with <they explain -- mainly> | To correct transcription errors |
| 46:11 | Replace <itself, the picture, the audio, you> with <itself -- the picture, the audio; you> | To correct transcription errors |

| | | |
|---|---|---|
| 46:13 | Insert <;> between <video> and <and> | To correct transcription errors |
| 60:16 | Replace <majority are actually> with <majority actually> | To clarify the record |
| 62:8 | Insert <to> between <as> and <what> | To clarify the record |
| 77:9 | Replace <it should> with <the “should”> | To correct transcription errors |
| 77:20 | Replace <they still> with <is still> | To correct transcription errors |
| 78:10 | Replace <wording, used must never> with <wording used, “must never”> | To correct transcription errors |
| 82:10 | Replace <less> with <rights> | To correct transcription errors |
| 83:14 | Replace <, it should be> with <website> | To clarify the record |
| 84:10 | Replace <audio video> by <audio visual> | To clarify the record |
| 84:16-84:17 | Replace <one, but last> with <next to last> | To clarify the record |
| 89:4 | Replace <Katherine> with <Catherine> | To correct transcription errors |
| 89:6 | Replace <Katherine> with <Catherine> | To correct transcription errors |
| 89:12 | Replace <concise> with <precise> | To correct transcription errors |
| 96:6 | Replace <Van Der> with <van der> | To correct transcription errors |
| 104:18 | Replace <other> with <“other” --> | To correct transcription errors |
| 104:20 | Replace <Elysee> with <Élysée> | To correct transcription errors |
| 105:4 | Replace <’98> with <’88> | To clarify the record |
| 105:18 | Replace <date> with <update> | To correct transcription errors |
| 108:13 | Replace <baccalaureat> with <baccalauréat> | To correct transcription errors |
| 108:14 | Replace <time, science> with <time: science> | To correct transcription errors |
| 108:18 | Replace <Elysee de Chanel> by <Lycée | To correct transcription errors |

| | international de> | |
|---|---|---|
| 109:6 | Replace <basic> with <basics> | To clarify the record |
| 109:21 | Replace <Elysee> by <the lycée> | To correct transcription errors |
| 112:6 | Replace <of> by <over> | To correct transcription errors |
| 117:16 | Replace <services, Mathematica> with <services. Mathematica> | To correct transcription errors |
| 117:18 | Replace <reserve and> with <research, and> | To correct transcription errors |
| 124:4 | Replace <IRAA> with <RIAA> | To correct transcription errors |
| 125:8-9 | Replace <of which ISWC, ISTC> with <including ISWC and ISTC> | To clarify the record |
| 128:8 | Replace <what to put you at the beginning> with <where to put you at the beginning> | To clarify the record |
| 129:3 | Insert <and> between <provided,> and <defining> | To clarify the record |
| 129:5 | Replace <claims, then> with <claims. Then> | To correct transcription errors |
| 129:6-129:7 | Replace <data, meaning, the activity on the platform, the streams and> with <data -- meaning, the activity on the platform, the streams -- and> | To correct transcription errors |
| 129:11-129:12 | Replace <those performing in mechanical rights> with <either performing or mechanical rights> | To clarify the record |
| 129:14 | Insert <and> after <functionally,> | To clarify the transcript |
| 129:15 | Replace <defined> with <define> | To clarify the transcript |
| 130:4 | Replace <fragment> with <fragmented> | To correct transcription errors |
| 130:9 | Replace <effective> with <respective> | To clarify the record |

| | | |
|---|---|---|
| 131:5 | Replace <published licenses,> with <publishers license> | To correct transcription errors |
| 131:20 | Replace <ISRC> with <ISWC> | To correct transcription errors |
| 135:4 | Replace <DSB> by <DSP> | To correct transcription errors |
| 142:19 | Replace <DSBs> by <DSPs> | To correct transcription errors |
| 148:4 | Replace <topic, security> with <topic. Security> | To correct transcription errors |
| 148:5 | Replace <high matter, computer> with <important matter. Computer> | To clarify the record |
| 168:18 | Replace <name, a clip> with <name – a clip> | To correct transcription errors |
| 168:19 | Replace <name, nothing in this definition hints me> with <name. Nothing in this definition hints to me> | To clarify the record |
| 169:20 | Replace <long> with <on> | To correct transcription errors |
| 169:20 | Replace <to 15,000 tags, 10, 15,000, 20,000 tags> with <to 10,000 tags -- 15,000 20,000 tags --> | To correct transcription errors and clarify the record |
| 178:5 | Replace <BCMI> with <CMI> | To clarify the record |
| 178:5 | Insert <for> between <is> and <rights> | To clarify the record |
| 178:6 | Replace <purposes for financial claims and this is> with <purposes -- for financial claims -- and this is> | To correct transcription errors |
| 178:9 | Replace <process is> with <processes> | To correct transcription errors |
| 180:10 | Replace <to> with <two> | To correct transcription errors |
| 189:6 | Insert <on> between <work> and <on> | To clarify the record |

Witness: Francois-Xavier Nuttall — September 30, 2022 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)
Job No. 876151

| | | |
|---|---|---|
| 190:13 | Insert <do> after <not> | To clarify the record |
| 193:24 | Replace <void> with <devoid> | To clarify the record |
| 199:24 | Replace <sentence> with <sense> | To correct transcription errors |
| 201:16 | Replace <scientific or research> with <scientific research> | To correct transcription errors |
| 202:6 | Insert <,> between <process> and <where> | To correct transcription errors |
| 202:8 | Replace <give> with <gives> | To correct transcription errors |
| 202:9 | Insert <,> between <process> and <where> | To correct transcription errors |
| 204:18 | Remove <I> after <that> | To correct transcription errors |
| 208:12 | Replace <MPEG> with <FFmpeg> | To clarify the record |
| 210:14 | Replace <or dramatically> with <automatically> | To correct transcription errors |
| 210:16 | Replace <floor> with <tool> | To correct transcription errors |
| 218:9 | Replace <that, A,> with <that, first,> | To clarify the record |
| 218:10 | Replace <and; second, that> with <and, second, that> | To correct transcription errors |
| 220:3 | Replace <expectation> with <exploitation> | To correct transcription errors |
| 227:6-227:7 | Replace <an as easy> with <as easy a> | To clarify the record |
| 228:21 | Replace <IRAA> with <RIAA> | To correct transcription errors |
| 236:10 | Replace <content, trying to persuade you> with <content. I’m trying to persuade YouTube> | To correct transcription errors |
| 236:12 | <YouTube, it's very> with <YouTube. It’s very> | To correct transcription errors |

Witness: Francois-Xavier Nuttall — September 30, 2022 Deposition
*Schneider v. YouTube, LLC,* No. 3:20-cv-04423-JD (N.D. Cal.)
Job No. 876151

FXN Subject to the above changes, I certify that the transcript is true and correct.

__________ No changes have been made. I certify that the transcript is true and correct.

____________________ (signature)

November 4th 2022 (date)

Witness: Francois-Xavier Nuttall — September 30, 2022 Deposition
*Schneider v. YouTube, LLC,* No. 3:20-cv-04423-JD (N.D. Cal.)
Job No. 876151

ACKNOWLEDGMENT OF DEPONENT

I, Francois-Xavier Nuttall, do hereby certify that I have read and examined the foregoing testimony, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

(signature)

November 4th 2022

(date)