# EXHIBIT 93

Pages 1 - 56

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

MARIA SCHNEIDER, UNIGLOBE            )
ENTERTAINMENT, LLC, and AST          )
PUBLISHING LTD., individually        )
and on behalf of all others          )
similarly situated,                  )
                                     )
          Plaintiffs,                )
                                     )
  VS.                                )   NO. C 20-04423 JD
                                     )
YOUTUBE, LLC and GOOGLE LLC,         )
                                     )
          Defendants.                )
_____)
                                     )
YOUTUBE, LLC and GOOGLE LLC,         )
                                     )
          Counterclaimants,          )
                                     )
  VS.                                )
                                     )
PIRATE MONITOR LTD., PIRATE          )
MONITOR LLC, and GÁBOR CSUPÓ,        )
                                     )
          Counterclaim               )
          Defendants.                )
_____)

                              San Francisco, California
                              Thursday, July 7, 2022


                     **TRANSCRIPT OF PROCEEDINGS**


                    **(APPEARANCES ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official U.S. Reporter

```
 1   APPEARANCES:

 2   For Plaintiffs:
                         BOIES SCHILLER FLEXNER LLP
 3                       55 Hudson Yards, 20th Floor
                         New York, New York 10001
 4               BY:   PHILIP C. KOROLOGOS, ATTORNEY AT LAW

 5                       KOREIN TILLERY LLC
                         205 North Michigan Avenue, Suite 1950
 6                       Chicago, Illinois 60601
                 BY:   GEORGE A. ZELCS, ATTORNEY AT LAW
 7                     RANDALL P. EWING, JR., ATTORNEY AT LAW

 8                       KOREIN TILLERY LLC
                         505 North 7th Street, Suite 3600
 9                       St. Louis, Missouri  63101
                 BY:   CAROL L. O'KEEFE, ATTORNEY AT LAW
10

11   For Defendants:
                         WILSON, SONSINI, GOODRICH & ROSATI
12                       650 Page Mill Road
                         Palo Alto, California 94304
13               BY:   DAVID H. KRAMER, ATTORNEY AT LAW
                       LAUREN GALLO WHITE, ATTORNEY AT LAW
14                     MAURA L. REES, ATTORNEY AT LAW

15

16

17

18

19

20

21

22

23

24

25
```

<u>**Thursday - July 7, 2022**</u>                                    <u>**11:14 a.m.**</u>

**P R O C E E D I N G S**

---o0o---

    **THE CLERK:**  Calling Civil 20-4423, Schneider vs.
YouTube, LLC.

    Counsel, please state your appearances for the record.

    **MR. KOROLOGOS:**  Good morning, Your Honor.  Phil Korologos
with Boies Schiller Flexner on behalf of the plaintiffs.  With
me is Ms. O'Keefe, Mr. Zelcs, and Mr. Ewing, all from the
Korein Tillery firm.

    **MR. KRAMER:**  Your Honor, Dave Kramer from Wilson Sonsini
for the defendants.  And with me from my firm are Maura Rees
and Lauren White.

    **THE COURT:**  Okay.  My other discovery problem case.  This
is going to resolve Docket Numbers 140, 142, 144, 145, 147,
149.  Then we'll discuss the case management schedule after
that.

    Okay.  Plaintiff, what would you like me to do?

    **MR. KOROLOGOS:**  Well, Your Honor, I'm happy to go
through --

    **THE COURT:**  Just tell me what you want.

    **MR. KOROLOGOS:**  On the Autoplay motion, which is 140,
I believe what we should be entitled to is the descriptions of
the algorithms that are used either for nominating candidates
in the Watch Next function, which is what drives Autoplay, and

1  the algorithms that are used to rank those nominees.

2      In a recent deposition --

3      **THE COURT:**  Well, let me ask you this:  When you say you

4  just want a description, what does that mean?

5      **MR. KOROLOGOS:**  Well, that's what I'm getting to,

6  Your Honor.

7      **THE COURT:**  All right.

8      **MR. KOROLOGOS:**  In a recent deposition, we used

9  Plaintiff's Exhibit 131.  This came in after the letter; so

10  it's not in the letter, Your Honor.

11      **THE COURT:**  Oh, okay.  All right.

12      **MR. KOROLOGOS:**  And in that document, it describes some of

13  the nominators.  Some are called direct nominators, and some

14  are called indirect nominators.

15      May I pause for one moment, Your Honor?

16      **THE COURT:**  Sure.

17      **MR. KOROLOGOS:**  I'm not sure the affiliation of the

18  gentleman in the gallery, but some of the documents that I was

19  going to discuss have been marked "Highly Confidential" under

20  the protective order.  And --

21      **THE COURT:**  Well, that's all right.  Go ahead.  It's the

22  courtroom of the people.

23      **MR. KOROLOGOS:**  And given that we're not sealed, I'll try

24  to --

25      **THE COURT:**  Yeah.

1    **MR. KOROLOGOS:**  -- deal with that in a way that --

2    **THE COURT:**  Sealing --

3    **MR. KOROLOGOS:**  -- doesn't disclose the information.

4    **THE COURT:**  You should read my Google order on my position

5    on sealing.  This courtroom belongs to the citizens of the

6    Unites States.  All right?  If you have a Kentucky Fried

7    Chicken recipe or the secret formula for Coke, it's going to

8    come out.  So let's just get on to it.  All right?

9    **MR. KOROLOGOS:**  Thank you, Your Honor.

10   So in Plaintiff's Exhibit 131, that has very general

11   descriptions of the nominator algorithms.  And the witness that

12   I asked about that document confirmed that hyperlinks in that

13   document at the names of the nominator algorithms go to

14   documents that describe the algorithm and how it is

15   implemented.

16   Those documents are the documents that we want.  They have

17   a cache of these documents.

18   **THE COURT:**  So just whatever is in that hyperlink?

19   **MR. KOROLOGOS:**  Those hyper- -- it's a series of

20   hyperlinks in that document.  But I believe there are more

21   documents like that that are in Plaintiff's Exhibit 131.

22   **THE COURT:**  Okay.

23   **MR. KOROLOGOS:**  In other words, those hyperlink to a

24   storage of documents, not all of which are mentioned in 131,

25   including because 131 is about nominators; it's not about the

1  ranking algorithm.  So there are sort of two sets of

2  algorithms.

3          **THE COURT:**  All right.

4      **MR. KOROLOGOS:**  So that's the first part of Autoplay.

5      **THE COURT:**  What's wrong with that, Mr. Kramer?

6      **MR. KRAMER:**  Your Honor, this interest in the Autoplay

7  functionality in a copyright infringement -- this isn't a

8  patent case.  This isn't about the nitty-gritty details of how

9  the algorithms in Autoplay work.

10      **THE COURT:**  He just wants descriptions.  He doesn't want

11  the nitty-gritty details.  He just wants a description of the

12  algorithm.

13      **MR. KRAMER:**  I'm not sure that's so, Your Honor.

14      But we have produced hundreds of documents showing how the

15  Autoplay functionality works.  The question of how it works

16  isn't in dispute.  The question of its relevance to a copyright

17  infringement case is very much in dispute, but it's a

18  fundamentally legal question.

19      The parties disagree about what the implications are about

20  the fact that there is this functionality on YouTube.  That's

21  the disagreement.

22      But as with so many of these, plaintiffs are --

23      **THE COURT:**  How many documents are we talking about?  If

24  Mr. --

25      **MR. KRAMER:**  It depends on where we draw the line,

1   Your Honor.

2       So we've gotten this request for linked documents, but

3   that's the culture of Google.  Documents link to one another.

4   A document that we produce may link to ten more and ten more

5   after that, and they will never end in terms of the universe of

6   documents that --

7       **THE COURT:**  They will end.

8       **MR. KRAMER:**  -- we're talking about.

9       **THE COURT:**  There is an end.  I guarantee you, it's not

10  linked to everything in the world.

11      How many documents is it?  Just give me an estimate.  Have

12  you looked?  Do you even know?

13      **MR. KRAMER:**  No, Your Honor.  Our position, with respect

14  to Autoplay --

15      **THE COURT:**  What's the time period for this,

16  Mr. Korologos?

17      **MR. KOROLOGOS:**  I believe the time period for this ought

18  to be from 2015 forward.

19      **THE COURT:**  All right.

20      Produce them.  That's granted.

21      What's the next issue?

22      **MR. KOROLOGOS:**  The next issue is also related to

23  Autoplay, Your Honor, which is documents relating to policies

24  and procedures.

25      **THE COURT:**  All right.  Just a second.

1      So I'm going to describe that as "Granted for the

2  hyperlink algorithm description."  All right?  That's what I'm

3  going to call it.

4      Okay.  Go ahead.

5      **MR. KOROLOGOS:**  And to be clear, with respect to that one,

6  Your Honor, it's algorithms for each of the nominator

7  algorithms, and then there's also the ranking or scoring

8  algorithms.

9      **THE COURT:**  All right.  What's the next one?

10     **MR. KOROLOGOS:**  The next one are documents relating to the

11 policies and procedures and changes to the policies and

12 procedures about Autoplay.

13     And for that, what we think should be done is to identify

14 three to five custodians.  And we will provide some search

15 terms and --

16     **THE COURT:**  What does that have to do with the case?

17     **MR. KOROLOGOS:**  Pardon me?

18     **THE COURT:**  What does that have to do with the case?

19     **MR. KOROLOGOS:**  It shows how Autoplay and the policies

20 around Autoplay are established.

21     Remember that Autoplay relates to issues in the case in

22 the sense of whether they are entitled to the DMCA safe

23 harbors.  There is an exception to the DMCA safe harbors that

24 if they control the content and they make money off of it, then

25 they're not entitled to the exception.

1          They are choosing what plays for the user in Autoplay.  It
2    automatically plays.  That's the way they describe it.  And
3    they're choosing what is played through these algorithms,
4    ranking them, and then --
5          **THE COURT:**  Why do you need --
6          **MR. KOROLOGOS:**  -- playing the next video.
7          **THE COURT:**  Just do a 30(b)(6) deposition.  Why do you
8    need five custodians?
9          **MR. KOROLOGOS:**  Well, what we'd like to understand,
10   Your Honor, what are the policies and procedures and how have
11   they changed over time.
12         **THE COURT:**  I understand that.  Just, why isn't that a
13   30(b)(6) deposition?
14         **MR. KOROLOGOS:**  We have had depositions, Your Honor.  And
15   in asking that, it's not clear we're getting all of the answers
16   that we're entitled to because they're saying things like
17   "I don't remember anything else" when that doesn't seem to be
18   true, but we can't --
19         **THE COURT:**  I can't help you with that.  Okay?  The fact
20   that you have doubts is not something I can work with.  You
21   have to have some evidence.  Okay?
22         I understand you may be unhappy that someone says "I can't
23   recall."  I can't beat -- I can't get blood out of a turnip.
24   Okay?  If they say "I don't recall," there's nothing I'm going
25   to do for you that's going to change that.

1      What is it you want?  I'm not going to order five

2  custodians.  That's ridiculous.  What is it you want?

3      If you're just -- if all this is, you're just unhappy with

4  the evidence you got, there's little I can do, unless you come

5  in and show me, for example, "I have a document that says that

6  this witness wasn't truthful or that this witness evaded my

7  question."  That's all I'm going to do for you.

8      Do you have anything to that effect with respect to these

9  policies?

10      **MR. KOROLOGOS:**  Let me propose a slightly different

11  approach.

12      I can't remember exactly when.  It's not in my notes.  The

13  defendants had agreed to produce these documents or documents

14  sufficient to show these policies and changes in the policies

15  with respect to issues that relate to copyright or revenue

16  considerations with respect to Autoplay.

17      They then changed that, however, to say that they would

18  only provide those policies and procedures that were driven by

19  copyright or revenue issues.

20      That narrows it to the null set because they say that

21  there were none that were driven by those two categories:

22  copyright and revenues.

23      If we can go back to what was originally agreed, which are

24  to produce documents sufficient to show the policies and

25  procedures or changes or considered changes to Autoplay --

1      **THE COURT:**  Autoplay?  And that's 2015 --

2      **MR. KOROLOGOS:**  -- with respect to --

3      **THE COURT:**  -- 2015 through today?

4      **MR. KOROLOGOS:**  Yes.

5      **THE COURT:**  All right.  What's wrong with that,

6  Mr. Kramer?

7      **MR. KRAMER:**  Your Honor, we disagree with what the

8  agreement was.  But with regards to what plaintiffs are talking

9  about, the issue was specifically policies and procedures that

10  were presented, not in someone's e-mail somewhere where someone

11  had an idea that was never implemented or never went beyond the

12  stage of his or her brain.

13      And we agreed that we would give them documents that were

14  related to copyright or revenue considerations.

15      We've looked.  The semantic difference that they're making

16  with respect to "driven by" versus "related to" is of no

17  consequence here.  But, yes, we can do that, Your Honor.  We

18  are willing to do that.

19      **THE COURT:**  All right.  That's fine.  I understand it's

20  the official policy or procedure, not passing comments.

21      Okay.  So that's granted to that extent.

22      All right.  Okay.  What's next?

23      **MR. KOROLOGOS:**  142, Your Honor --

24      **THE COURT:**  Yes.

25      **MR. KOROLOGOS:**  -- relates to fair use documents.

1      Fair use is a defense that they have raised as an

2  affirmative defense.  It also is an issue that they have raised

3  on occasion as possibly an argument they will assert in

4  opposition to class certification.

5      And for -- for this issue, there are three things that we

6  would like.  Again, there's a policies and procedures issue

7  with respect to "considered."  I think the same kind of scope

8  we just talked about, that's what we ask for in Request for

9  Production 66(a).

10     **THE COURT:**  But policy and procedures for what?  For fair

11 use?

12     **MR. KOROLOGOS:**  Yes, Your Honor.  With respect to dealing

13 with fair use, how they handle issues of fair use.

14     **THE COURT:**  What does that mean, "how they handle issues

15 of fair use"?

16     **MR. KOROLOGOS:**  Occasionally, people raise issues of fair

17 use.  So, for instance, if a takedown notice comes in, somebody

18 says, "That's my content.  Here's a DMCA takedown notice.

19 YouTube, you should take that down off of the system," the

20 person that uploaded that video has an opportunity to do a

21 counter notification.

22     **THE COURT:**  I'm really very familiar with all of this.

23 Just tell me what you want.

24     **MR. KOROLOGOS:**  They may raise the issue of fair use, and

25 we'd like to see how they handle issues of fair use when that's

1   raised.

2       **THE COURT:**  Policy or practice for that.

3       **MR. KOROLOGOS:**  Yes.

4       **THE COURT:**  Okay.  Do you have any procedures on fair use

5   claims in response to a takedown letter?

6       **MR. KRAMER:**  I would say that most are privileged, Your

7   Honor.

8       **THE COURT:**  What?

9       **MR. KRAMER:**  Most are privileged.

10      **THE COURT:**  Did you put them on a privilege log?

11      **MR. KRAMER:**  Sure.  To the extent that the parties'

12  agreement covers documents that were created before the

13  litigation, anything that has to do with fair use that is

14  privileged would be logged.

15      **THE COURT:**  Well, I think -- I wouldn't -- well, I mean, I

16  would have said, "Any YouTube practices or procedures with

17  respect to claims of fair use."  Okay?  And if you think

18  they're privileged, just put them on a log.

19      **MR. KRAMER:**  Certainly, Your Honor.

20      I do have a question about fair use, Your Honor.  With

21  respect to these requests, there isn't much in the way of a

22  relevance showing.  If the Court's not interested in that, I

23  understand.

24      **THE COURT:**  Well, no.  I mean, it says here you --

25  "you" -- intend to make it an issue.

```
 1        MR. KRAMER:  Well --

 2        THE COURT:  So it's relevant.

 3        MR. KRAMER:  It is an issue with respect to the question

 4   of class certification.

 5        THE COURT:  All right.  Then that's all we need for

 6   relevance.  That's what relevance means.  If you're going to

 7   use it, they get the chance to look at it.  Okay?

 8        So any practices or procedures that are standardized or

 9   company-wide, or however you want to say it, for claims of fair

10   use.

11        What else, Mr. Korologos?

12        And these are all 2015 to whenever you agreed to end it.

13        MR. KRAMER:  To the statute of limitations period,

14   Your Honor?

15        THE COURT:  You said 2015, didn't you?

16        MR. KOROLOGOS:  I did, Your Honor.

17        THE COURT:  Yeah.  All right.

18        MR. KRAMER:  That's not the statute of limitations period.

19        THE COURT:  Well, that's fine.  They can do a year or two

20   before.

21        2015 to what?  The filing of the complaint?  What's your

22   cutoff date?  Do you have one?

23        You two work it out.  You two work out the back end.

24   Okay?

25        MR. KOROLOGOS:  We may be able to do the filing of the
```

 1   complaint.

 2        **THE COURT:**  All right.  Okay.

 3        **MR. KOROLOGOS:**  But we'll confirm that for the defendants.

 4        **THE COURT:**  That takes care of fair use.  All right.

 5        **MR. KOROLOGOS:**  Well, it takes care of one-third of the

 6   fair use issues.

 7        **THE COURT:**  What else is there?

 8        **MR. KOROLOGOS:**  And let me stick on that issue for just

 9   one moment.

10        Our view, including we cite a case in our letter, once a

11   policy or procedure becomes the policy or procedure, even if

12   it's only internally circulated, that's not privileged.

13        **THE COURT:**  I'm not taking that up now.  You can raise

14   privilege challenges later.

15        **MR. KOROLOGOS:**  Thank you.

16        **THE COURT:**  Let's see what we're working with first, see

17   what the basis of the assertion is; then we can decide what to

18   do.

19        **MR. KOROLOGOS:**  Thank you, Your Honor.

20        With respect to Request for Production 66(c), that relates

21   to a fair use filter.  There was a brief period of time,

22   apparently, that belatedly got disclosed to us, that they

23   considered an algorithm approach to identifying fair use,

24   called LFU, likely fair use, algorithm.

25        We'd like to get documents related to that.  That's going

1   to assist in dealing with potential fair use issues that might

2   be claimed, again, at a class level to show whether there are

3   means of dealing with it in some automated form or at least

4   some regular form, even if it's not automated.

5        **THE COURT:**  All right.  Mr. Kramer?

6        **MR. KRAMER:**  There are no means of dealing with fair use

7   in an automated form, Your Honor.  It is, according to the

8   Supreme Court, an individualized case-by-case determination.

9   It's one of the problems, one of the many problems.

10       **THE COURT:**  I don't see how you could possibly have it

11  automated, but --

12       **MR. KRAMER:**  We agree.

13       **THE COURT:**  -- was there a period -- your colleague seems

14  to think there was some time when you tried it or something.

15       **MR. KRAMER:**  There are two problems.  Yes, Your Honor,

16  there was a legal-driven effort to say:  Is there some

17  possibility of us telling copyright holders:  Hey, you might

18  want to think about fair use here, all by lawyers, all years

19  ago.  Went nowhere because the engineers came back and said

20  "no."

21       And then there's the problem that the plaintiffs haven't

22  asked about that.  If you look at the request before the Court,

23  66(c) --

24       **THE COURT:**  Let's just -- I really want to be very

25  directed here.  So that's denied.

1      If you come up with something that suggests Mr. Kramer may

2  have -- there are other facts, then you can let me know; but

3  right now, what I'm hearing is it didn't happen.  Somebody may

4  have asked, but it never happened.  So that one's denied.

5      All right.  What's left for 142?

6      **MR. KOROLOGOS:**  142, the last part is RFP 67 --

7      **THE COURT:**  Yes.

8      **MR. KOROLOGOS:**  -- which relates to how frequently fair

9  use is raised as an issue.

10     And they --

11     **THE COURT:**  What does that -- I mean, look, this is some

12  person responding to a takedown letter.  What difference does

13  it make if a bunch of non-lawyers say "fair use"?  What does

14  that matter?

15     **MR. KOROLOGOS:**  We want to show that it is far outweighed

16  by common issues in the class, Your Honor.

17     **THE COURT:**  That it's what?

18     **MR. KOROLOGOS:**  Common issues for the class.  That the

19  instances of fair use are so uncommon, very infrequent,

20  including they --

21     **THE COURT:**  You want to know how many -- as a proportion

22  of class members, how many people assert fair use?

23     **MR. KOROLOGOS:**  Sort of.  Starting with, you know, with

24  respect to takedown notices, how much is fair use raised in

25  response?  We know that very few counter notifications come in,

1    and only a fraction of those are going to be about fair use.

2    We'd like to know how many.

3        **THE COURT:**  All right.  Does YouTube do that?

4        **MR. KRAMER:**  No, Your Honor, we don't with respect to

5    takedown notices.  There's a form language that the disputer

6    has to submit in response to a counter -- as a counter

7    notification.

8        But the idea that we can quantify how often fair use comes

9    up on the service doesn't make any sense.

10       **THE COURT:**  Well, I think I'm asking a simpler question.

11   Does anybody track that at YouTube?

12       "We got 70 claims of fair use this quarter."

13       **MR. KRAMER:**  There are millions, Your Honor.  There are

14   millions.

15       **THE COURT:**  Millions of fair use claims?

16       **MR. KRAMER:**  Millions of fair use claims, Your Honor.

17       And I want to be clear.  There are millions with respect

18   to the universe where there's actually a claim, where something

19   has --

20       **THE COURT:**  Let me suggest this.  If you're going to bring

21   up this issue as a defense to certification or anything else, I

22   will look to see if you have adequately provided the plaintiffs

23   with information.  If you have not, I will strike the argument.

24       **MR. KRAMER:**  Certainly, Your Honor.

25       **THE COURT:**  So --

1    **MR. KRAMER:**  Let me be --

2    **THE COURT:**  -- I'm going to leave it up to you two to

3    calibrate it.  Okay?

4    So that's the -- I mean, this is an obvious consequence;

5    but if you're going to -- if you say -- just hypothetically

6    speaking, if you say, somewhere in opposition to class cert or

7    something like that, "You can't certify because we get millions

8    of claims of fair use" and you did not provide your colleagues

9    with the means of testing that, it will be stricken as a

10   defense.

11   **MR. KRAMER:**  Your Honor, let me be clear about this one,

12   because I think it's important.

13   This is a factor that other courts have identified as one

14   of many that stand as an obstacle to class certification in a

15   copyright infringement case.

16   But for YouTube to know how often class

17   certification [sic] arises is to know the unknowable.  It only

18   arises in a specific --

19   **THE COURT:**  How often fair use arises.

20   **MR. KRAMER:**  How often fair use arises.

21   **THE COURT:**  Okay.  That's fine.  I'm not hedging this.

22   **MR. KRAMER:**  Okay.

23   **THE COURT:**  That's my order.  Okay?  So it's really quite

24   binary.  You say it, and you did not provide adequate

25   discovery, I will not take it into account and it will be

 1   stricken.

 2        **MR. KRAMER:**  Well, Your Honor, I want to be --

 3        **THE COURT:**  There's no "Well, Your Honor," Mr. Kramer.

 4   You two work it out.  That's the dynamic.

 5        All right.  144, what do we have for that, Mr. Korologos?

 6        **MR. KOROLOGOS:**  Your Honor, 144 relates to internal

 7   policies and procedures with respect to copyright management

 8   and specifically dealing with infringers and suspensions and

 9   terminations of infringer accounts.

10        **THE COURT:**  What would you like?

11        **MR. KOROLOGOS:**  Well, we've learned in the discovery we

12   have received that the defendants keep something called the

13   knowledge base.  And --

14        **THE COURT:**  Knowledge base.  Okay.

15        **MR. KOROLOGOS:**  Yes.  And the knowledge base is updated

16   regularly.

17        We have an e-mail chain, for instance, Your Honor, that

18   runs -- I think it's from July of 2020 to April of 2021, that

19   is to an internal group called the Copy Knights -- the

20   Copyright Knights, within YouTube.  And it says things like

21   "The following policy on suspensions of channels has been

22   updated.  Please review it."  And it has a link.

23        So we now know from that document and from testimony

24   associated with that document that there is a knowledge base of

25   such policies and procedures.  We would like to get the

```
 1  policies and procedures that are in that knowledge base that

 2  relate to issues about copyright management.

 3       Now, why does that matter?  Because --

 4       THE COURT:  Well, okay.  I mean, that seems relatively

 5  straightforward.

 6       Mr. Kramer?

 7       MR. KRAMER:  Certainly, Your Honor.  Just to be clear, we

 8  haven't had the opportunity to respond to any of these.

 9       THE COURT:  This is your opportunity.

10       MR. KRAMER:  Great.  I will take it, Your Honor.

11       THE COURT:  All right.

12       MR. KRAMER:  With respect to the knowledge base, this is a

13  document created hand in glove with the lawyers.  The lawyers

14  provide advice on how to deal with situations of an

15  extortionate Nigerian prince suing over bitcoin scammers, or

16  how to deal with Justin Bieber impersonators, and so forth.

17       This is a database filled with legal advice, for the most

18  part.  Now, we've looked through this; and we've said:  Okay,

19  here are 75 or so of these directives that don't appear to have

20  legal advice:  like how to put your time records into finance

21  or how to record something in the system.

22       THE COURT:  Let me just make sure I understand.  This is

23  an in-house for YouTube employees.  If they have a question,

24  they can look at the knowledge base.

25       MR. KRAMER:  Correct.
```

 1          **THE COURT:**  Okay.  All right.  Go ahead.

 2          **MR. KRAMER:**  And so when they asked us for the contents of

 3     the knowledge base, we said:  The stuff that you are looking

 4     for that actually has relevance to this case is privileged.

 5          **THE COURT:**  All right.

 6          **MR. KRAMER:**  The stuff that you -- but if you insist, we

 7     will go through the knowledge base and we will look for stuff

 8     that isn't privileged and either give you that stuff directly

 9     or redact the parts of it that we think are privileged.

10          **THE COURT:**  Okay.  So we're in agreement on that.  So the

11     rest of it, just put on a privilege log.

12          And, Mr. Korologos, you can challenge it if you think

13     there's grounds for it.  Okay?

14          **MR. KOROLOGOS:**  Thank you, Your Honor.

15          **THE COURT:**  All right.  That's the disposition for that

16     one.

17          Let us turn to Mr. Kramer for Docket Number 145.

18          **MR. KRAMER:**  Aah.  A very short letter from us,

19     Your Honor.

20          **THE COURT:**  Yes.

21          **MR. KRAMER:**  At the last hearing, the Court directed us to

22     prepare for this conference and said no more discovery letter

23     briefs.

24          And we said "Okay."  We didn't file any more letter

25     briefs, and the plaintiffs filed five.

 1        And per the Court's standing order, we're not allowed to

 2   respond to those.  So we came here --

 3        **THE COURT:**  Wait.  Did I say "no" and you filed five after

 4   I said "no"?

 5        **MR. KOROLOGOS:**  What had happened, Your Honor, is we

 6   agreed, on April 28, to have a June 2 conference and that, in

 7   lieu of letters prior to the June 2 conference, we would submit

 8   an agenda.  We did that on May 26.

 9        After that, Mr. Kramer came down with COVID and asked that

10   we --

11        **THE COURT:**  Oh.  Is that right?

12        **MR. KRAMER:**  Yes, Your Honor, unfortunately, for quite

13   some time.  It was not great, and it's still not great.  But I

14   am not contagious.  I'm not --

15        **THE COURT:**  You're still not fully recovered?

16        **MR. KRAMER:**  I'm not myself.

17        **THE COURT:**  Sorry to hear that.

18        **MR. KRAMER:**  Thank you, Your Honor.

19        **MR. KOROLOGOS:**  As a result, he asked whether we would

20   agree to appear virtually on the 2nd.

21        We collectively called and left a message to that effect

22   with Your Honor's chambers.  We were informed that the Court

23   preferred --

24        **THE COURT:**  Not my chambers.

25        **MR. KOROLOGOS:**  -- to go in person.

1          **THE COURT:**  You spoke to Ms. Clark.

2          Okay.  I don't remember what happened, but why did you

3     file five letters after I said "no"?

4          **MR. KOROLOGOS:**  Because, Your Honor, after the June 2 --

5          **THE COURT:**  Did I say "yes" later?

6          **MR. KOROLOGOS:**  After the June 2 conference got canceled,

7     we stipulated, both sides, to have it moved one week to June 9

8     so that we could deal with issues before the close of

9     discovery, which was two days ago.

10         But with that date looming and the date for today's

11    conference set on July 7, after the close of discovery --

12         **THE COURT:**  Oh, okay.

13         **MR. KOROLOGOS:**  -- we needed to protect our client's

14    abilities to get these documents and wanted to file those so

15    that we could be heard today on these issues.

16         **THE COURT:**  All right.  Well, it wasn't great but --

17         **MR. KRAMER:**  Your Honor, the only issue is that --

18         **THE COURT:**  We're here now.

19         **MR. KRAMER:**  We are indeed, Your Honor.

20         The only issue is that we have not had the opportunity, in

21    light of the Court's directive of no more letters --

22         **THE COURT:**  It's today.  It's right now.  Look, I don't

23    even normally call for oppositions.  I normally just get people

24    on the phone, as you know because you've done this, because --

25    and I don't even record it -- I mean, report it.  I just try to

1  get it done on the phone.  Half the time, I don't even call for

2  an opposition because it's relatively straightforward.

3       The only reason you're here today is because you are a

4  problem case and I have to put a lot of time into shepherding

5  you two to victory because you can't seem to be able to do it

6  on your own.  So that's why we're here.  And everybody's going

7  to get their day in court.

8       All right.  What about Number 14- --

9       **MR. KRAMER:**  Your Honor?

10      **THE COURT:**  What?

11      **MR. KRAMER:**  One more thing, though, Your Honor.  The

12  point or the problem isn't the lack of opposition, which is a

13  function of the Court's standing order, and I'm fine with that.

14  I'm fine with approaching the issues this way.

15      The problem is that because the Court said no more letters

16  in its last hearing, the defendants have not raised for

17  the Court --

18      **THE COURT:**  Tell you what.  At the end of this, you can

19  give me your laundry list of whatever you want.  Okay?

20      **MR. KRAMER:**  Wonderful, Your Honor.

21      **THE COURT:**  All right.

22      **MR. KRAMER:**  That's great.

23      **THE COURT:**  147 and 149?

24      **MR. KOROLOGOS:**  Yes, Your Honor.

25      **THE COURT:**  Okay.

1      **MR. KOROLOGOS:**  Your Honor, Ms. O'Keefe is going to handle

2    147 and 149, if that's all right.

3      **THE COURT:**  Oh.  Yeah.  Is this co-counsel for the

4    plaintiff?

5      **MR. KOROLOGOS:**  Yes, Your Honor.

6      **THE COURT:**  Okay.

7      **MS. O'KEEFE:**  Good morning, Your Honor.

8      **THE COURT:**  Yes.

9      **MS. O'KEEFE:**  So in 147, we asked for two discrete sets of

10   data.

11      The first deals with YouTube's repeat infringer policy and

12   their implementation of that policy.  So to qualify for the

13   safe harbor, YouTube has an obligation to identify and remove

14   repeat infringers from the platform.  We've asked for data,

15   including DMCA takedown notices, copyright strikes that are

16   assessed, counterclaims that are raised by the uploaders.

17      **THE COURT:**  That's just way too much.  You're going to

18   have to cut this down.

19      What is it you actually want to know?  Like, what's the

20   repeat infringer policy or something?

21      **MS. O'KEEFE:**  No.  We want to know the data from the

22   takedown notices.  We want to be able to identify the class

23   members.  We want to know the videos that were on the platform

24   that infringed their works.

25      **THE COURT:**  Why is this coming up at the very end of

1  discovery?

2      **MS. O'KEEFE:**  We actually --

3      **THE COURT:**  Why didn't you do this a year ago?

4      **MS. O'KEEFE:**  -- moved on this twice before, Your Honor.

5      The data was the original letter motion.  And Your Honor

6  then instructed co-lead -- the lead counsel for both sides to

7  discuss it.

8      When we renewed that data motion, you instructed them to

9  discuss it again.

10      We still don't have any data.  We have a couple of -- six

11  tables that we have received -- four tables we have received

12  sample data from.  We have six tables that we have received

13  schema for, a listing of fields and a description of what's in

14  the fields.

15      **THE COURT:**  Mr. Kramer?

16      **MR. KRAMER:**  Your Honor, that's what they have because

17  that's what we agreed to as part of the court-ordered

18  meet-and-confer process.

19      We said both times:  This is crazy.  We'll give you a way

20  of focusing your inquiry.  Don't ask for the entirety of

21  databases.  Come back to us and say:  Run a report that shows a

22  sampling.

23      **THE COURT:**  When was that?

24      **MR. KRAMER:**  Well, it was -- we've done it twice.  So

25  August of 2021 and then again in February of 2022.

1    **THE COURT:**  That was my sense.  So why did you wait so

2    long to bring this up again?  If you weren't happy in February,

3    why didn't you come back in March?

4        **MS. O'KEEFE:**  I believe we have filed two motions on this

5    previously, Your Honor.

6        **THE COURT:**  I know that.

7        **MS. O'KEEFE:**  This is the third motion.

8        **THE COURT:**  I sent you to the four-hour meet and confer

9    and did other things.

10       I mean, why did you wait till the end of June or middle of

11   June to tell me about this?

12       **MS. O'KEEFE:**  I believe we wrote a letter to defendants on

13   June 6th that they did not respond to, detailing --

14       **THE COURT:**  I understand that.

15       **MS. O'KEEFE:**  -- with respect to --

16       **THE COURT:**  I'm talking about in February, when you had

17   this agreement, why didn't you come right in the next week?

18   Why did you wait three months?

19       **MS. O'KEEFE:**  Because we were told that we

20   were -- actually, what we did was we served an interrogatory,

21   saying:  Give us the schema.  Identify the databases for us.

22       That interrogatory, I believe, was responded to --

23   February, perhaps?

24       **THE COURT:**  All right.  February.  So why did you wait

25   three months? is my question.

1          **MS. O'KEEFE:**  Your Honor, we didn't wait three months.  We

2     continued to meet and confer in good faith.  We expected --

3          **THE COURT:**  When I say "wait," Counsel --

4          **MS. O'KEEFE:**  -- that they --

5          **THE COURT:**  -- I'm talking about coming to me.

6          Why did you wait three months to come to me?  You knew --

7     this has been going on for a year now.  Why did you wait until

8     the very last day for you to come to me, to the Court, and say,

9     "Please help me"?

10         **MS. O'KEEFE:**  Because we wanted to try and work it out

11    with defendants.  And we realized that we had finally reached

12    impasse.  We were not going to be able to do it.  We gave a

13    list of specific fields that we wanted.  We gave a time frame

14    for specific fields.  And it was very clear to us that

15    defendants were not going to produce that data.

16         We have an obligation to come to a complete impasse before

17    we reach out and write another letter to the Court.  It wasn't

18    a comfortable thing to write a third letter to the Court.

19         **THE COURT:**  I appreciate the sentiment, but it has been

20    honored in the breach by both sides in this case from Day One.

21    So please do not trumpet the high road because neither of you

22    have been particularly good about solving discovery throughout

23    the -- from the inception of this action.

24         I don't know what you want me to do.  Discovery is closed.

25    You're a little bit late.  So just, what discrete set of things

 1   would you like me to consider?

 2        **MS. O'KEEFE:**  The DMCA takedown notices, strikes,

 3   counterclaims, and channel suspensions.

 4        **THE COURT:**  I imagine there must be an enormous volume.

 5        **MS. O'KEEFE:**  15.

 6        **THE COURT:**  Please, when I speak --

 7        **MS. O'KEEFE:**  Sorry.

 8        **THE COURT:**  -- you need to stop --

 9        **MS. O'KEEFE:**  I apologize.

10        **THE COURT:**  -- because the record will not be clear, and I

11   come first.

12        I imagine there's an enormous volume of takedown notices.

13        **MR. KRAMER:**  Tens of millions, Your Honor.

14        **THE COURT:**  Okay.  So that's not going to fly.  So what do

15   you want?  I'll give you something that you can put into six

16   bankers boxes.  Okay?

17        **MS. O'KEEFE:**  Okay.

18        **THE COURT:**  Figuratively speaking.

19        So what is it you want?

20        **MS. O'KEEFE:**  Well, we'd like to identify the class.  For

21   that, I think we need the claimant information from each of the

22   DMCA takedown notices, perhaps from 2015 on, since that seems

23   to be an appropriate date.

24        **THE COURT:**  Well, I mean --

25        **MR. KRAMER:**  That's tens of millions, Your Honor.

1          **THE COURT:**  Tens of millions.  You're not going to do

2    that.

3          And, by the way, you understand that there are some

4    parameters on how large a class can be.  Are you planning to

5    ask for a class that exceeds a million people?

6          **MS. O'KEEFE:**  I am not certain that the class will exceed

7    a million people.  So we don't know how many individual

8    claimants there are.  We only know, roughly, the number of

9    takedown notices that have been filed.

10         I believe in the 2017 copyright report, they indicated

11   that they had -- or the 2018 copyright report indicated that

12   approximately 300,000 claimants had filed takedown notices in

13   2017.

14         **THE COURT:**  Well, that's --

15         **MR. KRAMER:**  Your Honor, if I can cut to the chase.

16         **THE COURT:**  -- an awfully large class.

17         Yeah, go ahead.

18         **MR. KRAMER:**  We've offered and have produced samples of

19   the database.  We have offered and produced samples of other

20   databases.

21         **THE COURT:**  Well, just what does that mean, "samples"?

22         **MR. KRAMER:**  The point is that we are perfectly -- the

23   plaintiffs should have what they need here, is my point.  We

24   tried to cut through this.  We gave them schemas.  We gave them

25   descriptions.  We gave them data that was sampled from these

1   databases.  And we think that should be enough because --

2       **THE COURT:**  What would that tell them?

3       **MR. KRAMER:**  What it would tell them is how YouTube

4   records information so that, during the discovery period, they

5   could come back to us and say:  You know what I need?  I need a

6   report that shows me, for this week or this time frame, how

7   many claims YouTube got or how YouTube handled these.

8       To be clear, the DMCA has a requirement that a service

9   provider have a repeat infringement policy.  It gives

10  tremendous latitude to the service to come up with that policy.

11  And we've told them all about the policy.  And it requires the

12  service show reasonable implementation.  We've shown them, by

13  leaps and bounds, reasonable implementation.

14      What the plaintiffs want to do is look at every single

15  notice that YouTube received and say:  No, you didn't handle

16  that one properly.  You didn't handle that one properly.

17      And that's not what the DMCA -- the whole point of the

18  DMCA is to --

19      **THE COURT:**  Well, it's also not going to be a basis for

20  certification.  If you have to look at every notice, that's

21  just not going to work.

22      **MR. KRAMER:**  We agree, Your Honor.

23      The DMCA is supposed to be a prophylactic protection for

24  online services against copyright litigation.  It can't be that

25  if you invoke it as an online service provider, the other side

1 is now entitled to say:  Now give me every single claim you've

2 ever received so I can second-guess.

3    **THE COURT:**  All right.  Let's do this.  You two should

4 just meet and confer over the next week and see if you can come

5 up with something.  It's going to have to be modest and

6 focused.  Okay?

7    **MS. O'KEEFE:**  Agreed, Your Honor.

8    **THE COURT:**  All right.  And the last one, Number 149, from

9 the plaintiffs.

10    **MS. O'KEEFE:**  In this motion, Your Honor, we just ask that

11 defendants run custodial searches with search terms in order to

12 respond to outstanding discovery requests.  We had asked this

13 from the beginning of discovery.  And we believe that they have

14 not run any custodial search terms.  If they have run those

15 searches, we don't know what they are.

16    **THE COURT:**  Why is this coming up at the very end of the

17 discovery period?  I don't understand what you were waiting on.

18 Why haven't you asked earlier?

19    You can't just sort of get to the end of the case, when

20 the discovery cutoff is imminent, and say:  Oh, I just realized

21 we don't have 50 percent of what we asked for.

22    You waited too long.  So I just -- why am I giving you any

23 help on this?

24    **MS. O'KEEFE:**  Your Honor, I can only --

25    **THE COURT:**  These references are all to events in 2021 in

1    Docket Number 149.  So I think you're a day late and a dollar

2    short, unless you can tell me otherwise.

3        **MS. O'KEEFE:**  We were waiting for an outpouring of

4    discovery in the latter stages.  We had defense counsel telling

5    us that they had agreed to produce certain categories of

6    documents, and we were waiting for them to be produced.

7        **THE COURT:**  Well, I'll consider -- if you have an

8    agreement, I'll consider enforcing it.  But, I mean, just

9    coming in at the end and saying, "Oh, well, we've noticed that

10   we got stiffed," you've got to do that earlier in the case.  I

11   mean, discovery is over now.

12       **MS. O'KEEFE:**  Understood, Your Honor.

13       **THE COURT:**  Okay?  So is there an agreement that you think

14   Mr. Kramer didn't honor?

15       **MS. O'KEEFE:**  Yes, Your Honor.  We believe that they have

16   agreed to produce documents on certain requests for

17   production --

18       **THE COURT:**  Okay.  Let's put some --

19       **MS. O'KEEFE:**  -- and have not --

20       **THE COURT:**  -- specifics on it, please.

21       **MS. O'KEEFE:**  -- adequately searched.

22       **THE COURT:**  Just tell me specifically when was --

23       **MS. O'KEEFE:**  I will give you an example, Your Honor.

24       On June 16th, I believe, defendants produced a spreadsheet

25   that we saw for the very first time.  It is a spreadsheet that

1    we believe is put together by a product specialist, and it

2    details each implementation and change to the policy for

3    ContentID and, also, some of the copyright management policies.

4         That spreadsheet then has hyperlinks to a document that

5    explains it, called a CommDoc, or to a document that implements

6    it, called an Ariane, or to a training deck that tells YouTube

7    employees how to implement that policy.

8         We received that on -- I believe it was either June 4th or

9    16th.  We have, since then, asked for those hyperlinked

10   documents that are plainly relevant to outstanding requests,

11   and we did that in letter form.

12        **THE COURT:**  What I was asking you for is an example where

13   Mr. Kramer said, "I will give you X," and he didn't.

14        So you're just telling me you got a document and you

15   wanted some follow-up and then discovery closed.  I'm not going

16   to do that.  You're too late.

17        You need to tell me "Mr. Kramer agreed" or one of his

18   colleagues agreed -- when I say "Mr. Kramer," he's a

19   representative of the YouTube legal team -- "agreed that they

20   would produce X, and we never got it."  That's all I'm going to

21   help you with, because this is just way too late in the game

22   for you to be asking at this point.

23        So do you have any examples of that, a broken promise?

24        **MS. O'KEEFE:**  At my fingertips, I do not, Your Honor; but

25   if I could refer to that spreadsheet --

```
 1        THE COURT:  No.  I'm not --

 2        MS. O'KEEFE:  -- I could tell you --

 3        THE COURT:  I'm not taking any more --

 4        MS. O'KEEFE:  -- exactly what they are.

 5        THE COURT:  -- letters.

 6        Let me be clear.

 7        MS. O'KEEFE:  Okay.

 8        THE COURT:  Discovery is over.  I'm not taking any more

 9   letters.  We're done with this now.  This has taken up way too

10   much federal judicial time already.

11        MS. O'KEEFE:  I will --

12        THE COURT:  So if you don't have it handy, that issue is

13   closed.  Okay?

14        MS. O'KEEFE:  Your Honor?  Your Honor, may I, please, if I

15   could.  I can give you different categories of documents.

16        THE COURT:  I'm not asking for that.  I said agreements,

17   and you said you don't have it available right now.  If you

18   don't have it, you're out.  All right?

19        Okay.  Mr. Kramer, what is it on the defendant's side?

20        MR. KRAMER:  Yes, Your Honor.  Let me start with the words

21   "outpouring of discovery."  AST --

22        THE COURT:  No, no, no, no.  We're past that.  What is

23   it that you --

24        MR. KRAMER:  No, no.

25        THE COURT:  What are the --
```

1      **MR. KRAMER:**  I completely understand.

2      **THE COURT:**  Let's just stop for a moment, and let's focus

3  on me.

4      You said you had some things that you felt you couldn't

5  raise because you were honoring what you understood to be a ban

6  on letters.  Whether or not there was one, I don't remember,

7  but I'll take your word for it.

8      What is it that you did not get from the plaintiffs that

9  you think you should get?

10      **MR. KRAMER:**  Yes, Your Honor.

11      The new plaintiffs that were added to this case 16 months

12  in, AST and Uniglobe, came to the case with a promise that it

13  wouldn't delay things.

14      AST was immediately asked for its documents.  We didn't

15  get a single piece of paper until June.  They were joined in

16  November.  We didn't get a document until June.

17      On July 5th, the day of the discovery cutoff, we got more

18  than 75 percent of their documents.  That strikes us as

19  sandbagging.

20      With respect to AST's deposition, we asked for them in

21  February.

22      They told us, "We can't.  There's a war."

23      We said, "Okay.  Just tell us when you can."

24      **THE COURT:**  Are they Ukrainian?

25      **MR. KRAMER:**  They're Russian.

 1          **THE COURT:**  They're Russian?

 2          **MR. KRAMER:**  They are.

 3          **THE COURT:**  Are they actually in Russia?

 4          **MR. KRAMER:**  They are.

 5          And they told us that they weren't going to be able to

 6     make it before the end of the discovery period.

 7          We said okay.

 8          And then, with ten days left in the discovery period, with

 9     19 of our depositions left to go, the plaintiffs said:  Oh, you

10     can depose them in the United Arab Emirates on July 4th.

11          That was the offer that we got and, by the way, with none

12     of their documents or virtually none of their documents.

13          We don't think that AST has been faithful to the Court's

14     standing orders or with respect to its obligations under the

15     federal rules of discovery.

16          Uniglobe is a slightly different story.

17          **THE COURT:**  Well, one at a time.

18          **MR. KRAMER:**  Sure.

19          **THE COURT:**  All right.  Well, look, I just took your

20     colleague here to task for waiting too long.  I was prepared to

21     do that here, but this war thing -- so they claim the war

22     prevented them from responding?

23          **MR. KRAMER:**  They have, Your Honor.  And we asked how, and

24     we haven't gotten an explanation for that.

25          **THE COURT:**  Well, I don't think you need to ask how.  It's

obvious.  It's just not -- life is not good right now in that

part of the world.  So I don't need that.  I'm fine with that.

I accept that as a reasonable -- but maybe the accommodation

is, for that party alone, you get another 30 days or something.

**MR. KRAMER:**  And that would be fine.

**THE COURT:**  Who's doing AST?

**MR. KOROLOGOS:**  I believe I can handle it.  I may turn to

Mr. Ewing on certain specifics.

**THE COURT:**  Okay.  Go ahead.  So if war was invoked as

a -- and it's a very credible reason, they couldn't meet their

discovery deadlines, then that will be pushed out.  That's a

fair reason.

**MR. KOROLOGOS:**  And we're fine with that, Your Honor.

**THE COURT:**  Okay.  All right.  How much time do you want

for that?

**MR. KRAMER:**  30 days is fine.

**THE COURT:**  This is just this one party now.

**MR. KRAMER:**  Totally understood.

**THE COURT:**  30 days?

**MR. KRAMER:**  30 days is fine.

**THE COURT:**  You're sure?

**MR. KRAMER:**  Assuming we get a representation, as

the Court's standing order requires, that the plaintiffs have

completed their discovery.  We sent them a letter saying we're

done.  We haven't gotten one from the plaintiffs saying they've

 1  produced all responsive documents.

 2      **THE COURT:**  You need to do that.  So get that done by the

 3  end of next week.  Okay?

 4      **MR. KOROLOGOS:**  Yes, Your Honor.

 5      **THE COURT:**  Okay.  I'll let you two work out the details,

 6  but whatever you need, 30, 35 days.  Okay?

 7      **MR. KRAMER:**  That'll be fine.

 8      **THE COURT:**  That's just for AST.

 9      Okay.  Next one.

10      **MR. KRAMER:**  Uniglobe is another plaintiff that joined in

11  November.  And under -- in deposition last week, they told us

12  that they had given all of their documents to their lawyers

13  when they joined the case in November.  But we didn't get them,

14  or 55 percent of them, until three days -- over a weekend --

15  before the deposition.

16      Again, it looks to us like sandbagging.  Now, we don't

17  know because the only person whose testimony we got was the

18  witness's.

19      **THE COURT:**  Well, is this another Russian entity?

20      **MR. KRAMER:**  No.  It's local.  United States, L.A.

21      **THE COURT:**  This one, you waited too long on.

22      **MR. KRAMER:**  Well, to be clear --

23      **THE COURT:**  No.  I've already taken -- look, this is a

24  goose-gander courtroom.  Okay?  So they're going to live by

25  that; you're going to live by it too.

1    **MR. KRAMER:**  The problem, Your Honor, is the Court said we

2    couldn't bring it to the Court's attention in April.  We

3    couldn't file letters.  The Court said no more letters, and we

4    took the Court at its word.

5    We would have brought it to the Court's attention

6    immediately and said -- in fact, we did file a motion with

7    respect to AST and said:  We have no documents.

8    But when the Court said no more letters, we respected

9    the Court's directive, and that means we didn't file a motion

10   six weeks ago with respect to --

11   **THE COURT:**  When did I say "no more letters"?  When did I

12   say that?

13   **MR. KRAMER:**  At the hearing, when we talked about how we

14   were going to structure the next status conference.

15   **THE COURT:**  You know, I do so many hearings.  What date,

16   roughly?

17   **MR. KRAMER:**  It was April 28th.  And we talked about --

18   the Court actually said:  Okay.  I don't want more letters.

19   Put it in a --

20   **THE COURT:**  All right.  I'll just rely on the transcript.

21   I don't need paraphrases.

22   Look, I mean, they were due in November, and you waited

23   till the end of April?

24   **MR. KRAMER:**  No, sir.  They were joined to the case in

25   November.  We asked for their documents immediately in

 1  November.  We got a production from them in February.  And we

 2  said okay, and we scheduled their deposition.

 3      And then three days before their deposition, which was

 4  June 27th, we got tens of thousands of documents that had not

 5  previously been produced but which the witness then testified

 6  had been provided to counsel when they joined the case in

 7  November.

 8      So we don't understand how it is that we were left without

 9  the ability --

10      **THE COURT:**  Why did you wait till June 21st to tell me

11  that you wanted to file things?  That's Docket Number 145.  You

12  waited till June 21st.  Why did you wait that long?

13      **MR. KRAMER:**  Your Honor, I thought Your Honor's directive

14  was clear with respect to no more letters.

15      **THE COURT:**  I understand that.  But if you were itching,

16  why didn't you ask for clarification?  Particularly if you

17  think that your colleagues were breaking the rules, why didn't

18  you -- which is what you're saying here --

19      **MR. KRAMER:**  This one -- I'm sorry, Your Honor.

20      **THE COURT:**  -- Document 145, why didn't you just do it

21  earlier?

22      **MR. KRAMER:**  Well, Your Honor, we thought that the Court

23  was clear, that there wasn't any ambiguity there, and that

24  these letter briefs that were being filed were being filed in

25  contravention of the Court's directive.  And we understand that

1    the parties should spend whatever time they can to try to

2    resolve matters.

3            We didn't know about this issue until June 30th.  The

4    deposition of the witness on June 30th, that we had requested

5    many months before, revealed to us that the documents had been

6    produced to counsel in November and had been turned over to us

7    three days before the deposition, rendering them effectively

8    useless for purposes of the deposition.

9            **THE COURT:**  Mr. Korologos?

10           **MR. KOROLOGOS:**  First, Your Honor, it was nine days, not

11   three days.

12           Second, that production was based on extensive meet and

13   confers where they argued that the initial production was

14   insufficient.  We believe the initial production was more than

15   sufficient; but to get rid of the issues that they were raising

16   in the meet and confers, we decided to give them a whole bunch

17   of additional documents, most of which are not actually

18   relevant to the case or are duplicative of the original

19   production.

20           And so we provided it.  We provided it before the

21   deposition.  They didn't ask for the deposition to be postponed

22   because of that.  And we think that that issue ought to be

23   done, Your Honor.

24           **THE COURT:**  What do you want me to do, Mr. Kramer?

25           **MR. KRAMER:**  Your Honor, we'd like the right to redepose

 1  the witness after we've had an opportunity to review the

 2  documents that have been produced and dumped on us at the last

 3  deposition.

 4      THE COURT:  One deposition?

 5      MR. KRAMER:  Yes, Your Honor.

 6      THE COURT:  For how many hours?  Two?

 7      MR. KRAMER:  I was going to say three.  If the Court

 8  thinks two -- I think three might be better, Your Honor,

 9  because we don't yet know what's in these documents.

10      THE COURT:  All right.  Three-hour deposition,

11  Mr. Korologos.  Done.

12      Okay.  What's the witness's name?

13      MR. KRAMER:  Namrata Singh, Your Honor.  It's Uniglobe --

14      THE COURT:  You know who it is?

15      MR. KRAMER:  The name of the -- the name of the plaintiff.

16      MR. KOROLOGOS:  Ms. Cooper.

17      MR. KRAMER:  Ms. Cooper.  Ms. Cooper.

18      THE COURT:  Is it Singh or Cooper?

19      MR. KRAMER:  I think it's Singh Cooper.

20      THE COURT:  All right.  I'll leave it up to you.  You two

21  know who you're talking about?

22      MR. KOROLOGOS:  We know who we're talking about.

23      THE COURT:  Okay.

24      MR. KOROLOGOS:  Naomi.

25      THE COURT:  All right.  What's next, Mr. Kramer?

1    **MR. KRAMER:**  Your Honor, the plaintiffs have spent a lot

2    of time on YouTube searching for their videos, doing manual

3    searches on the service, saying, "Here's my name.  What videos

4    come up?"  They do a search.

5        They've done these searches --

6    **THE COURT:**  You mean on their own?  They're just doing it

7    on their own?

8    **MR. KRAMER:**  On their own.  On their own for years.

9        And in the context of this case, the plaintiffs, through

10   counsel, have done these searches to identify videos that they

11   want to contend infringe.

12   We said:  Okay.  Tell us about that.  Give us all the

13   information you have about the searches you did, when you did

14   them, what you saw, what you did with respect to what you saw.

15       It bears directly on statute of limitations issues.  It

16   bears directly on failure to mitigate damages issues.

17       And the plaintiffs said:  Privileged.

18       Now, it can't possibly be privileged for what the

19   plaintiffs themselves did, independent of counsel; nor can it

20   be privileged with respect to what counsel did insofar as they

21   communicated to YouTube.  They're using the YouTube service and

22   typing in the name of the plaintiff or the name of a movie.

23       We don't know who the plaintiffs are when they're visiting

24   YouTube.  But if they've done searches on YouTube and

25   identified alleged infringements or seen stuff and chosen to

1   leave it there, which is often the case with respect to these

2   plaintiffs, we need to know.

3       And the plaintiffs thus far have not given us information

4   that demonstrates what they searched for, when they searched,

5   what they saw, and what they did.

6       **THE COURT:**  When did you ask for it?

7       **MR. KRAMER:**  When did we ask?  When did we ask for this

8   information?

9       **THE COURT:**  Yes.

10      **MR. KRAMER:**  I think we asked for it in our very first

11  interrogatory, Your Honor.

12      **THE COURT:**  All right.  Well, it's a little late now.  So

13  why didn't you come to me earlier?  That was two years ago;

14  right?

15      **MR. KRAMER:**  That's an excellent question, Your Honor.  I

16  have to think about that.  Why didn't we come earlier?

17      I guess that we thought -- the reality is, Your Honor,

18  that if the plaintiffs are now going to say our ability to

19  search for infringements is insufficient, we all need access to

20  this ContentID system --

21      **THE COURT:**  That's fine.  You waited too long.  I don't

22  understand why you waited so long.  So I think the answer is

23  "no."

24      Anything to add, Mr. Korologos?

25      **MR. KOROLOGOS:**  No.

1    **THE COURT:**  The answer is "no" on that.

2    Okay.  How much more do you have, Mr. Kramer?

3    **MR. KRAMER:**  Last one, Your Honor.

4    **THE COURT:**  All right.  Good.  Okay.

5    **MR. KRAMER:**  Yesterday -- two days ago --

6    **THE COURT:**  Yesterday.

7    **MR. KRAMER:**  -- we finally got the deposition --

8    **THE COURT:**  Yesterday was July -- oh, July 6th.

9    **MR. KRAMER:**  July 6th.  The last day of discovery.

10   -- we finally got the deposition of counterclaim defendant

11   Gabor Csupo, who was there testifying on behalf of

12   Pirate Monitor, the former plaintiff that had to dismiss its

13   claims with prejudice after revelations surfaced about the way

14   in which they had manipulated the YouTube system.

15   During his deposition, he was wildly unprepared and

16   pointed to a person of interest in Hungary and said "He's the

17   person responsible" over and over and over again.

18   So instead of getting the corporation's person most

19   knowledgeable, we got a person who pointed to someone in

20   Hungary and said, "He's the guy who has all the answers."

21   **THE COURT:**  This was a 30(b)(6) deposition?

22   **MR. KRAMER:**  Correct.  It's a 30(b)(6) deposition of

23   Pirate Monitor Ltd.

24   **THE COURT:**  Okay.

25   **MR. KRAMER:**  And so we found his testimony to be

1   insufficient to satisfy the requirements of Rule 30(b)(6) and

2   the Court's standing order.

3        **THE COURT:**  Let me ask you this:  Pirate Monitor is out of

4   the case?

5        **MR. KRAMER:**  They're not out of the case.

6        **THE COURT:**  Is it really worth asking some guy in Hungary,

7   who's going to tell you -- look, let's just be realistic,

8   Mr. Kramer.  We've both been around the block.  You know this

9   fellow in Hungary is not going to give you the time of day.  So

10  is this really worth flying some poor person to Hungary and

11  trying to depose this fellow?

12       What is it that you want?

13       **MR. KRAMER:**  I think that what it is worth, Your Honor, is

14  to talk -- so the plaintiffs' major point in this case is that

15  ContentID should be available to everyone.  Everyone who wants

16  it should be able to have access to this tool.

17       Pirate Monitor is a terrific example of why YouTube can't

18  give access to ContentID to claim and block videos as they see

19  fit because they're fraudsters.

20       **THE COURT:**  Yes, but it seems to me, whatever you have

21  from the person you did depose will work just fine at a trial

22  when you point out:  Pirate Monitor is the gang that couldn't

23  shoot straight, and this is Exhibit A about why we don't hand

24  out ContentID to everybody.

25       **MR. KRAMER:**  Exactly, Your Honor.  But let me propose

1  this, then.  If we can't depose the gentleman in Hungary or

2  they choose not to present the gentleman in Hungary, then --

3      **THE COURT:**  Well, I'll tell you this.  If you call him at

4  trial, if we get to that point -- and we're going to talk about

5  that in a minute -- you can depose him before he testifies.

6  Okay?  So if you call him as a trial witness, you're going to

7  have to make him available a week before in-person, not video,

8  in-person.  You can take the deposition then.

9      **MR. KRAMER:**  Certainly, Your Honor.  And I guess along

10  those lines, to the extent that Mr. Csupo, the witness for

11  Pirate Monitor, suddenly has a newfound recollection of the

12  events because he doesn't like the way this is going --

13      **THE COURT:**  Then you will have a glorious

14  cross-examination, but that's it.

15      **MR. KRAMER:**  We will, Your Honor.

16      **THE COURT:**  Okay?

17      **MR. KRAMER:**  Thank you.

18      **THE COURT:**  Okay.  Now, what is this about changing the

19  schedule?  Plaintiffs?

20      **MR. KOROLOGOS:**  Your Honor, what we wanted to do was to

21  adjust the schedule to allow us to get the information that we

22  have asked for, and much of which we've been granted today; get

23  an opportunity to receive that and follow up on it.  Until we

24  see that, we don't know what --

25      **THE COURT:**  Discovery is closed; so there's not going to

1  be any following up.

2      So what exactly -- what date do you want to change?

3      **MR. KOROLOGOS:**  In our proposed order, Your Honor, we had

4  suggested changing, by 45 days, all of the dates for close of

5  fact discovery, expert disclosures and discovery, and class

6  certification.  Not any of the dates after that.

7      **THE COURT:**  This is a 2020 case.  Okay?  We're already not

8  going to try this thing until 2023.  This is just going on way

9  too long.

10     **MR. KOROLOGOS:**  And this would not change that trial

11 schedule, Your Honor.

12     **THE COURT:**  No, I understand that.  But my point is,

13 there's no basis for extending discovery.  You all have had

14 plenty of time, two years, to get this thing wrapped up.  So --

15     **MR. KOROLOGOS:**  May I address that just briefly,

16 Your Honor?

17     **THE COURT:**  Yeah.  And we just spent over an hour today

18 finishing your last points.  So I am not going to reopen

19 discovery.  That's just not going to happen.

20     Is there another date you want to change?

21     **MR. KOROLOGOS:**  Well, we would at least like to have the

22 opportunity to get the information that we've been granted

23 today, to be able to utilize that sufficiently in --

24     **THE COURT:**  That's fine.  You want to push --

25     **MR. KOROLOGOS:**  -- our expert reports.

1      **THE COURT:**  -- the summary judgment, or something, out?

2      **MR. KOROLOGOS:**  Well, we'd like to push --

3      **THE COURT:**  Experts?

4      **MR. KOROLOGOS:**  -- expert disclosure and discovery and the

5   class certification briefing.

6      **THE COURT:**  That seems okay.

7      Are you okay with that, Mr. Kramer?

8      **MR. KRAMER:**  So certainly, with respect to experts,

9   Your Honor, we don't have a problem with that.  Both sides are

10  undoubtedly exhausted as a result of this last push to the

11  close of discovery.  So pushing out the expert disclosures and

12  discovery period is fine with us.

13     We do have some hesitation about pushing off the class

14  certification issue.  As the Court will recall, that is a huge

15  issue for the parties and a divide between them.

16     In our view, this case is individual plaintiffs whose

17  claims collectively are worth a few thousands dollars, and the

18  plaintiffs are saying it's worth billions.  And that disconnect

19  is class certification.  So the sooner that can be heard, the

20  better.

21     But if the Court is inclined, and with the Court's

22  approval, I have no problem kicking that off 30 days.  I just

23  don't want to put it off months.

24     **THE COURT:**  Well, I think the proposal is 45 days.

25     **MR. KOROLOGOS:**  Yes, Your Honor.

1      **THE COURT:**  That's fine.  So I'll do a scheduling order.

2   Everything but close of fact discovery, I'll push out 45 days.

3   That will change the trial date a little bit, but that's okay.

4      Now, what's happening with settlement?  You can't do it?

5   I'm hearing from Mr. Kramer you actually can't do it.

6      That's fine.  If you can't do it, you can't do it.

7      **MR. KOROLOGOS:**  As we've discussed before, we did have one

8   round with former Judge Scheindlin.  We agreed, at that,

9   that --

10     **THE COURT:**  Oh, that's right.

11     **MR. KOROLOGOS:**  -- that we would best be served to await

12  and see discovery develop and likely get through class

13  certification briefing.

14     I think that the best opportunity, consistent with

15  Your Honor's discussion about class certification issues at the

16  last hearing, where Your Honor may recall, you suggested the

17  possibility of providing some preliminary indications to the

18  parties about class certification.

19     **THE COURT:**  Oh, without a formal order.

20     **MR. KOROLOGOS:**  Yes.

21     **THE COURT:**  I see.

22     **MR. KOROLOGOS:**  And --

23     **THE COURT:**  That seems like a good idea.

24     **MR. KOROLOGOS:**  -- Mr. Kramer and I --

25     **THE COURT:**  Yeah.

1      **MR. KOROLOGOS:**  Mr. Kramer and I discussed that.  I think

2  that they --

3      **THE COURT:**  Do you like that idea?

4      **MR. KOROLOGOS:**  I like that idea.  I don't think they like

5  that idea.

6      **MR. KRAMER:**  Your Honor, given the pendency of the motion,

7  we'd rather have the issue addressed on a full record.

8      **THE COURT:**  No.  It will be a full record.  I just won't

9  pull the trigger on a final order.  It's going to be a full

10  record.  You're going to file your briefs.  You're going to

11  have an argument.  And I'll tell you what my -- I'll, in

12  effect, give you a tentative.

13      **MR. KOROLOGOS:**  That's what I think would help the

14  parties, Your Honor.  At argument or shortly after that, we're

15  called in and given a tentative.  I think either way that goes,

16  settlement discussions at that point have a significant

17  possibility of being fruitful.

18      I also think that it is beneficial to have those

19  settlement discussions occur before there is any ruling,

20  because if we're going to settle, my guess is they're going to

21  want to have a class settlement so that they can get a class

22  release.

23      **THE COURT:**  I understand.  This is the last bet before the

24  river card shows.

25      So do you want to stick with Judge Scheindlin, or do you

1    want to try someone else?

2        **MR. KOROLOGOS:**  I think we --

3        **THE COURT:**  Talk about that with Mr. Kramer?

4        **MR. KOROLOGOS:**  Yeah, I think we may want to try somebody

5    else, but why don't Mr. Kramer and I talk about that.

6        **THE COURT:**  That's a good idea.

7        **MR. KOROLOGOS:**  We've got some time to set that up.

8        **THE COURT:**  It's nothing about Judge Scheindlin.  I don't

9    know her personally.  I'm not casting any doubts on her

10   abilities.  But sometimes a little change of scenery can help.

11       And I'll leave it up to you.

12       **MR. KRAMER:**  Your Honor suggested Judge Walker, which

13   strikes us as a great suggestion.

14       **THE COURT:**  Well, actually, I was just reminded in that

15   *Broadcom* case right before you, Justice Lambden, local, very,

16   very good; and that's --

17       **MR. KOROLOGOS:**  That's also a helpful suggestion.

18       **THE COURT:**  -- someone I would definitely want you to

19   consider if you were -- it's totally up to you, of course.

20       This is a hundred percent driven by you two and your

21   selection.  But Justice Lambden would also be someone I might

22   want to take into account.

23       **MR. KRAMER:**  I look forward to --

24       **THE COURT:**  Okay.  I do like the idea of the tentative,

25   because I do think it can help to promote settlement, and it

 1  would be relatively easy to get a final order out shortly after

 2  that.

 3      Okay.  That's it, Plaintiffs?

 4      **MR. KOROLOGOS:**  One remaining discovery issue, I believe,

 5  Your Honor.

 6      **THE COURT:**  We've got to wrap it up because the court

 7  reporter has been here since 10:00.

 8      **MR. KOROLOGOS:**  It should be pretty simple.

 9      There was a witness that, the day before we were to take

10  her deposition, Ms. Suk got ill.

11      **THE COURT:**  Oh.

12      **MR. KOROLOGOS:**  So we did not take her deposition.

13      **THE COURT:**  That's fine.  You can finish it.

14      **MR. KOROLOGOS:**  They've offered the 14th.

15      **THE COURT:**  If it's illness, just get it done.  That's

16  fine.

17      **MR. KRAMER:**  We just need your approval, Your Honor.

18      **THE COURT:**  Listen, you two can work out any individual

19  deals you want.  I'm not lifting discovery.  But you can work

20  out any individual deal you want, as long as it doesn't involve

21  me.  Okay?  So however you want to do it is fine.  I leave it

22  up to you.  You guys, you know your case; you're experienced

23  lawyers; you can work it out.

24      **MR. KOROLOGOS:**  Thank you, Your Honor.

25      **THE COURT:**  I don't have to prove any of that.

1          **MR. KRAMER:**  Thank you, Your Honor.

2          **THE COURT:**  All right.  Thanks very much.

3          **THE CLERK:**  All rise.

4                  (Proceedings adjourned at 12:11 p.m.)

5                          ---o0o---

6

7                  <u>**CERTIFICATE OF REPORTER**</u>

8          I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10

11   DATE:  Sunday, July 10, 2022

12

13                      *Ana Dub*

14   _____

15       Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
                Official United States Reporter

16

17

18

19

20

21

22

23

24

25