# EXHIBIT 5

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

```
_____
                                    )
MARIA SCHNEIDER, UNIGLOBE           )
ENTERTAINMENT, LLC, and AST         )
PUBLISHING LTD., individually and   )
on behalf of all others similarly   )
situated,                           )
                                    )
           Plaintiffs,              )
                                    )
vs.                                 ) No. 3:20-cv-4423
                                    )
YOUTUBE, LLC; and GOOGLE LLC,       )
                                    )
           Defendants.              )
_____ )
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF JOSEPH M. WINOGRAD

San Francisco, California

Thursday, September 29, 2022

Volume I

Reported by:
CATHERINE A. RYAN, RMR, CRR, B.S.
CSR No. 8239

Job No. 5490258

PAGES 1 - 281

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4
 5    _____
                                    )
 6    MARIA SCHNEIDER, UNIGLOBE     )
      ENTERTAINMENT, LLC, and AST   )
 7    PUBLISHING LTD., individually and )
      on behalf of all others similarly )
 8    situated,                     )
                                    )
 9              Plaintiffs,         )
                                    )
10    vs.                  ) No. 3:20-cv-4423
                                    )
11    YOUTUBE, LLC; and GOOGLE LLC, )
                                    )
12              Defendants.         )
      _____)
13
14
15
16
17        Videotaped deposition of JOSEPH M.
18    WINOGRAD, Volume I, taken on behalf of Defendants,
19    with the Witness appearing at WILSON SONSINI
20    GOODRICH & ROSATI, One Market Street Spear Tower,
21    Suite 3300, San Francisco, California, beginning at
22    9:13 a.m. and ending at 4:56 p.m., on Thursday,
23    September 29, 2022, before CATHERINE A. RYAN,
24    Certified Shorthand Reporter No. 8239.
25
```

Page 3

```
 1    APPEARANCES:
 2
 3    For Plaintiffs:
 4       KOREIN TILLERY
         BY:  GEORGE A. ZELCS
 5       Attorney at Law
         205 North Michigan Plaza, Suite 1950
 6       Chicago, Illinois  60601
         (312) 641-9750
 7       (312) 641-9751 Fax
         gzelcs@koreintillery.com
 8
         BY:  ANDREW ELLIS (appearing remotely)
 9       Attorney at Law
         505 North 7th Street, Suite 3600
10       St. Louis, Missouri  63101
         (314) 241-4844
11       aellis@koreintillery.com
12       BOIES SCHILLER FLEXNER LLP
         BY:  ROBERT DWYER (appearing remotely)
13       Attorney at Law
         55 Hudson Yards, 20th Floor
14       New York, New York  10001
         (212) 303-3524
15       (212) 446-2350 Fax
         rdwyer@bsfllp.com
16
17    For Defendants:
18       WILSON, SONSINI, GOODRICH & ROSATI, P.C.
         BY:  DAVID H. KRAMER
19            QIFAN HUANG
         Attorneys at Law
20       650 Page Mill Road
         Palo Alto, California  94304
21       (650) 320-4741 (Mr. Kramer)
         (650) 849-3456 (Mr. Huang)
22       dkramer@wsgr.com
         qhuang@wsgr.com
23       lwhite@wsgr.com
24
25    //
```

Page 4

```
 1    APPEARANCES (Continued):
 2
 3    For Defendants:
 4       WILSON, SONSINI, GOODRICH & ROSATI, P.C.
         BY:  LAUREN GALLO WHITE
 5       Attorney at Law
         One Market Street
 6       Spear Tower, Suite 3300
         San Francisco, California  94105
 7       (415) 947-2058
         lwhite@wsgr.com
 8
         (Ms. White was not present at the commencement
 9       of the deposition proceedings.)
10
11
12    ALSO PRESENT:
13    PETER YAROSCHUK, Videographer, Veritext
14
15
16
17               ---o0o---
18
19
20
21
22
23
24
25
```

Page 5

```
 1                      INDEX
 2    WITNESS                            EXAMINATION
 3    JOSEPH M. WINOGRAD
      Volume I
 4        BY MR. KRAMER                       8
 5        BY MR. ZELCS                      272
 6        BY MR. KRAMER                     275
 7
 8                     EXHIBITS
 9    NUMBER         DESCRIPTION              PAGES
10    Exhibit 1   "EXPERT REPORT OF JOSEPH M. WINOGRAD    40
11        FOR PLAINTIFFS"; 86 pages
12
13    Exhibit 2   Chart; Bates GOOG-SCHNDR-00050365; 11  198
14        pages
15
16    Exhibit 3   Slide deck entitled "Watch Next Eng    254
17        Review" dated 5/8/2017; Bates
18        GOOG-SCHNDR-00052174 -
19        GOOG-SCHNDR-00052263
20
21    Exhibit 4   Slide deck entitled                    256
22        "WatchNext/Autoplay Deep Dive" dated
23        5/16/2019; Bates GOOG-SCHNDR-00035026
24        - GOOG-SCHNDR-00035049
25               ---o0o---
```

Page 6

1  San Francisco, California; Thursday, September 29, 2022
2  9:13 a.m.
3
4      THE VIDEOGRAPHER:  Good morning.  We are
5  going on the record at 9:13 a.m. on September 29th,
6  2022.
7      Please note that the microphones are
8  sensitive and may pick up whispering, private
9  conversations, and cellular interference.  Please
10 turn off all cell phones or place them away from the
11 microphones, as they can interfere with the
12 deposition audio.
13     Audio and video recording will continue to
14 take place unless all parties agree to go off the
15 record.
16     This is Media No. 1 of the video-recorded
17 deposition of Joseph Winograd, taken by counsel for
18 Defendant in the matter of Maria Schneider, et al.,
19 versus YouTube, LLC, et al., filed in the United
20 States District Court for the Northern District of
21 California, Case No. 3:20-cv-04423JD.
22     The deposition is being held at One Market
23 Street, 34th floor, San Francisco, California.
24     My name is Peter Yaroschuk, from the firm
25 Veritext.  I am the videographer.

Page 7

1      The court reporter is Catherine Ryan, from
2  the firm Veritext.
3      I am not authorized to administer an oath,
4  I am -- I am not related to any party in this
5  action, nor am I financially interested in the
6  outcome.
7      Counsel and all present and everyone
8  attending remotely, please now state your
9  appearances and affiliations for the record.
10     If there are any objections to proceeding,
11 please state them at the time of your appearance,
12 beginning with the noticing attorney.
13     MR. KRAMER:  My name is Dave Kramer.  I'm
14 a partner with Wilson Sonsini Goodrich & Rosati,
15 counsel for Defendants.  With me is Qifan Huang of
16 my firm.
17     MR. ZELCS:  George Zelcs on behalf of the
18 plaintiffs.
19     THE VIDEOGRAPHER:  On the phone?
20     MR. ZELCS:  Bob and Andrew, please state
21 your appearances.
22     MR. DWYER:  Robert J. -- Robert J. Dwyer,
23 Boies Schiller Flexner LLP, for the plaintiffs.
24     MR. ELLIS:  Andrew Ellis, with Korein
25 Tillery, for the plaintiffs.

Page 8

1      THE VIDEOGRAPHER:  Thank you.
2      Would the court reporter please swear in
3  the witness.
4
5      JOSEPH M. WINOGRAD,
6  having been administered an oath, was examined and
7  testified as follows:
8
9      EXAMINATION
10 BY MR. KRAMER:
11     Q  Mr. Winograd, good morning.
12     A  Good morning.
13     Q  Have you ever been deposed before?
14     A  Yes, I have.
15     Q  Can you give me the context in which that
16 deposition took place?
17     A  I'm happy to answer the question.  I will.
18     And afterwards, I'd like to make a comment
19 as well, before you ask your next question, if
20 that's all right.
21     Q  Feel free.
22     A  Okay.  Thank you.
23     I was deposed in a patent infringement
24 litigation for -- as an inventor of a technology.  I
25 was deposed for the defense.  I was a witness for

Page 9

1  the defense related to a patent infringement case
2  made against my employer, Verance Corporation.
3      Q  Just that one time, then, sir?
4      A  Just that one time.
5      Can I make my --
6      Q  And when was that?
7      A  Can I make my comment now?
8      Q  Sure.
9      A  Okay.  Great.
10     I wanted to just make you aware of three
11 corrections to my report that I've become aware of
12 in reviewing the report since it was submitted.  If
13 you'd like, I'll recite those.
14     There's an incorrect word on page 50, in
15 paragraph 102.  Where it says "1,000 Claims," the
16 correction is that it should say "1,000 Matches."
17     On page 82, in Exhibit B, there's a
18 citation that should be added.  The citation is a
19 document with the title "2022.01.14 AutoPlay
20 Attachment A with Works.PDF."
21     And then, third and finally, on page 69,
22 in a footnote, 181, that added reference should be
23 included in the citation there, in the
24 parenthetical, as an additional citation.
25     Q  When did you realize that the report that

Page 10

1  you submitted was inaccurate in those respects, sir?
2     A   Yesterday.
3     Q   And was there a reason why you couldn't
4  have shared that information earlier than just now
5  on the record?
6     A   I don't know of a way that I might have
7  done so. It was late in the day yesterday.
8     Q   When were you retained in connection with
9  this matter, sir?
10    A   I believe it was around February of this
11 year.
12    Q   Who reached out to you?
13    A   George Zelcs of Korein Tillery.
14    Q   Did you know Maria Schneider before you
15 were -- personally, before you were retained in this
16 matter?
17    A   I did not.
18    Q   Did you know an attorney by the name of
19 Mark Righter before you were retained in connection
20 with this matter?
21    A   I did not.
22    Q   When did you start working in connection
23 with this matter?
24    A   Sometime in February of this year.
25    Q   Who drafted your report, sir?

Page 11

1     A   I did.
2     Q   Did Plaintiffs' counsel tell you what they
3  wanted you to say in it?
4     A   They did not.
5     Q   How did you get the materials that you
6  relied on for purposes of your report?
7     A   They were provided by Plaintiff counsel.
8     Q   Who, specifically?
9     A   They came from several different people
10 over the course of the -- over the course of my
11 work.
12    Q   And how did that happen? Did you ask for
13 specific materials, or did Plaintiffs' counsel
14 supply you with specific materials?
15    A   Both.
16    Q   What specific materials did you request?
17    A   I don't recall with specificity the
18 specific materials. I provided them with different
19 subject areas that I thought would be relevant, but
20 I don't recall the -- and can't distinguish those
21 that were provided specifically in response to my
22 request from those that were provided for some other
23 reason.
24    Q   And to be clear, when you said that you
25 drafted your report, did you actually type the words

Page 12

1  of the report into some word processing program?
2     A   I did.
3     Q   All of them?
4     A   All of them.
5     Q   When was the first draft of your report
6  completed?
7     A   That's -- that's a complicated question
8  because I wrote the report, which is a fairly long
9  report, over the course of several months; and
10 during the course of those months, I provided the
11 report in sections to -- to the plaintiff counsel.
12        And I guess the first -- I wouldn't be
13 able to easily distinguish the first complete
14 report.
15        If you mean the first report -- when the
16 report was finalized, it was finalized and complete,
17 I believe, you know, in the day or two before it was
18 served in the case.
19    Q   Did you communicate at any point in
20 connection with the preparation of your report with
21 Plaintiff Maria Schneider?
22    A   I did not.
23    Q   Did you communicate in connection with the
24 preparation of your report at any point with the
25 attorney named Mark Righter?

Page 13

1     A   I have not.
2     Q   Did you communicate with anyone in
3  connection with the preparation of your report other
4  than Plaintiffs' counsel?
5     A   You mean about the subject matter of the
6  report?
7     Q   Yes, sir.
8     A   Not that I'm aware of.
9     Q   The opinions that are expressed in your
10 report about YouTube, did you hold any of those
11 before you were retained to work in connection with
12 this matter?
13    A   I don't believe so.
14    Q   So the opinions that are expressed in your
15 report are opinions that you developed for purposes
16 of this litigation?
17    A   That's right.
18    Q   In paragraph 14 of your report, which we
19 will look at in just a second, you say that your
20 work is being billed at a rate of $750 an hour; is
21 that correct?
22    A   Yes, it is.
23    Q   How many hours have you spent so far?
24    A   I don't know exactly, but what I can say
25 is, as of the first of September, it was

Page 38

1   any other social media service that has invested
2   hundreds of millions of dollars to develop copyright
3   management tools?
4       A   I have not been provided any information
5   about any amount that they've spent; so, I -- I
6   don't have information on who's spent more or less
7   than any amount that you might state.
8       Q   So my question is:  Are you aware of any?
9           And since you have no information, the
10  answer is, "no," you're not aware of any other
11  social media service that has spent hundreds of
12  millions of dollars on copyright management tools,
13  right?
14      A   The answer is the answer that I gave you.
15      Q   Given that you've never worked with a
16  social media service on copyright management tools,
17  is it fair to say that you don't have any experience
18  assisting social media services in policing abuse of
19  their copyright management tools?
20      A   I have not assisted a social media service
21  in policing abuse of their copyright management
22  tools.
23      Q   Verance's technology, specifically
24  Cinavia, but I think all of them, use audio and
25  video watermarking, correct?

Page 39

1       A   I'm sorry.  Can you ask the question
2   again?
3       Q   Well, I'll ask it more simply.
4           Verance's Cinavia technology is an audio
5   watermarking technology, right?
6       A   That is correct.
7       Q   Are all of Cinavia's products audio or
8   video watermarking technologies?
9       A   Cinavia is an audio watermarking
10  technology.
11      Q   Okay.  Are all of Varance's products audio
12  and video watermarking technologies?
13      A   I would say that all of the products that
14  we've built have related to audio or video
15  watermarking.
16      Q   To your knowledge, does YouTube's
17  Content ID system use watermarking technology?
18      A   I'm not aware of YouTube's Content ID
19  system using watermarking technology.
20      Q   How many distinct parties use Verance's
21  Cinavia technology?
22      A   I don't know the number.
23      Q   Is it hundreds?
24      A   Yes, I believe so.
25      Q   Is it more than that?

Page 40

1       A   I don't believe there's -- no, I don't
2   believe there's more than hundreds.
3           MR. KRAMER:  How long have we been going?
4   I don't have a watch.
5           MR. HUANG:  Forty-three minutes.
6           MR. KRAMER:  Let's keep going.
7           Are you okay to keep going for a little
8   bit?
9           THE WITNESS:  Yes.
10          MR. KRAMER:  Let's get marked Exhibit 1 to
11  your deposition your report, the "EXPERT REPORT OF
12  JOSEPH M. WINOGRAD FOR PLAINTIFFS."
13          I see you've got a copy in front of you
14  already, so I'll give you another one, and we'll
15  have one marked for the record.
16          I'm sorry.
17          (Exhibit 1 was marked for identification
18          by the court reporter.)
19          THE WITNESS:  I should say:  In addition
20  to the answer I just gave to that question, I was
21  answering with respect to users who are using the
22  technology in direct relationship with Verance.
23          There are, of course, hundreds of millions
24  of consumer devices that include the Cinavia
25  technology by which consumers interact with the

Page 41

1   technology if they are using unauthorized copies of
2   copyrighted works protected by Cinavia.
3   BY MR. KRAMER:
4       Q   But Verance has no relationship with those
5   end users, right?
6       A   Not a direct business relationship; that's
7   right.
8       Q   If you would open your report, sir --
9           And I see -- you can use the copy that
10  you've got.  That's fine.
11      A   Thank you.
12      Q   -- to paragraph 22.
13          Are you there?  Great.
14          The first sentence says, quote:  "YouTube
15  collects, organizes, promotes and presents a body of
16  audiovisual content (which Defendants refer to as
17  'video') on a global basis."
18          Do you see that?
19      A   I do.
20      Q   Is that your opinion, sir?
21      A   I -- I understand it to be a fact.
22      Q   So that's what you think is a fact?
23      A   Yes, it is.
24      Q   And how do you come by your belief that
25  that statement is true?

Page 42

1  A   I -- this sentence has one, two, three,
2  four, five -- six footnoted references in this
3  single sentence, each of which provides support for
4  each one of those statements.  In fact, nearly each
5  word in the sentence is -- support is provided and
6  reference is indicated in the footnotes.
7       Q   Okay.  So you're just repeating something
8  that you read in this sentence?
9           MR. ZELCS:  Objection.  Form.
10          THE WITNESS:  I'm -- I'm characterizing
11 YouTube's activities.  I've synthesized the
12 information from material that I've reviewed, and
13 I'm presenting it as I think valuable introductory
14 material for this section III A of my report.
15 BY MR. KRAMER:
16      Q   The next sentence says, quote:  "Videos
17 are uploaded to the YouTube system by third parties
18 (Uploaders), some of whom are commercial partners of
19 Defendants (YouTube Partners) and others of whom are
20 simply members of the general public who have
21 created an account with Defendants and
22 clicked-through an agreement accepting the YouTube
23 Terms of Service."
24          Right?  I read that correctly, did I?
25      A   I believe so.

Page 43

1       Q   Is that your expert opinion?
2       A   It's my understanding of -- of basic facts
3  of the activities of the -- of users of YouTube and
4  the functions provided by the YouTube system, and,
5  again, providing it as a background and context for
6  this introductory paragraph of section III A of my
7  report.
8       Q   And how do you come by that information
9  that you just reported in that sentence?
10      A   Again, in -- in the case of this sentence,
11 I've provided two footnotes in this sentence
12 identifying supporting material that I've reviewed
13 and synthesized for the purpose of establishing the
14 context of this section.
15      Q   So that's your view of what the documents
16 say that are cited in footnotes 9 and 10 of your
17 report, right?
18      A   I -- that's -- the footnote -- the
19 document cited in footnotes 9 and 10 are the support
20 provided for this -- what I think is useful
21 background information in this introductory
22 paragraph.
23      Q   Do you think a jury could read those
24 documents and understand them?
25      A   These particular documents?  Which

Page 44

1  documents do you mean?  The ones in the second
2  sentence or the ones in the first sentence?
3       Q   The ones that you're relying on for
4  purposes of support for this sentence that starts
5  with "videos are uploaded."
6       A   Thank you.
7           And your question is would a jury be able
8  to read these documents and understand --
9       Q   Could a juror --
10      A   -- what's in them?
11      Q   Could a juror read, for example, the
12 YouTube blog post entitled
13 "responsibility-good-business-and-creator-economy"?
14          Could a juror read that and understand it?
15      A   I -- they might be able to.
16      Q   Is there a reason to believe that this
17 jury could not understand a YouTube blog post made
18 for a general audience?
19      A   I suppose it depends on the -- on the
20 sophistication of the individual juror.
21      Q   So you don't think this jury could
22 understand the YouTube blog post?
23          MR. ZELCS:  Objection.  Form.
24          THE WITNESS:  I -- I'm not in a position
25 to make, I think, general, blanket statements about

Page 45

1  individual jurors in a -- in a jury pool drawn from
2  the general public.
3  BY MR. KRAMER:
4       Q   Sir, you quoted another document here in
5  footnote 9 titled "YouTube Help:  YouTube Partner
6  Program overview and eligibility," and there's a URL
7  for that document.
8           Do you think that the average person could
9  read and understand that document?
10      A   I'm not, frankly, clear where you're
11 reading from.  Can you identify a page or footnote?
12      Q   Footnote 9, sir.
13      A   Thank you.
14          And -- and which -- what were you reading?
15      Q   I was reading your sentence that the
16 uploader must have at least a thousand subscribers
17 to their channel and their videos must have at least
18 4,000 qualifying watch hours over a one-year period,
19 and then you have a citation there in footnote 9 to
20 the page "YouTube Help:  YouTube Partner Program
21 overview and eligibility."
22          And the question is:  Could the average
23 person read and understand that page?
24      A   I think -- I think the average person
25 likely could read and understand that page.

Page 54

1  mind. I'm going to read it back.
2       "The statement about the system's
3       capabilities, the last statement that we
4       just read at the end of paragraph 36, is
5       just your understanding of the deposition
6       testimony you cite in footnote 37,
7       correct?"
8       MR. ZELCS: Objection. Form.
9       THE WITNESS: I believe it's what's stated
10 in the record of that deposition in -- I cite
11 specific page numbers and line numbers.
12 BY MR. KRAMER:
13   Q   In paragraph 39 of your report, the last
14 sentence says, quote: "Defendants' Matching System
15 is applied comprehensively to videos on YouTube, and
16 Content ID Partners are given broad control over and
17 access to their results."
18       I want to focus on the first phrase,
19 "Defendants' Matching System is applied
20 comprehensively to videos on YouTube."
21       Is that something you have firsthand
22 knowledge of, sir?
23   A   I'm not sure I fully understand your
24 meaning of the use of the term "firsthand
25 knowledge."

Page 55

1   Q   Do you know that by virtue of your work
2 with the matching system that defendants apply?
3   A   I have not done work with the matching
4 system that Defendants apply.
5   Q   So there's no citation for this
6 proposition in your report, right?
7   A   There is -- there is a citation in this
8 report for that -- for that statement. It's not
9 attached to this sentence, but I could identify the
10 citation to the deposition of David Rosenstein,
11 where he -- he states that this is the case.
12   Q   So it's your testimony today that this
13 statement, "Defendants' Matching System is applied
14 comprehensively to videos on YouTube," is drawn from
15 the deposition testimony of Mr. Rosenstein?
16   A   That's -- that's -- I -- that's a -- a
17 source of support for this statement that I can
18 identify, sitting here now, for you. There may be
19 others.
20   Q   And is this your expert opinion, or is
21 this simply repeating what you read from
22 Mr. Rosenstein?
23   A   This is, in this case, not me expressing
24 my own opinion. It's me expressing the facts as I
25 understand them from review of the materials

Page 56

1 provided to me.
2   Q   Paragraph 42, sir, of your report, is a
3 long paragraph about how aspects of YouTube's
4 Content ID system supposedly work.
5       I'm going to ask you, if you would,
6 please, to find for me something in here,
7 paragraph 42, that you believe constitutes your
8 expert opinion.
9       Take your time to read it.
10       (Pause.)
11   A   So in this paragraph, I include a number
12 of citations for the various facts stated, and I
13 also characterize the net effect of these different
14 matching functions or search methods, as they're
15 called here, being used in combination.
16       And so I would say that one might view my
17 characterization of the purpose and combined effect
18 of these three search functions -- instant claiming,
19 instant reverse, and legacy scanning -- being used
20 as a matter of my having assessed the factual
21 functions of these three search methods.
22       And based on my knowledge and
23 understanding of how copyright management systems
24 are designed and the function that they need to
25 perform for their users, I applied expertise to --

Page 57

1 to characterize the relationship between these three
2 methods and the -- their purpose and -- and the --
3 you know, the -- what I understand to be the
4 relationship and goals of them used in combination.
5   Q   Where is the opinion, sir, in
6 paragraph 42?
7   A   I don't know that I --
8       MR. ZELCS: Objection. Form.
9       THE WITNESS: I don't know that I stated
10 that there was an opinion here. I said that I
11 synthesized these facts together with my expertise
12 to characterize their purpose.
13 BY MR. KRAMER:
14   Q   Were you involved in determining the
15 purpose of the various functionalities that are
16 described in paragraph 42 at YouTube?
17   A   In what respect was I involved?
18       I don't think I understand your question.
19   Q   Were you personally involved in
20 determining what purpose would be served by the
21 various functionalities that are described in
22 paragraph 42 of your report?
23   A   Do you mean --
24       MR. ZELCS: Objection. Form.
25       THE WITNESS: Do you mean was I involved

Page 58

1  in -- in designing these systems?
2  BY MR. KRAMER:
3      Q   Yes, sir.
4      A   No, I was not.
5      Q   So you wouldn't have firsthand knowledge,
6  then, of the purpose for which these systems were
7  designed, right?
8          MR. ZELCS:  Objection.  Form.
9          THE WITNESS:  Can you clarify what you
10 mean by "firsthand"?
11 BY MR. KRAMER:
12     Q   If you weren't involved in developing the
13 systems, you weren't involved in conversations with
14 people about what the purpose of the systems was,
15 right?
16     A   That's correct.  I was not involved
17 working with the people there.
18         So I understand my role as an expert in
19 developing this report and opinion is to take the --
20 the materials and facts and information provided to
21 me and combine that with my expertise and
22 understanding in the field of the design of
23 copyright management systems and the function of the
24 matching technologies, and to present my expert
25 assessment of that information, synthesize the

Page 59

1  information, and explain it in the clearest possible
2  fashion as I understand it.
3          That's -- that's what I've done here.  So
4  I take facts, and I -- I use my expertise to draw
5  inferences and -- and present characterizations.
6      Q   In paragraph 43, sir, there are a series
7  of factual assertions regarding how Content ID
8  works.  I want to understand where you got those
9  assertions from.
10         Is any of the information in paragraph 43
11 information that you have firsthand knowledge of, or
12 is it just stuff that you read?
13         MR. ZELCS:  Just for clarification, every
14 time you ask about firsthand knowledge, you're
15 asking about whether he built these systems and
16 worked at YouTube, right?
17         MR. KRAMER:  Not necessarily.  He could
18 have firsthand knowledge in some other way, but
19 I'm --
20     Q   The question is -- there's a distinction
21 between what you know and what you read somewhere in
22 connection with this case.
23         So with respect to the factual
24 propositions in paragraph 43, do you have any
25 firsthand knowledge of those assertions, or is it

Page 60

1  just an assimilation or agglomeration of what you
2  read?
3      A   Okay.  Thank you.  I'll review
4  paragraph 43, and then I'll try to answer your
5  question.
6          (Pause.)
7      A   Okay.  I've read the paragraph.
8          My answer to your question is:  I have
9  not -- the -- the description given in this
10 paragraph is not based on use of -- personal use of
11 the Content ID tool.  It's based -- this is --
12 characterizes my understanding of the operation of
13 the system based on review of the cited materials
14 and other -- in the document and those identified in
15 Exhibit B.
16     Q   Paragraph 57 of your report, sir, offers a
17 summary on how YouTube Search works.
18         Let me give you a second to get there.
19         MR. ZELCS:  Forty-seven?
20         MR. KRAMER:  Fifty-seven.
21         MR. ZELCS:  Fifty-seven.  Thank you.
22 BY MR. KRAMER:
23     Q   And I'm quoting from the paragraph:  For
24 YouTube Search to find an infringing video, it must
25 have associated text annotations that the search

Page 61

1  engine can match to the user's entered query string.
2          Do you see that in paragraph 57?
3      A   I do.
4      Q   Is there a citation to anything for that
5  assertion in paragraph 57?
6      A   There is not.
7      Q   Is that something that is your expert
8  opinion?
9      A   It's -- it's my understanding based on
10 review of the documentation -- public documentation
11 provided on YouTube Search.  It's cited elsewhere in
12 the document, perhaps not on this sentence.
13     Q   Did you conduct any experiments to
14 establish or assess the validity of that assertion?
15     A   I did not conduct experiments on this
16 assertion.
17     Q   Do you know that statement to be true?
18     A   It's my -- it reflects my understanding,
19 yes.
20     Q   And where did you get that information
21 from, sir?
22     A   The citation -- or the source that I can
23 direct you to in -- sitting here now is the second
24 from the bottom on page 79 of my report in
25 Exhibit B.  It's a document titled "YouTube Search."

Page 186

1    with those additional users and videos?
2        A    Can you restate the question or ask it
3    again or read it back?
4        Q    Doesn't the question of whether YouTube
5    makes more money from more users watching more
6    videos depend on what the costs are associated with
7    more users watching more videos?
8        A    What I would say is -- is the -- the
9    profit relates to their costs.  The revenues, I
10   think, are separate from the costs.
11           So I think my discussion here relates
12   to -- to revenues, in the first sentence of 111.
13       Q    You're talking about the financial success
14   of YouTube's advertising business, which is (as
15   read):  "Without a doubt, directly linked to its
16   ability to engage the largest possible audience of
17   viewers."  You're not talking about more revenue.
18   You're talking about financial success.
19           You understand there's a difference
20   between those two, right?
21       A    Okay.  So it -- it depends -- it depends
22   on what your metric is.  I understand there are some
23   companies and some investors who measure success
24   based on profitability, others who may measure
25   financial success based on topline revenues.

Page 187

1    There's many different factors that any individual
2    might take to consider financial success.
3        Q    When you wrote the words "financial
4    success of YouTube's advertising business," were you
5    referring to profit or were you referring to
6    revenue?
7        A    I -- I actually think the two are
8    relatively linked, but this paragraph is -- is, I
9    think, as set forth in the first sentence, I think
10   more focused on revenue than -- than profit.
11       Q    Does YouTube make -- does the question of
12   whether YouTube makes more profit from more users
13   watching more videos depend on YouTube's costs from
14   the more users and more videos?
15       A    Yes, I think it does.
16       Q    And doesn't the question of whether
17   YouTube even earns more revenue from more users
18   watching more videos depend on whether YouTube
19   actually has advertisements to show those additional
20   users watching additional videos?
21       A    I think it does depend, in part, on -- on
22   having a set of advertisers who are willing to
23   advertise to those -- those viewers.
24       Q    For example, if all of the users are in
25   Tajikistan, and YouTube has no ads to show to users

Page 188

1    in Tajikistan, YouTube wouldn't make any more
2    revenue from adding lots more users in Tajikistan,
3    even if they're watching more videos, right?
4            MR. ZELCS:  Objection.  Form.
5            THE WITNESS:  Okay.  I -- yes, I'll --
6    I'll accept that hypothetical.
7    BY MR. KRAMER:
8        Q    So as you sit here today, you don't know
9    one way or another whether, in the main, more users
10   watching more videos on YouTube means YouTube
11   generates more revenue?
12           MR. ZELCS:  Objection.  Form.
13           THE WITNESS:  I -- it's my understanding
14   that that's the case.
15           I think your hypothetical is far removed
16   from the reality.  And, in fact, my report cites, in
17   particular, a study that was performed -- it's in
18   paragraph 122 -- where I was -- I was provided with
19   the results of a study related to the AutoPlay
20   function, which reported that when AutoPlay was
21   tested on the desktop, additional viewing happened
22   and additional ads happened.
23           And, really, the -- the bulk of this
24   section number 6 of my report is exploring the
25   questions of the relationship at -- I'd say,

Page 189

1    substantially, the relationship -- really, the
2    section, I guess, 6A talks about the relationship
3    between the design of the system, the -- the intent
4    that YouTube engineers have taken to designing the
5    system to increase the amount of watching on the
6    platform, and in this experiment that's identified
7    in paragraph 122, the specific benefit that the
8    business realizes in terms of growth in the amount
9    of advertising that's watched.
10   BY MR. KRAMER:
11       Q    As you sit here today, you don't know one
12   way or another whether more users watching more
13   videos on YouTube means YouTube generates more
14   revenue, do you?
15       A    Yes, I do.  I -- I strongly believe that's
16   the case.  And all --
17       Q    I'm not asking what you believe.
18           Do you know it?
19       A    So the purpose of my report, right, is to
20   take facts and information, synthesize it together
21   with my expertise --
22       Q    Sir, I'm not interested in this.
23           MR. ZELCS:  Don't --
24           MR. KRAMER:  I don't need this.
25           MR. ZELCS:  Don't --

Page 190

1     MR. KRAMER:  I'm going to interrupt him
2  because he's just wasting time and making speeches.
3     MR. ZELCS:  He's not wasting time.
4     MR. KRAMER:  He is.
5     MR. ZELCS:  That's your -- your
6  presumption.
7     MR. KRAMER:  It's really not.
8     MR. ZELCS:  It is.
9     MR. KRAMER:  I'm going to stop you.  I
10 don't need -- I don't need you to answer that
11 question that way, sir.  So if you're going to go
12 into that long speech, I don't need to hear it.
13    MR. ZELCS:  You're withdrawing your
14 question?
15    MR. KRAMER:  I'll withdraw the question.
16    MR. ZELCS:  Fair enough.
17    MR. KRAMER:  Sure.
18    MR. ZELCS:  I mean, we're happy to have
19 you withdraw any further questions you have.
20    MR. KRAMER:  Sure.
21  Q   Does --
22    MR. ZELCS:  But he does want to answer
23 them.
24 BY MR. KRAMER:
25  Q   Does YouTube have, sir, an infinite amount

Page 191

1  of advertising to run on videos?
2   A   I don't know.
3   Q   Do you know how much advertising it has
4  available to run?
5   A   In 2021, it had $28 billion in advertising
6  to run.
7   Q   You're citing to me a fact that you
8  learned secondhand from reading something?
9   A   I don't know if it's firsthand or
10 secondhand.  I read it in the Alphabet's annual
11 report to the -- to its investors, which I
12 understand is held to a high standard of accuracy
13 because it's, you know, scrutinized by the SEC --
14  Q   And you're saying --
15  A   -- and it's audited and so forth.
16  Q   -- that that $28 billion in advertising --
17 that reflects that YouTube had $28 billion in
18 advertising in 2021?
19  A   Yes.
20  Q   That's your read of the annual report?
21  A   Yes, it's stated quite explicitly in the
22 annual report.
23  Q   Does YouTube have additional advertising
24 to run for each viewer that it adds to the service?
25  A   I don't know.

Page 192

1   Q   If YouTube adds 100,000 users watching
2  videos but doesn't have any more ads to run, does
3  YouTube earn any additional revenue from those
4  users?
5   A   I don't know.  Perhaps not advertising
6  revenue.
7   Q   All right.  So as you sit here today, you
8  don't know whether more users watching more videos
9  on YouTube means YouTube generates more revenue, do
10 you?
11    MR. ZELCS:  Objection to form.
12    THE WITNESS:  I will say that that's my --
13 my understanding.  Based on review of the materials
14 provided, that's my -- that is, frankly, in my view,
15 not a -- not a controversial thing.
16    In fact, it's my understanding, from the
17 review of the materials, that -- that it is, in
18 fact, the explicit intent of the designers of
19 YouTube to generate the most possible watching that
20 they can.
21 BY MR. KRAMER:
22  Q   Were you involved in determining the
23 objectives of YouTube's overall system?
24  A   I was not.
25  Q   So you're just reporting what you think

Page 193

1  you read about some -- about the intent of the
2  parties developing the YouTube system?
3   A   I'm reporting what I know I read about the
4  intent of the designers of the YouTube system.  It's
5  explicitly written in many places and acknowledged
6  in deposition --
7   Q   Did you --
8   A   -- testimony.
9   Q   Did you conduct interviews of those folks?
10  A   No, that was -- my role didn't involve
11 conducting interviews.  I reviewed interviews that
12 were conducted by others.
13  Q   And you've interviewed everyone who was
14 involved in determining what the intent YouTube has
15 in -- in offering its system?
16  A   As -- as I said, I didn't interview
17 anybody.  I reviewed interviews that were conducted
18 by other people.
19  Q   And you think, as a result of having
20 reviewed deposition testimony, you have the ability
21 to testify as to the intent of the designers of the
22 YouTube system?
23  A   Without question.  And not just based on
24 the testimony, but also based on what's explicitly
25 written in the multiple documents that I've

Page 194

1  reviewed, which are -- many of which are cited in
2  this report.
3      Q   So you're giving your view of depositions
4  and documents and coming to a conclusion about what
5  those depositions and documents say?
6      A   Yes.  In some cases, the conclusion is --
7  is written directly on the page or stated
8  explicitly, but I -- in all cases, my job is to
9  synthesize that information, collate it, organize
10 it, apply my expertise to interpret it.  And it's
11 reflected here in the report and in the opinion
12 which I've just stated -- or the understanding which
13 I've stated.  I'm not even sure it rises to an
14 opinion.  I'm not sure there's any question.
15     Q   I'm not sure it does either, sir.  I
16 appreciate your candor there.
17         Let me ask you this:  You say in note 181
18 of your report -- footnote 181, that data provided
19 by Defendants indicated --
20         Let me wait 'til you get there.
21         MR. ZELCS:  It's page 69.
22         THE WITNESS:  Okay.  Thank you.  Footnote
23 181, you said?
24         MR. KRAMER:  Yes, sir.
25         THE WITNESS:  Thank you.

Page 195

1  BY MR. KRAMER:
2      Q   You say that:  "Data provided by
3  Defendants indicated that a single infringing copy
4  of '5 Weddings' on YouTube had more than 9 million
5  views, 20,000 of which were due to AutoPlay," and
6  then you have a citation to a document, right?
7      A   Yes.  And this morning, in my kind of
8  opening remarks, I identified a second document that
9  should be -- also be cited in that parenthetical on
10 the second line of footnote 181.  So I'll just --
11 I'll just remind you of that.
12     Q   Let me ask you a question first, and then
13 we'll go look at those documents, I think.
14         Is that statement, "Data provided by
15 Defendants indicated that a single infringing copy
16 of a version of 'Five Weddings' on YouTube had more
17 than 9 million views, 20,000 of which were due to
18 AutoPlay" -- is that opinion?
19     A   No, I think that specific statement is
20 a -- is a statement of fact in evidence based on
21 the -- looking at that evidence.
22     Q   Okay.  So where did you get that from?
23 I'm trying to --
24     A   Okay.  So you want me to -- so there's a
25 second citation that I had to rely on to get that,

Page 196

1  which I'll read to you again.  I read it in my
2  opening remarks.  It is a document with the title
3  "2022.01.14 AutoPlay Attachment A with Works.PDF."
4      Q   Is there a number associated with that
5  document, sir, a Bates number?
6          I don't know if you know what a Bates
7  number is.
8      A   Yeah, I do know what a Bates number is.
9          There may be.  I did not -- I did not note
10 it.  I'm sure it's in the record somewhere.  And --
11 yeah.
12     Q   Okay.  So --
13     A   Yeah.
14     Q   So you got this information that's
15 reported in footnote 81 from two documents:
16 GOOG50365 and the document you just read to me,
17 2022.01.14 AutoPlay Attachment A, right?
18     A   Yes.
19     Q   Okay.  What did you do to confirm that
20 what you report in footnote 181 was, in fact, true?
21     A   Yes.  So -- so the 50365 document, as I
22 recall, is a spreadsheet that includes a list of
23 video IDs and, for each video ID, data relating to
24 the number of plays and AutoPlays of that video.
25         And then in the document -- the other

Page 197

1  document, the 2022.01.04 [sic] document, there is a
2  table that match- -- that identifies four -- some of
3  those same video IDs, the specific work that is
4  owned by different plaintiff parties.
5          And so by cross-referencing the video IDs
6  in the two documents, I was able to associate the
7  plays and AutoPlays in the 50365 document with the
8  titles of works owned by the plaintiff.
9          Now, that's my best recollection of the
10 process, not having the documents here before me.
11     Q   How did you confirm that it was an
12 infringing copy of "Five Weddings"?
13     A   I was told that was the case by Plaintiff
14 counsel.
15     Q   Who specifically?
16     A   I -- I don't recall.
17     Q   So Plaintiffs' counsel told you there was
18 an infringing copy of "Five Weddings" on YouTube
19 with more than 9 million views?
20     A   Plaintiff counsel told me that the list of
21 works in the -- in the 2022.01.14 document were --
22 had been determined to be infringing videos on the
23 YouTube platform.
24     Q   Did you make any effort to independently
25 confirm the truth of that matter?

## Errata Sheet

| Page: Line | Change | Reason |
|---|---|---|
| 15:17-18 | Replace <Authority [sic]> with <Administrator> | To correct transcription errors |
| 41:7 | Insert < But Verance does a number of indirect things related to the hundreds of millions of consumers who interact with Cinavia technology.> between <.> and <Q> | To clarify the record |
| 53:22 | Replace <and> with <in the> | To correct transcription errors |
| 80:25 | Replace <subscribers> with <channels> | To clarify the record |
| 85:7 | Replace <knows> with <"knows" –> | To correct transcription errors |
| 118:17 | Insert <, which I now see is on page 6 of that report for the second half of 2021.> between <based> and <.> | To clarify the record |
| 135:25 | Replace <anyone> with <"anyone"> | To correct transcription errors |
| 156:18 | Replace <billed> with <built> | To correct transcription errors |
| 160:15 | Replace <too> with <to> | To correct transcription errors |
| 160:17 | Replace <too> with <to> | To correct transcription errors |
| 164:25 | Replace <threat> with <thread> | To correct transcription errors |
| 173:3 | Insert <,> between <systems> and <are> | To correct transcription errors |
| 173:3 | Insert <not> between <likely> and <to> | To correct transcription errors |
| 197:2 | Replace <four – some> with <for some> | To correct transcription errors |
| 205:4 | Replace < discovery> with <"discovery"> | To clarify the record |
| 205:5 | Replace <rights management> with <"rights management"> | To clarify the record |
| 205:9 | Replace <rights management> with <"rights management"> | To clarify the record |
| 218:14 | Replace <base> with <basis> | To correct transcription errors |
| 221:25 | Replace <machine> with <regime> | To correct transcription errors |
| 244:2 | Replace <DMC> with <DMCA > | To correct transcription errors |

___X___    Subject to the above changes, I certify that the transcript is true and correct.

_____    No changes have been made. I certify that the transcript is true and correct.

_____                                    11/2/2022
(Signature)                                                     (date)

## ACKNOWLEDGMENT OF DEPONENT

I, Joseph Winograd, do hereby certify that I have read and examined the foregoing testimony, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____          _11/2/2022_____
(Signature)                                                                              (date)