DAVID H. KRAMER, SBN 168452
MAURA L. REES, SBN 191698
LAUREN GALLO WHITE, SBN 309075
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email:  dkramer@wsgr.com
          mrees@wsgr.com
          lwhite@wsgr.com

BRIAN M. WILLEN (admitted *Pro Hac Vice*)
CATHERINE R. HARTMAN (admitted *Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
Email:  bwillen@wsgr.com
Email:  chartman@wsgr.com

Attorneys for Defendants and Counterclaimants
YOUTUBE, LLC and GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> YOUTUBE, LLC and GOOGLE LLC, <br><br> Defendants <br><br>———————————————————<br><br> YOUTUBE, LLC and GOOGLE LLC, <br><br> Counterclaimants, <br><br> v. <br><br> PIRATE MONITOR LTD, PIRATE MONITOR LLC, and GÁBOR CSUPÓ, <br><br> Counterclaim Defendants. | CASE NO.:  3:20-cv-04423-JD <br><br> **DEFENDANTS AND COUNTERCLAIMANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Date:     April 13, 2023 <br> Time:     10:00 a.m. <br> Dept.:    11 <br> Judge:   Hon. James Donato <br><br> **PUBLIC VERSION – REDACTED** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

    I.     Congress Enacted The DMCA To Adapt Copyright Law To The Internet. ..........2

    II.    Congress Designed The DMCA To Accommodate Privacy Interests. ..................3

    III.   YouTube Operates Its Service Consistent With The DMCA................................4

ARGUMENT ........................................................................................................................6

    I.     Plaintiffs' Motion Is Premature Under The Rule Against One-Way Intervention. ........................................................................................................6

    II.    YouTube Reasonably Implemented Its Repeat Infringer Policy...........................7

         A.   The DMCA Safe Harbors Protect Services That Offer Private Communications............................................................................................8

         B.   Plaintiffs Have No Evidence That YouTube Purposely Eviscerated Implementation Of Its Repeat Infringer Policy........................................11

CONCLUSION ..................................................................................................................13

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### CASES

4

*Capitol Recs., LLC v. Vimeo, LLC*,
    826 F.3d 78 (2d Cir. 2016) ................................................................................. 3

5

*Capitol Recs., LLC v. Vimeo, LLC*,
    972 F. Supp. 2d 500 (S.D.N.Y. 2013) ................................................. 4, 8, 9, 12

6

7

*Corbis Corp. v. Amazon.com, Inc.*,
    351 F. Supp. 2d 1090 (W.D. Wash. 2004) ...................................................... 3, 8

8

*Davis v. Pinterest, Inc.*,
    601 F. Supp. 3d 514 (N.D. Cal. 2022) ................................................................. 4

9

*Diva Limousine, Ltd. v. Uber Techs., Inc.*,
    392 F. Supp. 3d 1074 (N.D. Cal. 2019) ............................................................. 7

10

11

*Edwards v. First Am. Corp.*,
    2013 WL 12213848 (C.D. Cal. Apr. 9, 2013) .................................................... 7

12

*Hamm v. Mercedes-Benz USA, LLC*,
    2019 WL 4751911 (N.D. Cal. Sept. 30, 2019) .................................................. 7

13

14

*In re Aimster Copyright Litig.*,
    252 F. Supp. 2d 634 (N.D. Ill. 2002) .......................................................... 10, 11

15

*In re Aimster Copyright Litig.*,
    334 F.3d 643 (7th Cir. 2003) ................................................................... 1, 2, 10

16

17

*Long v. Dorset*,
    369 F. Supp. 3d 939 (N.D. Cal. 2019) ............................................................... 4

18

*Perfect 10 v. CCBill*,
    488 F.3d 1102 (9th Cir. 2007) .................................................................. 3, 10, 11

19

20

*Schwarzschild v. Tse*,
    69 F.3d 293 (9th Cir. 1995) ............................................................................. 6, 7

21

*Sidibe v. Sutter Health*,
    2021 WL 879875 (N.D. Cal. Mar. 9, 2021) ...................................................... 7

22

23

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,
    718 F.3d 1006 (9th Cir. 2013) ................................................................... 2, 4, 9

24

*Ventura Content, Ltd. v. Motherless, Inc.*,
    885 F.3d 597 (9th Cir. 2018) ................................................................ 1, 4, 8, 11

25

26

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    676 F.3d 19 (2d Cir. 2012) ................................................................... 1, 2, 9, 12

27

28

*Viacom Int'l Inc. v. YouTube, Inc.*,
    940 F. Supp. 2d 110 (S.D.N.Y. 2013) ................................................................ 5

*Villa v. S.F. Forty-Niners, Ltd.*,
    104 F. Supp. 3d 1017 (N.D. Cal. 2015) ......................................................... 6, 7

**STATUTES**

17 U.S.C. § 512 .........................................................................................................*passim*

17 U.S.C. § 1201 ............................................................................................................ 4

**MISCELLANEOUS**

144 Cong. Rec. S11888 (daily ed. Oct. 8, 1998)............................................................ 4

S. Rep. No. 105-190 ............................................................................................... 2, 3, 4, 9

1

**INTRODUCTION**

2     Plaintiffs' motion seeks to gut the Digital Millennium Copyright Act's (DMCA) safe

3 harbor and alter the way hundreds of millions of people use the Internet today by making their

4 private content subject to the prying eyes of any copyright holder. Their dangerous contention is

5 that any online service allowing users to store or share content privately forfeits DMCA safe

6 harbor protection for want of a viable "repeat infringer policy." That theory would disqualify from

7 the safe harbor all manner of services that Congress plainly intended to protect—from email and

8 chat services, to cloud storage services, to popular social media services that allow users to post

9 personal content without having to expose it to the entire world. Plaintiffs would exclude these

10 services from the DMCA's protections simply because they do not enable copyright holders to

11 readily search through users' private content and communications for potential infringement.

12     Congress did not share Plaintiffs' dystopian vision of a copyright Big Brother. The

13 DMCA's text and purpose foreclose their argument, as does a stack of precedent. *See, e.g.*, 17

14 U.S.C. § 512(m) (entitled "Protection of Privacy"); *see also Viacom Int'l, Inc. v. YouTube, Inc.*,

15 676 F.3d 19, 41 (2d Cir. 2012) (service providers need not "provide access" to "search

16 mechanisms"); *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 619 (9th Cir. 2018)

17 (affirming summary judgment of DMCA safe harbor and valid repeat infringer policy where

18 service offered "anonymous" uploading function). Indeed, the cases uniformly recognize that

19 service providers have broad discretion to implement the policies best suited to their service. *See,*

20 *e.g.*, *Motherless*, 885 F.3d at 617-18.

21     The supposedly "instructive" (Mot. 5) *Aimster* case that Plaintiffs muster is inapposite. *In*

22 *re Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir. 2003), does not remotely stand for the

23 proposition that an online service that allows users to store content or communicate information

24 that is not publicly searchable is unprotected by the DMCA. Aimster operated a peer-to-peer file-

25 sharing service "whose very *raison d'etre* appear[ed] to be the facilitation of and contribution to

26 copyright infringement on a massive scale." 334 F.3d at 653. Aimster's owner encrypted all

27 information concerning file transfers between its users in an apparent attempt "to prevent himself

28 from learning what surely he strongly suspect[ed] to be the case: that the users of his service—

maybe *all* the users of his service—are copyright infringers." *Id.* at 650. As the Seventh Circuit explained, far from discouraging repeat infringers, "Aimster invited them to [infringe], showed them how they could do so with ease using its system, and by teaching its users how to encrypt their unlawful distribution of copyrighted materials disabled itself from doing anything to prevent infringement." *Id.* at 655. Plaintiffs have not offered evidence showing that YouTube has done anything like that. To the contrary, the record overwhelmingly shows that YouTube maintains and aggressively enforces its repeat infringer policy. It receives and processes takedown notices and terminates users with respect to public and private videos alike. The private and unlisted video features Plaintiffs attack are common to online services and highly beneficial to users (including Plaintiffs themselves). Plaintiffs' unsupported position that these privacy-enhancing functions disqualify YouTube from the safe harbor should be rejected.

Though Plaintiffs' motion fails as a matter of law and evidence, it faces a procedural obstacle as well. The rule against one-way intervention, as applied here, prevents adjudication of the merits of the DMCA safe harbor before class proceedings in this case have concluded. Were it otherwise, putative class members could decide whether to opt in to a class that had obtained what they see as a favorable DMCA ruling, or opt out of a class that received an unfavorable one. Ninth Circuit precedent forbids that unfairness. Plaintiffs' motion cannot proceed.

## **BACKGROUND**

### I.   **Congress Enacted The DMCA To Adapt Copyright Law To The Internet.**

Congress enacted the DMCA "to update domestic copyright law for the digital age." *Viacom*, 676 F.3d at 26. It was intended to "ensure[] that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand." *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (alteration in original) (citation omitted). Recognizing that "[i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability," *id.* (alteration in original) (quoting S. Rep. No. 105-190, at 8 (1998)), Congress established four "safe harbors" for everyday activities of online service providers, *see* 17 U.S.C. § 512(a)-(d). These safe harbors offer protections for essential service

providers including Internet Service Providers (ISPs) that carry all manner of content, hosting

services that store and make content accessible to others, and messaging service providers that

facilitate user communications. *See* S. Rep. No. 105-190, at 54 ("service provider" "definition

includes, for example, services such as providing Internet access, e-mail, chat room and web

page hosting services."). The safe harbor most relevant in this case is § 512(c), which shields

services from copyright claims that arise "by reason of the storage at the direction of a user" of

copyrighted material. In effect, the DMCA grants an online service immunity from infringement

claims over material uploaded by its users, provided the service promptly removes that material

upon receipt of a notice of alleged infringement from a copyright claimant. *See Capitol Recs.,*

*LLC v. Vimeo, LLC*, 826 F.3d 78, 83 (2d Cir. 2016).

Section 512 has a set of threshold requirements for all service providers seeking safe

harbor. *Id.* at 95. The premise of Plaintiffs' motion is that YouTube has not met the requirement

of:

> adopt[ing] and reasonably implement[ing], and inform[ing] subscribers and
> account holders of the service provider's system or network of, a policy that
> provides for the termination in appropriate circumstances of subscribers and
> account holders of the service provider's system or network who are repeat
> infringers.

17 U.S.C. § 512(i)(1)(A). Congress' use of broad and discretionary terms like "reasonably" and

"appropriate" in this "repeat infringer policy" requirement was deliberate—intended to vest

service providers with the ability to craft the policies they determine best suit their service and

user base. *See, e.g.*, *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1100-01 (W.D.

Wash. 2004) ("The fact that Congress chose not to adopt … specific provisions when defining a

user policy indicates its intent to leave the policy requirements, and the subsequent obligations of

the service providers, loosely defined."); *Perfect 10 v. CCBill*, 488 F.3d 1102, 1109 (9th Cir.

2007) ("The statute permits service providers to implement a variety of procedures").

## II.     Congress Designed The DMCA To Accommodate Privacy Interests.

The DMCA also reflects Congress' interest in protecting user privacy. Section 512(m),

entitled "Protection of Privacy," makes clear that the DMCA safe harbor is not contingent on a

service provider monitoring users' communications for potential instances of infringing activity. 17 U.S.C. § 512(m); *see also* S. Rep. No. 105-190, at 55 (§ 512(m) is "designed to protect the privacy of Internet users"). Elsewhere, the statute strikes a similar balance between privacy protections and the interests of copyright holders. *See, e.g.*, 17 U.S.C. § 1201(i) (authorizing users to circumvent copyright protection mechanisms that collect personally identifying information). Congress intended to "preserve the critical balance ... between the interests of copyright owners and the privacy interests of information users." 144 Cong. Rec. S11888 (daily ed. Oct. 8, 1998) (statement of Sen. John Ashcroft).

Consistent with that desire, Congress specifically envisioned that the DMCA safe harbors would protect services that allow people to store or share content privately or in an otherwise non-searchable manner. *See, e.g.*, 17 U.S.C. § 512(a) (creating a safe harbor for ISPs carrying all manner of private communications); S. Rep. No. 105-190, at 54 (service providers entitled to safe harbor "include[], for example, services such as providing Internet access, e-mail, chatroom and web page hosting services"). Services that offer private communications clearly enjoy safe harbor from copyright claims based on allegedly infringing user content in ***"e-mail*****,**" S. Rep. No. 105-190, at 54, ***"electronic storage lockers,***" *Shelter Capital*, 718 F.3d at 1016, ***"anonymous" videos***, *Motherless*, 885 F.3d at 619, and ***"priva[te]" videos***, *Capitol Recs., LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 517 (S.D.N.Y. 2013).

**III.     YouTube Operates Its Service Consistent With The DMCA.**

A multitude of Internet services that rely upon the DMCA—from Facebook to Snapchat to Twitter to Dropbox to Pinterest to Apple's iCloud and far more—enable users to enjoy aspects of their services in private. *See, e.g.*, *Long v. Dorset*, 369 F. Supp. 3d 939, 944-47 (N.D. Cal. 2019) (granting Facebook's motion to dismiss copyright claim based on DMCA safe harbor); *Davis v. Pinterest, Inc.*, 601 F. Supp. 3d 514, 536 (N.D. Cal. 2022) (granting summary judgment to Pinterest based on DMCA); *see also* Harold Decl. ¶ 8. YouTube is no different. Its private video function allows users to store content privately on the service or share that content with a circle of no more than 50 specified individuals. Zhu Decl. ¶ 5. This feature has operated in the same manner for more than a decade. *Id.* ¶ 4. Indeed, when Viacom unsuccessfully challenged

YouTube's DMCA safe harbor years ago, Viacom made and then abandoned the very argument about private videos that Plaintiffs here advance. *Viacom Int'l, Inc. v. YouTube, Inc.*, No. 07-cv-02103 (S.D.N.Y. Apr. 24, 2008), Dkt. No. 106 ¶ 44 (alleging that "Youtube offers a feature that allows users to designate 'friends' who are the only persons allowed to see videos they upload, preventing copyright owners from finding infringing videos with this limitation"); *Viacom Int'l Inc. v. YouTube, Inc.*, 940 F. Supp. 2d 110, 123 (S.D.N.Y. 2013) (holding that YouTube is entitled to the DMCA's protections as a matter of law).

YouTube has similarly long offered users the ability to create "unlisted" videos on the service. Zhu Decl. ¶ 4. These videos are not included in YouTube's search index, and thus are not recommended in search results on the site. *Id.* ¶ 6. But unlisted videos can be accessed by those with the video's URL. *Id.* Accordingly, users can share unlisted videos within a school, a community, or among their customers without broadcasting them to YouTube's much larger global audience. For example, a news outlet may upload videos to YouTube and set them to be unlisted, but then share the video URLs with subscribers to its own website, to direct users there rather than to YouTube.[1]

In offering these and numerous other functionalities, YouTube complies with each requirement Congress laid out in the DMCA's safe harbors, including adopting and reasonably implementing a repeat infringer policy. *Viacom*, 940 F. Supp. 2d at 123. Per its policy, YouTube promptly processes takedown notices alleging that videos on the service infringe copyrights, assesses "strikes" against allegedly infringing users, and terminates those who accrue three or more strikes, removing all channels and all content associated with the terminated user's account.[2] Zhu Decl. ¶ 2. YouTube applies its repeat-infringer policy to all videos on the service,

---

[1] Plaintiffs purport to give the Court a percentage of the total number of videos on YouTube that are private or unlisted. These calculations do not have a proper foundation, nor are they relevant. Given their audience limitations, private and unlisted videos are inevitably viewed far less often, if at all, as compared to videos that are publicly accessible and surfaced through YouTube search results or other recommendation features. Plaintiffs offer no evidence suggesting private or unlisted videos generate appreciable views or watch time on YouTube.

[2] *See* "Copyright strike basics," https://support.google.com/youtube/answer/2814000 (last accessed Mar. 17, 2023).

1  whether publicly accessible, private, or unlisted. *Id.* It employs a team of 20 full-time employees

2  and over 300 vendors to implement the policy, and processes millions of takedown notices,

3  ***including over a hundred thousand notices directed to private and unlisted videos annually***.

4  *See, e.g.*, *id.* ¶ 3; *see also id.*, Ex. A (Copyright Transparency Report). Each year, pursuant to its

5  policy, YouTube terminates hundreds of thousands of users, out of the hundreds of millions on

6  the service, based on their accrual of three strikes. *See, e.g.*, *id.* ¶ 3.

7       And YouTube does far more to help copyright holders than what the DMCA requires. It

8  has invested heavily to develop and operate additional copyright management tools, such as the

9  copyright removal request webform, Content ID, and the Copyright Match Tool. Zhu Decl. ¶¶ 8-

10  12. These tools afford copyright holders unprecedented control over whether and where their

11  content appears on the service. *Id.*

12  **<u>ARGUMENT</u>**

13  **I.**    **Plaintiffs' Motion Is Premature Under The Rule Against One-Way Intervention.**

14       Plaintiffs' motion should be denied as premature based on the rule against one-way

15  intervention. Under that rule, district courts "generally do not grant summary judgment on the

16  merits of a class action until the class has been properly certified and notified." *See*

17  *Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995). The rule "exists in part to protect

18  defendants from unfair 'one-way intervention,' where the members of a class not yet certified

19  can wait for the court's ruling on summary judgment and either opt in to a favorable ruling or

20  avoid being bound by an unfavorable one." *See Villa v. S.F. Forty-Niners, Ltd.*, 104 F. Supp. 3d

21  1017, 1021 (N.D. Cal. 2015).

22       This rule applies to partial motions for summary judgment like Plaintiffs' here because a

23  class certification motion is pending, and this motion squarely bears on the merits of the putative

24  classes' claims. *See id.* at 1018, 1022 (denying plaintiffs' "partial summary judgment" motion

25  without prejudice per the one-way intervention rule). Defendants previously explained, *see* Dkt.

26  No. 239 at 2-3, that prematurely adjudicating the application of the DMCA safe harbor would

27  unfairly allow putative class members to participate in the action after a favorable ruling while

28  giving them the opportunity to avoid being bound by an unfavorable one. That would subject

1    Defendants to the very risk the one-way intervention rule exists to avoid.[3]

2           Courts in this Circuit routinely deny dispositive motions (or hold them in abeyance)

3    while class certification remains pending and putative members have not been identified. *See*

4    *Hamm v. Mercedes-Benz USA, LLC*, 2019 WL 4751911, at *9 (N.D. Cal. Sept. 30, 2019)

5    (denying plaintiffs' motion for partial summary judgment); *Diva Limousine, Ltd. v. Uber Techs.,*

6    *Inc.*, 392 F. Supp. 3d 1074, 1095 (N.D. Cal. 2019) (same); *Villa*, 104 F. Supp. 3d at 1018 (same);

7    *Sidibe v. Sutter Health*, 2021 WL 879875, at *4 & n.23 (N.D. Cal. Mar. 9, 2021) (deferring

8    ruling on summary judgment "until the opt-out period ended to prevent 'one-way intervention'";

9    "district courts should 'not grant summary judgment on the merits of a class action until the class

10   has been properly certified and notified.'" (quoting *Schwarzschild*, 69 F.3d at 295)); *Edwards v.*

11   *First Am. Corp.*, 2013 WL 12213848, at *3 (C.D. Cal. Apr. 9, 2013) (holding that ruling on

12   defendant's motion during class certification appeal "could violate the one-way intervention

13   rule"). The same treatment is appropriate here to avoid a "heads I win; tails you lose" scenario. If

14   class certification is denied, as YouTube has argued it should be, a summary judgment motion on

15   the DMCA can proceed as applied to the named Plaintiffs' claims. Otherwise, this motion should

16   be denied or tabled until after the Court determines who, if anyone beyond the named Plaintiffs,

17   will be bound by the DMCA's application in this case.

18   **II.     YouTube Reasonably Implemented Its Repeat Infringer Policy.**

19          On the merits, Plaintiffs' effort to radically diminish the DMCA safe harbors should be

20   rejected. Plaintiffs do not challenge any aspect of YouTube's DMCA defense other than how

21   private and unlisted videos intersect with YouTube's repeat infringer policy. Plaintiffs take issue

22   "solely" with the fact that YouTube "excludes private and unlisted videos from discovery by its

23   YouTube search bar tool" and therefore has not "reasonably implemented" its repeat infringer

24   policy. Mot. 1. Said differently, Plaintiffs believe YouTube should be required by law to make

25   all videos on its service searchable, whether they are private or not, to make it easier for

26

27           [3] The potential for one-way intervention led YouTube to refrain from filing its own DMCA

28   summary judgment motion while Plaintiffs' motion for class certification remains pending and
     any putative class members remain unidentified.

1  copyright holders to levy allegations of infringement against those who might be infringing. That

2  argument ignores the broad discretion Congress vested in service providers to set and implement

3  their own repeat infringer policies, flouts the law granting safe harbor to services enabling

4  private storage and communications, would have disastrous consequences for user privacy across

5  the Internet, and fails as a matter of undisputed fact even under the standard Plaintiffs advance.

6  **A.  The DMCA Safe Harbors Protect Services That Offer Private Communications.**

7  Congress chose not to dictate the specific requirements of a DMCA repeat infringer

8  policy or its implementation. It would, for example, have been simple to require that service

9  providers make all content, including all users' private communications, searchable. But

10  Congress did nothing of the sort. Instead, it chose to give service providers broad discretion over

11  the design and implementation of repeat infringer policies. *See Corbis Corp.*, 351 F. Supp. 2d at

12  1100-01; *accord Vimeo*, 972 F. Supp. 2d at 511-17. Indeed, the Ninth Circuit in *Motherless*

13  blessed a service provider's policy and its "reasonable" implementation that was "little more

14  than [an individual's] multifactor judgment based largely on his recollection of DMCA notices."

15  885 F.3d at 617-18 ("[s]afe harbor eligibility does not require perfection, just 'reasonable'

16  implementation" of the policy a service has chosen to adopt; rejecting claim that service must

17  employ "some automated means of catching" repeat infringers). And *Motherless* rejected the

18  idea that Congress mandated specific procedures for implementing repeat infringer policies. *See*

19  *id.* at 618 ("Congress did not require that, to be eligible for safe harbor, a provider must maintain

20  a logbook of infringers which it consults whenever it receives a DMCA notice.").

21  Because the DMCA grants YouTube wide-ranging discretion over its repeat infringer

22  policy, Plaintiffs are forced to an extreme, and extremely meritless, position. They argue that

23  YouTube's privacy features "leav[e] Plaintiffs with no means of identifying [private or unlisted]

24  videos that infringe their copyright," and that in turn, "renders its repeat infringer policy a

25  nullity." Mot. 1, 5. Plaintiffs' premise is false—copyright holders can and regularly do identify

26  alleged infringements in private or unlisted videos on YouTube. *See supra* at 5-6. The only

27  difference is that private and unlisted videos may be harder for members of the public, including

28

1    copyright holders, to find. But that has nothing to do with YouTube's repeat infringer policy; it is

2    inherent in the nature of those functionalities.

3           The DMCA and its precedents make clear that the fact that user-stored content is not

4    publicly available or searchable on a service does not mean that service is excluded from the safe

5    harbor. The Second Circuit in *Viacom* held that a service provider does not lose safe harbor

6    eligibility by "refusing to provide access to mechanisms by which [it] monitors its own

7    network." *Viacom*, 676 F.3d at 41. As noted, the Court of Appeals specifically approved

8    YouTube's repeat infringer policy, holding that "YouTube cannot be excluded from the safe

9    harbor by dint of a decision to restrict access to its proprietary search mechanisms." *Id*. Another

10   court confirmed safe harbor protection for the online video service Vimeo, notwithstanding the

11   fact that Vimeo, like YouTube, offers private video functionality. *Vimeo*, 972 F. Supp. 2d at 505,

12   515-17, 534 (rejecting arguments that private videos were disqualifying either as inducing

13   infringement or as interfering with ability to send takedown notices). The Ninth Circuit made the

14   same point plain in *Shelter Capital*, recognizing that Congress "clearly" intended the DMCA

15   safe harbor to cover users' "electronic storage lockers," to which copyright holders and other

16   members of the public at large, by definition, would not have access. *See* 718 F.3d at 1016

17   (citation omitted). And the DMCA's legislative history is to the same effect, explaining that the

18   safe harbor covers "e-mail" services, even though copyright holders obviously cannot rummage

19   through private communications in search of alleged infringements. S. Rep. No. 105-190, at 54.

20          Perhaps the best illustration of the fallacy of Plaintiffs' argument is the DMCA's safe

21   harbor for ISPs that carry the world's transitory electronic communications. *See* 17 U.S.C.

22   § 512(a). Just like the § 512(c) safe harbor protecting YouTube for hosting content, the safe

23   harbor for transitory communications requires ISPs to implement a repeat infringer policy. *Id*. §

24   512(i). If Plaintiffs were right that enabling private communications nullifies a repeat infringer

25   policy, ISPs would have to afford copyright holders the ability to scan all Internet traffic for

26   possible infringements or else forfeit their safe harbor. Every online service that allows users to

27   limit the public exposure of the content they choose to store—including email services, file-

28   storage sites, private messaging and chat services, friends-only posts on social media

platforms—would face a categorical loss of DMCA protection. That is not—and could not be—the law. No one, certainly not Congress, imagined that the DMCA would usher in this sort of a copyright surveillance state.

Plaintiffs do not grapple with the relevant authorities or with the extensive privacy invasions their argument would trigger. Instead, they invoke an obviously distinguishable case, to argue that "purposely eviscerating" a repeat infringer policy is not an "implementation" as required by § 512(i). *See* Mot. 5 (emphasis omitted); *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 659 (N.D. Ill. 2002). *Aimster* did not address anything like YouTube's private and unlisted video functionalities. It involved a peer-to-peer file sharing service created to facilitate copyright infringement that had no "non-infringing purpose." *Supra* at 1-2. While the service claimed the DMCA's protections, the evidence showed that it had developed a sham repeat infringer policy that was literally unenforceable. Specifically, the record showed that Aimster encrypted all of the content carried on its service, in order to deliberately blind itself to the widespread infringement taking place and to "disable[] itself from doing anything to prevent infringement." *Aimster*, 334 F.3d at 655. As a result, ***it never received a DMCA takedown notice or terminated a repeat infringer***. *See Aimster*, 252 F. Supp. 2d at 659. Aimster itself took the position that its "policy [wa]s not implemented because it cannot be implemented" because of its encryption scheme. *Id.* (emphasis added). Based on these extreme facts, the Seventh Circuit concluded that Aimster was not entitled to DMCA protection. *Aimster*, 334 F.3d at 665. But that ruling does not suggest that simply allowing users to designate certain content as not publicly available (or searchable) excludes a service provider from the DMCA.

Plaintiffs claim that two Ninth Circuit cases "expanded on [*Aimster*'s] reasoning." Mot. 5. They did not—or at least not in any way helpful to Plaintiffs here. *Perfect 10, Inc. v. CCBill LLC,* which neither involved nor addressed private content, concerned whether defendants kept sufficient records of users who had repeatedly been identified as alleged infringers in DMCA takedown notices. 488 F.3d 1102, 1109 (9th Cir. 2008). The panel agreed that, as in *Aimster*, service providers may not actively "prevent[] copyright holders from providing DMCA-compliant notifications." *Id.* at 1109-10. But it went on to affirm summary judgment for the

defendants, reasoning that a service provider's failure to track all alleged infringers was quite different from *Aimster*, where "the encryption system ensured that *no* information about the repeat infringer[s] was collected." *Id.* at 1110-11. *CCBill* thus simply confirms that "a substantial failure to record webmasters associated with allegedly infringing websites" can undermine a repeat infringer policy. *Id.* It does not in any way suggest that allowing users to store content privately defeats safe harbor protection.

*Motherless* makes even more clear that Plaintiffs' position is wrong. The video-sharing service there allowed for "anonymous" uploads. *Motherless*, 885 F.3d at 618. Because the uploaders were anonymous, the defendant could not track allegations of infringement against them. *Id.* Nevertheless, the Ninth Circuit confirmed that the service's repeat infringer policy was reasonably implemented as a matter of law. *Id.* As it explained, "[s]afe harbor eligibility does not require perfection, just 'reasonable' implementation" of the repeat infringer policy a service has chosen to adopt. *Id.*; *see also id.* at 618 (safe harbor eligibility "is not lost just because some repeat infringers may have slipped through the provider's net for screening them out").

In short, the case law provides no support for Plaintiffs' argument that all user-uploaded materials must be accessible and searchable by the world in order for a service to have a valid repeat infringer policy. The fact that Plaintiffs may not be able to peer into users' private storage or communications does not render YouTube's robust implementation of its repeat infringer policy a nullity. Plaintiffs' argument fails as a matter of law.

### B. Plaintiffs Have No Evidence That YouTube Purposely Eviscerated Implementation Of Its Repeat Infringer Policy.

Even applying the standard driven by *Aimster*'s unique facts, Plaintiffs suffer a failure of proof. Plaintiffs neither demonstrate that YouTube "eviscerat[ed] any hope" of implementing its repeat infringer policy, nor that YouTube did so "purposely." *Aimster*, 252 F. Supp. 2d at 659.

Any suggestion that YouTube has eviscerated all hope of enforcing its repeat infringer policy is indefensible. The evidence is undisputedly to the contrary. Plaintiffs themselves have sent numerous takedown notices, and YouTube has acted on them, just as YouTube has timely acted on millions of takedown notices received from claimants generally. *See, e.g.*, Zhu Decl.

¶ 3; Ex. A (Copyright Transparency Report).[4] YouTube removes videos in response to notices, issues strikes to uploading users, and terminates repeat infringers in accordance with its "three strikes" policy. *See* Zhu Decl. ¶ 2. Indeed, YouTube terminates hundreds of thousands of users for violating its repeat infringer policy each year. *See id.* ¶ 3. And YouTube's policy applies with equal force to takedown notices it receives for private and unlisted videos. Again, YouTube receives and acts upon takedown notices for over a hundred thousand private and unlisted videos each year. *Id.* YouTube processes those notices just like others, assessing strikes and terminating users for repeat infringement. *Id.* ¶¶ 2-3. Far from acting to eviscerate its repeat infringer policy, YouTube conscientiously implements it, routinely terminating those who are alleged to be repeat infringers.

Separately, Plaintiffs have not even tried to argue (much less offered any evidence) that YouTube *purposely* designed its private and unlisted videos functionalities to eviscerate its repeat infringer policy. *See* Mot. 1-6; *see generally Vimeo*, 972 F. Supp. 2d at 534 ("Nothing in the record suggests that Vimeo's privacy settings … were implemented in order to enable users to upload infringing material and then restrict copyright holders' access to it."). While the absence of evidence is alone enough to defeat Plaintiffs' motion, it is worth highlighting just how misguided Plaintiffs' attack is. YouTube's privacy settings serve the important purpose of allowing users to limit the audience for their content. Zhu Decl. ¶ 7 ("YouTube certainly does not offer those functionalities for the purpose of undermining its repeat infringer policy."). The Court need only look at how Plaintiffs themselves have used these functions to confirm their utility. *See* Harold Decl. ¶¶ 2-7; Harold Exs. 1-10. Maria Schneider, for example, testified that she "on several occasions posted private or unlisted videos containing [her] works to YouTube to be used by new individual musicians subbing with my band who need to learn my

---

[4] YouTube goes beyond what the DMCA requires by offering numerous tools to assist copyright holders in identifying and notifying YouTube of alleged infringements. It provides copyright holders with powerful text-based search capabilities for public videos on the site; it offers a streamlined Webform that prompts users to include each of the categories of information the DMCA requires a takedown notice to contain; and it makes available cutting-edge digital fingerprinting tools like Content ID and the Copyright Match Tool. Zhu Decl. ¶¶ 8-12. As the *Viacom* panel explained, the DMCA does not require YouTube to develop and offer these technologies to anyone. 676 F.3d at 41. Plaintiffs cite nothing to suggest otherwise.

compositions." Harold Ex. 1 (Corrected Schneider Decl.) ¶ 43. She also on occasion authorized third parties to upload videos containing her works, provided the videos were "unlisted." *Id.* ¶ 44; *see also* Harold Decl. ¶¶ 3, 5. Uniglobe too used the "unlisted" functionality to post and share videos with potential distributors ███████████████████████ Harold Ex. 10. This underscores that YouTube's privacy options are not, like the encryption scheme in *Aimster*, some artifice for defeating the DMCA's repeat infringer requirement. To the contrary, they serve to benefit users (who are very often themselves creators and copyright owners) by empowering them to control who can view their content. Plaintiffs have not raised a triable issue of fact on the matter.

## **CONCLUSION**

Plaintiffs' motion cannot proceed in light of the one-way intervention rule. But even if the motion were ripe, the law, the record, and common sense foreclose Plaintiffs' argument. Congress crafted the DMCA to empower the growth of Internet services and balance competing interests. It was intended both to protect services that enable private storing and sharing of content and to allow services broad latitude in setting and implementing policies for terminating repeat infringers. Disregarding all of that, Plaintiffs put forward an argument that would expose any online service allowing private or non-searchable communication to the potentially ruinous copyright damages that the DMCA safe harbors were intended to foreclose. The motion must be denied.

Respectfully submitted,

Dated:  March 17, 2023

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


By: _____*/s/ David H. Kramer*_____
        David H. Kramer
        dkramer@wsgr.com

Attorneys for Defendant