DAVID H. KRAMER, SBN 168452
MAURA L. REES, SBN 191698
LAUREN GALLO WHITE, SBN 309075
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email:  dkramer@wsgr.com
        mrees@wsgr.com
        lwhite@wsgr.com

BRIAN M. WILLEN (admitted *Pro Hac Vice*)
CATHERINE R. HARTMAN (admitted *Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
Email:  bwillen@wsgr.com
Email:  chartman@wsgr.com

Attorneys for Defendants and Counterclaimants
YOUTUBE, LLC and GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>YOUTUBE, LLC and GOOGLE LLC,<br><br>Defendants<br><br>YOUTUBE, LLC and GOOGLE LLC,<br><br>Counterclaimants,<br><br>v.<br><br>PIRATE MONITOR LTD, PIRATE MONITOR LLC, and GÁBOR CSUPÓ,<br><br>Counterclaim Defendants. | CASE NO.: 3:20-cv-04423-JD<br><br>**DEFENDANTS AND COUNTERCLAIMANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFFS' PROPOSED EXPERTS JOSEPH M. WINOGRAD AND PAUL JESSOP**<br><br>Date:   April 13, 2023<br>Time:   10:00 a.m.<br>Dept.:   11<br>Judge:  Hon. James Donato |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................ 1

    I.    WINOGRAD'S REPORT AND TESTIMONY SHOULD BE EXCLUDED ....... 1

        A.    Winograd's Factual Narration Is Not Admissible. ...................................... 1

        B.    Winograd Persistently Invokes His "Expertise" But Fails To Establish Its Relevance Here Or Show How It Influences His Assertions. ................................................................................................... 3

        C.    Plaintiffs Offer No Support For Winograd's Lone, Speculative Opinion. ..................................................................................................... 4

    II.    JESSOP'S REPORT AND TESTIMONY SHOULD BE EXCLUDED ................ 5

        A.    Jessop's Report Is Inadmissible. ................................................................. 5

        B.    Jessop Lacks Expertise In The Subjects On Which He Opines. ................. 6

        C.    Jessop's Matching Process Is Not The Product Of Any Reliable Or Scientific Methodology. ............................................................................. 8

        D.    Jessop's Hypothetical And His Testimony Regarding ISRCs Are Likely To Confuse Or Mislead The Jury. ................................................... 8

CONCLUSION ....................................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*D.F. by & through Amador v. Sikorsky Aircraft Corp.*,
    2017 WL 4922814 (S.D. Cal. Oct. 30, 2017) .................................................................... 4

*Day v. GEICO Cas. Co.*,
    2022 WL 16556802 (N.D. Cal. Oct. 31, 2022) .................................................................. 5

*DZ Rsrv. v. Meta Platforms, Inc.*,
    2022 WL 912890 (N.D. Cal. Mar. 29, 2022) ..................................................................... 2

*GC2 Inc. v. Int'l Game Tech.*,
    391 F. Supp. 3d 828 (N.D. Ill. 2019) ............................................................................ 9, 10

*Harrington v. Pinterest, Inc.*,
    2022 WL 4348460 (N.D. Cal. Sept. 19, 2022) ................................................................ 10

*Lord Abbett Mun. Income Fund, Inc. v. Asami*,
    2014 WL 3417941 (N.D. Cal. July 11, 2014) ................................................................... 2

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
    2018 WL 6511146 (N.D. Cal. Dec. 11, 2018) .................................................................. 2

*United States v. Laurienti*,
    611 F.3d 530 (9th Cir. 2010) ............................................................................................ 4

*Waymo LLC v. Uber Techs., Inc.*,
    2017 WL 5148390 (N.D. Cal. Nov. 2, 2017) ................................................................ 2, 3

### STATUTES

17 U.S.C. § 1202 ............................................................................................................... 6, 9, 10

### RULES

Fed. R. Civ. P. 26 ....................................................................................................................... 3

# INTRODUCTION

Plaintiffs cannot rescue their proposed storytellers, Joseph Winograd and Paul Jessop. Their slanted account of the record, legal conclusions, and speculation regarding YouTube's state of mind are all plainly improper testimony for expert witnesses. Further, no matter how much experience Winograd has with watermarking or Jessop with "standard" identifiers, neither is an expert on the topics they hope to discuss, let alone on YouTube's technology and operations. Their reports and their testimony should be excluded.

# ARGUMENT

## I. WINOGRAD'S REPORT AND TESTIMONY SHOULD BE EXCLUDED

### A. Winograd's Factual Narration Is Not Admissible.

Plaintiffs misrepresent Defendants' motion challenging Winograd as merely attacking "two paragraphs of an 86-page report" (Opp. 4). Not so. Nearly all of Winograd's report is factual regurgitation. *See* Mot. 3 (citing Dkt. 261-5 ("Winograd Rep.") ¶¶ 18-30, 39-42, 45-50, 53-54, 57, 62-65, 68-73, 78-84, 89-90, 93-97, 118-122, 126, 140-145). Indeed, Winograd testified repeatedly that his role was to recount "facts" for the jury as he and Plaintiffs' counsel saw them. *See* Mot. 4 (citing Dkt. 261-6 at 41:8-42:14, 59:20-60:15, 197:11-198:13). Nearly his entire report should be excluded on this basis.[1]

Plaintiffs do not dispute that an "expert" may not recite and spin the record. Winograd does just that. But Plaintiffs say his narration reflects application of "industry experience" to documents "beyond the[] comprehension" of jurors. Opp. 5. Again, no. Much of what Winograd offers is restatement and slanted characterization of Google's public blog posts and help pages— materials that, by design, require no specialized training to understand. *E.g.*, Winograd Rep. ¶¶ 22-27, 39, 43-44, 46-51; Ex. B. Even Winograd agrees. When asked about one such page, Winograd admitted that "the average person likely could read and understand that page." Decl. of Qifan Huang ("Huang Decl."), Ex. 1 ("Winograd Tr.") 45:24-25. When asked about another, he could not say that the average person "could [not] understand" it. *See id.* 44:21-45:2. It is

---

[1] His lone opinion (Winograd Rep. ¶ 95) lacks any foundation and is entirely speculative. It should be excluded on separate grounds. *Infra* at 4-5.

plain that Plaintiffs have hired a witness claiming "expertise" to wave over perfectly accessible documents and tell jurors what to think about them. This Court and a host of others have said that is improper. *E.g.*, *DZ Rsrv. v. Meta Platforms, Inc.*, 2022 WL 912890, at *8-9 (N.D. Cal. Mar. 29, 2022) (Donato, J.); *Lord Abbett Mun. Income Fund, Inc. v. Asami*, 2014 WL 3417941, at *13, n.8 (N.D. Cal. July 11, 2014); *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 2018 WL 6511146, at *7 (N.D. Cal. Dec. 11, 2018); *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 2, 2017).

Winograd's reference to a handful of "technical" documents (Opp. 4) does not transform his improper narrative into proper expert opinion. He cites these documents for non-technical propositions that lack any nexus to his supposed expertise. Plaintiffs highlight his citation of a "Watch Next" presentation (Dkt. 276-14), but he references that document only once and only for the factual proposition that WatchNext uses machine learning (Winograd Rep. ¶ 124). A percipient witness would readily say the same thing, albeit without Plaintiffs' advocacy. Plaintiffs' other example, "Abuse Threat in Watch Next" (Dkt. 276-12), is again cited only once and only to support a factual assertion about YouTube's "objective" in designing WatchNext to recommend videos that users would enjoy watching (Winograd Rep. ¶ 120). Neither document requires specialized expertise to use them in the way Winograd does in his report. Even if they did, Winograd has no experience with WatchNext or other recommendation tools that puts him in a better position than a juror to read these documents. *See* Mot. 5; *infra* at 3-4. And he surely is not in a better position than the authors of the documents to testify about what they mean.

Plaintiffs claim Winograd's narrative reflects his "conclusions" about the evidence (Opp. 5 (citing Dkt. 278-8 at 56:22-57:4, 189:17-21, 194:3-14)). But even in Plaintiffs' hand-picked deposition excerpts, Winograd denies offering an "opinion" or admits that "the conclusion is – is written directly on the page or stated explicitly" (Winograd Tr. 57:9-10, 194:6-8). And while Plaintiffs contend that Winograd "affirmatively opines" on YouTube's recommendation tools (Opp. 6), that portion of his report does nothing but describe how he believes the tools work. Not only is that not an opinion, it is an issue on which he has no experience—much less expertise (*see infra* at 3-4).

Much as Plaintiffs might prefer to put these problems off to "cross-examination" (Opp. 6), the rules of evidence require exclusion of supposed experts like Winograd, whose "only contribution would be to pile on a misleading facade of expertise" to evidence that "can speak for itself." *Waymo*, 2017 WL 5148390, at *5.

### B. Winograd Persistently Invokes His "Expertise" But Fails To Establish Its Relevance Here Or Show How It Influences His Assertions.

Winograd has deep experience in watermarking, but he has no expertise in the relevant technology here—YouTube's copyright management and recommendation systems. Mot. 4-6. Plaintiffs' response is an attempt to recast Winograd as an expert in fingerprinting and "artificial intelligence" (*see* Opp. 2-3), but that revision does not wash. Plaintiffs point to Winograd's work at Verance, a company that exclusively produces watermarking technologies;[2] to an Emmy award Winograd received for Verance's watermarking technology; and to a handful of patents and patent applications, most of which relate (again) to watermarking. Opp. 2. This is just more of the same. *See* Winograd Rep., Ex. A (curriculum vitae, which includes no reference to fingerprinting, but **94** references to watermarking). It does not make Winograd an expert on fingerprinting technology any more than his experience "designing large complex data analysis systems" (whatever that means), or his student research of "artificial intelligence" ***thirty years ago*** (Dkt. 276-3 ("Winograd Decl.") ¶¶ 10-11), makes him an expert on recommendation algorithms today.

If Winograd actually believed that the projects and decades-old research that Plaintiffs tout in a new and improper declaration (*id.*; Opp. 2-3) were the basis for his testimony, the time to disclose this history ***was months ago***, when his supposed expertise could have been examined and refuted. *See* Fed. R. Civ. P. 26(a)(2)(B)(i), (iv) (requiring "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the witness's qualifications"). Plaintiffs cannot declare Winograd an expert on these subjects ex post facto. Nor should they be allowed to wave away the significant differences between watermarking and

---

[2] *See* Winograd Tr. 39:11-15 ("Q. Are all of Verance's products audio and video watermarking technologies? A. I would say that all of the products that we've built have related to audio or video watermarking.").

1  fingerprinting technologies by broadly labeling them "content identification technologies" in the
2  hopes of circumventing the *Daubert* gatekeeping function.
3      Even if Winograd *were* an expert on fingerprinting technology or artificial intelligence, it
4  would not salvage his report. Winograd does not opine on these subjects generally[3]—but instead
5  on the functioning of *YouTube's* proprietary technology, with which Winograd admittedly has
6  no experience. And, despite testifying at length about the basis for dozens of assertions in his
7  report, Winograd did not indicate that *any* of his claims concerning how YouTube operates were
8  based on experience with (or expertise in) fingerprinting or artificial intelligence. *See, e.g.*,
9  Winograd Tr. 61:9-11 ("It's -- it's my understanding based on review of the documentation --
10 public documentation provided on YouTube Search."), 117:4-7 ("Q. So you're just repeating
11 something you read with respect to that statistic? A. Yes, that fact is based on information
12 provided by Defendants."). Plaintiffs cite no case that excuses an expert from having experience
13 with or knowledge of the subject of their proposed testimony.[4]

**C.  Plaintiffs Offer No Support For Winograd's Lone, Speculative Opinion.**

The only actual opinion Winograd offers—about the feasibility of making YouTube's proprietary matching technology available to a putative class—is rank speculation. *See* Mot. 6-7. The supposedly "extensive support" for this opinion is thin—a sentence of deposition testimony from a YouTube witness and two exhibits. Opp. 7 (citing Dkts. 276-5, 276-15, 276-16). At best, the testimony suggests that the marginal cost of matching one additional work via the system is minimal; the two exhibits suggest that YouTube devotes substantial resources to its copyright management tools. None provides a foundation (much less "extensive support") for Winograd's opinion that the new matching approach Plaintiffs want is within YouTube's "existing

---

[3] Winograd's report contains one paragraph discussing fingerprinting generally (Winograd Rep. ¶ 34) and not a single mention of "artificial intelligence."

[4] In *United States v. Laurienti*, 611 F.3d 530, 548 (9th Cir. 2010), the Ninth Circuit found that it was abuse of discretion to exclude an expert's testimony on NASD rules since the expert's lack of experience with specific types of stocks did not undermine his knowledge of those rules. And in *D.F. by & through Amador v. Sikorsky Aircraft Corp.*, 2017 WL 4922814, at *16 (S.D. Cal. Oct. 30, 2017), the court found that a robotics and engineering expert with significant experience drawing electrical schematics could offer opinions on a particular wiring configuration. Neither speaks to what Plaintiffs and Winograd are attempting here.

1  capabilities and budget for such activities and could be executed with little technical risk."
2  Winograd Rep. ¶ 95.

3  Tellingly, Plaintiffs have abandoned the nonsensical justification Winograd advanced for his opinion at his deposition—that he counted up unrelated product developments and imagined that, if YouTube could accomplish those, it could accomplish the work Plaintiffs now demand. *See* Mot. 6-7. That is enough to jettison the opinion altogether. In an attempt to salvage it, Plaintiffs contrive an alternative, after-the-fact justification based on two documents (a public support page and an internal presentation). Opp. 8 (citing Winograd Rep. ¶¶ 93-94). But Winograd cited these documents to describe current features of YouTube's service, not for any estimation of the feasibility or cost to YouTube to expand its tools. Nor can an insubstantial reference to Winograd's supposed "experience" support this opinion—he has none of relevance. *See* Mot. 4-5. And Plaintiffs do not dispute Winograd's admissions that he had no insight into YouTube's budget or operating costs, no experience developing copyright management tools at YouTube, and no idea how long it would take in time or personnel hours to develop the new tool Plaintiffs want. *See* Winograd Tr. 148:25-149:5, 158:17-19, 160:23-161:17.

Try as they might, Plaintiffs cannot credibly blame Winograd's failures on Defendants. Plaintiffs say Defendants should have "produce[d] documents" that would enable "a more accurate assessment of the costs." Opp. 7 (citing *Day v. GEICO Cas. Co.*, 2022 WL 16556802, at *4 (N.D. Cal. Oct. 31, 2022)). But Plaintiffs have only themselves to blame for their witness offering an opinion that is unsupported by the record after more than two years of discovery.[5] Winograd's lone opinion must be excluded.

**II. JESSOP'S REPORT AND TESTIMONY SHOULD BE EXCLUDED**

**A. Jessop's Report Is Inadmissible.**

Plaintiffs' defense of their other narrator, Jessop, is no better. As Defendants showed,

---

[5] *Day* is not to the contrary, as it concerned whether to allow a preliminary damages report in support of class certification (*see* 2022 WL 16556802, at *4) at an early stage of the case. Winograd's opinion, by contrast, is final, offered just before trial, and does not merely set up a damages theory to be validated later. Similarly, the absence of a rebuttal report has no bearing on whether Plaintiffs can establish the admissibility of Winograd's opinion. As the record shows, they clearly cannot.

1  Jessop repeatedly offers improper legal interpretation and analysis. Mot. 9-10.

2        Plaintiffs' suggestion that Jessop does nothing more than "refer to the law" in expressing
3  his opinions (Opp. 11) is easily refuted. Jessop not only relays, but also purports to interpret and
4  even opine on the history of, Section 1202. *See* Dkt. 264-4 ("Jessop Rep.") ¶¶ 104-109
5  (indicating, for example, that Section 1202's protection against "alteration of CMI" is "broadly
6  conditioned on the change being made in connection with copyright infringement"). He likewise
7  offers his own determinations of whether metadata meets the statutory definition of CMI. *See id.*
8  ¶¶ 30-31; *see also id.* ¶ 152 ("The name of the original audio recording that appears in the 'clfn'
9  field is certainly rights management metadata in terms of the definitions used here and it plainly
10 meets the definition of CMI in the DMCA."). Even more problematically, he opines on
11 YouTube's supposed liability, stating that: "By deleting [metadata], YouTube . . . places itself on
12 the wrong side of Section 1202 in doing so. When CMI is deleted and that allows an
13 infringement to persist, that must surely be concealment." *Id.* ¶ 165. This is all well outside the
14 bounds of permissible expert testimony. Mot. 10.

15       Equally improper are Jessop's repeated attempts to describe YouTube's state of mind.
16 Mot. 9. Plaintiffs' denials cannot change what Jessop's report actually says. They claim he does
17 not opine on YouTube's state of mind but merely "points to evidence showing that YouTube had
18 the ability to know and explains the factors and considerations supporting that conclusion." Opp.
19 10. That is obviously false. Jessop makes repeated claims about specific knowledge or
20 "awareness" YouTube supposedly possesses. *See, e.g.*, Jessop Rep. at 55 ("YouTube . . . ***is***
21 ***aware*** that most recording metadata has been stripped"), at 52 ("YouTube ***knows*** the meaning of
22 the metadata"), ¶ 171 ("When YouTube accepts the upload of a video file with music content
23 and without metadata about the music, it ***must be aware*** that the metadata (that it ***knows*** has been
24 present) has been removed at some point.") (emphases added). Plaintiffs' dissemblance is no
25 cure for the impropriety of that testimony.

26       **B.  Jessop Lacks Expertise In The Subjects On Which He Opines.**

27       Plaintiffs barely attempt to support Jessop's status as an expert. *See* Opp. 12-13. They are
28 silent on Jessop's lack of expertise concerning YouTube's technology and costs (or "platforms,"

"developers," "users," and supposed "infringers" more generally). *See* Mot. 10-12. They do point to Jessop's experience working with "technical ***standards*** for metadata and standard identifier codes" (Opp. 8 (emphasis added)), but that does not make Jessop qualified to opine on "CLFN" metadata, which is anything but a "***standard*** identifier" (*see* Dkt. 268-1 ("Foucu Decl.") ¶¶ 4, 6)).[6] Even Jessop ***admitted*** that the "CLFN" video field fell outside the scope of his expertise and experience, which is in audio and not video. *See* Huang Ex. 2 ("Jessop Tr.") 234:24-235:2 ("I would not expect to have heard of ["CLFN"] because it's the parameter in a video context, and my expertise is in audio and my experience is in audio"). Plaintiffs also appear to concede, as they must, that Jessop has no experience in video transcoding, online search engines, platforms for user-generated content, and video editing software, but suggest he is nonetheless "generally qualified" to opine on those subjects.[7] Opp. 12. They do not, however, offer any explanation of how or why that might be.[8] Jessop's uncontested lack of relevant expertise renders his opinions on these subjects inadmissible.

---

[6] The "CLFN" field is not defined in the international standard specifications and, as discovery in this case demonstrated, often contains incomprehensible (*e.g.*, "ÃŠâˆžÃ3râ€žÃ‡ï¿½") or generic (*e.g.*, "My Movie") text. Foucu Decl. ¶¶ 4, 6.

[7] Whether or not it was "necessary" for Jessop to opine on those topics (*see* Opp. 12) he did so throughout his Report. *See, e.g.*, Jessop Rep. ¶ 145 ("The video editing software may read these tags in order to assist the user in selecting the correct item — but may also include them in the tags that the software itself writes into the final product video file. This may be done deliberately, or it may be done by default and without fanfare."), ¶ 154 ("without reading this metadata YouTube cannot read the video data to transcode it for its own purposes"), ¶ 155 ("If this were done [metadata] would be searchable via YouTube's Search bar and appear on (or via) video landing pages for machine and human consumption."), ¶ 156 ("While associating 'My Movie 1' with a video file uploaded to YouTube would not help identify an infringing work, it is similarly unlikely to create confusion. Any 'clfn' fields populated with gibberish will not impact the video — they simply will not end up in search results."), ¶ 159 ("Google's own search engine illustrates Defendants' capacity to identify and recognize CMI metadata in a standard field designed to identify component works of a user-generated video.").

[8] While Plaintiffs highlight Jessop's degree (Opp. 12), Jessop had just three years of university-level technical education. *See* Jessop Tr. 26:5-28:4. In the early 1980s, Jessop studied engineering and computer science, with a concentration in computer graphics. *Id.* 27:18-28:4. As Jessop explained, following his three years of study, he was awarded a master's degree based on his work at British Telecom in telephone and consumer electronics development. *Id.* 27:4-17, 31:12-32:23. This was all long before the public Internet existed and long before user generated content services like YouTube were born.

### C. Jessop's Matching Process Is Not The Product Of Any Reliable Or Scientific Methodology.

Jessop's rudimentary method for identifying Schneider's works consisted of nothing more than scanning the "CLFN" metadata field in videos for the titles of her songs—something any ordinary juror could do. Mot. 12-13. Plaintiffs do not dispute that this is the process Jessop undertook, but suggest that his effort was somehow "expert" because he first loaded the information from the video metadata files into Microsoft Excel to create a table, before manually reviewing the contents of the metadata fields to mark those he found "interesting," and then filtering those "interesting" fields from the rest. *See* Opp. 13; Jessop Tr. 241:13-242:17. In other words, Plaintiffs think Jessop's elementary matching was transformed into a complex methodology through use of a spreadsheet. It was not. Any processing was unnecessary for purposes of identifying Schneider's song titles in the ten "CLFN" metadata fields; it merely made the matching process easier. A juror with print-outs of the metadata files is equally capable of recognizing Schneider's song titles on ten of those pages—no experience (or expertise) necessary.

### D. Jessop's Hypothetical And His Testimony Regarding ISRCs Are Likely To Confuse Or Mislead The Jury.

*Hypothetical*. Plaintiffs claim that Jessop's hypothetical explains "issue[s] relevant to Plaintiffs' case," but none of the issues Plaintiffs list in their brief (*e.g.*, "how an artist creates a sound recording and assigns it an ISRC") are issues that Schneider has actually introduced in the record. Opp. 15. Among other things, Schneider has not explained how she creates sound recordings or how music service providers handle metadata for those recordings. Plaintiffs cannot use their expert's misleading hypothetical as a means of introducing facts that are not actually in the case. Nor can Plaintiffs simply wave away the confusion occasioned by Jessop's clear invocations of Schneider in his counterfactual hypothetical.

While Plaintiffs admit that Jessop's hypothetical about metadata involves concepts that are "foreign to the average juror" (Opp. 15; *id.* at 1 (claiming metadata use is a "highly technical matter")), they nonetheless argue that Defendants "vastly underestimate the jury pool" (Opp. 15)

1  in asserting that the hypothetical is apt to confuse or mislead. Plaintiffs argue that the
2  hypothetical will aid the jury in understanding "'how metadata is of importance to a creator in
3  the music sector today.'" Opp. 15 (quoting Jessop Rep. ¶ 42). Not so. Jessop's rambling story
4  strays far beyond the use of metadata to search for copyrighted works online (the issue actually
5  relevant to Plaintiff's claim) and rests on facts not in evidence. *See* Jessop Rep. ¶¶ 42-61. As just
6  an example, Jessop's story would lead a jury to believe that the absence of certain information in
7  embedded file metadata ***causes*** that information to be absent from "the YouTube video landing
8  page." *Id.* ¶ 58 (metadata was "stripped by YouTube during the processing of the upload - so the
9  YouTube video landing page bears only the" infringer's name, title, and keywords). But this is
10 directly contrary to the evidence in the record. In this case, the information (*e.g.*, song titles) that
11 Schneider claims was removed from the metadata of videos containing her works was, in every
12 instance, presented on "the YouTube video landing page[s]" (*id.*) of those videos. Mot. 14.
13 Jessop's hypothetical aims to obscure that indisputable fact (and others). Rather than providing
14 clarity on the relevant uses of metadata, Jessop's hypothetical is far more likely to sow jury
15 confusion.[9] To the extent Jessop is permitted to testify about the uses of metadata, he can do so
16 without thinly veiled allusions to Schneider that are contradicted by the record.

17       ***ISRCs***. Jessop's testimony regarding ISRCs is irrelevant because Plaintiffs' theory—that
18 ISRCs associated with sound recordings were not carried forward into the metadata of video files
19 containing those sound recordings—is not legally cognizable.[10] Mot. 13. Plaintiffs' sole case to
20 the contrary is inapposite. Opp. 14. The court in *GC2* declined to overturn a jury verdict where

---

[9] Plaintiffs take a myopic view of YouTube's citation to the requirement that "a hypothetical question propounded to an expert witness must remain within the range of the issues and include only such matters as are supported by the evidence, directly or inferentially." Mot. 15. Regardless of whether a hypothetical is posed to an expert or volunteered by the expert, it must be sufficiently grounded in the facts and issues in the case to aid, rather than confuse, the jury.

[10] Plaintiffs' theory stretches the statute beyond its breaking point. An example is illustrative. If a school gymnastics team performed a routine to a sound recording that has an associated ISRC, and someone recorded that performance, the ISRC would not be present in the video recording of the performance. Section 1202(b) does not require the video creator to locate the ISRC and add it to her video. That is true even if she is well aware that sound recordings often carry ISRCs. And if she uploads her video to YouTube, it is not incumbent on YouTube to recognize the background sound recording and find and add an ISRC to the video. None of that is what Section 1202 is about. *See* Mot. 13.

the defendant was "contractually obligated," but failed, to place the plaintiffs' visual logo on digital artwork the defendant used in a video game. *GC2 Inc. v. Int'l Game Tech.*, 391 F. Supp. 3d 828, 844 (N.D. Ill. 2019). It does not remotely support Plaintiffs' argument that Section 1202(b) imposes a statutory obligation to carry forward CMI from one work (a sound recording) into a new, derivative work (a video). And the case law to the contrary is legion. Mot. 13.

Even if Plaintiffs' theory were viable, Jessop's testimony still would not be helpful to a jury and would be unfairly prejudicial. Plaintiffs contend Jessop's "opinions squarely bear on YouTube's knowledge that ISRCs were removed . . . ." Opp. 13. But he seeks to opine that the general prevalence of ISRCs in sound recordings necessarily means that, when they are absent from uploaded video files, their removal (and the consequences of that removal) must be "apparent" to YouTube.[11] Jessop Rep. ¶¶ 170-171; *see also id.* ¶¶ 32-34, 165, 169, 172. That testimony is contradicted by the record (Mot. 14) and is more likely to mislead the jury than to aid it. Indeed, regardless of Jessop's knowledge about ISRCs, his testimony will not help the jury decide the relevant questions here: whether the specific versions of sound recordings used to create specific videos on YouTube contained ISRCs, and what YouTube ***actually knew*** about the prior presence and removal of ISRCs from the sound recordings in those videos.[12]

## CONCLUSION

Defendants respectfully request that the Court exclude both Winograd and Jessop.

---

[11] Jessop's testimony that the absence of ISRCs should be "apparent" or "clear" or beyond "reasonabl[e] . . . doubt" to YouTube is irrelevant. *See* Jessop Rep. ¶¶ 165, 170-72. A Section 1202(b) claim based, like Plaintiffs', on the alleged distribution of works absent copyright management information ("CMI") cannot rest on what YouTube should have known. Actual knowledge that CMI has been removed is required. *See* 17 U.S.C. § 1202(b)(3); *Harrington v. Pinterest, Inc.*, 2022 WL 4348460, at *4 (N.D. Cal. Sept. 19, 2022).

[12] Plaintiffs do not engage with YouTube's argument that Jessop's opinions as to what YouTube (or others) "could," "should," or "ought" to do are irrelevant to the question of YouTube's liability today. Mot. 14 n.5. Instead, they claim that his opinions are admissible because they "relate to best practices and industry standards for metadata and whether YouTube conforms to them." Opp. 15 n.19. That redirection is baseless. While there might exist some "best practice" or "industry standard" that Jessop could opine on, he does not offer an opinion about such practices or standards for online platforms like YouTube. Nor could he. Mot. 11. Instead, the cited portions of his report are, at most, his musings about what he thinks YouTube ought to do, absent any discussion of or comparison to actual industry practice. *See* Jessop Rep. ¶¶ 118-119, 121.

Dated: March 24, 2023

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ David H. Kramer
      David H. Kramer

Attorneys for Defendants and Counterclaimants
YOUTUBE, LLC and GOOGLE LLC