# EXHIBIT 1

to the Declaration of Qifan Huang

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4
 5     _____
                                      )
 6     MARIA SCHNEIDER, UNIGLOBE      )
       ENTERTAINMENT, LLC, and AST    )
 7     PUBLISHING LTD., individually and )
       on behalf of all others similarly )
 8     situated,                      )
                                      )
 9              Plaintiffs,           )
                                      )
10     vs.                            ) No. 3:20-cv-4423
                                      )
11     YOUTUBE, LLC; and GOOGLE LLC,  )
                                      )
12              Defendants.           )
       _____)
13
14
15         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
16         VIDEOTAPED DEPOSITION OF JOSEPH M. WINOGRAD
17                San Francisco, California
18                Thursday, September 29, 2022
19                        Volume I
20
21     Reported by:
       CATHERINE A. RYAN, RMR, CRR, B.S.
22     CSR No. 8239
23     Job No. 5490258
24
25     PAGES 1 - 281
```

                                              Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4

5    _____

                                        )

6    MARIA SCHNEIDER, UNIGLOBE          )

     ENTERTAINMENT, LLC, and AST        )

7    PUBLISHING LTD., individually and )

     on behalf of all others similarly )

8    situated,                          )

                                        )

9             Plaintiffs,               )

                                        )

10   vs.                                ) No. 3:20-cv-4423

                                        )

11   YOUTUBE, LLC; and GOOGLE LLC,      )

                                        )

12            Defendants.               )

     _____)

13

14

15

16

17           Videotaped deposition of JOSEPH M.

18   WINOGRAD, Volume I, taken on behalf of Defendants,

19   with the Witness appearing at WILSON SONSINI

20   GOODRICH & ROSATI, One Market Street Spear Tower,

21   Suite 3300, San Francisco, California, beginning at

22   9:13 a.m. and ending at 4:56 p.m., on Thursday,

23   September 29, 2022, before CATHERINE A. RYAN,

24   Certified Shorthand Reporter No. 8239.

25

                                              Page 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES:
 2
 3    For Plaintiffs:
 4         KOREIN TILLERY
           BY:  GEORGE A. ZELCS
 5         Attorney at Law
           205 North Michigan Plaza, Suite 1950
 6         Chicago, Illinois  60601
           (312) 641-9750
 7         (312) 641-9751 Fax
           gzelcs@koreintillery.com
 8
           BY:  ANDREW ELLIS (appearing remotely)
 9         Attorney at Law
           505 North 7th Street, Suite 3600
10         St. Louis, Missouri  63101
           (314) 241-4844
11         aellis@koreintillery.com
12         BOIES SCHILLER FLEXNER LLP
           BY:  ROBERT DWYER (appearing remotely)
13         Attorney at Law
           55 Hudson Yards, 20th Floor
14         New York, New York  10001
           (212) 303-3524
15         (212) 446-2350 Fax
           rdwyer@bsfllp.com
16
17    For Defendants:
18         WILSON, SONSINI, GOODRICH & ROSATI, P.C.
           BY:  DAVID H. KRAMER
19             QIFAN HUANG
           Attorneys at Law
20         650 Page Mill Road
           Palo Alto, California  94304
21         (650) 320-4741 (Mr. Kramer)
           (650) 849-3456 (Mr. Huang
22         dkramer@wsgr.com
           qhuang@wsgr.com
23         lwhite@wsgr.com
24
25    //
```

Page 3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    any other social media service that has invested        09:55:16

 2    hundreds of millions of dollars to develop copyright

 3    management tools?

 4        A    I have not been provided any information

 5    about any amount that they've spent; so, I -- I          09:55:25

 6    don't have information on who's spent more or less

 7    than any amount that you might state.

 8        Q    So my question is:  Are you aware of any?

 9             And since you have no information, the

10    answer is, "no," you're not aware of any other          09:55:37

11    social media service that has spent hundreds of

12    millions of dollars on copyright management tools,

13    right?

14        A    The answer is the answer that I gave you.

15        Q    Given that you've never worked with a          09:55:49

16    social media service on copyright management tools,

17    is it fair to say that you don't have any experience

18    assisting social media services in policing abuse of

19    their copyright management tools?

20        A    I have not assisted a social media service     09:56:09

21    in policing abuse of their copyright management

22    tools.

23        Q    Verance's technology, specifically

24    Cinavia, but I think all of them, use audio and

25    video watermarking, correct?                            09:56:22
```

Page 38

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A    I'm sorry.  Can you ask the question          09:56:25

 2   again?

 3        Q    Well, I'll ask it more simply.

 4             Verance's Cinavia technology is an audio

 5   watermarking technology, right?                         09:56:33

 6        A    That is correct.

 7        Q    Are all of Cinavia's products audio or

 8   video watermarking technologies?

 9        A    Cinavia is an audio watermarking

10   technology.                                             09:56:44

11        Q    Okay.  Are all of Varance's products audio

12   and video watermarking technologies?

13        A    I would say that all of the products that

14   we've built have related to audio or video

15   watermarking.                                           09:57:01

16        Q    To your knowledge, does YouTube's

17   Content ID system use watermarking technology?

18        A    I'm not aware of YouTube's Content ID

19   system using watermarking technology.

20        Q    How many distinct parties use Verance's      09:57:14

21   Cinavia technology?

22        A    I don't know the number.

23        Q    Is it hundreds?

24        A    Yes, I believe so.

25        Q    Is it more than that?                         09:57:23
```

Page 39

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A    I don't believe there's -- no, I don't        09:57:25

 2   believe there's more than hundreds.

 3             MR. KRAMER:  How long have we been going?

 4   I don't have a watch.

 5             MR. HUANG:  Forty-three minutes.              09:57:35

 6             MR. KRAMER:  Let's keep going.

 7             Are you okay to keep going for a little

 8   bit?

 9             THE WITNESS:  Yes.

10             MR. KRAMER:  Let's get marked Exhibit 1 to     09:57:41

11   your deposition your report, the "EXPERT REPORT OF

12   JOSEPH M. WINOGRAD FOR PLAINTIFFS."

13             I see you've got a copy in front of you

14   already, so I'll give you another one, and we'll

15   have one marked for the record.                         09:57:54

16             I'm sorry.

17             (Exhibit 1 was marked for identification

18             by the court reporter.)

19             THE WITNESS:  I should say:  In addition

20   to the answer I just gave to that question, I was       09:58:15

21   answering with respect to users who are using the

22   technology in direct relationship with Verance.

23             There are, of course, hundreds of millions

24   of consumer devices that include the Cinavia

25   technology by which consumers interact with the         09:58:33
```

Page 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q    Is that your expert opinion?                10:01:33

2      A    It's my understanding of -- of basic facts

3   of the activities of the -- of users of YouTube and

4   the functions provided by the YouTube system, and,

5   again, providing it as a background and context for    10:01:56

6   this introductory paragraph of section III A of my

7   report.

8      Q    And how do you come by that information

9   that you just reported in that sentence?

10     A    Again, in -- in the case of this sentence,    10:02:07

11  I've provided two footnotes in this sentence

12  identifying supporting material that I've reviewed

13  and synthesized for the purpose of establishing the

14  context of this section.

15     Q    So that's your view of what the documents     10:02:23

16  say that are cited in footnotes 9 and 10 of your

17  report, right?

18     A    I -- that's -- the footnote -- the

19  document cited in footnotes 9 and 10 are the support

20  provided for this -- what I think is useful           10:02:43

21  background information in this introductory

22  paragraph.

23     Q    Do you think a jury could read those

24  documents and understand them?

25     A    These particular documents?  Which           10:02:54

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    documents do you mean?  The ones in the second          10:02:58

 2    sentence or the ones in the first sentence?

 3         Q    The ones that you're relying on for

 4    purposes of support for this sentence that starts

 5    with "videos are uploaded."                              10:03:07

 6         A    Thank you.

 7              And your question is would a jury be able

 8    to read these documents and understand --

 9         Q    Could a juror --

10         A    -- what's in them?                             10:03:28

11         Q    Could a juror read, for example, the

12    YouTube blog post entitled

13    "responsibility-good-business-and-creator-economy"?

14              Could a juror read that and understand it?

15         A    I -- they might be able to.                    10:03:47

16         Q    Is there a reason to believe that this

17    jury could not understand a YouTube blog post made

18    for a general audience?

19         A    I suppose it depends on the -- on the

20    sophistication of the individual juror.                  10:03:57

21         Q    So you don't think this jury could

22    understand the YouTube blog post?

23              MR. ZELCS:  Objection.  Form.

24              THE WITNESS:  I -- I'm not in a position

25    to make, I think, general, blanket statements about     10:04:19
```

Page 44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    individual jurors in a -- in a jury pool drawn from        10:04:26

2    the general public.

3    BY MR. KRAMER:

4        Q    Sir, you quoted another document here in

5    footnote 9 titled "YouTube Help:  YouTube Partner          10:04:32

6    Program overview and eligibility," and there's a URL

7    for that document.

8             Do you think that the average person could

9    read and understand that document?

10       A    I'm not, frankly, clear where you're             10:04:51

11   reading from.  Can you identify a page or footnote?

12       Q    Footnote 9, sir.

13       A    Thank you.

14            And -- and which -- what were you reading?

15       Q    I was reading your sentence that the             10:05:04

16   uploader must have at least a thousand subscribers

17   to their channel and their videos must have at least

18   4,000 qualifying watch hours over a one-year period,

19   and then you have a citation there in footnote 9 to

20   the page "YouTube Help:  YouTube Partner Program         10:05:21

21   overview and eligibility."

22            And the question is:  Could the average

23   person read and understand that page?

24       A    I think -- I think the average person

25   likely could read and understand that page.            10:05:36

Page 45

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q    In the next sentence -- actually, a little      10:05:41

 2   bit further down in paragraph 22, you've got the

 3   statement, quote:  "Uploaded videos are generally

 4   published and available for viewing by YouTube users

 5   in a matter of minutes."                                  10:05:54

 6             Do you see that?

 7        A    Yes.

 8        Q    You're not purporting to state an opinion

 9   there, are you?

10        A    No, I'm not.                                    10:06:04

11        Q    You're setting forth what you think is a

12   fact, right?

13        A    I'm -- yes, I'm presenting information

14   that I've synthesized from the review of the -- of

15   the documents that I relied upon.                         10:06:14

16        Q    Do you think the average person could

17   conduct the synthesis you say you engaged in in

18   order to understand the document cited after that

19   sentence?

20        A    If they -- if they could find it, yes.         10:06:35

21        Q    In the next sentence in paragraph 22, you

22   state, quote:  "YouTube has been in operation since

23   2005."

24             Is that your expert opinion?

25        A    No, that's my understanding of the -- of       10:06:50
```

Page 46

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     to characterize the relationship between these three      10:21:31

 2     methods and the -- their purpose and -- and the --

 3     you know, the -- what I understand to be the

 4     relationship and goals of them used in combination.

 5          Q    Where is the opinion, sir, in               10:21:54

 6     paragraph 42?

 7          A    I don't know that I --

 8               MR. ZELCS:  Objection.  Form.

 9               THE WITNESS:  I don't know that I stated

10     that there was an opinion here.  I said that I      10:22:00

11     synthesized these facts together with my expertise

12     to characterize their purpose.

13     BY MR. KRAMER:

14          Q    Were you involved in determining the

15     purpose of the various functionalities that are      10:22:11

16     described in paragraph 42 at YouTube?

17          A    In what respect was I involved?

18               I don't think I understand your question.

19          Q    Were you personally involved in

20     determining what purpose would be served by the      10:22:23

21     various functionalities that are described in

22     paragraph 42 of your report?

23          A    Do you mean --

24               MR. ZELCS:  Objection.  Form.

25               THE WITNESS:  Do you mean was I involved      10:22:31
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    in -- in designing these systems?                    10:22:32

2    BY MR. KRAMER:

3         Q    Yes, sir.

4         A    No, I was not.

5         Q    So you wouldn't have firsthand knowledge,   10:22:35

6    then, of the purpose for which these systems were

7    designed, right?

8              MR. ZELCS:  Objection.  Form.

9              THE WITNESS:  Can you clarify what you

10   mean by "firsthand"?                                  10:22:48

11   BY MR. KRAMER:

12        Q    If you weren't involved in developing the

13   systems, you weren't involved in conversations with

14   people about what the purpose of the systems was,

15   right?                                                10:22:54

16        A    That's correct.  I was not involved

17   working with the people there.

18             So I understand my role as an expert in

19   developing this report and opinion is to take the --

20   the materials and facts and information provided to   10:23:08

21   me and combine that with my expertise and

22   understanding in the field of the design of

23   copyright management systems and the function of the

24   matching technologies, and to present my expert

25   assessment of that information, synthesize the        10:23:26
```

Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   information, and explain it in the clearest possible        10:23:29

2   fashion as I understand it.

3           That's -- that's what I've done here.  So

4   I take facts, and I -- I use my expertise to draw

5   inferences and -- and present characterizations.            10:23:38

6      Q    In paragraph 43, sir, there are a series

7   of factual assertions regarding how Content ID

8   works.  I want to understand where you got those

9   assertions from.

10          Is any of the information in paragraph 43           10:23:56

11  information that you have firsthand knowledge of, or

12  is it just stuff that you read?

13          MR. ZELCS:  Just for clarification, every

14  time you ask about firsthand knowledge, you're

15  asking about whether he built these systems and         10:24:10

16  worked at YouTube, right?

17          MR. KRAMER:  Not necessarily.  He could

18  have firsthand knowledge in some other way, but

19  I'm --

20     Q    The question is -- there's a distinction        10:24:19

21  between what you know and what you read somewhere in

22  connection with this case.

23          So with respect to the factual

24  propositions in paragraph 43, do you have any

25  firsthand knowledge of those assertions, or is it       10:24:28

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   just an assimilation or agglomeration of what you          10:24:32

2   read?

3        A    Okay.  Thank you.  I'll review

4   paragraph 43, and then I'll try to answer your

5   question.                                                 10:24:40

6            (Pause.)

7        A    Okay.  I've read the paragraph.

8            My answer to your question is:  I have

9   not -- the -- the description given in this

10  paragraph is not based on use of -- personal use of      10:25:55

11  the Content ID tool.  It's based -- this is --

12  characterizes my understanding of the operation of

13  the system based on review of the cited materials

14  and other -- in the document and those identified in

15  Exhibit B.                                                10:26:18

16       Q    Paragraph 57 of your report, sir, offers a

17  summary on how YouTube Search works.

18            Let me give you a second to get there.

19            MR. ZELCS:  Forty-seven?

20            MR. KRAMER:  Fifty-seven.                       10:26:28

21            MR. ZELCS:  Fifty-seven.  Thank you.

22  BY MR. KRAMER:

23       Q    And I'm quoting from the paragraph:  For

24  YouTube Search to find an infringing video, it must

25  have associated text annotations that the search        10:26:45

Page 60

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    engine can match to the user's entered query string.        10:26:48

 2           Do you see that in paragraph 57?

 3      A    I do.

 4      Q    Is there a citation to anything for that

 5    assertion in paragraph 57?                                  10:27:05

 6      A    There is not.

 7      Q    Is that something that is your expert

 8    opinion?

 9      A    It's -- it's my understanding based on

10    review of the documentation -- public documentation        10:27:43

11    provided on YouTube Search.  It's cited elsewhere in

12    the document, perhaps not on this sentence.

13      Q    Did you conduct any experiments to

14    establish or assess the validity of that assertion?

15      A    I did not conduct experiments on this            10:28:01

16    assertion.

17      Q    Do you know that statement to be true?

18      A    It's my -- it reflects my understanding,

19    yes.

20      Q    And where did you get that information        10:28:12

21    from, sir?

22      A    The citation -- or the source that I can

23    direct you to in -- sitting here now is the second

24    from the bottom on page 79 of my report in

25    Exhibit B.  It's a document titled "YouTube Search."     10:29:07
```

Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   A URL is provided there.                          10:29:11

 2        Q    I want to understand what you're saying

 3   here in reporting from that document.

 4            You say:  "For YouTube Search to find an

 5   infringing video, it must have associated text     10:29:26

 6   annotations that the search engine can match to the

 7   user's entered query."

 8            If I did a search on YouTube Search for

 9   the Star-Spangled Banner, are you telling me that

10   the only videos that are going to be returned in    10:29:41

11   response to that query are videos that say

12   "Star-Spangled Banner" in the title or the

13   description of the video?

14        A    No, that's not what I'm saying.

15            There's actually a portion of my report    10:29:54

16   where I describe text annotations in more detail.  I

17   believe it's paragraph 52.

18        Q    So what are you saying, if you're not

19   saying that "Star-Spangled Banner" has to be in the

20   title and description?                              10:30:11

21        A    Yeah.  I'll read you paragraph 52:

22   "YouTube Search takes a text-based search Query

23   entered by the user, searches an index of text

24   annotations associated with each publicly viewable

25   video on YouTube, rank orders the results, and      10:30:25
```

Page 62

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | access the system at risk of having their access | 11:51:07 |
| 2 | revoked if they -- in whole or in part, if they | |
| 3 | violate those terms. | |
| 4 | So I understand also that there are a set | |
| 5 | of incentives that have been created by Defendants | 11:51:20 |
| 6 | to encourage good action. | |
| 7 | But I think that -- I think that any | |
| 8 | system -- pretty much any system that has been built | |
| 9 | is, you know, subject to certain forms of abuse and | |
| 10 | that a series of protections against those abuses | 11:51:38 |
| 11 | are necessary and appropriate and, in the case of | |
| 12 | Content ID, are in place. | |
| 13 | And, in fact, the defendants state in | |
| 14 | their Transparency Report that their incidence rate | |
| 15 | for Content ID users -- among Content ID users is, | 11:51:53 |
| 16 | in fact, quite small, less than 1 percent. | |
| 17 | BY MR. KRAMER: | |
| 18 | Q    Is that your opinion or something that | |
| 19 | you've read somewhere? | |
| 20 | A    Which part of my answer?  That was a long | 11:52:04 |
| 21 | answer. | |
| 22 | Q    It sure was. | |
| 23 | The last part, where you referenced the | |
| 24 | Transparency Report. | |
| 25 | A    So, yeah, I think the -- the -- the | 11:52:12 |

Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    1 percent statistic is specifically written in that     11:52:16

 2    report and is cited and mentioned in my -- in my

 3    report.

 4         Q    So you're just repeating something you

 5    read with respect to that statistic?                    11:52:26

 6         A    Yes, that fact is based on information

 7    provided by Defendants.

 8         Q    Now, back to the question I actually

 9    asked.

10         Can a Content ID participant falsely claim         11:52:36

11    music as their own in order to siphon off revenue

12    that properly belongs to a record label?

13              MR. ZELCS:  Objection.  Form.

14              THE WITNESS:  Yeah.  I mean, I think the

15    short answer to that is:  I don't know specifically.    11:52:57

16         I described my knowledge, in my prior

17    answer, that relates to abuse within the system and

18    then controls and safeguards and mechanisms for

19    identifying and correcting it.

20    BY MR. KRAMER:                                          11:53:06

21         Q    Is it possible for a Content ID user in

22    Russia to use the Content ID system to falsely claim

23    Ukranian antiwar videos as their own in order to

24    block them from appearing on YouTube?

25              MR. ZELCS:  Objection.  Form.                 11:53:20
```

                                                   Page 117

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  My understanding is that | 11:53:48 |
| 2 | that is -- that may be possible, that abuse of the | |
| 3 | tool is -- is -- is possible. | |
| 4 | BY MR. KRAMER: | |
| 5 | Q    How often does abuse of the Content ID | 11:53:52 |
| 6 | system lead to videos being claimed by someone who | |
| 7 | doesn't have the right to claim them? | |
| 8 | A    My recollection from the Copyright | |
| 9 | Transparency Report is that the rate of abuse or | |
| 10 | misuse of the -- of the Content ID system is below | 11:54:35 |
| 11 | 1 percent. | |
| 12 | Q    What are you basing that on, sir?  Are you | |
| 13 | basing that on the fact that there are 1 percent of | |
| 14 | claims that are disputed? | |
| 15 | A    I, frankly, would need to look at the | 11:54:47 |
| 16 | Copyright Transparency Report to find the -- the | |
| 17 | data on which my understanding is based. | |
| 18 | Do you have a copy? | |
| 19 | Q    Sure.  Sure.  I'll come back to it, | |
| 20 | though. | 11:55:01 |
| 21 | Let's assume it's 1 percent, for the sake | |
| 22 | of argument. | |
| 23 | How many videos on YouTube would that | |
| 24 | constitute? | |
| 25 | A    My understanding is that the -- the | 11:55:31 |

Page 118

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | year-over-year basis, including increasing the scale | 13:33:04 |
| 2 | of its use of Content ID; and that it's my view, | |
| 3 | based on the review of information I've been given, | |
| 4 | as well as my expertise and experience leading | |
| 5 | technology development and delivery of copyright | 13:33:16 |
| 6 | management tools, that -- that to expand the use | |
| 7 | of -- expand access to matching systems would not, | |
| 8 | you know, be a -- be a multiplier on the amount of | |
| 9 | costs that they're expending, in particular given | |
| 10 | that, as the record shows, in particular | 13:33:43 |
| 11 | Rosenstein's deposition, that all of the content | |
| 12 | that's being uploaded to YouTube in increasing | |
| 13 | amounts on a daily basis, hundreds of hours of | |
| 14 | content per minute, are all being matched against | |
| 15 | each other in the defendants' ordinary course of | 13:33:59 |
| 16 | business; and that in -- in many cases, the | |
| 17 | additional work would simply be that of exposing | |
| 18 | information that the defendant's already producing | |
| 19 | and already has on matches between content that's | |
| 20 | been identified as infringing or has been identified | 13:34:17 |
| 21 | as owned by a party, it's just a matter of exposing | |
| 22 | that existing information to the copyright owners. | |
| 23 | MR. KRAMER:  Move to strike. | |
| 24 | Q    In paragraph 96 of your report, sir, you | |
| 25 | say, quote (as read):  I have not been provided with | 13:34:30 |

Page 147

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | information that could be used to project the amount | 13:34:32 |
| 2 | of additional content expand- -- additional content | |
| 3 | expanding access to Content ID would attract to the | |
| 4 | service nor the associated monetary or computational | |
| 5 | costs that Defendants would consequential -- | 13:34:45 |
| 6 | consequentially bear. | |
| 7 |      Do you see that? | |
| 8 | A   You went a little fast for me. | |
| 9 |      Did you start at the beginning of 96, or | |
| 10 | did you start on the second sentence of 96? | 13:34:58 |
| 11 | Q   I started on the second sentence. | |
| 12 | A   Thank you. | |
| 13 | Q   "I have not been provided with information | |
| 14 | that could be used to project the amount of | |
| 15 | additional content." | 13:35:04 |
| 16 | A   Yes.  Yes, I see that sentence. | |
| 17 | Q   Is that statement true? | |
| 18 | A   Yes. | |
| 19 | Q   So you don't know what the added costs | |
| 20 | would be, right? | 13:35:18 |
| 21 | A   What I don't know is the incremental | |
| 22 | amount of content that would be added to the system | |
| 23 | separate and apart from what might ordinarily be | |
| 24 | added to the system, absent this capability. | |
| 25 | Q   So back in paragraph 95, you said that | 13:35:33 |

Page 148

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    YouTube could expand access within its existing        13:35:36

2    capability and budget, but you don't know what their

3    actual budget is, and you don't know what the

4    increased costs would be, right?

5         A    Not with specificity, no.                    13:35:51

6         Q    Okay.  Back on that same sentence in

7    paragraph 95, you say that YouTube could expand

8    access to effective tools with little technical

9    risk.

10             What do you mean by "technical risk"?        13:36:06

11        A    So -- so in -- in the course of my work as

12   the chief technology officer for Verance, I'm often

13   called upon, and have been over the course of my 27

14   years there, to look at different paths of

15   developing product, services, capabilities, and       13:36:27

16   provide an assessment to leadership at the company

17   of:  If we try to do this, will it work?  And that

18   is really:  Can it be done on time, on budget, and

19   will it meet the identified need?

20             And those are the primary components of      13:36:49

21   technical risk.  And to assess that, you'd take into

22   account, you know, your expertise, historical

23   knowledge of both the team's capability of

24   delivering capabilities and the, you know, financial

25   circumstances of the organization.                     13:37:16
```

Page 149

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              And taking into consideration these        13:37:22

 2    factors, as well as the information I've reviewed in

 3    the preparation of this report, much of which is

 4    described herein, that's my assessment.

 5        Q    So if I can parse what you just said, when   13:37:36

 6    you talk about technical risk, you mean can it be

 7    done on time, on budget, and will it meet the

 8    identified need; is that correct?

 9        A    Yes.

10        Q    You told me, though, that you don't know,   13:37:52

11    for example, what Verance's budget is, right?

12        A    I said I don't know that -- if we -- if we

13    have a budget, yes.

14        Q    How can you be called upon to determine

15    whether something is going to be within Verance's    13:38:05

16    tolerances for technical risk if you don't know the

17    budget?

18        A    I didn't say I don't know the budget.

19    What I said is I don't know if the organization as a

20    whole has a budget.                                  13:38:19

21              I'm not in charge of our sales and

22    marketing efforts.  I'm not in charge of our legal

23    efforts.  I'm not in charge of our finance efforts.

24    And so the information that I work with and review

25    is in relation to our developing technologies, doing 13:38:31
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A     So the analysis -- the logic that I just        13:44:46

 2   gave you is -- doesn't require that I perform an

 3   individual assessment.

 4           What I did was I said, "Let's consider

 5   these features as representing a level of effort        13:45:01

 6   that is comparable to an average feature."

 7           So each one of those 60 features built in

 8   2020 is a 60th of the effort, on average, and you

 9   can apportion that to these features.

10           I, frankly, think that's a generous           13:45:19

11   estimate, because these features are not new

12   capabilities.  Each of the features outlined in

13   paragraph 93, frankly, is a feature that has already

14   been implemented, tested, and is being delivered to

15   customers in the Content ID system.                    13:45:32

16           So I think it may be reasonable to expect

17   that the cost associated with -- with performing

18   this would be less than that average, but I'll --

19   I'll grant the average as a best estimate based on

20   the information available.                             13:45:47

21        Q    You have absolutely no idea of what was

22   involved to develop any of the features on the list

23   of features developed by YouTube in 2020.

24           You weren't there, were you?

25           MR. ZELCS:  Objection.  Form.                  13:46:01
```

Page 157

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   Argumentative.  It's not a question.  It's a          13:46:01

 2   statement.

 3   BY MR. KRAMER:

 4        Q    Were you working at YouTube in 2020?

 5        A    I was not working at YouTube in 2020.        13:46:08

 6        Q    Do you know what was involved in terms of

 7   resources to develop any of the features on

 8   YouTube's feature list of accomplishments in 2020?

 9        A    I think if asked to do so, I would be able

10   to identify, from the descriptions provided in the    13:46:23

11   cited document, features which are large features,

12   features which are small features, based on, again,

13   my extensive experience over time in building and

14   delivering copyright management tools.

15        Q    For YouTube?                                 13:46:44

16        A    Is that a question?

17        Q    Yes.  You've developed copyright

18   management tools for YouTube?

19        A    No.  I didn't.

20        Q    Okay.                                        13:46:52

21        A    My -- my understanding of YouTube's

22   expenditures comes from their expenditure statement,

23   where I have, side by side in these two documents,

24   cited in footnote 112 the amount that they spent and

25   what they accomplished with that expenditure.         13:47:03
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q     I'm sorry.  So based on your view of the        13:47:07

 2   expenditure statements, you think you can project

 3   what the technical risk would be for YouTube to

 4   offer four features that it currently doesn't offer?

 5        A     These are features -- I'm sorry -- that         13:47:18

 6   they do offer.  As I've stated, there's five of them

 7   as well.

 8        Q     So without any firsthand information

 9   regarding the level of resources required for any of

10   the development projects YouTube undertook in 2020,    13:47:31

11   you think you can opine that the features identified

12   in paragraph 23 could be developed at some

13   relatively low cost?

14        A     That -- that's -- that is my estimate

15   based on the information provided and my assessment,   13:47:49

16   yes.

17        Q     Okay.  Do you have all the information

18   that's necessary to provide that opinion?

19        A     I believe that the opinion is

20   appropriately tailored to the -- in specificity, as   13:48:03

21   I've identified, I don't have -- I don't have

22   greater specificity than this, than -- to the

23   information available.

24        Q     How long would it --

25        A     That's my best estimate.                    13:48:16
```

Page 159

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q     Sorry.                               13:48:17

 2              How long would it take YouTube to develop

 3        the version of the Copyright Match Tool that you

 4        describe in paragraph 93?

 5        A     Do -- what do you mean by "you"?  Can you    13:48:29

 6        clarify that?

 7        Q     How long would it take YouTube to develop

 8        a version --

 9        A     Oh, YouTube.

10        Q     -- to develop a version of the Copyright    13:48:35

11        Match Tool that you describe in paragraph 93?

12        A     I see.  I understand.  I thought you

13        said --

14              MR. ZELCS:  He did say "you."

15              THE WITNESS:  -- "you too" --             13:48:42

16              MR. ZELCS:  You did say "you."

17              THE WITNESS:  -- "you too."

18              Yeah.  Okay.

19              MR. KRAMER:  I didn't.  The record is --

20              MR. ZELCS:  We'll get there.            13:48:47

21              MR. KRAMER:  Okay.  The record is what it

22        is.

23              THE WITNESS:  How long would it take

24        YouTube to develop this?

25        //
```

Page 160

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. KRAMER: | 13:48:51 |
| 2 | Q   Yes. | |
| 3 | A   And you mean in -- in elapsed calendar | |
| 4 | time? | |
| 5 | Q   Sure.  Let's start there. | 13:48:58 |
| 6 | A   I don't know. | |
| 7 | Q   How about in terms of person hours? | |
| 8 | A   I don't know. | |
| 9 | To -- to determine that, right, would | |
| 10 | require additional information. | 13:49:11 |
| 11 | So we've got the amount of work | |
| 12 | accomplished and the amount of expense to accomplish | |
| 13 | it without identifying the number of people that | |
| 14 | that money was amortized across. | |
| 15 | So person hours, I don't think can be -- | 13:49:24 |
| 16 | can be estimated from that information.  We'd need | |
| 17 | to know the number of people. | |
| 18 | Q   You don't know that? | |
| 19 | A   The number of people? | |
| 20 | Q   Yes. | 13:49:36 |
| 21 | A   No, it's not included in the -- either of | |
| 22 | the two documents on the subject that I've received, | |
| 23 | which are both cited in footnote 112. | |
| 24 | Q   And you don't know how productive those | |
| 25 | people are, right? | 13:49:46 |

Page 161

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  you read about some -- about the intent of the          14:35:57

2  parties developing the YouTube system?

3       A    I'm reporting what I know I read about the

4  intent of the designers of the YouTube system.  It's

5  explicitly written in many places and acknowledged      14:36:07

6  in deposition --

7       Q    Did you --

8       A    -- testimony.

9       Q    Did you conduct interviews of those folks?

10      A    No, that was -- my role didn't involve        14:36:13

11 conducting interviews.  I reviewed interviews that

12 were conducted by others.

13      Q    And you've interviewed everyone who was

14 involved in determining what the intent YouTube has

15 in -- in offering its system?                            14:36:24

16      A    As -- as I said, I didn't interview

17 anybody.  I reviewed interviews that were conducted

18 by other people.

19      Q    And you think, as a result of having

20 reviewed deposition testimony, you have the ability     14:36:33

21 to testify as to the intent of the designers of the

22 YouTube system?

23      A    Without question.  And not just based on

24 the testimony, but also based on what's explicitly

25 written in the multiple documents that I've            14:36:45

Page 193

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    reviewed, which are -- many of which are cited in        14:36:46

 2    this report.

 3         Q    So you're giving your view of depositions

 4    and documents and coming to a conclusion about what

 5    those depositions and documents say?                     14:36:56

 6         A    Yes.  In some cases, the conclusion is --

 7    is written directly on the page or stated

 8    explicitly, but I -- in all cases, my job is to

 9    synthesize that information, collate it, organize

10    it, apply my expertise to interpret it.  And it's       14:37:14

11    reflected here in the report and in the opinion

12    which I've just stated -- or the understanding which

13    I've stated.  I'm not even sure it rises to an

14    opinion.  I'm not sure there's any question.

15         Q    I'm not sure it does either, sir.  I          14:37:27

16    appreciate your candor there.

17              Let me ask you this:  You say in note 181

18    of your report -- footnote 181, that data provided

19    by Defendants indicated --

20              Let me wait 'til you get there.               14:37:50

21              MR. ZELCS:  It's page 69.

22              THE WITNESS:  Okay.  Thank you.  Footnote

23    181, you said?

24              MR. KRAMER:  Yes, sir.

25              THE WITNESS:  Thank you.                      14:38:01
```

Page 194

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MR. KRAMER:                                       14:38:01

 2       Q    You say that:  "Data provided by

 3   Defendants indicated that a single infringing copy

 4   of '5 Weddings' on YouTube had more than 9 million

 5   views, 20,000 of which were due to AutoPlay," and    14:38:10

 6   then you have a citation to a document, right?

 7       A    Yes.  And this morning, in my kind of

 8   opening remarks, I identified a second document that

 9   should be -- also be cited in that parenthetical on

10   the second line of footnote 181.  So I'll just --    14:38:25

11   I'll just remind you of that.

12       Q    Let me ask you a question first, and then

13   we'll go look at those documents, I think.

14            Is that statement, "Data provided by

15   Defendants indicated that a single infringing copy   14:38:36

16   of a version of 'Five Weddings' on YouTube had more

17   than 9 million views, 20,000 of which were due to

18   AutoPlay" -- is that opinion?

19       A    No, I think that specific statement is

20   a -- is a statement of fact in evidence based on     14:38:59

21   the -- looking at that evidence.

22       Q    Okay.  So where did you get that from?

23   I'm trying to --

24       A    Okay.  So you want me to -- so there's a

25   second citation that I had to rely on to get that,   14:39:11
```

Page 195

**Errata Sheet**

| Page: Line | Change | Reason |
|---|---|---|
| 15:17-18 | Replace <Authority [sic]> with <Administrator> | To correct transcription errors |
| 41:7 | Insert < But Verance does a number of indirect things related to the hundreds of millions of consumers who interact with Cinavia technology.> between <.> and <Q> | To clarify the record |
| 53:22 | Replace <and> with <in the> | To correct transcription errors |
| 80:25 | Replace <subscribers> with <channels> | To clarify the record |
| 85:7 | Replace <knows> with <"knows" –> | To correct transcription errors |
| 118:17 | Insert <, which I now see is on page 6 of that report for the second half of 2021.> between <based> and <.> | To clarify the record |
| 135:25 | Replace <anyone> with <"anyone"> | To correct transcription errors |
| 156:18 | Replace <billed> with <built> | To correct transcription errors |
| 160:15 | Replace <too> with <to> | To correct transcription errors |
| 160:17 | Replace <too> with <to> | To correct transcription errors |
| 164:25 | Replace <threat> with <thread> | To correct transcription errors |
| 173:3 | Insert <,> between <systems> and <are> | To correct transcription errors |
| 173:3 | Insert <not> between <likely> and <to> | To correct transcription errors |
| 197:2 | Replace <four – some> with <for some> | To correct transcription errors |
| 205:4 | Replace < discovery> with <"discovery"> | To clarify the record |
| 205:5 | Replace <rights management> with <"rights management"> | To clarify the record |
| 205:9 | Replace <rights management> with <"rights management"> | To clarify the record |
| 218:14 | Replace <base> with <basis> | To correct transcription errors |
| 221:25 | Replace <machine> with <regime> | To correct transcription errors |
| 244:2 | Replace <DMC> with <DMCA > | To correct transcription errors |

_____x_____    Subject to the above changes, I certify that the transcript is true and correct.

_____    No changes have been made. I certify that the transcript is true and correct.

_____
(Signature)

11/2/2022
_____
(date)

ACKNOWLEDGMENT OF DEPONENT

I, Joseph Winograd, do hereby certify that I have read and examined the foregoing

testimony, and that the same is a correct transcription of the answers given by me to the

questions therein propounded, except for the corrections or changes in form or substance, if any,

noted in the attached Errata Sheet.

_____
(Signature)

11/2/2022
_____
(date)