DAVID H. KRAMER, SBN 168452
MAURA L. REES, SBN 191698
LAUREN GALLO WHITE, SBN 309075
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: dkramer@wsgr.com
        mrees@wsgr.com
        lwhite@wsgr.com

BRIAN M. WILLEN (admitted *Pro Hac Vice*)
CATHERINE R. HARTMAN (admitted *Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
Email: bwillen@wsgr.com
Email: chartman@wsgr.com

Attorneys for Defendants and Counterclaimants
YOUTUBE, LLC and GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> YOUTUBE, LLC and GOOGLE LLC, <br><br> Defendants <br> ———————————————— <br> YOUTUBE, LLC and GOOGLE LLC, <br><br> Counterclaimants, <br><br> v. <br><br> PIRATE MONITOR LTD, PIRATE MONITOR LLC, and GÁBOR CSUPÓ, <br><br> Counterclaim Defendants. | CASE NO.: 3:20-cv-04423-JD <br><br> **DEFENDANTS AND COUNTERCLAIMANTS' OPPOSITION TO COUNTERCLAIM DEFENDANTS PIRATE MONITOR LTD. AND GABOR CSUPO'S MOTION FOR SUMMARY JUDGMENT** <br><br> Date:   April 13, 2023 <br> Time:   10:00 a.m. <br> Dept.:  11 <br> Judge:  Hon. James Donato <br><br> **PUBLIC VERSION – REDACTED** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 2

I.      GÁBOR CSUPÓ BECOMES THE PUBLIC FACE OF A VENTURE TO
        MONETIZE YOUTUBE VIDEOS. .............................................................. 2

II.     CSUPÓ LANDS CONTRACTS WITH HUNGARIAN COMPANIES BUT
        CANNOT MAKE MONEY WITHOUT CONTENT ID. .................................. 3

III.    CSUPÓ FAILS TO DEMONSTRATE NEED FOR CONTENT ID. .................. 3

IV.     CSUPÓ COMMITS FRAUD TO CONJURE NEED FOR CONTENT ID. ......... 5

V.      YOUTUBE DISCOVERS CSUPÓ'S FRAUD. .............................................. 7

VI.     CSUPÓ DECIDES TO SUE FOR CONTENT ID UNDER A NEW SHELL
        COMPANY TO HIDE HIS EARLIER FRAUD. ............................................. 8

ARGUMENT .................................................................................................................... 10

I.      CSUPÓ'S CLAIM OF INNOCENCE IS SPECIOUS. ..................................... 11

II.     CSUPÓ IS RESPONSIBLE FOR ACTING ON BEHALF OF OTHERS. .......... 13

III.    CSUPÓ IS RESPONSIBLE FOR WHAT HIS AGENTS DID. ........................ 14

IV.     CSUPÓ IS RESPONSIBLE FOR WHAT HIS ALTER EGO (IPLLC) DID. ...... 16

        A.      A Jury Could Hold IPLLC Liable For The Fraudulent Takedown
                Notices. ...................................................................................... 16

        B.      A Jury Could Find That Csupó Is The Alter Ego Of IPLLC. .............. 17

V.      RULE 56(D) PROVIDES AN ADDITIONAL REASON TO DENY THE
        MOTION. ................................................................................................ 19

VI.     YOUTUBE'S REQUESTED REMEDIES ARE PROPER. ................................ 20

        A.      YouTube's Damages Include Its Investigation Costs And Attorneys'
                Fees. ............................................................................................ 20

        B.      YouTube Has Standing To Seek Injunctive Relief. ........................... 22

VII.    PIRATE MONITOR LTD. IS RESPONSIBLE FOR WHAT ITS ALTER
        EGO (CSUPÓ) DID. ................................................................................. 23

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*,
    2015 U.S. Dist. LEXIS 176870 (C.D. Cal. Feb. 12, 2015) ............................................. 18

*Armstrong v. Davis*,
    275 F.3d 849 (9th Cir. 2001) ...................................................................................... 22

*Automattic Inc. v. Steiner*,
    82 F. Supp. 3d 1011 (N.D. Cal. 2015) ....................................................................... 21

*Baisley v. Henry*,
    55 Cal. App. 760 (Cal. Ct. App. 1921) ...................................................................... 15

*Black v. Grant Cnty. Pub. Util. Dist.*,
    820 F. App'x 547 (9th Cir. 2020) ............................................................................... 10

*Blizzard Energy, Inc. v. Schaefers*,
    71 Cal. App. 5th 832 (Cal. Ct. App. 2021) ................................................................ 24

*Cal. Beach Co. v. Han Xian Du*,
    2020 WL 6260013 (N.D. Cal. Oct. 6, 2020) .............................................................. 21

*Carrillo v. Cnty. of L.A.*,
    798 F.3d 1210 (9th Cir. 2015) .................................................................................... 10

*Claremont Press Publ'g Co. v. Barksdale*,
    187 Cal. App. 2d 813 (Cal. Ct. App. 1960) ............................................................... 25

*Davis v. Wal-Mart Stores Inc.*,
    2017 WL 499595 (C.D. Cal. Feb. 6, 2017) ........................................................ 15, 17

*Enttech Media Grp. LLC v. Okularity, Inc.*,
    2020 WL 6888722 (C.D. Cal. Oct. 2, 2020) .............................................................. 14

*George F. Hillenbrand, Inc. v. Ins. Co. of N. Am.*,
    104 Cal. App. 4th 784 (Cal. Ct. App. 2002) ......................................................... 16, 17

*Gil v. City of Pensacola, Fla.*,
    396 F. Supp. 3d 1059 (N.D. Fla. 2019) ..................................................................... 23

*Hansen v. Integrity Assets LLC*,
    2021 WL 5999317 (C.D. Cal. Dec. 20, 2021) ........................................................... 16

*Helton v. Factor 5, Inc.*,
    2012 WL 2072848 (N.D. Cal. June 8, 2012) ............................................................. 20

*Izquierdo v. Panera Bread Co.*,
    450 F. Supp. 3d 453 (S.D.N.Y. 2020) ....................................................................... 23

*Karsant Fam. Ltd. P'ship v. Allstate Ins. Co.*,
    2009 WL 188036 (N.D. Cal. Jan. 27, 2009) .............................................................. 14

*Lenz v. Universal Music Corp.*,
    2010 WL 702466 (N.D. Cal. Feb. 25, 2010)....................................................................21

*Lenz v. Universal Music Corp.*,
    815 F.3d 1145 (9th Cir. 2016)....................................................................................21

*Littlejohn v. SF City*,
    2010 WL 5158330 (N.D. Cal. Dec. 14, 2010) .........................................................23

*Logtale, Ltd. v. Canton*,
    2021 WL 5908412 (N.D. Cal. Dec. 14, 2021) ..................................................14, 16

*Mauia v. Petrochem Insulation, Inc.*,
    2018 WL 3241049 (N.D. Cal. July 3, 2018) ...........................................................23

*McClellan v. Northridge Park Townhome Owners Ass'n, Inc.*,
    89 Cal. App. 4th 746 (Cal. Ct. App. 2001) .............................................................18

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012)....................................................................................23

*Ming-Hsiang Kao v. Holiday*,
    58 Cal. App. 5th 199 (Cal. Ct. App. 2020) .............................................................25

*Miranda v. Coach, Inc.*,
    2015 WL 636373 (N.D. Cal. Feb. 13, 2015) ..........................................................23

*Misik v. D'Arco*,
    197 Cal. App. 4th 1065 (Cal. Ct. App. 2011) .............................................17, 24, 25

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
    210 F.3d 1099 (9th Cir. 2000)..................................................................................15

*Oracle USA, Inc. v. Rimini St., Inc.*,
    783 F. App'x 707 (9th Cir. 2019)..............................................................................22

*Peredia v. HR Mobile Servs., Inc.*,
    25 Cal. App. 5th 680 (Cal. Ct. App. 2018) .............................................................14

*PMC, Inc. v. Kadisha*,
    78 Cal. App. 4th 1368 (2000) ..................................................................................13

*Prompt Staffing, Inc. v. United States*,
    321 F. Supp. 3d 1157 (C.D. Cal. 2018) ...................................................................24

*Shultz Steel Co. v. Hartford Accident & Indem. Co.*,
    187 Cal. App. 3d 513 (Cal. Ct. App. 1986)..............................................................14

*Signal 23 Television v. Anthony*,
    2020 WL 11206863 (N.D. Ga. Sept. 1, 2020) .........................................................22

*Toho-Towa Co. v. Morgan Creek Prods., Inc.*,
    217 Cal. App. 4th 1096 (Cal. Ct. App. 2013) .........................................................18

*VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*,
    784 F.2d 1472 (9th Cir. 1986)..................................................................................20

*Whitlow v. Rideout Mem'l Hosp.*,
    237 Cal. App. 4th 631 (Cal. Ct. App. 2015) ................................................ 14

*Yoo v. Safeco Ins. Co. of Am.*,
    2022 WL 2704048 (N.D. Cal. July 12, 2022) ........................................ 25

**STATUTES**

17 U.S.C. § 505 ...................................................................................................... 21

17 U.S.C. § 512 ................................................................................................ *passim*

Cal. Civ. Code § 2343 ............................................................................................ 13

Cal. Civ. Code § 2349 ............................................................................................ 16

Cal. Civ. Code § 2351 ...................................................................................... 16, 17

Hungarian Act No. V of 2013 on the Civil Code § 6:542(1) ........................... 13, 14

**RULES**

Fed. R. Civ. P. 45 .................................................................................................. 19

Fed. R. Civ. P. 56 .............................................................................................. 19, 20

**MISCELLANEOUS**

H.R. Rep. No 105-551 ............................................................................................ 21

S. Rep. No. 105-190 ............................................................................................... 21

1

## **INTRODUCTION**

Plaintiffs hand-picked Pirate Monitor Ltd. to lead this lawsuit seeking to obtain, for anyone who wants it, direct access to YouTube's proprietary video-matching system (called "Content ID"). Plaintiffs say YouTube is too restrictive in whom it trusts to use Content ID properly. But their chosen representative, Pirate Monitor Ltd., and its sole-owner and alter ego, Gabor Csupó (together, "Movants"), perfectly illustrate why YouTube must be selective with this powerful tool. Csupó, through a series of corporate shells, attempted a wide-ranging fraud against YouTube to gain access to Content ID, making nearly two thousand knowingly false misrepresentations. When those facts came to light in this case and YouTube asserted counterclaims based on the fraud, Plaintiffs did everything in their power to erase their connection to Csupó and Pirate Monitor Ltd. *See* ECF 44 (motion to dismiss); ECF 100 (motion to sever). Those attempts properly failed. And further discovery into Movants' corporate shell game has established that YouTube is entitled to relief from their fraud.

On this motion, Movants ask the Court to do what it cannot: weigh the evidence, assign credibility, and pick their version of events over YouTube's. The evidence compellingly shows that Csupó and his associates, including a wholly-owned shell named Intellectual Property LLC (IPLLC), wanted access to Content ID to make money by identifying allegedly infringing video clips on YouTube and claiming a share of advertising revenue associated with those clips. But they were unable to demonstrate *real* need for Content ID, or the competence to use it safely. Accordingly, they hired a young man in Pakistan to upload 1,975 clips of their client's copyrighted works to YouTube and then claimed the clips were copyright infringements in 1,975 bogus takedown notices—all to fabricate a need for Content ID. Those false assertions of infringement, all signed by Csupó, violated the DMCA's prohibition in 17 U.S.C. § 512(f) against misrepresentations in takedown notices and gave rise to YouTube's counterclaims. Csupó and his shells cannot escape liability for that unlawful conduct.

For these and additional reasons explained below, summary judgment should be denied.

**STATEMENT OF FACTS**

**I.    GÁBOR CSUPÓ BECOMES THE PUBLIC FACE OF A VENTURE TO MONETIZE YOUTUBE VIDEOS.**

████████████ Hungarian entrepreneur Endre Holman had a business idea. He had developed video monitoring technology called "Pirate Monitor," supposedly capable of scanning the whole internet for unauthorized copies of copyrighted works. *See* Kramer Ex. 29 at 111:16-112:5, 138:15-139:14[1]; *see also id.* Ex. 1. If he could convince Hollywood studios to use his software, he hoped to charge 50% of any revenues diverted from discovered infringers. *See id.* Ex. 5; *see also id.* Ex. 29 at 139:21-141:1. But he had a problem. Studios—especially American companies like ████████████ and others—had no idea who Holman was. He needed a front man with the connections and fame to get in the door. Someone like Csupó, a known producer and filmmaker. *See id.* Ex. 9.

Holman (and his associates) ████████████ for months. *See, e.g.*, Kramer Exs. 2a & 2b; *id.* Exs. 3a & 3b. But Csupó ████████████████████████████████ ████████████████████████████████. *See id.* Exs. 4a & 4b. Holman's solution was a Delaware corporation called Intellectual Property LLC or "IPLLC." *See id.*; *see also id.* Ex. 29 at 132:19-22, 134:25-135:4. As an American company, IPLLC (and Csupó) could be the public face, contracting with studios and other copyright owners while Holman worked in the background. *See id.* Ex. 29 at 59:19-20; 143:5-144:11.

Csupó subsequently signed on for a "50/50" profits split with Holman. *See* Kramer Ex. 29 at 143:8-144:1; *see also id.* Ex. 5. A Holman associate named József Kovács assigned all shares in IPLLC to Csupó for *one dollar*. *See id.* Ex. 29 at 26:22-27:10; ECF 260-18 at -12, -18. And Csupó got to work pitching Pirate Monitor to studios, film repositories, and the lawyers representing them. *See, e.g.*, Kramer Exs. 6-11, 29 at 111:21-112:5.

---

[1] Exhibits cited as "Kramer Ex." are attached to the concurrently filed March 24, 2023 Declaration of Andrew Kramer in support of this Opposition.

## II.     CSUPÓ LANDS CONTRACTS WITH HUNGARIAN COMPANIES BUT CANNOT MAKE MONEY WITHOUT CONTENT ID.

Discovery suggests that the Csupó-Holman partnership only produced deals with Hungarian companies; chief among them was a company owned by Gábor Kálomista called MegaFilm. *See* Kramer Ex. 29 at 150:2-14, 164:3-14. MegaFilm allegedly controlled the copyrights to several films previously at issue in this case and contracted with IPLLC to enforce those rights to those and other works. *See* ECF 260-8 § 2.3. MegaFilm instructed IPLLC to remove from YouTube any complete copies of MegaFilm's movies, but to capture revenue from partial clips of those movies if they appeared on YouTube. *See id.* §§ 2.5-2.6. For its efforts, IPLLC would receive 50% of the advertising revenue it collected on clips. *Id.* §§ 4.1-4.2.

With the contract in hand, it was up to Holman and his team to deliver by finding clips of MegaFilm's movies, claiming them, and collecting advertising revenue from YouTube. But Csupó and Holman's business plan had a major flaw. While they could police against unauthorized use of MegaFilm's works and ask YouTube to remove allegedly infringing clips via DMCA takedown notices, under the contract with MegaFilm, Csupó and Holman did not make money from takedowns. *See* ECF 260-8 §§ 4.1-4.2. They stood to make money only when clips were left up on YouTube to generate advertising revenues in which they could partake. For that, they needed access to YouTube's Content ID tool.

## III.    CSUPÓ FAILS TO DEMONSTRATE NEED FOR CONTENT ID.

Much has already been said about Content ID in this case. *See* ECF 160, 164-4, 268-2. Briefly, YouTube has invested hundreds of millions of dollars to develop and operate an Emmy-award-winning matching technology that allows copyright owners to block, monetize, or track videos containing works that they own. *See* Zhu Decl. ¶ 4.[2] This option to monetize videos that contain a given copyrighted work was precisely how IPLLC imagined it would make money from its agreement with MegaFilm. Content ID works by using fingerprinting technology that automatically compares the audiovisual content of uploaded videos to reference files provided by

---

[2] Citations to "Zhu Decl." reference the concurrently filed Declaration of Chenyuan Zhu in support of this Opposition. Citations to "Zhu Ex." are exhibits attached thereto.

content owners. *See id.* In competent hands, Content ID is a cutting-edge tool that affords rights

holders nearly unprecedented control over their works. But in incompetent hands, Content ID

can cause chaos.[3] *See* Zhu Decl. ¶ 8. And in malicious hands, copyright claims can be used as

weapons to, among other things, stifle dissent, *see, e.g.*, *id.* Ex. 10 (copyright claims used to

censor critic of Azerbaijan government); *id.* Ex. 11 (Turkish broadcaster censors dissidents with

copyright claims), and siphon millions from creators, *see, e.g.*, *id.* Ex. 12 (thieves who claimed to

own 50,000 songs used Content ID to steal $20M from rightsholders); *see also id.* ¶ 9.

YouTube recognizes the risks of misuse and abuse. Accordingly, it limits *direct* Content

ID access to those who can demonstrate a need and competency to use the system. *See* Zhu Decl.

¶ 10. To be sure, millions of others can gain access to Content ID through one of hundreds of

different intermediaries. *See id.* ¶ 11.[4] But Csupó and Holman wanted direct access to the system

so they could make more money. That desire and their subsequent attempts to deceive YouTube

into granting that access are the root of YouTube's counterclaims.

Csupó and Holman applied for Content ID access shortly after beginning their

collaboration. The first application was in Csupó's name. *See* Kramer Ex. 12. Thereafter, Csupó

filed a number of copyright complaints using an account opened in the name of a nonexistent

entity, Pirate Monitor LLC, a name a Holman associate made up. *See id.* Ex. 29 at 117:23-118:6,

126:5-127:16, 131:2-7, 149:10-21; *see also* ECF 69 at 3; Zhu Exs. 17a & 17b (also referencing

Csupó's Content ID application). Then Csupó and Holman applied for Content ID again using

the Pirate Monitor LLC account, but sending the application from an IPLLC email address. Zhu

Ex. 18; *see also* Zhu Decl. ¶¶ 28-29; Kramer Exs. 37a & 37b.

---

[3] *See, e.g.*, Zhu Ex. 1 (networks' livestreams of Comic-Con were blocked by their own copyright claims); *id.* Ex. 2 (music label claims videos uploaded by cinematographer from whom it had obtained non-exclusive stock footage license); Ex. 3 (music publisher mistakenly blocked a K-Pop group's video on behalf of Madonna); *id.* Ex. 4 (news service claimed and blocked all NASA footage of historic Mars landing); *id.* Ex. 5 (Harvard law copyright lecture blocked); *id.* Ex. 6 (NYU copyright lecture blocked); *id.* Ex. 7 (music distributor claims sound recording uploaded under creative commons license); *id.* Ex. 8 (music publisher accidentally blocked a Romney political ad including a clip of Obama singing); *id.* Ex. 9 (a clip of video game play was blocked by an episode of Family Guy that reused the clip).

[4] For example, Plaintiff Maria Schneider had access to the system for years through her publishing agent, Modern Works Publishing, who used its direct Content ID access on her behalf to block and claim content. Kramer Ex. 30 at 163:7-12, 193:10-194:23; ECF 164-6 ¶¶ 5-8.

1    YouTube rejected the Pirate Monitor LLC application. For starters, "Pirate Monitor

2    LLC" (*i.e.* Csupó) had previously sent a takedown notice for a video appearing to be a fair use,

3    demonstrating the potential to misuse the automated tool. *See* Zhu Ex. 18 (informing Csupó there

4    were consequences for false claims of infringement in takedown notices). And, Csupó had not

5    demonstrated a need for Content ID—*e.g.*, by showing through numerous, successful takedown

6    requests that third parties were, without authorization, uploading an appreciable number of clips

7    from MegaFilm's copyrighted works. *See id.*

8    If Csupó and Holman *really* needed Content ID to manage MegaFilm's portfolio, they

9    could have shown that through honest means. Specifically, they could have sent YouTube

10   DMCA takedown notices for alleged infringements to demonstrate need. But that would have

11   resulted in the removal of videos that they hoped to make money from. So Csupó and Holman

12   had to find another way.

13   **IV.    CSUPÓ COMMITS FRAUD TO CONJURE NEED FOR CONTENT ID.**

14   Beginning in August 2019, Csupó and Holman used another "associate" of Holman's

15   named Zsombor Oszlánczi, *see, e.g.*, ECF 260 at 8 (citing ECF 260-4 at 216:25-217:8); Kramer

16   Ex. 29 at 178:2-179:12, 180:4-10, to hire a young freelancer in Pakistan named Sarfraz Arshad

17   Khan. *See id.* Ex. 13. Oszlánczi informed Khan that he needed to upload around 2,000 clips from

18   MegaFilm movies to YouTube. *See id.* Ex. 15. Oszlánczi did not pay much for these efforts (only

19   a few hundred dollars in total) and included an extra $25 to upload the clips "on separate

20   channels," presumably to manufacture some veneer that multiple people were responsible for the

21   uploads. *Id.* Ex. 14. Khan did not use his real name to create the channels, nor did he use the

22   names of Oszlánczi, Holman, Csupó, IPLLC, Pirate Monitor LLC, or MegaFilm. Instead, he

23   created channels, mostly under variations of the name "Ransom Nova," each linked to different

24   email addresses. *See* Zhu Decl. ¶ 12. Then he began uploading short clips of MegaFilm's

25   copyrighted movies. YouTube believes Khan uploaded a total of 1,975 clips in four batches

26   between August and November 2019. *See id.* ¶¶ 12-15; *infra* Table 1.

27   As Csupó now admits, the uploads of each of these clips of MegaFilm's content was

28   *authorized*. Kramer Ex. 29 at 154:15-25, 173:9-174:6, 177:2-179:12, 180:4-16, 182:19-183:9,

185:20-188:10, 189:9-20, 190:24-191:2. MegaFilm authorized IPLLC to upload clips of its films and to delegate that authority to others; and IPLLC delegated the authority to Khan. *See id.* Nonetheless, while the batches of uploads were ongoing, Csupó sent bogus takedown notices for each of those 1,975 clips, averring in each that: "*I have a good faith belief that the use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.*" *See* ECF 260-13 (emphasis added); Zhu Decl. ¶¶ 14-15; *see also, e.g.*, ECF 68 ¶¶ 35, 79; ECF 69 ¶¶ 35-36, 79. Each one of these fraudulent takedown notices bore Csupó's name, signature, residential address, and telephone number. *See, e.g.*, ECF 260-12; ECF 260-13; Ex. 29 at 14:5-8. Relying on the notices, and in accordance with the DMCA, YouTube took down the clips. Zhu Decl. ¶ 16.

*Table 1. Breakdown of Khan's Uploads and Csupó's Takedowns*

| Batch | # of Clips | Date of Uploads | Date of Takedown Notices |
|-------|-----------|-----------------|--------------------------|
| 1 | 117 | Aug. 24 to Sept. 3, 2019 | Oct. 11 & Nov. 13, 2019 |
| 2 | 247 | Sept. 25 to Sept. 28, 2019 | Nov. 11 to Nov. 12, 2019 |
| 3 | 788 | Oct. 7 to Oct. 8, 2019 | Oct. 29 to Nov. 4, 2019 |
| 4 | 823 | Nov. 4 to Nov. 10, 2019 | Nov. 13 to Nov. 15, 2019 |

The parties agree every one of the 1,975 DMCA takedown notices Csupó sent contained material, false statements about copyright infringement—statements that were knowingly false when made. *See* ECF 260-13 (Ex. 11) at -898.

With this volume of "successful" takedown notices in hand, Csupó then complained to YouTube about a lack of access to Content ID. *See, e.g.*, Zhu Ex. 13 ("I would like you to respond to our repeated request [verbatim] to enter Content ID due to the large number of [unauthorized uploads]."). Csupó and Holman plainly hoped that their multitude of fabricated takedowns would convince YouTube that they should be given Content ID to manage (and make money from) MegaFilm's portfolio and could be trusted to use it properly.

**V.     YOUTUBE DISCOVERS CSUPÓ'S FRAUD.**

Csupó's takedown notices raised eyebrows at YouTube. After a lengthy investigation, a member of YouTube's copyright operations team reported that all (or many) of the allegedly infringing video clips identified in Csupó's notices had been "uploaded **recently** + with the same **title** + all about 30-40 seconds in **length** + 0 **views**." *Id.* Further, all of the clips of movies in Hungarian had been uploaded from Pakistan, and from accounts with a series of related email addresses. *Id.* YouTube suspected it was being scammed. It thus suspended the Pirate Monitor LLC account from which Csupó sent the takedown notices. *See id.* Exs. 14a & 14b. And when Csupó tried creating a second account under the name Intellectual Property LLC, YouTube recognized the connection and terminated that one too. *See id.* Exs. 15a & 15b.

Csupó audaciously pushed back. He claimed "unknown users" had "published a massive quantity" of his clients' "copyright protected works" on YouTube. *Id.* Ex. 16. He even filed a second Content ID application, this time on behalf of MegaFilm and IPLLC, an application that highlighted "1001" recent takedown notices—omitting that he and his cohorts had manufactured those takedown notices. *See id.* Exs. 19a & 19b.

Csupó's response prompted YouTube to investigate further. It discovered even more evidence of the fraud. The same unique Internet Protocol (IP) address had been used to login to one of the Ransom Nova accounts (*i.e.*, an account that uploaded the videos) *and* Csupó's Pirate Monitor LLC account (*i.e.*, the account sending the takedown notices). *See* Zhu Decl. ¶ 22. In fact, that IP address was being used by the Ransom Nova account at roughly the same time that it was being used by Csupó's Pirate Monitor LLC account to send takedown notices. *See id.* In other words, YouTube's costly investigation revealed that whoever posted the videos to YouTube was not "unknown" to Csupó, as he had claimed in his email to YouTube. Rather, the uploader was directly associated with Csupó, and using the same Internet connection. *Cf. id.* Ex. 16. YouTube did not, as Csupó demanded, restore his Pirate Monitor LLC and IPLLC accounts; it terminated them. *See* Zhu Decl. ¶¶ 24-25.

1  **VI.    CSUPÓ DECIDES TO SUE FOR CONTENT ID UNDER A NEW SHELL**
2  **COMPANY TO HIDE HIS EARLIER FRAUD.**

3          YouTube's termination of Pirate Monitor LLC's and Intellectual Property LLC's

4  accounts prompted a crisis for Csupó and Holman. Their entire business venture was premised

5  on getting access to Content ID so that they could claim and make money from videos on the

6  service. Their plan to trick YouTube into providing access had failed, so they hatched a new

7  scheme: a lawsuit.

8          ████████████████████████ proposed filing a class action against YouTube on behalf

9  of ██████ and others ████████████████████. *See* Kramer Exs. 20a & 20b; *see*

10  *also id.* ████████████. As originally conceived, the lawsuit would have been brought by

11  ████████. *See id.* Exs. 21a & 21b. But someone thought better of it. After all, Csupó, Holman,

12  IPLLC, and even MegaFilm were all directly linked, in one way or another, to the earlier

13  fraudulent takedowns. So Csupó and Holman enlisted József Kovács to come up with another

14  prefabricated entity (Pirate Monitor Ltd.), and again sell it to them for the nominal price of *one*

15  *dollar*. *See* ECF 260-5 at -38, -40; *see also* Kramer Ex. 29 at 58:15-24, 59:25-60:2, 60:7-21,

16  77:6-10. The new shell company, they hoped, could pursue copyright infringement litigation

17  using MegaFilm's works and would appear "clean" in ways that IPLLC, Csupó, Pirate Monitor

18  LLC, Holman, and MegaFilm were not. Kramer Exs. 28a & 28b ("PM is clean"); *accord id.* Ex.

19  29 at 185:4-6, 185:13-188:10. Of course, there was no real distinction between Csupó (dba Pirate

20  Monitor LLC), IPLLC, and Pirate Monitor Ltd.—the corporate entities were both owned and

21  managed by Csupó, both had the same "employees," *see id.* Ex. 29 at 133:16-24, held joint board

22  meetings (from which no minutes were produced), *see id.* at 145:5-146:17, and sometimes used

23  the same email address, *see id.* at 86:9-14.

24          Still, Csupó thought that Pirate Monitor Ltd. as copyright plaintiff could work. ██

25  ████████████████████████████████████████████████████████████

26  ████████ He had Holman review "[t]he Paki kid['s]" (i.e., Sarfraz Arshad Khan) uploads and

27  determined they should avoid the films *Csak szex es mas semmi* and *Zimer Fermi* from which

28  Khan had uploaded clips. Kramer Exs. 22a & 22b; *id.* Ex. 29 at 177:2-10. Hours later, Csupó

1   sent MegaFilm a request for the right to sue over three other works. *See id.* Exs. 23a & 23b; *id.*

2   Ex. 29 at 168:13-169:25. MegaFilm granted those rights shortly thereafter. *See id.* Ex. 24.[5]

3         Csupó and Holman took further steps to obscure Pirate Monitor Ltd.'s connection to their

4   earlier fraud. ██████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████

6   ███████████████████████████████████ Kramer Exs. 25a & 25b; *see also id.* Ex. 29 at

7   90:15-92:2, 93:5-94:20. That meant that when interacting with YouTube, Pirate Monitor Ltd.'s

8   IP addresses would not match those that Csupó previously used. After taking this additional step

9   to try to disinfect the latest iteration of their continuing venture, Csupó and Holman, through

10  Pirate Monitor Ltd., submitted takedown requests to YouTube and, once again, applied for

11  Content ID access. *See* Zhu Ex. 20.

12        But Csupó and Holman did not go far enough to conceal their earlier misconduct. Their

13  new takedown requests and Content ID application from Pirate Monitor Ltd. were in *Csupó's*

14  name—the same name used previously on the fraudulent takedown notices and prior

15  applications. *See, e.g., id.* Thus, YouTube's further investigation uncovered what Csupó and

16  Holman had worked to conceal, and YouTube denied Pirate Monitor Ltd.'s Content ID

17  application. *See, e.g., id.*; *see also* Kramer Ex. 26. When Pirate Monitor Ltd. sued for copyright

18  infringement in service of obtaining access to Content ID, YouTube filed its counterclaims

19  naming Pirate Monitor Ltd., Pirate Monitor LLC, and Csupó. ECF 160.

20        Unsurprisingly, YouTube did not fully appreciate the complex web of shell corporations

21  Csupó employed in service of his scheme at the onset of the case, or know the details of how he

22  accomplished it. Accordingly, YouTube pleaded claims in the alternative: if the 1,975 clips that

23  they had uploaded were infringements, then Csupó *et al* were liable for breach of YouTube's

24   

25        [5] Though Csupó and Holman explicitly tried to sanitize Pirate Monitor Ltd. by not using *Csak szex es mas semmi* in their suit, and though they did not seek or acquire rights to that work

26  from MegaFilm, ***the complaint they filed claimed infringement of that work***. It avers that Pirate Monitor Ltd. has exclusive Internet rights to *Csak szex es mas semmi*. *See* ECF 1 ¶¶ 17, 65.

27  Pirate Monitor Ltd.'s sworn interrogatory response, verified by Csupó, avers that Pirate Monitor Ltd. ***owns Csak szex es mas semmi***. Kramer Ex. 27. The representations in both the complaint

28  and the verified interrogatory response were false. Pirate Monitor Ltd. purposefully did not obtain rights in that work. Plaintiffs' counsel later claimed these false representations were merely a "scrivener's error." ECF 260 at 9 n.8.

Terms of Service contract and for fraud for falsely representing that the uploads were authorized; if the clips actually were authorized, then the fraud lay with the 1,975 takedown notices which, in violation of § 512(f), falsely asserted that the clips were infringements. *See* ECF 160 ¶¶ 2, 76. Csupó has since represented that the uploads were authorized by MegaFilm. *See* ECF 260 at 8. Accordingly, his fraudulent takedowns (rather than the uploads) are the focus of the counterclaims.

Once Csupó's conspiracy to defraud was revealed, Pirate Monitor Ltd. became a liability to Plaintiffs' counsel and they dismissed its affirmative claims against YouTube with prejudice. *See* ECF 66. YouTube's counterclaims remain. Through discovery, YouTube came to understand IPLLC's involvement in the scheme. But Pirate Monitor Ltd. and Csupó were less than forthcoming at best. Neither listed IPLLC in their initial disclosures as a witness with relevant information. Kramer Decl. ¶ 28 & Ex. 31. And when YouTube sought more information on IPLLC's role via subpoena, Csupó was obstructionist, leading to a motion to compel in Delaware. That dispute was only recently transferred to this Court and is set to be heard on April 13, 2023. *See YouTube, LLC v. Intellectual Property LLC*, No. 23-cv-1100-JD, ECF 20 (N.D. Cal.). Now, after failing to identify IPLLC and refusing to turn over discovery from it, Csupó and Pirate Monitor Ltd. seek to lay blame for their fraud at IPLLC's feet.

## ARGUMENT

Csupó and Pirate Monitor Ltd.'s summary judgment motion ignores much of this complex history and invites the Court to credit Csupó's version of events over YouTube's. Even if Csupó's narrative were credible, and it manifestly is not, that is not how the process works. Where the nonmoving party offers a view of the evidence that a reasonable jury could credit, the Court must accept it. *See Carrillo v. Cnty. of L.A.*, 798 F.3d 1210, 1218 (9th Cir. 2015) ("Where disputed issues of material fact exist, we assume the version of the material facts asserted by the non-moving party." (citation omitted)). Unless no reasonable jury could find liability, the Court must deny summary judgment. *Black v. Grant Cnty. Pub. Util. Dist.*, 820 F. App'x 547, 552 (9th Cir. 2020).

The evidence that Csupó (and his shells) made material misrepresentations in takedown notices in violation of Section 512(f) does not merely raise a question of fact; it leaves no doubt as to the answer. The motion for summary judgment must be denied.

## I. CSUPÓ'S CLAIM OF INNOCENCE IS SPECIOUS.

Csupó remarkably claims innocence. He argues that his only involvement was to own IPLLC. *See* ECF 260 at 16. But Csupó and Pirate Monitor Ltd. neither present nor grapple with *any* of the evidence showing Csupó's direct involvement in the fraudulent takedowns. It was *Csupó* who signed the takedown notices, as required by 17 U.S.C. § 512(c)(3)(A). *See, e.g.*, ECF 260-12; ECF 260-13. It is *Csupó's* name, residential address, and telephone number listed on all 1,975. *See* Kramer Ex. 29 at 14:5-8, 121:11-13, 122:21-25. And in rare moments of candor, Csupó admitted sending them: "Q. So you sent this takedown notice to YouTube on behalf of Mega Film, correct? A. Correct." Kramer Ex. 29 at 120:4-6. It was Csupó who feigned ignorance and doubled (indeed tripled) down on the scheme in aggressive correspondence to YouTube, after YouTube suspended his accounts based on suspected misconduct. *See, e.g.*, Zhu Ex. 16. In other words, when it comes to the 1,975 fraudulent takedowns and their aftermath, Csupó not only was responsible, but also tried to get YouTube to rescind its suspensions. A reasonable jury need not buy Csupó's convenient "it wasn't me" narrative, which is supported by his say so alone and contradicts his earlier statements and actions. *Cf.* ECF 260 at 7-8.

Csupó's version of events is not credible. Csupó testified that, after he told MegaFilm that the Pirate Monitor LLC and IPLLC accounts had been "frozen" (i.e., suspended), MegaFilm instructed Csupó to "just take down everything" and someone—not Csupó—misinterpreted that instruction as meaning to send takedown requests. *See* Kramer Ex. 29 at 207:11-208:23; *see also id.* at 191:3-192:4; ECF 260 at 7-8. This does not add up.

*First*, the timing doesn't work. MegaFilm could not have been told about the account suspensions until they *happened*. The suspensions occurred on November 18, 2019, *after* the fraudulent takedowns had been sent (by November 15, 2019). Zhu Exs. 14a & 14b; *see also* Kramer Exs. 19a & 19b (██████████████████████████████); Kramer Ex. 29 at 208:14-17 ("I [(Csupó)] sent him [(MegaFilm's owner)] copies of . . . YouTube's

responses where they said . . . your account is frozen . . . .”). Indeed, those accounts were suspended *because* of the fraudulent takedowns, all of which were submitted at least three days *before* the Pirate Monitor LLC account was suspended. *See* Zhu Exs. 18a & 18b; *see also id.* ¶¶ 24-25. In other words, whatever MegaFilm instructed after learning about the account suspensions could not have influenced the takedowns because those *takedowns had already occurred*.

*Second*, even if Csupó's testimony did not contain temporal inconsistencies, the contemporaneous written record does. Khan had uploaded only half of the 1,975 video clips by October 2019. *See* Zhu Decl. ¶¶ 14-15. Csupó submitted bogus takedowns for all of those by November 4, 2019. *See id.*; *see also supra* Table 1 (Batch 3). After all those takedowns, Khan uploaded the *other* half of the clips between November 4 and November 10, 2019. *See supra* Table 1 (Batch 4). Csupó submitted takedowns for all of those by November 15, 2019. *See id.* Csupó's testimony requires a jury to believe that MegaFilm's instruction to "take it all down" (which came somewhere around the end of 2019, Kramer Ex. 29 at 204:13-20) explains *all* fraudulent takedowns at issue in the case. But given that half of the fraudulent takedowns occurred before the other half of the videos were even *uploaded*, Csupó's version of events is simply a lie.[6]

*Third*, Csupó claims that the takedowns were submitted because MegaFilm concluded IPLLC, Csupó, and Holman "can't function," Kramer Ex. 29 at 208:13, suggesting IPLLC was in danger of losing its contract with MegaFilm, *see* ECF 260 at 7. But the evidence does not support this narrative. Indeed, IPLLC and Csupó continued submitting takedown notices on MegaFilm's behalf months after their account was suspended. *See* Kramer Exs. 16a & 16b (dated Feb. 18, 2020); *id.* Ex. 17 (dated Feb. 19, 2020); *id.* Exs. 18a & 18b (dated Mar. 9, 2020).

---

[6] The alternative is that Khan, at Csupó's direction, uploaded hundreds of video clips after MegaFilm said to "take it all down." If that is the story Csupó now wants to run, Khan's second tranche of uploads was not authorized by MegaFilm despite Csupó's assertion that they were. That, in turn, would mean, as YouTube pleaded in the alternative, that the uploading breached the YouTube Terms of Service and was itself fraudulent because of the representation that the uploads were proper. *See* ECF 160 ¶¶ 2, 39-41, 54-75.

*Fourth*, the evidence contradicts Csupó's protestations that this was all Holman's (or Holman's employees'/agents') doing, and that Csupó was ignorant of it. *See* Kramer Ex. 29 at 179:13-180:16. In January 2020, half a year *before* filing this lawsuit, Csupó and Holman discussed the films that their Pakistani agent, Sarfraz Arshad Khan, uploaded. Kramer Exs. 22a & 22b; *see also id.* at 176:22-178:13. Based on this email alone, a jury could very well conclude Csupó was well-aware of the upload scheme *before* this lawsuit, actively participated in it, and designed the transfer of works from MegaFilm to Pirate Monitor Ltd. (and arranged for use of his personal VPN account) to avoid the implications of his earlier fraud.

A reasonable jury need not twist itself into knots trying to follow the inconsistencies of Csupó's story. They could and should believe YouTube's far simpler version: Csupó needed Content ID to make money from his collaboration with Holman and concocted a fraudulent scheme to try to get it.

## II.   CSUPÓ IS RESPONSIBLE FOR ACTING ON BEHALF OF OTHERS.

Even if a jury credited Csupó's story that his company—IPLLC—was the principal behind the fraud, Csupó still faces direct liability for sending the 1,975 fraudulent takedowns on IPLLC's behalf. Csupó is IPLLC's sole director. *See* Kramer Ex. 29 at 27:8-10. "Directors are jointly liable with the corporation and may be joined as defendants if they personally directed or participated in the tortious conduct." *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1379-80 (Cal. Ct. App. 2000), *as modified on denial of reh'g* (Apr. 7, 2000).

It is irrelevant whether Csupó was out for himself or acting as an agent of MegaFilm, an agent of IPLLC or someone else when he sent the fraudulent takedown notices. If acting as the agent of MegaFilm, he did so under its agreement with IPLLC, which is governed by "Act V of 2013 on the Civil Code" of Hungary. *See* ECF 260-8 § 9.2. Section 6:542(1) of that Act says: "If an agent causes damage to a third party in his capacity as an agent, the agent and the principal shall have joint and several liability towards the injured party." Alternatively, if Csupó was acting as the agent of IPLLC, presumably under California law, the same principles apply. "One who assumes to act as an agent is responsible to third persons as a principal for his acts in the course of his agency, . . . [w]hen his acts are wrongful in their nature." Cal. Civ. Code § 2343.

Indeed, "an agent is liable for his or her own torts, whether the principal is liable or not, and in spite of the fact that the agent acted in accordance with the principal's directions." *Peredia v. HR Mobile Servs., Inc.*, 25 Cal. App. 5th 680, 692 (Cal. Ct. App. 2018).

## III.    CSUPÓ IS RESPONSIBLE FOR WHAT HIS AGENTS DID.

Csupó's story about who sent the takedowns is no model of clarity. *See, e.g.*, Kramer Ex. 29 at 120:4-6 (admitting he sent them); *id.* at 121:20-25 (blaming a Holman associate). But even if a jury concluded that someone else sent the takedown notices, signed Csupó's name and added his home address and telephone number to them, Csupó would still be liable. As a principal, he cannot simply delegate away his liability. Rather, under the law he "is personally liable for the torts of [his] agent if [he] directed or authorized the agent to perform the tortious act, or if [he] ratified that act." *Karsant Fam. Ltd. P'ship v. Allstate Ins. Co.*, 2009 WL 188036, at *9 (N.D. Cal. Jan. 27, 2009) (citing *Shultz Steel Co. v. Hartford Accident & Indem. Co.*, 187 Cal. App. 3d 513, 519 (Cal. Ct. App. 1986)); *accord Logtale, Ltd. v. Canton*, 2021 WL 5908412, at *3 (N.D. Cal. Dec. 14, 2021); *see also Enttech Media Grp. LLC v. Okularity, Inc.*, 2020 WL 6888722, at *5 (C.D. Cal. Oct. 2, 2020) (agent's lack of good faith belief of infringement in sending DMCA takedown notice imputed to principal under §512(f)). The same is true under Hungarian law. *See* Hungarian Act No. V of 2013 on the Civil Code § 6:542(1). And the agency relationship is itself a fact-intensive question. *See Whitlow v. Rideout Mem'l Hosp.*, 237 Cal. App. 4th 631, 635 (Cal. Ct. App. 2015) ("[T]he issue of agency is a quintessential question of fact.").

Csupó argues that because "Mr. Holman himself was a lawful sub-agent of MegaFilm," that "neither IPLLC nor Mr. Csupo can be held liable for his acts." ECF 260 at 17. But Csupó admits that he personally "gave permission to Mr. Holman and his agents to send in Takedown Notices on behalf of IPLLC and its client MegaFilm kft." *Id.* at 2; *see also* Kramer Ex. 29 at 121:20-25. A jury could find that IPLLC delegated its duties under the MegaFilm agreement to Csupó, who in turn tasked Holman and others with sending the takedown notices. Indeed, Csupó claimed at deposition that he personally was "the authorized representative of Mega Film." Kramer Ex. 29 at 130:3-5. And when MegaFilm supposedly wanted all of its content removed from the service, it "called [Csupó] up personally as the representative and acting agent of

IPLLC." *Id.* at 204:15-16. That is consistent with the record. The takedown notices identify "Gábor Csupó," not IPLLC, as the claimant submitting the notices on MegaFilm's behalf, and they contain Csupó's personal information. *See e.g.*, ECF 260-12; ECF 260-13. Even if others actually sent them, could a reasonable jury conclude Csupó directed or ratified the fraudulent takedown notices? Of course it could.

*Direction*: The evidence shows that Csupó and Holman desperately wanted Content ID to make money from their contract with MegaFilm. *See supra* at 3. When they could not prove a *need* for Content ID, they tried to manufacture one. *See supra* at 3-7; *see also* Kramer Ex. 29 at 121:20-25 (admitting that the individual who physically sent the fraudulent takedown notice "had [Csupó's] authorization to do this"). Csupó's different—and nonsensical—story (one in which Holman's associates did everything wrong without his knowledge or direction, *see* ECF 260 at 7-8) does not take this factual inquiry out of the hands of the jury. Rather, a jury will consider the competing stories and recognize that Csupó knew all about the fraud, participated in it, or at the very least, directed others to accomplish it. *See supra* at 11-13.

*Ratification*: After YouTube suspended IPLLC's and Pirate Monitor LLC's accounts in response to the fraudulent takedown notices, Csupó personally defended the notices and demanded reinstatement, complaining that the suspension prevented them from submitting further takedown requests. Zhu Ex. 16. In so doing, Csupó took responsibility for the fraudulent notices.

Csupó thus cannot escape liability by arguing that those who carried out his scheme were "subagents" whose conduct he is not responsible for. *See Davis v. Wal-Mart Stores Inc.*, 2017 WL 499595, at *3 (C.D. Cal. Feb. 6, 2017) (agent is liable for subagent's conduct if agent "improperly co-operates in the latter's acts or omissions" (quoting *Baisley v. Henry*, 55 Cal. App. 760, 763 (Cal. Ct. App. 1921))); *see also infra* at 16-17. In any event, Csupó makes no attempt whatsoever to carry his burden of persuasion as to the subagency theory under *Hungarian* law, *i.e.*, the law chosen by parties to the MegaFilm policing contract. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

IV.     **CSUPÓ IS RESPONSIBLE FOR WHAT HIS ALTER EGO (IPLLC) DID.**

Even if the jury somehow found that Csupó is not liable for his own actions or the actions of his agents, it could still hold him jointly liable based on findings that: (a) IPLLC is liable for the fraudulent takedown notices; and (b) Csupó is IPLLC's alter ego.

A.     **A Jury Could Hold IPLLC Liable For The Fraudulent Takedown Notices.**

Csupó invokes a subagency theory, saying IPLLC is not liable for the actions of those it charged with acting for it, like Holman. *Cf.* ECF 260 at 17. Csupó points out IPLLC's agreement with MegaFilm unremarkably provides that "[a]ll employees and representatives of the Agent [(IPLLC)] are entitled to act as deputy on behalf of [IPLLC]," ECF 260-8 at -126, in carrying out IPLLC's duty to "monitor the YouTube portal," *id.* § 2.3, and "act to remove infringements," ECF 260 at 6. According to Csupó, that provision "specially authorized" IPLLC to appoint Holman as MegaFilm's subagent so as to absolve IPLLC (and Csupó) of responsibility for Holman's wrongdoing. ECF 260 at 17 (citing Cal. Civ. Code §§ 2349, 2351). Not so.

Even beyond Csupó's personal involvement, a jury could reasonably conclude that IPLLC is responsible for the fraud irrespective of whether its agents (like Holman) are *also* liable. *See, e.g.*, Kramer Ex. 29 at 190:8-191:12. After all, if the fraud had worked, IPLLC would have been a main beneficiary. *See supra* at 3. IPLLC should be liable for the authorized or ratified actions of its agents in sending the notices. *See Logtale*, 2021 WL 5908412, at *3.

Movants invoke California Civil Code Section 2351, but it does not relieve IPLLC of responsibility here.[7] It "contemplate[s] a situation where an agent appoints somebody completely independent to assume a responsibility." *George F. Hillenbrand, Inc. v. Ins. Co. of N. Am.*, 104 Cal. App. 4th 784, 822 (Cal. Ct. App. 2002) (quoting trial court with approval). It "does not provide an escape hatch" for companies to avoid liability when they act through their employees and representatives, as corporate entities must. *Id.* at 824.

---

[7] Csupó's motion does not address what law applies to this question. *See Hansen v. Integrity Assets LLC*, 2021 WL 5999317, at *4 (C.D. Cal. Dec. 20, 2021) ("declin[ing] to conduct the choice-of-law analysis for [movant]" where movant "fail[ed] to address choice of law [contract provision] at all").

1    That escape hatch is precisely what Csupó wants. Although Csupó testified that IPLLC

2    has no "employees," he made clear that "Endre Holman is running [IPLLC] for [Csupó]."

3    Kramer Ex. 29 at 134:23-24. There "is no evidence [MegaFilm] could control the acts of

4    [Holman] or that [MegaFilm] agreed [IPLLC] would be absolved of liability when it acted in the

5    only way a corporation can act," *George F. Hillenbrand*, 104 Cal. App. 4th at 824—through its

6    "employees and representatives," ECF 260-8 at -126. To the contrary, IPLLC's agreement with

7    MegaFilm merely recognized the obvious fact that IPLLC's "employees and representatives"

8    could act "on behalf of" *IPLLC. Id.* And there are at least questions of fact as to whether Csupó,

9    as opposed to MegaFilm, controlled Holman's activities. Csupó himself testified that "Endre

10   Holman was *IPLLC's* authorized agent to . . . act on behalf of -- of *my* instructions." Kramer Ex.

11   29 at 217:12-14 (emphases added); *see also id.* at 175:8-10 (Csupó "told [Holman] to promote

12   [MegaFilm's] films with short snippets and – and with – with commercials or trailers"), 208:25-

13   209:4 (Csupó claiming that he personally gave Holman the instruction to remove all MegaFilm's

14   content from YouTube).

15   Beyond that, even if a jury found that those who sent the takedown notices bearing

16   Csupó's name were acting as MegaFilm's subagent(s), a jury still could find that IPLLC remains

17   liable because it directed or participated in those actions. *Supra* at 3-7; *see Davis*, 2017 WL

18   499595, at *3. Or, a jury could find that IPLLC's scheme was not authorized by MegaFilm,

19   which means § 2351 would not apply. Nothing in the MegaFilm/IPLLC agreement authorizes

20   IPLLC to appoint subagents to secure the removal of non-infringing content through

21   misrepresentations. *See* ECF 260 at 6 (MegaFilm only "authorized IPLLC to monitor YouTube

22   and act to remove infringements").

23   **B.    A Jury Could Find That Csupó Is The Alter Ego Of IPLLC.**

24   Courts will disregard the corporate form and hold an individual liable as an alter ego

25   where (1) "there is a sufficient unity of interest and ownership . . . that the separate personalities

26   of the individual and the corporation no longer exist"; and (2) "treating the acts as those of the

27   corporation alone will sanction a fraud, promote injustice, or cause an inequitable result." *Misik*

28   *v. D'Arco*, 197 Cal. App. 4th 1065, 1072 (Cal. Ct. App. 2011). This is a case-specific fact

1    question not governed by "prior decisions involving factual situations which appear to be

2    similar." *Toho-Towa Co. v. Morgan Creek Prods., Inc.*, 217 Cal. App. 4th 1096, 1108 (Cal. Ct.

3    App. 2013) (citations omitted).

4            *Unity of Interest and Ownership*. Although IPLLC has withheld much of the information

5    requested in YouTube's document subpoena about its corporate operations, *see infra* at 19-20,

6    the current record alone easily supports a finding that IPLLC is a mere facade for Csupó and

7    Holman's partnership. Fearing that Hollywood studios would not do business with a Hungarian

8    entity, Csupó purchased IPLLC for $1. *See supra* at 2; Kramer Ex. 29 at 143:2-4. IPLLC has no

9    revenue, no assets, and no corporate bank account. *Id.* at 142:25-143:1, 144:24-145:4. It holds

10   board meetings with Csupó's other wholly-owned entity, Pirate Monitor Ltd., records of which

11   have not been produced. *Id.* at 145:5-146:1. Further, Csupó is the sole owner and director of

12   IPLLC, *id.* at 27:5-10, 36:19-21, 132:11-18, and equates himself to IPLLC, *see, e.g.*, *id.* at

13   179:19-24; *see also* Zhu Exs. 17a & 17b at -373 (identifying *Csupó—i.e.*, not IPLLC—as the

14   "Managing Director" of "Pirate Monitor LLC, authorized representative of MEGA FILM Kft.").

15   In other words, limited discovery from IPLLC strongly supports a finding that Csupó and IPLLC

16   share a unity of interest, and it strongly suggests that a complete production would confirm the

17   lack of separation between it and Csupó. *See infra* at 19-20.

18           *Inequitable Result*. Csupó wants to blame his fraudulent scheme with Holman on IPLLC,

19   a company with no assets, and absolve himself of liability for his actions. Permitting him to do

20   so would work precisely the kind of unjust result that the alter ego doctrine is intended to avoid.

21   *See McClellan v. Northridge Park Townhome Owners Ass'n, Inc.*, 89 Cal. App. 4th 746, 752-53

22   (Cal. Ct. App. 2001) ("It is well settled that when a corporation 'is used by an individual or

23   individuals … to perpetrate a fraud … a court may *disregard the corporate entity* and treat the

24   acts as if they were done by the individuals themselves ….'" (citation omitted)); *see also Almont*

25   *Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 2015 U.S. Dist. LEXIS 176870, at

26   *16 (C.D. Cal. Feb. 12, 2015).

27

28

1    **V.      RULE 56(D) PROVIDES AN ADDITIONAL REASON TO DENY THE MOTION.**

2          Throughout discovery in this case, Csupó and Pirate Monitor Ltd. have hidden the ball. In

3    their answers to YouTube's counterclaims, Csupó and Pirate Monitor Ltd. asserted that another

4    "entity" was responsible for sending the DMCA takedown notices underlying those claims.

5    Kramer Decl. ¶ 29. But in their initial disclosures, they never identified IPLLC (or Holman or

6    Búzás or Kálomista or MegaFilm or Khan) as witnesses possessing relevant information. *Id.* ¶ 28

7    & Ex. 31. Now, they say the "entity" they failed to identify was IPLLC, as if it was someone

8    separate from Csupó. *See* ECF 260 at 16. Further, while Csupó owns and controls IPLLC, and it

9    is plainly his alter ego, he refused to produce documents from IPLLC in response to the

10   discovery that YouTube served on him personally. YouTube indulged Csupó's fiction that

11   IPLLC was a separate party, and served IPLLC with a subpoena. Kramer Decl. ¶ 32.

12         IPLLC—represented by Plaintiffs' attorneys who also represent Pirate Monitor Ltd. and

13   Csupó—continued the obstruction. It refused to produce documents unless: (1) they were in

14   Csupó's possession; (2) in the U.S.; and (3) Csupó decided the documents relate to IPLLC as

15   opposed to one of the other entities he controls (as if there was some actual distinction). *Id.*

16   ¶¶ 31, 34. Critically, IPLLC has not denied that there are other responsive documents under

17   Csupó's control, or in possession of IPLLC personnel outside the United States. On June 8,

18   2022, after protracted meet and confer efforts (and before the close of fact discovery in this

19   case), YouTube moved to enforce the subpoena in the District of Delaware as Rule 45 requires.

20   On February 21, 2023, the Delaware court held a hearing on the motion and, finding exceptional

21   circumstances, transferred the motion here. *YouTube, LLC v. Intellectual Property LLC*, No. 23-

22   cv-1100-JD, ECF 1 (N.D. Cal.). That motion is now pending before the Court. Kramer Decl.

23   ¶ 36.[8]

24

25

26         [8] On March 6, 2023—after the Delaware court announced its intent to transfer the motion
     to compel and after Csupó and Pirate Monitor Ltd. filed their summary judgment motion—
27   IPLLC produced its first and only privilege log along with an email chain and attached
     information sheet about the Pirate Monitor software. Kramer Decl. ¶ 37. That meager, belated
28   production of documents previously withheld as privileged does not come close to meeting
     IPLLC's discovery obligations, but shows that there are other documents being withheld.

The motion seeks to compel production of: (1) documents relating to Csupó, Pirate Monitor Ltd., or Content ID, as well as agreements between IPLLC and Csupó, Pirate Monitor Ltd., or MegaFilm; (2) documents and communications related to the DMCA takedown notices that IPLLC sent to YouTube; (3) documents regarding IPLLC's agents, including communications with Holman, Zoltan Búzás or Sarfraz Arshad Khan and/or Ransom Nova; and (4) documents reflecting IPLLC's observation of corporate formalities. Kramer Decl. ¶ 35(a)-(d). The limited discovery YouTube has obtained already makes a compelling case for Csupó's and Pirate Monitor Ltd.'s liability. But it also strongly suggests that a complete production from IPLLC would confirm Csupó's personal knowledge of and involvement in the scheme and/or the absence of corporate lines between Csupó and his entities such that neither IPLLC nor Pirate Monitor Ltd. should be treated as distinct legal entities from one another or from Csupó. *Id.* For example, neither IPLLC, Csupó, nor Pirate Monitor Ltd. have produced communications between Holman and those he worked with regarding the fraudulent takedown notices. *Id.* Nor has anyone produced minutes from IPLLC's board meetings, which were jointly held with Pirate Monitor Ltd. *Id.*

Because this information, which speaks directly to Csupó's and Pirate Monitor Ltd.'s involvement in and liability for the fraudulent scheme, is "the subject of outstanding discovery requests" at the time YouTube's opposition is due, Rule 56(d) provides an additional ground for this Court to deny the motion. *See Helton v. Factor 5, Inc.*, 2012 WL 2072848, at *4 (N.D. Cal. June 8, 2012) (quoting *VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475 (9th Cir. 1986)).

## VI.   YOUTUBE'S REQUESTED REMEDIES ARE PROPER.

### A.   YouTube's Damages Include Its Investigation Costs And Attorneys' Fees.

Section 512(f) provides for recovery of "*any damages, including costs and attorneys' fees*, incurred by the alleged infringer . . . as the result of the service provider relying upon [the] misrepresentation in removing or disabling access to the material or activity claimed to be infringing." (emphasis added). YouTube's damages from Csupó's fraudulent scheme plainly include the significant costs YouTube incurred in its investigation. *See* 17 U.S.C. § 512(f);

1   *Automattic Inc. v. Steiner*, 82 F. Supp. 3d 1011, 1031 (N.D. Cal. 2015) (§ 512(f) plaintiff may

2   recover damages based on its "employees' lost time" because "the time they spent as a result of

3   Defendant's takedown notices was time they could not spend on other projects"); *see* Zhu Decl.

4   ¶ 23. The statute also makes plain that damages include the attorneys' fees YouTube has been

5   forced to spend to establish the misconduct and litigate liability, including the instant motion.

6       Congress enacted § 512(f) not only to remedy harm caused by knowing abuses of the

7   DMCA's notice-and-takedown process but also to deter fraudsters from engaging in such abuses

8   in the first place. *See* S. Rep. No. 105-190, at 49; H.R. Rep. No 105-551, at 59 ("This subsection

9   is intended to deter knowingly false allegations to service providers in recognition that such

10  misrepresentations are detrimental to rights holders, service providers, and Internet users."). The

11  statute thus provides that prevailing plaintiffs "shall" be entitled to "any damages, including

12  costs and attorneys' fees" as a matter of right, overriding the Copyright Act's default permissive

13  fee-shifting standard. *Cf.* 17 U.S.C. § 505. Section 512(f)'s recognition of attorneys' fees as

14  damages furthers Congress' objectives of safeguarding the DMCA's notice-and-takedown

15  regime through meaningful private rights of action and deterring bad actors.

16      Relying on a single district court decision, Csupó and Pirate Monitor Ltd. assert that

17  attorneys' fees are recoverable under § 512(f) "*only* where a plaintiff retained an attorney to

18  remove or disable access to the material." ECF 260 at 18 (citing *Lenz v. Universal Music Corp.*,

19  2010 WL 702466, at *11 (N.D. Cal. Feb. 25, 2010)). That interpretation is contrary to § 512(f)'s

20  text and Congress' interest in deterrence of misconduct. It is thus no surprise that, on appeal, the

21  Ninth Circuit took a different view of the law. Without directly reversing, the court observed that

22  the plaintiff's *litigation* costs and attorneys' fees "arose as a result of the injury incurred" and

23  assumed the trial court would consider those on remand. *See Lenz v. Universal Music Corp.*, 815

24  F.3d 1145, 1157 (9th Cir. 2016). Further, courts routinely award *litigation* costs and attorneys'

25  fees under § 512(f). *See Automattic*, 82 F. Supp. 3d at 1033 (awarding under 512(f) attorneys'

26  fees incurred in bringing suit); *see also Cal. Beach Co. v. Han Xian Du*, 2020 WL 6260013, at

27  *3 (N.D. Cal. Oct. 6, 2020) (same), *report and recommendation adopted*, 2020 WL 6271225

28

1   (N.D. Cal. Oct. 26, 2020); *Signal 23 Television v. Anthony*, 2020 WL 11206863, at *4 (N.D. Ga.

2   Sept. 1, 2020) (same). YouTube's litigation costs are a proper element of its damages claim.

3   **B.    YouTube Has Standing To Seek Injunctive Relief.**

4          Csupó and Pirate Monitor Ltd. contend that YouTube lacks standing to seek injunctive

5   relief that would prevent them from continuing or renewing their fraudulent scheme. ECF 260 at

6   19. Not so. Csupó and Pirate Monitor Ltd. have continually refused to take responsibility for

7   their actions, much less forswear similar misconduct in the future.[9] Again, Csupó sent thousands

8   of false DMCA takedown notices as part of an artifice to gain access to YouTube's powerful

9   copyright management tools. *Supra* at 5-6. When he and his cohorts were caught, Csupó first lied

10  about the scheme in an audacious protest, then engaged in a corporate shell game to continue

11  their venture by having a "clean[er]" Pirate Monitor Ltd. bring claims in this action seeking

12  access to those tools. ECF 1; Kramer Decl. Ex. 29 at 237:22-238:9.

13         Although YouTube was able to detect *this* scheme and, with the aid of some civil

14  discovery, unravel the complex web of actors spanning the globe, it has now revealed its method

15  of detection to Csupó, Holman, IPLLC, Pirate Monitor Ltd., and any other entity they might have

16  waiting in the wings. Indeed, after YouTube caught on to their earlier scheme, Csupó and

17  Holman made sure that Pirate Monitor Ltd. secured its own VPN in an apparent attempt to mask

18  their IP address and the connection between those entities before starting Pirate Monitor Ltd.'s

19  campaign against YouTube. *Supra* at 9. Csupó's and Holman's motives of securing access to

20  Content ID, their demonstrated willingness to conceal identities, their failure to accept

21  responsibility, and the harm their months-long scheme has caused, demonstrate the need for

22  injunctive relief. *See Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) ("[W]here the

23  defendants have repeatedly engaged in the injurious acts in the past, there is a sufficient

24

25         [9] Counterclaim Defendants make a passing assertion that Csupó is "no longer engaged in
    the business of representing clients in connection with copyright infringement." ECF 260 at 4.
26  Conspicuously absent is any declaration or citation to that effect. In any event, given
    Counterclaim Defendants' pattern of fraudulent behavior and attempts to conceal their identities,
27  Csupó supposed voluntary cessation of policing activities does not eliminate the threat of future
    harm to YouTube. *Cf. Oracle USA, Inc. v. Rimini St., Inc.*, 783 F. App'x 707, 710 (9th Cir. 2019)
28  (defendant's assertion that it had "ceased the challenged conduct" did not prevent entry of
    permanent injunction).

1   possibility that they will engage in them in the near future . . . ."), *abrogated on other grounds by*

2   *Johnson v. California*, 543 U.S. 499 (2005); *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir.

3   2012) ("pattern" and "practice" of wrongful conduct makes repetition "sufficiently likely" to

4   warrant injunction).

5          Csupó and Pirate Monitor Ltd.'s cases are inapposite. In all but one, the plaintiffs

6   controlled whether they would again encounter the alleged harm, and they were unable to muster

7   more than the abstract possibility that they might.[10] The remaining case involved tenuous

8   speculation by a plaintiff for why he might get caught up in unwarranted parole searches directed

9   at his parolee friends. *See Littlejohn v. SF City*, 2010 WL 5158330, at *2 (N.D. Cal. Dec. 14,

10  2010). None of those cases involved defendants who engaged in a months-long scheme to

11  defraud the plaintiff and demonstrated a willingness for donning and doffing corporate masks to

12  evade liability. YouTube should not be forced to continue expending substantial sums to try to

13  police against further misconduct by Csupó, IPLLC, Pirate Monitor Ltd. or their agents (or

14  mysterious subagents).

15  **VII.    PIRATE MONITOR LTD. IS RESPONSIBLE FOR WHAT ITS ALTER EGO**
16  **          (CSUPÓ) DID.**

17         Csupó disregarded corporate formalities with Pirate Monitor Ltd. just as much as he did

18  with IPLLC. He purchased and funded Pirate Monitor Ltd. with $1. *See supra* at 8. He is the sole

19  owner, director, and shareholder. *See* Kramer Ex. 29 at 25:23-26:2, 26:13-21, 58:11-14, 132:11-

20  18. He blended Pirate Monitor Ltd.'s and IPLLC's board meetings. *See id.* at 145:5-146:17.

21  Pirate Monitor Ltd. also held IPLLC's records, as it produced a smattering of IPLLC documents

22  in discovery. *See, e.g.*, Kramer Ex. 6; *id.* Exs. 18a & 18b; *id.* Exs. 16a & 16b; *id.* Exs. 2a & 2b.

23  ───────────────

24         [10] *See Mauia v. Petrochem Insulation, Inc.*, 2018 WL 3241049, at *11 (N.D. Cal. July 3,
      2018) (wage-and-hour plaintiff had not been employed by the defendant for years and did not
25    allege that he "may seek future employment" with the defendant); *Miranda v. Coach, Inc.*, 2015
      WL 636373, at *3 (N.D. Cal. Feb. 13, 2015) ("The named plaintiffs here are former employees
26    long gone from working at Coach and with no alleged prospect of ever returning to employment
      there."); *Izquierdo v. Panera Bread Co.*, 450 F. Supp. 3d 453, 460 (S.D.N.Y. 2020) ("[O]ne may
27    reasonably infer [from plaintiff's own allegations] that now that he is aware of the Bagel's
      ingredients, he will not purchase it again."); *Gil v. City of Pensacola, Fla.*, 396 F. Supp. 3d 1059,
28    1062 (N.D. Fla. 2019) (ADA plaintiff did not "allege any concrete plans to move to, or even
      visit, Pensacola; instead, he only considers the City to be a 'viable living option' that he is
      considering").

1  Csupó did not create a separate bank account for Pirate Monitor Ltd. *Id.* Ex. 29 at 77:23-78:7.

2  And Pirate Monitor Ltd.'s only source of funding is from Csupó's "personal savings," *id.* at

3  84:15-85:3, as was the case when Csupó used ███████████████████████████████████

4  ████████████████. *See id.* Exs. 25a & 25b. Pirate Monitor Ltd. operates out of Csupó's

5  home. *See id.* Ex. 29 at 55:19-56:10. It has not generated any revenue. *See id.* at 77:3-5. It has

6  zero cash on the balance sheet. *See id.* at 77:17-22. And Csupó was not sure if Pirate Monitor

7  Ltd. even has a corporate email address. *See id.* at 98:15-21. In short, there is a unity of interest

8  between Csupó and Pirate Monitor Ltd.

9      Counterclaim Defendants assert without valid citation that to hold Pirate Monitor Ltd.

10  liable there must have been a unity of interest at the time of the alleged wrong. ECF 260 at 9. But

11  that requirement is nowhere stated in the alter ego test. *See id.* (citing only an unpublished

12  California case). While lack of a unity of interest at the time of the alleged wrong may bear on

13  the inequitable-result inquiry, it does not shelter entities that, like Pirate Monitor Ltd., were

14  established to conceal a past fraud. *See Prompt Staffing, Inc. v. United States*, 321 F. Supp. 3d

15  1157, 1161 (C.D. Cal. 2018) ("Each time that trouble looms or Byrne's creditors come close to

16  claiming their debts, Byrne clears the chess board, enlists one of his pawns to open a new

17  staffing agency, and moves all the clients and resources to the new agency."); *see also Blizzard*

18  *Energy, Inc. v. Schaefers*, 71 Cal. App. 5th 832, 847-48 (Cal. Ct. App. 2021).

19      The only remaining question is whether treating Csupó and Pirate Monitor Ltd. as

20  separate entities would "sanction a fraud, promote injustice, or cause an inequitable result."

21  *Misik*, 197 Cal. App. 4th at 1072. It would. For starters, it is unclear whether Csupó has

22  sufficient assets to cover an adverse judgment in this case. Pirate Monitor Ltd. has at least some

23  assets that could cover damages—i.e., the exclusive "internet rights" to movies it received from

24  MegaFilm. *See* Kramer Ex. 24; *see also id.* Ex. 29 at 76:16-24. Moreover, holding Pirate

25  Monitor Ltd. liable is necessary to protect YouTube from future harm. The only reason Csupó

26  spent a dollar to buy Pirate Monitor Ltd. was to try to come up with a "clean" entity to use

27  against YouTube despite his earlier fraud. *See id.* Exs. 28a & 28b. He also used this "clean"

28  entity to apply for Content ID. *See, e.g.*, Zhu Ex. 20. As discussed above, absent an injunction

1  against Pirate Monitor Ltd., that company could be used to repeat or revive these fraudulent

2  efforts to obtain Content ID. *See supra* at 5-9. Ignoring that Pirate Monitor Ltd. is a pawn in

3  Csupó and Holman's larger scheme to obtain Content ID by fraud would perpetuate injustice and

4  invite further machinations that YouTube will be forced to expend further resources to detect and

5  (hopefully) prevent. *See Misik*, 197 Cal. App. 4th at 1072; *see also Yoo v. Safeco Ins. Co. of Am.*,

6  2022 WL 2704048, at *2 (N.D. Cal. July 12, 2022); *Ming-Hsiang Kao v. Holiday*, 58 Cal. App.

7  5th 199, 207 (Cal. Ct. App. 2020); *Claremont Press Publ'g Co. v. Barksdale*, 187 Cal. App. 2d

8  813, 817 (Cal. Ct. App. 1960).

9  ## CONCLUSION

10       For all these reasons, Csupó and Pirate Monitor Ltd.'s motion should be denied.

11

12

13      Respectfully submitted,

14  Dated:  March 24, 2023     WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation

15

16      By:  */s/ David H. Kramer*

17        David H. Kramer

18      Attorneys for Defendants and
    Counterclaimants

19      YOUTUBE, LLC and GOOGLE LLC

20

21

22

23

24

25

26

27

28