DAVID H. KRAMER, SBN 168452
MAURA L. REES, SBN 191698
LAUREN GALLO WHITE, SBN 309075
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: dkramer@wsgr.com
       mrees@wsgr.com
       lwhite@wsgr.com

BRIAN M. WILLEN (admitted *Pro Hac Vice*)
CATHERINE R. HARTMAN (admitted *Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
Email: bwillen@wsgr.com
Email: chartman@wsgr.com

Attorneys for Defendants and Counterclaimants
YOUTUBE, LLC and GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>YOUTUBE, LLC and GOOGLE LLC,<br><br>Defendants<br><br>YOUTUBE, LLC and GOOGLE LLC,<br><br>Counterclaimants,<br><br>v.<br><br>PIRATE MONITOR LTD, PIRATE MONITOR LLC, and GÁBOR CSUPÓ,<br><br>Counterclaim Defendants. | CASE NO.: 3:20-cv-04423-JD<br><br>**DECLARATION OF CHENYUAN ZHU IN SUPPORT OF DEFENDANTS AND COUNTERCLAIMANTS' OPPOSITION TO COUNTERCLAIM DEFENDANTS PIRATE MONITOR LTD. AND GABOR CSUPO'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: April 13, 2023<br>Time: 10:00 a.m.<br>Dept.: 11<br>Judge: Hon. James Donato<br><br>**PUBLIC VERSION – REDACTED** |

I, Chenyuan Zhu, declare as follows:

1. I am currently a Product Manager for Content ID for Defendant Google LLC ("YouTube"). I previously worked in and then led YouTube's copyright operations team. I am familiar with YouTube's practices regarding copyright operations, including the business records YouTube regularly creates and maintains related to those operations. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently to them.

**DMCA Notice-and-Takedown Process**

2. One of the ways in which YouTube has sought to support the interests of copyright holders is by developing and implementing robust procedures for complying with the Digital Millennium Copyright Act's ("DMCA") notice-and-takedown process. Once YouTube receives a notification of alleged infringement, YouTube uses a largely automated process to screen each notice to determine whether they contain the information and representations required for a DMCA notice – that is, does the notice identify the allegedly infringed work; identify the allegedly infringing material; provide the complaining party's contact information; and contain representations that the person submitting the request is authorized to act on behalf of the copyright owner and has a good faith belief that the allegedly infringing material is not authorized by the copyright owner, its agent, or the law. *See* 17 U.S.C. § 512(c)(3)(A). If a notice contains the required representations and does not otherwise carry indications of mistake or abuse, YouTube acts expeditiously to remove the identified material from its service or disable access to it.

3. On rare occasions YouTube may ask for more information from a party submitting a takedown notice, but it is in no position to ultimately determine issues such as whether the party sending the notice is, in fact, the owner or agent of the owner claiming the copyright interest asserted in the notice; whether the video the notice claims is infringing is, in fact, an infringement; or whether an allegedly infringing video is, in fact, authorized (*e.g.*, via a license agreement).

**YouTube's Content ID System**

4.  While YouTube complies in all respects with safe harbor provisions of the Digital Millennium Copyright Act ("DMCA"), YouTube's efforts in helping copyright owners and content creators protect against unwanted use of their works goes far beyond what the law requires. For example, YouTube has invested hundreds of millions of dollars to develop and operate Content ID, an Emmy-award-winning content identification system that uses digital fingerprinting technology to help identify copyrighted materials. Using Content ID, rightsholders and/or their agents can be automatically notified of user-uploaded videos that "match" what they claim are their copyrighted works and can choose in advance what they want to happen when those videos are detected, including options to "monetize" the videos, (*i.e.* earn advertising revenue when users watch the videos) or to "block" the videos from appearing altogether.

5.  Content ID is a powerful tool that can be misused to claim ownership of or restrict access to videos that are rightfully posted and shared by others on YouTube. In contrast to DMCA takedown notices, Content ID works automatically and can result in the blocking or removal of content without human intervention. It is precisely because this tool is susceptible to abuse that YouTube limits access to it to qualifying rights holders. Even without intentional censorship, Content ID could be misused in ways that result in overclaiming by rightsholders, whether because those rightsholders are not sufficiently sensitive to fair use or because they might indiscriminately block uses of their content even where these uses are authorized, such as musical works licensed to appear in a film.

6.  These concerns are not just hypothetical. For example, in or around December 2019, YouTube discovered that one of its Content ID partners was improperly asserting copyright ownership over video clips concerning a highly-publicized criminal proceeding. After an investigation, YouTube determined that the party was blocking video uploads related to that topic to censor the content, rather than to further a legitimate copyright interest. YouTube subsequently terminated the partner's access to Content ID.

7.  In or around January 2020, YouTube discovered that another Content ID partner had improperly blocked re-uploads of dozens of videos created by other high-profile users by

1 submitting that content as reference files to the Content ID tool, resulting in more than a thousand
2 Content ID claims. YouTube terminated that partner's access to Content ID as well.

3       8. Attached as **Exhibits 1-9** are true and correct copies of printouts of online news
4 articles and a YouTube video reporting on the harm that *misuse* of Content ID has caused. Each of
5 these sources discusses an actual incident that arose from the misuse of Content ID and that
6 YouTube worked to address.
7 For example, in the wrong hands, Content ID can lead to:

8       a. Accidental blocking of the rightsholder's own content (*e.g.*, Ex. 1_ (networks'
9       livestreams of Comic-Con were blocked by their own copyright claims));

10       b. Accidental blocking of other rights holders' legal content (*e.g.*, Ex. 2 (music label
11       claims videos uploaded by cinematographer from whom it had obtained non-
12       exclusive stock footage license); Ex. 3 (music publisher mistakenly blocked a K-
13       Pop group's video on behalf of Madonna), Ex. 4 (a news service claimed and
14       blocked all NASA footage of Mars landing)); and/or

15       c. Blocking of otherwise legal uses of copyrighted works, including educational and
16       political fair uses (*e.g.*, Ex. 5 (Harvard law copyright lecture blocked), Ex. 6 (NYU
17       copyright lecture blocked), Ex. 7 (music distributor claims sound recordings
18       uploaded under creative commons license), Ex. 8 (music publisher blocked a
19       Romney political ad including a clip of Obama singing, which the article
20       incorrectly attributes to a takedown notice), Ex. 9 (a clip of video game play was
21       blocked by an episode of Family Guy that reused the clip)).

22 These reports are a drop in the bucket in terms of the volume of misuse that occurs on the
23 Content ID platform. Similar problems arise daily, and require extensive resources for YouTube
24 to identify and address.

25       9. Attached as **Exhibits 10-12** are true and correct copies of printouts of online
26 articles reporting on the harm from *abuse* of Content ID. For example, in malicious hands,
27 Content ID has been used to:
28

a.  Stifle dissent (*e.g.*, Ex. 10 (copyright claims used to censor critic of Azerbaijan government); Ex. 11 (Turkish public broadcaster censors dissidents with copyright claims)); and

b.  Siphon millions from creators of legal content (*e.g.*, Ex. 12 (DOJ press release about thieves who claimed to own 50,000 songs, costing rightsholders $20M)).

Each of these news articles discusses an actual incident that arose from the abuse of Content ID that YouTube worked to address. Abuse of the Content ID system is not as rare as YouTube would like. We encounter problems like these regularly, and they too require extensive resources for YouTube to identify and address.

10.  There are far too many instances of Content ID misuse and abuse to recount, and incidents like them can occur without YouTube's knowledge. YouTube has likely avoided many more similar incidents by limiting access to Content ID to trustworthy, qualifying parties on the front end and working closely with Content ID users to help manage their use. YouTube's policies are designed to ensure that direct access to Content ID is made available to rightsholders who have a genuine need for it and are unlikely to misuse or abuse it, whether because of intentional censorship, overzealous claiming, or simple carelessness.

11.  While YouTube limits direct access to Content ID, rights holders can obtain the benefits of the system by partnering with one of hundreds of third-party intermediary services that have been vetted by YouTube and trained in the operation of the system and how to use it on behalf of third parties. For example, rather than have direct access to Content ID, a composer can rely on her publishing agent to use the system on her behalf, and on behalf of hundreds of other composers. A directory of Content ID intermediaries is available online at https://servicesdirectory.withyoutube.com/directory/#?services=content-id-management.

**Csupó/Pirate Monitor LLC/IPLLC Uploads and Corresponding Takedowns**

12.  Between August and November 2019, over 1,970 video clips were uploaded to YouTube. Those videos contained clips of at least one of the copyrighted works that Pirate Monitor Ltd. claimed in this lawsuit to own (the Hungarian film *Csak szek és más semi*), or clips from related works—including from the Hungarian film, *Zimmer Feri*, a prequel to *Zimmer Feri*

*2*, another of Pirate Monitor Ltd.'s alleged works in suit. The person or persons uploading these video clips used a variety of accounts and usernames, but many of them were variants of the name "Ransom Nova" (such as "RansomNova11," "RansomNova12").

13. In many cases, just a few days after the RansomNova-related accounts uploaded these videos to YouTube, and with the videos in many cases having no recorded views on YouTube, the videos were the subject of takedown requests from "Pirate Monitor, LLC"—using an account opened in the name of Gábor Csupó. Csupó claimed during the takedown request process to be an authorized representative of Mega Film Kft. ("Mega Film"), a movie producer based in Hungary.

14. According to YouTube's records maintained in the ordinary course of business regarding its receipt and processing of DMCA takedown notices, RansomNova-related accounts uploaded 117 YouTube videos allegedly containing Mega Film's copyrighted works between August 24 and September 3, 2019. RansomNova-related accounts uploaded another 247 YouTube videos allegedly containing Mega Film's copyrighted works between September 25 and September 28, 2019. YouTube received DMCA takedown notices for the first batch of RansomNova videos (the batch uploaded between August 24 and September 3, 2019) on October 11 and November 13, 2019. The notices were signed by Gábor Csupó and contained the address 5277 Shoshone Ave, Encino, California 91316 and phone number +1 310-994-8100. Each of the notices stated that the sender had a good faith belief that the specified video(s) were infringing Mega Film's copyright. YouTube received DMCA takedown notices for the second batch of RansomNova videos (the batch uploaded between September 25 and September 28, 2019) on November 11 and November 12, 2019. Again, the notices were signed by Gábor Csupó and contained the address 5277 Shoshone Ave, Encino, California 91316 and phone number +1 310-994-8100. Each of the notices stated that the sender had a good faith belief that the specified video(s) were infringing the copyrights of Mega Film.

15. Between October 7 and October 8, 2019, the RansomNova-related accounts uploaded nearly 800 more YouTube videos allegedly containing Mega Film's copyrighted work. Between October 29 and November 4, 2019, Gábor Csupó sent DMCA takedown notices to

1  YouTube claiming that those same YouTube videos infringed Mega Film's copyrights. Again, the
2  notices contained Csupó's address, phone number and electronic signature. Between November 4
3  to November 10, 2019, the RansomNova-related account uploaded a fourth batch of over 800
4  more videos that allegedly contained Mega Film's copyrighted works. Between November 13 and
5  November 15, 2019, YouTube received DMCA takedown notices for this fourth batch of videos
6  as well, which contained a representation that the videos infringed the copyrights of Mega Film.
7  Once again, each of those takedown notices were signed by "Gábor Csupó," and bore his address
8  and phone number.

9      16.    In reliance on Csupó's representations in the DMCA takedown notices that the
10 videos infringed Mega Film's copyrights, YouTube promptly disabled public access to the nearly
11 2000 videos identified in those takedown requests.

12     17.    Many of these DMCA takedown notices were for videos uploaded through the
13 "Ransom Nova" accounts within a short time after the videos were uploaded. For example, 99
14 clips were uploaded through the "Ransom Nova" account, "Amazing Channel," on November 10,
15 2019. All 99 clips were the subject of DMCA takedown notices four days later. At the time
16 YouTube received those takedown notices, none of the videos targeted in those notices had an
17 appreciable number of views on YouTube. In many cases, the videos targeted in takedown notices
18 had not recorded even a single view on YouTube.

19     18.    After observing this pattern of suspicious activity—including numerous uploads of
20 short clips of generally uniform length followed quickly by takedown notices for those same
21 videos which otherwise had not been viewed in many cases—Albina Gabrelyan, a full-time
22 member of YouTube's copyright operations team, escalated the suspicious activity to the team in
23 accordance with YouTube's policies. Attached as **Exhibit 13** is a true and correct copy of the
24 email she sent to the copyright operations team, which was stored by YouTube in the ordinary
25 course of business and produced in this action with the Bates number GOOG-SCHNDR-
26 00037970. In that email, Ms. Gabrelyan reports that the takedowns concerned "videos uploaded
27 **recently** + with the same **title** + all about 30-40 seconds in **length** + 0 **views**." Ex. 13. And every
28 video was uploaded from Pakistan with similar emails: "ransomnova19@gmail.com OR

1  ransomnova7@gmail.com OR ransomnova25@gmail.com OR ransomnova10@gmail.com." *Id.*

2  She also relays a statement from the Pirate Monitor LLC account reiterating its request for Content

3  ID: "I would like you to respond to our repeated request to enter Content ID due to the large

4  number of [notices]. We have not yet received a substantive answer on this matter." *Id.* (emphasis

5  omitted).

6      19.    Given my years of experience working in and managing the YouTube copyright

7  operations team, I am quite familiar with their regularly conducted activities. Moreover, I have

8  personal knowledge of this particular email because I was involved in the response to the issues

9  Ms. Gabrelyan identified. The copyright operations team regularly conducts activities like those of

10  Ms. Gabrelyan. This email chain was recorded at or near the time of her investigation into Csupó's

11  suspicious takedown requests by the person conducting that investigation and, thus, someone with

12  knowledge, and it was kept in the ordinary course of business. Documenting her investigation was

13  also the regular practice of the YouTube copyright operations team.

14      20.    YouTube conducted an investigation into the takedown notices and associated

15  videos. This investigation has required YouTube to expend considerable resources to, among other

16  things, review over 1,900 DMCA takedown notices sent by Csupó, remove the videos identified in

17  those notices, and analyze and compare the user accounts associated with both the video uploads

18  and the subsequent takedown requests.

19      21.    Among other things, YouTube's investigation revealed that most of the subject

20  videos were uploaded using Internet Protocol ("IP") addresses associated with Pakistan. Further,

21  the clips lacked any apparent order from the films, used nondescript, non-informative titles for the

22  clips, and were generally uniform and short in length (approximately 30 seconds in duration). *See,*

23  *e.g.*, https://www.youtube.com/channel/UCjD2F2LhPlWLUsGN2zWt70w.

24      22.    YouTube also discovered that the YouTube account used to send the takedown

25  requests between October and November 2019 in the name of Pirate Monitor LLC, was created

26  using an IP address in Hungary. This suggests that the person creating the account that was used

27  to send the takedown requests was based in Hungary. The Hungarian IP address that Csupó used

28  to send the takedown requests was the very same Hungarian IP address used repeatedly by

1  someone to log into one of the "Ransom Nova" YouTube accounts. In fact, "Ransom Nova,"
2  though ostensibly uploading videos from Pakistan, used the Hungarian IP address multiple times
3  to log into a Ransom Nova account at roughly the same time that "Pirate Monitor, LLC" was
4  logged into their own account and sending takedown requests from that same IP address. Further,
5  though Ransom Nova was apparently operating out of Pakistan (based on IP addresses associated
6  with the videos uploads), the recovery phone number that Ransom Nova provided for at least two
7  of the RansomNova accounts was a phone number in Hungary. One individual who has surfaced
8  in our investigation of the "Ransom Nova" YouTube accounts is Sarfraz Arshad Khan.

9       23.    YouTube's investigation was conducted by several YouTube employees in its
10 copyright operations team overseen by me over several days. YouTube still does not know the
11 full extent of Counterclaim Defendants' misconduct. I estimate, based on the hours spent on the
12 investigation and the salaries for the employees involved that the investigation cost well above
13 $20,000 in personnel time.

14      24.    On November 18, 2019, YouTube suspended Pirate Monitor LLC's account as a
15 result of the suspicious takedown notices. Attached as **Exhibit 14a** is a true and correct copy of
16 an email from YouTube dated November 18, 2019, as produced in this action by IPLLC with the
17 Bates number IPLLC_0000000067, under a CONFIDENTIAL designation. Attached as **Exhibit**
18 **14b** is a true and correct copy of a certified English language translated version of
19 IPLLC_0000000067. In that email, [REDACTED]
20 [REDACTED]
21 [REDACTED]

22      25.    On November 18, 2019, YouTube also closed IPLLC's YouTube account, which
23 was created using the same email address as the Pirate Monitor LLC account. Attached as
24 **Exhibit 15a** is a true and correct copy of an email from YouTube dated November 18, 2019, as
25 produced in this action by IPLLC with the Bates number IPLLC_0000000066, under a
26 CONFIDENTIAL designation. Attached as **Exhibit 15b** is a true and correct copy of a certified
27 English language translated version of IPLLC_0000000066. In that email, [REDACTED]
28

ZHU DECLARATION ISO OPPOSITION TO      -8-     CASE NO. 3:20-CV-04423-JD
COUNTERCLAIM DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

███████████████████████████████████

26. On December 2, 2019, YouTube received an email from Csupó regarding the suspension of IPLLC's account. Attached as **Exhibit 16** is a true and correct copy of that email, which was produced in this action with the Bates number GOOG-SCHNRD-00052417.

**Other Csupó/Pirate Monitor LLC/IPLLC/Pirate Monitor Ltd. Communications with YouTube**

27. In April 2019, before any of the uploads and corresponding takedowns described above, YouTube received a DMCA takedown notice that Gábor Csupó signed and sent from the email address usintellectualpropertyllc@gmail.com. In follow up correspondence regarding that takedown notice, Csupó identified himself as "Managing Director" of "Pirate Monitor LLC, Authorized Representative of MEGA FILM Ltd." Attached as **Exhibit 17a** is a true and correct copy of that email correspondence, which was produced in this action with the Bates number GOOG-SCHNDR-00000370. Attached as **Exhibit 17b** is a true and correct copy of the certified translated English version of GOOG-SCHNDR-00000370.

28. On June 3, 2019, YouTube received a DMCA takedown notice Gábor Csupó signed and sent from the email address usintellectualpropertyllc@gmail.com. That takedown notice provided the user name "Pirate Monitor LLC" and alleged that the video located at the URL www.youtube.com/watch?v=P2E3unUsUeE infringed Mega Film Kft.'s copyrighted work.

29. Later that month, YouTube received an application from Gábor Csupó for YouTube's copyright management tools, which includes Content ID. Attached as **Exhibit 18** is a true and correct copy of YouTube's June 3, 2019 response to that application, which includes the information that Csupó provided in the application and was produced in this action with the Bates number GOOG-SCHNDR-00000273. Csupó submitted the application for a company identified as "Intellectual Property LLC" and claimed that the company had submitted 11 takedown notices, the last of which on June 3, 2019. Ex. 18. YouTube rejected the application on June 5, 2019. *Id.*

30. On November 25, 2019, after YouTube had suspended Pirate Monitor LLC's and IPLLC's accounts due to the uploads and takedowns described above, YouTube received another Copyright Tools application from Gábor Csupó. In the application, Csupó provided his own name, and identified "Intellectual Property LLC" when asked for a company name. Csupó claimed in the application that IPLLC had submitted 1001 takedown notices for various works, including *Zimmer Feri* and *Csak szex és más semmi*. Attached as **Exhibit 19a** is a true and correct copy of YouTube's May 13, 2020 response to that application, which includes the information that Csupó provided in his application. The document was produced in this action with the Bates number GOOG-SCHNDR-00051540. Attached as **Exhibit 19b** is a true and correct copy of the certified translated English version of GOOG-SCHNDR-00051540. YouTube rejected the application on May 13, 2020. *Id.*

31. On April 21, 2020, YouTube received another Copyright Tools application signed by Gábor Csupó, this time identifying his company as "Pirate Monitor Ltd" and claiming that the company had submitted a single takedown notice on March 23, 2020. Attached as **Exhibit 20** is a true and correct copy of YouTube's June 9, 2020 response to that application, which includes the information that Csupó provided in the application. The document was produced in this action with the Bates number GOOG-SCHNDR-00034930. YouTube rejected the application on June 9, 2020. *Id.*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed this 24th Day of March 2023, at San Bruno, California.

                                                    */s/ Chenyuan Zhu*
                                                    Chenyuan Zhu

**ATTORNEY ATTESTATION**

I, David H. Kramer, am the ECF User whose ID and password are being used to file this document. In compliance with N.D. Cal. Civil L.R. 5-1(h)(3), I hereby attest that the concurrence in the filing of this document has been obtained from the signatory.

> */s/ David H. Kramer*
> David H. Kramer