# EXHIBIT 29

to the Declaration of Andrew T. Kramer

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4
 5   MARIA SCHNEIDER, UNIGLOBE        ) Case No.
     ENTERTAINMENT, LLC, and AST      ) 3:20-cv-04423-JD
 6   PUBLISHING LTD., individually and)
     on behalf of all others similarly)
 7   situated,                        )
                                      )
 8           Plaintiffs,              )
                                      )
 9           vs.                      )
                                      )
10   YOUTUBE, LLC and GOOGLE LLC,     )
                                      )
11           Defendants.              )
     _____)
12   YOUTUBE, LLC and GOOGLE LLC,     )
                                      )
13           Counterclaimants,        )
                                      )
14           vs.                      )
                                      )
15   PIRATE MONITOR LTD, PIRATE MONITOR)
     LLC, and GÁBOR CSUPÓ,            )
16                                    )
             Counterclaim Defendants. )
17   _____)
18   VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF
19       GÁBOR CSUPÓ, 30(B)(6) OF PIRATE MONITOR LTD
20
21     Remotely Testifying from Los Angeles, California
22
23   Stenographically Reported By:
24   Hanna Kim, CLR, CSR 13083
25   Job No. 5301969-A
```

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
 5    MARIA SCHNEIDER, UNIGLOBE        ) Case No.
      ENTERTAINMENT, LLC, and AST      ) 3:20-cv-04423-JD
 6    PUBLISHING LTD., individually and )
      on behalf of all others similarly )
 7    situated,                        )
                                       )
 8            Plaintiffs,              )
                                       )
 9            vs.                      )
                                       )
10    YOUTUBE, LLC and GOOGLE LLC,     )
                                       )
11            Defendants.              )
      _____ )
12    YOUTUBE, LLC and GOOGLE LLC,     )
                                       )
13            Counterclaimants,        )
                                       )
14            vs.                      )
                                       )
15    PIRATE MONITOR LTD, PIRATE MONITOR )
      LLC, and GÁBOR CSUPÓ,            )
16                                     )
              Counterclaim Defendants. )
17    _____ )
18           Virtual videoconference video-recorded
19    deposition of GÁBOR CSUPÓ, testifying as a 30(B)(6)
20    witness of PIRATE MONITOR LTD, taken on behalf of
21    the Defendants and Counterclaimants and pursuant to
22    the stipulations of counsel thereof, on Tuesday,
23    July 5, 2022, commencing at 10:47 a.m. and ending at
24    6:19 p.m., before Hanna Kim, CLR, Certified
25    Shorthand Reporter, No. 13083.
```

1    Csupó.

2         Q.    And can you spell your name, please.

3         A.    G-A-B-O-R is my first fame.  Last name is

4    Csupó, C-S-U-P-O.

5         Q.    Could you please state your current

6    address for record.

7         A.    My home address is 5277 Shoshone Avenue,

8    Encino, California 91316.

9         Q.    And do you understand that you are

10   testifying under oath as if you were in a court of

11   law; correct?

12        A.    I understand.  Correct.

13        Q.    If you do not understand a question I ask,

14   please say so and I will rephrase it.  Otherwise,

15   I'll assume you understood the question.

16             Is that fair?

17        A.    That's fair.  Thank you.

18        Q.    Please give audible answers.

19             Okay?

20        A.    Yes.

21        Q.    If you do not understand a question, say

22   so, and I will rephrase it.

23             Okay?

24        A.    (Witness nods.)

25        Q.    Please wait until I finish my question

```
 1              THE WITNESS:  I don't remem- --
 2              MR. ZELCS:  -- if you can.
 3              THE WITNESS:  -- I -- I don't remember
 4    that corporation, ma'am.
 5              MR. ZELCS:  Catherine, I think you
 6    misstated the name of the company, just for your
 7    help.
 8    BY MS. HARTMAN:
 9        Q.   You identified a number of entities that
10    you owned.
11              You identified NCAT [verbatim] Studios;
12    right?
13        A.   Yes.
14        Q.   And IP, LLC; correct?
15        A.   That's right.
16        Q.   Pirate Monitor LTD; right?
17        A.   That's right.
18        Q.   And what was the other entity you
19    identified?
20        A.   I said in -- I was a past owner of Klasky
21    Csupó Incorporated.
22        Q.   Thank you.
23              You're an owner of Pirate Monitor LTD;
24    right?
25        A.   That's right.
```

Page 26

1        Q.    Are you the sole owner?

2        A.    Yes.

3        Q.    And what are your duties at Pirate Monitor

4    LTD?

5        A.    I'm sorry.

6        Q.    What are your duties at Pirate Monitor

7    LTD?

8        A.    To require -- inquire content and promote

9    it [verbatim].

10       Q.    For how long have you been the owner of

11   Pirate Monitor LTD?

12       A.    Since January 2020.

13       Q.    And are you the sole share owner of Pirate

14   Monitor LTD?

15       A.    Absolutely, hundred percent.

16       Q.    And are you the sole director of Pirate

17   Monitor LTD?

18       A.    I'm sorry?

19       Q.    Are you the sole director of Pirate

20   Monitor LTD?

21       A.    Yes.

22       Q.    And are you the sole owner of Intellectual

23   Property LLC?

24       A.    Yes.

25       Q.    For how long have you been an owner of

1   Intellectual Property LLC?

2        A.    I don't recall it exactly.   Probably a few

3   years before I -- I -- I purchased Pirate Monitor

4   LTD; around 2019, my estimation would be.

5        Q.    Are you the sole share owner of

6   Intellectual Property LLC?

7        A.    Yes.

8        Q.    And are you the sole director of

9   Intellectual Property LLC --

10       A.    Yes.

11            MR. ZELCS:   Again, please let her finish

12   the question before you start to answer or we're

13   going to have a bad record.

14            THE WITNESS:   Okay.

15   BY MS. HARTMAN:

16       Q.    You currently live in Encino, California;

17   correct?

18       A.    Correct.

19       Q.    And you gave your address as 5277 Shoshone

20   Avenue, Encino, California; correct?

21       A.    Correct.

22       Q.    For how long have you lived there?

23       A.    Twelve years.

24       Q.    Were you involved in any steps to preserve

25   evidence in connection with this lawsuit?

1    In my mind, I already answered your question, ten

2    questions ago.

3         Q.   Did you identify documents responsive to

4    requests to Intellectual Property LLC?

5         A.   I don't know if I did or not.

6         Q.   You don't know if you identified documents

7    responsive to requests to Intellectual Property LLC?

8         A.   I don't know.

9         Q.   Are there documents located in Hungary

10   that are responsive to this -- strike that.

11             Are there documents located in Hungary

12   that are relevant to this lawsuit?

13        A.   I don't believe so.

14        Q.   Okay.  Intellectual Property LLC produced

15   documents in this action on July 3rd, 2022; right?

16        A.   If you say so, it must be so.

17        Q.   You don't know?

18        A.   No, I don't know.

19        Q.   You're the sole owner of Intellectual

20   Property LLC; right?

21        A.   That's right.

22        Q.   And you don't know whether it produced

23   documents on July 3rd?

24        A.   Well, I -- I have my attorneys who

25   handling all the legal and administrative side of

Page 55

1    before I purchased on -- on -- on June 2020.

2            I mean, in January 2020.

3        Q.   Do you know when it was formed?

4        A.   I don't know the exact date.  Could be ten

5    years ago.

6        Q.   Where was Pirate Monitor formed?

7        A.   British Virgin Islands.

8        Q.   Does Pirate Monitor LTD have a principal

9    place of business?

10           MR. ZELCS:  Objection.  Form.

11           THE WITNESS:  You mean an existing office?

12   BY MS. HARTMAN:

13       Q.   Yes.

14       A.   Not an office space per se, but several

15   locations, including the authorized agents',

16   members' offices or -- or homes where they

17   [verbatim] conducting the business through their

18   computers.

19       Q.   Pirate Monitor LTD has a virtual office in

20   the British Virgin Islands; right?

21       A.   Yes.

22       Q.   Have you been to the office building in

23   the British Virgin Islands?

24       A.   No, I didn't.

25       Q.   Pirate Monitor LTD does not have a

Page 56

1    physical office location; right?

2         A.   One of it is in Los Angeles, in my home

3    office.   And others scattered around Europe where my

4    associates [verbatim] working out of their offices,

5    office spaces or their home computers.

6         Q.   One of Pirate Monitor LTD's office

7    locations is your personal residence; right?

8         A.   That's right.

9         Q.   In Encino, California?

10        A.   Yes.

11        Q.   And there's no other office location for

12   Pirate Monitor LTD -- let me withdraw that.

13             The other office locations you just

14   testified about are simply your employees' homes;

15   correct?

16             MR. ZELCS:   Objection.   Form.

17             THE WITNESS:   They're not my employees

18   per se.   They are authorized agents to act

19   [verbatim] behalf of Pirate Monitor LTD.

20   BY MS. HARTMAN:

21        Q.   Does Pirate Monitor LTD have physical

22   office space in Europe?

23        A.   The authorized agents, yes, they have.

24        Q.   Those office spaces are paid for by Pirate

25   Monitor LTD?

1        A.    No.

2        Q.    Who pays for them?

3        A.    Themselves.

4        Q.    The individuals?

5        A.    Sorry?

6        Q.    The individuals?

7              MR. ZELCS:  Objection.  Form.

8              THE WITNESS:  Endre Holman and his

9    entities.  Endre Holman is in charge of his

10   corporation who are authorized agents.

11   BY MS. HARTMAN:

12       Q.    What entities are you referring to?

13       A.    General Digital, Start Corporation.

14   And -- and he has other.  I -- I -- I can't recall.

15   He has -- he has several companies.

16       Q.    And those companies rent office space?

17             MR. ZELCS:  Objection.  Form.  I -- I -- I

18   can try to clarify for you, or you can spend some

19   time.  I think you've misunderstood one of his

20   answers, but go ahead.

21             MS. HARTMAN:  Please go ahead.

22             MR. ZELCS:  He's testified that people

23   work in their homes on their computers.  He's not

24   talking about anybody having office space.

25   BY MS. HARTMAN:

1      Q.   Is that correct, Mr. Csupó?

2      A.   That's correct.

3      Q.   Does Pirate Monitor LTD have a parent

4   company?

5      A.   No.

6      Q.   Does Pirate Monitor LTD have any

7   subsidiaries?

8      A.   No.

9      Q.   And currently, Pirate Monitor LTD -- let

10   me withdraw that.

11          Currently you are the sole shareholder,

12   managing director, and owner of Pirate Monitor LTD;

13   right?

14      A.   Right.

15      Q.   Has Pirate Monitor LTD had any owners

16   other than you?

17      A.   Before?

18      Q.   Yes.

19      A.   Yes.

20      Q.   Who was an owner prior to you?

21      A.   A gentleman whose name I can't recall

22   in -- in -- in -- in Singapore, who sold his company

23   to -- to Mr. Kovács, and I bought the company from

24   Mr. Kovács.

25      Q.   And when did you buy the company from

1    Mr. Kovács?

2         A.   On January 2020, to my best recollection,

3    yes.

4         Q.   Please identify all of Pirate Monitor

5    LTD's current employees.

6         A.   We don't have employees on payroll, if

7    that's what you're referring to.

8         Q.   Please identify all individuals who

9    perform work for Pirate Monitor LTD.

10        A.   Endre Holman, General Digital; and

11   all other corporations and -- and -- and LTDs he

12   might own.  And Zoltán Búzás who's actually working

13   for Endre, and that's all I know.

14        Q.   How long has Mr. Búzás worked at Pirate

15   Monitor LTD?

16             MR. ZELCS:  Objection.  Form.

17             THE WITNESS:  He did not work per se for

18   Pirate Monitor LTD.  He works for Mr. Holman.  And

19   Mr. Holman is in charge of all work to be done for

20   Pirate Monitor.

21   BY MS. HARTMAN:

22        Q.   How long has Mr. Holman worked for Pirate

23   Monitor LTD?

24             MR. ZELCS:  Objection.  Form.

25             THE WITNESS:  Holman was in- -- Mr. Holman

Page 60

1  was involved with Pirate Monitor LTD even before I

2  purchased it.   So I don't know exact start date.

3  BY MS. HARTMAN:

4        Q.    Was he an owner of Pirate Monitor LTD?

5        A.    No, was not an owner of Pirate Monitor

6  LTD.

7              I explained it was Mr. Kovács who I bought

8  it from, not from Mr. Holman.

9        Q.    What was Mr. Holman's role in connection

10  with Pirate Monitor LTD?

11        A.    He's the authorized agent, including all

12  of his corporations and -- and associates to promote

13  and to -- to govern all activities for Pirate

14  Monitor.

15        Q.    What type of services does Mr. Holman

16  provide for Pirate Monitor LTD?

17        A.    He has full authorization to -- to do

18  anything regarding the necessities for Pirate

19  Monitor LTD, including purchasing, negotiations,

20  uploading, or -- or -- or taking down fraudulent

21  videos.

22        Q.    And what entities provide services for

23  Pirate Monitor LTD?

24        A.    All of Mr. Holman's entities.

25        Q.    Please identify them.

1      Q.   And so, when you signed the written

2  resolutions, you stated that the company is dormant;

3  it doesn't conduct any activities.   Correct?

4      A.   Correct.

5      Q.   And can you estimate when you signed the

6  written resolutions of the directors?

7      A.   No, I can't.

8      Q.   But it was after July 1st, 2020; correct?

9      A.   I don't recall.

10      Q.   It wasn't signed when you received this

11  e-mail; correct?

12      A.   Please check the dates.  I'm -- I'm

13  almost -- almost positive that the dates mentioned

14  in the correspondence are correct.  I -- I don't

15  have those dates in my head.

16      Q.   Does Pirate Monitor LTD have any assets?

17      A.   Assets?

18      Q.   Yes.

19      A.   Yes.

20      Q.   What are its assets?

21      A.   Three movies purchased from MEGA FILM,

22  KKarafde.

23      Q.   Does it have any other assets?

24      A.   No.

25      Q.   Does Pirate Monitor LTD have any

```
 1    liabilities?

 2         A.    Not to my knowledge.

 3         Q.    Does Pirate Monitor LTD generate revenue?

 4         A.    Not 'til this point, but it has the

 5    potential in the future.

 6         Q.    Sitting here today, has Pirate Monitor LTD

 7    generated revenue?

 8         A.    No.

 9         Q.    How is the company funded?

10         A.    I purchased it for $1.

11         Q.    Does Pirate Monitor LTD have expenses?

12         A.    If they have them, it's covered by

13    Mr. Holman, Endre, and his entities.

14         Q.    Do you know whether Pirate Monitor LTD has

15    expenses?

16         A.    Per se, direct expenses, none.

17         Q.    How much cash is on Pirate Monitor LTD's

18    balance sheet?

19         A.    Sorry?

20         Q.    How much cash is on Pirate Monitor LTD's

21    balance sheet?

22         A.    Hmm.   Zero.

23         Q.    Does Pirate Monitor LTD have a corporate

24    bank account?

25         A.    Not sure.
```

1    Q.    You don't know whether Pirate Monitor has

2    a corporate bank account?

3    A.    Endre Holman is the authorized agent to

4    handle all business activities, promotions, and

5    anything related to Pirate Monitor LTD., and he

6    might [verbatim] opened up accounts.   I -- I'm not

7    sure.

8    Q.    Does Pirate Monitor LTD pay taxes?

9    A.    If -- if it's due, I'm sure it -- to my

10   knowledge, Endre Holman and his entities filed every

11   necessity [verbatim] paperwork which is required by

12   law.

13   Q.    Does that include paying taxes?

14   A.    If there --

15   MR. ZELCS:  Object- -- hold on.

16   Objection.  Form.

17   THE WITNESS:  If there were due any, I'm

18   sure, yes.

19   BY MS. HARTMAN:

20   Q.    But you don't know?

21   A.    I don't know.

22   MS. HARTMAN:  Qifan, please mark as an

23   exhibit from Tab 5.

24   (Csupó Deposition Exhibit 6A was marked

25   electronically.)

1      A.   Yes.

2      Q.   And that's referring to Start Corporate

3   Services' client; right?

4           MR. ZELCS:  Sorry, Catherine.  You broke

5   up in the middle of the question.  Could -- could

6   the reporter read it back, please.

7           THE COURT REPORTER:  Question:  "And

8   that's referring to Start Corporate Services'

9   client; right?"

10          THE WITNESS:  Yes.

11  BY MS. HARTMAN:

12     Q.   And Start Corporation's [verbatim] client

13  is Pirate Monitor LTD; correct?

14     A.   Correct.

15     Q.   And in the box, it says "Source of funds

16  is made out of personal savings generated from

17  professional activities.  As a Director and

18  Producer, Mr. Csupó made several blockbuster

19  animations in the USA and worldwide."

20          Do you see that?

21     A.   Yes.

22     Q.   So Pirate Monitor LTD's source of funds is

23  Mr. Csupó's personal savings; correct?

24     A.   Whatever I put into the corporation from

25  my personal savings, yes.

Page 85

1        Q.    Does Pirate Monitor LTD have another

2    source of funds?

3        A.    Not to my knowledge.

4        Q.    Please turn to PIRATEMONITOR_'38, which is

5    PDF Number 8.

6        A.    It's in the same document?

7             MR. EWING:  Yes.

8             THE WITNESS:  On the bottom?

9             MR. EWING:  So page 8.  You can see the

10   page number right here.

11            THE WITNESS:  Oh, I see.  I see.  Okay.

12            So --

13            MR. EWING:  Which exhibit is he on?  6A.

14   Thank you.

15            THE WITNESS:  Yes, I got that, ma'am.

16   Thank you.

17   BY MS. HARTMAN:

18        Q.    At the top it says "INFORMATION REQUIRED

19   FOR ORGANISATION OF COMPANY."

20            Do you see that?

21        A.    Yes.

22        Q.    Do you recognize this document?

23        A.    Yes.

24        Q.    What is it?

25        A.    "OUTGOING AND INCOMING SHAREHOLDER

```
 1    MEMBER."  That's what it's named in the top.
 2         Q.   And your e-mail is listed as
 3    csupo@usipllc.com.
 4              Do you see that?
 5         A.   Where -- where would I see that, in the --
 6    in the same page?
 7         Q.   Yes.
 8         A.   Yes, I see that.  Yes.
 9         Q.   Is that a corporate e-mail address for
10    Intellectual Property LLC?
11         A.   Yes.
12         Q.   And this is a corporate document for
13    Pirate Monitor LTD; right?
14         A.   Yes.
15         Q.   Why are you using an Intellectual Property
16    LLC e-mail address for a corporate document for
17    Pirate Monitor LTD?
18         A.   Why?  Because my associates choose so.
19         Q.   What do you mean?
20         A.   That's what I mean.  We felt that was a
21    proper or -- or -- or good enough e-mail address.
22         Q.   Did you input this information in this
23    document?
24         A.   No.
25         Q.   Who did?
```

```
 1              THE WITNESS:  Okay.
 2              MR. ZELCS:  Take -- take a look at the
 3      e-mail and she'll ask you a question about it.
 4              THE WITNESS:  Okay.
 5      BY MS. HARTMAN:
 6         Q.   Let me know when you're done, please.
 7         A.   (Witness reviews.)
 8              Yes.  Okay.
 9         Q.   This e-mail references a VPN; right?
10         A.   Yes.
11         Q.   What is a VPN?
12         A.   It's a -- a -- an internet-based
13      technology platform where it makes your conversation
14      secured and private.
15         Q.   And why was Mr. Búzás setting up a VPN?
16         A.   Yes [verbatim].
17         Q.   Why?
18              MR. ZELCS:  Please listen to her question
19      before you answer.  She asked you, Why.
20              THE WITNESS:  Oh, just now.  I didn't
21      answer the why part yet.
22              MR. ZELCS:  Oh, I'm sorry.
23              THE WITNESS:  Yeah.
24              Why?  I believe the e-mail explains it
25      based on our attorney's request.
```

Page 91

1    BY MS. HARTMAN:

2         Q.    What's your understanding as to why a VPN

3    was being set up?

4         A.    My understanding?

5         Q.    Yes.

6         A.    To separate it from IPLLC and to be a

7    separate account strictly for Pirate Monitor LTD to

8    make it secure.

9         Q.    To make what secure?

10        A.    Any communications relating between our

11   attorneys and related to the case.

12        Q.    So the VPN was being set up to have

13   communications about this case?

14        A.    That's right.   And also to make it sort of

15   separate entity, dividing more the -- the situation

16   and -- and activities between the two companies.

17        Q.    Did you use the VPN to access documents

18   for this case?

19        A.    Not to my knowledge.

20        Q.    Did your attorneys use the VPN to access

21   documents for this case?

22        A.    You might as well ask them, ma'am.

23        Q.    I'm asking you.

24        A.    I don't know.

25        Q.    Do you know if anyone used the VPN to

1    access documents for this case?

2            A.    I don't know.

3            Q.    In the middle paragraph, the second

4    sentence says "The VPN will certainly be a paid

5    service, and it is possible that the recording of

6    notifications will be a paid service, which we would

7    like you pay for with your credit card, as the BVI

8    company doesn't have a bank account."  [As read]

9            Do you see that?

10           A.    Yes.

11           Q.    What is the BVI company?

12           A.    I -- I don't know.

13           Q.    You don't know?

14           A.    No.

15           Q.    Is Mr. Búzás saying that Pirate Monitor

16   LTD doesn't have a bank account?

17           A.    I can only speculate that's correct.

18           Q.    And Mr. Búzás is asking you to pay for the

19   VPN service with your personal credit card; right?

20           A.    Yes, he's asking for it.

21           Q.    And on the document Bates stamped '206,

22   which is page 2 of the PDF, there is an e-mail dated

23   March 10th, 2020, at the bottom.

24           Do you see that?

25           A.    This one?

1        Yes.

2      Q.   And so, Pirate Monitor LTD is the company

3  purchasing the VPN; correct?

4      A.   That's right.

5      Q.   And you did purchase the VPN service for

6  Pirate Monitor LTD; right?

7      A.   I -- I -- I believe so, unless it was

8  Endre's company.  I -- I'm -- I don't remember.

9      Q.   If you look a bit further up, there's a

10  March 10th, 2020, e-mail from you.  It starts

11  with "hi, Zoli."

12        Do you see that?

13      A.   I only see "redacted," "redacted."  It's

14  not "hi, Zoli."

15      Q.   On page 2 of the PDF.

16      A.   Oh, yes.  I see it, yeah.

17      Q.   And it says "I just talked to Endre, and

18  as he suggested, I bought a VPN service at

19  gcsupo@gmail.com."

20        Do you see that?

21      A.   Yes.

22      Q.   Does that refresh your recollection --

23      A.   Yes.

24      Q.   -- that you bought the VPN?

25      A.   Yes.

Page 94

1    Q.    And you used your personal credit card to
2    make the purchase; correct?
3    A.    That's right.
4    Q.    And you used your personal e-mail address
5    for this subscription; right?
6    A.    That's right.
7    Q.    What other expenses have you paid on
8    behalf of Pirate Monitor LTD using your personal
9    credit card?
10   A.    None.   And this was not necessary for
11   Pirate Monitor LTD.   This was a -- for my own
12   personal e-mail address, as you can tell.
13   Q.    But you agree that the VPN subscription
14   was purchased for Pirate Monitor LTD; correct?
15   A.    Well, it -- also for my personal assets as
16   well, since, you know, it's quite expensive and I
17   used it for everything on my computer.
18   Q.    So you used it for Pirate Monitor LTD and
19   for your personal use; correct?
20   A.    Yes.
21   Q.    Does Pirate Monitor LTD hold board
22   meetings?
23   A.    We had conversation with myself and Endre
24   Holman regularly about ongoing issues, yes.
25   Q.    And where were those meetings held?

1    BY MS. HARTMAN:

2         Q.   Yes.

3         A.   Net yet since we didn't collect any -- any

4    services to be billed for or to invoice for.

5         Q.   Does Pirate Monitor have its own corporate

6    letterhead?

7         A.   Yes.

8         Q.   What does Pirate Monitor's letterhead say?

9         A.   Pirate Monitor LTD.

10        Q.   Is there a logo?

11        A.   I believe so, yes.

12        Q.   Has Pirate Monitor LTD sent letters on

13   corporate letterhead?

14        A.   Not sure.

15        Q.   Does Pirate Monitor LTD have a corporate

16   e-mail address?

17        A.   I'm not sure if there's an e-mail address

18   or -- or -- or associated address we receive

19   correspondence.  I'm not sure.  Again, Endre Holman

20   is handling all the activities I assigned him for

21   this.

22        Q.   When you send e-mails on behalf of Pirate

23   Monitor LTD, what e-mail address do you use?

24        A.   I have no idea.  Probably something

25   involving saying "Pirate Monitor."

1   producers one by one signed up [verbatim] that we

2   would get the rights to their movies on Wowster, if

3   we are successfully removing the illegally infringed

4   material across the board from YouTube channel.

5       Q.    IPLLC sent takedown notices for content on

6   YouTube; correct?

7       A.    Correct.

8       Q.    How did Wowster help IPLLC send those

9   takedown no- -- takedown notices?

10      A.    I got a list of movies, which we would

11  have the right to put on Wowster.  And then I -- I

12  give that list to IPLLC and its authorized agents.

13  And I asked them to start to hunt it down and send

14  in removal notices, if they find anything not

15  authorized.

16      Q.    And how did IPLLC find those works online?

17      A.    By a -- a software called Pirate Monitor.

18  And it's not the Pirate Monitor LTD, but the

19  software itself called Pirate Monitor, which was

20  under the supervision and ownership of Endre Holman.

21      Q.    And how did that software work?

22      A.    It scanned the internet and find it

23  immediately, all the uploaded versions across the

24  universe, all Torrent sides, all everywhere, of

25  e-mail or YouTube.  Anything.  It's -- it's -- it's

1    a software which I have no idea how it works, but

2    it's a genius software.  In two or three seconds, it

3    pulls up thousands of -- any title you mention, and

4    we illustrated that successfully to Hollywood

5    Studios, as well.

6         Q.   And is IPLLC still using the Pirate

7    Monitor software?

8         A.   I believe the case activities after the

9    file -- filing of our lawsuit.

10        Q.   I don't understand your response.

11             Is IPLLC still using the Pirate Monitor

12   software?

13        A.   I explained, ma'am.  If I understood

14   correctly the question, that the way I see it is,

15   that after the lawsuit filed, we cased [verbatim]

16   activity with the Pirate Monitor software as well.

17        Q.   You stopped using the Pirate Monitor

18   software after this lawsuit was initiated; correct?

19        A.   That's right.

20        Q.   Why?

21        A.   Why?  Because we lost the contract with

22   the Hungarian Film Fund and with the producers

23   because we couldn't show results.  Enough.  We -- we

24   succeeded to a very small amount of level, but it

25   wasn't enough to -- to be constantly on top of the

Page 117

1    be working for Endre Holman, again.

2    BY MS. HARTMAN:

3        Q.   Does this refresh your recollection about

4    the company World Web Data Kft?

5        A.   I -- I don't have a -- a -- a

6    recollection, remembering this name.

7        Q.   Do you recall why you received -- received

8    this e-mail?

9        A.   No, I don't recall it why [verbatim].  I

10   can read it now and it explains it, but I still

11   don't understand why.  Probably it was a requirement

12   and, again, we always wanted to do everything clean

13   and legal.  So my associates were always top of

14   everything [verbatim], and every time they --

15   something needed to be changed per law, they

16   corrected it and -- and organized it and sent it

17   back.  That's how I interpret this e-mail.

18       Q.   Are you familiar with a company called

19   Pirate Monitor LLC?

20       A.   I don't believe the company like that

21   exists, ma'am.  But I saw it in -- in reviewing some

22   documents, yes.

23       Q.   Is Pirate Monitor LLC a registered legal

24   entity?

25       A.   No.

1        Q.   Did you ever have a relationship with an

2    entity called Pirate Monitor LLC?

3        A.   No.

4        Q.   Have you ever held a position at an entity

5    called Pirate Monitor LLC?

6        A.   No.

7        Q.   You used the name Pirate Monitor LLC in

8    communications with YouTube; right?

9        A.   Not me personally, ma'am.  Never.

10       Q.   Who did?

11            MR. ZELCS:  Objection.  Form.

12            THE WITNESS:  I only know this because I

13   reviewed some documents before this deposition, and

14   I saw it that Zoltán Búzás used it in communication.

15   BY MS. HARTMAN:

16       Q.   What communication are you referring to?

17       A.   I don't remember.  I just saw it some --

18   on some e-mails that he used that.

19            MS. HARTMAN:  Qifan, please pull the next

20   exhibit from Tab 10.

21            MR. HUANG:  Sorry, a second.  Tab 10?

22            MS. HARTMAN:  Yes.

23            (Csupó Deposition Exhibit 10A was marked

24            electronically.)

25            (Csupó Deposition Exhibit 10B was marked

Page 119

1          electronically.)

2     BY MS. HARTMAN:

3          Q.   I'm showing you what has been marked as

4     Exhibits 10A and 10B.  Exhibit 10A is a takedown

5     notice correspondence with YouTube dated April 12th,

6     2019, through April 17, 2019, that was produced in

7     this action as GOOG-SCHNDR-'370 through '392.

8               And Exhibit 10B is an English translation

9     of that document.

10              Please open Exhibit 10A.

11         A.   10A?  The Hungarian version?

12         Q.   Yes.

13         A.   Okay.  I see that.

14         Q.   Please turn to page 2 of the PDF of

15    Exhibit A --

16         A.   Yes.

17         Q.   -- 10A.

18              Do you see your electronic signature on

19    this document?

20         A.   Yes.

21         Q.   So do you recognize this document as

22    containing a takedown notice with your electronic

23    signature?

24         A.   Yes.

25         Q.   If you scroll to the first page, you can

1    see that it identifies MEGA FILM.

2            You see that?

3        A.   Yes.

4        Q.   So you sent this takedown notice to

5    YouTube on behalf of MEGA FILM; correct?

6        A.   Correct.

7        Q.   Please turn to Exhibit 10B.

8            Let me know when you're ready.

9        A.   Yes.

10       Q.   On the first page, which is stamped

11   GOOG-SCHNDR-'370 in the box it says full name, Gábor

12   Csupó.

13       A.   On the top of page 5?

14       Q.   Page 2.

15       A.   Page 2.  I don't see -- are they talking

16   about confirmation of copyright infringement

17   notification?

18       Q.   Yes.

19       A.   Okay.  I see that.

20       Q.   Then it says "Full name (pseudonym,

21   username or initials may not be used):  Gábor

22   Csupó."

23            Do you see that?

24       A.   I don't see Gábor Csupó.  I see my address

25   and I see MEGA FILM and I see Pirate Monitor,

Page 121

1    intellectual --

2             MR. ZELCS:  Just -- just above your

3    address.  Just look in the paragraph --

4             THE WITNESS:  I don't have -- I don't have

5    anything that -- oh, I see.  "Full name."

6             Yes, I see it.  Yes.  Yes.

7    BY MS. HARTMAN:

8        Q.   And you are listed as the authorized

9    representative in this takedown notice; correct?

10       A.   Absolutely, yes.

11       Q.   And below that is your residential address

12   in Encino, California; right?

13       A.   That's right.

14       Q.   Below that it says "User name:  Pirate

15   Monitor LLC"; correct?

16       A.   Where is that?

17       Q.   Below the address it says "User name:

18   Pirate Monitor LLC"; correct?

19       A.   Oh, yes, I see that.  Yes.

20       Q.   Why did you invoke the name Pirate Monitor

21   LLC in this takedown notice to YouTube?

22       A.   Because I didn't fill this out.

23       Q.   Who did?

24       A.   Zoltán Búzás, and he had my authorization

25   to do this.  That's why he put my name on it.

Page 122

```
 1        Q.   Do you know why he used the name Pirate

 2    Monitor LLC?

 3        A.   I have no idea, ma'am.  I -- I can only

 4    speculate that that was a mistake.

 5        Q.   But this takedown notice was sent with

 6    your electronic signature; correct?

 7        A.   That's right.

 8             So is YouTube's -- okay.

 9             Please go forward.

10             THE COURT REPORTER:  I'm sorry, what was

11    the last thing you said, Mr. Csupó?

12             THE WITNESS:  I was just thinking out

13    loud, but it's not an [verbatim] importance.  We can

14    go forward.

15    BY MS. HARTMAN:

16        Q.   Whose telephone number is listed at the

17    bottom of the first page?

18             THE COURT REPORTER:  I'm sorry, Counsel, I

19    can't hear you.

20    BY MS. HARTMAN:

21        Q.   Whose telephone number is listed at the

22    bottom of the first page?  Sorry, the second page.

23    Whose telephone number is listed on the second page?

24        A.   It's my personal and business telephone

25    number.
```

Page 126

1          Q.   Is that a no?

2          A.   It's a no.

3          Q.   And your e-mail says that you were the

4     Pirate -- let me withdraw that.

5               Your e-mail says that Pirate Monitor LLC

6     is the authorized representative of MEGA FILM Kft.

7               Do you see that?

8          A.   I see that.  Let me clarify one thing,

9     ma'am.  This is not my e-mail.  This is an e-mail

10    coming from an authorized agent from me who made the

11    mistake.  That's the end of the story.

12         Q.   Is Pirate Monitor LLC the authorized

13    representative of MEGA -- MEGA FILM Kft?

14         A.   No.

15         Q.   If you look to paragraph 2 in this e-mail,

16    you ask that YouTube process your Content ID and

17    Content Verification Program requests.

18              Do you see that?

19         A.   Yes.

20         Q.   Did Pirate Monitor LLC apply for access to

21    Content ID?

22         A.   I'm not sure.

23         Q.   Well, you testified earlier that Pirate

24    Monitor LLC doesn't exist; right?

25         A.   That's right.

1        Q.   Did you know whether it applied for access
2    to Content ID?
3        A.   I don't know.
4             MR. ZELCS:   Objection.   Form.
5    BY MS. HARTMAN:
6        Q.   You can answer.
7        A.   I have no idea.
8        Q.   Did Pirate Monitor LLC apply for access to
9    the Content Verification Program?
10            MR. ZELCS:   Objection to form.
11            THE WITNESS:   Based on this document, it
12   seems like Zoltán Búzás sent in an application under
13   that name.   Why?   I have no idea.   I can only assume
14   again that it was a name mistake.   The fact is that
15   we had the right to that movie, and nothing else is
16   important.
17   BY MS. HARTMAN:
18       Q.   Did you -- did you use the name Pirate
19   Monitor LLC because you wanted YouTube to think you
20   were a legal entity?
21       A.   What?   I'm sorry, can you repeat that?
22       Q.   Did you use the name Pirate Monitor LLC
23   because you wanted YouTube to think you were a legal
24   entity?
25       A.   I never wanted to use Pirate Monitor LLC

1          That part is hundred percent true.  The

2     rest is -- doesn't matter.

3          Q.   It's true that Pirate Monitor LLC is the

4     authorized representative of MEGA FILM?

5          A.   Gábor Csupó is.

6          Q.   Is Pirate Monitor LLC the authorized

7     representative of MEGA FILM Kft?

8          A.   Sorry?

9          Q.   Is Pirate Monitor LLC the authorized

10    representative of MEGA FILM Kft?

11         A.   Again, it's --

12              MR. ZELCS:  Hold on, please.

13              Objection.  Form.  He -- he's told you

14    repeatedly that there is no Pirate LLC, but you keep

15    wasting time asking if a nonexisting entity is an

16    authorized representative.  Obviously you have the

17    right to take this deposition any way you want, but

18    I'm not sure what the point here is.  I apologize

19    for interrupting.

20              MS. HARTMAN:  Okay.  Your objection is

21    sufficient.  Thank you.

22              THE WITNESS:  Would you like to answer --

23    me to answer the question?  If so, then please

24    repeat it.  I don't know what I [verbatim] supposed

25    to answer or not.

 1    BY MS. HARTMAN:

 2        Q.    Is Pirate Monitor LLC the authorized

 3    representative of MEGA FILM Kft?

 4              MR. ZELCS:  Objection.  Form.

 5              THE WITNESS:  No such an entity exists.

 6    That was a mistake by Zoltán Búzás.  And I don't

 7    know what else to tell you.

 8    BY MS. HARTMAN:

 9        Q.    Mr. Csupó, when was IPLLC incorporated?

10        A.    I believe in the very beginning of 1990,

11    if I remember correctly.

12        Q.    In 1990; correct?  I just misheard you.

13        A.    Or 2019.

14        Q.    In 2019.

15              Where was IPLLC incorporated?

16        A.    Well, originally in Singapore, and then I

17    bought that company from -- also from Mr. Kovács.

18    Or I'm sorry, the incorporation itself must have

19    happened a lot later.  I purchased IPLLC in -- in

20    2019.

21        Q.    Does IPLLC have a physical office?

22        A.    Most likely in Singapore, but I -- I've

23    never been there.

24        Q.    So you're not sure whether IPLLC has a

25    physical office; correct?

Page 132

```
 1        A.   I'm not sure.  It -- its representatives
 2   have a lot of offices.
 3        Q.   Who are its representatives?
 4        A.   Endre Holman and his entities.
 5        Q.   Does IPLLC have a parent company?
 6        A.   Not to my knowledge.
 7        Q.   Does IPLLC have any subsidiaries?
 8        A.   Not to my knowledge.
 9        Q.   You were the sole owner of Pi- -- let me
10   withdraw that.
11             You were the sole owner of IPLLC; correct?
12        A.   Correct.
13        Q.   And you were the sole shareholder of
14   IPLLC; correct?
15        A.   Correct.
16        Q.   And you were the sole managing director of
17   IPLLC; correct?
18        A.   Correct.
19        Q.   Why did you obtain ownership in IPLLC?
20        A.   Because I needed a company to monitor the
21   material I needed to fill my needs for Wowster
22   Corporation.
23        Q.   Why did you need a separate entity from
24   Wowster to do that?
25        A.   Because Wowster was a streaming channel,
```

1  not a -- a -- a -- a company who hunts down illegal

2  material.

3      Q.   Did you at any point share ownership in

4  IPLLC?

5      A.   Sorry?

6      Q.   Did you at any point share ownership in

7  IPLLC?

8      A.   I don't think so.  Not to my knowledge,

9  no.  I purchased it, and since them I'm the sole

10  owner.

11      Q.   Please identify all of IPLLC's employees.

12      A.   I can't list up all of them, but it's the

13  same as for Pirate Monitor LTD.  It's Endre Holman

14  and all the control- -- controlled entities under

15  him, including Zoltán Búzás.

16      Q.   So Pirate Monitor LTD and IPLLC have the

17  same employees; correct?

18      A.   Yes.  Not necessarily all been the same,

19  but overlappingly yes.

20      Q.   Who works for IPLLC that doesn't work for

21  Pirate Monitor LTD?

22      A.   That is a question only Endre Holman could

23  answer because he allocates people for both

24  companies.

25      Q.   What type of work does Mr. Búzás perform

1    for IPLLC?

2         A.    Everyday day-to-day operations.

3         Q.    Such as what?

4         A.    Taking orders from Endre Holman, what to

5    do, filling out paperwork, being sure that

6    everything is correct and legally represented and

7    things like that.  And sometimes if Endre instructs

8    him to do certain tasks, such as uploading or

9    promoting or taking down material, then he would

10   function as the -- the manager of that task.

11        Q.    And when did he begin performing work for

12   IPLLC?

13        A.    I'm sorry?

14        Q.    When did Mr. Búzás begin performing work

15   for IPLLC?

16        A.    Mr. Búzás is a long-time employee of Endre

17   Holman.  And soon as IPLLC started operations, he

18   immediately became to be part of the board member.

19        Q.    Mr. Búzás is a board member of IPLLC?

20        A.    No.  I -- I meant it to come under

21   [verbatim] board of -- of the operational people.

22   And he might as be well.  I -- I'm not sure because,

23   again, Endre Holman is running these two companies

24   for me.

25        Q.    Is Mr. Holman a former owner of IPLLC?

1      A.    No, not to my knowledge.   I -- I believe I

2   bought it from Mr. Kovács and he might have some

3   association with -- with Mr. Kovács, but to my

4   knowledge, he was not an owner.

5      Q.    Please identify any independent

6   contractors who performed work for IPLLC.

7      A.    All the same as I mentioned before, Endre

8   Holman and all his entities.

9      Q.    Do the same independent contractors

10  perform work for IPLLC that perform work for Pirate

11  Monitor LTD?

12     A.    Same?

13     Q.    Yes.

14     A.    Mostly the same, but there are overlapping

15  differences.

16     Q.    What are the differences?

17     A.    There are people who are work [verbatim]

18  for only one company and other people only working

19  for that, and a bunch of people working for both

20  companies.

21     Q.    Who only works for IPLLC?

22     A.    I have no idea.  It's a question to

23  Mr. Holman.

24     Q.    Who works only for Pirate Monitor LTD?

25     A.    Same answer.

```
 1              THE WITNESS:  Yes.
 2              MR. EWING:  -- right there.
 3              THE WITNESS:  Yes.
 4              CC'd, yes.
 5   BY MS. HARTMAN:
 6         Q.   Do you recognize this as an e-mail that
 7   Tracy Kramer sent to Craig Jacobson copying you?
 8         A.   That's right.
 9              MR. ZELCS:  Please read the e-mail before
10   you testify about it.
11              THE WITNESS:  (Witness reviews.)
12   BY MS. HARTMAN:
13         Q.   Please let me know when you're ready.
14         A.   Okay.
15         Q.   If you turn to page 4, in the second
16   paragraph it says that Mr. Holman "is engaged in the
17   cutting edge technology and his company has
18   developed a revolutionary anti-piracy program."  [As
19   read]
20              Do you see that?
21         A.   Yes.
22         Q.   What program is this referring to?
23         A.   Named PirateMonitor.
24         Q.   The next sentence says, "PirateMonitor can
25   not only track any pirate -- pirated film, it can do
```

1    it throughout the world, refreshing it's content

2    every few minutes."  [As read]

3              Do you see that?

4         A.   That's right.

5         Q.   How does it track pirate -- pirated films?

6         A.   It's a technical question.  Please ask

7    Endre Holman.  He's the one who developed it.  I

8    don't know.

9         Q.   Was PirateMonitor used to track content on

10   YouTube?

11        A.   Sorry?

12        Q.   Was PirateMonitor the software used to

13   track content on YouTube?

14        A.   Yes.

15             MR. ZELCS:  Objection.

16             Hold on.  Let me -- I guess it doesn't

17   matter now.  I made it too late.  Go ahead.

18             THE WITNESS:  I'm sorry.

19             MR. ZELCS:  It's all right.

20   BY MS. HARTMAN:

21        Q.   In the fifth paragraph on that same page

22   it says, "PirateMonitor would offer the studios free

23   monitoring and immediate removal of all their

24   illegally uploaded feature films (any content for

25   that matter) in exchange for 50% of collected fees

1    on short content profits by YouTube, Facebook, Vimeo

2    et cetera?"

3             Do you see that?

4        A.   No, I'm getting lost in the document.

5    Where is it?   In this same e-mail?

6        Q.   The fifth paragraph.

7        A.   Yes.

8        Q.   Can you explain how Pirate Monitor, the

9    software, would complete the immediate removal of

10   illegally uploaded content?

11       A.   I believe it can only identify and -- and

12   immediate removal would be taken care of by it

13   [verbatim] or sending in takedown notices or -- or

14   sending in notifications of -- in this instant, it

15   doesn't only talk about YouTube.   It's Facebook,

16   Vimeo, anywhere, by -- by basically requiring the

17   provider to -- to take it down because it's

18   illegally up there.   That's my understanding.

19       Q.   And can you explain how Pirate Monitor

20   would earn 50 percent of the collected fees from

21   YouTube?

22       A.   I'm not quite sure.   I -- I think Endre

23   and Tracy might have figured out some sort of a

24   business model.   I'm not sure I understand what is

25   50 percent here exactly means.   It can be

1    interpreted several different ways.

2         Q.    How did you intend to make money from the

3    PirateMonitor software?

4         A.    By licensing it to the studios or actually

5    performing the -- the -- the work and then make some

6    sort of arrangement for the studios.

7         Q.    Did you intend to make money from

8    advertising on YouTube?

9         A.    Me?  No.  It never even crossed my mind.

10        Q.    Who is Tracy Kramer?

11        A.    My business manager and personal artist

12   manager who is the head of Toltec Artists.

13        Q.    What is Toltec Artists?

14        A.    It's a talent management company.

15        Q.    Was the PirateMonitor software licensed?

16        A.    Licenses is that you don't sell the -- the

17   software itself, you just loan it to the studios to

18   a certain amount of time.

19        Q.    And did that happen?

20        A.    Sorry?

21        Q.    And did that happen?

22        A.    We were in a process of -- of negotiating

23   further, but the studio's response was to prove

24   yourself first.  And that's why we tried our -- our

25   software and efficiency in the Hungarian film

1    market.

2        Q.   Does IPLLC have any clients?

3        A.   Any what?

4            MR. ZELCS:  I'm sorry.  I'm sorry.  Could

5    the court reporter read back the question, please.

6            THE COURT REPORTER:  Question:  "Does

7            IPLLC have any clients?"

8            THE WITNESS:  Clients?

9            Yes.  IPLLC had a lot of clients, ma'am.

10   All -- all -- practically all Hungarian film

11   maker -- film makers, starting with the Hungarian

12   Film Funds [verbatim], they have several thousands

13   of movies; the Hungarian film archive which belongs

14   under them; 41 independent famous Hungarian

15   producers; plus MEGA FILM, which is biggest

16   independent Hungarian film production and TV

17   production company.  And they were all our clients.

18   BY MS. HARTMAN:

19       Q.   How many clients does IPLLC have?

20       A.   I'm sorry.  I just -- I just told you.

21       Q.   I'm asking how many.

22       A.   I -- I -- I'm not adding machine, ma'am.

23   I don't know.  Forty-one, 43, 45, 40- -- it's around

24   40-something clients.

25       Q.   Does IPLLC generate revenue?

Page 143

1      A.    No.

2      Q.    How is IPLLC funded?

3      A.    By me buying it for a dollar, so I owned

4   it.

5      Q.    Does IPLLC have any expenses?

6      A.    Yes.  It was covered all by Endre Holman

7   and his -- his -- his colleagues.

8      Q.    So who pays for the expenses of IPLLC?

9      A.    Endre Holman and his -- his colleagues.

10     Q.    Do you reimburse him?

11     A.    I didn't have to.  I had a -- I had a

12   50/50 deal with him.

13     Q.    Can you explain what you mean?

14     A.    I meant it's not 49 percent and not

15   51 percent.  It's 50/50.

16     Q.    Do you have a written agreement to that

17   effect?

18     A.    I believe so -- or actually, I don't

19   remember if it we written down or it was a handshake

20   deal.  But since he controlled the software which

21   belonged a hundred percent to him, and I controlled

22   the -- all my connections in the industry, both of

23   us would benefit from our -- our collaboration.  And

24   there was just a -- a, most likely, handshake deal.

25   I -- I don't quite remember if it was put down in

Page 144

1    writing or not.

2         Q.    So if IPLLC has expenses, Mr. Holman pays

3    for them --

4         A.    That's right.

5         Q.    -- correct?

6         A.    Yes.   He was part of -- technically, was

7    part of the company, yes.

8         Q.    How is he part of the company?

9         A.    He was an associate agent, authorized

10   agent to act [verbatim] behalf of -- of the

11   corporation.

12        Q.    How much cash is on IPLLC's balance sheet?

13        A.    Zero.   Thanks to YouTube.

14        Q.    What do you mean?

15        A.    That's what I mean because you guys

16   sabotage -- not -- not you.   I'm sorry.   YouTube

17   sabotaged our activity and we could not succeed.

18        Q.    In what way?

19        A.    Sorry?

20        Q.    In what way?

21        A.    In what way?   Boycotting our -- our

22   efforts to take down all the illegal material by

23   coming up with all kind of bullshit excuses.

24        Q.    Does IPLLC have a corporate bank account?

25        A.    Nope.

Page 145

1      Q.    Does IPLLC have any assets?

2      A.    Nope.

3      Q.    Does IPLLC have any liabilities?

4      A.    No.

5      Q.    Does IPLLC hold board meetings?

6      A.    Again, we confer regularly about issues.

7      Q.    Who attends meetings of IPLLC?

8      A.    Myself, Endre Holman, Zoltán Búzás, and

9   sometimes some attorneys involved, Hungarian

10  attorneys.

11     Q.    How often are these meetings held?

12     A.    I would say at least once a month.

13     Q.    And are these the same meetings that are

14  held for Pirate Monitor LTD?

15     A.    I'm sorry?

16     Q.    Are these the same meetings that are held

17  for Pirate Monitor LTD?

18         MR. ZELCS:  Objection.  Form.

19         THE WITNESS:  Hmm.  We conducted a bunch

20  of conference calls and -- and video chat meetings.

21  And sometimes we covered one company, another

22  meeting the other.  And -- and there was several

23  meetings where we covered both companies'

24  activities, especially when Pirate Monitor LTD was

25  purchased by me after that.  Until that, it was only

1    IPLLC on the -- on the -- on the agenda.

2    BY MS. HARTMAN:

3         Q.    How often did you discuss Pirate Monitor

4    LTD and IPLLC at the same meeting?

5         A.    Well, since Pirate Monitor LTD is a lot

6    newer company, it was -- it was just a couple of

7    times after, the two companies overlapped.

8         Q.    Does IPLLC keep contemporaneous minutes

9    for board meetings?

10        A.    I hope so.  I believe so, that they took

11   everything down what was talked about.  Endre Holman

12   might have those.

13        Q.    Were those minutes produced in this

14   lawsuit?

15        A.    Minutes produced in what?

16        Q.    In this lawsuit.

17        A.    Oh.  I -- I -- I don't think so, no.

18        Q.    Why not?

19        A.    Because I -- I'm not in charge of what --

20   what was asked for, and I don't -- if I don't have a

21   copy of it, then you don't have a copy of it.  If I

22   have a copy of it, you have a copy of it.

23        Q.    But there are documents located in Hungary

24   regarding IPLLC; correct?

25             MR. ZELCS:  Objection.  Form.

Page 149

1    read]

2              Is that your signature on page 8?

3         A.   Yes.

4         Q.   And the information in these interrogatory

5    responses are true and accurate to the best of your

6    knowledge, information, and belief; correct?

7         A.   That's correct.

8         Q.   What is the nature of the -- let me

9    withdraw that.

10             What is the nature of the relationship

11   between MEGA FILM and Pirate Monitor LLC?

12        A.   Pirate Monitor LTD?

13        Q.   No.  Pirate Monitor LLC?

14        A.   Where do you see that in this document?

15        Q.   I'm just asking you a question.  It's not

16   about that document.

17        A.   Oh.  What -- is this a trick question?  We

18   explained to you, ma'am, that there is no such an

19   entity exists.  MEGA FILM exists and -- and Pirate

20   Monitor LLC was a mistake by Zoltán Búzás.  So there

21   can't be any relationship.

22        Q.   Let's discuss MEGA FILM and IPLLC.

23        A.   Okay.

24        Q.   Has MEGA FILM assigned any of its

25   copyrighted works to IPLLC?

1        A.    Yes.

2        Q.    What works has MEGA FILM assigned to

3    IPLLC?

4        A.    They authorized IPLLC to monitor --

5              (Interruption in audio/video.)

6              THE COURT REPORTER:   Excuse me.   I didn't

7    get the first word of your answer.   Could you please

8    start again.

9              THE WITNESS:   MEGA FILM authorized IPLLC

10   to monitor and -- and find all the uploaded material

11   on YouTube.   And if they find any infringement, had

12   a hundred percent right to remove it.   And we have a

13   contract for that.   It shows that he authorizes all

14   of his movies controlled by IPLLC.

15   BY MS. HARTMAN:

16       Q.   My question was whether MEGA FILM assigned

17   any of its copyrighted works to IPLLC.

18       A.    Not to IPLLC.   "Assigned," meaning just

19   giving it to us?   I -- I don't understand the

20   question.

21       Q.   Did MEGA FILM transfer its rights in any

22   copyrighted works to IPLLC?

23       A.    MEGA FILM had copyrights on all their

24   material, and they authorized us to govern all of

25   it.

1    something for mon- -- monetizing reasons when people

2    could watch the same thing for free in any infringed

3    version.

4         Q.   Did this agreement authorize IPLLC to send

5    notices to YouTube to take down MEGA FILM's content

6    that was on YouTube?

7         A.   Amongst other things, yes.

8         Q.   What else did it authorize IPLLC to do?

9         A.   To find it and to build an own- -- and --

10   and I believe it's also in this contract.  If not,

11   that was in a separate contract that we could build

12   a -- MEGA FILM's own channel, once all the illegally

13   uploaded material is re- -- been removed -- have

14   been removed.

15        Q.   So this contract authorized IPLLC to

16   upload videos containing MEGA FILM's works to

17   YouTube; correct?

18        A.   I believe so.  If not, there must be

19   another contract.  But I know I had the rights to it

20   because Gábor and I talked about this for a long

21   time and he -- he authorized IPLLC to -- to do that.

22        Q.   IPLLC was authorized to upload videos to

23   YouTube of MEGA FILM's works --

24        A.   That's right.

25        Q.   -- correct?

Page 164

```
 1    testimony?
 2         A.    No.
 3         Q.    Is there a relationship between MEGA FILM
 4    and Pirate Monitor LTD?
 5         A.    Other than both of the owners are the
 6    same, I don't believe so.
 7         Q.    Who is the owner of MEGA FILM?
 8         A.    Gábor Kálomista.
 9         Q.    Is he the sole owner of MEGA FILM?
10         A.    I believe so, yes.   He got married to
11    the -- to the lady who was running his company.   And
12    maybe she become part owner based on the -- the --
13    this new relationship, I'm not sure.   But to my
14    knowledge, he's the sole owner, yes.
15         Q.    And is he also an owner of Pirate Monitor
16    LTD?
17         A.    I'm sorry?
18         Q.    Is he -- Mr. Kálomista also an owner of
19    Pirate Monitor LTD?
20         A.    No, no.
21         Q.    Has MEGA FILM assigned any of its
22    copyrighted works to Pirate Monitor LTD?
23         A.    Yes.
24         Q.    MEGA FILM assigned Pirate Monitor rights
25    to "Zimmer Feri 2," "Immigrants" and "Vakvagányok";
```

Page 168

1    against YouTube; right?

2         A.   Well, exact phrase might differ from how

3    you're saying it.  But that's a legal term I'm not

4    qualified to verify.  So please consult with my

5    attorneys regarding that.

6              MS. HARTMAN:  Qifan, please pull the

7    document from Tab 23.

8              (Csupó Deposition Exhibit 16A was marked

9              electronically.)

10             (Csupó Deposition Exhibit 16B was marked

11             electronically.)

12   BY MS. HARTMAN:

13        Q.   I'm showing you what has been marked as

14   Exhibits 16A and 16B.

15        A.   Yes.

16        Q.   This -- Exhibit 16A is an e-mail dated

17   January 8th, 2020, that has been produced in this

18   case as a document Bates stamped PIRATEMONITOR_'143.

19        A.   Yes.

20        Q.   Exhibit 16B is an English translation of

21   that document.

22             Please turn to Exhibit 16A.

23        A.   I can -- since I'm the only one who can

24   read it, I can verify it -- that's a correct copy.

25   And I did sign it, and I recognize the e-mail.

Page 169

1    Everything is fine about it.  If you'd like, we can

2    go to the English version.

3          Q.    Great.

4          A.    Thank you.

5          Q.    And Mr. Kálomista received this e-mail

6    from you; correct?

7          A.    That's right.

8          Q.    And you testified earlier that he is an

9    owner of MEGA FILM; right?

10         A.    That's right.

11         Q.    Does this e-mail refresh your recollection

12   as to why Pirate Monitor LTD sought an assignment of

13   certain works from MEGA FILM?

14         A.    Absolutely.

15         Q.    Well, what does it refresh your

16   recollection to be?

17         A.    That after my consulting why my -- with my

18   attorneys, this is the solution we came to, to

19   acquire three movies that we can have under U.S.

20   copyright as -- as -- as attachment to that -- to

21   the lawsuit.

22         Q.    So these works were a license to Pirate

23   Monitor LTD so that it could bring a lawsuit against

24   YouTube; correct?

25         A.    Correct.

1   that is the channel I know about, yes.  And mostly,

2   we just had problems with -- with illegal material,

3   not -- not -- our main reason to exist was not to

4   build channels but to monitor.  Besides Wowster

5   would be the reason to -- to have streaming with

6   ours.  IPLLC's main reason was to -- to take care of

7   the excess material which was not authorized to be

8   on YouTube.

9        Q.   Did IPLLC upload videos to YouTube

10   anywhere else apart from MEGA FILM's channel?

11        A.   I only know this because now I -- I --

12   I -- I read all the documents, and -- and -- and I'm

13   familiar of -- of what happened through the years.

14   My answer right now, based on my knowledge, yes.

15        Q.   Where else did IPLLC upload videos?

16        A.   I got authorization from Kálomista and

17   MEGA FILM to upload and promote their movies with

18   shorter pieces all over -- all over, I believe, the

19   internet.  But mostly, the -- the -- the -- the

20   full-length movies he authorized us to upload to his

21   own channel.  And the short version promotional

22   stuff, everywhere to be able to find to promote his

23   movies, mostly commercials or trailers.

24        Q.   So IPLLC was authorized by MEGA FILM to

25   upload short clips of MEGA FILM's works on YouTube;

Page 174

1    correct?

2         A.    As well as full-length movies as well, but

3    we wouldn't do that until we took down all the

4    illegal versions and -- and we were ready to build

5    his own channel, but we never really got to that

6    point.

7         Q.    Did you direct anyone to create YouTube

8    channels on YouTube?

9         A.    No.

10        Q.    Did you direct anyone to upload videos to

11   YouTube?

12        A.    No.  I mean, let me put it this way:  When

13   Kálomista told me to promote his movies, his --

14   his -- his legacy, his -- his library of movies,

15   which was in his opinion on his channel, he

16   authorized me to -- to promote it.  And you see the

17   contract, technically, I could have done anything

18   with any of his material I choose to.  And so, I --

19   I -- I -- I authorized my associates and acting

20   agents, Endre Holman and his entities and his

21   companies, to promote and to scan for illegally

22   uploaded versions, anything we needed to do to -- to

23   clean out the slate for our path.

24        Q.    Did Mr. Holman upload videos to YouTube on

25   behalf of IPLLC?

1        A.    I don't think he personally did anything.

2   He is too big of a guy.  He has hundreds of

3   employees.  He gave out the task to his people,

4   and -- and he probably instructed them what to do.

5        Q.    Are you aware of any instance in which

6   Mr. Holman instructed anyone to upload videos to

7   YouTube?

8        A.    Yes, when I told him to promote

9   Kálomista's films with short snippets and -- and

10  with -- with commercials or trailers, then he

11  probably authorized his people to do it.

12       Q.    And were those videos, in fact, uploaded

13  to YouTube?

14       A.    Now I know it because I read all the up --

15  you know, documents in this -- in this dispute.  Now

16  I have knowledge that, yes, they've been uploaded.

17       Q.    When were videos of MEGA FILM's work

18  uploaded to YouTube by IPLLC?

19       A.    When?

20       Q.    Yes.

21       A.    Oh, I -- I don't remember the exact dates.

22  Either in -- in 19- -- 9 -- I mean, 2019 or the

23  early part of 2020.  I don't remember.  But probably

24  the second half of -- of 2019.  Or even -- even

25  earlier.  I just remember the year.

1          MS. HARTMAN:  Qifan, can you pull the

2     document from Tab 25 for the next exhibit.

3               (Csupó Deposition Exhibit 17A was marked

4               electronically.)

5               (Csupó Deposition Exhibit 17B was marked

6               electronically.)

7     BY MS. HARTMAN:

8          Q.   I'm showing you what has been marked

9     Exhibits 17A and 17B.  17A is an e-mail and

10    attachment from Mr. Holman to Mr. Csupó, dated

11    January 8th, 2020, that was produced in this action

12    as a document Bates stamped PIRATEMONITOR_'136

13    through '140.  I'm also showing you a translation of

14    the cover e-mail Bates stamped PIRATEMONITOR_'136.

15              Please open Exhibit 17A.

16         A.   Okay.

17         Q.   Do you recognize your name on this e-mail?

18         A.   Yes.

19         Q.   And do you recognize this as an e-mail

20    that Mr. Holman sent to you on January 8th, 2020?

21         A.   Yes.

22         Q.   Please turn to Exhibit 17B.

23              Please let me know when you're ready.

24         A.   Yes, ready.

25         Q.   This is the English translation of 17A.

1      A.    Yes.

2      Q.    The e-mail from Mr. Holman says, "Hi

3  Gábor, the Paki kid uploaded only "Csak szex és más

4  semmi" and "Zimmer Feri 1."

5            Do you see that?

6      A.    Yes.

7      Q.    MEGA FILM owns the works "Csak szex és más

8  semmi" and "Zimmer Feri 1"; Correct?

9      A.    Yes, but we were authorized agents to

10  handle his -- his whole library.

11      Q.    You were authorized to enforce MEGA FILM's

12  copyrights with respect to certain works; correct?

13      A.    And, also, we were authorized to upload it

14  to his channel, yes.

15      Q.    And specifically, you were authorized to

16  upload the "Csak szex és más semmi" and "Zimmer Feri

17  1" videos to YouTube; correct?

18      A.    No.   We were specifically authorized to

19  upload anything we wanted from his whole library.

20  And you'll see the attachment, all his work,

21  including all these films you were mentioning in

22  this e-mail, we were authorized to upload or take

23  down or to find infringed material then.

24      Q.    And that includes the two works listed in

25  this e-mail; correct?

1        A.    That's right.

2        Q.    Who is the "Paki kid" referenced here?

3        A.    Somebody who -- one of his -- he also

4    hired some of his employees --

5              (Interruption in audio/video.)

6              THE COURT REPORTER:   Could you please

7    repeat that, sir.

8              THE WITNESS:   The question was, who is --

9    who is the Paki kid means [verbatim] to me.   I

10   believe that he is one of the -- the -- the persons

11   Endre Holman and his companies hired for a certain

12   task like uploading things like that, because he was

13   less expensive workforce than the guys in Hungary.

14   BY MS. HARTMAN:

15       Q.    Do you know his name?

16       A.    No.

17       Q.    And the individual referenced as the "Paki

18   kid" was involved in uploading videos to YouTube

19   that contained MEGA FILM's works; right?

20       A.    I'm sorry?

21       Q.    The individual identified as the "Paki

22   kid" in this e-mail --

23       A.    Yes.

24       Q.    -- was involved in uploading videos to

25   YouTube that contained MEGA FILM's works; right?

1        A.    Yes, yes, yes.   Not only him, others --

2    probably other people too, but he was one of them,

3    yes.

4        Q.    And he was based in Pakistan?

5        A.    Since the name suggest it, I assume so.

6        Q.    And he was hired by Mr. Holman; correct?

7        A.    Correct.   Not by him personally, but he

8    probably told his workers, find a cheap tech guy.

9    And I think now by reading the documents, I saw that

10   they -- they find him on freelance.com where he sold

11   himself as a -- a technical person who knows about

12   the internet.   That's why they find him.

13       Q.    Why was he hired to upload videos

14   containing MEGA FILM's works to YouTube?

15       A.    Why was he hired?

16       Q.    Yes.

17       A.    Please ask that to Mr. Holman.   I didn't

18   instruct Holman to hire anybody.

19       Q.    But IPLLC hired this individual to upload

20   videos to MEGA FILM; correct?

21            MR. ZELCS:   Objection.   Form.

22            THE WITNESS:   I don't think so because

23   IPLLC did not know about it.   I am the shareholder

24   and the owner, and I did not know about this.

25   BY MS. HARTMAN:

Page 180

1    Q.    When did you first learn about this?

2    A.    After the lawsuit filed and I started to

3  see corresponding documents.

4    Q.    Did you ask Mr. Holman about it?

5    A.    Oh, yes.

6    Q.    And what did he tell you?

7    A.    We've hired him because he was cheap, and

8  we had a hundred percent rights to -- to do this.

9  So we just paid him, and he did what we told him to

10  do.

11    Q.    And what did -- and what was this

12  individual from Pakistan told to do?

13         MR. ZELCS:  Objection.  Form.

14         THE WITNESS:  I don't know firsthand, but

15  I believe that they gave him a list of stuff to do,

16  and he performed it for a certain amount of money.

17  BY MS. HARTMAN:

18    Q.    Who instructed the individual from

19  Pakistan identified in this e-mail to upload videos

20  to YouTube?

21         MR. ZELCS:  Objection.  Form.

22         I'm sorry, I --

23         THE WITNESS:  Did they hear you?

24         MR. ZELCS:  Objection.  Form.

25         THE WITNESS:  I'm sorry.  I didn't -- now

1    I -- I -- I'm -- I'm confused.  I'm really

2    apologizing.  Please repeat the question.

3    BY MS. HARTMAN:

4        Q.   Who instructed the individual identified

5    in this e-mail as the "Paki kid" to upload videos to

6    YouTube?

7        A.   Who instructed?  I -- I -- I was telling

8    you that Mr. Holman probably instructed the --

9    Búzás, Zoltán to take care of this assignment from

10   MEGA FILM.  And from there on, I can only assume

11   that he hired this guy because now I know he hired

12   the guy because I saw the documents relating to it.

13   But if your question [verbatim] did I hire the guy,

14   then definitely not.

15       Q.   Do you know an individual named "Zonbor

16   Oshlansky [phonetic]"?

17       A.   I'm sorry, what?

18       Q.   Do you know an individual named "Zonbor

19   Oshlansky [phonetic]"?

20       A.   Oh, not -- not at all.  Never met him.

21   I -- again, to be honest with you, I saw his name

22   after some documents surfaced in front of me during

23   this lawsuit.  But before that, I never even heard

24   his name in my life.

25       Q.   Which document are you referring to?

1        A.    I don't remember.  Something about his

2   involvement through Búzás, Zoltán, and there were

3   some tasks he -- he -- he performed under Holman,

4   Endre's instructions.  I don't remember the exact

5   document, but his name popped up.

6        Q.    Did you discuss his involvement with

7   Mr. Holman?

8        A.    No.

9              MS. HARTMAN:  Qifan, can you pull the next

10  document from Tab 26.

11             (Csupó Deposition Exhibit 18A was marked

12             electronically.)

13             (Csupó Deposition Exhibit 18B was marked

14             electronically.)

15  BY MS. HARTMAN:

16       Q.    Sorry, before we switch to the next

17  exhibit, I have a couple more questions.

18       A.    Sure.

19       Q.    Looking back at Exhibit 17B, what was your

20  understanding as to why Mr. Holman was telling you

21  that the Paki kid uploaded certain films?

22       A.    What was my -- what was my understanding?

23       Q.    Yes.

24       A.    My understanding was that he acted on

25  behalf of MEGA FILM's instruction, when he -- when

1    Kálomista told us to promote his -- his material.

2    That was my understanding.   And the Paki guy

3    uploaded only "Csak szek és más semmi" and "Zimmer

4    Feri."   And, specifically, my understanding was

5    these are full movies which was authorized by

6    Kálomista to upload it to -- to his own channel.

7    And by reading this e-mail, my take was that so they

8    hired the cheap labor to upload these two movies to

9    his own channel.

10        Q.   And it was IPLLC that was authorized to

11   upload the videos on behalf of MEGA FILM; correct?

12        A.   That's right.

13        Q.   Okay.   Please open Exhibit 18A.   I'm

14   showing you what has been marked as Exhibit 18A and

15   18B.   18A is an e-mail chain between Mr. Csupó and

16   Mr. Kálomista dated September 28, 2020, through

17   September 29, 2020, that was produced in this action

18   as a document Bates stamped PIRATEMONITOR_'165.   And

19   Exhibit 18B is an English translation of that

20   e-mail.

21            Please open Exhibit 18A.

22        A.   Yes.   I -- I can verify that it's in

23   Hungarian, and it's exactly the same thing which the

24   English translation says.

25        Q.   And do you recognize this e-mail chain?

Page 184

```
 1        A.   Yes.
 2        Q.   If you scroll to the bottom, the first
 3   e-mail, which is September 28, 2020, Mr. Kálomista
 4   sent you a link; correct?
 5        A.   That's right.
 6        Q.   And that link was about YouTube's claims
 7   in this action; correct?
 8        A.   That's right.
 9        Q.   And you responded to his e-mail that same
10   day; correct?
11        A.   That's right.
12        Q.   Please open Exhibit 18B.
13        A.   I have it open.
14        Q.   In your e-mail dated September 28, 2020,
15   you said, "Half of this is true, half is not."
16        A.   That's right.
17        Q.   "There's a big lawsuit, as I said, it's
18   true, YouTube, because it's a class-action lawsuit,
19   is very pissed off, they're trying to bring
20   everything against PM."
21             Do you see that?
22        A.   Yes.
23        Q.   You're referring to this lawsuit; correct?
24        A.   I'm referring against Pirate Monitor as
25   PM, yes.
```

```
 1        Q.    YouTube's claims against Pirate Monitor;
 2   right?
 3        A.    That's right.
 4        Q.    And "PM" stands for Pirate Monitor in this
 5   e-mail?
 6        A.    Yes.
 7        Q.    What did you mean when you said that
 8   YouTube is trying to bring everything against PM?
 9        A.    By turning the -- the -- the whole claim
10   around and trying to blame their fraudulent activity
11   on a company who's actually trying to fight
12   fraudulent activity.
13        Q.    In the next sentences you say, "Pirate
14   Monitor is clean.  The company called IPLLC, who has
15   a contract with you and the Hungarian Film Fund,
16   acted as a full agent for the rights holder when it
17   uploaded those film clips to YT."  [As read]
18              Do you see that?
19        A.    Yes.  To YouTube, yes.
20        Q.    You were saying that it was IPLLC that
21   uploaded the videos to YouTube that are the subject
22   of YouTube's claims against Pirate Monitor; correct?
23        A.    That's right.
24        Q.    And you were saying that IPLLC was
25   authorized to upload those videos; right?
```

1        A.    That's right.   And it's true.

2        Q.    IPLLC was authorized to upload those

3   videos by MEGA FILM; correct?

4        A.    And the Hungarian Film Fund and a bunch of

5   other producers, yes.

6        Q.    The next sentence reads "(only a couple of

7   minutes of film clips were uploaded so that we can

8   prove to our clients that YT is not doing anything,

9   despite our efforts to get them to let us know)."

10            Do you see that?

11       A.    That's right.

12       Q.    You were saying that the videos that were

13   uploaded to YouTube were only short clips of the

14   MEGA FILM's works; right?

15       A.    Gábor already knew, Kálomista already knew

16   that the -- the full-length videos were uploaded to

17   his channel.   So we just explaining that this --

18   this dispute -- about this issue between PM and --

19   and YouTube.

20       Q.    You were saying that short clips of MEGA

21   FILM's videos were uploaded to YouTube --

22       A.    That's right.

23       Q.    -- right?

24       A.    We -- we could do anything we wanted

25   with --

1            MR. ZELCS:  Please, please, please allow

2    her to finish her question.

3            THE WITNESS:  I thought she did.

4            MR. ZELCS:  You have to wait for --

5            THE WITNESS:  I -- I thought --

6            (Interruption in audio/video.)

7            THE COURT REPORTER:  One -- one person at

8    a time, please.

9            MR. ZELCS:  Please let her finish her

10   question before you start to answer.  Otherwise,

11   we'll have an incredibly difficult time --

12           MS. HARTMAN:  Mr. Zelcs --

13           MR. ZELCS:  -- making --

14           MS. HARTMAN:  -- an objection is

15   sufficient.

16           MR. ZELCS:  I'm sorry, I didn't hear you.

17   What?

18           MS. HARTMAN:  An objection is sufficient.

19           MR. ZELCS:  Thank you.

20   BY MS. HARTMAN:

21      Q.   What did you mean when you said "we can

22   prove to our clients that YT is not doing anything

23   despite our efforts to get them to let us know"?

24      A.   What I mean by that is that we had to show

25   our contractual clients that YouTube is sabotaging

1   our efforts by not removing when we asked them to do

2   so, although we proved them with evidence that we

3   had the right to do so.

4        Q.    So what is exactly YouTube not doing?

5            MR. ZELCS:  Objection.  Form.

6            THE WITNESS:  Can I answer this or not?

7            MR. ZELCS:  Sure, you can answer.

8            THE WITNESS:  Yes, what is exactly YouTube

9   not doing?  YouTube is not removing millions of

10  infringed material from their site.

11  BY MS. HARTMAN:

12       Q.    And how would uploading short clips of

13  films show that?

14       A.    That was just part of the process.  We

15  were in the -- in the direction of achieving our

16  goals by actually monitoring and -- and the taking

17  down illegally uploaded material.  And YouTube kept

18  sabotaging us all the way.

19       Q.    So you wanted to upload clips of MEGA

20  FILM's works and send takedown notices for those

21  clips; right?

22            MR. ZELCS:  Objection.  Form.

23            THE WITNESS:  Not me personally, not at

24  all.

25  BY MS. HARTMAN:

Page 189

```
 1        Q.    Who did?
 2              MR. ZELCS:  Objection.
 3              THE WITNESS:  Nobody.
 4              MR. ZELCS:  Form.
 5              Again, please let me get an objection
 6    before you answer.
 7              THE WITNESS:  Nobody.
 8    BY MS. HARTMAN:
 9        Q.    The next sentence reads, "This right of
10    the IPLLC cannot be challenged by YT as a third
11    party, its counterclaim is therefore without merit
12    in several respects."
13              Do you see that?
14        A.    That's right.
15        Q.    What did you mean by that?
16        A.    Because IPLLC had the rights to do
17    anything with authorized material which was in its
18    possession.  And it cannot be challenged because we
19    had the contract signed and stamped by all of our
20    clients.  That's what I mean.
21        Q.    YouTube alleges that Pirate Monitor
22    uploaded videos to YouTube and sent takedown notices
23    for those same videos; correct?
24              MR. ZELCS:  Catherine, when -- when you
25    use the term "Pirate Monitor" in that question, are
```

1    you referring to Pirate Monitor LTD?

2              MS. HARTMAN:  Yes.

3              MR. ZELCS:  Thank you.

4              THE WITNESS:  Did Pirate Monitor LTD

5    upload movies or shorts or what -- what is the

6    question, I'm sorry?

7    BY MS. HARTMAN:

8         Q.   YouTube claims in this lawsuit that Pirate

9    Monitor LTD uploaded videos to YouTube and then sent

10   notices to YouTube requesting that it take down

11   those same videos; correct?

12        A.   Correct.  And it's wrong.

13        Q.   How is it wrong?

14        A.   Because Pirate Monitor LTD never uploaded

15   any shorts.

16        Q.   Who did?

17        A.   IPLLC and its authorized agents.

18        Q.   Who are the authorized agents?

19        A.   Are we joking now or what?  I mean, I -- I

20   think this question went over and over about hundred

21   times, and I explained.  Endre Holman and all his

22   entities.  He was the authorized agents [verbatim]

23   for IPLLC.

24        Q.   You're saying that IPLLC had the right to

25   upload the videos to YouTube that are the subject of

Page 191

1    YouTube's counterclaims; correct?
2          A.    Absolutely.
3          Q.    And after those videos were uploaded,
4    IPLLC sent takedown notices to YouTube for those
5    same videos; right?
6          A.    I only know this about reading the lots of
7    documents.  I did not know that beforehand.
8          Q.    Do you know it to be true now?
9          A.    About the takedown notices.
10              I'm sorry, say it again.
11         Q.    Do you know that to be true now?
12         A.    I know that was done, yes.
13         Q.    How do you know that IPLLC sent takedown
14   notices for videos IPLLC itself uploaded to YouTube?
15         A.    I found it out after the fact that we read
16   all the correspondent documents in this lawsuit.
17   What happened is, Mr. Kálomista, after longest time,
18   we couldn't maintain his -- his own material on
19   YouTube without successfully removing all the
20   infringements.  He basically told me to take down
21   everything.  And I called up Endre and I said, "Take
22   them all down."
23              I never said to him to file takedown
24   notices.  All I said, "I got instructions from my
25   client to take all the materials down, what you guys

1    sufficient, but I will clarify.

2              MR. ZELCS:  Well, I -- I -- an objection

3    wouldn't clarify the problem because you're not

4    making your question clear.  This is supposed to

5    be --

6              MS. HARTMAN:  Understood.

7              MR. ZELCS:  -- 30(b)(6) than an you

8    individual.  So I'm trying to figure out what one

9    you're asking.

10   BY MS. HARTMAN:

11        Q.   Mr. Csupó, did MEGA FILM instruct -- let

12   me withdraw that question.

13             What entity was instructed to remove all

14   of MEGA FILM's content from YouTube?

15        A.   Mr. Kálomista called me up personally as

16   the representative and acting agent of IPLLC, and he

17   told me at that time to remove all of his material.

18        Q.   And when was that?

19        A.   I don't remember the exact date.

20   Somewhere around the -- the end -- end of 2019.

21        Q.   And were the takedown notices sent in

22   accordance with that instruction?

23        A.   Instruction of what?  I mean, I called --

24   I -- I explained this, that I made a phone call to

25   Endre, and I said our client wishes to remove his

1    material from YouTube.  Anything is up in this

2    second [verbatim], anything you can find infringed

3    or even things we loaded up, he [verbatim] asking us

4    to remove it.  That's what I told him.  I did not

5    instruct him to do individually takedown notices.

6    All I instructed him to remove the material, or call

7    up his people and tell them to do it.

8         Q.   And were the takedown notices sent?

9         A.   When?

10         Q.   Were they?

11         A.   Were?  Where they started, they -- if they

12    actually start --

13              MR. ZELCS:  Hold -- hold -- hold on,

14    please.

15              Could I have the question back?  It --

16    it -- it's -- are -- are we still talking about

17    takedown notices being sent after Kálomista talks to

18    Mr. Csupó --

19              MS. HARTMAN:  Yes.

20              MR. ZELCS:  -- or a certain -- other point

21    in time?

22              MS. HARTMAN:  Yes.

23              MR. ZELCS:  Okay.  So could you read back

24    the question, please.

25              THE COURT REPORTER:  Question:  "And were

Page 206

```
 1              the takedown notices sent?"
 2              THE WITNESS:  After -- after the
 3    instruction?  I believe so, yes.  And especially
 4    now, that reading all the material available, I can
 5    see that it was started, yes.
 6    BY MS. HARTMAN:
 7        Q.   And the instruction from Mr. Kálomista
 8    came around the end of 2019; correct?
 9        A.   I believe so, yes.
10        Q.   When did you begin monitoring MEGA FILM's
11    copyrights on YouTube?
12        A.   As soon as we signed the contract with him
13    in the beginning.
14              MR. ZELCS:  Again, Catherine, to the
15    extent that you can, please identify who you're
16    asking about, whether it's IPLLC, Pirate Monitor
17    Limited, Mr. Csupó, individually or what.  Thank
18    you.
19              MS. HARTMAN:  Understood.  An objection is
20    fine.  Thank you.
21    BY MS. HARTMAN:
22        Q.   Mr. Csupó, the takedown notices that were
23    sent following Mr. Kálomista's instruction to remove
24    all of MEGA FILM's content in videos on YouTube --
25    let me withdraw that question.
```

Page 207

1          Mr. Kálomista of MEGA FILM instructed you

2    to remove unauthorized videos containing MEGA FILM's

3    works; right?

4        A.    Depends what moment we're talking about.

5    In the very beginning, he authorized me to remove

6    all fraudulently uploaded material, so illegally

7    uploaded materials.

8          And later on, when we couldn't perform

9    because YouTube sabotaged that action, then he asked

10   me to remove everything.

11       Q.    Why would Mr. Kálomista not want you to

12   remove everything from the beginning?

13          MR. ZELCS:   Objection.   Form.

14          THE WITNESS:   He authorized us to keep

15   uploading legally to his channel.   And we have

16   all -- the contract, which shows that all those

17   movies, which you very kindly shared back with me on

18   the document.   We had the rights to handle all of

19   that.

20          Basically, it says you can do anything

21   with it, upload it, take it down, upload it, take it

22   down, anything we wanted -- promote it, put it

23   sideways, anything we wanted.   Okay?   A hundred

24   percent rights to it.   Not that we owned anything,

25   but that we had the authorization to -- to basically

Page 208

1    promote it, upload it, anything.

2              In the beginning, we tried to clear up all

3    the illegally uploaded materials so we could really

4    cleanly build his own channel with leg- --

5    legally -- legally uploaded stuff, which we would do

6    for him.

7              And at the same time, we were monitoring

8    the illegally uploaded materials, which we kept

9    sending takedown notices to YouTube very

10   unsuccessfully.

11             And when he saw that it didn't work, then

12   month and month [verbatim] later, he called me up

13   and, you know what, you guys can't function.  And I

14   understand because I sent him copies of -- of

15   that -- the -- YouTube's responses where they said

16   that -- that, you know, we're not going to take it

17   down or your account is frozen or whichever reason,

18   they -- they boycotted our activities I sent him.

19             And he said, You know what, just take down

20   everything.  And -- and including the -- the legally

21   uploaded and the illegally uploaded stuff.  He just

22   wanted off -- everything off of YouTube.  So I

23   called up Endre, and they instructed him.

24   BY MS. HARTMAN:

25        Q.   So you're saying that you instructed

1    Mr. Holman to remove all unauthorized videos on

2    YouTube containing MEGA FILM's works?

3         A.    Everything, not just unauthorized; even

4    the one we uploaded legally.

5         Q.    Okay.

6              MS. HARTMAN:  Qifan, please pull the

7    document from Tab 28.

8              (Csupó Deposition Exhibit 20A was marked

9              electronically.)

10             (Csupó Deposition Exhibit 20B was marked

11             electronically.)

12   BY MS. HARTMAN:

13        Q.   I'm showing you what has been marked as

14   Exhibits 20A and 20B.  20A is a document dated

15   November 12th, 2019, through November 13, 2019, that

16   was produced in this action as a document Bates

17   stamped GOOD-SCHNDR '10898 through '10901.

18             And Exhibit 20B is an English translation

19   of that document.

20        A.   I'm just going to look at the...

21             Yes.

22        Q.   Please turn to the bottom of Exhibit 20A.

23        A.   I'm on 20B now.  It's the English version

24   I'm looking at, but we can just go straight there.

25        Q.   Please open to 20A just for a moment.

1  got a -- a few notices where YouTube says, Yes, we

2  did, and a hundred notices where they refused.  So,

3  yes, there was a few.  No question.  Good covering

4  YouTube's ass.

5       Q.   How many takedown notices were sent to

6  YouTube between August 2019 and November 2019 that

7  contained your authorized signature?

8            MR. ZELCS:  By whom, in -- in -- in terms

9  of who was sending them?

10            MS. HARTMAN:  I'm asking for any takedown

11  notices that contained his authorized signature that

12  were sent to YouTube between August 2019 and

13  November 2019.

14            MR. ZELCS:  Thank you.

15            THE WITNESS:  No idea.

16  BY MS. HARTMAN:

17       Q.   Can you estimate?

18       A.   No.

19       Q.   Who would know the answer to that

20  question?

21       A.   The people who actually filled out the

22  takedown notice and the people who actually find

23  the -- the -- the material needed to be removed.

24       Q.   And who is that?

25       A.   Endre Holman and his companies and his

1    employees.  I'm mostly referring to -- to General

2    Digital, because they're the one who -- who -- who

3    mostly, they're authorized to -- to deal with this

4    specific matter.

5            And if anything outside of that company

6    falling toward that territory, then Endre decided

7    who to assign to certain tasks.  But General Digital

8    is the one who -- who, basically, did all this.

9        Q.   And who at General Digital would be

10   responsible for sending takedown notices to YouTube

11   with your electronic signature?

12       A.   Well, Endre Holman was IPLLC's authorized

13   agent to be the -- to -- to act on behalf of -- of

14   my instructions.  Endre Holman, in fact, then went

15   to his own company, General Digital, and assigned

16   his employees the certain task to deal with it.

17            And inside of this -- inside of his

18   companies, Búzás Zoltán was -- was his main source

19   where he -- you know, Búzás Zoltán knew -- knew most

20   about this stuff because he was an assigned person

21   to -- to the YouTube situation.

22            So he's the one who would most likely know

23   most about it, and he's the one who handled most of

24   the takedown notices.

25       Q.   Can you name any other individuals that

1   record?  That's what I mean.

2        Q.   How is YouTube not letting you have a

3   strong track record of sending takedown notices

4   to --

5        A.   Oh, my God.  This whole lawsuit is about

6   it.  Just please read from Page 1, and then you will

7   know.

8        Q.   Apart from this application, what other

9   efforts has Pirate Monitor LTD made to gain access

10  to Content ID?

11       A.   Applying for it.  I -- I don't think

12  [verbatim] what else you can do.  You can't knock on

13  the door and beg for it.

14       Q.   Did Pirate Monitor LTD sue YouTube to get

15  access to Content ID?

16       A.    Not for that reason.  We sued YouTube

17  because of the scheme of -- of -- of things that

18  they [verbatim] doing.  And including the fact that

19  they are refusing giving out Content ID to actually

20  real copyright holders to sabotage the whole

21  process.

22       Q.   Did Pirate Monitor LTD hope that it would

23  get access to Content ID through the lawsuit against

24  YouTube?

25       A.    That's one of the reasons.  And we also

1    want to teach YouTube a lesson and -- and control

2    them to make stronger applications and stronger

3    efforts to not to let -- to be -- from the beginning

4    to be uploading illegally copyright infringements to

5    its channels when they already have existing

6    software, which automatically can recognize it, and

7    they're refusing to use it.  They only use it when

8    they feel like they want to, to show a little good

9    faith.  But that's not good enough.

10          Q.   You testified that IPLLC requested access

11   to Content ID; right?

12          A.   I'm sorry?

13          Q.   You testified that IPLLC requested access

14   to Content ID; right?

15          A.   Yes.

16          Q.   How many times did IPLLC request access to

17   Content ID?

18          A.   I don't recall it exactly.  I believe more

19   than once.

20          Q.   Did IPLLC request access to Content ID for

21   IPLLC's own purpose?

22          A.   Oh, I'm lost in that question.  I'm so

23   sorry.  Can you phrase it differently?

24          Q.   Did IPLLC request access to Content ID on

25   behalf of other entities?

Page 253

1                    CERTIFICATE OF REPORTER

2              I, Hanna Kim, a Certified Shorthand

3    Reporter, do hereby certify:

4              That prior to being examined, the witness

5    in the foregoing proceedings was by me duly sworn to

6    testify to the truth, the whole truth, and nothing

7    but the truth;

8              That said proceedings were taken before me

9    at the time and place therein set forth remotely and

10   were taken down by me in shorthand and thereafter

11   transcribed into typewriting under my direction and

12   supervision;

13             I further certify that I am neither

14   counsel for, nor related to, any party to said

15   proceedings, not in anywise interested in the

16   outcome thereof.

17             Further, that if the foregoing pertains to

18   the original transcript of a deposition in a federal

19   case, before completion of the proceedings, review

20   of the transcript [x] was [ ] was not requested.

21             In witness whereof, I have hereunto

     subscribed my name.

22   Dated:  12th day of July, 2022

23

24

                   Hanna Kim

25                 CLR, CSR No. 13083