# EXHIBIT 3

to the Declaration of Qifan Huang

PUBLIC VERSION - REDACTED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated,

Plaintiffs,

v.

YOUTUBE, LLC; and GOOGLE LLC,

Defendants.

______________________________

Case No.: 3:20-cv-04423-JD

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF JULIAN BILL

June 22, 2022
9:09 a.m.

Magna Legal Services
866-624-6221
www.MagnaLS.com

44 Montgomery Street, 41st Floor

San Francisco, California

REPORTED BY:

Siew G. Ung

CSR No. 13994, RPR, CSR



**APPEARANCES:**

For Plaintiffs:
KOREIN TILLERY, LLC
CAROL O'KEEFE, ESQ.
505 North 7th Street, Suite 3600
St. Louis, Missouri 63101
314.241.4844
cokeefe@koreintillery.com

RYAN Z. CORTAZAR, ESQ.
205 North Michigan, Suite 1950
Chicago, Illinois 60601
312.641.9750
rcortazar@koreintillery.com,

For Defendants:

WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
ELI B. RICHLIN, ESQ.
CATHERINE HARTMAN, ESQ.
1301 Avenue Of The Americas 40th Floor
New York, New York 10019
212.497.7781
erichlin@wsgr.com
chartman@wsgr.com

GOOGLE (in-house)
JOHN JANHUNEN, ESQ.

Also Present:
RANDALL THIEBEN, Videographer

INDEX TO EXAMINATIONS

**WITNESS:** Julian Bill

| EXAMINATION | PAGE |
|---|---|
| BY MS. O'KEEFE | 7 |
| BY MR. RICHLIN | 221 |

INDEX TO EXHIBITS
JULIAN BILL
WEDNESDAY, JUNE 22, 2022
Siew G. Ung CSR No. 13994, RPR

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 121 | Packet of Documents (GOOG-SCHNDR-00000924 to GOOG-SCHNDR-00001058) | 40 |
| Exhibit 122 | Pre-Publish Checks V1 Pro (GOOG-SCHNDR-00041470 to GOOG-SCHNDR-00041476) | 130 |
| Exhibit 123 | Documents (GOOG-SCHNDR-00038782 to GOOG-SCHNDR-00038807) | 158 |

(Exhibits Continued)

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 124 | YouTube In-Flight Report: Manual Claiming Changes (GOOG-SCHNDR-00038961 to GOOG-SCHNDR-00038965) | 190 |
| Exhibit 125 | Brandon's Quick Guide to CIMA/CLA apps (GOOG-SCHNDR-00001289 to 1290) | 196 |
| Exhibit 126 | Addressing creator feedback and an update on my 2019 priorities by Susan Wojcicki (GOOG-SCHNDR-00021200 to GOOG-SCHNDR-00021204) | 200 |
| Exhibit 127 | Master Launches, Master CommDoc (GOOG-SCHNDR-00053755 to GOOG-SCHNDR-00053763) | 204 |



SAN FRANCISCO, CALIFORNIA;
WEDNESDAY, JUNE 22, 2022, 9:09 A.M.
***

**THE VIDEOGRAPHER:** Good morning, everyone. We are on the record. This begins Videotape No. 1 in the deposition of Julian Bill in the matter of Maria Schneider versus YouTube, LLC.

It is being heard in the US District Court, Northern District of California, San Francisco Division. The case number is 3:20-cv-04423-JD. Today is Wednesday, June 22nd, 2022. The time now is 9:10 a.m. Pacific.

This deposition is being taken at the law offices of Boies Schiller Flexner at 44 Montgomery Street, 41st floor, San Francisco, California 94104, at the request of the New York office of Boies Schiller Flexner LLP.

My name is Randall Thieben. I'm the videographer from Magna Legal Services. And our court reporter today is named Siew Ung of Magna Legal Services.

If counsel and all parties present can please state their appearances and whom they represent.

**MS. O'KEEFE:** Carol O'Keefe of

Korein Tillery on behalf of the plaintiffs. With me is Ryan Cortazar also of Korein Tillery.

**MR. RICHLIN:** Eli Richlin of Wilson Sonsini Goodrich & Rosati for defendants, as well as the witness. With me is my colleague Catherine Hartman and John Janhunen, who is in-house counsel with Google.

**MS. O'KEEFE:** Can you swear the witness?

**THE VIDEOGRAPHER:** Great. Thank you everyone.

And if the court reporter can please swear in the witness, we are ready to go.

JULIAN BILL,
having been first duly sworn, was examined and
testified as follows:

EXAMINATION BY MS. O'KEEFE

**Q. Good morning, Mr. Bill.**

A. Good morning.

**Q. Let's start off with your employment at Google.**

**When did you start working there?**

A. I first started at Google there in 2006.

**Q. And what was your first role there?**

A. I was a sales engineer.

**Q. In -- in what division of Google?**

A. I worked in the AdSense syndication division. The actual division was called PSO, the Partner Services Organization.

**Q. And what does a sales engineer do?**

A. My job was to partner with -- with business development to be responsible for the technical aspects of our advertising syndication deals with large publishers.

**THE REPORTER:** Technical aspects of?

**THE WITNESS:** AdSense syndication deals. So AdSense is a -- a Google products, where we can run Google Ads from third-party sites.

**MR. RICHLIN:** Mr. Bill, when she asks you a question, she just wants to hear the word again.

**THE WITNESS:** I see.

**MR. RICHLIN:** She's transcribing it.

**BY MS. O'KEEFE:**

**Q. So was your first role at Google as part of the Google Ads team?**

A. It was part of Google AdSense team, which is distinct from the Google Ads teams.

**Q. Okay. And describe what AdSense does?**

A. AdSense is a product offered by Google whereby a third-party website can run Google Ads on their -- on their sites and then share the revenue

with Google.

**Q. And am I correct that uploaders and channels who monetize on YouTube must have an AdSense account?**

**MR. RICHLIN:** Objection to form.

You can answer.

**THE WITNESS:** Okay. Yes. The reason I paused there is because that -- the product -- the AdSense products I worked on before was not associated with the issue.

**BY MS. O'KEEFE:**

**Q. All right. And how long were you in that role?**

A. I worked for PSO until it became -- it became gTech, which is a different organization that I worked at until 2015.

**Q. And what is gTech?**

A. gTech was a rebranding for the same organization, Google Technology Services.

**Q. And what were your role -- your roles were -- did they remain the same under the rebranding?**

A. So I started as a sales engineer, and then I became a technical account manager. And then I moved into a role where I was managing the technical

MAGNA LEGAL SERVICES





A. I do not.
**Q. Okay. What is the name of the audiovisual fingerprinting technology?**
A. I would refer to it as audiovisual matching.
**Q. How accurate is Content ID's matching technology?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** As we talked earlier, we -- pre- -- precision is a key measure of -- of our system. So we -- we tune it to be precise.
**THE REPORTER:** We what to be precise?
**THE WITNESS:** We tune it to be precise.
**BY MS. O'KEEFE:**
**Q. How precise is your system today?**
A. We aim to keep it at or above 99 percent precision.
**Q. And when you say "at or above 99 percent precision," what is the numerator metric and what is the denominator metric?**
A. It's based on a manual evaluation that we perform every month. So we sample a collection of videos, and we evaluate the -- a section of claimed videos, and we evaluate the claims on those -- on that sample of videos.

**Q. Okay. And what does the numerator represent?**
A. The numerator represents the proportion of those claimed videos that we classify as being precise claims.
**Q. Okay. And what does the denominator represent?**
A. All of the claimed videos from the sample.
**Q. I'm going to ask you a slightly different question.**
A. Okay.
**Q. How accurate is Content ID matching as opposed to Content ID claiming?**
A. I don't know.
**MR. RICHLIN:** Objection to form.
**BY MS. O'KEEFE:**
**Q. Okay. Who would know how accurate Content ID matching is?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** I would need to consult with our engineering team.
**BY MS. O'KEEFE:**
**Q. Okay. Who on the engineering team is based in the United States?**
A. Our rights management engineering team is

based in the United States.
**Q. Who on the Content ID Core engineering team is based in the United States?**
A. None of them.
**Q. Okay. Does anyone who reports to Fabio Magagna work in the United States?**
A. Yes.
**Q. Who?**
A. Kevin Zhu.
**Q. So we discussed the manual claiming process which is designed to find the videos that copy creator content but are not surfaced by the Content ID matching technology, correct?**
A. I'm sorry, can you repeat the question.
**Q. We discussed the manual claiming process --**
A. Yeah.
**Q. -- which is designed to find videos that contain copyrighted content that is not found by the Content ID matching technology, correct?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** I'd say it slightly differently. It's designed to allow partners to find videos that contain that -- that content.
///

**BY MS. O'KEEFE:**
**Q. Are you aware of any instances in which Content ID generates a false match?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** How would you define a "false match"?
**BY MS. O'KEEFE:**
**Q. Where Content ID says that an uploaded video matches the digital fingerprint of a reference file, and that determination is incorrect?**
A. I'm not aware of any situation like that.
**Q. Have you ever heard of any such situations discussed at YouTube?**
A. No.
**Q. Let's go back to the Content ID onboarding process.**
**When you have a new Content ID partner and they are in the manual review stage, what tools do you provide them to refine their reference files and improve the precision of their Content ID claims?**
A. We -- we have classifiers that will process reference files provided by our partners, and attempt to flag portions of those reference files as invalid.
**Q. What is a "classifier"?**





A. A classifier is a name for a system that processes something and attempts to classify it according to some set of rules.

**Q. So one of those classifiers would be public domain content, correct?**

A. We have a Public Domain Classifier. that's not necessarily associated with reference file classification.

**Q. How do you help Content ID partners identify public domain content within their reference file?**

A. So our guidance to partners is to not provide us with reference content that is public domain.

**Q. Okay. And if a Content ID partner makes a mistake and in their initial reference file provides the song "Happy Birthday to You" as part of the reference file, how do you identify that for the Content ID partner?**

**MR. RICHLIN:** Objection to form.

**THE WITNESS:** I don't know if "Happy Birthday to You" is necessarily in the public domain. That's a -- that's a big topic that you have brought up.

///

**BY MS. O'KEEFE:**

**Q. Sorry, I knew I picked the wrong one.**

A. But I understand the question.

**Q. We will look at the metadata associated with the musical composition, and we will attempt to determine whether or not that musical work is in the -- the public domain.**

**THE REPORTER:** Did you say original composition?

**THE WITNESS:** The musical composition.

**THE REPORTER:** Musical. Okay. Sorry.

**BY MS. O'KEEFE:**

**Q. What metadata do you routinely use as part of the Content ID system?**

A. So starting with sound recordings.

**Q. Uh-huh.**

A. A sound recording is delivered to us -- a reference file name of the track, and ISRC, which is and an identifier for a sound recording, ISRC, the artist name, release dates for the content. They are the ones, the main ones that I can recall. There's probably more.

**Q. Do you require ISRC codes to be provided with all audio reference files?**

A. We strongly recommend a version of ISRC

codes. I don't recall whether we reject deliveries if they don't include ISRC codes.

**Q. How does the DDEX metadata stream work with Content ID?**

A. DDEX is a standard -- is -- is an umbrella term for standards for music supply chain definition. We -- we ingest metadata described using the DDEX standard.

**Q. And is an IR -- ISRC code part of that DDEX stream?**

**THE REPORTER:** Stream or string?

**MS. O'KEEFE:** Stream.

**BY MS. O'KEEFE:**

**Q. Can you think of any other metadata associated with the audio reference files that is used by the Content ID system?**

A. No.

**Q. What metadata associated with audiovisual reference files is utilized by the Content ID system?**

A. Name of the asset. Depending on the type of the asset, it can be a movie or a TV episode, so you can provide metadata that describes the movie or the TV episode.

**Q. Uh-huh.**

A. They are the ones that I can recall.

**Q. Approximately how many active Content ID partners does YouTube have now?**

A. I don't recall.

**Q. Where would you go to find that out?**

A. I would consult with the Trust and Safety team.

**Q. What measures of accuracy do you use to evaluate the accuracy of the Content ID claiming system?**

**MR. RICHLIN:** Objection to form.

**THE WITNESS:** Precision.

**BY MS. O'KEEFE:**

**Q. Anything else?**

A. That's our key measure of accuracy.

**Q. Do you use any other measures?**

A. I don't know.

**Q. Do you measure the rate at which uploaders dispute Content ID claims?**

A. Yes.

**Q. And in the context of that metric, how accurate is Content ID's claiming system?**

**MR. RICHLIN:** Objection to form.

**THE WITNESS:** So a -- when a claim is disputed, that's independent of whether or not the





**precluded by virtue of YouTube's rules from monetizing?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** So there -- I think there is an assumption in that question that YouTube precludes monetization in the event of -- of an overlap.
**BY MS. O'KEEFE:**
**Q. Yes.**
A. I don't know whether that's always true.
**Q. Okay. Let's assume it's true.**
A. Okay.
**Q. In -- in any situation where YouTube precludes monetization --**
A. Yep.
**Q. -- by Content ID partners, will YouTube still monetize that video?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** So in the situation where a claim has been made where there's some ambiguity to that claim, maybe multiple partners are asserting ownership on that same content or, as you say, maybe there is overlapping references, we would not run ads of our own accord.
///

**BY MS. O'KEEFE:**
**Q. How many strikes can a Content ID partner receive on their channel before being subject to termination?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** So a channel can receive three strikes before -- before a channel is subject to termination.
**BY MS. O'KEEFE:**
**Q. Are the rules any differently applied for Content ID partners?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** Not that I'm aware of.
**BY MS. O'KEEFE:**
**Q. What is an unlisted video?**
A. An unlisted video is a video that an uploader has published but has not surfaced in search and discovery. So the only way another viewer could access that video is if the -- if the URL had been shared.
**Q. And how is an unlisted video different from a private video?**
A. A private video has an access control that is associated with it. So the uploader has to explicitly provide the channel, I think, with

permission to access that video.
**Q. Will an unlisted video surface in the Content ID search engine tool?**
A. When you say the "Content ID search engine tool," what you are referring to?
**Q. I mean the search engine that is provided as part of the Content ID management suite?**
A. Gotcha. I don't know.
**Q. Will an unlisted video surface in the YouTube search bar?**
A. By the YouTube --
**Q. By the users on the platform?**
A. So our -- our regular user?
**Q. Yes.**
A. If the user knows the URL of the video, then they can put that into their browser, and they will be able to see the video.
**Q. Other than the URL, will the unlisted video surface based on a search that would ordinarily hit on the metadata or tags associated with that video at the time of upload?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** I'm not sure I fully understand the question.
///

**BY MS. O'KEEFE:**
**Q. Let's talk about a -- a video upload?**
A. Yeah.
**Q. When I upload my daughter's basketball video --**
A. Yeah.
**Q. -- I have the opportunity to associate tags with it, like, "Kayli O'Keefe and basketball," "1997 and Motown soundtrack."**
**Those tags are searchable in the YouTube search bar, correct?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** I don't know.
**BY MS. O'KEEFE:**
**Q. How does the YouTube search bar operate?**
A. I don't know. It's not my product area.
**Q. You don't know. Well, what is your understanding of the restrictions that are imposed upon unlisted videos?**
A. My understanding of the intent of unlisted videos is that there's a video URL that a -- that an uploader can share with people that will allow them to access that video.
And that is -- that video is not discoverable otherwise.



**Q. So it wouldn't be discoverable from the YouTube search bar?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** So the YouTube search bar being the -- the search bar that is on YouTube.com?
**BY MS. O'KEEFE:**
**Q. Yes.**
A. Not as far as I know, no.
**Q. And it wouldn't be discoverable from the Google search bar?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** Not -- given what I understand about the intent of unlisted videos, no, but I -- I don't work on search.
**BY MS. O'KEEFE:**
**Q. And can an unlisted video be embedded in another non-Google website?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** So can -- can it be embedded as a YouTube --
**BY MS. O'KEEFE:**
**Q. As a URL?**
A. So you could link -- it's a URL. So if you have the URL, you can access the video. And if that URL is placed into another website, then yes,

the video can be found.
**Q. So is it possible for unlisted videos to be seen by millions of viewers?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** It's a URL, I mean, so, yes.
**BY MS. O'KEEFE:**
**Q. Okay. And yet it cannot be surfaced in the YouTube search bar?**
**MR. RICHLIN:** Objection to form. Asked and answered.
**THE WITNESS:** Yeah, I agree with --
**THE REPORTER:** Sorry?
**THE WITNESS:** Asked and answered.
**THE REPORTER:** No. Don't --
**THE WITNESS:** I agree. Yes.
**BY MS. O'KEEFE:**
**Q. So if Maria Schneider's song "Data Lords" is uploaded by a YouTube user, and the video contains the soundtrack to her song, and it also contains the cover of her album, and it is unlisted on the YouTube platform, she will not be able to search and find that video, will she?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** I -- I don't know. To the extent of my knowledge, no.

**BY MS. O'KEEFE:**
**Q. And yet it could be seen by millions of users?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** As mentioned, it's -- it's a URL that's unlisted but is accessible on the internet.
**BY MS. O'KEEFE:**
**Q. Okay. Are you familiar with the different Content ID strategies for protecting intellectual property?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** Can you explain more about what you are referring to?
**BY MS. O'KEEFE:**
**Q. Do you or other members of your team have discussions with Content ID users to develop claiming or monetizing or blocking policies that are designed to correlate with their goals regarding their intellectual property?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** So the -- the partner has the freedom to specify policies as they see fit.
**BY MS. O'KEEFE:**
**Q. Uh-huh.**

A. With respect to the presence of their content in user-uploaded videos. Me and my team, we -- we don't engage with the partners like that.
**Q. Okay. But you have a background in advertising, right?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** So, yeah, we used to syndicate Google Ads to --
**THE REPORTER:** Wait. Sorry.
**THE WITNESS:** We used to syndicate Google Ads to third-party websites, yes.
**BY MS. O'KEEFE:**
**Q. All right. What is "RPM"?**
A. Typically, it refers to revenue per thousand views normally.
**Q. And in terms of generating revenue, is there a distinction, an important distinction between long-form user-generated content and short-form user-generated content?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** When you say a "distinction," what -- how would you define the distinction.
**BY MS. O'KEEFE:**
**Q. Does long-form user-generated content**



**BY MS. O'KEEFE:**
**Q. And if the Creator had obtained a valid license to use the work prior to upload, then presumably they would dispute the Content ID claim, correct?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** That's one of the mechanisms by which they can address a claim made against their video.
I -- I -- it's hard to reason about all the means by which a creator can obtain a license to use content in -- in their video.
There are other mechanisms in the system that allow -- partners can go in and release claims proactively.
**Q. Uh-huh.**
A. Or they can even whitelist channels or -- sorry -- allow those channels, which means that Content ID doesn't make claims on those videos for that product.
BY MS. O'KEEFE:
**Q. Are full -- are full album UGC uploads assessed a copyright strike under the DMCA?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** So as mentioned before, I

think a video that is designated as a full album upload doesn't say anything about copyright infringement -- and sorry. The question was about whether they are assessed a strike?
**BY MS. O'KEEFE:**
**Q. Whether they are assessed a copyright strike under the DMCA?**
A. So a copyright strike is associated with a takedown, which is a notification of copyright infringement to YouTube.
**Q. Uh-huh. And --**
**THE REPORTER:** A notification of ...
**THE WITNESS:** Copyright infringement.
**THE REPORTER:** Under the ...
**THE WITNESS:** It's a take -- a strike -- I forget what I said now. A strike is associated with a takedown, which is a notification of copyright infringement to YouTube.
**THE REPORTER:** UG?
**THE WITNESS:** YouTube.
**THE REPORTER:** YouTube. Okay. Sorry.
**THE WITNESS:** Sorry. I'm trying to talk louder and more clearly.
**BY MS. O'KEEFE:**
**Q. Moving to the next page of that document,**

**in the middle of the page under "Open Items," it says, "Partners want to change conditions to catch more content. Test lowering of the conditions for percentage of same artists on video to [REDACTED]"**
**Why do partners want to catch more content?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** I don't know. Actually I'm not sure what the background is to that particular point.
**BY MS. O'KEEFE:**
**Q. Move to page 7 of that document, Bates number ending in 38788.**
A. Okay.
**Q. It states near the bottom, "Private videos disallowed in potential claims for short audio."**
**Why were private claims -- private videos being disallowed?**
**MR. RICHLIN:** Objection to form.
**THE WITNESS:** This specific -- so this -- this specifically refers to potential claims, not automatic claims. So a potential claim -- I think when -- when we were talking about Safe Mode earlier, we talked about potential claims.
So that's a case where Content ID, I think

it could make a claim between an asset and a video where it requires the partner to review the claim before it's actually made active on the video.
**BY MS. O'KEEFE:**
**Q. Uh-huh.**
A. One of the aspects of short matching -- as I -- as I mentioned, it's hard to maintain precision the shorter the matches are on the video.
So as we -- we rolled this feature out very carefully. And one of the things we did was -- when -- when we made shorter matches, we surfaced those matches in a partner's potential claims queue and then required the partner to actually review the video to make a -- a human assertion of whether or not that video contained their content. And that's -- that's one mechanism that you can use to -- to increase the confidence, increase the precision.
With respect to this particular feature, we are talking about potential claims, and we are talking about potential claims made on private videos.
It's very important that we uphold the privacy expectations of our users. So therefore if the video has been designated as private by a user,



we can't make that private video available to a claimant to review.

**Q. Uh-huh.**

A. Because it's been designated as private. Therefore, the claimant can't reasonably review that claim in the context of the video because they don't know what the video is about. Therefore, it wasn't suitable for -- for this -- this aspect of our attempts to increase recall in match claiming.

**Q. Moving to the next page of this document, at the very bottom of the page, it talks about "Total Recall."**

**What is the Total Recall Task Force?**

A. It's the project name for a lot of what we we've just been discussing. So incr- --

**Q. And what was the goal of the Total Recall Task Force?**

A. It was to increase recall by making claims on shorter uses of music while maintaining precision.

**Q. Let's move to page 10 of this document under "Short Audio Match Precision -- Precision" near the bottom, the second bullet says "Per in-person meeting with UMG, they love getting these short matches and are excited we can catch this**

**content to decrease the manual claim work. The partner is excited for automatic matches to be made and to cut down on potential claim queue review."**

**Who is UMG?**

A. Universal Music Group.

**Q. And why do they love getting these short matches?**

**MR. RICHLIN:** Objection to form.

**THE WITNESS:** I -- I wasn't in that meeting. So I don't know.

**BY MS. O'KEEFE:**

**Q. Okay. But this is referring to short audio match that is automated as opposed to manual claim, right?**

**MR. RICHLIN:** Objection to form.

**THE WITNESS:** That appears to be the case, yes.

**BY MS. O'KEEFE:**

**Q. And then looking at the first bullet there, it says, "Greater than 12K short match claims were made and only five (.04 percent) claims disputed."**

**Is that an example of a precision calculation as you have described them today?**

A. No.

**Q. Why not?**

A. So whether -- whether a claim gets disputed or not isn't really a contact -- a consequence of whether their claim is precise or not.

It -- we can -- we can make very precise claims, and they might -- can still be disputed if the user believes they have the rights to use the content in the video.

**Q. Moving to the next page of this document.**

**"Allow for easier DDEX delivery. Partners would like the custom policy in DDEX delivery to take match conditions from saved policy to allow for easier scheduling, to be resolved before majors migrate to DDEX for Content ID."**

**What's the role of DDEX that is described here?**

**MR. RICHLIN:** Objection to form.

**THE WITNESS:** So I think what this refers to is we used to have a proprietary protocol for partners to deliver content to YouTube. It's commonly referred to as the XML protocol.

We wanted partners -- well, there was -- there was basically industry demand to move to a more standardized supply chain delivery mechanism as

defined by the DDEX standard.

**BY MS. O'KEEFE:**

**Q. Uh-huh.**

A. So we worked with all of our partners to migrate them from the old proprietary XML format to the DDEX format.

But there were aspects of Content ID including referring to policies in the DDEX standard that needed to be accounted for.

And I think we worked with the DDEX standard parties to make that supportable in DDEX, and then we had to build that into the parser, the -- the thing that decoded DDEX deliveries.

**THE REPORTER:** And then we had to in --

**THE WITNESS:** Incorporate that into the parser, p-a-r-s-e-r. It's the parser's files. And then, that's what this refers to, I think -- and we always refer to match policies in DDEX.

**MS. O'KEEFE:** All right. Ryan, let's mark as Exhibit--

**MR. RICHLIN:** Carol, before you go to the next exhibit --

**MS. O'KEEFE:** You want to take a break?

**MR. RICHLIN:** Yeah. We have been going about an hour or so.



**Witness: Julian Bill — June 22, 2022**

***Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)**

**Errata Sheet**

| **Page:Line** | **Change** | **Reason** |
|---|---|---|
| 8:11 | Replace <products> with <product> | To clarify the record |
| 8:12 | Replace <from> with <on> | To clarify the record |
| 8:20 | Insert <the> between <of> and <Google AdSense team> | To clarify the record |
| 9:16 | Replace <2015> with <2012> | To clarify the record |
| 23:9 - 23:11 | Replace <Insomuch as it's one of the actions that you can apply, the way you make a claim a video as monetize is – is one of those actions> with <Insomuch as monetization is a claiming policy that a Content ID partner can apply to a video that matches the partner's reference file> | To clarify the record |
| 23:24 | Replace <roles> with <rules> | To clarify the record |
| 32:12 | Replace <they> with <I> | To clarify the record |
| 41:20 | Replace <Mihel> with <Michal> | To correct transcription error |
| 42:9 | Replace <do> with <use> | To correct transcription error |
| 47:15 | Replace <determine> with <it determines> | To clarify the record |
| 50:10 | Replace <he> with <we> | To correct transcription error |
| 53:19 | Replace <slash> with <question mark> | To clarify the record |
| 56:18 | Replace <recreate> with <we create> | To clarify the record |
| 58:25 | Replace <most> with <almost> | To correct transcription error |
| 62:18 | Replace <publishing collection> with <publisher or collection> | To correct transcription error |
| 71:4 | Omit <Q.> | To correct transcription error |
| 71:19 | Omit <and> | To clarify the record |
| 85:11 | Replace <denominator> with <numerator> | To clarify the record |

**Witness: Julian Bill — June 22, 2022**

***Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)**

| 85:13 | Replace <claim> with <claimant> | To correct transcription error |
|---|---|---|
| 94:7 | Replace <service> with <surface> | To correct transcription error |
| 100:23 | Replace <the light of Responses to Objections> with <light of YouTube's Responses and Objections> | To clarify the record |
| 113:12 - 113:13 | Replace <So a record label is – is inherently what they do> with <That is inherently what a record label does> | To clarify the record |
| 117:18 | Replace <formed> with <shown> | To correct transcription error |
| 119:7 | Replace <definitely> with <differently> | To correct transcription error |
| 127:15 | Insert <Oh.> before <I agree> | To correct transcription error |
| 141:24 | Replace <off a> with <off> | To correct transcription error |
| 148:18 | Replace <content> with <Content ID> | To correct transcription error |
| 154:16 | Replace <chose> with <choose> | To correct transcription error |
| 161:15 | Replace <that are able> with <that we are able> | To correct transcription error |
| 166:23 | Omit <called product –> | To clarify the record |
| 167:23-167:24 | Replace <the content that he> with <Content ID> | To clarify the record |
| 170:17 | Replace <in the> with <and a> | To correct transcription error |
| 173:23 | Replace <instances> with <partners> | To clarify the record |
| 175:25 | Replace <substitution or> with <substitutional> | To correct transcription error |
| 181:1 - 181:2 | Replace <under services,> with <enter into agreements with YouTube pursuant to which they represent that> | To clarify the record |
| 181:2 | Replace <they have> with <they need to have> | To clarify the record |
| 182:18 | Replace <allow> with <allowlist> | To correct transcription error |
| 182:20 | Replace <product> with <partner> | To clarify the record |

**Witness: Julian Bill — June 22, 2022**

***Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)**

| | | |
|---|---|---|
| 202:6 | Replace <monetized> with <monetize> | To correct transcription error |
| 203:1 | Replace <policies> with <policy> | To correct transcription error |
| 203:2 | Delete <content> | To correct transcription error |
| 203:3 | Replace <create> with <created> | To correct transcription error |
| 203:4 | Replace <created> with <creator> | To correct transcription error |
| 203:5 | Replace <were being> with <that were then> | To clarify the record |
| 203:6 | Replace <monetizing> with <monetize> | To clarify the record |
| 203:12 | Replace <monetized> with <monetize> | To correct transcription error |
| 208:22 | Replace <pre-published> with <pre-publish> | To correct transcription error |
| 209:23 | Replace <asset> with <search> | To correct transcription error |
| 213:22 | Replace <aggregated> with <aggregator> | To correct transcription error |
| 214:3 | Replace <to> with <would> | To clarify the record |
| 215:8 | Insert <No> after <okay.> | To correct transcription error |
| 215:10 | Replace <Better ask him> with <you have better eyes than me> | To correct transcription error |
| 217:1 | Replace <contact> with <context> | To clarify the record |
| 219:21 | Replace <User> with <users of> | To correct transcription error |
| 220:9 | Replace <may> with <must> | To correct transcription error |
| 221:2 | Insert <OK, we have a copy of this email.> between <MS. O'KEEFE:> and <Do> | To correct transcription error |
| 221:5 | Insert <even> between <don't> and <know> | To correct transcription error |
| 221:6 | Replace <that it even> with <for whether it> | To clarify the record |

Witness: Julian Bill — June 22, 2022
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

| | | |
|---|---|---|
| 202:6 | Replace <monetized> with <monetize> | To correct transcription error |
| 203:1 | Replace <policies> with <policy> | To correct transcription error |
| 203:2 | Delete <content> | To correct transcription error |
| 203:3 | Replace <create> with <created> | To correct transcription error |
| 203:4 | Replace <created> with <creator> | To correct transcription error |
| 203:5 | Replace <were being> with <that were then> | To clarify the record |
| 203:6 | Replace <monetizing> with <monetize> | To clarify the record |
| 203:12 | Replace <monetized> with <monetize> | To correct transcription error |
| 208:22 | Replace <pre-published> with <pre-publish> | To correct transcription error |
| 209:23 | Replace <asset> with <search> | To correct transcription error |
| 213:22 | Replace <aggregated> with <aggregator> | To correct transcription error |
| 214:3 | Replace <to> with <would> | To clarify the record |
| 215:8 | Insert <No> after <okay.> | To correct transcription error |
| 215:10 | Replace <Better ask him> with <you have better eyes than me> | To correct transcription error |
| 217:1 | Replace <contact> with <context> | To clarify the record |
| 219:21 | Replace <User> with <users of> | To correct transcription error |
| 220:9 | Replace <may> with <must> | To correct transcription error |
| 221:2 | Insert <OK, we have a copy of this email.> between <MS. O'KEEFE:> and <Do> | To correct transcription error |
| 221:5 | Insert <even> between <don't> and <know> | To correct transcription error |
| 221:6 | Replace <that it even> with <for whether it> | To clarify the record |

JB Subject to the above changes, I certify that the transcript is true and correct.



Witness: Julian Bill — June 22, 2022
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

__________ No changes have been made. I certify that the transcript is true and correct.

(signature) 8/12/2022 (date)

ACKNOWLEDGMENT OF DEPONENT

I, Julian Bill, do hereby certify that I have read the transcript, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in this Errata Sheet.

8/12/2022 (Date) (Signature)