# EXHIBIT 6

to the Declaration of Qifan Huang

PUBLIC VERSION - REDACTED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated;

Plaintiffs,

vs. Case No. 3:20-cv-04423-JD

YOUTUBE, LLC; and GOOGLE LLC;

Defendants.
___________________________/

THIS TRANSCRIPT CONTAINS

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

DEPOSITION OF CHRIS TING

SAN FRANCISCO, CALIFORNIA

WEDNESDAY, JUNE 29, 2022

STENOGRAPHICALLY REPORTED BY:

ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR

CSR LICENSE NO. 9830

JOB NO. 846000



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
---oOo---

MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated;

Plaintiffs,

vs. Case No. 3:20-cv-04423-JD

YOUTUBE, LLC; and GOOGLE LLC;

Defendants.

_________________________/

Remote Videotaped Deposition of Chris Ting, taken at Boies Schiller & Flexner, 44 Montgomery Street, 41st Floor, San Francisco, on behalf of the Plaintiffs, on Wednesday, June 29, 2022, beginning 8:58 a.m., and ending at 1:20 p.m., Pursuant to Notice, and before me, ANDREA M. IGNACIO, CSR, RPR, CRR, CLR ~ No. 9830.



**A P P E A R A N C E S:**

**COUNSEL FOR THE PLAINTIFFS:**
KOREIN TILLERY, LLC
By: CAROL O'KEEFE, Esq.
RYAN CORTAZAR, Esq.
205 North Michigan, Suite 1950
Chicago, IL 60601
(312) 641-9750
cokeefe@koreintillery.com

-- and--

BOIES SCHILLER FLEXNER LLP
By: DEMETRI BLAISDELL, Esq.
55 Hudson Yards, 20th Floor
New York, NY 10001
(212) 446-230
dblaisdell@bsfllp.com



**A P P E A R A N C E S:** (Cont.)

**COUNSEL FOR THE DEFENDANTS:**
WILSON SONSINI GOODRICH & ROSATI
**BY:** BRIAN WILLEN, Esq.
NATHALIE GORMAN, Esq.
650 Page Mill Road
Palo Alto, CA 94304-1050
(650) 493-9300
bwillen@wsgr.com

**ALSO PRESENT:** Keigo Painter, Videographer
Samuel Reed Dippo, Google
---oOo---



I N D E X

**WITNESS:** Chris Ting


| EXAMINATION | PAGE |
|---|---|
| By Ms. O'Keefe | 7 |


E X H I B I T S


| EXHIBIT | PAGE |
|---|---|
| Exhibit 134 SpiderMADison: Copyright Suspension Expansion to Linked Channels, Bates GOOG-SCHNDR-00000918 - '23 | 94 |


---oOo---

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
(See attached 7-25-22 Letter from Wilson Sonsini)



DEPOSITION PROCEEDINGS
WEDNESDAY, JUNE 29, 2022
8:58 A.M.

**THE VIDEOGRAPHER:** We are on the record. This begins videotape No. 1 in the deposition of Chris Ting.

In the matter of Maria Schneider, et al., versus YouTube LLC, et al. In the Northern District of California, San Francisco Division. Case No. 3:20-CV-04423 JD.

Today is June 29th, 2022, and the time is 8:58.

This deposition is being taken at Boies, Schiller & Flexner, LLP, 44 Montgomery Street, 41st Floor, San Francisco, California 94104, at the request of Boies, Schiller & Flexner, LLP.

The videographer is Keigo Painter of Magna Legal Services, and the court reporter is Andrea Ignacio of Magna Legal Services.

Will counsel and all parties present state their appearances and whom they represent.

**MS. O'KEEFE:** I am Carol O'Keefe from Korein Tillery, appearing on behalf of the plaintiffs.

With me is Ryan Cortazar, also of Korein Tillery.

**MR. BLAISDELL:** Demetri Blaisdell of Boies, Schiller & Flexner, LLP, for the plaintiffs.

**MR. WILLEN:** Brian Willen from Wilson Sonsini, representing the defendants.

With me is Nathalie Gorman, also from Wilson Sonsini.

**MR. REED DIPPO:** Samuel Reed Dippo of Google LLC.

**THE VIDEOGRAPHER:** Okay. Would the court reporter please swear in the witness.

CHRIS TING,
having been sworn as a witness
by the Certified Shorthand Reporter,
testified as follows:

EXAMINATION

BY MS. O'KEEFE:

**Q Good morning, Mr. Ting.**

A Good morning.

**Q Could you please tell me what your roles have been at Google.**

A Yes. I -- I am currently the -- a people

manager on the copyright review ops team. Previously to that, I was an individual contributor on the same team. And previous to that, I was a contractor for YouTube.

**Q Okay. And when did you begin in your role as a contractor for YouTube?**

A I began my role in 2012.

**Q And what were your responsibilities as a contractor?**

A As a contractor, I reviewed and processed DMCA takedown requests.

**Q And did you -- were you hired directly by YouTube, or did you work for a vendor?**

A As a contractor?

**Q Yes.**

A As a contractor, I worked for a vendor.

**Q And what was the name of the vendor that you worked for?**

A I have worked for multiple vendors.

**Q And what were the names of the vendors that you worked for?**

A I can't remember the first one, but the second one was Adecco, and the third one was Vaco.

**Q And how long were you with Adecco?**

A I -- I don't recall exactly how long.

**Q Okay. So how many years altogether did you work as a contractor at YouTube?**

A I don't recall exactly. I can estimate, if that's -- probably about three or -- between three and four.

**Q Three and four years?**

A Three and four years. Correct.

**Q And were you a Tier 1 reviewer in your role as a contractor?**

A That is how a contractor starts, at Tier 1. So yes, I was a Tier I when I began.

**Q And during the time that you worked as a contractor, did you become a Tier 2 reviewer?**

A I -- yes. So as I -- I progressed to the next level, which is Tier 2.

**Q And how long did it take you to progress from Tier 1 to Tier 2?**

A I -- it was quite a while ago. I don't recall exactly how long that transition took.

**Q And when were you hired by YouTube?**

A 2016.

**Q Okay. And what was your position when you were hired by YouTube?**

A My position when I was hired by YouTube was copyright operations specialist.



Page 38

the claimant who has not provided a full copy of the work, we may still find that there is a strong likelihood of copyright exception.

**MS. O'KEEFE:** Okay.

**Q Have you ever found a DMCA takedown notice to be insufficient where you did not have -- strike that.**

**Have you ever found a DMCA takedown notice to be insufficient on the basis of an exception for fair use where you did not have a complete copy of the copyrighted work?**

**MR. WILLEN:** Objection to the form.

**THE WITNESS:** I'm sorry. There -- there are multiple parts to that -- that question. Could you repeat it one more time, please.

**MS. O'KEEFE:** Q. Have you ever found a DMCA takedown notice to be insufficient on the basis of an exception for fair use where you did not have a complete copy of the copyrighted work?

**MR. WILLEN:** Same objection.

**THE WITNESS:** So in the case where we have received a DMCA takedown request, it may be incomplete for varieties of reasons. It may have failed the statutory requirements.

In the case that it is a -- it meets the statutory requirements, but we feel that there is a --

Page 39

after reviewing for -- under our -- our review protocol for checking for copyright exceptions, we -- we may find that the takedown request -- we -- we may ask the claimants to consider some copyright exception and ask them to consider things like whether the -- the work is transformed.

**MS. O'KEEFE:** Q. So you engage in back and forth with the claimant over the contours of the fair use exception?

**MR. WILLEN:** Objection to the form.

**THE WITNESS:** We -- we merely ask -- after we've done our own analysis on potential copyright exception or the likelihood of potential copyright exception existing in a -- yes, the likelihood of potential copyright exception existing, we merely ask the claimant to consider whether they thought about things like the four factors.

**MS. O'KEEFE:** Okay.

**Q And do you identify those four factors for the claimant when you ask that question?**

A We -- we have a response where we ask them to consider things like whether the work has -- the new work has a different meaning than the original work, and ask them to consider how much of their work has been used in the -- in the new work.

Page 40

**Q Okay. Do you have canned responses that bear on fair use?**

A This response to them describing is a canned response.

**Q How many canned responses do you have that bear on fair use?**

**MR. WILLEN:** Objection to the form.

**THE WITNESS:** I -- I don't recall at this point.

**MS. O'KEEFE:** Q. Is it more than one?

A I -- I believe it's more than one.

**Q Is it more than five?**

A I -- I'm not sure about that.

**Q In your canned response that bears on fair use, do you advise the DMCA claimant that they could face civil penalties if they make an unjustified DMCA takedown claim?**

A I -- I don't recall the exact text of the canned response. So if -- if -- if you're asking what's in the canned response, I'm not sure if that -- that is in there.

**Q You had stated that the second factor was how much of the work was used.**

**Please describe for me the physical steps that you take in interacting with your user interface**

Page 41

**and applying the tools that are at your fingertips to make a determination on how much of the original work is used.**

**MR. WILLEN:** Objection to the form.

**THE WITNESS:** So I think there, the tool itself is -- it -- you know, it just shows the -- the targeted -- the video that is targeted for removal.

And beyond that, you know, if -- as I mentioned previously, if the claimant has provided a -- a copy of their original work, then -- then we can analyze both the -- the targeted work for removal as well as the original work.

**MS. O'KEEFE:** Q. What percentage of DMCA takedown notices include a copy of the original work?

A Oh, I -- I don't know the answer to that.

**Q Is it more than 50 or less than 50 percent?**

A I -- I have -- I would only -- I would be speculating if I guessed on this.

**Q Okay. In the context of your review of DMCA takedown notices for fair use, what percentage of the claims that you have reviewed for fair use have provided a copy of the original work?**

**MR. WILLEN:** Objection to the form.

**THE WITNESS:** Unfortunately, I -- I don't know the answer to that.



**MS. O'KEEFE:** Q. Is it nearly 100 percent?
A Your question is, are 100 percent of the -- potentially the cases where they have potential fair use or some copyright exception cases where --
**Q Simply fair use. We're talking about just fair use right now.**
**When you have examined videos for fair use, how frequently do you have a complete copy of the original work provided by the DMCA takedown claimant?**
**MR. WILLEN:** Objection to the form.
**THE WITNESS:** I -- I -- I don't know.
**MS. O'KEEFE:** Okay.
**THE WITNESS:** I -- I'm just, like --
**MS. O'KEEFE:** Q. Is it more than 10 percent of the time?
A It could be. I -- I just -- I -- total speculation if I answered this question. So I don't have a sense of the percentage in this case.
**Q When was the last time you consulted legal counsel regarding a fair use determination?**
A Myself personally?
**Q Uh-huh.**
A Maybe in the last two weeks.
**Q And how many times in the last month have you consulted legal counsel for a fair use determination?**

A Myself personally?
**Q Yourself personally.**
A I -- I would, I guess, remind -- remind you that I -- I -- I'm a people manager, so I am not participating in individual work as frequently as -- as some other people on the team. So I may not be myself processing many takedown requests at any given time.
So with that in mind, the question was, how many times per month?
**Q How many times in the last month have you consulted with legal counsel on a fair use question?**
A I -- I don't have an exact number.
**Q What's your best estimate?**
A I would say likely less than ten.
**Q Less than five?**
A I'm not sure about less than five.
**Q And how many DMCA takedown notices have you processed this month?**
**MR. WILLEN:** Objection to the form.
**THE WITNESS:** I think similarly to my previous response, again, I'm a people manager, so I -- I don't participate very much these days in actioning DMCA requests myself. So I -- I do not remember how many I've processed in the last month.

**MS. O'KEEFE:** Q. Can -- can you give me your best estimate?
A I would also say less -- less than ten.
**Q Less than ten?**
A (Witness nods head.)
**Q You've -- you've -- you've examined less than ten DMCA takedown notices in the last month?**
A Myself personally?
**Q Yourself personally, yeah.**
A Yes.
**Q What is the policy -- strike that.**
**How does a member of the copyright operations team determine whether to review a particular takedown notice for fair use?**
**MR. WILLEN:** Objection to the form.
**THE WITNESS:** So I think we would -- a member of the copyright operations team would review a DMCA takedown notice by going through certain steps.
Number one is to determine whether the takedown meets the statutory requirements, whether the -- as required by the DMCA, there are some elements there that need to be present.
And after that, the copyright operations team would look to see whether the -- there's any abuse of the process. For instance, if the claimant does

not -- is submitting a DMCA takedown request for content that they are not -- they do not own or are falsifying information on the legal form.
And then the last step would be to determine -- to -- to evaluate potential copyright exceptions, such as fair use.
**MS. O'KEEFE:** Okay.
**Q Do you evaluate every single takedown notice for copyright exceptions?**
A We -- there are a portion of -- so we have -- we have some degree of automation.
So a -- a classifier will evaluate a certain subset of DMCA takedown requests. And per the logic of the classifier, if there are signals in -- that it detects which potentially would flag it for manual review, for human review, then it would send it over to human review. And as part of human review, reviewers will evaluate for copyright exceptions.
**Q What is your best understanding of the classifiers that will send a takedown notice for manual review?**
A My best understanding of the classifiers?
Unfortunately, that is -- it's kind of the domain of the product team. Like, I -- I myself and -- and my team, we -- we don't -- we don't set the



logic of -- of how the classifiers work. So that -- it's a bit outside my expertise.
**Q Okay. I understand that you don't set the logic.**
**Do you have an understanding of the logic of how the classifiers work?**
A Broadly.
**Q Can you please provide me with your broad understanding of the logic of how those classifiers work.**
A So similar to how I've described the overall review process where, you know, our -- any given DMCA takedown request is evaluated for completeness on the basis of the DMCA statutory requirements, as well as, you know, ruling out potential abuse, and then taking into consideration copyright exceptions such as fair -- fair use, a -- the classifier will similar -- similarly try to take some of these into account.
So if the classifier is uncertain -- this is to my best knowledge. Again, I -- I'm not an expert in this on the product side. But to my best knowledge, if the classifier is uncertain that one of these requirements has been met, then it will route it for a human to take a look at.
**Q Okay. Does YouTube ever find a DMCA notice**

**to be insufficient without a manual review?**
A If the classifier finds that it is uncertain, again, to the best of my knowledge, as I am not a product specialist or have expertise in -- in the product or the classifier itself, my understanding is that if the classifier is uncertain, and there is the possibility that a DMCA notice is incomplete in some way, it will route to human review. And the human will there -- will complete the task and review all the -- all the elements as I've described.
**Q To the best of your knowledge, does the classifier consider the number of views on the video?**
A I -- I do not know the answer to that.
**Q Do you know whether the classifier considers the number of subscribers to the channel on which the video is posted?**
A I -- I don't know. These are --
**Q Who --**
A -- questions for the product team.
**Q Yeah.**
**Who is on the product team that would deal with the classifier, if you know?**
A I -- I believe Kevin Zhu is -- would -- would be -- he -- he's familiar with the product side.
**Q Okay. I believe Mr. Zhu has moved to**

**content ID.**
**So who would be -- who else would be on the --**
A I believe that is --
**Q -- the team?**
A -- that's the same team.
**Q That's the same team?**
A (Witness nods head.)
**Q Okay. Who else is on that team besides Kevin Zhu?**
A I -- I believe Julian Bill is on that team.
**Q And who else is on that team?**
A I believe he reports to David Rosenstein.
**Q Okay. Going back to the factors for fair use, when the DMCA takedown notice does not include a copy of the original work, how do you determine how much of the original work has been used?**
A It's a case-by-case basis. In certain cases, the claimants may provide a link to a work on a different site -- their -- their work on a different site which we may be able to access and -- and view.
In cases where the claimant provides a description of the work, it may be so well known that we understand to some degree what -- what is the -- the extent of that work; for instance, if it's a

well-known film.
**Q And in the absence of those resources, how do you determine how much of the work is used?**
A We have -- in -- in the UI, there is -- the review UI, there is a section where timestamps -- where we allow the claimant to pro- -- to provide timestamps where the original -- where they believe their -- their original work is used in the targeted work.
**Q So that would allow you to determine how much of the targeted work -- strike that.**
**So that would allow you to determine what portion of the targeted work is represented by the original work; correct?**
**MR. WILLEN:** Objection to the form.
**THE WITNESS:** So that would -- that provide -- that information is -- provides us with what the claimants believe -- what timestamps the claimant believes their original work exists in the targeted work.
It may be correct, it may be incorrect, but it gives us a guidepost to -- to look at the targeted work and determine whether -- you know, after looking at it ourselves, whether that content, in fact -- the claimant's content, in fact, or is likely to -- to



**THE WITNESS:** I think when we analyze that factor in -- in copyright -- in determining whether there is a likelihood of a copyright exception such as fair use existing, we will evaluate the -- the targeted video and compare it to the description of the original work as provided by the claimant.

And if there is -- if there are resources available that will help us make the determination available, then we will -- we will use those resources.

**MS. O'KEEFE:** Q. And what factors do you take into consideration in evaluating the fourth fair use factor, the nature of the use?

**MR. WILLEN:** I'm just going to give you the same general admonition that I've given with respect to this question before.

**THE WITNESS:** Broadly, I think when, you know, this is part of case law and -- and precedent outside of YouTube, it's -- courts have considered whether a, you know, work is -- an original work is a factual work or fictional work. And -- and this may play a part in determining whether a copyright exception is -- is stronger or weaker.

**MS. O'KEEFE:** Q. In your opinion, is a copyright exception stronger or weaker for a factual

work?

A I think it depends on the situation again. Like, that's a -- it's a consideration that we've -- that we take into account because courts have. But again, I think when we look at the individual facts of a given DMCA takedown request, this may play a smaller or larger part. But generally, it's just one factor that we consider, and it's highly dependent upon the facts of the case.

**Q Do the members of the copyright operations team that you manage contact counsel directly?**

**Or do they need to get approval through you in order to contact counsel regarding questions of fair use?**

A The team has standing meetings with counsel. So they -- we can bring our questions to counsel at the standing meeting. Outside of that, we can e-mail counsel as well.

**Q And if a member of your team were to e-mail counsel with regard to a question regarding fair use, would they copy you on that e-mail?**

A It's likely they would.

**Q Okay. How many DMCA takedown notices has your team processed in the last month?**

A I -- I don't have an exact number.

**Q Can you please provide me with your best estimate.**

A I would -- likely over 400,000.

**Q Okay. And of those 400,000 DMCA takedown notices, how many times have you or members of your team needed to consult with counsel regarding a question of fair use?**

A I -- I don't know the answer to that.

**Q Okay. Would it be more or less than ten?**

A Likely more than ten.

**Q Would it be more or less than 100?**

A What was the time frame again?

**Q In the last month.**

A Month? Probably less than 100.

**Q Okay. Would it be more or less than 50?**

A I'm not sure about that.

**Q Okay. Would it be more or less than 75?**

A It -- it may be in that ballpark.

**Q In what ballpark? What ballpark would you put it in?**

A 50 to 100, ballpark.

**Q Okay. What is your best understanding of the exceptions to copyright that your team analyzes in connection with DMCA takedown notices?**

**MR. WILLEN:** Objection to the form.

**THE WITNESS:** So we will -- as one part of our analysis of the DMCA takedown removal request, we will look at exceptions in the -- in the U.S., such as fair use, which may allow work to be lawfully used without being infringing, and we may consider similar international equivalence of fair use.

**MS. O'KEEFE:** Q. Are there any other exceptions that you consider?

A So I -- I think that fair use and -- and similar copyright exceptions that use a similar framework as the fair use -- as fair use does in the United States, we do consider those.

**Q Okay. Other than copyright exceptions or similar provisions applicable in other countries, what exceptions -- I'm sorry. Strike that.**

**Other than fair use or similar provisions that are applicable in other countries, what exceptions to copyright do you consider?**

A I think as described, fair use and similar international exceptions, those would be the exceptions that -- that we evaluate.

Obviously, if something is not subject to copyright, if it's a completely different legal issue such as trademark or privacy, that is outside the scope of copyright. I wouldn't describe it as an

MAGNA
LEGAL SERVICES

Page 62

exception, but it would be something we would not process if we receive a DMCA request for it.

**Q Okay. One more follow-up question on the numbers. Please provide me with your best estimate of the number of DMCA takedown notices that your team has disallowed in the past month on the basis of fair use.**

**MR. WILLEN:** Objection to the form.

**THE WITNESS:** I -- I don't have the number off the top of my head of how many takedown requests we have asked the claimants to consider fair use for.

**MS. O'KEEFE:** Okay.

**Q Do -- does your team ever find a DMCA takedown notice to be deficient on the basis of fair use?**

**MR. WILLEN:** Objection to the form.

**THE WITNESS:** I'm not sure about -- sure about the word "deficient."

But we have -- as we go through the process of reviewing a DMCA takedown, once we've gotten to the step of evaluating potential copyright exceptions such as fair use, we will ask the claimants to consider fair use and respond back to us with more detail about why they believe the content that they are targeting for removal does not qualify under a copyright exception such as fair use.

Page 63

**MS. O'KEEFE:** Okay.

**Q And after the claimant has responded, what is the next step for your team?**

A After the claimant has responded, we will typically consult with product counsel.

**Q And after you have consulted with product counsel, what is the next step for your team?**

**MR. WILLEN:** Objection to the form.

**THE WITNESS:** Relating to the ticket that is at issue or the DMCA takedown request that is at issue, product counsel may advise whether we comply with the removal request based on the information that we've been provided by the claimants, or product counsel may advise that we do not remove the content if the likelihood of there being a copyright exception is -- is strong.

**MS. O'KEEFE:** Okay.

**Q Does product counsel always contribute to the determination not to remove the content under the fair use exception?**

A There are situations where we -- so typically, over time we work with product counsel on a variety of cases which allows us to set some internal precedent on how to handle similar fact patterns.

And if a fact pattern has been -- we've

Page 64

consulted with -- with product counsel, we understand the fact pattern, and the close -- and the new one closely mirrors that, and we have a decision -- we -- we understand what was previously done in a similar situation, we may adopt the same decision for the new case without consulting product counsel.

**Q Please provide me with your best estimate for the number of times in the last month that your team has determined not to remove content on the grounds of a fair use exception.**

A Unfortunately, I -- I do not know the -- the number there.

**Q Do you think it's more or less than 100 times in the last month?**

A Unfortunately, I -- I don't have a good reference as -- in terms of the volume. So I -- I have no -- I can't even provide an estimate here --

**Q Okay.**

A -- unfortunately.

**Q Does your team provide the content owner with the reason for the refusal to remove the content?**

A Our team has canned responses which will, depending on the situation, explain to the claimant who is ask -- who is requesting to remove the video, we'll either provide them -- provide the claimants

Page 65

with additional questions for them to answer to help us understand if there is further information that, you know, is missing that will help us determine whether to comply or not comply with the takedown request.

**Q Okay. And in the event that you make the decision not to remove the content on the grounds of fair use, do you communicate with the claimant that the reason the video has not been removed is due to a finding of fair use?**

A We have canned responses which ask the claimants to -- we've already flagged to the claimant, like, this potentially may -- may be a copyright exception, and ask -- ask the claimant to provide us with further information as to why they believe that is not a copyright exception.

If, past that stage, counsel has advised us that the likelihood of a copyright exception is strong, and we will not comply with the removal request, then we will -- we will respond to the -- to the claimant and tell them we are not removing the content.

**Q Okay. When you tell the claimant that you will not remove the content, do you provide fair use as the reason for not removing the content?**

MAGNA LEGAL SERVICES

confident that they do have the same benefit.

**Q In your user interface, is -- is the uploader identified as an enterprise partner when they have that status?**

A The -- the review -- the user interface for reviewing DMCA takedown requests provides information to the reviewer, and that information may include the partner status of the uploader whose video is being targeted for removal.

**Q Okay. And do you apply any different practices in implementing the repeat infringer policy for YouTube enterprise partners?**

**MR. WILLEN:** Objection to the form.

**THE WITNESS:** If we receive a DMCA takedown request against a YouTube enterprise partner, we evaluate it using the same process that I've described.

So we -- we will check the takedown request for completeness, making sure that the statutory requirements are satisfied.

We look -- we check for abuse to make sure that the -- the claim is -- is not -- the claim -- the takedown request itself is not fraudulent.

And then we also, again, look for potential exceptions to copyright, such as fair use, on the

YouTube enterprise partner's video.

So that process remains the same. And should we go through that process and arrive at the conclusion that we will remove the video, that video will be removed, and the strike will be applied.

**MS. O'KEEFE:** Q. And if a YouTube enterprise partner has three active strikes, and the courtesy period on the final strike has expired, is the YouTube enterprise partner's channel suspended for a copyright violation?

A So I think -- I'm not sure the distinctions between the partner tiers exactly.

I believe there -- in certain cases, it should mirror the YouTube partnership program channels in that, yes, should a -- should there be some number of strikes on a channel -- sorry -- should there be three strikes or more at the end of the courtesy period, a channel will be automatically terminated.

However, I believe at some partner tier, there is an additional safeguard which allows the -- certain enterprise partners to continue to stay live -- channels to stay live

**Q Okay. Do you know whether the classifier requires manual review for all DMCA takedown notices filed against a YouTube enterprise partner channel?**

A I don't know, as that's -- that's a product question. There are -- I -- I don't know.

There may be situations where a classifier may be able to take action against -- against the YouTube enterprise partner channel's video.

There may be situations where the classifier is not confident enough to take action, and it routes to human review.

The particulars of that logic would be outside of my domain. It's a product team question.

**Q Okay.**

**MR. WILLEN:** Is this a good time for -- sorry. We've just been going for over two hours, I think. So I don't know how you're feeling, but --

**THE WITNESS:** I'm okay to break if -- if we want to.

**THE REPORTER:** I need a restroom break soon.

**MR. WILLEN:** Yeah, I think it's --

**MS. O'KEEFE:** I think this is a fine time to take a break.

Let's go off the record, please.

**THE VIDEOGRAPHER:** We are going off the record. The time is 11:19.

(Recess taken.)

**THE VIDEOGRAPHER:** We are back on the record.

The time is 11:42.

**MS. O'KEEFE:** Q. Mr. Ting, does YouTube provide the courtesy strikeout period to anyone other than YouTube partners, enterprise partners, or premium partners?

A I believe those are the partner statuses that receive the courtesy period.

**Q Does YouTube provide delayed courtesy strikeout periods to any channels on an ad hoc basis other than the partners that we just detailed?**

**MR. WILLEN:** Objection to the form.

**THE WITNESS:** There are certain instances where, at the direction of counsel, we may extend a courtesy period to non-YouTube partners; for instance, a government channel or a channel similar -- in a similar situation.

**MS. O'KEEFE:** Okay.

**Q Can you please detail for me all of the situations that you're aware of where you have extended the courtesy period to a channel who was not a YouTube partner, enterprise partner, or premium partner.**

A I believe the -- the example of a -- a government channel has -- is -- is one use case.

Aside from that, we have extended a courtesy

MAGNA LEGAL SERVICES



he has reports. Do you want some names from that team?

**Q Uh-huh.**

A Zelia Rosas and Sindhu -- last initial S. Elliot Poh.

That -- that's what I can remember at this time.

**Q Who do you report to?**

A I report to Shantal Poovala.

**Q And who does he report to?**

A She --

**Q She.**

A -- she reports to Pierce Stacy.

**Q Okay. What metrics are the copyright operations team evaluated on?**

A We -- the copyright operations team is evaluated on quality. So that is the accuracy of handling DMCA takedown requests and the accuracy of handling counter-notification requests.

In addition, another metric would be timeliness. So this would be the speed of removing of -- excuse me -- the speed of reviewing a takedown request and responding to -- to that takedown request, whether it be a pushback or complying with the removal request.

**Q Any other metrics?**

A Those are the main two.

**Q Can you think of any others?**

A There are subsets of metrics underneath the timeliness metric. So we -- as an example, average response -- excuse me -- average time to response would be one metric. And then a different dimension of the metric would be average percents within target handling time.

**Q And what is your target handling time?**

**Q And for a counter-notice?**

**Q And when was that change made?**

A January 2022.

**Q Are there any other sub-metrics within the timeliness category?**

A No.

**Q And what is your target handling time for responding to a takedown notice?**

**I just want to make sure.**

A I'm not sure if there is a distinction there.

**Q Okay.**

A I think they -- as I'm understanding it, it's the same -- same thing.

**Q Okay. How do you measure the accuracy of a DMCA takedown response?**

A We have a quality assurance process by which samples of handled tickets or previously answered DMCA takedown requests are pulled and reviewed by a quality team.

Those -- those quality reviewers will evaluate the initial decision by determining whether the correct canned response was sent, determining whether the video was properly removed or properly left live.

There are some other factors involved in quality; for instance, whether -- there is an abuse check as well. So one consideration in the quality is whether the reviewer considered -- correctly considered abuse as a factor. And if the complaint wasn't seemingly abusive, pushed back against the

claimant to request more information to validate whether there is -- is or is not abuse.

**Q Does the quality assurance review result in reports?**

A By "reports," you mean, like, a summary of the results of the -- the findings?

**Q (Counsel nods head.)**

A We -- we track metrics on week over -- week-over-week quality. So in terms of reporting, it -- it would be available in our dashboards.

**Q And what dashboards would it be available on?**

A Our metrics dashboard.

**Q And do you assess the accuracy of your handling of counter-notices in the same way that you assess the accuracy of handling takedown notices?**

A We do perform quality review on counter-notification handling by reviewers. The approach is a little different, because the counter-notification workflow has different steps to it than a takedown workflow. But in terms of the broad categories, they are similar.

So for counter-notification quality, we are looking at whether the DMCA requirements are -- are present in the counter-notification, which is similar to the process in the takedown.



Those are different requirements for a counter-notification versus a -- a takedown, so that will be different in the quality review of that -- of that process.

Also, similarly, we will check for abuse in -- in the submission of a counter-notification; for instance, if the uploader who is submitting a counter-notification has provided correct and non-abusive contact information or non-fraudulent contact information.

And in addition, we look at the counter-state -- statement which is provided by the uploader. And -- and the quality -- the reviewer will assess whether the initial reviewer correctly -- correctly analyzed the counter-statement from the uploader.

**Q Okay. And are any counter-notifications accepted without manual review?**

**MR. WILLEN:** Objection to the form.

**THE WITNESS:** All of our counter-notifica- -- all counter-notifications -- excuse me.

There -- there is no automation run on counter-notifications.

**MS. O'KEEFE:** Okay.

**THE WITNESS:** So any counter-notification

that is submitted to YouTube is -- is reviewed manually.

**MS. O'KEEFE:** Q. And what percentage of counter-notifications do you -- does the copyright operations team find to be valid?

**MR. WILLEN:** Objection to the form.

**THE WITNESS:** So the -- the team will review counter-notifications based on guidelines that are provided in -- in the training.

The -- the YouTube team does not determine, at the end of the day, whether the uploader has the right to -- to post the content. That -- that is some -- that -- that dispute is between the -- the uploader and the claimant.

And the counter-notification is just the process by which the uploader is able to dispute under the law.

So when the YouTube review team -- copyright ops review team reviews the counter-notification, we are checking to see whether the counter is valid on its face and meets the requirements of the DMCA and otherwise would be fine to forward to the claimant to -- to initiate the counter process which is described by statute.

**MS. O'KEEFE:** Okay.

**Q So what percentage of counter-notifications that you review do you find are sufficient to initiate the counter process described by the statute?**

A I -- I don't have a -- a number -- or I don't -- I don't remember the number.

**Q Okay. Can you give me your best estimate.**

A I'm sorry. Was the question how many were --

**Q What percentage --**

A -- forwarded?

**Q -- do you find are sufficient to initiate the counter process?**

A I -- I don't have an exact number. I can ballpark, maybe. I -- I think it's somewhere around 50- to 60 percent are sufficiently complete to initiate the process.

**Q Okay. Has that percentage changed over time that you have been at YouTube?**

A It -- again, I -- I don't know the specific data over time, so I wouldn't be able to accurately answer that question. I can imagine that percentage changing up or down, but I don't have a -- I don't have a frame of reference on the data.

**Q Okay. Do you have any perception of the general trend over time in the percentage of sufficient copyright counters?**

**MR. WILLEN:** Objection to the form.

**THE WITNESS:** As I recall, the -- the percentage has -- there's been ups and downs. I -- I believe the general trend for the last -- this is all an estimate on my part right now, but I think the general trend has -- has been to reject more counter-notifications.

**MS. O'KEEFE:** Okay.

**Q Do you have any perception of the general trend over time in the number of count- -- copyright counters submitted?**

A I think as with all of our incoming volume, there is -- there tends to be growth. So year over year, the numbers for both takedown requests and counter-notifications have increased, but I don't have a specific percent increase over time.

**Q Okay. Do you have any perception of whether the increase -- rate of increase for copyright counters has been higher than the rate of increase for DMCA takedowns?**

A I -- I don't have that information.

**Q Okay. Do you know whether the copyright operations analytics team creates any reports that reflect the metrics?**

A The information -- I'm sorry. Which metrics?

MAGNA LEGAL SERVICES

## Errata Sheet

| **Page:Line** | **Change** | **Reason** |
|---|---|---|
| 2:15 | Replace <Remote Videotaped> with <In-Person> | To correct the record |
| 40:3 | Replace <to them> with <that I'm> | To correct the record |
| 61:6 | Replace <equivalence> with <equivalents> | To correct the record |
| 76:12 | Replace <many> with <any> | To correct the record |
| 106:4 | Replace <Sindhu> with <Sindhuja> | To correct the record |
| 114:8 | Replace <process> with <processed> | To correct the record |
| 107:17 | Replace [REDACTED] with [REDACTED] | To correct the record |
| 115:6 | Replace <CEO> with <CO> | To correct the record |

[initials] ____________ Subject to the above changes, I certify that the transcript is true and correct.

____________ No changes have been made. I certify that the transcript is true and correct.

[signature] ______________________________
(signature)

August 10, 2022
(date)

Witness: Chris Ting - June 29, 2022
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

ACKNOWLEDGMENT OF DEPONENT

I, Chris Ting, do hereby certify that I have read and examined the foregoing testimony, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

[signature]
(signature)

August 10, 2022
(date)

2