# EXHIBIT 29

to the Declaration of Qifan Huang

PUBLIC VERSION - REDACTED

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD individually and on behalf of all others similarly situated; et al., Plaintiffs, | : | CASE NO. 3:20-cv-04423-JD |
| v. | : | |
| YOUTUBE, LLC and GOOGLE LLC, Defendants. | : | |
| ------------------------ | : | |

**VIDEOTAPE DEPOSITION OF:**

HAL J. SINGER, Ph.D.

NEW YORK, NEW YORK

FRIDAY, JANUARY 13, 2023

REPORTED BY:
SILVIA P. WAGE, CCR, CRR, RPR
JOB NO. 5647971

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

January 13, 2023
9:11 a.m.

Videotape deposition of HAL J. SINGER, Ph.D., held at the offices of WILSON SONSINI GOODRICH & ROSATI, 1301 Avenue of the Americas, 40th Floor, New York, New York, pursuant to agreement before SILVIA P. WAGE, a Certified Shorthand Reporter, Certified Realtime Reporter, Registered Professional Reporter, and Notary Public for the States of New Jersey, New York, and Pennsylvania.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**A P P E A R A N C E S:**

BOIES SCHILLER FLEXNER LLP
Attorneys for Plaintiffs
55 Hudson Yards, 20th Floor
New York, New York 10001
(212) 446-2359
Jwright@bsfllp.com
Pkorologos@bsfllp.com
**BY:** JOANNA WRIGHT, ESQ.
**BY:** PHILIP C. KOROLOGOS, ESQ. (VIA TELECONFERENCE)

KOREIN TILLERY, LLC
Attorneys for Plaintiffs
505 North 7th Street, Suite 3600
St. Louis, Missouri 63101
(314) 241-4844
Cokeefe@koreintillery.com
Gzelcs@koreintillery.com
Aellis@koreintillery.com
BY: CAROL O'KEEFE, ESQ.
BY: GEORGE ZELCS, ESQ. (VIA TELECONFERENCE)
BY: ANDREW ELLIS, ESQ. (VIA TELECONFERENCE)

WILSON SONSINI GOODRICH & ROSATI
Attorneys for Defendants
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
(212) 999-5800
Acandido@wsgr.com
Qhuang@wsgr.com
BY: AMY CANDIDO, ESQ.
BY: QIFAN HUANG, ESQ.

**A L S O P R E S E N T:**

STEVEN PETERSON, Ph.D.
PLAINTIFF'S EXPERT
PAUL BAKER
VIDEOGRAPHER

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

I N D E X

| WITNESS: HAL J. SINGER, Ph.D. | PAGE |
|---|---|
| EXAMINATION BY MS. CANDIDO | 7 |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Expert Report of Hal J. Singer, Ph.D., for Plaintiffs dated November 17, 2022 | 9 |
| Exhibit 2 | errata for Dr. Singer's export report dated January 10, 2023 | 10 |
| Exhibit 3 | document titled, "Life of a YouTube Upload," GOOG-SCHNDR-00034775 to GOOG-SCHNDR-00034798 marked Highly Confidential - Attorneys' Eyes Only | 135 |
| Exhibit 4 | partial transcript of Arpan Agrawal dated July 1, 2022 | 184 |
| Exhibit 5 | Expert Rebuttal Report of Steven R. Peterson, Ph.D., dated December 29, 2022 | 283 |

PREVIOUSLY MARKED EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| | NONE | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

\- - -

DEPOSITION SUPPORT INDEX

\- - -

Direction to Witness Not to Answer
Page Line

Request for Production of Documents
Page Line
None

Stipulations
Page Line
None

Question Marked
Page Line
None

Reservation
Page Line
None

Motion to Strike
Page Line
None

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**THE VIDEOGRAPHER:** Good morning. We are going on the record at 9:11 a.m. Eastern Standard Time on Friday, January 13, 2023.

Please note that the microphones are sensitive and may pick up whispering and private conversation.

This is Media Unit 1 of the video recorded of Dr. Hal J. Singer in the matter of Maria Schneider, et al, versus YouTube LLC, et al, filed in the United States District Court in the Northern District of California.

This deposition is being held at Wilson Sonsini located at 1301 Avenue of the Americas, New York, New York.

My name is Paul Baker and I am the Videographer. The Court Reporter is Silvia Wage and we are both from Veritext.

May I please have an introduction from Counsel beginning with the noticing attorney.

**MS. CANDIDO:** Amy Candido from Wilson Sonsini Goodrich & Rosati for the Defendants YouTube and Google.

And with my is Qifan Huang also from

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Wilson Sonsini and Dr. Steven Peterson.

**MS. O'KEEFE:** Carol O'Keefe of Korein Tillery for the Plaintiffs.

**MS. WRIGHT:** Joanna Wright from Boies Schiller & Flexner, also, for the Plaintiffs.

**THE VIDEOGRAPHER:** Will the Court Reporter please swear in the witness.

**THE STENOGRAPHER:** Sir, if you can please raise your right hand so I can administer the oath.

HAL J. SINGER, Ph.D.,

(Previously Listed Address) Econ One Research, 805 15th Street, N.W., Suite 510, Washington, D.C. 20005, after having been duly sworn, was examined and testified as follows:

**THE STENOGRAPHER:** Thank you.

You may proceed.

**EXAMINATION BY MS. CANDIDO:**

**Q. Good morning, Dr. Singer. As I said, my name is Amy Candido. It's a pleasure to meet you.**

**Would you please state your full name and address for the record.**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

A. Sure. Full name is Hal Jason Singer. And the address -- I imagine you're asking for my business address.

**Q. Sure.**

A. We just moved to Rosslyn, Virginia. It's in WeWorks. I'm not sure of the exact street address. But you can find me there --

**Q. Okay.**

A. -- on the 25th floor.

**Q. Good enough.**

**Dr. Singer, I understand that you've been deposed many times before; is that correct?**

A. Correct.

**Q. So you understand the process of giving deposition testimony. But just to cover the bases, I'll remind you that we have a Court Reporter and Videographer here today. But in order that the Court Reporter can get clear testimony, I'll ask that you allow me to finish my questions before you give your answers.**

**Will you agree to do that please?**

A. Yes.

**Q. Okay. And will you also agree to ask me for clarification if you do not understand any**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**of my questions, because if you do not ask me for clarification, we'll understand -- we will assume that you understood my questions; is that okay with you?**

A. Sure.

**Q. And if you need at a break at anytime, please ask me for a break and we can have a break. But, otherwise, if I have a question that's pending, would you please answer my question before we have a break? Will you agree to that?**

A. Yes.

**Q. Is there any reason that would prevent you from giving your full and complete testimony today?**

A. No. Although if gadgets continue beeping at me while I'm answering, I might have a hard time concentrating.

**Q. Hopefully, we can get those under control.**

**I'm going to mark your deposition -- I'm sorry, your expert report and your errata.**

**(Deposition Exhibit Singer 1, Expert Report of Hal J. Singer, Ph.D., for Plaintiffs**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**dated November 17, 2022, was marked for identification.)**

**(There is a discussion off the record.)**

**MS. CANDIDO:** So I'm going to mark as Singer Exhibit 1 the expert report of Hal J. Singer Ph.D. for Plaintiffs dated November 17, 2022.

(There is a discussion off the record.)

(Deposition Exhibit Singer 2, errata for Dr. Singer's export report dated January 10, 2023, was marked for identification.)

**MS. CANDIDO:** And I'm marking as Singer Exhibit 2 the Expert Report of Hal J. Singer, Ph.D., for Plaintiffs' errata dated January 10, 2023.

**Q. Dr. Singer, do you recognize Exhibit 1?**

A. Yes.

**Q. What is that?**

A. It's my expert report in this matter.

**Q. And do you recognize Exhibit 2?**

A. Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Q. What is that?**

A. It's an errata that fixes some errors in the initial report.

I'll note that, I think, I also turned in a fresh table of contents as well, but I can let that go. But I just want to note for the record that I was upset about how the table of contents looked and I gave you a fresh one of those as well.

**Q. That's correct. I apologize. We do have a copy of that. But it's unimportant from my perspective, so I apologize. I don't have that today, but I will acknowledge that we did receive that.**

**Would you please turn to Page 59 of Exhibit 1?**

A. Yes, I'm there.

**Q. Is that your signature?**

A. It is.

**Q. And would you please turn to the second page of Exhibit 2?**

A. I'm there.

**Q. You're there.**

**Is that your signature?**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

A. It is.

**Q. Okay. When did you determine that you needed to prepare the errata that is Exhibit 2?**

A. I think in preparing my deposition, I just noticed some errors just in words that needed to be changed, in addition to the table of contents. And I like to say nothing focuses the mind like a deposition. And so, you know, I probably had read this thing multiple times before I signed off. But you always catch things as you're preparing for the deposition, as I did.

I just thought it would be helpful for the record for us to have an understanding of what I intended to say when I -- when it was off.

**Q. You read your expert report that is Exhibit 1 before you signed it?**

A. Oh, yes, yes.

**Q. And when you read Exhibit 1, your expert report before signing it, you didn't catch any of the errors that you corrected in your errata?**

A. Correct.

**Q. It was only in preparing for your**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**deposition that you caught those mistakes?**

A. Correct.

**Q. Would you please take a look at the second page of your errata?**

A. Sure.

**Q. Are you there?**

A. Yeah.

**Q. On the second page of your errata, there are -- I guess in the left column, you have the errata numbered 1 through 22.**

**Do you see that?**

A. Yes.

**Q. Okay. Referring to those numbers, there are several errata like No. 1, 6, 9, 10, 12 that are correcting the edition of an extra space in between words. Essentially, there were two spaces instead of one.**

**Do you see that?**

A. Yes. Some -- some of these have in common spacing issues. That's correct.

**Q. So, essentially, you went from correcting there being two spaces and you removed that extra space?**

A. Yeah, I don't like that.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

that would control for all the other things that could affect advertising revenue and isolate what I think is the key variable that was being affected here, which is the time spent on the website. And I want to know controlling for all other things, what's the relationship at the margin between an increment of time spent on YouTube and YouTube's advertising revenues and then I'm going to ratchet that time down by what I'm calling the infringing share or IS to get at damages.

**Q. Well, I think I must be confused, because I thought that the only thing that was different in the hypothetical is infringing content, but you're talking about time.**

A. I can explain.

**Q. Okay.**

A. So you can think of this as a two-part proof. We first see that time spent on the platform controlling for all other things is statistically significantly related to the number of takedowns in a given month. So that tells us that's there something special about this content, in particular, right, that is causing

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

the time spent to be higher than otherwise would be. And the second part of the two-part proof I want to be able to connect Google's -- sorry, YouTube's ad revenues with time spent controlling for all other things that affect Google's ad revenues. It's simple two-part proof.

And then the final part is that once we've identified and established those two statistically significant relationships, then we can start engaging in what you know an economist would call simulation or prediction or counterfactual construction of a counterfactual world. Now, we're trying to simulate a world in which everything was identical except for the amount of the time spent. We're going to move it down by -- likely, it's be a fairly small amount to account for the increment in time across both infringing and non-infringing science that can be attributable to the challenged conduct here.

**Q. Why not create a, I guess, regression in which the variable that you are investigating is content, the actual, you know, variable at issue?**

A. This is the first time I'm hearing of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

that. And I hate to rule out, you know, alternative methods of proof. I don't want to suggest that I've stumbled upon the only pathway. I like my pathway. I think it's rigorous and appropriate here.

But remember, ultimately, at the end of the day, we want to have a model that will predict revenues. So what I don't hear in your building block, which is why not have a model that predicts content, you'd have to tell me a little bit more about it, as to how it, ultimately, relates to the decline in revenues.

At the end of the day the theory of harm here, as you know, is that YouTube enjoyed some ill-gotten revenues by virtue of not policing the infringing activity as vigorously as it should be.

And so tell me more. So I want to be accepting and accommodating of your pathway, because there isn't one pathway of proving impact, right. I've offered one. I think it's pretty good. But I can't rule out the possibility that there are other pathways.

**Q. Well, let me ask you more about your**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**"pathway."**

**You said the first step is a connection between time and takedowns?**

A. Correct, yeah. I want to test the proposition that takedowns, which is a proxy for the amount of -- the extent of infringing that's occurring on the platform after Content ID is correlated with time spent on the platform. This is a direct test of the proposition that this content is special. If it were not special and were instead fungible and could be replaced by any other content on the site, then what you would expect is that there would be no relationship between takedown activity and watch time. But, in fact, we find the opposite. We find a very tight connection including when we control for all the other things that might be affected in watch time. So that tells me that there's something special about the infringing content.

**Q. All right. We'll come back to that.**

**But is it fair to say that your analysis of the entire sort of but for world, this entire construct is grounded in your**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**framework of YouTube as a multi-sided platform.**

A. I do think it's well-grounded because it establishes what we call the causal pathways. We've got advertising as the dependent variable on the left-hand side and we have these measures of user engagement and other factors that can be driving advertising revenues. I think that is the direction -- the causal direction that the advertisers are there for the users and not vice versa. And so that's my way of saying, yes, I do think it was well-grounded in a multisided platform framework.

**Q. Okay. So you modelled YouTube as a multisided platform; is that right?**

A. I did. There's a theory section, which I thought was a precursor to the model. Because these relationships are complex and can be confusing and I wanted to make clear what I believed everyone's role was, what, essentially -- where the network effects were, who they implicated and what were advertisers doing in this complicated construct.

**Q. What is a "multisided platform" in the short version?**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

A. I'll be short. I hope you don't think I'm filibustering. I'm trying to be short.

I think that a multisided platform is one in which a platform provider brings together two groups of users in a way that exploits opportunities for spillover effects in both directions.

**Q. What are "spillover effects"?**

A. Well, I also use the word network effects.

The idea is that you can create -- we don't have to talk about the Internet. We can call a club, you know, that brings together men and women dancing right, that the concept is you bring together different groups and each group gets greater utility from knowing that more people of the other type are there. This is called indirect network effects.

So here you can think of YouTube as bringing together users, consumers on one side of the platform and content providers. So what happens is the users get more utility, more happiness, value the platform more the more content providers show up, the more fun stuff

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

there is to watch. And, likewise, the content providers value the platform more the more users show up because after all they want people to watch their stuff.

**Q. And "spillover effects" are the same as network effects, those terms are interchangeable?**

A. I'm using them largely interchangeable here. I try to be as precise as I can. You know, there are different flavors of network effects. There's direct effects and indirect effects and we talk about how the infringing content can stimulate non-infringing conduct directly and it can also stimulate non-infringing content indirectly through views.

So it's -- I use the word a lot, but I feel like spillover and network are capturing largely the same thing.

**Q. You just mentioned direct and indirect network effects.**

**Could you explain what the difference is between those two?**

A. Sure. So, in the example that I just gave you before, I was defining an indirect

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

network effect in the sense that the user was getting more utility by the more content providers were showing up. So indirect is capturing this idea that two distinct groups of users are enjoying the platform more all things equal with the other type shows up, more the other type shows up.

In contrast, a direct network effect is one in which the user on one side drives greater utility when more of his or her kind show up, right. And so the classic case of a direct network effect would -- I'm dating myself. But when we think about AOL and Instant Messenger. Like, we were all the same types there, right, when we were kids and when we would type and we would talk to each other. And then, you know, the more people who showed up and interacted on the platform, you know, the more valuable and exciting the platform was for us. You try to get all your friends to join. But they were people like us, right.

And indirect is capturing the idea there are people not like us but yet we still like them.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**arrow?**

A. Arrow C, you know, as I describe, is as I say that the potential to sell things to viewers is what brings the advertisers out. That's what C is capturing.

**Q. I think you describe it as also advertisers benefit from more monetized visits or longer visits to the extent that means more ads.**

**So that's more advertising revenue, isn't it?**

A. It's the potential for more advertising revenue. But what the arrow is indicating is that this is value that's being generated that's bringing advertisers to the platform, right. They value the opportunity of being able to sell things to consumers, content consumers and that's what C arrow is meant to indicate.

**Q. Does that represent the concept, though, that viewer time causes advertising -- ultimately, causes advertising revenue?**

A. I think that when you go to my final regression where I've got advertising revenue on the left-hand side, what I'm positing is that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

advertising revenue is going to increase the more viewer engagement you have on the platform. That's what's being tested in that model.

**Q. I mean, all else equal, a change in content alone would not change advertising revenue, right?**

A. I don't think I can agree with that given the findings that we have, right. If that were true, then we wouldn't expect the takedown notices to explain variations in ad revenues, but we do. And so that tells us that content is not fungible. There's something special about this content.

**Q. Well, in Paragraph 64 you say, "In other words, holding user visits and visit duration content constant, we do not expect any substantive change in advertising from a change in the number of providers as YouTube only realizes such revenues when consumers visit the content that includes ads. Advertisers on YouTube want to attract consumers' attention. Thus more content or additional content providers only benefit advertisers to the extent that the former draw additional consumers that advertisers**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**seek to reach."**

**Do you see that?**

A. Yes, and consistent with what my answer was.

**Q. But together don't those sentences mean that holding all else the same a change in content alone would not change YouTube's advertising revenues?**

A. Well, when you say, "holding all else equal," when you -- I was holding all else equal in my regression that involved takedowns on the right-hand side. And I was showing that an increase in takedowns is statistically and economically significantly related with both advertising revenues and watch time. So that tells me that that content is special.

I think that in my final regression I'm spelling out all the factors that I think go into ad revenue including viewer engagement statistics. And what I'm positing there is that I've controlled for all the things that drive ad revenue as reflected by this very high r-squared in the model. I've explained over 90 percent of the variation in ad revenue.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Q. You keep saying "that content" referring to takedowns.**

**Do you think there's something special about the takedown content?**

A. I think there's something special about the content that was taken down, yes, because if there wasn't, then you would not expect to see any relationship between takedowns and ad revenues or between takedowns and watch time.

The fact that you do is telling me that there is something special about this content, in particular. There was some sizzle associated with the infringing content. And, indeed, I think, YouTube recognizes there's something special about infringing content. They've decided to build a monetization strategy in part around infringement. That's the Content ID plan.

**Q. Okay. So are you talking about all infringing content or, specifically, the content represented by the takedown notice sample?**

A. Well, that's the only data that I have to test. But I do acknowledge that that

Page 106

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

takedown activity could be capturing the presence of infringing activity in general. I mean, there is a lot of infringement that could occur that never receives a takedown notice.

The only way that the content holder or the copyright holder can launch a takedown request is if she or he learns of it. But you know, you imagine there's got to be a lot of episodes where they don't learn of it. Or even if they learn of it, there might be a cost in submitting, basically, enforcing and policing it on your own, which is what these class members are asked to do.

So, for all those reasons, I can acknowledge that there are other infringing activity that's going on on the platform that's not being captured through the takedown notices but might be correlated with the takedown notice, which is the only data that we have.

**Q. What is your understanding of Content ID?**

A. My understanding of Content ID is that for the large content providers YouTube has offered up a program in which a content provider

Page 107

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

can decide, but it's an all or nothing take or leave it offer to either monetize videos that contain infringing content or block them all from the website. And my understanding is that the vast majority of these content providers have elected the monetization option.

**Q. Do you have an understanding of the types of content providers who participate in Content ID?**

A. Yes. I understand that these are the larger content providers, the more established content creators and are not members of the class.

**Q. And do you understand that the types of content providers that participate in the Content ID include -- strike that.**

**Do you have a sense of any of the types of examples of the types of content providers that would participate in Content ID?**

**MS. O'KEEFE: Objection, outside the scope of his expert report. He's not expressed any expert opinion regarding the operation of Content ID.**

**THE WITNESS:** Does that mean I should

Page 108

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

answer the question?

**MS. O'KEEFE:** If you know the answer to the question.

A. I think that I haven't studied particular content providers who subscribe or who are part of that Content ID matching program. But I understand that they are generally the larger content providers. And I also understand that the class members are the smallest. They're the ones that are not part of Content ID.

**Q. Do you have any basis to believe that the type of content provided by the class members is at all comparable to the type of content provided by the participants of Content ID?**

**MS. O'KEEFE: Objection, outside the scope and form.**

A. So that's not something that I've studied. But I just keep coming back to this point that there's something special about the class members' content, about the content that was received, the takedown notice, because if there weren't, we wouldn't expect takedown notice to predict movements and ad revenues and then watch time.

Page 109

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

So I've studied the specialness of the class members' content. That doesn't mean that nonclass members' content isn't also special in other ways. But I haven't -- I haven't formed any opinions about what makes Content ID creators and participants special.

**Q. Do you have any understanding of the nature of the actual content of the takedown notice videos?**

A. Do I have an understanding of the nature of what type of content was there?

**Q. Yes.**

A. I don't think I can learn anything more than just what the data shows me. So I see the takedown notice and I see the revenues that were associated with it. There are other fields in the takedown as well. But I don't know if there is a field that like says comedy or something or romantic comedy. I just don't know if I can get a handle on "the nature."

I don't know where you're going with "the nature," but maybe you can help me out with what you mean by "nature."

**Q. Have you seen any of those videos?**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

A. It's possible I've seen them just by watching YouTube or watching my son watch YouTube, who is unfortunately addicted. But I don't know with certainty if I've ever watched a video that was subject to a takedown notice. It's certainly possible.

**Q. You said that you looked at the revenue associated with those takedown notices?**

A. I had to, right, because that's the way that I got the direct or proximate disgorgement damages.

**Q. Do you have a sense of how that revenue compares to the average revenue of YouTube videos?**

A. Yeah, it's lower. And my understanding is that it's hard for this content, the class members' content, at least, prior to March of 2021 to even qualify or be a candidate or have the potential for monetization. My understanding is that the only way that these videos that we're talking about here of the class members that could have been monetized is if -- I hope I can get this right. There are only two ways.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

One is if it was posted by a participant in the YouTube partner program, right, or if it was posted by someone else who just happened to infringe on the copyright of a content creator in Content ID, right. And so, if you think about you have a big circle of like all the content or all the videos that were ever posted that potentially infringe -- no, that did infringe on the class members' copyrights and you have these tiny little areas of overlap, you know, with the two categories I just told you. So by construct -- and I'm not judging that this was good thing or bad thing. But, just by design, the likelihood that any of this content could have been directly monetizeable given YouTube's monetization strategy was low.

So, when I see that as a result the direct revenues were small in Dr. Peterson's words or if they're small relative to the indirects, it's not -- it shouldn't be surprising, right. These guys were -- by design, they weren't in a position to monetize by YouTube's design.

**Q. Have you seen the class member --**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**strike that.**

**Have you seen the named Plaintiffs' videos at issue?**

A. They've been described to me and I understand it concerns -- some of the videos that were posted may have included her songs. But I don't think I've watched them yet.

**Q. Have you seen the other named Plaintiffs' videos?**

A. I don't think that I've watched the named Plaintiffs' videos, no.

**Q. I think you were referencing Ms. Schneider's e-mail -- sorry, Ms. Schneider's videos previously.**

**Is it your understanding that those videos have "sizzle"?**

A. I don't think I go so far as to make a call about the "sizzle" of any particular video. I think what my regressions allow me to say that, in general, across all the videos that were subject to a takedown notice, there must have been something special or some "sizzle" there; otherwise, takedown notice would not be able to explain movements in ad revenues and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

watch time on the platform.

**Q. I think it's probably time for another break.**

A. We're getting close to the lunch hour so...

**THE VIDEOGRAPHER:** One moment please. Stand by.

The time is 11:57 a.m. We are off the record.

(Recess taken 11:57 to 12:16 a.m.)

**THE VIDEOGRAPHER:** The time is p.m. We are back on the record. You may proceed.

**Q. Dr. Singer, do you agree in order to be reliable, an economic model must be based on reasonable assumption?**

A. I think that's fair.

**Q. That the assumptions must be substantiated by facts and/or data?**

A. I would add that or I would amend that they should be substantiated by facts, record evidence and economic theory and then, ultimately, tested with data.

**Q. Do you agree that an economic model**

Page 114

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**relied on assumptions that deviated significantly from economic theory, record facts and evidence, then the model would be unreliable?**

A. I think that's fair. I think you want to conform to economic theory and facts of the case in setting up the model, as I've done.

**Q. One of the assumptions that you make in your report is that the percentage of infringing content videos on YouTube is responsible for the same percentage of time that viewers spend on YouTube; is that correct?**

A. It is an assumption that I'm forced to make given YouTube's refusal to turn over the data that we asked for. So I am not going to going to die on the hill that that assumption is necessarily true. I think that it's, roughly, correlated. But what I'm hoping to get with better data is a way to measure the infringing share after it has been weighted by watch time or buy views.

You should interpret, just to be clear, the 1.3 that's in that class report as a placeholder and only as a placeholder given the limited data that I have access to.

Page 115

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Q. Okay. The 1.32 percent is a percentage of infringing content that you've calculated, correct?**

A. Given the limited data I had available, that was the best estimate that I could come up with, yes.

**Q. Alright. What I'd like to talk about now is the assumption that you make in your report that the percentage of infringing content, whatever that is, is responsible for the same percentage of viewer time that viewers spend on YouTube.**

**Do you understand that?**

A. I understand and I just want to us both before we go into this knowing that I can allow for the possibility that once you weight these videos by either watch time or by views, you could get a very different infringing share. So I just want it to be crystal clear that that 1.32 estimate was the best that I could do given the data limitations and that when we get to the merits, I would hope to allow for the possibility that these ratios could diverge. But I don't want you to think for a second that I'm pedaling

Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

or defending the assumption to death that the ratio of videos is going to equal to the ratio once these videos are weighted by watch time. I can't know what that number is going to do. It could go up. It could go down.

**Q. Okay. So I may have been misunderstanding.**

**When you've used the phrase, "infringing share," were you using that to refer to the percentage of infringing content or the percentage of watch time that the infringing content receives?**

A. Let me make it absolutely clear. So, in the class cert report, the ratio is videos to videos. So the numerator are videos subject to the takedowns, right, divided by all videos on the platform. So it's videos to videos.

What we're doing there is we are -- just as you said -- we are assuming that that ratio is correlated with the ratio of watch time associated with the videos subject to a takedown divided by all watch time associated with all videos. And so what I'm offering to you is that what I aspire to one day measure in this case is

Page 117

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

infringing videos of class members' copyrights weighted by time divided by all videos on the platform weighted by time over some relevant window, say, the statute of limitations. That's one way to do the weights. Another weighting would be you weight the numerator and denominator by views.

Just to give you an idea of what troubles me about video to video is that I know that in corpus of videos, which I hope we can agree is the ballpark of [redacted], at least, for some part of what was the original damages period, there are some videos there that got posted 15 years ago that haven't generated a view or any watching time for 15 years and yet they're all coming into the denominator as if they're just as exciting as the stuff that's in the numerator where we know has been watched recently. It wouldn't have gotten a takedown. I think it's pretty safe inference that it wouldn't have gotten a takedown unless it had been viewed recently.

And so, when we do videos to videos, we're going to be potentially understating the

Page 118

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

contribution of class members' content or infringing content relative to the total content for the reasons that I just explained.

So this is why I would really -- I really aspire to apply weights such as watch time or views so that we can get to the most accurate measure of how big of a footprint these videos have relative to all videos on the site.

**Q. Before I continue with this, I just wanted to ask, with respect to the numerator, do you have any reason to believe that the videos subject to takedown notices have all had recent views?**

A. Well, they had to have, at least, had one view, right. That's when the copyright holder and class member learned of the infringement, right. So I'll leave it at that.

**Q. Other than the identification of the video for purposes of requesting that it be taken down, do you have any reason to believe that the video has been viewed?**

A. Sure. The other reason is that it would be very hard to learn of a video that was posted that infringed on your content, unless you

Page 119

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

found it in search or if the algorithm took you there.

So I think that the facts -- the fact of discovery of infringement strongly suggests that there was, at least, some viewing of the content in question. Put differently if it had never been viewed, if it was, basically, a dormant video, I think it would be harder at the margin to learn of the infringement, for a class member.

**Q. Have you as part of forming your opinions investigated the number of views that the takedown notices had received?**

A. I don't recall the views being a field in the data that I saw, at least. We can go back and check. But I know what was in there was the direct revenues. The advertising revenues were sold against it.

But I'm aware that -- my understanding is that YouTube collects such data and can turn it over to us, if it so desired, or if it were compelled by the Court.

Can I just add one last thing to that? I just want to -- it's an important

Page 120

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

consideration that I -- these are the things that keep me up at night.

But it also occurs to me and I just want to share with you that you're asking me about views and watch time of the infringing videos. And by construction, a video that gets taken down cannot generate views or watch time on a going forward basis. So there's this curious -- unless it gets reposted. I mean, there are a few caveats to that. But, in general, what gets taken down can't be watched. So the experiment is truncated in a sense.

And so, as a result, when we're trying to come up with this measure of infringing share, we should be cognizant of the fact that these videos weren't allowed by construction to generate the same type of engagement as the non-infringing videos, which could just stay up forever.

And I just want to point that out. It's something that I've been noodling on and I want to make sure that we're sensitive to when we go about ultimately measuring the footprint of these videos. And for example, one way to kind

Page 121

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

of account for this is to look at engagement while it was up. That's something that has been percolating in my mind. But I'll just leave it at that.

**Q. So, if you do not receive additional data regarding watch time or views with respect to the infringing content, is it your intention to proceed with the assumption that the infringing content is responsible for the same percentage of view time as the percentage of infringing content?**

A. I think you meant to say as non-infringing content or as the average time; in other words, does the -- can I -- I was kind of going to help things along, that the share of videos to videos is a proxy for the share of watch time to watch time; is that...

**Q. Well, I guess, to the extent that you don't receive viewer time or watch time information, is it your intention to proceed with the assumption that the percentage of infringing content videos is responsible for the same percentage of time, I guess, proportionate to its percentage of overall content?**

31 (Pages 118 to 121)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**MS. O'KEEFE: Objection, form.**

A. I mean, I'm going to -- just so the record is clear -- I'm going to interpret the question to be -- we're on the same page. I promise.

**Q. Okay. Alright.**

A. But if someone were to read the question, they might not get what you and I are both recognizing, which is...

Well, would I be comfortable, I think, extrapolating or relying exclusively on the share of videos to videos as a proxy for watch time to watch time. That's how I'm interpreting the question, in the event that I'm not permitted to get access to watch time or views of infringing content, fair?

**Q. Fair.**

A. And I think that if I got put in that position, I would be required to make that assumption. I really wouldn't -- I wouldn't have any other alternative. It still would be the best estimate of the share that we're trying to get at. And so I would defend it with those caveats.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

But I just want the record to be, you know, absolutely clear that there is no reason that I should have to make that assumption given that YouTube has this data.

**Q. Did you ask for watch time data before preparing your report?**

A. I believe so. I'd have to go back and confirm that. But I think that we've asked for a whole litany of things that we didn't receive. And I feel like watch time and views was part of the list.

**Q. Do you know whether your attorneys sought watch time data?**

A. Sitting here I don't have perfect recall as to everything that was asked for. So I don't know with certainty, but I think it was.

**Q. Do you know whether your attorneys moved to seek that production of that data?**

A. Not with certainty. But I believe that they did and it's something that we can certainly find out.

**Q. Do you know if the judge granted or denied those requests?**

A. I'm going to assume that everything

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

that I've received has made it through the judge's orders. So, if I don't see something, I feel like it's a safe assumption that the judge didn't compel YouTube to turn it over at this juncture of the case.

**Q. Your disgorgement damages calculation are all premised on this assumption that infringing content is responsible for the same percentage of viewing time, right?**

A. No. I want you to interpret the model in the class cert report as a proffer of a methodology and the methodology is going to turn on certain key inputs; primarily, the infringing share. And my intention is to measure the infringing share in terms of watch time and views in both the numerator and the denominator. So I don't want you to think that I'm offering you an estimate of damages today.

What I'm offering you is a methodology for getting to damages that turns on certain common grammars. When I say "common," I mean, common to the class, whatever the infringing share is. It's not going to vary by class member.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

So, when you say you're assuming this in order to get damages, I just think it's an unfair characterization of what I'm offering -- what opinion I'm offering at this point.

**Q. Can you look at Page 108 of your -- I'm sorry, Paragraph 108 of your report please.**

A. Yes, I saw it.

**Q. Okay. So the first sentence is utilizing your calculations or pulling in the calculations of infringing content where there's a range and you would have corrected this of 1.32 to 6 percent of the content on YouTube. And then you go on to say, "I further assume that such content is responsible for the same percentage of time that viewers spend on YouTube."**

**Do you see that?**

A. I see it.

**Q. And then from there you go on to calculate YouTube's predicted revenues assuming that the infringing content would not have been uploaded to YouTube resulting in the disgorgement damages calculations, right?**

A. I see it, yes.

**Q. So that assumption is built into the**

Page 126

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**disgorgement damages methodology that you're offering, correct?**

A. For the purposes of this class cert report, in which I didn't have any better data to refine the estimate of the infringement share, the infringing share, I am forced to make that assumption and only after I make that assumption can I use the model to come up with a damages estimate.

But I think it would be a mistake for you to interpret this to be my ultimate damages estimate of the merits. It's not.

What I'm offering up is a methodology, which is -- if we go out and measure as best we can the infringing share -- and I hope Dr. Peterson and I can even agree on what it is. It's not that controversial -- that we can then go and reduce the actual watch time in the real world by that amount to figure out the ill-gotten gains and revenues.

**Q. Absent different data, however, the methodology -- strike that.**

**The methodology you've offered up in your report involves this assumption, assuming**

Page 127

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**that content is responsible for the same percentage of time that viewers spend on YouTube, right?**

A. I think that in the class cert report, as I said, given the data limitations, I was forced to make that assumption. It was only way I could get to a damages estimate.

But the purposes of this report is not to offer you a damages estimate. I just want to make that crystal clear, right. The purposes of the report is to show you the methodology, which is the common to the class, as to how I would go about estimating damages at the merits phase.

**Q. And that methodology involves that assumption?**

A. It really doesn't. The methodology will not involve that assumption of the merits phase. That -- in the class cert report I was forced to make that assumption, because that's the only estimate we have in the record of what the infringing share is.

**Q. But you did not disclose in this report that you were intending to use a different**

Page 128

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**methodology at the merits phase, right?**

A. I don't think that's true. I think that I made it clear that I was forced to make a whole bunch of assumptions in this report by virtue of the data limitations. In fact, I lead off with the section titled, "Limitations of the data," and here's what it's going to force me to do as a result.

**Q. I understand that.**

**But the new methodology that you're describing that you would potentially use at the merits phase is not described in this report, would you agree with that?**

A. I don't think I would agree with it. But I just want to be clear that -- let me go back and see if I gave a preview of what I would like to do in terms of the infringing share.

But I think this is very fair, that economists generally doesn't like to make assumptions. Like, the fewer assumptions you have to make, the better. And the only reason I have to make this assumption here is because of the lack of data given YouTube's unwillingness to turn over the data, right.

Page 129

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

So it's not an assumption that I intend to live with at the merits phase. It's an assumption that we're -- it's kind of forced upon me by the lack of data production.

**Q. Specifically, with respect to this assumption that I understand was "forced" on you, you don't have any empirical evidence that supports that assumption, correct?**

**MS. O'KEEFE: Objection, form.**

A. I think we do have evidence that takedowns, which, ultimately, inform the infringing share, are statistically significantly related to watch time. So that is -- that does provide the predicate, but there's no reason why we need to guess or assume this, right.

If YouTube has the data and can allow us to do the weighting as we wish, either by watch time or views, turn over the data. I mean, Dr. Peterson had access to the data I presume and didn't use it.

**Q. So, other than -- well, strike that.**

**The evidence that you were referring to is your regression of the takedown notices, I guess, what in Table 5?**

33 (Pages 126 to 129)

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**content."**

**Do you see that?**

A. Yes.

**Q. "Head content by contrast makes up about [REDACTED] of the raw number of videos uploaded to YouTube, but they account for more than [REDACTED] of total watch time."**

**Do you see that?**

A. Yes.

**Q. Do you have any reason to think that these statements by YouTube are not true?**

**MS. O'KEEFE: Objection. He does not have knowledge concerning --**

**MS. CANDIDO:** You don't need to make speaking objections.

**MS. O'KEEFE:** Alright. Objection outside the scope of his expert report, outside the scope of his personal knowledge.

**Q. Dr. Singer, you've studied YouTube. You've read a whole bunch of articles. You've cited a zillion of them in your report.**

**Based on all your study and knowledge and expertise, do you have any reason to believe that the statements in this document that I'm**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**showing you are untrue?**

A. I don't have any reason to believe and when I think about distribution of downloads from music sites, you see similar occurrences where just a few songs tend to dominate the amount listened. And this is an aspect that is repeated throughout this industry where the most popular songs or books or videos are the ones that tend to dominate views and watch time.

**Q. Is Exhibit 3 a document that you would have wanted to see when you were making the assumptions that removing the allegedly infringing content on YouTube would result in an equivalent reduction in a percentage of watch time on YouTube?**

A. No, because it's not necessarily inconsistent. So I can't -- I'm looking at it now and you just asked me, does that cause you have to any less comfort in the assumption. The answer is, no.

What we're trying to get at is -- we're not assuming that every video that was ever subject to a takedown is getting the average watch time. That's not what we're saying.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

What we're saying is that across all videos subject to takedown, that those videos pull their weight with respect to the average. They, certainly, don't pull their weight with respect to the, you know, to what we call the headers or the winners or the dominant. But that was never presumed in the calculation.

And I just have to go back and say that the assumption again was by force of YouTube's refusal to turn over the data, you know. I'm telling you we don't have to make assumptions of these ratio of videos of watch time in the aggregate. We can just go right to YouTube's data and find out precisely how much watch time or how many views these infringing videos received. We don't have to guess.

**Q. Aren't you assuming that the infringing content is pulling their weight with respect to the average of videos on YouTube?**

A. Yeah, with respect to the average. But what this is telling me is just that the average -- that, you know, to understand, appreciate the distribution, there are few guys who dominant. We can tolerate that. You can

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

still have an average despite the fact that certain people dominant, right. In fact, you're going to have that in almost any distribution when it comes to content. There's always books -- certain books that dominant and movies that dominant and songs that dominant. You still come up with the average.

And what I'm assuming and for purpose of that placeholder assumption is that the infringing videos that are subject to the takedowns are pulling their weight with respect to the average video, right. Are included in that average videos are all those dogs that have just sat that for years and never been watched, right. So your figure likes to call attention to the headers or the cool guys, the ones who are commanding all the attention and they go into the average but so do the dogs.

**Q. Well, is it -- well, strike that.**

**If you knew that the allegedly infringing content was not part of the head, wouldn't it be more reasonable to come up with an average that excluded the [REDACTED] of the raw number of videos that were in the head?**

**MS. O'KEEFE: Objection, incomplete hypothetical.**

A. No. And how would I even know that they're not part of the head?

What I'm -- all I'm assuming -- they don't even have to be part of the head, but it's possible that some of them are.

But what is really going on behind that assumption is that on average they're pulling the same watch time review weight as the average video in the corpus of videos on YouTube. It's knot a comparison to the headers. It's a comparison to the average, which is a very different statement.

**Q. So are you saying that the infringing content is the same as non-infringing content because they're average?**

A. No. What I'm saying is that the total watch time comprised by the -- of the infringing on average is hitting the mark average of all videos in the corpus of videos in YouTube's content library. That is, once we go to denominator and weight these ratios by watch time and by views, that we're not going to expect

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

to see a big shift from the number that I've put forward.

**Q. By using the takedown notices as -- well, strike that.**

**You decided to use the takedown notices as the proxy for the amount of infringing content on YouTube, right?**

A. I think that's fair. I mea, particularly, in the regressions where takedowns shows up as the right-hand side variable. I think that it's serving there as a proxy for infringing activity outside of Content ID.

**Q. Well, Content ID is not part of the case, right?**

A. I think that's fair. Let's just say it's not part of my ambit. I'm not estimating damages with respect to Content ID. But it is part of the case in the sense like one of my key opinions -- and I'll give you a preview. I've stated it already.

But I feel that YouTube's decision business strategy to monetize infringing activity via Content ID tells us something about the profitability of permitting infringement on the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

site. I think that it makes business sense for Google. It increases the profits. It increases their revenues.

So I'm going to lean on the choice to monetize or to give the copyright holders the opportunity to monetize infringements as a key fact that I plan to rely on in discussing, in describing why YouTube would earn less money in a but for world in which they are compelled to police more aggressively.

**Q. How is Content ID allowing YouTube to monetize infringements?**

A. Well, because when YouTube puts the offer to the copyright holder, they say that you can choose one or two. You can compel us to take it down, all the infringements. But you would have to do it for all of them. Or you can take a cut of the advertisement that we sell against this content, which includes infringements. And so that's how infringements -- infringing activity becomes a profitable activity for Google, permitting infringement activity and compensating the copyright holder for permitting such infringement.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Q. Do you understand the difference between a licensed use and an infringement?**

**MS. O'KEEFE: Objection, calls for a legal conclusion.**

A. I have a -- some understanding about the license. But the license there is between YouTube and the copyright holder. It is not between the uploader, the content creator and the copyright holder.

And my understanding of infringement is the use of copywritten material without the prior consent of the copyright holder. So, in my mind -- and I'm not trying to offer you a legal opinion here, but any kind of agreement that's going on between YouTube and the copyright holder doesn't negate the possibility of infringement. I think that infringing still occurs by the definition I'm using, which is the use of copywritten material without the consent of the copyright holder.

**Q. But if the copyright holder provides consent, then it's not an infringement; is that your understanding?**

A. No, that's not my understanding.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MS. O'KEEFE: Objection, calls for a legal conclusion.

A. It's not my understanding because I -- the way that I interpret it -- and, again, this isn't all that important for my opinions, because you're asking me to, I think, weigh in on --

**Q. Well, it sounded like you were going to provide an opinion that there was infringement. So it seems reasonably fair that I get to ask --**

A. Absolutely, ask away.

**Q. Yeah.**

A. There are no bad questions today. They've all been wonderful.

What I -- what my opinion was is that we see that Google has set up a -- or YouTube has set up a regime that permits monetization of what would otherwise be an infringement of someone's copyright. I see it as compensation for the infringement. I don't see it as the negation. Because so long as an agreement doesn't exist between the content creator who is infringing and the original copyright owner, I don't see how

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

that can -- how that can square with my understanding, at least, of the definition of infringement. I think these are infringements. They're just the copyright holder is just being compensated for permitting the infringement.

**Q. So, in forming your opinions, you assumed that the takedown notices submitted to YouTube can serve as a proxy for the amount of infringing content on YouTube, you agreed with that?**

A. Yes.

**Q. And by doing so your model assumes that the URLs identified in the takedown notices provided to you in the data sample are infringing works that are part of the infringement classes; is that right?**

A. I don't think I'm going to go so far as -- you added, part of the infringing class.

What, ultimately, my understanding of the role of Dr. Cowan is to figure out what portion of these takedowns map both into the copyright register and also into the class members', you know, portfolio of content, of copywritten content.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

So I'm going to take those calls -- let's put it this way. Dr. Cowan is going to make those calls. I'm not going to make those calls. Those are an input to the model.

**Q. Did you assume that all of the URLs identified in the takedown notice sample are actually infringing?**

A. I don't think I am going to make an assumption or an opinion as to whether any particular takedown constituted infringement. But this is what I do know is that YouTube assesses each and every takedown and approves or disapproves the takedown. And I think they've -- these are takedowns that YouTube has studied and approved with something like an 80 percent approval rate. And I also know that very few of these taken down videos reappear.

I think the percentage that I saw in the record was something on the order of 2 percent who are actually successfully challenged and put back up. So I think all of that suggests to me that a successful takedown notice, which is what these are, are strongly indicative that an infringement occurred from all

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

parties' perspective, from YouTube's perspective and from the content creators -- sorry, from the copyright holder's perspective.

Beyond that, I don't know what more you would want from me as an economist to kind of verify that it was, in fact, infringing. I don't want to adverse step on this question of violation. I'm not going to offer any opinions about violation, in particular.

But I do think the takedowns are a reasonable approximation of infringing activity for all the reasons I've spelled out in my report.

**Q. So you're aware that not all the videos in the takedown sample were, in fact, taken down?**

A. No, that's not my understanding. I think that they -- these are successful takedowns is what -- is my understanding as what I'm looking at. I recognize that some of them could have been reposted, but I don't think they make it into the data if YouTube in the first instance disapproved of the takedown. I think Google has approved of these takedowns.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Q. Fair enough. That was -- I phrased that incorrectly.**

**So you're aware that the videos from the takedown sample, some of them were put back up?**

A. My -- the record evidence suggests that 2 percent of these videos on average that are taken down are successfully challenged and put back up.

But I also understand that Dr. Cowan when we get to the merits phase will be able to employ a certain matching algorithm. I think it might involve APIs. But this, again, is in his domain. It's not mine. In which case, the correction to the infringing share could be made before it is inputted into my model.

**Q. Does the fact that thousands of the videos identified in the takedown notice sample are still available on YouTube change your opinion?**

A. No, because thousands would be a tiny share of the total that come down. I think that on average -- I'm going by memory -- 2022 we're looking at 27,000 per day. And then if you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

stretch over a longer period, the average is about 19,000 per day over the sample that I looked at.

And so, then if you were to tell me a couple of thousands got put up, I mean, yeah, that makes sense. Two percent of this gigantic number got put back up. That's all consistent with my understanding.

**Q. Would it be relevant to your analysis to know what percentage of revenue this still available videos represent out of the total revenue attributable to the videos in the takedown sample?**

A. I do want to get at an accurate sample of what I call approximate disgorgement or direct revenue from the infringing videos. So I don't think we're going to get into a fight over this. I think that we should be able to estimate, you know, down to the less decimal what the direct revenues were of the infringing videos.

And if it changes because certain ones got taken down or put back up, I think that Dr. Cowan is going to account for all of this.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Q. So you're aware that some of the reasons why a takedown video can be back on the service is because the copyright holder retracted their takedown?**

**MS. O'KEEFE: Objection, outside the scope of his report.**

A. I think there can be retractions, yes.

**Q. If a user submitted a retraction of their takedown notice, would you still consider the video they identified in their retracted notice to be an infringement?**

**MS. O'KEEFE: Objection, calls for a legal conclusion.**

A. I think I don't have an opinion on that one, because the infringing share is going to be crafted, ultimately, by Dr. Cowan. He's going to be looking at things like retractions and successful challenges and all of that is my understanding is going to be accounted before he gives me the input.

**Q. So, in this instance, the sample that you used did, Dr. Cowan provide it to you?**

A. No, I did it because I wanted to show

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

the judge how this methodology could be used in a common way in the merits phase.

**Q. You just took the sample as it was?**

A. Well, I took the sample, but with my understanding of what the sample represented, which was these are successful takedown notice. They represent a reasonable approximation of the ultimate set that we'll be looking at. But I recognize that there are further refinements that we can make to the data to account for things like successful challenges.

**Q. So you don't have an opinion with respect to whether a takedown notice belongs in the sample, ultimately, in terms of retractions or counter notices?**

**MS. O'KEEFE: Objection, calls for a legal conclusion, outside the scope of his report.**

A. Yeah, I see that falling in the ambit of Dr. Cowan. And Dr. Cowan most likely is going to follow the guidance of Counsel as to what should be included or not be included when it comes to these specific assumptions.

**Q. Right now your regression assumes**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**that all the videos in the takedown notice sample are actual infringement, correct?**

A. Just when you say my regression, the ones that involve the takedown variable as an explanatory variable in the right-hand side, that is the first two regressions. The third regression doesn't involve -- I'm just trying to be clear, because you said, "your regression."

**Q. Correct.**

**But to the extent that they build on one another, there's an element of cohesiveness I suppose.**

A. I was going to answer the question with respect to the first two regressions that actually make use of the takedown --

**Q. Sure.**

A. -- variable, right.

**Q. That's fine.**

A. I am using that as a proxy for infringement activity for sure. But I'm not offering an opinion that any one particular takedown constitutes infringement. No one is asking me about, you know, to weigh in on matters of violations. This would all have to be, you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

know, proven by the Plaintiffs or opinions that are reached by the fact finder. Those are outside my ambit.

**Q. And the primary basis for relying on the takedown notices as a proxy for infringement is your understanding that YouTube made a determination of infringement; is that right?**

A. Well, they blessed it. They approved it. I understand that they scrutinize all of them and then about only 87 percent of cases are -- is the takedown honored. That is Google can deny it from the get go these 13 percent.

So they have been scrutinized once and approved by YouTube and those are the ones that I think I was looking at to measure my share of takedowns or takedown activity in a given month.

**Q. Do you know what standards YouTube is applying in terms of determining whether to deny a takedown request?**

**MS. O'KEEFE: Objection, outside the scope of his report.**

A. I don't have any insight as to the particular standards they're using, no.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Q. Do you know if YouTube attempts to determine if it has a license to a video identified in the takedown notice?**

**MS. O'KEEFE: Objection, outside the scope of his report, calls for a legal conclusion.**

A. If -- sorry, and I just want to make clear, as to who has the license?

**Q. If YouTube has the license to the video.**

A. Well, these are outside of Content ID, right. So I don't think that YouTube is going to have a license to these videos. These are things that are happening outside of Content ID.

**Q. My question is, do you know if YouTube attempts to determine if it has a license to the video identified in the takedown notice?**

**MS. O'KEEFE: Objection, outside the scope of his report.**

A. If YouTube has? If YouTube has a license?

I don't know. I don't know that.

**Q. Do you know if YouTube actually**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**determines whether a video identified in the takedown notice is a fair use?**

**MS. O'KEEFE: Objection, outside the scope of his report.**

A. I think fair use could be one of the reasons for denying the original takedown notice or it could be a reason for restating, if there's a complaint, a successful complaint.

**Q. Okay. Do you know if YouTube makes an actual determination of fair use or not?**

**MS. O'KEEFE: Objection, outside the scope of his report.**

A. I -- my understanding is that if someone complains, if the original poster/content creator complains that, in fact, it was fair use, they can lodge a complaint and YouTube will adjudicate that dispute.

**Q. Do you know if YouTube actually determines whether a video identified in a takedown notice contains the copyrighted work identified in the notice?**

**MS. O'KEEFE: Objection, outside the scope of his report.**

A. I do not know if they are doing that.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**say the allegedly infringing content contributed to is revenues from ads served on the non-infringing content, which you call network effect disgorgement revenue; is that right?**

A. Correct.

**Q. If you take a look at Figure 4 on Page 38 please.**

A. Okay. I got it.

**Q. Does No. 9 on Figure 4 represent the network effect disgorgement revenue?**

A. Yes, it is.

**Q. In Paragraph 77, you call that indirect network effect disgorgement revenues; is that the same thing?**

A. Yes.

(There is a discussion off the record.)

**Q. So we've talked about the two categories of revenue subject to disgorgement, the proximate disgorgement revenues and the network effect disgorgement revenues.**

**On Page 56 in Paragraph 108 of your report in Table 7, those are your calculations of the second category of damages, the network**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**effect disgorgement damages; is that right?**

A. No, it's not correct. As I state in my report, this is a combination of the two and then once you have the direct, you can back out the direct to get the network effect disgorgement damages.

**Q. I'm sorry, that's right. You did say that earlier.**

**And you're saying that it says that here in the report that this is the combination of both?**

A. Yes.

**Q. In Table 7, your disgorgement damages figure combined for both categories in the scenario where you're using 1.32 percent infringing content is, roughly, $640 million.**

**Do you see that?**

A. Right. And, to be clear, that only gets you through December of 2020 but, yes.

**Q. Okay. So you're saying that figure would have [REDACTED] of the proximate disgorgement revenue and then [REDACTED] of the indirect network effects disgorgement revenue; is that correct?**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A. Well, roughly. Remember what's going on -- the reason why we're stopping here to take a pause is that we're now going to have to project revenues going forward. Remember the YouTube revenue data ended. But I think the takedown data may have gone forward.

So it's conceivable that what I would feel more comfortable us doing is going through Table 8 that got us through the end of the period through 2022. I'd feel more comfortable saying if we subtracted the total amount of direct or proximate revenues from the 980 number, right --

**Q. Okay.**

A. -- I'd feel comfortable that that would cover the period of the takedown data.

**Q. Okay. So, if we used Table 8 --**

A. Uh-huh.

**Q. -- the 980 million in damages is combined for both categories?**

A. Correct.

**Q. And of that 980 million, [REDACTED] would be proximate disgorgement damages and [REDACTED] would be indirect network effects disgorgement revenue; is that correct?**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A. It just -- it depends on what the sum is. We're just assuming for this hypothetical that it's [REDACTED]. But whatever the sum of the takedown revenue is over this period. That's easy. If that was all that was needed, I probably wouldn't even be here.

But we have to -- we're going to subtract that out. But whatever the sum is, it is. I don't think there's much controversy over this.

**Q. In your opinion, is it reasonable to believe that infringing content that's responsible for [REDACTED] in proximate disgorgement damages would be responsible for [REDACTED] in indirect network effects disgorgement revenue?**

A. It is reasonable and we're just going to accept for the purpose of this question that -- with [REDACTED] with a star, right, because it's possible it's more than that, right.

But we talked before about given YouTube's monetization strategy that one would expect that in the absence of those two areas of overlap and also infringed to content, something

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

covered by Content ID or it was posted by a YouTube partner, it wasn't even eligible for direct monetization.

So, if you come back and say, what is your expectation of the ratio of the indirect network effect disgorgement to the direct, I would -- going in, I would expect it to be very very high. Of course, the direct, it wasn't eligible to be monetized, right, at least, before March of 2021.

So, yes, it is reasonable. It's a long way of saying it's reasonable. Going in we should expect that that ratio of direct to indirect should be very high.

**Q. So, if the ratio is 35 times more indirect network effects disgorgement revenue to proximate disgorgement revenue, that would be reasonable to you?**

A. It could be reasonable. You know, economics doesn't give us some crisp ratio of what it should be. All we can figure out as economists is that this content was largely ineligible by YouTube's own design for direct monetization until March of 2021, which covers

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

most of the study period. And so knowing that your expectation should be that this stuff isn't going to generate a lot of direct. It doesn't mean it wasn't important. It doesn't mean that there's something special there. And it doesn't mean that revenues are going to be the same in the but for world when you wipe this infringing off the board. It just means they didn't have an opportunity to monetization given Google -- sorry, YouTube's monetization routine.

**Q. When you say that this content was ineligible for monetization by YouTube's own design, do you believe that YouTube was somehow discriminating against this content?**

**MS. O'KEEFE: Objection, form.**

**THE WITNESS:** I'm sorry.

A. I think that's outside of anything I've opined here. My understanding is that one of the remedies that perhaps that Plaintiffs are seeking is that they would be a participant in the content -- Content ID matching algorithm, make it easier to police infringements instead of putting the burden on them for actually having it automated. And under YouTube's monetization

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

routine, then that would have allowed them to, at least, opt into monetization over takedowns.

So I don't know if I'm ready to say discriminatory. But I hear that as an aspect of what's being sought here as an expansion of Content ID.

**Q. To your knowledge, can you --**

A. I'm sorry, Content ID matching. I'm sorry. Okay.

**Q. To your knowledge, can you monetize a video on YouTube without participating in Content ID matching?**

A. Yeah, I just told you. Prior to March of 2021, the videos got monetized or got served up with ads one of two ways. One is that they were from the YouTube partner program. The content -- the post as a member of the participant in the YouTube, right, partner program. So that's a pathway to monetization that doesn't involve being caught up in Content ID.

Can I just say and then after March of 2021, when YouTube change its monetization scheme, now I understand that other videos are

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

eligible and could be -- and monetization could be a function of, for example, watch time regardless of whether or not you are part of Content ID or YouTube partner program.

**Q. So turning back briefly to Page 38 and Figure 4 again.**

A. Okay.

**Q. The other side of the arrow on the right, the black half of the arrow, No. 4, Arrow 4 -- or No. 4 on the arrow represents advertising revenue from non-infringing videos that's unrelated to the presence of allegedly infringing content on YouTube, right?**

A. That's pretty good. I mean, I use the word "independent." And, just to be clear, it's -- it's the revenues that would continue to flow even in the but for world from the non-infringing content. That is the ones that weren't created in any way, shape through these spillover effects watching the infringing videos.

**Q. You call that non-infringing content revenue?**

A. I actually call it "independent," which is an important word that you left out.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Because remember it's the stuff that's going to stick around in the but for world. What we are trying to get at is the blue shaded portion of that arrow going down marked No. 9.

**Q. Plaintiffs aren't seeking any of that part of the arrow of No. 4, correct?**

A. Certainly not through me. It's not part of my ambit.

**Q. If a user starts to watch a video that's infringing and then watches 30 more videos of the same length that are not infringing, is it your opinion that all of the subsequent viewing of the additional 30 videos is attributable to the first infringing video?**

**MS. O'KEEFE: Objection, incomplete hypothetical.**

A. I don't think that's my opinion and I don't think I'm making those calls on a video-by-video basis. As you know, I'm using in my first two regressions, the ones that get at something related to this, this network effect. I'm using all takedowns in a month as a predictor of either watch time of all videos or revenues from non-infringing videos. And so it's looking

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

just empirically at what's the relationship between those series. So I don't think that I have an opinion that -- a hypothetical where someone starts off with infringing and saying it's referred via the algorithm, the recommendation algorithm to a non-infringing. I mean, that's certainly a pathway. That's how it happens for sure. But I don't think that I'm making calls with respect to individual episodes. I'm looking at it in the aggregate.

**Q. So are you able to say whether a user who watched a video that's infringing -- strike that.**

**Is your analysis able to establish a causal relationship between the user who watched an infringing video and the revenue created by any additional non-infringing videos that they watched after that that may have had ads on those videos?**

A. I would say that I'm not performing the analysis on a user-by-user basis. I'm not making those specific calls. What I'm doing instead is looking at the relationship of takedowns in either watch time in total or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

revenues on non-infringing content in total by month and I find that those variables are highly statistically significantly related. And that's that relationship that lets me know that there's something special about this content.

**Q. Has your analysis examined the role of auto play in the creation of additional non-infringing revenue for YouTube?**

A. I wouldn't put much of the onus or responsibility to auto play per se. I see that as a feature as the recommendation algorithm. I do think the recommendation algorithm is an important mechanism by which the indirect network effects or spillover effects occur. That is you get someone onto the platform, they start -- they see the infringing. It gives YouTube information about them and their cohort and then they get steered via the recommendation algorithm to places where YouTube can monetize their activity. That is an important mechanism.

I wouldn't -- I don't -- I wouldn't necessarily invoke auto play. If I understand correctly, auto play is just the idea that it will play for you once the algorithm has taken

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

you there or made the recommendation, it starts playing for you automatically.

But I think that whether auto play is turned on or you're actually making the elections, I feel like it's the recommendation algorithm that's supporting, at least, in part the mechanism at work here.

**Q. Is there a part of your analysis that has examined the role that the recommendation algorithm plays in the creation of non-infringing revenue from the display of infringing content on YouTube?**

A. That was kind of long and I may have gotten lost in there.

But I'd certainly -- you can go into my report and search for recommendation and you'll see that I recognize this as an important mechanism for how the spillover or indirect network effects can be occurring.

**Q. Has any of your analysis your -- strike that.**

**Have you looked empirically at the role that the recommendation algorithm plays?**

A. If what you're asking is have I

Page 186

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

testimony.

**Q. So you reject Mr. Agrawal's testimony?**

A. It just doesn't conform with my empiricism and it also doesn't conform with other documents that I've seen and websites even, public explanations of YouTube of what they're trying to do. They are trying -- they are trying to maximize watch times and they're trying to trigger and stimulate user engagement because only then is the viewer in a position to be served up an ad.

And so, you know, I would direct you to -- and I regret not having cited but an August 2020 blog posting by YouTube, like, watch time, why do we care about it.

So I realize he is saying this here and it doesn't make sense as an economic matter. What I would say, though, is that whenever -- you know, in the face of contradictory evidence -- you can imagine I've come across this in my experience -- it's up for the fact finder to engage in a weighting of the credibility of this litigation statement. It's not a contemporaneous

Page 187

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

document. It's a litigation statement against empiricism and all the other record statement, contemporaneous record evidence. I'm not the one making that weighting. It's got to be done by the fact finder.

**Q. Would you also turn please to Page 36 in this transcript, Exhibit 4.**

A. I'm sorry, what page?

**Q. It's Page 36 of the transcript.**

**MS. O'KEEFE: Can we let him read Page 35, since you have it there as well and just take a moment to read?**

**MS. CANDIDO:** Sure.

A. Okay, I've seen 35 and 36 now.

**Q. Okay. On Page 36 Mr. Agrawal also says, "And historically we have had far more usage than advertising demand and so it's sufficient inventory to satisfy advertiser spend."**

**Do you see that?**

A. Yes.

**Q. Do you have any reason to doubt Mr. Agrawal's statement was incorrect?**

A. Yes.

Page 188

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Q. And is your answer -- strike that.**

**Is your reasoning for doubting Mr. Agrawal's statement here the same as the prior answer?**

A. No, it's different. The prior answer because it conflicts with my empiricism. This one conflicts with economics and my understanding of this market and all the record evidence in the case and that is -- and it's an opinion of Dr. Peterson embraced, which I disagree with respectfully, that all content is fungible and that if they wouldn't -- if you take away this content, they're just going to sell advertising somewhere else.

So, certainly, that can't be squared with my regression results showing that the takedowns are statistically significantly related to watch time and to advertising revenue on non-infringing.

And it also misconstrues what unsold inventory means. It's unsold for a reason. The reason why something isn't sold is because there wasn't enough demand to generate interest among advertisers there. And the notion that we can

Page 189

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

just willy-nilly assume that I can move an advertiser's from where people are watching to where they're not and recapture the revenue in that way is naive, right. There's an economic reason why inventory doesn't go unsold -- doesn't go sold and it's because it's less valuable inventory.

So the basis of this opinion and Dr. Peterson's opinion, you know, that unused inventory can just be -- in a but for world -- can be re-slotted and utilized here just defies economic logic.

**Q. Do you consider all ads on YouTube as "unsold inventory"?**

A. No.

**Q. I'm sorry, strike that.**

**I meant all videos on YouTube as "unsold inventory" for ads?**

A. No, that wasn't -- that wasn't part of my answer, even related to my answer, no.

**Q. Do you assume that all monetized views generate equal revenue?**

A. No, I do not.

**Q. In what way do you take into**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**consideration that views can generate different amounts of revenue?**

A. Well, I don't think any of my models turn on that assumption. But I just -- I understand as an economist that different inventory and different views can be worth different amounts. So there's no requirement that all views generate the same advertising revenue.

**Q. To your knowledge, does YouTube charge advertisers the same amount per impression for advertisements shown to users from different countries, for example?**

A. No, my understanding is the opposite, that the cost per impression can vary. It's set by an auction and there's no requirement that it's the same everywhere. In fact, you expect it to be different based on the demand, the local demand.

**Q. Does your regression -- excuse me.**

**Does your regression account for geographic differences in YouTube's ad revenue for impression?**

A. I don't have a regression that's

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

looking at revenue per impression. But you know the three regressions and I think that I've accounted for various other factors that would affect revenues -- this is their aggregate revenues for the companywide level by month. And I feel like at 92 percent or 90 something percent r-squared I've accounted for all or almost all the factors that explain variations in ad revenues.

You know, when I go to predict Google's advertising revenues, YouTube's advertising revenue out of sample, I have something like 96 percent accuracy when I go to predict the 2021 and 2022 years. So I feel very confident that whatever is causing fluctuations in ad revenues from month to month, my model's accounting for it.

**Q. Did you consider the geographic location of the -- strike that.**

**If there's a geographic disparity between the revenue generated by the infringing content and the rest of YouTube's revenue, the failure to take into account geographic differences would impact your analysis, correct?**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**MS. O'KEEFE: Objection, form.**

A. It certainly wouldn't affect any of the regressions, right. The regressions are just telling us -- the final regression is telling us when the time spent on the site comes down controlling for all the things, how much is advertising fall.

There's no way in the regression to account or no need to even to account for these geographic differences given how I've set up the model.

And then the other input to the model, of course, is this -- what we've been talking about infringing share. And the infringing share I think that once I get the data that I'm seeking, which is weighting it on a watch time or viewing time -- again, I don't think geographic component goes into that calculus either. So I just don't think that knowing the geographic -- and, in any event, no one has established to me that the infringing content at issue in this case is occurring in certain geographic areas or doing it in a way that's any different than the distribution of all

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

content on the platform.

**Q. Have you asked whether there is any geographic differences with respect to the infringing content at issue in this case?**

A. I don't really know what you mean by "geographic."

Are you talking about the geography of the person who's posting or the geography of the copyright holder?

**Q. I think there is a lot of potential geography questions to ask.**

**Have you asked any of them?**

A. Well, I don't ask questions that don't have any bearing on my analysis. So I don't think that I've asked these. I just don't find them as interesting as Dr. Peterson does.

**Q. Would you consider a view of a YouTube video that was uploaded, processed and viewed in India a part of this case?**

A. Well, it could be a part of my analysis. I don't know what you mean by, part of the case, when I'm thinking what informed my analysis. When I'm thinking of the aggregate statistics that I'm looking at from Semrush and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

but for world. And it's a very common way of showing common impact, right.

And, you know, the question that I always get is, what would happen if in your first stage, in that model, the effect on the pricing conspiracy were zero? You didn't find an effect. I would say we'd stop.

We don't then take the model and start predicting everyone's price. It's over, right. There is no general effect. So how could there be individual affects, if there is no general effect, right.

And so here, I think, the analogy is that if you -- I want you to assume infringing share is zero. You're basically telling me either there is no liability, in which case we don't go to damages, or you're telling me that when we went out and measured this stuff properly and applied our weights, you know, the number was so close to zero that it was immaterial. It was di minimus, right.

At which point I would say, no, no, we're not going to use this model to make a prediction. My best estimate of damages in that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

case is zero.

**Q. Okay. But putting aside zero scenario, which I understand was a bad hypothetical.**

A. No, but it's Dr. Peterson's -- I'm sorry.

**Q. Aren't we effectively carrying $117 million damages penalty around because of these sort of error built into the model?**

A. We're not. What -- respectfully, what Dr. Peterson is doing is conflating prediction error with bias, right. So.

Every model has prediction error and, as I told you, the prediction error here is concentrated for two reasons, the transformation from logs back to linear and, two, is that we're predicting over a shorter interval of time than of the study period.

If we stretch this out to a longer period of time that covered the study period, then by construction the residuals we're going to sum up something closer to five.

But, more importantly, just think about predicting for a given month, right. Let's

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

not sum up across everything. Let's just think about what damages would be in a month, right. We take our regression model once it's fit to the data and we would set the time watched down by a peg, say 1.3 percent and we'd hold all other variables constant and we'd make a prediction, okay, and let's call it -- that's the prediction for this particular month. Let's call it June of 2020, okay, you with me?

And the question I have for you is would you want to make any adjustment to that prediction, right, given that your model was estimated with high degree of precision and the coefficients are unbiased. And the answer is, no. That prediction is the best prediction possible. There is no further adjustment to the month.

And once I convince you of that, then if we sum these differences across months, you still are not justified in making any -- an adjustment. There is no textbook that says adjusts for the prediction error of the model.

**Q. In Paragraph 111, you say -- I'm sorry, I'll let you get there.**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

A. Okay.

**Q. You say that your "analysis permits apportionment to class members in proportion to the total time viewers spent on videos that infringed on their content views or other possible metrics."**

**Do you see that?**

A. Yes, I do. And happy to explain or you can ask the question, whatever.

**Q. Do you agree that apportionment of profits insofar as it provides -- sorry, strike that.**

**Do you agree that the Copyright Act requires apportionment of profits insofar as it provides that the copyright owner is entitled to recover only those profits of the infringer that are attributable to the infringement?**

**MS. O'KEEFE: Objection, it requires a legal opinion.**

A. Yeah, I don't have an opinion on that. And I think I'm using the word "apportion" here as more like allocation to the class members. So, once we have a pot of money and suppose the pot of money was generated with a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

time weighted infringing share of point -- of one, let's make it easy. Let's say it falls from 1.3 to 1 when we do the time weighting, watch time weighting, right. We have a pot of money and then a class member steps forward and you would say, okay, Dr. Singer, how much would that class member be entitled to?

And I would say, give me the total watch time on his infringing videos, and divide it by the watch time of all infringing videos or videos that are subject to the takedown notice and that's his share, that would be his share of the pot.

When I use the word -- let me make sure that I'm...

Apportionment -- when I use the word "apportionment," I'm using it synonymously with allocation, like, how you would apportion or allocate the pot of aggregate damages for each class member, and I'm telling you to me the most logical one would be pro rata based on their contribution to total watch time or their contribution to total views or their contribution to total videos, okay. Those are the three.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Those are the three possibilities.

I think that when Dr. Peterson uses the word "apportionment," I know what he means. It's a different concept. It's should you apportion the revenues or make a further adjustment to revenues to account for the fact that not 100 percent of the video was infringing. I think that's what he means by apportionment.

**Q. Do you agree that you should apportion revenues to account for the fact that not 100 percent of the video was infringing?**

**MS. O'KEEFE: Objection, form.**

A. So, when you're asking me should, I just want to make clear I'm giving you an economic answer. I'm not trying to interpret the law. The law is whatever it is, right. And so whatever the court or the fact finder instructs is the way we can do it.

From an economic perspective, I'll just point out that when you think about the monetization of these videos by YouTube it's not done according to any portion of the video. The ad is sold against the video. And so, when I think about the way in which YouTube thinks about

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

it and the industry might think about it, I think, it's artificial to start going in and slicing up a video into what portion is infringing and what's not. That's not how ad revenue is generated. It's done for the ad in full. And I think that if that argument doesn't persuade you, I would -- and the fact finder were to say, you know what, we need to drill down and whatever Singer said was the infringing share. We need to reduce it by another slice to account for the fact that when he does it by watch time, it's not true to the hundred percent of these videos were infringing. Some portion was.

My understanding is in that takedown notice data that the filer must notify YouTube of the particular slice of time on the video that they think is infringing. So if we had to do it, we could do it and we could do it in a calm way.

**Q. You mentioned earlier that you had worked on patent damages cases before, right?**

A. Correct. I've been involved in a bunch of what are called pay for delay cases, in which case there is a patent in dispute, yes.

**Q. Have you had to apportion damages in**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**patent cases?**

A. Sitting here I can't think of a particular apportionment exercise, but I've just articulated to you how one would do it here, if one were compelled by the law or by the court.

**Q. Do you -- does your disgorgement revenue regression currently apportion YouTube's advertising revenues among the allegedly infringing videos other protected components?**

**MS. O'KEEFE: Objection to form.**

A. I don't know if I followed the question.

**Q. To the extent that a video has multiple components that are protected by copyright such as visual components, a screen play, sound recording, musical compositions, et cetera, does your disgorgement regression apportion YouTube's advertising revenues among those allegedly infringing components?**

A. So it doesn't. And I wouldn't do it in the first instance to get the pot of damages, the aggregate damage for the class. I think each takedown would be treated as one episode of infringement.

Witness: Hal Singer, January 13, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

**Errata Sheet**

| Page: Line | Change | Reason |
|---|---|---|
| 6:25 | Replace <my> with <me> | Transcription error |
| 8:7 | Replace <WeWorks> with <WeWork> | Transcription error |
| 10:13 | Replace <export> with <expert> | Transcription error |
| 10:18 | Replace <Exhibit 2 the Expert Report of Hal J. Singer, Ph.D., for Plaintiffs' errata dated January 10, 2023> with <Exhibit 2, the errata dated January 10. 2023 to the Expert Report of Hal J. Singer, Ph.D.> | To clarify the record |
| 14:11 | Replace <this> with <that's—that's> | Transcription error |
| 16:3 | Replace <exist> with <exists> | Transcription error |
| 16:4 | Relace <And I report> with <And my report> | Transcription error |
| 16:9 | Replace <page> with <pages> | Transcription error |
| 16:11 | Replace <some human number> with <some smaller number> | Transcription error |
| 18:25 | Replace <log rhythm> with <logarithm> | Transcription error |
| 19:9 | Replace <that> with <to> | Transcription error |
| 19:14 | Replace <log of YouTube> with <Log YouTube> | To clarify the record |
| 19:14-15 | Replace <log of Facebook> with <Log Facebook> | To clarify the record |
| 20:5 | Replace <was> with <were> | Transcription error |
| 21:4 | Replace <a control> with <"a control"> | To clarify the record |
| 22:10 | Replace <interests> with <interest> | Transcription error |
| 23:6 | Replace <picking> with <pick> | Transcription error |
| 23:25 | Replace <that you> with <that to you> | Transcription error |
| 25:10 | Replace <proceed> with <precede> | Transcription error |
| 27:4 | Replace <in> with <on> | Transcription error |
| 29:12 | Replace <members> with <members'> | Transcription error |

Witness: Hal Singer, January 13, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

| 30:3 | Replace <process before> with <process - before> | Transcription error |
|---|---|---|
| 36:17 | Replace <sort of> with <on> | Transcription error |
| 39:9-10 | Replace <depositions sort of economic articles> with <depositions, economic articles> | Transcription error |
| 43:12 | Replace <Woo> with <Wu> | Transcription error |
| 43:25 | Delete <that> | Transcription error |
| 44:10 | Replace <Ko> with <Koh> | Transcription error |
| 46:4 | Replace <full-line> with <full-time> | Transcription error |
| 48:23 | Delete <sort of> | Transcription error |
| 49:11 | Replace <we> with <you> | Transcription error |
| 51:6 | Replace <patents> with <patent> | Transcription error |
| 53:6 | Replace <a play store> with <the Play Store> | To clarify the record |
| 53:10 | Replace <within> with <Within> | To clarify the record |
| 54:10 | Replace <the ones> with <those> | Transcription error |
| 55:18 | Replace <which if> with <which, if> | Transcription error |
| 55:19-20 | Replace <impacts to class members> with <impacts to Class Members> | To clarify the record |
| 55:21 | Replace <Plaintiffs' count> with <Plaintiffs' counsel> | Transcription error |
| 56:10 | Replace <against> with <accord> | Transcription error |
| 56:19 | Replace <challenged conduct> with <Challenged Conduct> | To clarify the record |
| 56:20 | Replace "categories. One, advertising> with <categories. 1 advertising> | To clarify the record |
| 56:24 | Replace <in the> with <from the> | Transcription error |
| 57:2 | Replace <infringing content contributing> with <Infringing Content contributed> | Transcription error |
| 59:21 | Replace <Would> with <When> | Transcription error |
| 60:6 | Replace "summing up the ads> with <summing up the revenue from the ads> | To clarify the record |

Witness: Hal Singer, January 13, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

| | | |
|---|---|---|
| 61:2 | Replace <affects> with <effects> | Transcription error |
| 61:2-3 | Replace <infringing content> with <Infringing Content> | To clarify the record |
| 63:12 | Delete <the> | Transcription error |
| 63:18 | Replace <challenge> with <challenged> | Transcription error |
| 63:22 | Replace <disappear> with <disappears> | Transcription error |
| 63:25 | Replace <expert> with <experts> | Transcription error |
| 64:13-14 | Replace <you people it call it counterfactual> with <you people call it counterfactual> | Transcription error |
| 65:24 | Replace <correct> with <keep> | To clarify the record |
| 67:7 | Replace <It's simple> with <It's a simple> | Transcription error |
| 67:17 | Replace <it's> with <it'd> | Transcription error |
| 69:7 | Replace <infringing> with <infringement> | Transcription error |
| 73:4 | Replace <providers were> with <providers that were> | Transcription error |
| 74:6-7 | Replace <instance case but> with <instant case by> | Transcription error |
| 76:2 | Replace <common> with <consumer> | Transcription error |
| 76:22 | Replace <just no> with <just a no> | Transcription error |
| 76:23 | Replace <come> with <comes> | Transcription error |
| 78:20 | Replace <multisided> with <multi-sided> | Transcription error |
| 79:7 | Replace <exist> with <exists> | Transcription error |
| 79:8 | Replace <non-existent> with <nonexistent> | Transcription error |
| 79:12 | Replace <direction. Advertisers> with <direction: advertisers> | To clarify the record |
| 80:6 | Replace <the favor> with <disfavor> | Transcription error |
| 82:9 | Replace <content ID> with <Content ID> | To clarify the record |
| 82:12 | Replace <there are so> with <there is so> | Transcription error |
| 83:5 | Replace <is> with <are> | Transcription error |
| 83:23-24 | Replace <across on all> with <across all> | Transcription error |

| 85:5 | Replace <Multisided> with <Multi-sided> | Transcription error |
|---|---|---|
| 85:13 | Replace <then it attracts> with <then attracts> | Transcription error |
| 87:3 | Replace <effects> with <affects> | Transcription error |
| 92:12 | Replace <are subset> with <is a subset> | Transcription error |
| 95:17 | Replace <product> with <products> | Transcription error> |
| 97:4 | Replace <involved> with <involves> | Transcription error |
| 97:7 | Replace <used> with <use> | Transcription error |
| 97:10 | Replace <methodology that I> with <methodology I> | Transcription error |
| 101:9 | Replace <revenue's> with <revenues> | Transcription error |
| 115:25 | Replace <pedaling> with <peddling> | Transcription error |
| 124:22 | Replace <grammars> with <factors> | Transcription error |
| 125:12 | Replace <corrected> with <expected> | Transcription error |
| 134:15 | Replace <Alan> with <Allen> | Transcription error |
| 134:20 | Replace <construction> with <obstruction> | Transcription error |
| 134:21 | Replace <miss-mash> with <mishmash> | Transcription error |
| 135:5 | Replace <better videos> with <better than videos> | Transcription error |
| 135:9 | Replace <expert> with <experts> | Transcription error |
| 137:23 | Replace <four font> with <four-point font> | To clarify the record |
| 139:15 | Replace <fewer videos loss> with <fewer videos with lots> | To clarify the record |
| 145:3 | Replace <people dominant> with <people are dominant> | To clarify the record |
| 145:6 | Replace <books that dominant> with <books that are dominant> | To clarify the record |
| 145:7 | Replace <dominant and> with <are dominant and> | To clarify the record |
| 145:7 | Replace <songs that dominant> with <songs that are dominant> | To clarify the record |
| 145:13 | Replace <Are> with <And> | Transcription error |

| 145:15 | Replace <just sat that> with <just sat there> | Transcription error |
|---|---|---|
| 146:11 | Replace <review> with <view> | Transcription error |
| 146:13 | Replace <knot> with <not> | Transcription error |
| 147:9 | Replace <I mea> with <I mean> | Transcription error |
| 147:22 | Replace <decision> with <decision as a> | Transcription error |
| 149:18 | Replace <infringing> with <infringement> | Transcription error |
| 153:8 | Replace <adverse step> with <overstep> | Transcription error |
| 155:20 | Replace <less decimal> with <last decimal> | Transcription error |
| 161:8 | Replace <restating> with <reinstating> | Transcription error |
| 167:10 | Replace <interested> with <interested in> | Transcription error |
| 169:23 | Replace <108000> with <4080000> | Transcription error |
| 175:10 | Replace <to> with <for> | Transcription error |
| 180:17 | Replace <infringing> with <infringement> | Transcription error |
| 183:17 | Replace <host> with <a host> | Transcription error |
| 185:24 | Replace <in the firm> with <infirm> | Transcription error |
| 187:3 | Replace <record statement> with <record statements> | Transcription error |
| 188:10 | Delete <of> | Transcription error |
| 189:3 | Replace <advertiser's> with <advertiser> | Transcription error |
| 192:7 | Replace <how much is> with <how much does> | Transcription error |
| 192:10 | Replace <to even to account> with <to even account> | Transcription error |
| 195:4 | Replace <potentially> with <potential> | Transcription error |
| 200:14 | Replace <You are> with <Your> | Transcription error |
| 202:20 | Insert <be> between <to> and <necessarily> | Transcription error |
| 205:20 | Replace <necessarily inferior> with <necessarily be inferior> | Transcription error |
| 207:10 | Delete <and> | Transcription error |

Witness: Hal Singer, January 13, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

| 208:10 | Delete <music> | Transcription error |
|---|---|---|
| 208:16 | Replace <a damages> with <damages> | Transcription error |
| 208:21 | Replace <I am not.> with <I have not.” | Transcription error |
| 210:2 | Replace <transform> with <transformation> | Transcription error |
| 214:24 | Replace <challenge> with <challenged> | Transcription error |
| 214:25 | Replace <challenge> with <challenged> | Transcription error |
| 215:11 | Replace <parameters unbiased> with <parameters, unbiased> | Transcription error |
| 218:22 | Replace <di minimus> with <de minimis> | Transcription error |
| 233:13 | Replace <some question> with <your question> | Transcription error |
| 234:10-11 | Replace <that YouTube monetizations> with <that YouTube monetizes> | To clarify the record |
| 234:16 | Replace <down> with <time> | Transcription error |
| 238:15 | Replace <I don’t anything> with <I don’t have anything> | Transcription error |
| 247:19 | Replace <copyright the works> with <copyrighted works> | Transcription error |
| 251:10 | Replace <such key metric> with <such a key metric> | Transcription error |
| 259:5 | Replace <affect> with <affects> | Transcription error |
| 263:10 | Replace <variation advertising> with <variation in advertising> | Transcription error |
| 267:21 | Replace <pages vary visited> with <pages visited> | To clarify the record |
| 268:16 | Replace <model is bias> with <model is biased> | Transcription error |
| 269:5 | Replace <are bias> with <are biased> | Transcription error |
| 269:7 | Replace <if is> with <if it’s a> | Transcription error |
| 269:20 | Replace <are bias> with <are biased> | Transcription error |
| 271:10 | Replace <is reposted now> with <reposted is now> | Transcription error |
| 271:20 | Replace <di minimus> with <de minimis> | Transcription error |

Witness: Hal Singer, January 13, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

| | | |
|---|---|---|
| 272:7 | Replace <di minimus> with <de minimis> | Transcription error |
| 273:17 | Replace <serves> with <served> | Transcription error |
| 277:10 | Replace <Comsport> with <ComScore> | Transcription error |
| 277:13 | Replace <he> with <it> | Transcription error |
| 280:12 | Insert <be> between <all> and <billed> | Transcription error |
| 287:15 | Replace <suffer> with <suffers> | Transcription error |
| 288:14 | Replace <bias> with <biased> | Transcription error |
| 290:2 | Replace <than> with <then> | Transcription error |

___X___ Subject to the above changes, I certify that the transcript is true and correct.

________ No changes have been made. I certify that the transcript is true and correct.

________________
(Signature)

February 23, 2023
(date)