# EXHIBIT 41

to the Declaration of Qifan Huang

PUBLIC VERSION - REDACTED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - - - - x

MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated,

Plaintiffs,

-against-

Case No. 3:20-cv-04423-JD

YOUTUBE, LLC; and GOOGLE LLC;

Defendants.

- - - - - - - - - - - - - - - - - - - - - x

**CONFIDENTIAL**

Videotaped oral deposition of GREG HALM, taken pursuant to notice, was held at the law offices of BOIES SCHILLER & FLEXNER LLP, 55 Hudson Yards, New York, New York 10001, commencing January 18, 2023, 9:07 a.m., on the above date, before Leslie Fagin, a Court Reporter and Notary Public in the State of New York.

- - -

MAGNA LEGAL SERVICES
320 West 37th Street, 12th Floor
New York, New York 10018
(866) 624-6221



**APPEARANCES:**

KOREIN TILLERY, LLC
Attorneys for Plaintiffs
205 North Michigan, Suite 1950
Chicago, Illinois 60601
BY: CAROL O'KEEFE, ESQUIRE
-and-
BOIES SCHILLER & FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, New York 10001
BY: PHILIP C. KOROLOGOS, ESQUIRE
JEFFREY WALDRON, ESQUIRE

WILSON SONSINI GOODRICH & ROSATI
Attorneys for Defendants
650 Page Mill Road
Palo Alto, California 94304-1050
BY: ANDREW KRAMER, ESQUIRE

**ALSO PRESENT:**
CHARLES COWAN
JACOB USCINOWICZ, Videographer
Magna Legal Services

(Plaintiffs' Exhibit 170, copy of Greg Halm's report, marked for identification.)
(Plaintiffs' Exhibit 171, copy of Dr. Cowan's report of November 17, 2022, marked for identification.)
**HE VIDEOGRAPHER:** Good morning. We are now on the record.
This begins videotape No. 1 in the deposition of Greg Halm in the matter of Maria Schneider v. YouTube, LLC.
Today is Wednesday, January 18, 2023 and the time is now approximately 9:07 a.m.
This deposition is being taken at Boies Schiller Flexner LLP.
The videographer is Jacob Uscinowicz of Magna Legal Services and the court reporter is Leslie Fagin of Magna Legal Services.
Will counsel and all parties present state their appearances and who think represent.
**MR. KOROLOGOS:** Phil Korologos with

Boies Schiller Flexner on behalf of the plaintiffs.
**MR. KRAMER:** Andrew Kramer with Wilson Sonsini on behalf of the defendants.
**MR. WALDRON:** Jeffrey Waldron of Boies Schiller Flexner on behalf of plaintiffs.
**MS. O'KEEFE:** Carol O'Keefe of Korein Tillery on behalf of plaintiffs.
**MR. KOROLOGOS:** We also have Chuck Cowan present.
G R E G H A L M, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:
EXAMINATION BY
**MR. KOROLOGOS:**
**Q. Good morning.**
A. Good morning.
**Q. Would you state your name and address, please?**
A. My name is Greg Halm.
Are you asking for my home address

or business?
**Q. Business address.**
A. 2200 Powell Street, Suite 1200 in Emeryville, California.
**Q. You were retained as an expert in this case on behalf of defendants, is that right?**
A. Correct.
**Q. Do you recall when you were retained?**
A. I believe it was in late May, approximately, of 2022.
**Q. I see you brought what appears to be a copy of your report, is that right?**
A. That's correct.
**Q. Let me hand you what we have marked as Plaintiffs' Exhibit 170.**
**If you can confirm for me that is a copy also of your report?**
A. Yes, it appears to be. The only comment I would make is that my copy also contains the schedules that were referenced. There are maybe four pages at the back end which were also provided when I submitted my




G. Halm

report.

**Q. Okay. I may refer to your report throughout the deposition as Plaintiffs' Exhibit 170 or your report, but since you confirmed for me they are the same, feel free to refer to either version that you have in front of you.**

A. Thank you.

**Q. Have you had a chance to review your report and its appendices since you signed it in December of 2022?**

A. Yes.

**Q. Is there anything you wish to correct in the report?**

A. It's not so much a correction as a minor addition to -- as a minor addition.

I'm happy to tell you what that is if you would like me to.

**Q. Please.**

A. Footnote 18 on page 10 lists a number of copyright tools that YouTube uses and footnote 18 should also list the content verification program or CVP as one of those tools.

G. Halm

**Q. Any other corrections to your report?**

A. No.

**Q. Anything to add to your report?**

A. No.

**Q. Any additional opinions beyond what you've set forth in your report that you have arrived at since you wrote your report?**

A. Since I wrote my report, the court, as I understand it, made a summary judgment ruling that may impact the methodology for identifying class members.

As I understand it, there is three potential areas where that could have an impact and those areas are not reflected in Dr. Cowan's report.

Those three areas, one of them, I believe, relates to the relevant time period for inclusion in the class which is the cutoff of July 2, 2019, I believe, rather than July 2, 2017.

And then, as I understand it, the other areas, going from memory here, relate to if a video was uploaded to YouTube by the

G. Halm

owner of the copyrighted work and if that video is still on YouTube, my understanding is that the court ruled that that would grant a license to YouTube and that would also -- that fact would also make a class member perhaps not eligible for inclusion in one or more of the classes.

In addition to those factors, I did attend Dr. Cowan's deposition yesterday and heard his testimony and that perhaps caused me to form some new opinions. Those are not all fully developed since that was just yesterday.

**Q. Even though they may not be fully developed, what additional opinions have you arrived at or been considering since Dr. Cowan's deposition yesterday?**

A. One of them relates to paragraph 63 of Dr. Cowan's report, and I'm turning right now in my report because I know I cite a portion of paragraph 63 which is cited on page 15 of my report.

And so generally, as a contextual matter, it was my impression yesterday that

G. Halm

Dr. Cowan was describing a number of analyses he conducted which are not described with sufficient specificity in his report and provided explanations for the meaning of what was written in his report.

When I prepared my rebuttal report I prepared it in the context of what was written in his report and my understanding of it and he provided an explanation yesterday for paragraph 63 that struck me as not how I could possibly have read the writings in his report and so it was -- it struck me as a puzzling statement, so I will read that sentence and then provide the explanation.

So this sentence, which was from his paragraph 63, is Even if the data were perfect, I've concluded there would be no reliable way to estimate the number of class members and works associated to each class when one is only 90 days sampled out of 826 days in the investigation period.

Specifically where it says there would be no reliable way to estimate the number of class members, my understanding

MAGNA LEGAL SERVICES

G. Halm

yesterday from Dr. Cowan's testimony was that that was meant to convey that there would be a high degree of variants or essentially a large margin of error in any estimates, however, the writings describes a reliable way to estimate. It's not necessarily, at least as I read it, describing the reliability of the estimate itself or the -- not the reliability of the estimate, but the precision of the estimate.

So a reliable method can yield a wide margin of error, if you will. That was one take away that I had from yesterday.

There were other perhaps observations from various things that Dr. Cowan said. Maybe one correction, as well, for something that doctor -- I don't know if it was something he said, but there is a quote from an auditing textbook in my report. I'm just finding the location of that quote. On page 35, that refers to discovery sampling and I just wanted to clarify that I didn't cite that quote advocating for discovery sampling, it was more a general sampling

G. Halm

principle regarding locating occurrences of something in a population when perhaps the rate of occurrence is very low.

**Q. Anything else?**

A. Not necessarily, although, again, that was yesterday, so I'm still evaluating what was said and would like to review the transcript, as well.

**Q. In terms of corrections or additions to your report, are your answers any different if we make sure we include the appendices and schedules?**

A. They are not different.

**Q. What were you asked to do in this case?**

A. I was asked to evaluate Dr. Cowan's methodology.

**Q. Anything else?**

A. No.

**Q. Were you asked to identify any class members?**

A. I was not.

**Q. Were you asked to provide any estimate of the size of any class?**

**G. Halm**

A. No.

**Q. Were you asked not to identify any class member?**

A. I was never given that instruction.

**Q. Did you have any discussions with anybody about whether you should identify any class member?**

**MR. KRAMER:** I will caution you, if you had discussions with counsel, not to reveal the substance of those communications, it's privileged.

A. One way or the other, I don't recall discussions of whether I should or should not identify any class members.

**Q. Did you have any discussions with anybody about whether you should provide an estimate of the size of any class?**

**MR. KRAMER:** Same instruction.

A. No.

**Q. What's your understanding of Dr. Cowan's assignment in this case?**

A. Well, I would say, generally, it was to identify class members and estimate the size of the class or each of the classes.

G. Halm

I believe I cited more precisely what he said somewhere in my report. I think that's a general description of what he was asked to do.

So I would refer wherever I provided a more -- I know I provided a description in my report, so I would refer to that, to the extent it clarifies anything.

**MR. KOROLOGOS:** Off the record.

(Off the record.)

**THE VIDEOGRAPHER:** The time is now approximately 9:23 a.m. We are now going off the record.

(Off the record.)

**THE VIDEOGRAPHER:** The time is now approximately 9:27 a.m. We are now going back on the records.

**Q. Before the short interruption, I was asking you about Dr. Cowan's assignment and your understanding of that.**

**Could you help me find in your report where you reference what his assignment was?**

A. Paragraph 3. So my understanding

G. Halm

is his assignment was to identify a methodology to identify class members, determine the number of class members in each of the four proposed classes and determine the number of allegedly infringing videos or number of infringing works that are allegedly infringed in those videos and associated with each class member.

**Q. Is that a fair description of your understanding of Dr. Cowan's assignment?**

A. It is.

**Q. Is it your understanding that Dr. Cowan's assignment included -- let me withdraw that.**

**Is it your understanding that Dr. Cowan was asked to identify class members to be included in his report?**

A. I don't know whether he was given that specific instruction, one way or the other.

My understanding is that that would be encompassed within the development of the methodology to do so.

**Q. Is it your opinion, as you sit here**

**G. Halm**

**today, having sat through Dr. Cowan's deposition yesterday, that Dr. Cowan attempted to identify class members, but was unable to identify class members?**

A. I know that he has attempted to identify class members. I heard his testimony that he had identified class members, however, the identity of those class members has not been provided such that I can review and evaluate whether they -- the identification of those class members is consistent with the class definitions or the methodology he proposes.

**Q. And I take it from your earlier testimony today that you did not attempt to identify any class members yourself, is that right, for any class?**

A. I evaluated elements of Dr. Cowan's methodology that would work towards that end.

As I reviewed the methodology, it stopped short of where it could need to go to identify those class members, so it didn't lead to that conclusion.

**Q. Did you or did you not attempt**

**G. Halm**

**yourself to identify any class members for any of the classes in this case?**

A. Not independent of the methodology described by Dr. Cowan.

**Q. Did you use Dr. Cowan's methodology to try to identify any class members?**

A. I implemented aspects of his methodology. In my opinion, the methodology doesn't lead to a systematic identification of class members, so it seems to, at least as described in the report, stops short and so I didn't implement any additional steps to do so.

There is also other flaws in his methodology that, in my view, would cause it to not reliably identify class members if implemented, so I didn't -- did not take the steps to try to identify class members by layering on some elements of additional work or applying my own judgment to filter through search results or that sort of thing.

**Q. So was that a no, that you did not use Dr. Cowan's methodology to try to identify a class member?**

**G. Halm**

A. I suppose that's a no, yeah.

**Q. Did you attempt to estimate the size of any class in this case?**

A. No, that would require first identifying class members, which I didn't identify, so I didn't attempt to estimate the size.

Let me just add a clarifying comment with respect to identification of class members, which I think is the intention of your question is, which is identifying class members apart --

**Q. I hate to interrupt the witness, but there is no question pending. If there is something you want to add to your last answer to correct it, but your counsel gets to ask questions at the end, so if there are things you wish to clarify, I'm sure he will clear that up for you.**

A. Okay.

**Q. In your report, if you turn to paragraph 14, that's on page 5. Paragraphs 14 and 15 are the summary of your opinions, correct?**



**G. Halm**
A. Correct.
**Q. And 14 has three different subparts of which each subpart has three or four subparts, am I seeing that right?**
A. Correct.
**Q. In part 14-A, you state that Dr. Cowan has failed to identify a single class member, apart from the named plaintiffs.**
**Do you see that?**
A. I do.
**Q. Is it your opinion that Dr. Cowan attempted to identify class members, but then failed to do so?**
A. It's my understanding he attempted to do so, that's what I heard yesterday at the deposition. It is still my opinion that no members apart from the named plaintiffs are identified in his report.
Yesterday I heard Dr. Cowan testify that he had identified some number of class members.
**Q. And before yesterday, were you of the opinion that Dr. Cowan had attempted to identify a class member?**

**G. Halm**
A. Yes.
**Q. And before yesterday, were you of the opinion that Dr. Cowan had attempted to identify class members, but had failed to do so?**
A. Correct, based on his report.
**Q. What in his report gave you that understanding?**
A. There is no class members identified in his report.
**Q. What in his report gave you the understanding that he had attempted to identify them, but not been able to do so?**
A. To answer that question, I would like to see a copy of his report.
**Q. Let me show you what the court reporter has previously marked as Plaintiffs' Exhibit 171, which is a copy of Dr. Cowan's report of November 17, 2022.**
A. Thank you for that.
Would you like me to answer the question that you just asked based upon --
**Q. Please. Thank you.**
A. You're welcome.

G. Halm
I may not be able to identify all of them, but, for example, in paragraph 7 on page 4, the report says, This report encompasses the following task, present and test a methodology using data provided by defendants and databases commonly used in the industry to identify members of the classes.
So in order to test a methodology, I would understand that one would need to try to locate class members, so that would be one example.
In paragraph 57, he refers to efforts undertaken to accomplish his task of estimating the number of owners and the number of works posted on YouTube -- paragraph 57, Dr. Cowan talks about efforts to estimate the number of owners and number of works posted on YouTube.
There is an analysis in paragraph 65 through 68 about an inexplicable dip in the takedown data. I would assume that that was part of -- that was analysis undertaken along the ends of trying to locate class members, it would appear.

G. Halm
Paragraph 69 has a substantive discussion about challenges posed by the data which would seem to perhaps have been discovered undertaking an analysis of trying to locate class members.
There is a statement in paragraph 78 that his methodologies are effective, rather than would be effective, which implies in perhaps the present tense that the methodology works in his view.
In paragraph 93, he says, to determine works that have at least one ISRC code, I tested the search for works using the search tool on the Sound Exchange website. For each work, I created a copyright on the name or the artist name and the title of the copyrighted work. From the top 100 results presented by the Sound Exchange search tool, I choose, if available, a single ISRC code with the artist's name or copyright owner and title match, so he, there, refers to the fact that he did test that method.
In paragraph 96, he discusses a process for analyzing or cleaning, if you



G. Halm
of my opinions. I don't know that that's actually possible.
For example, you are essentially -- the question seems to ask me to assume away 14-B.
**Q. Well, where in 14-A do you rely on the opinions set forth in 14-B?**
A. 14-A does not rely on 14-B, but your hypothetical asked me to assume that his methodology, as presented, or his efforts to apply his method as he presents it did identify class members effectively and that runs directly to 14-B, which is dealing with his methodology.
If you were asking me to assume, I don't want to be too helpful here, but maybe if you were asking me to assume that he expressed the opinion that he had identified class members applying his methodology rather than the factual assertion that he did, so if it was his view that he had, for example, then I wouldn't have a conflict with 14-B.
**Q. Let me ask you about 14-B for a second.**

**G. Halm**
**Are you saying that 14-B says that it's impossible to identify any class members?**
A. No.
**Q. Is it your opinion in this case, aside from whether it's in 14-B or not, that it is not possible to identify any class members in this case?**
A. No.
**Q. If you assume that Dr. Cowan used his methodology and was able to identify some number, but not all, class members, does that change any of your opinions set forth in 14-A?**
A. We still run into the problem of 14-B because there is problems with the way he proposes to go about identifying that, as expressed in the report, seem to be unworkable methods --
**Q. Well --**
A. -- in your hypothetical, sorry.
**Q. Thank you.**
**14-B seems to be talking about -- let me withdraw that.**

**G. Halm**
**14-B, before we get to the subparts, reads, Dr. Cowan's proposed methodologies are so severely flawed that they cannot adequately serve the purpose of identifying class members, if any.**
**Do you see that?**
A. I do.
**Q. And I take it from what you told me a moment ago, this is not conveying that it is not possible to identify any class members, right?**
A. Correct.
**Q. So I'm not sure I understand why the hypothetical I've asked you to assume, that Dr. Cowan was able to identify some, but not all class members, conflicts, in your mind, with 14-B, when I ask whether that hypothetical causes you to change any of the opinions identified in 14-A?**
A. Well, unless I'm misunderstanding your question, it would seem you are asking me to assume that Dr. Cowan would apply his methodology to identify at least one class member. That's the part of the question to

G. Halm
me that seems troubling.
If perhaps you are asking me if he applied -- to assume he applied some other methodology to identify at least one class member, that's a different hypothetical.
**Q. It would be. But I still don't see why the hypothetical that I have asked that used his methodology to identify some class members, but not all, conflicts with what you say in 14-B, when we established that 14-B does not offer the opinion that it is not possible, using Dr. Cowan's methodologies, to identify any class member?**
A. That's a different statement because you just added now, it's not impossible using Dr. Cowan's methodology.
I would say it seems to be impossible, using Dr. Cowan's methodology. I don't have the opinion that it's impossible to identify class members using some other methodology.
**Q. What methodology?**
A. I haven't developed a methodology on my own to identify class members. I



G. Halm

haven't been asked to do that.

**Q. Did you consider any such methodology?**

A. I was not asked to undertake my own effort to independently develop a methodology to identify class members or estimate the size of the classes and so I did not do that.

**Q. Even though you may not have been asked, did you consider any such methodology?**

A. No.

**Q. Is it your opinion that Dr. Cowan's methodologies are not capable of identifying any class members?**

A. As expressed in his report, yes, reliably.

**Q. Why?**

A. So paragraph B, little I, says, Dr. Cowan's proposed methodologies cannot adequately identify class members, if any, because all of the methodologies, except unreliable user-entered data at face value, as if it were completely reliable, without any empirical support, that it is actually reliable.

G. Halm

In fact, the user-entered name of copyright owner field he proposes to use does not reliably identify the name of the copyright owner and the user-entered title of copyrighted work field he proposes to use does not reliably identify the specific copyrighted work. Verifying the accuracy of any entry in these fields would require individualized inquiry.

**Q. Anything else?**

A. Item 2 would relate to the methodology to estimate the size of the class, not as much to identify any class members, so if the task is to find at least one, the issue of a manual methodology isn't really relevant, would seem to be an encumbrance, per se.

So item 2 relates more to if I'm trying to find the full quantum.

Item 3, as written in his report, would run to the issue of any, item -- paragraph 14, item B, No. 3, would run to that issue, as well, with respect to the CLFN class.

G. Halm

**Q. Are you finished?**

A. I am.

**Q. When you say that in section B of paragraph 14 of your report, you are saying that Dr. Cowan's methodologies cannot identify any class members reliably, are you saying that there are no class members that can be identified by that methodology?**

A. In the absence of a methodology to confirm or test the veracity of the fields he proposes to use, that's correct.

**Q. What do you mean by that?**

A. I mean what I said.

**Q. When you said, In the absence of -- my transcript reads, In the absence of the methodology, did you say the methodology or a methodology?**

A. A methodology.

**Q. When you referred me to subpart I of paragraph 14-B, you focused first on the part that talks about -- let me withdraw that.**

**When you referred me to paragraph 14-B(i), at the beginning of that paragraph,**

**G. Halm**

**it refers to Dr. Cowan's methodologies accepting unreliable user-entered data at face value as if it were completely reliable.**

**Do you see that?**

A. I do.

**Q. Is it your opinion that the user-entered data that Dr. Cowan proposes to rely on with his methodologies and that you were referencing there is completely unreliable?**

A. I've identified numerous instances where it is not reliable. I've reviewed or have not seen corroborative or alternate analysis confirming its reliability, however, I have not done an analysis and do not have an opinion that every entry in that field -- in those fields is unreliable.

**Q. Do you have a belief -- let me withdraw that.**

**Do you have an opinion as to whether any of the user-entered data that Dr. Cowan's methodologies propose to rely on is accurate?**

A. What do you mean by accurate?

MAGNA
LEGAL SERVICES

G. Halm

**Q. Factually correct.**

A. I think it would depend on the question posed.

Dr. Cowan is relying on it for a certain purpose. It's not clear that that purpose is the purpose that the user intended to convey when entering that information, so it would depend on the -- what was being -- what's being communicated with the posting into that field.

**Q. Does that mean you have an opinion that the user-entered data in the databases that Dr. Cowan proposes to rely upon for his methodologies contains no factually correct information?**

A. I don't have that opinion.

**Q. I take it from one of your earlier answers that you did not engage in any analyses to determine the amount of information in the data fields that Dr. Cowan's methodology proposes to rely on that is or is not accurate, is that right?**

A. I identified instances that are not accurate. I did not undertake a methodology

G. Halm

to identify instances that were accurate and I did not identify all instances that were inaccurate.

**Q. You identified -- let me withdraw that.**

**When you say that you identified instances that are not accurate, is that when you referred to entries of titles of works that included the phrase, my video?**

A. That's part of it.

**Q. What else?**

A. Paragraph 74 through 80.

**Q. Anything else?**

A. Not in my report.

**Q. In paragraph 74, you found 483 records where the field for the title of copyrighted work and the sample takedown data started with the phrase, my video, right?**

A. Correct.

**Q. And then how many other records do you identify that were not accurate?**

A. So just to preface that accuracy here, the context of identifying the specific copyrighted work or the specific copyrighted

G. Halm

owner, because that's the purpose for which it's used in Dr. Cowan's method.

In footnote 111, I've identified at least three values in the field that might correspond to more records, so it's at least three records. Not in the sample takedown data, but in other data, at the end of paragraph 75, there is a reference to a takedown from plaintiff, Uniglobe, with respect to the 20th Century Fox opening sequence.

In paragraph 77, there is an instance where the name which corresponds to 5,488 records in the data where the name of the copyright owner field has a value of essentially a third party copyright management company and the title of the copyrighted work is referring to a generic TV series and not the specific -- that contains thousands of episodes, I believe, and not the specific works, 1,092 episodes and not the specific episodes in question.

Paragraph 79 -- withdraw that.

Paragraph 80 then identifies other

G. Halm

instances where the title of the copyrighted work is too generic, so as to be sufficiently accurate.

One example there is with respect to a mobile video game and the other relates to the Indian Premier League 2019.

**Q. Anything else?**

A. Not in my report.

**Q. For the video games, you give a number of instances that you found inaccurate records?**

A. I do not have the number of instances in the report. I do know it was most definitely more than one. I think it was a large number, I just don't have it.

**Q. Do you give the number with respect to the Indian Premier League?**

A. I don't. Same answer, I do recall it was far more than one, I just don't remember how many.

**Q. When you refer to the -- let me withdraw that.**

**These are examples you were able to find out of the 90-day sample takedown data?**



**G. Halm**

A. That's correct.

**Q. There are approximately 1.8 million entries in that data, is that right?**

A. That's about right.

**Q. Would you agree with me that the numbers you identified in your report are a very small fraction of the entries in that database?**

A. The numbers identified in my report are a small fraction, that's correct.

I did not seek out to identify all the entries.

**Q. Do you think it would be fair for me to conclude, based on your not identifying any others, that you had not actually identified any others than those that you put into your report?**

A. I don't.

**Q. Why not?**

A. Because I characterize these as examples.

**Q. Do you think it would be fair for me to conclude that because you do not identify the number of video game entries**

**G. Halm**

**where you say the information is not accurate, that there actually are no video game entries where the information is not accurate?**

A. Can you say that one more time, please.

**Q. Sure.**

**Do you think it would be fair for me to conclude that because you do not identify the number of video game entries where you say the information is not accurate, that there actually are no video game entries where the information is not accurate?**

A. No, because I identify at least one, so there can't be zero, and, again, characterize it as an example.

**Q. Working on your report, did you have any conversations with Dr. Peterson, one of defendant's other experts?**

A. I've had discussions with Dr. Peterson. I don't believe I would characterize them as in working on my report, but during the case, I've had discussions

G. Halm

with him.

**Q. Did you work with Dr. Peterson in any capacity, other than in connection with this case?**

A. No.

**Q. Did you talk with Dr. Peterson at all about whether he has any views about the level of precision required in a class action case?**

A. No.

**Q. Did you have any discussions with Dr. Peterson about whether he is aware of any papers on that subject?**

A. No, and you can continue your questioning, I was just going to ask if I could take a bathroom break.

**Q. Two more questions.**

A. Totally fine.

**Q. Did you talk with Dr. Peterson at all about whether he had written any papers about the level of precision required in a class action case?**

A. No.

**Q. Did you talk with Dr. Peterson**

**G. Halm**

**about the doctoral thesis for his Ph.D.?**

A. No.

**Q. Do you know what that was in?**

A. No.

**MR. KOROLOGOS:** Why don't we take a break.

**THE VIDEOGRAPHER:** The time is now approximately 10:45 a.m. We are now going off the record.

(Recess.)

**THE VIDEOGRAPHER:** The time is approximately 10:58 a.m. We are now going back on the record.

**Q. Good morning again.**

A. Good morning.

**Q. We talked a little bit this morning about the 90-day sample takedown database.**

**Do you recall that?**

A. I do.

**Q. And that even after the court's narrowing of the statute of limitations start period to July 2nd of 2019, as we talked about this morning, there is still only a portion of the takedown data available for**



Page 74

G. Halm

**others on your team reviewed portions of the depositions that -- let me withdraw that.**
**Do I understand correctly that you only reviewed parts of the depositions that are listed on page 2 of appendix B?**
A. Your question is that I only reviewed parts of the depositions that are listed on appendix B besides Mr. Agrawal?
**Q. Yes.**
A. That's correct.
**Q. Do I also understand that some members of your team read more of those depositions than you did?**
A. Correct, I recall telling Mr. Sternberg to and confirming that he did review all of the balance of the deposition transcripts that we received.
**Q. How did you determine what portions of the deposition, other than Mr. Agrawal, you would read?**
A. Based on what Mr. Sternberg flagged as potentially pertinent to what my assignment was and then staff subsequent to him potentially identifying other things, as

Page 75

G. Halm

well.
**Q. Did the lawyers supplement any of that selection of portions of the depositions for you to review?**
A. I believe they may have flagged things to look at. If I inquired about, you know, a particular topic or what deposition testimony might be most relevant to the subject.
**Q. Right above depositions, there is an identification of plaintiffs' reports.**
**Do you see that?**
A. You are referring to my appendix B?
**Q. Yes, I am.**
A. Correct.
**Q. That lists Dr. Cowan's report, September 1st and his report of November 17th, correct?**
A. Correct.
**Q. We talked about those. So you reviewed both Dr. Singer's September 1st and his November 17th expert report?**
A. I did.
**Q. Did you ever any opinions with**

Page 76

G. Halm

**respect to Dr. Singer's November 17th report?**
A. I have not been asked to offer any opinions with respect to his November 17th report.
**Q. Sticking with that page of your appendix B, there is then a list of documents produced in the litigation that are identified by Bates number.**
**Do you see that?**
A. I do.
**Q. Who selected those documents for review?**
A. Some of those documents would have been information provided by counsel without me necessarily asking, perhaps early on in the case.
Others would have been when I requested documents of a certain nature and some of these, I believe, are also essentially produced versions of publicly available content that I had researched, if that makes sense. It's a printout of a Google page of some kind that happens to have a Bates number on it, but it's also available

Page 77

G. Halm

publicly.
**Q. If you flip over to page 4 of your appendix, some of the things on that part of the research list might show up as Bates stamped versions that were produced in the case?**
A. I don't know -- that's possible, I don't know that's necessarily the case. I believe that the way it would have happened is if we had listed some website and then perhaps counsel said, oh, there is a Bates stamp version of that, can you list that, so then we would have not listed it under research.
Generally, I try for research to be other research obtained by me that isn't a produced document, but it's possible there is duplication.
**Q. I may have asked this and, if so, I apologize. I think I established that since your report, you have not had a conversation with Mr. Agrawal.**
**Have you had any conversations with anyone else from YouTube or Google since you**





G. Halm

**wrote your report?**

A. No.

**Q. I believe your report in paragraph 11 identifies BRG's rate for your time at $650 an hour, is that correct?**

A. Yes.

**Q. Was that the rate you charged since you were retained in May?**

A. Yes.

**Q. Do you know how much time you spent on this matter, approximately?**

A. I would say it's approximately 160 hours.

**Q. 1-6-0?**

A. 1-6-0.

**Q. Do you know approximately how much time has been spent by members of your staff above that?**

A. It's at least an equal amount, but I can't give you a precise number.

**Q. When you say, at least an equal amount, you mean another 160 hours distributed among the others?**

A. At least.

G. Halm

**Q. Did you run any regression analyses in connection with this case?**

A. I did with respect to YouTube's cost structure and those are attached at schedules 1.1 through 1.4 to my report.

**Q. Any others that you ran?**

A. No.

**Q. Did you review any of the -- let me withdraw that.**

**Did you provide any comments to Dr. Peterson on his report before it was issued?**

A. No.

**Q. Did you review it before it was issued?**

A. No.

**Q. I take it from your list, you reviewed it since it was issued -- actually, maybe not.**

A. I did. I was given a copy of it maybe within the last week or week and a half, but it's not listed on the list of materials considered as of the date of my report.

**Q. Because you had not yet reviewed it**

G. Halm

**on the date of your report?**

A. That's correct.

**Q. Do I understand correctly, you have a bachelor of science degree?**

A. Yes.

**Q. Any other degree?**

A. No.

**Q. When did you get your BS?**

A. March of 2008.

**Q. Where did you get it?**

A. University of California at Davis.

**Q. And in your appendix A to your report, which is your CV, on the last page of that, page 6, it identifies education.**

**Do you see that?**

A. Correct.

**Q. Your BS was in managerial economics?**

A. Correct.

**Q. What is managerial economics?**

A. It's essentially a financial economics degree that UC Davis offers. I don't know that I could explain it better than that. There are two econ degrees at UC

G. Halm

Davis. There is an econ degree -- or in the field of economics, there's two. There is an econ degree that has lower requirements and requires someone to minor in something else and then there is managerial economics, which has more coursework, that's probably the best definition I can give, but I've asked the same question.

**Q. Below your bachelor of science in managerial economics, it reads, Accounting coursework at University of California Berkeley.**

**What coursework are you referring to there?**

A. In order to obtain my CPA license, because I didn't obtain an accounting major, I had to take sufficient accounting coursework, so sit for the exam and get the license, so it was a number of accounting classes, I don't recall how many, after graduating from UC Davis.

**Q. And any courses you took at UC Berkeley, other than for the purpose of getting your CPA?**





Page 82

G. Halm
A. No.
**Q. What statistics coursework did you take at Penn State?**
A. I took a -- this would have been in 2011 and '12, approximately, maybe spilling into early '13, but I don't believe so. I took a number of statistics-related courses simply because I found I was using statistics a fair bit at work and then I had more than one child and stopped.
**Q. So your statistics changed?**
A. Correct, yeah.
**Q. You were in Pennsylvania at that time?**
A. No, that was Penn State, but remotely, so those were remote classes through Penn State.
**Q. When did you get your CPA?**
A. 2010, I believe.
**Q. Anything you have to do to stay current for that?**
A. Yes.
**Q. What is that?**
A. There is a continuing education

Page 83

G. Halm
requirement that is 80 total hours spread over two years with a minimum of 20 in any one year.
**Q. So you can't binge all at the end?**
A. You cannot binge all at the end. I was warned once when I wasn't aware of that requirement the first time I renewed, but hasn't been a problem since then.
**Q. I want to go back to your -- since we got the page open to your prior testimony. I understand from what you said earlier, you testified at trial twice, is that right?**
A. That's correct.
**Q. And you've been deposed four times?**
A. I believe that's correct, and they're all listed under there.
**Q. The cases in which you were deposed, none of those four went to trial, is that right?**
A. That's correct.
**Q. Aside from those six cases, four depositions and two trials, are there somewhere you issued a report, but did not have to testify either at deposition or at**

Page 84

G. Halm
**trial?**
A. There are a fair number, yes.
**Q. How many?**
A. Best estimate would be a dozen.
**Q. Were any of those class actions? And for now, I'm limiting it to the ones where you had a report, but did not testify.**
A. I understand. I don't believe so.
**Q. What about any of the six where you testified either at deposition or at trial, were any of those class actions?**
A. No, I don't believe so. The State of Washington matter was sort of like the state on behalf of people, but it wasn't a class action, per se.
**Q. What about any cases where you've acted as a consultant as opposed to a testifying expert, any of those cases class actions?**
A. Yes.
**Q. Which cases?**
A. I don't know -- all those cases I know have like protective orders and confidentiality agreements, so I don't know

Page 85

G. Halm
whether I'm -- I remember them and I can describe the nature of the case, but I don't know whether I can provide the parties.
**Q. Approximately how many?**
A. Probably four or five.
**Q. What was your role as a consulting expert in those four or five cases?**
A. It would depend on, to some extent, the status of the case and where it was at, but in some matters, at least one that I can think of, I was simply helping counsel identify pertinent information and data and run analyses of data.
In the balance of the others, that would have been an aspect of the analysis, as well as working with a testifying expert and also generally advising counsel on different issues that came up as the case progressed, maybe helping them with depositions of experts, things of that nature.
**Q. In any of those cases, were you involved in identifying class members?**
A. That would have been part of the work, I believe.



G. Halm

A. I recall either reviewing testimony or a declaration addressing about some sort of portion of records that have further review in terms of their takedown processes. I suppose that would address, to some extent, validity in the context of whether that information was sufficient to warrant a takedown.

**Q. And you are familiar, I take it from some of the things in your report, that after a takedown notice is submitted, the content may be taken down, the content that is the target of the takedown notice, is that right?**

A. That can happen.

**Q. And that the person who uploaded that content could submit what's referred to as a counter notification. Are you familiar with that?**

A. Yes.

**Q. Do you know what -- let me back up.**

**Other than the -- let me withdraw that.**

**With respect to counter**

G. Halm

**notifications, do you know how those get submitted?**

A. Logistically, how they get submitted?

**Q. You said you are familiar with how Web Forms get submitted and you looked at that?**

A. Correct.

**Q. So a corollary being how does somebody submit a counter notification, are you familiar with that?**

A. I am not.

**Q. Are you familiar at all with what YouTube does with the information it receives in a counter notification?**

A. I am not.

**Q. Do you know what YouTube does if anything with the information received from a counter notification, other than to record that a counter notification was received, as you know, from the 90-day sample?**

**MR. KRAMER:** Objection to form.

A. I know that something is done with it because some counter notifications are

G. Halm

successful and the video is reinstated and some are not, so there are processes applied to evaluate those in some capacity. Exactly what those processes are, as I sit here, I don't have an understanding.

**Q. While you may not have an exact understanding, you have a general understanding, other than what you just stated, that some process must happen?**

A. It must.

**Q. But beyond that, you don't have any understanding?**

A. Correct, exactly what those processes are, I don't have an understanding. It's probably in the deposition testimony somewhere.

**Q. Even if it's not exact, you don't have a general understanding, other than that there is some process?**

A. Correct.

**Q. You mentioned earlier that you recalled either reviewing testimony or a declaration where some portion of records would have further review.**

G. Halm

**What do you recall about that?**

A. Well, the only thing that sticks into my memory is something about looking at -- I don't know why [REDACTED] sticks in my mind, but some percentage of records have some kind of review and this was in the context of me researching the speed of processing a takedown and the information considered.

So this was essentially in the context of evaluating the question of if a takedown is submitted and then another takedown for the same work for other YouTube videos were to be, say, submitted immediately thereafter, would the first takedown have been capable of being evaluated when the second takedown was submitted, so I was just gaining a general understanding as to the sort of the timeline and whether it's a fully automated or whether there are other aspects of the review for processing takedowns.

**Q. Anything else you recall about that?**

A. No, no. I believe that that



G. Halm

deposition testimony, though, is cited -- what is the name of the individual for the record here? Chris Ting.

**Q. Where are you referring in your report?**

A. Footnote 79. T-I-N-G.

**Q. So that was with respect to the length of time it takes to resolve a takedown, is that right?**

A. The length of time and the testimony discussed the processes and that wasn't the only -- that was the most relevant portion of Mr. Ting's testimony, that I know that he spoke about processes in one or two other places.

**Q. Any other testimony or other documents you recall reviewing about what YouTube does after it receives a takedown notice?**

A. No.

**Q. Do you recall that Dr. Cowan relies on -- let me withdraw that.**

**Do you recall that Dr. Cowan's methodologies propose using various different**

**G. Halm**

**third party databases?**

A. Yes.

**Q. Did you attempt to -- let me withdraw that.**

**Did you review any of those databases?**

A. There were two databases which he obtained and produced. The U.S. Copyright Database and the MusicBrainz database, I reviewed those. I also reviewed those databases as they exist in an online searchable form.

He then referred to EIDR, Sound Exchange and INDB, but did not provide what I would call like a static database, a downloaded database from the sources, but I reviewed those databases in their online searchable forms, as well.

**Q. Did you use any sampling techniques to conduct tests of the reliability of any of those databases?**

A. No.

**Q. Did you perform any other statistical analyses of any of those**

**G. Halm**

**databases, aside from sampling technique?**

A. No.

**Q. Do you have an understanding of what the Sound Exchange database is set up to do?**

A. I know that one of the things in the Sound Exchange database is an ISRC search function where one can search on the artist name, title, release name, version or year of recording.

**Q. Anything else?**

A. I am not aware of what other things one might be able to do with the Sound Exchange database.

**Q. Do you know why Sound Exchange has that data available?**

A. I don't.

**MR. KOROLOGOS:** Why don't we break for lunch?

**THE VIDEOGRAPHER:** The time is now approximately 12:40 p.m. We are now going off the record.

(Luncheon recess taken at 12:40 p.m.)

G. Halm

A F T E R N O O N S E S S I O N

(Time noted: 1:29 p.m.)

G R E G H A L M, resumed and testified as follows:

**THE VIDEOGRAPHER:** The time is now approximately 1:29 p.m. and we are now going back on the record.

EXAMINATION BY (Cont'd.)

**MR. KOROLOGOS:**

**Q. Good afternoon.**

A. Good afternoon.

**Q. Do you remember a discussion in your report about -- I withdraw that.**

**Do you remember a discussion in your report concerning cleaned data?**

A. Yes.

**Q. If you look over at paragraph 60, I think is the neighborhood of that discussion. Let me know if that's right. Page 29.**

A. Okay. Clean fields.

**Q. Clean fields, yes.**

**In paragraph 60, you start by saying, Dr. Cowan asserts that these issues would be addressed if YouTube would produce**



G. Halm

**the clean fields.**

**Do you see that?**

A. I do.

**Q. Setting aside for the moment -- let me withdraw that.**

**If you assumed those clean fields existed, do you believe that would help with respect to this aspect of Dr. Cowan's proposed methodology?**

A. If, in the hypothetical, that they existed, it might, but it would depend on how they were cleaned and it's a hypothetical that's somewhat hard to understand because it's a difficult process, so it would depend on the processes employed to clean those fields.

**Q. Okay. Why don't we try a hypothetical to explore that a little bit.**

**Let's assume that somebody submits a takedown notice and a takedown notice and that is submitted through the Web Form as a description of the copyrighted work that is vague or incomplete, and assume -- let's stop there.**

G. Halm

**Are you with me so far in understanding the hypothetical?**

A. Generally, I mean, the reference point's important for this, so it would be vague or incomplete as to what comparative data point, I guess, but, generally, I think I'm tracking with you.

**Q. By vague or incomplete, I meant that the information entered for the name of the copyright work.**

**Do you understand that?**

A. I do.

**Q. Let's assume that somebody at YouTube sees that that information is vague or incomplete and they ask for additional information from the person who submitted the takedown notice.**

**Are you with me so far?**

A. Yes.

**Q. Let me first ask, are you aware of any instances like that?**

A. Not offhand.

**Q. When you say, not offhand, what do you mean?**

G. Halm

A. I reviewed the takedown data. I have an understanding that perhaps there is other data that can be obtained, for example, like in the counter notification process, maybe there are communications of some kind, so it's my understanding that other information -- I don't know if I would want to call it data elements, but other information can exist in correspondence perhaps.

**Q. Do you know what YouTube does with any of that information that's obtained in correspondence as opposed to on the Web Form itself?**

A. I do not.

**Q. So you don't know whether that gets incorporated into the takedown notice database or incorporated into some other database or something else that happens with that information?**

A. I do not.

**Q. Do you have any understanding of any of the types of information that might be obtained in a communication process similar**

G. Halm

**to what you described a moment ago?**

A. Not specifically.

**Q. Do you have any understanding, generally?**

A. By inference, there might be information, for example, with respect to whether a license for permission exists to display a video, for example, with an unsuccessful or a counter notification that did not result in the video being -- a counter notification where a video was reinstated, that information may have been exchanged.

**Q. Any other understanding or inference?**

A. No.

**Q. In that instance where you talk about a counter notification that results in a video being reinstated, that's effectively a successful counter notification, right?**

A. Possibly, yes, probably is. I don't know if there are other reasons that a video can come back up outside of the counter notification process.



Page 106

G. Halm

**Q. One way, as you understand it, that a video can come back up is because after being taken down by a takedown notice, the up loader submits a counter notification and if the counter notification ends up itself being successful, the video gets put back up?**

A. That would be one way.

**Q. Are you aware of any other way that the video might get put back up that had been taken down as a result of a takedown notice?**

A. I would suppose that there could be many possible ways. I would assume that a possible way could be if the parties, the third parties are not YouTube, outside of the counter notification process entered into some kind of agreement with respect to the content and it came back up, for example, that seems like a possibility.

**Q. Are you aware of any such instances?**

A. No.

**Q. Any other possibilities that you are aware of?**

A. No.

Page 107

G. Halm

**Q. Any other possibilities that you might think exist?**

A. I haven't thought about it hard enough.

**Q. In the situation where a video is taken down as a result of a takedown notice and then a counter notification results in the video being reinstated. Are you with me so far?**

A. I am.

**Q. Is it your understanding that Dr. Cowan's methodology would not count that instance as a successful takedown notice for purposes of the class definitions?**

A. I believe that would be correct with respect to his analysis of the takedown data. If it's in the takedown data and it's active, he would not include that in the class.

**Q. Okay. What is your understanding of what an ISRC code is?**

A. My general understanding is that it's a unique code assigned to a track.

**Q. When you say, track, what do you**

Page 108

**G. Halm**

**mean?**

A. A musical track assigned.

**Q. Do you know what YouTube uses ISRC codes for, if anything?**

A. I don't.

**Q. In paragraph 48 of your report, on page 24. Are you with me?**

A. I am.

**Q. In that paragraph, in the second sentence, you say, Dr. Cowan proposes that he would identify takedown records that have an ISRC code by matching takedown notice information to the Sound Exchange website based on the owner name or artist name and the title of the copyrighted work, but he does not specify the exact fields he would use to undertake this matching exercise.**

**Do you see that?**

A. I do.

**Q. Did you attempt to do what Dr. Cowan describes there?**

A. I did not because his description was not sufficiently specific to know exactly what he is proposing.

Page 109

G. Halm

**Q. Did you try to take any information available from the sample takedown data and try to compare any of that information with any information available from Sound Exchange?**

A. Not that I recall.

**Q. Do you know if anybody on your team did?**

A. Not specifically.

**Q. Do you know generally?**

A. No.

**Q. Are you offering an opinion that it is not possible to engage in any matching process between the takedown data and Sound Exchange?**

A. No.

**Q. Over to paragraph 85.**

A. I'm there.

**Q. Paragraph 85 quotes a portion of what appears to be paragraph 94 of Dr. Cowan's report, correct?**

A. Correct.

**Q. Then in the first sentence of paragraph 86, you comment on that quoted**



G. Halm

**it was displayed on YouTube, but when it was displayed, did it no longer have the CLFN information or was that copyright management information altered?**

A. Correct. That would be -- that's the issue we are talking about. It's not something that I'm necessarily taking exception to, one way or the other or not.

**Q. Do you still have Dr. Cowan's report in front of you?**

A. I do.

**Q. If you can flip to paragraph 63, please.**

A. I'm there.

**Q. We talked a little bit about this this morning.**

**Do you recall that?**

A. I do.

**Q. You focused on the last sentence of paragraph 63.**

**The first sentence reads, Traditional sampling theory is not equipped to deal with this problem.**

**Do you see that?**

G. Halm

A. I do.

**Q. And what's your understanding of the problem that he is referring to there?**

A. Understanding the sequence number of a takedown in the data with respect to other takedowns for the same work.

**Q. The second sentence of paragraph 63, Dr. Cowan writes, More advanced areas of probability theory such as latent structure theory need more information to be able to put into practice.**

**Do you see that?**

A. I do.

**Q. What's your understanding of latent structure theory?**

A. I don't really have one and you didn't investigate it much because he raises it and then dismisses it because he says it needs more information.

**Q. What's your understanding of advanced areas of probability as he uses that in the second sentence of paragraph 63?**

A. I would be speculating as to what he meant to convey, other than referring to

G. Halm

latent structure theory.

**Q. Okay. Which he helps us with?**

A. There you go.

**MR. KOROLOGOS:** Why don't we take a short break.

**THE VIDEOGRAPHER:** The time is now approximately 2:21 p.m. We are now going off the record.

(Recess.)

**THE VIDEOGRAPHER:** The time is now approximately 3:05 p.m. We are now going back on the record.

**Q. Thanks for your patience on the break. It helped us organize things so we can finish quickly I hope.**

A. You're welcome.

**Q. Do you know whether YouTube has data about the number of times a video that is in the takedown database as having been taken down was viewed?**

A. I think I testified earlier that I recall seeing data potentially of that type with respect to the named plaintiff data, as I recall. I haven't made that inquiry with

G. Halm

respect to general takedowns.

**Q. What about data about the location that a view took place, like the IP address of the computer that was used to view a YouTube video, do you know whether YouTube keeps track of that?**

A. I do not.

**Q. What about the location from which an upload occurred, like an IP address or even just a country, do you know whether YouTube keeps track of that?**

A. I do not.

**Q. What about the location at which the video that is available for display on YouTube is electronically stored, do you know whether YouTube keeps data with respect to that?**

A. Can you say that one more time because you had a pause, so it was hard to follow.

**Q. Sorry.**

A. That's all right.

**Q. Do you know whether YouTube has data about the location at which a video that**





G. Halm

**is available for display on YouTube is electronically stored?**

A. I do not.

**Q. You still have your report there?**

A. I do.

**Q. Let's go back to your last section, section 5. The heading for section 5 is Analysis of the Now Abandoned Damages Calculation Methodology Proposed in Dr. Cowan's Initial Report.**

**Do you see that?**

A. I do.

**Q. You understand that that's -- when you are saying now abandoned, that's no longer in Dr. Cowan's November report and, instead, Dr. Singer talks about damages.**

**Do you remember that from the reports?**

A. That is my understanding.

**Q. If I understand from your testimony earlier, it's not been your assignment to comment on Dr. Singer's report at all, is that right?**

A. Not his November report, that is

G. Halm

correct.

**Q. Not Dr. Singer's November report?**

A. Correct. Thank you for clarifying that.

**Q. You understand that that's Dr. Singer's operative report?**

A. I do.

**Q. Even though Dr. Cowan doesn't address damages in his November report, since you talk about it here a little bit, I want to talk with you about it a little bit.**

A. Okay.

**Q. In your subpart C, you say, Dr. Cowan did not account for YouTube's incremental costs.**

**Do you see that?**

A. I do.

**Q. What do you mean by incremental costs?**

A. In a damages analysis such as this one, if we are identifying the revenue, hypothetically, that YouTube received because of the allegedly infringing acts, that it otherwise would not have received the

G. Halm

incremental cost would be costs associated with that revenue that YouTube did receive, but would not have received in a but-for world.

**Q. How did you go about identifying incremental costs for purposes of your chart 3 that appears between paragraphs 104 and 105 of your report?**

A. So my first step was to review the relevant financial reports that have been produced in this case.

Also, those are publicly available. That data is summarized at schedule 1.0 of my report and another step was to gain a further understanding of the nature of the costs and with more specificity, by discussing those costs with Mr. Agrawal and then after doing those two things, I used a method that is commonly employed by forensic accountants to run a linear regression analysis where the cost is the dependent variable, so the Y variable and the revenue is the independent variable, the X variable.

So it measures the relationship

G. Halm

between those two things and the results of that are posted in chart 3. There is a fixed amount which is essentially the intersect in each regression and then there is the variable cost which is the coefficient on the X variable in each regression.

**Q. Let's talk about schedule 1.0.**

A. Okay.

**Q. This schedule has the heading Summary of YouTube Profit and Loss Statement Data, correct?**

A. Correct.

**Q. Did you use all of the data in this schedule 1.0 in your regression?**

A. I believe I did, but just give me one moment. I did. Other than the column that says, SEC filings is more for corroborative purposes, so that's listing the annual or half year revenue information published in Alphabet's SEC filings. That annual data was not used in the regression. The monthly data was used in the regression.

**Q. What did you do about the instances where the SEC filing data did not match the**





Witness: Greg Halm — January 18, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

**Errata Sheet**

| **Page:Line** | **Change** | **Reason** |
|---|---|---|
| 9:21 | Replace <is> with <has> | To correct transcription errors |
| 9:21 | Replace <826> with <1,826> | To correct transcription errors |
| 10:4 | Replace <variants> with <variation> | To correct transcription errors |
| 21:16 | Replace <created a copyright on the > with <can query the copyright owner> | To correct transcription errors |
| 23:25 | Replace <826> with <1,826> | To correct transcription errors |
| 25:16 | Replace <identify> with <identified> | To correct transcription errors |
| 42:21 | Replace <except> with <accept> | To correct transcription errors |
| 45:13 | Replace <I've> with <I haven't> | To correct transcription errors |
| 60:16 | Replace <title> with <tight> | To correct transcription errors |
| 66:9 | Insert <and> between <me> and <in> | Clarify the record |
| 70:9 | Insert <not> between <had> and <been> | To correct transcription errors |
| 81:19 | Replace <so> with <to> | To correct transcription errors |
| 87:5 | Replace <RC> with <CV> | To correct transcription errors |
| 99:15 | Replace <INDB> with <IMDb> | To correct transcription errors |
| 123:17 | Replace <you> with <I> | To correct transcription errors |
| 133:19 | Replace <interest> with <difference> | To correct transcription errors |
| 141:12 | Replace <comes> with <hums> | To correct transcription errors |
| 152:12 | Replace <it> with <in> | To correct transcription errors |
| 167:15 | Replace <but> with <about> | To correct transcription errors |

____X____ Subject to the above changes, I certify that the transcript is true and correct.

Witness: Greg Halm — January 18, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

__________ No changes have been made. I certify that the transcript is true and correct.

________________________ February 22, 2023
(signature) (date)

Witness: Greg Halm — January 18, 2023 Deposition
*Schneider v. YouTube, LLC*, No. 3:20-cv-04423-JD (N.D. Cal.)

ACKNOWLEDGMENT OF DEPONENT

I, Greg Halm, do hereby certify that I have read and examined the foregoing testimony, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

| ______________________ | February 22, 2023 |
|---|---|
| (signature) | (date) |

3