# EXHIBIT 42

to the Declaration of Qifan Huang

PUBLIC VERSION - REDACTED

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

MARIA SCHNEIDER, UNIGLOBE
ENTERTAINMENT, LLC, and
AST PUBLISHING LTD.,
individually and on behalf
of all others similarly
situated;

        Plaintiffs,
vs.                              Case No. 3:20-cv-04423-JD

YOUTUBE, LLC; and GOOGLE
LLC;

        Defendants.
_____/


THIS TRANSCRIPT CONTAINS

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

DEPOSITION OF CHRIS TING

SAN FRANCISCO, CALIFORNIA

WEDNESDAY, JUNE 29, 2022


STENOGRAPHICALLY REPORTED BY:

ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR

CSR LICENSE NO. 9830

JOB NO. 846000



MAGNA LEGAL SERVICES

Page 2

```
 1    UNITED STATES DISTRICT COURT
 2    NORTHERN DISTRICT OF CALIFORNIA
 3              ---oOo---
 4
 5    MARIA SCHNEIDER, UNIGLOBE
      ENTERTAINMENT, LLC, and
 6    AST PUBLISHING LTD.,
      individually and on behalf
 7    of all others similarly
      situated;
 8
              Plaintiffs,
 9    vs.            Case No. 3:20-cv-04423-JD
10    YOUTUBE, LLC; and GOOGLE
      LLC;
11
              Defendants.
12    _____/
13
14
15        Remote Videotaped Deposition of Chris Ting,
16    taken at Boies Schiller & Flexner, 44 Montgomery
17    Street, 41st Floor, San Francisco, on behalf of the
18    Plaintiffs, on Wednesday, June 29, 2022, beginning
19    8:58 a.m., and ending at 1:20 p.m., Pursuant to
20    Notice, and before me, ANDREA M. IGNACIO, CSR, RPR,
21    CRR, CLR ~ No. 9830.
22
23
24
25
```

Page 3

```
 1    A P P E A R A N C E S:
 2
 3
 4    COUNSEL FOR THE PLAINTIFFS:
 5      KOREIN TILLERY, LLC
 6      By:  CAROL O'KEEFE, Esq.
 7           RYAN CORTAZAR, Esq.
 8      205 North Michigan, Suite 1950
 9      Chicago, IL 60601
10      (312) 641-9750
11      cokeefe@koreintillery.com
12
13    -- and--
14
15      BOIES SCHILLER FLEXNER LLP
16      By:  DEMETRI BLAISDELL, Esq.
17      55 Hudson Yards, 20th Floor
18      New York, NY 10001
19      (212) 446-230
20      dblaisdell@bsfllp.com
21
22
23
24
25
```

Page 4

```
 1    A P P E A R A N C E S:  (Cont.)
 2
 3
 4    COUNSEL FOR THE DEFENDANTS:
 5      WILSON SONSINI GOODRICH & ROSATI
 6      BY:  BRIAN WILLEN, Esq.
 7           NATHALIE GORMAN, Esq.
 8      650 Page Mill Road
 9      Palo Alto, CA 94304-1050
10      (650) 493-9300
11      bwillen@wsgr.com
12
13
14    ALSO PRESENT:  Keigo Painter, Videographer
15                   Samuel Reed Dippo, Google
16              ---oOo---
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              I N D E X
 2
 3    WITNESS:  Chris Ting
 4
 5    EXAMINATION                    PAGE
 6    By Ms. O'Keefe                  7
 7
 8            E X H I B I T S
 9    EXHIBIT                        PAGE
10    Exhibit 134  SpiderMADison: Copyright    94
11       Suspension Expansion to Linked
12       Channels, Bates
13       GOOG-SCHNDR-00000918 - '23
14
15              ---oOo---
16
17    HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
18    (See attached 7-25-22 Letter from Wilson Sonsini)
19
20
21
22
23
24
25
```



Page 6

```
 1        DEPOSITION PROCEEDINGS
 2        WEDNESDAY, JUNE 29, 2022
 3              8:58 A.M.
 4
 5
 6        THE VIDEOGRAPHER:  We are on the record.
 7   This begins videotape No. 1 in the deposition of Chris
 8   Ting.
 9        In the matter of Maria Schneider, et al.,
10   versus YouTube LLC, et al.  In the Northern District
11   of California, San Francisco Division.  Case
12   No. 3:20-CV-04423 JD.
13        Today is June 29th, 2022, and the time is
14   8:58.
15        This deposition is being taken at Boies,
16   Schiller & Flexner, LLP, 44 Montgomery Street,
17   41st Floor, San Francisco, California 94104, at the
18   request of Boies, Schiller & Flexner, LLP.
19        The videographer is Keigo Painter of Magna
20   Legal Services, and the court reporter is Andrea
21   Ignacio of Magna Legal Services.
22        Will counsel and all parties present state
23   their appearances and whom they represent.
24        MS. O'KEEFE:  I am Carol O'Keefe from Korein
25   Tillery, appearing on behalf of the plaintiffs.
```

Page 7

```
 1        With me is Ryan Cortazar, also of Korein
 2   Tillery.
 3        MR. BLAISDELL:  Demetri Blaisdell of Boies,
 4   Schiller & Flexner, LLP, for the plaintiffs.
 5        MR. WILLEN:  Brian Willen from Wilson
 6   Sonsini, representing the defendants.
 7        With me is Nathalie Gorman, also from Wilson
 8   Sonsini.
 9        MR. REED DIPPO:  Samuel Reed Dippo of Google
10   LLC.
11        THE VIDEOGRAPHER:  Okay.  Would the court
12   reporter please swear in the witness.
13
14              CHRIS TING,
15        having been sworn as a witness
16        by the Certified Shorthand Reporter,
17             testified as follows:
18
19              EXAMINATION
20   BY MS. O'KEEFE:
21   Q   Good morning, Mr. Ting.
22   A   Good morning.
23   Q   Could you please tell me what your roles have
24   been at Google.
25   A   Yes.  I -- I am currently the -- a people
```

Page 8

```
 1   manager on the copyright review ops team.  Previously
 2   to that, I was an individual contributor on the same
 3   team.  And previous to that, I was a contractor for
 4   YouTube.
 5   Q   Okay.  And when did you begin in your role as
 6   a contractor for YouTube?
 7   A   I began my role in 2012.
 8   Q   And what were your responsibilities as a
 9   contractor?
10   A   As a contractor, I reviewed and processed
11   DMCA takedown requests.
12   Q   And did you -- were you hired directly by
13   YouTube, or did you work for a vendor?
14   A   As a contractor?
15   Q   Yes.
16   A   As a contractor, I worked for a vendor.
17   Q   And what was the name of the vendor that you
18   worked for?
19   A   I have worked for multiple vendors.
20   Q   And what were the names of the vendors that
21   you worked for?
22   A   I can't remember the first one, but the
23   second one was Adecco, and the third one was Vaco.
24   Q   And how long were you with Adecco?
25   A   I -- I don't recall exactly how long.
```

Page 9

```
 1   Q   Okay.  So how many years altogether did you
 2   work as a contractor at YouTube?
 3   A   I don't recall exactly.  I can estimate, if
 4   that's -- probably about three or -- between three and
 5   four.
 6   Q   Three and four years?
 7   A   Three and four years.  Correct.
 8   Q   And were you a Tier 1 reviewer in your role
 9   as a contractor?
10   A   That is how a contractor starts, at Tier 1.
11   So yes, I was a Tier I when I began.
12   Q   And during the time that you worked as a
13   contractor, did you become a Tier 2 reviewer?
14   A   I -- yes.  So as I -- I progressed to the
15   next level, which is Tier 2.
16   Q   And how long did it take you to progress from
17   Tier 1 to Tier 2?
18   A   I -- it was quite a while ago.  I don't
19   recall exactly how long that transition took.
20   Q   And when were you hired by YouTube?
21   A   2016.
22   Q   Okay.  And what was your position when you
23   were hired by YouTube?
24   A   My position when I was hired by YouTube was
25   copyright operations specialist.
```



Page 38

1  the claimant who has not provided a full copy of the
2  work, we may still find that there is a strong
3  likelihood of copyright exception.
4      MS. O'KEEFE:  Okay.
5      Q  Have you ever found a DMCA takedown notice to
6  be insufficient where you did not have -- strike that.
7      Have you ever found a DMCA takedown notice to
8  be insufficient on the basis of an exception for fair
9  use where you did not have a complete copy of the
10 copyrighted work?
11     MR. WILLEN:  Objection to the form.
12     THE WITNESS:  I'm sorry.  There -- there are
13 multiple parts to that -- that question.  Could you
14 repeat it one more time, please.
15     MS. O'KEEFE:  Q.  Have you ever found a DMCA
16 takedown notice to be insufficient on the basis of an
17 exception for fair use where you did not have a
18 complete copy of the copyrighted work?
19     MR. WILLEN:  Same objection.
20     THE WITNESS:  So in the case where we have
21 received a DMCA takedown request, it may be incomplete
22 for varieties of reasons.  It may have failed the
23 statutory requirements.
24     In the case that it is a -- it meets the
25 statutory requirements, but we feel that there is a --

Page 39

1  after reviewing for -- under our -- our review
2  protocol for checking for copyright exceptions, we --
3  we may find that the takedown request -- we -- we may
4  ask the claimants to consider some copyright exception
5  and ask them to consider things like whether the --
6  the work is transformed.
7      MS. O'KEEFE:  Q.  So you engage in back and
8  forth with the claimant over the contours of the fair
9  use exception?
10     MR. WILLEN:  Objection to the form.
11     THE WITNESS:  We -- we merely ask -- after
12 we've done our own analysis on potential copyright
13 exception or the likelihood of potential copyright
14 exception existing in a -- yes, the likelihood of
15 potential copyright exception existing, we merely ask
16 the claimant to consider whether they thought about
17 things like the four factors.
18     MS. O'KEEFE:  Okay.
19     Q  And do you identify those four factors for
20 the claimant when you ask that question?
21   A  We -- we have a response where we ask them to
22 consider things like whether the work has -- the new
23 work has a different meaning than the original work,
24 and ask them to consider how much of their work has
25 been used in the -- in the new work.

Page 40

1      Q  Okay.  Do you have canned responses that bear
2  on fair use?
3    A  This response to them describing is a canned
4  response.
5      Q  How many canned responses do you have that
6  bear on fair use?
7      MR. WILLEN:  Objection to the form.
8      THE WITNESS:  I -- I don't recall at this
9  point.
10     MS. O'KEEFE:  Q.  Is it more than one?
11   A  I -- I believe it's more than one.
12   Q  Is it more than five?
13   A  I -- I'm not sure about that.
14   Q  In your canned response that bears on fair
15 use, do you advise the DMCA claimant that they could
16 face civil penalties if they make an unjustified DMCA
17 takedown claim?
18   A  I -- I don't recall the exact text of the
19 canned response.  So if -- if -- if you're asking
20 what's in the canned response, I'm not sure if that --
21 that is in there.
22   Q  You had stated that the second factor was how
23 much of the work was used.
24     Please describe for me the physical steps
25 that you take in interacting with your user interface

Page 41

1  and applying the tools that are at your fingertips to
2  make a determination on how much of the original work
3  is used.
4      MR. WILLEN:  Objection to the form.
5      THE WITNESS:  So I think there, the tool
6  itself is -- it -- you know, it just shows the -- the
7  targeted -- the video that is targeted for removal.
8      And beyond that, you know, if -- as I
9  mentioned previously, if the claimant has provided
10 a -- a copy of their original work, then -- then we
11 can analyze both the -- the targeted work for removal
12 as well as the original work.
13     MS. O'KEEFE:  Q.  What percentage of DMCA
14 takedown notices include a copy of the original work?
15   A  Oh, I -- I don't know the answer to that.
16   Q  Is it more than 50 or less than 50 percent?
17   A  I -- I have -- I would only -- I would be
18 speculating if I guessed on this.
19   Q  Okay.  In the context of your review of DMCA
20 takedown notices for fair use, what percentage of the
21 claims that you have reviewed for fair use have
22 provided a copy of the original work?
23     MR. WILLEN:  Objection to the form.
24     THE WITNESS:  Unfortunately, I -- I don't
25 know the answer to that.

11 (Pages 38 to 41)



```
                                                    Page 42
 1        MS. O'KEEFE:  Q.  Is it nearly 100 percent?
 2     A  Your question is, are 100 percent of the --
 3  potentially the cases where they have potential fair
 4  use or some copyright exception cases where --
 5     Q  Simply fair use.  We're talking about just
 6  fair use right now.
 7        When you have examined videos for fair use,
 8  how frequently do you have a complete copy of the
 9  original work provided by the DMCA takedown claimant?
10        MR. WILLEN:  Objection to the form.
11        THE WITNESS:  I -- I -- I don't know.
12        MS. O'KEEFE:  Okay.
13        THE WITNESS:  I -- I'm just, like --
14        MS. O'KEEFE:  Q.  Is it more than 10 percent
15  of the time?
16     A  It could be.  I -- I just -- I -- total
17  speculation if I answered this question.  So I don't
18  have a sense of the percentage in this case.
19     Q  When was the last time you consulted legal
20  counsel regarding a fair use determination?
21     A  Myself personally?
22     Q  Uh-huh.
23     A  Maybe in the last two weeks.
24     Q  And how many times in the last month have you
25  consulted legal counsel for a fair use determination?
```

```
                                                    Page 43
 1     A  Myself personally?
 2     Q  Yourself personally.
 3     A  I -- I would, I guess, remind -- remind you
 4  that I -- I -- I'm a people manager, so I am not
 5  participating in individual work as frequently as --
 6  as some other people on the team.  So I may not be
 7  myself processing many takedown requests at any given
 8  time.
 9        So with that in mind, the question was, how
10  many times per month?
11     Q  How many times in the last month have you
12  consulted with legal counsel on a fair use question?
13     A  I -- I don't have an exact number.
14     Q  What's your best estimate?
15     A  I would say likely less than ten.
16     Q  Less than five?
17     A  I'm not sure about less than five.
18     Q  And how many DMCA takedown notices have you
19  processed this month?
20        MR. WILLEN:  Objection to the form.
21        THE WITNESS:  I think similarly to my
22  previous response, again, I'm a people manager, so
23  I -- I don't participate very much these days in
24  actioning DMCA requests myself.  So I -- I do not
25  remember how many I've processed in the last month.
```

```
                                                    Page 44
 1        MS. O'KEEFE:  Q.  Can -- can you give me your
 2  best estimate?
 3     A  I would also say less -- less than ten.
 4     Q  Less than ten?
 5     A  (Witness nods head.)
 6     Q  You've -- you've -- you've examined less than
 7  ten DMCA takedown notices in the last month?
 8     A  Myself personally?
 9     Q  Yourself personally, yeah.
10     A  Yes.
11     Q  What is the policy -- strike that.
12        How does a member of the copyright operations
13  team determine whether to review a particular takedown
14  notice for fair use?
15        MR. WILLEN:  Objection to the form.
16        THE WITNESS:  So I think we would -- a member
17  of the copyright operations team would review a DMCA
18  takedown notice by going through certain steps.
19        Number one is to determine whether the
20  takedown meets the statutory requirements, whether
21  the -- as required by the DMCA, there are some
22  elements there that need to be present.
23        And after that, the copyright operations team
24  would look to see whether the -- there's any abuse of
25  the process.  For instance, if the claimant does
```

```
                                                    Page 45
 1  not -- is submitting a DMCA takedown request for
 2  content that they are not -- they do not own or are
 3  falsifying information on the legal form.
 4        And then the last step would be to
 5  determine -- to -- to evaluate potential copyright
 6  exceptions, such as fair use.
 7        MS. O'KEEFE:  Okay.
 8     Q  Do you evaluate every single takedown notice
 9  for copyright exceptions?
10     A  We -- there are a portion of -- so we have --
11  we have some degree of automation.
12        So a -- a classifier will evaluate a certain
13  subset of DMCA takedown requests.  And per the logic
14  of the classifier, if there are signals in -- that it
15  detects which potentially would flag it for manual
16  review, for human review, then it would send it over
17  to human review.  And as part of human review,
18  reviewers will evaluate for copyright exceptions.
19     Q  What is your best understanding of the
20  classifiers that will send a takedown notice for
21  manual review?
22     A  My best understanding of the classifiers?
23        Unfortunately, that is -- it's kind of the
24  domain of the product team.  Like, I -- I myself
25  and -- and my team, we -- we don't -- we don't set the
```



```
                                                    Page 46
 1   logic of -- of how the classifiers work.  So that --
 2   it's a bit outside my expertise.
 3        Q  Okay.  I understand that you don't set the
 4   logic.
 5           Do you have an understanding of the logic of
 6   how the classifiers work?
 7        A  Broadly.
 8        Q  Can you please provide me with your broad
 9   understanding of the logic of how those classifiers
10   work.
11        A  So similar to how I've described the overall
12   review process where, you know, our -- any given DMCA
13   takedown request is evaluated for completeness on the
14   basis of the DMCA statutory requirements, as well as,
15   you know, ruling out potential abuse, and then taking
16   into consideration copyright exceptions such as
17   fair -- fair use, a -- the classifier will similar --
18   similarly try to take some of these into account.
19           So if the classifier is uncertain -- this is
20   to my best knowledge.  Again, I -- I'm not an expert
21   in this on the product side.  But to my best
22   knowledge, if the classifier is uncertain that one of
23   these requirements has been met, then it will route it
24   for a human to take a look at.
25        Q  Okay.  Does YouTube ever find a DMCA notice
```

```
                                                    Page 47
 1   to be insufficient without a manual review?
 2        A  If the classifier finds that it is uncertain,
 3   again, to the best of my knowledge, as I am not a
 4   product specialist or have expertise in -- in the
 5   product or the classifier itself, my understanding is
 6   that if the classifier is uncertain, and there is the
 7   possibility that a DMCA notice is incomplete in some
 8   way, it will route to human review.  And the human
 9   will there -- will complete the task and review all
10   the -- all the elements as I've described.
11        Q  To the best of your knowledge, does the
12   classifier consider the number of views on the video?
13        A  I -- I do not know the answer to that.
14        Q  Do you know whether the classifier considers
15   the number of subscribers to the channel on which the
16   video is posted?
17        A  I -- I don't know.  These are --
18        Q  Who --
19        A  -- questions for the product team.
20        Q  Yeah.
21           Who is on the product team that would deal
22   with the classifier, if you know?
23        A  I -- I believe Kevin Zhu is -- would -- would
24   be -- he -- he's familiar with the product side.
25        Q  Okay.  I believe Mr. Zhu has moved to
```

```
                                                    Page 48
 1   content ID.
 2           So who would be -- who else would be on
 3   the --
 4        A  I believe that is --
 5        Q  -- the team?
 6        A  -- that's the same team.
 7        Q  That's the same team?
 8        A  (Witness nods head.)
 9        Q  Okay.  Who else is on that team besides Kevin
10   Zhu?
11        A  I -- I believe Julian Bill is on that team.
12        Q  And who else is on that team?
13        A  I believe he reports to David Rosenstein.
14        Q  Okay.  Going back to the factors for fair
15   use, when the DMCA takedown notice does not include a
16   copy of the original work, how do you determine how
17   much of the original work has been used?
18        A  It's a case-by-case basis.  In certain cases,
19   the claimants may provide a link to a work on a
20   different site -- their -- their work on a different
21   site which we may be able to access and -- and view.
22           In cases where the claimant provides a
23   description of the work, it may be so well known that
24   we understand to some degree what -- what is the --
25   the extent of that work; for instance, if it's a
```

```
                                                    Page 49
 1   well-known film.
 2        Q  And in the absence of those resources, how do
 3   you determine how much of the work is used?
 4        A  We have -- in -- in the UI, there is -- the
 5   review UI, there is a section where timestamps --
 6   where we allow the claimant to pro- -- to provide
 7   timestamps where the original -- where they believe
 8   their -- their original work is used in the targeted
 9   work.
10        Q  So that would allow you to determine how much
11   of the targeted work -- strike that.
12           So that would allow you to determine what
13   portion of the targeted work is represented by the
14   original work; correct?
15           MR. WILLEN:  Objection to the form.
16           THE WITNESS:  So that would -- that
17   provide -- that information is -- provides us with
18   what the claimants believe -- what timestamps the
19   claimant believes their original work exists in the
20   targeted work.
21           It may be correct, it may be incorrect, but
22   it gives us a guidepost to -- to look at the targeted
23   work and determine whether -- you know, after looking
24   at it ourselves, whether that content, in fact -- the
25   claimant's content, in fact, or is likely to -- to
```

13 (Pages 46 to 49)



Page 58

1  **THE WITNESS:** I think when we analyze that
2  factor in -- in copyright -- in determining whether
3  there is a likelihood of a copyright exception such as
4  fair use existing, we will evaluate the -- the
5  targeted video and compare it to the description of
6  the original work as provided by the claimant.
7      And if there is -- if there are resources
8  available that will help us make the determination
9  available, then we will -- we will use those
10 resources.
11     **MS. O'KEEFE:** Q. And what factors do you
12 take into consideration in evaluating the fourth fair
13 use factor, the nature of the use?
14     **MR. WILLEN:** I'm just going to give you the
15 same general admonition that I've given with respect
16 to this question before.
17     **THE WITNESS:** Broadly, I think when, you
18 know, this is part of case law and -- and precedent
19 outside of YouTube, it's -- courts have considered
20 whether a, you know, work is -- an original work is a
21 factual work or fictional work. And -- and this may
22 play a part in determining whether a copyright
23 exception is -- is stronger or weaker.
24     **MS. O'KEEFE:** Q. In your opinion, is a
25 copyright exception stronger or weaker for a factual

Page 59

1  work?
2      A  I think it depends on the situation again.
3  Like, that's a -- it's a consideration that we've --
4  that we take into account because courts have. But
5  again, I think when we look at the individual facts of
6  a given DMCA takedown request, this may play a smaller
7  or larger part. But generally, it's just one factor
8  that we consider, and it's highly dependent upon the
9  facts of the case.
10     **Q  Do the members of the copyright operations**
11 **team that you manage contact counsel directly?**
12     **Or do they need to get approval through you**
13 **in order to contact counsel regarding questions of**
14 **fair use?**
15     A  The team has standing meetings with counsel.
16 So they -- we can bring our questions to counsel at
17 the standing meeting. Outside of that, we can e-mail
18 counsel as well.
19     **Q  And if a member of your team were to e-mail**
20 **counsel with regard to a question regarding fair use,**
21 **would they copy you on that e-mail?**
22     A  It's likely they would.
23     **Q  Okay. How many DMCA takedown notices has**
24 **your team processed in the last month?**
25     A  I -- I don't have an exact number.

Page 60

1      **Q  Can you please provide me with your best**
2  **estimate.**
3      A  I would -- likely over 400,000.
4      **Q  Okay. And of those 400,000 DMCA takedown**
5  **notices, how many times have you or members of your**
6  **team needed to consult with counsel regarding a**
7  **question of fair use?**
8      A  I -- I don't know the answer to that.
9      **Q  Okay. Would it be more or less than ten?**
10     A  Likely more than ten.
11     **Q  Would it be more or less than 100?**
12     A  What was the time frame again?
13     **Q  In the last month.**
14     A  Month? Probably less than 100.
15     **Q  Okay. Would it be more or less than 50?**
16     A  I'm not sure about that.
17     **Q  Okay. Would it be more or less than 75?**
18     A  It -- it may be in that ballpark.
19     **Q  In what ballpark? What ballpark would you**
20 **put it in?**
21     A  50 to 100, ballpark.
22     **Q  Okay. What is your best understanding of the**
23 **exceptions to copyright that your team analyzes in**
24 **connection with DMCA takedown notices?**
25     **MR. WILLEN:** Objection to the form.

Page 61

1      **THE WITNESS:** So we will -- as one part of
2  our analysis of the DMCA takedown removal request, we
3  will look at exceptions in the -- in the U.S., such as
4  fair use, which may allow work to be lawfully used
5  without being infringing, and we may consider similar
6  international equivalence of fair use.
7      **MS. O'KEEFE:** Q. Are there any other
8  exceptions that you consider?
9      A  So I -- I think that fair use and -- and
10 similar copyright exceptions that use a similar
11 framework as the fair use -- as fair use does in the
12 United States, we do consider those.
13     **Q  Okay. Other than copyright exceptions or**
14 **similar provisions applicable in other countries, what**
15 **exceptions -- I'm sorry. Strike that.**
16     **Other than fair use or similar provisions**
17 **that are applicable in other countries, what**
18 **exceptions to copyright do you consider?**
19     A  I think as described, fair use and similar
20 international exceptions, those would be the
21 exceptions that -- that we evaluate.
22     Obviously, if something is not subject to
23 copyright, if it's a completely different legal issue
24 such as trademark or privacy, that is outside the
25 scope of copyright. I wouldn't describe it as an

16 (Pages 58 to 61)



Page 62

1  exception, but it would be something we would not
2  process if we receive a DMCA request for it.
3  **Q  Okay.  One more follow-up question on the**
4  **numbers.  Please provide me with your best estimate of**
5  **the number of DMCA takedown notices that your team has**
6  **disallowed in the past month on the basis of fair use.**
7      MR. WILLEN:  Objection to the form.
8      THE WITNESS:  I -- I don't have the number
9  off the top of my head of how many takedown requests
10 we have asked the claimants to consider fair use for.
11     MS. O'KEEFE:  Okay.
12 **Q  Do -- does your team ever find a DMCA**
13 **takedown notice to be deficient on the basis of fair**
14 **use?**
15     MR. WILLEN:  Objection to the form.
16     THE WITNESS:  I'm not sure about -- sure
17 about the word "deficient."
18     But we have -- as we go through the process
19 of reviewing a DMCA takedown, once we've gotten to the
20 step of evaluating potential copyright exceptions such
21 as fair use, we will ask the claimants to consider
22 fair use and respond back to us with more detail about
23 why they believe the content that they are targeting
24 for removal does not qualify under a copyright
25 exception such as fair use.

Page 63

1      MS. O'KEEFE:  Okay.
2  **Q  And after the claimant has responded, what is**
3  **the next step for your team?**
4      A  After the claimant has responded, we will
5  typically consult with product counsel.
6  **Q  And after you have consulted with product**
7  **counsel, what is the next step for your team?**
8      MR. WILLEN:  Objection to the form.
9      THE WITNESS:  Relating to the ticket that is
10 at issue or the DMCA takedown request that is at
11 issue, product counsel may advise whether we comply
12 with the removal request based on the information that
13 we've been provided by the claimants, or product
14 counsel may advise that we do not remove the content
15 if the likelihood of there being a copyright exception
16 is -- is strong.
17     MS. O'KEEFE:  Okay.
18 **Q  Does product counsel always contribute to the**
19 **determination not to remove the content under the fair**
20 **use exception?**
21     A  There are situations where we -- so
22 typically, over time we work with product counsel on a
23 variety of cases which allows us to set some internal
24 precedent on how to handle similar fact patterns.
25     And if a fact pattern has been -- we've

Page 64

1  consulted with -- with product counsel, we understand
2  the fact pattern, and the close -- and the new one
3  closely mirrors that, and we have a decision -- we --
4  we understand what was previously done in a similar
5  situation, we may adopt the same decision for the new
6  case without consulting product counsel.
7  **Q  Please provide me with your best estimate for**
8  **the number of times in the last month that your team**
9  **has determined not to remove content on the grounds of**
10 **a fair use exception.**
11     A  Unfortunately, I -- I do not know the -- the
12 number there.
13 **Q  Do you think it's more or less than 100 times**
14 **in the last month?**
15     A  Unfortunately, I -- I don't have a good
16 reference as -- in terms of the volume.  So I -- I
17 have no -- I can't even provide an estimate here --
18 **Q  Okay.**
19     A  -- unfortunately.
20 **Q  Does your team provide the content owner with**
21 **the reason for the refusal to remove the content?**
22     A  Our team has canned responses which will,
23 depending on the situation, explain to the claimant
24 who is ask -- who is requesting to remove the video,
25 we'll either provide them -- provide the claimants

Page 65

1  with additional questions for them to answer to help
2  us understand if there is further information that,
3  you know, is missing that will help us determine
4  whether to comply or not comply with the takedown
5  request.
6  **Q  Okay.  And in the event that you make the**
7  **decision not to remove the content on the grounds of**
8  **fair use, do you communicate with the claimant that**
9  **the reason the video has not been removed is due to a**
10 **finding of fair use?**
11     A  We have canned responses which ask the
12 claimants to -- we've already flagged to the claimant,
13 like, this potentially may -- may be a copyright
14 exception, and ask -- ask the claimant to provide us
15 with further information as to why they believe that
16 is not a copyright exception.
17     If, past that stage, counsel has advised us
18 that the likelihood of a copyright exception is
19 strong, and we will not comply with the removal
20 request, then we will -- we will respond to the -- to
21 the claimant and tell them we are not removing the
22 content.
23 **Q  Okay.  When you tell the claimant that you**
24 **will not remove the content, do you provide fair use**
25 **as the reason for not removing the content?**

17 (Pages 62 to 65)

Page 106

```
 1    he has reports.  Do you want some names from that
 2    team?
 3        Q   Uh-huh.
 4        A   Zelia Rosas and Sindhu -- last initial S.
 5    Elliot Poh.
 6            That -- that's what I can remember at this
 7    time.
 8        Q   Who do you report to?
 9        A   I report to Shantal Poovala.
10        Q   And who does he report to?
11        A   She --
12        Q   She.
13        A   -- she reports to Pierce Stacy.
14        Q   Okay.  What metrics are the copyright
15    operations team evaluated on?
16        A   We -- the copyright operations team is
17    evaluated on quality.  So that is the accuracy of
18    handling DMCA takedown requests and the accuracy of
19    handling counter-notification requests.
20            In addition, another metric would be
21    timeliness.  So this would be the speed of removing
22    of -- excuse me -- the speed of reviewing a takedown
23    request and responding to -- to that takedown request,
24    whether it be a pushback or complying with the removal
25    request.
```

Page 107

```
 1        Q   Any other metrics?
 2        A   Those are the main two.
 3        Q   Can you think of any others?
 4        A   There are subsets of metrics underneath the
 5    timeliness metric.  So we -- as an example, average
 6    response -- excuse me -- average time to response
 7    would be one metric.  And then a different dimension
 8    of the metric would be average percents within target
 9    handling time.
10        Q   And what is your target handling time?
11    
12    
13        Q   And for a counter-notice?
14    
15    
16    
17    
18        Q   And when was that change made?
19        A   January 2022.
20        Q   Are there any other sub-metrics within the
21    timeliness category?
22        A   No.
23        Q   And what is your target handling time for
24    responding to a takedown notice?
25    
```

Page 108

```
 1    
 2    
 3    
 4            I just want to make sure.
 5        A   I'm not sure if there is a distinction there.
 6        Q   Okay.
 7        A   I think they -- as I'm understanding it, it's
 8    the same -- same thing.
 9        Q   Okay.  How do you measure the accuracy of a
10    DMCA takedown response?
11        A   We have a quality assurance process by which
12    samples of handled tickets or previously answered DMCA
13    takedown requests are pulled and reviewed by a quality
14    team.
15            Those -- those quality reviewers will
16    evaluate the initial decision by determining whether
17    the correct canned response was sent, determining
18    whether the video was properly removed or properly
19    left live.
20            There are some other factors involved in
21    quality; for instance, whether -- there is an abuse
22    check as well.  So one consideration in the quality is
23    whether the reviewer considered -- correctly
24    considered abuse as a factor.  And if the complaint
25    wasn't seemingly abusive, pushed back against the
```

Page 109

```
 1    claimant to request more information to validate
 2    whether there is -- is or is not abuse.
 3        Q   Does the quality assurance review result in
 4    reports?
 5        A   By "reports," you mean, like, a summary of
 6    the results of the -- the findings?
 7        Q   (Counsel nods head.)
 8        A   We -- we track metrics on week over --
 9    week-over-week quality.  So in terms of reporting,
10    it -- it would be available in our dashboards.
11        Q   And what dashboards would it be available on?
12        A   Our metrics dashboard.
13        Q   And do you assess the accuracy of your
14    handling of counter-notices in the same way that you
15    assess the accuracy of handling takedown notices?
16        A   We do perform quality review on
17    counter-notification handling by reviewers.  The
18    approach is a little different, because the
19    counter-notification workflow has different steps to
20    it than a takedown workflow.  But in terms of the
21    broad categories, they are similar.
22            So for counter-notification quality, we are
23    looking at whether the DMCA requirements are -- are
24    present in the counter-notification, which is similar
25    to the process in the takedown.
```

28 (Pages 106 to 109)



Witness: Chris Ting – June 29, 2022
Schneider v. YouTube, LLC, No. 3:20-cv-04423-JD (N.D. Cal.)

Errata Sheet

| Page:Line | Change | Reason |
|---|---|---|
| 2:15 | Replace &lt;Remote Videotaped&gt; with &lt;In-Person&gt; | To correct the record |
| 40:3 | Replace &lt;to them&gt; with &lt;that I'm&gt; | To correct the record |
| 61:6 | Replace &lt;equivalence&gt; with &lt;equivalents&gt; | To correct the record |
| 76:12 | Replace &lt;many&gt; with &lt;any&gt; | To correct the record |
| 106:4 | Replace &lt;Sindhu&gt; with &lt;Sindhuja&gt; | To correct the record |
| 114:8 | Replace &lt;process&gt; with &lt;processed&gt; | To correct the record |
| 107:17 | Replace ▬▬ with ▬▬ | To correct the record |
| 115:6 | Replace &lt;CEO&gt; with &lt;CO&gt; | To correct the record |

_X_ Subject to the above changes, I certify that the transcript is true and correct.

___ No changes have been made. I certify that the transcript is true and correct.

_____          August 10, 2022
(signature)                                           (date)

Witness: Chris Ting - June 29, 2022
Schneider v. YouTube, LLC, No. 3:20-cv-04423-JD (N.D. Cal.)

Case 3:20-cv-04423-JD   Document 305-1   Filed 04/07/23   Page 12 of 12

ACKNOWLEDGMENT OF DEPONENT

I, Chris Ting, do hereby certify that I have read and examined the foregoing testimony, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____          _August 10, 2022_
      (signature)                              (date)