# EXHIBIT 43

to the Declaration of Qifan Huang

PUBLIC VERSION - REDACTED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>YOUTUBE, LLC AND GOOGLE LLC,<br><br>        Defendants | CASE NO.: 3.20-cv-04423-JD |
| YOUTUBE, LLC and GOOGLE LLC,<br><br>        Counterclaimants,<br><br>v.<br><br>PIRATE MONITOR LTD, PIRATE MONITOR LLC, AND GÁBOR CSUPÓ,<br><br>        Counterclaim Defendants. | |

**Expert Rebuttal Report of Greg Halm, CPA**

December 29, 2022

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## Table of Contents

I.   **Introduction.** ................................................................................................ **1**

   A.   Scope of Engagement. ............................................................................ 1

   B.   Expert Background. ................................................................................ 3

   C.   Information Considered. ......................................................................... 5

II.   **Summary of Opinions.** .................................................................................. **5**

III.   **Background.** ................................................................................................. **7**

   A.   Class Definitions. ................................................................................... 7

     i.   Registered Works Infringement Class. ................................................ 8

     ii.   Foreign Unregistered Works Infringement Class. ............................... 9

     iii.   CMI Class – International Standard Recording Code ("ISRC") Class. .......................... 9

     iv.   CMI Class – Clip Filename ("CLFN") Class. ..................................... 9

   B.   Data Produced by YouTube in This Litigation, and Used by Dr. Cowan. ........................ 10

     i.   90-Day Sample Takedown Notice Data. ............................................. 10

     ii.   Takedown URL Revenue Data. ......................................................... 12

     iii.   CLFN Metadata Table. .................................................................... 12

   C.   Third-Party Data Consulted or Retrieved by Dr. Cowan. ........................... 12

   D.   Overview of Dr. Cowan's Proposed Non-Statistical Methodologies and Assumptions. .. 14

     i.   Dr. Cowan's Proposed Method to Filter the Takedown Data. ....................................... 16

     ii.   Dr. Cowan's Proposed Manual Method for Identifying Members of the Registered Works Infringement Class. ................................................. 18

     iii.   Dr. Cowan's Proposed Manual Method for Identifying Members of the Foreign Unregistered Works Infringement Class. ................................................. 21

     iv.   Dr. Cowan's Proposed Manual Method for Identifying Members of the ISRC Class... 24

     v.   Dr. Cowan's Proposed Method for Identifying Members of the CLFN Class. ............. 25

IV.   **Detailed Analysis of Dr. Cowan's Proposed Methodologies for Identifying Class Members.** .................................................................................................. **25**

   A.   Dr. Cowan's "Missing" and "Impoverished" Data Excuses Do Not Hold Up. ................. 25

     i.   Dr. Cowan's Assertion of "Impoverished Data" Is Unfounded and Does Not Explain His Failure to Locate Even One Class Member. ....................................... 26

     ii.   Dr. Cowan's Missing Data Critiques are Misplaced and Do Not Explain His Failure to Identify Even One Class Member. ......................................... 28

B.  Dr. Cowan's Sampling Excuse Does Not Hold Up. ........................................................ 32

C.  Dr. Cowan's Pivot Away From Sampling Provides Empirical Evidence that the Supposed Classes Are At Most Miniscule and Any Members Would be Burdensome to Locate, If Any Class Members Exist At All. ................................................................................................ 34

D.  Dr. Cowan's Proposed Identification Methodology Is Entirely Speculative and By His Own Admission, Will Not Work ............................................................................................ 36

E.  Dr. Cowan's Methods Will Not Work Because His Methods Rely Completely On Uncontrolled User-Entered Data, With No Means to Confirm the Data Apart From Individual Inquiry. ............................................................................................................................ 36

F.  Dr. Cowan Does Not Propose a Method to Determine the Nature of Infringement for the Foreign Unregistered Works Class. ................................................................................. 42

G.  Dr. Cowan Acknowledges a Flaw in His ISRC and Foreign Unregistered Works Class Methodologies – and Fails to Specify a Way to Overcome His Flaw. ................................ 43

H.  Dr. Cowan's Proposed CLFN Class Method Does Not Work – It Is Inconsistent with Plaintiffs' Class Definition. ............................................................................................. 44

**V.  Analysis of the Now Abandoned Damages Calculation Methodology Proposed in Dr. Cowan's Initial Report. ...................................................................................................... 46**

A.  How YouTube Generates Revenue. ................................................................................ 47

B.  Dr. Cowan's Proposed Methodology Was Not a Proper But-For Analysis. .................... 48

C.  Dr. Cowan Did Not Account for YouTube's Incremental Costs. ..................................... 51

D.  The Data Dr. Cowan Proposed to Use Is Not Actual GAAP Revenue Data. ................... 53

## I.    INTRODUCTION.

### A.  Scope of Engagement.

1.      I have been retained on behalf of Google LLC ("Google") in the matter *Maria Schneider et al. v. YouTube, LLC et al*. YouTube, LLC ("YouTube") is a subsidiary of Google LLC ("Google") (collectively, "Defendants"). Google is the primary subsidiary of Alphabet Inc. ("Alphabet"). Plaintiffs allege that Defendants engaged in acts causing infringing works to be reproduced, distributed, displayed, and publicly performed on the Internet, specifically through YouTube's video streaming service.[1] Plaintiffs seek the following categories of damages for each of the following proposed plaintiff classes:

  a)  Registered Works Infringement Class – Either statutory damages, <u>or</u> Defendants' profits derived from their alleged improper acts.

  b)  Foreign Unregistered Works Infringement Class – Defendants' profits derived from their alleged improper acts.

  c)  CMI Classes (ISRC Class and CLFN Class) – statutory damages.[2]

2.      Plaintiffs retained two damages experts, Hal J. Singer, Ph.D. and Charles D. Cowan, Ph.D. Dr. Singer and Dr. Cowan each submitted reports in this matter on September 1, 2022 (the "Initial Singer Report" and the "Initial Cowan Report").[3] Dr. Singer and Dr. Cowan each then issued "updated" reports on November 17, 2022 (the "Updated Singer Report" and the

---

[1] First Amended Class Action Complaint ¶ 1, Dkt. 99.

[2] Notice of Motion and Plaintiffs' Motion for Class Certification at 20-21, Dkt. 190. I note that while Plaintiffs assert that members of the CMI Classes "may elect between actual and statutory damages," neither Dr. Cowan nor Dr. Singer suggests a methodology to compute actual damages for the CMI Classes.

[3] The September 1, 2022 Expert Report of Charles D. Cowan, Ph.D. and the September 1, 2022 Expert Report of Hal J. Singer, Ph.D. for Plaintiffs.

"Updated Cowan Report").[4]

3.      Dr. Cowan proposes a methodology that he claims will work to identify class members, to determine the number of class members in each of the four proposed classes, and to determine the number of allegedly infringing videos or number of works that are allegedly infringed in those videos and are associated with each class. Although the Initial Cowan Report also set forth a proposed method to compute Defendants' profits with respect to the Foreign Unregistered Works Infringement Class and the Registered Works Infringement Class, the Updated Cowan Report contains no such method.[5] Dr. Singer purports to compute YouTube's revenue earned as a result of "Infringing Content," which he defines as "videos that infringed the works of Plaintiffs and the putative Classes."[6] Neither Dr. Singer nor Dr. Cowan undertake an analysis of whether or how a given video infringes the copyrighted work of a putative class member. Neither Dr. Singer nor Dr. Cowan performs an analysis of the value of the copyrighted works allegedly at issue in this litigation, nor does either expert present a calculation of Plaintiffs' lost profits. And neither Dr. Singer nor Dr. Cowan presents a calculation of damages specific to any of the named Plaintiffs.

4.      I have been asked by WSGR to evaluate the methodology that Dr. Cowan claims will work to identify putative class members, to determine the number of class members in each supposed class and to determine the number of allegedly infringing videos or allegedly infringed works associated with each class. I have also been asked to evaluate the methodology that Dr.

---

[4] The November 17, 2022 Expert Report of Charles D. Cowan, Ph.D. and the November 17, 2022 Expert Report of Hal J. Singer, Ph.D. for Plaintiffs.

[5] Initial Cowan Report, ¶¶ 11, 68-70. Plaintiffs cite the Initial Cowan Report in their motion for class certification ("[Dr. Cowan] has developed a methodology to calculate direct revenues based on YouTube's records, which include revenue information on a URL-by-URL basis.") at 14.

[6] Updated Singer Report, ¶¶ 1, 108-111.

Cowan originally proposed to use to compute Defendants' revenue and profits. For purposes of my analysis, I have assumed the class definitions specified by Plaintiffs in their motion for class certification.[7] I have not been asked to ascertain the classes on my own, determine whether they could be ascertained, or perform my own calculation of hypothetical damages for any group.

### B. Expert Background.

5.      I am a Managing Director at Berkeley Research Group LLC ("BRG"). I specialize in providing forensic accounting and other economic consulting services in complex commercial disputes. Prior to BRG, I was employed at FTI Consulting and LECG in similar capacities. I have been employed in this line of work for over 14 years.

6.      I have consulted on a wide variety of matters related to forensic accounting and economic damages involving many industries. I have previously provided expert testimony, at trial, in the United States District Court, Northern District of California, as to defendants' alleged profits from the improper use of copyrighted works.

7.      The matters on which I am engaged frequently involve gathering data and analyzing databases retrieved from different sources. To provide just some examples, in prior assignments I have:

a)   Correlated third-party invoice data against company accounting ledger entries (*e.g.*, sales ledgers, accounts payable registers, etc.);

b)   Compiled banking transactional records and correlated those banking transactional records to company accounting ledger entries;

c)   Correlated company records of cash receipts against customer account statement

---

[7] Motion for Class Certification, Dkt. 190.

data for mortgage servicers;

d)   Compiled publicly available data on financial securities (*e.g.*, from Bloomberg LP) and correlated this data to securities holdings data;

e)   Correlated accounting transactional data records produced by different, unrelated entities (*e.g.*, a company and a vendor or customer);

f)   Extracted data elements from free-form loan servicing notes and correlated these data elements to financial transaction data; and

g)   Compiled timekeeping and payroll records, including from different timekeeping and payroll systems, and correlated these records.

8.      In these assignments, I have dealt with both structured financial data (*e.g.*, sales amounts, invoice numbers, dates, etc.) and free-form user-entered data (*e.g.*, transaction description fields in a company's general ledger, or free-form loan servicing notes).

9.      As a forensic accountant, I frequently employ statistical techniques to analyze and validate data. For example, I frequently use statistical techniques, such as regression analyses, to prepare financial forecasts and evaluate cost behavior, and sampling techniques to conduct tests of the reliability of data fields.

10.      I have previously provided expert reports and testimony on matters in Federal Court, California State Court, and in arbitration, and I have been qualified to and have offered testimony on damages in Federal Court and in arbitration. I have never been disqualified from offering expert testimony, nor has any portion of my expert testimony ever been excluded. I received a Bachelor of Science, *summa cum laude*, in Managerial Economics from the University of California at Davis and I am a Certified Public Accountant in California. A copy of my *curriculum vitae* is attached as **Appendix A** hereto.

11.     BRG is being compensated at a rate of $650 per hour for my time on this engagement. BRG is also being compensated for the work of staff working under my direction at standard hourly rates. BRG's compensation is not contingent upon the opinions I reach, my testimony, or the outcome of this matter.

### C.  Information Considered.

12.     My opinions are based on my education and experience, together with the information provided to me in this matter, information researched by me during the course of my assignment, and discussions with Arpan Agrawal, a YouTube Senior Finance Manager who is familiar with YouTube's practices regarding financial analysis and disclosure and external affairs disclosures. A listing of the information I have considered in my analysis is set forth at **Appendix B**.

13.     To the extent that additional documents, testimony, other experts' reports, or information are provided to me, I reserve the right to review those materials and amend or supplement my opinions and analysis if appropriate.

## II.  SUMMARY OF OPINIONS.

14.     As set forth in detail below, my opinions are summarized as follows:

a) Dr. Cowan has failed to identify a single class member (apart from the named Plaintiffs). This total *failure* suggests that, at best, the proposed classes are extremely small, or that *identifying any class members would be extremely difficult*.

   i. In his Initial Report, Dr. Cowan claimed that a 90-day sample of takedown data would enable him to estimate the size of each class and the damages associated with each class.[8] Dr. Cowan received 1,786,656 records of takedown notices for the 90-day sample period he selected. But despite his assurance of what he would be able to do from the sample data, Dr.

---

[8] Initial Cowan Report, ¶¶ 4-6, 14.

Cowan *failed to identify a single class member*.

    ii. Dr. Cowan has now pivoted away from any statistical methods. He claims that, as it turns out, sampling was never going to work (in contravention of his earlier claim) because he believes that locating repeat takedowns for a given work (as is required to satisfy class definitions) in a sample is a "near mathematical impossibility." He has also raised excuses about data being "missing" or "impoverished" to justify his *failure to identify a single member of any proposed class*.

    iii. Dr. Cowan's assertion that locating repeat takedowns in the sample he selected is a "near mathematical impossibility" is unfounded.

    iv. Dr. Cowan's "missing" and "impoverished" data assertions are also unfounded.

    v. Rather, Dr. Cowan's pivot away from sampling provides *empirical evidence that the proposed classes are either miniscule, non-existent and/or that implementing his methods would be extremely difficult*.

b) Dr. Cowan's proposed methodologies are so severely flawed that they cannot adequately serve the purpose of identifying class members, if any.

    i. Dr. Cowan's proposed methodologies cannot adequately identify class members, if any, because all of the methodologies accept unreliable user-entered data at face value – as if it were completely reliable – without any empirical support that it is actually reliable. In fact, the user-entered "name_of_copyright_owner" field he proposes to use does not reliably identify the name of the owner, and the user-entered "title_of_copyrighted_work" field he proposes to use does not reliably identify the specific copyrighted work. Verifying the accuracy of any entries in these fields would require individualized inquiry.

    ii. Dr. Cowan's proposed methodologies to ascertain the Registered Works Infringement Class, the Foreign Unregistered Works Infringement Class, and the ISRC Class are *manual methodologies that would require running thousands of individual searches* against third party website data, and then manually sifting through the search results to try and discern whether there is a match to the takedown records. These methods rely on individualized inquiry and Dr. Cowan has not demonstrated that they would work. Even Dr. Cowan acknowledges that he will encounter situations where he will not be able to identify the specific work because the associated single takedown record will have more than one potential match in the third-party data.[9]

---

[9] Updated Cowan Report, ¶ 94 and Appendix 1.

iii.  Dr. Cowan's proposed methodology to ascertain the CLFN Class does not even meet all of the criteria in Plaintiffs' definition of the CLFN Class. His proposed methodology simply ignores the third criteria of Plaintiffs' proposed class, requiring the display of an at-issue work on YouTube on or after July 2, 2017 without the associated CLFN or with altered CMI.[10]

c)  Dr. Cowan's previously proposed damages methodology contained numerous flaws, rendering it unsuitable to reliably compute damages for a given member of a hypothetical class, even if Dr. Cowan had not abandoned it in his operative report.

i.  His previously proposed damages methodology was not a proper but-for analysis – it would not compute the profits supposedly gained by Defendants as a result of their alleged infringement.

ii.  His previously proposed damages methodology ignored the incremental costs YouTube incurred to the extent that allegedly infringing content actually caused YouTube to earn any additional revenue.

iii.  The data he proposed to use to compute YouTube's revenue is not GAAP revenue data – it is a dataset used to compute payments to content providers and overstates YouTube's revenue per video.

15.  In light of the foregoing fundamental problems with his methodologies, Dr. Cowan has failed to show anything about the size of the proposed classes, and he has failed to present a methodology capable of identifying class members without conducting case-by-case individual inquiries. Dr. Cowan has also failed to present a viable or commonly accepted method to compute YouTube's revenue and/or profits resulting from any alleged infringement with respect to either the Registered Works Infringement Class or the Foreign Unregistered Works Infringement Class.

## III.  BACKGROUND.

### A.  Class Definitions.

16.  The following sets forth Plaintiffs' definitions of each proposed class, based on

---

[10] *See* Motion for Class Certification at 4, Dkt. 190.

Plaintiffs' motion for class certification as well as Dr. Cowan's reports, which I accept for the purpose of my report. The class definitions that Plaintiffs offered in their First Amended Complaint differ from those that Plaintiffs offered in their class certification briefing.[11] I also understand that the Court vacated Plaintiffs' class certification motion.[12] However, I assume that Plaintiffs' class definitions in any future motion for class certification will track those provided in their initial class certification motion and Dr. Cowan's reports.

### i.   Registered Works Infringement Class.

17.     The Registered Works Infringement Class allegedly includes all persons who own copyrights in one or more works: 1) registered with the United States Copyright Office; 2) contained in a video that was displayed on YouTube and then removed from YouTube due to a successful Takedown Notice (not submitted via Content ID); and 3) contained in a video that was displayed on YouTube subsequent to the first successful Takedown Notice and then removed from YouTube due to a second successful Takedown Notice that was submitted on or after July 2, 2017.[13]

---

[11] Compare First Amended Complaint, ¶ 103, Dkt. 99 with Class Certification Motion at 3-4, Dkt. 190.

[12] Minute Entry, Dkt. 213.

[13] *See* Plaintiffs' Class Certification Motion at 3-4. While Plaintiffs' Class Certification Motion does not include the Content ID exclusion, the Updated Cowan Report specifies that "DMCA Takedown Notices submitted via Content ID" would be excluded (Updated Cowan Report, ¶ 79). Furthermore, Plaintiff Schneider's discovery letter to Judge Donato dated November 18, 2022 ("Plaintiffs' November 18, 2022 Discovery Letter") states: "Defendants further compounded the difficulty for Plaintiffs of using the produced takedown notice data by refusing to eliminate from their production URLs that are known to have been the result of Content ID matching, either through identifying third party takedown claimants with Content ID access, or by screening out URLs known to have been identified in Content ID matching. As a result, the data produced includes URLs that are processed by third-party providers who have access to Content ID matching and URLs identified through the Copyright Match tool. With considerable effort, Plaintiffs can filter those entries by examining websites to identify which claimants might have access to Content ID matching." Thus, it appears that Dr. Cowan's proposed filter for submission via Content ID may be too narrow a restriction, and that perhaps Plaintiffs agree that takedowns from anyone with access to Content ID or Copyright Match should be excluded. I reserve the right to address this issue further should it be raised by Dr. Cowan, or Plaintiffs, at a later time. Based on my review, I also note a significant body of takedown records submitted by third parties who appear to focus on submitting takedowns on behalf of clients.

### ii.    Foreign Unregistered Works Infringement Class.

18.    The Foreign Unregistered Works Infringement Class allegedly includes all persons who own copyrights in one or more works: 1) first published outside the United States; 2) contained in a video that was displayed on YouTube and then removed from YouTube due to a successful Takedown Notice (not submitted via Content ID); and 3) contained in a video that was displayed on YouTube subsequent to the first successful Takedown Notice and then removed from YouTube due to a second successful Takedown Notice that was submitted on or after July 2, 2017.[14]

### iii.    CMI Class – International Standard Recording Code ("ISRC") Class.

19.    The ISRC Class allegedly includes all persons who own copyrights in one or more digital form sound recordings of musical works that: 1) contained an ISRC code; 2) were a component of a video that was displayed on YouTube and then removed from YouTube due to a successful Takedown Notice (that was not submitted via Content ID); and 3) on or after July 2, 2017, were displayed on YouTube with respect to a video that included such sound recordings of musical works without including or referencing the associated ISRC code.[15]

### iv.    CMI Class – Clip Filename ("CLFN") Class.

20.    The CLFN Class allegedly includes all persons who own copyrights in one or more works: 1) contained in a video that was displayed on YouTube and then removed from

---

[14] *See* Plaintiffs' Class Certification Motion at 4. Again, Plaintiffs' Class Certification Motion does not include the Content ID exclusion, but the Updated Cowan Report specifies that "DMCA Takedown Notices submitted via Content ID" would be excluded (Updated Cowan Report, ¶ 79). In addition, based on Plaintiff's November 18, 2022 Discovery Letter, referenced in n. 13 above, it appears that submission via Content ID may be too narrow a restriction, and that perhaps Plaintiffs agree that takedowns submitted by parties with access to Content ID or Copyright Match should be excluded. I reserve the right to address this subject further should it be raised by Dr. Cowan at a later time.

[15] *Id.*

YouTube due to a successful Takedown Notice; 2) on or after July 2, 2017, contained in a video uploaded to YouTube that had an associated CLFN field populated with copyright management information; and 3) displayed on YouTube with respect to a video that included such work(s) without including or referencing the associated CLFN or with the copyright management information altered.[16]

**B. Data Produced by YouTube in This Litigation, and Used by Dr. Cowan.**

           **i.     90-Day Sample Takedown Notice Data.**

21.      YouTube produced a table containing 1,789,656 takedown records for a 90-day sample period (the "Sample Takedown Data").[17] YouTube's associated correspondence to Plaintiffs indicated that none of the Takedown Notices in this sample were submitted through the Content ID interface.[18] It is my understanding that the 90 sampled days were selected by Dr. Cowan. The Sample Takedown Data contains the following fields:

    a)   date_of_notice – The date that the takedown notice was submitted.

    b)   name_of_claimant – The name of the party submitting the takedown request as entered by the submitting party in an open text field. *A user could enter anything he or she wanted into this field*.

    c)   name_of_copyright_owner – The name of the supposed copyright owner as

---

[16] *Id.*

[17] This file is "Takedown Notice Data_HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.csv" and is described at the Gallo White letter to O'Keefe of October 7, 2022.

[18] *See* Defendants' December 12, 2022 Discovery Letter Brief in Response to Plaintiffs' November 18, 2022 Letter, Dkt. 210. According to YouTube, takedown notices could be submitted via 1) email or fax; 2) Webform, a public web-based form that anyone can use to facilitate the submission of a takedown notice under the Digital Millennium Copyright Act (DMCA); and 3) the Copyright Match Tool, a tool offered to anyone with a YouTube account who is either in the YouTube Partner Program or has submitted a valid copyright takedown notice. YouTube Copyright Transparency Report, H1 2022.

entered by the submitting party in an open text field. *A user could enter anything he or she wanted into this field*.

d)  title_of_copyrighted_work – The name of the supposed copyrighted work as entered by the submitting party in an open text field. *A user could enter anything he or she wanted into this field*.

e)  removed_video_url – The URL of the video for which the takedown request is submitted. YouTube's Webform automatically confirms that the URL entered in this field is an active YouTube video at the time the notice is submitted (*i.e.*, that the video actually exists on YouTube).[19]

f)  counternotification_received? – This field contains a value of "Yes" if a counter-notification was received (whether it was successful or not), and is blank otherwise.

22.     I also note that the Sample Takedown Data is a dataset of takedown requests, but this data is not limited to videos that are no longer available on the service. According to data produced by Dr. Cowan, the Sample Takedown Data includes 14,289 URLs that remain active and accessible on YouTube.[20]

23.     I understand further that in an order dated December 15, 2022, the Court directed YouTube to produce additional fields with respect to this data: "the complaint origin and country of origin data fields, and the field identifying the type of copyrighted work that was infringed."[21] I have not reviewed this data.

---

[19] *See*, *e.g.*, YouTube's "Request video removal" form, which can be accessed from https://support.google.com/youtube/answer/2807622?hl=en.

[20] Takedown URL Lookup.xlsx.

[21] Minute Order dated December 15, 2022 at 1, Dkt. 213.

### ii. Takedown URL Revenue Data.

24.     YouTube also produced a table showing total advertising revenue associated with the ~1.8 million URLs in the Sample Takedown Data.[22] I discuss this data further, in Section V.

### iii. CLFN Metadata Table.

25.     YouTube produced a data table that, according to its discovery communications to Plaintiffs, contains all metadata contained in the CLFN field for any video among the videos listed in the Sample Takedown Data (the "CLFN Metadata Table"), to the extent that the metadata existed in a readily accessible database.[23] The CLFN Metadata Table contains 649 records. My understanding is that while Plaintiffs requested additional CLFN metadata, the Court ruled that "the request for additional CLFN metadata is denied."[24]

### C. Third-Party Data Consulted or Retrieved by Dr. Cowan.

26.     As explained in the following section of this report, Dr. Cowan's proposed methodologies for identifying members of the Registered Works Infringement Class, the Foreign Unregistered Works Infringement Class, and the ISRC Class rely on comparisons of YouTube's takedown data to third-party data. The third-party data that Dr. Cowan proposes to consult are:

    a) The U.S. Copyright Registration Database. While the Copyright Office's database can be searched online,[25] Dr. Cowan obtained a copy of the database, which he produced weeks after submitting his Updated Report.[26]

---

[22] Total Ad Revenue Data_HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.csv

[23] Declaration of Thierry Foucu in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, ¶ 6.

[24] Minute Order dated December 15, 2022, Dkt. 213.

[25] https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?DB=local&PAGE=First

[26] These database documents were produced in a folder called "Retrospective".

b) MusicBrainz. According to MusicBrainz, its database "includes information about artists, release groups, releases, recordings, works, and labels, as well as the many relationships between them" and "a full history of all the changes that the MusicBrainz community has made to the data."[27] Dr. Cowan obtained a copy of the MusicBrainz database, which he produced weeks after submitting his Updated Report.[28]

c) SoundExchange. SoundExchange has an ISRC search function on its website, where a user can search on artist name, title, release name, version, or year of recording.[29] SoundExchange's terms of use (at the bottom of its search page) specify that, "SoundExchange does not warrant … that information accessible via the Sites will be complete, accurate, or timely." Dr. Cowan did not provide a copy of the SoundExchange database.

d) IMDb. IMDb describes itself as "the world's most popular and authoritative source for movie, TV and celebrity content, designed to help fans explore the world of movies and shows and decide what to watch" with a "searchable database" that "includes millions of movies, TV and entertainment programs and cast and crew members."[30] Dr. Cowan did not provide a copy of the IMDb database.

e) EIDR. EIDR describes itself as "a not-for-profit industry association that was founded by MovieLabs, CableLabs, Comcast, and TiVo to meet a crucial need

---

[27] https://musicbrainz.org/doc/MusicBrainz_Database.

[28] The database documents were produced in a folder called "mbdump".

[29] https://isrc.soundexchange.com/#!/search

[30] https://help.imdb.com/article/imdb/general-information/what-is-imdb/G836CY29Z4SGNMK5?ref_=helpart_nav_1#

across the entertainment supply chain for universal identifiers for a broad array of audio visual objects."[31] With respect to its registry data, EIDR disclaims that it "cannot make any representations or warranties about the suitability, accuracy or completeness of the registry data or registry."[32] Dr. Cowan did not provide a copy of the EIDR database.

**D.  Overview of Dr. Cowan's Proposed Non-Statistical Methodologies and Assumptions.**

27.      In this section, I provide an overview of Dr. Cowan's proposed methodologies, with a more detailed analysis in Section IV. After two reports, Dr. Cowan has *not identified any class members* using his proposed identification methods. In his Initial Report, Dr. Cowan claimed that he would use statistical sampling techniques to implement his class identification methodology for a sample of takedown data:

> "I understand that, in order to apply my proposed methodologies, Defendants will be producing data consistent with the Court's Order of August 30, 2022 . . . 90 sampled days of Takedown Data that includes the date of the takedown notice, claimant information, copyright owner information, copyrighted work infringed, URL of the infringing video, counter-notification data, and Google gross ad revenue associated with the video."[33]

> "I expect to develop a sample methodology following the Court's Order of August 30, 2022; I will provide Plaintiffs' attorney with samples of 90 . . . days as directed by the Court in its order."[34]

> "I will develop a methodology to estimate, from the 90 . . . day samples provided: the size of each Class, the total damages for the Copyright Infringement Class, the total number of possible statutory violations for the

---

[31] https://www.eidr.org/about-us/

[32] https://www.eidr.org/assets/EIDR-Terms-of-Use-February-2021.pdf

[33] Initial Cowan Report, ¶ 4.

[34] Initial Cowan Report, ¶ 5.

Registered Works Class, and the total number of possible statutory violations for the ISRC Class and CLFN Class based on standard sampling methodologies."[35]

28.     After receiving the precise data he requested, Dr. Cowan reversed course and now asserts that sampling will not work, and that his method for identifying class members and the YouTube videos associated with those class members' works will require the full population of takedown data:

> "It is nearly impossible to find multiple takedown notices in a sample of 90 days, no matter how carefully the sample is designed."[36]

> "Even if the data were perfect, I have concluded that there would be no reliable way to estimate the number of class members and works associated to each class when one has only 90 days sampled out of 1,826 days in the investigation period."[37]

> "…if I were to receive the entirety of the takedown notice database, the sizes of the Copyright Infringement Classes could be accurately determined based on the data matching and cross-referencing methodologies set forth herein."[38]

29.     Having abandoned the use of statistical sampling, *there is no element of Dr. Cowan's proposed methodology that uses statistics*. Rather, his proposed methodologies, as described below, are entirely exercises in filtering data, comparing different data tables or running searches, manually reviewing search results, and performing arithmetic (*e.g.*, adding up the number of identified class members). Therefore, Dr. Cowan is incorrect when he opines, albeit only in his summary of opinions section, that, "a formulaic methodology using common

---

[35] Initial Cowan Report, ¶ 14.

[36] Updated Cowan Report, ¶ 59.

[37] Updated Cowan Report, ¶ 63.

[38] Updated Cowan Report, ¶ 64.

statistical methods can be applied to identify the members of each class [and]…the number of infringing video URLs that qualify for an award of either actual or statutory damages."[39] Dr. Cowan's proposed methodology uses no statistical formulas or "common statistical methods."

30.    I summarize Dr. Cowan's proposed non-statistical methodologies below.

### i.    Dr. Cowan's Proposed Method to Filter the Takedown Data.

31.    To identify members of the Registered Works Infringement Class and Foreign Unregistered Works Infringement Class, Dr. Cowan now says he needs YouTube's full population of Digital Millennium Copyright Act ("DMCA") takedown data for the relevant time period,[40] rather than the Sample Takedown Data he said he would rely on in his Initial Report.[41] Dr. Cowan would then make several exclusions from this data for both classes.

a)  **He would exclude takedown notices that were rejected by YouTube or were the subject of a successful counter-notification**.[42] Dr. Cowan proposes to accomplish this by checking whether the URL listed in the "removed_video_url" field is still active.[43] Dr. Cowan produced a dataset (not with his Updated Report, but in response to a later discovery request) which sets forth 14,289 active URLs that he had identified out of the Sample Takedown Data.[44]

b)  **He would exclude any records where the "title of the copyrighted work" field is blank or only contains a single hyphen** – *i.e.*, where the supposed

---

[39] Updated Cowan Report, ¶¶ 12-13.

[40] Updated Cowan Report, ¶¶ 63-64.

[41] Initial Cowan Report, ¶¶ 4-6.

[42] Updated Cowan Report, ¶ 79.

[43] Updated Cowan Report, ¶ 81.

[44] Takedown URL Lookup.xlsx.

work is simply not specified at all.[45]

c) **He would exclude takedown notices submitted via Content ID**. It is my understanding that the Sample Takedown Data is already filtered to exclude such records.[46]

d) **He would exclude any takedown notice where there is only one takedown notice for a given copyrighted work or on behalf of a given copyright owner**.[47] Dr. Cowan would propose to accomplish this step based on the data reported in the "name_of_copyright_owner" field and the "title_of_copyrighted_work" field. In doing so, Dr. Cowan is assuming that (a) the party that submitted the takedown request correctly entered the specific name of the copyright owner into the "name_of_copyright_owner" field, (b) the party that submitted the takedown request correctly entered the specific name of the copyrighted work that is contained in the video into the "title_of_copyrighted_work" field, and (c) the owner of the copyrighted work

---

[45] Updated Cowan Report, ¶ 82.

[46] *See* Defendants' December 12, 2022 Discovery Letter Brief in Response to Plaintiffs' November 18, 2022 Letter, Dkt. 210. Plaintiff's November 18, 2022 Discovery Letter, Dkt. 199 states: "Defendants further compounded the difficulty for Plaintiffs of using the produced takedown notice data by refusing to eliminate from their production URLs that are known to have been the result of Content ID matching, either through identifying third party takedown claimants with Content ID access, or by screening out URLs known to have been identified in Content ID matching. As a result, the data produced includes URLs that are processed by third- party providers who have access to Content ID matching and URLs identified through the Copyright Match tool. With considerable effort, Plaintiffs can filter those entries by examining websites to identify which claimants might have access to Content ID matching." Thus, it appears that submission via Content ID may be too narrow a restriction, and that perhaps Plaintiffs agree that takedowns for anyone with access to Content ID or Copyright Match Tool should be excluded. I reserve the right to address this subject further should it be raised by Dr. Cowan at a later time.

[47] Updated Cowan Report, ¶ 84.

did not assign the same name to two distinct copyrighted works.[48]

32.     The foregoing process would create a limited dataset of takedown notices that Dr. Cowan would propose to use to ascertain the Registered Works Infringement Class and the Foreign Unregistered Works Infringement Class. Dr. Cowan says he would then sequence this dataset to identify the occurrence number of each takedown notice of each particular copyrighted work (*i.e.*, first takedown notice for the work, second takedown notice for the work, etc.), because he specifies that damages would not be awarded for the first successful takedown for a copyrighted work.[49] I refer to this hypothetical limited dataset as the "Cowan-Limited Takedown Data."

33.     Dr. Cowan did not report the results of applying his filters to the Sample Takedown Data (*i.e.*, to create the Cowan-Limited Takedown Data).

### ii.     Dr. Cowan's Proposed Manual Method for Identifying Members of the Registered Works Infringement Class.

34.     Dr. Cowan says he would use the Cowan-Limited Takedown Data to search for matches to the U.S. Copyright Registration Database in order to identify members of the Registered Works Infringement Class. Dr. Cowan's Updated Report provides little specific information as to how Dr. Cowan would accomplish this. Indeed, the following *three sentences*

---

[48] While not identified as a filter by Dr. Cowan, he would also need to exclude a significant number of records where the "title_of_copyrighted_work" is simply the URL for another YouTube video. For example, the takedown record corresponding to the largest amount of revenue in the Takedown Data URL Revenue has a value in the "title_of_copyrighted_work" field of "https://www.youtube.com/watch?v=9sXZVLMkKQo." This is a video named "Motorcyclist gets ambushed by the Angry Ram" on the YouTube channel "Angry Ram." The video is a helmet camera view of a motorcyclist who encounters a ram while trail riding. The video that was subject to the takedown in the sample (https://www.youtube.com/watch?v=yUNfkY-KD4g) is a narrated video compilation titled "MOMENTS IF WERE NOT FILMED, NO ONE WOULD BELIEVE!" on the YouTube channel "CubeHub01" that contains a portion of the ram video. Based on my research, YouTube URLs will not match to any of the third-party databases that Dr. Cowan proposes to employ. As such, records where the "title_of_copyrighted_work" is a YouTube URL would also need to be filtered out of the data, but Dr. Cowan's methodology fails to account for this issue. After his report, Dr. Cowan produced a spreadsheet titled "Youtube URL in Title Lookup.xlsx." The exact purpose of this spreadsheet is not specified.

[49] Updated Cowan Report, ¶ 79.

is all he says on this subject:

> I am able to use the Copyright Data to search for potential matches to all identified unique works. In some instances, where information on owner or artist is evident, I can run two queries: one for artist and title, and another for owner and title. Following this process, I can match and identify works that qualify for the Registered Works Infringement Class.[50]

35.     Dr. Cowan's first step would be to "run two queries: one for artist and title, and another for owner and title."[51] The U.S. Copyright Registration Database produced by Dr. Cowan in this matter contains 67 fields,[52] none of which are named "artist," "owner," or "title." He does not specify which fields he would consider to be "artist," "owner," or "title" in this search or if he would simply search all the fields for a search hit. Nonetheless, his first step is clearly a search process (not a matching process) because it could contain more than one possible match, thus requiring a second step. His second step would be to then take his search results and "match and identify works that qualify for the Registered Works Infringement Class."[53] Dr. Cowan says nothing about how he would "match and identify" these works – *i.e.*, how he would objectively and reliably sift through his search results.

36.     Dr. Cowan's more extensive (but still incomplete) description in his Initial Report clarified that his proposed methodology for matching to the U.S. Copyright Registration

---

[50] Updated Cowan Report, ¶ 85.

[51] Updated Cowan Report, ¶ 85.

[52] This database was produced in the form of 135 files in a folder called "Retrospective." Dr. Cowan did not provide this database along with his updated report on November 17, 2022. I understand that Plaintiffs provided the database on December 7, 2022 in response to repeated requests from Defendants' counsel. Dr. Cowan's Initial Report (at ¶¶ 51-52) further specifies that he would implement "standard data structure review and data cleaning methods necessary to eliminate any outliers in the data or other data abnormalities which may interfere with the quality of the dataset or matching process." Dr. Cowan did not describe this process such that it could be tested, nor did he indicate whether he carried out the process outlined in his Initial Report.

[53] Updated Cowan Report, ¶ 85.

Database would be a manual one. In his Initial Report, Dr. Cowan spent several paragraphs explaining his process. His Initial Report specified that he would start by searching the "claimant's name" against the U.S. Copyright Registration Database,[54] and that he would use unspecified "algorithms developed to check for matches for possible variations of this name."[55]

37.     He then stated that, among the records that identified hits from his "claimant name" search, he would search for matches in fields named "title" and "content."[56] Dr. Cowan claimed he would have found a potential match if a takedown record survived both searches.[57]

38.     His Initial Report acknowledged a significant problem with this methodology: "given the possible non-uniformity of the datasets in question, there would be instances where both false-positive and false-negative matches may occur."[58] Dr. Cowan then acknowledged the need to implement a quality control process where he would "manually review" the results to "improve and validate the matching process," and that he may need to "implement improvements" in his unspecified "matching algorithm."[59]

39.     There is no way for me to test Dr. Cowan's methodology because it appears that his methodology has not actually been fully developed or finalized. However, what is abundantly clear is that his methodology will involve a process of trial and error, and manual review. Dr. Cowan's proposed methodology is not a proven automated methodology, but an unproven manual process.

---

[54] Dr. Cowan did not identify the exact fields he would search, but paragraph 51 explained that the "Copyright Claimant" field would be a field he "would review for matching."

[55] Initial Cowan Report, ¶ 54.

[56] Initial Cowan Report, ¶¶ 51, 55.

[57] Initial Cowan Report, ¶ 55.

[58] Initial Cowan Report, ¶ 56.

[59] Initial Cowan Report, ¶ 56.

40.     Dr. Cowan could have applied all of his proposed filters (discussed above) to the Sample Takedown Data, and the resulting filtered data could have been compared to the U.S. Copyright Registration Database such that Dr. Cowan could have reported what his methodology would actually end up looking like in practice and what results it would generate.  Dr. Cowan offered no reason why he could not or did not employ his proposed methodology. In short, Dr. Cowan could have presented the results of his proposed methodology using these datasets, but chose not to do so. Dr. Cowan failed to report a single match using this proposed methodology and offered no explanation for that failure.

### iii.   Dr. Cowan's Proposed Manual Method for Identifying Members of the Foreign Unregistered Works Infringement Class.

41.     To identify members of the Foreign Unregistered Works Class, Dr. Cowan says he would take the Cowan-Limited Takedown Data and run searches against the following third-party databases: MusicBrainz (for musical works), EIDR, and IMDb (for motion picture works).[60] Dr. Cowan does not specify the search criteria or the matching criteria he would apply. However, it is apparent from Dr. Cowan's Updated Report that Dr. Cowan's methodology is not automated.

42.     In Appendix 1 to his Updated Report, Dr. Cowan describes his process for creating a dataset from the MusicBrainz database and running searches on that dataset. After providing his report, Dr. Cowan also provided, after weeks of delay: (a) the underlying MusicBrainz data tables, (b) the SQL code used to create his MusicBrainz dataset (*i.e.*, limited to what he believes are foreign works), and (c) his proposed search query. From this data, it is

---

[60] Updated Cowan Report, ¶ 86. In Plaintiffs' reply to Defendants' opposition to their certification motion, Plaintiffs state that "AST's works are included in the ISBN database, which is for literary works, including audiobooks." Reply in Support of Motion for Class Certification, Dkt. 203 n. 7. Dr. Cowan did not identify the ISBN database in his reports, nor did he explain how he would go about identifying matches against this database.

apparent that Dr. Cowan proposes to run individual searches against his database, each of which would generate between 0 and 100 search results that hit on one of his keywords or search parameters.[61] For example, in his search script, he uses a SQL function to rank search results by their relevance, and limit the output to only the top 100 search results.[62] If Dr. Cowan had devised a program to identify exact matches programmatically, this 100-result limit would be unnecessary. In his Appendix 1, Dr. Cowan acknowledges that this search process would pose challenges. One of the challenges he identifies is as follows:

> "The MusicBrainz database contains multiple iterations of releases. What would be called an album is segmented into multiple types of releases. For instance, that album may have been released once on vinyl, once as a deluxe edition CD, and once as a 10th anniversary edition re-master. I did not have enough data in the Sampled Takedown Data to determine which edition or version of a work of art may have violated copyright."[63]

---

[61] *See* Seach Query.sql. Also, at Appendix 1, Dr. Cowan states, "After I created our dataset, I then prepared the dataset for searching. This was done by creating a full-text search vector in the database, which indexes the fields and allows us to perform searches against the database. I used this search vector to perform searches on fields from the Sampled Takedown Notice Data to determine whether each sampled item from the Sampled Takedown Notice Data was included within our subset of the MusicBrainz dataset which contained only foreign works."

[62] *See* Search Query.sql.

[63] Updated Cowan Report, Appendix 1. The query that Dr. Cowan used to create his MusicBrainz dataset (MusicBrainz Dataset Query.sql) assigns a release date to each unique combination of track name and artist name, such that his dataset does not report each release date for each combination of track name and artist name. For example, for the popular Foo Fighters song "Everlong", the table Dr. Cowan created has one record, with a release date of December 31, 2022. This corresponds to the most recent release year of the "Everlong" song on an album. However, the MusicBrainz database has many records for the song named exactly "Everlong" by Foo Fighters (even more if the search includes an expressly "live" or "acoustic" version). This includes versions that are clearly a different work than the original 1997 release on the album The Colour and the Shape with a length of 4:11. For example, MusicBrainz lists "Everlong" by Foo Fighters as a 6:57 song on the release "2021-06-20: New York, NY" (*i.e.*, a live recording in New York). Dr. Cowan's methodology distills the many records for "Everlong" into a single record. Condensing the data by merely dropping records does not address the matching issue Dr. Cowan identifies – it only eliminates data. Further, this example illustrates another issue with Dr. Cowan's method: the MusicBrainz database appears to be unreliable as a measure for the date of publication relevant to the foreign work inquiry. While "Everlong" appears on MusicBrainz with an initial Japan release date of May 10, 1997 and a US release date of May 20, 1997, the date of publication provided in the United States Copyright Office's records is May 8, 1997, which predates both dates in the MusicBrainz database. (MusicBrainz data independently researched from https://musicbrainz.org/search, Dr. Cowan's MusicBrainz output at released_foreign_deduped_final.txt, and US Copyright Data researched from https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?DB=local&PAGE=First)

43.     Here, Dr. Cowan acknowledges he simply has no way to ensure an accurate match between the takedown data and the third-party data. Ultimately, Dr. Cowan provides no mechanism for sifting through the up to 100 search results he would get for each of his searches and reliably and systematically determining which of the search results (if any) is a true match. In other words, Dr. Cowan's search script, which would result in up to 100 results per search, is the last analytical step he has offered. From there, he would need to engage in individualized judgment calls for each search result, for which he has offered no guiding principles capable of being applied consistently on a class-wide basis.

44.     Dr. Cowan claims that he ran searches against the EIDR and IMDb websites but did not produce any results from those searches.[64]

45.     In summary, Dr. Cowan's proposed method for identifying the Foreign Unregistered Works Class appears to be to run individual searches against third-party databases, each of which could generate perhaps up to 100 results, and then to sift through each set of search results to somehow identify what he believes to be a true match. As specified, Dr. Cowan's proposed method is not an automated methodology, but rather a manual one that would require significant effort and subjective determination.

46.     Further, Dr. Cowan assumes that the information in the third-party databases is accurate. He provides no basis to support this assumption, and at least one of his proposed databases expressly disclaims any representation as to the accuracy of the information it provides.[65]

---

[64] Updated Cowan Report, ¶ 86.

[65] EIDR, Terms of Use, https://www.eidr.org/assets/EIDR-Terms-of-Use-February-2021.pdf ("EIDR CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES ABOUT THE SUITABILITY, ACCURACY OR COMPLETENESS OF THE REGISTRY DATA OR REGISTRY").

47.     In any event, after running the unspecified searches he claims to have run, Dr. Cowan does not report a single match to any of these databases. I assume this is because he *did not obtain any viable matches*. He again offers no other explanation as to why he did not report any matches using his methodology.

### iv.    Dr. Cowan's Proposed Manual Method for Identifying Members of the ISRC Class.

48.     Dr. Cowan does not specify his starting point for identifying members of the ISRC class.[66] Dr. Cowan proposes that he would identify takedown records that have an ISRC code by matching takedown notice information to the SoundExchange website based on the owner name (or artist name) and the title of the copyrighted work,[67] but he does not specify the exact fields he would use to undertake this matching exercise. Dr. Cowan's ISRC Class methodology appears to be a *manual methodology* similar to his proposed methodology for identifying members of the Registered Works Infringement Class or the Foreign Unregistered Works Class. For example, Dr. Cowan states:

> "For each work I can query the copyright owner name (or the artist's name) and the title of the copyrighted work. From the top 100 results presented by the SoundExchange search tool, I choose, if available, a single ISRC code where the [sic] both the artist's name (or copyright owner) and the title match."[68]

49.     Dr. Cowan asserts that any matches would provide a basis upon which to compute

---

[66] Updated Cowan Report, ¶¶ 93-94. It would seem that Dr. Cowan would, at a minimum, need to apply various filters to the takedown data before attempting to implement his methodology. For example, he would need to exclude records where the "title_of_copyrighted_work" field is blank (because the records cannot be matched), and he would need exclude records where the "title_of_copyrighted_work" is a YouTube URL, because these would clearly not be musical works capable of matching to SoundExchange.

[67] Updated Cowan Report, ¶ 93.

[68] Updated Cowan Report, ¶ 93.

damages,[69] and reports that he "tested the search for works using the search tool on the

SoundExchange website."[70] However, he does not report having identified any viable matches

between these datasets.

50.    Again, Dr. Cowan assumes that the information in the third-party databases is

accurate, but provides no basis for this assumption, even in the face of SoundExchange's express

disclaimer of any representation as to the accuracy of the information it provides.[71]

> **v.    Dr. Cowan's Proposed Method for Identifying Members of the CLFN Class.**

51.    Dr. Cowan proposes to identify members of the CLFN class simply by comparing

the value in the CLFN field for a given takedown video to the "name_of_copyright_owner" and

"title_of_copyrighted_work" fields in the takedown data. If the "name_of_copyright_owner" or

"title_of_copyrighted_work" (or both) are subsumed within the CLFN field, then he would

consider it to be a member of the CLFN class.[72] Dr. Cowan states that he determined that certain

violations occurred based on this methodology, but he has not identified those purported

violations anywhere in his Updated Report.[73]

## IV.    DETAILED ANALYSIS OF DR. COWAN'S PROPOSED METHODOLOGIES FOR IDENTIFYING CLASS MEMBERS.

### A.  Dr. Cowan's "Missing" and "Impoverished" Data Excuses Do Not Hold Up.

52.    Dr. Cowan claims that it is neither a shortcoming in his methodologies, nor the

---

[69] Updated Cowan Report, ¶ 95.

[70] Updated Cowan Report, ¶ 93.

[71] SoundExchange, Terms of Use, https://www.soundexchange.com/terms-of-use/ ("SoundExchange does not warrant ... that information accessible via the Sites will be complete, accurate, or timely.").

[72] Updated Cowan Report, ¶¶ 96-97.

[73] Updated Cowan Report, ¶ 96.

tiny size of any proposed classes (to the extent they exist) that prevented him from identifying even one class member in the samples. Instead, he blames the data. He claims that, if not for "missing" and "impoverished" data (and if he had the entire population of takedowns rather than a sample, as discussed in Section IV.B, *infra*), he would be able to implement his methodologies and identify class members.[74] These assertions are not supported and do not explain his *failure to identify even one class member* from the data sample that Plaintiffs' counsel requested per his specifications.

> ### i. Dr. Cowan's Assertion of "Impoverished Data" Is Unfounded and Does Not Explain His Failure to Locate Even One Class Member.

53.    Dr. Cowan complains that there are certain data fields that he expected to be produced, but were not, and that the absence of these fields prevents him from implementing his proposed methodologies.[75] However, the data fields he identifies would not enable him to implement his methodologies.

54.    Dr. Cowan claims that he needs to have the "copyright_complaint_id" field and/or the UNIX format of the "create_time" field in order to determine if certain takedown notices were discrete or part of the same takedown notice.[76] Dr. Cowan does not provide an example of what he is referring to, but I assume that he is referring to instances where there are two or more records on the same date, each listing a different "removed_video_url", but where all other fields are the same. The supposed issue here is that YouTube's Webform allows a user to request multiple "videos for removal" in a single form submission.  The concern Dr. Cowan raises is hypothetical, and one of administrative form over economic substance – *i.e.*, whether a user

---

[74] Updated Cowan Report, ¶¶ 65-78.

[75] Updated Cowan Report, ¶¶ 70-78.

[76] Updated Cowan Report, ¶¶ 47, 74-78.

elected, on a single day, to include all takedown requests related to a single work in a single submission form, or to break those takedown requests up across multiple submission forms (each pertaining to the same work) on the same day. Dr. Cowan is essentially asserting that perhaps the size of the class – and by extension class members' damages – should be boosted if a claimant elected to file more paperwork than necessary and administratively break up its takedown requests across multiple submission forms in a single day. Dr. Cowan asserts that without the ability to discern such behavior, he simply cannot accurately implement any of his identification methodologies.[77]

55.     I understand Dr. Cowan's complaint is moot, as Plaintiffs will not receive this additional data.[78] Regardless, it is not clear that, if a user chose to submit more takedown forms than necessary, YouTube could have factored the prior takedown submissions into its evaluation of subsequent takedown submissions. This is because YouTube does not resolve all takedowns instantaneously.[79]

56.     In any event, Dr. Cowan's supposed need for these fields did not excuse his failure to apply his methodology to the data he has or report any potential class members that he was able to identify. Dr. Cowan could have implemented his methodology assuming that each unique combination of "date_of_notice", "name_of_claimant", "name_of_copyright_owner", and "title_of_copyrighted_work" represented a single takedown form submission. He could have then reserved his intention to argue that perhaps his calculation should be boosted down the road if it turns out that some users chose to fill out more forms than necessary. But he did not do so.

57.     The other issue that Dr. Cowan raises is the "failure to include the claimant

---

[77] Updated Cowan Report, ¶¶ 74-76.

[78] Minute Order dated December 15, 2022.

[79] Deposition of Chris Ting, 45:8-46:24.

country of origin field" and the "dropdown field that identifies the type of work."[80] These fields, he claims, would help him know which of the works identified in the takedown notices are more likely to have associated ISRCs or be foreign unregistered works and would help him identify which third-party database is most likely to contain information about the work.[81] Dr. Cowan's explanation for requesting these fields demonstrates that his proposed methodologies for identifying members of the Registered Works Infringement Class, the Foreign Unregistered Works Class, and the ISRC Class are manual and individualized.[82] His complaint is one of efficiency. If Dr. Cowan knew which works were films, or music, he says, he could run searches of only IMDb, or only MusicBrainz, and he would have fewer sets of search results to sift through. However, Dr. Cowan's desire for improved efficiency still does not explain why Dr. Cowan was *unable to identify even a single class member using the considerable data he had*.

58.     Whatever additional data Dr. Cowan receives will not cure the problems with his proposed identification methodology because it could only make his inefficient manual search methodologies slightly more efficient manual search methodologies. Additional data would not render his manual search methods scalable or reliable.[83]

> ii.   **Dr. Cowan's Missing Data Critiques are Misplaced and Do Not Explain His Failure to Identify Even One Class Member.**

---

[80] Updated Cowan Report, ¶ 75.

[81] *Id.*

[82] *Id.* To the extent that Dr. Cowan's methodology is actually "automated," he is only complaining about machine time – *i.e.*, his computer having to search a bit more data to find a match (*e.g.*, having to run an automated search against MusicBrainz, EIDR, and IMDb, rather than running an automated search against just one of these databases). Computer machine time is not relevant to the ability to implement an automated methodology in this case.

[83] While Dr. Cowan does not explain this, it is possible he is concerned that he might get a match in IMDb and MusicBrainz for the same work title, and he might not know whether an allegedly infringed work is the song, or the video. Dr. Cowan did not demonstrate that such a theoretical double-match situation would occur. Nonetheless, production of this data will resolve this minor theoretical issue.

59.     Dr. Cowan asserts that there are two elements of missing data. One element of "missing data" is a dataset containing "cleaned fields" that he seems to mistakenly think that YouTube possesses. In particular, Dr. Cowan complains that certain ways that users entered data when submitting takedown notices make it impossible for him to implement his methodology.[84] The issues he references concern:

a)  "blanks in the title of the work";

b)  "misspellings";

c)  "illegible entries"; and

d)  "other such problems that would make it impossible to match one takedown notice with another."[85]

60.     Dr. Cowan asserts that these issues would be addressed if YouTube would produce "the cleaned fields."[86] He seems to be speculating that YouTube created a separate unproduced dataset by unilaterally going through the user-entered data, fixing all their misspellings, performing translations, and eliminating all ambiguities, thus creating data that would enable Dr. Cowan's methodology to work. Dr. Cowan does not explain why he believes these "cleaned fields" exist, or point to any evidence of their existence, and it is my understanding that they do not exist. Dr. Cowan admits that his identification methodology is presently unworkable without these imagined "cleaned fields," and claims that "[a]utomation of processes requires consistency of inputs."[87] On this, I agree with Dr. Cowan: without "cleaned fields," his method is hopeless. However, in the absence of "cleaned fields," or any description

---

[84] Updated Cowan Report, ¶ 69.

[85] Updated Cowan Report, ¶ 69.

[86] Updated Cowan Report, ¶ 72.

[87] Updated Cowan Report, ¶ 72.

of a process for creating them, Dr. Cowan's emphasis of the need for such non-existent "cleaned fields" establishes that his identification methodology is unworkable.

61.     As I understand the process for submitting a takedown notice, users entered the data they chose to enter, in the format of their choosing, at the time of submission. Humans make data-entry mistakes, and users were not obligated to spell their submissions correctly or "copy-and-paste" from the U.S. Copyright Registration Database, IMDb, or any of the other third-party databases that Dr. Cowan proposes to consult, so as to assist Dr. Cowan's matching efforts. Indeed, I understand that even the takedown notices submitted by named Plaintiffs in this action do not always reflect the name or the owner of the copyrighted work as they appear in the U.S. Copyright Registration Database.[88] It is my understanding that the data produced by Defendants in the Sample Takedown Data reflects the user-entered data as it is stored in Defendants' records, and there is not a "cleaned fields" version of this data.[89] I discuss common examples of these user entries in the following sections of this report.

62.     The other "missing data" complaint raised by Dr. Cowan is an alleged "inexplicable dip in the data in the latter half of 2018"[90] in the number of takedowns. Dr. Cowan claims that this "inexplicable dip" is an indication that perhaps some data from the sampled days

---

[88] *See, e.g.*, Defendants' Opposition to Plaintiffs' Motion for Class Certification at 10: "Plaintiffs' notion of comparing takedown notices with Copyright Office registration records (Mot. 10) is fraught with burden and error. Schneider, for example, purportedly registered multi-movement compositions under a single title without listing individual movements." *See* Harold ¶ 8 & Ex. 6 at 1 (claiming that "'Choro Dancado,' 'Pas de Deux,' and 'Danca Illusoria,' … are movements of 'Three Romances'"). She then sent takedown notices for the individual movements without mentioning the registered work. *See, e.g.,* Harold Exs. 7-9. Nothing in the takedown notices or Copyright Office records could connect the notices with a registration—evidence from Schneider would be required."

[89] To the extent that Dr. Cowan claims that entries that are "illegible" because they were entered using a non-Roman alphabet, such entries would not necessarily be usable by Dr. Cowan anyway – as he proposes to match to databases that are not necessarily maintained in such languages. For example, the U.S. Registered Works Database is maintained only in English; IMDb is maintained in English, French, German, Hindi, Italian, Portuguese, and Spanish; MusicBrainz is maintained in English, German, French, Italian, and Dutch; and EIDR appears to only be maintained in English.

[90] Updated Cowan Report, ¶ 66.

Highly Confidential - Attorneys' Eyes Only

in this period is missing.[91] Dr. Cowan's speculation is unsupported.

63.    While Dr. Cowan did not produce his analysis,[92] I have charted the average number of takedowns in the Sample Takedown Data by 6-month interval in **Chart 1**, below. Even from this data, the observations in the second half of 2018 do not constitute an "inexplicable dip" – the average number of takedowns in the second half of 2018 is just 1.5% below the second half of 2017. This is shown in the solid blue line in **Chart 1**. However, further analysis shows the slight dip that is observed in the overall average is correlated to the distribution of sampled days (selected by Dr. Cowan, himself) across the days of the week. Specifically, 3 of 9 sampled days in the second half of 2018 are weekend days (on which takedowns were consistently lower than weekdays), whereas 2 of 9 sampled days in the first half of 2018 are weekend days. In other words, the random selection of more weekend days than weekdays pushed down the second half of 2018 average. If the average is normalized to control for the days of the week, the magnitude of the dip is either reduced or eliminated.[93] Dr. Cowan then draws the wrong conclusion from his observation of this slight variability. The fact that some variability in the population has made its way into a random sample is to be expected, it is not a reason to doubt the validity of the data provided.[94]

---

[91] Updated Cowan Report, ¶ 66.

[92] His assertion is literally unsupported.

[93] *See* Schedule 2.0. The average for sampled weekdays in the second half of 2018 was actually higher than the average in the first half of 2018 for weekdays, and higher than the sampled average for the second half of 2017 for weekdays. Because there is no dip in weekdays, Dr. Cowan's observation appears to have been caused by a slight decline in takedowns on the sampled weekend days only.

[94] "The basic sampling view assumes that …errors in the estimates occur only because just part of the population is included in the sample. Such errors are referred to as sampling errors." Steven K. Thompson, *Sampling,* Wiley, . 5 (3d ed. 2011). "The error of estimate arises solely from the random sampling variation that is present when *n* of the units are measured instead of the complete population of *N* units." William G. Cochran, *Sampling Techniques,* Wiley & Sons, 359 (3d ed.1991).

**Chart 1**

**Average Daily Takedowns for the Sample Takedown Data[95]**



### B.  Dr. Cowan's Sampling Excuse Does Not Hold Up.

64.      In his Updated Report, Dr. Cowan claims that he pivoted away from sampling because, according to him, there is a "near mathematical impossibility" of finding repeat takedowns (*i.e.*, for the same work) in a 90-day sample.[96] In **Chart 2** below, I chart the probability of finding at least two repeat occurrences in a sample, assuming different values of total repeat occurrences in the population (using the same statistical formula as Dr. Cowan and

---

[95] *See* Schedule 2.0.

[96] Updated Cowan Report, ¶ 59.

adopting, for this illustration, Dr. Cowan's assumption of an even distribution of takedowns).[97]

**Chart 2**

**Summary of Cowan-Calculated Probability Formula**



65.     *All of these probabilities are in excess of zero.*[98] In other words, while sampling inherently reduces the probability of finding repeat occurrences, it does not make it impossible, and if there are a high number of repeat occurrences in the population for a given combination of "name_of_copyright_owner" and "title_of_copyrighted_work", the probability of finding at least

---

[97] The calculation of at least two matches in a sample is the probability of not getting exactly zero matches and not getting exactly one match, *i.e.*, 1 - *P(0)* - *P(1)*. The mathematical formula to compute the probability of one match, or the probability of zero matches is: $P(exactly\ k\ matches) = {}_nC_k \cdot p^k \cdot (1-p)^{n-k}$; where ${}_nC_k = \frac{n!}{(n-k)! \cdot k!}$ ; and where $n$ = the number of takedowns in the population; $k$ = the number of matches in the sample; $p$ = the probability of pulling any one item in the sample, in this case, 90/1826 or 4.9%.

[98] For example, even the probability of finding both takedowns if there are only 2 is 0.24%, and the probability of finding at least 2 of 3 total takedowns is 0.71%. If Dr. Cowan had found any occurrences in his 90-day, 1,789,656 record sample, he could have used the calculated probabilities and extrapolated to the population with a quantifiable margin of error (*i.e.*, to account for the "infinitesimal" probability of locating repeat occurrences in the 90-day sample). For example, a widely regarded book on sampling specifies, "We know how frequently any particular sample *Si* will be selected, and we know how to calculate the estimate from the data in *Si*. It is clear, therefore, that a sampling theory can be developed for any procedure of this type, although the details of the development may be intricate. The term *probability sampling* refers to a method of this type." (William G. Cochran, *Sampling Techniques,* Wiley, 9 (3d ed. 1991))

two in a sample is actually quite high (*e.g.*, 71.3% if there are 50 repeat occurrences in the population).

66.     Further, Dr. Cowan acknowledged the need to locate repeat occurrences when he proposed (and selected) a 90-day sample in order to locate class members.[99] Similarly, the probability of locating repeat occurrences was also calculable using the same statistical formulas Dr. Cowan now uses. Further, it appears that Dr. Cowan took into consideration the fact that locating repeat occurrences in a sample would require a larger sample than if only one occurrence were required: he specified in his Initial Report a smaller 30-day sample (*i.e.*, 30 days out of the 90-day sample) for the CLFN metadata, which he would have presumably used to locate any occurrence (*i.e.*, not necessarily repeating) of a YouTube video URL containing a work having copyright management information in the CLFN field.[100] In other words, it appears that Dr. Cowan specified his sample to accommodate the repeat occurrence issue, and that he did not believe (at least initially) that sampling itself would impose a "near mathematical impossibility" of ever locating a class member. His sampling excuse does not hold up.

## C. Dr. Cowan's Pivot Away From Sampling Provides Empirical Evidence that the Supposed Classes Are At Most Miniscule and Any Members Would be Burdensome to Locate, If Any Class Members Exist At All.

67.     If Dr. Cowan actually tried to implement his methodologies, his failure to identify a single class member in the sample he selected indicates that actually locating any class members (if any exist at all) would be a burdensome exercise, resulting in the identification of, at best, a miniscule population. This concept is documented in an accounting textbook addressing

---

[99] Initial Cowan Report, ¶ 45.

[100] Initial Cowan Report, ¶ 4.

the subject of sampling in the context of an audit:[101]

> "Although discovery sampling is designed to locate relatively rare items, it cannot locate a needle in a haystack. If an extremely small number of deviations exist within a population (*e.g.*, 0.1 percent or less), no sample of reasonable size can provide adequate assurance that an example of the deviation will be encountered. Still, discovery sampling can (with a very high degree of confidence) ensure detection of deviations occurring at a rate as low as 0.3 to 1 percent."[102]

68.     The challenge that Dr. Cowan now claims to be running into is that he failed to specify a large enough sample to identify potential class members, if any exist. Thus, Dr. Cowan has reverted to the one method that he can be sure will improve his odds of finding at least one class member, if any exist – examining the entire population. But, as discussed in Section III.D above and Sections IV.E through IV.H below, even getting the full sample would not cure the defects in Dr. Cowan's methodologies because they require manual review, subjective determination, and rely on unreliable user-entered data.

69.     In summary, sampling theory tells us that the proper conclusion to draw from Dr. Cowan's failure to locate even one class member in his sample is that the classes are, at most, miniscule – that is, that the classes constitute, at most, a very small proportion of takedowns. Further, Dr. Cowan cannot yet rule out the possibility that the classes (apart from possibly the

---

[101] Sampling is widely used in the audit profession. For example, AU-C Section 530, *Audit Sampling*, specifies: "Audit sampling enables the auditor to obtain and evaluate audit evidence about some characteristic of the items selected in order to form or assist in forming a conclusion concerning the population from which the sample is drawn." AU-C 530.A7, retrieved from https://us.aicpa.org/content/dam/aicpa/research/standards/auditattest/downloadabledocuments/au-c-00530.pdf. I frequently employ audit sampling techniques to validate financial data.

[102] Whittington and Pany, *Principles of Auditing & Other Assurance Services,* McGraw-Hill, 347-348 (16th ed. 2007). This concept is somewhat intuitive. If a phenomenon occurs infrequently in a population, one would need to look at a larger sample (or the whole population) in order to observe it. Or stated differently, if one looks at an appropriately sized sample and does not observe the phenomenon, one can have confidence that the rate of occurrence in the population is at most very low.

named Plaintiffs) simply do not exist.

### D. Dr. Cowan's Proposed Identification Methodology Is Entirely Speculative and By His Own Admission, Will Not Work.

70.     In his Initial Report, Dr. Cowan proposed a methodology to identify class members and asserted, without qualification, that the specified 90-day sample data would allow him to implement his proposed methodology.[103] As I have demonstrated in the prior sections, and as Dr. Cowan admits in his Updated Report, he was wrong.[104] Now, Dr. Cowan claims that only if he receives a dataset that does not exist (the "cleaned data"), and a dataset for the entire population, will he be able to use his proposed methodology to identify class members. But absent that data, by his own admission, *his methodology will not work*.

71.     Further, Dr. Cowan cites no work product in this matter, nor in any other matter, which provides any proof that his methodology could work. Because he has *not identified even one single class member for any of the classes* from the 1,789,656 takedown records in the Sample Takedown Data, Dr. Cowan's assertion that his proposed methodology will enable identification of class members is entirely speculative.

### E. Dr. Cowan's Methods Will Not Work Because His Methods Rely Completely On Uncontrolled User-Entered Data, With No Means to Confirm the Data Apart From Individual Inquiry.

72.     In each of Dr. Cowan's methods, he proposes to rely on the "name_of_copyright_owner" and "title_of_copyrighted_work" fields in the takedown data. For example,

---

[103] Initial Cowan Report, ¶¶ 4, 5, 14.

[104] Updated Cowan Report, ¶¶ 59-64.

a)  to identify the Registered Works Infringement Class, he would use these fields to identify repeat takedowns of the same work, and to match against the U.S. Copyright Registration Database;[105]

b)  to identify the Foreign Unregistered Works Infringement Class, he would use these fields to identify repeat takedowns and to match to third-party data from MusicBrainz, EIDR, or IMDb;[106]

c)  to identify the ISRC Class, he would have to match these fields to third-party data published by SoundExchange;[107] and

d)  to identify the CLFN class, he would have to compare the takedown data fields to the data published in the CLFN field.[108]

73.     In each instance, Dr. Cowan's methodology relies on user-entered data and requires that this user-entered data is 100% accurate. That is, he assumes that whatever the user entered as the work title is in fact the work contained in the identified YouTube video and that whatever the user entered as the copyright owner is in fact the name of the rights holder. As mentioned before, I understand that even the takedown notices submitted by named Plaintiffs in this action do not always reflect the name or the owner of the copyrighted work as they were shown in the U.S. Copyright Registration Database.[109]

74.     Dr. Cowan's methodology has an insurmountable flaw: he provides no way to prove or corroborate that this uncontrolled data is accurate. The data fields he intends to use are

---

[105] Updated Cowan Report, ¶ 85.

[106] Updated Cowan Report, ¶ 86.

[107] Updated Cowan Report, ¶ 93.

[108] Updated Cowan Report, ¶¶ 96-97.

[109] *See supra* fns. 60 & 88.

fields in which a user can type in whatever numbers or letters they choose. The fact that users can enter literally anything is plainly evident from the data itself. For example, for 483 records in the Sample Takedown Data, the "title_of_copyrighted_work" field starts with the phrase "my video." Examples include:

    a)   "My Video Thumbnail";

    b)   "My Video Content ID";

    c)   "My videos";

    d)   "My video I own lost acess [sic] to youtube account, No choice but to strike down my own video because I dont [sic] want this on the internet!"; and

    e)   "My video".[110]

75.    These are clearly not the titles of copyrighted works, but rather other information that the user chose to enter in that field. The existence of these entries (and other entries that are clearly not names of copyrighted works)[111] confirm that user entries into the "title_of_copyrighted_work" field are not reliable. Furthermore, thousands of videos in the Sample Takedown Data that were initially removed in response to takedown notices were later reinstated, likely because (1) the uploader submitted a successful counter-notification; or (2) the claimant retracted its takedown notice.[112] These reinstated videos further indicate that the "title_of_copyrighted_work," as entered, may not accurately identify the work, or that the

---

[110] *See* Takedown Notice Data_HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.csv

[111] Other examples in the Sample Takedown Data include: "FORTNITE is an online video game developed by Epic Games, released in 2017. Epic owns FORTNITE's in-game accounts and V BUCKS currency and does not allow cheats or hacks that exploit the game to win."; "I don't have it its old video"; "This video spreads viruses with link in description which is stealing personal data from everyone who downloads it".

[112] Takedown URL Lookup.xlsx; Retract a claim of copyright infringement - YouTube Help (google.com), available at https://support.google.com/youtube/answer/2807691?hl=en; Submit a copyright counter notification - YouTube Help (google.com), available at https://support.google.com/youtube/answer/2807684?hl=en; Copyright strike basics - YouTube Help (google.com), available at https://support.google.com/youtube/answer/2814000?hl=en.

Highly Confidential - Attorneys' Eyes Only

takedown URL actually infringes the work. For example, I understand from counsel that in one of its takedowns, Plaintiff Uniglobe incorrectly claimed that a 20-second clip of the 20th Century Fox opening sequence infringed one of its copyrights.[113]

76.     Apart from facially erroneous entries and the existence of reinstated videos, as discussed below, further inquiry confirms that:

    a)  the "title_of_copyrighted_work" field cannot be used to accurately identify repeat occurrences; and

    b)  the "name_of_copyright_owner" does not accurately identify the name of the owner of the copyright.

77.     To illustrate these issues, I refer to example records from the Sample Takedown Data where the "title_of_copyrighted_work" is "Meitantei Conan" and the "name_of_copyright_owner" is "comeso GmbH," although this is just one example of many. There are 5,488 such records in the Sample Takedown Data across 32 different days (*i.e.*, 32 repeat takedowns). First, I note that this title/owner combination does not match to the U.S. Copyright Registration Database, and thus would not meet the criteria for inclusion in the Registered Works Infringement Class. Second, this combination does not match to a search of SoundExchange, and as such, would not meet the criteria for inclusion in the ISRC Class.

78.     Applying Dr. Cowan's methodology for the Foreign Unregistered Works Infringement Class, a search against IMDb reveals that "Meitantei Conan" is a Japanese animated series that can also be translated as "Detective Conan."[114] According to IMDb, the

---

[113] Declaration of Paul N. Harold in Support of Defendant's Opposition to Plaintiffs' Motion for Class Certification, at ¶ 45.

[114] https://www.imdb.com/title/tt0131179/  and https://www.imdb.com/title/tt0131179/companycredits?ref_=tt_dt_co

Highly Confidential - Attorneys' Eyes Only

series was originally released in Japan in 1996 and contains 1,092 episodes.[115] According to IMDb, the series was created by Gosho Aoyama, is produced by TMS Entertainment, Tokyo Movie, and V1 Studio, and is distributed by 74 different companies.[116] One issue is immediately apparent: none of the takedowns specify the episode – *i.e.*, the specific copyrighted work. Without this identification, it would be impossible to identify either the original takedown request or the subsequent takedown request for that same work, if any. Dr. Cowan's proposed methodology of using the value in the "title_of_copyrighted_work" field to identify repeat takedowns for the same work would identify a vast number of potential false positives and generate erroneous results.

79.      The second issue that this example raises is in the fact that the "name_of_copyright_owner" field lists "comeso GmbH." Based on the data in IMDb, this is not one of the producers of the show, nor is it one of the distribution channels. Based on my research, comeso GmbH offers copyright media solutions.[117] In other words, this company was most likely hired by someone (the user-entered data does not say who) to identify potentially infringing works and submit takedown requests. In fact, comeso GmbH has takedown requests in the Sample Takedown Data with 137 different values of "title_of_copyrighted_work." This record, and many others like it, illustrates that the "name_of_copyright_owner" field cannot be relied upon to identify the actual owner of the copyrighted work. The fact that this record would not create a match to IMDb under Dr. Cowan's methodology would miss the point – the point is that the field itself does not reliably identify the copyright owner.

80.      I note that multi-episode series are not the only category of content where the

---

[115] *Id.*

[116] *Id.*

[117] https://comeso.org/en/company

information provided in takedowns is so generic as to foreclose a specific identification of repeat takedowns for the same work. Other instances that are common in the data are videogames (*i.e.*, videos of gameplay) and sports content. It is my understanding that aspects of a videogame, such as specific characters, a script, musical works, sound effects, artwork, code, and in-game video could all be subject to separate copyright protection. Furthermore, it is my understanding that an entire season of a sport would not be subject to a single copyright, but rather each individual broadcast (*i.e.*, a specific game, or specific highlight reel) could each be subject to separate copyright protection. As examples, there are many takedown requests submitted by "Tencent" (the "name_of_copyright_owner") for the videogame "PUBG MOBILE" (the "title_of_copyrighted_work"). With only this generic information provided by the user submitting these takedown requests, it would not be possible to identify the instances of repeat takedowns for each copyrighted work. Similarly, there are many takedown requests where the "name_of_copyright_owner" is "Indian Premier League" and the "title_of_copyrighted_work" is "Indian Premier League 2019." There would be no way to determine which sports broadcast each record pertained to, and no way to identify repeat takedowns for the same specific work.

81.    In my opinion, the only way to corroborate the accuracy of each user-entered data point would be to review both the claimed copyrighted work and the video that was taken down, and confirm a match. This would be a manual, individualized, and likely subjective review. It is also not clear whether such a review would be possible given that (a) the videos in question are no longer available on YouTube (*i.e.*, one would need to review an archived copy, to the extent such a copy exists), and (b) the potentially infringed work may not be readily available online.[118]

---

[118] Further, sampling techniques would not overcome this problem. For example, sampling techniques would yield an estimate of the overall error rate (*i.e.*, rate of false positives), but would not allow for specific identification and exclusion of each false positive.

82.     Dr. Cowan might say that he is also relying on the fact that these videos were actually taken down, and perhaps, that this provides assurance that the user-provided information was accurate (*i.e.*, because the party who uploaded the video did not successfully challenge the takedown, the information must have been accurate). This too, would be an unsupported assumption that is controverted by the data. Take, for example, the circumstances in which takedown notices that did not actually identify a copyrighted work were successful (*e.g.*, takedowns that identified the copyrighted work as "my video"). The takedowns were successful even though the user did not provide the specific name of a specific work.[119] The fact that such records can be excluded from a damages analysis would miss the point: the existence of such records in the user-entered data shows that the user-entered data field is not reliable, and that the counter-notification process is not capable of surfacing all unsubstantiated takedown requests.

83.     Because Dr. Cowan provides no methodology to confirm the reliability of user-entered data (without conducting an individual, manual review), his methodology is not capable of reliably identifying class members.

### F.  Dr. Cowan Does Not Propose a Method to Determine the Nature of Infringement for the Foreign Unregistered Works Class.

84.     In addition to all the flaws associated with his proposed methodology for the Registered Works Infringement Class, as discussed above, Dr. Cowan's proposed methodology to identify foreign unregistered works would provide no means of identifying the location of infringement, if any. For example, Dr. Cowan's proposed methodology would not provide any information confirming that a video containing a work was uploaded by someone in the United

---

[119] Further, even giving credence to the assumption, a video might actually contain a copyrighted work, but the data entered might not accurately describe the specific work. Thus, the takedown could be successful even if challenged, while the information entered could still be erroneous.

States, processed by YouTube in the United States, or viewed in the United States. It is my understanding that, for the Foreign Unregistered Works Class, there must be a showing that an infringement occurred in the United States (*e.g.*, that the infringing content was uploaded or viewed in the United States).[120] It is my understanding that if, for example, a foreign unregistered work was uploaded in Germany, processed by YouTube in Germany, and viewed in France, there would be no actionable infringement in this litigation absent some other act of infringement in the United States.[121] Dr. Cowan's proposed methodology provides no way of evaluating where any actionable infringement may have occurred.[122]

### G. Dr. Cowan Acknowledges a Flaw in His ISRC and Foreign Unregistered Works Class Methodologies – and Fails to Specify a Way to Overcome His Flaw.

85.    With respect to the ISRC Class, Dr. Cowan notes that:

> "in many instances there are multiple unique ISRC codes that are associated with similar titles and artists…because multiple versions of the same work may exist… I cannot determine which version(s) were infringed upon from the takedown data."[123]

86.    Dr. Cowan identifies this issue, but does not identify any way to overcome it. Similarly, in his Appendix 1, pertaining to the MusicBrainz database for the Foreign Unregistered Works Infringement Class, Dr. Cowan states the following:

> "The MusicBrainz database contains multiple iterations of releases. What would be called an album is segmented into multiple types of releases. For instance,

---

[120] Defendants' Opposition to Plaintiffs' Motion for Class Certification at 5, 11.

[121] *Id.*

[122] Based on Alphabet's 10-K filings, I note that the majority of its revenues are not in the United States.

[123] Updated Cowan Report, ¶ 94. For example, there are seven different ISRC codes associated with the Foo Fighters song "Everlong." Two of them have a blank "version" field. (https://isrc.soundexchange.com/#!/search)

that album may have been released once on vinyl, once as a deluxe edition CD, and once as a 10th anniversary edition re-master. I did not have enough data in the Sampled Takedown Data to determine which edition or version of a work of art may have violated copyright."[124]

87.     Without a way to overcome this problem, Dr. Cowan's proposed method of identifying works for the ISRC Class and Foreign Unregistered Works Class cannot be reliably applied.

## H.  Dr. Cowan's Proposed CLFN Class Method Does Not Work – It Is Inconsistent with Plaintiffs' Class Definition.

88.     The methodology that Dr. Cowan proposes to identify the CLFN Class will not work because his proposed methodology would identify a group of videos that do not meet the Plaintiffs' CLFN Class definition. The CLFN Class includes all persons who own a copyright in at least one work:

    a)  contained in a video that was displayed on YouTube and then removed from YouTube due to a successful Takedown Notice;

    b)  on or after July 2, 2017, contained in a video uploaded to YouTube that had an

---

[124] Updated Cowan Report, Appendix 1. The query that Dr. Cowan used to create his MusicBrainz dataset (MusicBrainz Dataset Query.sql) assigns a release date to each unique combination of track name and artist name, such that his dataset does not report each release date for each combination of track name and artist name. For example, for the popular Foo Fighters song "Everlong", the table Dr. Cowan created has one record, with a release date of December 31, 2022. This corresponds to the most recent release year of the "Everlong" song on an album. However, the MusicBrainz database has many records for the song named exactly "Everlong" by Foo Fighters (even more if the search includes an expressly "live" or "acoustic" version). This includes versions that are clearly a different work than the original 1997 release on the album The Colour and the Shape with a length of 4:11. For example, MusicBrainz lists "Everlong" by Foo Fighters as a 6:57 song on the release "2021-06-20: New York, NY" (*i.e.*, a live recording in New York). Dr. Cowan's methodology distills the many records for "Everlong" into a single record. Condensing the data by merely dropping records does not address the matching issue Dr. Cowan identifies – it only eliminates data. Further, this example illustrates another issue with Dr. Cowan's method: the MusicBrainz database appears to be unreliable as a measure for the date of publication relevant to the foreign work inquiry. While "Everlong" appears on MusicBrainz with an initial Japan release date of May 10, 1997 and a US release date of May 20, 1997, the date of publication provided in the United States Copyright Office's records is May 8, 1997, which predates both dates in the MusicBrainz database. (MusicBrainz data independently researched from https://musicbrainz.org/search, Dr. Cowan's MusicBrainz output at released_foreign_deduped_final.txt, and US Copyright Data researched from https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?DB=local&PAGE=First)

associated CLFN field populated with copyright management information; and

    c)   displayed on YouTube with respect to a video that included such work(s) without including or referencing the associated CLFN or with the copyright management information altered.

89.    Dr. Cowan's proposed method only claims to identify instances that meet the first two criteria:

    a)   He is pulling from the takedown data, therefore he would flag an instance of a work "contained in a video that was displayed on YouTube and then removed from YouTube due to a successful Takedown Notice"; and

    b)   He is filtering the data to isolate occurrences (at least purportedly) where the removed video "had an associated Clip Filename ('CLFN') field populated with copyright management information."[125]

90.    Dr. Cowan's proposed methodology does not address the third criteria at all. He fails to propose any method at all that would locate an occurrence of a video containing an at-issue work, or that would determine whether the video was being displayed on YouTube on or after July 2, 2017 "without including or referencing the associated CLFN or with the copyright management information altered."[126] For example, I understand that the information that one of the named Plaintiffs claims was removed from the CLFN data of YouTube videos supposedly containing her works was, in each instance, made publicly available on YouTube in the videos'

---

[125] "I determined a violation occurred when either (a) the name of the copyright owner was completely included in the CLFN metadata or (b) the title was completely included in the CLFN metadata." Updated Cowan Report ¶ 96.

[126] *See* Motion for Class Certification at 4, Dkt. 190.

titles.[127] Dr. Cowan does not explain how, if the CLFN data containing identifying information of the at-issue work was not included in the titles or descriptions, he would identify such a video. And even assuming Dr. Cowan provided a method for locating such videos and determining whether these videos were actually displayed on the service on or after July 2, 2017 (he did not), he provides no method to determine whether the supposedly removed or altered CLFN data was in fact presented along with the videos.

91.    Thus, Dr. Cowan's methodology, as presented, cannot work. Dr. Cowan does not even hypothesize as to how he would find videos that satisfy the class definition. I would expect that locating such a video would require a challenging individualized review.

## V.    ANALYSIS OF THE NOW ABANDONED DAMAGES CALCULATION METHODOLOGY PROPOSED IN DR. COWAN'S INITIAL REPORT.

92.    Dr. Cowan's Updated Report does not propose a methodology to compute Defendants' profits. However, in his Initial Report, Dr. Cowan claimed he could calculate Defendants' profits (or at least revenues) by simply adding up the revenue data produced by Defendants corresponding to each takedown URL (*e.g.*, the Takedown URL Revenue Data).[128] Further, in their prior motion for class certification, Plaintiffs claimed: "Charles Cowan has developed a methodology to calculate direct revenues based on YouTube's records, which include revenue information on a URL-by-URL basis."[129] While Dr. Cowan has since abandoned that methodology,, I briefly address the fundamental flaws which rendered his methodology unreliable.

---

[127] Declaration of Thierry Foucu in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification ¶ 7, Dkt. 198-1.

[128] Initial Cowan Report, ¶¶ 11, 68-70.

[129] Plaintiffs' Class Certification Motion at 14.

93.     In summary, Dr. Cowan's prior methodology was unsound because it did not represent a proper but-for analysis. Instead, Dr. Cowan proposed to merely perform a mechanical adding up of the revenue data provided for each video and failed to factor in an offset for incremental costs.

94.     A proper analysis of YouTube's profits, if any, from its alleged infringement would use a but-for analysis method. This method would first look at the actual revenue generated by YouTube, and then compare this to the revenue YouTube would have earned if the alleged infringement had not occurred (*i.e.*, the but-for revenue). To the extent that the actual revenue is higher than the but-for revenue, the analysis would then turn to evaluate YouTube's cost structure, and whether higher actual revenue caused YouTube to incur additional costs – which would reduce the profits from the alleged infringement. Dr. Cowan did not propose to perform such an analysis.

### A.  How YouTube Generates Revenue.

95.     It is important, before analyzing Dr. Cowan's damages calculation, to have an understanding of how YouTube's business generates revenue. YouTube generates revenue from advertising and subscriptions. Neither Dr. Singer's nor Dr. Cowan's report analyzes how YouTube generated subscription revenue from any alleged infringement; therefore, I have not undertaken any analysis of YouTube's subscription revenues. YouTube generates advertising revenue when advertisers pay it to display ads to users on YouTube.[130] YouTube sells a variety

---

[130] For example, Google's fiscal 2009 10-K filing described the YouTube business as follows: "YouTube offers video ads solutions to advertisers that provide advertisers with a way to promote their content to the YouTube community as well as to associate themselves with content being watched by their target audience." (https://www.sec.gov/Archives/edgar/data/1288776/000119312510030774/d10k.htm).

Highly Confidential - Attorneys' Eyes Only

of advertising products to advertisers, and the mix of products sold has changed over time.[131]

Advertisers commit to a certain advertising budget.[132] YouTube then uses its proprietary "ads algorithm" to display ads to users, seeking to deliver ads according to each advertiser's budget and advertising goals.[133] The ads algorithm does not display ads on all views of content, nor does it even display ads on all content – *i.e.*, many videos simply never have ads run in connection with them.[134] Instead, the YouTube ads algorithm places ads based on a variety of factors, such as the user's past activity on the service and the advertiser's targeting criteria.

96.     YouTube was started in 2005 and acquired by Google in 2006.[135] Alphabet, Google's parent company, did not begin to separately report YouTube's ad revenue in its public filings until 2019,[136] and the accounting data produced by Defendants in this matter reports that

████████████████████████████████████████████████████████████████

██████████████████████████[137]

## B.  Dr. Cowan's Proposed Methodology Was Not a Proper But-For Analysis.

97.     Dr. Cowan proposed to simply add up the "total_revenue_usd" field

---

[131] *See, e.g.*, Updated Singer Report, ¶¶ 27-37.

[132] Deposition of Arpan Agrawal, 62:19-63:8, 71:8-72:1; *see also* GOOG-SCHNDR-00055112-55114: "To run your ads on Google, you'll need to decide on the right budget and bidding options. Your budget establishes a charging limit for an individual campaign."

[133] https://support.google.com/youtube/answer/9269689?hl=en.

[134] Per GOOG-SCHNDR-00043844 and GOOG-SCHNDR-00052969, many videos have views, but no attribution of ad revenue for purposes of computing payments to content providers.

[135] Associated Press, Google buys YouTube for $1.65 billion, NBC NEWS, Oct. 9, 2006, https://www.nbcnews.com/id/wbna15196982.

[136] GOOG-SCHNDR-00041788-885 at -848. The 2019 10-K filing reports three-year results, such that the 2019 10-K contains information going back to 2017. However, YouTube ad revenue was not reported in the 2017 and 2018 10-K filings.

[137] *See* Schedule 1.0.

Highly Confidential - Attorneys' Eyes Only

corresponding to each identified "removed_video_url."[138] For example, the URL

https://www.youtube.com/watch?v=-fA9gsoLskg, which Dr. Cowan might say infringed on the

"title_of_copyrighted_work" named "UEFA Champions League 2018- Sony Pictures Networks

India Pvt. Ltd." reports $3.70 in "total_revenue_usd." For purposes of an analysis of Defendants'

profits, the relevant question is: if the removed video[139] had never been active and available on

YouTube, would YouTube have displayed the ads that allowed it to generate approximately

$3.70 in revenue? Given the abundance of content on YouTube and the function of YouTube's

ads algorithm and search functions, as discussed earlier in this report, it is inappropriate to

simply assume, as Dr. Cowan apparently would, that the existence of this video[140] caused

YouTube to generate an additional $3.70 that it otherwise would not have generated.

98.     There are two ways in which YouTube could have avoided a revenue loss and still

attained the $3.70 in ad revenue, in this example. If this video was a soccer video (based on the

title), then it would certainly be feasible that YouTube would have drawn upon another, similar

soccer video in response to the user's activity on the service (*e.g.*, search query) to display those

same advertisements to the same users at the same time and generate the same revenue.

Alternatively, YouTube could also have run more ads on other types of content that the user may

have watched in the absence of another soccer video. That YouTube's corpus of other videos

provided sufficient capacity to engage its users and saturate its advertiser demand is corroborated

by Arpan Agrawal. Mr. Agrawal testified:

> "I would take some issue with the idea [that] a video auto playing is necessarily
> generating the revenue. Users clicking through the videos or watching videos –
> it's the user activity that drives the revenue. And, **historically, we have had far**

---

[138] Initial Cowan Report, ¶¶ 11, 68-70.

[139] https://www.youtube.com/watch?v=-fA9gsoLskg.

[140] *Id.*

Highly Confidential - Attorneys' Eyes Only

**more usage than advertising demand, and so it's sufficient inventory to satisfy advertiser spend.**"[141] [Emphasis added.]

99.     Mr. Agrawal's testimony should also be viewed in the context of the data produced in this litigation, and Dr. Cowan's proposed methodology for identifying class members from takedown data. Even before applying any of Dr. Cowan's proposed filters, the 90-day Takedown URL Revenue Data, as extrapolated to the pertinent time period of 5 years (*i.e.*, the second half of 2017 through the first half of 2022), comprise just ▮▮▮▮ of YouTube's ad revenue over the same time period.[142] This is before considering the fact that Dr. Cowan has not identified a single class member in this population. Given the de-minimis contribution of the allegedly infringing content (*i.e.*, much less than ▮▮▮▮) and Mr. Agrawal's testimony that YouTube has "had far more usage than advertising demand," there is no basis to assume, as Dr. Cowan has, that the allegedly infringing content actually caused an increase in YouTube's revenue.

100.     In sum, Dr. Cowan's method would not be a proper but-for analysis and would not calculate the revenue that YouTube gained from alleged infringement. He has not considered the reality of YouTube's business, at all, nor has he considered the de-minimis nature of the allegedly infringing conduct.

---

[141] Deposition of Arpan Agrawal, 35:23-36:5.

[142] I start with all of the revenue data in the entire 90-day sample: ▮▮▮▮. I then multiply this by the ratio of 1,826 days (the total days in the 5-year sampled period) to 90 days (the sampled days) to equate the figure to the full 5-year period from which it was drawn. This results in an extrapolated total revenue figure of ▮▮▮▮ – *i.e.*, the aggregate revenue from all videos with a non-Content ID takedown between July 2, 2017 and July 2, 2022. Because this data is limited to takedowns from July 2, 2017 to July 2, 2022, the revenue associated with these videos would necessarily relate to a longer period of time, *i.e.*, before July 2, 2017 and even after this period for unsuccessful takedowns. I then divide this calculated result into YouTube's total ad revenue for the more limited period of the second half of 2017 through the first half of 2022 - $93,794,000,000 (*see* Schedule 1.0).

Highly Confidential - Attorneys' Eyes Only

**C.  Dr. Cowan Did Not Account for YouTube's Incremental Costs.**

101.    Even if Defendants earned additional revenues that they would not have but-for any alleged infringement, Defendants would not have retained all of those revenues as incremental profits. This is because YouTube incurs significant variable costs to achieve its revenues. Based on my discussions with Arpan Agrawal, YouTube's main cost categories are: (a) content acquisition costs (*i.e.*, revenue sharing payments to the parties that upload videos), (b) costs to support advertiser spend (*e.g.*, credit card processing fees for payments from advertisers), (c) costs of infrastructure to host and deliver content, (d) costs to certify demographic reach (*e.g.*, with vendors such as Nielson), and (e) general operating expenses.

102.    Companies, including YouTube, report <u>all</u> of their costs on their profit and loss statements. In other words, a profit and loss statement reports both fixed and variable costs, but does not break them into fixed and variable costs, but rather into functional cost categories. YouTube, for example, reports categories of:

    a)   "CAC" (or content acquisition costs);

    b)   "COGS+Infra" (or cost of goods sold and infrastructure costs) – these include credit card processing fees, costs of infrastructure to host content, and costs to certify demographic reach; and

    c)   "Opex" (or operating expense).

103.    Each of these functional categories include fixed and variable costs. Fixed costs remain unchanged from month-to-month as revenue moves up or down. For almost any business, some minimum of fixed costs are necessary simply to operate as a business. Variable costs, on

51

Highly Confidential - Attorneys' Eyes Only

the other hand, move up and down with business activity (such as revenue).[143] Because

companies typically do not, in the ordinary course, classify costs into fixed and variable buckets,

but rather use cost descriptors that explain the nature of a cost (rather than its behavior), an

analyst must typically undertake further analysis of a company's cost structure in order to

distinguish between fixed and variable costs, and perform a proper analysis of incremental

costs.[144]

104.     One method that is commonly used to evaluate a business' cost structure is

regression analysis.[145] As such, to evaluate YouTube's cost structure and quantify its incremental

costs, I have performed a regression analysis using YouTube's monthly financial statement data,

where YouTube's costs are the dependent (y) variable, and its revenues are the independent (x)

variable. The results of my analysis are summarized in **Chart 3**, below. This analysis quantifies

the fixed component of each cost, as well as the variable component. This data could then be

used to quantify YouTube's incremental costs to the extent that any incremental revenue is ever

identified.[146] For example, to the extent that YouTube, hypothetically, gained $10,000 in revenue

from the alleged infringement, this data tells me that YouTube also would have incurred an

additional ▇▇▇▇ in content acquisition costs (as one example).

---

[143] *See, e.g.*, Srikant Datar and Madhav Rajan, *Horngren's Cost Accounting: A Managerial Emphasis,* Pearson, 32-36 (16th ed. 2018).

[144] *Id.* 372-396.

[145] *Id.* 384.

[146] I would also take into consideration the size of any revenue earned relative to YouTube as a whole. If the revenue amount is extremely small, it would be unlikely that it would have caused YouTube to incur additional operating expenses. As such, for a very small amount of incremental revenue, I would only offset CAC and COGS + Infra costs, as these cost categories are directly variable, rather than indirectly variable.

Highly Confidential - Attorneys' Eyes Only

**Chart 3**

**Summary of YouTube Cost Structure[147]**



| Category | Baseline Fixed Cost Amount | Variable Cost for Each Dollar of Revenue |
|---|---|---|
| CAC | | |
| COGS+Infra | | |
| Opex | | |
| Total | | |

105.    Neither of Dr. Cowan's reports even acknowledge that YouTube has costs, and his methodology did not take these costs into consideration at all.

### D.  The Data Dr. Cowan Proposed to Use Is Not Actual GAAP Revenue Data.

106.    Finally, the data that Dr. Cowan said, in his Initial Report, that he could use to calculate YouTube's revenue is data that YouTube produced in this action showing total advertising revenue associated with the ~1.8 million URLs in the Sample Takedown Data.[148]



---

[147] *See* Schedules 1.1 through 1.4.

[148] Total Ad Revenue Data_HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.csv



As a result, any damages calculation based on the data would be inflated.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Respectfully Submitted,

Greg Halm

December 29, 2022

---

[149] This data is pulled from the same source as the "Estimated partner revenue" associated with the Modern Works Publishing Screenshots produced for Maria Schneider's works. *See, e.g.*, GOOG-SCHNDR-00052455 and GOOG-SCHNDR-00052456.

[150]



**Appendix A**

*Curriculum Vitae*



**GREG HALM**

BERKELEY RESEARCH GROUP, LLC
2200 Powell Street, Suite 1200
Emeryville, CA 94608

Direct: 510.874.5956
ghalm@thinkBRG.com

## SUMMARY

Mr. Halm is a Managing Director at BRG and leads its San Francisco Bay Area office. Mr. Halm provides forensic accounting and financial consulting services in complex commercial disputes. Mr. Halm has a breadth of consulting experience and has testified at trial as a damages expert in Federal District Court and arbitration, and at deposition in both state and federal court. Mr. Halm's work has been relied upon by the Court. On many occasions Mr. Halm's work has also assisted parties in achieving settlements early in the litigation cycle.

Mr. Halm has consulted on many damages analysis engagements related to, among other issues, theft of trade secrets, copyright infringement, tortious business interference, breach of contract, unfair business practices, false advertising, and wage and hour matters. These engagements have covered a broad set of industries and businesses ranging from small business to large public enterprises.

Mr. Halm has substantial consulting experience in the consumer finance industry, where he specializes in advising clients in large-scale disputes involving significant amounts of data. Mr. Halm advises on case strategy, and frequently supports both subject matter experts and damages experts.

In addition to his experience on damages issues and consumer finance disputes, Mr. Halm has consulted on other financial consulting and forensic accounting engagements involving issues such as revenue recognition, the valuation of businesses and ownership interests, the analysis of business models and structures, forensic analysis and reconstruction of complex transactions, consideration of income tax effects of transactions, reconstruction of financial statements, and complex financial models.

## REPRESENTATIVE EXPERIENCE

**Damages Analysis Experience**
- Prepared a calculation of damages related to a system-wide computer outage at a major bank.
- Prepared a report on damages caused by an unlawful raid by a foreign government of the offshore office of a large financial institution.
- Prepared a calculation of damages related to allegedly unlawful solicitation of clients by a former member of a financial advisory firm.
- Prepared a calculation of damages resulting from construction defect repairs at a large mixed-use commercial property.
- Prepared a calculation of financial damages with respect to an alleged raid of employees from an insurance brokerage.



- Advised counsel in numerous matters regarding possible damages exposure for matters involving allegations of missed meal and rest breaks, and unrecorded overtime.
- Provided an expert report and testified at trial in a matter involving an alleged copyright infringement in connection with a t-shirt design.
- Prepared a calculation of financial damages with respect to an alleged raid of a group of financial advisors.
- Prepared a calculation of alleged financial damages stemming from the termination of an agreement between a financial institution and its service provider of identity theft and credit monitoring services to consumers.
- Provided an expert report and testimony with respect to alleged damages and valuation of an alleged trade secret anti-counterfeiting technology.
- Prepared a calculation of financial damages in a matter involving an alleged breach of reps and warrants in a purchase agreement.
- Prepared a calculation of financial damages in a matter involving alleged copyright infringement of residential appraisal management software. The matter also involved allegations of breach of contract between the software provider and the mortgage bank.
- Prepared a calculation of financial damages in a breach of contract dispute between two companies in the travel and leisure industry.
- Consulted on a calculation of lost profits suffered by a large inter-dealer broker as a result of the 9/11 attacks.
- Calculated lost earnings for a large resort casino in Atlantic City associated with various significant disasters.
- Prepared a calculation of financial damages in a matter involving the theft of customer account information and unfair business practices in the consumer banking industry.
- Prepared an analysis of financial damages in a dispute between a pomegranate juice seller and a large beverage company involving allegations of false advertising and unfair business practices.
- Prepared analysis of financial damages in a matter involving alleged theft of trade secrets and tortuous business interference in the asset management industry.
- Prepared analysis of lost wages in wage and hour case involving the calculation of restitution of lost wages in the banking industry.
- Assisted in calculation of lost profits and lost royalties in a matter involving an alleged theft of intellectual property in the fish processing industry.
- Conducted an analysis of financial damages in a matter involving a theft of customer account data from a printing business.
- Consulted for counsel in an arbitration matter regarding a royalty fee dispute in the video gaming industry.

**Other Forensic Accounting Experience**
- Performed an analysis of allegedly improper related-party transactions involving private equity funds.
- Provided a report on liability and damages issues in a dispute between a venture capital firm and its auditor over audit malpractice claims.
- Prepared a calculation of damages due to a pre-mature liquidation of a 457(b) plan.
- Provided an analysis of partnership distributions for a large mixed-use real estate development.



- Reconstructed GAAP financial statements of a television production company from the company's bank statements and other records, and performed a variety of financial and accounting analyses related to transactions entered into by the company.
- Prepared a complex insurance claim for a leading manufacturer of precision testing and measurement equipment whose property and operations were adversely impacted by a wildfire.
- Analyzed alleged export transactions wherein the alleged receivables were factored to various banks. Analyzed the flow of funds related to such transactions through multiple entities, bank accounts, and countries.
- Provided an analysis of historical financial data and calculated the EBITDA of a behavioral healthcare company.
- Prepared a variety of analyses involving the financial aspects of an advisor's role in the development of an Indian Gaming property.
- Prepared an accounting of various transaction classes, including distributions, related to an entity that developed and operated a solar power plant in India.
- Advised counsel representing a pharmaceutical company of accounting standards pertaining to joint ventures and collaborative arrangements.
- Advised a broker-dealer on changes in revenue recognition standards.
- Performed due diligence of the budgeting systems of a university.
- Investigated allegedly improper transactions of the CEO of a credit union.
- Performed a forensic analysis of various financing and sale transactions in a dispute between a bank and a former executive.
- Analyzed the propriety of the alleged importer's accounting for the transactions and traced the transactions through numerous bank accounts.
- Analyzed the structure and accounting records of a real estate development partnership in the context of allegations of improper transactions by the general partner.
- Provided an expert report on damages with respect to an alleged e-commerce fraud. The alleged fraud involved the exploitation of promotional subsidies. Mr. Halm correlated disparate data sets containing tens of thousands of transaction records.
- Provided forensic accounting analysis of banking transactions related to allegedly fraudulent banking transactions perpetrated on a significant account holder.
- Provided forensic accounting analysis of the banking transactions of an alleged perpetrator of a Ponzi scheme.
- Performed a forensic analysis of a San Francisco seafood business for purposes of estimating lost profits.
- Prepared a forensic analysis of cash transactions for a San Francisco non-profit.
- Consulted for an investment bank specializing in municipal bonds over large irregularities discovered in its accounting records. Identified the source of the irregularities and assisted the client with numerous regulatory complications stemming from the irregularities. Designed and implemented reporting software to mitigate the risk of future irregularities.
- Prepared a forensic analysis of expense report records for a wrongful termination matter.
- Conducted a forensic accounting analysis of tax shelter transactions.
- Analyzed the structure, business plans, and operating histories of several HVAC suppliers related to allegations of alter-ego.



- Consulted for counsel in a dispute over the alleged misappropriation of trading algorithms. Compiled database of trading profits from records located in multiple disparate data sources.
- Conducted an analysis of accounting irregularities contained in the books and records of a video game joint venture.
- Prepared a valuation of a competitive local exchange carrier.
- Prepared a valuation of a partnership interest and calculated lost distributions and wages.

**Mortgage Disputes Experience**
- Consulted for a loan servicer on matters involving allegedly improper loan servicing brought by government agencies.
- Provided an accounting for a service-member's loan subject to active-duty deferral.
- Consulted for large loan servicers on matters involving allegations of improperly charging borrowers for default loan servicing costs.
- Consulted for a large mortgage servicer on disputes with mortgage insurers over rescissions, as well as denials and curtailments of mortgage insurance claims.
- Consulted for a large multi-national bank on numerous disputes with mortgage insurers over billions in disputed coverage. Consulted on issues such as underwriting, fraud investigations, insurance claims, and residential property appraisals.
- Consulted on the quantification of financial damages associated with alleged violations of the Home Affordable Modification Program by one of the country's largest mortgage servicers.
- Consulted for counsel in securities litigation over RMBS with total par value of more than $10 billion. Consulted on statistical sampling and re-underwriting of thousands of mortgage loans.
- Consulted for counsel in securities litigation over RMBS. Conducted a statistical sample of mortgage loans and estimated the variance of appraised values from the sample of loans.
- Consulted for counsel in securities litigation over RMBS. Analyzed plaintiff's investment analysis documents.
- Consulted for counsel on a dispute involving allegations of predatory lending in the state of Missouri. Analyzed the economic structure of the high CLTV mortgage loan transactions at issue in the context of mortgage market in the late 1990s and early 2000s.
- Consulted for counsel in a dispute over financial guarantee insurance of various RMBS. Analyzed insurers' underwriting of the insurance policies. Analyzed the controls of the sponsor, master servicer, and underwriter, and the operation of such controls, over the acquisition, securitization, and servicing of mortgage loans.
- Consulted for a large multi-national bank on its fraud investigative practices for mortgage loans.

**Other Economic and Statistical Analysis Experience**
- Performed various analyses of a large Microsoft Access database used by an auto parts distributor.
- Advised counsel on statistical issues related to an effort to estimate the occurrence of a certain type of email in a population of unknown size.



- Provided financial consulting services to an airline in its efforts to obtain insurance recoveries in connection with a system failure.
- Assisted a leading maker of precision measuring and testing equipment in the preparation of a property damage and business interruption claim related to a wildfire that damaged the company's headquarters.
- Consulted for counsel on class certification issues pertaining to a proposed class of hundreds of thousands of purchasers of groceries through a home delivery website.
- Consulted for counsel on a highly publicized white collar crime matter. Provided statistical, accounting, and economic analysis.
- Consulted on statistical issues in matter involving an alleged breach of a contract for the purchase of thousands of bullet proof vests.
- Consulted for counsel on a breach of contract dispute involving a complex derivative instrument.
- Prepared a stock price correlation analysis and consulted on various statistical issues in a dispute between a large regional bank and its insurer.
- Consulted for counsel in a dispute over the alleged misappropriation of trading algorithms. Provided various statistical analyses.
- Analyzed the credit rating practices of a major bank regarding one of its customers.


**TESTIMONY**

*State of Washington v. Greyhound Lines, Inc.* Superior Court of the State of Washington in Spokane County. Deposition in August 2021.

*Price-Simms Holdings, LLC v. Candle3, LLC.* United States District Court for the Eastern District of California. Declaration in February 2021.

*Meridith Hutchens v. Polaris Greystone Financial Group, LLC.* American Arbitration Association. Trial Testimony in October 2020.

*E\*Trade Financial Corporation, et al v. U.S. Specialty Insurance Company.* District Court of Harris County, Texas. Declaration in September 2020.

*Darren Thienes v. LoanCare, LLC.* Superior Court of the State of California in Marin County. Declarations in January 2020.

*PH Investor Co LLC v. AvalonBay Communities, Inc. and Pleasant Hill Manager, LLC.* Superior Court of the State of California in Contra Costa County. Depositions in October and November 2019.

*Gates Corporation v. CRP Industries, Inc.* Federal District Court for the District of Colorado. Declaration in May 2019.

*Bradley J. Puetz v. Teespring, Inc.* Federal District Court in the Northern District of California. Trial Testimony in May 2017.

5



_North Venture Partners, LLC, v. Vocus, Inc.,_ Federal District Court in the Northern District of California. Declarations in October 2015 and February 2016

_Document Security Systems, Inc., v. Coupons.com Incorporated_.  Federal District Court in the Western District of New York.  Deposition in January 2014.

**PUBLICATIONS**

_Mortgage Servicers Will Bear Brunt of CARES Act Relief,_ published by Law360 on June 2, 2020. Recognized by Law360 as a Top 10 Most-Read Securities Article by Law360 Guest Experts in 2020.

_Suggested Modeling Principles to Support the PPP Necessity Certification_, published by thinksetmag.com on September 16, 2020.

**PRESENTATIONS**

_Using Financial Information in Business Transactions_ – Presented at Practising Law Institute's Pocket MBA in San Francisco, CA on October 19, 2017, October 1, 2018, September 23, 2019

Participated in Panel Discussion at Deposition Skills Workshop held by Reed Smith LLP on July 20, 2018

_Recent Developments and Key Considerations in Consumer Finance False Claims Act (FCA) Litigation_ – CLE Presented with Paul Noring at BRG and Elizabeth McKeen and David Leviss at O'Melveny & Myers LLP on February 3, 2021.

**EDUCATION**

    B.S. in Managerial Economics, University of California at Davis, _Summa Cum Laude_
    Accounting Coursework at University of California at Berkeley
    Graduate-Level Statistics Coursework at Penn State University

**CERTIFICATIONS**

    Certified Public Accountant

# Appendix B

# Information Considered

**Legal:**

- First Amended Class Action Complaint
- Plaintiff Maria Schneider's Third Set of Interrogatories to Defendants YouTube, LLC and Google LLC
- Plaintiff's Fourth Set of Requests for the Production of Documents to Defendants YouTube, LLC and Google LLC
- Plaintiff Maria Schneider's Objections and Responses to Defendants YouTube, LLC and Google LLC's Sixth Set of Interrogatories to Plaintiff Maria Schneider (Nos. 21-23)
- Notice of Motion and Plaintiffs' Motion for Class Certification
- Defendants' Opposition to Plaintiffs' Motion for Class Certification
- Plaintiffs' Reply in Support of Motion for Class Certification
- YouTube, LLC and Google LLC's Motion for Summary Judgement as to Plaintiff Maria Schneider
- Plaintiff Maria Schneider's Opposition to Defendants' Motion for Summary Judgement
- YouTube, LLC and Google LLC's Reply in Support of Motion for Summary Judgement as to Plaintiff Maria Schneider
- Declaration of Thierry Foucu in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification
- Declaration of Paul N. Harold in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification and Exhibits 28-31
- Letter from Philip C. Korologos to The Honorable James Donato re: Schneider v. YouTube, June 10, 2022
- Letter from Carol O'Keefe to Honorable James Donato re: Schneider et al v. YouTube LLC, et al., July 29, 2022
- Letter from Carol O'Keefe to Honorable James Donato re: Schneider et al v. YouTube LLC, et al., August 16, 2022
- Letter from Lauren Gallo White to The Honorable James Donato re: Schneider et al. v. YouTube, LLC et al., Response to Discovery Letter Brief (Dkt. No. 156), August 22, 2022
- Email from Anthony Geritano to WSGR re: FW Activity in Case 3:20-cv-04423-JD Schneider et al v. YouTube, LLC et al Order, August 30, 2022
- Email from Kelly Knoll to Carol O'Keefe re: RE: Schneider et al. v. YouTube, LLC et al., Case No. 3:20-cv-04423-JD, October 7, 2022
- Letter from Lauren Gallo White to Carol O'Keefe re: Schneider et al. v. YouTube, LLC et al., October 7, 2022
- Letter from Lauren Gallo White to Carol O'Keefe re: Schneider et al. v. YouTube, LLC et al., November 11, 2022
- Letter from Carol O'Keefe to Lauren Gallo White re: Schneider et al. v. YouTube, LLC et al., November 14, 2022
- Email from Lauren Gallo White to Carol O'Keefe re: Re: Schneider et al. v. YouTube, LLC et al., Case No. 3:20-cv-04423-JD, November 15, 2022
- Letter from Carol O'Keefe to Honorable James Donato re: Schneider et al v. YouTube, LLC et al., November 18, 2022
- Letter from Lauren Gallo White to The Honorable James Donato re: Schneider et al. v. YouTube, LLC et al., December 12, 2022
- Civil Minutes re: Schneider et al v. YouTube, LLC et al, 3:20-cv-04423-JD, Proceedings, Notes and Orders, December 15, 2022
- Exhibit 2 to the Declaration of Catherine Hartman

- Schneider, et al. v. YouTube, et al.: Plaintiffs' February 25, 2022 List of Infringements
- Schneider v. YouTube 7.5.22 Supplemental List of Infringements.pdf

**Plaintiff Reports:**
- Expert Report of Charles D. Cowan, Ph.D., September 1, 2022
- Expert Report of Charles D. Cowan, Ph.D., November 17, 2022
- Expert Report of Hal J. Singer, Ph.D., September 1, 2022 (and materials provided along with report)
- Expert Report of Hal J. Singer, Ph.D., November 17, 2022 (and materials provided along with report)

**Depositions:**
- Deposition of Arpan Agrawal, July 1, 2022
- Deposition of Brad Froehle, June 30, 2022
- 30(b)(6) Deposition of Brad Froehle, June 30, 2022
- Deposition of David Rosenstein, July 1, 2022
- Deposition of Chris Ting, June 29, 2022
- Deposition of Amy Wu, May 24, 2022
- 30(b)(6) Deposition of Amy Wu, June 28, 2022
- 30(b)(1) Deposition of Kevin Zhu, June 21, 2022
- 30(b)(6) Deposition of Kevin Zhu, June 21, 2022

**Documents Produced in Litigation (Beginning Bates):**
- GOOG-SCHNDR-00000040
- GOOG-SCHNDR-00000051
- GOOG-SCHNDR-00000077
- GOOG-SCHNDR-00000146
- GOOG-SCHNDR-00020258
- GOOG-SCHNDR-00020553
- GOOG-SCHNDR-00020657
- GOOG-SCHNDR-00040511
- GOOG-SCHNDR-00040619
- GOOG-SCHNDR-00040833
- GOOG-SCHNDR-00041505
- GOOG-SCHNDR-00041605
- GOOG-SCHNDR-00041675
- GOOG-SCHNDR-00041788
- GOOG-SCHNDR-00041886
- GOOG-SCHNDR-00041959
- GOOG-SCHNDR-00042010
- GOOG-SCHNDR-00043844
- GOOG-SCHNDR-00050365
- GOOG-SCHNDR-00052455
- GOOG-SCHNDR-00052456
- GOOG-SCHNDR-00052969
- GOOG-SCHNDR-00052970
- GOOG-SCHNDR-00052988

- GOOG-SCHNDR-00053011
- GOOG-SCHNDR-00054422
- GOOG-SCHNDR-00055112
- GOOG-SCHNDR-00055783

**Other Documents Provided by Counsel:**
- CLFN Metadata_HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.csv
- Takedown Notice Data_HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.csv
- Total Ad Revenue Data_HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.csv

**Interviews:**
- Arpan Agrawal

**Research:**
- Alphabet Inc. 2016 10-K Filing
- Alphabet Inc. 2017 10-K Filing
- Alphabet Inc. 2018 10-K Filing
- Alphabet Inc. 2019 10-K Filing
- Alphabet Inc. 2020 10-K Filing
- Alphabet Inc. 2021 10-K Filing
- Alphabet Inc. 2022 10-K Filing
- Alphabet Inc. 2016 Q1 10-Q Filing
- Alphabet Inc. 2016 Q2 10-Q Filing
- Alphabet Inc. 2016 Q3 10-Q Filing
- Alphabet Inc. 2017 Q1 10-Q Filing
- Alphabet Inc. 2017 Q2 10-Q Filing
- Alphabet Inc. 2017 Q3 10-Q Filing
- Alphabet Inc. 2018 Q1 10-Q Filing
- Alphabet Inc. 2018 Q2 10-Q Filing
- Alphabet Inc. 2018 Q3 10-Q Filing
- Alphabet Inc. 2019 Q1 10-Q Filing
- Alphabet Inc. 2019 Q2 10-Q Filing
- Alphabet Inc. 2019 Q3 10-Q Filing
- Alphabet Inc. 2020 Q1 10-Q Filing
- Alphabet Inc. 2020 Q2 10-Q Filing
- Alphabet Inc. 2020 Q3 10-Q Filing
- Alphabet Inc. 2021 Q1 10-Q Filing
- Alphabet Inc. 2021 Q2 10-Q Filing
- Alphabet Inc. 2021 Q3 10-Q Filing
- Alphabet Inc. 2022 Q1 10-Q Filing
- Alphabet Inc. 2022 Q2 10-Q Filing
- Alphabet Inc. 2022 Q3 10-Q Filing
- Alphabet Earnings Call Transcripts, Q2 2016 through Q3 2022

- AU-C 530, Audit Sampling
  (https://us.aicpa.org/content/dam/aicpa/research/standards/auditattest/downloadabledocuments/au-c-00530.pdf)
- Copyright Transparency Reports (https://transparencyreport.google.com/report-downloads?hl=en)
- Srikant Datar and Madhav Rajan, Horngren's Cost Accounting: A Managerial Emphasis, 16th Edition, Pearson, 2018
- Whittington and Pany, Principles of Auditing & Other Assurance Services, 16th Ed. McGraw-Hill, 2007
- William G. Cochran, Sampling Techniques, 3rd Ed., Wiley
- YouTube's "Request Video Removal" Form
  (https://support.google.com/youtube/answer/2807622?hl=en)
- UBS, Alphabet Inc.: Trying to Forecast the Perfect Number(s), February 1, 2018
- BMO Capital Markets, Alphabet: Strong Top Line, but Margins Fall Short, February 2, 2018
- Credit Suisse, Alphabet (Googl): Happy to Underwrite Incremental Expenses in Pursuit of Long-Term Opportunity, February 2, 2018
- BMO Capital Markets, Alphabet: Strong Top Line, but Margins Fall Short, February 2, 2018
- Jeffries, Alphabet Inc (Googl): Elephants Don't Always Balance Gracefully, February 2, 2018
- J.P. Morgan, Alphabet Inc.: Investments Driving Strong Growth and Also Pressure Margins; Positive TAC & Cloud Commentary; Reiterate OW, PT to $1,330, February 2, 2018
- Wells Fargo Securities, Alphabet Inc.: GOOGL: A Guide Would be Nice, February 2, 2018
- Morgan Stanley, Alphabet Inc.: 1 Trillion Reasons for GOOGL to Improve Disclosure, February 5, 2018
- Jeffries, Alphabet Inc: Q4 First Look: Impressive Top Line Beat, Though Less So for Cloud, February 2, 2021
- UBS, Alphabet Inc.: Q4 2020 Quick Take, February 2, 2021
- Credit Suisse, Alphabet: Back to an Offensive Stance in 2021 after Managing Through 2020, February 3, 2021
- Jeffries, Alphabet, Inc: Q4: Big Beat from A to Z; a Top Pick for 2021, February 3, 2021
- J.P. Morgan, Alphabet Inc.: Remains Top Idea; Strong Ad Growth w/ Momentum into 2021 & Google Cloud Should Scale; Reiterate Overweight & PT to $2,390, February 3, 2021
- Morgan Stanley, Alphabet Inc.: Welcome to the Sum of the Parts Club, February 3, 2021
- Wells Fargo, Alphabet Inc. (GOOGL): GOOGL: Essential to Retail (and Consumers); Maintain Overweight, Raise PT to $2,350, February 3, 2021
- https://comeso.org/en/company
- https://servicesdirectory.withyoutube.com/
- https://support.google.com/youtube/answer/2807622?hl=en&ref_topic=9282363
- https://support.google.com/youtube/answer/9269689?hl=en
- https://www.imdb.com/title/tt0131179/
  https://www.imdb.com/title/tt0131179/companycredits?ref_=tt_dt_co
- https://www.nbcnews.com/id/wbna15196982
- https://www.youtube.com/watch?v=-fA9gsoLskg

**Databases Cited in the Expert Reports of Dr. Cowan:**

- EIDR: Entertainment Identifier Registry (https://ui.eidr.org/search)
- IMDB (https://www.imdb.com/)
- MusicBrainz (https://metabrainz.org/ and https://musicbrainz.org/)
- SoundExchange ISRC Search (https://isrc.soundexchange.com/#!/search)
- U.S. Copyright Registration Database (https://www.copyright.gov/public-records/)

- YouTube Data API (https://developers.google.com/youtube/v3/docs/videos/list)

**Materials Provided By Dr. Cowan After His November 17, 2022 Report Submittal:**
- released_foreign_deduped_final.txt
- copymarc21 rev 080221.pdf
- longrecs
- part001
- part002
- part003
- part004
- part005
- part006
- part007
- part008
- part009
- part010
- part011
- part012
- part013
- part014
- part015
- part016
- part017
- part018
- part019
- part020
- part021
- part022
- part023
- part024
- part025
- part026
- part027
- part028
- part029
- part030
- part031
- part032
- part033
- part034
- part035
- part036
- part037
- part038
- part039

- part040
- part041
- part042
- part043
- part044
- part045
- part046
- part047
- part048
- part049
- part050
- part051
- part052
- part053
- part054
- part055
- part056
- part057
- part058
- part059
- part060
- part061
- part062
- part063
- part064
- part065
- part066
- part067
- part068
- part069
- part070
- part071
- part072
- part073
- part074
- part075
- part076
- part077
- part078
- part079
- part080
- part081
- part082
- part083
- part084

- part085
- part086
- part087
- part088
- part089
- part090
- part091
- part092
- part093
- part094
- part095
- part096
- part097
- part098
- part099
- part100
- part101
- part102
- part103
- part104
- part105
- part106
- part107
- part108
- part109
- part110
- part111
- part112
- part113
- part114
- part115
- part116
- part117
- part118
- part119
- part120
- part121
- part122
- part123
- part124
- part125
- part126
- part127
- part128
- part129

- part130
- part131
- part132
- part133
- part134
- LATEST
- mbdump.tar
- mbdump.tar.bz2
- MusicBrainz Dataset Query.sql
- Search Query.sql
- Takedown URL Lookup.xlsx
- Youtube URL in Title Lookup.xlsx
- COPYING
- README
- REPLICATION_SEQUENCE
- SCHEMA_SEQUENCE
- TIMESTAMP
- alternative_release_type
- area
- area_alias
- area_alias_type
- area_gid_redirect
- area_type
- artist
- artist_alias
- artist_alias_type
- artist_credit
- artist_credit_gid_redirect
- artist_credit_name
- artist_gid_redirect
- artist_ipi
- artist_isni
- artist_type
- cdtoc
- country_area
- editor_collection_type
- event
- event_alias
- event_alias_type
- event_gid_redirect
- event_type
- gender
- genre
- genre_alias
- genre_alias_type

- instrument
- instrument_alias
- instrument_alias_type
- instrument_gid_redirect
- instrument_type
- iso_3166_1
- iso_3166_2
- iso_3166_3
- isrc
- iswc
- l_area_area
- l_area_event
- l_area_instrument
- l_area_recording
- l_area_release
- l_area_series
- l_area_url
- l_area_work
- l_artist_artist
- l_artist_event
- l_artist_instrument
- l_artist_label
- l_artist_place
- l_artist_recording
- l_artist_release
- l_artist_release_group
- l_artist_series
- l_artist_url
- l_artist_work
- l_event_event
- l_event_place
- l_event_recording
- l_event_release
- l_event_release_group
- l_event_series
- l_event_url
- l_event_work
- l_instrument_instrument
- l_instrument_label
- l_instrument_url
- l_label_label
- l_label_place
- l_label_recording
- l_label_release
- l_label_release_group

- l_label_series
- l_label_url
- l_label_work
- l_place_place
- l_place_recording
- l_place_release
- l_place_series
- l_place_url
- l_place_work
- l_recording_recording
- l_recording_release
- l_recording_series
- l_recording_url
- l_recording_work
- l_release_group_release_group
- l_release_group_series
- l_release_group_url
- l_release_release
- l_release_series
- l_release_url
- l_series_series
- l_series_url
- l_series_work
- l_url_work
- l_work_work
- label
- label_alias
- label_alias_type
- label_gid_redirect
- label_ipi
- label_isni
- label_type
- language
- link
- link_attribute
- link_attribute_credit
- link_attribute_text_value
- link_attribute_type
- link_creditable_attribute_type
- link_text_attribute_type
- link_type
- link_type_attribute_type
- medium
- medium_cdtoc
- medium_format

- orderable_link_type
- place
- place_alias
- place_alias_type
- place_gid_redirect
- place_type
- recording
- recording_alias
- recording_alias_type
- recording_gid_redirect
- release
- release_alias
- release_alias_type
- release_country
- release_gid_redirect
- release_group
- release_group_alias
- release_group_alias_type
- release_group_gid_redirect
- release_group_primary_type
- release_group_secondary_type
- release_group_secondary_type_join
- release_label
- release_packaging
- release_status
- release_unknown_country
- replication_control
- script
- series
- series_alias
- series_alias_type
- series_gid_redirect
- series_ordering_type
- series_type
- track
- track_gid_redirect
- url
- url_gid_redirect
- work
- work_alias
- work_alias_type
- work_attribute
- work_attribute_type
- work_attribute_type_allowed_value
- work_gid_redirect

- work_language
- work_type