# EXHIBIT 47

to the Declaration of Qifan Huang

PUBLIC VERSION - REDACTED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated, ) ) ) ) ) | CASE NO.: 3.20-cv-04423-JD |

MARIA SCHNEIDER, UNIGLOBE
ENTERTAINMENT, LLC, and AST
PUBLISHING LTD., individually and on behalf
of all others similarly situated,       )

          Plaintiffs,       )

v.       )

YOUTUBE, LLC AND GOOGLE LLC,       )

          Defendants       )

_____ )

YOUTUBE, LLC and GOOGLE LLC,       )

          Counterclaimants,       )

v.       )

PIRATE MONITOR LTD, PIRATE MONITOR
 LLC, AND GÁBOR CSUPÓ,       )

          Counterclaim Defendants.       )

_____ )

CASE NO.: 3.20-cv-04423-JD

**Expert Rebuttal Report of Steven R. Peterson, Ph.D.**

December 29, 2022

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

# Contents

I.   Introduction and Assignment ................................................................................. 1

II.  Basis for Opinions ................................................................................................. 1

   A.   Qualifications ................................................................................................. 2

   B.   Materials Relied Upon ................................................................................... 2

III. Summary of Opinions ........................................................................................... 3

IV.  Background ........................................................................................................... 7

   A.   YouTube's Business ....................................................................................... 7

   B.   YouTube's Revenues ..................................................................................... 8

   C.   YouTube's Costs ............................................................................................ 8

   D.   Class Definitions ............................................................................................ 9

   E.   Plaintiffs' Damages Claims .......................................................................... 10

   F.   Calculation of Copyright Infringement Damages ........................................ 11

V.   Criticisms of Dr. Singer's Disgorgement Opinions and Regression ................... 12

   A.   The Economics of Counterfactual Analyses ............................................... 12

   B.   Dr. Singer's Estimate of Disgorgement Is Flawed and Unreliable .............. 14

     1.   Dr. Singer's Proxies for Allegedly Infringing Content Are Erroneous .................... 15

       a)   Dr. Singer Incorrectly Assumes That All YouTube Videos Removed in Response to a Takedown Notice Are Infringing .......................................................... 15

       b)   Dr. Singer Recognizes That His Proxy for Infringing Content Is Untethered to Class Definitions ........................................................................................ 16

       c)   Dr. Singer's Proxy for Allegedly Infringing Content Based on the Sample of Takedown Notices Fails to Measure Such Content at Any Point in Time ...................... 17

       d)   Dr. Singer's Alternative Estimates of the Amount of Allegedly Infringing Content on YouTube Cannot Be Reliably Generalized Across YouTube ...................... 20

2. Dr. Singer's Assumption that Viewer Time Is Proportional to His Infringing Content Proxy's Percentage of All Content Is Economically Unfounded ......................................... 22

3. Dr. Singer's Multisided-Platform Framework for YouTube Implies His Disgorgement Regression Is Fundamentally Flawed ................................................................. 28

    a) The Economics of Multisided Platforms ................................................ 29

    b) Dr. Singer's Model of YouTube as a Multisided Platform .................................... 30

    c) Dr. Singer's Regression Is Economically Baseless and Its Results Are Unreliable 34

4. Dr. Singer's Disgorgement Methodology Is Flawed .................................... 40

    a) Dr. Singer's Disgorgement Calculation Incorrectly Treats the Error of His Regression's Revenue Predictions as Disgorgement Damages ......................................... 40

    b) Dr. Singer's Disgorgement Calculation Ignores the Impact of Reduced Content When Predicting YouTube's Counterfactual Revenue ................................................... 44

    c) Dr. Singer Ignores YouTube's Incremental Costs When Calculating Disgorgement ........................................................................................................ 47

VI. Dr. Singer's Supporting Regressions Purporting to Demonstrate Indirect Network Effects Are Unreliable and Do Not Support Disgorgement by YouTube ................................................. 48

  A. Dr. Singer's Regression of "Non-Infringing" Advertising Revenue on Content Is Biased and Yields Implausible Results .................................................................. 48

  B. Dr. Singer's Regression Seeking to Explain Viewer Time Spent on YouTube Is Biased and Unreliable Because His Estimates Do Not Account for the Indirect Network Effects Inherent in His Multisided Platform Framework ................................................... 51

VII. Conclusion ................................................................................ 54

## I.    Introduction and Assignment

1.      I have been retained by counsel for Defendants YouTube, LLC and Google LLC (jointly "YouTube") as an expert in this litigation.  I understand that Plaintiffs generally allege that Defendants have engaged in copyright infringement by reproducing, distributing, displaying and/or publicly performing videos through YouTube's video-streaming service.[1]

2.      I have been asked to review the opinions expressed by Dr. Hal J. Singer in the matter *Maria Schneider et al. v. YouTube, LLC et al.*, to review the bases provided for those opinions, and to provide this report setting forth my analysis and opinions regarding Dr. Singer's opinions and methodology, including the reliability of his methods and conclusions.

3.      I am an economist with almost 30 years of experience conducting statistical and economic analyses.  I received my Ph.D. in economics from Harvard University in 1992.  I am an Executive Vice President at Compass Lexecon.  Compass Lexecon is an economics consulting firm that specializes in the economics of competition, finance, and regulation, among other areas.

4.      Compass Lexecon's compensation is not contingent on the opinions I reach, my testimony, or on the outcome of this matter.  Compass Lexecon is being compensated at the rate of $930 per hour for my time working on this matter.  Compass Lexecon is also being compensated at standard hourly rates for staff members who are working under my direction on this matter.

## II.    Basis for Opinions

5.      I have summarized below my educational background, career history, and other relevant qualifications.  My full curriculum vitae is attached as Appendix A.

---

[1]      Expert Report of Hal J. Singer, Ph.D. for Plaintiffs, dated November 17, 2022 ("Updated Singer Report"), ¶ 1.

### A.    Qualifications

6.      I received my A.B. in economics from the University of California, Davis, in 1987 and my Ph.D. in economics from Harvard University in 1992.  While at Harvard, my areas of specialization were economic theory and industrial organization. Industrial organization is the study of the interactions of larger firms that can strategically influence their environments. Industrial organization includes the study of firms' costs and the factors that affect costs. I have also served as an adjunct faculty member in the Department of Economics at Northeastern University where I taught Principles of Economics and courses on the economics of competition, regulation, and public policy.

7.      During my career, I have consulted on the economics of antitrust and competition, mergers, estimation of damages, valuation, regulation, and public policy. I have extensive experience with the economics of intellectual property.  I testified on behalf of the Radio Music License Committee ("RMLC") on issues of market definition and market power in *Radio Music License Committee v. SESAC, Inc., SESAC, LLC, and SESAC Holdings, Inc.*, and I testified on public performance license rates for radio in the subsequent arbitration proceedings.  I addressed similar issues in RMLC's litigation against Global Music Rights ("GMR").  I have also testified before the United States Copyright Royalty Judges, Library of Congress, regarding appropriate rates for digital public performances of sound recordings.

### B.    Materials Relied Upon

8.      In forming my opinions contained in this report, I have relied upon the relevant economic literature, public information regarding YouTube and its related businesses, materials produced as part of this litigation, Dr. Singer's and Dr. Cowan's reports and work papers, and my own knowledge and experience in statistics and economics. A complete list of the materials used to prepare my report is attached in Appendix B.

9.      To the extent that additional documents, testimony, other experts' reports, discovery disclosures, or other information are provided to me, I will review those materials and amend or supplement my opinions and analysis as appropriate.

10.     For purposes of forming my opinions, I have assumed that Plaintiffs' factual allegations regarding copyright infringement are correct, though I have no personal knowledge on this question, nor do I have an opinion regarding the merits of Plaintiffs' legal claims.

### III.     Summary of Opinions

11.     In his updated report, Dr. Singer explains that, as damages for alleged infringement by Defendants, Plaintiffs seek disgorgement of any profits that Defendants derived from both (1) advertising or subscription revenues that YouTube obtained from the playback of videos that included allegedly infringing content, and (2) additional profits that YouTube obtained from the presence of non-infringing content resulting from the alleged "spillover effects" to which the allegedly infringing content contributed.[2]  Dr. Singer's analysis of disgorgement damages purports to determine the counterfactual amount of revenue that YouTube would have earned had it not engaged in the alleged infringement of the proposed class members' content.  He calculates disgorgement as the difference between the revenue that YouTube earned in the "actual" scenario with the alleged infringement and the smaller amount of revenue that he estimates YouTube would have earned in the counterfactual scenario absent the alleged infringement.

12.     For the reasons summarized below, Dr. Singer's counterfactual analysis of what YouTube's revenue would have been absent the alleged infringement has multiple flaws that render it unreliable.  Dr. Singer's analysis does not support disgorgement in any amount.

13.     Disgorgement damages must be the result of YouTube's making available and performing the allegedly infringing content.  In other words, there must be a causal connection between the allegedly infringing content and the profits to be disgorged.  Here, Dr. Singer ignores this fundamental causation requirement.  In fact, his analysis is not even tied to an estimate of proposed class members' allegedly infringing content.  Instead of measuring the proposed class members' allegedly infringed content on YouTube, Dr. Singer estimates the total number of videos that were subject to takedown notices from July 2017 through October 2022.

---

[2]          See, *e.g.*, Updated Singer Report, ¶¶ 3, 17.

Highly Confidential - Attorneys' Eyes Only

But successful takedown notices are not a reasonable or reliable proxy for infringing content on YouTube because YouTube's removal of a video upon receipt of a takedown notice does not imply that the video is actually infringing, merely that someone has completed a takedown request alleging infringement.[3]  Nevertheless, Dr. Singer's disgorgement calculation rests on that inaccurate assumption.

14.     Dr. Singer admits that the appropriate input into his disgorgement model is the "number of unique URLs subject to recovery for each of the CI [copyright infringement] classes,"[4] but he instead bases his primary disgorgement calculation on what he characterizes as a "proxy" in his report.[5]  Dr. Singer's "proxy" for allegedly infringing content is not related to Plaintiffs' definitions of proposed copyright infringement classes.[6]

15.     Even if we were to assume that every video identified in a takedown notice, in fact, infringes a proposed class member's copyright, the starting point of Dr. Singer's analysis – that 1.32% of all videos on YouTube were infringing – would still be unreliable.  Dr. Singer calculates that percentage by dividing the estimated total number of takedown notices *over a period of more than five years* by an estimated total number of videos on YouTube *at a specific point in time*.  This calculation does not measure the percentage of allegedly infringing videos available to attract viewers on YouTube at any point in time – the relevant metric.  His alternative estimates of the percentage of allegedly infringing content on YouTube similarly fail to measure the relevant percentage of allegedly infringing content on YouTube at any time.  In

---

[3]     Declaration of Chenyuan Zhu in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, Dkt. 198 ("Zhu Declaration"), ¶ 3.

[4]     Updated Singer Report, ¶ 103.

[5]     Updated Singer Report, ¶ 104.

[6]     Updated Singer Report, ¶ 103 ("I understand that plaintiffs have engaged another expert, Dr. Charles Cowan, to identify the members of the copyright infringement classes and estimate the number of videos on YouTube that have infringed the copyrights of members of those classes and provide a basis for assessing damages.  When Dr. Cowan has calculated the number of unique URLs subject to recovery for each of the CI [copyright infringement] Classes, I can apply this same methodological framework and analysis to estimate the profits generated by the unique URLs subject to recovery for each of the CI Classes.").

Highly Confidential - Attorneys' Eyes Only

short, Dr. Singer's entire approach to measuring the quantity of allegedly infringing videos overstates the percentage of allegedly infringing videos on YouTube and is unreliable.

16.     Without any basis, Dr. Singer assumes that his 1.32% "proxy" for allegedly infringing content "likewise accounts for 1.32% of all viewer time spent on the platform"[7] and that the removal of those 1.32% of allegedly infringing videos on YouTube would lead to a corresponding 1.32% reduction in YouTube watch time. But he provides no support for that assumption, which ignores the fact that viewers could substitute the viewing of allegedly infringing videos with the viewing of non-infringing videos that remain on YouTube with the same or similar content as the removed videos.  In fact, removing an allegedly infringing video does not necessarily remove the underlying content.  For example, the removal of an allegedly infringing copy of a video including the sound recording "Eye of the Tiger" by Survivor does not mean that viewers will leave YouTube in order to find that sound recording elsewhere.  Instead, viewers would be able to watch a licensed video containing the same song on YouTube.[8]

17.     Dr. Singer purports to show using a regression analysis that the reduction in viewer time that he assumes will result from removing allegedly infringing content would reduce YouTube's advertising revenue.  As described below, Dr. Singer's regression is flawed, and his conclusion does not survive the single most basic and necessary correction to his regression.  His conclusion is also inconsistent with the economics driving YouTube's advertising revenue.  YouTube has more opportunities to place advertisements on its service than advertisers demand to fill those ad-placement opportunities.  As a result, there is no economic basis to assert that the small reduction in viewer time that Dr. Singer assumes would result from the removal of allegedly infringing content on YouTube (which Dr. Singer claims accounts for a mere 1.32% of all videos on YouTube) would leave YouTube with too few opportunities to satisfy its advertisers' demands.  If any ad-placement opportunities were lost from the reduction in viewer time that he assumes, YouTube could run the same ads in currently unused advertising opportunities.  Dr.

---

[7]     Updated Singer Report, ¶ 104.

[8]     https://www.youtube.com/watch?v=btPJPFnesV4.

Singer's opinion that reduced content would lead to reduced viewing time and to reduced advertising revenue does not withstand either theoretical or empirical economic scrutiny.

18.     Dr. Singer's analysis also improperly assumes that allegedly infringing and non-infringing videos earn the same average revenues, but that is wrong.  Compared to non-infringing content, allegedly infringing videos earn less revenue on average.  Moreover, monetization depends on the location of the viewer.  Views of videos in developing markets like India generally generate less revenue per view than views in developed markets such as the United States.  Thus, Dr. Singer's implicit assumption that all videos can be treated the same as the average YouTube video implicitly assumes infringement happens uniformly across YouTube's global presence without any demonstration that such is the case.

19.     In addition, Dr. Singer's model incorporates multiple errors that render it unreliable.  For example, Dr. Singer's model generates the result that YouTube should disgorge roughly $117 million even if nothing on YouTube were infringing, *i.e.*, even if YouTube has not infringed any proposed class member's copyright.

20.     Further, Dr. Singer includes an explanatory variable in his disgorgement regression representing "content" on YouTube but ignores the effect of reduced content on the counterfactual revenue predictions that his regression generates.  Having included "content" as an explanatory variable in his regression, Dr. Singer cannot ignore that variable when using the regression to predict revenue in a scenario where the key assumption is that YouTube has *less content* (because allegedly infringing content is removed in the counterfactual scenario).  Correcting this fundamental error in Dr. Singer's disgorgement regression leads to the result that in the counterfactual scenario without alleged infringement, YouTube is predicted to have *higher* revenue than in the actual scenario with alleged infringement.  Mathematically, this implies negative disgorgement, or practically, that Dr. Singer's model justifies no disgorgement.

21.     Dr. Singer also fails to account for any of YouTube's incremental costs when estimating disgorgement.  If YouTube earned incremental revenue as the result of alleged infringement, disgorgement should account for YouTube's costs of earning that revenue.  YouTube's variable

Highly Confidential - Attorneys' Eyes Only

costs include all or portions of content acquisition costs, cost of sales, infrastructure, and operating costs.  These costs amount to approximately ▮▮ of YouTube's advertising revenue.

22.     Dr. Singer runs additional regressions to demonstrate the purported interdependence of the advertisers, content creators, and viewers that interact through YouTube.  But these regressions are inherently flawed and biased based on Dr. Singer's own description of YouTube as a multisided platform.  They yield economically implausible results and do not provide support for disgorgement in any amount.

23.     As explained in this report, Dr. Singer's disgorgement methodology and calculations are inherently flawed and do not meet the standards of reliability that are generally accepted in economics.

**IV.     Background**

> **A.     YouTube's Business**

24.     YouTube is a video-sharing platform that allows users to upload, share, and view videos. YouTube was founded in 2005 and acquired by Google in 2006.  YouTube's streaming service allows anyone with an internet connection to create and share their own videos on the platform. Users upload more than 500 hours of content to YouTube every minute.[9]  While there are billions of videos on YouTube, the vast majority of them generate few, if any views at all.[10] Instead, a small subset of popular videos account for a disproportionately high percentage of views and watch time.[11]

---

[9]      https://blog.youtube/press/.

[10]     GOOG-SCHNDR-00034775: 785 ("For perspective: ▮▮ of videos uploaded to YouTube have been watched fewer than ▮▮ times, and these videos account for less than ▮▮ of total watch time.").

[11]     GOOG-SCHNDR-00034775: 785 ("▮▮ of the raw number of videos uploaded to YouTube . . . account for more than ▮▮ of total watch time."); see also https://blog.youtube/creator-and-artist-stories/10-years-of-youtubes-billion-views-club-psy-gangnam-style/.

Highly Confidential - Attorneys' Eyes Only

### B.  YouTube's Revenues

25.  YouTube primarily generates revenue through advertising, although it also provides various subscription-based services like YouTube Premium and YouTube TV.[12]  In 2020, YouTube reported over $19 billion in ad revenue.[13]  Advertisers start a campaign on YouTube by setting a budget, a bidding strategy that meets its goals (such as maximizing views, impressions, actions, or conversion), and the type of audience the advertisers wish to reach or the general categories of videos they want their ads to show alongside.[14]  YouTube then uses a variety of automated systems to serve and display these ads.[15]

### C.  YouTube's Costs

26.  YouTube's expenses include content acquisition, cost of sales, infrastructure costs, and operating expenses.[16]  For YouTube's advertising-supported business, the most significant of these costs are content acquisition costs, which represent more than ████████ of YouTube's ad revenue.[17]  YouTube's content acquisition costs are high because YouTube shares the ad revenue it earns with content creators.  Uploaders who participate in the YouTube Partner Program ("YPP") can monetize their videos through advertising by receiving a portion of the advertising revenue.[18]  YouTube has also invested in various programs to attract top content creators, such as

---

[12]  https://www.youtube.com/howyoutubeworks/our-commitments/sharing-revenue/. Dr. Singer mentions subscription revenues, but his report does not contain any actual discussion of how YouTube's subscription revenues could be attributable to allegedly infringing videos.  In Dr. Singer's words, the "primary focus" of his report is to analyze YouTube's purported "ill-gotten advertising revenues." Updated Singer Report ¶ 28. As a result, I do not address YouTube's subscription revenues in my report.

[13]  GOOG-SCHNDR-00054422.

[14]  https://support.google.com/google-ads/answer/2375497.

[15]  https://support.google.com/youtube/answer/7438625.

[16]  GOOG-SCHNDR-00054422.

[17]  GOOG-SCHNDR-00054422.

[18]  https://support.google.com/youtube/answer/72857. There are over 2 million channels currently in the YPP. https://blog.youtube/news-and-events/supporting-the-next-wave-of-creative-entrepreneurs/

To be eligible to participate in the YPP (and thereby generate revenue on YouTube), uploaders must meet various requirements, such as following all the YouTube channel monetization policies, having more than 4,000 valid public watch hours in the 12 months before joining the program, and having more than 1,000 subscribers. https://support.google.com/youtube/answer/72851.

setting up funds to encourage the making of short-form videos and investing in programs to promote independent music.[19]  Across its businesses, for the three years before June 2022, YouTube paid over $50 billion to creators, artists, and media companies who contributed and/or licensed content to the site,[20] and YouTube paid $6 billion to the music industry from July 2021 to June 2022 alone.[21]

### D.    Class Definitions

27.    The following sets forth Plaintiffs' definitions of each proposed class, based on Plaintiffs' motion for class certification. The class definitions that Plaintiffs offered in their First Amended Complaint differ from those that Plaintiffs offered in their class certification briefing.[22] I also understand that the Court vacated Plaintiffs' class certification motion.[23]  However, I assume that Plaintiffs' class definitions in any future motion for class certification will track those provided in their initial class certification motion.

28.    **Registered Works Infringement Class:** "All persons who own copyrights in one or more works: 1) registered with the United States Copyright Office; 2) contained in a video that was displayed on YouTube and then removed from YouTube due to a successful Takedown Notice; and 3) contained in a video that was displayed on YouTube subsequent to the first successful Takedown Notice and then removed from YouTube due to a second successful Takedown Notice that was submitted on or after July 2, 2017."[24]

29.    **Foreign Unregistered Works Infringement Class:** "All persons who own copyrights in one or more works: 1) first published outside the United States; 2) contained in a video that was

---

[19]    See, *e.g.*, https://blog.youtube/news-and-events/introducing-youtube-shorts-fund/; https://blog.youtube/creator-and-artist-stories/youtube-music-foundry-class-of-2022-announcement/.

[20]    https://blog.youtube/news-and-events/supporting-the-next-wave-of-creative-entrepreneurs/.

[21]    https://blog.youtube/creator-and-artist-stories/6-billion-paid-to-the-music-industry-in-12-months/.

[22]    Compare First Amended Class Action Complaint, Dkt. 99 ("First Amended Complaint"), ¶ 103, with Plaintiffs' Motion for Class Certification [SEALED], Dkt. 190 ("Plaintiffs' Mtn for Class Cert."), pp. 3-4.

[23]    See Minute Order from the Court, December 15, 2022, Dkt. 213 ("Minute Order").

[24]    Plaintiffs' Mtn for Class Cert., pp. 3-4.

9

displayed on YouTube and then removed from YouTube due to a successful Takedown Notice; and 3) contained in a video that was displayed on YouTube subsequent to the first successful Takedown Notice and then removed from YouTube due to a second successful Takedown Notice that was submitted on or after July 2, 2017."[25]

30.     **International Standard Recording Code ("ISRC") Class:** "All persons who own copyrights in one or more digital form sound recordings of musical works that: 1) contained an ISRC code; 2) were a component of  a video that was displayed on YouTube and then removed from YouTube due to a successful Takedown Notice; and 3) on or after July 2, 2017, were displayed on YouTube with respect to a video that included such sound recordings of musical works without including or referencing the associated ISRC code."[26]

31.     **Clip Filename Class:** "All persons who own copyrights in one or more works: 1) contained in a video that was displayed on YouTube and then removed from YouTube due to a successful Takedown Notice; 2) on or after July 2, 2017, contained in a video uploaded to YouTube that had an associated Clip Filename ("CLFN") field populated with copyright management information; and 3) displayed on YouTube with respect to a video that included such work(s) without including or referencing the associated CLFN or with the copyright management information altered."[27]

### E.     Plaintiffs' Damages Claims

32.     According to Dr. Singer, Plaintiffs seek two categories of damages: (1) "disgorgement of any profits that Defendants derived from" the alleged infringement; and (2) statutory damages.[28] The former consists of (a) "revenues from ads served on [allegedly infringing] content"; and (b) "incremental YouTube profits from the presence of non-infringing content resulting from the

---

[25]     Plaintiffs' Mtn for Class Cert., p. 4.

[26]     Plaintiffs' Mtn for Class Cert., p. 4.

[27]     Plaintiffs' Mtn for Class Cert., p. 4.

[28]     Updated Singer Report, ¶¶ 3, 6.

spillover effects to which the [allegedly infringing] content contributed."[29] Dr. Singer refers to the first type of revenues as "proximate disgorgement revenues," while he refers to the latter as "network effect disgorgement revenues."[30]

33.     Plaintiffs seek the following categories of damages for each of the following proposed classes:

      a.  Registered Works Infringement Class – Either statutory damages, or disgorgement of Defendants' profits derived from the alleged infringement.

      b.  Foreign Unregistered Works Infringement Class – Disgorgement of Defendants' profits derived from the alleged infringement.

      c.  CMI Classes (the ISRC Class and the Clip Filename Class) – Statutory Damages.[31]

### F.  Calculation of Copyright Infringement Damages

34.     I have been instructed by Defendants' counsel that to calculate damages associated with copyright infringement, assuming U.S. copyright law applies to the infringement, one would first need to calculate the loss, if any, to the copyright holder.  That is, one would need to ascertain the amount of profit the copyright holder lost as a result of the infringement from, for example, lost sales or licensing fees.  Next, one would need to calculate any non-duplicative profits the infringer earned that were attributable to that specific infringement.  That would require addressing multiple considerations, including determinations of (1) causation; (2) apportionment; and (3) the Defendant's variable costs.  One would then need to exclude any portion of the Defendant's profits that are accounted for in the calculation of the copyright holder's losses.

---

[29]     Updated Singer Report, ¶¶ 3, 72.

[30]     Updated Singer Report, ¶¶ 72-73.

[31]     Plaintiffs' Mtn for Class Cert., pp. 20-21. I note that while Plaintiffs assert that members of the CMI Classes "may elect between actual and statutory damages," neither Dr. Cowan nor Dr. Singer suggests a methodology to compute actual damages for the CMI Classes.

35.     For example, if a 5-minute exercise video on YouTube were alleged to contain an unauthorized 30-second clip of the song "Eye of the Tiger" by Survivor, determination of the damages associated with alleged infringement by YouTube would require inquiry into at least: (a) the money the songwriter was earning in connection with that song (*e.g.*, licensing rates); (b) the money that YouTube earned in connection with advertisements that ran on the allegedly infringing video; (c) whether inclusion of the song in the video was a cause of that advertising revenue; (d) how much of the total advertising revenue for the video should be apportioned to the song as opposed to other aspects of the video; (e) accounting for YouTube's hosting, engineering, and content acquisition costs; and (f) what of that allocated YouTube profit is not already accounted for in the copyright holder's losses.

36.     Dr. Singer makes no attempt to calculate any losses that the named Plaintiffs or potential class members may have suffered as a result of the alleged infringement. Nor does he address the other video- and work-specific inquiries discussed above. Instead, he only attempts to calculate disgorgement – the amount of revenue YouTube supposedly earned.

## V.     Criticisms of Dr. Singer's Disgorgement Opinions and Regression

37.     Below, I briefly describe the steps required to perform an economically sound counterfactual analysis.  I then address the flaws of the counterfactual analysis and regression model that Dr. Singer uses to estimate disgorgement damages.  The bottom line is that his disgorgement regression, if taken at face value, **implies that removing allegedly infringing content would *raise* rather than *lower* YouTube's revenue**.  Therefore, Dr. Singer's own disgorgement regression indicates that there should be no disgorgement.  This result demonstrates that Dr. Singer's opinions regarding disgorgement are inherently flawed and unreliable.

### A.     The Economics of Counterfactual Analyses

38.     Dr. Singer uses a counterfactual analysis to estimate the profit that YouTube supposedly received as the result of alleged infringement and that should be disgorged. Counterfactual analysis is a technique generally used to estimate a plaintiff's damages – whether injury directly to the plaintiff or benefit to the defendant to be disgorged to the plaintiff – relative to the scenario

12

Highly Confidential - Attorneys' Eyes Only

where the alleged infringement did not occur.  The analysis is "counterfactual" because it proceeds by comparing events and outcomes as they occurred (*i.e.*, the "actual" scenario) to outcomes in a counterfactual scenario (*i.e.*, the "but for" or "counterfactual" scenario) in which Defendants do not engage in the alleged infringement.

39.    Here, Dr. Singer attempts to assess the effects of the alleged infringement by evaluating YouTube's financial position had it not engaged in the alleged infringement relative to YouTube's financial position in the actual scenario with the alleged infringement.  The alleged infringement is assumed to have occurred for purposes of the calculation.  The goal is to isolate the financial impact of the alleged infringement.  Importantly, the only difference between the actual and counterfactual scenarios is that the Defendants do not engage in the alleged wrongful conduct.[32]

40.    In this matter, the actual and counterfactual scenarios differ in that as the content available on YouTube includes allegedly infringing videos in the actual scenario, while in the "but for" scenario, those videos allegedly containing proposed class members' works would not have been available for viewing – at least after the first takedown notice for those works.[33]  The amount of profit[34] that YouTube earned in the actual scenario can be observed from financial data.  In contrast, YouTube's profit in the counterfactual analysis is not directly observed and must be estimated using a reliable model.  For example, a regression that reliably predicts a firm's profits in the actual scenario can be used to predict the firm's profits in the counterfactual

---

[32]    See, *e.g.*, Allen, Hall, and Lazear, "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence*, 3rd ed., Federal Judicial Center and National Research Council, 2011, p. 432.

[33]    Per the class definitions in this case, infringed videos in the copyright infringement class must be the basis of two successful takedown notices.  See paragraphs 28-31.

[34]    Dr. Singer seeks to measure the revenue associated with the alleged infringement.  The change in revenue is not the same as YouTube's profit or gain from the alleged infringement, which would also account for YouTube's costs.  This is particularly the case when content acquisition costs average more than ■■ of YouTube's revenue.  These costs are revenue that is shared with content providers.  See GOOG-SCHNDR-00054422.

13

Highly Confidential - Attorneys' Eyes Only

scenario.  This estimation is done by using the regression coefficients to estimate profit based on the values of explanatory variables that would occur in the counterfactual scenario.

### B.    Dr. Singer's Estimate of Disgorgement Is Flawed and Unreliable

41.    At its core, Dr. Singer's opinion is that the allegedly infringing videos – which generated a relatively small amount of revenue in and of themselves – are responsible for YouTube's earning over forty times more revenue on other, non-infringing videos.  Dr. Singer estimates the monthly revenue earned by allegedly infringing videos when building his regression dataset. Using the method that Dr. Singer developed to estimate the total number of allegedly infringing videos including months without sample data, it is possible to estimate the revenue on allegedly infringing videos for all months.[35]  Using Dr. Singer's approach to scale the sample of takedown notices to the level of all allegedly infringing videos, allegedly infringing videos in total generated approximately ▮▮▮▮▮▮ dollars in Dr. Singer's "proximate disgorgement revenues" between July 2017 and December 2020.[36] However, according to Dr. Singer, the presence of these allegedly infringing videos purportedly allowed YouTube to earn a total of $640 million in revenue during the same period (*i.e.*, revenue YouTube would not have earned absent the presence of the allegedly infringing videos).[37]

42.    Put differently, Dr. Singer's opinion is that the presence of allegedly infringing videos that earned ▮▮▮▮▮▮ in actual revenue (before they were removed from YouTube) allowed YouTube to earn nearly ▮▮▮▮▮▮ in ad revenue attributable to indirect network effects on other, non-infringing videos.[38]

---

[35]    Updated Singer Report, ¶ 103 n.123.

[36]    See my workpapers.

[37]    Updated Singer Report, Table 7.

[38]    Updated Singer Report, ¶ 68 ("The methodology I apply here aims to isolate the revenues that YouTube obtained as a result of the presence of Infringing Content on its site.  Such revenues result through either of the two avenues I described in paragraph three of this report: (1) from advertisements that YouTube served on Infringing Content, and (2) from advertisements that YouTube served on non-infringing content that YouTube would not have obtained but-for the presence of Infringing Content.").

14

43.     To reach this implausible result, Dr. Singer (1) uses an unfounded "proxy" for allegedly infringing content that overstates the allegedly infringing content's percentage of all content on YouTube, (2) assumes without any basis that viewer time and his proxy for content change proportionally, (3) applies the assumed reduction in viewer time to a flawed regression analysis that does not comport with the multisided platform framework he uses to describe YouTube, and (4) uses the wrong measure of YouTube's revenue in the actual scenario when calculating the amount of disgorgement in the counterfactual.

### 1.     Dr. Singer's Proxies for Allegedly Infringing Content Are Erroneous

#### a)     *Dr. Singer Incorrectly Assumes That All YouTube Videos Removed in Response to a Takedown Notice Are Infringing*

44.     Dr. Singer's first step in his counterfactual analysis is to measure the amount of content on YouTube that allegedly infringes a proposed class member's copyright.  Based on the sample of takedown notices produced by YouTube,[39]  Dr. Singer estimates that between July 2017 and October 2022, there were approximately 39.7 million videos or "unique infringing URLs."[40]

45.     One of Dr. Singer's key underlying assumptions in reaching this estimate is that YouTube's removal of a video upon receipt of a successful takedown notice necessarily means that the video is infringing.  But Dr. Singer offers no justification for that assumption, and he has no basis to assume that YouTube's removal of a video in response to a successful takedown notice establishes that the underlying video was infringing.

46.     Contrary to Dr. Singer's assumption, Chenyuan Zhu, a Product Manager for YouTube who previously led YouTube's copyright operations team, explains that YouTube uses "a largely automated process to review each notice to determine whether they contain the information and representations required for a DMCA notice."[41]  Moreover, Mr. Zhu explains that YouTube's

---

[39]     See "Takedown Notice Data HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.csv."

[40]     Updated Singer Report, ¶ 104 & n.123.

[41]     Zhu Declaration, ¶ 2.

process for removing videos in response to a takedown request does not include a determination that the video is infringing:

> "[YouTube] is in no position to ultimately determine issues such as whether the party sending the notice is, in fact, the owner or agent of the owner claiming the copyright interest asserted in the notice; whether the video the notice claims is infringing is, in fact, an infringement; or whether an allegedly infringing video is, in fact, authorized (*e.g.*, via a license agreement)."[42]

47.     In short, Dr. Singer's failure to provide a basis for his assumption that videos subject to successful takedown notices are definitively infringing implies that he has not done the analysis necessary to show that the inputs to his disgorgement calculation correctly measure infringement.  This oversight renders his proxy for the amount of infringing content on YouTube unreliable.

> ### b)     *Dr. Singer Recognizes That His Proxy for Infringing Content Is Untethered to Class Definitions*

48.     Dr. Singer reports that he intends to rely on Dr. Cowan to "identify the members of the copyright infringement classes and estimate the number of videos on YouTube that have infringed the copyrights of members of those classes *and provide a basis for assessing damages.*"[43]  However, Dr. Singer's estimate of allegedly infringing content does not reflect any of the filters that Dr. Cowan describes he would apply to identify potential class members and the members' infringed copyrights.[44]  Dr. Singer makes no attempt to constrain his calculation to

---

[42]     Zhu Declaration, ¶ 3.

[43]     Updated Singer Report, ¶ 103.

[44]     Expert Report of Charles D. Cowan, Ph.D., dated November 17, 2022 ("Updated Cowan Report"), ¶¶ 79-80; Expert Report of Charles D. Cowan, Ph.D., dated September 1, 2022 ("Initial Cowan Report"), ¶ 14 ("I will develop a methodology to estimate from the 90 and 30 day samples provided:  the size of each Class, the total damages for the Copyright Infringement Class, the total number of possible statutory violations for the Registered Works Class, and the total number of possible statutory violations for the ISRC Class and CLFN Class based on standard sampling methodologies.").  Updated Cowan Report, ¶ 63.  In his updated report, Dr. Cowan explains that he cannot make the calculations he described in his initial report.  Updated Cowan Report, § VI.

Highly Confidential - Attorneys' Eyes Only

potential class members in this case or to copyrights that are the basis of two or more takedown requests. Instead, Dr. Singer assumes that *every URL* in *any takedown notice* is a relevant infringement for purposes of disgorgement.[45] Thus, Dr. Singer's estimate fails to account for either Plaintiffs' proposed class definitions or other limitations that would be imposed by Dr. Cowan's proposed methodology and the number of videos that allegedly infringe those potential class members' works, which purportedly would "provide a basis for assessing damages."[46] Without information from Dr. Cowan regarding the sizes of the proposed classes and the number of videos that allegedly infringe those potential class members' works, Dr. Singer's estimate of the percentage of allegedly infringing content is upwardly biased by an unknown amount and cannot be used to estimate disgorgement reliably and Dr. Singer recognizes this upward bias.[47]

   c) ***Dr. Singer's Proxy for Allegedly Infringing Content Based on the Sample of Takedown Notices Fails to Measure Such Content at Any Point in Time***

49. Dr. Singer's counterfactual analysis uses the percentage of allegedly infringing content on YouTube as an input.[48] To estimate the percentage of allegedly infringing videos on YouTube, Dr. Singer relies on his estimate of the total number of videos removed as the result of takedown notices (the numerator) and an estimate of the number of videos available on YouTube of ███████ (the denominator).[49] Dr. Singer concludes that 1.32% of YouTube videos are allegedly infringing (*i.e.*, 39.7 million divided by ██████ is 1.32%).[50] This percentage is not a

---

[45] For example, Plaintiffs' definitions for the Infringement Classes require that each work have been the subject of a first, successful takedown notice and then reappeared on YouTube in a different video after July 2, 2017. See Plaintiffs' Mtn for Class Cert. pp. 3-4.

[46] Updated Singer Report, ¶ 103.

[47] Updated Singer Report, ¶ 105 ("The proxy overestimates Infringing Content because it includes takedown notices filed on behalf of copyright claimants who are not members of either the Registered Works Infringement Class or the Foreign Unregistered Works Infringement Class.").

[48] Updated Singer Report, ¶ 108.

[49] Updated Singer Report, ¶ 104 & n.124.

[50] Updated Singer Report, ¶ 104.

valid proxy for the percentage (share) of allegedly infringing content because the numerator of the percentage is a count of videos that were available on YouTube over a period of more than five years and the denominator is an estimate of the number of videos available at a specific point in time.

50.     To calculate a valid share of allegedly infringing content, the numerator and denominator need to measure the same concept.  In the context of Dr. Singer's estimate of the share of allegedly infringing content on YouTube, the denominator should be the number of videos that a viewer could access on YouTube *at a particular time* and the numerator should be the number of allegedly infringing videos that a viewer could access on YouTube *at the same particular time*. However, the numerator of Dr. Singer's percentage is something entirely different.  It is Dr. Singer's estimate of the total number of unique video URLs removed as the result of a takedown request *over the period from July 2017 through October 2022*.[51]  At any given point in time, many of the videos subject to takedown requests would not have been available because they had been removed from YouTube or because they had not yet been uploaded.  For example, a video removed in 2017 would not be available to attract viewers and earn ad revenue during 2018-2020 when it is unavailable on the service.  Obviously, a particular video can attract viewer attention and earn revenue only *when it is available on YouTube*.  Therefore, a relevant measure of allegedly infringing videos on YouTube must measure the allegedly infringing videos available at a particular point in time.  The ratio of the total number of videos taken down between July 2017 and October 2022 divided by the total videos available at a single point in time does not measure the percentage of videos available to earn revenue on YouTube at any particular time during the damages period.[52]

---

[51]     Updated Singer Report, ¶ 104.

[52]     Note that not all the videos in the takedown sample remained taken down.  As described below, some takedown requests were rescinded, and the videos were restored to YouTube and remain available.  These videos presumably do not infringe a copyright.  See https://support.google.com/youtube/answer/2807691?hl=en for a discussion of retraction of copyright infringement claims.

18

Highly Confidential - Attorneys' Eyes Only

51.     As a result of this error, Dr. Singer's estimate of allegedly infringing content could be too large by a significant amount.  For illustration purposes, if allegedly infringing videos are available on YouTube for only six months on average (rather than the 64 months that Dr. Singer assumes) before removal, the amount of allegedly infringing content available on YouTube at any time would be less than one-tenth of Dr. Singer's estimate.  If allegedly infringing videos are typically identified and removed within a month, then only one month's worth of videos subject to takedown notices would be available on YouTube at any time and Dr. Singer's estimate that 1.32% of videos are allegedly infringing would be roughly 64 times too large.

52.     In addition to creating a conceptually flawed "proxy" for the percentage of allegedly infringing videos on YouTube, the inputs that Dr. Singer uses to develop this "proxy" are themselves biased and unreliable.  In particular, Dr. Singer uses nonstandard methods both to reach the estimate of 39.7 million videos from the sample data and to obtain monthly estimates of the count of takedown notices for his regression analyses.  He then extends his flawed estimate outside of Dr. Cowan's investigation period.

53.     Dr. Singer's method for calculating the numerator in his proxy does not conform with standard methods.  Dr. Singer estimates the number of takedown requests in a month by multiplying the average daily number of takedown requests in the month by the number of days in the month.[53]  He then uses a regression to estimate the number of takedown notices in months that were not sampled and outside of the sample period.[54]  The standard approach to estimating the total number of unique takedown notices is to divide the number of unique takedown notices by the probability of being sampled.[55]  Dr. Cowan indicates that the probability of a sample day

---

[53]     See Updated Singer Report workpapers, "5- Econometric Modeling-with Table Output.sas."

[54]     Updated Singer Report, ¶ 104 n.123.

[55]     The standard approach to estimating the total number of takedown notices from a sample is to divide the number in the sample by the probability the observation is selected.  See, *e.g.*, Sharon L. Lohr, Sampling Design and Analysis, 2nd Ed. Brooks/Coal Cengage Learning, 2010, pp. 225-226.  See Updated Singer Report, footnote 123 for a description of the method Dr. Singer used to estimate the number of allegedly infringing videos.

Highly Confidential - Attorneys' Eyes Only

being selected is 90/1,826 (*i.e.*, 90 sample days out of an investigation period of 1,826 days).[56]
Using the standard approach yields 36.2 million videos as having a takedown notice associated
with them between July 2, 2017, and July 1, 2022.

54.     Dr. Singer's estimate that there are ███████ videos on YouTube is also unreliable.
Dr. Singer took this range from the deposition testimony of a Google employee, but that
employee "testified that he did not know how many videos there are on YouTube."[57]  Moreover,
when faced with an estimated range of ██████ videos, Dr. Singer does not choose the upper
bound or the midpoint as his estimate.  He chooses the lower bound of the estimated range,
which yields the highest estimate of the percentage of YouTube content that is allegedly
infringing and yields the highest estimate of disgorgement.

55.     Finally, Dr. Singer uses his estimate that allegedly infringing content constitutes 1.32%
of content on YouTube no matter the time period that he examines for disgorgement.[58]

> ### d)     Dr. Singer's Alternative Estimates of the Amount of Allegedly Infringing Content on YouTube Cannot Be Reliably Generalized Across YouTube

56.     Dr. Singer reports that counsel for Plaintiffs asked him to "estimate the revenue
attributable to all videos on the platform that infringe copyrighted works, regardless of whether
they have been identified and removed from the platform through the takedown notice
process."[59]  Such estimates are not limited to infringement of potential class members'

---

[56]     Dr. Cowan reports that the investigation period covered by his survey is 1,826 days, which appears to cover the period from July 2, 2017, through July 1, 2022.  Updated Cowan Report, ¶ 63.  Note that Dr. Cowan has not described his sampling procedure, which could imply a different method for scaling the sample total to the total during the investigation period to the extent days in different time periods were sampled with different probability.

[57]     Updated Singer Report, ¶ 104 n.124.

[58]     Updated Singer Report, Tables 7 and 8. This approach is incorrect because in the context of a disgorgement calculation that ends as of December 2020, many of the allegedly infringing videos that were subject to a takedown notice during January 2021 through October 2022 likely would not be available on YouTube and could not have been the source of revenues subject to disgorgement.

[59]     Updated Singer Report, ¶ 106.

copyrights as the classes have been defined.  Dr. Singer provides estimates of the percentage of allegedly infringing content on YouTube from two sources.  Neither can be generalized across YouTube during the damages period at issue here.

57.     The first source, *Digital Music News*, reported on analysis from Midia Research that found "just 2% of music video content on YouTube is actually infringing."[60]  This estimate is not reliable for estimation of disgorgement in this matter because it is not clear what methodology was used to reach the estimate or precisely what was measured.  The estimate is from no later than mid-2016, which is prior to the damages period in this matter.  Moreover, the allegedly infringing content in this case is not limited to music videos, but this particular estimate is limited to music videos.  Based on these considerations, there is no economic basis to assume that if 2% of music video content on YouTube circa 2016 was "actually infringing," then 2% of all content on YouTube between 2017 and 2022 is also actually infringing.

58.     Dr. Singer identifies another source, *Digital Trends*, that cites another study that reported 6% to 10% allegedly infringing content on YouTube.[61]  This study was performed by Vidmeter.com and reportedly analyzed the share of the 6,725 most popular videos on YouTube that were removed as the result of a request by a copyright holder.[62]  The article that Dr. Singer cites for this study is 15 years old.  As a result, it does not account for either the substantial licensing efforts that YouTube has undertaken,[63] or the set of copyright management tools

---

[60]     Updated Singer Report, ¶ 107 & n.125 (quoting Paul Resnikoff, "99.5% of All Infringing Music Videos are Resolved by Content ID, YouTube Claims," *Digital Music News*, Aug. 8, 2016, https://www.digitalmusicnews.com/2016/08/08/copyright-problems-resolved-content-id/).

[61]     Updated Singer Report, ¶ 107.

[62]     Geoff Duncan, "Infringing Videos Not Big on YouTube?" *Digital Trends*, Apr. 5, 2007, https://www.digitaltrends.com/home/infringing-videos-not-big-on-youtube/.

[63]     See, *e.g.*, Declaration of Joanne Suk in Support of YouTube, LLC and Google LLC's Motion for Summary Judgment as to Plaintiff Maria Schneider (Dkt. 164-2), pp. 1-2.

Highly Confidential - Attorneys' Eyes Only

YouTube has developed for copyright owners, such as Content ID and Copyright Match Tool.[64] The analysis was also limited to top videos on YouTube, which are not representative of all videos on YouTube.[65]  Thus, this study is both stale and narrowly focused on an unrepresentative sample limited to top videos.  It cannot be reliably generalized to YouTube as a whole. Moreover, the Vidmeter.com report itself explicitly cautions against generalizing the results of the study to YouTube as a whole: "*This report is not designed to provide any exact numbers which can be extrapolated across YouTube's entire network, but rather to provide general estimates and case studies for the topics covered.*"[66]

59.     In short, Dr. Singer has not provided a reliable basis to extrapolate the percentage of allegedly infringing videos found in these studies across YouTube as a whole during the relevant time.

> **2.     Dr. Singer's Assumption that Viewer Time Is Proportional to His Infringing Content Proxy's Percentage of All Content Is Economically Unfounded**

60.     Having developed his 1.32% proxy for the percentage of allegedly infringing content on YouTube, Dr. Singer attempts to determine the effect of the availability of allegedly infringing content on viewer activity as the next step in his counterfactual analysis. Dr. Singer's economic framework describing YouTube as a multisided platform should guide the estimation of the relationship between content and viewer time.  See Figure 3.  However, Dr. Singer ignores the multisided platform framework that he develops and simply assumes without basis that the

---

[64]     Content ID and Copyright Match Tool were released in October 2007 and July 2018, respectively. See https://googleblog.blogspot.com/2007/10/latest-content-id-tool-for-youtube.html; https://blog.youtube/news-and-events/helping-creators-protect-their-content/.

[65]     Geoff Duncan, "Infringing Videos Not Big on YouTube?" *Digital Trends*, Apr. 5, 2007, https://www.digitaltrends.com/home/infringing-videos-not-big-on-youtube/ ("Vidmeter decided to take a look at YouTube's list of most-watched video clips fourt [sic] times per day between December 9, 2006, and March 22, 2007, pulling down YouTube's own lists of the most-watched videos by day, week, month, and all-time.").

[66]     Bri Holt, Heidi R. Lynn, and Michael Sowers, "Analysis of Copyrighted Videos on YouTube.com," Vidmeter.com, 2007, p. 1.

Highly Confidential - Attorneys' Eyes Only

percentage of viewer time on YouTube attributable to allegedly infringing content is the same as the percentage of allegedly infringing content on YouTube.[67]   This assumption also implies that viewer time changes proportionally with changes in YouTube's content.[68]

61.     There are fundamental economic reasons that Dr. Singer's assumption that viewer time falls in proportion to the percentage of allegedly infringing content removed from YouTube is incorrect.

62.     First, allegedly infringing content on YouTube is substitutable with non-infringing content.[69]   Therefore, if allegedly infringing content is removed from YouTube, viewers can find similar content to watch, minimizing, if not eliminating, the impact of lost content on viewers' activity.

63.     Second, approximately 35.6% of the allegedly infringed copyrights identified in the Takedown Notice Sample identify only a YouTube URL as the title of the allegedly infringed copyrighted work.[70]   In other words, when asked to identify their own work, the copyright holder has pointed to a video on YouTube and then pointed to some other video that allegedly infringes that work.  This indicates that removing the allegedly infringing video that is the subject of the takedown notice will generally leave the complainant's own work available on YouTube for users to watch. For example, a YouTube user who uploaded a music video onto his or her channel may find other copies of the same music video on other channels and choose to submit takedown notices against those other videos. But even if the other videos are removed in response to those takedown notices, the original music video, uploaded by the YouTube user on

---

[67]     Updated Singer Report, ¶ 104 ("I further assume that such content is responsible for the same percentage of time that viewers spend on YouTube.").

[68]     Updated Singer Report, ¶ 104 ("Hence, I assume that this proxy for Infringing Content videos likewise accounts for 1.32% of all viewer time spent on the platform.").

[69]     Creators may submit false takedown requests against videos that compete for the same audience. See, *e.g.*, YouTube Copyright Transparency Report, H1 2022, pp. 6-7.

[70]     The "name" of the copyright infringed is a YouTube URL in approximately 35.6% of the sample takedown notices—that is, there are 636,508 takedown requests where the copyright name is simply an URL out of a total 1,789,656 takedown requests.  See my workpapers.

23

Highly Confidential - Attorneys' Eyes Only

his or her channel and identified as the allegedly infringed work in their takedown notice, would generally remain on YouTube and be available for others to watch.  Moreover, the allegedly infringed works could remain on YouTube in other circumstances, such as when the owner of a sound recording requests that a particular video containing the song be removed from YouTube but has licensed the work to YouTube in another video.  Thus, taking down an allegedly infringing video does not necessarily remove the underlying content from YouTube, and other versions of the content may remain on YouTube and continue to attract viewers.  The substitutability of YouTube videos and the fact that removing an allegedly infringing video does not necessarily make the underlying content in an authorized form unavailable on YouTube imply that changes in viewership would be less than proportional to the percentage of removed content.

64.     Third, allegedly infringing content is demonstrably different from average or typical content on YouTube.  Using Dr. Singer's method for scaling the sample of takedown notices to cover the full damages period, it is possible to estimate the revenue earned on allegedly infringing videos that he claims represent 1.32% of all videos on YouTube and compare that estimated revenue to the revenue that YouTube earns on a representative 1.32% of its total corpus of content.  Specifically, Dr. Singer calculates that from July 2017 through December 2020, YouTube earned revenue of $50.7 billion.[71]  This implies that a representative (*i.e.*, random) sample of 1.32% of YouTube's total corpus of videos would on average generate revenues of approximately $670 million (*i.e.*, $50.7204*0.0132 = ~ $670.8 million).  However, the allegedly infringing videos (which Dr. Singer claims represent 1.32% of YouTube's total content) generated approximately ███████████ revenue from the ads placed against them during the period from July 2017 through December 2020.[72]  See Figure 1.  Thus, Dr. Singer's disgorgement result implies that average content would earn roughly ██ times more direct revenue than the videos subject to takedown notices (*i.e.*, ██████████████ ).

---

[71]     Updated Singer Report, Table 7.

[72]     See my workpapers.  The calculation of revenue is based on Dr. Singer's methodology for scaling unique takedown requests to account for months that were not sampled.

Highly Confidential - Attorneys' Eyes Only

**Figure 1**
**Comparison of Total Advertising Revenues Corresponding to Average YouTube Content
and Allegedly Infringing Videos
July 2017 – December 2020**



65.     In fact, the difference in monetization between allegedly infringing videos and average videos is even more stark than Dr. Singer's calculations imply.  Some of the videos subject to takedown notices were not permanently removed from YouTube, likely because the takedown notices were retracted by the claimant or were rescinded as the result of successful counternotifications.[73]  If the 6,547 revenue-earning videos from the Takedown Notice Sample that were not permanently removed from YouTube are excluded from the Takedown Notice Sample, Dr. Singer's method for estimating the total revenue of allegedly infringing videos

---

[73]     See my workpapers and Copyright strike basics - YouTube Help (google.com); Retract a claim of copyright infringement - YouTube Help (google.com); Submit a copyright counter notification - YouTube Help (google.com). My calculation of the number of videos in the takedown data sample that remain available is based on evaluating on December 14, 2022, whether that video is still available on YouTube.

Highly Confidential - Attorneys' Eyes Only

implies videos that remained unavailable on YouTube earned only ▮▮▮▮▮▮ for the period from July 2017 through December 2020.[74]  See Figure 2. With this correction, Dr. Singer's methods estimate that average YouTube videos would generate ▮ times more revenue during the period from July 2017 through December 2020 than the videos that were removed from YouTube in response to takedown notices.[75]

**Figure 2**
**Comparison of Total Advertising Revenues Corresponding to Average YouTube Content and Videos Permanently Removed**
**July 2017 – December 2020**



---

[74]    After removing the 6,547 revenue-earning videos that were not permanently removed from YouTube, the estimated number of allegedly infringing videos falls slightly below 1.32%.

[75]    For the period from July 2017 through September 2022, the total revenue on the allegedly infringing videos is ▮▮▮▮▮▮, accounting for videos that were restored to YouTube.  Over this period, 1.32% of YouTube's revenues as estimated by Dr. Singer in his Table 8 is $1.25 billion.  If the allegedly infringing videos had performed like average videos on YouTube, they should have generated ▮ times more revenue than they did.

26

Highly Confidential - Attorneys' Eyes Only

66.    There are multiple reasons that videos subject to takedown requests would earn *less* revenue than average videos, within the framework of Dr. Singer's calculations.  First, to the extent allegedly infringing videos are removed from YouTube, they are no longer available to viewers.  Given that their time on YouTube is driven by the takedown notices rather than the uploaders' decisions regarding when to remove them, they should not be compared to other videos on a one-to-one basis because doing so will overstate the amount of revenue from allegedly infringing content relative to non-infringing videos.  This conclusion is further supported by the finding that among videos in the sample of takedown notices with nonzero revenue, the videos that were restored to YouTube (and thus are still available on the service) have much higher revenue than videos that were removed from YouTube.[76]

67.    Second, the revenue that YouTube earns at any point in time (*e.g.*, in a day) depends on viewer activity on that day.  To the extent content drives viewer activity, as Dr. Singer asserts, it is the allegedly infringing content available at a point in time that determines YouTube's revenue at that time.  As discussed above (see Section V.B.1.c)), the construction of Dr. Singer's "proxy" for allegedly infringing content indicates that it fails to capture the amount of allegedly infringing content on YouTube at any particular point in time.  By treating all allegedly infringing videos as having been available for more than five years (July 2017 to October 2022), Dr. Singer's methods overstate the actual amount of allegedly infringing content on YouTube at any single point in time.

68.    Third, as YouTube is able to generate higher ad revenue per view in developed countries than in less developed countries, it may be the case that alleged infringement is distributed across the regions in which YouTube operates in proportion to the revenue earned from each region.  If infringement is more prevalent in countries where advertising rates are relatively low compared

---

[76]    Out of 103,956 revenue-generating URLs in the sample of takedown notices, the 6,547 URLs that were restored to YouTube have average revenue of ███. The 97,409 URLs that were permanently removed from YouTube have average revenue of ███ (see my workpapers).  The concentration of revenue in a relatively small percentage of videos is unsurprising.  Approximately ███ of videos uploaded to YouTube have been watched fewer than ███ times and account for less than ███ of total watch time, while ███ of the raw number of videos uploaded to YouTube account for more than ███ of total watch time.  GOOG-SCHNDR-00034775: 785.

to the United States or other developed regions, Dr. Singer's assumption that allegedly infringing videos perform like average videos would overstate the revenue earned on allegedly infringing videos.[77]

69.     Finally, allegedly infringing content also may differ from average or typical content on YouTube in other ways that Dr. Singer has not considered.  For example, allegedly infringing content may be of different type, character, or quality and draw fewer viewers on average relative to non-infringing content.[78] Allegedly infringing content may also be less likely to meet YouTube's advertising standards and, therefore, may not be eligible to be monetized.[79]  Dr. Singer does not account for these factors.

70.     In short, Dr. Singer's assumption that removing allegedly infringing videos on YouTube would lead to a proportional reduction in YouTube viewer time is contrary to the revenue performance of allegedly infringing videos and is economically baseless.

### 3.     Dr. Singer's Multisided-Platform Framework for YouTube Implies His Disgorgement Regression Is Fundamentally Flawed

71.     The key economic feature of Dr. Singer's economic analysis of YouTube is that he models YouTube as a multisided platform.  A multisided platform is a business that facilitates interactions between different types of agents.  In the case of YouTube, the relevant constituencies on the platform are viewers, content creators, and advertisers.  As described below, Dr. Singer claims that his multisided platform framework guides his regression analysis, but it does not.  As a result, his regression analysis is biased and unreliable.

---

[77]     "[D]eveloping markets initially monetize at a lower rate than more mature markets." Alphabet Form 10-K for the fiscal year ended December 31, 2021, p. 28.

[78]     YouTube described efforts to bring premium content to YouTube and to develop a "premium experience" on YouTube in a 2016 earnings call.  Alphabet Q4 2016 Earnings Call, January 26, 2017, p. 16.  This indicates that the type and quality of content is important, not just the volume.

[79]     See https://support.google.com/youtube/answer/6162278?hl=en.

### a) *The Economics of Multisided Platforms*

72.     As a treatise on multisided platforms explains, "[m]ulti-sided platforms create value by bringing two or more different types of economic agents together and facilitating interactions between them that make all agents better off."[80]  There are many examples of businesses that exhibit characteristics of multisided platforms.  A common example is payment cards, such as Mastercard and Visa.[81]  The key feature of the payment card business is that having a payment card becomes more valuable to a consumer as the number of merchants (*e.g.*, stores, restaurants, & hotels) that accept it for payment grows.  Similarly, the benefit to merchants from accepting a particular payment card rises as the number of consumers carrying and preferring to pay with that card grows.  Each side of the payment card platform (*i.e.*, card-holding consumers and card-accepting merchants) benefits from increased use or acceptance of the card on the *other side of the* platform.  The benefit to cardholders of acceptance of a card at a greater number of merchants (and vice versa) is positive feedback, also known as an indirect network effect.  It is a positive externality that cardholders and merchants cannot capture individually.  Card issuers, such as Visa, are in the business of managing and profiting from this network effect by getting both merchants and cardholders onto their platforms and facilitating transactions.[82]

---

[80]     David S. Evans & Richard Schmalensee, "The Antitrust Analysis of Multisided Platform Businesses," in *The Oxford Handbook of International Antitrust Economics*, Vol. 1, Oxford University Press, 2015, p. 2.

[81]     David S. Evans & Richard Schmalensee, "The Industrial Organization of Markets with Two-Sided Platforms," *Competition Policy International*, Vol. 3, No. 1 (Spring 2007), pp. 156-157.

[82]     Other examples of businesses where increased activity on one side of a platform makes the platform more valuable to the other side include: (1) video game console manufacturers, (2) ride-sharing companies, and (3) short-term apartment rental brokers.  (See, *e.g.*, Jean-Charles Rochet & Jean Tirole, "Two-Sided Markets: An Overview," Mar. 12, 2004 (hereinafter "Rochet and Tirole"); Daniel Trabucchi and Tommaso Buganza, "Fostering Digital Platform Innovation: From Two to Multi-Sided Platforms," *Creativity and Innovation Management*, 2020.)  A video game console manufacturer must get both game players and game developers to adopt its console to be successful because the greater the number of players, the more likely developers are to create a game for a console, and the greater the number of games available on a console, the more valuable the console is to players.  Similarly, Uber and Lyft bring together drivers and passengers, and Airbnb brings together people who want to rent out an apartment or home with individuals looking for short-term rentals.  In each of these cases, it is necessary to ensure that both types of individuals using the platform are sufficiently present for the business to be viable.  Ensuring that both types of customers are present requires that prices be established for each side of the platform with that goal in mind. (Rochet and Tirole, p. 10).

73.     Dr. Singer claims that YouTube also functions as a multisided platform.

### b) *Dr. Singer's Model of YouTube as a Multisided Platform*

74.     Dr. Singer's description of YouTube as a multisided platform posits a complicated relationship between the amount of content on YouTube and viewer activity. As shown in Figure 3 illustrating Dr. Singer's multisided platform framework, content and viewer activity are jointly determined (*i.e.*, there is a direct two-way relationship between content and viewer activity). This relationship must be estimated using data on content and viewer activity, accounting for the two-way relationship between these variables using simultaneous equations methods, otherwise regression results will be biased.[83]  Dr. Singer skips such economic analysis, however, and simply relies on the economically implausible assumption that content and viewer time on YouTube change in direct proportion to each other.  As discussed above, he offers no basis for that assumption, which is inconsistent with his model of YouTube as a multisided platform.

---

[83]     See Jeffrey M. Wooldridge, Econometrics A Modern Approach, 5th Ed. Cengage Learning, 2013, ("Wooldridge"), pp. 558-560.

**Figure 3**
**Reproduction of Dr. Singer's Figure 3**

FIGURE 3: MULTI-SIDED INTERACTION BETWEEN CONSTITUENCIES ON YOUTUBE PLATFORM



Network effects flow both ways
between content providers and
consumers.

75.    Dr. Singer claims his opinions are grounded in his analysis of YouTube as a multisided platform that embodies indirect network effects.  He describes viewers (*i.e.*, content consumers) and content providers as the primary agents on different sides of the platform.  In his framework for YouTube, "[c]onsumers [*i.e.*, viewers] benefit from additional content providers and the variety they provide.  Likewise, content providers benefit from additional consumers in various ways, including advertising revenue, brand enhancement from increased attention, and subscription revenue share."[84]

76.    In Dr. Singer's framework, the primary indirect network effects are between content providers (and the quantity of content) and viewer activity,[85] but Dr. Singer's description makes clear that advertisers are also important to the YouTube ecosystem because they fund the free

---

[84]    Updated Singer Report, ¶ 48 (footnote omitted).

[85]    Updated Singer Report, ¶ 56 ("I focus my analysis of these effects on the relationship between the two key constituencies—namely, content users on one side and content providers on the other.").

Highly Confidential - Attorneys' Eyes Only

viewing on YouTube.[86]  Ad revenue increases the incentive for content providers to provide additional available content because content providers that meet certain eligibility requirements can share in the ad revenue earned from advertisements shown on the watch pages of videos they produce.[87]  Advertisers seek to reach viewers with demographic profiles that make them likely consumers of their products by placing ads on YouTube.  As the pool of viewers on YouTube becomes larger and more diverse, the opportunities or "slots" to display an ad with a video increase.[88]

77.    Dr. Singer's diagram summarizing his view of the interactions between advertisers, content providers, and viewers (*i.e.*, content consumers), and importantly, the *directions* of those interactions (*i.e.*, what factors directly influence or *cause* other factors), is reproduced in Figure 3 above.  These interactions and their indicated directions are critical to evaluating the reliability and relevance of Dr. Singer's regression analyses, including his disgorgement regression.  As Dr. Singer explains, "[b]ecause my assignment in this matter involves determining the incremental causal effect of the infringing content on advertising revenues that YouTube obtained from the non-infringing content, I use the diagram [] to trace this effect through the platform.  This process also informs the econometric methodology I apply in the subsequent section." [89]  I briefly describe the key elements of Dr. Singer's framework below.

---

[86]    Updated Singer Report, ¶ 51 ("The YouTube platform involves three sides, though indirect network effects flow primarily between content consumers and providers, while advertisers subsidize the interaction between them.").

[87]    See https://www.youtube.com/creators/how-things-work/video-monetization/?gclid=EAIaIQobChMIpN-Nwvv7-wIVgbbICh3-3gBPEAAYASAAEgIA0vD_BwE#youtube-partner-program.

[88]    The opportunity to place an ad with a video does not mean that an ad will be placed on the video.  YouTube has more potential opportunities to place ads than demand from advertisers seeking to place ads.  Deposition of Arpan Agrawal, July 1, 2022 (Agrawal Deposition), 36:2-5, 55:1-3 (███████████ ██████████████████████████████).  See https://support.google.com/youtube/answer/6162278?hl=en for a discussion of YouTube's advertiser-friendly content guidelines.

[89]    Updated Singer Report, ¶ 60.

78.     As Dr. Singer explains, the striped blue arrows that point from content providers to content consumers (labeled "A") "reflect the network effects commencing with the upload and display of content, which then attracts users [*i.e.*, content consumers]."[90]  The red arrows (labeled "B") "reflect the network effects in the opposite direction, as content consumers then attract even more content providers."[91]  According to Dr. Singer, it is this relationship between content providers and the activity of viewers, working in both directions, that makes YouTube a multi-sided market.[92]

79.     Viewers draw advertisers to YouTube, as illustrated by the red checkered arrow (labeled "C").  Dr. Singer asserts that "no corresponding line exists in the opposite direction (from advertisers to consumers), reflecting the one-way nature of the effects between consumers and advertisers."[93]

80.     The green arrow (labeled "D") points from advertisers to YouTube, "reflecting the nature of the financial arrangement, whereby entities pay YouTube for the right to serve ads on the platform."[94]  The second green arrow (labeled "E") points from YouTube to content providers, "reflecting the portion of the platform's revenue that it shares with the latter."[95]  Singer notes that

---

[90]     Updated Singer Report, ¶ 61.

[91]     Updated Singer Report, ¶ 61.

[92]     Updated Singer Report, ¶ 48 ("The presence of indirect network effects renders YouTube a multi-sided platform serving two primary groups: consumers on one side and providers of video content on the other.").

[93]     Updated Singer Report, ¶ 62.  Dr. Singer is incorrect when he asserts that there is no feedback from advertisers to the number of viewers or visits on the platform.  He admits as much in the sentence following the denial of a two-way effect when he avers that "consumers may also view advertising as a nuisance, as evidenced by the use of ad blockers and the fact that platforms offer subscription services to consumers in exchange for avoiding ads." Updated Singer Report, ¶ 62.  In other words, according to Dr. Singer, advertising reduces the number of viewers and views relative to the absence of advertising.  Thus, Dr. Singer's model should include an arrow pointing from advertisers to viewers (visits), recognizing that the effect is negative rather than positive.  Dr. Singer cites other literature that also indicates the amount of advertising affects viewer activity.  Updated Singer Report, footnotes 88 and 90.

[94]     Updated Singer Report, ¶ 63.

[95]     Updated Singer Report, ¶ 63.

"no reverse line exists from content providers to advertisers, highlighting the unidirectional nature of the effects.  In other words, holding user visits and visit duration constant, we do not expect any substantive change in advertising from a change in the number of providers, as YouTube only realizes such revenues when consumers visit the content that includes ads."[96]

81.     As explained further below, Dr. Singer's description of how viewers, advertisers, and content creators influence one another is key to evaluating the reliability and relevance of his regressions purporting to show network effects and to measure disgorgement because the relationships Dr. Singer posits must be reliably estimated.  A reliable estimation of these relationships requires satisfying the standard conditions for unbiased regression coefficients.[97] Dr. Singer's disgorgement regression does not correspond to his multisided platform framework with the consequence that the regression fails to satisfy the conditions necessary for regression coefficients to be unbiased.

   c)   *Dr. Singer's Regression Is Economically Baseless and Its Results Are Unreliable*

82.     In paragraph 98 of his report, Dr. Singer describes a regression equation that he purportedly uses to estimate disgorgement (*i.e.*, Dr. Singer's Equation 3).[98]  Moreover, Dr. Singer states that the results of the regression he describes appear in Table 6 of his report.[99]  But Table 6 contains the results of a *different regression* with different explanatory variables than the regression he describes.  Dr. Singer does not present the results of the regression he describes in paragraph 99.  Had Dr. Singer run that regression, it would not support disgorgement.[100] Below I

---

[96]     Updated Singer Report, ¶ 64.  Dr. Singer's claim that changes in content do not affect advertising revenue holding other factors constant is key to evaluating the design of his regressions.

[97]     See Wooldridge pp. 83-87, 101-102.

[98]     Updated Singer Report, ¶ 98.

[99]     Updated Singer Report, ¶ 98.

[100]    The regression specification that Dr. Singer describes in paragraph 99 but does not run finds a negative relationship between viewer time and YouTube's revenue. This result is inconsistent with Dr. Singer's theory of disgorgement.  See my workpapers.

34

address the regression reported in Dr. Singer's Table 6, which he uses to estimate disgorgement damages.

83.   The regression reported in Dr. Singer's Table 6 takes the following form:

$$LRev_t = \alpha_1 + \beta_1 LPages\_YT_t + \beta_2 LTime\_YT_t + \sum_{n=3}^{N} \beta_n X_{tn} + \varepsilon_t$$

84.   The key variables in the equation are:

a)      $LRev_t$ – The natural logarithm of total advertising revenues in month $t$.

b)      $LPages\_YT_t$ – the natural logarithm of the total number of pages visited on YouTube in month $t$ ("YouTube Pages"). (Dr. Singer notes that this variable is a proxy for *content* on YouTube.[101])

c)      $LTime\_YT_t$ – the natural logarithm of total viewer minutes spent on YouTube in month $t$.[102]

85.   The results of Dr. Singer's regression are shown in the first column of results in Table 1, labeled "Singer Model."

---

[101]   Updated Singer Report, ¶ 100 ("I include the pages variable to proxy the effects of additional content."). Dr. Singer does not address the biases that can be introduced to regression analysis by the use of proxy variables. The use of proxies can bias the coefficients of all variables in the regression. See Wooldridge, pp. 309-310.

[102]   Updated Singer Report, Table 6 & ¶ 98. Dr. Singer uses additional explanatory variables to predict YouTube's monthly revenue (*i.e.*, Log Facebook Pages and the other $X_{tn}$).

**Table 1**
**Results of Both Dr. Singer's Disgorgement Regression and the Partially Corrected Regression**

| | Dependent Variable: Log[Revenue] | |
| --- | --- | --- |
| | Singer Model | Excluding Proxy for Content |
| Log YouTube Pages Visited | -0.839*** | - |
| | (0.150) | - |
| Log Facebook Pages Visited | 0.039 | -0.108* |
| | (0.069) | (0.063) |
| Log Time Spent on YouTube | 0.781*** | 0.174 |
| | (0.161) | (0.132) |
| Covid-19 Pandemic Flag | -0.262*** | -0.247* |
| | (0.083) | (0.135) |
| 4th Quarter Flag | 0.226*** | 0.319*** |
| | (0.029) | (0.038) |
| Quarter-end Month | 0.146*** | 0.153*** |
| | (0.033) | (0.040) |
| UM Consumer Sentiment | -0.019*** | -0.039*** |
| | (0.006) | (0.007) |
| Log Manufacturer Orders | -0.321 | -0.563* |
| | (0.238) | (0.332) |
| PPI Internet Advertising | -0.030*** | -0.039*** |
| | (0.009) | (0.011) |
| Log Non-Farm Payroll Employment | 5.051 | 9.989** |
| | (3.029) | (4.328) |
| BLS Misery Index | 0.005 | 0.056 |
| | (0.043) | (0.061) |
| Intercept | -69.075 | -159.228* |
| | (58.020) | (82.669) |
| N | 48 | 48 |
| R-squared | 0.932 | 0.889 |

Source: Singer Expert Report Backup.
Notes: heteroskedasticity-robust standard errors shown in parentheses. Statistical significance shown at 1% (***), 5% (**), and 10% (*) levels.

86.     According to Dr. Singer's explanation of YouTube as a multisided platform, content on YouTube does not directly influence advertisers or advertising revenue.[103]  Rather, it is viewer activity that influences advertisers because advertisers are trying to reach viewers.[104]  See Figure 3.  Thus, to construct a regression consistent with Dr. Singer's multisided platform framework, once an explanatory variable for viewer activity is included in the regression, a proxy for the amount of content available on YouTube should not be included in the regression.  This conclusion follows from Dr. Singer's own description of the interactions between content, ad revenue, and viewer time.[105] Dr. Singer explains that with other factors including viewer time held constant, changes in content alone do not explain YouTube's advertising revenue.[106] Nevertheless, Dr. Singer includes a proxy for the amount of content on YouTube as an explanatory variable in his disgorgement regression.  The proxy he chooses is the number of YouTube pages visited (Log YouTube Pages Visited in Table 1).[107]

87.     Within Dr. Singer's framework, adding an "extra" explanatory variable representing the amount of content on YouTube to the regression is not benign because including a proxy for content biases the regression's coefficients.[108]  The source of bias is clear in Figure 3, which shows that if the regression were designed to be consistent with Dr. Singer's multisided platform framework, advertising would directly influence content, but content would *not* directly affect

---

[103]     Updated Singer Report, ¶ 64.

[104]     Updated Singer Report, ¶ 62 ("Content consumers also draw advertisers to the YouTube platform . . . . The potential for consumers to view ads attracts advertisers; advertisers benefit from a greater number of monetized visits (when ads appear) and/or from longer visit duration to the extent the consumer can see more ads per time spent on YouTube.").

[105]     Updated Singer Report, ¶ 64 & Figure 3.

[106]     Updated Singer Report, ¶ 64 ("In other words, holding user visits and visit duration constant, we do not expect any substantive change in advertising from a change in the number of providers, as YouTube only realizes such revenues when consumers visit the content that includes ads.").

[107]     Updated Singer Report, ¶ 100 ("I include the pages variable to proxy the effects of additional content.").

[108]     See Wooldridge pp. 83-87, 101-102.

advertising revenues.[109]  By including a proxy for content in his regression explaining revenue, Dr. Singer's regression incorrectly assumes content directly affects revenue rather than the other way around.

88.     The proxy for content is an *endogenous* explanatory variable, *i.e.*, a variable that is correlated with the error term (the term that contains unobserved factors which affect the dependent variable – *i.e.*, the difference between the model's predicted values and the actual values) of the regression.  The reason that the proxy for content is correlated with the error term in the revenue regression is that the proxy for content depends on ad revenue (*i.e.*, the green arrows in Figure 3) and ad revenue depends on the error term in the revenue regression. Therefore, the proxy for content also depends on the error term in the revenue regression.[110] This guarantees that the proxy for content will be correlated with the error term in the regression equation.  However, a basic and fundamental requirement for any ordinary least squares regression to be unbiased is that the explanatory variables be uncorrelated with the error term, *i.e.*, there is no endogeneity.[111]  If there is an endogenous explanatory variable, as is the case here, the conditions required for the regression to be unbiased are not met.[112]  As a result, the regression coefficients will be biased, and predictions based on the regression will be biased an unreliable.

89.     The results of Dr. Singer's disgorgement regression further illustrate how the inclusion of the proxy for content as an explanatory variable has rendered his results unreliable.  Within Dr. Singer's framework, the coefficient on the proxy for content in the disgorgement regression should be zero because the regression controls for viewer activity, and holding viewer activity

---

[109]     Updated Singer Report, ¶ 64 ("Note that no reverse line exists from content providers to advertisers.").

[110]     See Wooldridge, pp. 559-560 for a description of this issue.

[111]     Fumio Hayashi, *Econometrics*, Princeton University Press, 2000, p. 187 and p. 12; see also Wooldridge, pp. 83-87.

[112]     See Wooldridge pp. 83-87, 101-102 ("failure of the zero conditional mean assumption . . . causes OLS to be biased.").  Endogeneity of an explanatory variable means that the zero conditional mean assumption is not satisfied.

Highly Confidential - Attorneys' Eyes Only

constant, changes in content should not affect revenue according to Dr. Singer.[113]  But directly contrary to Dr. Singer's multisided platform framework, the coefficient on the proxy for content is large in magnitude *and negative*, as shown in the left column (Singer Model) of estimates in Table 1.  It is economically implausible that, all else equal, an increase in content available on YouTube would *cause* a significant reduction in YouTube's revenue, but this is the direct implication of Dr. Singer's regression if we are to (wrongly) accept that changes to the explanatory variables in the regression will causally lead to changes in YouTube's revenue.  If changes in explanatory variables do not causally lead to the predicted changes in YouTube's revenue (as is evident in the case of the proxy for content), then Dr. Singer's disgorgement regression cannot reliably predict YouTube's revenue in the counterfactual scenario with less content and viewer activity.

90.     Removing the proxy for content (YouTube Pages Visited) from Dr. Singer's regression leads to regression results that do not support his contention that there is a statistically meaningful relationship between viewer time on YouTube and YouTube revenue.  Removing Dr. Singer's endogenous proxy for content from the disgorgement regression yields the results in the right column of estimates in Table 1 ("Excluding Proxy for Content").  With the most problematic explanatory variable removed, the coefficient on viewer time spent on YouTube falls by nearly 80% and is no longer statistically significantly different than zero. With no statistically significant relationship between viewer time and YouTube's advertising revenue, the foundation of Dr. Singer's disgorgement analysis is entirely undermined.

91.     While this version of Dr. Singer's regression, modified to exclude the endogenous content proxy, should not be taken as reliable, the result that increased viewing on YouTube would have little or no causal impact on YouTube's revenues is plausible.  Arpan Agrawal, a senior finance manager at YouTube, reports that "advertising revenue and watch time are . . . quite independent of each other."[114]  The reason for the independence of watch time and

---

[113]     Updated Singer Report, ¶ 64.

[114]     Agrawal Deposition, 55:3-11.

Highly Confidential - Attorneys' Eyes Only

advertising revenue is YouTube has had more viewer activity than is necessary to satisfy its advertisers' demand for ad placements.[115]  This excess supply of advertising opportunities on YouTube means that there is no economic basis to assert that increased viewer activity on the platform would lead to increases in YouTube's advertising revenue.  In other words, viewer activity is not the factor constraining advertisers' spending on YouTube.

### 4.      Dr. Singer's Disgorgement Methodology Is Flawed

92.      Dr. Singer makes multiple methodological errors when implementing his disgorgement calculation.  As shown below, Dr. Singer mistakenly treats the error inherent in his regression's prediction of YouTube's actual revenue as part of disgorgement damages, biasing damages upward by approximately $117 million.  Still more seriously, Dr. Singer includes a proxy for content in his disgorgement regression but ignores the effects of the reduction in YouTube content that is an inherent part of his counterfactual scenario with no infringement.  It is an error for Dr. Singer to include a proxy for content in his disgorgement regression based on his framework.  However, having included the proxy for content, the change in content change between the actual and counterfactual scenarios must be considered.  When the required reduction in content (reflecting the removal of allegedly infringing content) is properly considered in the calculation of YouTube's revenue in the counterfactual scenario, Dr. Singer's regression implies that YouTube's revenue would be *higher* with no alleged infringement than with it.  This result implies there should be no disgorgement.

#### a)      *Dr. Singer's Disgorgement Calculation Incorrectly Treats the Error of His Regression's Revenue Predictions as Disgorgement Damages*

93.      Table 2 illustrates the approach and results of Dr. Singer's counterfactual analysis.  In the column labeled "Revenues," Dr. Singer provides YouTube's actual revenue, as reported, between July 2017 through December 2020 (top row), the *prediction* of YouTube's revenue from his disgorgement regression for the "actual" scenario" (second row) and his prediction of

---

[115]     Agrawal Deposition, 36:2-5 ("[H]istorically, we have had far more usage than advertising demand, and so it's sufficient inventory to satisfy advertiser spend.").

Highly Confidential - Attorneys' Eyes Only

YouTube's revenue in three counterfactual scenarios.  Each of Dr. Singer's counterfactual scenarios corresponds to removing a different amount of allegedly infringing content (*i.e.*, 2%, 6%, and 1.32%).[116]

**Table 2[117]**
**Reproduction of Dr. Singer's Disgorgement Calculation with Partial Corrections**
**July 2017 through December 2020**

|  | Revenues | Dr. Singer's Alleged Damages | Alleged Damages with Partial Corrections |
|---|---|---|---|
| Actual | $50,720,411,716 | | |
| Predicted (with smearing adjustment) | $50,602,738,580 | | |
| Predicted (2% Infringing) | $49,810,301,578 | $910,110,138 | $792,437,002 |
| Predicted (6% Infringing) | $48,214,695,739 | $2,505,715,977 | $2,388,042,841 |
| Predicted (1.32% Infringing) | $50,080,124,466 | $640,287,250 | $522,614,115 |

94.    As Dr. Singer's counterfactual scenario is, by definition, hypothetical, he does not observe YouTube's revenue in the counterfactual scenario.  Therefore Dr. Singer uses his disgorgement regression to predict YouTube's revenues under the counterfactual by replacing the actual values of the explanatory variables with the values of the explanatory variables he (wrongly) asserts would obtain in the relevant counterfactual scenario.  In Table 2**Error! Reference source not found.** above, Dr. Singer assumes that viewer time falls by the same percentage as the assumed percentage of allegedly infringing content that becomes unavailable to viewers in the counterfactual scenario.  To estimate YouTube's counterfactual revenue, Dr. Singer predicts YouTube's revenue with the viewer time reduced by the assumed amount.  All other explanatory variables in the regression are left unchanged between the actual and

---

[116]    Updated Singer Report, Tables 7 & 8.

[117]    The numbers in Dr. Singer's Table 7 do not match the results from running the code in his backup.  Table 2herein reflects the results in Dr. Singer's backup.

Highly Confidential - Attorneys' Eyes Only

counterfactual scenarios – including the proxy for YouTube content *even though there would be less content available on YouTube in the counterfactual scenario by definition*.[118]

95.     To calculate the revenue that YouTube purportedly earned as the result of the allegedly infringing content, Dr. Singer subtracts his *predicted* revenue in that counterfactual scenario from the *actual* revenue YouTube earned (top row in Table 2).  For example, in the scenario assuming 1.32% allegedly infringing content (bottom row), Dr. Singer counterfactually assumes that viewer time was 1.32% lower as a result of eliminating the alleged infringement (but erroneously holds the amount content at the same level as if alleged infringing content were still available), and estimates based on his regression that YouTube would have earned $50,080,124,466.[119]  According to Dr. Singer, alleged damages in this scenario are $640,287,494, which is the difference between YouTube's actual revenue in the real world (top row) and the predicted amount it would have earned in the case that 1.32% of content were removed from YouTube.

96.     The *predicted* revenues in the second row of Table 2 are Dr. Singer's estimate of YouTube's actual revenues in the actual scenario with alleged infringement.  As is clear in Table 2, Dr. Singer's estimate is roughly $117 million lower than YouTube's actual revenue found in its financial records ($50,720,411,716 - $50,602,738,580 = $117,673,136).  This $117 million reflects the inability of Dr. Singer's regression to precisely explain actual revenues and has nothing to do with the alleged infringement.  Thus, Dr. Singer's disgorgement regression's estimate of YouTube's revenue is biased too low by roughly $117 million.  This bias affects each of Dr. Singer's counterfactual predictions of YouTube's revenue as well.  As a result, by comparing his model's results against YouTube's actual revenue in his calculation of

---

[118]     Updated Singer Report, ¶ 104 ("Based on an estimate of 3 billion videos on the platform, this proxy for Infringing Content videos represents 1.32% of all videos.  I further assume that such content is responsible for the same percentage of time that viewers spend on YouTube.  Hence, I assume that this proxy for Infringing Content videos likewise accounts for 1.32% of all viewer time spend on the platform." (footnote omitted))

[119]     This figure comes from running the code in Dr. Singer's backup.  In certain instances, there are differences between numbers included in Dr. Singer's report and numbers generated by the backup materials he provided.

Highly Confidential - Attorneys' Eyes Only

disgorgement damages, Dr. Singer biases them upward by $117 million. The unbiased calculation of disgorgement within Dr. Singer's framework would take the difference between YouTube's *predicted* revenues in the actual scenario (the second row) and YouTube's *predicted* revenues in the relevant counterfactual scenario.

97.     The results of making this single correction are shown in the right-hand column of Table 2. The correction yields a reduction in damages or disgorgement of roughly $117 million in each scenario. For example, the correction reduces estimated disgorgement to $522,614,115 in the 1.32% alleged infringement scenario.

98.     Dr. Singer's calculations shown in Table 2 are wrong because they treat the $117 million *prediction error* of his regression (*i.e.*, the difference between YouTube's actual revenue and YouTube's revenue in the actual scenario as predicted by Dr. Singer's regression) as damages. The error built into Dr. Singer's regression analysis does not constitute damages because the difference between YouTube's actual revenues and Dr. Singer's prediction of YouTube's actual revenues is the result of the imprecision of Dr. Singer's measurements. That difference has nothing to do with YouTube's alleged conduct. One way to see that Dr. Singer's calculations are incorrect is that the estimate of disgorgement never falls below $117 million using Dr. Singer's method, even as the percentage of allegedly infringing content falls to zero.

99.     The fact that Dr. Singer's disgorgement estimate cannot fall below $117 million using his method is illustrated in Table 3 using the case of 1.32% alleged infringement. The row labeled "Predicted (1.32% Infringing)" shows Dr. Singer's and the "corrected" disgorgement damages implied by his model. The proportion of alleged infringement is reduced by a factor of 10 in each of the successive rows, with the bottom row having no infringing content. The implied disgorgement trends toward zero in the column with the correct calculation, which is based on YouTube's predicted revenues from Dr. Singer's disgorgement regression. In the column based on Dr. Singer's calculation, disgorgement damages never fall below $117 million. This result demonstrates that Dr. Singer's calculation is incorrect.

Highly Confidential - Attorneys' Eyes Only

**Table 3**
**Illustration of Dr. Singer's Calculation Error**
**Effect of Declining Infringement on Disgorgement**
**July 2017 through December 2020**

| | Revenues | Dr. Singer's Alleged Damages | Alleged Damages with Partial Corrections |
|---|---|---|---|
| Actual | $50,720,411,716 | | |
| Predicted (with smearing adjustment) | $50,602,738,580 | | |
| Predicted (1.32% Infringing) | $50,080,124,466 | $640,287,250 | $522,614,115 |
| Predicted (0.132% Infringing) | $50,550,547,793 | $169,863,923 | $52,190,787 |
| Predicted (0.0132% Infringing) | $50,597,522,601 | $122,889,115 | $5,215,979 |
| Predicted (0.00132% Infringing) | $50,602,219,410 | $118,192,306 | $519,170 |
| Predicted (0.000132% Infringing) | $50,602,689,084 | $117,722,631 | $49,496 |
| Predicted (0.0000132% Infringing) | $50,602,736,052 | $117,675,664 | $2,529 |
| Predicted (0% Infringing) | $50,602,738,580 | $117,673,136 | $0 |

> **b)**   *Dr. Singer's Disgorgement Calculation Ignores the Impact of Reduced Content When Predicting YouTube's Counterfactual Revenue*

100.    Dr. Singer's counterfactual disgorgement methodology is flawed for the additional reason that its calculations ignore the impact of the reduction of content on YouTube's revenue.  This approach is incorrect because the reduced amount of content available on YouTube is the *defining* feature of the counterfactual scenario in which *the allegedly infringing content is removed from YouTube*.[120]   Moreover, as discussed above, Dr. Singer's regression that estimates YouTube's revenues in the counterfactual scenarios *includes YouTube's content as an explanatory variable*.  If YouTube's content belongs in the regression as an explanatory variable, then the different amounts of YouTube's content in the actual and counterfactual scenarios (reflecting the removal of the allegedly infringing content in the counterfactual scenario) must be explicitly taken into account.  In short, having chosen to include explanatory variables for both content and viewer time in his regression, Dr. Singer cannot simply choose to ignore an

---

[120]    Updated Singer Report, ¶ 104.

Highly Confidential - Attorneys' Eyes Only

explanatory variable that explicitly changes between the actual and counterfactual scenarios when predicting YouTube's counterfactual revenue in the world in which there is no alleged infringement on YouTube.

101.    The appropriate method to calculate YouTube's counterfactual revenue using Dr. Singer's regression equation is to account for *both* of the explanatory variables that differ from their actual levels in Dr. Singer's counterfactual scenarios – that is, account for the identical proportional reductions in both content and viewer time in the counterfactual scenario posited by Dr. Singer.[121]  YouTube's counterfactual revenue actually rises relative to its actual revenue when the results of Dr. Singer's disgorgement regression are taken at face value and used appropriately to predict YouTube's revenue in the counterfactual scenario in which both viewer time and content fall by 1.32%.  As shown in Table 4, for example, the estimated disgorgement is negative when correctly calculated, which implies no disgorgement is economically warranted based on Dr. Singer's model.

**Table 4**
**Revenue and Disgorgement Accounting for Reductions in Content and Viewer Time**
**July 2017 through December 2020**

|  | Revenues | Alleged Damages with Partial Corrections |
|---|---|---|
| Predicted (with smearing adjustment) | $50,602,738,580 | |
| Predicted (2% Infringing) | $50,662,190,278 | ($59,451,698) |
| Predicted (6% Infringing) | $50,785,038,137 | ($182,299,557) |
| Predicted (1.32% Infringing) | $50,641,834,714 | ($39,096,133) |

102.    The reason that YouTube's predicted counterfactual revenues rise when the differences in both content and viewer time between the actual and counterfactual scenarios are considered is readily apparent from Dr. Singer's regression results.  The coefficient on Dr. Singer's proxy for

---

[121]    Updated Singer Report, ¶ 104 ("[T]his proxy for Infringing Content videos represents 1.32% of all videos. I further assume that such content is responsible for the same percentage of time that viewers spend on YouTube.  Hence, I assume that this proxy for Infringing Content videos likewise accounts for 1.32% of all viewer time spent on the platform.").

Highly Confidential - Attorneys' Eyes Only

content is -0.839, and the coefficient on time spent on YouTube is 0.781.[122]  Thus, if both content and time spent on YouTube *fall* by 1.32% (or fall by any other common percentage), the effect on revenue of falling content will be positive and larger in magnitude than the negative effect of falling viewer time on YouTube.[123]

103.    The results in Table 4 completely undermine Dr. Singer's disgorgement analysis.  Even if we were to ignore the many assumptions and errors in his counterfactual analysis, the results of Dr. Singer's regression, taken at face value, indicate that YouTube *did not* benefit from the alleged infringing content – that is, there is no profit benefit to disgorge.

104.    Dr. Singer presents a second estimate of disgorgement based on his prediction of YouTube's revenues over the period from July 2017 through September 2022 in his Table 8.  Dr. Singer does not have YouTube's actual monthly revenues over this period, so he does not make the mistake of calculating disgorgement as the difference between YouTube's predicted revenue in a counterfactual scenario and YouTube's actual revenues (rather than predicted revenues).  However, all of the other failings of Dr. Singer's work apply equally to Dr. Singer's Table 8.

105.    Most importantly, as above, if Dr. Singer's disgorgement damages are corrected by proportionally reducing both YouTube's content and viewer time on YouTube, the estimate of disgorgement damages is negative.  This result is shown in Table 5.  As with the case above, Dr. Singer's regression results imply that YouTube *did not* benefit from the availability of allegedly infringing content.

---

[122]    See Table 1 for the relevant regression results.

[123]    In the case of a 1.32% reduction in content and viewer time, we have 0.781*(-1.32%) - 0.839*(-1.32%) = 0.077%.  To the extent that there is substitution between videos or that the removal of a video does not remove the underlying content from YouTube, the reduction in content would be larger than the reduction in viewer time, which would lead to an increase in YouTube's revenue that is larger than calculated here.

Highly Confidential - Attorneys' Eyes Only

**Table 5**
**Revenue and Disgorgement Accounting for Reductions in Content and Viewer Time**
**July 2017 through September 2022[124]**

| | Revenues | Alleged Damages with Partial Corrections |
|---|---|---|
| Predicted (with smearing adjustment) | $94,367,234,717 | |
| Predicted (2% Infringing) | $94,478,103,747 | ($110,869,030) |
| Predicted (6% Infringing) | $94,707,198,318 | ($339,963,601) |
| Predicted (1.32% Infringing) | $94,440,143,384 | ($72,908,667) |

### c)   *Dr. Singer Ignores YouTube's Incremental Costs When Calculating Disgorgement*

106.    Dr. Singer calculates the purported increase in YouTube's revenue as the result of alleged infringement.  Even if his estimate were correct, which it is not, the increase in revenue from alleged infringement does not measure the benefit to YouTube that would result from infringement because YouTube bears costs to earn incremental revenue, whether infringing or not.

107.    YouTube has provided information on its monthly revenues and costs for the years 2017 through 2020.  To measure how YouTube's costs rise as YouTube's revenues rise, I have regressed YouTube's total costs on YouTube's revenue.  The result is that YouTube's costs rose, on average, by ▮▮▮▮▮ with each dollar of additional revenue.[125]  To the extent that YouTube's costs rise with its revenue, the benefit to YouTube in Dr. Singer's framework would be reduced by the costs associated with those revenues.  Any disgorgement damages should be reduced to reflect YouTube's variable costs.

---

[124]    The numbers in Dr. Singer's Table 8 do not match the results from running the code in his backup.  Table 5 herein reflects the results in Dr. Singer's backup.

[125]    See my workpapers.

**VI.    Dr. Singer's Supporting Regressions Purporting to Demonstrate Indirect Network Effects Are Unreliable and Do Not Support Disgorgement by YouTube**

108.    Dr. Singer includes two additional regressions in his report that he claims support his economic description of YouTube as a multisided platform with network effects.[126]  Dr. Singer uses these supporting regressions to corroborate other results and not to directly calculate disgorgement, but the regressions do not correspond to his framework for YouTube as a multisided platform or account for the indirect (feedback) effects between the constituencies on the platform.  This bias is evident from the economically implausible coefficients that his regressions generate.  Dr. Singer's supporting regressions do not provide empirical support for disgorgement in any amount and have biased coefficients.

**A.    Dr. Singer's Regression of "Non-Infringing" Advertising Revenue on Content Is Biased and Yields Implausible Results**

109.    In paragraph 90 of his expert report, Dr. Singer describes a regression that he claims to use to estimate *revenue earned from non-infringing videos* based on variables measuring visits to YouTube and the average daily takedown requests in each month, among other explanatory variables.[127]  The variables described in paragraph 90 as being included in Dr. Singer's regression, however, are not the same as the variables reported in Dr. Singer's Table 4, which supposedly contains Dr. Singer's regression results from the regression he describes.  Herein, I address the regression that Dr. Singer actually ran, which is reproduced in Table 6 below.[128]

---

[126]    Updated Singer Report, ¶¶ 92 & 96.

[127]    Updated Singer Report, ¶ 90.

[128]    The regression that Dr. Singer describes but does not run does not support Dr. Singer's opinions regarding disgorgement.  Among other things, it fails to even address the relationship between viewer time and revenue on non-infringing videos that is the mechanism through which Dr. Singer's spillover effect operates. See my workpapers.

**Table 6**
**Reproduction of Dr. Singer's Regression of Factors Affecting YouTube Ad Revenues from Non-Infringing Content**

|  | Dependent Variable: Log[Non-Infringing Revenue] |
|---|---|
| Log YouTube Pages Visited | 0.073 |
|  | (0.175) |
| Log Facebook Pages Visited | -0.122 |
|  | (0.106) |
| Log Takedown Requests | 0.265*** |
|  | (0.067) |
| Covid-19 Pandemic Flag | -0.198** |
|  | (0.079) |
| 4th Quarter Flag | 0.277*** |
|  | (0.033) |
| Quarter-end Month | 0.185*** |
|  | (0.038) |
| UM Consumer Sentiment | -0.023*** |
|  | (0.007) |
| Log Manufacturer Orders | 0.601* |
|  | (0.352) |
| PPI Internet Advertising | -0.032*** |
|  | (0.011) |
| Log Non-Farm Payroll Employment | 2.839 |
|  | (4.648) |
| BLS Misery Index | 0.001 |
|  | (0.066) |
| Intercept | -34.269 |
|  | (90.250) |
| N | 38 |
| R-squared | 0.907 |

Source: Singer Expert Report Backup.

Notes: heteroskedasticity-robust standard errors shown in parentheses. Statistical significance shown at 1% (***), 5% (**), and 10% (*) levels.

Highly Confidential - Attorneys' Eyes Only

110.    Dr. Singer's regression examines ad revenue earned on "non-infringing" content, which he calculates by subtracting his estimate of the revenue earned on allegedly infringing content from YouTube's monthly advertising revenue.  As a practical matter, this means that Dr. Singer subtracts about ███████████ of revenue earned from placing ads on allegedly infringing content from the $46.15 billion in total ad revenue that YouTube earned in the 38 months covered by his regression.[129]  This is a key point for evaluating whether Dr. Singer's regression is plausible because it indicates that YouTube's $46.15 billion of revenue on non-infringing content is significantly driven by allegedly infringing content that itself earned only ███████████ ████████████████████████████████) of YouTube's revenue.

111.    The key explanatory variables in the regression presented in Table 6 are "Log YouTube Pages Visited," and the average number of daily takedown requests in a month, *i.e.*, "Log Takedown Requests."  These explanatory variables are proxies for YouTube's content and allegedly infringing content on YouTube, respectively, according to Dr. Singer.[130]  Thus, Dr. Singer's regression seeks to explain YouTube's "non-infringing" revenue by the quantity of content and allegedly infringing content on YouTube.

112.    Once again, Dr. Singer's regression analysis has the *causation* between revenue and content exactly backwards relative to his multisided platform framework for YouTube.  As discussed above, Dr. Singer claims that it is ad revenue that directly affects the amount of content on YouTube and that changes in content, all else equal, do not directly affect YouTube's revenues.[131]  Yet, Dr. Singer's regression seeks to explain YouTube's "non-infringing" ad revenue based on a proxy for content on YouTube.  As above, the backward causation in the

---

[129]    Dr. Singer estimates the monthly revenue from videos subject to takedown notices when building his regression dataset.  The sum of those monthly values for the months included in the regression above is ███████████.  Dr. Singer's adjustment to YouTube's revenue does not account for the videos that were restored to YouTube and are not infringing.  See my workpapers.

[130]    Updated Singer Report, ¶¶ 100, 105.

[131]    Updated Singer Report, ¶ 64.

regression means that the basic requirements for Dr. Singer's regression to estimate unbiased coefficients *are not met*.[132]  As a result, Dr. Singer's regression is biased.[133]

113.    The evidence of bias is evident from the regression's coefficients.  According to Dr. Singer's regression, Log Takedown Requests would increase YouTube's non-infringing revenues, and the relationship is statistically significant. However, the regression implies that an increase in Log YouTube Pages Visited, which represents the full corpus of YouTube's videos, would not increase YouTube's non-infringing revenues by a statistically significant amount. This result is economically implausible.  In short, Dr. Singer's regression says that changing the amount of non-infringing content does not matter to YouTube's revenues, but changing the number of videos that are removed for being allegedly infringing *does* matter to YouTube's revenues.  The implausibility of this result is amplified by the previously noted economic irrelevance of the allegedly infringing works, which according to Dr. Singer's methodology generate only 0.030% of YouTube's ad revenue over the 38 months examined by his regression.

### B.    Dr. Singer's Regression Seeking to Explain Viewer Time Spent on YouTube Is Biased and Unreliable Because His Estimates Do Not Account for the Indirect Network Effects Inherent in His Multisided Platform Framework

114.    Dr. Singer's analysis indicates that a takedown request has a larger positive effect on viewer time than an average video that is added to YouTube and remains there until the uploader wishes to remove it.  However, the poor revenue performance of videos subject to takedown requests contradicts the implication that removed videos have such outsize effects relative to non-infringing videos.  As described above in paragraph 64, videos subject to takedown requests have substantially lower revenue than average YouTube videos.[134]

---

[132]    Wooldridge, pp. 83-87, 101-102.

[133]    Wooldridge, pp. 559-560.

[134]    See also Figure 2 and Figure 3.

51

115.     Dr. Singer maintains that the interdependency of available content and viewer activity is central to the economics describing YouTube, as illustrated in Figure 3.[135]  In short, Dr. Singer argues that the feedback effects between the amount of available content and content providers on one side and viewers and viewer activity on the other is the primary indirect network effect on the YouTube Platform.[136]  This means that content and viewer activity are *jointly* determined through feedback effects from one side to the other.

116.     Of course, when the dependent and explanatory variables of a regression are jointly determined, the basic assumptions required for regression coefficients to be unbiased are not met.[137]  Econometric techniques, which Dr. Singer does not employ, are required to estimate regression parameters without bias in these circumstances.  A treatise on multisided platforms explains the issue in context: "For multi-sided platforms, the demand by one group of economic agents also depends on the number (or other measures of the size and quality) of each of the other groups of economic agents that the platform serves.  Loosely speaking, the sides are complements in demand.  Failure to account for these demand interdependencies in an economic model renders the results of that model suspect if not completely unreliable when such interdependencies are important."[138]

117.     The results of Dr. Singer's regression explaining viewer time based on proxies for infringing and non-infringing content on YouTube are reproduced below in Table 7.

---

[135]     See also Updated Singer Report, ¶ 61.

[136]     Updated Singer Report, ¶ 56 ("While advertisers also participate in the multi-sided interaction that occurs on YouTube, they have limited influence on the indirect network effects that characterize the platform.  As such, I focus my analysis of these effects on the relationship between the two key constituencies—namely, content users on one side and content providers on the other.").

[137]     Wooldridge, pp. 559-560.

[138]     David S. Evans & Richard Schmalensee, "The Antitrust Analysis of Multisided Platform Businesses," in *The Oxford Handbook of International Antitrust Economics*, Vol. 1, 2015, p. 9.

Highly Confidential - Attorneys' Eyes Only

**Table 7**
**Reproduction of Dr. Singer's Regression Explaining Time on YouTube**

|  | Dependent Variable: Log[Time Spent on YouTube] |
| --- | --- |
| Log Takedown Requests | 0.418*** |
|  | (0.056) |
| Log YouTube Pages Visited | 1.040*** |
|  | (0.125) |
| Log Facebook Pages Visited | -0.146** |
|  | (0.058) |
| Intercept | 0.387 |
|  | (3.097) |
| N | 52 |
| R-squared | 0.853 |

Source: Singer Expert Report Backup.

Notes: heteroskedasticity-robust standard errors shown in parentheses. Statistical significance shown at 1% (***), 5% (**), and 10% (*) levels.

118.    The bias in Dr. Singer's regression results is illustrated by the implausibly disproportionate effect of the number of takedown requests in the model.  As described, takedown requests are, according to Singer, 1.32% of the total content on YouTube, and over the period from July 2017 through September 2022 videos removed from YouTube generated ▮ million in revenue.[139]  Yet according to Dr. Singer's regression, a 1% increase in this small number of low-revenue videos  that are removed from YouTube (1.32% of all YouTube videos generating $21 million) would yield an increase in viewer time that is approximately 40% as large as a 1% increase in *all YouTube videos* that generated approximately $94.4 billion during the months included in the regression.[140]  It is economically implausible that a 1% change in the

---

[139]    The relevant allegedly infringing videos would have generated over 30% less revenue had Dr. Singer accounted for videos that were restored to YouTube because they were not infringing.  See my workpapers.

[140]    Updated Singer Report, Table 8.

relatively small number of removed videos that earned ███████ of YouTube's revenue would have an effect that is roughly 40% as large as the effect of a 1% increase in much larger number of all videos on YouTube.  Put another way, Dr. Singer's regression results imply that adding an additional takedown request has a larger effect on viewer time on YouTube than an average video, despite the evidence that videos subject to takedown requests earn small amounts of revenue, both individually and in the aggregate.

119.    Neither of the regressions that Dr. Singer claims support his conclusions regarding indirect network effects is consistent with his economic framework explaining YouTube as a multisided platform.  The regressions are economically unreliable and do not support disgorgement in any amount.

## VII.    Conclusion

120.    Dr. Singer's disgorgement analysis is plagued by multiple errors that render it unreliable. The starting point for his analysis is a purported proxy for the allegedly infringing content available on YouTube, *i.e.*, videos identified in takedown notices.  Dr. Singer, however, has not shown that these videos that he uses as a proxy for infringing content are in fact infringing.  And Dr. Singer admits that his proxy for allegedly infringing content is too high because it is not limited to copyrights owned by potential class members.[141]

121.    Next, Dr. Singer assumes that viewer time on YouTube changes in proportion to changes in content.  This assumption ignores the framework he develops to characterize YouTube as a multisided platform.  In his framework, the relationship between the amount of content on YouTube and viewer time on YouTube is the result of feedback effects between content and viewer activity.  This framework shows that it is not appropriate to assume that viewer time on YouTube changes proportionally to changes in YouTube content.  Instead, the relationship between the two variables must be empirically measured, which Dr. Singer does not do. Moreover, Dr. Singer ignores the ability of viewers to substitute licensed and/or non-infringing

---

[141]    Updated Singer Report, ¶ 105 ("The proxy overestimates Infringing Content because it includes takedown notices filed on behalf of copyright claimants who are not members of either the Registered Works Infringement Class or the Foreign Unregistered Works Infringement Class.").

content for allegedly infringing content, which indicates that viewer time would change less than proportionally to changes in YouTube content.  In sum, Dr. Singer discards his economic framework and replaces it with an implausible and unreliable assumption.

122.    Dr. Singer's analysis does not follow the economic framework that he develops for YouTube and is unreliable and biased as a result.  It cannot be used to justify disgorgement damages in any amount.  Dr. Singer includes a proxy for all content on YouTube as an explanatory variable in his regression.  However, his multisided framework implies that this explanatory variable is unneeded and including it in the regression will bias the regressions' results.  The regression coefficients show the effects of this bias.  In addition, Dr. Singer's estimate of disgorgement damages fails to account for the reduction in allegedly infringing content that is at the heart of his counterfactual scenario, despite his decision to include the proxy for YouTube content as an explanatory variable in his disgorgement regression.  When this error is corrected, Dr. Singer's disgorgement regression analysis shows that YouTube did not earn additional revenue as the result of alleged infringement and that disgorgement damages are zero.

December 29, 2022


_____

Steven R. Peterson

Appendix A



CURRICULUM VITAE

# Steven R. Peterson, Ph.D.

**OFFICE:**          Compass Lexecon
                     200 State Street
                     9th Floor
                     Boston, MA 02109
                     (617) 520-0200 main
                     (617) 520-0217 direct
                     speterson@compasslexecon.com

## PROFESSIONAL EXPERIENCE

Compass Lexecon
Boston, MA
*Executive Vice President,* April 2013 – present
*Managing Director, Boston Office*, January 2007 – June 2010
*Senior Vice President*, January 2006 – March 2013
*Managing Director,* August 1999 – December 2005

The Economics Resource Group, Inc.
*Senior Economist*, 1992 – July 1999
*Economist*, 1990 – 1992

Northeastern University, Boston, MA
*Adjunct Faculty*, 2011 – 2017

Harvard University, Cambridge, MA
*Teaching Fellow*, 1989 – 1990

## EDUCATION

Harvard University, Cambridge, MA
         Ph.D. in Economics, 1992
         Dissertation: "Strategic Aspects of Litigation and Settlement"

University of California, Davis
         A.B., Economics, 1987, Highest Honors

**TESTIMONY AND CONSULTING EXPERIENCE**

YouTube, LLC

> *Maria Schneider, Uniglobe Entertainment, LLC, and AST Publishing Ltd., individually and on behalf of all others similarly situated v. YouTube, LLC and Google LLC (Case No.: 3:20-cv-04423-JD)*, in the United States District Court, Northern District of California, San Francisco Division. Preliminary Expert Rebuttal Report of Steven R. Peterson, September 22, 2022.

Canadian National Railway

> *Before the Surface Transportation Board, In re Application of the National Railroad Passenger Corporation under 49 U.S.C. § 24308(a), Docket No. FD 35743,* Verified Statement of Steven R. Peterson, May 27, 2022. Reply Verified Statement of Steven R. Peterson, July 26, 2022.  Rebuttal Verified Statement of Steven R. Peterson, August 25, 2022.

MGM Studios

> Consultant to MGM on acquisition by Amazon Inc. (2022).

Equal Justice Under Law

> *Nathan Wright et al., v. Family Support Division of the Missouri Department of Social Services et al.,* in the United States District Court for the Eastern District of Missouri Eastern Division.  Affidavit (November 15, 2019).  Deposition (December 4, 2019).  Rebuttal Affidavit (January 31, 2020).

Google, LLC

> In re: *Determination of Rates and Terms for the Digital Performance of Sound Recording and Making of Ephemeral Copies to Facilitate Those Performances*, before the United States Copyright Royalty Judges, The Library of Congress. Written Direct Testimony (September 23, 2019, Amended December 10, 2019). Written Rebuttal Testimony (January 10, 2020, Amended February 7, 2020). Trial Testimony (August 25-26, 2020).

Radio Music License Committee

> *Radio Music License Committee v. Broadcast Music, Inc.,* in the United States District Court for the Southern District of New York.  Expert Report (July 22, 2019).  Expert Rebuttal Report (August 19, 2019).  Deposition (September 11, 2019).

Legal Aid Justice Center

> *Damian Stinnie et al., v. Richard Holcomb in his official capacity as the Commissioner of the Virginia Department of Motor Vehicles*, in the United States District Court for the Western District of Virginia, Charlottesville Division. Hearing Testimony (November 15, 2018).  Expert Report (May 1, 2019). Deposition (May 24, 2019).

Keweenaw Bay Indian Community

*Keweenaw Bay Indian Community v. Nick A. Khouri et al.,* in the United States
District Court for the Western District of Michigan. Expert Report (May 25,
2018). Supplemental Report (August 3, 2018). Deposition (September 6, 2018).

United States Soccer Federation, Inc.
*North American Soccer League, LLC v. United States Soccer Federation, Inc.* in
the United States District Court for the Eastern District of New York.  Declaration
(October 16, 2017). Reply Declaration (November 1, 2017).

Radio Music License Committee
In an Arbitration before the Hon. Vaughn Walker, Kenneth R. Feinberg, Esq., and
Lee A. Freeman, Jr., Esq. between: *SESAC, Inc., SESAC, LLC, and SESAC
Holdings, Inc., Claimants v. Radio Music License Committee, Respondent,* Expert
Report (December 23, 2016).  Reply Expert Report (January 23, 2017). Hearing
Testimony (February 23 and March 10, 2017).

Radio Music License Committee
*Radio Music License Committee v. Global Music Rights, LLC.* in the United
States District Court for the Eastern District of Pennsylvania.  Declaration
(November 18, 2016). Declaration (July 21, 2017).

TransCanada Corporation
Consultant to TransCanada Corporation on its acquisition of Columbia Pipeline
Group (March – June 2016).

Sanum Investments Limited
In an Arbitration Under the Rules of the Singapore International Arbitration
Centre between: *Sanum Investment Limited, Claimant, versus ST Group Co., Ltd.,
Sithat Xaysoulivong, S.T. Vegas Co., Ltd., S.T. Vegas Enterprise Ltd., Xaya
Construction Co., Ltd. and Xaysana Xaysoulivong*, *Respondents*, Witness
Statement, with Joseph P. Kalt and Eric Henson (April 20, 2016).

National Association of Broadcasters and Pandora Media, Inc.
In re: *Determination of Royalty Rates and terms for Ephemeral Recording and
Digital Performance of Sound Recordings*, before the United States Copyright
Royalty Judges, Library of Congress. Expert Report (February 23, 2015),
Deposition Testimony (March 24, 2015), Hearing Testimony (May 14, 2015).

National Association of Broadcasters
In re: *Antitrust Consent Decree Review: American Society of Composers, Authors
and Publishers/Broadcast Music, Inc.*  Comments on Behalf of the National
Association of Broadcasters (August 6, 2014).

Leidos, Inc.
*United States of America v. Leidos, Inc.,* in the United States District Court for the
District of Columbia.  Expert Report (March 28, 2014).

3

Radio Music License Committee
> *Radio Music License Committee v. SESAC, Inc., SESAC, LLC, and SESAC Holdings, Inc.* in the United States District Court for the Eastern District of Pennsylvania.  Declaration (November 14, 2013).  Deposition (December 4, 2013).  Trial Testimony (December 10, 2013).

BJ's Wholesale Club, Inc.
> *Irene Cappalli v. BJ's Wholesale Club Inc.* in the United States District Court, District of Rhode Island.  Expert Report (March 15, 2012). Deposition (April 27, 2012). Declaration (February 12, 2013).

National Marine Fisheries Service
> Consultant to National Marine Fisheries Service on market power and excessive-share limits in the Surf Clam and Ocean Quahog fisheries (2010 – 2011).

Energy Intensive Manufacturers Working Group
> *Coalition for Responsible Regulation, Inc. et al. v. United States Environmental Protection Agency*, in the United States Court of Appeals for the District of Columbia Circuit. Declaration (September 14, 2010).

Amex Construction Company, Inc.
> *ExxonMobil Oil Corporation v. Amex Construction Company, Inc.*, in the United States District Court, Northern District of Illinois, Eastern Division. Expert Report (February 15, 2010). Deposition (March 2, 2010).

Delta Air Lines, Inc.
> Consultant to Delta Air Lines on LaGuardia/Reagan National Airport slot swap with U.S. Airways (2009 – 2010).

Imperial Credit Industries, Inc.
> *In re: Imperial Credit Industries, Inc.,* in the United States Bankruptcy Court, Central   District of California, Santa Ana Division. Rebuttal Report (April 27, 2007). Trial Testimony (May 22, 2008).

Delta Air Lines, Inc.
> Consultant to Delta Air Lines on Delta-Northwest merger (2007 – October 2008).

Greater Lakeside Corporation
> *The Higbee Company v. Greater Lakeside Corporation, Causeway LLC of Delaware, Broadway Management Corporation, and Jeffrey Feil,* in the United States District Court for the Eastern District of Louisiana. Expert Report (September 18, 2007). Supplemental Expert Report (September 25, 2007). Deposition (October 19, 2007).

TransCanada Corporation
> Consultant to TransCanada Corporation on its acquisition of ANR Group (2007).

4

Exxon Mobil Corporation
>    *JAAM, Inc., d/b/a Tigerland Exxon v. Exxon Mobil Corporation and Mon Valley Petroleum, Inc.,* in the United States District Court for the Western District of Pennsylvania. Expert Report (January 12, 2007).

Finova Capital
>    *In Re: Finova Capital Corporation and Finova Mezzanine Capital, Inc.,* in the United States Bankruptcy Court for the District of Delaware. Expert Report (May 19, 2006). Deposition (August 2, 2006).

Volvo Cars of North America, Inc.
>    *Bay Ridge Volvo American, Inc. et al. v. Volvo Cars of North America, Inc.,* in the United States District Court Southern District of New York.  Expert Report (June 1, 2005).  Deposition (August 17, 2005).  Supplemental Expert Report (November 11, 2005).

Israel Electric Corporation, Ltd.
>    *Israel Electric Corporation Ltd. vs. the Public Utilities Authority, the Minister of National Infrastructures, the Minister of Finance, the Israel Securities Authority and the Government Corporations Authority (Request for Injunction)*: In the Israeli Supreme Court, No. /04, August 2004.  Statement (August 30, 2004), with Joseph P. Kalt and Paul B. Vasington.

Flying J, Inc.
>    *Flying J, Inc. v. Comdata Network, Inc., in the United States District Court of Utah (Northern Division).* Declaration (June 22, 2004). Damages Report (June 22, 2004). Deposition (October 6, 2004). Hearing Testimony (November 19, 2004).

Musicmatch, Inc.
>    *Gracenote, Inc. v. Musicmatch Inc., In the United States District Court Northern District of California (Oakland Division).* Expert Report (February 17, 2004). Declaration (February 24, 2004).  Deposition (March 2004).

Monica Pappas, Bill DeVitt, and Monica Pappas Associates
>    *The Healthcare Financial Group, Inc., v. Monica Pappas DeVitt et al., in the District Court, Arapahoe County, Colorado.*  Filed written expert testimony on lost-profits damages (February 2003).

Ticketmaster Corporation
>    Evaluated damages from asserted anti-competitive conduct (2003).

Amoco Production Company, Amerada Hess Corporation, and Shell Western E&P, Inc.
>    Assessed fair market value of $CO_2$ for payment of royalties.  Analyzed issues of market structure of $CO_2$ industry and marketability of $CO_2$ at the well (2002).

5

American Airlines
    Conducted analysis of market structure, capacity additions, and pricing in an antitrust suit asserting predatory conduct (2001).

For a Mutual Insurance Company
    Conducted market research and performed benchmarking analyses to establish pricing approach and prices for new internet services (2000).

Bass Enterprises Production Company
    Assessed fair market rental value of oil-bearing property temporarily taken by the federal government (2000).

Boeing Company
    Filed declaration of behalf of Boeing Company (Delta Launch Services, Inc.) for a NASA administrative proceeding regarding release of contract information under the Freedom of Information Act (2000).

Honeywell, Inc.
    Conducted study of damages arising from monopolization in the market for ring laser gyroscope inertial navigation systems. Conducted analysis of damages arising from patent infringement (1998).

British Airways, Plc.
    Conducted study of the competitive effects of British Airways' proposed alliance with American Airlines. Advised on and assisted with presentations before the European Commission (1998).

HarperCollins Publishers
    *Brother Records, Inc., et al., v. HarperCollins Pub. Inc., et. al.* Filed written expert testimony on damages in libel litigation (December 1997).

Northeast Utilities
    *Before the Federal Energy Regulatory Commission, OA97-237-000, ER 97-1079-000, and EC97-35-000.* Conducted analysis of competition in the New England generation market. Filed affidavit in support of NU's Answer to Requests to Reject or Condition Approval of Market-Based Rates (with Frank A. Felder) (July 1997).

McDonnell Douglas Corporation
    *McDonnell Douglas Corporation v. National Aeronautics and Space Administration, in the U.S. District Court for the District of Columbia.* Filed affidavit describing how the public release of cost and price information affects negotiations and competition in markets for launch services (November 1996).

6

Pennzoil

*Before the Federal Energy Regulatory Commission, Docket No, IS95-35-000.* Provided written direct testimony (October 1996) and oral testimony (January 1997) on the cost of capital of oil pipeline facilities.

Pennzoil

*Before the Federal Energy Regulatory Commission, Docket No. IS94-37-000* and *Docket No. IS 94-23-000.* Provided written direct testimony (April 1995) and oral testimony (November 1995).

BP Exploration (Alaska) Inc.

Modeled the costs and benefits associated with increased enhanced oil recovery activities within the Prudhoe Bay Unit (1995).

Burlington Northern Industries-Santa Fe Pacific Corporation

Performed cost-benefit analysis of the proposed Burlington Northern/Santa Fe merger. Analyzed the benefits accruing to shippers from expanded single-line service (1994 – 1995).

## PUBLICATIONS AND RESEARCH

"Using Economics to Identify Common Impact in Antitrust Class Certification," American Bar Association, Section of Antitrust Law, Economics Committee Newsletter, Vol. 11, No. 1, Spring 2011 (with Andrew Lemon).

"Rigorous Analysis to Bridge the Inference Gap in Class Certification" (with Andrew Lemon), *Journal of Competition Law and Economics*, March 2011.

"Oil Price Volatility and Speculation" (with Kenneth Grant), *The Energy Daily*, August 25, 2009.

"Understanding Today's Crude Oil and Product Markets" (with Kenneth Grant and David Ownby), American Petroleum Institute, 2006.

"Understanding Natural Gas Markets" (with Charles Augustine and Bob Broxson), American Petroleum Institute, 2006.

"Regulatory Failure in the California Electricity Crisis" (with Charles Augustine), *The Electricity Journal*, August/September 2003.

"Market Power Analysis in a Dynamic Electric Power Industry" (with F. Felder), *The Electricity Journal*, April 1997.

"Testing the Merits of Providing Customized Risk Management" (with Frank A. Felder and Sarah E. Tobiason), 17th Annual North American Conference of the United States Association for Energy Economics, International Association for Energy Economics, October 1996.

"Competition Between Regulators and Venue Shopping by Natural Gas Pipelines in California" (with Joseph P. Kalt), 14th Annual Conference of the Advanced Workshop in Regulation and Public Utility Economics, May 1995.

"Environmental Regulation and International Competitiveness:  What Does the Evidence Tell Us?" (with Adam B. Jaffe, Paul R. Portney, and Robert N. Stavins), *Journal of Economic Literature*, Vol. 33, March 1995.

"Implementation of the Core of a Two Person Exchange Economy without Integer Games or Refinements of Nash Equilibrium" (with Simon Grant, Stephen King, and Ben Polak), *Economics Letters*, 1992.

**OTHER REPORTS AND PRESENTATIONS**

 "The Economic Impact of Delta Air Lines Seattle Expansion," (with Bryan Keating). August 14, 2015.

 "Antitrust Analysis of Aftermarkets," American Bar Association, Section of Antitrust, 2010 Spring Meeting (with Edward Schwartz and Paula Render).

"Do Environmental Regulations Impair Competitiveness?  A Critical Review of Economic Studies" (with Barry Galef and Kenneth Grant).  Prepared by ICF Consulting Group and The Economics Resource Group, Inc., for the Office of Policy Analysis and Review, Office of Air and Radiation, U.S. Environmental Protection Agency, September 1995.

"Indexing Natural Gas Pipeline Rates" (with Amy B. Candell, Joseph P. Kalt, Sheila M. Lyons, and Stephen Makowka). Explored indexing as a form of Incentive regulation for natural gas pipelines and created the Pipeline Producer Price Index that could be used to implement indexing proposals. The Economics Resource Group, Inc., April 1995.

"Environmental Regulations and the Competitiveness of U.S. Industry" (with A. Jaffe, P. Portney and R. Stavins), U.S. Department of Commerce, Economics and Statistics Administration, Washington, DC, NTIS No. PB-93-193514, July 1993.

**HONORS AND AWARDS**

Jacob K. Javits Fellow, Harvard University, 1987 – 1991

Phi Beta Kappa, University of California, Davis, 1987

Appendix B

**Materials Relied Upon**

**Bates Documents**

> GOOG-SCHNDR-00034775

> GOOG-SCHNDR-00054422

**Depositions**

> Deposition of Arpan Agrawal

**Declarations**

> Declaration of Chenyuan Zhu in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification

> Declaration of Joanne Suk in Support of YouTube, LLC and Google LLC's Motion for Summary Judgment as to Plaintiff Maria Schneider

> Declaration of Paul Harold in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification

**Literature**

> Allen, Hall, and Lazear, "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence*, 3rd ed., Federal Judicial Center and National Research Council, 2011

> Arthur Lewbel, *The Identification Zoo: Meanings of Identification in Econometrics,* 57(4) Journal of Economic Literature 835-903 (2019), *available at* https://pubs.aeaweb.org/doi/pdfplus/10.1257/je1.20181361

> Arnold Zellner, *An Efficient Method of Estimating Seemingly Unrelated Regressions and Tests for Aggregation Bias,* Journal of the American Statistical Association,57(298) (1962), 348-368.

> Peter Kennedy, A Guide to Econometrics, 4[th] Ed., MIT Press, 1998.

> Sebastian Voigt and Olivier Hinz, *Network effects in two-sided markets: why a 50/50 user split is not necessarily revenue optimal,* Business Research, 8, (2015), 139-170 at 159151.

1

Oliver Hinz, Thomas Otter & Bernd Skiera, *Estimating Network Effects in Two-Sided Markets,* Journal of Management Information Systems, 37(1), (2020), 12-38Benjamin Klein, Andres V. Lerner, Kevin M. Murphy and Lacey L. Plache, *Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees,* 73(3) Antitrust Law Journal 571-626 (2006)


Bodo Herzog, *Valuation of Digital Platforms: Experimental Evidence for Google and Facebook,* 6(4) International Journal of Financial Studies (2018), *available at* https://www.mdpi.com/2227-7072/6/4/87/pdf?version=1539747767


Daniel Trabucchi and Tommaso Buganza, "Fostering Digital Platform Innovation: From Two to Multi-Sided Platforms," *Creativity and Innovation Management*, 2020.


David Evans and Richard Schmalensee. *The Industrial Organization of Markets with Two-Sided Plafforms,* NBER Working Paper, Working Paper 11603, September 2005


David S. Evans and Richard Schmalensee, *The Antitrust Analysis of Multisided Platform Businesses,* in 1 The Oxford Handbook of International Antitrust Economics 404 (Roger Blair and D. Daniel Sokol, eds. Oxford Univ. Press, 2015)


David S. Evans and Richard Schmalensee, *The Industrial Organization of Markets with Two-Sided Platforms,* 3(1) Competition Policy International 151 (Spring 2007)


Howard Shelanski, Samantha Knox and Arif Dhilla, *Network Effects and Efficiencies in Multisided Markets,* submitted for Item 8 at the 127th meeting of OECD Competition Committee on 21-23 June 2017, *available at* https://one.oecd.org/document/DAF/COMP/WD(2017)40/FINAL/en/pdf


Jean-Charles Rochet and Jean Tirole, *Platform Competition in Two-Sided Markets,* 1(4) Journal of the European Economic Association 990-1029 (2003)

Jean-Charles Rochet and Jean Tirole, "Two-Sided Markets: An Overview," March 12, 2004.

Jouni Kerman, Peng Wang, and Jon Vaver, *Estimating Ad Effectiveness using Geo Experiments in a Time-Based Regression Framework,* Google, March 2017, *available at* https://static.googleusercontent.com/media/research.google.com/en//pubs/archive/45950.pdf

Lapo Filistrucchi, Damien Geradin, Eric van Damme, Pauline Affeldt, *Market Definition in Two-Sided Markets: Theory and Practice,* 10(2) Journal of Competition Law and Economics 293-339 (2014)

Marc Rysman, *Competition Between Networks: A Study of the Market for Yellow Pages,* 71 Review of Economic Studies 483-512 (2004)

Marc Rysman, *The Economics of Two-Sided Markets,* 23(4) Journal of Economic Perspectives 125-143 (2009)

Michael L. Katz and Carl Shapiro, *Network Externalities, Competition, and Compatibility,* 75(3) American Economic Review 424-440 (1985)

Naihua Duan, *Smearing Estimate: A Nonparametric Retransformation Method,* 78(383) Journal of the American Statistical Association, 605-610 (1983)

S.J. Liebowitz & Stephen Margolis, *Network Externalities (Effects),* in The New Palgrave's Dictionary of Economics and the Law (MacMillan, 1998)

S.J. Liebowitz and Stephen E Margolis, *Network Externality: An Uncommon Tragedy,* 8(2) Journal of Economic Perspectives 133-150 (1994)

Shiyu Yang, Dominique Brossard, Dietram A. Scheufele, and Michael A. Xenos, *The science of YouTube: What factors influence user engagement with online science videos?,* 17(5) PLoS ONE (2022)

3

Sharon L. Lohr, Sampling Design and Analysis, 2nd Ed. Brooks/Coal Cengage Learning, 2010

Simon P. Anderson and Bruno Jullien, *The advertising-financed business model in two-sided media markets,* in 1 Handbook of Media Economics 41-90 (Elsevier 2015)

**Legal Documents**

First Amended Class Action Complaint, Dkt. 99.

Plaintiffs' Motion for Class Certification, Dkt. 190.

Minute Order from the Court re 12-15 Hearing, Dkt. 213.

**Expert Reports**

Expert Report of Hal J. Singer, Ph.D. for Plaintiffs, September 1, 2022.

Expert Report of Charles D. Cowan, Ph.D., September 1, 2022.

Expert Report of Hal J. Singer, Ph.D. for Plaintiffs, November 17, 2022.

Expert Report of Charles D. Cowan, Ph.D., November 17, 2022.

**Publicly Available Materials**

Alphabet Form 10-K for the fiscal year ended December 31, 2021. Available at https://abc.xyz/investor/static/pdf/2021_alphabet_annual_report.pdf?cache=3a96f54

Alphabet Q4 2016 Earnings Call, January 26, 2017. Available at https://abc.xyz/investor/static/pdf/2016_Q4_Earnings_Transcript.pdf

Bri Holt, Heidi R. Lynn, and Michael Sowers, "Analysis of Copyrighted Videos on YouTube.com," Vidmeter.com, 2007. Available at https://web.archive.org/web/20070408025119/https://www.vidmeter.com/i/vidmeter_copyright_report.pdf

Geoff Duncan, *Infringing Videos Not Big on YouTube?,* Digital Trends, April 5, 2007, available at https://www.digitaltrends.com/home/infringing-videos-not-big-on-youtube/

YouTube Copyright Transparency Report, H1 2022. Available at https://transparencyreport.google.com/report-downloads

Paul Resnikoff, "99.5% of All Infringing Music Videos are Resolved by Content ID, YouTube Claims," *Digital Music News*, August 8, 2016, available at https://www.digitalmusicnews.com/2016/08/08/copyright-problems-resolved-content-id/

Survivor, *Eye of the Tiger*. https://www.youtube.com/watch?v=btPJPFnesV4

YouTube for Press. https://blog.youtube/press/

Susan Wojcicki, "YouTube at 15: My personal journey and the road ahead", Feb 14, 2020. https://blog.youtube/news-and-events/youtube-at-15-my-personal-journey/

How Does YouTube Make Money? https://www.youtube.com/howyoutubeworks/our-commitments/sharing-revenue/

Create a Video Campaign. https://support.google.com/google-ads/answer/2375497

How Ads Show on Videos You Monetize, https://support.google.com/youtube/answer/7438625

How to Earn Money on YouTube. https://support.google.com/youtube/answer/72857

YouTube Partner Program Overview & Eligibility. https://support.google.com/youtube/answer/72851

Amy Singer, "Introducing the YouTube Shorts Fund", May 22, 2021. https://blog.youtube/news-and-events/introducing-youtube-shorts-fund/

Amjad Hanif, "Made on YouTube: Supporting the Next Wave of Creative Entrepreneurs", Sep 20, 2022. https://blog.youtube/news-and-events/supporting-the-next-wave-of-creative-entrepreneurs/

Lyor Cohen, "$6 Billion Paid to the Music Industry in 12 Months", Sep 13, 2022. https://blog.youtube/creator-and-artist-stories/6-billion-paid-to-the-music-industry-in-12-months/

Retract a Claim of Copyright Infringement. https://support.google.com/youtube/answer/2807691?hl=en

David King, "Latest Content ID Tool for YouTube", Oct 15, 2007. https://googleblog.blogspot.com/2007/10/latest-content-id-tool-for-youtube.html

Fabio Magagna, "Helping Creators Protect Their Content", Jul 11, 2018. https://blog.youtube/news-and-events/helping-creators-protect-their-content/

Advertiser-Friendly Content Guidelines. https://support.google.com/youtube/answer/6162278?hl=en

YouTube Partner Program.
https://www.youtube.com/creators/how-things-work/video-monetization/?gclid=EAIaIQobChMI
pN-Nwvv7-wIVgbbICh3-3gBPEAAYASAAEgIA0vD_BwE#youtube-partner-program