# EXHIBIT 6

George A. Zelcs*
  gzelcs@koreintillery.com
Randall P. Ewing, Jr.*
  rewing@koreintillery.com
Ryan Z. Cortazar*
  rcortazar@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Stephen M. Tillery*
  stillery@koreintillery.com
Steven M. Berezney, CA Bar #329923
  sberezney@koreintillery.com
Carol O'Keefe*
  cokeefe@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Joshua Irwin Schiller, CA Bar #330653
  jischiller@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293-6800
Facsimile: (415) 293-6899

Philip C. Korologos*
  pkorologos@bsfllp.com
Jeffrey Waldron*
  jwaldron@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

* Admitted *pro hac vice*

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING, LTD., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>YOUTUBE, LLC and GOOGLE LLC,<br><br>Defendants. | Case No. 3:20-cv-04423-JD<br><br>**DECLARATION OF JEFFREY WALDRON IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 6 TO EXCLUDE DISCOVERY SEARCH RESULTS**<br><br>Date:     May 25, 2023<br>Time:    1:30 p.m.<br>Dept.:    11<br>Judge:   Hon. James Donato |

Case No. 3:20-cv-04423-JD

1    I, Jeffrey Waldron, declare as follows:

2    1.    I am an attorney at Boies Schiller Flexner LLP, co-counsel to Plaintiffs and

3    putative class representatives Maria Schneider, Uniglobe Entertainment, LLC, and AST

4    Publishing, Ltd.  I make this declaration in support of Plaintiffs' Opposition to Defendants'

5    Motion in Limine No. 6 to Exclude Discovery Search Results.  I have knowledge of the facts

6    stated herein from my personal knowledge and, if called as a witness, I could and would

7    competently testify thereto.

8    2.    Attached hereto as **Exhibit 1** is a true and correct copy of the Expert Report of

9    Joseph M. Winograd, dated September 1, 2022.

10    3.    Attached hereto as **Exhibit 2** is a true and correct copy of a YouTube document

11    entitled "Life of a YouTube upload" dated February 15, 2020, bearing production number GOOG-

12    SCHNDR-00034775.

13    4.    Attached hereto as **Exhibit 3** is a true and correct copy of a document downloaded

14    from https://www.blog.google/documents/27/How_Google_Fights_Piracy_2018.pdf/ (last

15    accessed May 5, 2023) entitled "How Google Fights Piracy," dated November 2018, that was

16    produced in black and white as a document bearing on its first page production number GOOG-

17    SCHNDR-00021221.

18    5.    Attached hereto as **Exhibit 4** is a true and correct copy of a YouTube document

19    entitled "Copyright Transparency Report," for the first half of 2021.

20

21    I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th

22    day of May 2023 at New York, New York.

23

24                                    _/s/ Jeffrey Waldron_____
                                       Jeffrey Waldron

25

26                                **ATTESTATION**

27

28                                    2                    Case No. 3:20-cv-04423-JD

1   My user ID and password are being used in the electronic filing of this document and, in

2   compliance with N.D. Cal. Civil L.R. 5-1(h)(3), I hereby attest that concurrence in the filing of the

3   document has been obtained from each of the other Signatories.

4

5   */s/ Philip Korologos*
    Philip Korologos

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JEFFREY WALDRON IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 6 TO EXCLUDE
DISCOVERY SEARCH RESULTS

# EXHIBIT 1
Filed Under Seal

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| MARIA SCHNEIDER, UNIGLOBE ENTERTAINMENT, LLC, and AST PUBLISHING LTD., individually and on behalf of all others similarly situated;<br><br>     Plaintiffs,<br><br>v.<br><br>YOUTUBE, LLC; and GOOGLE LLC,<br><br>     Defendants. | Case No. 3:20-cv-4423 |

**EXPERT REPORT OF JOSEPH M. WINOGRAD FOR PLAINTIFFS**

September 1, 2022

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................ 4

    A.   Engagement ................................................................................................ 4

    B.   Qualifications ............................................................................................. 5

    C.   Compensation ............................................................................................ 8

    D.   Materials Considered ................................................................................. 8

    E.   Terminology ............................................................................................... 8

    F.   Assumptions ............................................................................................... 8

II.     SUMMARY OF CONCLUSIONS AND OPINIONS ..................................... 9

III.    CONTENT ID IS HIGHLY EFFECTIVE IN FINDING COPYRIGHT
        INFRINGEMENT ON YOUTUBE. .............................................................. 10

    A.   Content ID automatically finds infringing videos using Defendants' powerful
         Matching System ...................................................................................... 10

    B.   Defendants' Matching System enables Content ID to find a range of infringing
         material ..................................................................................................... 14

    C.   Defendants' Matching System is applied comprehensively to videos on
         YouTube .................................................................................................... 19

IV.     THE TOOLS DEFENDANTS PROVIDE TO ORDINARY COPYRIGHT OWNERS
        ARE DESIGNED IN A MANNER THAT PREVENTS THE IDENTIFICATION OF
        MANY TYPES OF INFRINGING VIDEOS. ............................................... 24

    A.   The tools provided to Ordinary Copyright Owners are dramatically less
         effective at finding copyright infringement than those provided to Content ID
         Partners .................................................................................................... 24

    B.   YouTube Search cannot detect a wide range of typical copyright
         infringements and its deduplication feature prevents users from finding
         multiple similar videos that infringe their works ................................... 26

        1.  YouTube Search cannot find infringing videos that are not annotated with text that
            specifically identifies the infringed work ........................................... 30

        2.  YouTube Search is ineffective at finding videos that infringe works identified by
            generic or non-unique descriptions .................................................... 31

        3.  Infringing videos on YouTube with a privacy setting of unlisted or private are shielded
            from discovery using YouTube Search ............................................... 33

    C.   Manual Copyright Search is designed to find infringing videos on YouTube but
         is not available to most Ordinary Copyright Owners. ........................... 35

D.   COPYRIGHT MATCH TOOL PROVIDES AN INFERIOR MATCHING TOOL TO A LIMITED NUMBER OF ORDINARY COPYRIGHT OWNERS. ............................................................. 36

   1.   **Copyright Match Tool was developed to protect YouTube's popular YouTube Partner channels** ............................................................................................ 37

   2.   **Defendants limited the utility of the Copyright Match Tool extended to filers of successful DMCA takedown notices.** ......................................................... 41

V.   **DEFENDANTS COULD PROVIDE THE PLAINTIFF CLASS WITH FULL ACCESS TO THEIR MATCHING SYSTEM AT LIMITED ADDITIONAL COST** ............................... 43

   A.   DEFENDANTS HAVE ALREADY BUILT AND ARE OPERATING THE CAPABILITIES NEEDED TO ENABLE ORDINARY COPYRIGHT OWNERS TO EFFECTIVELY FIND INFRINGING VIDEOS ON YOUTUBE ............................................................................................... 43

   B.   PROVIDING ORDINARY COPYRIGHT OWNERS WITH EFFECTIVE TOOLS TO FIND INFRINGING VIDEOS ON YOUTUBE IS WITHIN DEFENDANTS' EXISTING CAPABILITIES AND BUDGET FOR SUCH ACTIVITIES AND COULD BE EXECUTED WITH LITTLE TECHNICAL RISK ......................... 46

   C.   DEFENDANTS CAN PROVIDE ORDINARY COPYRIGHT OWNERS WITH ACCESS TO CONTENT ID'S MATCHING CAPABILITIES WITHOUT INCREASING ABUSE AND INVALID USE .................. 48

VI.   **THROUGH YOUTUBE'S AUTOPLAY AND WATCHNEXT VIDEO RECOMMENDATION SYSTEMS, DEFENDANTS ACTIVELY PROMOTE AND CONTROL THE PRESENTATION OF INFRINGING CONTENT TO VIEWERS.** ..... 53

   A.   DEFENDANTS' WATCHNEXT RECOMMENDATIONS ARE THE ███████████████████ OF WHAT VIDEO IS WATCHED ON YOUTUBE ................................................................... 53

   B.   DEFENDANTS EXERT EXPLICIT CONTROL OVER WHAT VIDEOS ARE RECOMMENDED BY WATCHNEXT, AND CONSEQUENTLY WHAT VIDEOS YOUTUBE VISITORS WATCH .................. 59

   C.   DEFENDANTS' DESIGN OF WATCHNEXT AND AUTOPLAY AND THEIR WITHHOLDING OF EFFECTIVE COPYRIGHT MANAGEMENT TOOLS FROM ORDINARY COPYRIGHT OWNERS HAVE ENABLED THEM TO PROMOTE INFRINGING VIDEOS ON YOUTUBE TO VIEWERS WITH THE STRONGEST INTEREST ...................................................................................... 67

   **Exhibit A.**      **Curriculum Vitae** ............................................................................ 71

   **Exhibit B.**      **List of Materials Considered** ...................................................... 77

   **Exhibit C.**      **Glossary of Terms** ......................................................................... 83

   **Exhibit D.**      **Capabilities Summary of YouTube Copyright Management Tools** ......... 86

CONFIDENTIAL

# I.  <u>Introduction</u>

## A.  Engagement

**[1]** I have been engaged by plaintiffs Maria Schneider, Uniglobe Entertainment, LLC, and AST Publishing Ltd. ("Plaintiffs") in the above-captioned matter brought by Plaintiffs against defendants YouTube, LLC and Google, LLC ("Defendants") to provide expert testimony as set forth below. My engagement by Plaintiffs was made solely in my personal capacity and has been conducted independently and without involvement of any kind by my employer, Verance Corporation.

**[2]** I have been asked by Plaintiffs to provide expert opinions on (a) the effectiveness of YouTube's Content ID system in finding copyright infringement; (b) the inadequacy of the tools Defendants provide to Ordinary Copyright Owners seeking to find infringing works on the YouTube platform; (c) the role played by Defendants' Autoplay and WatchNext video recommendation systems in serving copyright infringing videos to YouTube viewers; and (d) the costs associated with providing Content ID's matching capability to the plaintiff class.

**[3]** My opinions are based in part on more than 25 years of active development and operation of content identification technologies for the entertainment industry, including widely used industry standard technologies for copyright management of video and music. These technologies have been applied to many thousands of commercial works and incorporated in over 500 million consumer devices. Throughout my career, I have worked in close concert on content identification and copyright management issues with technical, legal, and business representatives of the film, television broadcasting, radio

4

CONFIDENTIAL

broadcasting, feature music, non-feature music, advertising, performing rights, computer system, computer software, silicon chip, and consumer electronics industries.

**[4]** In addition to my personal knowledge, background, and experience in the field, my opinions are based on an independent examination of documents and materials produced in the matter to date. Should additional relevant information become available, I respectfully reserve the right to amend or supplement my opinions as necessary.

**[5]** This Expert Report ("Report") has been prepared in connection with the above-referenced matter.

**[6]** If called upon as a witness in this matter, I could and would provide the following testimony.

### B.    Qualifications

**[7]** I currently serve as the Executive Vice President and Chief Technology Officer of Verance Corporation ("Verance"). Verance is a technology development and licensing company whose primary business activity is providing content identification solutions for the media and entertainment, computer, and consumer electronics industries. I am a founder of the company and have been engaged in this capacity by Verance and its predecessor company, ARIS Technologies, Inc., since 1995. My role at Verance includes executive-level responsibility for technology development, product development, product strategy, intellectual property, industry standards, and product evangelism. Under my leadership, Verance's content identification solutions have been adopted as multi-industry standards for music, film, and television and commercially deployed as follows.

CONFIDENTIAL

**[8]** In 1999, Verance's *VCMS/A* audio watermarking technology (also marketed under the names *ARIS-SOLANA-4C* and *VERANCE-4C*) was selected as a multi-industry standard for copyright protection of commercial sound recordings by the 200-member Secure Digital Music Initiative consortium. The purpose of this standard is to provide a means for personal computer applications, such as personal music library software, and consumer electronic devices such as portable music and optical disc players and recorders, to automatically identify and limit the use of unauthorized copies of copyrighted sound recordings. As a result of this selection, in partnership with the 4C Entity, LLC (a consortium controlled by Intel, IBM, Matsushita (Panasonic), and Toshiba), the technology was in 2001 made a mandatory component of the DVD-Audio consumer electronics format and incorporated in over 50 million consumer optical disc recorders and players.

**[9]** Between 2000 and 2006, Verance operated the *ConfirMedia* service that use audio watermarking technology to automatically identify and measure the use of audio and audiovisual works in radio and television broadcasts. The service was used by over 100 advertisers, programmers, broadcast networks, performing rights organization, and non-feature (background) music to obtain next-day measurement confirmation of the inclusion of their works on national and local radio and television broadcasts across the 100 largest U.S. markets.

**[10]**        In 2006, Verance's *Cinavia* audio watermarking technology (also marketed under the name *VCMS/AV*) was selected as a multi-industry standard by the AACS LA, LLC (a consortium controlled by The Walt Disney Company, Intel, Microsoft, Matsushita (Panasonic), Warner Bros. Entertainment, IBM, Toshiba, and Sony Corp.) for copyright

CONFIDENTIAL

protection of movies, television programs, and other commercial audiovisual works. The purpose of this standard is to provide a means for consumer electronics devices and computer systems to automatically identify and limit the use of unauthorized copies of copyrighted audiovisual works. As a result of this selection, the technology was in 2011 made a mandatory component of the Blu-ray Disc consumer electronics format and incorporated in over 500 million Blu-ray Disc players, personal computers, and game consoles, including Sony PlayStation 3, 4 and 5, and Microsoft Xbox 360, One, and Series X. The *Cinavia* technology has been applied to protect hundreds of theatrical and home entertainment titles, including releases from Warner Bros., Universal Studios, Twentieth-Century Fox Films, The Walt Disney Company, Lions Gate Entertainment, and Sony Pictures Entertainment.

[11]     In 2015, Verance's *VP1* audio and video watermarking technologies (also referred to by the standards numbers ATSC A/334 and ATSC A/336 and marketed under the tradename *Aspect*) were selected as multi-industry standards by the Advanced Television Systems Committee (the governing body of the North American television broadcast system) and the DVB (the governing body of the international television broadcast standard used across Europe and in 40 other countries worldwide) to enable content identification of broadcast video for the purpose of enabling interactive applications to be incorporated within traditional broadcast television services. The first television sets incorporating these standards were launched by LG Electronics in 2022, with the FOX network as the first national broadcast network deploying the technology.

[12]     I am the recipient of a Technical and Engineering Emmy award from the National Academy of Television Arts and Sciences for my contributions to advancements in

content identification technologies and I am the inventor of 63 issued U.S. Patents and an additional 81 published U.S. Patent Applications in the field. All this work has been performed in my capacity as the founder and Chief Technology Officer of Verance.

**[13]**   My patent and publication lists are included in my curriculum vitae, a copy of which is attached to the Report as Exhibit A.

### C.   Compensation

**[14]**   My work on this matter is being billed at the rate of $750.00 per hour. My compensation is not contingent upon, dependent upon, or related in any way to the outcome of the matters.

### D.   Materials Considered

**[15]**   In preparation for the Report and expert testimony that I may be called on to provide, I have considered the materials listed in Exhibit B.

### E.   Terminology

**[16]**   Certain terminology is used in this report with a specific meaning that differs from its general English usage. Such terminology is written with its first letter capitalized and is listed, with a definition of my intended meaning, in Exhibit C.

### F.   Assumptions

**[17]**   Counsel has informed me that there are two elements to establish copyright infringement: (1) ownership of the copyrighted work; and (2) violation of at least one exclusive right in the copyrighted work.[1]   For purposes of this report, counsel has asked

---

[1] 17 U.S.C. § 501(a).

8

CONFIDENTIAL

me to assume that copyright infringement occurs when a copyrighted work is contained in a video uploaded to YouTube without the copyright owner's permission.[2]

## II.   <u>Summary of Conclusions and Opinions</u>

[18]      YouTube stores a massive collection of videos uploaded by its users and presents them together with paid advertising to an equally massive global audience. Defendants provide a small group of copyright owners a tool called Content ID that enables them to find and assert Claims against the large number of uploaded videos to YouTube that infringe their copyrights. Content ID employs a powerful Matching System that comprehensively scans videos on YouTube and can automatically find a wide range of infringing material. (Part III)

[19]      Copyright owners that are denied access to Content ID and the full infringement discovery capabilities of Defendants' Matching System are relegated to the use of inferior tools, designed by Defendants in a manner that makes them ineffective at finding many types of infringing videos on YouTube. (Part IV)

[20]      Defendants have already built and are operating the capabilities that would allow copyright owners denied access to Content ID to effectively find videos on YouTube that infringe their works and could provide the necessary access at limited additional cost and without increasing abuse and invalid use of their tools. (Part V)

[21]      At the same time Defendants are impeding the discovery of infringing videos on YouTube, they operate the WatchNext recommendation system that will select those

---

[2] *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001) (holding that uploading files to peer-to-peer site without copyright owner's permission constituted copyright infringement).

same videos for promotion and automatic presentation to viewers. This recommendation system is the ███████████ of what video is watched on YouTube and makes its selections using methods that demonstrate Defendants' explicit intent, including the intent that the infringing videos be promoted and automatically presented to viewers with the greatest interest in watching them.  (Part VI)

### III.   Content ID is highly effective in finding copyright infringement on YouTube.

#### A.    Content ID automatically finds infringing videos using Defendants' powerful Matching System

[22]      YouTube collects,[3] organizes,[4] promotes[5] and presents[6] a body of audiovisual content (which Defendants refer to as "video")[7] on a global basis.[8] Videos are uploaded to the YouTube system by third parties (Uploaders), some of whom are commercial partners of Defendants (YouTube Partners)[9] and others of whom are simply members of the general public who have created an account with Defendants and clicked-through an agreement accepting the YouTube Terms of Service.[10] No payment or other qualification is required to become an Uploader. Uploaded videos are generally published and

---

[3] "YouTube Help: Upload videos in YouTube Studio," https://support.google.com/youtube/answer/57407.
[4] "YouTube Help: Watch different types of videos," https://support.google.com/youtube/topic/9257410.
[5] "YouTube Product Features: Recommended Videos," https://www.youtube.com/howyoutubeworks/product-features/recommendations/.
[6] YouTube, https://www.youtube.com.
[7] To avoid confusion, I will use the term "video" to refer to audiovisual content in the same manner as Defendants. I will use the terms "video component" and "audio component" when referring to an audiovisual work's constituent parts.
[8] "YouTube for Press: YouTube by the Numbers," https://blog.youtube/press/.
[9] Participation in the YouTube Partner program is available to uploaders who publish works on the service and have demonstrated success at attracting an audience. To qualify, the uploader must have at least 1,000 subscribers to their "channel" and their videos must have at least 4,000 qualifying watch hours over a one-year period ("YouTube Help: YouTube Partner Program overview and eligibility," https://support.google.com/youtube/answer/72851). In 2021, there were more than 2 million YouTube Partners ("YouTube Blog: Responsibility is good for business and for the creator economy," https://blog.youtube/inside-youtube/responsibility-good-business-and-creator-economy/).
[10] "YouTube Help: Upload videos in YouTube Studio," https://support.google.com/youtube/answer/57407.

CONFIDENTIAL

available for viewing by YouTube users in a matter of minutes.[11] YouTube has been in operation since 2005[12] and, while its scale of usage and content varies daily, there is no question that the total content available is enormous: recent reports indicate that the service maintains a corpus of over ▇ billion videos[13] and that more than 500 hours of additional video are uploaded to the site every minute of every day.[14]

[23]        Viewing of videos on YouTube is widely accessible via Defendants' website YouTube.com and their applications on dozens of devices, digital media adapters, and smart televisions.[15] YouTube videos can also be included in third-party websites. This capability, which is referred to as *embedding*, enables a web page on the third-party site to include and present videos directly from YouTube to its visitors using computer code freely provided by Defendants.[16] Viewing of YouTube videos by users and embedding of uploaded videos into third-party websites requires no account registration, payment, or other qualification.[17] YouTube's massive collection of uploaded videos has attracted an equally massive audience; more than 2 billion users from 100 countries log into the site each month and each day they collectively spend more than a billion hours watching more than 2 billion YouTube videos.[18]

---

[11] "YouTube Help: 4k video uploads and processing time," https://support.google.com/youtube/thread/1626616.
[12] "YouTube Blog: Here's to eight great years," May 19, 2013, https://blog.youtube/culture-and-trends/heres-to-eight-great-years/.
[13] Goodrow depo., p. 16 ln. 18-p. 17 ln. 22.
[14] "YouTube for the Press: YouTube by the Numbers," https://blog.youtube/press/.
[15] "YouTube Help: Watch videos on different devices," https://support.google.com/youtube/topic/9257096.
[16] "YouTube Help: Embed videos & playlists," https://support.google.com/youtube/answer/171780.
[17] YouTube also offers an ad-free paid tier of access to its uploaded videos but its user base is so small that the company only discloses its subscriber count combined together with its streaming music service and free trial memberships. ("YouTube Official Blog: 50 Million," https://blog.youtube/news-and-events/50-million/)
[18] "YouTube for the Press: YouTube by the Numbers," https://blog.youtube/press/.

CONFIDENTIAL

[24]       The experience that a visitor is presented with upon arrival at YouTube is that of

an unlimited smorgasbord of free entertainment. An example of what YouTube presents

to a new website visitor is given in Figure 1.



*Figure 1. YouTube website. (https://www.youtube.com)*

[25]       YouTube's policy of allowing any user to upload video has also encouraged

copyright infringement. In 2007, following complaints from large copyright holders,[19]

YouTube introduced the first generation of a copyright management tool that is now

known as Content ID.[20]

---

[19] "Viacom files $1 billion lawsuit against YouTube and Google," *New York Times*, May 13, 2007.
https://www.nytimes.com/2007/03/13/business/worldbusiness/13iht-viacom.4892466.html.
[20] "Google Official Blog: Latest content ID tool for YouTube," October 15, 2007,
https://googleblog.blogspot.com/2007/10/latest-content-id-tool-for-youtube.html.

12

CONFIDENTIAL

[26]     Content ID analyzes the contents of videos uploaded to YouTube to find

reproductions of copyrighted works and permits copyright owners to assert copyright

claims on those videos.[21] It is now YouTube's primary copyright management tool, being

the source of more than 99% of all copyright assertions on the site in 2021.[22]

[27]     YouTube maintains strict control over who can use the tool and as of December

2021, a select group of 9,196 commercial partners of Defendants (Content ID Partners)

had access to the tool.[23]  Yet during that year, the tool was used to assert a remarkable *1.4

billion* copyright Claims[24] on videos uploaded to YouTube, fewer than 1% of which were

disputed by the Uploader.[25]

[28]     How was this small group of Content ID Partners able to find so many

infringements? Content ID's effectiveness as a copyright management tool derives from

its ability to automatically find infringing videos using Defendants' powerful matching

system.

[29]     The task of a copyright management tool on YouTube can be understood to entail

two steps: a *discovery* step followed by a *rights management* step. The purpose of the

discovery step is to find uses of copyrighted works in uploaded videos (or "finding

---

[21] "YouTube Help: How Content ID Works," https://support.google.com/youtube/answer/2797370.

[22] Aggregate value from Exhibit 1.2 in each of the two half-year 2021 YouTube Copyright Transparency Reports (https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-1-1_2021-6-30_en_v1.pdf, https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf).

[23] "YouTube Copyright Transparency Report H2 2021" p. 5, Exhibit 1.1. https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf.

[24] Aggregate values for the first and second halves of 2021 (722,649,569 and 759,540,199 claims and 3,698,019 and 3,810,395 disputes, respectively) according to the YouTube Copyright Transparency Reports for H1 and H2 2021 (https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-1-1_2021-6-30_en_v1.pdf, https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf) for those periods.

[25] Aggregate values from *Ibid.,* p. 6.

infringing videos"). The purpose of rights management is to decide what action to take (if any) when use of a copyrighted work is found. Whether the rights management step occurs at all is entirely contingent on the discovery step being successful, making the discovery step of primary importance to the tool's effectiveness.

[30]      Content ID provides two methods for finding infringing videos: matching and text-based search. Of the 1.4 billion Claims asserted with Content ID in 2021, more than 99% were found using a system that Defendants refer to as *matching*.[26] This high degree of reliance on matching is not simply a matter of convenience but is rather due to the disparate capabilities of these two approaches. The remainder of Part III describes the capabilities of Defendants' Matching System. Part IV.C describes the capabilities of Content ID's text-based search system.

### B.      Defendants' Matching System enables Content ID to find a range of infringing material

[31]      Defendants' Matching System is a specialized search engine designed for automated discovery of uses of copyrighted works. It functions similarly to a text-based search engine like Google Search (http://www.google.com) with which we are all familiar; however, instead of finding matching text, this system finds matching digital media including video, audio, and musical compositions (or "melodies," as they are called by Defendants).[27]

---

[26] Aggregate values from YouTube Copyright Transparency Reports for H1 and H2 2021, Exhibit 3.1 (https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-1-1_2021-6-30_en_v1.pdf, https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf)
[27] GOOG-SCHNDR-00000924, at -929.

**[32]**        An illustration of how Defendants' text-based search engines and Matching System follow a generic archetype is given in Figure 2. The archetypal search engine (see Figure 2(a)) first builds a searchable index from a corpus of objects. Upon receipt of a Query, it uses the index to produce results that identify objects from the corpus that match the Query.[28]



*Figure 2. (a) Search engine archetype; (b) text-based search engine; (c) Matching System.*

**[33]**        A text-based search engine (see Figure 2(b)) obviously fits the model neatly, searching an index of documents (*e.g.*, web pages) to find those with text that matches given Query terms. The index functions like the one found in the back of a reference book, but compiled across all the documents, identifying where in the corpus each word can be found, by document and location within the document. When a Query is entered, the search function can look up each word in the index to build a list of documents where each can be found. Once the locations of the terms are found, the search results may be subsequently filtered to apply rules such as *and, or,* and *exact phrase* that winnow the

---

[28] "Google Search Central: In-depth guide to how Google Search works," https://developers.google.com/search/docs/advanced/guidelines/how-search-works.

results, and then the results are *ranked* to determine the order in which the filtered results will be presented.

[34]      Defendants' Matching System (see Figure 2(c)) applies this same concept to audiovisual content, which Defendants refer to as "video."[29]  The function of a video Matching System is to find which videos in the corpus contain a copy of (*i.e.*, "match") all or part of a video provided as a Query.[30] Because digital media types are so large, matching indices and matching processes don't work on direct representations of the content—they instead use statistical descriptions of the media known as Fingerprints[31] that are designed to capture essential characteristics of a part of the video in a compact form. The index contains Fingerprints generated from each of the videos from the corpus and matching is performed by searching the index for Fingerprints that match the Fingerprints calculated from the Query video. While the illustration in Figure 2(c) shows use of audiovisual content as the search Query and corpus, Defendants' Matching System is also capable of matching video components, audio components, and melodies[32] contained within audio components separately.[33] This is because these components are all sufficiently different in character that each is Fingerprinted, indexed, and matched separately using a different matching technology.

---

[29] GOOG-SCHNDR-00000924, at -012.

[30] In some contexts, Defendants refer to the Query video as a "probe."

[31] The term Fingerprint in the context of matching systems is intended as an analogy to the fingerprints that you *have* that are used to uniquely identify a person as opposed to the fingerprints that you *leave* that are used to identify a person's actions.

[32] While Audio Matching will find videos that contain a copy of the original recording of Bruce Springsteen performing his song "Born to Run," Melody Matching will find videos with audio that contain the melody of "Born to Run," regardless of who is singing or performing the work (Magagna depo., p. 16 ln. 17-p. 17 ln. 21). Defendants also call their Melody Matching technology "covercat" (GOOG-SCHNDR-00001411, at -413).

[33] GOOG-SCHNDR-00000924, at -929.

CONFIDENTIAL



*(a)*

*(b)*

*Figure 3. (a) Example of matching video X against an index of videos A-H to find matches in videos C, D, and H. (b) Example of matching results showing location, duration, and type of each match found.*

**[35]**　　　Figure 3 provides an example of how Defendants' Matching System is used.[34] In Figure 3(a), an index has been populated with Fingerprints from the 8 videos labeled A through H. Matching is performed using a video X (a TV show) as the search Query and the videos C, D, and H are found to match video X. Figure 3(c) illustrates, in the context of this example, the type of detailed information that Defendants' Matching System produces.[35] The audio component of video C was found to consist, in its entirety, of a copy of the opening theme music in video X (an "audio match"). No matches were found

---

[34] GOOG-SCHNDR-00000924, at -012.
[35] "YouTube Content ID API: Claims," https://developers.google.com/youtube/partner/docs/v1/claims.

17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

in the first half of video D but the second half is a copy of a show segment from video X, including both video and audio components (an "audiovisual match"). Video H was found to contain a recording of the closing theme song from show X; not the recording from the show, but a recording of the song performed by a different artist (a "melody match").

**[36]**      Of particular note in this example is that Defendants' Matching Systems do not treat the Query video as a whole, finding only complete and intact copies, but rather as a combination of components (video, audio and melody) and segments of time that can each be matched individually.[36] This is analogous to a text-based search performed with an *or* rule (which finds documents that match any term in the Query) rather than *exact phrase* logic (find documents that match the Query terms taken as a whole phrase). Defendants' Matching System permits Content ID Partners to find video and audio component matches as short as ▮▮▮▮▮▮ in duration and melody matches of melodies of as short as ▮▮▮▮▮.[37]

**[37]**      The capability of finding videos that match individual components or segments enables Defendants' Matching System to be used to find many types of infringements that would otherwise be extremely difficult to discover. This includes full copies of works, full copies of works incorporated into other content, partial copies of works, partial copies of works incorporated into other content, and performances of full or partial works.

---

[36] "YouTube Content ID API: Claims," https://developers.google.com/youtube/partner/docs/v1/claims.
[37] Magagna depo., p. 43 ln. 5-p. 46 ln. 13.

18

[38]        Copyright infringement takes on many forms. Content ID's use of Defendants'

Matching System automatically identifies a broad range of infringements.

### C.    Defendants' Matching System is applied comprehensively to videos on YouTube

[39]        Content ID enables Content ID Partners to find and Claim videos on the YouTube

platform that infringe the Partner's copyright protected works.[38] Content ID Partners can

protect a variety of copyrighted works including movies, TV shows, music recordings,

and musical compositions. Content ID Partners provide Defendants with digital copies

(Reference Files) and text descriptions of the works they own; Defendants refer to these

as Assets.[39] When matching is performed with an Asset, Content ID uses Video, Audio,

and Melody Matching as appropriate to the type of work that the Asset represents.[40]

Defendants' Matching System is applied comprehensively to videos on YouTube, and

Content ID Partners are given broad control over and access to their results.

[40]        As new Assets are received, their Reference Files are added to a reference index

which currently contains more than 90 million references.[41] As each new video is

uploaded to the YouTube platform, it is matched against the current reference index as

described in Part III.B to find out if there are any Assets it might infringe.[42]

[41]        This is one of the ways that matching is used to find infringing videos for Content

ID Partners, but it is not the only way. It provides only a *future* discovery capability, in

---

[38] "YouTube Copyright Transparency Report H2 2021," https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf.

[39] "YouTube Help: Create an asset," https://support.google.com/youtube/answer/3011552.

[40] Video matching is applicable to audiovisual and video-only assets. Audio matching is applicable to audiovisual and audio-only assets (Bill depo., p. 113 ln. 9-p. 114 ln. 15; "YouTube Help: Create a policy: Claim dubbed versions of my content," https://support.google.com/youtube/answer/106964). Melody matching is applicable to musical composition assets (GOOG-SCHNDR-00001411, at -413).

[41] Magagna depo., p. 12 ln. 22-p. 13 ln. 22.

[42] Magagna depo., p. 10 ln. 12-p. 11 ln. 8.

the sense that it will only find infringing videos that are uploaded after the Asset has been provided to Defendants by the Content ID Partner. At the time the Asset is provided, there may already be infringing videos among the billions already on the service.

**[42]**      In order to find infringing videos from the *past*, Defendants perform matching using three additional search methods that they call ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ ███████████████ ████████████████████████████████ ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████ ██████████████████████████ ██████████████████████████ ██████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████[47]

---

[43] Magagna depo., p. 80 ln. 8-p. 82 ln. 7.
[44] GOOG-SCHNDR-00054295, at -298, para. 1.
[45] GOOG-SCHNDR-00054327, at -329. GOOG-SCHNDR-00054295, at -297-98.
[46] Magagna depo., p. 82 ln. 15-p. 83 ln. 3.
[47] Magagna depo., p. 83 ln. 21-p. 84 ln. 14. Also "YouTube Help: Using Content ID,"
https://support.google.com/youtube/answer/3244015.

**[43]**       The results of matching an Asset are filtered to determine whether they meet eligibility criteria of the Defendants and the Content ID Partner. Content ID Partners can assign explicit Match Conditions to Assets describing what types of uses in uploaded videos they would like to Claim; matches that don't conform to those rules are ignored.[48] Match Conditions are a set of rules that include the match type and amount of use of an Asset that the Content ID Partner wants to find. The match type in a rule can be specified as audiovisual, video only, or audio only. The amount of use in a rule can be specified as duration of Reference File, percentage of Reference File, duration of uploaded video, or percentage of uploaded video.[49] Content ID Partners are permitted to specify match durations as short as ███████ for audiovisual, visual matches, and audio matches, and ███████ for melody matches.[50] Content ID Partners are also able to identify segments of their Reference Files that should be excluded from matching (Excluded Segments). This avoids finding matches for parts of their Assets that they are not interested in protecting, such as those that include content they do not own (*e.g.*, a song licensed from another content owner) or that is of little commercial interest (*e.g.*, a studio logo sequence or movie credits).[51] Defendants apply additional automated and manual filtering of matches to determine, for example, whether they meet their criteria for asserting a Claim without prior review by the rightsholder[52] and to detect abuse or invalid use of the tool.[53]

---

[48] "YouTube Help: Upload and Match Policies," https://support.google.com/youtube/answer/107129.
[49] "YouTube Help: Create a policy," https://support.google.com/youtube/answer/106964.
[50] Magagna depo., p. 43 ln. 5-p. 46 ln. 13.
[51] Content ID Partners are required to exclude segments that do not meet certain conditions of eligibility for matching via Content ID. ("YouTube Help: Content Eligible for Content ID," https://support.google.com/youtube/answer/2605065).
[52] Magagna depo., p. 23 ln. 9-p. 25 ln. 19.
[53] GOOG-SCHNDR-00001442, at -443.

21

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**[44]**       Matching results are made known to Content ID Partners for their Assets through the YouTube Content Management System (CMS), a web site accessible through a user-interface or direct data feed.[54] The CMS provides Content ID Partners the ability to obtain the URL of uploaded videos that match their Assets, learn who posted the matched video, access detailed matching results, review matched segments from the uploaded videos and Reference Files side-by-side, and control whether Claims are asserted on individual matched uploaded videos. The user interface provided for review of match results is shown in Figure 4.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[54] GOOG-SCHNDR-00040244, at -266. "YouTube Help: View your claims," https://support.google.com/youtube/answer/106990.  "YouTube Content ID API: Claims," https://developers.google.com/youtube/partner/docs/v1/claims?hl=en. "YouTube Operations Guide: Using Content ID," https://support.google.com/youtube/answer/3244015.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



*Figure 4. YouTube Content Management System user interface for reviewing matches. Match type, location, duration, percentage of video, percentage of reference are shown to the user and the longest match in the video is identified. The uploaded video and Reference File can be played back side-by-side to assist the user in reviewing the match (image from GOOG-SCHNDR-00040244, at -266).*

**[45]**   In summary, the three factors that make Content ID effective at finding infringing videos—enabling 9,196 Content ID Partners to make 1.4 billion Claims on videos uploaded to YouTube in 2021—are:

- Defendants' powerful Video, Audio, and Melody Matching technologies;

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- the ability of Content ID Partners to select which of their Assets are matched, how their match results are filtered, and to gain access to detailed match results; and

- Defendants' comprehensive use of their Matching System to find reproductions of those Assets in videos on YouTube.

## IV. The tools Defendants provide to Ordinary Copyright Owners are designed in a manner that prevents the identification of many types of infringing videos.

### A. The tools provided to Ordinary Copyright Owners are dramatically less effective at finding copyright infringement than those provided to Content ID Partners

[46]     The primary copyright enforcement mechanism Defendants provide to Ordinary Copyright Owners who lack access to Content ID is the submission of a DMCA takedown notice.[55] The DMCA takedown notice must identify each individual infringing video by its unique web address (or URL)—meaning the content owner must first find the infringing video.

[47]     The only tool for finding infringing videos that Defendants make available to all Ordinary Copyright Owners is YouTube Search—the text-based search engine provided to all YouTube users for finding videos to watch. Defendants provide a small group of copyright owners with access to a more capable text-based search tool that I will refer to as Manual Copyright Search.[56] And during the pendency of this lawsuit, Defendants

---

[55] "YouTube Help: Submit a copyright takedown request," https://support.google.com/youtube/answer/2807622.

[56] YouTube refers to this capability by a variety of different names in the materials that I have reviewed. It is referred to variously as "Copyright Search" (GOOG-SCHNDR-00042071, at -096), "Content ID search" (Zhu 30(b)(1) depo., p. 26 ln. 12-13 and p. 40 ln. 18), "Content Management System Tool" (Bill depo., p. 53 ln. 6-p. 54 ln. 12), "Manual Claiming Tool" ("YouTube Help: Use the Manual Claiming Tool," https://support.google.com/youtube/answer/9346683), and the "Content Verification Tool" ("YouTube Help: Use the Content Verification Tool," https://support.google.com/youtube/answer/3010500). In this report I will use the term Manual Copyright Search which describes its use and purpose.

24

extended the availability of a very limited matching tool, the Copyright Match Tool, to a small group of Ordinary Copyright Owners.[57]

**[48]**     The tools provided to Ordinary Copyright Owners are dramatically less effective at discovering copyright infringement than those provided to Content ID Partners. The difference in infringement discovery capabilities between these tools and Content ID is so stark that searching for infringing videos for an Ordinary Copyright Owner can be likened to searching for needles in a haystack by hand while, with the full power of Defendants' Matching System, Content ID Partners are able to search with a powerful electromagnet.

**[49]**     In their public explanation of their copyright management policies, Defendants state these tools are appropriate for "users who hold few copyrights and scarcely find it on YouTube"[58] and whose frequency of claims is "infrequent (a few times a year)" or "occasional (a few times a month)" while the powerful Content ID tool is reserved for rightsholders who have demonstrated that they can make claims "daily."[59] When Defendants deny an Ordinary Copyright Owner access to Content ID, they advise them that "the best course of action for any rightsholder is to make use of the tools we do provide them in order to illustrate that there exists an issue for which they need a more scaled tool to fully address."[60] It is a cruel irony that Defendants use the fact that an

---

[57] "YouTube Blog: YouTube's approach to copyright," August 31, 2021, https://blog.google/around-the-globe/google-europe/youtubes-approach-to-copyright/.
[58] "YouTube Copyright Transparency Report H2 2021," https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf.
[59] This characterization of who Defendants deem deserving of Content ID is further supported by YouTube's internal policy document regarding Content ID Partner eligibility which lists "*100s claims/month*" among the "*mandatory criteria.*" (GOOG-SCHNDR-00001188, at -196).
[60] "YouTube Copyright Transparency Report H2 2021," p. 5, https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf.

Ordinary Copyright Owner is unable to *find* sufficient numbers of infringements of their works on YouTube as justification for withholding access to the matching capabilities required to find those infringing works.

**[50]**     A summary table comparing the capabilities of the Matching System employed by Content ID against the capabilities of the tools available to Ordinary Copyright Owners for finding infringing videos is provided for reference in Exhibit D.

**B.     YouTube Search cannot detect a wide range of typical copyright infringements and its deduplication feature prevents users from finding multiple similar videos that infringe their works**

**[51]**     YouTube Search is available to all YouTube users—Uploaders and viewers alike—on the home page of the YouTube website and is readily accessible within YouTube mobile and television applications. Its purpose is to help users of YouTube find relevant and useful videos to watch.[61]

**[52]**     YouTube Search takes a text-based search Query entered by the user, searches an index of text annotations associated with each publicly viewable video on YouTube, rank orders the results, and displays search results to the user as a list of videos. The index of text annotations is populated from the following sources:[62]



---

[61] "YouTube Search," https://www.youtube.com/howyoutubeworks/product-features/search/.
[62] GOOG-SCHNDR-00034775, at -791-794.



**[53]**     Defendants have recognized that what constitutes "relevant results" to an

Ordinary Copyright Owner who is looking for infringing videos on YouTube is

materially different from those of a YouTube user who is looking for a video to watch for

information or entertainment.[63] A copyright owner, for example, may be seeking to find

all videos that are copies of their work. A YouTube user, by contrast, may find a list of

duplicate copies of the same work unhelpful and prefer a selection of results that includes

only one copy of the work identified in the search Query together with other results that

are related or similar videos of interest.

**[54]**     For this reason, Defendants have designed YouTube Search to remove all

duplicate videos from its results.[64] This is of particular importance when the same

infringing video has been posted to YouTube more than once and the Ordinary Copyright

Owner would like to find them all. If they are using YouTube Search, they can find only

one at a time and will be completely unable to find any of the others so long as the first is

---

[63] Zhu 30(b)(1) depo., p. 41 ln. 11-p. 42 ln. 3. Goodrow depo., p. 122 ln. 3-16.
[64] Goodrow depo., p. 75 ln. 20-p. 76 ln. 13.

CONFIDENTIAL

deemed "more relevant" to their interests by the YouTube Search ranking algorithm. This clearly places Ordinary Copyright Owners at a particular disadvantage in finding infringing videos on YouTube, a fact that is presumably understood well enough by Defendants to have motivated the development of the additional tool, the Manual Copyright Search tool, discussed in Part IV.C.[65] However, this limitation is not discussed in the YouTube Help pages relating to copyright enforcement through the DMCA takedown process. Defendants do not inform Ordinary Copyright Owners that the only search tool provided on the YouTube platform is designed to *not* find multiple copies of infringing videos.

**[55]**     Figure 5 shows how the results of such a search are presented to the user. The images shown on this results page include a Thumbnail image as a "quick snapshot" of each video that was either selected by the Uploader or by YouTube's automatic algorithms.[66] The text shown on the results page includes the video title, video description (truncated), channel name, and playlist name entered by the Uploader for each video. Also shown for each video are the duration, elapsed time since it was uploaded, and number of views.  The user can click on a video from the results, and it will begin playing.

---

[65] Zhu 30(b)(1) depo., p. 41 ln. 11-p. 42 ln. 3.
[66] "YouTube Help: Add video thumbnails on YouTube," https://support.google.com/youtube/answer/72431.



*Figure 5. Search results for the search term "cat" using the text-based YouTube Search tool (image from https://www.youtube.com/results?search_query=cat).*

**[56]**     The user can scroll through the list looking for information in the text and images that suggest that a video might infringe their rights. In some cases, the suggestion can be strong, for example if the Thumbnail contains a readily identifiable image from a copyrighted movie or if the title of the video clearly matches the artist and title of a copyrighted sound recording. In other cases, the suggestion of infringement could be weaker, and the user may have to play the video and examine various portions of it in order to determine whether it contains one of their copyrighted works. For an Ordinary Copyright Owner with a meaningful body of copyrighted works, the reviewing process will be laborious and painstaking work.

**[57]**     But of greater concern is that for YouTube Search to find an infringing video, it must have associated text annotations that the search engine can match to the user's

entered Query string and, if matches are found, those infringing videos must be ranked high enough in the results list (among the billions of potentially matching videos on the service) that any reasonable amount of scanning could reach them. Unfortunately for the Ordinary Copyright Owner, there are many typical forms of copyright infringement where YouTube Search, indeed any text-based keyword search tool, does not suffice.

### 1.   YouTube Search cannot find infringing videos that are not annotated with text that specifically identifies the infringed work

[58]      YouTube Search is ineffective at finding infringing videos that are not annotated with text that specifically identifies the infringed work. There are many common copyright infringement scenarios where this will be the case. Consider, for example, a video of a live performance of a musical composition owned by an Ordinary Copyright Owner. The video may be annotated in good faith by the Uploader with text that identifies the performer, location, and date of the performance, but in many cases it will not include a list of songs performed or their composers. This video will not be surfaced by text-based searches that identify the musical composition because no matching annotation is associated with it. ███████████████████████████

███████████████████████████████████████████████ ██████████████████

███████████████████[68]

[59]      A second example relates to so-called "nonfeature" content; a significant category of creative works intended for inclusion in other works rather than as a standalone work.

---

[67] GOOG-SCHNDR-00034775, at -793.
[68] The Melody Matching technology used by Content ID Partners *could* recognize the composition in the video, in which case the annotation would be applied to the video to enable text-based searching, and in this case the rightsholder (a Content ID Partner) could also be notified automatically of the match through Content ID. But Defendants' Melody Matching is denied the Ordinary Copyright Owner, ensuring that annotations with distinctive works description will not be made and the work will not be discoverable in this way.

CONFIDENTIAL

Nonfeature music includes jingles, themes, intros, interludes, outros, walk-on music, and background music. Nonfeature video works includes stock footage and documentary footage. Nonfeature content is used in almost every high-quality video production and there is a robust market for creation and licensing of copyrighted nonfeature material.[69] It would only in the rarest cases be acknowledged in a text description of work in which it is used with authorization; even less likely so for an infringing use. As with the prior example, the fact that the infringing video lacks any text annotation associated with the infringed nonfeature work renders unfindable using any text-based search term that the content owner can conceivably know. And again, Defendants' Matching System could automatically find and notify its users of this type of infringing uses of their works.

**[60]**     As a final example, infringing videos may be uploaded to YouTube using a text description specifically intended to thwart its discovery by a rightsholder with access to only text-based search.  They can render the video discoverable to its intended audience using descriptive terms (*e.g.*, video identified as "top summer romance movie") or by circulating specialized knowledge through other means (*e.g.*, post to their social media followers: "I have uploaded the full Maria Schneider catalog to YouTube tagged as '*ariam redienhcs*'; go have a listen!"[70]). For Content ID Partners, Defendants' Matching System finds videos posted in this way and reports their existence automatically.

### 2.     YouTube Search is ineffective at finding videos that infringe works identified by generic or non-unique descriptions

---

[69] See, for example, Getty Images (https://www.gettyimages.com).

[70] "ariam redienhcs" is Maria Schneider spelled backwards, but any string sufficiently unique to allow the knowing viewer to find the infringing upload with YouTube Search and that the rightsholder doesn't know will achieve the uploaders aim of thwarting its discovery by the rightsholder.

**[61]**      YouTube Search is also ineffective at finding videos that infringe works identified by generic or non-unique descriptions. The ASCAP/BMI Songview repertory includes over 5,700 distinct copyrighted musical compositions whose title is "Tonight,"[71] over 4,800 titled "Stay,"[72] and over 2,300 titled "Baby."[73] An attempt by the rightsholder of any of these more than 10,000 distinct musical compositions to use a text-based search tool to find infringing videos that include performances of these compositions (*e.g.*, using the search term "tonight song") would yield a list of videos associated with the search term, ordered by the search engine's ranking metric. The composer of a song that is not among the most popular compositions sharing the name would be required to individually examine so many videos as to make this effort unreasonable. In the case of "Tonight," Google Search reports over 45 million pages with matching text on the YouTube site.[74]

**[62]**      Defendants' Melody Matching technology learns the musical composition from analysis of a sound recording of its performance, not from the work's name, and can find and present to the owner of the work a list of just the specific videos in which it is used.

**[63]**      The issue of generic or non-unique descriptions is not only an issue for music composition owners; YouTube is overflowing with categories of legitimately copyrightable content described and discovered using such terms: "how to fry an egg," "beginner's yoga," "5 minute workout," "skateboard tricks," etc.

---

[71] https://www.ascap.com/repertory#/ace/search/title/tonight?at=false&searchFilter=SVW&page=1
[72] https://www.ascap.com/repertory#/ace/search/title/stay?at=false&searchFilter=SVW&page=1
[73] https://www.ascap.com/repertory#/ace/search/title/baby?at=false&searchFilter=SVW&page=1
[74] https://www.google.com/search?q=site%3Ayoutube.com+%22tonight%22. Google Search is used to obtain an estimate of the number of videos on YouTube because YouTube Search does not report a count of matches.

[64]    Consider, for example, a rightsholder in videos based on the telling of traditional fairy tales. Such videos may be infringed in videos uploaded to YouTube and a search performed by entering a descriptive text Query such as "Three Little Pigs" into a text-based search of YouTube will similarly result in an impractically long list of results for manual review, wherein infringing videos are mixed among a vast number of other distinct videos telling the same fairy tale. At the time of writing this report, Google Search reports over 100,000 pages with text matching the term "Three Little Pigs" on the YouTube site.[75]

[65]    Again, using Defendants' Matching System, Content ID will reliably locate and notify a Content ID Partner of infringing videos containing copies of their works, regardless of how many similarly titled works exist on YouTube. For the Ordinary Copyright Owner, the text-based search tools are of little use in locating infringements of this type of content.

### 3.   Infringing videos on YouTube with a privacy setting of *unlisted* or *private* are shielded from discovery using YouTube Search

[66]    Infringing videos on YouTube with a privacy setting of *unlisted* or *private* are shielded from discovery using YouTube Search. YouTube allows Uploaders to apply a privacy setting to each uploaded video that is *public, private,* or *unlisted.*[76] A video whose privacy setting is *public* is included in the YouTube Search index and recommendations systems and available for viewing by any YouTube user.

---

[75] https://www.google.com/search?q=site%3Ayoutube.com+%22three+little+pigs%22. Google Search is used to obtain an estimate of the number of videos on YouTube because YouTube Search does not report a count of matches.
[76] "YouTube Help: Change video privacy settings," https://support.google.com/youtube/answer/157177.

33

**[67]**     A video whose privacy setting is *unlisted* is not included in the YouTube Search index or recommendation systems but is available for public viewing on the YouTube website by anyone with whom the Uploader has shared the URL of the video. Unlisted videos can also be embedded for playback on any third-party website by anyone with the URL and the embedded video can be viewed by any visitor to that website. A video whose privacy setting is *private* is similarly not included in the YouTube Search index or recommendation systems but can be viewed only by logged-in YouTube users whose YouTube accounts were given specific authorization by the Uploader.[77]

**[68]**     Designating a video as *unlisted* or *private* provides Uploaders a means to infringe the rights of many Ordinary Copyright Owners without recourse because even if the infringing video is annotated with keywords that would otherwise enable their discovery with text-based search, those annotations are not included in a searchable index that they can access.

**[69]**     No such limitation applies to Content ID Partners because unlisted and private videos are not similarly shielded from the Content ID's matching; such matching videos will be found by the Content ID system and the rightsholder notified.

**[70]**     This is far from a theoretical concern. Matching performed by Defendants for the Plaintiffs in the course of discovery in this matter identified a significant number of videos on YouTube that had been designated by the Uploader as *unlisted* or *private* and matched all or a part of Plaintiffs' copyrighted works.[78]

---

[77] "YouTube Help: Change video privacy settings," https://support.google.com/youtube/answer/157177.

[78] Defendants did not identify the particular *unlisted* or *private* videos that were matched nor did they provide detailed information on the individual matches (*e.g.*, duration of match) that would be necessary for Plaintiffs to

### C.  Manual Copyright Search is designed to find infringing videos on YouTube but is not available to most Ordinary Copyright Owners.

[71]     Like YouTube Search, Manual Copyright Search is a text-based keyword search tool, and so it suffers from the same limitations with respect to finding infringing videos, including those described in Parts IV.B.1-IV.B.3.[79]

[72]     Unlike YouTube Search, however, Manual Copyright Search was designed for the express purpose of finding copyright infringing videos on the YouTube platform and uses a different ranking algorithm. Defendants have designed Manual Copyright Search to provide results that include multiple videos with the same content that match the Query,[80] whereas YouTube Search will remove all duplicate videos from its results.[81] This is of particular importance when the same infringing video has been posted to YouTube more than once, each with text annotations that make it amenable to text-based searching, and the Ordinary Copyright Owner would like to find them all. Using the Manual Copyright Search tool, one search could potentially accomplish this task.

[73]     Moreover, as illustrated in Figure 6, when using the Manual Copyright Search tool, additional images chosen automatically from the video by YouTube's algorithms are shown which reduce the likelihood of a misleading Thumbnail image chosen by the Uploader hiding the true contents of the video from a copyright owner.

---

determine how many of these matched videos were infringements of Plaintiffs' copyrights (see *Schneider_v_YouTube_CID Data Extraction_complete.xlsx*).

[79] One possible exception to this exists with respect to Manual Copyright Search's inability to search text annotations associated with *unlisted* videos. The information available to me is ambiguous on this capability. GOOG-SCHNDR-00000924, at -009 states that it can search through "publicly available YouTube videos." It is unclear whether Defendants consider *unlisted* videos to be publicly available and allow their text annotations to be searched using this tool.

[80] Zhu 30(b)(1) depo., p. 41 ln. 11-p. 42 ln. 3.

[81] Goodrow depo., p. 75 ln. 20-p. 76 ln. 13.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



*Figure 6. Search results for the search term "cat" using the text-based Manual Copyright Search tool (image from GOOG-SCHNDR-00001066, at -094).*

**[74]**    While this makes it more useful for finding infringing videos, Defendants do not make this tool available to most Ordinary Copyright Owners. Manual Copyright Search is made available only to YouTube partners with Content Management System access,[82] which includes YouTube Partners,[83] Content ID Partners,[84] and Content Verification Program Partners.[85]

### D.    Copyright Match Tool provides an inferior matching tool to a limited number of Ordinary Copyright Owners.

**[75]**    Defendants have provided some Ordinary Copyright Owners with a limited ability to find infringing videos on YouTube using their Matching Systems through the

---

[82] GOOG-SCHNDR-00042071, at -096.
[83] "YouTube Help: Set up your Content Manager," https://support.google.com/youtube/answer/6301188.
[84] "YouTube Help: Use the Manual Claiming Tool," https://support.google.com/youtube/answer/9346683.
[85] "YouTube Help: Use the Content Verification Tool," https://support.google.com/youtube/answer/3010500.

Copyright Match Tool. The capabilities provided by this tool are inferior to those of Content ID in several important respects.

### 1. Copyright Match Tool was developed to protect YouTube's popular YouTube Partner channels

[76]     Copyright Match Tool was originally deployed in 2018 as a means of protecting YouTube Partners from having new videos that they have published on YouTube copied and re-uploaded to YouTube by competing channels.[86]

[77]     The Copyright Match Tool uses the same Matching System employed by Content ID to check videos uploaded to YouTube for matches against an index of copyrighted videos.[87]   However, Defendants have incorporated restrictions in the function of the tool that limit the tool's capabilities to finding only a few narrowly defined types of infringement.

[78]     Defendants describe this original intended use of the Copyright Match Tool in their public documentation as follows (emphasis added):

> *"For partners in the YouTube Partner Program (YPP), or any channel that's filled out this form and shown a need for an advanced rights management tool,* ***the Copyright Match Tool will scan for full reuploads of your videos*** *on other YouTube channels.* ***The tool scans videos uploaded after yours, so it's important you're the first one to upload the content to YouTube****."[88]*

[79]     Three important limitations of the tool are embedded subtly within this description, one in the first highlighted phrase and another two in the second.

---

[86] "YouTube Official Blog: Helping creators protect their content," July 11, 2018, https://blog.youtube/news-and-events/helping-creators-protect-their-content/.
[87] Magagna depo., p. 10 ln. 4-10. Bill depo., p. 30 ln. 3-22.
[88] "YouTube Help: Use the Copyright Match Tool," https://support.google.com/youtube/answer/7648743.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

[80]        The meaning of "it's important you're the first one to upload the content to YouTube" in the second highlighted phrase is the most significant of the limitations on the Copyright Match Tool. Defendants apply a condition of eligibility to videos submitted for protection using the Copyright Match Tool that I will refer to as First to Upload. Defendants determine whether a rightsholder is the First to Upload a video by matching their uploads against the pre-existing YouTube Corpus using video component and audio component matching.[89] An uploaded video is disqualified from protection using the Copyright Match Tool if the majority of the video (by duration) is found to match an existing video on the site.[90] The nefarious logic of this rule is that Defendants are using the fact that they have found potentially infringing matches of a video on the site as the basis for excluding the video from protection against infringement with the tool. And further, the potentially infringing matches that the tool has used as the basis for disqualifying the rightsholder's work from protection are identified in the match results and fully known to the Defendants—but, importantly, they are neither disclosed nor identified to the rightsholder. Defendants apply no such exclusion to Assets provided by Content ID Partners for matching in the Content ID system. In fact, the ███████████ ████████████████████████████ functions described in Part III.C were created specifically for the purpose of ensuring that previously uploaded videos that match Assets newly introduced to the Content ID system are found and exposed to rightsholder Claims as rapidly as possible.[91]

---

[89] Rosenstein depo., p. 198 ln. 2-p. 200 ln. 6. "YouTube Help: Use the Copyright Match Tool: I'm a musician, can I use this tool to find uploads of my songs?," https://support.google.com/youtube/answer/7648743.

[90] Magagna depo., p. 77 ln. 7-p. 78 ln. 11.

[91] GOOG-SCHNDR-00054327, at -329-330. GOOG-SCHNDR-00054295, at -295-296.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

[81]     The second important limitation relates to the meaning of "full reuploads" in the first highlighted phrase. This means that the Copyright Match Tool will only find infringing videos that match ███ or more of the duration of the video that the rightsholder is seeking to protect.[92] Infringing videos that match less than this duration of the protected video may have been discovered by the Defendants' Matching System but, if so, those matches will be ignored by the tool and the rightsholder will not be notified of the match. This renders the tool ineffective against infringing videos that include only a portion of a work. Not only does this ignore the common infringement scenarios that use excerpts of a work without permission such as a critical scene from a film, but an Uploader whose infringing video is found and removed from YouTube using the tool can simply divide their upload into two parts—each with half of the complete work—and while the Matching System may still find the copies, neither of the two halves constitute a Full Reupload so they are given a free pass by the tool. Notably, Defendants do not limit matching results in this way in Content ID, which finds infringing videos with audiovisual, video, and audio matches as short as ███████ and melody matches as short as ███████ and reports them to Content ID Partners.[93]

[82]     The meaning of "the tool scans videos uploaded after yours" in the second highlighted phrase is plainly that matching for Full Reuploads is only performed prospectively, against uploads to YouTube that are made after the copyrighted work is uploaded to YouTube by the Copyright Match Tool user. Infringing videos that were uploaded to YouTube prior to the rightsholder's upload, even if they are Full Reuploads,

---

[92] Magagna depo., p. 73 ln. 21-p. 74 ln. 25.
[93] Magagna depo., p. 43 ln. 5-p. 46 ln. 13.

are ignored by the Copyright Match Tool and the rightsholder will not be notified,[94] even when such matches would be found through Defendants' ongoing matching for other purposes.[95]  Again, Defendants' Content ID system does not limit matching in this way. Content ID performs ███████████████████████████████ as described in Part III.C to match each new Reference File against the entire pre-existing YouTube Corpus, finding infringing videos on behalf of Content ID Partners regardless of when they were uploaded to the site.

**[83]**      There is also a fourth limitation associated with Copyright Match Tool that is not disclosed in Defendants' public documentation, which is that the videos uploaded by Copyright Match Tool simply bypass the use of Defendants' melody match system.[96]  As a result, Copyright Match Tool provides rightsholders in musical compositions with no ability to discover infringing videos containing original performances of those works, even if they are future uploads of the full work. Contrast this with Content ID, which uses melody match to find infringing performances of musical compositions of as short as █ ███[97] in both past and future uploaded videos.

**[84]**      With this analysis of these four limitations understood, none of which are applied to Content ID Partners, the narrow capabilities of the original intended use of the Copyright Match Tool can be more clearly understood.  It can aid a rightsholder in finding future uploaded videos (but not previous videos) that contain full copies (but not

---

94 Rosenstein depo., p. 205 ln. 18-p. 206 ln. 11.
95 Rosenstein depo., p. 202 ln. 21-p. 204 ln. 4. Goodrow depo., p. 75 ln. 20-p. 76 ln. 13.
96 Bill depo., p. 59 ln. 16-p. 60 ln. 7.
97 Magagna depo., p. 43 ln. 5-p. 46 ln. 13.

40

CONFIDENTIAL

partial copies) of video and audio components (but not melodies) from copyrighted works that are not already being infringed on the YouTube site.

### 2. Defendants limited the utility of the Copyright Match Tool extended to filers of successful DMCA takedown notices.

[85]     The functionality of the Copyright Match Tool was expanded in 2021, during the pendency of this litigation, to enable Ordinary Copyright Owners who had successfully used the DMCA takedown process to prevent copies of that same infringing video from being re-uploaded.[98] Defendants describe this version of the Copyright Match Tool[99] in their public documentation as follows (emphasis added):

> "The Copyright Match Tool is available to any YouTube user who's submitted a valid copyright takedown request. Once your takedown request is approved, **the Copyright Match Tool will start scanning YouTube uploads for potential matches to the videos reported in your takedown**. We'll surface these potential matches to you so you can decide what action to take next."

[86]     There are four important limitations on the function of the Copyright Match Tool for this intended use; two implied in the highlighted phrase and two not included in the public documentation.

[87]     The first and most serious limitation is implied by the text "potential matches to the videos reported in your takedown." This means that the tool will check only for matches of the specific infringing videos that the rightsholder has already discovered on YouTube in some other way and successfully taken down.[100] Any other distinct video that infringes their work, for example one that comprises a different portion of the

---

[98] "YouTube Copyright Transparency Report H1 2021," p. 2, para. 4, https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-1-1_2021-6-30_en_v1.pdf.
[99] This version of the Copyright Match Tool is also referred to by Defendants as "takedown/staydown" (Bill depo., p. 29 ln. 10-23) and in the public YouTube help pages as "prevent copies" ("YouTube Help: Prevent reuploads of removed videos," https://support.google.com/youtube/answer/10298392).
[100] Rosenstein depo., p. 202 ln. 21-p. 204 ln. 4.

CONFIDENTIAL

infringed work or that places their full work within different content, will not be matched. Copyright Match Tool is thus only applicable to the re-discovery of uploads of an infringing video that the rightsholder has already discovered on YouTube in some other way.

[88]     The second limitation, which is implied by the text "scanning YouTube uploads" means that only future uploads are checked for matches, not videos already present on YouTube.[101] As a result of this limitation, while an Ordinary Copyright Owner who has found and successfully taken down an infringing video from YouTube may be protected by the Copyright Match Tool against future re-uploads of that same infringing video, additional copies of that same infringing video that were uploaded prior to the takedown will remain and must be discovered and taken down individually by using another means.

[89]     It is hard to understand why Defendants would arbitrarily limit the efficacy of this tool in this way. Since the rightsholder has already filed a successful DMCA takedown notice, Defendants have already accepted the rightsholder's claim that the video is infringing. Moreover, Defendants' comprehensive matching activities have *already identified* which pre-existing videos match the video that was the subject of the successful DMCA takedown.[102] This matching is performed in YouTube's ordinary course of operation and supports several of the previously mentioned functions, including the First to Upload feature of the Copyright Match Tool (see Part IV.D.1) and the de-duplication feature of YouTube Search (see Part IV.B). So, without performing any additional matching analysis, for each video removed from the YouTube platform

---

[101] Rosenstein depo., p. 205 ln. 18-p. 206 ln. 11.
[102] Rosenstein depo., p. 198 ln. 9-p. 200 ln. 6.

through a successful DMCA takedown process, YouTube may have already identified—and could easily inform the Ordinary Copyright Owner of—any other videos on the platform that are known to match infringing portions of the taken-down video and allow the copyright owner to review those videos to determine whether they also infringe their copyrighted work. This failure to inform the copyright owner of known potential infringements is compounded by the YouTube Search tool's removal of such duplicates from search results,[103] impeding any effort to locate other matching instances.

**[90]**      Like the version of the Copyright Match Tool provided to YouTube Partners, the tool provided to successful DMCA takedown claimants also ignores re-uploads of successfully taken down videos that are less than "full copies" (*i.e.*, they match less than ██ of the duration of the taken down video)[104] and does not check for melody matches against the taken-down work.[105] The implications of these limitations make this intended use of the Copyright Match Tool equally deficient at enabling Ordinary Copyright Owners to discover infringing videos on YouTube.

## V.      **Defendants could provide the plaintiff class with full access to their Matching System at limited additional cost**

### A.      **Defendants have already built and are operating the capabilities needed to enable Ordinary Copyright Owners to effectively find infringing videos on YouTube**

**[91]**      It is not the purpose of this report to design a copyright management tool for use by Defendants nor to recommend any remedy from the court on behalf of Plaintiffs. However, if I am to address the costs associated with providing Content ID's matching

---

[103] Goodrow depo., p. 75 ln. 20-p. 76 ln. 13.
[104] Magagna depo., p. 74 ln. 1-25 and p. 76 ln. 14-p. 77 ln. 5.
[105] Bill depo., p. 59 ln. 16-p. 60 ln. 7.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

capabilities to Plaintiffs, I must first provide some description of what would be necessary to accomplish this. I will do so by considering how the existing capabilities within YouTube discussed in Parts III and IV of this report could meet the need. This will demonstrate that Defendants have already built and are operating the capabilities needed to enable Ordinary Copyright Owners to effectively find infringing videos on YouTube.

**[92]**    Consider the operation of the Copyright Match Tool as it is currently implemented by Defendants for YouTube Partners (see Part IV.D.1). A Copyright Match Tool user uploads a video to YouTube and can designate it as *private* so it will not be published. This *private* video is matched against the existing YouTube Corpus using Defendants' Matching System to determine if the user is First to Upload the video.[106] This *private* video is matched against the existing Content ID reference corpus and future additions to the Content ID reference corpus to determine if there are any Content ID Partner Claims on the video and the user is notified of such Claims as they are found.[107] If the video is deemed eligible for protection using the Copyright Match Tool, it is then matched against future uploads to YouTube in order to determine if they are copies.[108] For each future upload found to be a Full Reupload of an eligible video, the Copyright Match Tool user is notified of the matching video and provided the opportunity to review it and choose to either archive the notification, contact the Uploader of the matching video, or submit a DMCA takedown notice.[109]

---

[106] Rosenstein depo., p. 198 ln. 2-p. 200 ln. 6. "YouTube Help: Use the Copyright Match Tool: I'm a musician, can I use this tool to find uploads of my songs?," https://support.google.com/youtube/answer/7648743.
[107] Rosenstein depo., p. 199 ln. 15-17. Magagna depo., p. 83 ln. 21-p. 84 ln. 14. "YouTube Help: Using Content ID," https://support.google.com/youtube/answer/3244015. "YouTube Help: Learn about Content ID claims," https://support.google.com/youtube/answer/6013276.
[108] Rosenstein depo., p. 205 ln. 18-p. 204 ln. 4.
[109] "YouTube Help: Use the Copyright Match Tool," https://support.google.com/youtube/answer/7648743.

CONFIDENTIAL

[93]       Defendants could provide a version of the Copyright Match Tool that enables Ordinary Copyright Owners to access the same matching capabilities made available to Content ID Partners that varies from the tool provided to YouTube Partners in only the following ways:

- When the user uploads a video to YouTube, permit them to specify match conditions[110] and Excluded Segments[111] for the video in the same manner such capabilities are made available to Content ID Partners. This would allow users to exclude content in their copyrighted work that is in the public domain, or which is licensed from another copyright owner.

- Do not disqualify the video from eligibility based on the First to Upload test. Instead, perform matching against videos already present on YouTube in accordance with the match conditions and Excluded Segments the user has designated.

- Notify the user of the match results for previously uploaded videos and facilitate side-by-side review of the matches. This would enable the user to locate infringing videos that are already present on the YouTube platform.

- When the user's video is matched against the future uploads to YouTube, perform matching in the same manner it is performed for Content ID Partners, in accordance with the match conditions and Excluded Segments that the user has designated.

---

[110] "YouTube Help: Upload and Match Policies," https://support.google.com/youtube/answer/107129.
[111] GOOG-SCHNDR-00000924, at -945

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Notify the user of these match results and facilitate side-by-side review of the matches. This would again allow the user to identify infringing videos.

[94]     Extending those capabilities to users of the Copyright Match Tool only involves using functions and systems that Defendants *have already built and are operating* for existing users of Copyright Match Tool and Content ID; it is simply a reconfiguration of those capabilities, taking capabilities already built for Content ID and incorporating them into the existing Copyright Match Tool.

**B.     Providing Ordinary Copyright Owners with effective tools to find infringing videos on YouTube is within Defendants' existing capabilities and budget for such activities and could be executed with little technical risk**

[95]     I have not conducted an analysis of the scope of effort required to reconfigure the capabilities of the Copyright Match Tool to enable expanded access to matching results as described in Part V.A; to do so would require that it first be specified in greater detail than the outline provided here and would also require more information about Defendants' product development process and costs than have been provided to me. But based on my review of Defendants' existing copyright management tools and their historical copyright management tool feature development activities and expenditures[112] and my 25 years of experience in overseeing the development and delivery of copyright management tools, it is my opinion that providing Ordinary Copyright Owners with effective tools to find infringing videos on YouTube is within Defendants' existing capabilities and budget for such activities and could be executed with little technical risk.

---

[112] GOOG-SCHNDR-00040616. GOOG-SCHNDR-00053786.

46

[96]     As to the operating costs of this capability, let us consider what additional load this would place on the systems that the feature relies on: the uploading of content to YouTube and the matching of this content by Ordinary Copyright Owners that might otherwise not have been uploaded. I have not been provided with information that could be used to project the amount of additional content that this would attract to the service nor the associated monetary or computational resource costs that Defendants would consequently bear.[113] However, the described use demands little in the way of new matching on uploaded videos; every video uploaded to YouTube is already matched against all other videos, public or private[114] and every taken-down work is already matched against future uploads if the copyright owner has requested it.

[97]     Defendants clearly operate their business in a manner intended to encourage growth in scale, placing no meaningful limit on the amount of any relevant user activities. In particular, Defendants' policies that apply to all Uploaders, including Copyright Match Tool users, place no limit on the number or total duration of videos uploaded to the YouTube Corpus[115] and consequently introduced into Defendants' comprehensive matching activities. The policies that apply to Content ID Partners place no limit on the number or duration of audiovisual, video, audio, or composition Assets that are introduced for matching into the Content ID reference corpus.[116]

---

[113] The most precise cost estimate I have reviewed for the matching of an additional work is "extremely small to tiny." (Magagna depo., p. 32 ln. 18-p. 33 ln. 9.) I have also not received any information on the costs associated with additional uploads to YouTube.
[114] Rosenstein depo., p. 199 ln. 21-p. 200 ln. 3.
[115] "YouTube Policies," https://www.youtube.com/howyoutubeworks/policies/overview/.  Individual videos for accounts with verified phone numbers are limited to a 12 hour duration.
[116] "YouTube Help: Policies for Content ID," https://support.google.com/youtube/answer/9142671.

47

CONFIDENTIAL

### C. Defendants can provide Ordinary Copyright Owners with access to Content ID's matching capabilities without increasing abuse and invalid use

[98]     Another potential cost that I will address is the cost of abuse and misuse (or "invalid use", as Defendants call it) of the Defendants' copyright management tools. Defendants justify denying access to Content ID to Ordinary Copyright Owners on the basis that "we must balance the need to protect creators, viewers, and other rightsholders from the significant disruption that can result from the abuse or otherwise invalid use of our tools."[117] From a review of evidence presented regarding the causes and controls of these issues, Defendants can provide Ordinary Copyright Owners with access to Content ID's matching capabilities without increasing abuse and invalid use.

[99]     Defendants highlight as a "key point" in their Copyright Transparency Report that "when we make a tool available to everyone without any eligibility requirements, we see high levels of abuse,"[118] emphasizing that they observe a "30x higher abuse rate in webform[119] than in takedown tools with limited access."[120] This is unsurprising for the simple reason that for a tool with unlimited access an abuser is free to repeat their abusive behavior, whereas for a limited-access tool the abuser's access can be revoked.

[100]     When Defendants defend their exclusionary practices with explanations like "the limited availability of Content ID…limits abuse of the tool,"[121] they fail to acknowledge that Content ID Partners are required to adhere to Defendants' strict policies regarding its

---

[117] "YouTube Copyright Transparency Report H2 2021," p. 6.  https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf.
[118] Ibid.
[119] "Webform" refers to YouTube's publicly available web page for submitting a DMCA takedown notice.
[120] Ibid.
[121] Ibid.

CONFIDENTIAL

use and risk having their use of the tool limited, suspended, or revoked for violations.[122] Given Content ID's essentiality to defending works from copyright infringement on YouTube, it stands to reason that those with access would go to great lengths to avoid any act that would put their continued ability to protect their works at risk. This same imperative that ensures that today's Content ID Partners adhere to Defendants' policies also exists for Ordinary Copyright Owners. The low rate of abuse of Content ID may, in fact, have little to do with the copyright owners whom Defendants deny access to the tool and much to do with Defendants' ability to revoke access of those who abuse it.

[101]     Defendants further justify their limiting of access to Content ID on the basis that while "one bad copyright webform notice can result in a handful of videos being temporarily removed from YouTube[, in] Content ID the impact is multiplied due to its automated nature; one bad reference file can impact hundreds or even thousands of videos across the site."[123] The automation they are referring to here, though, isn't that of their Matching System automatically finding copies. Finding matches causes no harm whatsoever in Content ID. The problem is that a subset of Content ID users is permitted to automate the assertion of copyright Claims based on matches made to their Assets. It is only in the case of automated *claiming* that the described harm exists.

[102]     Defendants clearly recognize this distinction; their Content ID system provides a so-called "safe mode" of operation in which matching is performed on a copyright owners' Assets and they are required manually to review each potential Claim before it is

---

[122] "YouTube Help: Content Manager Policies & Policies for Content ID," https://support.google.com/youtube/answer/9142671.
[123] "YouTube Copyright Transparency Report H2 2021," p. 6.  https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf.

CONFIDENTIAL

asserted.[124] In fact, every new content owner given access to Content ID is placed in this mode and is only provided with automated Claiming once they have made ████████ ███████████████████████.[125]

**[103]**       I agree that large-scale automated claiming poses a risk of large-scale invalid assertions and that some measure of limiting access to the feature is warranted. I disagree, however, that this risk provides a justification for excluding copyright owners from accessing Defendants' Matching System for the purpose of finding and reviewing videos that include their copyrighted works.

**[104]**       The access to matching for infringement discovery described in Part V.A is neither a takedown nor a Claiming tool. It is rather a search tool for locating matching items of interest within the vast library of videos on YouTube.  Searching for information is a separable step from the assertion of rights through a DMCA takedown notice or Claim, and one that Defendants have built their empire upon. Google's stated corporate mission is "to organize the world's information and make it universally accessible and useful."[126]  Not only do Defendants provide access to their eponymous text-based search engine without limitation, but they similarly provide an image matching feature called "Google Search with an Image" that enables any visitor to upload an image and find matches throughout the web.[127] Defendants' own actions demonstrate that permitting unlimited access to search capabilities, including those based on content matching, is not by itself untenable.

---

[124] Bill depo., p. 46 ln. 1-13.
[125] GOOG-SCHNDR-000001112, at -113.
[126] "About Google," https://about.google/intl/ALL_us/.
[127] "Google Search Help: Search with an image on Google," https://support.google.com/websearch/answer/1325808.

CONFIDENTIAL

**[105]**     This is because abuse and misuse derive not from search or matching results, but from the second step mentioned above: the processes and incentives for assertion of rights via DMCA takedown notice or Claiming.

**[106]**     The connection between abuse, misuse and the rights assertion process is supported by Defendants' justification that "limited availability of Content ID also helps to limit abuse of that tool… because claiming can happen automatically, and while one copyright request removal made from the webform impacts only one (or a handful) of videos, just one invalid reference file in Content ID can impact thousands of videos and users."[128] The abuse risk from this tool emanates from the fact that Content ID can instantly replicate a bad Claim across thousands of videos without human review, not that its users have a better search engine.

**[107]**     Also consider the incentives for abuse that Defendants highlight:

> *"**Impersonator:** Uses a fake name/email address to get away with submitting fake requests*
> ***Reputation Manager:** Uses Copyright webform to remove allegedly defamatory content*
> ***Competitor:** Submits requests on legitimate content to target their competitors*
> ***Backdater:** Pretends to have created content first…in order to remove other people's content"[129]*

**[108]**     In each of these cases, the abuser is motivated to act against a target already in their sights and seeking to perform a fraudulent assertion of rights. There is little to suggest that having the ability to access Content ID's matching capability would provide additional opportunity or incentive to engage in these behaviors. Said another way, none

---

[128] "YouTube Copyright Transparency Report H2 2021," p. 6. https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf..
[129] Ibid., p. 7.

CONFIDENTIAL

of these forms of abuse are impeded in any apparent way by the lack of ability to find matching content, so there is no reason to expect that the ability to access Content ID's matching capability would provide additional opportunity or incentive to engage in these behaviors.

**[109]**     It is true that if Ordinary Copyright Owners have the ability to find more infringing videos on YouTube by gaining access to Content ID's matching capabilities, it is to be expected that there will be an increase in the number of rights assertions made, which will lead to an increase in both the number of valid and invalid rights assertions. The increase in the number of valid assertions will be evidence of the access to Content ID's matching capability achieving the goal of permitting Ordinary Copyright Owners to protect their interests. The rate at which the number of invalid rights assertions grows relative to this depends on factors that are under Defendants' control and at which they have substantial experience, including establishing criteria and oversight for allowing access to different rights assertion capabilities, and providing tools and training that support efficient and accurate review of matching results as they have already done for Content ID Partners (see, for example, the side-by-side match review feature shown in Figure 4 on page 23 and the training certifications[130] that Defendants require Content ID Partners earn prior to use of the tool).[131]

**[110]**     If Defendants are able to successfully apply these resources to constrain the rate of growth in invalid assertions to not exceed the rate of growth in valid assertions, and if

---

[130] "YouTube Help: YouTube Certified program overview: Content Owner Course & Music Rights Management Course," https://support.google.com/youtube/answer/6145904#zippy=%2Ccontent-ownership-course%2Cmusic-rights-management-course.
[131] GOOG-SCHNDR-00001188, at -196.

the total amount of abuse stays constant for the reasons described above, the net effect will be to reduce the rate of abuse and misuse that is observed, improving the overall accuracy of their copyright management tools.

## VI.   Through YouTube's Autoplay and WatchNext video recommendation systems, Defendants actively promote and control the presentation of infringing content to viewers.

### A.   Defendants' WatchNext recommendations are the ███████████ of what video is watched on YouTube

[111]     YouTube's primary business is advertising, earning its parent company Alphabet over $28 billion in advertising revenues for 2021.[132] A typical ad on YouTube is a brief commercial video that is similar in presentation to a traditional television ad and is presented to the viewer before, during, or after the uploaded video the viewer wants to watch.[133] The financial success of YouTube's advertising business is, without a doubt, directly linked to its ability to engage the largest possible audience of viewers; having more viewers watching YouTube videos for longer periods of time creates more opportunities for presentation of the paid advertising. Defendants have an intrinsic motivation to maximize engagement from viewers.

[112]     The original designers of YouTube recognized early on that while a visitor to the service may arrive with a specific desire – to search for a video or to watch a video from a direct link – once that desire is fulfilled, what then? As early as November 2005, just six months following its launch, the service began including a list of "related videos" on each webpage that was displaying the video that a visitor had chosen to watch.[134] The

---

[132] "2021 Alphabet Annual Report," p. 29, https://abc.xyz/investor/static/pdf/2021_alphabet_annual_report.pdf.
[133] "YouTube Help: YouTube advertising formats," https://support.google.com/youtube/answer/2467968.
[134] "Waiting till 9 a.m for XBox 360! Wooo!!!," video watch page from YouTube.com, Nov. 24, 2005. https://web.archive.org/web/20061215205212/http://www.youtube.com/watch.php?v=0oBXDc9Opug.

benefit to the visitor of these recommendations was to ensure that at the end of the video they had chosen, or at any time if they found the onscreen video unsatisfying, they would have a list of alternatives in front of them and be a single click away from another video. The benefit to the service was to retain their audience for increasing lengths of time. In July 2006 the service announced that it was delivering 100 million videos per day.[135] Three months later, YouTube was acquired by Google, which launched its in-video advertising business in August 2007.[136]

**[113]**  Since 2007, the role of recommendations in YouTube has expanded to the point that it now influences every step of the viewer journey.[137] The YouTube home page, each video viewing page, and each video end slate all include a collection of automatically generated recommendations of "next" videos for the user to watch.[138] YouTube calls the system that generates these recommendations WatchNext.[139]

**[114]**  But WatchNext recommendations are also now more than just a short list of choices. In 2013, YouTube introduced a feature called Autoplay into its television apps[140] that chooses the next video to play and begins playing it automatically shortly after the previous video ends.[141] With Autoplay, the visitor only has to select a single video to get

---

[135] "YouTube serves up 100 million videos a day online," *CBS News*, July 16, 2006. https://usatoday30.usatoday.com/tech/news/2006-07-16-youtube-views_x.htm.
[136] "Google aims to make YouTube profitable with ads," *New York Times,* Aug. 22, 2007. https://www.nytimes.com/2007/08/22/technology/22iht-22google.7206224.html.
[137] In all materials I have reviewed, YouTube maintains a distinction between the YouTube Search feature, in which the visitor expresses interest directly via a text Query, and YouTube recommendations, in which the visitor's interest must be predicted. I will preserve that distinction and exclude YouTube Search from my consideration here.
[138] GOOG-SCHNDR-00040865, at -867-870.
[139] Goodrow depo., p. 9 ln. 24-p. 10 ln. 4.
[140] GOOG-SCHNDR-00040840, at -843.
[141] "YouTube Help: Autoplay Videos," https://support.google.com/youtube/answer/6327615.

things started, and, subsequently, video after video will play.  The feature was rolled out

broadly across YouTube in 2015.[142]

**[115]**     The presentation format of WatchNext recommendations will vary depending on

how the viewer is accessing YouTube (*i.e.*, website, mobile app, television app, etc.). On

the website, they will appear as a list of suggestions alongside the currently watched

video while it is played (see Figure 7(a)).

**[116]**     After the current video ends, unless Autoplay has been deactivated, the

Thumbnail of the video selected by Autoplay—infringing or not—will be shown

automatically (see Figure 8(b)) and proceed to play unless the viewer takes some

affirmative step to stop it.

**[117]**     If Autoplay is not active or if the viewer dismisses the Autoplay video, the viewer

is presented with a collection of Thumbnails from the most highly ranked videos from the

recommendations list as a prompt to select one (see Figure 7(c)). The viewer's response

to the video, including if they do nothing and allow the Autoplay video to play, will be

recorded and used to inform and improve future predictions and recommendations made

for the video, and potentially also for the user, by the components of the WatchNext

system.

---

[142] GOOG-SCHNDR-00040865, at -882.

CONFIDENTIAL



(a)

(b)

(c)

*Figure 7. The presentation on YouTube.com of: (a) WatchNext recommendations placed alongside a video being watched (b) a pending Autoplay video after a video has just ended; (c)*

56

*ranked WatchNext recommendations at the end of a video if Autoplay is turned off or if the Autoplay selection has been dismissed.*

**[118]**　　　WatchNext has not just become an integral part of the YouTube user experience;

██████████████████████████████████████████████████████████

████████████████████████████████. Figure 8 is from a 2017 WatchNext

engineering review and shows how visitors arrive at the videos they watch.  The report

states that the ████ of time spent viewing videos selected by the Watch Next system in

2017 amounted to ████████ watch hours per day.[143]



*Figure 8. For each of 5 different methods by which a YouTube visitor could choose which video to watch, the percentage of total video watch time due to videos chosen using that method from mid-2015 to mid-2017. The five methods are: direct link into YouTube, next item in a selected playlist, selected from YouTube Search results, selected from Home page, or resulting from a Watch Next recommendation. (GOOG-SCHNDR-00052174, at -186)*

---

[143] 2017 is the most recent year in which I have been provided data on the percentage of video watch time by method of selection. I have also reviewed data from 2019 for WatchNext indicating that it was responsible for ████ of watch time at that time. ████████████████████████████████████████████
██████████████████████████████████████████████

[119]      It is no accident that WatchNext (including Autoplay) became so influential over

YouTube viewers' choices. Defendants have brought their world-class expertise in

optimization and Machine Learning to the task, leveraging the billions of data points they

collect from all visitor interactions with the service to predict how a visitor is likely to

respond to an individual video recommendation.[144] Being able to make these predictions

allows its designers to direct the video recommendations made by the algorithms at

achieving clearly defined objectives in viewer behavior.

[120]      The primary objectives that the WatchNext engineers directed the system to

pursue have changed over time. In 2007, the primary objective that guided the system's

actions was to choose recommendations predicted to result in the highest likelihood of

the viewer choosing to start playing one of the recommended videos (optimizing for

"clicks").[145] In 2012, the objective was changed to choose recommendations predicted to

keep the viewer watching one of the recommended videos for the longest amount of time

(optimizing for "engagement").[146] In 2018, the objective was changed to choose

recommendations predicted to keep the viewer on YouTube for the longest period of time

while maintaining high viewer satisfaction ("valued watch time") as determined through

behavioral indications such as ratings, likes, dismissals, shares, and complaints.[147]

[121]      While these top-line objectives are not all the same, they all align understandably

with Defendants' commercial interest of having the largest possible audience to whom

they can deliver advertisements. While information that I have reviewed indicates that the

---

[144] Froehle depo., p. 127 ln. 2-p. 128 ln. 7.
[145] GOOG-SCHNDR-00051798, at -801.
[146] Ibid., at -802.
[147] GOOG-SCHNDR-00051628, at -629. GOOG-SCHNDR-00051863, at -870-872. GOOG-SCHNDR-00051798, at -804-811.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Watch Next team does not optimize for advertising revenues, there is also no evidence to suggest that maximizing the number of clicks, watch time, or valued watch time that a visitor spends watching YouTube videos serves any purpose other than this, however altruistic Defendants claim their motives to be.[148]

[122]      Defendants are clearly not blind to this alignment. Prior to the launch of Autoplay on the desktop in 2015, Defendants performed an experiment to measure its potential impact. The results showed that the Autoplay function increased both the number of videos viewed by visitors on the YouTube site and the time spent watching these videos by +████.[149] The experiments also measured the impact on ad viewing. The number of ads watched due to Autoplay also increased +████, while the amount of time spent watching ads increased substantially more—over +████.[150] Unsurprisingly, YouTube now automatically activates Autoplay for all users who have not self-identified as minors[151] and in 2021 the feature remained enabled for ████ of them.[152] And, as a matter of course, before each launch of changes to the recommendation system, the YouTube vice president of engineering in charge of recommendations will notify the vice president in charge of advertising of any changes that could impact their part of the product.[153]

## B.   Defendants exert explicit control over what videos are recommended by WatchNext, and consequently what videos YouTube visitors watch

[123]      The period 2011-2021 has been labeled by Jeffrey Dean, Google's Senior Vice President of Research, "a golden age of machine learning," and much of the progress has

---

[148] "YouTube Blog: On YouTube's recommendation system," September 15, 2021, https://blog.youtube/inside-youtube/on-youtubes-recommendation-system/.
[149] GOOG-SCHNDR-00040840, at -845-846.
[150] Ibid.
[151] "YouTube Help: Autoplay Videos," https://support.google.com/youtube/answer/6327615.
[152] GOOG-SCHNDR-00040723, at -725.
[153] Froehle 30(b)(6) depo., p. 70 ln. 13-p. 73 ln. 23.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

been due to Google's own investments and innovation in the technology.[154] Its accomplishments have enabled remarkable recent advances in both highly visible applications, such as autonomous driving and facial recognition, and less visible but equally important ones, such as medical diagnosis, drug development, and flood forecasting.

[124]    The WatchNext recommendation system's design has benefited from its proximity to this work, adopting new discoveries early[155] and in some cases being the application whose demand for new capabilities drove progress.[156] WatchNext relies heavily on Machine Learning in its operation.[157]

[125]    Machine Learning systems are trained by presenting them with large numbers of examples of a type of problem (each a possible input) and their solution (for each input, an output). If provided with enough examples, they can automatically learn to generalize and obtain the ability to solve entirely new instances of the problem.[158]

[126]    Machine Learning predictions, while important, are only a small part of how a video comes to be recommended by WatchNext. There are many other steps in the process, most of which use traditional computer programming techniques whose logic is fully transparent and for which Defendants' intent is overt and clearly expressed.[159] Considering the WatchNext recommendation system as a whole, Defendants exert

---

[154] Jeffrey Dean, "A Golden Decade of Deep Learning: Computing Systems & Applications," Daedalus, Spring 2022. https://www.amacad.org/sites/default/files/publication/downloads/Daedalus_Sp22_04_Dean.pdf.
[155] GOOG-SCHNDR-00034975.
[156] "Inside Sibyl, Google's Massively Parallel Machine Learning Platform," *Datanami,* July 17, 2014. https://www.datanami.com/2014/07/17/inside-sibyl-googles-massively-parallel-machine-learning-platform/.
[157] Froehle 30(b)(6) depo, p. 14 ln. 25-p. 15 ln. 21.
[158] "Machine learning, explained," https://mitsloan.mit.edu/ideas-made-to-matter/machine-learning-explained.
[159] GOOG-SCHNDR-00052429.

explicit control over what videos are recommended by WatchNext, and consequently what videos YouTube visitors watch. To understand why, I will discuss in detail the process of how WatchNext recommendations are produced for a single user on a single video watch page. The purpose of this explanation is to make clear that YouTube's recommendation system is not an opaque "black box" making decisions of its own accord. Each step in the process—nomination strategies, filtering, scoring, and packing— carries a clear imprint of explicit design intent.

**[127]**   Each time a YouTube user visits a video watch page, the process of generating the recommendations of next videos is begun anew.[160] The process takes into consideration information known about the current video, information known about the user, such as their viewing history, age, country, and language setting, and the context of the viewing session, such as the viewing device.[161]

**[128]**   Defendants have a Machine Learning model that can predict the user's interest level in a particular video based on this information, but it would be far too much work to calculate this for each of the billions of videos on the service in an exhaustive search for the optimal selection. Instead, a collection of independent software components called

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████    █████████████

██████████████████████████████████████████████████

---

[160] GOOG-SCHNDR-00052429, at -431.
[161] Ibid., at -431-433.
[162] Ibid., at -432.



[163] GOOG-SCHNDR-00052429, at -433. Also Froehle 30(b)(6) depo., p. 64 ln. 11-p. 65 ln. 19.
[164] Froehle 30(b)(6) depo., p. 52 ln. 11-p. 53 ln. 23.
[165] GOOG-SCHNDR-00035026, at -032.
[166] Froehle 30(b)(6) depo., p. 49 ln. 14-p. 52 ln. 10.



167 GOOG-SCHNDR-00052429, at -433.
168 Froehle 30(b)(6) depo., p. 67 ln. 12-p. 70 ln. 5.
169 Froehle 30(b)(6) depo., p. 83 ln. 3-p. 84 ln. 19.
170 I was provided with information (GOOG-SCHNDR-00035026, at -036) that identified only 12 of the more than 200 scoring model inputs.
171 GOOG-SCHNDR-00035026, at -036.

---

[172] GOOG-SCHNDR-00051628, at -629.
[173] GOOG-SCHNDR-00052315, at -318.



**[137]**     When Autoplay is active, a particular process is applied to select a video to be

automatically played when the present video ends if the viewer takes no action. This

process includes the following:[178]



---

[174] GOOG-SCHNDR-00052429, at -436.
[175] GOOG-SCHNDR-00051628, at -632-633. GOOG-SCHNDR-00035026, at -037.
[176] Defendants operate a Machine Learning system that automatically classifies videos uploaded to YouTube with
respect to "authoritativeness" and "borderline" adherence to community guidelines ("YouTube Official Blog: On
YouTube's recommendation system," September 15, 2021, https://blog.youtube/inside-youtube/on-youtubes-
recommendation-system/).
[177] Goodrow depo., p. 120 ln. 8-25.
[178] GOOG-SCHNDR-00051950, at -956-962.

65



**[138]**     With the recommendation selection and ranking now complete, the videos are ready for presentation to the viewer as described in Part VI.A.

**[139]**     The business imperative of growing audience to serve the advertising business is clearly a dominant factor in the design of the WatchNext recommendation algorithm, but it is not the only factor. The interests of creators are considered, for whom they create opportunities of exposure throughout the lifecycle of a video. The interests of society are also considered through explicit mechanisms including filtering of age-related,

borderline, and authoritative content. As discussed in Part VI.A, the influence of

WatchNext over what YouTube viewers are watching—and, by extension, not

watching—is tremendous. Through their design of the YouTube's recommendation

system, Defendants decide what content is promoted and what content is not. Where

WatchNext's design strategies lead, YouTube viewing follows.

C.     **Defendants' design of WatchNext and Autoplay and their withholding of effective copyright management tools from Ordinary Copyright Owners have enabled them to promote infringing videos on YouTube to viewers with the strongest interest**

[140]     As discussed in Part VI.B, each visit by a viewer to the watch page of a video is

effectively an experiment performed by WatchNext on each recommended video's ability

to attract Defendants' desired response of the viewer playing, watching to completion,

and "liking" the video. Each experiment adds new predictive information to the system

about the relationship between the visited video, the recommended videos, and the viewer

themself that is fed back into the system to improve its decisions in future experiments.

For new videos, the WatchNext system is capable of bootstrapping itself from small bits

of knowledge – *e.g.,* ████████████████████████████████████

████████████████████. With the ability to perform and learn from this experiment

billions of times each day, it can ultimately predict viewers' appetite for particular videos

with sufficient accuracy to dictate in large measure what viewers watch.

[141]     Defendants' actions demonstrate their recognition that viewers' appetites may in

some instances be unhealthy. Because of the limited data on which WatchNext's viewer

engagement predictions are built, Defendants have incorporated "business and policy

logic" into the WatchNext systems in the form of filters that use external data sources

(e.g. classifiers for "borderline" and "authoritative" content) to reduce or remove recommendations that could be harmful to viewers, society, and their reputation.[179]

**[142]**      So, what about the harm done by the WatchNext system due to promotion of copyright infringing videos? WatchNext does not need to know who holds rights in a video in order to do its job well; it only needs to determine who wants to watch it. While it will use specific information about the works or the publisher of a video when those annotations are available, this information is not essential; it has the ability to find the interested audience for a video from much more ambiguous information, such as its general topic or what other videos are being watched by its viewers. It has no "business and policy logic" for copyright.[180]

**[143]**      As discussed in Part III, Defendants have provided a select group of copyright holders with access to their Content ID tool, which automatically finds videos on YouTube that infringe their works using a powerful Matching System. Matching is essential because finding copyright infringement requires great specificity. In a pool of over ▮ billion videos, it is far from enough to know that a video is related to a particular topic like "contemporary jazz music" for a rightsholder to determine whether it might infringe an owned work—there would be far too many such videos to review—even though that could be sufficient for WatchNext to narrowly target the video to its most interested audience—*e.g.,* fans of the specific performer whose work is infringed.

---

[179] GOOG-SCHNDR-00052429, at -436. GOOG-SCHNDR-00051628, at -632-633. GOOG-SCHNDR-00035026, at -037.
[180] Autoplay has previously avoided selecting videos whose audio had been muted due to copyright infringement, but it no longer does this. (Froehle depo., p. 42 ln. 20-p. 43 ln. 20.)

CONFIDENTIAL

**[144]**      I will illustrate this in more detail with an example work from a Plaintiff: Uniglobe's Bollywood romantic comedy feature, "5 Weddings."[181] Suppose an infringing copy of this movie has been uploaded to YouTube in two parts, each containing half of the film, and the Uploader has entered the video titles: "Bollywood movie part 1" and "Bollywood movie part 2." For a content owner with access to Content ID who has uploaded an active Reference File, these infringing videos, and any others including copies of the movie of ███████ or greater, would be discovered automatically, often within minutes of being uploaded (see Part III.C). But for an Ordinary Copyright Owner, the Copyright Management Tool will not find the infringing videos because they are not complete copies as that tool requires (see Part IV.D) and the text-based search tools will not surface them because they have only generically identifiable text annotations (see IV.B.1).

**[145]**      These infringing uploads will also not be easily findable by its fans using text-based search but this is not necessary because WatchNext can bring it to them automatically, as follows. ████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████ A subset of these viewers will accept the recommendation and a subset of those will watch it to completion. (They can easily move

---

[181] Note that data provided by Defendants indicated that a single infringing copy of "5 Weddings" on YouTube had more than 9 million views, 20,000 of which were due to Autoplay (GOOG-SCHNDR-00050365). I was not provided with data indicating the number of times it was viewed pursuant to a recommendation to the viewer by WatchNext or what text annotations may have been associated with each particular upload that would have facilitated its discovery by viewers or Uniglobe via YouTube Search.

CONFIDENTIAL

from the first to the second part of the movie by selecting the Uploader's "channel" if the two are not recommended in sequence.) The particular subsets that make these two selections will not escape notice of the WatchNext algorithm, whose Nominators can observe the particular affinities of the viewers to whom it is of interest. The movie, for example, may be of interest not only to people who like Bollywood but also to people who have been watching wedding-themed movies generally. WatchNext will observe these correlations and can begin recommending the video to viewers who are watching wedding movies but would otherwise not be watching Bollywood films. By careful observation and many experiments, WatchNext can find new communities of interest for the movie that are not suggested by the upload annotations at all; *e.g.*, viewers of movies with themes of transpacific cultural exchange, romantic comedy, and more. Machine Learning algorithms are able to discover and extend these associations in many directions automatically and implicitly, proliferating the movie to Defendants' benefit while the content owner, without access to the matching technology to uncover the infringement of their copyrights, remains blind to it all.

Joseph M. Winograd

September 1, 2022

70

CONFIDENTIAL

# Exhibit A.    Curriculum Vitae

### JOSEPH M. WINOGRAD, PH.D.

**SUMMARY**

Emmy-winning technology leader and executive specializing in technology development and licensing for the digital media, entertainment, consumer electronics and computer industries.

- Technology innovator with a track record of entrepreneurial leadership and success.
- Comprehensive expertise in digital and broadcast media technology and markets.
- Significant experience in advanced technology, R&D, product strategy and development, intellectual property development and licensing, industry standardization and corporate partnership initiatives.

**EXPERIENCE**

**VERANCE CORPORATION, San Diego, CA,** *September 1995-Present*
Verance is a developer of enabling technologies to enhance the value of media content and platforms. The company was formed in October 1999 following the acquisition of ARIS Technologies, Inc. by Solana Technology Development Corporation.

***Executive Vice President and Chief Technology Officer***, *November 2008-Present*
***Chief Technology Officer***, *October 1999-November 2008*
- Responsible for corporate technology assets, strategy, and partnerships, including technology and product strategy, product architectures, core technology and intellectual property development, technical business development, and external technical representation of the company. Reporting to CEO.
- Led efforts to establish company's digital watermarking technology as a global industry standard component of the Xbox, PlayStation, Blu-ray Disc, DVD, SD card, ATSC/NextGen TV, and DVB/HbbTV, consumer entertainment platforms.
- Developed and readied for market Aspect, a system for enabling the delivery of interactive application experiences for broadcast television services. Consumer launch scheduled for 2022.
- Developed and brought to market Cinavia, a system for identifying and limiting the use of unauthorized copies of filmed entertainment content. Licensed products to over 100 companies in the entertainment, consumer electronics, semiconductor, and computer industries. Incorporated in over 500 million consumer products since 2004, including Xbox and PlayStation. Customers include Universal Studios, Sony Pictures Entertainment, Warner Bros. Entertainment, 20th Century Fox Films, Panasonic, Sony, Samsung, Pioneer, Microsoft, Intel, Analog Devices, Broadcom, MediaTek and Sigma Designs.
- Developed and brought to market ConfirMedia, a nationwide radio and television broadcast monitoring network and information service delivering proof-of-performance solutions to advertising, programming, music, and broadcast industry participants. Tracked over 120 million broadcast events during 2001-2006. Clients included The Coca Cola Company, General Motors, A&E Television Networks, Premiere Radio Networks, Turner Broadcasting and SESAC.
- Developed and brought to market the Verance Copy Management System (VCMS), a system for identifying and limiting the use of unauthorized copies of commercial sound recordings. Licensed products to over 50 companies in the entertainment, consumer electronics, semiconductor, and computer industries. Incorporated in over 100 million consumer products since 1999. Customers currently include Universal Music Group, Warner Music Group, Sony BMG Music, EMI Music, Panasonic, Sony, Toshiba, Samsung, Pioneer, Philips, Microsoft, Creative Technologies, Intel, Texas Instruments, Hitachi, Cirrus Logic, ST Microelectronics, Zoran, and National Semiconductor.
- Led research and development and associated IP portfolio (currently over 61 issued patents and 80 pending patent applications). Authored 10 patent applications.
- Developed corporate technology licensing strategy, business model, and programs.
- Managed growth of engineering staff from headcount of 7 to 45 full-time employees.
- Represented company in industry standards groups and consortia and served as the primary company spokesman to industry and the media.
- Served on the Board of Directors of ConfirMedia, Inc. (Japan), a joint venture with Toshiba, Video Research, Inc. (Japan), Constellation Ventures (Japan).
- Managed patent infringement litigation involving 13 patents; negotiated settlement of all claims and counterclaims.

**ARIS TECHNOLOGIES, INC., Cambridge, MA,** *September 1995-October 1999*
ARIS Technologies (now Verance) was a R&D-oriented pioneer in the development and commercialization of digital audio watermarking technologies. ARIS invented and commercialized the core technology currently employed in Verance products.

***Chief Technology Officer,*** *February 1997-October 1999*
- Responsible for corporate technology strategy, research & development, intellectual property protection, and engineering management. Report to CEO.

CONFIDENTIAL

- Led successful effort to establish company's proprietary technology as worldwide industry standard within Secure Digital Music Initiative (interim standard) and DVD-Audio (final standard) products.
- Managed growth of engineering staff from headcount of 1 to 7 FTEs.
- Authored 4 patents.
- Developed technologies for audio watermarking, including novel signal modulation techniques, psychoacoustic modeling and testing, digital communications protocols for noisy and fading channels, system component and protocol security analysis, compressed audio format processing.

**Technical Consultant**, *September 1995-February 1997*
- Digital audio watermarking algorithm research and development.

**THE MATHWORKS, INC., Natick, MA**, *June 1993-September 1993*
**Intern, Applications Group**
- Developed algorithms for color map reduction, image dithering, stereoscopic rendering and other functions for the *Matlab* technical computing environment and *Matlab Image Processing Toolbox*.

**GEORGIA INSTITUTE OF TECHNOLOGY, Atlanta, GA**, *March 1992-June 1993*
**Research Assistant**, *DSP Laboratory, Dept. of EE*
- Developed extensions to the *Mathematica* technical and scientific computing environment that support the design and analysis of signal processing systems. These extensions are included in the *Signals and Systems* package for *Mathematica* sold by Wolfram Research, Inc.

**SLEEP RESEARCH LABORATORY, INC., Atlanta, GA**, *January 1992-June 1996*
**Software Engineer**
- Developed software for the collection, management, and analysis of sleep research data.

**OCEAN TECHNOLOGY, INC., Burbank, CA**, *November 1990-January 1992*
**Software Engineer**
- Lead software engineer of a real-time RISC-based multiprocessor graphics workstation with stereo displays.

**GEORGIA INSTITUTE OF TECHNOLOGY, Atlanta, GA**, *September 1986-November 1990*
**Software Engineer**, *Human Cognition and Aging Laboratory*
- Developed software for the collection, management, and analysis of human perception data.


**EDUCATION**
Ph.D. Electrical Engineering, Boston University, 1997.
M.S. Electrical Engineering, Boston University, 1994.
B. Computer Engineering, Georgia Institute of Technology, 1993.
B.S. Information and Computer Science, Georgia Institute of Technology, 1990.

**HONORS AND AWARDS**
2015 Technology & Engineering Emmy Award, "Steganographic Technologies for Audio/Video."
1999 POV Magazine Top 50 Entrepreneurs Under 35.
1998 DISCOVER Award for Technological Innovation.

**TESTIMONY**
None in the last four years.

**PATENTS**
U.S. Patent 5,940,135.  Apparatus and method for encoding and decoding information in analog signals
U.S. Patent 6,145,081.  Method and apparatus for preventing removal of embedded information in cover signals
U.S. Patent 6,175,627.  Apparatus and method for embedding and extracting information in analog signals using distributed signal features
U.S. Patent 6,737,957.  Remote control signaling using audio watermarks
U.S. Patent 7,369,677.  System reactions to the detection of embedded watermarks in a digital host content
U.S. Patent 7,616,776.  Methods and apparatus for enhancing the robustness of watermark extraction from digital host content
U.S. Patent 7,644,282.  Pre-processed information embedding system
U.S. Patent 7,788,684.  Media monitoring, management and information system
U.S. Patent 8,005,258.  Methods and apparatus for enhancing the robustness of watermark extraction from digital host content
U.S. Patent 8,020,004.  Forensic marking using a common customization function

72

CONFIDENTIAL

U.S. Patent 8,103,049.  System reactions to the detection of embedded watermarks in a digital host content
U.S. Patent 8,106,744.  Remote control signaling using audio watermarks
U.S. Patent 8,106,745.  Remote control signaling using audio watermarks
U.S. Patent 8,321,679.  Pre-processed information embedding system
U.S. Patent 8,340,348.  Methods and apparatus for thwarting watermark detection circumvention
U.S. Patent 8,451,086.  Remote control signaling using audio watermarks
U.S. Patent 8,538,066.  Asymmetric watermark embedding/extraction
U.S. Patent 8,549,307.  Forensic marking using a common customization function
U.S. Patent 8,745,404.  Pre-processed information embedding system
U.S. Patent 8,791,789.  Remote control signaling using audio watermarks
U.S. Patent 8,806,517.  Media monitoring, management and information system
U.S. Patent 8,811,655.  Circumvention of watermark analysis in a host content
U.S. Patent 8,838,977.  Watermark extraction and content screening in a networked environment
U.S. Patent 8,838,978.  Content access management using extracted watermark information
U.S. Patent 8,869,222.  Second screen content
U.S. Patent 9,009,482.  Forensic marking using a common customization function
U.S. Patent 9,055,239.  Signal continuity assessment using embedded watermarks
U.S. Patent 9,153,006.  Circumvention of watermark analysis in a host content
U.S. Patent 9,189,955.  Remote control signaling using audio watermarks
U.S. Patent 9,208,334.  Content management using multiple abstraction layers
U.S. Patent 9,251,322.  Signal continuity assessment using embedded watermarks
U.S. Patent 9,251,549.  Watermark extractor enhancements based on payload ranking
U.S. Patent 9,323,902.  Conditional access using embedded watermarks
U.S. Patent 9,547,753.  Coordinated watermarking
U.S. Patent 9,558,526.  Signal continuity assessment using embedded watermarks
U.S. Patent 9,571,606.  Social media viewing system
U.S. Patent 9,596,521.  Interactive content acquisition using embedded codes
U.S. Patent 9,602,891.  Service signaling recovery for multimedia content using embedded watermarks
U.S. Patent 9,607,131.  Secure and efficient content screening in a networked environment
U.S. Patent 9,639,911.  Watermark detection using a multiplicity of predicted patterns
U.S. Patent 9,648,282.  Media monitoring, management and information system
U.S. Patent 9,681,203.  Interactive content acquisition using embedded codes
U.S. Patent 9,704,211.  Signal continuity assessment using embedded watermarks
U.S. Patent 9,769,543.  Enhanced metadata and content delivery using watermarks
U.S. Patent 9,805,434.  Content management based on dither-like watermark embedding
U.S. Patent 9,854,331.  Interactive content acquisition using embedded codes
U.S. Patent 9,854,332.  Interactive content acquisition using embedded codes
U.S. Patent 9,942,602.  Watermark detection and metadata delivery associated with a primary content
U.S. Patent 9,990,688.  Signal continuity assessment using embedded watermarks
U.S. Patent 10,110,971.  Interactive content acquisition using embedded codes
U.S. Patent 10,178,443.  Enhanced metadata and content delivery using watermarks
U.S. Patent 10,218,994.  Watermark recovery using audio and video watermarking
U.S. Patent 10,257,567.  Watermark based content recognition improvements
U.S. Patent 10,277,959.  Service signaling recovery for multimedia content using embedded watermarks
U.S. Patent 10,354,354.  Content synchronization using watermark timecodes
U.S. Patent 10,445,848.  Content management based on dither-like watermark embedding
U.S. Patent 10,477,285.  Watermark-based data recovery for content with multiple alternative components
U.S. Patent 10,499,120.  Interactive content acquisition using embedded codes
U.S. Patent 10,504,200.  Metadata acquisition using embedded watermarks
U.S. Patent 10,820,065.  Service signaling recovery for multimedia content using embedded watermarks
U.S. Patent 10,848,821.  Watermark based content recognition improvements
U.S. Patent 11,297,398.  Watermark-based metadata acquisition and processing
U.S. Patent 11,368,766.  System and method for signaling security and database population

**PENDING PATENT APPLICATIONS**

U.S. Patent App. 20210382929. MULTIMEDIA CONTENT TAGS
U.S. Patent App. 20210127179. SYSTEM AND METHOD FOR SIGNALING SECURITY AND DATABASE
    POPULATION
U.S. Patent App. 20210076095. WATERMARK-BASED DYNAMIC AD INSERTION
U.S. Patent App. 20210058681. WATERMARK-BASED DATA RECOVERY FOR CONTENT WITH MULTIPLE
    ALTERNATIVE COMPONENTS

CONFIDENTIAL

U.S. Patent App. 20200128303. WATERMARK-BASED METADATA ACQUISITION AND PROCESSING
U.S. Patent App. 20200065322. MULTIMEDIA CONTENT TAGS
U.S. Patent App. 20190356965. SERVICE SIGNALING RECOVERY FOR MULTIMEDIA CONTENT USING
    EMBEDDED WATERMARKS
U.S. Patent App. 20190318061. DEVICE AUTHENTICATION IN COLLABORATIVE CONTENT SCREENING
U.S. Patent App. 20190306567. WATERMARK BASED CONTENT RECOGNITION IMPROVEMENTS
U.S. Patent App. 20190222554. CONTENT IDENTIFICATION AND PROCESSING INCLUDING LIVE BROADCAST
    CONTENT
U.S. Patent App. 20190132652. SYSTEM AND METHOD FOR SIGNALING SECURITY AND DATABASE
    POPULATION
U.S. Patent App. 20190090033. INTERACTIVE CONTENT ACQUISITION USING EMBEDDED CODES
U.S. Patent App. 20180220200. WATERMARK-BASED DATA RECOVERY FOR CONTENT WITH MULTIPLE
    ALTERNATIVE COMPONENTS
U.S. Patent App. 20180192163. INTERACTIVE CONTENT ACQUISITION USING EMBEDDED CODES
U.S. Patent App. 20180167630. WATERMARK RECOVERY USING AUDIO AND VIDEO WATERMARKING
U.S. Patent App. 20180146245. WATERMARK BASED CONTENT RECOGNITION IMPROVEMENTS
U.S. Patent App. 20180089790. SIGNAL CONTINUITY ASSESSMENT USING EMBEDDED WATERMARKS
U.S. Patent App. 20180018748. CONTENT MANAGEMENT BASED ON DITHER-LIKE WATERMARK EMBEDDING
U.S. Patent App. 20170374434. ENHANCED METADATA AND CONTENT DELIVERY USING WATERMARKS
U.S. Patent App. 20170316189. OBJECT-BASED WATERMARKING
U.S. Patent App. 20170280205. INTERACTIVE CONTENT ACQUISITION USING EMBEDDED CODES
U.S. Patent App. 20170272839. INTERACTIVE CONTENT ACQUISITION USING EMBEDDED CODES
U.S. Patent App. 20170251282. SERVICE SIGNALING RECOVERY FOR MULTIMEDIA CONTENT USING
    EMBEDDED WATERMARKS
U.S. Patent App. 20170251254. TRACING PIRACY OF LIVE BROADCASTS
U.S. Patent App. 20170140493. SIGNAL CONTINUITY ASSESSMENT USING EMBEDDED WATERMARKS
U.S. Patent App. 20160241932. INTERACTIVE CONTENT ACQUISITION USING EMBEDDED CODES
U.S. Patent App. 20160225116. SIGNAL CONTINUITY ASSESSMENT USING EMBEDDED WATERMARKS
U.S. Patent App. 20160182973. SERVICE SIGNALING RECOVERY FOR MULTIMEDIA CONTENT USING
    EMBEDDED WATERMARKS
U.S. Patent App. 20160162858. SCREENING ARCHITECTURES ENABLING REVOCATION AND UPDATE
U.S. Patent App. 20160150297. ENHANCED METADATA AND CONTENT DELIVERY USING WATERMARKS
U.S. Patent App. 20160148334. WATERMARK DETECTION AND METADATA DELIVERY ASSOCIATED WITH A
    PRIMARY CONTENT
U.S. Patent App. 20160073148. MEDIA CUSTOMIZATION BASED ON ENVIRONMENTAL SENSING
U.S. Patent App. 20160057317. CONTENT SYNCHRONIZATION USING WATERMARK TIMECODES
U.S. Patent App. 20160055607. CONTENT MANAGEMENT BASED ON DITHER-LIKE WATERMARK EMBEDDING
U.S. Patent App. 20160055606. WATERMARK DETECTION USING A MULTIPLICITY OF PREDICTED PATTERNS
U.S. Patent App. 20150324947. METADATA ACQUISITION USING EMBEDDED WATERMARKS
U.S. Patent App. 20150286809. FORENSIC MARKING USING A COMMON CUSTOMIZATION FUNCTION
U.S. Patent App. 20150269362. SIGNAL CONTINUITY ASSESSMENT USING EMBEDDED WATERMARKS
U.S. Patent App. 20150264429. INTERACTIVE CONTENT ACQUISITION USING EMBEDDED CODES
U.S. Patent App. 20150261753. METADATA ACQUISITION USING EMBEDDED CODES
U.S. Patent App. 20150121534. CONTENT MANAGEMENT USING MULTIPLE ABSTRACTION LAYERS
U.S. Patent App. 20150036873. CIRCUMVENTION OF WATERMARK ANALYSIS IN A HOST CONTENT
U.S. Patent App. 20150030200. WATERMARK EXTRACTOR ENHANCEMENTS BASED ON PAYLOAD RANKING
U.S. Patent App. 20150016228. REMOTE CONTROL SIGNALING USING AUDIO WATERMARKS
U.S. Patent App. 20140325550. REAL-TIME ANTI-PIRACY FOR BROADCAST STREAMS
U.S. Patent App. 20140279549. REFERRED SALE SYSTEM
U.S. Patent App. 20140279296. REFERRED SALE SYSTEM
U.S. Patent App. 20140074855. MULTIMEDIA CONTENT TAGS
U.S. Patent App. 20140071342. SECOND SCREEN CONTENT
U.S. Patent App. 20140067950. SOCIAL MEDIA VIEWING SYSTEM
U.S. Patent App. 20140029786. FORENSIC MARKING USING A COMMON CUSTOMIZATION FUNCTION
U.S. Patent App. 20130339029. REMOTE CONTROL SIGNALING USING AUDIO WATERMARKS
U.S. Patent App. 20130152210. COORDINATED WATERMARKING
U.S. Patent App. 20130151856. CONDITIONAL ACCESS USING EMBEDDED WATERMARKS
U.S. Patent App. 20130151855. WATERMARK EMBEDDING WORKFLOW IMPROVEMENTS
U.S. Patent App. 20130142382. PRE-PROCESSED INFORMATION EMBEDDING SYSTEM
U.S. Patent App. 20130011006. ASYMMETRIC WATERMARK EMBEDDING/EXTRACTION
U.S. Patent App. 20130007462. CIRCUMVENTION OF WATERMARK ANALYSIS IN A HOST CONTENT
U.S. Patent App. 20120130719. REMOTE CONTROL SIGNALING USING AUDIO WATERMARKS

CONFIDENTIAL

U.S. Patent App. 20120072731. SECURE AND EFFICIENT CONTENT SCREENING IN A NETWORKED ENVIRONMENT
U.S. Patent App. 20120072730. CONTEXT ACCESS MANAGEMENT USING WATERMARK EXTRACTION INFORMATION
U.S. Patent App. 20120072729. WATERMARK EXTRACTION AND CONTENT SCREENING IN A NETWORKED ENVIRONMENT
U.S. Patent App. 20120026393. MEDIA MONITORING, MANAGEMENT AND INFORMATION SYSTEM
U.S. Patent App. 20120017091. METHODS AND APPARATUS FOR THWARTING WATERMARK DETECTION CIRCUMVENTION
U.S. Patent App. 20110311056. FORENSIC MARKING USING A COMMON CUSTOMIZATION FUNCTION
U.S. Patent App. 20110286625. SYSTEM REACTIONS TO THE DETECTION OF EMBEDDED WATERMARKS IN A DIGITAL HOST CONTENT
U.S. Patent App. 20110068898. REMOTE CONTROL SIGNALING USING AUDIO WATERMARKS
U.S. Patent App. 20100287579. MEDIA MONITORING, MANAGEMENT AND INFORMATION SYSTEM
U.S. Patent App. 20100228857. MEDIA MONITORING, MANAGEMENT AND INFORMATION SYSTEM
U.S. Patent App. 20100146286. Pre-Processed Information Embedding System
U.S. Patent App. 20100111355. METHODS AND APPARATUS FOR ENHANCING THE ROBUSTNESS OF WATERMARK EXTRACTION FROM DIGITAL HOST CONTENT
U.S. Patent App. 20080310673. System reactions to the detection of embedded watermarks in a digital host content
U.S. Patent App. 20080002854. Signal continuity assessment using embedded watermarks
U.S. Patent App. 20070247278. Remote control signaling using audio watermarks
U.S. Patent App. 20070012782. Forensic marking using a common customization function
U.S. Patent App. 20060239503. System reactions to the detection of embedded watermarks in a digital host content
U.S. Patent App. 20060239502. Methods and apparatus for enhancing the robustness of watermark extraction from digital host content
U.S. Patent App. 20060239501. Security enhancements of digital watermarks for multi-media content
U.S. Patent App. 20060005029. Pre-processed information embedding system
U.S. Patent App. 20040169581. Remote control signaling using audio watermarks
U.S. Patent App. 20040073916. Media monitoring, management and information system

## PUBLICATIONS

Author of 6 technical journal articles, 10 technical conference papers, and 1 United States Air Force technical report in the areas of digital signal processing, real-time systems design, and computer graphics algorithms.

### Journal Articles (6)

R. Petrovic, J.M. Winograd, K. Jemili, E. Métois, "Data Hiding within Audio Signals," *Facta Universitatis (NIS)*, Series: Electronics and Energetics, vol.12, No.2 (1999), pp.103-122.
S. H. Nawab, A. V. Oppenheim, A. P. Chandrakasan, J. M. Winograd and J. T. Ludwig, "Approximate Signal Processing," *J. VLSI Signal Processing*, vol. 15, no. 1, pp. 177-200, January 1997.
 J. M. Winograd and S. H. Nawab, "Probabilistic Complexity Analysis for a Class of Approximate DFT Algorithms," *J. VLSI Signal Processing*, vol. 14, no. 2, pp. 193-205, December 1996.
J. M. Winograd and J. H. McClellan, "How to Use a Computer Algebra System for Reconstruction of Functions from Parallel-Line Projections," *Computers in Physics*, vol. 9, no. 2, pp. 156-164, March 1995.
J. M. Winograd and S. H. Nawab, "Incremental Refinement of DFT and STFT Approximations," *IEEE Signal Processing Letters*, vol. 2, no. 2, pp. 1-3, February 1995.
S. J. Adelson, J. B. Bentley, I. S. Chong, L. F. Hodges, and J. M. Winograd, "Simultaneous Generation of Stereoscopic Views," *Computer Graphics Forum*, vol. 10, no. 1, pp. 3-10, March 1991.

### Conference Papers (10)

R. Petrovic, B. Tehranchi, and J. M. Winograd, "Security of Copy Control Watermarks," *TELSIKS 2007,* Sept. 2007.
R. Petrovic, B. Tehranchi, and J. M. Winograd, "Digital Watermarking Security Considerations," *Proc. 8th ACM Wkshp. Multimedia & Security,* (Geneva), Sept. 2006.
J. M. Winograd and S. H. Nawab, "Probabilistic Complexity Analysis of Incremental DFT Algorithms," *Proc. IEEE Int. Conf. Acoustics, Speech, and Signal Processing*, (Munich), April 1997.
J. M. Winograd, J. T. Ludwig, S. H. Nawab, A. V. Oppenheim, and A. P. Chandrakasan, "Flexible Systems for Digital Signal Processing," *Proc. AAAI Symposium on Flexible Computation*, (Cambridge, MA), November, 1996.
R. Mani, S. H. Nawab, J. M. Winograd, and B. L. Evans, "Integrated Numeric and Symbolic Signal Processing in a Heterogeneous Design Environment," *Advanced Signal Processing Algorithms*, (ed. F. T. Luk) Proc. SPIE, (Denver, CO), August 1996.

CONFIDENTIAL

J. M. Winograd, S. H. Nawab, and A. V. Oppenheim, "FFT-Based Incremental Refinement of Suboptimal Detection," *Proc. IEEE Int. Conf. Acoustics, Speech, and Signal Processing*, (Atlanta, GA), May 1996.

J. M. Winograd, J. T. Ludwig, S. H. Nawab, A. Chandrakasan and A. V. Oppenheim, "Approximate Processing and Incremental Refinement Concepts," *Proc. Second ARPA RASSP Conf.*, (Washington D.C.), July 1995.

J. M. Winograd and S. H. Nawab, "Mixed-Radix Approach to Incremental DFT Refinement," *Advanced Signal Processing Algorithms*, (ed. F. T. Luk), Proc. SPIE 2563, (San Diego, CA), July 1995.

J. M. Winograd and S. H. Nawab, "A C++ Software Environment for the Development of Embedded Signal Processing Systems," *Proc. IEEE Int. Conf. Acoustics, Speech, and Signal Processing*, vol. 4, pp. 2715-2718, (Detroit), May 1995.

S. H. Nawab and J. M. Winograd, "Approximate Signal Processing Using Incremental Refinement and Deadline-Based Algorithms," *Proc. IEEE Int. Conf. Acoustics, Speech*, and Signal Processing, vol. 5, pp. 2857-2860, (Detroit), May 1995.

**Technical Reports (1)**

J. M. Winograd, "IPUS C++ Platform User's Manual."  In *High Level Adaptive Signal Processing Architecture with Applications to Radar Non-Gaussian Clutter*, Technical Report RL-TR-95-164, Rome Laboratory Air Force Materiel Command, Griffiss Air Force Base, NY, Sep. 1995.

CONFIDENTIAL

## Exhibit B.     List of Materials Considered

### Deposition Transcripts

Bill, Julian – 2022.06.22
Froehle, Brad (30(b)(6) portion) – 2022.06.30
Froehle, Brad (individual portion) – 2022.06.30
Goodrow, Cristos – 2022.06.28
Magagna, Fabio (Winograd excerpts) – 2022.07.05
Rosenstein, David – 2022.07.01
Suk, Joanne – 2022.07.14
Wu, Amy – 2022.05.24
Zhu, Kevin (30(b)(1) portion) (Winograd excerpts) – 2022.06.21

### Public Documents

"2021 Alphabet Annual Report," p. 29,
https://abc.xyz/investor/static/pdf/2021_alphabet_annual_report.pdf.
About Google," https://about.google/intl/ALL_us/.
ASCAP/BMI Songview Repertory, https://www.ascap.com/repertory#/.
"Cloudflare Blog: In 2021, the Internet went for TikTok, space and beyond,"
https://blog.cloudflare.com/popular-domains-year-in-review-2021/.
Getty Images, https://www.gettyimages.com.
"Google AI: Responsibilities," https://ai.google/responsibilities/.
"Google aims to make YouTube profitable with ads," *New York Times*, Aug. 22, 2007.
https://www.nytimes.com/2007/08/22/technology/22iht-22google.7206224.html.
"Google Knowledge Graph Search API," https://developers.google.com/knowledge-graph.
"Google Official Blog: Latest content ID tool for YouTube,"
https://googleblog.blogspot.com/2007/10/latest-content-id-tool-for-youtube.html.
"Google Search Central: In-depth guide to how Google Search works,"
https://developers.google.com/search/docs/advanced/guidelines/how-search-works.
"Google Search Help: Search with an image on Google,"
https://support.google.com/websearch/answer/1325808.
"Google's Next Generation Music Recognition," https://ai.googleblog.com/2018/09/googles-next-generation-music.html.
"Inside Sibyl," Google's Massively Parallel Machine Learning Platform,"
https://www.datanami.com/2014/07/17/inside-sibyl-googles-massively-parallel-machine-learning-platform/.
Jeffrey. Dean, "A Golden Decade of Deep Learning: Computing Systems & Applications," Daedalus, Spring 2022.
https://www.amacad.org/sites/default/files/publication/downloads/Daedalus_Sp22_04_Dean.pdf.
"Take YouTube Certified Courses," https://support.google.com/youtube/answer/7380223.
"Viacom files $1 billion lawsuit against YouTube and Google,"
https://www.nytimes.com/2007/03/13/business/worldbusiness/13iht-viacom.4892466.html.
"Waiting till 9 a.m for XBox 360! Wooo!!!," video watch page from YouTube.com, Nov. 24, 2005.
https://web.archive.org/web/20061215205212/http://www.youtube.com/watch.php?v=0oBXDc9Opug.
YouTube, https://www.youtube.com.

CONFIDENTIAL

"YouTube Advertising Policies: Copyright," https://support.google.com/adspolicy/answer/6018015.

"YouTube Advertising Policies: Review Process," https://support.google.com/adspolicy/topic/1316546.

"YouTube Blog: Here's to eight great years," https://blog.youtube/culture-and-trends/heres-to-eight-great-years/.

"YouTube Blog: On YouTube's recommendation system," September 15, 2021, https://blog.youtube/inside-youtube/on-youtubes-recommendation-system/.

"YouTube Blog: Responsibility is good for business and for the creator economy," https://blog.youtube/inside-youtube/responsibility-good-business-and-creator-economy/.

"YouTube Blog: YouTube's approach to copyright," August 31, 2021, https://blog.google/around-the-globe/google-europe/youtubes-approach-to-copyright/.

 "YouTube Community: Updates to YouTube's Terms of Service (November '20)," https://support.google.com/youtube/thread/83733719.

"YouTube Composition Share Asset," https://support.google.com/youtube/answer/6175220.

"YouTube Content ID API," https://developers.google.com/youtube/partner.

"YouTube Content ID API: Claims," https://developers.google.com/youtube/partner/docs/v1/claims.

"YouTube Copyright and rights management," https://support.google.com/youtube/topic/2676339.

"YouTube Copyright Transparency Report H1 2021," https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-1-1_2021-6-30_en_v1.pdf.

"YouTube Copyright Transparency Report H2 2021," https://storage.googleapis.com/transparencyreport/report-downloads/pdf-report-22_2021-7-1_2021-12-31_en_v1.pdf.

"YouTube Creators: How to Prevent Videos You've Taken Down From Being Reuploaded," https://www.youtube.com/watch?v=DP0zLUVeevg.

"YouTube Creators: How to use YouTube's Copyright Match Tool," https://www.youtube.com/watch?v=5-2R-IZITZ8.

"YouTube for Content Managers," https://support.google.com/youtube/topic/9153648.

"YouTube for Press: YouTube by the Numbers," https://blog.youtube/press/.

"YouTube for the Press: YouTube by the Numbers," https://blog.youtube/press/.

"YouTube Help: 4k video uploads and processing time," https://support.google.com/youtube/thread/1626616.

"YouTube Help: Access to YouTube tools and features," https://support.google.com/youtube/answer/9890437.

"YouTube Help: Add video thumbnails on YouTube," https://support.google.com/youtube/answer/72431.

"YouTube Help: Autoplay Videos," https://support.google.com/youtube/answer/6327615.

"YouTube Help: Change video privacy settings," https://support.google.com/youtube/answer/157177.

"YouTube Help: Content Eligible for Content ID," https://support.google.com/youtube/answer/2605065.

"YouTube Help: Content Manager Policies," https://support.google.com/youtube/answer/9142671.

"YouTube Help: Content Verification Program," https://support.google.com/youtube/answer/6005923.

"YouTube Help: Create a policy," https://support.google.com/youtube/answer/106964.

"YouTube Help: Create an asset," https://support.google.com/youtube/answer/3011552.

"YouTube Help: Dispute a Content ID claim," https://support.google.com/youtube/answer/2797454.

"YouTube Help: Embed videos & playlists," https://support.google.com/youtube/answer/171780.

"YouTube Help: Exclude parts of your references," https://support.google.com/youtube/answer/4389910.

"YouTube Help: How Content ID Works," https://support.google.com/youtube/answer/2797370.

"YouTube Help: Learn about Content ID claims," https://support.google.com/youtube/answer/6013276.

CONFIDENTIAL

"YouTube Help: Let us know your copyright management needs!,"
https://support.google.com/youtube/contact/copyright_management_tools_form.
"YouTube Help: Policies for Content ID," https://support.google.com/youtube/answer/9142671.
"YouTube Help: Prevent reuploads of removed videos,"
https://support.google.com/youtube/answer/10298392.
"YouTube Help: Qualify for Content ID," https://support.google.com/youtube/answer/1311402.
"YouTube Help: Requirements for copyright infringement notifications: Videos,"
https://support.google.com/youtube/answer/6005900.
"YouTube Help: Set up email notifications," https://support.google.com/youtube/answer/2811709.
"YouTube Help: Submit a copyright counter notification,"
https://support.google.com/youtube/answer/2807684.
"YouTube Help: Submit a copyright takedown request,"
https://support.google.com/youtube/answer/2807622.
"YouTube Help: Upload and Match Policies," https://support.google.com/youtube/answer/107129.
"YouTube Help: Upload videos in YouTube Studio," https://support.google.com/youtube/answer/57407.
"YouTube Help: Use the Content Verification Tool,"
https://support.google.com/youtube/answer/3010500.
"YouTube Help: Use the Copyright Match Tool," https://support.google.com/youtube/answer/7648743.
"YouTube Help: Use the Manual Claiming Tool," https://support.google.com/youtube/answer/9346683.
"YouTube Help: Verify your YouTube Account," https://support.google.com/youtube/answer/171664.
"YouTube Help: View your claims," https://support.google.com/youtube/answer/106990.
"YouTube Help: Watch different types of videos," https://support.google.com/youtube/topic/9257410.
"YouTube Help: Watch videos on different devices," https://support.google.com/youtube/topic/9257096.
"YouTube Help: YouTube advertising formats," https://support.google.com/youtube/answer/2467968.
"YouTube Help: YouTube Certified Program overview,"
https://support.google.com/youtube/answer/6145904.
"YouTube Help: YouTube Certified program overview: Content Owner Course and Music Rights
Management Course," https://support.google.com/youtube/answer/6145904#zippy=%2Ccontent-
ownership-course%2Cmusic-rights-management-course.
"YouTube Help: YouTube Channel Monetization Policy,"
https://support.google.com/youtube/answer/1311392.
"YouTube New "Checks" Step in the Upload Flow on Desktop,"
https://support.google.com/youtube/thread/102365314.
"YouTube Official Blog: 50 Million," https://blog.youtube/news-and-events/50-million/.
"YouTube Official Blog: Helping creators protect their content," https://blog.youtube/news-and-
events/helping-creators-protect-their-content/.
"YouTube Operations Guide," https://support.google.com/youtube/answer/6084146.
"YouTube Operations Guide: Using Content ID," https://support.google.com/youtube/answer/3244015.
"YouTube Partner Program overview & eligibility," https://support.google.com/youtube/answer/72851.
"YouTube Policies," https://www.youtube.com/howyoutubeworks/policies/overview/.
"YouTube Product Features: Recommended Videos,"
https://www.youtube.com/howyoutubeworks/product-features/recommendations/.
"YouTube Search," https://www.youtube.com/howyoutubeworks/product-features/search/.
"YouTube serves up 100 million videos a day online," CBS News, July 16, 2006.
https://usatoday30.usatoday.com/tech/news/2006-07-16-youtube-views_x.htm.

CONFIDENTIAL

**Production Documents**

GOOG-SCHNDR-00000859
GOOG-SCHNDR-00000918
GOOG-SCHNDR-00000924
GOOG-SCHNDR-00001059
GOOG-SCHNDR-00001066
GOOG-SCHNDR-00001112
GOOG-SCHNDR-00001129
GOOG-SCHNDR-00001188
GOOG-SCHNDR-00001252
GOOG-SCHNDR-00001279
GOOG-SCHNDR-00001283
GOOG-SCHNDR-00001354
GOOG-SCHNDR-00001411
GOOG-SCHNDR-00001442
GOOG-SCHNDR-00002131
GOOG-SCHNDR-00002146
GOOG-SCHNDR-00021221
GOOG-SCHNDR-00030913
GOOG-SCHNDR-00034775
GOOG-SCHNDR-00034975
GOOG-SCHNDR-00035026
GOOG-SCHNDR-00038640
GOOG-SCHNDR-00038782
GOOG-SCHNDR-00038808
GOOG-SCHNDR-00038834
GOOG-SCHNDR-00038863
GOOG-SCHNDR-00038876
GOOG-SCHNDR-00038910
GOOG-SCHNDR-00038932
GOOG-SCHNDR-00038946
GOOG-SCHNDR-00038961
GOOG-SCHNDR-00038966
GOOG-SCHNDR-00039024
GOOG-SCHNDR-00039051
GOOG-SCHNDR-00039064
GOOG-SCHNDR-00039095
GOOG-SCHNDR-00039113
GOOG-SCHNDR-00040244
GOOG-SCHNDR-00040515
GOOG-SCHNDR-00040616
GOOG-SCHNDR-00040619
GOOG-SCHNDR-00040623

CONFIDENTIAL

GOOG-SCHNDR-00040661
GOOG-SCHNDR-00040721
GOOG-SCHNDR-00040723
GOOG-SCHNDR-00040751
GOOG-SCHNDR-00040756
GOOG-SCHNDR-00040761
GOOG-SCHNDR-00040840
GOOG-SCHNDR-00040860
GOOG-SCHNDR-00040865
GOOG-SCHNDR-00041318
GOOG-SCHNDR-00041330
GOOG-SCHNDR-00041383
GOOG-SCHNDR-00041389
GOOG-SCHNDR-00041457
GOOG-SCHNDR-00041470
GOOG-SCHNDR-00041477
GOOG-SCHNDR-00041492
GOOG-SCHNDR-00042066
GOOG-SCHNDR-00042071
GOOG-SCHNDR-00042424
GOOG-SCHNDR-00042486
GOOG-SCHNDR-00042564
GOOG-SCHNDR-00042607
GOOG-SCHNDR-00042619
GOOG-SCHNDR-00043717
GOOG-SCHNDR-00043860
GOOG-SCHNDR-00043864
GOOG-SCHNDR-00044022
GOOG-SCHNDR-00046791
GOOG-SCHNDR-00048006
GOOG-SCHNDR-00048014
GOOG-SCHNDR-00048018
GOOG-SCHNDR-00048040
GOOG-SCHNDR-00050365
GOOG-SCHNDR-00050398
GOOG-SCHNDR-00051628
GOOG-SCHNDR-00051657
GOOG-SCHNDR-00051743
GOOG-SCHNDR-00051798
GOOG-SCHNDR-00051824
GOOG-SCHNDR-00051863
GOOG-SCHNDR-00051907
GOOG-SCHNDR-00051950

CONFIDENTIAL

GOOG-SCHNDR-00051976
GOOG-SCHNDR-00052063
GOOG-SCHNDR-00052099
GOOG-SCHNDR-00052174
GOOG-SCHNDR-00052315
GOOG-SCHNDR-00052341
GOOG-SCHNDR-00052429
GOOG-SCHNDR-00052970
GOOG-SCHNDR-00053129
GOOG-SCHNDR-00053190
GOOG-SCHNDR-00053221
GOOG-SCHNDR-00053226
GOOG-SCHNDR-00053523
GOOG-SCHNDR-00053529
GOOG-SCHNDR-00053755
GOOG-SCHNDR-00053764
GOOG-SCHNDR-00053786
GOOG-SCHNDR-00054239
GOOG-SCHNDR-00054245
GOOG-SCHNDR-00054286
GOOG-SCHNDR-00054295
GOOG-SCHNDR-00054327
GOOG-SCHNDR-00054372
GOOG-SCHNDR-00054373
Schneider_v_YouTube_CID Data Extraction_complete.xlsx

CONFIDENTIAL

## Exhibit C.      <u>Glossary of Terms</u>

The following terms are used in this report with a specific technical meaning that differs from their general English usage.

**Asset:** Digital copies of copyrighted works ("Reference Files") and descriptive text provided to Defendants by Content ID Partners of works that they own.

**Audio Matching:** A technology that finds audio containing a copy of another audio recording for which it has previously generated an audio Fingerprint.

**Autoplay:** A feature of YouTube wherein after the viewer has selected a first video to view, a sequence of videos selected by the WatchNext recommendation system are automatically played for viewers without any further interaction required.

**Candidate:** A video selected by a WatchNext Nominator for potential recommendation to the user.

**Claim:** A copyright assertion made using the Content ID tool.

**Content ID:** A YouTube copyright management tool that provides matching and claiming functions to Content ID Partners.

**Content ID Partner:** A copyright owner who has been granted access to Content ID by Defendants.

**Excluded Segment:** A temporal segment of a video or audio component (or both) of a video that should be excluded from matching.

**Fingerprint:** A statistical description of a digital media item (e.g. video, audio, or a "melody" aka musical composition) that is designed to capture its essential characteristics in a compact form.

**First to Upload:** A policy of the Copyright Match Tool wherein a video is disqualified from protection if the majority of the video (by duration) is found to match an existing video on YouTube.

**Full Reupload:** A policy of the Copyright Match Tool whereby the tool will only find infringing videos that match ███ or more of the duration of the video that the rightsholder is seeking to protect

██████████████████████████████████████

███████████████████████████████████████

████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

CONFIDENTIAL

**Knowledge Graph:** Google's data model for everything, either physical or abstract, in the real world.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████

**Machine Learning:** A technology for problem-solving wherein an algorithm is trained by presenting it with large numbers of examples of a type of problem (each a possible input) and their solution (for each input, the desired output). If provided with enough examples, it can automatically learn to generalize and obtain the ability to solve entirely new instances of the problem.

**Manual Copyright Search:** A feature of the YouTube Content Management System with which Defendants permits a subset of copyright owners employ a text-based search engine designed to assist in finding infringing videos.

**Match Conditions:** A set of rules assigned to an Asset by a Content ID Partner that describes what types of uses in uploaded videos they would like to claim; matches that don't conform to those rules are ignored.

**Matching System:** A specialized search engine designed for automated discovery of uses of copyrighted works using Video Matching, Audio Matching, and Melody Matching.

**Melody Matching:** A technology that finds Videos whose audio component contains a performance of a musical composition for which it has previously generated a melody Fingerprint.

**Nominator:** A software component in the WatchNext recommendation system that pursues a particular strategy for identifying a few dozen promising Candidates for recommendation to the viewer.

**Ordinary Copyright Owners:** Rightsholders who do not meet Defendants' requirements for eligibility to become a Content ID Partner.

**Query:** An item presented to a search engine for matching against items in the search engine's index.

**Reference File:** A digital copy of a copyrighted work uploaded to Content ID by a Content ID Partner for matching.

**Thumbnail:** A still image associated with a video on YouTube that is displayed to users when the video is listed in YouTube Search results or WatchNext recommendations.

**Uploader:** A YouTube Partner or member of the general public who has uploaded content to YouTube.

**URL:** Uniform Resource Locator; a web address.

CONFIDENTIAL

**Video Matching:** A technology that finds videos whose video component contains a copy of another video component for which it has previously generated a video Fingerprint.

**WatchNext:** YouTube's recommendation system that selects videos to promote to users.

**Webform:** YouTube's publicly available web page for submitting a DMCA takedown notice.

**YouTube Corpus:** The collection of videos on YouTube that are eligible for presentation to users.

███████████████████████████████████

████████████████

**YouTube Partner:** Uploaders who have entered into a commercial partnership with YouTube.

**YouTube Search:** The text-based search engine provided to all YouTube users for finding videos to watch.

CONFIDENTIAL

## Exhibit D.    Capabilities Summary of YouTube Copyright Management Tools

| Infringing Video Characteristics | | Copyright Management Tool Efficacy | | | | | | | |
| Type of Infringement | Type of Annotation | Content ID | | Copyright Match Tool | | Copyright Search | | YouTube Search | |
| | | Past | Future | Past | Future | Past | Future | Past | Future |
|---|---|---|---|---|---|---|---|---|---|
| Full copy | Specific | Yes | Yes | No | Yes, if first to upload or previously discovered and taken down | Yes | No | Yes, one instance at a time | No |
| Full copy | Generic | Yes | Yes | No | Yes, if first to upload or previously discovered and taken down | No | No | No | No |
| Full copy | Unrelated | Yes | Yes | No | Yes, if first to upload or previously discovered and taken down | No | No | No | No |
| Full copy, incorporated | Specific | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | Yes | No | Yes, one instance at a time | No |
| Full copy, incorporated | Generic | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | No | No | No | No |
| Full copy, incorporated | Unrelated | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | No | No | No | No |
| Partial copy | Specific | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | Yes | No | Yes, one instance at a time | No |
| Partial copy | Generic | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | No | No | No | No |
| Partial copy | Unrelated | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | No | No | No | No |
| Partial copy, incorporated | Specific | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | Yes | No | Yes, one instance at a time | No |
| Partial copy, incorporated | Generic | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | No | No | No | No |
| Partial copy, incorporated | Unrelated | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | No | No | No | No |
| Performance | Specific | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | Yes | No | Yes, one instance at a time | No |
| Performance | Generic | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | No | No | No | No |
| Performance | Unrelated | Yes | Yes | No | Yes, if the distinct infringing video was previously discovered and taken down | No | No | No | No |

**Definitions**

*Types of Infringement:*

| | |
|---|---|
| Full copy | Infringing videos whose video and/or audio consist solely of a complete copy of the infringed work |
| Full copy, incorporated | Infringing videos whose video and/or audio incorporate a full copy of the infringed work in addition to other content |
| Partial copy | Infringing videos whose video and/or audio consist solely of a copy of a portion of the infringed work |
| Partial copy, incorporated | Infringing videos whose video and/or audio incorporate a copy of a portion of the infringed work in addition to other content |
| Performance | Infringing videos that includes a performance of all or a part of the infringed musical composition |

*Types of Annotation:*

| | |
|---|---|
| Specific | Infringing videos that are annotated with text that specifically identifies the infringed work in a unique way |
| Generic | Infringing videos that are annotated with text that generically identifies the infringed work or for which the specific identifies the work in a non-unique way |
| Unrelated | Infringing videos that are annotated with text unrelated to the infringed work |

*Types of Efficacy:*

| | |
|---|---|
| Past | Applicable to infringing videos currently on YouTube that were uploaded to the service in the past |
| Future | Applicable to infringing videos that will be uploaded to YouTube in the future |

*Efficacy:*

| | |
|---|---|
| Yes | Tool is effective at finding typical infringing videos with the given characteristics |
| No | Tool is not effective at finding typical infringing videos with the given characteristics |

86

# EXHIBIT 2
Filed Under Seal

# Life of a YouTube upload

YouTube
Developer's
Handbook

Search this site

Home
∨ System overviews
   Accounts and identity
   Who or what are YouTube
   content viewers?
   Life of a video watch
   Life of an upload
 ∨ Life of a YouTube dollar
   Life of a video
   recommendation
> Coding
> Experiments
> Production
> YTFE and Python Only
> Community, guidelines, and
  standards
> Writing good documentation

 Review outdated · Reviewed by virtual on 2020-02-15 · Edited 2020-05-11

Was this page helpful? 

go/life-of-an-upload

This document is a high-level discussion of how videos get added to YouTube and become a part of the YouTube corpus, and how our system processes, publishes, and analyzes those videos.

## Introduction

YouTube's core use case is deceptively simple: creators upload videos to our platform, we store them, and we send those videos to viewers whenever they ask for them. Easy!

However, the picture gets more complex when we consider some of the conditions under which YouTube operates. These considerations are what make YouTube fast, feature rich, and easy to use. They include:

- **Technology diversity among both creators and viewers.** YouTube ingests video from creators that upload from a variety of devices and formats, from mobile phone cameras to professional-grade video recording studios. Viewers watch those videos on an equally diverse set of devices, including mobile phones, desktop computers, and living room devices such as game consoles and TVs. Basically, we need to be able to accept (almost) anything and output (almost) everything.

- **Latency targets.** Latency is delay–the delay before a video loads, or when a user changes a video's resolution or skips to a particular time index. YouTube strives to minimize latency. The less time a user spends waiting for screens to load or for videos to start playing, the better their overall experience and the longer they watch on YouTube.

- **A feature-rich user experience.** YouTube's user experience provides many additional features besides simply storing and serving video. These include search and discovery, recommendations, rights management, and more. These features are dependent on metadata that comes from YouTube's video processing and analysis. Even the thumbnail images that users see when browsing videos are generated automatically by YouTube's video processing pipeline.

- **Resource optimization.** YouTube delivers more than 1 billion watch hours of video to viewers in over 150 countries around the world. There are more than 500 hours of video uploaded to YouTube every minute, and YouTube accounts for almost a quarter of US mobile and fixed-line internet traffic. YouTube's video infrastructure must be able to process that amount of data and serve that amount of traffic as efficiently as possible–without either breaking the internet or bankrupting ourselves with escalating CPU, memory, and storage costs.

  > 📄 Note: See Video infrastructure key statistics for a breakdown of how YouTube ranks among Google PAs for resource usage, network egress, and more.

YouTube employs several major video infrastructure systems to ensure that we can fulfill all of these requirements. Some of the systems are unique to YouTube and maintained by us; examples include the Content ID framework and Quality-of-Experience pipeline. Other systems are general-purpose Google systems that are used by multiple products, including YouTube. These systems do common processing work at Google scale. Examples include the Venom/Viper video processing system and the Scotty system for file uploads and downloads.

All of these systems work together to serve YouTube's core use case: accepting video uploads in a wide variety of formats, and delivering that video content to billions of users around the world as fast as we can.

## What does this document cover?

This document provides an overview of how YouTube accepts user-generated content (UGC) and makes it part of the YouTube corpus. UGC videos represent the bulk of videos uploaded to YouTube. When creators use the upload interface in the YouTube mobile app or the YouTube website to submit their video, they're creating UGC.

This process includes the following steps:

1. Upload
2. Initial processing: transcoding, content analysis, copyright match, thumbnailing, and more
3. Storage: making the video in all its formats available to Google's CDN
4. Indexing: making the video appear in YouTube Search and Discovery
5. Optimization: further processing or re-processing based on video popularity

Contents

Introduction
   What does this document cover?
   What does this document not cover?

Uploading and initial processing
   Uploading the file
   Creating the video
   Starting processing
   Publication

Transcoding and asset generation
   Generating assets with Venom and
   Viper
   What assets does You Tube create?
   Transcoding

Video storage and distribution
   Storing a processed YouTube video

Corpus indexing
   YouTube Corpus
   Generating metadata on upload
   YouTube Legos

Corpus intelligence
   Why optimize the corpus?
   Popularity vs. treatments
   Types of optimization
   Expedited optimization
   Continuous Optimization Pipeline
   Tracking optimization impact

Further reading

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Each of these steps is discussed at a high level, describing the YouTube systems that handle each step in the process and how they communicate with each other.

## What does this document not cover?

The following topics are related to, but beyond the scope of, this overview:

- Detailed information on how to work with video infrastructure systems. Refer to each system's dedicated documentation for help with integration or details on implementation.
- Playback. Please refer to the Life of a Video Watch overview for information on how YouTube delivers existing video to viewers. There is some overlap between this document and Life of a Video Watch, mostly around how video propagates through Google's CDN.
- Live streaming. The live streaming and broadcasting use cases differ enough from video-on-demand that it's worth covering them in a dedicated document.
- Ingesting High-Value Content (HVC). HVC is premium content, like shows and movies, created by major studios or other large partners and distributed on YouTube. HVC content is usually a scheduled release and is protected by a paywall. While HVC videos use some of the same processing systems as user-generated content (UGC), HVC comes from a different front-end and its processing pipeline is managed separately from how YouTube accepts UGC.

We'll start by discussing the upload process: How users submit original video files that become YouTube videos.

## Uploading and initial processing

A YouTube video starts its life as a file upload. Whether a video was recorded with a professional camera, a webcam peripheral, or a mobile device, each recording apparatus ultimately outputs a video file to be uploaded to YouTube.

Once sufficient data has accumulated in the inbound source file, YouTube begins initial processing. The initial processing steps use the uploaded file to create a viewable video on YouTube. Creating a YouTube video from a source file means generating a collection of related data:

- Playable transcodes of the source file
- Other assets derived from the source file, such as fingerprints for content analysis
- Video metadata, such as the video owner, title, length, and details on where and how the video was recorded

The YouTube Uploads team is largely responsible for all of the code in this phase of the video's life cycle, from file upload to when the video is made public and sent to subscribers of the video's channel. Once the video is made public, it can be picked up by YouTube's corpus indexing systems, and other downstream business logic can process it.



GOOG-SCHNDR-00034776



## Uploading the file

The process of adding a video begins when a creator uses a YouTube application (desktop or mobile) to upload a source file.

The YouTube upload interface accepts video files in a few different ways:

- On the web, a user can upload an existing video file from somewhere in the local file system.
- On mobile devices, a user can upload videos from the local file system, shared from other apps, or recorded directly within the YouTube mobile app for Android or iOS.
- A user can import video files stored in cloud services such as Drive or Google Photos.

## YouTube and Scotty



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GOOG-SCHNDR-00034777



As soon as Scotty has accumulated sufficient data in the inbound file, YouTube can create the video and begin
initial processing.

> 🖹 Note: See the YouTube Uploads documentation for the Scotty Agent for more information on how
> processing starts; the code paths are different for web and mobile uploads.

## Creating the video

After the upload, YouTube begins creating a video from the inbound source file. A YouTube video, as an entity, is a
document that consists of a collection of data. This data includes:

- Metadata about the video's contents
- One or more playable/servable versions of the video
- Other assets derived from the video data, like thumbnail images or Content ID fingerprints

The video entity that YouTube creates is what gets served to viewers and handled by other downstream YouTube
back-ends; the actual source file that the user uploaded gets archived by YouTube during processing.

YTFE and YouTube Uploads services handle creating the video metadata, and send the initial requests to Google's
video processing systems to create playable/servable transcodes and other assets.

## Registering the video

The first step in video creation is registration. When YouTube registers a video, it does the following things:



The External Video ID is the key value for the master video database.

## Video metadata



GOOG-SCHNDR-00034778

- Video ID
- Title
- Description
- Length
- Information about the original uploaded file: size, filetype, etc.
- Whether or not the video is public
- The video owner ID (the uploader's `user ID`)
- Keywords
- View count
- Flags relating to the video's content, licensing, review status, and more
- Separate flags relating to streamable formats for the video

Some parts of the video metadata, such as the title, description, and keywords, are provided by the video's owner through the upload UI. Other parts of the video metadata, such as length and view count, are either derived later from the video's content or updated by YouTube over the video's lifetime.

## Video state and lifecycle

Throughout a video's life, YouTube tracks the video's state as part of the video metadata. State is stored in the `state` field of the `VAPI.Video` entity. The `state` value can be set to one of the following values:

- Uploaded: The source file has been uploaded and transferred by YouTube, but initial processing is not complete.
- Processed: Initial processing has been completed; the video is viewable on YouTube and is potentially discoverable.
- Failed: The video has failed during initial processing for some reason; this might include a failed transcode, an aborted upload, or an invalid format.
- Rejected: The video has been rejected for some reason; this could be because the video has been flagged as inappropriate, flagged as spam, or found to be in violation of trademark or copyright.
- Deleted: The video is marked for deletion and is awaiting purging from storage.

You can see all of the potential state information for a YouTube video in `video.proto` in Code Search.

Once the video has been registered, YouTube Uploads manages the state transition from Uploaded to Processed by sending the initial processing request to Venom, Google's general-purpose video processing interface. If initial processing fails for any reason, the video is marked `Failed`.

## Starting processing

YouTube's initial video processing creates a variety of assets from the source file. An asset represents a piece of content derived from the original media. These assets become part of the document that represents the YouTube video. Some examples of assets YouTube creates include:

- Playable transcodes
- Thumbnail images
- Fingerprints for Rights Management and Content ID
- Signals for abuse detection, such as filters for spam and inappropriate content



The delay between the time a video is uploaded and the "go live" signal is on the order of seconds. Depending on the size of the video, the delay between when the video is uploaded and when all assets have finished processing is on the order of seconds or minutes.

## The "Go live" signal

"Go live" represents the point when a video becomes viewable on YouTube. Specifically, it means when a video becomes available for public viewing at a specific URL and when YouTube notifies any subscribers to the video's channel that the new video is available.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GOOG-SCHNDR-00034779



Design considerations around "go live"



## Publication

Once YTFE has marked the video as `Processed` (contingent on the completion of the format 18 transcode), it is considered live and public. A newly-public video triggers two mechanisms:

- The video is sent to the Feeds Queue to be pushed to subscribers.
- The video metadata becomes available in YouTube Corpus for downstream processing.

### Feeds Queue

After processing is complete, YTFE sends the video to the Feeds Queue. The Feeds Queue is a post-transcode processing daemon responsible for sending a notification to the Feeds Service that a new video is live and available. The Feeds Service, in turn, notifies subscribers.

### Corpus indexing: YouTube Corpus



When a video is added to YouTube Corpus, it becomes available to downstream YouTube backends that work on public videos. This includes Search and Discovery systems like YouTube Search, Watch Next, and Personalization. These downstream backends process the videos asynchronously, picking up new videos as they are added to YouTube Corpus.

> 📄 Note: New videos added to YouTube Corpus are marked with a "dirty bit" that indicates the video is new. Downstream systems look for videos with the bit set. This way, corpus indexing works somewhat faster than, say, web crawling.

See the section on corpus indexing later in this document for more information.

Next, we'll discuss video processing: how YouTube uses Venom and Viper to schedule transcoding, content analysis, and other processing for an uploaded video.

## Transcoding and asset generation

A YouTube video is a collection of data derived from a user's uploaded media file, and much of that data needs to be generated by YouTube itself. A lot of it comes from transcoding, which involves creating copies--or "transcodes"--of the actual video bytes in different formats. Other data is related to content analysis: what the video is about, whether or not the video is spam or inappropriate, or whether the video contains a content owner's intellectual property.

GOOG-SCHNDR-00034780

Collectively, these data are called assets. An asset represents data that YouTube derives from an original media file. Assets take time and computational resources to create, and asset generation often continues for some time after a video has been uploaded.

## Generating assets with Venom and Viper

The Video Processing team is responsible for the systems that produce assets. The primary systems for video processing are Venom and Viper.



⚠ Note: In addition to YouTube, Venom and Viper handle video processing for a variety of client applications at Google. For example, they process video for Google Play, for video attachments in Gmail, and for videos scanned from the public web in Google Web Search results.

## Basic video processing flow

The following diagram shows the basic processing flow for YTFE, Venom, and Viper:



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GOOG-SCHNDR-00034781



Future processing flow and notifications



## What assets does YouTube create?

The actual assets that YouTube creates vary, depending on the video. However, we can break down the potential assets into three broad categories:

- Transcodes
- Non-transcode primary assets
- Best-effort assets

Transcodes are a complex subject worthy of independent discussion; see the [Transcoding](#) section later in this document for more information. The other types of assets, along with the system that Venom uses to select them, are discussed in the following sections.

## Asset priority

Assets can have different priority levels. Venom is responsible for enforcing asset priority when generating Viper graphs, and the priority determines the quality-of-service (QoS): time-sensitive or best-effort. Asset priority depends on a number of factors, including:

- Technical factors, such as assets required by YouTube Player UIs
- YouTube's Terms of Service and partner agreements
- Asset size and cost



Asset priority can also be affected by Google and YouTube infrastructure. In general, the larger and more expensive the asset, the lower the priority. However, certain large assets that take a long time to process cannot

GOOG-SCHNDR-00034782

be created at low priority because the associated Borg jobs would be pre-empted too often for the asset to finish processing.

## Non-transcode primary assets

Every video needs some essential non-transcode assets. These assets are needed either to make the video function correctly in the YouTube client UIs, or to let YouTube fulfill its Terms of Service. Non-transcode primary assets include:

- **Media info**: This asset derives basic info about the video, such as length, format, resolution, and frame rate. Media info is a prerequisite for transcoding, and some of the statistics are also available in the YouTube web UI.



- **Content ID fingerprints**: Viper generates digital fingerprints associated with the video for YouTube's Content ID system. Content ID detects copyright violations, which are a high priority for YouTube's business. We try to detect potential copyright claims within 30 minutes of upload.

- **Thumbnail**: This is the still image for the video that appears on YouTube's Home, Search results, and Watch pages.

- **Storyboard**: These are the images that appear when the user interacts with the video progress bar. They help viewers seek to a particular point in the video.

- **Captions**: These are the automatically-generated closed captions for the video's speech, if applicable. Captions are important for accessibility and for viewers without sound capabilities.

- **Original Archive**: As part of initial processing, Viper archives the original media file. Originals are eventually backed up on tape; YouTube stores over ███████ of original video data, growing every day.

- **Video Content Analysis**: The `VesperAnnotator` asset refers to YouTube's audio-visual search system, Golden6. Golden6 annotates YouTube videos with entities from the Google Knowledge Graph. These annotations tag the video with its subject matter. For example, Golden6 can detect that a video is about an abstract concept like "sports" or "cooking", or a specific entity like "tennis" or "cheesecake". Data from Golden6, as well as Content ID and other analysis, is important later during corpus indexing.

> 📓 Note: Golden6 is the replacement for Vesper, which was the original collaboration project between Video Content Analysis and YouTube search. Vesper ended in 2014, replaced by the Golden5 and Golden6 systems; however, some legacy naming still exists in the code base.

## Best-effort assets

Viper creates some content-analysis assets at a lower quality-of-service called "best effort". These assets may take some time to create, depending on available capacity. They include, but are not limited to, the following:

- Signals for abuse filters
- Transcoding quality metrics
- Signals for music detection systems
- Character/text recognition (OCR)
- Speech recognition



## TrustMe and asset selection

Some assets are situational--they may be necessary for some videos, but not others. A video without speech won't need language-recognition assets, for example.

> 📓 Note: Genera correspond to the business unit or feature responsible for the video. The majority of all YouTube uploads are of the User-Generated Content genus.

See go/venom-trustme for more information on how videos are classified in TrustMe and how TrustMe makes its processing decisions.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Transcoding

Transcoding is the process of taking encoded audio and video data and converting it into a different encoding scheme. Transcoding can convert videos into different standards, like H.264 and VP9, and also into various resolutions within each standard.

YouTube never serves an uploaded video in its original format. Once a video has been ingested, Viper archives the original video and stores and serves processed and formatted copies, called transcodes, instead.

> 📖 Note: YouTube does re-use the original media file if a video is later re-processed for reasons of optimization or error correction.

For detailed technical information on Google's transcoding infrastructure and transcoding in general, see the transcoder infrastructure documentation.

## Why do we transcode videos?

Transcoding is an essential part of video processing at YouTube. We transcode videos for a few major reasons:

- **Device support.** An uploaded video may not be in a format viewable for all the devices that might consume it. Transcoding lets YouTube deliver the video to a variety of devices, and ensure that the video is playable on both modern and legacy devices.

- **Compression.** YouTube transcodes videos using preferred codecs, many of which provide good data compression. The VP9 codec, for example, provides around 600x data compression over raw video. Compressed transcodes help YouTube save bandwidth when delivering popular videos, and on storage space for less-popular videos.

- **Security and privacy.** Transcoding ensures that YouTube sanitizes a potentially malicious uploader's content before that content can be sent to a viewer. Likewise, metadata on an uploader's original video is removed or protected before the transcoded version is sent to a viewer.

## Types of transcodes



### Mezzanine format



### Transcoding costs

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Transcoding is the most time-consuming and resource-intensive form of processing that YouTube performs. Some of the resource costs of transcoding include:

- **Compute and memory.** Converting a file from one format to another uses RAM and processor time in proportion to the video's size and length ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

  > 📖 Note: Project Argos, which deploys hardware-based transcoding to the Google fleet, is likely to have a significant effect on YouTube's transcoding costs. See the Argos section below for more information.

- **Storage.** Once a video file has been transcoded, the transcoded copy needs to be stored if it is to be reused. As YouTube transcodes a video into different formats, it creates additional copies of the file, and the amount of storage required for that video increases accordingly.

- **Time.** Each transcode that YouTube performs takes a certain amount of time to complete. Not only does this tie up machines in our fleet, but it can also result in latency for the viewer if we need to transcode a video into a new format at playback time.

At YouTube scale, with over 500 hours of video uploaded every minute, the compute and storage costs of transcoding can escalate very quickly. Our biggest advantage is knowing that not all of those 500 hours of video per minute need to be transcoded at all.

## "Head" vs. "tail"

To get an accurate picture of transcoding costs, we need to first understand that not all videos are equal.

A rank-frequency distribution for UGC YouTube videos that measures watch time against watch-time ranking might look something like this:



More popular videos that get viewed often are sometimes referred to as "head" content. "Head" videos represent a small subset of videos on YouTube, but they generate a disproportionately high percentage of watch traffic.

Less popular videos are sometimes called "tail" or "long tail" content. "Long tail" videos make most of the YouTube corpus by raw number of videos, but they are rarely (or often never) watched by viewers.



## Transcoding strategy



GOOG-SCHNDR-00034785



Determining transcode needs: VOD or OTF?



Mobile uploads



How does VOD transcoding work?



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



How does OTF transcoding work?



Argos

Argos is a joint project between YouTube and Google Platforms to create a hardware-based transcoding platform. Hardware-based transcoding dramatically reduces the CPU cost of video transcoding operations. Currently, Argos-enabled machines are being added to the Google fleet and can be used for general YouTube transcoding tasks.

Computationally less expensive transcoding with Argos enables YouTube to undertake some additional transcoding-based projects, like Originals Replacement.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



## Future transcoding projects

As YouTube grows, the video processing team is undertaking several projects to improve the transcoding infrastructure and process. They include:



# Video storage and distribution

Once a YouTube video has been uploaded and processed, it needs to become accessible to the systems that deliver and play videos: Video Streaming and YouTube Player. YouTube has a few core storage systems that are the point of origin for all traffic delivered by Video Streaming to Player.

The YouTube Uploads flow deposits processed videos into these core storage systems, where the videos are indexed and made available for streaming.

## Storing a processed YouTube video

There are two major operations involved in storing a processed YouTube video:

- Storing the playable video bytes, in the form of Viper-generated transcodes, to the Storage Manager v3 (SMv3) storage backend.
- Indexing the video in Content Directory so that serving systems can find it.

Both of these operations are invoked from within the Viper graph that processes the video. For storage, Viper writes the completed transcodes directly to SMv3. To index the video, Viper invokes the Streamer Indexer Service.

The following diagram shows the storage flow, from the YouTube Uploads processing pipeline to the video becoming available for serving systems:



The following sections provide more information about YouTube's core storage systems and the systems that connect to them: SMv3, SIS, Content Directory, and Datagen.

## Storage Manager v3



## Content Directory

## Streaming Indexer Service

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



🔖 Note: SIS is also used to index uploads to Google Play Music.

## Playback time: Datagen



See Life of a Video Watch for a high-level overview of YouTube's video streaming and serving systems.

Next, we'll discuss corpus indexing: how the video becomes available to YouTube Search and Discovery systems, and what data we generate for them.

# Corpus indexing

Corpus indexing refers to the process by which YouTube videos, once uploaded and processed, begin to appear in YouTube's search and discovery systems. Some of YouTube's search and discovery systems include:

- YouTube Search
- YouTube Home Page
- Recommendations
- Watch Next
- YouTube Mixes

YouTube's search and discovery systems are driven by video metadata. Video metadata is additional data associated with the video that tells us what it's about, who uploaded it, and what's in it.

Video metadata comes from a variety of sources, including:

- Basic metadata (title, description, tags) provided by the video's uploader
- Data from content analysis assets created during Viper processing
- Signals from viewer behavior around the video, such as what other videos they've watched and where in the world they're watching from
- Signals from other content the owner has uploaded

## YouTube Corpus



## DVMS

GOOG-SCHNDR-00034790

Search indexing



Generating metadata on upload



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GOOG-SCHNDR-00034791

The video creator supplies some basic metadata about the video at upload time, usually by entering data into text fields. The YouTube web upload interface, for example, prompts the user to enter basic info:



This metadata includes:

- Title
- Description
- User-specified keywords, called 'Tags'



## Content analysis data

Some Videodata comes from content analysis of the actual video bytes, which is performed as part of Viper processing. Two of the highest-priority assets that Viper triggers are:

- Video Understanding's Golden6 system
- Content ID processing

## Golden6



Content ID processing

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

YouTube's Content ID system scans uploaded videos to see if they contain copyrighted material. For example, Content ID can detect if a video uploaded to YouTube contains copyrighted music, film, or television content.

> 🚩 Note: A Content ID match does not necessarily mean a video is blocked or taken down. See the Content Owners and Agent Users overview for more information about how Content ID works.

Content ID matches can provide additional clues about what's in a video, and data from Content ID is incorporated into video metadata.

## YouTube Legos



### Types of Legos annotations



### Generating Legos annotations



GOOG-SCHNDR-00034793



Using Legos



You can see Legos in action by installing the Legos extension for your Chrome browser. The Legos extension lets you browse the Legos annotations for videos, playlists, and channels while you navigate the YouTube site.

Next, we'll discuss how YouTube can optimize processing for existing videos to ensure the best use of resources and technology.

# Corpus intelligence

Corpus Intelligence refers to the way YouTube decides how to process and re-process videos to provide a high-quality viewing experience and resource-efficient delivery. Corpus Intelligence primarily affects how we transcode videos--what formats we make available and how we generate them.

YouTube Video Infrastructure and the Media Algorithms teams have developed a variety of treatments to apply to a video. A treatment is an optimized transcoding profile that can produce better output files. This profile encompasses a combination of different formats, codecs, and settings in Viper.

In general, optimization treatments are more expensive, in terms of CPU cost, than the standard processing that every video receives at upload time. Because of the increased cost, optimization treatments are not feasible for every video, and YouTube needs to be judicious in how it applies them.

## Why optimize the corpus?

Corpus Intelligence provides the following benefits:

- Optimizing videos for more efficient use of resources
- Improvements in Quality-of-Experience (QoE) for viewers
- Driving advances in transcoding technology
- Issue resolution

## Resource usage

Optimization treatments help YouTube make more efficient use of both bandwidth and CPU resources.



## Improving Quality-of-Experience

A video that undergoes an optimization treatment has a number of performance improvements, including:

GOOG-SCHNDR-00034794



## Driving advances in transcoding technology

Optimization treatments give YouTube the opportunity to introduce new transcoding technologies such as the AV1 codec. AV1 is a next-generation, open source, royalty free codec developed in part by Google as part of the Alliance for Open Media. AV1 improves upon the VP9 codec (currently YouTube's most advanced codec) in both compression and bitrate.



## Issue resolution

Corpus intelligence systems can schedule videos to be reprocessed to resolve technical issues that might have arisen. See COP issue resolution for more information.

## Popularity vs. treatments



GOOG-SCHNDR-00034795



## Types of optimization

Broadly speaking, Corpus Intelligence performs two types of optimization:

## Expedited optimization

## Continuous Optimization Pipeline

## Popularity changes

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Note: Viewership data drives a lot of decision-making at YouTube, and affects both technical and business logic. See the YouTube view for more information on how YouTube counts views.



COP issue resolution



## Tracking optimization impact

The Video Infrastructure team monitors the health of the YouTube corpus in Venom to track the impact of various Corpus Intelligence efforts. See Corpus Intelligence - The Charts and the Corpus Health Report for additional information.

# Further reading

For more high-level overview content in the YDH, see:

- Life of a Video Watch: Serving all that video we just uploaded
- Accounts and Identity: How User and Channel identity work in YouTube
- Content Owners and Agent Users: Administering YouTube's Content ID system

For more details on YouTube video infrastructure systems:

- Venom and Viper: General-purpose video processing
- Introduction to Transcoder Infrastructure
- Video Core Streaming and Storage

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GOOG-SCHNDR-00034797

- Video Content Analysis at YouTube (presentation deck)
- Legos team starter (presentation deck)
- YouTube Indexing Overview

Was this page helpful?



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GOOG-SCHNDR-00034798

# EXHIBIT 3

# How Google Fights Piracy



# How Google Fights Piracy

November 2018

**Introduction**                                                                                          **6**

Google's Anti-Piracy Principles                                                                              8

The State of the Industry and Online Innovation                                                            9

**Copyright by the Numbers**                                                                              **12**

**Working with Government and Industry**                                                                  **15**

**YouTube**                                                                                                **18**

YouTube's Impact for Creators                                                                              19

How YouTube Benefits the Music Industry                                                                    21

YouTube Helps Creators and Rightsholders Manage Copyrighted Works                                          24

    Content ID                                                                         24

    Content ID and Live Streams                                                        29

    Copyright Match Tool                                                               29

    YouTube Copyright Policies                                                         29

        The YouTube Copyright Center and Copyright Takedown Notices   30

        YouTube Content Verification Program                         30

    Stream Ripping                                                                     31

YouTube Values Transparency and Guarding Against Abuse                                                     31

    YouTube Counter Notification Procedure                                              31

    Examples of Invalid Notices                                                        31

    YouTube's Fair Use Protection                                                      32

**Google Web Search**                                                                                     **33**

Infringing Results Do Not Appear for the
Vast Majority of Media-Related Queries                                                                      34

Handling a High Volume of Requests at Scale                                                                37

Trusted Copyright Removal Program Partners                                                                 38

Demoting Infringing Websites                                                                               39

        The UK's Voluntary Code of Practice                          40

Removing Piracy-Associated Terms from Autocomplete and Related Search   41

Making Legitimate Alternatives More Visible   41

Updates to Google Image Search   43

Google Search Detects Abuse and Values Transparency   44

    Examples of Invalid DMCA Requests   45

    Understanding Copyright Removals Through Transparency   46

    Not-in-Index URLs   47

Search and Piracy: The Reality   48

## Google Play   51

Play Provides Better Legitimate Alternatives to Piracy   52

    Movies and TV Shows   52

    Books and Magazines   53

    Apps and Games   53

    Play Fights Against Piracy   54

## Advertising   55

Following the Money   56

Best Practices   57

AdSense   58

Google Marketing Platform and Google Ad Manager   59

## Fighting new forms of piracy   60

Kodi Add-Ons   61

Streaming Abuse   61

Piracy on Other Google Products   62

## Conclusion   63

Links to More Information   64

# Introduction



# Introduction

The internet has enabled people worldwide to connect, create, and distribute new works of art like never before in human history. Google continues to be a key part of that growth and success by enabling legitimate distribution of all kinds of content, and by doing more than ever to fight piracy.

Successfully decreasing incidents of copyright infringement has required providing more and better legitimate alternatives to infringing content, as well as more effective tools for combating piracy. For example, a global 2018 study found the percent of internet users who engage in piracy has been falling, while spending on legal content is rising in nearly all countries and content categories studied.[1] Nonetheless, Google takes the ongoing challenge of fighting online piracy seriously—investing significant resources in tools to report and manage copyrighted material and working with other industry leaders to set the standard for how tech companies fight piracy. This report describes some of these efforts and explains how Google creates opportunities for creators around the world.

[1] *Institute for Information Law, "Global Online Piracy Study," August 2018, <https://goo.gl/mPPT7Q>*

A global 2018 study found the percent of internet users who engage in piracy has been falling, while spending on legal content is rising in nearly all countries and content categories studied.

# Google's Anti-Piracy Principles

Five principles guide Google employees, as well as our substantial investments of time, money, and computing power, in fighting piracy:

### 1. Create More and Better Legitimate Alternatives

Piracy often arises when consumer demand goes unmet by legitimate supply. The best way to battle piracy is with better, more convenient, legitimate alternatives to piracy, which can do far more than attempts at enforcement can. By developing products with compelling user experiences like Google Play Music and YouTube, Google helps drive revenue for creative industries and steer people toward legitimate alternatives. Google also supports the larger ecosystem by providing the cloud infrastructure that other legitimate services depend on to deliver fast, reliable streaming to their customers.

### 2. Follow the Money

Rogue sites that specialize in online piracy are commercial ventures, which means that one effective way to combat them is to cut off their money supply. Google is a leader in rooting out and ejecting rogue sites from our advertising and payment services, and we help establish best practices across the industry.

### 3. Be Efficient, Effective, and Scalable

Google strives to implement anti-piracy solutions that work at scale. For example, as early as 2010, Google began making substantial investments in streamlining the copyright removal process for search results. As a result, these improved procedures allow Google to process copyright removal requests for search results at the rate of millions per week.

### 4. Guard Against Abuse

Fabricated copyright infringement allegations can be used as a pretext for censorship and to hinder competition. Google is committed to ensuring that it detects and rejects bogus infringement allegations, such as removals for political or competitive reasons, even as it battles online piracy.

### 5. Provide Transparency

Google is committed to providing transparency. In our external Transparency Report, Google discloses the number of requests it receives from copyright owners and governments to remove information from its services to inform ongoing discussions about online content regulation.[2]

[2] *For more information, go to: <https://transparencyreport.google.com>*

# The State of the Industry and Online Innovation

More music, video, written works, apps, and software are being created by more people in more places than ever before.[3] This boom in the creative economy has generated an enormous amount of revenue worldwide. Digital video revenues are expected to soar from $64 billion to $119 billion between 2017 and 2022,[4] while global music streaming revenues have more than doubled from 2015 to 2017.[5] A separate music industry report similarly found that in 2017 alone, global streaming revenues surged by over 41% globally, contributing to a more than 8% rise in industry-wide revenues.[6]

This trend holds true around the world. In Southeast Asia, digital products and services are projected to contribute an additional $1 trillion to the region's GDP by 2025.[7] Across EU 27 nations, online subscription video revenue has risen 128% annually.[8] In the U.S., where the internet is one of the greatest success stories of economic growth, the digital economy has grown 370% faster than the economy as a whole, contributing well over $1 trillion per year to America's GDP.[9] In fact, a recent study showed that 14.8 million independent creators based in the U.S. earned nearly $6 billion from posting their art and other works online in 2016.[10] And in Latin America, a 2018 industry report measured an astounding 18% growth in recording revenues, driven by a 49% surge in streaming revenue—the largest growth of any region in the world.[11]

The internet has created new streams of revenue for creators and fundamentally changed how fans enjoy videos, music, and other media; people can now watch entire seasons of TV shows on Netflix and Google Play, or stream the entire catalogue of an artist's music on Spotify or YouTube Music. Services like YouTube export cultural content between countries at an unprecedented scale, with expansions into more countries and languages than ever before. These changes are good for creators, consumers, and the creative industry.

Digital video revenues are expected to soar from $64 billion to $119 billion between 2017 and 2022, while global music streaming revenues have more than doubled from 2015 to 2017.

[3] Computer & Communications Industry Association, "The sky is rising," October 2014, <https://goo.gl/4geQaK>

[4] Juniper Research, "OTTs Vs TV Networks ~ 3 Winning Strategies," <https://goo.gl/AxbsMt>

[5] PwC, 'Perspectives from the Global Entertainment & Media Outlook 2018~2022,' June 2018, <https://goo.gl/LCf3Yj>

[6] International Federation of the Phonographic Industry, "Global Music Report 2018," April 2018, <https://goo.gl/bDix9X>

[7] AtKearny, "The ASEAN Digital Revolution," 2016, <https://goo.gl/108J6W>

[8] European Audiovisual Observatory, "Trends in the EU SVOD Market," November 2017, <https://goo.gl/XN2Z68>

[9] Bureau of Economic Analysis, "Defining and Measuring the DIgital Economy," March 2018, <https://goo.gl/b5QyxT>

[10] Re:Create Coalition, "Inaugural Study Finds Nearly 15 Million Americans Earning Billions in the New Creative Economy," February 2018, <https://goo.gl/FVvtEg>

[11] IFPI, "Global Music Report 2018: State of the Industry," April 2018, <https://goo.gl/7CNAdj>

Google builds platforms where people can legitimately purchase, consume, and discover entertainment and culture. We also pioneer innovative approaches to monetizing online media. Google's ability to elevate digital artists using its platforms can be seen in the YouTube-powered explosion in the popularity of Latin American music around the world. In 2017, daily YouTube view counts for top Latin acts skyrocketed, growing 316% in India, 268% in Indonesia, 257% in the Philippines, 206% in Egypt, 150% in Israel, 120% in the United Kingdom and 116% in Australia.[12]

[12] *YouTube for Artists, "Exploring Latin music's explosive YouTube growth," November 2017, <https://goo.gl/kHeqVr>*

> Easy access to convenient, legitimate music, videos, and other media is one of the most effective weapons to fight infringement.

Easy access to legitimate music, videos, and other media is one of the most effective ways to reduce infringement. The music industry has demonstrated the efficacy of this approach by licensing a variety of music services, including free, advertising-supported streaming services (like YouTube Music, Spotify Free, and Pandora), download stores (like Apple's iTunes), and on-demand subscription products (like YouTube Music Premium and Spotify Premium). This ensures that media can reach the largest and most diverse array of fans at every price point.

The effects of these licensing deals on online piracy is clear. For example, Spotify's success in Sweden, Australia, and the Netherlands has resulted in a significant drop in piracy rates in these countries, demonstrating that a greater availability of legitimate forms of streaming media causes rates of piracy to plummet.[13] Numerous other examples show that this effect is common:

[13] *Copia, "The Carrot or the Stick?" October 2015, <https://goo.gl/VXEe58>; Mediavision, "Music Sweden File Sharing & Downloading," 2011, <http://goo.gl/XTUVH>; Spotify, "New Spotify study sees encouraging downwards trend in music piracy in the Netherlands," July 2013, <http://goo.gl/ImsYbB>; Billboard, "Streaming Services Make Inroads Into Piracy Down Under, Spotify's Will Page Tells Bigsound" September 2014, <http://goo.gl/UGstju>; TorrentFreak, "Spotify Helps to Beat Music Piracy, European Commission Finds," October 2015, <https://goo.gl/kvFuvD>*

[14] *University of Amsterdam Institute for Information Law, "Global Online Piracy Study" July 2018, <https://goo.gl/X2ddDU>*

- A 2018 report from the University of Amsterdam similarly found that as European spending on legal content grew between 2014 and 2017, the percent of Europeans committing piracy decreased.[14]

- A French study found that the number of pirates declined by 8% from 2016 to 2017. Pirates also reportedly streamed less infringing content than the year before and were more willing to pay for content.[15]

- A 2018 report by a Spanish anti-piracy group reported noticeable declines[16] in the number of people who accessed unauthorized content. A survey from the Australian government also found an overall drop in this number in 2018.[17]

- A study released by the U.K. regulator OFCOM noted several features of content-delivery services that could be improved in order to further reduce piracy, including working with creators and rightsholders to increase the catalogues of available works, and decreasing the window of time between when a television show, song, or movie premieres and when it is available for download.[18]

Another way to combat infringement is to "follow the money" to starve infringing sites of their income. The Police Intellectual Property Crime Unit in the United Kingdom estimated in 2015 that shutting off advertising revenue would close 95% of these infringing sites.[19] Indeed, this approach has proven effective. For example, in March 2016, three of the most popular file-sharing sites in Europe shut down, citing problems monetizing their service through advertising.[20]

Google has joined other industry leaders in the "follow the money" approach to fight online piracy by ejecting infringing sites from Google's advertising services and promoting industry-wide advertising standards through groups like the Coalition for Better Ads.[21] We've also built an ad blocker into the Chrome browser that filters ads from web pages that do not comply with industry quality standards, as anecdotal evidence suggests these ads are disproportionately found on infringing sites.[23] The end result—a virtuous cycle produced by better incentives for legitimate businesses—reaches far beyond Google's own ad networks.

[15] EY, "Un manque à gagner a minima de 1,18 milliard d'euros," June 2018, <https://goo.gl/eZHMyW>

[16] Coalition of Creators and Content Industries, "Piracy observatory and digital content consumption habits 2017," April 2018, <https://goo.gl/sVu6Wy>

[17] Australian Department of Communications and the Arts, "Consumer survey on online copyright infringement 2018," August 2018, <https://goo.gl/nsWDbZ>

[18] IDATE, "Online Content Study: Changes in the distribution, discovery, and consumption of lawful and unauthorised online content," November 2015, <https://goo.gl/PYxmg2>

[19] Mike Weatherley, "Strides in the right direction," July 2015, <http://goo.gl/s0Lo4M>

[20] TorrentFreak, "Three Large File-Sharing Sites Announce Shutdown," March 2016, <https://goo.gl/OMFpND>

[21] For more information on these industry efforts, see: https://www.betterads.org

[22] For more information on the Better Ads Standards, see: https://www.betterads.org/standards

[23] TorrentFreak, "Chrome's Default 'Ad-Blocker' is Bad News for Torrent Sites," July 2017, <https://goo.gl/DbNqYn>

# Copyright by the Numbers

Copyright by the Numbers

## Revenue We Have Generated



# $3 Billion+

The amount YouTube has paid rightsholders who have monetized use of their content in other videos through Content ID.



# $1.8 billion+

From Oct 2017 to Sep 2018, YouTube paid out over $1.8 billion in ad revenue to the music industry. The music industry has earned over $6 billion in total ad revenue from YouTube.

## Scope of Our Effort



# $100 Million+

The amount we've invested in building Content ID, including staffing and computing resources.



# 9,000+

The number of partners using Content ID to manage and monetize their works. These partners include major network broadcasters, movie studios, music publishers, and record labels. They have provided 80 million+ active reference files for our Content ID database.

# Actions We Have Taken



### Evaluated
# 882 Million URLs

Content owners have notified us about 882 Million URLs in 2017 alone. Google removed more than 95% of these webpages, meaning we pushed back on around 54 million removal requests that were incomplete, mistaken, or abusive.



### Over
# 10 Million Ads

In 2017, Google rejected more than 10 million ads that we suspected of copyright infringement.



# 98% of copyright issues handled through Content ID

98% of copyright claims on YouTube in 2017 were made through Content ID, which gives creators a way to manage and control their works without having to send takedown notices. More than 90% of all Content ID claims result in monetization, generating significant revenue for YouTube partners.

# Working with
# Government and Industry



# Working with Government and Industry

Google is actively involved in discussions with policymakers around the world on how best to fight online piracy and connect people with legitimate content. Some recent examples include:

- In September 2017, Google entered into a partnership with the *Centre National du Cinema* and the French anti-piracy association ALPA to build a "one-stop shop" for small copyright holders in France. This enabled them to protect their content with tools designed for larger copyright owners and organizations, such as YouTube's Content ID and Search's Trusted Content Removal Program.

- In February 2017, Google joined a Voluntary Code of Practice along with the Motion Picture Association, British Phonographic Industries Ltd, Microsoft Bing, and other representatives of creative industries. In cooperation with the U.K. Intellectual Property Office, the Code assesses the effectiveness of search engines' voluntary efforts to combat piracy while also providing a forum to strengthen industry cooperation. Both search engines have passed all quarterly independent effectiveness tests to date.

- In March 2016, Google partnered with the Australian Digital Alliance (ADA) to organize a copyright forum in Canberra with the participation of industry leaders, policymakers, and international experts. It provided an opportunity for Australian and New Zealand government officials and advisers to meet with experts on copyright reform and learn from their experiences reforming copyright laws.

- In April 2015, Google participated in the U.S. Department of Commerce's Internet Policy Task Force multi-stakeholder process to improve the operation of the Digital Millennium Copyright Act's (DMCA) notice-and-takedown system.[24] These discussions resulted in a list of best practices for DMCA notice-and-takedown processes.[25]

- In March 2015, Google supported the "follow the money" process initiated by the French Minister of Culture. As a member of IAB France, Google signed a charter of best practices to fight online copyright infringement. Signatories to this charter committed to the establishment of clear and transparent principles to prevent advertising services from engaging with "rogue sites."

[24] *The DMCA is a U.S. law that provides qualifying online service providers like Google with a safe harbor from monetary liability for copyright infringement claims. One of the requirements of these safe harbor provisions is that the service provider (Google, in this case) remove or disable access to allegedly infringing material upon receiving a request that meets certain requirements. Laws governing other jurisdictions, such as Europe's E-Commerce Directive, have similar safe harbors for service providers.*

[25] *United States Patent and Trademark Office, "U.S. Commerce Department Announces Digital Millennium Copyright Act Multistakeholder Forum Results," April 2015, <https://goo.gl/NQZB2r>*

[26] The White House, "Coming Together to Combat Online Piracy and Counterfeiting," July 2013, <https://goo.gl/86x1QE>

- In July 2013, Google worked with the White House's Office of the U.S. Intellectual Property Enforcement Coordinator (IPEC), and other leading ad networks, to participate in Best Practices and Guidelines for Ad Networks to Address Piracy and Counterfeiting. Under these best practices, ad networks maintain and post policies prohibiting websites that are principally dedicated to engaging in online piracy from participating in the ad network's advertising programs.[26]

[27] EU Growth, "Memorandum of Understanding on online advertising and intellectual property rights," July 2018, <https://youtu.be/5-yXMWk3cW0>

- In June 2018, Google joined a broad coalition of advertising businesses, rightsholders and industry groups in signing a voluntary Memorandum of Understanding (MoU) with the European Commission. The MoU endorses a "follow the money" strategy to stem the flow of ad revenues to sites and apps engaging in piracy and counterfeiting. Google actively engaged through the months-long negotiation process that led up to the deal and was the only major tech company to sign the MoU.[27]

Google is also actively working with other industry leaders to standardize processes for identifying pirated works and to develop best practices for online advertisers. Some examples include:

- In May 2018, Google partnered with the Audiovisual Anti-Piracy Alliance, a group of European businesses that provide audiovisual services and the security technologies for delivering them. We committed to working with the Alliance's members across the E.U. to tackle piracy through best practices and ongoing collaborative efforts.

[28] Trustworthy Accountability Group, "About the Certified Against Piracy Program," <https://goo.gl/SQ1we5>

- Since 2015, Google has participated in the Trustworthy Accountability Group's (TAG) Anti-Piracy Working Group. A 2017 report commissioned by TAG showed that anti-piracy steps taken by the digital advertising industry have reduced ad revenue for pirate sites by between 48 and 61 percent.[28]

- Since 2015, Google has participated in multiple WIPO workshops for experts and intellectual property offices (IPOs) from ASEAN member states focusing on the value of copyright and how it spurs innovation.

- In February 2015, Google worked with a cross-industry group in the United Kingdom called the Digital Trading Standards Group (DTSG) to create self-regulatory best practice principles for online advertisers to help ensure that ads do not appear on allegedly infringing websites.

YouTube



# YouTube

YouTube empowers the world to create, broadcast, and share video in furtherance of its mission to give everyone a voice and show them the world. Today, more than 400 hours of video are uploaded to YouTube every minute, spanning every conceivable topic from politics to comedy, from sports to religion. More than 1.9 billion people visit YouTube every month, whether it be on their mobile device, their living room TV, or their computer. Each day these users watch more than a billion hours of video and generate billions of views. YouTube is a truly global platform—local versions exist in more than 90 countries, and people can navigate YouTube in 80 different languages (covering 95% of the internet population). More than 70% of watchtime happens on mobile devices. YouTube Go, our app for emerging markets, is now available in over 140 countries around the world. As a result of this global reach, 85% of YouTube's views are from outside the United States.

## YouTube's Impact for Creators

Today, millions of channels from over 90 different countries earn revenue from their videos—from some of the world's biggest record labels, movie studios, and news organizations, to independent musicians and creators who are, in essence, small local businesses. The amount of revenue YouTube drives toward creators has continued to grow. The number of channels earning more than $100,000 per year on YouTube is up 40% year-over-year, and the number of channels earning more than $10,000 annually grew by more than 35%.

Many of these creators have translated their success on YouTube into entirely new revenue streams and business opportunities. On top of the revenue share they receive from advertisements that display in front of and alongside their videos on YouTube, these top creators have diversified their success through new projects that range from brand endorsement deals to best-selling books. For example, teen creator JoJo Siwa has partnered with retailers like WalMart and Claire's to sell her signature hair bows to fans around the world. Her followers use the hair bows to signal that they support JoJo's anti-bullying message.[29]

29  *AdAge, "Q&A with the Girl Behind that Big Hair Bow", December 2017, <https://goo.gl/tqDFbS>*

To further invest in and support this global creative community, we have opened YouTube Spaces in Berlin, Dubai, Los Angeles, Mumbai, London, New York, Paris, Rio de Janeiro, Tokyo, and Toronto. The YouTube Spaces are collaborative production facilities available to YouTube creators for free where they can learn from industry experts, share ideas over coffee with fellow YouTubers, and use the latest equipment to create their next great video. Before creators can produce a video in the YouTube Spaces, they are required to complete a copyright training to ensure they know the rules for respecting other artists' work. As of August 2018, creators have produced over 26,000 videos filmed in the YouTube Spaces, generating over 3 billion views and more than 150 million hours of watchtime.






Photos of YouTube Space Paris. For more information, visit youtube.com/space.

# How YouTube Benefits the Music Industry

YouTube has partnerships with every major record label, as well as hundreds of collecting societies, independent labels, and music publishers, to help share recorded music and music videos with fans on YouTube. Through licensing agreements with our partners in the music industry as well as the tools we offer, like Content ID, creators and rightsholders are compensated when fans visit YouTube to watch music videos. From October 2017 to September 2018, YouTube paid out over $1.8 billion in ad revenue to the music industry. The music industry has earned over $6 billion in total ad revenue from YouTube. Combined with revenue from our growing subscription service, YouTube Music Premium, and money earned from monetizing fan uploads, YouTube is contributing a meaningful and growing revenue stream for the industry while providing a powerful platform to engage with fans around the world.

Through the recently launched YouTube Music, as well as the main site, YouTube is the premier destination for fans to discover, share and listen to legitimate sources of the music they love. For example, as of July 2018, the music video for Taylor Swift's "Shake It Off" had been viewed more than 2.5 billion times, over 10 times more listens than on the leading streaming services.[30] There are now more than 100 YouTube videos with 1 billion or more views—there were only 15 videos to reach this mark as of 2015.[31] According to MIDiA, music videos reach 1 billion views 10 times faster on YouTube today than in 2010.[32] The music industry, recognizing that fans turn to YouTube to engage with their favorite artists and albums, now includes YouTube views in Billboard's Top 100 Charts and the U.K.'s Official Charts Company ratings. YouTube has also introduced its own charts in 44 countries to highlight trending music, as well as top songs, artists, and music videos.[33]

[30] Taylor Swift, "Shake It Off," <https://youtu.be/nfWlot6h_JM>; Headline Planet, "Taylor Swift's "Shake It Off" Reaches 200 Million Spotify Streams," July 2018, <https://goo.gl/LfWFKo>

[31] YouTube Playlist, "One Billion Club," <https://goo.gl/Q6KHJ6>

[32] In 2010, it took an average of 1,841 days for a music video to reach 1 billion views; in 2017, it took an average of just 171 days. Mark Mulligan, "State of the YouTube Music Economy 2.0: A Turning Point for All Parties," August 2018, <https://goo.gl/5oHPrU>

[33] YouTube for Artists, "YouTube charts launch in 44 countries," May 2018, <https://goo.gl/yRGDaE>

YouTube has paid over $6 billion to the music industry from advertising alone.

YouTube also provides the technology and audience that makes it a sought-after destination for premium music events, such as Beyoncé's history-making performance at Coachella, which was live-streamed to a global audience and attracted 458,000 concurrent live viewers. Another artist, Childish Gambino, premiered his award-winning music video, "This is America," coordinated with a live performance on Saturday Night Live. The simultaneous debut created a pop-culture moment, with the video earning over 85 million views in its first week and reaching #1 on the YouTube Songs chart in 11 countries, including the United States, the United Kingdom, Australia, South Africa, Ireland, and Norway.[34]

YouTube is also a platform with incredible promotional value for new artists and entire music genres. Thanks to famous predecessors like Justin Bieber, Camila Cabello, and Dua Lipa, starting a music career on YouTube is now a well-established path to success and a meaningful funnel of new talent for the music industry.[35] In the U.K., grime music has found a home on YouTube, driven by trailblazers like Skepta and Stormzy and fueled by channels that highlight new rappers.[36] To support and help more artists get discovered at every phase of their career, YouTube created a new monthly program called Artist on the Rise, which aims to shine a light on emerging musicians and bands on the Trending tab, driving new audiences to a diverse lineup of music's most important new voices.[37]

Along with promoting artists and their work, YouTube also helps them reach fans in innovative, data-driven ways. In 2017, YouTube launched Official Artist Channels, which help make it easier for fans to find music from their favorite artists by uniting their full body of work (from official videos to live performances, to individual songs and albums) under one channel.[38] Services like YouTube Music Insights and YouTube Analytics can help artists prepare for upcoming milestones in their career, including planning releases & tours, selling merchandise items to fans, and live streaming.[39] YouTube encourages labels and publishers to offer artists and songwriters direct access to YouTube Analytics. In 2017, YouTube partnered with Ticketmaster to create a feature that displays upcoming concert listings alongside an artist's official music video on YouTube. With one simple click, fans can go to Ticketmaster to purchase tickets to events.[40] YouTube has also partnered with Teespring to help creators sell custom merchandise to viewers directly from their YouTube channel.[41]

[34] Billboard, "Beyonce's Coachella Set Is the Most-Viewed Performance on YouTube Live Stream," April 2018, <https://goo.gl/opEV5U>; YouTube Music Charts & Insights, May 2018, <https://goo.gl/BUzeGM>

[35] ABC News, "Pop Star Justin Bieber Is on the Brink of Superstardom," November 2009, <https://goo.gl/f1w1So>; YouTube for Artists, "Camila Cabello: Made in Miami," February 2018, <https://goo.gl/zamXxU>; YouTube for Artists, "Dua Lipa: From sharing covers to being covered," June 2017, <https://goo.gl/6uA8Pz>

[36] YouTube for Artists, "Stormzy: Gang Signs & Prayer," September 2017, <https://goo.gl/PcZntR>; YouTube for Artists, "YouTube at The Great Escape," May 2017, <https://goo.gl/qikMYM>

[37] Engadget, "YouTube's 'Artist on the Rise' program spotlights new music stars," May 2018, <https://goo.gl/vSqWjD>

[38] YouTube for Artists, "New official artist channels on YouTube," January 2018, <https://goo.gl/NQtNqJ>

[39] For more information: <https://charts.youtube.com/> and <https://goo.gl/TVspXb>

[40] YouTube for Artists, "YouTube and Ticketmaster," November, 2017, <https://goo.gl/5tghuJ>

[41] YouTube Creator Blog, "VidCon 2018: Helping creators earn more money and build stronger communities," June 2018, <https://goo.gl/n55G9R>

# Over 98% of copyright issues on YouTube are handled through Content ID.

YouTube

# YouTube Helps Creators and Rightsholders Manage Copyrighted Works



Copyright owners can use Content ID to easily identify and manage their content on YouTube: youtu.be/9g2U12SsRns.

## Content ID

In 2007, YouTube launched Content ID, a first-of-its-kind copyright management system that gives rightsholders the tools they need to effectively monitor and manage their works on YouTube. Using Content ID, rightsholders can be automatically notified of user-uploaded videos that contain their creative work and can choose in advance what they want to happen when those videos are detected.

Over 98% of copyright issues on YouTube are handled through Content ID, rather than the notice-and-takedown process. Within Content ID, 98% of claims in 2017 were automated—meaning that Content ID automatically identified the work and applied the copyright owner's preferred action, without the need for intervention by the copyright owner.

Here's how Content ID works: rightsholders deliver reference files (audio-only or audiovisual) of works they own, metadata describing that content, and what action they want YouTube to apply when Content ID finds an appropriate match. The library of reference material in the system includes more than 80 million files of audio and visual content.

YouTube then compares videos uploaded to the site against those reference files and automatically identifies the work and applies the rightsholder's preferred action for that content.[42] Rightsholders can choose between three actions when an upload matches their content:

1. make money from it;
2. leave it up and track viewing statistics; or
3. block it from YouTube altogether.[43]

These policies can be flexibly applied depending on how the content has been reused. Rightsholders can configure rules based on the amount of their content used in a video, or on the percent of the video their content accounts for. To avoid claiming videos which may not be infringing, Content ID users have the flexibility to review certain claims, rather than taking automated action.

Thanks to the different options that Content ID gives copyright owners, it's not just an anti-piracy solution, but also a revenue-generation tool. Through Content ID, creators and rightsholders can earn money even when their work hasn't been properly licensed by the uploader. In 2017, rightsholders choose to monetize 90% of all Content ID claims, opening up a multitude of new revenue streams for themselves. In the music industry, rightsholders choose to monetize over 95% of Content ID claims. We have paid out over $3 billion to rightsholders who have monetized use of their content in other videos through Content ID. The size and effectiveness of Content ID are unparalleled in the industry, offering an efficient way to earn revenue from the unanticipated, creative ways that fans reuse songs and videos.[44]

[42] For more information: <https://goo.gl/A48tna>

[43] For more information: <https://goo.gl/nzDGrS>

[44] Christophe Muller, "YouTube: 'No other platform gives as much money back to creators," April 2016, <http://goo.gl/N9QoF8>

These "unofficial videos" can yield large dividends for artists. Australian indie-pop singer Betty Who's song "Somebody Loves You" attracted new attention when it served as the soundtrack of a marriage proposal video that has been viewed over 14 million times.[45] Amateur British EDM producer Alan Walker distributed his track "Fade" through the YouTube channel NoCopyrightSounds, allowing it to be reused freely by other YouTube creators in their videos. It grew so popular that he acquired a global fan base, signed a record deal with a major label, and accrued nearly 2 billion views on his official upload of the song.[46] To help fans discover new music, YouTube uses Content ID data to display information about songs that appear in fan-uploaded videos, including the title, artists and songwriters, and the record labels and music publishers who represent them.[47] Content ID also enables rightsholders to automatically link back to their official channel from user-uploaded videos that feature their content.[48]

Through memes and dance challenges, YouTube is unveiling new ways to turn songs into hits. Songs like Rae Sremmurd's "Black Beatles" and Drake's "In My Feelings," were not intended for release as singles, but reached the top of the charts thanks to fans creating viral dance videos that resulted in tens of millions of extra Content ID-claimed views. Similar successes include Maître Gims's "Sapés Comme Jamais," Zay Hilfiger's "Juju on that Beat (TZ Anthem)," iLoveMemphis's "Hit the Quan," Silentó's "Watch Me (Whip/Nae Nae)," Pharrell Williams's "Happy," Beyoncé's "Single Ladies (Put a Ring on It)," Baauer's "Harlem Shake," Ayo and Teo's "Rolex Challenge," and Soulja Boy's "Crank That (Soulja Boy)." Artists have even seen new success for past releases, like when Fleetwood Mac's "Dreams," released in 1977, returned to Billboard's Hot Rock Songs chart thanks to renewed interest in the song after its use in a popular meme.[49] After the French national men's soccer team won the 2018 World Cup, fans made video tributes to their team featuring Gloria Gaynor's "I Will Survive," released in 1978, leading to a renewed surge of interest in the song.[50]

[45] *"Spencer's Home Depot Marriage Proposal," <https://youtu.be/I4HpWQmEXrM>*

[46] *Billboard, "Alan Walker: From Bedroom Producer to Official Sia Remixer," December 2016, <https://goo.gl/sCFKuN>; "Alan Walker - Faded," December 2015, <https://youtu.be/60ItHLz5WEA>*

[47] *To learn more, see: <https://goo.gl/9Y92sG>*

[48] *To learn more, see: <https://youtu.be/QuOn93KPlr4>*

[49] *Billboard, "A Meme Pushes Fleetwood Mac's 'Dreams' Onto Hot Rock Songs Chart," April 2018, <https://goo.gl/yJzc45>*

[50] *Le Figaro, "I Will Survive de Gloria Gaynor cartonne depuis la victoire des Bleus en Coupe du monde," July 2018, <https://goo.gl/MDmz5p>*

Moreover, YouTube is improving Content ID constantly, and has invested over $100 million in Content ID to maintain its status as the best-in-class copyright management tool. Content ID can now catch efforts to evade detection like changing a video's aspect ratio, flipping images horizontally, and speeding up or slowing down the audio.[51] With advancements in machine learning, Content ID can now detect copyrighted melodies, video, and audio, helping identify cover performances, remixes, or reuploads they may want to claim, track, or remove from YouTube. Creators and rightsholders have gained enormous benefits from YouTube's thriving community of cover performers by recognizing song melodies even when they differ from the official sound recording.



"Music in this video" uses the data and technology behind Content ID to help fans learn more when a song catches their ear in a video.

Since YouTube's inception, talented amateur musicians have uploaded cover songs, helping them reach new audiences and start to create their own original music. Teen sisters Chloe x Halle were discovered after Beyoncé saw them perform her song, "Pretty Hurts," a video which received over 15 million views and was claimed by the music publisher through Content ID.[52] She was so impressed she signed them to her record label and now they've released their first EP of original music.[53] South Korean high schooler Sungha Jung started out posting guitar covers of his favorite songs and now has a following of over 5 million subscribers, several albums of original music, and worldwide tours.[54] Because YouTube recognizes that cover songs mutually benefit both songwriters, publishers, and performers, Content ID allows both parties to earn revenue on videos where it has identified a match with a song composition, but not the official sound recording.[55]

[51] *Fast Company, "YouTube is using AI to police copyright—to the tune of $2 billion in payouts," July 2016, <https://goo.gl/5emYdZ>*

[52] *Chloe x Halle, "Beyonce - "Pretty Hurts (Chloe x Halle Cover)," December 2013, <https://youtu.be/uPwuduhx0vw>*

[53] *Rolling Stone, "How Chloe x Halle Caught Beyoncé's Ear," June 2016, <https://goo.gl/xBa899>*

[54] *Rappler, "Sungha Jung: Growing up on YouTube," February 2016, <https://goo.gl/vNYmRM>*

[55] *For more information on Content ID, see: <https://goo.gl/iLnmJc>*

While Content ID generally represents an attractive bargain for both copyright owners and fan uploaders, like any content filtering system it is susceptible to error. If video uploaders get a Content ID claim that they believe is invalid, they can choose to dispute that claim.[56] Fewer than 1% of Content ID claims are disputed, and of that number, over 60% resolve in favor of the uploader. User disputes highlight areas for improvement, both for YouTube's matching technology and for copyright owners' rights management practices. For example, an Australian musician who produces original white noise tracks disputed several incorrect Content ID claims generated by distinct white noise.[57] In another case, a German music professor who uploaded public domain recordings of classical music had to dispute a series of Content ID claims from various music labels, even though the recordings were no longer protected by copyright.[58]

YouTube aims to deactivate invalid Content ID reference material, such as works in the public domain and insufficiently distinct audio or video.[59] Over the past few years, YouTube has invested in proactive detection of this material through a combination of automation and human review. In addition, YouTube has made significant improvements to the dispute process to increase the fairness to all parties, such as allowing videos to continue to earn revenue while a Content ID claim is under dispute.[60]

[56]   *For more information on disputing a Content ID claim, see: <https://goo.gl/6lBubT>*

[57]   *BBC, "White noise video on YouTube hit by five copyright claims," January 2018, <https://goo.gl/ZtoQqS>*

[58]   *Wikimedia Foundation, "Can Beethoven send takedown requests? A first-hand account of one German professor's experience with overly broad upload filters," August 2018, <https://goo.gl/9xwnma>*

[59]   *For more information on material ineligible for Content ID, see: <https://goo.gl/7NLHeE>*

[60]   *YouTube Creator Blog, "Update: Improving Content ID for creators," November 2016, <https://goo.gl/u4GehP>*

Fewer than 1% of Content ID claims are disputed.

## Content ID and Live Streams

Thanks to continued efforts to improve Content ID, we are now able to scan all YouTube live streams for matches to copyrighted content. This includes live broadcasts like a sporting event or music festival. For instance, in 2018, the Fuji Rock Music Festival was live streamed on YouTube, and the rightsholders used Live Content ID to keep unauthorized streams off the platform.[61] Many premier sports leagues like LaLiga in Spain now also use Content ID to automatically detect and block full-length copies of their live-broadcast games.[62] When content from the Content ID database is identified, a placeholder image may replace the live stream until the content is no longer detected. In some cases, infringing live streams may be terminated and the YouTube channel owner may temporarily lose access to the live streaming feature.[63]

## Copyright Match Tool

YouTube recently launched its Copyright Match Tool, which uses the power of the Content ID matching system to find near identical re-uploads of creator videos on YouTube.[64] Instead of uploading a reference file to YouTube, creators who are the first to upload a video to YouTube are shown subsequent uploads of their videos. Creators can then review the matching videos and file takedowns for any they wish to remove. They can also choose to contact the uploader. In this way, creators remain in control of the works they create on YouTube. This new tool simplifies copyright management so that creators can focus their time on making great videos.

## YouTube Copyright Policies

The vast majority of media uploaded to YouTube does not infringe anyone's copyright. Nevertheless, YouTube takes its role in educating people about copyright seriously and creates strong incentives to discourage infringing activity. As a result, YouTube has a number of policies in place designed to discourage copyright infringement and terminate repeat offenders:

1. When YouTube removes a video in response to a valid copyright removal notice, we notify the user and apply a "strike" to the account of the user who uploaded the video;

2. By completing an online "Copyright School" program, the user can both learn about copyright and become eligible to have one strike expire from their account; and

3. After three strikes, the user's account is suspended and all the videos uploaded to the account are removed.

[61]  Japan Forward, "Fuji Rock 2018 Livestream Highlights: Enjoy Japan's Most Famous Rock Festival from Home," July 2018, <https://goo.gl/5rzxoJ>

[62]  Vozpópuli, "LaLiga se vale de Google para evitar el pirateo del fútbol en YouTube," May 2017, <https://goo.gl/hP434N>

[63]  For more information on Content ID and live streams, see: <https://goo.gl/PH9SZk>

[64]  For more information on the Copyright Match Tool, see: <https://goo.gl/VRxWU3> and <https://goo.gl/cSi4gJ>

*The YouTube Copyright Center and Copyright Takedown Notices*

While the vast majority of copyright issues on YouTube are resolved via Content ID, the remaining 2% are addressed through DMCA takedown requests. Copyright owners and their representatives can submit takedown notices through the YouTube Copyright Center, which offers an easy-to-use webform,[65] as well as extensive information aimed at educating people about copyright.

In 2017, YouTube received over 2.5 million DMCA takedown requests from over 300,000 copyright claimants, requesting the removal of more than 7 million video URLs. While the vast majority of the time we remove this content, we also find a large number of requests represent a misunderstanding of the process or sometimes even outright abuse. YouTube carefully reviewed these takedown requests and either asked for more information or rejected requests targeting more than 300,000 of those videos.



Glove and Boots explain copyright in the YouTube Copyright Center: https://youtube.com/yt/about/copyright.

*YouTube Content Verification Program*

In addition to an easy-to-use public webform, YouTube offers a Content Verification Program for creators and rightsholders who have a regular need to submit high volumes of copyright removal notices and have demonstrated high accuracy in their prior submissions. This program makes it easier to search YouTube and quickly identify allegedly infringing videos. With a recently upgraded user interface and integration with the search functionality of Content ID, the Content Verification Program is an efficient and effective way for creators and rightsholders to control their works on YouTube.

[65] *For Google's webform to submit a takedown notice, see: <https://www.youtube.com/copyright_complaint_form>*

### Stream Ripping

"Stream ripping" refers to the practice of converting streaming media to a downloadable format to make copies of works, typically music. It can occur in different technical forms—including through sites, tools, apps, and services. This can negatively affect YouTube and its content partners, as it allows content to be used outside of our advertising or payment ecosystem. YouTube's Terms of Service prohibit the downloading or copying of videos without the prior written consent of YouTube or the respective copyright licensor, and we take technical steps to prevent this behavior. Once notified of an infringing tool or service that violates our Terms of Service, we take action, including disabling access to the YouTube API (if applicable). In addition, we work with the music industry to identify and respond to stream ripping entities. YouTube also takes action when stream ripping sites are infringing YouTube's trademarks.

## YouTube Values Transparency and Guarding Against Abuse

### YouTube Counter Notification Procedure

YouTube strives to be as transparent as possible when we remove content for copyright infringement. For that reason, we notify our users when we take action on their videos. If a video uploader believes that a copyright owner has submitted an invalid DMCA takedown request for their video, they can file a counter notification via a webform to explain why the copyright owner made the wrong call.[66] Unless the copyright owner files a lawsuit against the uploader, we may reinstate the video.

[66] *For more information on counter notifications, see: <https://goo.gl/CKW3se>*

In 2017, YouTube received over 150,000 counter notifications for more than 200,000 videos. In an effort to reduce the burden on rightsholders to review and respond to misguided appeals, YouTube has invested in teams to carefully review counter notifications and ensure that they not only include all legally-required elements, but also provide a sound rationale for reinstatement. More than ⅔ of the counter notifications we receive don't pass this basic review, and we reject them outright to save time for rightsholders.

### Examples of Invalid Notices

YouTube takes the abuse of our tools seriously. Partners who abuse these tools will have their access to the tools disabled. As part of our effort to help the YouTube community and copyright owners alike develop best practices as a community, we've published some examples of abusive and overreaching copyright takedown requests:

- A major fast food company sent a takedown notice in an attempt to remove a popular music video. The music video showed a blacked-out version of the company's logo in a scene staged in one of their restaurants. We asked the company to consider whether the use of their logo is protected by fair use, but never heard back. We did not remove the video.

- An American novelty gift company sent a takedown notice aimed at a video promoting a cutting board shaped like an ampersand, claiming it infringed on their similar-looking cutting board design. Copyright protects original expression, not ideas. We did not remove the video.

- A rogue employee at a Turkish content network sent copyright takedown notices to remove videos critical of the government of Azerbaijan, which were posted by several dissident news channels. Although the videos were initially removed, we later reinstated them. The content network closed its office in Azerbaijan to avoid further abusive removals.

- The grandchild of a deceased French architect attempted to remove a video that discussed the rehabilitation of a building her grandfather had designed. The claimant was unable to explain why the use of a photograph of the building wasn't protected by a specific exception to copyright infringement. We did not remove the video.

## YouTube's Fair Use Protection

As demonstrated above, YouTube sometimes receives takedown requests targeting videos that seem like clear examples of fair use or fair dealing, or that fall under similar exceptions to copyright infringement. U.S. courts have held that rightsholders must consider fair use before they send a copyright takedown notice, so in many cases (though it's a very small percentage of copyright takedowns overall), we ask rightsholders to confirm they've done this analysis.

In some very special cases, we've asked the video's creator to join a new effort that protects some of the very best examples of "fair use" on YouTube from copyright takedown requests.[67] Through this initiative, YouTube indemnifies creators whose fair use videos have been subject to takedown notices for up to $1 million of legal costs in the event the takedown results in a lawsuit for copyright infringement. This ensures those creators have a chance to protect their work and provides a set of helpful examples to the community of creators on YouTube that demonstrate both the importance and limits of fair use doctrine.

[67] For more information on fair use, see: <https://goo.gl/J4t2eH>

# Google Web Search



# Google Web Search

Users worldwide perform trillions of searches per year on Google Search. Indeed, Search helps more than a billion people worldwide find licensed videos, music, images, and other media. For example, between our Search and Google News services, Google sends over 10 billion clicks per month to news publishers' websites. Moreover, services like Subscribe with Google help these sites quickly convert those visits into subscribing customers.

## Infringing Results Do Not Appear for the Vast Majority of Media-Related Queries

Hundreds of billions of webpages are organized in the Search index; only an extremely small portion of these have any connection to piracy. Even for media-related queries, the vast majority of the top search results pages show only legitimate results. This is thanks to both our constant improvements to the algorithms that power Google Search and the efforts of rightsholders to prioritize and target their copyright removal notices.

### Presenting Legitimate Alternatives

Google believes that providing convenient, compelling, legitimate alternatives is one of the best means of fighting piracy. Accordingly, Google has launched a number of initiatives to present legitimate alternatives to people as part of search results, including providing advertisements on queries for movies and music to link people to legitimate means of purchasing content or finding movie showtimes in local theaters. Google also collaborates with copyright owners and music services to help them understand how to use SEO (search engine optimization) techniques to get their offerings into search results for "long tail" queries where they may not be appearing today.

Between our Search and Google News services, Google sends over 10 billion clicks per month to publishers' websites.

Google Web Search

Nevertheless, some critics paint a misleading picture by focusing on the results for rare, "long tail" queries, adding terms like "watch" or "free" or "download" to a movie title or performer's name. The first problem with this argument is that many legitimate services now allow fans to watch or download movies for offline playback—sometimes for free. These types of queries are not in themselves indicative of piracy. Second, while the search results for these rare queries could include potentially problematic links, it is important to consider how rare those queries are. Look at the relative frequency of these top Google searches:[68]

[68] Note: top search terms are drawn from Google's 2017 "Year in Search" report: <https://trends.google.com/trends/yis/2017/GLOBAL>; search query comparison data is based on searches made between January and August 2018.

The relative frequency of any search query can be compared using the Google Trends tool, available at https://www.google.com/trends/

### Top 3 Most Google Searched Musicians in 2017
"ariana grande" was searched **7,184X** more often than "ariana grande torrent"
"linkin park" was searched **5,269X** more often than "linkin park free download"
"lady gaga" was searched **3,785X** more often than "lady gaga torrent"

### Top 3 Most Google Searched TV Shows in 2017
"stranger things" was searched **15,474X** more often than "stranger things watch free"
"13 reasons why" was searched **7,277X** more often than "13 reasons why watch free"
"big brother brasil" was searched **30,473X** more often than "big brother brasil torrent"

### Top 3 Most Google Searched Songs in 2017
"despacito" was searched **2,927X** more often than "despacito torrent"
"shape of you" was searched **2,017X** more often than "shape of you torrent"
"perfect" was searched **1,732X** more often than "perfect torrent"

### Top 3 Most Google Searched Movies in 2017
"it" was searched **3,313X** more often than "it free download"
"wonder woman" was searched **10,719X** more often than "wonder woman watch free"
"beauty and the beast" was searched **8,021X** more often than "beauty and the beast watch free"

### Oscar Nominees for Best Picture in 2018
"lady bird" was searched **11,707X** more often than "lady bird watch free"
"the post" was searched **10,353X** more often than "the post free download"
"three billboards outside ebbing, missouri" was searched **20,274X** more often than "three billboards outside ebbing, missouri watch free"
"the shape of water" was searched **8,588X** more often than "the shape of water watch free"

Google Web Search



"ariana grande" was searched

# 7,184x

more often than "ariana grande torrent"



"stranger things" was searched

# 15,474x

more often than "stranger things watch free"



"despacito" was searched

# 2,927x

more often than "despacito torrent"



"it" was searched

# 3,313x

more often than "it free download"

Google does not want to include links to infringing material in our search results, and we make significant efforts to prevent infringing webpages from appearing. The heart of those efforts is cooperation with creators and rightsholders to identify and remove results that link to infringing content and to present legitimate alternatives.

## Handling a High Volume of Requests at Scale

Although the vast majority of media-related queries yield clean results, there are some infrequent queries where the results do include problematic links. For these "long-tail" queries, Google collaborates with copyright owners to address the problem in a few ways. To help copyright owners submit these copyright removal notices, Google has developed a streamlined submission process built around an online webform that copyright owners can use to submit removal notices for nearly all of Google's services.[69]

[69] *For Google's webform and more information on submitting a removal notice, see: <https://support.google.com/legal>*

The information we ask for in our webform is consistent with the DMCA and similar laws and provides a simple and efficient mechanism for copyright owners from countries around the world to submit notices to us. Since 2011, more than 135,000[70] different submitters have requested we remove webpages from search results for copyright violations. Google has never charged copyright owners for providing these services, and we continue to invest substantial resources and engineering efforts into improving our procedures for receiving and processing copyright removal notices.

[70] *Google Transparency report: Content Removals Due to Copyright, <https://transparencyreport.google.com/copyright>*

### Removing Content From Google

This page will help you get to the right place to report content that you would like removed from Google's services under applicable laws. Providing us with complete information will help us investigate your inquiry.

If you have non-legal issues that concern Google's Terms of Service or Product Policies, please visit http://support.google.com

We ask that you submit a separate notice for each Google service where the content appears.

What Google product does your request relate to?

- Blogger/Blogspot
- Google+
- Web Search
- A Google Ad
- Google My Business (reviews, questions & answers (Q & A), and business listings)
- Drive and Docs
- Google Play: Music
- Google Play: Apps
- Google Shopping
- Image Search
- Google Photos and Picasa Web Albums
- YouTube
- See more products

Google Web Search

Since launching this submission tool for copyright owners and their agents, we have removed over 3 billion URLs that infringed copyright from Search. In 2017 alone, about 882 million webpages were requested to be removed from over 586,000 unique domains, or top-level sites. The number of URLs listed in takedown requests decreased by 9%, reversing a long-term trend where the number of URLs requested for removal increased year-over-year. Google removed over 95% of these webpages upon review. The remaining 54 million webpages were rejected or reinstated because we either needed additional information, were unable to find the page, or concluded that the material was not infringing.

> We have removed over 3 billion URLs that infringed copyright from Search results.

## Trusted Copyright Removal Program Partners

In addition to our content removal webform, Google provides a tool for copyright owners with a proven track record of submitting accurate notices and a consistent need to submit thousands of webpages each day. Google created the Trusted Copyright Removal Program (TCRP) for Search to further streamline the submission process, allowing copyright owners or their enforcement agents to submit large volumes of webpages on a consistent basis. As of 2017, there are more than 178 TCRP partners, who together submit the vast majority of notices.

Google Web Search

## Demoting Infringing Websites

In addition to removing pages from search results when notified by the copyright owners, Google also factors in the number of valid copyright removal notices we receive for any given site as one signal among the hundreds that we take into account when ranking search results. Consequently, sites for which Google has received a large number of valid removal notices appear much lower in search results. This "demotion signal" amplifies the power of DMCA takedown notices, because each delisted URL can have an effect on the entire domain.

> Sites for which Google has received a large number of valid removal notices appear much lower in search results.

In some cases, such as titles of films identified by content partners as still-in-theater or being prepared for commercial release, the nature of the copyrighted work may further amplify the demotion signal. The demotion signal helps people find legitimate, quality sources of content more easily and helps steer them away from infringing content. One study showed that the availability of affordable, legal content impacts people's choices to watch or listen to legitimate content instead of pirate content.[71]

This process has proven extremely effective. Immediately upon launching improvements to our demotion signal in 2014, one major torrent site acknowledged traffic from search engines had dropped by 50% within the first week.[72] In May 2016, we found that demoted sites lost an average of 89% of their traffic from Google Search. In addition, this may have contributed to the 9% decrease in the number of URLs listed in takedown notices from 2016 to 2017. These successes spur us to continue improving and refining the DMCA demotion signal. To date, the demotion signal has led to the demotion of more than 65,000 websites. By the end of 2017, we demoted an average of 500 websites in search results every week, and those demotions apply globally. We have also made it much harder for infringing sites to evade demotion by redirecting people to a new domain.

[71] *Institute for Information Law, "Global Online Piracy Study," August 2018, <https://goo.gl/mPPT7Q>*

[72] *TorrentFreak, "Google's New Search Downranking Hits Torrent Sites Hard," October 2014, <https://goo.gl/o7Ai61>*

By the end of 2017, we demoted
an average of 500 websites
in search results every week.

While we do demote entire sites in search results, we do not completely remove
pages from results unless we receive a specific removal request for the page.
Even for the websites for which we have received the largest numbers of
notices, the number of "noticed" pages is often only a tiny fraction of the total
number of pages on the site. It would be inappropriate to remove entire sites
under these circumstances.

The combination of efficient processing of takedown notices and the demotion
signal gives copyright owners a powerful tool against rogue sites. As new rogue
sites emerge, copyright owners can target their removal notices at these new
sites, providing Google information we can use to update the ranking signal.

*The UK's Voluntary Code of Practice*
The power of the demotion signal was recently put to the test as part of the
Voluntary Code of Practice that Google entered into, along with Microsoft and
major U.K. rightsholder organizations.[73] The heart of the Code is a process for
testing whether search engines have met "targets for reducing the visibility of
infringing content in search results." So far, Google Search results have
undergone four rounds of testing. Thanks to the demotion signal and our other
efforts to surface legitimate results in response to media-related queries, Google
Search has passed the test every time with flying colors—scoring considerably
under the thresholds agreed with the IPO.

[73] *U.K. Intellectual Property Office, "Search
engines and creative industries sign
anti-piracy agreement," February 2017,
<https://goo.gl/fgwii2>; a redacted
version of the code is available here:
<https://goo.gl/zkg4AH>*

## Removing Piracy-Associated Terms from Autocomplete and Related Search

Autocomplete is a convenience feature in Google Search that attempts to "complete" your query as it's typed, based on similar queries that other people have typed. Related Search shows queries that other people have typed that may be similar to yours. In both features, the query that appears is not one Google is itself suggesting. Instead, it reflects what others have searched for. Google has taken steps to prevent terms closely associated with piracy from appearing in Autocomplete and Related Search and continues to work on refining those steps.

> Google has taken steps to prevent terms closely associated with piracy from appearing in Autocomplete and Related Search and continues to work on refining those steps.

## Making Legitimate Alternatives More Visible

The best way to reduce piracy is to improve legitimate content offerings. Google has developed a number of new strategies that further promote authorized works in our search results.

**"Knowledge Cards" to Direct People to Licensed Works**

Searches for movies, musicians, albums, etc. often return "Knowledge Cards" at or near the top of search results. These cards provide people with facts, images, and quick answers to their queries. Within these cards, we've been testing new ways for creators and rightsholders to quickly enable fans to watch or listen online.

Google Web Search

**Watch and Listen Actions on "Long Tail" Consumption-Focused Queries**

When people search with the intention to watch or listen to media, we may show new cards for those queries directing them to legitimate sources. For example, if someone searches for the movie "Wonder Woman," Google may display a card with links to different services where they can stream, rent, or purchase a licensed copy of the film. These cards may also appear for queries to "stream" or "download" the movie, and also appear for similar music-related queries. Watch and Listen Actions make it easier for fans to find licensed movies and songs online.[74]

74 Because this service is provided through local partnerships, availability of the Watch Actions feature and partner content will vary by region.



To help expand efforts like these that lead people to licensed copies of their favorite works, there is more that authorized music, TV, and movie sites can do to help their sites be more effectively indexed by search engines.[75] Google looks forward to continuing collaborative efforts with copyright owners and delivery services to make licensed works even more visible in search results.

75 For example, Google worked with the Music Business Association to help publish guidelines on search engine optimization for music websites; Music Business Association, "SEO for Music Websites (Part II)", May 2014, <https://goo.gl/xNG9h8>

## Updates to Google Image Search

Long before innovations like "Knowledge Cards" and Watch Actions, Google introduced Image Search. The goal of Image Search has always been to help people discover information through photos, artwork, memes, GIFs, and other types of images online, while driving more traffic to the creators and owners of these images. We have made a lot of improvements to Image Search over the years, based on public feedback. Recently, we have worked directly with photographers and the stock photography industry to improve our product by encouraging people to view these images in the context of the websites where they are found. We've also added creator and credit metadata whenever present to images on Google Images. These updates give creators more ways to be discovered and connect with people interested in their work.



Google Web Search

# Google Search Detects Abuse
# and Values Transparency

Google works hard to detect and prevent abuses of the copyright removal process. As the number of copyright removal requests continue to swell, it becomes both more difficult and more important to detect abusive and erroneous removal notices.

Some of the copyright takedown requests we receive are flawed, incomplete, or downright abusive. A major study by UC Berkeley and Columbia found that nearly a third of copyright takedown requests submitted to Google (28.4%) had characteristics that raised basic questions about their validity.[76] In these circumstances, we may refuse to remove a URL from our search results or choose to reinstate content that we had previously removed. In 2017, Google refused to remove, or reinstated, more than 54 million webpages from our search results.

Like YouTube, Google Search also relies heavily on its counter notification process as a check against mistaken or abusive takedown requests. In 2017, Google reinstated more than 210,000 URLs to our Search index in response to over 26,000 counter notifications filed by website owners.

[76] *Jennifer M. Urban, Joe Karaganis, Brianna L. Schofield, "Notice and Takedown in Everyday Practice," March 2017, <http://goo.gl/HYTDUS>*

In 2017, Google refused to remove, or reinstated, more than 54 million webpages from our search results.

## Examples of Invalid DMCA Requests

Here are a few examples of requests submitted through our copyright removals process that were clearly invalid. In each case, we did not remove the URL in question from search results:

- An individual claiming to be a candidate for political office in Egypt filed a copyright complaint to delist 2 pages on Egyptian news sites reporting on the individual's arrest record.

- An anti-piracy enforcement firm representing a music label filed a copyright complaint asking to delist a number of articles discussing the release of the work in question, presumably because the word "download" appeared in the text of the article.

- A Ukrainian politician sent us a copyright complaint regarding the use of his image in a number of articles critical of his performance in office.

- A business filed a copyright complaint regarding the use of images of its products in an article discussing that business's attempt to make Google delist a number of pages.

- A poet sent repeated takedown notices targeting criticism and commentary relating to the poet's online copyright enforcement efforts.

- A well-known publisher of children's books sent a takedown notice targeting the use of excerpts by a critic discussing the use of gun imagery in children's literature.

- A physician claiming a copyright in his signature sent a takedown notice aimed at a document related to the suspension of his license to practice medicine.

Detecting inaccurate or abusive notices can be challenging, and we take our commitment to guarding against abuse seriously. This is why we continue to invest more resources to address this issue. When it comes to our Trusted Copyright Removal Program, we have terminated or suspended partners from the program for repeatedly sending invalid or incomplete notices through our high-volume submission mechanisms. In addition, we've built transparency tools so that the community can identify and appeal invalid takedown requests.

## Understanding Copyright Removals Through Transparency

When we remove URLs from search results, we believe the public should be able to see who made the removal request and why. Because copyright infringement allegations are the basis for the vast majority of the legal requests that we receive to remove items from search results, we have taken the following steps to ensure transparency:

1. **Maintaining the Google Transparency Report.** In 2012, we added details regarding copyright removal notices to our Transparency Report site.[77] Updated daily, the site shows the aggregate number of webpages we have been asked to remove, as well as who submitted the notices on behalf of which copyright owners and for which websites. Google's Transparency Report has also proven useful in detecting abusive notices, as journalists, webmasters, and other interested members of the public have examined the data made available there.[78]

2. **Notifying webmasters of removals.** If a website operator uses Google's Search Console, a notification will be provided to webmasters there when a webpage on their domain has received a takedown notice.[79] Webmasters who don't use the Search Console can find removal notices received for their domain in the Transparency Report. These tools empower webmasters to submit a counter-notice if they determine that a page on their site has been removed from Google Search results due to an erroneous copyright removal notice.

3. **Providing copies of notices to Lumen.** Since 2002, Google has provided a copy of each copyright removal notice that we receive for search results to the nonprofit organization Lumen. By gathering together copyright removal notices from a number of sources, including Google and Twitter, Lumen fosters research and examination of removal notices submitted by copyright owners.[80] Recent Lumen research has focused on how some reputation management companies use DMCA notices and backdated websites to remove lawful but unflattering information about their clients.[81]

[77] Google Blog, "Transparency for copyright removals in search," May 2012, <https://goo.gl/rhNAM6>

[78] For more information, visit: https://transparencyreport.google.com/copyright

[79] Google Search Console, <https://www.google.com/webmasters/tools>

[80] Lumen Database, <https://lumendatabase.org>

[81] Lumen, "Bad Reviews: How Companies Are Using Fake Websites to Censor Content," August 2017, <https://goo.gl/eNnuYL>

> When we remove URLs from search results, we believe the public should be able to see who made the removal request and why.

4. **Informing people when results have been removed from their search results.**
   When people perform a search where results have been removed due to a copyright complaint, Google displays the following notice:

   • In response to a complaint we received under the US Digital Millennium Copyright Act, we have removed 1 result(s) from this page. If you wish, you may read the DMCA complaint that caused the removal(s) at LumenDatabase.org.

> *In response to a complaint we received under the US Digital Millennium Copyright Act, we have removed 1 result(s) from this page. If you wish, you may read the DMCA complaint that caused the removal(s) at LumenDatabase.org.*

## Not-in-Index URLs

While Google Search processes takedown notices for a large number of URLs every year, a large portion of those URLs have never appeared in Google Search results. This is because Google accepts notices for URLs that are not even in our index at the time of submission. Nevertheless, Google will still proactively block the URL from appearing in our search results and demote other pages from the same domain. Some reporting organizations submit a substantial number of "not-in-index" URLs. In one sample, around 82% of the URLs we delisted were not in our index.[82] Indeed, in 2017, the three organizations submitting the most URLs all had not-index rates of more than 98%. Collectively, these three organizations submitted 312,479,799 URLs for removal, but fully 306,892,799 of those URLs were not in the index in the first place, and thus had never appeared in Google Search Results. While we will continue to act on these notices, they suggest that the volume of URLs we block is not a good proxy for the number of allegedly infringing links we serve.

[82]  See: "Google Inc. - Additional Comments [Amended]" in the U.S. Copyright Office's Section 512 Study, February 2017, <https://goo.gl/CSJxX6>

In one sample, around 82% of the URLs we delisted were not in our index.

# Search and Piracy: The Reality

In reflecting on the role search engines can play in addressing the problem of piracy, commentators often overlook some important realities:

### 1. Search is not a major driver of traffic to pirate sites

Google Search is not how music, movie, and TV fans intent on pirating media reach pirate sites. Research from MPAA found only about 19% of traffic to pirate sites comes from search engines,[83] and if reasonable assumptions are applied, data from this study indicates this number may be closer to 7%.[84] Further, research that Google co-sponsored with PRS for Music in the U.K. confirmed that traffic from search engines is not what keeps these sites in business.[85] These findings were also validated in a research paper published by the Computer & Communications Industry Association.[86]

### 2. Search can't eradicate pirate sites

Search engines do not control what is on the web. Hundreds of billions of webpages are organized in Google's index, and there will always be new sites dedicated to making copyrighted works available as long as there is money to be made doing so. Replicating these sites is easy and inexpensive, and attempts to make them disappear should focus on eradicating the business model that supports them.[87] Law enforcement and governments are increasingly recognizing this worldwide. For instance, when Google signed a 2018 Memorandum of Understanding (MoU) committing to cut funding to bad actors in Europe, Vice President of the European Commission, Andrus Ansip, praised the efficacy of this approach, noting, "I have always been a strong defender of the 'follow the money' approach and working actively and closely with industry representatives. MoUs are a key pillar in the work on the enforcement of IPRs. And we see that our approach works."[88] Rather than focusing on Search, a "follow the money" approach is the most promising means of fighting piracy.

[83] MPAA, "Understanding the Role of Search in Online Piracy," September 2013, <https://goo.gl/KMDQyu>; See also: DiSCo, "MPAA: Online Demand for Movies is a Problem," September 2013, <https://goo.gl/1S2LdS>

[84] Note that 19% refers to how many users reach a pirate site within 20 minutes of a TV or film-related query. It could be argued that 20 minutes is an exceptionally long window for finding content on a search engine. This could indicate search results failed to guide the user to a pirate site, and this person used other methods. According to this study, this number falls to less than 10% if the time is reduced to within 7 minutes of a related search, and less than 2% within 1 minute. The study also reports 42% of searches included domain names in the query, meaning these users already knew their destination pirate site, and were using search only as a navigational aid. Thus, if the time horizon is reduced from 20 to 7 minutes, and navigational queries are correctly excluded, the number of sessions influenced by search engines drops to 7%.

[85] BAE Systems Detica, "The Six Business Models for Copyright Infringement," June 2012, <https://goo.gl/S1XKur>

[86] CCIA, "The Search Fixation: Infringement, Search Results, and Online Content," 2013, <https://goo.gl/ZVSg0r>

[87] Northeastern University, "Clickonomics: Determining the Effect of Anti-Piracy Measures for One-Click Hosting," 2013, <https://goo.gl/sKsRMv>

[88] European Commission, "Statement by Vice-President Ansip at EU Blockathon 2018 on the Memorandum of Understanding on online advertising and intellectual property rights," June 2018, <https://goo.gl/4CEMSL>

### 3. Whole-site removals are ineffective and over-censor content

Google's existing copyright removal framework provides copyright owners with an effective and efficient means to remove any infringing page from search results. When it comes to entire websites, Google may demote a site in our search results if we receive enough copyright removal notices for it, but we do not remove full sites from search results for copyright infringement. Although this would reduce our operational burden, whole-site removal is ineffective and can easily result in the censorship of lawful material.

Blogging sites, for example, contain millions of pages from hundreds of thousands of different people, as do social networking sites, e-commerce sites, and cloud computing services. All can inadvertently contain material that is infringing. Even on alleged "pirate sites," several studies have shown that tens of thousands of documents, files, and other types of content are downloaded legally everyday.[89] And even for the sites for which Google receives the largest number of copyright removal requests, the number of pages identified as infringing is often only a fraction of the total number of pages we index from those sites.[90]

Further, whole-site removal sends the wrong message by favoring over-inclusive private censorship over the rule of law. Embracing such an overbroad approach to address one domestic law violation (copyright) will embolden those who seek similar whole-site removal remedies for violations of other laws (e.g., insults to the king, dissident political speech). This would jeopardize free speech principles, emerging services, and the free flow of information online globally in contexts far removed from copyright.

Finally, removing or blocking an entire site could not only impinge on free speech, it would also be counterproductive. Research led by the European Commission found that shutting down a prominent pirate site only resulted in a "Hydra effect," where several new pirate sites rose to take its place. This multiplication of pirate sites, in turn, made piracy harder and more costly to combat.[91] Similarly, whole site removal from Search results just drives piracy to legitimate sites and social networks that search engines cannot reasonably eliminate from search results. For "rogue" websites dedicated to copyright infringement or counterfeit, a widespread number of experts, policymakers, and industry analysts believe that a "follow the money" approach is a more effective measure to fight them.

[89] *TechDirt, "Yes, There Are Many, Many, Many, Many Legal Uses Of BitTorrent," October 2012, <https://goo.gl/X6SMEZ>*

[90] *For detailed data, see Google Transparency Report: <https://transparencyreport.google.com>*

[91] *Luis Aguiar, Jörg Claussen, Christian Peukert, "Catch Me if You Can: Effectiveness and Consequences of Online Copyright Enforcement," January 2018, <https://goo.gl/PXFWq5>*

**4. Google Search cannot proactively filter for copyright-infringing works**

It is a myth that Google could create a tool to filter the web for allegedly infringing material and remove images, video, and text from our search results proactively. Such a system is both infeasible and unnecessary. One problem is that there is no way to know whether something identified as infringing in one place and at one time is also unlawful when it appears at a different place and at a different time. Some uses of material are authorized or permitted by exceptions to copyright like fair use, the freedom of panorama, or the quotation exception. Copyrights are often licensed to different entities for different geographic regions and may also change hands, with different licensors or owners taking different approaches.

Even more fundamental for Search is the problem that Google does not have a copy of every media file available online (in contrast to a product like YouTube, where Google hosts the videos). Google Search indexes the text, images, and links on web pages. Google does not download every audio and video file on the internet in order to identify whether it is the same music or video as one previously targeted by a copyright removal notice. Even if Google were to attempt such a colossal undertaking, rogue sites could easily block Google's indexing crawlers from accessing such files, rendering the effort ineffective.

Proactively filtering the internet for copyright-infringing works would also open Search up to unprecedented abuse. Malicious actors could claim ownership of files made and owned by other people. Protecting against abuse is a hard enough problem at the scale of notice-and-takedown, but it becomes impossible in the case of proactively filtering billions of items from selfies, software code and emails, to 3D printing and CAD files.

Such an unprecedented filtering effort is also unnecessary in light of existing mechanisms developed in collaboration with copyright owners. As detailed above, notice-and-takedown, when combined with the use of a demotion signal that takes previous notices into account, already addresses the problem of rogue sites, preventing their appearance for the vast majority of search queries. Continued "follow the money" efforts are also proving successful.

Google Play

 # Google Play

Google Play is an online store that connects people with a diverse set of content and applications from various channels including Books, Games, Movies & TV, Music, and News. On Google Play, people can find, purchase, and enjoy entertainment for their computers, tablets, or smartphones. Play has also partnered with all of the major record labels, publishers, and movie studios to offer millions of songs and books, thousands of movies and TV shows, and thousands of news sources for the enjoyment of people using Android devices.

There are more than a billion active Google Play users around the world in more than 190 countries, presenting a tremendous opportunity for creative industries. More than 94 billion apps were downloaded from Google Play between May 2017 to May 2018. Google Play has also expanded rapidly into new countries in the last year: Play Movies is available in 117 countries, and Play Books in 75 countries. All this means that Google Play is a massive boon for content creators.

## Play Provides Better Legitimate Alternatives to Piracy

Each channel of Google Play provides people with direct access to licensed movies, TV shows, books, magazines, apps, and games, giving people compelling alternatives to piracy.

### Movies and TV Shows

Through partnerships with 200+ film & TV global distributors, including all major studios, Google Play offers tens of thousands of recently released movies and TV shows. It also offers innovative features that take advantage of the digital format to drive user engagement. For example, Info Cards may appear when a movie or TV show is paused to provide more information about the actors and music in a scene.

### Books and Magazines

Google Play is home to the world's largest selection of eBooks, with more than 5 million titles available in 75 countries. We have also partnered with news publishers to launch Subscribe with Google, a comprehensive platform to help publishers convert readers into subscribers and keep them engaged across Google and the web. This is important because subscribing is often a frustrating experience for people, resulting in a loss of potential business for publishers. Subscribe with Google dramatically simplifies the log-in and payment process when subscribing to a news publication, eliminating the need for account registration, memorizing new passwords, or entering a new credit card. Partnerships like these foster additional ways for readers to enjoy periodicals across all of their devices and create a new market for magazines and newspapers.

### Apps and Games

Google Play is an engine of economic opportunity for application developers because it gives them a free platform to build on and reach Play's 1 billion active monthly users. There are now more than 8 billion new app installs per month globally. From May 2016 to May 2017, the number of developers with over 1 million installs grew by 35%.

In addition to the benefits that Apps & Games provides to creators, several of the most popular apps are delivering licensed music, movies, and TV shows to fans, including. For example:

- Netflix allows subscribers to stream TV and movies;

- HBO GO allows people with a subscription to HBO's licensed TV and movie material to watch these shows on their mobile and tablet devices; and

- Spotify is a subscription music service that offers free, ad-supported access—as well as subscription access—to a huge catalog of licensed music.

Google Play provides game developers with a platform to showcase their creativity and sell their apps directly to gamers. As of March 2018, the number of Android users who installed a game has more than doubled year-over-year.

**Play Fights Against Piracy**

Our policies prohibit apps that infringe copyright, encourage illegal streaming, or attempt to deceive users by impersonating other apps. Creators and rightsholders can also notify us about content on Play that infringes on their rights. This combination of proactive enforcement and notice-and-takedown makes a big difference.

In addition to proactively removing content that violates our policies, we provide a webform that creators and rightsholders can use to notify us of potentially infringing apps that our proactive processes may have missed. When someone submits a request, our dedicated team reviews the notification and takes appropriate action. To prevent the abuse of our takedown tools and processes, Play recently began requiring authentication for anyone submitting a removal request through our webform. In 2017, more than 14,000 items were removed from the Play Store through the notice-and-takedown process.

In 2017, more than 14,000 items were removed from the Play Store through the notice-and-takedown process.

# Advertising



# Advertising

Google provides several platforms for advertisers to build awareness of their brands, engage new customers, and generate new sources of revenue. By working with other industry partners, we have helped set industry standards for safe online advertising. We also work diligently to block infringing sites from using our services.

## Following the Money

Pirate sites are almost exclusively for-profit enterprises, and as long as they are able to make money, anti-piracy strategies will have limited effect. One of the most effective ways to combat rogue sites that specialize in online piracy is to cut off their money supply. As a global leader in online advertising, Google is committed to rooting out and ejecting rogue sites from our advertising services. We also work with other advertising leaders to craft best practices aimed at raising standards across the entire online advertising industry. For example, Google has worked with regulators and other industry leaders in the European Union, U.K., France, Italy, Southeast Asia, and elsewhere to create self-regulatory principles that help ensure ads do not appear on alleged copyright-infringing websites.[92]

[92] *See above section: "Working with Government and Industry"*

One of the most effective ways to combat rogue sites that specialize in online piracy is to cut off their money supply.

# Best Practices

In April 2011, Google was among the first companies to certify compliance in the Interactive Advertising Bureau's (IAB's) Quality Assurance Certification program, through which participating advertising companies take steps to enhance ad buyer control over the placement and context of advertising in order to build brand safety.[93] This program helps ensure that advertisers and their agents are able to control where their ads appear across the web.

In July 2013, Google worked with the White House's Office of the U.S. Intellectual Property Enforcement Coordinator (IPEC), and other leading ad networks, to participate in Best Practices and Guidelines for Ad Networks to Address Piracy and Counterfeiting.[94] Under these best practices, ad networks will maintain and post policies prohibiting websites that are principally dedicated to engaging in online piracy from participating in the ad network's advertising programs. By working across the industry, these best practices help reduce the financial incentives for pirate sites by cutting off their revenue supply.

In 2015, Google began participating in ongoing discussions and the development of best practices arising out of the Trustworthy Accountability Group's (TAG) Anti-Piracy Working Group. This working group is also focused on bringing advertisers, rightsholders, and platforms together to develop additional best practices and tools to prevent the placement of online ads on websites dedicated to piracy or the sale of counterfeit goods.[95] TAG also provides a mechanism for participating rightsholders to submit information about infringing URLs in a uniform format. We find that in the vast majority of cases, our own processes have already removed ads from those URLs. However, in the rare instances that we have not, we can usually take action against a site within 48 hours.

We continue to work with both industry and governments on follow-the-money strategies. In February 2015, Google worked with a cross-industry group in the United Kingdom called the Digital Trading Standards Group (DTSG) to create self-regulatory best practice principles for online advertisers to help ensure that ads do not appear on alleged copyright-infringing websites.[96] In June 2018, Google joined a broad coalition of advertising businesses, rightsholders, and industry groups in signing a voluntary Memorandum of Understanding with the European Commission. It endorses a "follow the money" strategy to stem the flow of ad revenues to sites and apps engaging in piracy and counterfeiting.

[93] IAB, "IAB Launches First and Only Quality Assurance Certification for Ad Networks And Exchanges," April 2011, <https://goo.gl/Vg7TWx>

[94] The White House, "Coming Together to Combat Online Piracy and Counterfeiting," July 2013, <https://goo.gl/86x1QE>

[95] Trustworthy Accountability Group, "TAG Anti-Piracy Working Group," <https://goo.gl/oekrIi>

[96] For more information on DTSG brand safety, see: <https://goo.gl/narFxp>

## AdSense

More than 2.5 million web publishers use AdSense to make money from their content on the web, making it the chief Google advertising product used by online publishers. The overwhelming majority of those publishers are not engaged in any kind of copyright infringement. AdSense has always prohibited publishers from using AdSense to place ads on pages that contain pirated works, and Google proactively monitors the AdSense network to root out bad publishers.

Since 2012, Google has terminated over 13,000 AdSense accounts and ejected more than 100,000 sites from our AdSense program for violations of our policy on copyrighted material. The vast majority of these ejections were caught by AdSense's own proactive screens. Almost all AdSense ad formats include a link that permits a copyright owner to report sites that are violating Google's policies. Copyright owners may also notify Google of violations through a webform. Each time Google receives a valid copyright removal notice for Search, we also blacklist that page from displaying any AdSense advertising in the future.

> AdSense ads appear on fewer than one-tenth of 1% of the pages that copyright owners identify in copyright removal notices for Search.

Google does not want to be in business with rogue sites specializing in piracy. Thanks to our ongoing efforts, Google is succeeding in detecting and ejecting these sites from AdSense. While a rogue site might occasionally slip through the cracks, the data suggests that these sites are a vanishingly small part of the AdSense network. For example, AdSense ads appear on fewer than one-tenth of 1% of the pages that copyright owners identify in copyright removal notices for Search. Of course, when Google does find such a violation, we take action against the AdSense publisher as well. Through integration with Search's tools for processing DMCA takedown notices, Google will stop serving ads on pages that receive a valid DMCA notice. This includes cutting off ads to entire sites that have been demoted in Search. We also use classifiers to detect potential sites and route them to human review. Through these efforts, about 7,000 sites had AdSense disabled in 2017.

# Google Marketing Platform and Google Ad Manager

Through Google Marketing Platform and Ad Manager, Google offers a suite of online advertising platform solutions for both advertisers and web publishers. The principal customers for these services are large advertisers, ad agencies, large publishers, and ad networks. It is virtually unheard of for these sorts of commercial entities to be operating rogue sites specializing in copyright infringement. Nevertheless, Google prevents publishers from using these services to display ads on pages that have been identified as infringing, just in case.

 Google Ads

Google Ads is Google's premier advertising product, delivering the advertisements that appear next to Google Search results as well as the text advertisements on our network of partner sites across the Web. Google has zero tolerance for copyright-infringing ads in Search, and has dedicated considerable human and engineering resources across the company to develop and implement measures to root out infringing ads. In 2017, Google disapproved more than 10 million ads that we suspected of copyright infringement or that link to infringing sites. People can also notify Google of ads that they believe infringe their copyright through a webform.[97] We have also implemented changes to ensure that if an ad receives a valid DMCA takedown notice, the ad gets blocked permanently from Google Ads

[97] For more information, see: <https://goo.gl/477ex3>

> In 2017, Google disapproved more than 10 million ads that we suspected of copyright infringement or that link to infringing sites.

# Fighting new forms of piracy



# Fighting New Forms of Piracy

## Kodi Add-Ons

Combating illegal streaming on open-source media players like the Kodi box shows both the challenge and the importance of a balanced approach in the fight against piracy. Open-source set top boxes themselves are legal and the XBMC Foundation, which developed the Kodi media player application, has taken steps to deter its use for streaming piracy. Nonetheless, pirates have created add-ons to enable Kodi boxes to access infringing works. Google has taken a number of steps to prevent this form of piracy:

**Shopping:** We removed set-top boxes with suspicious add-ons from Google Shopping.

**Play:** We proactively sweep the Play Store for apps with pre-installed Kodi add-ons that give access to infringing sites and remove them before they are made available.

## Streaming Abuse

In recent years, Google has focused on identifying infringing streaming from Google Drive. Specifically, we established the first full-time abuse engineering team dedicated to tackling these illegal streams. We met with external stakeholders, including not only U.S. film studios and their industry associations, but also streaming providers both in the U.S. and the E.U., who felt their services were suffering from competition with the pirates. We relied heavily on data these external partners provided us, which helped us detect patterns of problematic activity on Drive, and make a number of changes to Drive architecture and policies. We were able to identify and take action against problematic accounts and also set up monitoring to look for suspicious changes in streaming activity and take action against specific files as needed.

After we strengthened our enforcement on Drive, we saw pirates attempt to exploit other hosted products, even Google Maps.[98] We were able to apply the measures we took with Drive to many of these products and significantly curtail suspicious activity.

[98] *TorrentFreak, "Spammers Populate Google Maps with Pirate Links," April 2017, <https://goo.gl/mmMLu8>*

Fighting new forms of piracy

# Piracy on Other Google Products

Google receives a smaller volume of copyright takedown notices requesting removal of content from other products through a publicly-accessible webform. In 2017, we performed the following removals:

- **Drive:** nearly 4,000,000 URLs removed

- **Google Photos:** over 200,000 URLs removed

- **Sites:** nearly 200,000 URLs removed

- **Blogger:** over 150,000 URLs removed

- **MyMaps and Google Maps:** nearly 4,000 URLs removed

- **Shopping:** over 1,000 URLs removed

# Conclusion

 # Conclusion

Today, Google's services are generating more revenue for creators and rightsholders, connecting more people with the content they love, and doing more to fight back against online piracy than ever before. YouTube and Google Play have helped millions of creators worldwide to reach global audiences and generate revenue. Along with new Google Search features, these platforms have made it easier for fans to find licensed copies of their favorite music, videos, books, and other creative works. By building industry-leading tools like Content ID and our Search demotion signal, working with policymakers and setting industry standards to cut off revenues to bad actors, we are tipping the scales against online piracy. Through continued innovation and partnership, we're committed to rolling back bad actors while empowering the creative communities who make everything we love about the internet today.

## Links to More Information

For more information, you can visit the links below:

**Google Transparency Report**
https://google.com/transparencyreport/removals/copyright/

**YouTube Copyright Center**
https://youtube.com/yt/copyright/

**Google Legal Request Webform**
https://support.google.com/legal



# EXHIBIT 4

 YouTube



# Copyright Transparency Report

At YouTube, supporting the free flow of ideas and creativity is core to our mission to give everyone a voice and show them the world. With this in mind, we build tools that empower users to access, create, and share information like never before — giving them more choice, opportunity, and exposure to a diversity of viewpoints. Today, over 2 billion logged-in users come to YouTube every month and more than 500 hours of video are uploaded every minute.

YouTube has also given rightsholders opportunities to earn money both from their own and user-generated content through our subscription-based and advertising-supported models. Our partnerships with major record labels, performing rights organizations, a multitude of independent labels and music publishers, television networks, and movie studios generate substantial revenues for the creative industries. Over the last three years, we've paid more than $30 billion to creators, artists, and media companies.

YouTube has over 50 million Premium and Music subscribers, including trialers, across 95 countries as of September 2021, and because of Content ID, YouTube has created an entirely new revenue stream from ad-supported, user generated content — paying more than $5.5 billion to rightsholders from ads alone as of December 2020, from content claimed and monetized through the tool.

**$30B** | To creators, artists, & media companies over last 3 years

**$5.5B** | ad revenue paid to rightsholders as of December 2020 from content claimed and monetized through Content ID

## YouTube's Copyright Management Suite

There are three main tools that make up our Copyright Management Suite: the webform, Copyright Match, and Content ID. All of these tools use technology to prevent the reupload of matching content. We have invested hundreds of millions of dollars to develop and operate these tools.



| | **Webform** <br> Users who hold few copyrights and scarcely find it on YouTube | **Copyright Match Tool** <br> YouTube channels and other creators that are prone to reposting of their copyrighted content | **Content ID** <br> Movie studios, service providers, and other publishers that have heavy reposting of copyrighted content |
|---|---|---|---|
| Frequency of Claims | **Infrequent** (A few times a year) | **Occasional** (A few times a month) | **Scaled** Daily |
| Resources | Self | Self | Dedicated team w/ expert knowledge |
| Block Reuploads | ✓ | ✓ | ✓ |
| Auto-Detect Reuse | | ✓ | ✓ |
| Eligibility | Open to everyone | Be in YouTube Partner Program or demonstrate short history of takedowns | Demonstrated need of scaled tool, understanding of copyright, and resources to manage complex automated matching system |
| Access | **Everyone** 2+ billion channels | **2+ million channels** | **9K+ partners** |
| Abuse | **High** | **Low** | **Low** |
| Automation | **Low** | **Medium** | **High** |



## Webform

All rightsholders have access to the webform, which we've built as a streamlined and efficient way to submit copyright removal requests, and it is available in 80 languages. It is designed for infrequent use, such as creators who hold few copyrights and occasionally find their content on YouTube. For the vast majority of rightsholders, the webform is the only tool they need.

While partners with access to Content ID can convert any match (see Content ID below) into a copyright removal request, some of these partners have access to a set of Studio Content Manager tools and among them is an "Enterprise Webform" that operates similarly to the public webform available to all channels.  Additionally, a small number of rightsholders and anti-piracy vendors who do not have access to Content ID have access to this Enterprise Webform. They are known as members of the Content Verification Program (CVP.) While these are different entry points, the Enterprise Webform operates like the public webform where rightsholders or their representatives search YouTube and manually file a takedown request for content that potentially infringes their copyright.



## Copyright Match Tool

After extensive collaboration with creators, we found there was a segment of rightsholders who experienced a higher amount of reposting of their copyrighted content and needed to submit more frequent copyright removal requests. With this in mind, we built the Copyright Match Tool to safely bring the power of Content ID matching technology (described in detail below) to more creators and rightsholders by providing access to those in the YouTube Partner Program. Creators who have access to the Copyright Match Tool through the YouTube Partner Program simply need to be the first to upload a video to YouTube (they can upload as public, private, or unlisted).

In October, we upgraded the Copyright Match Tool to also find reuploads of videos removed through the webform, so that the tool isn't only effective for and available to those willing to upload their video content onto YouTube. At the same time, we expanded access of this feature to any rightsholder who has submitted a valid copyright removal request through the webform, so that they will be shown  subsequent reuploads of the videos they reported for removal. Since the expansion took place after the reporting period, the data in this report does not reflect these changes.

Those not in the YouTube Partner Program can apply for access to all Copyright Match Tool features and other tools through the Copyright Management tools application.

For each video match, the Copyright Match Tool shows the user information on total views, the channel that uploaded it, what percentage of the video is made of their content, and a few screenshots of the video. We also label the matches to alert claimants if the match has different audio from their upload but the same video, which is often the case with "reaction videos," or if it's only a partial match, meaning their content may have been sampled but the video is not a simple re-upload. From this interface, users can choose to archive the match and leave the video up, file a takedown request, or contact the uploader.

---

# 2M+

Channels on YouTube have access to the Copyright Match Tool

*Data as of June 2021. In October 2021, we further expanded Copyright Match Tool access to anyone who has removed a video through the webform.*

| MATCHES 53 | REMOVAL REQUESTS 13 | MESSAGES 13 | ARCHIVE 54 |
| --- | --- | --- | --- |

≡ Filter

| Matching videos | Total views | Date | Channel | % match | Frames | Actions |
| --- | --- | --- | --- | --- | --- | --- |
| Jiggly Japanese Cheeseca... <br> Soufflé Cheesecake Recipe (J... | 3,001 | Dec 1, 2018 | Channel title <br> 8.4K subscribers | 80% of their video | | 🗀 ! ✉ |
| Day to Day Cook - Matcha... <br> Matcha Panna Cotta (Japane... | 4,432 | Dec 1, 2018 | Channel title <br> 8.4K subscribers | 30% of their video | | 🗀 ! ✉ |
| Tried and Tested - the Best... <br> Cream Puffs (Choux Creme)... | 2,014 | Dec 1, 2018 | Channel title <br> 8.4K subscribers | 100% of their video | | 🗀 ! ✉ |

*A sample of the interface for Copyright Match Tool. Not actual data.*

## Content ID



This is our solution for those with the most complex rights management needs, such as movie studios, record labels, and collecting societies. Smaller, independent creators who do not meet the eligibility criteria for Content ID can still access these features through a number of service providers*. These service providers manage rights through the system on behalf of others, on a daily basis.

YouTube and its Content ID partners enter into an agreement that sets the parameters for the use of the tool and allows YouTube to make appropriate use of the copyright owner's content for the purpose of making Content ID function. Partners provide YouTube with reference files for the works they own, along with metadata such as the title and detailed ownership rights. Based on these references, YouTube creates digital "fingerprints" for the copyright owner's works, and then conducts automated scans of the platform to determine when content in an uploaded video matches the reference content.

Copyright owners and service providers use YouTube's Studio Content Manager—the interface for managing the use of their content on the platform—to instruct the system to either block, monetize, or track matching content. The Content Manager interface provides highly granular access control to assist users who have specific, complex, or even conflicting ownership rights. For example, rights and policies may be specific to certain countries (e.g., a video may be monetized in one country, and blocked or tracked in another).

Reference files that reflect flawed or conflicting ownership data can create issues among Content ID partners. Content ID is designed to address these ownership conflicts among partners and manage disputes with uploaders. The system creates a queue of pending claims, for example, when the system is uncertain whether a claim should be made. As a result, Content ID requires users to make a high level of operational investment, without which other rightsholders could have their rights impaired and lawful expression could be inappropriately impacted.

 YouTube

# Everyone Has Access

YouTube has built a suite of Copyright Management tools for all rightsholders, and matches them with the appropriate tool based on the scale of their copyrighted work on YouTube and the resources they've dedicated to operate our tools.

*All data is from January 2021 - June 2021 unless otherwise noted*

## Key points



**Webform**

Anybody with a YouTube account has access to the webform, which means over 2 billion monthly logged-in users. In the first half of 2021, over 70% of claimants who used a tool in YouTube's Copyright Management Suite sent removal requests through the copyright webform, which is designed to be an easy option for those with infrequent needs.



**Copyright Match Tool**

As of July  2021, over 2 million channels have access to the Copyright Match Tool, which we built for those with more frequent copyright needs. It automatically detects copies of content uploaded to their channel. Following the expansion of the Copyright Match Tool in October 2021 to more users, now anybody with a YouTube account who is in the YouTube Partner Program or has submitted a valid copyright takedown notice is eligible for Copyright Match Tool access.



**Content ID**

Content ID is for partners (such as movie studios, record labels, and collecting societies) and service providers  who operate at an entirely different scale- over 9,000 partners have access and many have a dedicated team just to operate the tool.

The scale of copyright needs for these partners is in a class all by itself, and their content  - today's hit song, scenes from a new movie or the latest viral video -  is at the heart of creative reuse on YouTube. Claims from Content ID partners represent over 99% of all copyright actions on YouTube.

**Eligibility:** Channels in YPP automatically gain access to the Copyright Match Tool and see matches to their uploads. Those who have submitted a valid copyright removal request through our webform also gain access to the Copyright Match Tool and see matches for videos they've removed through the webform. They can also apply for all scaled copyright tools through our Copyright Management tools application.*

The following data demonstrates the relationship between how many people have access to a particular tool, how many people use that tool, and the scale of their need to manage their copyright on YouTube. We match rightsholders to the tool that best meets their needs, based in part on how much content on YouTube is subject to their copyright. The public webform is available to everyone, and used by more people than any other tool.

Those in the YouTube Partner Program and those who have used our public webform successfully become gain access to the Copyright Match and Tool and thus have the benefit of the most requested feature of Content ID - the ability to automatically detect potentially infringing content. This feature helps users better detect and manage their copyright through a user-friendly interface.

Content ID partners are managing content at an entirely different scale and sophistication. Though they represent the smallest number of users for any of our tools, their actions represent over 99% of all copyright actions on YouTube. This is because their content - today's hit song, scenes from a new movie or the latest viral video -  is at the heart of creative reuse on YouTube and is the most likely to be re-uploaded.



*January 2020 - June 2020



Content ID - 722,659,502 (99.08%)
Enterprise Webform - 2,878,611 (0.39%)
Copyright Match - 1,676,292 (0.23%)
Webform - 2,183,018 (0.30%)

*January 2021 - June 2021

**Exhibit 1.1 – Access and Usage of Copyright Tools**
The chart shows the number of rightsholders who have access to each tool as of July 2021, along with how many actively used the tool in the first half of 2021. In October 2021, we expanded Copyright Match Tool access to anyone who has submitted a valid copyright takedown request. That expansion is not shown here.

In some cases, an individual may make copyright removal requests or make claims using multiple tools (for example, if they are granted access to Copyright Match Tool after making successful copyright removal requests via the webform.) In these cases, they are counted as users of both tools.*

**Exhibit 1.2 – Copyright Actions by Tool**
This chart shows unique claims or copyright removal requests made in the first half of 2021. Note that some videos may be subject to multiple claims or removal requests, such as when an individual video features more than one copyrighted asset, or multiple parties share ownership.

*A Content ID claim can convert to a copyright removal request at the claimant's request. In these cases, we have counted them as two separate actions: one Content ID claim and one copyright removal request.*

# Eligibility and access

Every logged-in YouTube user, regardless of size or need, has access to the webform, which we built to be a  streamlined and efficient way to submit claims. Google has invested considerable resources into making the webform easy to use and effective for the vast majority of use cases.

We automatically offer Copyright Match Tool access to channels in the YouTube Partner Program. For these channels, the tool finds potential matches of their uploads to YouTube. In October 2021, we extended automatic access to anyone who submits valid copyright removal requests through our webform - for these cases, the tool detects and surfaces potential matches of videos removed by the rightsholder. Rightsholders can also apply for all copyright tools via <u>YouTube's Copyright Management tools application.</u>* The eligibility criteria for each copyright management tool is described in <u>YouTube's Help Center.</u>**

A history of sending YouTube complete and valid copyright removal requests to remove allegedly infringing content serves as the primary indicator that an applicant both needs scaled tools and understands copyright. Abuse of our webform, or otherwise invalid use due to a lack of understanding about copyright, is very common.

When YouTube responds to an applicant who completes YouTube's Copyright Management tools application, YouTube always explains the tools available to a given applicant. We also indicate that, if the applicant believes they should be eligible for additional tools, they are welcome to apply again in 90 days. In the interim, **the best course of action for any rightsholder is to make use of the tools we do provide them in order to illustrate that there exists an issue for which they need a more scaled tool to fully address, that they own rights in the content, and that they understand copyright removal processes**. If an applicant wishes to appeal the initial decision and provide additional information for us to consider, they may respond directly to the email.

*<u>https://support.google.com/youtube/contact/copyright_management_tools_form</u>;
**<u>https://support.google.com/youtube/answer/9245819?hl=en</u>

 YouTube

# Creating a Balanced Ecosystem

As we work to expand access to more powerful tools in the YouTube Copyright Management Suite, we must balance the need to protect creators, viewers, and other rightsholders from the significant disruption that can result from the abuse or otherwise invalid use of our tools.

*All data is from January 2021 - June 2021 unless otherwise noted, and is preliminary.*

## Key points

YouTube takes steps to prevent abuse or otherwise invalid use of our rights management tools, and also empowers uploaders to push back on requests and claims they believe are wrongful. As is demonstrated by our public copyright webform, when we make a tool available to everyone without any eligibility requirements, we see high levels of abuse. This is why we must balance access to tools against the significant disruptions to the ecosystem they can cause.

### 30x

Higher abuse rate in webform than in takedown tools with limited access

Over 8% of videos requested for removal through the public webform in the first half of 2021 were the subject of abusive copyright removal requests, meaning these requests were assessed by our review team as a likely false assertion of copyright ownership. This abuse rate is more than 30 times higher than in other tools with limited access, like the Copyright Match Tool and Enterprise Webform, where it is 0.2% or lower.[1]

Similarly, the limited availability of Content ID also helps to limit abuse of that tool. This is especially important because claiming can happen automatically, and while **one copyright request removal made from the webform impacts only one (or a handful) of videos, just one invalid reference file in Content ID can impact thousands of videos and users**, stripping them of monetization or blocking them altogether.

Uploaders are empowered to push back on removals requests they believe are invalid by filing counter notifications, and they can push back on Content ID claims by disputing the claim.  Like abuse, pushback from uploaders occurs most often on those tools that are available to more people. Uploaders have filed counter notifications in response to over 5% of removal requests from the first half of 2021 made through the webform, whereas it's fewer than 2% for both Enterprise Webform and for Copyright Match Tool.  Fewer than 1% of all Content ID claims made in the first half of 2021 have been disputed, though when they are, over 60% of disputes were resolved in favor of the uploader.[*]

**Invalid requests** often occur when someone incorrectly submits a copyright removal request due to a lack of understanding of either copyright law or our tools. Invalid requests can take many forms, such as filing a copyright request for a trademark or privacy issue, or simply failing to provide the necessary information required to constitute a valid copyright removal request. For Content ID partners, this occurs when partners unintentionally deliver low-quality reference files that contain incomplete metadata, insufficiently unique content, or pieces of content that they don't own exclusively - such as a news broadcast that contains public domain footage, or a song that uses a licensed beat.

**Abuse**, on the other hand, occurs when someone is deemed by our review team to have intentionally and maliciously used our tools in an attempt to remove content from YouTube through a likely false assertion of copyright ownership. Sometimes this takes the form of political actors attempting to censor political speech or companies stifling criticism of their products or practices. Other times individuals try to use our copyright processes to bully other creators, or to remove videos they may see as competing for the same audience.

Regardless of the intent, both invalid requests as well as abuse can cause significant disruptions to all members of the YouTube ecosystem - creators, viewers, and rightsholders. Just one bad copyright webform notice can result in a handful of videos being temporarily removed from YouTube. In Content ID the impact is multiplied due to its automated nature; one bad reference file can impact hundreds or even thousands of videos across the site. In one highly-publicized instance, a news channel uploaded public domain footage from NASA of a Mars rover and ended up making inappropriate claims against all other news channels and creators using the same footage, even against the NASA channel itself.

We have dedicated teams working to detect and prevent abuse or otherwise invalid use of each of our tools. We rely on a combination of humans and technology to detect suspicious behavior, request additional information where necessary, and remove reference files that are low-quality or invalid. We take abuse of our tools seriously—we terminate tens of thousands of accounts each year that attempt to abuse our copyright tools.

## Common types of abusers



**Impersonator**

Uses a fake name/ email address to get away with submitting fake requests



**Reputation Manager**

Uses DMCA form to remove allegedly defamatory content



**Competitor**

Submits requests on legitimate content to target their competitors



**Backdater**

Pretends to have created content first (backdates) in order to remove other people's content

## Copyright removal requests through Copyright Webform, Copyright Match, and Content ID

Because it is available to everyone, our copyright webform is subject to a significant amount of abuse or otherwise invalid use. We have a team dedicated to processing copyright removal requests, and when necessary, we request additional information or deny the request altogether. Below you can see real world examples, anonymized for the report, to see how we respond to complaints we received.

| Possible responses by YouTube to a copyright removal request, with examples | |
|---|---|
| **Remove:** The URL was removed from YouTube | **Examples:** *A removal request is accepted by YouTube and the video is removed for copyright under the owner name given in the request.* <br><br> *A removal request is received for a video that's already been removed from YouTube, either by the uploader or for violating another policy.* |
| **Abuse:** A webform submission that is deemed by our review team to be a likely false assertion of copyright ownership. | **Examples:** *An individual falsely claiming to be a celebrity or a large company.* <br><br> *Creator trying to take down a video competing for the same audience.* |
| **Invalid Request:** There are a number of reasons that requests may be ruled invalid. This may be because the user submitting the request failed to demonstrate they represent the entity they claim to, they failed to consider fair use, fair-dealing or other international equivalents, or they are trying to address a non-copyright issue (like trademark or other content moderation issues) through the copyright form. | **Examples:** *A fan requests a takedown on behalf of a creator, but doesn't appear to be authorized to make claims on their behalf.* <br><br> *An individual does not provide necessary information to process a request, for example they are not sufficiently clear about what content in the video they are claiming, or fail to provide the URL of the video that they claim is infringing.* <br><br> *A company asserts their logo is infringed, but the logo is a plain wordmark that is appropriate for a trademark removal notice.* |
| **Other:** In some cases, we hold a request for further review, send a one-off response, or follow a slightly different process because the content was provided to us under license. In these situations, we've categorized them as 'Other.' | **Examples:** *A movie producer submits a takedown request for a movie, but the movie's distributor (who works with the producer) licensed that video to YouTube.* |

# YouTube actions in response to copyright removal requests by tool





**Exhibit 2.1**
This chart shows the video-level result of each copyright removal request made in the first half of 2021 through the **webform**.*



**Exhibit 2.2**
This chart shows the video-level result of each copyright removal request made in the first half of 2021 through the **Enterprise Webform**.*



**Exhibit 2.3**
This chart shows the video-level result of each copyright removal request made in the first half of 2021 through the **Copyright Match Tool**.*

---

# How YouTube protects against wrongful claims

## Content ID claims

We also have a dedicated team that monitors for bad reference files delivered to Content ID. The team uses automated systems along with manual review to detect reference files (or segments of reference files) that may be causing an issue, and requests partners review them.

**The rightsholder can choose to:**

- Exclude the segment from the larger reference file

- Remove the entire reference file

- Ask our dedicated abuse team to re-review the suspicious flag

If the partner does not respond, the reference file is marked as invalid and removed from Content ID. When a reference file (or a segment) is removed from Content ID, all claims associated with that reference file (or segment) are released.

There are multiple reasons this can happen, but most often it occurs when partners deliver non-exclusive content, such as content in the public domain or content they've licensed but don't own. For example, an owner of a late night talk show may deliver a reference file of an entire episode of their show, which included a clip of a film that one of their interviewees is promoting, and that clip may inadvertently claim the filmmaker's official upload of the film.  Alternatively, reference files may capture indistinct sound effects, nature sounds, or content that is in the public domain and not subject to copyright.

Unlike webform requests that are rejected, which only affect one or a handful of videos, the impact of reference files in Content ID is multiplied.

# How YouTube empowers uploaders to fight wrongful claims

## Counter notifications

Beyond the work YouTube does to prevent abuse or otherwise invalid use, there are also disputes that can only be resolved between rightsholders. YouTube is not in a position to know whether re-use of content has been authorized by a license, whether ownership is shared by multiple parties, or held by different parties in different regions. In these cases, recipients of copyright removal requests or Content ID claims have the ability to counter notify or dispute, respectively.

The ability to counter notify is a requirement of the U.S. DMCA. If an uploader believes they have the required license to use content or are subject to an exception such as fair use, they can file a counter notification. YouTube is not in a position to mediate this type of dispute as we are not a court of law; however, counter notifications are reviewed for completeness and to ensure they have a clear explanation for why the uploader believes they have all necessary rights for the removed video. If we accept the counter notification, a copy of the notice is sent to the claimant who requested removal of the video(s). After receiving a counter notification, the claimant has 10 business days to provide evidence they've initiated a court action to keep the content down, otherwise we will reinstate the content. This time period is a requirement of copyright law.

### % Counter notifications received

This represents the % copyright removal requests submitted in each tool, where the uploader had responded with a counter notification asserting that they do have the right to keep the video up (as of July 2021).



## Content ID claim resolution

We offer a number of methods for uploaders to address Content ID claims they receive. As of March 2021, uploaders are notified through our Checks functionality during the video upload process whether there is material in their video that may result in a Content ID claim.* Before they publish the video, they may edit out** the content or use the dispute process described below. These options are also available after a video is published and claimed.

If uploaders feel that their use of claimed content is valid, the Content ID dispute process allows recipients of Content ID claims to push back and assert their right to upload the content in question. Claimants can respond to disputes by releasing the claim or upholding it. If a claimant does not respond to a dispute, the claim automatically expires after 30 days. Claims that are upheld after dispute can be appealed by the uploader, which gives the claimant another 30 days to decide whether to release the claim or issue a removal request. If the video is removed through this process, uploaders can further pursue remediation by filing a counter notification or seeking a retraction from the claimant.

No system is perfect, and despite the fact that access to Content ID is limited to partners with a demonstrated need for a scaled solution, working knowledge of copyright, and the necessary resources to manage a complex tool, there are still errors. Fewer than 1% of all Content ID claims made in the first half of 2021 had been disputed as of July 2021. When disputes take place, the process provided by YouTube provides real recourse, and over 60% of these disputes were resolved in favor of the uploader.

## Total Content ID claims

# 722,649,569

Total # of Content ID claims made in the first half of 2021

### Total Content ID claims vs total disputes

This chart shows the total number of Content ID claims, and the proportion of those claims that are disputed by the uploader.

Claimants have 30 days to review the dispute and decide whether to release the claim, uphold the claim, or issue a removal request. If they don't respond within 30 days, the claim expires.



- Undisputed Content ID claims - 718,951,550 (99.5%)
- Disputed Claims - 3,698,019 (0.5%)

## Total number of disputes

# 3,698,019

Total # of disputes of claims above as of July 2021

* https://support.google.com/youtube/thread/102365314?hl=en
** https://support.google.com/youtube/answer/2902117?hl=en&ref_topic=9257784

## Resolution of disputes

If the claimant chooses to uphold their claim or file a copyright removal request in response to a dispute, the claim is considered to have resolved in favor of the claimant.

Alternatively, after receiving a dispute the claimant may choose to release the claim, or may allow the claim to expire after 30 days. In either case, the claim is removed from the video and is considered to have resolved in favor of the uploader.



● In favor of uploaders - 2,219,794 (60.0%)
● In favor of claimant - 1,478,203 (40.0%)

---

# 38,864

Total # copyright removals originating from the disputes above

If a claimant upholds their claim after the uploader has disputed, the uploader can appeal that decision. At this point the claimant can no longer re-assert their Content ID claim, and must instead choose to either release the claim or file a legal copyright removal request. Additionally, in some cases, disputes may directly result in a copyright removal request.

At this stage, the ownership issue has exited the Content ID claim and dispute system built by YouTube, and enters the legal removal and remediation process defined by the DMCA and similar applicable laws.

## Counter notifications received

As is the case with all copyright removal requests received by YouTube, uploaders have the ability to file a counter notification in response to the removals above, which is a legal request for YouTube to reinstate a video.

If we receive a valid counter notification the claimant will have 10 business days to provide evidence that they've initiated a court action to keep the content down. (see below)



● No Counter Notification - 35,393 (91.1%)
● Counter-Notification Received - 3,471 (8.9%)

## Lawsuits

---

# <1%

Lawsuits from the counter notifications above

Some claims ultimately have to be adjudicated by a court if the claimant and uploader still disagree after going through our robust dispute and counter notification processes. As shown, of the 720 million claims we started with, we're notified of very few that result in a lawsuit.

 YouTube

# Our Tools Are Cutting Edge

We've invested hundreds of millions of dollars to develop powerful tools to help rightsholders manage their content on YouTube. We've also accumulated over a decade of learnings on how to best balance the needs of rightsholders and creators, and continue to iterate on our tools accordingly.

*All data is from January 2021 - June 2021 unless otherwise noted and is preliminary*

## Key points

**99%**

Content ID claims that are made automatically

Content ID's systems automatically detect potential infringement, and additionally some rightsholders can manually search for and claim content not automatically detected.  Over 99% of Content ID claims from the first half of 2021 were made through automated detection,  with partners' usage of manual options being exceedingly rare (fewer than 0.5% of total claims.)

When partners do make manual claims on videos not detected by our systems, uploaders are more likely to dispute the claim's validity (fewer than 0.6% of automated claims from the first half of 2021 were disputed", vs. over 1% for manual claims)

Based on reference files provided by Content ID partners, YouTube creates digital "fingerprints" for the copyright owner's works, and then conducts automated scans of the platform to determine when content in an uploaded video matches the reference content. When a match is found, Content ID automatically claims the content. Because of continued investment in our matching technology, over 99% of all claims made by Content ID in the first half of 2021 were automatic.

Despite the power of technology, there are some cases where Content ID fails to identify a match with a user video. This can be due to uploaders' efforts to evade Content ID, or due to the fleeting use of the copyrighted work. For videos missed by automated identification, many Content ID partners have the ability to issue claims manually. While this tool covers an important gap, it accounted for fewer than 1% of Content ID claims made in the first half of 2021. For music rightsholders in particular, the automation rate is even higher. Finally, all channels on YouTube also have access to our copyright removal webform to request removal of any content not captured by another tool to which they have access.

We've spent years tuning our automatic tools to automatically detect reuse of licensed content when appropriate. That said, it's impossible for matching technology to take into account complex legal considerations like fair use or fair dealing. Despite that, claims made manually by partners are more than twice as likely to result in a dispute than claims made automatically.





**Exhibit 3.1 – Automated vs. Manual Content ID Claims**
The exhibit above shows the number of Content ID claims that were made by automated systems vs. those that were made using manual tools. Out of 720 million claims made in the first half of 2020, 99.6% were automated and .4% were manual.

**Exhibit 3.2 – % Disputes on Automated vs. Manual Content ID Claims**
This exhibit shows the % of claims from Exhibit 3.1 that had been disputed as of July 2021, divided between whether or not the claim was made by Content ID's automated systems, or was made by a rightsholder using Content ID's manual claiming feature.

## Tackling new challenges by continuing to refine our tools

Whether it be fans making reaction videos, aspiring musicians singing covers, or pirates attempting to re-stream a championship soccer game, we understand that there are countless scenarios where rightsholders need a tool that is powerful enough to quickly detect reuse and apply the appropriate policy.

Unfortunately, some individual channels attempt to circumvent the system by transforming the content they upload. This can take many forms, from shifting the pitch of audio, to altering the color, orientation, or surroundings of a video. Below are some examples of the types of manipulations channels engage in.



Original



Flipped / Mirrored



Framed



Color shifted



Aspect ratio change



Light effects

Content ID's match technology must continually adapt to such efforts, without sacrificing its precision. In other words, in the effort to locate transformed copies of a given work, it cannot extrapolate so far that it begins to inaccurately sweep in similar works.

For more information about YouTube's approach to rights management, please visit How YouTube Works.