1

2

3

4                             UNITED STATES DISTRICT COURT

5                           NORTHERN DISTRICT OF CALIFORNIA

6

7     MARIA SCHNEIDER, et al.,                Case No.  20-cv-04423-JD

8                  Plaintiffs,
                                              **ORDER RE MOTIONS TO CERTIFY**
9            v.                               **CLASS AND EXCLUDE EXPERTS**

10    YOUTUBE, LLC, et al.,

11                 Defendants.

12

13           In this copyright dispute, named plaintiffs Maria Schneider, Uniglobe Entertainment, and

14    AST Publishing have asked to certify four classes under Federal Rule of Civil Procedure 23(b)(3),

15    or, in the alternative, an issues class under Rule 23(c)(4).  Dkt. No. 243-1.  Defendants YouTube

16    and Google (YouTube) oppose certification and have asked to strike the testimony of two of

17    plaintiffs' experts.  Dkt. Nos. 261-1, 268.  Certification is denied across the board, and the motion

18    to strike is terminated without prejudice to renewal, as circumstances might warrant.

19                                         **BACKGROUND**

20           The summary judgment order provides a wealth of background on this litigation, and is

21    incorporated here.  *See* Dkt. No. 222.  In pertinent part, the gravamen of plaintiffs' case is that

22    YouTube is a known hotbed of copyright piracy but denies most copyright owners access to its

23    premier anti-piracy tool, known as Content ID.  *See* Dkt. No. 99 ¶¶ 1-2.  Content ID is "a digital

24    fingerprint tool that compares videos being uploaded on YouTube to a catalogue of copyrighted

25    material submitted by those entities permitted access to the tool."  *Id.* ¶ 2.  According to plaintiffs,

26    only a select group of "powerful" copyright owners are permitted to use Content ID, which allows

27    them to readily identify infringing works and pursue anti-piracy measures.  *Id.* ¶¶ 1, 56.  Plaintiffs

28    say that they and other "ordinary" copyright owners who do not have access to Content ID "are

United States District Court
Northern District of California

relegated to vastly inferior and time-consuming manual means" of searching for infringing videos on the massive YouTube platform.  *Id.* ¶¶ 1, 9.  Plaintiffs allege that this two-tiered system has allowed repeated infringement of their works.  Specifically, plaintiffs say that after they submitted a takedown notice and YouTube removed the challenged video, "the same person or another person has subsequently re-uploaded Plaintiffs' copyrighted feature-length films, music recordings, or books."  *Id.* ¶ 79.

In effect, plaintiffs allege that YouTube has violated the copyright laws by withholding broad access to Content ID.  *See id.* ¶ 80 ("[C]opyright holders should not be forced to *repeatedly* demand that the *same* platform take down infringing uses of the *same* copyrighted work, while other rights holders are provided access to standard digital fingerprinting and blocking tools.") (emphasis in original).  Plaintiffs also allege that YouTube automatically strips metadata out of uploaded videos, including copyright management information (CMI), which makes it harder to catch infringing conduct.  *Id.* ¶¶ 83-86.  The first amended complaint (FAC) presents claims for direct, contributory, and vicarious copyright infringement, and violations of Section 1202(b) of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1202(b)(1)-(3), for removal of CMI and distribution of works with CMI removed.

A number of developments have changed the litigation terrain since the filing of the complaint.  In the original complaint, plaintiff Pirate Monitor, a British Virgin Islands company that owns copyrights to foreign films, alleged that YouTube denied it access to Content ID and restricted the number of takedown notices it could submit in a day.  Dkt. No. 1 ¶¶ 17, 65-74.  Discovery indicated that Pirate Monitor may have uploaded thousands of videos and then submitted corresponding takedown notices under the DMCA to bolster its infringement claims.  *See, e.g.*, Dkt. No. 268-42 at 11 (YouTube interrogatory response stating that "[t]he facts that YouTube has learned based on its investigation to date leave little doubt that Pirate Monitor [and its agents] were responsible both for uploading clips of certain of the works-in-suit (and other related content) to YouTube in the first place and then for misusing the DMCA process to request the removal of those clips by YouTube").  YouTube filed counterclaims against Pirate Monitor based on the alleged scheme, and Pirate Monitor subsequently dismissed all of its claims against

YouTube with prejudice.  Dkt. Nos. 34, 66.  Pirate Monitor remains in the case as a counterclaim defendant and has filed a motion for summary judgment on the counterclaims.  *See* Dkt. Nos. 160, 260.

Another significant development was the Court's order on YouTube's summary judgment motion against Schneider.  *See* Dkt. No. 222.  YouTube fired a blunderbuss of defenses at Schneider's infringement claims, *see* Dkt. No. 163-10, but its main argument was that it held a "blanket catalog license" to all 76 of the musical compositions that Schneider asserted as works-in-suit.  Dkt. No. 222 at 5; *see also Great Minds v. Office Depot, Inc.*, 945 F.3d 1106, 1110 (9th Cir. 2019) (licensee is not liable for copyright infringement "if the challenged use of the work falls within the scope of a valid license").

The parties submitted reams of evidence on this issue, which established that there were substantial disputes of material facts.  The disputes centered on a chain of contracts and agreements for Schneider's works.  In 2008, Schneider appointed her management company, ArtistShare Music Publishing (AMP), as the "sole and exclusive Administrator" of her musical compositions via a Music Publishing Administration Agreement (AA).  Dkt. No. 164-7 § 6.  The AA gave AMP "the exclusive right to administer the Compositions" and "to execute in [Schneider's] name any licenses and agreements affecting the Compositions."  *Id.*  AMP assigned "all its duties" under the AA to Modern Works Music Publishing (MWP), which was a 50% co-owner of AMP.  Dkt. No. 164-6 ¶¶ 2-4.  In 2014, MWP granted YouTube a broad license to compositions "owned or controlled" by MWP via a Publishing License Agreement (PLA).  Dkt. No. 163-3 at 11, § 2(a).  The PLA was said to be the "blanket" license that covered Schneider's musical compositions.

The factual conflicts concerned Schneider's knowledge and authorization of these arrangements.  Schneider stated that she had not been advised about the assignment from AMP to MWP or the existence of the PLA, and that MWP has never been her publisher.  *See* Dkt. No. 222 at 6.  For its part, YouTube proffered emails indicating that MWP "supplied" some of Schneider's songs to YouTube, and royalty summaries showing that Schneider had received payments from YouTube for several of her works.  *Id.* at 7.  YouTube also submitted email communications

between MWP's president and Schneider to show that Schneider knew about the PLA and knew that MWP used Content ID to monitor her works. *Id*. Schneider stated that the communications and royalty statements did not disclose to her the existence of the PLA or MWP's licensing activities. *Id.*

Another subject of intense disagreement between the parties was the validity of the PLA in light of a consent provision in the AA between Schneider and AMP. *Id.* at 7-8. Section 7 of the AA required advance notice and written consent by Schneider for a license of her works. *See* Dkt. No. 164-7 § 7 ("Notwithstanding anything to the contrary expressed or implied herein, we must notify you and obtain your prior written approval for any license we grant on your behalf."). There was no evidence on summary judgment that AMP or MWP notified Schneider or obtained her written consent before MWP executed the PLA with YouTube. Dkt. No. 222 at 8.

Schneider contended that this was fatal to the PLA because under New York law, which governed the AA, Section 7 was a condition precedent to AMP's, and therefore MWP's, power to grant a license to YouTube. *Id.* In Schneider's view, a failure to satisfy the condition precedent negated any licenses ostensibly granted by the PLA. *Id.* YouTube argued that Section 7 was a covenant and not a condition precedent, and so a failure to notify Schneider and obtain her consent might have breached the AA, but did not invalidate the PLA. *Id.* The distinction was critical because the failure to satisfy a condition precedent would mean that "any use by the licensee is without authority from the licensor and may therefore, constitute an infringement of copyright," but the breach of a covenant would give rise only to "a cause of action for breach of contract, not copyright infringement." *Sohm v. Scholastic, Inc.*, 959 F.3d 39, 45 (2d Cir. 2020) (internal quotations omitted).

Determining whether Section 7 was a condition precedent or a covenant required a detailed analysis of other provisions in the AA, comparisons to other contractual terms that have been deemed conditions precedent under New York law, and consideration of the policy goals of federal copyright law. *See* Dkt. No. 222 at 9-12; *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1051 (9th Cir. 2020) ("A copyright license must be construed in accordance with the purposes underlying federal copyright law.") (internal quotation omitted). On the facts in the

record, the Court concluded that Section 7 was a covenant because it did not contain

"'unmistakable language'" in the "'linguistic conventions of condition.'"  Dkt. No. 222 at 9

(quoting *Sohm*, 959 F.3d at 46).  Consequently, a failure to satisfy the notice and consent

provision in Section 7 of the AA would not nullify the PLA.

In the end, a multiplicity of disputes of fact about Schneider's contractual arrangements

and licenses, and related issues, precluded summary judgment.  Dkt. No. 222 at 7.  A jury will

need to resolve these disputes.

YouTube raised another license defense on summary judgment based on its Terms of

Service (TOS).  *Id.* at 13.  The TOS grant a broad license to YouTube for content uploaded by

users, and the record established that users must agree to the TOS when creating an account or

uploading a video.  *Id.*; Dkt. No. 164-5 § 6(C).  YouTube argued it was entitled to summary

judgment on more than 100 of Schneider's infringement claims because she and her agents

uploaded several of her works-in-suit to YouTube.  Dkt. No. 222 at 13.

This question was properly resolved on summary judgment because the record established

that Schneider created a YouTube account in 2012, and that at least 15 of her works-in-suit were

included in videos that she and third parties acting with her permission uploaded to YouTube.  *Id.*

at 13-15.  Summary judgment was granted in favor of YouTube for Schneider's direct

infringement claims based on those works.  *Id.* at 15.

YouTube also asked for summary judgment on the grounds that many of the alleged

infringing videos Schneider identified were time-barred by a one-year limitations period in the

TOS.  *Id.*; Dkt. No. 164-5 § 14.  The record did not support Schneider's suggestion that the

contractual limitations period was unconscionable, and her interrogatory responses established that

she had actual knowledge of 121 alleged infringing videos more than one year before she filed

suit.  *See* Dkt. No. 222 at 16-20.  Summary judgment was granted for YouTube on the 121

untimely alleged infringements.  *Id.* at 20.  The parties agreed that Schneider had not identified

any infringements of 27 of her works-in-suit, and so summary judgment was granted in favor of

YouTube for those works.  *Id.* at 4 n.2.

Material disputes of fact again precluded summary judgment on Schneider's claims with respect to CMI under Section 1202(b) of the DMCA. The parties presented conflicting evidence on whether Schneider had identified any works-in-suit for which CMI had been removed, whether she and her agents use CMI to monitor infringement, and whether she had adduced evidence of scienter as required by the statute. *See id.* at 21-22.

Although the claims of plaintiffs Uniglobe and AST were not challenged on summary judgment, the parties' filings indicate that they have their own factual disputes about ownership and licenses akin to Schneider's. The FAC alleges that Uniglobe owns copyrights to motion pictures, *see* Dkt. No. 99 ¶¶ 66-69, but Uniglobe subsequently stated the allegations were "not entirely correct" because the copyright registrations were for dramatic works and screenplays. Dkt. No. 268-35 at 54:4-57:11, 66:5-20 (deposition testimony of Uniglobe's CEO). Uniglobe also stated that it owns its works-in-suit through transfers of ownership rights and work-for-hire agreements. Dkt. No. 268-33 at ECF p. 5 (Uniglobe's amended interrogatory responses). Although the takedown notices that Uniglobe submitted to YouTube identified "Uniglobe Entertainment" as the owner of the works, Uniglobe's representative could not say whether the plaintiff entity, Uniglobe Entertainment LLC (Wyoming), or the separate entity Uniglobe Entertainment LLC (Delaware), owned the works. *See* Dkt. No. 268-35 at 77:6-10, 93:6-94:16; *see also* Dkt. No. 248-22 (takedown notice identifying "Uniglobe Entertainment" as the copyright owner). Uniglobe identified more than 60 YouTube videos uploaded by Uniglobe or its agents that contain parts of its works-in-suit, and more than 50 licensing agreements that cover its works-in-suit, including multiple licenses that permit sub-licensing. Dkt. No. 268-33 at ECF pp. 9-14, Ex. A.

AST's situation is similarly convoluted. AST originally asserted infringement claims for print and audio books, Dkt. No. 99 ¶¶ 75-76, but stated later that "only the audiobook versions of the Works in Suit are at issue." Dkt. No. 268-34 at ECF p. 5 (letter clarifying AST's interrogatory responses). AST also said that it obtained ownership of its works-in-suit through "agreements with the authors and/or agents of the authors," and that it uploaded and authorized others to upload clips of its works-in-suit to YouTube. Dkt. No. 268-37 at 4, 7 (AST's interrogatory responses).

United States District Court
Northern District of California

1   Plaintiffs ask to certify four classes under Rule 23(b)(3).  *See* Dkt. No. 243-1.  The first

2   proposed class is a "Registered Works Infringement Class" (Registered Works class), to be

3   represented by Uniglobe and Schneider.  *Id.* at 3.  It is defined as "[a]ll persons who own

4   copyrights in one or more works:  1) registered with the United States Copyright Office; 2)

5   contained or used in a video that was displayed on YouTube and then removed from YouTube due

6   to a successful Takedown Notice; and 3) contained or used in a video that was displayed on

7   YouTube subsequent to the first successful Takedown Notice and then removed from YouTube as

8   a result of either a second successful Takedown Notice made on or after July 2, 2019, or an

9   allegation of infringement made in a court of law on or after July 2, 2019."  *Id.*

10   The second proposed class is a "Foreign Unregistered Works Infringement Class" (Foreign

11   Works class), to be represented by Uniglobe and AST.  *Id.*  It is defined as "[a]ll persons who own

12   copyrights in one or more works:  1) first published outside the United States; 2) contained or used

13   in a video that was displayed on YouTube and then removed from YouTube due to a successful

14   Takedown Notice; and 3) contained or used in a video that was displayed on YouTube subsequent

15   to the first successful Takedown Notice and then removed from YouTube as a result of either a

16   second successful Takedown Notice made on or after July 2, 2019, or an allegation of

17   infringement made in a court of law on or after July 2, 2019."  *Id.*

18   The third proposed class is an "International Standard Recording Code Class" (ISRC

19   class), to be represented by Schneider.  *Id.*  It is defined as "[a]ll persons who own copyrights in

20   one or more digital form sound recordings of musical works that:  1) has been assigned an

21   International Standard Recording Code ('ISRC'); and 2) was a component of a video that was

22   uploaded to YouTube that (a) did not include the assigned ISRC and (b) was removed from

23   YouTube as a result of either a successful Takedown Notice made on or after July 2, 2019, or an

24   allegation of infringement made in a court of law on or after July 2, 2019."  *Id.* at 3-4.

25   The fourth proposed class is a "Clip Filename Class" (CLFN class), again to be

26   represented by Schneider.  *Id.* at 4.  It is defined as "[a]ll persons who own copyrights in one or

27   more works that:  (1) had an associated Clip Filename ('CLFN') field populated with copyright

28   management information ('CMI') and (2) was contained in a video uploaded to YouTube (a)

7

1    either without the associated CMI metadata or with the CMI metadata altered and (b) that was

2    removed from YouTube as a result of either a successful Takedown Notice made on or after July

3    2, 2019, or an allegation of infringement made in a court of law on or after July 2, 2019." *Id*. at 4.

4                                        **DISCUSSION**

5    **I.      LEGAL STANDARDS**

6            The overall goal of Rule 23 is "to select the method best suited to adjudication of the

7    controversy fairly and efficiently." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455,

8    460 (2013) (cleaned up).  "The class action is 'an exception to the usual rule that litigation is

9    conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*,

10   569 U.S. 27, 33 (2013) (citation omitted).

11          Plaintiffs bear the burden of proving by a preponderance of the evidence that the proposed

12   classes satisfy all four requirements of Rule 23(a) and at least one of the subsections of Rule

13   23(b).  *Id.*; *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664-65

14   (9th Cir. 2022) (en banc), *cert. denied*, 143 S. Ct. 424 (2022).  The Court's analysis "must be

15   rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," but the

16   merits are to be considered only to the extent that they are "relevant to determining whether the

17   Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 465-66 (internal

18   quotations and citations omitted).  The class certification procedure is decidedly not an alternative

19   form of summary judgment or an occasion to hold a mini-trial on the merits. *Alcantar v. Hobart*

20   *Serv.*, 800 F.3d 1047, 1053 (9th Cir. 2015).  The decision of whether to certify a class is entrusted

21   to the sound discretion of the district court. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1186

22   (9th Cir. 2001).

23          Under Rule 23(b)(3), a class is appropriate when "questions of law or fact common to class

24   members predominate over any questions affecting only individual members," and a class action is

25   "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed.

26   R. Civ. P. 23(b)(3).  Each of the four required elements of Rule 23(a) -- numerosity, commonality,

27   typicality, and adequacy -- must also be established.

28

*United States District Court*
*Northern District of California*

8

The commonality requirement of Rule 23(a)(2) is satisfied when there are "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Because "any competently crafted class complaint literally raises common questions," the Court's task is to look for a common contention "capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Alcantar*, 800 F.3d at 1052 (internal quotations omitted).  What matters is the "capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotations omitted) (emphasis in original).  This does not require total uniformity across a class.  "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1019 (9th Cir. 1998), *overruled on other grounds by Dukes*, 564 U.S. 338.  The commonality standard imposed by Rule 23(a)(2) is "rigorous." *Leyva v. Medline Indus. Inc*., 716 F.3d 510, 512 (9th Cir. 2013).

Rule 23(b)(3) sets out the related but nonetheless distinct requirement that common questions of law or fact predominate over individual ones.  Fed. R. Civ. P. 23(b)(3).  This inquiry focuses on "'whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Olean*, 31 F.4th at 664 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).  Each element of a claim need not be susceptible to classwide proof, *Amgen*, 568 U.S. at 468-69, and the "important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Torres v. Mercer Canyons Inc*., 835 F.3d 1125, 1134 (9th Cir. 2016).  Rule 23(b)(3) permits certification when "one or more of the central issues in the action are common to the class and can be said to predominate," even if "other important matters will have to be tried separately, such as damages or some affirmative defenses particular to some individual class members." *Tyson Foods*, 577 U.S. at 453 (internal quotations omitted).

United States District Court
Northern District of California

9

"Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," *Comcast*, 569 U.S. at 34. "If the defendant provides evidence that a valid defense -- affirmative or otherwise -- will bar recovery on some claims," then the Court must "determine, based on the particular facts of the case, 'whether individualized questions … will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3).'" *Van v. LLR, Inc.*, 61 F.4th 1053, 1067 (9th Cir. 2023) (quoting *Olean*, 31 F.4th at 669). "The question is not whether a great number of plaintiffs will win or lose at trial on the individualized issue." *Id.* at 1067 n.11. Rather, the Court "must assess the necessity and manageability of the potential class-member-by-class member discovery process and trial." *Id.* Individualized issues "weigh heavy in the predominance balancing" if discovery and trial "must assess thousands of claims one claim at a time." *Id.*; *see also Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 458, 469 (9th Cir. 2023) (decertifying class where trial of individualized issues would be "prohibitively cumbersome," and plaintiffs did not prove that class issues predominated).

The "requirements of Rule 23(b)(3) overlap with the requirements of Rule 23(a)" and "courts must consider cases examining both subsections in performing a Rule 23(b)(3) analysis." *Olean*, 31 F.4th at 664. The Court finds it appropriate to assess commonality and predominance in tandem, with a careful eye toward ensuring that the specific requirements of each are fully satisfied. *See, e.g., Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120-21 (9th Cir. 2017).

It has been said that "copyright claims are poor candidates for class-action treatment," and for good reason. *Football Ass'n Premier League Ltd. v. YouTube, Inc.*, 297 F.R.D. 64, 65 (S.D.N.Y. 2013). Every copyright claim turns "upon facts which are particular to that single claim of infringement, and separate from all the other claims." *Id.* at 66. Every copyright claim is also subject to defenses that require their own individualized inquiries. *See, e.g., Kihn v. Bill Graham Archives LLC*, No. 20-17397, 2022 WL 18935, at *2 (9th Cir. Jan. 3, 2022) (unpublished) (reversing certification of a copyright class action because "individual issues of license and consent would predominate for the absent class members, who have not yet had the opportunity Plaintiffs had to sift through their claims and exclude those that lack merit"). A claim of copyright infringement typically entails a fact-specific evaluation of "the objective similarities of specific

10

expressive elements in the two works" that distinguishes "between the protected and unprotected material in a plaintiff's work," and tests "for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance." *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (en banc) (internal quotations omitted).

This is not to say that certification of a copyright infringement class is per se impossible. The Court certainly does not hold that here. But these factors underscore the challenges that plaintiffs face in seeking to obtain class certification.

## II.    THE REGISTERED WORKS AND FOREIGN WORKS CLASSES

The usual approach to class certification is to march through the Rule 23 factors in statutory order, starting with the requirements of Rule 23(a). A different organization is warranted for this copyright case. Plaintiffs face overwhelming problems with commonality and predominance that in themselves bar certification. Consequently, it makes sense to start the analysis with these dispositive issues. The other Rule 23 factors will be discussed in closing. *See McCarty v. SMG Holdings, I, LLC*, No. 17-cv-06232-JD, 2022 WL 913092, at *7 (N.D. Cal. Mar. 29, 2022) ("Because the factors the Court has discussed are sufficient to support the denial of the pending class certification request in its entirety, the Court declines to discuss the remaining Rule 23 factors."); *see also Waite v. UMG Recordings, Inc.*, No. 19-CV-01091 (LAK), 2023 WL 1069690 (S.D.N.Y. Jan. 27, 2023) (denying certification of a putative copyright class action on commonality and predominance grounds alone).

All of the class definitions proposed by plaintiffs, including those with respect to CMI, are based on a shared element: persons who own copyrights in one or more works. Dkt. No. 243-1 at 3-4. Ownership of a copyright is an essential predicate for these claims, *see Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991), just as the existence of a license or other permission to use the works is an essential defense against them, *Great Minds*, 945 F.3d at 1110; *see also* 17 U.S.C. § 1202(b) (prohibiting removal or alteration of CMI "without the authority of the copyright owner or the law," or distribution of such works).

Consequently, all of the proposed classes may be evaluated for Rule 23 purposes on the threshold question of whether plaintiffs can demonstrate copyright ownership on a classwide

United States District Court
Northern District of California

United States District Court
Northern District of California

basis, or whether issues of ownership and licenses will entail individualized proof that precludes certification.  YouTube's main argument against certification of each of the proposed classes is that proof of ownership and licensing will necessarily require individualized evidence for each claimant, as the named plaintiffs' own circumstances indicate.  *See* Dkt. No. 268 at 7-21. Plaintiffs say these questions can be answered on a classwide basis by leveraging takedown notices and other evidence in YouTube's possession.  *See* Dkt. No. 243-1.

The proposed infringement classes are a bellwether test of certification, and so will be taken up first.  "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).  The elements of direct copyright infringement are "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist Publ'ns*, 499 U.S. at 361.

For a claim of contributory copyright infringement, a plaintiff "must establish that there has been direct infringement by third parties" as a threshold matter.  *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1169 (9th Cir. 2007).  Liability for contributory infringement also requires proof that a defendant "'(1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement.'"  *VHT, Inc. v. Zillow Grp., Inc.,* 918 F.3d 723, 745 (9th Cir. 2019) (quoting *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007)).  In the online context, material contribution means the defendant "'has *actual* knowledge that *specific* infringing material is available using its system, and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works.'"  *Id*. (quoting *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 671 (9th Cir. 2017)) (emphasis in original).  "Inducement liability requires evidence of 'active steps … taken to encourage direct infringement,'" such as "'advertising an infringing use or instructing how to engage in an infringing use.'"  *Id*. (quoting *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005)).

Vicarious copyright infringement also requires a gateway showing of direct infringement by a third party.  *See Amazon*, 508 F.3d at 1173.  In addition, a plaintiff must demonstrate that a

defendant: "'has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity.'"  *VHT*, 918 F.3d at 746 (quoting *Giganews*, 847 F.3d at 673).  A key component of vicarious liability is evidence that the defendant had the practical and technical ability to identify or screen out infringing material, but did not do so.  *Id*.  A failure to change operations to avoid distribution of infringing content "'is not the same as declining to exercise a right and ability'" to stop direct infringement by others.  *Id*. (quoting *Amazon*, 508 F.3d at 1175).

### A.      The DMCA Takedown Procedures Do Not Supply Classwide Proof.

For the proposed Registered Works and Foreign Works classes, plaintiffs say that "nearly every element of every claim and affirmative defense will be established through common evidence."  Dkt. No. 243-1 at 5.  This common evidence is said to be "successful" takedown notices, meaning a takedown notice under the DMCA that resulted in the removal of the allegedly infringing content by YouTube, or the blocking of access to it.  *See* 17 U.S.C. § 512(c)(3); Dkt. No. 243-1 at 10.  Plaintiffs say a takedown establishes copyright ownership, registration, infringement, and the absence of affirmative defenses, "because YouTube admits it reviews such notices to ensure they are complete and valid and relies on them to remove content and issue copyright strikes."  Dkt. No. 243-1 at 7.[1]

The problem with this approach is that the takedown of content in response to a DMCA notice is miles away from substantive proof of copyright ownership or infringement.  The takedown procedure is part of the safe harbor provisions that Congress established in the DMCA to allow online service providers like YouTube to manage their risks with respect to infringing materials posted by users.  *See* 17 U.S.C. § 512(a)-(d); *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 603-04 (9th Cir. 2018).  A service provider may avoid infringement liability if it "responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity," upon receipt of a valid takedown notice that makes a claim of infringement pursuant to the DMCA's procedural requirements.  17 U.S.C.

---

[1] This is in some tension with the FAC, which expressly criticized YouTube's "rudimentary tools" with respect to "the takedown notification process."  Dkt. No. 99 ¶ 14.

§ 512(c)(1)(C); *see also Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1151 (9th Cir. 2016) (same).[2]  A failure to promptly remove or disable access in response to a valid takedown notice forfeits the protection of the safe harbor.  *Ventura Content*, 885 F.3d at 604 ("[T]he service provider, to maintain its shield, must respond expeditiously and effectively to the policing."); *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 37 (2d Cir. 2012) (service provider "who receives a takedown notice from a copyright holder is *required* to 'remove, or disable access to, the material' in order to claim the benefit of the safe harbor") (citation omitted) (emphasis in original).

To preserve the protections of the safe harbor, a service provider must also give the user an opportunity to respond to a takedown under the DMCA's "put-back procedures."  *Lenz*, 815 F.3d at 1151.  These procedures are codified in Section 512(g) of the DMCA and require the service provider to give notice of the takedown to the user, and allow the user an opportunity to restore the content by sending a counternotification to the effect that the takedown was in error.  *See* 17 U.S.C. § 512(g); *Lenz*, 815 F.3d at 1151.  When a valid counternotification is received, the service provider must then advise the copyright holder of the response, and must restore the content "not less than 10, nor more than 14 business days" thereafter, unless the service provider is given notice that the copyright holder has filed an infringement lawsuit in court against the user.  *Lenz*, 815 F.3d at 1151 (quoting 17 U.S.C. § 512(g)(2)(B)-(C)).

As these plainly worded statutory provisions demonstrate, the DMCA does not contemplate that a takedown of content is a substantive determination of copyright ownership or infringement.  An adjudication of those questions is expressly reserved for the courts in a lawsuit filed by the copyright claimant, with the attendant judicial scrutiny of ownership and "the objective similarities of specific expressive elements in the two works" to determine infringement liability.  *Skidmore*, 952 F.3d at 1064.  Irrespective of the takedown procedures, a copyright holder always retains the burden of establishing infringement.  *See UMG Recordings, Inc. v. Shelter Cap. Partners, LLC*, 718 F.3d 1006, 1022 (9th Cir. 2013).  A service provider retains all defenses to infringement, even if it did not act in a manner to preserve the benefits of the safe harbor.  *See* 17

---

[2] A valid notice must be signed under penalty of perjury, identify the copyrighted work and the alleged infringing use, and provide other information as stated in 17 U.S.C. § 512(c)(3).

United States District Court
Northern District of California

U.S.C. § 512(l) ("The failure of a service provider's conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense."); *see also* 4 Nimmer on Copyright § 12B.04 (the "penalty" for failing to remove or disable access to material in response to a takedown notice "is not automatic liability -- instead, the service provider simply loses the benefit of the safe harbor that Section 512 affords.") (citations omitted).

Consequently, a takedown under the DMCA indicates only an allegation of infringement. The allegation may be a strong one, *see UMG*, 718 F.3d at 1020, but in the end it is "only a *claim* of infringement," *id.* at 1020 n.12 (emphasis in original); *see also* 17 U.S.C. § 512(c)(3)(ii) (takedown notice must identify "the copyrighted work *claimed* to have been infringed") (emphasis added). The claim is subject to termination by operation of the statute unless the copyright claimant files a lawsuit in court to stop the restoration of access to the accused use. It is true that a takedown notice must be made under penalty of perjury, 17 U.S.C. § 512(c)(3)(vi), but that does not make it more than an allegation, just as the requirement that a counternotification must be made under penalty of perjury does not make it dispositive of non-infringement, *id.* § 512(g)(3)(C). It bears mention that Congress anticipated the possibility of fraudulent takedown notices by providing for an award of damages and attorneys' fees to a user who was wrongly accused of infringement. *Id.* § 512(f).

Plaintiffs try to overcome the provisional nature of takedowns by contending that YouTube "vets" every takedown notice to ensure "the Takedown Notice author's rights are superior to the uploader's rights" before removing a video. Dkt. No. 243-1 at 10. In effect, plaintiffs suggest that YouTube actually adjudicates copyright claims in response to a takedown notice, and expresses a substantive conclusion about ownership, infringement, and defenses every time it removes or blocks access to a video.

The record demonstrates otherwise. YouTube receives millions of DMCA takedown notices annually. *See* Dkt. No. 248-8 at 5 (YouTube Copyright Transparency Report showing that approximately two million removal requests were submitted via YouTube's webform in the first

1    half of 2022); Dkt. No. 325 at 23:11-24 (certification hearing transcript).  To handle this volume,

2    YouTube relies primarily on an automated process in the first instance to review notices for

3    conformance to the DMCA's procedural requirements.  *See, e.g.*, Dkt. No. 243-12 at 45:10-13,

4    46:11-24 (YouTube copyright review manager testifying that an automated "classifier" assesses

5    takedown notices for "completeness on the basis of the DMCA statutory requirements"); *see also*

6    Dkt. No. 268-2 ¶¶ 2-3 (YouTube declaration stating that "YouTube uses a largely automated

7    process to review each notice to determine whether they contain the information and

8    representations required for a DMCA notice").

9         YouTube's copyright operations team and contractors manually review takedown notices

10   in limited situations.  *See, e.g.*, Dkt. No. 243-12 at 46:22-24 ("[I]f the classifier is uncertain that

11   one of these requirements has been met, then it will route it for a human to take a look at.").

12   Human review typically is reserved for checking whether the notices contain the information

13   required by the DMCA and screening out suspicious and facially invalid notices.  *Id.* at 47:8-10.

14        On occasion, YouTube may contact the sender of a takedown notice and engage

15   YouTube's legal counsel on questions of fair use and the like.  *Id*. at 62:18-25, 63:4-5 (YouTube

16   may "ask the claimants to consider fair use and respond back to us with more detail about why

17   they believe the content that they are targeting for removal does not qualify under a copyright

18   exception such as fair use").  Contacts with legal counsel are infrequent in light of the volume of

19   takedown notices.  *Id.* at 60:4-21 (estimating approximately 50 to 100 monthly contacts with legal

20   counsel about fair use).

21        Overall, this record demonstrates that YouTube "vets" takedown notices to ensure that

22   they comply with the DMCA's procedural requirements, but does not make a substantive

23   determination of copyright ownership, infringement, or defenses.  For the most part, YouTube

24   uses an automated process to handle DMCA notices.  To the extent follow-up work is pursued, it

25   is limited to a fraction of the notices received and involves inquiries into highly individualized

26   issues like fair use.  The same goes for YouTube's handling of counternotifications from users

27   contesting a takedown.  *See id.* at 111:18-24 ("So when the YouTube review team -- copyright ops

28   review team reviews the counter-notification, we are checking to see whether the counter is valid

United States District Court
Northern District of California

on its face and meets the requirements of the DMCA and otherwise would be fine to forward to the claimant to -- to initiate the counter process which is described by statute.").

There are other reasons why takedowns are doubtful sources of classwide proof.  Consider the situation of plaintiff AST.  YouTube noted that none of the takedown notices submitted for works ostensibly owned by AST actually identified or even mentioned AST.  *See* Dkt. Nos. 244-17, 244-18, 244-19, 244-20, 244-21 (identifying a Russian name "АЗАПИ").  Plaintiffs say this is "misleading" because АЗАПИ is AZAPI in English, and other documents show that AZAPI was authorized to submit notices on AST's behalf through YouTube's content verification program.  *See* Dkt. No. 271-1 at 5 n.4.  Even if that were the case, the salient point is that it took plaintiffs multiple steps through language translation and documents to get to their ownership claim on behalf of a named plaintiff.  Plaintiffs have not demonstrated that anything less will be required for the claims of absent class members.

Consequently, reliance on takedown procedures will not provide classwide proof of copyright ownership, infringement, or defenses.  Plaintiffs have not demonstrated that these "central issues in the action" are subject to common evidence, and so the Registered Works and Foreign Works classes cannot be certified.[3]  *Tyson Foods*, 577 U.S. at 453 (internal quotation omitted).  This conclusion applies to all of the infringement claims, whether direct or indirect.  *See Amazon,* 508 F.3d at 1169 (contributory and vicarious copyright infringement liability require proof of an underlying act of direct infringement as a threshold matter).

Plaintiffs' mention of two cases that certified copyright classes does not lead to a different outcome.  In *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-5693 PSG (RZx), 2015 WL 4776932 (C.D. Cal. May 27, 2015), a copyright class was certified where the defendant admitted that it had used the works "without first seeking licenses or paying royalties," and the record did not demonstrate that "contentious ownership inquiries" would arise.  *Id.* at *11-12.  In *In re Napster, Inc. Copyright Litig.*, Nos. C MDL-00-1369 MHP, C 04-1671 MHP, 2005 WL 1287611

---

[3] This conclusion also relates to plaintiffs' lengthy discussion in their brief that YouTube's affirmative defenses, including eligibility for the DMCA safe harbor in 17 U.S.C. § 512, may be established with common evidence.  *See* Dkt. No. 243-1 at 16-20.  The absence of common proof of liability makes the question of common proof of defenses beside the point.

(N.D. Cal. June 1, 2005), a class was certified for a single notice of infringement on behalf of copyright owners who retained a single agent as their "common licensing and collection agent." *Id*. at *4-5.  The streamlined circumstances that gave rise to certification in those cases are a far cry from the factually contested issues of ownership and licensing here, and so the cases do not offer a basis for certification of the classes plaintiffs propose.

### B.        Individualized Questions Predominate.

Without a viable method of classwide proof, plaintiffs' infringement claims will necessarily require highly individualized inquiries into the merits.  The question of a license is a good example of this.  There can be no infringement of a copyrighted work if the challenged use falls within the scope of a valid license.  *Great Minds*, 945 F.3d at 1110.  Consequently, whether YouTube has a license for a particular work will be a matter of intense inquiry at trial.

As the record for plaintiff Schneider demonstrates, the answer to this inquiry will depend upon facts and circumstances unique to each work and copyright claimant.  YouTube's assertion of a license on summary judgment raised a flurry of factual and legal disputes about whether Schneider had actually granted licensing authority to a publisher.  *See* Dkt. No. 222 at 4-13.  The disputes prompted the filing of a mountain of evidence and arguments by the parties, and necessitated a close reading of multiple contracts.  *Id.*  Even then, the Court concluded that the license defense entailed disputes of material fact that a jury will need to decide.  *Id.* at 7.

So too for plaintiffs Uniglobe and AST, who have their own factual complications with respect to whether YouTube has a license under the TOS or otherwise to works these plaintiffs uploaded themselves.  *See, e.g.*, Dkt. No. 268-33 at ECF pp. 9-14, Ex. A (Uniglobe granted approximately 60 licenses for its works-in-suit, and uploaded or authorized its agents to upload some of its works-in-suit to YouTube); Dkt. No. 268-37 at 7 (AST and its authorized agents uploaded portions of audiobooks to YouTube, including its works-in-suit).

As other courts have aptly concluded, such "individual issues of license" in themselves typically preclude certification of copyright class actions under Rule 23(b)(3).  *Kihn*, 2022 WL 18935, at *2; *see also Palmer Kane LLC v. Scholastic Corp.*, No. 11 Civ. 7456(KBF), 2012 WL 2952898, at *7 (S.D.N.Y. July 16, 2012).  Plaintiffs have not demonstrated otherwise here.

United States District Court
Northern District of California

Plaintiffs suggest that YouTube "can cross-reference the ISRCs and other required CMI in YouTube's database against that information for the copyrighted work claimed by a class member" to establish whether a direct license exists.  Dkt. No. 243-1 at 13.  Even accepting this as true for present purposes, the approach might work as a first cut, but as the record for Schneider demonstrates, a grant of a license may be much more complicated and disputed than surface appearances indicate.  *See* Dkt. No. 222 at 4-13; *see also Spinelli v. Nat'l Football League*, 903 F.3d 185, 203 (2d Cir. 2018) ("[I]f a sublicensor has no right to issue a particular license, the sublicensee cannot acquire rights in copyrighted works simply because the sublicensor did so anyway.").  Plaintiffs have not demonstrated that a database cross-check will provide a clear-cut answer to the question of licenses on a classwide basis.

## III.   THE ISRC AND CLFN CLASSES

Plaintiffs' requests to certify the proposed ISRC and CLFN classes are equally unavailing. These classes are based on the CMI provisions of Section 1202(b) of the DMCA.  Section 1202(b)(1) provides that "[n]o person shall, without the authority of the copyright owner or the law … intentionally remove or alter" CMI "knowing" or "having reasonable grounds to know, that it will induce, enable, facilitate, or conceal" infringement.  17 U.S.C. § 1202(b)(1).  Section 1202(b)(3) provides that "[n]o person shall, without the authority of the copyright owner or the law," distribute or perform works "knowing that [CMI] has been removed or altered without authority of the copyright owner or the law," and "knowing" or "having reasonable grounds to know, that it will induce, enable, facilitate, or conceal" infringement.  *Id.* § 1202(b)(3).

As this plain language states, the predicate of a claim under either prong of Section 1202(b) is that CMI was removed or altered without a copyright owner's permission. Consequently, the ISRC and CLFN classes share with the Registered Works and Foreign Works classes the threshold element of copyright ownership.  *See* Dkt. No. 243-1 at 3-4.  In the opening brief for certification, plaintiffs did not say how they might establish ownership for the ISRC or CLFN classes with common evidence.  In a reply brief, they made a somewhat offhand mention of an intention to use again the takedown procedures as common proof of ownership for the ISRC class, *see* Dkt. No. 271-1 at 12, but said nothing with respect to the CLFN class.  Plaintiffs made

1    no other proposals for determining copyright ownership for either class on a common basis.

2    Giving plaintiffs every benefit of the doubt by assuming they proposed to rely on takedown

3    notices for both classes, the takedown approach works no better here than it did for the

4    infringement classes.  This is enough to deny certification of the ISRC and CLFN classes.

5        The scienter requirement in Section 1202(b) also weighs against certification.  As the

6    frequent use of "knowing" conveys, the statute puts an emphasis on scienter as an element of

7    liability.  Some courts have found a "double-scienter" requirement in Section 1202(b).  *See, e.g.*,

8    *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 171 (2d Cir. 2020).  What matters here is our circuit's

9    conclusion that, for both subsections (b)(1) and (b)(3), a plaintiff must prove that the defendant

10    possessed "the mental state of knowing, or having a reasonable basis to know, that his actions

11    'will induce, enable, facilitate, or conceal' infringement."  *Stevens v. Corelogic, Inc.*, 899 F.3d

12    666, 673 (9th Cir. 2018).

13        This scienter element demands specific proof.  A "generic" assertion that a "general

14    possibility" of infringement exists because CMI was removed "won't wash."  *Id.*  "[A] plaintiff

15    bringing a Section 1202(b) claim must make an affirmative showing, such as by demonstrating a

16    past 'pattern of conduct' or 'modus operandi,' that the defendant was aware or had reasonable

17    grounds to be aware of the probable future impact of its actions."  *Id.* at 674.  This entails

18    "evidence from which one can infer that future infringement is likely, albeit not certain, to occur

19    as a result of the removal or alteration of CMI."  *Id.* at 675.

20        Cases that discuss Section 1202(b) in the summary judgment context illustrate the type of

21    evidence sufficient to prove scienter.  In *Stevens,* for example, two photographers brought a

22    putative class action against a defendant that developed software used by online real estate

23    services.  *Id.* at 670.  The software automatically stripped photographs of CMI metadata during the

24    uploading process without the copyright holders' authorization.  *Id.* at 671.  As a result, the

25    photographers alleged that the defendant had violated Sections 1202(b)(1) and (3).  *Id.* at 672.

26        The Ninth Circuit affirmed the district court's grant of summary judgment for the

27    defendant.  *Id.* at 670.  To establish scienter, each plaintiff was required to make an "[a]ffirmative

28    [s]howing" with "specific evidence that removal of CMI metadata" from their copyrighted works

United States District Court
Northern District of California

"will impair their policing of infringement." *Id.* at 675.  The photographers did not prove this because they had no evidence that they "ever used CMI metadata to prevent or detect copyright infringement" and identified "*no* instance in which the removal of CMI metadata from any photograph 'induce[d], enable[d], facilitate[d], or conceal[ed] an infringement.'"  *Id.* (emphasis and alterations in original).  In the one instance where the defendant removed a photograph in response to a DMCA takedown notice, there was no evidence that the claimant "used metadata to identify the allegedly infringing copies, that her photograph even contained metadata, or that the infringement identified had anything to do with removal or alteration of metadata."  *Id.* at 676 n.6.

In *Victor Elias Photography, LLC v. Ice Portal, Inc.*, the Eleventh Circuit reached a similar outcome in another case where a photographer alleged Section 1202(b) claims against a defendant whose software automatically removed CMI metadata from photographs before they were posted online.  43 F.4th 1313, 1315-16 (11th Cir. 2022).  The Eleventh Circuit affirmed the district court's grant of summary judgment for the defendant.  *Id.* at 1316.  Although the record established that the photographer used CMI to police infringement and had identified specific infringements of his works with missing CMI, there was "no evidence linking [the defendant's] actions of removing the photographs' CMI with the instances of infringement."  *Id.* at 1323.  The photographer had no evidence of where or how the infringing works were copied, and so could not show that the infringements occurred because the defendant's software removed CMI from his works.  *Id.* at 1324-25.  The circuit concluded that the photographer had not shown an "identifiable connection between the defendant's actions and the infringement or the likelihood of infringement" necessary to establish the scienter element of Section 1202(b).  *Id.* at 1325.

Neither *Stevens* nor *Victor Elias* should be read as imposing exacting requirements of certain types of evidence to prove scienter for a Section 1202(b).  To the contrary, both cases noted the possibility that a wide range of evidence might do the job.  *See Stevens*, 899 F.3d at 675; *Victor Elias*, 43 F.4th at 1323.  But they nonetheless inform the Rule 23 question here in that they underscore the individualized showing that each ISRC and CLFN class member would need to make to prove the Section 1202(b) claims.  To satisfy the statute's scienter element, each putative class member would need to show, with specific evidence for each work-in-suit, how the removal

of an ISRC or CLFN induced, enabled, facilitated, or concealed an identifiable infringement of that work.

This requirement raises obvious barriers to classwide proof, as illustrated by the individualized disputes of fact that precluded summary judgment on Schneider's CMI claims. *See* Dkt. No. 222 at 21-22. Plaintiffs again have not demonstrated that "common, aggregating-enabling, issues" with respect to the scienter element of Section 1202(b) are "more prevalent or important the non-common, aggregation-defeating, individual issues." *Olean*, 31 F.4th at 664 (internal quotation omitted).

Another barrier to certification for the ISRC class is that Schneider, who was identified as the representative claimant for the class, does not have a work-in-suit that fits the class definition. The ISRC class is defined as "persons who own copyrights in one or more *digital form sound recordings* of musical works." Dkt. No. 243-1 at 3 (emphasis added). It does not include persons who own copyrights in the musical compositions underlying those recordings. *Id.* "It is well settled that '[s]ound recordings and musical compositions are separate works with their own distinct copyrights,'" *Williams v. Gaye*, 895 F.3d 1106, 1121 (9th Cir. 2018) (citation omitted and alteration in original), and a copyright in the composition does not automatically give the owner a copyright in a sound recording of it, *see Newton v. Diamond*, 388 F.3d 1189, 1191 (9th Cir. 2004).

The problem for Schneider is that her works-in-suit do not include sound recordings. She initially alleged ownership and infringement of two copyrighted sound recordings: *VIKINGS ANTHEM* and *Concert in the garden*. *See* Dkt. No. 99 ¶ 60 n.7; Dkt. No. 268-19 at 5-6 (interrogatory response). The other 76 works-in-suit she alleged were all copyrighted musical compositions. *Id.* Summary judgment was granted in favor of YouTube for both of the sound recordings. The record did not demonstrate that *VIKINGS ANTHEM* had been infringed, *see* Dkt. No. 222. at 4 n.2, and the alleged infringements of *Concert in the garden* were time-barred, *id.* at 20. The Court directed the parties to jointly file "a numbered list of Schneider's remaining works-in-suit and infringement claims" following summary judgment. *Id.* at 23. *VIKINGS ANTHEM* and *Concert in the garden* are not on the list. Dkt. No. 232. In effect, plaintiffs agreed that Schneider's remaining works-in-suit do not include any sound recordings.

Plaintiffs suggest that there may be ISRCs associated with other recordings of Schneider's works, *see, e.g.,* Dkt. No. 271-1 at 11-12; Dkt. No. 271-10 at 14-18; but that is of no moment here. She did not allege ownership or infringement of those sound recordings separate from the underlying compositions, and so she does not have a work-in-suit that fits the proposed ISRC Class definition.  *See* Dkt. No. 99 ¶ 60 n.7; Dkt. No. 268-19 at 5-6.  Consequently, Schneider is not a typical or adequate representative of the putative ISRC class.  *See* Fed. R. Civ. P. 23(a)(3)-(4); *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018) ("A named plaintiff must be a member of the class she seeks to represent").

## IV.     OTHER RULE 23(A) ELEMENTS

Given the shortfall on commonality and predominance, a detailed discussion of the other Rule 23(a) elements is not particularly called for.  Even so, the Court makes the ensuing observations.

### A.     Numerosity (23(a)(1))

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  In most cases, numerosity is readily established.  Here, the question is more nuanced.  In the absence of a classwide method of establishing copyright ownership and infringement, it is difficult to estimate numerosity with any degree of precision. The commonality and predominance concerns discussed above indicate that a headcount for the classes would require individual inquires into the merits.  While it is true that ascertainability is not an element of certification in our circuit, *see Briseno v. ConAgra Foods*, 844 F.3d 1121, 1131 (9th Cir. 2017), numerosity should be established by something more than a good guess.  *See, e.g., Mays v. Wal-Mart Stores, Inc.*, 804 F. App'x 641, 642 (9th Cir. 2020) (unpublished) ("bare assertions of numerosity without any clear factual grounding" and speculative expert testimony did not support a finding of numerosity).

Plaintiffs came rather close to doing just that by saying that numerosity must exist because YouTube hosts billions of videos and receives millions of takedown notices annually.  *See* Dkt. No. 271-1 at 3; Dkt. No. 244-12; Dkt. No. 248-8 at 5.  They dressed this up a bit with opinions by an expert that there are at least one thousand members in each proposed class.  *See* Dkt. No. 243-1

United States District Court
Northern District of California

at 4.  YouTube objected to the opinions as not properly disclosed during discovery, *see* Dkt. No. 268 at 6, and it is not entirely clear that the class size estimates are based on reliable methods.  But "[i]nadmissibility alone is not a proper basis to reject evidence submitted in support of class certification."  *Sali*, 909 F.3d at 1004.  On the record before the Court, it is plausible that the putative classes cross the threshold required under Rule 23(a)(1).  *See Ochoa v. McDonald's Corp.*, No. 3:14-cv-02098-JD, 2016 WL 3648550, at *4 (N.D. Cal. July 7, 2016) (numerosity is satisfied if a class comprises of 40 or more members).

**B.      Typicality (23(a)(3))**

Rule 23(a)(3) requires plaintiffs to prove that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The typicality requirement is intended to "assure that the interest of the named representative aligns with the interests of the class."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  To satisfy this requirement, the named plaintiffs' claims need only be "reasonably coextensive with those of absent class members; they need not be substantially identical."  *Just Film*, 847 F.3d at 1116 (internal citations and quotations omitted).  Typicality may be found when other members have the same or similar injury as the named plaintiffs arising out of the same course of conduct.  *Id.*  Typicality should not be found, and a class should not be certified, in cases where other members would suffer because the named plaintiffs would be "'preoccupied with defenses unique to'" them.  *Id.* (quoting *Hanon*, 976 F.2d at 508).

Typicality is questionable here.  Each work-in-suit will be the subject of individualized proof of ownership and infringement, which necessarily makes the claim of each plaintiff a *sui generis* inquiry.  The summary judgment record for Schneider, and YouTube's filings with respect to Uniglobe and AST, highlight these concerns.  *See* Dkt. No. 222.

**C.      Adequacy (23(a)(4))**

Except for the issues discussed with respect to Schneider and the ISRC class, YouTube did not challenge the adequacy of the proposed class representatives or proposed class counsel under Rule 23(a)(4).  Consequently, this element is not in dispute.

**V.     RULE 23(C)(4)**

"Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted," Rule 23(c)(4) "authorizes the district court in appropriate cases to isolate the common issues … and proceed with class treatment of these particular issues." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (citing Fed. R. Civ. P. 23(c)(4)).  An issues class must "have proper representatives and otherwise comply with Rule 23's requirements." *Zinser*, 253 F.3d at 1192 n.8; *see also Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981).  Certification of an issues class may be warranted when certifying particular issues "would significantly advance the resolution of the underlying case." *Valentino*, 97 F.3d at 1229; *see also Reitman v. Champion Petfoods USA, Inc.*, 830 F. App'x 880, 882 (9th Cir. 2020) (unpublished) (affirming denial of certification because "numerous individualized issues affecting determinations of liability make Rule 23(c)(4) certification inefficient")

Plaintiffs' cursory request for a Rule 23(c)(4) certification is not well taken.  *See* Dkt. No. 243-1 at 25.  They appear to regard it as something of a consolation prize in the event certification is denied under Rule 23(b)(3).  That is not the case.  Plaintiffs did not explain why an issues class might advance the litigation as a whole, particularly in light of all the individualized questions that foreclosed certification of a (b)(3) class.  Consequently, certification of an issues class is denied.

**VI.     THE MOTION TO EXCLUDE EXPERTS**

YouTube asked to exclude the opinions of plaintiffs' proposed experts, Dr. Charles Cowan or Dr. Hal Singer, under Federal Rule of Evidence 702 and *Daubert*.  *See* Dkt. No. 261-1.  The Court did not rely on any of these opinions, or the work of either expert, in deciding the certification motion.  Consequently, the questions of admissibility that YouTube raised are deferred to another day, as warranted by developments.  *See Milan v. Clif Bar & Co.*, 340 F.R.D. 591, 602 (N.D. Cal. 2021).

United States District Court
Northern District of California

1

## CONCLUSION

2          Plaintiffs' requests for certification of a class under Rule 23(b)(3), and for issues under

3    Rule 23(c)(4), are denied.

4          **IT IS SO ORDERED.**

5    Dated:  May 22, 2023

6

7    _____

8    JAMES DONATO
     United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28