# EXHIBIT A

**Plaintiffs' Deposition Designations[1]**

| Transcript Name | Plaintiffs' Designation | Defendants' Objections[2] | Defendants' Counter-Designations | Plaintiffs' Objections |
|---|---|---|---|---|
| Bornheimer, Zachary | 8:14-8:15 | | | |
| Bornheimer, Zachary | 17:9-17:22 | R, 403 | | |
| Bornheimer, Zachary | 18:7-18:20 | R, 403 | | |
| Bornheimer, Zachary | 139:9-140:7 | R, 403, LF, S, C | 91:1-91:16; 140:19-140:21 | Irrelevant (402) as to 91:1-16 |
| Bornheimer, Zachary | 222:16-222:23 | R, 403, C | 223:25-224:6; 225:10-225:15; 226:21-226:23 | Incomplete as to 223:25-224:6. Pursuant to FRCP 32(a)(6) and FRE 106, Plaintiffs designate 224:13 - 225:9.<br><br>Incomplete as to 225:10 – 225:15. Pursuant to FRCP 32(a)(6) and FRE 106, Plaintiffs designate 224:13-225:9; 225:16 – 226:13.<br><br>Incomplete as to 226:21 – 226:23. Pursuant to FRCP 32(a)(6) and FRE 106, Plaintiffs designate 225:16 – 226:13. |
| Bornheimer, Zachary | 223:3-223:8 | R, 403, LF, C | 223:25-224:6; 225:10-225:15; 226:21-226:23 | Incomplete as to 223:25-224:6. Pursuant to FRCP 32(a)(6) and FRE 106, Plaintiffs designate 224:13 - 225:9.<br><br>Incomplete as to 225:10 – 225:15. |

---

[1] Excerpts of the transcripts of the Bornheimer, Le Claire, Magagna, and Stacy 30(b)(6) depositions are attached as Exhibits A-1, A-2, A-3, and A-4, respectively.

[2] Defendants' Key of Deposition Objections is included below the chart of Plaintiffs' Deposition Designations.

| Transcript Name | Plaintiffs' Designation | Defendants' Objections[2] | Defendants' Counter-Designations | Plaintiffs' Objections |
|---|---|---|---|---|
| | | | | Pursuant to FRCP 32(a)(6) and FRE 106, Plaintiffs designate 224:13-225:9; 225:16 – 226:13.<br><br>Incomplete as to 226:21 – 226:23. Pursuant to FRCP 32(a)(6) and FRE 106, Plaintiffs designate 225:16 – 226:13. |
| Le Claire, Marie | 20:5-20:8 | | | |
| Le Claire, Marie | 22:16-23:17 | 402, R, H, C | 137:22-138:16; 265:17-265:18; 265:20-265:20 | Incomplete. Pursuant to FRCP 32(a)(6) and FRE 106, Plaintiffs designate 263:6 – 265:16.<br><br>Risk of jury confusion (403) as to 138:16. Witness testified that she would search YouTube for Ms. Schneider's works "when time would allow". Transcript inaccurately states "one time would allow". Transcript and closed captioning should be edited accordingly. |
| Le Claire, Marie | 127:21-127:24 | LF, 403 | | |
| Le Claire, Marie | 128:11-128:19 | H, LF, S, C | 235:5-235:15; | Incomplete. Pursuant to FRCP 32(a)(6) and FRE 106, Plaintiffs designate 235:16-19. |
| Le Claire, Marie | 129:13-129:24 | LF, 403 | | |
| Le Claire, Marie | 130:4-130:13 | LF, 403, S, H | | |

| Transcript Name | Plaintiffs' Designation | Defendants' Objections[2] | Defendants' Counter-Designations | Plaintiffs' Objections |
|---|---|---|---|---|
| Le Claire, Marie | 132:24-133:12 | H, LF, S, R, C | 134:8-134:11 | Lack of foundation (602) and unduly prejudicial (403) |
| Le Claire, Marie | 134:20-135:10 | | | |
| Le Claire, Marie | 135:23-136:4 | H, LF, S, R, 403 | | |
| Le Claire, Marie | 136:6-136:12 | S, LF, R, H, 403 | | |
| Le Claire, Marie | 136:14-136:18 | S, LF, C | 136:19-136:21 | |
| Le Claire, Marie | 136:22-137:4 | 403, R, LF, S, C | 191:15-191:20; 215:25-216:8; 216:12-216:13; 217:22-217:24 | Incomplete. Pursuant to FRCP 32(a)(6) and FRE 106, Plaintiffs designate 216:9-11, 217:14-21, and 217:25 – 218:11.

Irrelevant (402) and unduly prejudicial (403) as to LeClaire Dep. Exhibit 18 and 215:25-216:8; 216:12-216:13; 217:22-217:24. |
| Le Claire, Marie | 137:22-138:12 | C | 254:18-22; 254:24-255:8; 255:10-255:13; 255:15-255:24; 256:1-256:1 | |
| Le Claire, Marie | 138:17-138:24 | C | 190:20-190:22 | |
| Le Claire, Marie | 139:5-139:14 | C | 139:15-139:23 | |
| Le Claire, Marie | 141:23-142:4 | C | 142:5-143:2; 144:4-7; 144:12-144:13; 144:15-144:17; 161:3-161:16; 218:18-218:23; | Irrelevant (402) as to 144:4-7 |
| Le Claire, Marie | 146:6-147:4 | C | 168:1-168:3; 168:5-168:5; 170:12-170:17; 170:19-170:20 | Incomplete. Pursuant to FRCP 32(a)(6) and FRE 106, Plaintiffs designate 168:6-17.

Irrelevant (402) and prejudicial (403) as to 168:1-3 and 168:5-5 |
| Magagna, Fabio | 6:9-6:18 | | | |

| Transcript Name | Plaintiffs' Designation | Defendants' Objections[2] | Defendants' Counter-Designations | Plaintiffs' Objections |
|---|---|---|---|---|
| Magagna, Fabio | 7:7-7:8 | | | |
| Magagna, Fabio | 7:11-7:18 | | | |
| Magagna, Fabio | 10:4-10:5 | LF, 403 | | |
| Magagna, Fabio | 10:9-10:10 | R, LF, 403 | | |
| Magagna, Fabio | 27:18-27:21 | MIL, R, 403, PK, LF | | |
| Magagna, Fabio | 27:24-28:12 | MIL, R, 403, PK, LF, C | 28:13-29:14 | |
| Magagna, Fabio | 73:21-73:22 | 403 (Cumulative), LF | | |
| Magagna, Fabio | 74:1-74:20 | 403 (Cumulative), LF | | |
| Magagna, Fabio | 74:23-74:25 | 403 (Cumulative), LF | | |
| Magagna, Fabio | 76:14-76:18 | 403 (Cumulative), LF | | |
| Magagna, Fabio | 76:21-77:5 | 403 (Cumulative), LF | | |
| Magagna, Fabio | 77:7-77:10 | 403 (Cumulative), LF | | |
| Magagna, Fabio | 77:13-77:15 | 403 (Cumulative), LF | | |
| Magagna, Fabio | 77:17-77:17 | 403 (Cumulative), LF | | |
| Magagna, Fabio | 77:19-77:21 | 403 (Cumulative), LF | | |
| Stacy, Pierce - 30(b)(6) | 6:3-6:4, 6:23-7:18 | | | |
| Stacy, Pierce - 30(b)(6) | 8:1-8:10 | | | |
| Stacy, Pierce - 30(b)(6) | 11:11-11:18 | R, 403 (Prejudicial, Cumulative, Confusing), LF | | |
| Stacy, Pierce - 30(b)(6) | 12:4-12:11 | R, 403 (Prejudicial, Cumulative, Confusing), LF | | |
| Stacy, Pierce - 30(b)(6) | 15:3-16:7 | R, 403 (Prejudicial, | | |

| Transcript Name | Plaintiffs' Designation | Defendants' Objections[2] | Defendants' Counter-Designations | Plaintiffs' Objections |
|---|---|---|---|---|
| | | Cumulative, Confusing), LF | | |
| Stacy, Pierce - 30(b)(6) | 29:17-29:18 | R, 403 (Prejudicial, Cumulative, Confusing) | | |
| Stacy, Pierce - 30(b)(6) | 29:21-30:15 | R, 403 (Prejudicial, Cumulative, Confusing) | | |
| Stacy, Pierce - 30(b)(6) | 30:18-31:7 | R, 403 (Prejudicial, Cumulative, Confusing) | | |
| Stacy, Pierce - 30(b)(6) | 31:10-32:24 | R, 403 (Prejudicial, Cumulative, Confusing) | | |
| Stacy, Pierce - 30(b)(6) | 35:24-36:21 | R, 403 (Prejudicial, Cumulative, Confusing), LF, S | | |
| Stacy, Pierce - 30(b)(6) | 36:23-37:12 | R, 403 (Prejudicial, Cumulative, Confusing), LF, S | | |
| Stacy, Pierce - 30(b)(6) | 37:15-37:19 | R, 403 (Prejudicial, Cumulative, Confusing), LF, S, C | 38:7-38:10 38:12-39:6 | |
| Stacy, Pierce - 30(b)(6) | 40:6-40:9 | R, 403 (Prejudicial, Cumulative, Confusing), LF, S | | |

| Transcript Name | Plaintiffs' Designation | Defendants' Objections[2] | Defendants' Counter-Designations | Plaintiffs' Objections |
|---|---|---|---|---|
| Stacy, Pierce - 30(b)(6) | 40:11-41:1 | R, 403 (Prejudicial, Cumulative, Confusing), LF, S | | |
| Stacy, Pierce - 30(b)(6) | 41:4-41:13 | R, 403 (Prejudicial, Cumulative, Confusing), LF, S | | |
| Stacy, Pierce - 30(b)(6) | 41:15-42:2 | R, 403 (Prejudicial, Cumulative, Confusing), LF, S | | |
| Stacy, Pierce - 30(b)(6) | 42:4-42:25 | R, 403 (Prejudicial, Cumulative, Confusing), LF, S | | |
| Stacy, Pierce - 30(b)(6) | 43:6-44:8 | R, 403 (Prejudicial, Cumulative, Confusing), LF, S | | |
| Stacy, Pierce - 30(b)(6) | 59:13-59:16 | R, 403 (Prejudicial, Cumulative, Confusing), LF | | |
| Stacy, Pierce - 30(b)(6) | 59:19-60:18 | R, 403 (Prejudicial, Cumulative, Confusing), LF | | |

**Defendants' Key of Deposition Objections**

| Abbreviations | Deposition Objections |
|---|---|
| R | Relevance (FRE 401) |
| LF | Lacks foundation |
| H | Hearsay (FRE 802) |
| A | Authentication (FRE 901) |
| 403 | Rule 403 (unduly prejudicial/inflammatory/confusing/waste of time/misleading) |
| P | Privileged |
| C | Rule of Completeness (FRE 106) |
| 404(a) | Rule 404(a) (character evidence) |
| 1006 | Rule 1006 (summary of voluminous documents) |
| OR | Original Required (FRE 1002) |
| MIL/Daubert | Subject to MIL/Daubert |
| LP | Limited Purpose Only (FRE 105) |
| IER | Inadmissible expert report |
| UCDR/UCFR | Uncertified domestic or foreign record (FRE 902(11) & 902(12)) |
| 32(a) | FRCP 32(a) (does not comply with restrictions on use of depo testimony) |
| PK | Personal knowledge (FRE 602) |
| DO | Subject to objection to form of deposition question |
| 701 | Opinion testimony by lay witness (FRE 701) |
| 30(b)(6) | Outside the scope of the 30(b)(6) topics |
| 403, 404, 405 | Cumulative |
| S | Calls for Speculation |
| 703 | Expert Opinion |
| 704 | Ultimate Issue |

# EXHIBIT A-1

Page 1

1            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
2               SAN FRANCISCO DIVISION
3
       MARIA SCHNEIDER, UNIGLOBE
4       ENTERTAINMENT, LLC, and AST
       PUBLISHING, LTD., individually
5        and on behalf of all other
       similarly situated,          Case No.
6                         3:20-cv-4423
              Plaintiffs,
7
       vs.
8
       YOUTUBE, LLC; and GOOGLE, LLC,
9
              Defendants.
10     _____/
11
       VIDEOTAPED
12      DEPOSITION OF:  ZACHARY BORNHEIMER
13      DATE:        June 21, 2022
14      TIME:        9:22 a.m. to 4:56 p.m.
15      PLACE:       Zuckerman Spaeder, LLP
                       101 East Kennedy Boulevard
16                   Second Floor
                       Tampa, Florida
17
       PURSUANT TO:    Notice by counsel for Defendants
18                   for purposes of discovery, use at
                       trial or such other purposes as
19                   are permitted under the Federal
                       Rules of Civil Procedure
20
       REPORTED BY:    Aaron T. Perkins, RMR, CRR, CRC
21                   Notary Public, State of
                       Florida at Large
22
                       Pages 1 to 278
23
24
25

Bornheimer, Zachary

1       APPEARANCES:

2

        GEORGE A. ZELCS, ESQUIRE

3        Korein Tillery, LLC

        205 North Michigan, Suite 1950

4        Chicago, Illinois 60601

5            Attorney for Plaintiffs

6

7

8

        PAUL N. HAROLD, ESQUIRE

9        Wilson, Sonsini, Goodrich & Rosati

        1700 K Street NW

10       Fifth Floor

        Washington, D.C.  20006

11           -  and  -

        ANDREW KRAMER, ESQUIRE

12       Wilson, Sonsini, Goodrich & Rosati

        650 Page Mill Road

13       Palo Alto, California  94304

14           Attorneys for Defendant

15

16

17

        ALSO PRESENT:

18       Craig Black, videographer

19

20

21

22

23

24

25

8:14 to 8:15

Plaintiffs

1　counsel for defendants.

2　　　　MR. ZELCS:  George Zelcs on behalf of the

3　plaintiff and the witness.

4　　　　THE VIDEOGRAPHER:  Thank you.

5　　　　Will the court reporter please swear in the

6　witness and we may proceed.

7　　　　ZACHARY BORNHEIMER,

8　the witness herein, being first duly sworn on oath, was

9　questioned and testified as follows:

10　　　　THE WITNESS:  I do.

11　　　　THE REPORTER:  You're under oath.

12　　　　DIRECT EXAMINATION

13　BY MR. HAROLD:

14　　Q.  Hi, Mr. Bornheimer.  Thank you for appearing

15　today.

16　　　　Could you please state your full name and

17　current address for the record.

18　　A.  Zachary Bornheimer, 6722 13th Street North,

19　St. Petersburg, Florida 33702.

20　　Q.  And have you ever used any names, other names,

21　other than Zachary Bornheimer?

22　　A.  Zach Bornheimer.

23　　Q.  Is there anything that would prevent you from

24　giving your best testimony today?

25　　A.  No.

Page 17

17:9 to 17:22
Plaintiffs

1      A.   That I freelanced for, performed for, like

2   there are probably a lot, like 20, 30 more. As of the

3   freelance jazz saxophonist, you end up working with a

4   lot of different people, a lot of people pay your bills.

5      Q.   How long have you known Ms. Schneider?

6      A.   What do you mean?

7      Q.   When did you first meet Ms. Schneider?

8      A.   In person?

9      Q.   When did you first communicate with

10   Ms. Schneider?

11      A.   That I don't remember, but I do remember I

12   went on to ArtistShare and purchased music to study of

13   hers, and told in the, like, the purchase notes that I

14   loved her music, and she took the time to respond to

15   that. That was probably 2013, 2012, 2011. Somewhere

16   between 2011 and 2014, I would say.

17      And then I didn't meet or talk with her any

18   further. I would say that was the one communication at

19   that point.

20      Q.   What was the piece of music that you purchased

21   that led to you writing that note?

22      A.   "Cerulean Skies." Beautiful piece of music.

23      Q.   When did you first meet Ms. Schneider in

24   person?

25      A.   2015, I think. No, that's not right. 2014.

1    Or my school -- it was my junior year of -- sophomore

2    year.  It's coming back to me.  Sophomore year of my

3    undergrad.  She was a guest artist at USF; that's how I

4    met her.

5        Q.   Did she remember your note?

6        A.   I didn't bring it up.

7        Q.   How would you describe your relationship with

8    Ms. Schneider?

9        A.   I consider her family at this point.  I had

10   such a -- she's absolutely my mentor and my teacher.

11   She's incredibly supportive to the point where, you

12   know, I trust her deeply, and if I brought personal

13   issues to her, I have no doubt she would be able to help

14   guide me in that regard either.  So I would say

15   probably, like -- probably, like, the same way a lot of

16   us would -- would view kind of extended family.

17       Q.   Have you ever worked for Ms. Schneider?

18       A.   Yes.

19       Q.   When did you first work for Ms. Schneider?

20       A.   2017.

21       Q.   And what work were you performing for

22   Ms. Schneider in 2017?

23       A.   Music copy work.

24       Q.   What's "music copy work"?

25       A.   It's the process of taking sheet music, the

*18:7 to 18:20*

Plaintiffs

Bornheimer, Zachary

Page 91

1       Q.   Mr. Bornheimer, I'm showing you what's been

2   marked as Bornheimer Exhibit 5. It's an e-mail chain.

3   At the top the e-mail is dated May 19th, 2014, and it's

4   been produced in this litigation with the Bates number

5   SCHNEIDER 145756.

6       Do you recognize this document?

7       A.   Yes.

8       Q.   What is it?

9       A.   An e-mail between me and Marie LeClaire.

10      Q.   Now, you say it's between you and

11   Marie LeClaire, but the e-mail account you're e-mailing

12   with is mariaschneider@me.com; is that right?

13      A.   It looks like to be that way, yes.

14      Q.   So Ms. LeClaire was using Ms. Schneider's

15   e-mail account to communicate with you?

16      A.   It seems that way.

17      Q.   She says at the bottom of the first page:

18   "Hi, Zach. This is Maria's assistant, Marie."

19       Is that right?

20      A.   That's what this says.

21      Q.   So you understood that you were communicating

22   with Ms. LeClaire, not Ms. Schneider?

23      A.   Correct.

24      Q.   Did Ms. LeClaire contact you using

25   Ms. Schneider's e-mail account on other occasions?

*91:1 to 91:16*

Counter Designation

Page 139

1     Q.   So when you say that metadata, you're talking

2   about here would have needed to have been done on the

3   ArtistShare side? That's because the metadata you're

4   talking about is an order number or a customer number

5   that would have changed?

6     A.   Yes.

7     Q.   Yeah.

8     A.   That's what I'm referring to.

9     Q.   Have you ever embedded metadata in any files

10   containing Ms. Schneider's works?

11     A.   Yes.

12     Q.   When did you do that?

13     A.   I definitely did it before "Data Lords" was

14   published, but I don't remember every time I have done

15   it.

16     Q.   For which works of Ms. Schneider's did you

17   embed metadata?

18     A.   I have done it for all of her recorded works.

19   We went back for the back catalog after, after "Data

20   Lords" was released, because we wanted to add a new -- a

21   new rate of MP3 that people could download, so we just

22   regenerated all of the -- all of the files.

23     Q.   What metadata did you embed in those files?

24     A.   Artist name, track name, track number, total

25   tracks, album cover, ISRC, genre, comment metadata

*139:9 to 140:7*

Plaintiffs

Bornheimer, Zachary

Page 140

1     saying if you want -- if you like this song, or look at

2     the personnel on MariaSchneider.com, back slash, and

3     then the page on her website that corresponds to that

4     recording.  And composer.

5        Q.  And you embedded this metadata in MP3 files;

6     is that right?

7        A.  That's correct.

8        Q.  Did you embed metadata in any other types of

9     files?

10        A.  Yes.

11        Q.  What other types of files?

12        A.  FLAC files, WAV files, and I think that's it.

13     I think that's all.

14        Q.  So nothing other than MP3 files, FLAC files

15     and WAV files?

16        A.  I believe so.

17        Q.  Those are all audio files, right?

18        A.  That's correct.

19        Q.  Have you ever embedded any metadata in a video

20     file containing Ms. Schneider's works?

21        A.  I don't think so.

22        Q.  Why did you embed metadata in the MP3 files,

23     FLAC files, and WAV files?

24        A.  Reason one was so that way people who

25     downloaded those files got all the information about it

*140:19 to 140:21*

Counter Designation

Bornheimer, Zachary

Page 222

1    of recording, things like that.

2       Q.  And did you assist her with doing -- with

3    inputting that metadata?

4       A.  We didn't do it that way, but, yes, I did.

5       Q.  What do you mean when you say "We didn't do it

6    that way"?

7       A.  We just put a link to the website.  We ended

8    up putting a link to the website in the comments of the

9    metadata, in the description -- in that comment field.

10       Q.  Have you ever used metadata associated with a

11    particular file to locate infringement in

12    Ms. Schneider's work?

13       A.  I'm not really sure how to answer that

14    question.  Can you rephrase it?

15      Q.  Sure.

16      So say you have a particular file format and

17    there's a metadata field for composer and you wanted to

18    search -- or you were interested in searching for files

19    that had a particular value in the metadata field for

20    composers, say Maria Schneider.  Have you ever searched

21    for files containing a particular value in the metadata

22    fields?

23       A.  Yes.

24       THE REPORTER:  I'm sorry, a particular?

25       MR. HAROLD:  Value.

222:16 to 222:23

Plaintiffs

Page 223

| | |
|---|---|
| 1 | THE WITNESS:  Yes, I have. |
| 2 | BY MR. HAROLD: |
| 3 | Q.  Have you ever done that for Ms. Schneider? |
| 4 | A.  Yes. |
| 5 | Q.  What metadata fields have you searched for |
| 6 | Ms. Schneider? |
| 7 | A.  Title, composer, album, album artist, track |
| 8 | number, ISRC, genre and combinations therein. |
| 9 | Q.  Any other metadata fields that you've searched |
| 10 | for, for Ms. Schneider? |
| 11 | A.  Not that I can recall. |
| 12 | Q.  How did you conduct these searches of metadata |
| 13 | fields for Ms. Schneider? |
| 14 | A.  Various search engines, just searching for |
| 15 | those parallel fields, to search composer, |
| 16 | Maria Schneider song title, the song title, and file |
| 17 | type, MP3. |
| 18 | Q.  Which search engines permit you to search, |
| 19 | say, the metadata field for composer? |
| 20 | A.  Google for one, at least that's how I found |
| 21 | some.  Bing, I believe, also does, also how I found some |
| 22 | things. |
| 23 | Q.  YouTube? |
| 24 | A.  No. |
| 25 | Q.  Have you ever searched YouTube for metadata |

*223:3 to 223:8*
Plaintiffs

*223:25 to 224:6*
Counter Designation

Page 224

1      fields for Ms. Schneider?

2          A.  Technically, I think I have, but, again,

3      looking up an -- I mean, if the -- if the answer to your

4      question is if me searching, like, Maria Schneider on

5      YouTube is looking up metadata on YouTube, then the

6      answer would be yes; otherwise, it would be no.

7          Q.  So I'm a little bit -- so when you say, If the

8      answer is searching Maria Schneider on YouTube, is

9      looking at metadata on YouTube, then the answer would be

10     yes; otherwise, it would be no, have you ever searched

11     on YouTube for values in the composer metadata field?

12         A.  No.

13         Q.  Have you ever searched on YouTube for values

14     in the title "Metadata" field?

15         A.  Yes.

16         Q.  So YouTube has a functionality that allows you

17     to search for title "Metadata"?

18         A.  No.

19         Q.  I'm confused as to how you searched on YouTube

20     for values in the title "Metadata" field?

21         A.  You can't search the file metadata.  You can

22     search the YouTube title of the video, which is

23     different and distinct from the video metadata.

24         Q.  Okay.  So have you ever searched the file

25     metadata for infringements of Ms. Schneider's work on

224:13 to 225:9
Pltfs Completeness Obj.

Bornheimer, Zachary

Page 225

| 1 | YouTube? |
| 2 | A.  No. |
| 3 | Q.   And that would mean, for instance, that you |
| 4 | haven't conducted a search on YouTube for file metadata |
| 5 | about title, composer, album, album artist, track |
| 6 | number, ISRC, genre, or any other file metadata? |
| 7 | A.  I don't have the ability to search a video |
| 8 | file's metadata on YouTube using YouTube's search |
| 9 | functionality. |
| 10 | Q.   And so you've never searched video file |
| 11 | metadata on YouTube? |
| 12 | A.   I have never searched video file metadata for |
| 13 | files hosted on YouTube.  I'm able to take a title track |
| 14 | from the MP3, input it into a YouTube search, and that's |
| 15 | as close as I can get. |
| 16 | Q.   So, for instance, you could take the title of, |
| 17 | say, "The Pretty Road" and type that into YouTube's |
| 18 | search bar and it will return results? |
| 19 | A.  Yes. |
| 20 | Q.   But you haven't ever specifically searched the |
| 21 | file, video file metadata for title for videos that have |
| 22 | "The Pretty Road" in them? |
| 23 | A.  That's correct. |
| 24 | Q.  Why not? |
| 25 | A.  I don't think it's possible. |

*225:10 to 225:15*

Counter Designation

*225:16 to 226:13*

Pltfs Completeness Obj.

Page 226

226:21 to 226:23
Counter Designation

1      Q.   Have you tried?

2      A.   Yes.

3      Q.   What did you do to try?

4      A.   Use similar search queries as I would on

5    Google.

6      Q.   And what are those search queries?

7      A.   File type, MOV, title, colon, quote, The

8    Pretty Road, end quote, something like that.

9      Q.   And when you've done those searches on

10   YouTube, what results have you gotten?

11     A.   Nothing of consequence.  I don't remember what

12   I would have a gotten, but nothing of consequence,

13   though.

14     Q.   When did you do those searches?

15     A.   I believe in 2018.

16     Q.   Have you tried since 2018 to search YouTube

17   for video file metadata values?

18     A.   No.

19     Q.   Why not?

20     A.   I didn't think there was a point.

21     Q.   Has Ms. Schneider ever asked you to search

22   YouTube for video file metadata values?

23     A.   I don't remember.

24     Q.   Has Ms. Schneider ever asked you to search

25   Google for the video file metadata values?

# EXHIBIT A-2

Page 1

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4

5      MARIA SCHNEIDER, UNIGLOBE  )

       ENTERTAINMENT, LLC, and    )

6      AST PUBLISHING LTD.,       )

       individually and on        )

7       behalf of all others       )

       similarly situated,        )

8                                 )

              Plaintiffs,  )

9                         )

            vs.          )  No.  3:20-cv-4423

10                        )

       YOUTUBE, LLC; and GOOGLE   )

11      LLC,                 )

                          )

12            Defendants.   )

       ------------------------  )

13

14

15            June 23, 2022

16            9:28 a.m.

17

18         Deposition of MARIE LE CLAIRE, held at

19      the offices of Wilson Sonsini Goodrich &

20      Rosati, 1301 Avenue of the Americas, New York,

21      New York, pursuant to subpoena, before

22      Laurie A. Collins, a Registered Professional

23      Reporter and Notary Public of the State of New

24      York.

25

1        A P P E A R A N C E S:

2

3           KOREIN TILLERY

4           Attorneys for Plaintiffs

5               205 North Michigan, Suite 1950

6               Chicago, Illinois 60601

7        BY:   GEORGE A. ZELCS, ESQ.

8               gzelcs@koreintillery.com

9

10          WILSON SONSINI GOODRICH & ROSATI

11          Attorneys for Defendants

12              1700 K Street, N.W., Fifth Floor

13              Washington, D.C. 20006-3814

14        BY:   PAUL N. HAROLD, ESQ.

15              pharold@wsgr.com

16                 - and -

17          WILSON SONSINI GOODRICH & ROSATI

18              650 Page Mill Road

19              Palo Alto, California 94304-1050

20        BY:   ANDREW KRAMER, ESQ.

21              pkramer@wsgr.com

22

23        ALSO PRESENT:

24          DEVERELL WRITE, Videographer

25

Page 20

20:5 to 20:8
Plaintiffs
05/17/2023 09:59 AM

1      Q.    And when did you start working with

2    Ms. Schneider?

3      A.    Maybe a month or so after that, maybe a

4    little longer.

5      Q.    So you started working with

6    Ms. Schneider around 2008?

7      A.    I believe so, something around then,

8    yeah.  I believe it was 2008.

9      Q.    And when you first started working with

10   Ms. Schneider, what were you doing?

11     A.    Her initial interest in hiring me was

12   to help document the making of her projects for

13   her Web site for ArtistShare, but she wound up

14   hiring me to do assistant work for her as well.

15     Q.    And did your job responsibilities or

16   the scope of your work for Ms. Schneider change

17   between when you first started working with her in

18   2008 and when you stopped doing freelance work in

19   November 2021?

20     A.    Yes.

21     Q.    How did they change?

22     A.    Over time my responsibilities grew

23   quite a bit as I learned more about the business

24   and about her music and how she does things.  So

25   the more experience I gained, the more

1      A.    Yeah, well, I generally -- during the

2    time I was working for Maria, I would upload any

3    videos we needed to upload to YouTube.  Anything

4    that was needed, really, you know, whatever was

5    needed to be done, you know.

6      Q.    What needed to be done for

7    Ms. Schneider related to YouTube?

8      A.    Anything from, like I said, uploading

9    videos that we were either making public or using

10    to send examples of music to guys in the band to

11    doing takedown notices to applying for Content ID.

12    That's generally what I would do.

13      Q.    Were those tasks that Ms. Schneider

14    asked you to do?

15      A.    Yes.

16      Q.    Did you, as part of your work for

17    Ms. Schneider, search YouTube for videos

18    containing her works?

19      A.    Yes, sometimes.

20      Q.    Did Ms. Schneider ask you to search

21    YouTube for videos containing her works?

22      A.    Yes.

23      Q.    When you say "sometimes," how often did

24    you search YouTube for videos containing

25    Ms. Schneider's work?

22:16 to 23:17
Plaintiffs
05/29/2023 07:22 PM

1        A.    There wasn't any set schedule.  It

2    would depend on how busy I was with other things.

3    You know, it was basically when I had time to do

4    it.

5        Q.    And was that you think monthly?  less

6    frequently than monthly?

7        A.    It depends on -- it depends on what was

8    going on at the time.  If I was really busy with

9    another project, then it would take a back seat

10    for a while.  Then when I was -- I had free time

11    again, I would pick it up.  Like I said, it wasn't

12    like a scheduled thing.

13        Q.    The searches of YouTube for videos

14    containing Ms. Schneider's work was just an

15    ongoing thing that you did when you had time as

16    your priorities allowed?

17        A.    Yes.

18        Q.    During what period of time of your work

19    for Ms. Schneider were you performing searches of

20    YouTube for videos containing Ms. Schneider's

21    work?

22        A.    I don't know the exact time period.

23        Q.    Do you recall when you began

24    researching YouTube for videos containing

25    Ms. Schneider's work?

Page 127

1 bother to collect the $23.86?

2  A. I don't remember.

3  Q. Have you ever heard of Content ID?

4  A. Yes.

5  Q. What is it?

6  A. From what I understand it to be, it's

7 the program or the software, whatever, that

8 YouTube uses to identify works that -- to identify

9 works like who they belong to and either them

10 generate ad income from them or they can be taken

11 down by the content owner if they're part of the

12 program.

13  Q. You mentioned earlier applying to

14 Content ID.  Have you ever applied to be in

15 Content ID?

16  A. Not me personally.

17  Q. Do you own any copyrighted works that

18 have been registered with the U.S. Copyright

19 Office?

20  A. Me personally, no.

21  Q. So have you ever applied for Content ID

22 on behalf of someone else?

23  A. I applied through Maria's account for

24 her.

25  Q. Other than Ms. Schneider, have you ever

127:21 to 127:24

Plaintiffs

05/17/2023 10:05 AM

1    applied for access to Content ID on someone else's

2    behalf?

128:11 to 128:19

Plaintiffs

05/29/2023 07:24 PM

3        A.   No.

4        Q.    So the only Content ID applications

5    with which you've had any involvement are those on

6    behalf of Ms. Schneider?

7        A.   Yes.

8        Q.    How many advertisements did you apply

9    to Content ID for Ms. Schneider?

10        A.   I think only once.

11        Q.    When did you apply to Content ID for

12    Ms. Schneider?

13        A.   I mean, it was years ago at this point.

14    I don't remember exactly when it was.

15        Q.    Why did you apply for access to Content

16    ID for Ms. Schneider?

17        A.    Because we were interested in being

18    able to block Maria's works from being uploaded

19    without her permission.

20        Q.    Did Ms. Schneider ask you to apply for

21    Content ID on her behalf?

22        A.   Yes.

23        Q.    Are there any records of Ms. Schneider

24    asking you to apply for Content ID on her behalf?

25        A.   I don't know.

129:13 to 129:24
Plaintiffs
05/17/2023 10:06 AM

1    Q.    Did Ms. Schneider give you any

2    instructions for how to apply for Content ID on

3    her behalf?

4    A.    No.

5    Q.    Did she tell you anything that you

6    might put in the application for Content ID?

7    A.    I don't believe so.

8    Q.    So how did you know what to fill out

9    when you applied for Content ID on Ms. Schneider's

10   behalf?

11   A.    I read the instructions on YouTube's

12   Web site.

13   Q.    Why did you think Ms. Schneider should

14   be a part of Content ID?

15   A.    Because I thought it would be a great

16   way to keep people from uploading her work without

17   her permission.

18   Q.    And why would it be a great way to keep

19   people from uploading her work without her

20   permission?

21   A.    Because if her work is registered or

22   whatever it's called with Content ID, she can

23   choose whether or not she wants her work there and

24   people who try to upload it would be denied.

25   Q.    Are you aware of any instances in which

Le Claire, Marie

Page 130

1    Ms. Schneider has applied for Content ID other

2    than the one time on which you assisted her?

3        A.   No.

4        Q.   What was the result of your application

5    for Content ID on Ms. Schneider's behalf?

6        A.   It was denied.

7        Q.   Were you given any reasons for why

8    Ms. Schneider's application was denied?

9        A.   It was a standard e-mail that we got.

10   I don't remember exactly what it said; but from

11   what I do remember, it was lack of number of

12   subscribers, likes on her videos, and number of

13   videos uploaded.

14       Q.   So Ms. Schneider's YouTube channel

15   doesn't have many subscribers, does it?

16       A.   No.

17       Q.   And she appears not to have many

18   publicly available videos on her YouTube channel;

19   is that right?

20       A.   That's right.

21       Q.   Were you expecting Ms. Schneider's

22   application for Content ID to be accepted?

23       A.   I didn't know if it would be accepted.

24       Q.   Were you hoping that Ms. Schneider's

25   application for Content ID would be accepted?

130:4 to 130:13

Plaintiffs

05/29/2023 07:26 PM

1      A.   Sure.

2      Q.   Were you disappointed when the

3   application was rejected?

4      A.   Yes.

5      Q.   Did you have any conversations with

6   Ms. Schneider relating to the rejection of her

7   Content ID application?

8      A.   Yes.

9      Q.   What were those conversations about?

10      A.   Informing her that we'd been rejected

11   and just -- you know, and discussing I guess what

12   the -- you know, why it was rejected and generally

13   that we both thought that it was pretty awful that

14   she was rejected.

15      Q.   So did you make any attempt after the

16   application for Content ID was rejected to

17   increase the number of subscribers to

18   Ms. Schneider's YouTube channel?

19      A.   I don't think so.

20      Q.   Did you make any attempt after the

21   application for Content ID was rejected to

22   increase the number of likes on the videos on

23   Ms. Schneider's YouTube channel?

24      A.   I don't believe so.

25      Q.   Did you make any attempt after the

1    application for Content ID was rejected to

2    increase the number of videos uploaded to

3    Ms. Schneider's YouTube channel?

*132:24 to 133:12*

Plaintiffs

*05/17/2023 10:06 AM*

4        A.   I don't believe so.

5        Q.   Why not?

6        A.   Maria's never been very interested in

7    uploading a lot of her material to YouTube.

8        Q.   Did Ms. Schneider ever ask you to make

9    any attempt to increase the number of subscribers

10   to her channel or increase the number of likes on

11   videos on the channel or to increase the number of

12   videos uploaded to the channel for the purpose of

13   gaining access to Content ID?

14       A.   I don't believe so.

15       Q.   Since that application for Content ID

16   was rejected, have you had any conversations with

17   Ms. Schneider about applying for access to Content

18   ID again?

19       A.   I don't believe so.

20       Q.   Why is that?

21       A.   I mean, I don't know.  We haven't -- it

22   hasn't come up.  I couldn't tell you what Maria's

23   thinking is exactly.

24       Q.   Have you had any conversations with

25   Ms. Schneider about Content ID since her

Page 133

1      application for access to Content ID was rejected?

2          A.   Yeah, I'm sure we have.

3          Q.   What were the nature of those

4      conversations?

5          A.   There's no way for me to remember all

6      of our conversations about it, but generally that

7      it's -- I would say generally that it's really

8      disappointing that it seemed to us that YouTube is

9      only interested in providing Content ID to those

10     who are interested in just generating ad money for

11     YouTube instead of keeping their material from

12     being uploaded to YouTube as a preventative tool.

13         Q.   Was there any part of the application

14     that you submitted to YouTube for Content ID that

15     stated the number of works owned by Ms. Schneider?

16         A.   I don't remember all of what the

17     questions were on the application.

18         Q.   So what reason did you give on the

19     application for justifying access to Content ID?

20         A.   I don't remember.  I don't know what

21     the questions -- I don't know what the questions

22     even were.

23         Q.   Do you know Dan Coleman?

24         A.   A little bit.

25         Q.   Who is Dan Coleman?

Le Claire, Marie

Page 134

1      A.    Dan Coleman works with ArtistShare

2     doing publishing work.

3      Q.    Is he Ms. Schneider's publisher?

4      A.    He works with ArtistShare in

5     collecting -- in dealing with publishing, and

6     Maria -- yeah, Maria uses him in conjunction with

7     ArtistShare.

8      Q.    Did you know that Ms. Schneider's

9     publisher had put some of her works into Content

10    ID?

11      A.    I did not.

12      Q.    Have you ever heard that

13    Ms. Schneider's publisher put some of her works in

14    Content ID?

15       MR. ZELCS:  Let me just give you a

16    caution.  Don't answer that question if it's

17    based upon conversations that you had with

18    counsel.  Otherwise go ahead.

19     A.    No.

20      Q.    Did you have any discussions with

21    Ms. Schneider about whether she could gain access

22    to Content ID through a third party?

23      A.    At some point we became aware that

24    there are -- there are some companies that provide

25    a service that you can then pay to have them act

**134:8 to 134:11**
Counter Designation
*Lisa Lucas*    06/06/2023 02:09 PM

**134:20 to 135:10**
Plaintiffs
**05/17/2023 10:07 AM**

1    on your behalf and enter your works through

2    Content ID.

3        Q.   When did you become aware of those

4    companies that provide that service?

5        A.   I don't know exactly when that was.

6        Q.   Was it before this lawsuit was filed?

7        A.   Yes.

8        Q.   And this was something that

9    Ms. Schneider was aware of?

10       A.   Yes.

135:23 to 136:4
Plaintiffs
05/29/2023 07:28 PM

11       Q.   How did Ms. Schneider become aware that

12   these companies offered the service of putting

13   peoples' works into Content ID?

14       A.   I'm not sure exactly.

15       Q.   How did you become aware that these

16   companies offered the service of putting people's

17   works into Content ID?

18       A.   I don't remember exactly.  I don't

19   remember.

20       Q.   What companies offer this service?

21       A.   I couldn't -- I couldn't even name one

22   of them.  I don't remember.

23       Q.   Did you ever discuss with Ms. Schneider

24   the possibility of using one of these companies to

25   put her works in Content ID?

Page 136

1      A.    We discussed that they exist, but I

2  don't think we ever discussed the possibility of

3  using one of them.

4      Q.    Why not?

5          MR. ZELCS:  Objection, form.

6      A.    I can't really answer for Maria.  I

7  don't know.

8      Q.    You didn't suggest that she use one of

9  these services to put her works in Content ID?

10      A.    No.

11      Q.    But you knew she really wanted access

12  to Content ID; is that right?

13          MR. ZELCS:  Objection, form.

14      A.    I believe she wanted access to Content

15  ID, and I think we both agreed that it should be

16  available to anyone and not have to use a third-

17  party service that you have to pay for in order to

18  get it.

19      Q.    Do you recall how much these companies

20  charge to put people's works in Content ID?

21      A.    No.

22      Q.    Why do you think it would be

23  unreasonable to have to pay for access to Content

24  ID?

25      A.    Because if you're trying to use it as a

| | |
|---|---|
| *136:6 to 136:12* | |
| Plaintiffs | |
| *05/17/2023 10:07 AM* | |
| *136:14 to 136:18* | |
| Plaintiffs | |
| *05/17/2023 10:07 AM* | |
| *136:19 to 136:21* | |
| Counter Designation | |
| *Lisa Lucas*    06/06/2023 02:10 PM | |
| *136:22 to 137:4* | |
| Plaintiffs | |
| *05/29/2023 07:29 PM* | |

1     preventative tool from keeping your own material

2     that you own from being uploaded to YouTube, it

3     should be YouTube's obligation to help facilitate

4     people's property from being stolen.

5        Q.    And they should provide this

6     facilitation at no cost to people? Is that

7     your --

8        A.    Yes.

9        Q.    -- thinking?

10        You mentioned earlier that part of a

11    video that you uploaded to your channel had been

12    blocked by Content ID; isn't that right?

13        A.    Yes.

14        Q.    Did you steal those parts of that

15    video?

16        A.    I don't believe I stole them.

17        Q.    But someone who owns the rights to the

18    music in that video thinks you stole parts of it?

19        MR. ZELCS: Objection, form.

20        A.    I think it would be a matter of

21    opinion.

22        Q.    Did your work for Ms. Schneider involve

23    monitoring for instances of her works online?

24        A.    From time to time.

25        Q.    How would you go about searching for or

---

137:22 to 138:12
Plaintiffs
05/17/2023 10:08 AM

137:22 to 138:16
Counter Designation
Lisa Lucas     06/06/2023 02:06 PM

1    finding instances of unauthorized uses of her work

2    online?

3        A.   Just searching for -- we would do

4    searches for titles of her works or we would

5    search for Web sites that were either like file

6    sharing or different platforms of some kind.  And

7    then we would search -- then on those Web sites we

8    would search for anything of hers that we could

9    find.

10       Q.   Would you search YouTube for instances

11   of Ms. Schneider's works?

12       A.   Sure.

13       Q.   How frequently would you search YouTube

14   your instances of Ms. Schneider's works?

15       A.   It's hard to say.  It would basically

16   be just one time would allow.

17       Q.   And when you would search YouTube, what

18   would you use to search it?  Would you use

19   YouTube's search bar?

20       A.   Yes.

21       Q.   Would you use anything else to search

22   YouTube?

23       A.   That's the only way I'm aware of of

24   searching for something on YouTube.

25       Q.   Are you aware of any third-party tools

138:17 to 138:24

Plaintiffs

05/29/2023 07:31 PM

1    that can be used for searching YouTube?

2        A.    No.

3        Q.    Have you ever heard of PEX?

4        A.    No.

5        Q.    Now, I'm interested in the search terms

6    that you would use.  What search terms would you

7    use to search YouTube for Ms. Schneider's works?

8        A.    I would search things like her name.  I

9    would search Maria Schneider Orchestra.  I would

10    search album titles and song titles.

11        Q.    Anything else?

12        A.    I mean -- I mean, that's -- I can't --

13    I'm not sure exactly what else I would have

14    searched for.

15        Q.    So you don't recall using anything

16    other than Ms. Schneider's name, Maria Schneider

17    Orchestra, album titles and song titles in

18    YouTube's search bar to search YouTube of

19    instances of Ms. Schneider's works?

20        A.    I mean, that would be -- that would

21    make the most sense to me.  Even if I was

22    searching now, I don't know what else I would

23    search now.

24        Q.    Not only would that make sense to you;

25    it's what you did?

*139:5 to 139:14*
**Plaintiffs**
*05/29/2023 07:31 PM*

*139:15 to 139:23*
**Counter Designation**
*Lisa Lucas     06/06/2023 02:10 PM*

1      searches?

2          A.   Not of the searches, but there would

3      have been -- for instance, if I had e-mailed Maria

4      with a link to the video or something, that would

5      probably be the only kind of record I would have

6      from what I can remember.

7          Q.   You wouldn't have kept a record of the

8      search terms you used or the search results that

9      came up in response to the search terms; is that

10     right?

11         A.   Can you say that again?

12         Q.   So you did not keep any records of the

13     search terms that you used or the search results

14     that were returned by your search terms; is that

15     right?

16         A.   I don't believe so.

17         Q.   But you sometimes kept records of

18     videos that you found that you believed infringed

19     Ms. Schneider's works?

20         A.   If something -- if I was searching for

21     something of Maria's and I found it, then I would

22     show it to her to ask what to do about it.

23         Q.   Would you show Ms. Schneider every

24     video that you found on YouTube that contained her

25     works?

141:23 to 142:4

Plaintiffs

05/17/2023 10:08 AM

Page 142

1    A.   Yes.

2    Q.   And you'd ask her if she wanted those

3  videos taken down?

4    A.   Yes.

5    Q.   And did Ms. Schneider ask you to take

6  down every video that you found containing her

7  works?

8    A.   No.

9    Q.   Why didn't she ask you to take down

10  every video?

11       MR. ZELCS:  Objection, form.

12    A.   It depends on the video.

13    Q.   So what are some of the reasons why

14  Ms. Schneider would not have wanted you to take

15  down a video that you found containing her works?

16    A.   In some cases, for instance, if it was

17  a -- like a student band or something like that

18  that had uploaded a performance of one of her

19  pieces that they performed, it put Maria in a

20  really awkward position of having to contact the

21  school and telling them they can't have their

22  video uploaded.

23       So it was then a matter of weighing

24  which was worse:  having the video up on YouTube

25  or creating an awkward, uncomfortable situation

142:5 to 143:2
Counter Designation
*Lisa Lucas*    06/06/2023 02:10 PM

Page 143

1    with an institution that she could wind up working

2    with at another point in time.

3        Q.   Are there any other reasons why

4    Ms. Schneider would not have wanted you to take

5    down a video that you found containing her works?

6        A.   I would have to know more context.

7        Q.   Sure.  Do you recall any other reasons

8    why Ms. Schneider would have not wanted to take

9    down a video?

10       A.   Not off the top of my head, but it was

11   a case-by-case situation.

12       Q.   So every video you found on YouTube

13   containing Ms. Schneider's works you sent to

14   Ms. Schneider, and she would either tell you to

15   take it down or not take it down; is that right?

16       A.   Yes.

17       Q.   And if she told you to take down a

18   video, did you always send a takedown notice for

19   it?

20       A.   To the best of my knowledge.

21       Q.   And did YouTube always respond to those

22   takedowns by taking the video down?

23       A.   There were probably -- there were a

24   couple of instances where the takedown notice was

25   appealed and not taken down right away.

Page 144

1      Q.    Were those appeals eventually resolved

2   with the video being taken down?

3      A.   I believe so.

4      Q.    When there wasn't an appeal involved,

5   about how long did it take YouTube to take down

6   videos in response to your takedowns?

7      A.   Not long.

8      Q.    And for the appeals, about how long did

9   it take to take down the videos?

10     A.   A little bit longer, but I'm not -- I'm

11  not sure exactly how long.

12     Q.    Did Ms. Schneider ever give permission

13  for her works to be uploaded to YouTube?

14         MR. ZELCS:  Objection, form.

15     A.   She gave me permission to upload her

16  works to YouTube.  I can't speak to communications

17  she had herself with other -- with anybody else.

18     Q.    Are you aware of any instances in which

19  Ms. Schneider authorized someone other than you to

20  upload a video to YouTube containing her works?

21     A.   I don't know.

22     Q.    You're not aware of any such instances

23  or --

24     A.   I don't remember.

25     Q.    Were there any instances in which you

144:4 to 144:7
Counter Designation
Lisa Lucas    06/06/2023 02:10 PM

144:12 to 144:13
Counter Designation
Lisa Lucas    06/06/2023 02:11 PM

144:15 to 144:17
Counter Designation
Lisa Lucas    06/06/2023 02:11 PM

1      between you and Ms. Schneider?

2          A.   A number of them would be, but if I was

3      physically with Maria, I wouldn't have sent her an

4      e-mail about it; I would have just shown it to

5      her.

6          Q.   And how could you tell that a video

7      contained Ms. Schneider's work?

8          A.   Because I'm familiar with her -- I'm

9      familiar with her work.  I know her music.  I know

10     the titles to her music.

11         Q.   Would you watch a video before sending

12     it to Ms. Schneider?

13         A.   Yeah.

14         Q.   Would you watch the whole video before

15     sending it to Ms. Schneider?

16         A.   Probably, but, I mean, I don't know.

17         Q.   Would you watch the entire video before

18     sending a takedown notice for the video?

19         A.   Well, I didn't make the decisions to

20     take the videos down.  So ultimately it's Maria

21     who needed to watch the video and decide.

22         Q.   But you were the one who actually

23     submitted the takedown notice; right?

24         A.   Yes.

25         Q.   And you're the one who I guess swore

146:6 to 147:4

Plaintiffs

05/17/2023 10:14 AM

Le Claire, Marie

1     under penalty of perjury the takedown notice was

2     accurate; right?

3        A.   As Maria -- as representing Maria

4     through her account with her name.

5        Q.   So it was your understanding that it

6     was really Ms. Schneider who was swearing under

7     penalty of perjury that the take down was private

8     equity?

9        A.   Yes.

10        Q.   What steps did Ms. Schneider take to

11    determine that the videos were infringing?

12        MR. ZELCS:  Objection, form.

13        A.   I couldn't say.

14        Q.   Well, you were present with her for

15    some of these; right?  You showed her the video,

16    and she told you to send the takedown notice.  So

17    you were there when she made the decision, from

18    when she first saw the video to when she made the

19    decision, what would she do?

20        MR. ZELCS:  Objection, form.

21        A.   Maria -- I'm not in the habit of making

22    Maria justify her decisions to me.

23        Q.   I'm not asking about that.

24        What did you observe her do between

25    when you would show her a video you thought

Page 161

1        3/4/21, Bates-stamped LECLAIRE_370, marked for

2        identification.)

3        Q.   Ms. Le Claire, I'm showing you what's

4    been marked as Le Claire Exhibit 13.  It's an

5    e-mail dated March 4th, 2021, with the Bates

6    number LECLAIRE_370.

7            Do you recognize this document?

8        A.   I don't remember the specific e-mail,

9    but, you know, it came in to my e-mail address

10   so...

11       Q.   Does this look like an e-mail that you

12   received?

13       A.   Sure.

14       Q.   And it's an e-mail you produced to us

15   in response to the subpoena; is that right?

16       A.   Right.

17       Q.   It came to your

18   marieleclairemgmt@gmail.com account.  Do you still

19   use that Gmail account?

20       A.   I do.

21       Q.   And what do you use it for?

22       A.   I don't use it very much.  Most of the

23   e-mails I get through that e-mail address are

24   e-mails from guys in Maria's band, if they're

25   writing me, you know; just anyone who I sent

161:3 to 161:16
Counter Designation
Lisa Lucas       06/06/2023 02:11 PM

Page 168

| 1 | Q. Ms. Le Claire, can you tell from |
|---|---|

1　　　Q.　Ms. Le Claire, can you tell from

2　looking at a YouTube video whether it infringes

3　Ms. Schneider's work?

4　　　　MR. ZELCS:　Objection, form.

5　　　A.　Not necessarily.

6　　　Q.　Why "not necessarily"?

7　　　A.　Well, it's not -- it's not my judgment

8　call, so I would always just pass them on to Maria

9　for her to decide.

10　　　Q.　To decide what?

11　　　A.　Whether or not she believed it was

12　infringing.

13　　　Q.　So you never formed any belief one way

14　or the other about whether any particular YouTube

15　video was infringing?

16　　　　MR. ZELCS:　Objection, form.

17　　　A.　It was never my place to decide.

18　　　Q.　So I understand that all the takedown

19　notices you submitted were authorized and

20　submitted under the name of Ms. Schneider.　But

21　before notifying Ms. Schneider about YouTube

22　videos containing her works, would you ever form a

23　belief about whether the video infringed

24　Ms. Schneider's work?

25　　　　MR. ZELCS:　Objection, form.

---

168:1 to 168:3
Counter Designation
*Lisa Lucas*　06/06/2023 02:12 PM

168:5 to 168:5
Counter Designation
*Lisa Lucas*　06/06/2023 02:12 PM

168:6 to 168:17
Pltfs Completeness Obj.
*Lisa Lucas*　06/07/2023 01:37 PM

Page 170

1　only person Ms. Schneider has authorized to upload

2　a video to YouTube containing her works, why would

3　you think that a video uploaded by someone else

4　containing her works was there without

5　Ms. Schneider's permission?

6　　A.　I wouldn't know.  That's why I would

7　business trip it to Maria's attention.

8　　　　(Discussion off the record.)

9　　　　(Le Claire Exhibit 15, e-mails, Bates-

10　　　stamped SCHNEIDER_87300, marked for

11　　　identification.)

12　　Q.　Ms. Le Claire, I'm showing you what's

13　been marked as Le Claire Exhibit 15.  It's an

14　e-mail thread with the top e-mail dated April

15　16th, 2014, and with the Bates number

16　SCHNEIDER_87300.

17　　　　Do you recognize this document?

18　　　　(Pause.)

19　　A.　Yeah, it's an e-mail I forwarded to

20　Maria.

21　　Q.　And Le Claire Exhibit 15 the bottom

22　e-mail is from Frostad Bård to

23　musicinquiries@mariaschneider.com.

24　　　　Was musicinquiries@mariaschneider.com

25　an e-mail account that you had access to and

*170:12 to 170:17*
Counter Designation
*Lisa Lucas*　　*06/06/2023 02:12 PM*

*170:19 to 170:20*
Counter Designation
*Lisa Lucas*　　*06/06/2023 02:12 PM*

Page 190

1    Q.    What did you mean when you said, She

2    takes licensing and copyright seriously?

3    A.    I mean exactly that.  That's why she

4    wouldn't have sold it to him.  But beyond that I

5    don't remember.

6    Q.    So she takes licensing and copyright

7    seriously, but you don't know whether you had the

8    license to make a copy of the score and give it

9    away for free?

10    A.    No.  It wasn't my call.

11    Q.    Do you know what metadata is?

12    A.    I have very, very limited knowledge

13    about what that is.

14    Q.    Have you ever edited the metadata of a

15    file?

16    A.    No.

17    Q.    Have you ever inspected the metadata of

18    a file?

19    A.    No.

20    Q.    Have you ever used metadata to locate

21    videos containing Ms. Schneider's work?

22    A.    No.

23    Q.    Have you ever attempted to use metadata

24    to locate videos containing Ms. Schneider's work?

25    A.    No.

*190:20 to 190:22*
**Counter Designation**
*Lisa Lucas        06/06/2023 02:14 PM*

1        Q.    You're a videographer; right?

2        A.    I was.

3        Q.    And when you were preparing videos,

4    editing them, making them into nice polished

5    productions, would you ever edit the metadata of a

6    file?

7        A.    I wouldn't know how to.  I don't know

8    how to.

9        Q.    So you don't know what metadata is

10   associated with the videos that you personally

11   uploaded to YouTube?

12       A.    No, because I couldn't -- I couldn't

13   give you an accurate description of what it even

14   is, really.

15       Q.    When you uploaded videos to YouTube,

16   did you make any attempt to put information

17   identifying the artists or the title of the song

18   or any copyright-related information into the

19   metadata?

20       A.    I don't know how to do that.

21       Q.    Did Ms. Schneider ever ask you to do

22   that?

23       A.    I don't believe so.

24       Q.    Have you ever heard of Uniglobe

25   Entertainment, LLC?

191:15 to 191:20

Counter Designation

*Lisa Lucas*        *06/06/2023 02:14 PM*

Page 215

| |
|---|
| *215:25 to 216:8* |
| Counter Designation |
| *Lisa Lucas*　　　*06/06/2023 02:14 PM* |

1　　Q.　She just told you out of the blue:

2　Don't delete any videos from my YouTube channel?

3　　A.　I think it was like an FYI.

4　　Q.　Did Ms. Schneider ever tell you to not

5　delete videos with her content from your YouTube

6　channels?

7　　A.　I don't remember.

8　　Q.　You do remember her telling you not to

9　delete videos from her channel?

10　　A.　Yes.

11　　Q.　But you don't remember whether she told

12　you not to delete any videos from your channel?

13　　A.　No, I don't remember.

14　　Q.　Did she ever tell you to keep records

15　of your searches on YouTube for videos containing

16　her works?

17　　A.　I don't think so.

18　　Q.　Did she ever tell you to keep records

19　of videos you found on YouTube infringing her

20　works?

21　　A.　I don't think so.

22　　　(Le Claire Exhibit 18, e-mails, Bates-

23　　stamped beginning SCHNEIDER_178806, marked for

24　　identification.)

25　　Q.　Ms. Le Claire, I'm showing you what's

1        been marked Le Claire Exhibit 18.  It's an e-mail

2        thread dated February 18th, 2021, Bates number

3        SCHNEIDER_178806.

4                Do you recognize this?

5        A.   Yes.

6        Q.   What is it?

7        A.   I believe they are videos that had been

8    on YouTube that were deleted.

9        Q.   And when you say "they," you mean the

10   table here at the bottom of Exhibit 18?

11       A.   Yes.

12       Q.   And did you delete these videos?

13       A.   I believe I did.

14       Q.   Are you not certain whether you deleted

15   them?

16       A.   I don't remember deleting every single

17   one of these videos specifically, but I believe

18   that I did do it.

19       Q.   Do you remember deleting any of them

20   specifically?

21       A.   Yes.

22       Q.   Which ones do you remember deleting?

23       A.   I remember deleting Jack 2019 Holiday

24   Concert.

25       Q.   Do you remember deleting any others?

*216:9 to 216:11*
Pltfs Completeness Obj.
*Lisa Lucas        06/07/2023 01:36 PM*

*216:12 to 216:13*
Counter Designation
*Lisa Lucas        06/06/2023 02:15 PM*

| | |
|---|---|
| 1 | A.   Not specifically. |
| 2 | Q.   Now, Jack 2019 Holiday Concert, that's |
| 3 | I'm guessing a personal video of yours? |
| 4 | A.   Yes. |
| 5 | Q.   And why did you delete that one? |
| 6 | A.   Because I had only uploaded it to share |
| 7 | it with my family, and then I decided to take it |
| 8 | down. |
| 9 | Q.   And what led to you deciding to take it |
| 10 | down? |
| 11 | A.   I don't remember. |
| 12 | Q.   Was it an unlisted video? |
| 13 | A.   I believe so. |
| 14 | Q.   So why would you think you deleted |
| 15 | these other videos if you don't remember doing it? |
| 16 | A.   Because I remember Maria asking about |
| 17 | it when she sent this e-mail and me realizing, Oh, |
| 18 | crap, maybe I did delete those.  And then I sort |
| 19 | of vaguely remembered clearly out some old |
| 20 | unlisted videos from what I thought were uploaded |
| 21 | to my YouTube account. |
| 22 | Q.   Are these videos that contained |
| 23 | Ms. Schneider's works? |
| 24 | A.   Yes. |
| 25 | Q.   So the first one, Sanzenin 11 19 19, |

*217:14 to 217:21*
Pltfs Completeness Obj.
**Lisa Lucas**    06/07/2023 01:36 PM

*217:22 to 217:24*
Counter Designation
**Lisa Lucas**    06/06/2023 02:15 PM

*217:25 to 218:11*
Pltfs Completeness Obj.
**Lisa Lucas**    06/07/2023 01:36 PM

Page 218

1    that's a video with her work Sanzenin in it?

2         A.   Yes.

3         Q.   Same for Giant Steps, it's her

4    performance of Giant Steps; right?  She didn't

5    write Giant Steps?

6         A.   Right.

7         Q.   Look Up, CQ CQ, Data Lords, Sputnik,

8    Potter's Song, Bluebird, Potter's Song, Potter's

9    Song, Potter's Song, Stone Song, A World Lost, all

10   those are Ms. Schneider's works?

11        A.   Yes.

12        Q.   And these are all videos that have

13   Ms. Schneider's work in them?

14        A.   Yes.

15        Q.   And had you uploaded these videos to

16   YouTube?

17        A.   Yes.

18        Q.   And you uploaded them with

19   Ms. Schneider's permission?

20        A.   Yes.

21        Q.   Then you deleted them in February -- I

22   guess before February 2021?

23        A.   Yes.

24        Q.   Why would you have been cleaning up

25   your YouTube channel?

---

*218:18 to 218:23*

Counter Designation

*Lisa Lucas        06/06/2023 02:15 PM*

1    to identify it in some way.

2         (Le Claire Exhibit 22, printout from

3    ASCAP Web site, Bates-stamped beginning

4    LECLAIRE_842, marked for identification.)

5    Q.   Ms. Le Claire, I'm showing you what's

6    been marked Le Claire Exhibit 22.  It's a

7    document -- it's a printout of a Web site produced

8    in this litigation with a Bates number

9    LECLAIRE_842.

10        Do you recognize this?

11    A.   Yes.

12    Q.   What is it?

13    A.   It's a report generated from ASCAP's

14    Web site that's a list of Maria's registered

15    works.

16    Q.   When you say this is a list of

17    Ms. Schneider's registered works, you're referring

18    to works that have been registered with ASCAP?

19    A.   Yes.

20    Q.   If we look at the first work here on

21    page 1 of Exhibit 22, A Potter's Song, there's

22    three interested parties listed -- right? -- Maria

23    Schneider, MSF Music, and ArtistShare East; is

24    that right?

25    A.   Yes.

---

**235:5 to 235:15**

**Counter Designation**

*Lisa Lucas*     *06/06/2023 02:09 PM*

**235:16 to 235:19**

Pltfs Completeness Obj.

*Lisa Lucas*     *06/07/2023 01:35 PM*

1      A.   Because I don't remember the exact

2   conversations that we had with the venue when

3   providing any promotional materials they

4   requested.

5      Q.   So whether this would have permitted

6   the venue to upload something to YouTube

7   containing Ms. Schneider's works would depend on

8   conversations between Ms. Schneider and the venue?

9         MR. ZELCS:  Objection, form.

10     A.   I don't -- I don't know.  I don't

11  remember -- like I said, I don't remember the

12  conversations we had with this venue.

13     Q.   But you can't say, without remembering

14  those conversations, whether the venue would have

15  had permission to post clips to YouTube?

16        MR. ZELCS:  Same objection, form.

17     A.   No, I don't remember.  I don't know.

18     Q.   Say you were trying to figure out

19  whether a video uploaded by a venue to YouTube

20  containing Ms. Schneider's work was permitted by

21  one of these kinds of performance contracts.  What

22  would you need to look at?

23        MR. ZELCS:  Objection, form.

24     A.   It wouldn't be my call.  At the end of

25  the day, it was -- it's Maria that reads her

*254:18 to 254:22*
Counter Designation
*Lisa Lucas    06/06/2023 02:16 PM*

*254:24 to 255:8*
Counter Designation
*Lisa Lucas    06/06/2023 02:16 PM*

1    contracts, decides what's okay, and then signs off

2    on them.

3        Q.   So say she asked you:  Hey, a venue

4    posted a video of mine, a video containing my

5    works to YouTube; can you provide me all the

6    materials you have, as my booking agent, that are

7    relevant to whether the venue had permission to do

8    that, what would you give her?

9        MR. ZELCS:  Objection, form.

10       A.   I don't really follow.

11       Q.   Can you tell whether the video would

12   have been permitted on YouTube from looking just

13   at this kind of a contract?

14       MR. ZELCS:  Same objection, form.

15       A.   No.

16       Q.   Why not?

17       A.   Because it's very general, and it

18   doesn't look like Maria made notes on it saying

19   like they were restricting them.  But, again,

20   there may have been conversations with the venue

21   that I'm not remembering.

22       Q.   And those conversations could affect

23   whether or not the venue would have permission to

24   upload the videos to YouTube?

25       MR. ZELCS:  Objection, form.

255:10 to 255:13
Counter Designation
Lisa Lucas        06/06/2023 02:16 PM

255:15 to 255:24
Counter Designation
Lisa Lucas        06/06/2023 02:16 PM

Page 256

| 1 | A.    Yes. |
|---|---|

MR. HAROLD:  Let's take a break.

256:1 to 256:1
Counter Designation
*Lisa Lucas*        *06/06/2023 02:16 PM*

2    MR. HAROLD:  Let's take a break.

3    THE VIDEOGRAPHER:  The time on the

4    video monitor is 5:11 p.m.  We're off the

5    record.

6       (Recess taken from 5:11 to 5:22.)

7    THE VIDEOGRAPHER:  We are back on the

8    record.  The time on the video monitor is 5:22

9    p.m.  This starts media 6.

10    Q.    Ms. Le Claire, have you ever read

11    YouTube's terms of service?

12    A.    I'm sure I did at some point.

13    Q.    Do you recall any license in the

14    YouTube terms of service for content that you

15    upload to YouTube?

16    A.    I don't remember.

17    Q.    Did you have any general understanding

18    that uploading content to YouTube grants a license

19    to YouTube to that content under the terms of

20    service?

21    A.    I don't remember.

22    Q.    Do you know if Ms. Schneider understood

23    that uploading content to YouTube grants a license

24    to YouTube under the terms of service?

25    MR. ZELCS:  Objection, form.

Page 263

1      Mr. Epstein?

2          A.   I don't remember the exact timing of

3      it.  I don't remember if it was before or after

4      Maria moved from Ted Kurland to Epstein & Co.  I

5      don't remember what year that was.

6              (Le Claire Exhibit 31, e-mails, Bates-

7          stamped LECLAIRE_156, marked for

8          identification.)

9          Q.   Ms. Le Claire, I'm showing you what's

10     been marked Le Claire Exhibit 31.  It's an e-mail

11     chain, the top e-mail dated March 2nd, 2017.  The

12     Bates number is LECLAIRE_156.

13             Do you recognize this?

14             (Pause.)

15         A.   Yes, it looks like it's just an e-mail

16     between Maria and Dan Coleman that I was copied

17     on.

18         Q.   It appears that there was a video on

19     YouTube with the work Dance You Monster to My Soft

20     Song by Georg Ruby and the Blue Art Orchestra that

21     Ms. Schneider didn't want on YouTube; is that

22     right?

23         A.   That's what it looks like.

24         Q.   And Dan Coleman asks her:  Are you

25     issuing a takedown of this to YouTube or do you

*263:6 to 265:16*
Pltfs Completeness Obj.
*Lisa Lucas       06/07/2023 01:34 PM*

Le Claire, Marie

1       want me to do so?  And Ms. Schneider says, We are

2       doing it.  Thanks much.  Is that right?

3          A.   Yes, that's what it says.

4          Q.   Did you send a takedown notice for this

5       video?

6          A.   I don't remember.

7          Q.   Did Ms. Schneider ask you to send a

8       takedown notice for this video?

9          A.   I don't remember.

10         Q.   Would you consider Ms. Schneider

11      sending an e-mail where you're copied saying, We

12      are doing it, with the "it" referring to sending a

13      takedown notice, to be a request from

14      Ms. Schneider to send a takedown notice?

15         A.   Yes.

16         Q.   So did Ms. Schneider request you to

17     send a takedown notice for this video?

18         MR. ZELCS:  Objection, form.

19       A.   Yeah, I guess so.

20         Q.   And did you send a takedown notice?

21         MR. ZELCS:  Objection, form.

22       A.   I don't remember.

23         Q.   If Ms. Schneider asked you to send a

24     takedown notice, is there any reason you wouldn't

25     have sent a takedown notice?

Page 265

1    A.   No.

2    Q.   Do you know whether the people who

3   uploaded this video had a license to upload it?

4    A.   No.

5    Q.   Did you ever speak with Dan Coleman

6   about this video?

7    A.   I don't remember.

8    Q.   So Mr. Coleman offers to send a

9   takedown notice for this video. Do you know if he

10   ever sent any takedown notices on Ms. Schneider's

11   behalf?

12    A.   I don't recall him ever doing so.

13    Q.   Did Mr. Coleman ever offer to send

14   takedown notices on any other occasions?

15      MR. ZELCS: Objection, form.

16    A.   Not that I remember.

17    Q.   Ms. Schneider never sent any takedown

18   notices herself; right?

19      MR. ZELCS: Objection, form.

20    A.   I don't believe so.

21      (Le Claire Exhibit 32, Maria's analysis

22   of factors under Section 511 of Unemployment

23   Insurance Act, Bates-stamped beginning

24   LECLAIRE_1, marked for identification.)

25    Q.   Now, this is a document that has the

*265:17 to 265:18*
Counter Designation
*Lisa Lucas*    **06/06/2023 02:07 PM**

*265:20 to 265:20*
Counter Designation
*Lisa Lucas*    **06/06/2023 02:07 PM**

# EXHIBIT A-3

*FILED UNDER SEAL*

# EXHIBIT A-4

*FILED UNDER SEAL*