# EXHIBIT 1

Pages 1 - 53

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

MARIA SCHNEIDER, individually      )
and on behalf of all others        )
similarly situated,                )
                                   )
            Plaintiffs,            )
                                   )
  VS.                              )      **NO. C 20-4423 JD**
                                   )
YOUTUBE, LLC,                      )
                                   )
            Defendant.             )
_____   )

San Francisco, California
Thursday, May 25, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    BOIES, SCHILLER & FLEXNER LLP
                    55 Hudson Yards - 20th Floor
                    New York, New York  10001
            BY:  **PHILIP C. KOROLOGOS, ATTORNEY AT LAW**
                 **JEFFREY P. WALDRON, JR., ATTORNEY AT LAW**

                    KOREIN TILLERY LLC
                    505 North 7th Street - Suite 3600
                    St. Louis, Missouri  63101
            BY:  **CAROL L. O'KEEFE, ATTORNEY AT LAW**

                    KOREIN TILLERY LLC
                    205 North Michigan Avenue - Suite 1950
                    Chicago, Illinois  60601
            BY:  **RANDALL P. EWING, JR., ATTORNEY AT LAW**

        **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

```
 1    APPEARANCES:  (CONT'D)

 2    For Defendant:
                                KEKER & VAN NEST LLP
 3                              633 Battery Street
                                San Francisco, California  94111
 4                       BY:   ROBERT VAN NEST, ATTORNEY AT LAW
                               JULIA L. ALLEN, ATTORNEY AT LAW
 5                             LUKE P. APFELD, ATTORNEY AT LAW
                               AMOS ESPELAND, ATTORNEY AT LAW

 6

 7                              WILSON SONSINI GOODRICH & ROSATI
                                650 Page Mill Road
 8                              Palo Alto, California  94304
                         BY:   DAVID H. KRAMER, ATTORNEY AT LAW
 9                             LAUREN GALLO WHITE, ATTORNEY AT LAW
                               QIFAN HUANG, ATTORNEY AT LAW

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    Thursday - May 25, 2023                        1:35 p.m.

 2                     P R O C E E D I N G S

 3                        ---oOo---

 4         THE CLERK:  All rise.  This court is now in session.

 5    The Honorable James Donato presiding.

 6         THE COURT:  Good afternoon.

 7         THE CLERK:  Please be seated.

 8                    (Pause in proceedings.)

 9         THE CLERK:  Calling civil 20-4423, Schneider, et al.

10    versus YouTube, LLC.

11      Counsel, please state your appearances for the record.

12       MR. KOROLOGOS:  Good afternoon, Your Honor, Phil

13    Korologos with Boies Schiller Flexner on behalf of the

14    Plaintiffs.  With me from Boies Schiller is my colleague

15    Jeffrey Waldron.

16       MS. O'KEEFE:  Good afternoon, Your Honor, Carol

17    O'Keefe Korein Tillery on behalf of the Plaintiffs.

18       MR. EWING:  And, Your Honor, Randall Ewing from Korein

19    Tillery on behalf of the Plaintiffs.  I would like to introduce

20    our clients to the court in the front row here.  From your left

21    to right, we have Maxim Lisowsky, who is the deputy general

22    director of digital content for AST.  We have Maria Schneider.

23    We have Namrata Singh-Gujral Cooper, also known as Naomi

24    Cooper, who is the owner of Uniglobe, and we have Gabor Csupo,

25    here personally also as the owner of Pirate Monitor, Limited.
```

1          **THE COURT:**  Oh, okay.  All right.

2          **MR. VAN NEST:**  Good afternoon, Your Honor, Bob Van

3     Nest, Keker Van Nest and Peters for YouTube.  I'm here with

4     Julia Allen, Luke Apfeld, and Amos Espeland.  And Mr. Kramer is

5     here as well with Ms. Gallo.

6          **MR. KRAMER:**  Gallo-White.  And Qifan Huang from my

7     firm is also joining us and is our client Google, Matt

8     Gubiotti.

9          **THE COURT:**  Okay.  We have a remote -- live but remote

10    reporter, so just make sure you say your name when you get up;

11    okay.  She can see everything but we are experimenting.  There

12    is a court reporter crisis.  We are experimenting with remote

13    access to see if we can solve that.

14        Well, we have a lot of work to do.  Who is going to take

15    the lead for the Plaintiffs?

16          **MR. KOROLOGOS:**  I am, Your Honor.

17          **THE COURT:**  And Defendants?

18          **MR. VAN NEST:**  I will, Your Honor.

19          **THE CLERK:**  And state who you are one more time.

20          **MR. KOROLOGOS:**  Bill Korologos, Your Honor, for the

21    Plaintiff.

22          **MR. VAN NEST:**  Bob Van Nest for YouTube.

23          **THE COURT:**  All right.  We are going to -- we are

24    still set for June 12th.  Now, since the volume of pretrial

25    filings the world has changed.

1    So, what -- now, just -- we are just talking among friends

2  here.  I'm not tying anyone's hands.  What are you planning --

3  what's the plan for trial?  What are you planning to do in

4  terms of case?

5        **MR. KOROLOGOS:**  Well, Your Honor, I think the

6  remaining issue, now that Your Honor has dealt with the class

7  certification question, is Defendants' attempt to avoid their

8  affirmative defense, the DMCA safe harbor, which, as Your Honor

9  may recall from our administrative motion, they have expressed

10  a desire to withdraw that.

11    We do not believe that they have the ability to do that at

12  this time certainly without --

13        **THE COURT:**  Well, if I might just jump -- okay,

14  what's -- what claims -- what claims are you planning to

15  present to the jury?

16        **MR. KOROLOGOS:**  Infringement claims and the CMI

17  claims, Your Honor.

18        **THE COURT:**  Okay.  So, now infringement for whom?

19        **MR. KOROLOGOS:**  For each of our Plaintiffs,

20  Your Honor, Ms. Schneider, for UniGlobe, and for ASG.

21        **THE COURT:**  Now, so that's going to be a work-by-work

22  series of claims for --

23        **MR. KOROLOGOS:**  I think in terms of the way we plan to

24  present that, Your Honor, is a work-by-work for the

25  infringement but to do so in a summary fashion through the

1   Plaintiffs.

2          **THE COURT:**  In a summary fashion?

3          **MR. KOROLOGOS:**  In a summary fashion.  We are not

4   going to sit and watch an entire movie.  It's an hour and 38

5   minutes long.  I think we can identify that.

6          **THE COURT:**  I can assure you we are not going to do

7   that.

8          **MR. KOROLOGOS:**  Right.  And so similarly, I don't

9   think we need to listen to 25 or however many it is, musical

10  works that Ms. Schneider composed, but we can put the Plaintiff

11  on the stand and have them identify with a summary exhibit,

12  that we will provide for the jury including with links to the

13  actual musical recording or to the video that is infringing or

14  to the video of the movie or to the screenplay and things like

15  that, so that there is a pathway for the jury if they wish to

16  look at every single thing.  They will have that with them in

17  the courtroom.

18         **THE COURT:**  How many works are you thinking we are

19  going to see?

20         **MR. KOROLOGOS:**  Um, I believe the number of works,

21  Your Honor, is in the neighborhood of -- of, um --

22         **THE COURT:**  I saw 300 and something.  Is that --

23         **MR. KOROLOGOS:**  First of all, that's infringement.

24  That's not works.  So there is a --

25         **THE COURT:**  How many infringement items are you going

1    to have, 317?

2           MR. KOROLOGOS:  I think the number of infringements is

3    now in the neighborhood of 200, Your Honor.

4           THE COURT:  200, okay.  And --

5           MR. KOROLOGOS:  Covering about -- there are two works

6    for UniGlobe, two versions of the same movie -- one in English

7    one in Hindi -- I believe there are ten or 15 audiobooks by

8    AST, and I believe there are about 25 works of -- musical works

9    by Ms. Schneider.

10          THE COURT:  Well, here is what I was thinking:  I will

11   leave it up to you two, but it seems to me you two, Plaintiffs

12   and Defendants, can work out something.  You are not making any

13   concessions but you can agree that maybe we can put together

14   sets, some logical grouping of all of these works by Plaintiff,

15   by genre, whatever.

16        And Plaintiff you would say, "Here is the work that we

17   contend has been infringed; okay.  And here is the infringing

18   use."

19        You two -- no one is agreeing that it is actually

20   infringed or that the use is infringing.  You are just

21   packaging it in an agreed upon fashion.  That way you can have,

22   I don't know, 30 seconds of a music clip followed by 30 seconds

23   of whatever somebody is doing with it.

24        Does that sound all right?  Can we do that?  Just get that

25   all done ahead of time by stipulation.

1          MR. KOROLOGOS:  That's essentially how we planned to

2    present it.

3          THE COURT:  You are already ahead of me.  No?

4          MR. VAN NEST:  Well, here is the issue, Your Honor:

5    This is -- this is highly irregular; and that is, in the time

6    we are likely to be allotted, proving -- they have 317

7    infringements, you are right, at our last count after the

8    summary judgment --

9          THE COURT:  And that will be down to 200.

10         MR. VAN NEST:  He says.  We don't know which of these

11   works -- which of these infringing videos they intend to prove,

12   and that's one of the problems.  They are playing hide the ball

13   in the sense that we have been asking them "Are you going to

14   narrow your case so that you can try it in a few days because

15   Judge Donato has already said you can't just put in a takedown

16   notice?"

17        And in Ms. Schneider's case she doesn't have any takedown

18   notices on her infringements, how are you going to prove these

19   and which ones?

20        What I suggested, what I suggest today too is let the

21   Plaintiffs choose some number -- ten or 15 or 20 -- infringing

22   infringements.  Tell us what those are tomorrow or Monday so

23   that at least we are not in some chaotic situation where we are

24   trying to deal with 200 claims of infringement.

25        If this were a patent case, of course, we would have done

1   that a long time ago; but our suggestion is since likely they

2   are seeking mainly statutory damages.

3          THE COURT:  It's exclusively statutory damages; right?

4          MR. KOROLOGOS:  No, Your Honor.

5          THE COURT:  I thought you said in your pretrial

6   statement you are renouncing any actual damages?

7          MR. KOROLOGOS:  For the CMI claims, that's accurate,

8   I believe.  But for the infringement claims, for instance,

9   Your Honor, we have some Plaintiffs who have foreign works for

10  which statutory damages are not allowed.

11         THE COURT:  All right.

12         MR. KOROLOGOS:  So we have always taken the position

13  that for the infringements we have the right to select under

14  the statute statutory or actual damage.

15      Now, we are -- we are considering for the U.S. works going

16  to statutory only, which might reduce the number of

17  infringements.  And I stand corrected, Your Honor, from my

18  colleagues who -- I believe the number still is 317 but we have

19  the ability to --

20         THE COURT:  It is 317.

21         MR. KOROLOGOS:  It is.  But I believe we have the

22  ability to reduce that if we were to go, for instance, for

23  Ms. Schneider, whose works are U.S. works, to go to statutory

24  damages only.

25         THE COURT:  Well, I hear your colleague saying they

1   don't know what's on the table.  So when are we going to get

2   this all straightened out?  They have got to get ready.  You've

3   got to get ready.  I have to get ready.

4            MR. KOROLOGOS:  I think it's clear what's on the

5   table, Your Honor.  We have not hid the ball.  They know what

6   the works are.  They know what the infringements are.

7            THE COURT:  How do they know that?

8            MR. KOROLOGOS:  From discovery and from what we

9   provided them in our exhibits.

10            THE COURT:  This is a list -- is there a list of all

11   317?

12            MR. KOROLOGOS:  We have provided summary exhibits to

13   identify for them what the works are.

14            THE COURT:  That would be a list.  Don't you have a

15   list of all 317 claims?

16            MR. KOROLOGOS:  Yes, Your Honor.

17            THE COURT:  You do?  Okay.  Do you have that, Mr. Van

18   Nest?

19            MR. VAN NEST:  We have that list, Your Honor.  That's

20   really not the problem.  The problem is you can't try 317

21   separate infringement claims.

22       They don't have an expert that's going to discuss these.

23   It's going to be claim-by-claim, as Your Honor mentioned and

24   Counsel confirmed.  We can't do 317.

25       What I'm suggesting is, particularly since it doesn't

matter so much if you are seeking statutory damages, let's

choose a number; 10, 15, per Plaintiff and tell us what those

are so we can meet this head on.

       **THE COURT:**  But what about --

       **MR. VAN NEST:**  There is no way --

       **THE COURT:**  That's fine but I can't try this case

every quarter for the next three years in tranches of 15

claims.

       **MR. VAN NEST:**  That's for sure.

       **THE COURT:**  Can't do that.

       **MR. VAN NEST:**  But typically in a case like this the

Plaintiff would be required to narrow what they are going to

present.  They are going to have a limited time in your

courtroom especially now their disgorgement damages total

$7,500, not $750,000 or $7 million.  $7,500, that's their

disgorgement damages for all 317 videos if they were to prove

them.

   My point is we need some reasonable way of our knowing

which 15 are you going to present for Ms. Schneider and which

15 or 20 are you going to present for Ms. Cooper.  Otherwise,

we will be here for six months because it's not realistic to

think that in a one week or two-week trial you could do 317

separate claims of infringement where the jury would have to

find that it's a copy and it's not fair use and so on and so

forth.

1          **THE COURT:**  Let me suggest this:  Now, okay for

2     copyright ownership, you-all can agree on this or no?  Is this

3     going to be something we are going to have to have the jury do?

4          **MR. KOROLOGOS:**  Even with respect to registrations,

5     Your Honor, they have not agreed with us until we went and got

6     certified copies of the registrations.  Even though you can go

7     online and find these records, they have made us go get

8     certified registration.  So we have had great difficulty in

9     getting them to agree, Your Honor.

10          **THE COURT:**  Are we done on that one now?

11          **MR. KOROLOGOS:**  I think they came in yesterday.  We

12     are going to -- if we haven't already, we are going to give

13     those to them.  They told us if we give them to them, they will

14     drop the registration.

15          **THE COURT:**  How do you want to do this?  Look, you are

16     going to -- I just tried last week the verdict came in, okay,

17     $270 million, so it was a serious case.  It was the last opt

18     out from my very first MDL that I got the day I walked in in

19     2014, eight, nine years later, last opt -- well, second to last

20     opt out.  They tried it.

21          Each side got 12 hours for a Japanese language price

22     fixing case with a conspiracy period of 2001 to 2014.  Massive

23     in every respect.  Large reward.  They didn't even use the 12

24     hours each.  So you are going to get about 12 hours each.  So

25     how are you going to do this?

1          **MR. KOROLOGOS:**  Your Honor, I plan to put on -- I will

2     give you an example, Ms. Schneider.  I plan to put her on with

3     a summary exhibit.

4          **THE COURT:**  Of how many works will she have?

5          **MR. KOROLOGOS:**  I believe it's about 20, maybe it is

6     22.

7          **THE COURT:**  She will have 20 works.

8          **MR. KOROLOGOS:**  Twenty-two works, a -- I think that

9     may be about 200 infringements, videos that infringe; but she

10    will testify these are her works.  She will testify that she

11    has reviewed each of the alleged infringements and that they

12    are copies of her works and what kind of a copy it is.

13         **THE COURT:**  She is going to say that?

14         **MR. KOROLOGOS:**  She will say that, Your Honor, and we

15    will have a summary exhibit to provide to the jury that will

16    link to the evidence that we will put in through her of each

17    work and each infringement, but we don't need to play each one

18    and take the time if we have Ms. Schneider on the stand to say

19    "this is what it is and this is summarized in this chart and

20    yes, I have looked at each one and yes, it's a copy."

21         They can -- they have these already.  They can look at

22    them and they can say "that's not right," and they can tell the

23    jury if they think they have the evidence for it, which they

24    won't, that what Ms. Schneider said about the works as

25    summarized in the chart is not accurate.  And they can put that

1    on if they want to, but they are not going to be able to do

2    that.  I think it will go quite quickly.

3          **MR. VAN NEST:**  Your Honor, this is highly irregular.

4    They want to put up a chart with 217 claimed infringing videos

5    without the requirement to prove them, without showing the

6    jurors that it is indeed a copy.

7       Now --

8          **THE COURT:**  And by the way, just to jump in on that, I

9    mean, you are basically just asking the jury to burn its time

10   in the deliberation room looking at all these individually.

11   And that's not their job.

12      I mean, in a sense they are going to have to weigh each

13   one obviously; but you have got to put it on in court.  I mean,

14   there is no presumption that what any witness says is going to

15   be dispositive of infringement without actually seeing the

16   side-by-side clips or whatever you are going to do.

17         **MR. KOROLOGOS:**  We plan to put on enough to show that

18   they are the same but like I said earlier --

19         **THE COURT:**  How can you do anything less than all 200?

20   They are each going to be different; right?  I mean, by

21   definition they are each different infringing uses.  So how are

22   you going to do anything less than all 200?

23         **MR. KOROLOGOS:**  Well, I don't think we should have to;

24   but if Your Honor is saying that we need to touch each one, we

25   can play 30 seconds of each one to show what it is and the

1   witness can testify as to --

2           **THE COURT:**  Thirty seconds?

3           **MR. KOROLOGOS:**  -- what the overlap is.

4           **MR. VAN NEST:**  Your Honor, can I make this

5   suggestion -- I mean, this is completely impractical as I think

6   you are appreciating -- if they are seeking in the case of

7   Ms. Schneider, for example, statutory damages, they don't have

8   to prove all 217.  They have to prove some number so they can

9   argue to the jury there is a lot.

10       Let's pick a number that I'm not -- I'm not, you know,

11  fixed on anything, 10, 15, and let's try those and they will

12  either win them all or lose them all or there will be some mix;

13  and then they can argue that there were infringements and

14  YouTube is responsible and so on and so forth.

15       They want to put up a big summary as they have already

16  proved it.  That's not --

17          **THE COURT:**  I understand that but I -- okay, so then

18  what happens after that?  You have knocked 15 of 200 down.

19  What about the 185 that are left?

20          **MR. VAN NEST:**  They have to narrow their case,

21  Your Honor, and they can argue from those that this is

22  substantial and they are entitled to an award of statutory

23  damages.

24       The statutory damages are not awarded per video.  They are

25  awarded per work.  So if they have 26 works, let's say, for

1   Ms. Schneider, 26 different compositions, they can decide they
2   want to prove ten of those or 15 or all 26; but they would have
3   to prove infringement of each one and then they get a statutory
4   damage award on any one they proved.
5        So it is up to them to decide in the case of Ms. Schneider
6   whether they want to put on three videos, four videos or five
7   videos per work.  That's still a ton because there's 26 works.
8   If it were me, I would be saying, okay, take my best 10 and I
9   will prove two or three videos for each one and I will argue
10  for statutory damages based on that.
11       The statutory damage calculation is based on things like
12  willfulness, innocence, how serious is the conduct, stuff like
13  that.  And it doesn't -- you are not awarding damages per
14  infringing video.
15            **THE COURT:**  All right.  Here is what we are going to
16  do:  This is pretrial conference number 1, obviously.  You are
17  going to have to come back.  So you two, Mr. Korologos and
18  Mr. Van Nest, you need to work something out; okay.  I want you
19  two -- rather than triangulating with me, you two work out a
20  plan.
21       You are going to get about 12 hours.  That's exclusive of
22  opening and closing.  That's 12 hours of trial time.  So work
23  it out.  All right.  If you can't do something, I will solve it
24  and neither one of you will be happy.  You know that.  So, you
25  two come up with a plan for that.

1      Now, that aside, I just -- just thematically or

2  conceptually, however you want to put it, Mr. Korologos, I

3  just -- now it is just a straight copyright case.  What does

4  this have to do with content ID at this point?

5      I mean, the whole structure of the complaint is built

6  around access to content ID.  I just -- now we are talking

7  about "here are my 25 works; here are the 200 infringing uses;"

8  right?  We are not content -- I imagine somebody might mention

9  it, but it's not a big target in the case anymore; is that

10 right?

11         **MR. KOROLOGOS:**  Well, I don't think that's quite

12 right, Your Honor.  This goes back to where I started with

13 respect to -- in part at least with respect to the affirmative

14 defense that they raised back in September of 2020 and that we

15 have been litigating quite hard, the DMCA safe harbors, where

16 they say they have no liability on --

17         **THE COURT:**  All right.  They are abandoning ship on

18 that, so --

19         **MR. KOROLOGOS:**  We don't think they should be

20 permitted to, Your Honor.

21         **THE COURT:**  Why not?  I mean, you can drop claims

22 whenever you want.

23         **MR. KOROLOGOS:**  Not if they have been answered or a

24 summary judgment motion has been filed against them.

25         **THE COURT:**  That's absolutely not right.  You can walk

1  in here -- you could've walked in here today and say "We have

2  decided not to pursue any Section 1202(b) claims," and I would

3  have said great and Mr. Van Nest would have said great.

4          **MR. KOROLOGOS:**  If he agrees, yes.  We don't agree.

5  We don't consent to the withdrawal.

6          **THE COURT:**  I don't understand.  You cannot force a

7  Defendant to try an affirmative defense that they have

8  abandoned just like a Defendant cannot force you to try a claim

9  that you have abandoned.

10     Let's say you had an unfair competition law claim and you

11  decided you didn't want to do it anymore?  I mean, there is no

12  way in the world I would say, "I'm sorry.  You are absolutely

13  required to try to me an unfair competition claim."  That's

14  just not going to happen.

15          **MR. KOROLOGOS:**  Right, to try it but then judgment

16  should be entered on that.  We have a pending summary judgment

17  motion on their DMCA defense that's before the Court.  We are

18  entitled to a decision on that.

19     The primary reason you heard Mr. Van Nest talk about the

20  amount that's at stake for these particular individuals.  We

21  would have liked to have done it on behalf of a class but

22  without a class --

23          **THE COURT:**  If I may just interrupt, so what?  Why do

24  you care?  I mean, they are not going to assert the safe

25  harbor.  They are saying, "you know what, we are going to spot

1   you that.  We are so confident of whatever else we have in the

2   defense, we are not going to sail our ship into the safe

3   harbor.  We are done with that."

4       So what is the -- what are you trying to accomplish by

5   saying, no, you have to meet the safe harbor requirements?

6           MR. KOROLOGOS:  Because that's what goes to what

7   protects -- even without a class, Your Honor, that's what

8   protects copyright owners like these people.  It's what

9   protects them because our position is that the way they run

10  their platform is not consistent with the DMCA.  It is not

11  consistent with the repeat infringer requirement.  They do not

12  permit and they interfere with standard technical measures.

13  And look to Your Honor's question about content ID, which goes

14  to willfulness --

15          THE COURT:  You know the DMCA is entirely -- the safe

16  harbor is entirely optional.  You understand that?

17          MR. KOROLOGOS:  I do understand that.

18          THE COURT:  An online service provider doesn't need to

19  lift a finger if they don't want to avail themselves of it.

20          MR. KOROLOGOS:  I do understand.

21          THE COURT:  It is at their risk.  It's at their peril.

22  I mean, it's probably not good not to but they may choose not

23  to.  I don't -- I'm sorry but I just don't see -- what's the

24  jury supposed to decide with respect to the verdict form?  What

25  would the question be about the DMCA?  They are not even going

1    to put a case on so what would the question be to the jury?

2         **MR. KOROLOGOS:**  The *Carraher* decision that we cite in

3    our affirmative defense out of the Ninth Circuit where in their

4    pretrial brief in the *Carraher* case, just like here, they said

5    we are not going to pursue this affirmative defense.  And the

6    Court entered judgment against them on that affirmative

7    defense, and the Ninth Circuit said that's exactly right

8    because you can't abandon it that late after the date to amend

9    pleadings.  You can't abandon the affirmative --

10        **THE COURT:**  I'm sorry.  I just don't agree with that.

11   I think that's wrong.  And even if you are saying that that's

12   an accurate description of that case, which I will take a look

13   at, that's just wrong.  That's simply wrong under the Federal

14   Rules of Civil Procedure.

15        Just as if you decided to drop half your claims, you know,

16   I would not force you to try them or face what is effectively a

17   default judgment.  That's just not right.

18        **MR. KOROLOGOS:**  Well --

19        **THE COURT:**  I would not exercise my discretion to

20   penalize either party for improving the efficiency of the trial

21   by dropping claims that they no longer believe in.  That is

22   antithetical to the fair and just administration of cases not

23   to mention the efficient use of jury, party and court

24   resources.

25        **MR. KOROLOGOS:**  Let me address that.

```
 1            THE COURT:  That is so ridiculously formalistic I

 2    can't imagine any right thinking judge would ever say, "Well,

 3    I'm sorry.  I'm going to shove it down your throat anyway."

 4    That just can't be right.

 5            MR. KOROLOGOS:  Let me address a related issue then,

 6    Your Honor.

 7            THE COURT:  No.  I want you to answer my question

 8    about content ID.  What does it have to do with this case?

 9            MR. KOROLOGOS:  Your Honor, if I may, this relates to

10    the bigger picture.  If Your Honor, as I hear, is going to

11    allow them to not put on a DMCA safe harbor defense, then we

12    respectfully request from Your Honor a stay of the case to have

13    our Rule 23(f) petition heard by the Ninth Circuit.

14            THE COURT:  I'm not going to do that.  You got a trial

15    set on June 12th.  This is a 2020 case; okay.  It's showtime.

16            MR. KOROLOGOS:  Okay.  Then just to alert, Your Honor,

17    we are going to seek a stay from the Ninth Circuit.

18            THE COURT:  That's perfectly fine.  Mr. Korologos, you

19    are not the first to say that.

20            MR. KOROLOGOS:  I know that.  I'm just --

21            THE COURT:  Look, just do your thing; okay?  Let's

22    just focus on this trial.  Please answer my question.  What

23    does content ID have to do with the trial?  Third and last

24    call.  What's the answer?

25            MR. KOROLOGOS:  Even without DMCA, it goes to
```

1    willfulness, Your Honor.  The technology that's behind content

2    ID, they use already every day.  This is not asking them to run

3    it.

4         **THE COURT:**  I understand that.  They have it.  They

5    use it.  A small number of people get -- I get all that.

6         **MR. KOROLOGOS:**  My point is, Your Honor, it's

7    different than what Your Honor just said.  They use it as part

8    of their copyright match tool and what's called content age.

9         Every time a video goes up on the platform, they use their

10   matching technology to see where that content was first put

11   onto the system.  So they have the data of every video -- the

12   many, many videos on their system and Your Honor has seen what

13   those numbers are.  They have the data each time a video goes

14   up of what matches to that.

15        So every time they take something down because of a

16   complete and valid takedown notice, indicia of infringement,

17   they know what matches that video.  They already know.

18        Let me give, Your Honor, an example.

19        **THE COURT:**  We've got to move on a little more

20   briskly, Mr. Korologos.  What is the question?  You want the

21   jury to find predicate facts about content ID for willfulness?

22   Is that what you are saying?

23        **MR. KOROLOGOS:**  This data shows that they know the

24   infringements exist, and they don't surface that to people that

25   put in takedown notices for anything that's on the system in

 1   the past.

 2          **THE COURT:**  You are going to put it in in connection

 3   with willfulness.

 4          **MR. KOROLOGOS:**  Yes, Your Honor.

 5          **THE COURT:**  Okay.  All right.  That's fine.  Seems

 6   okay.

 7          **MR. KOROLOGOS:**  And that's -- that's a side --

 8          **THE COURT:**  I thought you were tying it to the

 9   copyright claims in a more direct infringement sense.  For

10   willfulness, it's fine.

11          **MR. KOROLOGOS:**  It's directly relevant to repeat

12   infringer, but repeat infringer is only relevant to the DMCA

13   safe harbor takedown -- sorry, the safe harbor defense under

14   512.

15          **THE COURT:**  So you-all are going to talk about a plan,

16   number of -- how we are going to get this done.  I understand

17   now about what you are going to do with the content ID.  I

18   mean, I will see how it goes.  We will see how it does.

19      The --

20          **MR. VAN NEST:**  Your Honor?

21          **THE COURT:**  Yes.

22          **MR. VAN NEST:**  I think you have resolved this but

23   technically on this DMCA issue, since the time has passed we

24   need your permission, which I think you have given, for us to

25   withdraw that affirmative defense.

1          **THE COURT:**  You know, there's an old doctrine which

2     was conforming pleadings to proof of trial, okay, which means

3     sometimes it doesn't even come up until the case gets submitted

4     to a jury that a claim hasn't been pursued.  And what you

5     typically do is you in affect amend the pleadings to conform to

6     the proof at trial.  So, yes.

7          **MR. VAN NEST:**  Thank you.  We will file an amended

8     answer and that moots the summary judgment motion.  You don't

9     have to deal with it.

10         **THE COURT:**  I don't have to deal with it.  Now, let me

11    ask you this:  These experts, now that we are not doing a

12    class, who can we give up?

13         **MR. KOROLOGOS:**  We have withdrawn Mr. Cowan who was

14    our class --

15         **THE COURT:**  Charles Cowan.

16         **MR. KOROLOGOS:**  And the flipside of Mr. Cowan was

17    Mr. Halm.

18         **THE COURT:**  Greg Halm.

19         **MR. KOROLOGOS:**  Yes.

20         **THE COURT:**  Those two by agreement are out.

21         **MR. KOROLOGOS:**  Yes, Your Honor.

22         **THE COURT:**  So that leaves Winograd, Jessop, Singer.

23         **MR. KOROLOGOS:**  Yes, Your Honor.

24         **THE COURT:**  And Nuttall.

25         **MR. KOROLOGOS:**  Nuttall and Peterson on their side.

1          THE COURT:  Is that right, Mr. Van Nest?

2          MR. VAN NEST:  It is, Your Honor, but I do want to

3    talk about Mr. Singer when you have a moment because that's

4    important.

5          THE COURT:  Yes, we will do that although it may not

6    be until the next conference but just let's -- let's see how

7    much of the -- right now we are pruning the canopy before we

8    get to the smaller branches.

9          MR. VAN NEST:  I don't think that's a small one, by

10   the way, but I'm certainly willing to --

11         THE COURT:  Well, more discrete branches.

12         MR. KOROLOGOS:  One more pruning, Your Honor.

13         THE COURT:  Yeah.

14         MR. KOROLOGOS:  With the class cert decision, we have

15   removed Mr. Thing as a fact witness because he went to the

16   issue of how they processed takedown notices.

17         THE COURT:  Oh, that's fine.

18         MR. KOROLOGOS:  He is still going to have a few

19   designations that are outside of that scope, but we don't need

20   to call him live anymore.

21         THE COURT:  That's probably more granular than I need

22   right now.  Okay.  Let me check my notes here.

23                      (Pause in proceedings.)

24         THE COURT:  All right.  What about the -- I mean, how

25   many of these motions in limine can we take off now that

1    it's -- can you help me with that?

2              MR. KOROLOGOS:   I will try to, Your Honor.

3              THE COURT:   Okay, so YouTube's are docket number 311.

4    Mr. Van Nest, what can I -- what can I prune now that it's not

5    a class?

6              MR. VAN NEST:   I think we need to know what the

7    Plaintiffs are going to be withdrawing.   We have had trouble

8    getting that, but --

9              THE COURT:   All right.   Let's start with the

10   Plaintiffs.   That's docket number --

11             MR. KOROLOGOS:   Your Honor, in terms of --

12             THE COURT:   224.

13             MR. KOROLOGOS:   -- terms of the class decision, I

14   don't believe that alters the motions in limine.

15             THE COURT:   None of these?

16             MR. KOROLOGOS:   I don't believe so, Your Honor.   In

17   terms of Your Honor permitting them to amend their answer on

18   DMCA takedown, I believe that Plaintiff's Motion Number 1 only

19   relates --

20             THE COURT:   We can't take off any of Plaintiffs

21   motions in limine?

22             MR. KOROLOGOS:   I don't believe with respect to the

23   class but with respect to DMCA number 1 and number 2 relate to

24   those issues, Your Honor.

25             MR. VAN NEST:   So, 1 and 2 are out.

1          **THE COURT:**  One and 2 are out for the Defendant?

2          **MR. VAN NEST:**  No, no, no.  I thought I heard Counsel

3  say 1 and 2 are out for the Plaintiffs.

4          **THE COURT:**  No.  He is saying your 1 and 2 are out.

5          **MR. KOROLOGOS:**  I was talking about ours, Your Honor.

6          **THE COURT:**  Oh, you are?

7          **MR. KOROLOGOS:**  Yes.

8          **THE COURT:**  All right.  I need to use docket numbers.

9          **MR. KOROLOGOS:**  I'm happy to throw all of his out.

10          **THE COURT:**  I'm looking at docket number 314-1.  This

11  is the sealed version of Plaintiff's motions in limine.  So

12  which ones, Plaintiffs, are you withdrawing?  Number 1?

13          **MR. KOROLOGOS:**  May I have one moment, Your Honor?

14          **THE COURT:**  Yeah, number 1 is something about

15  takedowns on private unlisted videos.

16          **MR. KOROLOGOS:**  Yes, and that related to evidence that

17  was put in in counter to our summary judgment on the DMCA

18  issues.  So I believe that's gone.

19          **THE COURT:**  All right.  That's out.

20          **MR. VAN NEST:**  Was that 1 or 2?

21          **THE COURT:**  Number 1.

22          **MR. KOROLOGOS:**  The hundred thousand.

23          **THE COURT:**  Number 2 is Plaintiff's motion with

24  respect to contesting facts described in Plaintiff's proffer of

25  evidence concerning DMCA factual disputes.  That's out?

1          **MR. KOROLOGOS:**  Let me have one moment, Your Honor.

2          **THE COURT:**  Sure.  That's fine.

3                    (Pause in the proceedings.)

4          **MR. KOROLOGOS:**  I believe that one is narrowed but not

5    completely out, Your Honor.

6          **THE COURT:**  Let's do this.  You two add that to your

7    meet-and-confer list; okay?  So just go through the motions in

8    limine both sides and tell me which ones I don't need to do.

9    There has got to be a couple.

10       Okay.  Now on the jury instructions, let me share with you

11   my approach and you are going to have to rework these sets;

12   okay.

13       So I give a preliminary set, every judge does, for right

14   after opening statements right after the jury is seated and

15   then we get the final instructions.

16       Now, I want you to use as a template what I just did in

17   this antitrust case that I just told you about.  It is docket

18   number 17-7046.  Now this has two numbers.  It has that number

19   and an MDL number.  Just use that number, 17-CV-7046 -- just

20   one second.

21                    (Pause in proceedings.)

22          **THE COURT:**  Preliminary instructions are all the nuts

23   and bolts things about what is evidence, what to believe.  I

24   want you to slavishly copy the text in those preliminary -- you

25   shouldn't need to change anything.  I have carefully -- our

1   jury committee in the circuit does hard work but it is drafted

2   by committee and it reads like it is written by people who

3   don't -- aren't native speakers of English.

4        So I have modified it in ways to make it intelligible and

5   easy to understand.  Use my version.  I'm going to give you the

6   docket number in just a second.

7        So your first set is to redo a preliminary set that looks

8   just like that.  Make it, you know, a joint submission.  I will

9   give you the docket number in a second.

10       Now, the final set -- the final set is docket number 375

11  in that case number I just gave you.  The case is called *Avnet*.

12  That is the Plaintiff, A-V-E-N-T, [sic] so you know you have

13  the right one.

14       And then, of course, that's antitrust.  It is totally

15  different but you are going to conform the approach, the

16  ordering and as much as possible, the carryover instructions to

17  look exactly like the ones in *Avnet*; okay.  So that's task

18  number 1.

19       Two sets, preliminary, final, as much as you can harvest

20  out of my *Avnet* exemplars as you can use.

21       Now, I do not under almost any circumstances -- okay, the

22  opening -- the preliminary set is docket number 353, and the

23  final set is docket number 375.

24       Now, I don't under almost any circumstances accept

25  tailored instructions.  Use the form instructions.  This case

```
 1   should be completely amenable to form instructions.  There are
 2   copyright form instructions, there are damage form
 3   instructions, there is a form instruction for almost
 4   everything.  Don't tailor it.
 5        Now, 10202(b), I don't know, maybe not.  You might have to
 6   work with that.  If you do work with that, I don't know if
 7   there's any equivalent but the ABA has a very useful set of its
 8   own antitrust instructions that I often look at, many judges
 9   do.  I don't always use them.  They are good.  Sometimes if
10   there is any copyright equivalent -- I doubt that there is.  I
11   can't think of one offhand -- you can try to find it.
12        So you can freelance on 1202 but everything else, strictly
13   by the book.  No modifications.  Please don't ask.  I don't do
14   it.  It just invites -- invites trouble.
15        All right.  So do that.  Make those two done.  Why don't
16   you give -- get the proposed jury instructions to me a week
17   from today -- well, no, get them to me by this coming Tuesday
18   5:00 p.m. this Tuesday; okay.
19        File by -- you can tell me this is too brisk but 5:00 p.m.
20   this Tuesday proposed jury instructions along the lines we just
21   discussed by 5:00 p.m. -- wait, Monday is a holiday?  All
22   right.  All this by 5:00 p.m. on Tuesday, the revised jury
23   instructions, your plan for the method and presentation of
24   evidence and all your works and claims and whatever
25   negotiations you reach on that, a statement with respect to
```

1    which motions in limine can be withdrawn in light of the class

2    certification order.

3        I'm not really hung up on exhibit lists and witness lists.

4    Don't worry about that.  You can always do that later.

5        You may need to redo the verdict form as well.  Please

6    also look at the verdict form in *Avnet*.  I like, as every judge

7    does, a plain and simple verdict form.

8        So look at that for inspiration.  That was a massive price

9    fixing conspiracy overseas case.  There were four questions and

10   that's all that was required to get the job done.  So look at

11   that and hue conceptually as tightly as you can to the

12   efficiency of that model.

13       Let me just cover a couple of other things and we can

14   discuss whatever you'd like.  Now, I do, we are still sending

15   out -- this was a legacy of the COVID period but we are still

16   doing it because it has turned out to be pretty good -- a

17   written screening questionnaire.  It's very basic.  All right.

18   It is not screening for much substantively although I will get

19   back to that in a second.

20       It's mainly screening about the -- screening for all the

21   demographic questions we used to ask in court:  Where do you

22   live, what's your name, are you married, do you work, college,

23   all that stuff.  Have you seen them?  You have seen them

24   before, Mr. Van Nest?

25           **MR. VAN NEST:**  Yes.

1          **THE COURT:**  Have you seen it, Mr. Korologos?

2          **MR. KOROLOGOS:**  I'm familiar with that.

3          **THE COURT:**  We are going to do that.  I have got to

4    get that out by June 1st or 2nd to the jury pool, and I will

5    put in a couple of questions typically focused on the parties,

6    you know, YouTube/Google in case anybody works there, has a

7    sister-in-law who works there.

8          And I also might do a little bit on "have you ever had a

9    copyright dispute; have you ever been involved in a copyright

10   dispute; do you know anything about copyright law;" that kind

11   of a thing.  That will be the main written questionnaire.

12         The whole point of this, as I said, was to kind of screen

13   for COVID issues.  Here is where we are:  COVID is officially

14   over.  So I still -- the U.S. Government said it's over.

15   California State said it's over.

16         So I'm not -- even so, there are questions in the

17   questionnaire about vaccine status and general COVID concerns.

18         I am still of the view that I have a strong preference for

19   people who are fully vaccinated; okay.  So I am not going to

20   make anybody wear masks or anything else with one proviso, I

21   will mention, but I am inclined not to seat anybody who either

22   declines to state their vaccine status or affirmatively states

23   that they are not fully vaccinated.  Are you okay with that?

24         **MR. VAN NEST:**  That's fine with us, Your Honor.

25         **THE COURT:**  Mr. Korologos, are you okay with that?

1          **MR. KOROLOGOS:**  Yes, Your Honor.

2          **THE COURT:**  Okay, good.  Now, in terms of actual COVID

3    protocols here, I will put both of you in charge of your teams

4    to make sure everybody in court who is unmasked is fully

5    vaccinated.  If there is a religious issue or something else,

6    that's fine but they must be masked.  I'm going to leave that

7    up to you.  I will not inquire.

8          You must also check with your witnesses.  If there is a

9    witness who is not fully vaccinated, I will need to be told and

10   that person will have to follow some protocols.  They will not

11   be masked.  The jury must see the face of each testifying

12   witness, but I may have them wear a plastic shield or put

13   something around the jury box.

14         In the first instance, I'm going to rely on you two as

15   part of your trial teams to advise me of any witnesses who may

16   have a less than full COVID vaccine record.

17         **MR. VAN NEST:**  That's fine, Your Honor.

18         **THE COURT:**  Now, I do allow the jury to wear masks.

19   I've had two trials in the last two months.  I would say about

20   40 percent of the jurors elected to.

21         One of them got sniffly.  I actually asked him to.  It is

22   not a problem.  It turned out it wasn't COVID.  I did ask him

23   too.  I gave them the option of seating -- sitting in a

24   staggered fashion.  I can sit 14.  I'm probably going to seat 8

25   jurors.  You will lose about one a week.  This will be a two,

1    two-and-a-half week trial.  So I'm probably going to seat 8 and

2    they will have a little space in between them.  That's it for

3    COVID.  You okay with all of that, Mr. Van Nest.

4            **MR. VAN NEST:**  We are, Your Honor.

5            **THE COURT:**  Mr. Korologos?

6            **MR. KOROLOGOS:**  Yes, Your Honor.

7            **THE COURT:**  Now, for jury selection, here is what's

8    going to happen:  We will get the written responses back.  Last

9    time I think we sent the questionnaire -- I seated -- I

10   sat 8 -- I seated 8 jurors last time and I think we had maybe

11   45 responses and it was more than enough to seat the jury for

12   my antitrust case.

13           **MR. VAN NEST:**  When do those come in, Your Honor?

14           **THE COURT:**  I'm going to get to that.  So I will

15   probably do about 45 again to get the questionnaire out of the

16   jury pool.  Then I will fill them out and we will send them

17   back, and they will come back usually the Tuesday or Wednesday

18   before trial starts and you and I will -- I don't mind doing

19   this by phone, by video call.  You don't have to come in.  You

20   might but you don't have to.

21       We will just go through all 45 or however many we get.  We

22   will probably get 40.  There are always five people that don't

23   respond.  And that's not a peremptory and that's not a

24   challenge.  Nobody is burning anything.

25       We will just flip through it.  If there is somebody we all

1  agree collectively doesn't look like they are going to be

2  suitable for whatever reason -- surgery the next day, COVID

3  protections aren't comforting enough, doesn't speak English --

4  that was a big one last time -- we will agree we won't call

5  them in.  All right.  No one is using any -- you are not

6  burning any right to excuse people once they get here.

7       Then they will get here.  I do what's called a modified

8  six-pack.  The reasons for that -- I have forgotten why it is

9  called that -- but people use livestock with that.  So it is a

10 modified six-pack.  So, I will seat 8.  That will be our first

11 tranche.  Everybody else is going to be in the gallery on the

12 right-hand side.  The rest of the venire panel.  We will go

13 through our list of questions to follow up on the written

14 questionnaire.

15      There will be a hand-held mic and you will be able to hear

16 most of the jurors say something.  They will be passing the mic

17 around, and we will deal with any responses to questions.

18      Now, the reason I mention the people in the gallery is

19 that as I ask the questions of the people in the box, the

20 people in the gallery are going to be following along with a

21 pad and paper to write down the question number and make a note

22 to themselves about whether they have an answer.  That way when

23 we fill seats after people are removed or excused, I don't have

24 to repeat all the questions.  All right.  It works like a

25 charm.

```
 1        Now, the reason it is called a modified six-pack is once
 2   we go through the first eight, we will come over here, have a
 3   sidebar and talk about your challenges, for cause, peremptory.
 4   You are going to get the statutory peremptories.  That's it.
 5   No more than that and we will ask people to leave.  But if you
 6   pass over anyone, they are seated.  You cannot go back later.
 7        So, for example, if we have eight people in the box and
 8   Plaintiffs challenge juror number 6 and Defendants challenge
 9   juror number 8, everybody else is seated.  You cannot go back
10   later and challenge juror number 2.  All right.  So once here
11   without a challenge, they are in.
12        MR. VAN NEST:  Your Honor, I assume each table will
13   get three peremptories but three per table.
14        THE COURT:  Three per side.
15        MR. VAN NEST:  And when we get up at sidebar, you are
16   wanting each side to tell you then which three or which two --
17        THE COURT:  You can do zero, 1, 2 --
18        MR. VAN NEST:  All the way up to 3.  Just give you
19   those at sidebar.
20        THE COURT:  And your challenges, you know, for cause.
21        MR. VAN NEST:  Sure.  And then we will work with
22   what's in the gallery if need be.
23        THE COURT:  That's right.  And then -- but the key
24   thing, they are seated if you both pass over someone, you can't
25   go back the next round and say, "Well, we thought about it; we
```

1    don't like number 1."  Can't do that.

2         MR. VAN NEST:  When these folks up come up from the

3    gallery, then you will have them tell you which questions they

4    have answers to.

5         THE COURT:  So they sit down.  I say, "All right, what

6    questions do you have a response to?"  It works like a charm.

7    I have done it 20 times, actually more than that.  They are

8    quite good about it and typically -- to be honest, it's

9    typically more hardship kind of things, typically in a case

10   like this.  It might be -- somebody might know someone who

11   works at Google or YouTube just because of where we are.  For

12   this size of a case it's typically, I have got a trip.  I have

13   got sick parents, you know, whatever it is.

14        MR. VAN NEST:  Will you allow us a question or two

15   follow-up on those?

16        THE COURT:  Very rarely.  I'm not closing the door

17   completely but typically no, okay.  I will do it.  If you want

18   to ask after my follow-up, I will look at you with a gimlet eye

19   and then I will consider it.

20        MR. VAN NEST:  Okay, but --

21        THE COURT:  Having said that -- I drive.  Let's put it

22   that way.  I drive.

23        MR. VAN NEST:  But we can ask you to drive in sparing

24   circumstances.

25        THE COURT:  Maybe twice.

1          **MR. VAN NEST:**   Okay.

2          **THE COURT:**   Okay.   That's a guiding principle.   All

3    right.   More likely than not -- what all this means for you is

4    you will definitely open on Monday and you will definitely put

5    witnesses on.   My jury selection has never broken 90 to 120

6    minutes.   All right.   So be ready to roll.   All right.

7          We will not break for the day after selection.   Every

8    minute -- I know you two are experienced and you appreciate it.

9    Every minute of jury time is precious.   So we are going to use

10   it to the max.   That also means you must have your next in line

11   witness ready to go.

12         I will not end early.   If it's 1:00 o'clock and your

13   witness isn't here, you will have rested.   That's -- I will

14   have deemed you to have rested unless you tell me in advance

15   and I have approved it and there is some good reason for it.

16   You can't stretch these things out for people.   So I know you

17   appreciate that.

18         **MR. VAN NEST:**   Are we still 8:30 to 2:30?

19         **THE COURT:**   No, no, 9:00 a.m. to 2:30.   It's very

20   important to me that people have a chance to -- there are other

21   judges in the building who have different schedules, maybe even

22   one right next to me, but it's very important that people have

23   a chance to get their families out the door, get their lives in

24   order, get in.   To me that means 9:00 o'clock.   It is also

25   important to me that they be able to get home without sitting

1   in traffic for an hour and a half.

2       There is no lunch.  There is two 20-minute breaks.  I'm

3   pretty religious about enforcing it.  It's not 30 minutes.

4   It's not 25.  It's two 20-minute breaks.  I do let people stand

5   up and stretch every so often.

6       As we get close to the end, I will increase the days if we

7   need to.  So if we are close to the end, we might be able to

8   close on a Friday if we go all day with witnesses on a

9   Thursday, we will do that.  There will be some flexibility

10  towards the end.  And I do Monday through Thursday.  Friday I

11  have to attend to other cases unless, again, we are close to

12  the end in which case we will just power through on Friday.

13      Any questions so far?  By the way, this is all going to be

14  in the pretrial order so you don't have to kill yourself

15  remembering it.  It will all be there.

16      **MR. KOROLOGOS:**  Four days a week?  Monday Tuesday

17  Wednesday and Thursday?

18      **THE COURT:**  Yes, until we get close to the end, we

19  might go all five.

20      **MR. KOROLOGOS:**  Okay.

21      **THE COURT:**  For example, this was -- this just came up

22  in the antitrust trial I talked about.  If we finish -- if the

23  close of evidence is on Thursday at, say, 11:00 a.m., you will

24  close on Thursday; okay.  We are not going to break for the day

25  and come back Friday morning.  We are going to deliberate on

1   Friday, but you will close on Thursday and we will just stay

2   until 5:00 o'clock because that will be -- the jury's

3   deliberation time will start after your one-hour closings.

4       So, just, it's -- we are not going to have overnight

5   breaks for things.  That's the message.  So just keep it going.

6       And I typically do half an hour max for openings and an

7   hour max for closings.  Do you have any problem with that?

8           **MR. VAN NEST:**  I don't, Your Honor.

9           **MR. KOROLOGOS:**  No, Your Honor.

10          **THE COURT:**  That doesn't count against your time

11  limit.  Ms. Clark keeps the clock and will check in with

12  everybody but she is the final arbiter and I do mean final.

13  There is no appeal to me.  She has the last word on who has

14  what time left.  Okay.

15          **MR. KOROLOGOS:**  We will respect that, Your Honor.

16          **MR. VAN NEST:**  Your Honor, can I ask two questions

17  about --

18          **THE COURT:**  Yes.

19          **MR. VAN NEST:**  In terms of planning our witnesses, my

20  understanding of our practice in this district is generally the

21  witness comes and he or she comes once.

22          **THE COURT:**  Yes, it is one and done.

23          **MR. VAN NEST:**  Witnesses from YouTube that they wish

24  to call in their case, I just want to make sure that if that

25  happens, we would be allowed to examine them fully.

1     **THE COURT:**  The rule is one and done.  We are not

2   standing on any formalities.  So we get one witness here.  That

3   is the one occasion.  Witnesses will not be coming back.  All

4   right.  So there won't be any Plaintiff's case and then

5   Defendant's case.  Just get them all done at the same time.

6       Now, let me ask you a question, we had, I think, two

7   live -- three live witnesses in this two-week trial, three.

8   Everything else was videotape and it was difficult.  Are you

9   planning to do that here?  Are you going to have real people,

10  live people or are you going to have video people?

11     **MR. KOROLOGOS:**  I think we are going to have a mix,

12  Your Honor.

13     **THE COURT:**  How much of a mix?

14     **MR. KOROLOGOS:**  Well, certainly our four clients are

15  going to testify live.

16     **THE COURT:**  I really strongly encourage you -- I felt

17  like giving the medal of honor to those jurors who had to sit

18  through maybe 70 or 80 percent of the testimony was bad depo

19  video.  It's excruciating.  I know your hands are tied in some

20  circumstances.  If you need help, I can help you get people

21  here.  Okay.  I have a long arm, as California likes to say.

22     **MR. VAN NEST:**  Your Honor --

23     **THE COURT:**  If you need help, I can do that.  Get as

24  much as you can, both sides, live people.

25     **MR. VAN NEST:**  That raises a very good question.  I

1   think I know the answer.  I have always understood that if I'm

2   going to present a witness live that's not a 30(b)(6), they

3   should be cross-examining him or her live --

4          **THE COURT:**  Absolutely.

5          **MR. VAN NEST:**  -- rather than playing the video.

6          **THE COURT:**  Absolutely.

7          **MR. VAN NEST:**  They have designated lots of video

8   people that we are going to bring live.  And I said, well, wait

9   a minute, if they are going to be here live --

10          **THE COURT:**  It is a live exam.  You can use the video

11   to impeach.  That's fine.  I don't have a problem with that if

12   you want to impeach them that way.  We are not going to have a

13   live person here and somebody plays tape.  Just ask them the

14   questions.  You have got their answers.  You know what they are

15   going to say.  It is all live.  We are not splitting that.  So

16   either you are here one hundred percent live or you are here

17   one hundred percent video.  There's nothing in between.

18      Okay.  Oh, I do like to have jurors ask questions.  I had

19   a phenomenal jury in that antitrust case, 20 questions, 20, and

20   they were all excellent.  I gave every one.  I asked every

21   question, I believe, except one subpart.  They were really

22   good.

23      Here is how that works:  They will have a little note

24   paper.  Before I discharge a witness, I will ask:  "Do you have

25   any questions?"  And they will pass them up.  They will leave.

1  I will share the questions with you.  We will talk about what

2  we want to do, and then I will call them back in and we will

3  either have the witness answer the questions or I will say I'm

4  not going to ask.  Okay.

5         **MR. VAN NEST:**  That's great.

6         **MR. KOROLOGOS:**  And that's at the end of the

7  examinations?

8         **THE COURT:**  What's that?

9         **MR. KOROLOGOS:**  That's at the end of the examinations?

10         **THE COURT:**  Yeah, when both of you are done with your

11  exams, I will just turn to the jury and say "are there any

12  questions?"  I will have to say juries run hot and cold.  That

13  was a very hot questioning jury in a very complicated case.

14     I have had other cases where there hasn't been a single

15  question in three weeks.  Okay.  So you never know, but I do

16  let them do that.

17     Oh, the other thing is I like to have the jurors have a

18  notebook.  So, you know, one-half like -- just like maybe this

19  size, reasonable size.  I think this is one inch.  You put in

20  50 pages of lined paper.  You put in some dividers and they are

21  going to put their jury instructions in there.

22     And each witness will get a headshot; okay.  When they

23  come in, you are going to hand the jury an 8-and-a-half by 11,

24  standard paper size, headshot in color with the witness' name

25  under it like 20 font, big letters, all right, and three hole

1    punched.  And before the witness testifies, Ms. Clark hands the

2    photo out.  Jurors love it.  Helps them keep track of who they

3    are and what they have seen.

4        The headshot must look exactly how the witness is going to

5    look on the stand.  So, if they are wearing a blue suit and

6    green tie on the stand, the headshot should have a blue suit

7    and a green tie.

8        Okay.  What else?  Oh, please, work everything out on the

9    exhibits.  I mean, I just -- just reach your agreements on

10   admissibility.  All right.  I hate to keep going back to the

11   antitrust trial.  It worked so well.  At the beginning of each

12   exam they just read into the official list all of the exhibits

13   that were admitted by agreement.  And that way during the exam,

14   you don't have to stop.  You don't have to interrupt your

15   questions.  You just hand them to your witness and it worked

16   like a charm; okay.  So see if you can do that.

17       I'm assuming we are past any of the first year law school

18   things like authenticity and is this a business record and all

19   that?

20           **MR. KOROLOGOS:**  Hopefully, Your Honor.

21           **THE COURT:**  Make it happen, okay.  I don't want to

22   waste time on custodians and all that kind of nonsense.  For

23   this level of play, I don't think that's -- I don't think

24   that's necessary or productive.  And you are going to burn your

25   time so just -- just make it happen.

```
1        Doesn't matter who calls the witness.  Time is just
2   counted by whoever is speaking; okay.  So you call -- it is
3   your witness.  You have them for an hour.  You got an hour.
4   Mr. Van Nest and his team cross-examines for 20 minutes.  They
5   get 20 minutes.  Doesn't matter who called who.  It is just a
6   matter of talk.
7        I don't do sidebars.  Don't ask, please.  If you want to
8   ask me something, do it when the jury is not here.  Don't stand
9   up and say "may we have a sidebar?"  The answer will be no
10  across the board.
11        MR. VAN NEST:  Can we ask Your Honor to pass that
12  testimony until the next break?  If it is prejudicial and we
13  have an objection and there is something more simple -- more
14  than simple, could we ask simply that the witness pass to the
15  next topic and we take it at the break?  Something like that,
16  you know, in extreme situations?
17        THE COURT:  So really saying "I want a sidebar" in
18  more fancy language.
19        MR. VAN NEST:  No.  At the break only.
20        THE COURT:  We will see.  We will play it by ear.  I'm
21  not saying no but I'm not excited about it.  What else?  So
22  next time we meet will be, I guess, a week from today.  Well,
23  let's see, next week is the 2nd, June 2nd?
24        THE CLERK:  First.
25        THE COURT:  Trial isn't until the 12th.  So would you
```

```
 1    rather me -- what's that Monday after that, Lisa?
 2              THE CLERK:  The 5th.
 3              THE COURT:  Is that June 5th?  Would you rather meet
 4    June 5th?  You got a fair amount to do.
 5              MR. KOROLOGOS:  Yes, Your Honor.
 6              THE COURT:  I don't want to make it too hard on the
 7    back end for me.
 8              MR. VAN NEST:  I think June 5th is okay.
 9              THE COURT:  1:30 on June 5th.  It's a Monday at --
10    June 5th at 1:30.  You can get all your other stuff -- let me
11    ask you this as a closing.  It's a very different case now.
12    What are you doing with respect to ADR, Mr. Korologos?
13              MR. KOROLOGOS:  There have been no discussions,
14    Your Honor.
15              THE COURT:  Nothing?
16              MR. KOROLOGOS:  There have been none.  The parties
17    have agreed to if there are ever going to be any, to have
18    retired Judge Vaughn Walker as a mediator.
19              THE COURT:  Judge Walker?
20              MR. KOROLOGOS:  Yes, that was --
21              THE COURT:  Have you met with him yet?
22              MR. KOROLOGOS:  That was a suggestion by Your Honor
23    and the parties agreed to it.
24              THE COURT:  No wonder I like it.  Have you seen him
25    yet?
```

1          **MR. KOROLOGOS:**  Nothing has been scheduled.  There

2     have been no attempts to schedule, no.

3          **THE COURT:**  It's up to you.  We are the United States

4     trial court, so we are here to serve but --

5          **MR. KOROLOGOS:**  Thank you, Your Honor.

6          **THE COURT:**  -- judgment day is coming for everybody.

7     So if you want to do it, this might be a time to think about

8     it.  Leave it up to you.

9          **MR. KOROLOGOS:**  We will talk about that too.

10         **THE COURT:**  Okay.  Anything else for today,

11    Mr. Korologos?

12         **MR. KOROLOGOS:**  Yes, Your Honor.  If we are going to

13    meet on June 5 --

14         **THE COURT:**  Yeah.

15         **MR. KOROLOGOS:**  -- given that this is a long weekend,

16    is it possible to move the Tuesday 5:00 p.m. deadlines by a

17    day?

18         **THE COURT:**  To Wednesday?

19         **MR. VAN NEST:**  That's fine with us, Your Honor.

20         **THE COURT:**  I'm worried more about me, to be honest.

21    So that would be Wednesday, the 30th -- oh, yeah, Wednesday,

22    the 31st?

23         **MR. KOROLOGOS:**  Yes, Your Honor.

24         **THE COURT:**  And then I will see you again the

25    following Monday, that's pretty tight for us.  Let's

1    compromise.  Wednesday by noon.  Okay.

2            **MR. KOROLOGOS:**  Thank you, Your Honor.

3            **THE COURT:**  12:00 p.m., Wednesday, the 31st.

4            **MR. KOROLOGOS:**  Also with respect to June 5.

5            **THE COURT:**  Make my life easy.  Solve some problems.

6    Okay.  Work out the evidence, how you are going to present

7    this.

8            **MR. KOROLOGOS:**  We are going to work on that,

9    Your Honor.

10           **THE COURT:**  Okay.

11           **MR. KOROLOGOS:**  And, Your Honor, do we need to bring

12   our clients here for June 5?

13           **THE COURT:**  That's up to you.  Totally up to you.  I

14   don't -- I don't require for pretrial conferences.  I don't

15   require it.  I will tell you the Defendant did not have a

16   client representative at this trial that just finished, and I

17   think the jury took that into account; but you both have been

18   to the well many times.  You can exercise your own discretion

19   on that.

20           **MR. VAN NEST:**  Your Honor, can I raise two issues?

21           **THE COURT:**  Please.  Is that it, Mr. Korologos?

22           **MR. KOROLOGOS:**  Yes, Your Honor.

23           **THE COURT:**  Okay.  Go ahead.

24           **MR. VAN NEST:**  One of the things that Plaintiffs have

25   advised us is that with respect to Plaintiff AST, they are

1  planning to play Russian audiobooks as part of their case in

2  Russian.

3      They have given us some documents that were translated but

4  none of the works have been translated; none of the audiobooks

5  have been translated.  And it just seems to me that we are

6  going to be wasting a lot of jury time listening to Russian --

7  these videos are nothing more than the cover of the book

8  showing on the screen and someone reading a book in Russian.

9      So, we can try to work that out but to my way of thinking

10 that's simply going to waste jurors' time unless we have

11 translations or something that will allow them to compare the

12 work to the alleged infringing audiobook.  I don't know how you

13 would do that.

14      **THE COURT:**  Interesting question for copyright,

15 whether a translation can prove infringement.  Maybe when it is

16 from Russian to English, which is a bit of a challenge.  What

17 are going to do about the Russian?

18      **MR. KOROLOGOS:**  Your Honor, I think we can play it in

19 Russian and the jury can hear that they are the same.

20      **THE COURT:**  Oh, no, no, no.  You are asking jurors to

21 use some kind of ear test?

22      **MR. KOROLOGOS:**  They may not understand the language

23 in order to understand that it's the same -- saying the same

24 thing.

25      **THE COURT:**  That's calling way too much on an average

1  juror.  To hear a sentence in Russian and then compare it to

2  someone else reading it and say these are the same sounds?

3  Absolutely not.  You must have official court translations.

4  It's in the jury instructions; okay.

5      And, by the way, it's the translation that is the

6  evidence.  So I don't know how you are going to make this

7  happen; but under the jury instructions in our court, the

8  translation is the evidence, not the original.  So I don't know

9  how you are going to do all of this.  But asking people to

10 listen to a completely foreign language that's not even

11 romanced or German based -- so completely unfamiliar to the

12 English ear -- and say "does this sound alike?"  No, that's not

13 enough to sustain a reasonable and informed copyright

14 determination.

15     You have got to work that out but they have to be court

16 certified translations.

17         **MR. VAN NEST:**  My last question --

18         **THE COURT:**  I don't know how this works for copyright.

19 When you start extracting out -- I haven't looked.  Maybe there

20 is case law on it.  I don't know how you prove infringement on

21 a translation.

22         **MR. VAN NEST:**  Your Honor, would you permit us to

23 bring in some larger monitors and electronic equipment --

24         **THE COURT:**  Bigger than that?

25         **MR. VAN NEST:**  -- to the courtroom, yeah.

1          **THE COURT:**  What are you going to use it for?

2          **MR. VAN NEST:**  We are just basically going to wire up

3    our hot seats.  Both sides are going to have courtroom

4    operators putting exhibits up on the --

5          **THE COURT:**  Yeah, you each get your usual tech team

6    but what do you want in terms of a monitor?

7          **MR. VAN NEST:**  I thought what we wanted was larger

8    monitors.  Does this go in front of the jurors or --

9          **THE COURT:**  That one sometimes goes over -- the jurors

10   all have monitors.

11         **MR. VAN NEST:**  Okay.

12         **THE COURT:**  They all have their --

13         **MR. VAN NEST:**  We just find that a bigger one that

14   they can all look at -- in a copyright case, we would like

15   people to have --

16         **THE COURT:**  I can spin one of these bigger ones around

17   if you want.  I mean, I'm not opposed to if you want to move it

18   on that little table right there and put one right there and

19   you both share it, that's probably okay.

20         **MR. VAN NEST:**  We will work that out.

21         **THE COURT:**  Okay.  There will be -- I forgot to

22   mention this:  You will work with Ms. Clark and come in and set

23   up your rigs and test them a couple days before trial starts.

24         **MR. VAN NEST:**  Set up your?

25         **THE COURT:**  Your AV stuff; okay.  You don't need to

1    know this.  I'm excited about this.  I'm finally getting

2    digitalized.  Oh, it's going to be right before this trial.

3    No?

4              **THE CLERK:**  No.

5              **THE COURT:**  Why not?

6         **MR. VAN NEST:**  The final arbiter just spoke.

7              **THE COURT:**  We will talk about it later, but it was

8    supposed to be done June 1st.  Well, you are going to miss it.

9    The day is going to come very, very soon and this is going to

10   be completely redone.  Okay.  Anything else?

11        **MR. VAN NEST:**  No, Your Honor.

12        **MR. KOROLOGOS:**  Your Honor, may I have one moment just

13   to check one thing?

14                     (Pause in proceedings.)

15        **MR. KOROLOGOS:**  Your Honor, the one motion we did not

16   discuss is the counterclaim Defendant's motion for summary

17   judgment, the Pirate Monitor issues.

18             **THE COURT:**  I forget about that.  I will take a look

19   at it.

20        **MR. VAN NEST:**  Thank you, Your Honor.

21             **THE COURT:**  You are planning to -- if summary judgment

22   is denied -- I don't know -- but if it is denied, you are going

23   to put that on as part of your case; right?

24        **MR. VAN NEST:**  We would assume that, yes.

25             **THE COURT:**  Okay.  I will see you next week.

1              MR. KOROLOGOS:  Thank you, Your Honor.

2              THE CLERK:  All rise.  Court is in recess.

3                  (Proceedings adjourned at 2:37 p.m.)

4                           ---oOo---

5

6                    CERTIFICATE OF REPORTER

7          I certify that the foregoing is a correct transcript

8     from the record of proceedings in the above-entitled matter.

9

10    DATE:   Sunday, May 28, 2023

11

12

13

14    _____

15         Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
          United States District Court - Official Reporter

16

17

18

19

20

21

22

23

24

25